UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| EDWARD SHAMOON, Individually and on Behalf of All Others Similarly Situated, | Civ. No. |
| Plaintiff, | CLASS ACTION |
| v. | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| GENERAL MOTORS COMPANY, MARY T. BARRA, and PAUL A. JACOBSON, | DEMAND FOR JURY TRIAL |
| Defendants. | |

Plaintiff Edward Shamoon ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding General Motors Company ("GM" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired GM securities between February 2, 2022 and October 26, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b)

1

and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     GM is an automotive manufacturing company that designs, builds, and sells trucks, crossovers, cars, and automobile parts worldwide.  The Company markets its vehicles primarily under the Buick, Cadillac, Chevrolet, GMC, Baojun, and Wuling brand names.

3.     Cruise LLC ("Cruise") is GM's majority-owned global segment responsible for the development and commercialization of autonomous vehicle ("AV")—*i.e.*, driverless—technology.   Cruise has secured various testing and driving permits for its AVs on the ostensible premise that those AVs were sufficiently safe for such purposes.

4.     Since at least as early as November 2020, GM's products have been the subject of multiple recalls because of defective airbag components in the Company's vehicles, exposing the Company to various global lawsuits.  Nevertheless, GM has consistently downplayed safety concerns related to its vehicles' airbags and the need to record additional warranty accruals for related product recalls, while touting the Company's efforts to identify and address perceived defects with its vehicles' airbag inflators.

5.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.

Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) GM downplayed concerns with its vehicles' airbags and the need to record additional warranty accruals for related product recalls; (ii) GM overstated the extent and efficacy of its efforts to analyze defects in its vehicles' airbag inflators; (iii) Cruise's AVs and/or AV technology were less safe and well-developed than Defendants had led investors, regulators, and the general public to believe; (iv) accordingly, regulatory approval of Cruise's AV products was unsustainable and the prospects for widespread regulatory approval and adoption of Cruise's AV products were overstated; (v) all the foregoing subjected GM to an increased risk of governmental and/or regulatory scrutiny and enforcement action, significant legal liabilities, product recalls, and reputational harm; and (vi) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

6.       On October 2, 2023, *NBC Bay Area* reported that a pedestrian suffered major injuries after she was run over by and pinned beneath a driverless Cruise AV. *NBC Bay Area* further reported that Cruise was cooperating with law enforcement regarding the incident.

7.       On this news, GM's stock price fell $1.09 per share, or 3.36%, to close at $31.38 per share on October 3, 2023.

8.     On October 5, 2023, the National Highway Traffic Safety Administration ("NHTSA") held a public hearing to recommend a recall of more than 50 million airbag inflators that have been linked to potentially deadly explosions.  Citing people familiar with the matter, *The Wall Street Journal* ("*WSJ*") subsequently reported that at least 20 million of GM's vehicles were built with the defective airbag inflators in question, at least one of which had led to a confirmed fatality.

9.     On this news, GM's stock price fell $0.73 per share, or 2.35%, to close at $30.31 per share on October 5, 2023.

10.    On October 24, 2023, the California Department of Motor Vehicles ("California DMV") issued a statement announcing the immediate suspension of Cruise's deployment and driverless testing permits.  In suspending Cruise's permits, the California DMV cited, among other issues, that Cruise "ha[d] misrepresented . . . information related to [the] safety of the autonomous technology of its vehicles."

11.    On this news, GM's stock price fell $0.66 per share, or 2.26%, to close at $28.56 per share on October 24, 2023.

12.    Then, on October 26, 2023, Cruise announced via a post on X (formerly Twitter) that it would pause all of its AV operations across the country "while we take time to examine our processes, systems, and tools and reflect on how we can better operate in a way that will earn public trust."

13.    On this news, GM's stock price fell $1.33 per share, or 4.66%, to close at $27.22 per share on October 27, 2023.

14.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

17.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  GM is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

18.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

19.    Plaintiff, as set forth in the attached Certification, acquired GM securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

20.    Defendant GM is a Delaware corporation with principal executive offices located at 300 Renaissance Center, Detroit, Michigan 48265-3000.  GM's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "GM".

21.    Defendant Mary T. Barra ("Barra") has served as GM's Chief Executive Officer and Chair of GM's Board of Directors at all relevant times.

22.    Defendant Paul A. Jacobson ("Jacobson") has served as GM's Executive Vice President and Chief Financial Officer at all relevant times.

23.    Defendants Barra and Jacobson are sometimes referred to herein collectively as the "Individual Defendants".

24.    The Individual Defendants possessed the power and authority to control the contents of GM's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of GM's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with GM, and their access to material

6

information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

25.     GM and the Individual Defendants are collectively referred to herein as "Defendants".

## SUBSTANTIVE ALLEGATIONS

### Background

26.     GM is an automotive manufacturing company that designs, builds, and sells trucks, crossovers, cars, and automobile parts worldwide.  The Company markets its vehicles primarily under the Buick, Cadillac, Chevrolet, GMC, Baojun, and Wuling brand names.

27.     Cruise is GM's majority-owned global segment responsible for the development and commercialization of AV technology.  Cruise has secured various testing and driving permits for its AVs on the ostensible premise that those AVs were sufficiently safe for such purposes.

28.     Since at least as early as November 2020, GM's products have been the subject of multiple recalls because of defective airbag components in the Company's vehicles, exposing the Company to various global lawsuits.  Nevertheless, GM has

consistently downplayed safety concerns related to its vehicles' airbags and the need to record additional warranty accruals for related product recalls, while touting the Company's efforts to identify and address perceived defects with its vehicles' airbag inflators.

## Materially False and Misleading Statements Issued During the Class Period

29.    The Class Period begins on February 2, 2022, when GM filed an annual report on Form 10-K with the SEC during pre-market hours, reporting the Company's financial and operational results for the quarter and year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K downplayed safety concerns with the airbags in GM's vehicles and the need to record additional warranty accruals for related product recalls, while simultaneously touting the Company's efforts to analyze perceived defects with its vehicles' airbag inflators, stating, in relevant part:

> In November 2020, the NHTSA directed that we replace the airbag inflators in our GMT900 vehicles, which are full-size pickup trucks and SUVs, and *we decided not to contest NHTSA's decision*. While we have already begun the process of executing the recall, given the number of vehicles in this population, the recall will take several years to be completed. Accordingly, in the year ended December 31, 2020, we recorded a warranty accrual of $1.1 billion for the expected costs of complying with the recall remedy, and *we believe the currently accrued amount remains reasonable*.

> GM has recalled certain vehicles sold outside of the U.S. to replace Takata Corporation (Takata) inflators in those vehicles. There are significant differences in vehicle and inflator design between the relevant vehicles sold internationally and those sold in the U.S. *We continue to gather and analyze evidence about these inflators and to share our findings with regulators.* Any additional recalls relating to

these inflators ***could*** be material to our results of operations and cash flows.

There are several putative class actions that have been filed against GM, including in the federal courts in the U.S., in the Provincial Courts in Canada and in Mexico, arising out of ***allegations*** that airbag inflators manufactured by Takata are defective. At this stage of these proceedings, we are unable to provide an estimate of the amounts or range of possible loss.

(Emphases added.)

30.     With respect to Cruise's AV technology, regulatory approvals, and the purported public benefits of and safety controls for its products, the 2021 10-K stated, *inter alia*:

Cruise is driving leadership in the development and commercialization of AV technology. We believe that building all-electric vehicles with autonomous capabilities integrated from the beginning, rather than through retrofits, is the most efficient way to unlock the tremendous potential societal benefits of self-driving cars. The Cruise Origin, a purpose-built, all-electric, self-driving vehicle that is being co-developed by GM, Cruise and Honda Motor Company, Ltd. (Honda), will be built on General Motors' all-new modular architecture, powered by the Ultium platform, at Factory ZERO starting in early 2023, pending government approvals. In October 2020, Cruise received a driverless test permit from the California [DMV] to remove test drivers from Cruise autonomous test vehicles in San Francisco and subsequently began fully driverless testing. In October 2020, GM and Cruise also announced they will file an exemption petition with the [NHTSA] seeking regulatory approval for the Origin's deployment, and withdrew an earlier exemption petition that was limited to the Cruise AV derived from the Chevrolet Bolt platform.

In June 2021, Cruise received a driverless test permit from the California Public Utilities Commission (CPUC) to provide unpaid rides to the public in driverless vehicles. In September 2021, Cruise received approval of its Autonomous Vehicle Deployment Permit from the

California [DMV] to commercially deploy driverless AVs. Cruise will need one additional permit from the CPUC to charge the public for driverless rides in California. Given ***the potential of all-electric self-driving vehicles to help save live***s, reshape our cities and reduce emissions, the goal of Cruise is to deliver its self-driving services as soon as possible, but as Cruise continues to expand and scale its operations ***safety will continue to be the gating metric — supported by Cruise's Safety Management System and its other risk identification, assessment and mitigation processes***.

(Emphases added.)

31.     Appended as an exhibit to the 2021 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that "[t]he [2021 10-K] fully complies with the requirements of section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [2021 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

32.     On March 18, 2022, GM issued a press release announcing additional investments in its Cruise division, while touting the capability and safety of Cruise's AV technology, stating, in relevant part:

Since GM acquired a majority ownership stake in 2016, Cruise has made self-driving cars a reality and is a leader on the pathway to commercial autonomous ridesharing and delivery, creating significant value for both GM shareholders and Cruise's minority shareholders.

\* \* \*

Last month Cruise achieved a significant milestone toward its vision of a safer, more sustainable and accessible transportation future as it

10

became the first company to offer fully driverless rides to the public in a major U.S. city.

The Cruise Origin . . . has been purposefully designed from the ground up to operate without a human driver. This means it does not rely on certain human-centered features, like a steering wheel or a sun visor, to operate safely.

33.    On April 27, 2022, GM filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended March 31, 2022 (the "1Q22 10-Q").  The 1Q22 10-Q contained substantively the same statements as referenced in ¶ 29, *supra*, downplaying safety concerns with the airbags in GM's vehicles and the need for additional warranty accruals for related product recalls, while simultaneously touting the Company's efforts to analyze perceived defects with its vehicles' airbag inflators.

34.    With respect to the safety and development of Cruise's AV technology, as well as its regulatory approvals and prospects, the 1Q22 10-Q stated, in relevant part:

Gated by safety and regulation, Cruise continues to make significant progress towards commercialization of a network of on-demand AVs in the United States and globally. In 2021, Cruise received a driverless test permit from the California Public Utilities Commission (CPUC) to provide unpaid rides to the public in driverless vehicles and received approval of its Autonomous Vehicle Deployment Permit from the California [DMV] to commercially deploy driverless AVs. Cruise will need one additional permit from the CPUC to charge the public for driverless rides in California.

35.     Appended as an exhibit to the 1Q22 10-Q were substantively the same SOX certifications as referenced in ¶ 31, *supra*, signed by the Individual Defendants.

36.     On July 26, 2022, GM filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended June 30, 2022 (the "2Q22 10-Q"). The 2Q22 10-Q contained substantively the same statements as referenced in ¶ 29, *supra*, downplaying safety concerns with the airbags in GM's vehicles and the need for additional warranty accruals for related product recalls, while simultaneously touting the Company's efforts to analyze perceived defects with its vehicles' airbag inflators.

37.     The 2Q22 10-Q also contained substantively the same statements as referenced in ¶ 34, *supra*, regarding the safety and development of Cruise's AV technology, as well as its regulatory approvals and prospects, while also touting that, "[i]n June 2022, Cruise received the first ever Driverless Deployment Permit granted by the CPUC, which allows them to charge a fare for the driverless rides they are providing to members of the public in certain parts of San Francisco."

38.     Appended as an exhibit to the 2Q22 10-Q were substantively the same SOX certifications as referenced in ¶ 31, *supra*, signed by the Individual Defendants.

39.     On August 2, 2022, GM issued a press release touting, in relevant part, that Cruise "has now completed over a quarter of a million driverless miles and thousands of driverless rides in San Francisco as of August 1, 2022" and that "[t]he

next steps for Cruise in the second half include working with regulators to increase their hours of operation and service area, expanding their fleet of Bolt AVs and testing the Cruise Origin."

40.     On October 25, 2022, GM filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended September 30, 2022 (the "3Q22 10-Q").   The 3Q22 10-Q contained substantively the same statements as referenced in ¶ 29, *supra*, downplaying safety concerns with the airbags in GM's vehicles and the need for additional warranty accruals for related product recalls, while simultaneously touting the Company's efforts to analyze perceived defects with its vehicles' airbag inflators.

41.     The 3Q22 10-Q also contained substantively the same statements as referenced in ¶¶ 34 and 37, *supra*, regarding the safety and development of Cruise's AV technology, as well as its regulatory approvals and prospects.

42.     Appended as an exhibit to the 3Q22 10-Q were substantively the same SOX certifications as referenced in ¶ 31, *supra*, signed by the Individual Defendants.

43.     On January 31, 2023, GM filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December  31, 2022 (the "2022 10-K").   The 2022 10-K contained substantively the same statements as referenced in ¶ 29, *supra*, downplaying safety concerns with the airbags in GM's vehicles and the need for additional warranty

13

accruals for related product recalls, while simultaneously touting the Company's efforts to analyze perceived defects with its vehicles' airbag inflators.

44.    With respect to Cruise's AV technology, regulatory approvals, and the purported public benefits of and safety controls for its products, the 2022 10-K stated, *inter alia*:

> General Motors and Cruise are pursuing what we believe is the most comprehensive path to autonomous mobility in the industry. In September 2021, Cruise began operating a driverless ride hail service in San Francisco, California, and in June 2022, began charging the public for driverless rides. Cruise continues to make regulatory progress in California. In December 2022, Cruise received regulatory approval to expand its operational design domain in California. Cruise is also seeking regulatory approval to add the Cruise Origin to its driverless test permit. Additionally, in September 2022, Cruise acquired regulatory permits to operate driverless ride hail services in Phoenix, Arizona and began pursuing ride hail operations in Austin, Texas. Given ***the potential of all-electric self-driving vehicles to help save lives***, reshape our cities and reduce emissions, the goal of Cruise is to deliver its self-driving services as soon as possible, but as Cruise continues to expand and scale its operations, ***safety will continue to be the gating metric, supported by Cruise's Safety Management System and its other risk identification, assessment and mitigation processes***.
>
> We believe that building all-electric vehicles with autonomous capabilities integrated from the beginning, rather than through retrofits, is the most efficient way to unlock the tremendous potential societal benefits of self-driving cars. The Cruise Origin, a purpose-built, all-electric, self-driving vehicle that is being co-developed by GM, Cruise and Honda Motor Company, Ltd. (Honda) will be built on GM's all-new modular architecture, powered by the Ultium platform, at Factory ZERO starting in 2023 pending government approvals. GM and Cruise are awaiting a decision on an exemption petition that was filed with the [NHTSA] seeking regulatory approval for the Origin's deployment.

(Emphases added.)

14

45.     Appended as an exhibit to the 2022 10-K were substantively the same SOX certifications as referenced in ¶ 31, *supra*, signed by the Individual Defendants.

46.     On April 25, 2023, GM filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended March 31, 2023 (the "1Q23 10-Q").  The 1Q23 10-Q contained substantively the same statements as referenced in ¶ 29, *supra*, downplaying safety concerns with the airbags in GM's vehicles and the need for additional warranty accruals for related product recalls, while simultaneously touting the Company's efforts to analyze perceived defects with its vehicles' airbag inflators.

47.     The 1Q23 10-Q also contained substantively the same statements as referenced in ¶¶ 34 and 37, *supra*, regarding the safety and development of Cruise's AV technology, as well as its regulatory approvals and prospects, while also touting that, "in September 2022, Cruise acquired regulatory permits to operate driverless ride hail services in Phoenix, Arizona and began pursuing ride hail operations in Austin, Texas"; and that "GM and Cruise are also awaiting a decision on an exemption petition that was filed with NHTSA seeking regulatory approval for the deployment of the Cruise Origin."

48.     Appended as an exhibit to the 1Q23 10-Q were substantively the same SOX certifications as referenced in ¶ 31, *supra*, signed by the Individual Defendants.

49.     On May 12, 2023, news outlets reported that GM had issued a recall for almost a million of its vehicles because of defective airbags.  For example, an article published by *Bloomberg* that day, entitled "GM to Recall Nearly 1 Million Vehicles Over Defective Air Bags", stated, in relevant part:

> General Motors Co. is recalling nearly 1 million vehicles over concerns that their air bag inflators could explode during deployment.
>
> The action involves certain Buick Enclave, Chevrolet Traverse and GMC Acadia vehicles from model years 2014 through 2017, the [NHTSA] said Friday in a filing. A total of 994,763 vehicles are being recalled.

50.     On July 25, 2023, GM filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended June 30, 2023 (the "2Q23 10-Q").  The 2Q23 10-Q contained substantively the same statements as referenced in ¶ 29, *supra*, downplaying safety concerns with the airbags in GM's vehicles and the need for additional warranty accruals for related product recalls, while simultaneously touting the Company's efforts to analyze perceived defects with its vehicles' airbag inflators.

51.     With respect to the recent additional recall of vehicles by GM to address its latest airbag safety issues, the 2Q23 10-Q stated, in relevant part:

> In May 2023, we initiated a voluntary recall covering nearly one million 2014-2017 model year Buick Enclave, Chevrolet Traverse, and GMC Acadia SUVs equipped with driver front airbag inflators manufactured by ARC Automotive, Inc. (ARC), and accrued an immaterial amount for the expected costs of the recall. As part of its ongoing investigation into ARC airbag inflators, NHTSA has issued a recall request letter to

16

ARC, in which the agency (a) tentatively concluded that a defect related to motor vehicle safety exists in 67 million frontal driver and passenger air bag inflators manufactured by ARC and supplied to a number of automakers, including GM, and (b) demanded that ARC issue a recall notice for these inflators. ARC has disputed the recall request, asserting that no identified defect trend exists in the inflators and that any problems are related to isolated manufacturing issues. Depending on the outcome of the dispute between NHTSA and ARC, and the possibility of additional recalls, the cost of which may not be fully recoverable, it is reasonably possible that the costs associated with these matters in excess of amounts accrued could be material, but we are unable to provide an estimate of the amounts or range of reasonably possible material loss at this time.

There are several putative class actions that have been filed against GM, including in the U.S., Canada, and Israel, arising out of allegations that airbag inflators manufactured by ARC are defective. At this stage of these proceedings, we are unable to provide an estimate of the amounts or range of reasonably possible material loss.

52.    The 2Q23 10-Q also contained substantively the same statements as referenced in ¶¶ 34, 37, and 47, *supra*, regarding the safety and development of Cruise's AV technology, as well as its regulatory approvals and prospects.

53.    Appended as an exhibit to the 2Q23 10-Q were substantively the same SOX certifications as referenced in ¶ 31, *supra*, signed by the Individual Defendants.

54.    The statements referenced in ¶¶ 29-48 and 50-53 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) GM downplayed concerns with its

vehicles' airbags and the need to record additional warranty accruals for related product recalls; (ii) GM overstated the extent and efficacy of its efforts to analyze defects in its vehicles' airbag inflators; (iii) Cruise's AVs and/or AV technology were less safe and well-developed than Defendants had led investors, regulators, and the general public to believe; (iv) accordingly, regulatory approval of Cruise's AV products was unsustainable and the prospects for widespread regulatory approval and adoption of Cruise's AV products were overstated; (v) all the foregoing subjected GM to an increased risk of governmental and/or regulatory scrutiny and enforcement action, significant legal liabilities, product recalls, and reputational harm; and (vi) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

### The Truth Emerges

55.    On October 2, 2023, during after-market hours, *NBC Bay Area* published an article, entitled "Hit-and-run driver strikes pedestrian, tossing her into path of Cruise car in San Francisco" (the "*NBC* Report"), which stated that a pedestrian suffered major injuries after she was run over by and pinned beneath a driverless Cruise AV, stating, in relevant part:

> A woman crossing a normally busy stretch of downtown San Francisco suffered serious injuries Monday night after a hit-and-run driver struck her, throwing her into the path of an oncoming driverless Cruise car, which then ran her over, according to video recorded by the [AV] that Cruise showed to the NBC Bay Area Investigative Unit.

18

* * *

The collision occurred around 9:30 p.m. near the corner of Fifth and Market streets. The driverless Cruise vehicle and the other sedan were traveling side-by-side, southbound on Fifth Street, according to video recorded by the driverless car. Cruise would not provide NBC Bay Area with a copy of the video but did show it to Senior Investigative Reporter Bigad Shaban.

56.    The *NBC* Report also noted that Cruise was cooperating with law enforcement regarding the incident, citing a Cruise representative who largely defended the AV, stating, in relevant part:

> "The [AV] then braked aggressively to minimize the impact," said Navideh Forghani, a Cruise spokesperson. "The driver of the other vehicle fled the scene, and at the request of the police the [AV] was kept in place. Our heartfelt concern and focus is the well-being of the person who was injured, and we are actively working with police to help identify the responsible driver."

> Rescuers found the woman pinned beneath the left rear axel of the Cruise vehicle, according to San Francisco Fire Department Capt. Justin Schorr. After Cruise disabled the car remotely, rescuers were then "able to get the car up off her" and used the jaws of life to free her.

> * * *

> The woman suffered multiple traumatic injuries and was taken to San Francisco General Hospital, according to first responders. Her condition was still unknown as of late Tuesday.

> Cruise tells the NBC Bay Area Investigative Unit it is turning over video of the accident to the San Francisco Police Department, which is now investigating the crash.

19

57.     The *NBC* Report further highlighted how this was not the first such safety incident with a Cruise AV, and that the California DMV had launched a safety probe into Cruise's AVs back in August 2023, stating, in relevant part:

> The California DMV, which is responsible for regulating autonomous vehicles across the state, has already been in the midst of investigating Cruise's safety record after what the agency described as "recent concerning incidents."
>
> The DMV launched its probe back in August, following a collision between a Cruise vehicle and a San Francisco fire truck.
>
> In conjunction with its announcement, the DMV also noted that Cruise agreed to cut its San Francisco fleet of driverless cars in half, limiting the company to just 50 vehicles during the day and 150 vehicles during the evening hours while the DMV continues its investigation.
>
> The DMV, which has the power to order driverless vehicles off the road by suspending or revoking their permits, has yet to issue any findings relating to its Cruise investigation or release a timeline of when it plans to do so.

58.     On this news, GM's stock price fell $1.09 per share, or 3.36%, to close at $31.38 per share on October 3, 2023.

59.     On October 5, 2023, the NHTSA held a public hearing to recommend a recall of more than 50 million airbag inflators that have been linked to potentially deadly explosions.  The same day, during intraday trading hours, the *WSJ* published an article, entitled "GM Has at Least 20 Million Vehicles With Potentially Dangerous Air-Bag Parts", citing people familiar with the matter and reporting that

at least 20 million of GM's vehicles were built with the defective airbag inflators in question, at least one of which had led to a confirmed fatality:

> [GM] has at least 20 million vehicles built with a potentially dangerous air-bag part that the government says should be recalled before more people are hurt or killed.
>
> The number of affected GM vehicles—a figure that hasn't been disclosed publicly—makes the Detroit-based automaker among the most exposed in a push by U.S. auto-safety regulators to recall 52 million air-bag inflators designed by Tennessee-based auto supplier ARC Automotive, according to people familiar with the matter.
>
> These inflators have been known to explode with too much force during a vehicle crash, sending metal shrapnel flying and hitting occupants in the face and neck with shards. At least two people have been killed, and several others injured in such incidents.
>
> The [NHTSA] has yet to release how many vehicles overall would be covered by a recall, or which specific models would be affected. The number of GM cars and trucks with these inflators could be higher depending on how regulators proceed.
>
> On Thursday, NHTSA held a public meeting on its determination that the air-bag parts are defective and should be recalled. In April, the regulatory agency sent a letter to ARC, demanding it recall the inflators, which are essentially mini-exploding devices designed to rapidly inflate the air-bag cushion in a collision.
>
> A recall of this size would be among the U.S.'s largest in history.
>
> * * *
>
> GM so far has done five recalls over a span of six years on vehicles that have the ARC-made air bags.
>
> The latest one was earlier this year, when it recalled nearly one million Chevrolet and Buick SUVs, after a Michigan woman was injured in a crash in March.

GM, said in a statement, it believes the evidence and data presented by NHTSA at this time doesn't provide a basis for any further recalls, and the ones it has conducted already were done out of an abundance of caution.

60. On this news, GM's stock price fell $0.73 per share, or 2.35%, to close at $30.31 per share on October 5, 2023.

61. On October 24, 2023, during intraday trading hours, the California DMV issued a statement announcing the immediate suspension of Cruise's deployment and driverless testing permits, asserting that Cruise "ha[d] misrepresented . . . information related to [the] safety of the autonomous technology of its vehicles", stating, in relevant part:

> The California DMV today notified Cruise that the department is suspending Cruise's [AV] deployment and driverless testing permits, effective immediately. The DMV has provided Cruise with the steps needed to apply to reinstate its suspended permits, which the DMV will not approve until the company has fulfilled the requirements to the department's satisfaction. This decision does not impact the company's permit for testing with a safety driver.
>
> Today's suspensions are based on the following:
>
> - 13 CCR §228.20 (b) (6) – Based upon the performance of the vehicles, the Department determines the manufacturer's vehicles are not safe for the public's operation.
>
> - 13 CCR §228.20 (b) (3) – The manufacturer has misrepresented any information related to safety of the autonomous technology of its vehicles.
>
> - 13 CCR §227.42 (b) (5) – Any act or omission of the manufacturer or one of its agents, employees, contractors, or

designees which the department finds makes the conduct of autonomous vehicle testing on public roads by the manufacturer an unreasonable risk to the public.

- <u>13 CCR §227.42 (c)</u> – The department shall immediately suspend or revoke the Manufacturer's Testing Permit or a Manufacturer's Testing Permit – Driverless Vehicles if a manufacturer is engaging in a practice in such a manner that immediate suspension is required for the safety of persons on a public road.

62.    On this news, GM's stock price fell $0.66 per share, or 2.26%, to close at $28.56 per share on October 24, 2023.

63.    Then, on October 26, 2023, during after-market hours, Cruise announced via a post on X (formerly Twitter) that it would pause all of its AV operations across the country "while we take time to examine our processes, systems, and tools and reflect on how we can better operate in a way that will earn public trust," stating, in relevant part:

(1/3) The most important thing for us right now is to take steps to rebuild public trust. Part of this involves taking a hard look inwards and at how we do work at Cruise, even if it means doing things that are uncomfortable or difficult.

* * *

(2/3) In that spirit, we have decided to proactively pause driverless operations across all of our fleets while we take time to examine our processes, systems, and tools and reflect on how we can better operate in a way that will earn public trust.

* * *

(3/3) This isn't related to any new on-road incidents, and supervised AV operations will continue.

23

We think it's the right thing to do during a period when we need to be extra vigilant when it comes to risk, relentlessly focused on safety, & taking steps to rebuild public trust.

64.    On this news, GM's stock price fell $1.33 per share, or 4.66%, to close at $27.22 per share on October 27, 2023.

65.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

66.    During the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

67.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the Company's securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective

24

disclosures.   Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

68.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, GM securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by GM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

69.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

70.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

71.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of GM;

- whether the Individual Defendants caused GM to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of GM securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

72.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

73.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- GM securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold GM securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

74.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

75.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

27

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

76.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

77.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

78.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of GM securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire GM securities and options at

artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

79.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for GM securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about GM's finances and business prospects.

80.    By virtue of their positions at GM, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

81.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of GM, the Individual Defendants had knowledge of the details of GM's internal affairs.

82.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of GM.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to GM's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of GM securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning GM's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired GM securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

83.    During the Class Period, GM securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the

materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of GM securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of GM securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of GM securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

84. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

85. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

86.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

87.     During the Class Period, the Individual Defendants participated in the operation and management of GM, and conducted and participated, directly and indirectly, in the conduct of GM's business affairs.  Because of their senior positions, they knew the adverse non-public information about GM's misstatement of income and expenses and false financial statements.

88.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to GM's financial condition and results of operations, and to correct promptly any public statements issued by GM which had become materially false or misleading.

89.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which GM disseminated in the marketplace during the Class Period concerning GM's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause GM to engage in the wrongful acts complained of herein.   The Individual

32

Defendants, therefore, were "controlling persons" of GM within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of GM securities.

90.     Each of the Individual Defendants, therefore, acted as a controlling person of GM.  By reason of their senior management positions and/or being directors of GM, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, GM to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of GM and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

91.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by GM.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated:  December 8, 2023                    Respectfully submitted,

                                            POMERANTZ LLP

                                            */s/ Jeremy A. Lieberman*
                                            Jeremy A. Lieberman
                                            J. Alexander Hood II
                                            600 Third Avenue, 20th Floor
                                            New York, New York 10016
                                            Telephone: (212) 661-1100
                                            Facsimile: (917) 463-1044
                                            jalieberman@pomlaw.com
                                            ahood@pomlaw.com

                                            *Attorneys for Plaintiff*

DocuSign Envelope ID: B9AA8DC1-FFE1-4172-B7DF-09021EBB29F6

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, _Edward Shamoon_____, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against General Motors Company ("GM") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire GM securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired GM securities during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in GM securities during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed  _____11/29/2023_____
                    **(Date)**

DocuSigned by:

_____
      **(Signature)** 915CC274FCCD4D5...

Edward Shamoon
_____
        **(Type or Print Name)**

**General Motors Company (GM)**                                                          **Edward Shamoon**

### List of Purchases and Sales

| Transaction Type | Security Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| Purchase | Common Stock | 5/20/2022 | 200 | $40.0000 |
| Purchase | Common Stock | 12/16/2022 | 200 | $37.0000 |
| Purchase | Common Stock | 3/16/2023 | 500 | $41.0000 |
| Sale | Common Stock | 10/28/2022 | (700) | $38.5000 |
| Sale | Common Stock | 2/2/2023 | (200) | $41.5505 |
| | | | | |
| Purchase | P 20221118 37.5 | 11/10/2022 | 1 | $0.2916 |
| Sale | P 20220520 40 | 4/21/2022 | (2) | $1.8000 |
| Sale | C 20221028 38.5 | 10/25/2022 | (7) | $0.2600 |
| Sale | P 20221118 37.5 | 11/2/2022 | (1) | $0.9483 |
| Sale | P 20221216 37 | 11/16/2022 | (1) | $1.2600 |
| Sale | P 20221216 37 | 11/17/2022 | (1) | $1.3800 |
| Sale | P 20230317 41 | 2/21/2023 | (5) | $1.3000 |