**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

|  |  |
|---|---|
| IN RE GENERAL MOTORS COMPANY SECURITIES LITIGATION | Case No. 4:23-cv-13132-SDK-EAS<br><br>District Judge Shalina D. Kumar<br><br>Magistrate Judge Elizabeth A. Stafford<br><br>**(Oral Argument Requested)** |

**GM DEFENDANTS' MOTION TO DISMISS
THE AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, Defendants General Motors Company, Mary T. Barra, Paul A. Jacobson, and Douglas L. Parks (the "GM Defendants"), by and through their attorneys, Paul, Weiss, Rifkind, Wharton & Garrison LLP and Bush Seyferth PLLC, move this Court to dismiss with prejudice Plaintiffs' Amended Consolidated Class Action Complaint, ECF No. 23 ("Complaint"), because Plaintiffs fail to state a claim upon which relief may be granted.

As Local Rule 7.1(a) and this Court's Practice Guidelines require, counsel for the GM Defendants conferred with Plaintiffs' counsel by telephone on July 29, 2024, to explain the basis for the GM Defendants' motion and seek concurrence in the relief sought, but concurrence was denied.

In support of this Motion, the GM Defendants rely on the arguments of law and statements of fact set forth in the accompanying Brief, as well as certain of the arguments of law and statements of fact set forth in the Memorandum of Law in support of the Motion to Dismiss by Defendants Cruise, LLC, Kyle Vogt, Wayne West, and Daniel Ammann (the "Cruise Defendants").

WHEREFORE, the GM Defendants respectfully request that this Court grant their Motion to Dismiss and enter an order dismissing the Complaint with prejudice.

|  |  |
|---|---|
| Daniel J. Kramer (N.Y. 1979392) | /s/ Roger P. Meyers |
| Andrew J. Ehrlich (N.Y. 4103909) | Stephanie A. Douglas (P70272) |
| Richard C. Tarlowe (N.Y. 4122677) | Roger P. Meyers (P73255) |
| Kristina A. Bunting (N.Y. 5510847) | **BUSH SEYFERTH PLLC** |
| **PAUL, WEISS, RIFKIND,** | 100 W. Big Beaver Rd. Suite 400 |
| **WHARTON & GARRISON LLP** | Troy, MI 48084 |
| 1285 Avenue of the Americas | Telephone: (248) 822-7800 |
| New York, NY 10019 | douglas@bsplaw.com |
| Telephone: (212) 373-3000 | meyers@bsplaw.com |
| dkramer@paulweiss.com | |
| aehrlich@paulweiss.com | |
| rtarlowe@paulweiss.com | |
| kbunting@paulweiss.com | |

*Counsel for GM Defendants*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

IN RE GENERAL MOTORS
COMPANY SECURITIES
LITIGATION

Case No. 4:23-cv-13132-SDK-EAS

District Judge Shalina D. Kumar

Magistrate Judge Elizabeth A. Stafford

**(Oral Argument Requested)**

## GM DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

## **TABLE OF CONTENTS**

**Page**

STATEMENT OF THE ISSUES PRESENTED ................................................... vi

CONTROLLING OR MOST APPROPRIATE AUTHORITIES ........................ viii

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS ................................................................................... 3

    A.    2016–2020: GM Acquires a Majority Stake in Cruise and Warns About the Nascent Nature of the Technology ....................................... 3

    B.    2020–2021: Cruise Obtains Initial AV Testing Permits ...................... 4

    C.    2021: Cruise Obtains Permit to Provide Free, Driverless Rides to Passengers in San Francisco ............................................................... 7

    D.    2021–2022: Cruise Receives Permits to Deploy Its Commercial AV Ride-Hail Service ........................................................................ 8

    E.    2022–2023: Cruise Expands Its AV Ride-Hail Operations ................. 9

    F.    October 2, 2023:  Crash and Aftermath ............................................ 10

ARGUMENT .................................................................................................... 11

I.    The Complaint Fails to Plead Falsity ..................................................... 12

    A.    Plaintiffs Do Not Allege That Cruise Vehicles Were Not "Level 4" ...................................................................................................... 13

    B.    Plaintiffs Do Not Allege That Cruise Vehicles Were Not Fully Driverless or Fully Autonomous ....................................................... 19

    C.    Plaintiffs Do Not Allege That Cruise AVs Were Less Safe than Human Drivers ................................................................................. 22

II.    The Complaint Fails to Raise a Strong Inference of Scienter ...................... 23

    A.    The Complaint Lacks Specific Allegations that Barra, Parks, or Jacobson Intentionally or Recklessly Misled Investors ...................... 24

    B.    Generalized Allegations Do Not Suffice to Plead Scienter ............... 26

    C.    The Complaint Does Not Allege Corporate Scienter as to GM .......... 29

    D.    The Non-Culpable Inference Is More Compelling ............................ 30

III.    The Complaint Fails to Plead Loss Causation ................................................ 32

IV.    The Complaint Fails to Plead Scheme Liability ............................................. 34

V.    Plaintiffs' Section 20(a) Claims Must Be Dismissed .................................... 35

CONCLUSION ................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bldg. Trades Pension Fund of W. Pa.* v. *Insperity, Inc.*,
   2022 WL 784017 (S.D.N.Y. Mar. 15, 2022) .......................................................31

*Bondali* v. *Yum! Brands, Inc.*,
   620 F. App'x 483 (6th Cir. 2015) ....................................................18, 21, 22, 29

*City of Monroe Emps. Ret. Sys.* v. *Bridgestone Corp.*,
   399 F.3d 651 (6th Cir. 2005) .............................................................................12

*In re Comshare Inc. Sec. Litig.*,
   183 F.3d 542 (6th Cir. 1999) .............................................................................29

*D.E. & J Ltd. P'ship* v. *Conaway*,
   284 F. Supp. 2d 719 (E.D. Mich. 2003), *aff'd*, 133 F. App'x 994
   (6th Cir. 2005)....................................................................................................24

*Dailey* v. *Medlock*,
   551 F. App'x 841 (6th Cir. 2014) .......................................................................16

*Das* v. *Unity Software Inc.*,
   2024 WL 1141733 (N.D. Cal. Mar. 15, 2024) ...................................................17

*Doshi* v. *Gen. Cable Corp.*,
   386 F. Supp. 3d 815 (E.D. Ky. 2019) ...........................................................17, 30

*Doshi* v. *Gen. Cable Corp.*,
   823 F.3d 1032 (6th Cir. 2016) ...........................................................24, 25, 30, 35

*In re EveryWare Glob., Inc. Sec. Litig.*,
   175 F. Supp. 3d 837 (S.D. Ohio 2016), *aff'd*, 849 F.3d 325 (6th
   Cir. 2017) ...........................................................................................................16

*In re Ferro Corp.*,
   2007 WL 1691358 (N.D. Ohio June 11, 2007) .............................................16, 17

*Helwig* v. *Vencor, Inc.*,
   251 F.3d 540 (6th Cir. 2001) .............................................................................24

*In re KBC Asset Mgmt. N.V.*,
   572 F. App'x 356 (6th Cir. 2014) ................................................................32, 34

*Kolominsky* v. *Root, Inc.*,
   667 F. Supp. 3d 685 (S.D. Ohio 2023), *aff'd,* 100 F.4th 675 (6th
   Cir. 2024) ............................................................................................................34

*Konkol* v. *Diebold, Inc.*,
   590 F.3d 390 (6th Cir. 2009) ...............................................................25, 27, 28

*La. Sch. Emps. Ret. Sys.* v. *Ernst & Young, LLP*,
   622 F.3d 471 (6th Cir. 2010) ...............................................................................18

*Ley* v. *Visteon Corp.*,
   543 F.3d 801 (6th Cir. 2008) ...............................................................................28

*Loc. 295/Loc. 851 IBT Emp. Grp. Pension Tr. & Welfare Fund* v.
   *Fifth Third Bancorp.*,
   731 F. Supp. 2d 689 (S.D. Ohio 2010) .......................................................17, 27

*Matrixx Initiatives, Inc.* v. *Siracusano*,
   563 U.S. 27 (2011)...............................................................................................11

*Miller* v. *Champion Enters.*,
   346 F.3d 660 (6th Cir. 2003) ...............................................................................23

*In re Omnicare, Inc. Sec. Litig.*,
   769 F.3d 455 (6th Cir. 2014) ........................................................12, 13, 25, 29

*Pension Fund Grp.* v. *Tempur-Pedic Int'l*,
   614 F. App'x 237 (6th Cir. 2015) ........................................................................23

*Pittman* v. *Unum Grp.*,
   861 F. App'x 51 (6th Cir. 2021) ..........................................................................29

*Plymouth Cty. Ret. Ass'n* v. *ViewRay, Inc.*,
   2022 WL 3972478 (6th Cir. Sept. 1, 2022) ......................................12, 16, 21, 22

*PR Diamonds, Inc.* v. *Chandler*,
   364 F.3d 671 (6th Cir. 2004) ...............................................................................27

*City of Pontiac Gen. Emps.' Ret. Sys.* v. *Stryker Corp.*,
   865 F. Supp. 2d 811 (W.D. Mich. 2012) .............................................................26

iii

*SEC* v. *Rio Tinto*,
    41 F.4th 47 (2d Cir. 2022) ...................................................................34

*Sanders Confectionery Prod., Inc.* v. *Heller Fin., Inc.*,
    973 F.2d 474 (6th Cir. 1992) ..............................................................35

*Sinay* v. *Lamson & Sessions Co.*,
    948 F.2d 1037 (6th Cir. 1991) ............................................................18

*Teamsters Loc. 237 Welfare Fund* v. *ServiceMaster Glob. Holdings, Inc.*,
    83 F.4th 514 (6th Cir. 2023) ........................................................*passim*

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).............................................................12, 24, 30

*Toth* v. *Grand Trunk R.R.*,
    306 F.3d 335 (6th Cir. 2002) ..............................................................12

*In re TransDigm Grp., Inc. Sec. Litig.*,
    440 F. Supp. 3d 740 (N.D. Ohio 2020) ..............................................32

*In re Unumprovident Corp. Sec. Litig.*,
    396 F. Supp. 2d 858 (E.D. Tenn. 2005)..............................................12

*In re Washington Prime Grp., Inc. Sec. Litig.*,
    2024 WL 1307103 (S.D. Ohio Mar. 27, 2024)............................33, 34

*Williams* v. *CitiMortgage, Inc.*,
    498 F. App'x 532 (6th Cir. 2012) .......................................................12

**Statutes**

15 U.S.C. § 78j(b) ..........................................................................11, 35

15 U.S.C. § 78u-4...................................................................*passim*

15 U.S.C. § 78t................................................................................35

**Other Authorities**

17 C.F.R. § 240.10b-5.................................................................11, 34, 35

Cal. Code. Regs. tit. 13, § 227 ......................................................*passim*

Cal. Code. Regs. tit. 13, § 228 ............................................................8, 14

Wright & Miller, 5C Fed. Prac. & Proc. Civ. § 1363 (3d ed.) ................................12

California Public Utilities Commisison Decision 18-05-043 ....................................4

California Public Utilities Commisison Decision 20-11-046 ...................................33

California Public Utilities Commisison Decision 21-05-017 ....................................9

Fed. R. Evid. 201 ......................................................................................12

## STATEMENT OF THE ISSUES PRESENTED

1.  Should this Court dismiss Plaintiffs' claims under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("Section 10(b)"), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), because Plaintiffs do not plead particularized facts demonstrating that the GM Defendants made statements that were false or otherwise actionable, as required by Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 ("PSLRA")?

2.  Should this Court dismiss Plaintiffs' claims under Section 10(b) and Rule 10b-5 because Plaintiffs do not plead particularized facts giving rise to a "strong inference" that any of the GM Defendants acted with scienter, as required by Rule 9(b), the PSLRA, and *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)?

3.  Should this Court dismiss Plaintiffs' claims under Section 10(b) and Rule 10b-5, because Plaintiffs do not plead particularized facts demonstrating that the GM Defendants' challenged statements caused Plaintiffs' alleged losses, as required by Rule 9(b) and the PSLRA?

4.  Should this Court dismiss Plaintiffs' claims under Section 10(b) and Rules 10b-5(a)/(c) for scheme liability because Plaintiffs do not allege that any GM Defendants participated in an actionable scheme?

5.     Should this Court dismiss Plaintiffs' claims under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), because Plaintiffs neither state an underlying securities law violation nor plead facts demonstrating that Defendants Barra, Jacobson, and Parks were control persons of Defendant Cruise?

The answer to each of these questions is "yes."

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

The controlling or most appropriate authorities for the relief that Defendants seek include:

1.    Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4

2.    *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)

3.    *Teamsters Loc. 237 Welfare Fund* v. *ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514 (6th Cir. 2023)

4.    *Plymouth Cty. Ret. Ass'n* v. *ViewRay, Inc.*, 2022 WL 3972478 (6th Cir. Sept. 1, 2022)

5.    *Pittman* v. *Unum Grp.*, 861 F. App'x 51 (6th Cir. 2021)

6.    *Doshi* v. *Gen. Cable Corp.*, 823 F.3d 1032 (6th Cir. 2016)

7.    *Bondali* v. *Yum! Brands, Inc.*, 620 F. App'x 483 (6th Cir. 2015)

8.    *Pension Fund Grp.* v. *Tempur-Pedic Int'l*, 614 F. App'x 237 (6th Cir. 2015)

9.    *In re Omnicare Sec. Litig.*, 769 F.3d 455 (6th Cir. 2014)

10.   *In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356 (6th Cir. 2014)

11.   *Dailey* v. *Medlock*, 551 F. App'x 841 (6th Cir. 2014)

12.   *Konkol* v. *Diebold, Inc.*, 590 F.3d 390 (6th Cir. 2009)

13.   *Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund* v. *Omnicare, Inc.*, 583 F.3d 935 (6th Cir. 2009)

14.   *Ley* v. *Visteon Corp.*, 543 F.3d 801 (6th Cir. 2008)

15.   *PR Diamonds, Inc.* v. *Chandler*, 364 F.3d 671 (6th Cir. 2004)

16.   *Miller* v. *Champion Enters.*, 346 F.3d 660 (6th Cir. 2003)

17.   *Helwig* v. *Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001) (en banc)

18.   *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542 (6th Cir. 1999)

19. *Sanders Confectionery Prod., Inc.* v. *Heller Fin., Inc.*, 973 F.2d 474 (6th Cir. 1992)

20. *Herm* v. *Stafford*, 663 F.2d 669 (6th Cir. 1981)

21. *SEC* v. *Rio Tinto*, 41 F.4th 47 (2d Cir. 2022)

## PRELIMINARY STATEMENT

General Motors Company ("GM") is an iconic American company that, among other things, designs, builds, and sells automobiles.  One of its subsidiaries, Cruise, has been working to develop and commercialize autonomous vehicles ("AVs").  In a few localities, Cruise had obtained permits to test and operate its AVs without human safety drivers as a ride-hailing service with fare-paying customers.

On October 2, 2023, a human hit-and-run driver collided with a pedestrian in San Francisco, forcing the pedestrian into the path of a Cruise AV, which struck and further injured the pedestrian.  Plaintiffs are *GM* shareholders who allegedly suffered losses when, following the October 2023 accident, California regulators suspended some of *Cruise's* permits and *Cruise* announced it would "pause driverless operations" pending an internal review.  Plaintiffs claim that GM, Cruise, and certain of their officers and directors perpetrated a years-long fraud beginning long before the October 2023 collision.  But that alleged fraud has nothing to do with anything revealed by the October 2023 accident and its aftermath.  Rather, Plaintiffs try to leverage that tragic event to concoct a securities fraud case built around statements about how "autonomous" Cruise AVs actually were.  But Plaintiffs fail to plead a coherent theory of fraud, and their claims fail for several, independent reasons.

*First*, Plaintiffs do not adequately allege any false or misleading statement. They challenge three categories of statements describing Cruise AVs as: (i) "Level

4," (ii) "driverless" or "autonomous," and (iii) safer than human-driven vehicles. But they invent new, self-serving definitions for the terms "Level 4," "driverless," and "autonomous," and suggest that no humans should have been involved in any way in the operation of Cruise's AVs.  In reality, "Level 4" refers to a technical industry benchmark that expressly contemplates remote human operators, as did the California regulations under which Cruise operated.  Against this backdrop, any reasonable investor would understand that Cruise's AVs were "driverless" and "autonomous" because they operated without a human driver in the vehicle—not without any human involvement whatsoever.  As to the third category, Plaintiffs fail to allege even a single fact comparing the safety of Cruise AVs to human-driven vehicles, much less that human-driven cars were safer than Cruise AVs.

*Second*, the Complaint must be dismissed because it fails to raise a "strong inference" of scienter—a uniquely high pleading standard that requires weighing particularized facts of fraudulent intent against nonculpable inferences.  Plaintiffs attempt to satisfy this high burden by pointing to the allegations of nine confidential witnesses, primarily from Cruise.  But none are alleged to have any insight into the state of mind of any GM Defendant.  And, given GM's extensive cautionary language and the fact that it invested more than $1 billion in Cruise during the proposed class period with purported knowledge of the supposed inflation in Cruise's value, any fraudulent inference fails from the jump.

2

*Third*, Plaintiffs fail to plead loss causation, as the "disclosed" information was either already public or unrelated to the alleged fraud.  The scheme liability claim fails because there are no allegations about the GM Defendants' involvement. And the control person claim fails because of the failure to plead a primary violation and because Plaintiffs plead no facts that any GM Defendant controlled Cruise.

Plaintiffs' claims should be dismissed in their entirety with prejudice.

## STATEMENT OF FACTS

### A.    2016–2020: GM Acquires a Majority Stake in Cruise and Warns About the Nascent Nature of the Technology

GM is a large multinational company.  Cruise, GM's partially-owned subsidiary, is responsible for developing and commercializing AV technology. Compl. ¶¶ 25–26, 44.[1]  In March 2016, GM acquired a majority of Cruise's stock and now owns approximately 80 percent of GM Cruise Holdings LLC.  ¶¶ 26, 46. GM's CEO, Mary Barra, serves as the Chair of Cruise's Board of Directors.  ¶ 27.

In each of its annual SEC filings between 2017 and October 2023, GM warned that its AV operations, including Cruise, were "subject to a variety of risks inherent with the development of new technologies, including [its] ability to continue to

---

[1] References to "¶ __" refer to paragraphs of the Complaint, ECF No. 23, PageID.240–445, and references to "Ex. __" refer to items in the Index of Exhibits, which the Court must consider because they are referenced in the Complaint or properly subject to judicial notice. *See infra* 12 n.4. For quoted material, unless otherwise indicated, all emphasis is added and all internal alterations, footnotes, quotations, and citations have been omitted.

develop self-driving software and hardware," and that the materialization of these risks "could materially and adversely affect" GM's "results of operations, financial condition and growth prospects." *E.g.,* Ex. 1 (2021 GM Form 10-K) at 15. GM cautioned that it faced "risks related to the commercial deployment of [AVs] on our targeted timeline or at all, including . . . achievement of adequate safety and other performance standards," and risks posed by "accidents . . . associated with [AV] driving systems." *Id.* In 2023, GM's revenue was approximately $171 billion, with just 0.06% attributable to Cruise. Ex. 2 (2023 GM Form 10-K) at 67.

### B.     2020–2021: Cruise Obtains Initial AV Testing Permits

Between 2016 and 2020, Cruise was developing its core AV technology and "trying to solve that engineering challenge of a generation of building a self-driving system." Ex. 3 (2021 GM Investor Day) at 37. Beginning in 2020, Cruise secured permits from California's Department of Motor Vehicles (the "DMV") and the California Public Utilities Commission (the "CPUC") allowing it to test AVs in San Francisco, and to provide the public free ride-hail services with a safety driver behind the wheel. *See, e.g.*, ¶ 55; *see also* Cal. Code. Regs. tit. 13, § 227.04(b) (drivered testing permit requires that test vehicle "is operated by an autonomous vehicle test driver"); Ex. 4 (CPUC Decision 18-05-043) at 50.

The next step was for Cruise to obtain permits allowing it to conduct testing without human safety drivers present in its vehicles (but with remote human

4

assistance).  Cruise had to certify, among other things, that its AVs could operate "without the presence of a driver inside the vehicle" and that its technology "meets the description of a level 4 or level 5 automated driving system" under the industry benchmark Society of Automobile Engineers Taxonomy (the "Taxonomy").  Cal. Code. Regs. tit. 13, § 227.38(c); ¶ 82.  The Taxonomy defines a "Level 4" AV as designed to be capable of "*sustained* and [*operational design domain*]-specific performance . . . of the entire [*dynamic driving task*] and [*dynamic driving task*] *fallback*."  Ex. 5 (SAE Taxonomy) at 31 (italics in original).

- The "**operational design domain**," or "**ODD**," is the "*[o]perating* conditions under which a given *driving automation system* or *feature* thereof is specifically designed to function," including geographic location or time of day.  *Id.* at 17 (italics in original); *see also id.* at 32–34.

- The "**dynamic driving task**," or "**DDT**," encompasses "[a]ll of the real-time *operational* and tactical functions required to operate a vehicle in on-road traffic," such as steering, acceleration/deceleration, and responding to objects and events.  *Id.* at 9 (italics in original).

- The "**DDT fallback**" is "[t]he response by the *user* to either perform the DDT or achieve a *minimal risk condition* (1) after occurrence of a DDT performance-relevant *system failure(s)*, or (2) upon [*ODD*] exit, or the response by an [*automated driving system*] to achieve *minimal risk condition*, given the same circumstances."  *Id.* at 10 (italics in original).

- A "**minimal risk condition**" is "[a] stable, stopped condition . . . in order to reduce the risk of a crash when a given *trip* cannot or should not be continued."  *Id.* at 15 (italics in original).  A minimal risk condition "may entail automatically bringing the *vehicle* to a stop within its current travel path, or it may entail a more extensive maneuver designed to remove the *vehicle* from an active lane of traffic and/or to automatically return the *vehicle* to a *dispatching* facility."  *Id.* (italics in original).

In other words, a Level 4 AV is capable of driving in real-time (i.e., performing the

DDT) under pre-specified conditions (i.e., the ODD), and, when the AV exits the ODD or cannot otherwise perform the DDT, it comes to a stop (i.e., DDT fallback of achieving a minimal risk condition).  Notably, a Level 4 AV may require "remote assistance," in the form of "information or advice" provided "by a ***remotely located human***" when the AV "encounters a situation it cannot manage."  *Id.* at 18.  For example, if a "Level 4 [AV] detects an object in its lane that appears to be too large to drive over and stops," a remote human operator may "use[] the *vehicle's* cameras to identify that the object is an empty bag that can be safely driven through/over, and provide[] the instruction to the [AV] to proceed."  *Id.* at 19 (italics in original).

Applicable California regulations further recognized the role of ongoing human input in Level 4 AV operations.  Cruise was also required to certify, among other things, that (i) there was "a communication link between the vehicle and the remote operator," who "engages and monitors the autonomous vehicle" and may have "the ability to perform the [DDT] for the vehicle or cause the vehicle to achieve a minimal risk condition"; and (ii) Cruise would "continuously monitor the status of the vehicle and the two-way communication link while the autonomous test vehicle is being operated without a driver."  Cal. Code Regs. tit. 13, §§ 227.02(n), 227.38(b).

In October 2020, the DMV authorized Cruise to conduct AV testing without human drivers physically present in its vehicles ("DMV Testing Permit").  ¶ 55. Throughout the rest of 2020 and into 2021, Cruise tested its AVs in San Francisco

without human safety drivers, which GM described as "driverless" testing.

For example, Barra explained on GM's 3Q20 earnings call that Cruise was "the first company to test autonomous vehicles **with no backup driver** in a dense and complex urban driving environment."  Ex. 6 (3Q20 Earnings Call) at 6.  Similarly, on GM's 4Q20 earnings call, Barra stated that "Cruise has now reached the point where it has **removed the human driver from behind the wheel**" and "is now fully testing driverless cars on the streets of San Francisco successfully."  Ex. 7 (4Q20 Earnings Call) at 8; *see also id.* at 11; ¶ 268, Ex. 8 (Mar. 25, 2021 JPMorgan Conf.) at 11 (Barra: Cruise is "piloting or testing vehicles **without a driver** in San Francisco," with the goal of being "able to **take the driver out of the vehicle** safely").  The market recognized this achievement and, like GM, understood that Cruise's "driverless" testing meant that its AVs were operating "**without any backup driver**."  Ex. 9 (Feb. 24, 2021 Wolfe Conf.) at 10; *see also id.* at 4.

Barra noted that this driverless testing was "an opportunity as we demonstrate technology for Cruise that's safer than a human driver."  ¶ 266; *see also* ¶ 268.  Nevertheless, GM cautioned that Cruise was working "continually to advance the technology" and that "continued development" was still necessary.  Ex. 8 at 11.

### C.      2021: Cruise Obtains Permit to Provide Free, Driverless Rides to Passengers in San Francisco

In June 2021, the CPUC issued a permit for Cruise to provide—for the first

time—unpaid public rides without a driver in the vehicle.  ¶ 56.[2]  Barra said that Cruise received "a permit to give passengers a ride ***without a driver behind the wheel***," as part of its "real-wor[l]d driverless vehicle testing in San Francisco." ¶ 272; *see also* ¶ 270.  Barra explained that Cruise was "shifting from just the R&D to the whole what will it take from a commercialization perspective."  Ex. 10 (June 3, 2021 Credit Suisse Conf.) at 12.

### D.   2021–2022: Cruise Receives Permits to Deploy Its Commercial AV Ride-Hail Service

In September 2021, following additional testing and months of free rides to the public, the DMV issued Cruise a permit needed to launch paid AV ride-hail service in San Francisco ("DMV Deployment Permit").  ¶ 57.  California regulations required Cruise to certify that its technology met the Taxonomy's "Level 4" definition, ¶ 11, and contemplated a communication link between its AVs and a remote operator on standby.  Cal. Code. Regs. tit. 13, §§ 227.02(n), 228.06(b)(1).

GM continued to describe Cruise AVs as "driverless," "fully driverless," and "fully autonomous," ¶¶ 298, 310, 312, 314, because there was "***[n]o driver in the car***."  ¶ 294; *see also* ¶ 292, 302, 316; Ex. 11 (3Q21 Earnings Call) at 5, 11.  GM also discussed Cruise's progress developing Level 4 AV technology.  For example,

---

[2] Cruise was required to hold the DMV Testing Permit and "ensur[e] that remote operators capable of performing the dynamic driving task" were on standby.  Ex. 4 at 52.

at GM's Investor Day on October 6, 2021, Barra explained that Cruise was "defining the commercialization strategies for Level 4 autonomy." ¶ 274; *see also* ¶ 290.

In June 2022, after additional testing, the CPUC approved Cruise's application for the final permit required to launch its commercial AV ride-hail service in certain areas of San Francisco. ¶ 68.[3] Barra subsequently described Cruise's "launch of fully driverless commercial operations" as "historic." ¶ 320; Ex. 13 (2Q22 Earnings Call) at 5. Cruise thus became "the first and only company to operate a commercial driverless ride-hail service in a major US city." ¶ 318. Still, GM repeatedly cautioned that it was "really just the beginning" of Cruise's "path to commercialization," Ex. 14 (June 13, 2022 GM Annual Meeting) at 9, as Cruise was only "in the first turn of the race." Ex. 15 (Feb. 23, 2022 Wolfe Conf.) at 5.

### E.    2022–2023: Cruise Expands Its AV Ride-Hail Operations

Cruise's groundbreaking progress did not come without challenges. As Cruise tested its AVs, they experienced isolated—but widely reported—technical issues that sometimes required human intervention. *See, e.g.*, ¶¶ 187–92.

For example, an article published by *TechCrunch* on April 11, 2022, described remote AV assistance provided by "a team of people" who "feed Cruise

---

[3] Cruise was required to hold the DMV Deployment Permit and certify that it complied with applicable DMV regulations, including that its AVs were "Level 4." *See* Ex. 12 (CPUC Decision 21-05-017 (defining driverless deployment program requirements)).

vehicles with information in instances where the vehicles experience problems." ¶ 187; Ex. 16 (Apr. 11, 2022 TechCrunch article) at 2; *see also* ¶¶ 188, 190–91.  As these and other reports made clear, while Cruise AVs operated without human drivers inside the vehicles, they occasionally required human input or intervention.

Over the course of 2022 and 2023, GM continued to describe Cruise's AV technology as "Level 4," "driverless," "fully driverless," and "fully autonomous." *See, e.g.*,  ¶¶ 320, 322, 324, 326, 334, 338, 342, 344, 346, 348, 350, 352.  At the same time, both GM and Cruise also conveyed the limited, but enduring, role of humans in assisting Cruise's AV fleet.  For example, in an interview published on September 19, 2022, Cruise's then-CEO Kyle Vogt stated that Cruise's remote human operators provide "customers peace of mind knowing ***there is always a human there to help*** if needed," and "I don't know why I'd ever want to get rid of that."  Ex. 17 (Sept. 19, 2022 *Reuters* Article) at 2.  By June 2023, Barra reported that Cruise AVs had logged two million "driverless miles, true driverless miles, so ***no one's behind the steering wheel***."  Ex. 19 (June 2, 2023 Bernstein Conf.) at 5.

### F.     October 2, 2023:  Crash and Aftermath

On October 2, 2023, a human hit-and-run-driver collided with a pedestrian, throwing her into the path of a Cruise AV, which struck her.  ¶ 194.  While pulling over in an attempt to achieve a minimal risk condition, the AV dragged the pedestrian for approximately 20 feet.  *Id.*  The media extensively covered the

collision, including that the pedestrian was dragged.  ¶ 235.  Plaintiffs do ***not*** allege

that this event disclosed any alleged fraud.  *See* ¶ 438.

Plaintiffs allege three partial corrective disclosures:

- On October 24, 2023, the DMV suspended Cruise's Deployment Permit, which automatically suspended Cruise's CPUC Driverless AV Deployment Permit.  ¶¶ 195, 198.  Plaintiffs allege that GM's stock price declined approximately 2.3%.  ¶ 438.

- On October 26, the National Highway Transportation Safety Authority ("NHTSA") allegedly released a letter to Cruise, saying that—as had been previously reported in December 2022—NHTSA was investigating reports of hard braking by Cruise AVs.  ¶ 200; Ex. 20 (Dec. 12, 2022 *The Verge* article).  Cruise announced later that day that it would "pause driverless operations."  ¶ 201.  Plaintiffs allege that the next day, GM's stock price declined approximately 4.7%.  ¶ 438.

- On November 8, Cruise remedied a software issue from its collision detection subsystem.  ¶ 202; Ex. 21 (Nov. 8, 2023 Cruise blog post) at 2–3.  Plaintiffs allege that GM's stock price declined about 2.7%.  ¶ 381.

## ARGUMENT

Under section 10(b) and Rule 10b-5, Plaintiffs must allege facts with

particularity showing, among other elements, (1) a material misrepresentation or

omission, (2) a "strong inference" of scienter, and (3) that the misrepresentations or

omissions caused Plaintiffs' losses.  *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S.

27, 37–38 (2011); *Teamsters Loc. 237 Welfare Fund* v. *ServiceMaster Glob.*

*Holdings, Inc.*, 83 F.4th 514, 525 (6th Cir. 2023).

This is no ordinary pleading standard; the "higher bar" set by the PSLRA

"stands as an elephant-sized boulder to such suits and its requirements are not easily

satisfied." *Plymouth Cty. Ret. Ass'n* v. *ViewRay, Inc.*, 2022 WL 3972478, at *2 (6th Cir. Sept. 1, 2022).  In addition to the allegations in the Complaint, the Court "must consider" documents referenced in the Complaint and materials subject to judicial notice.  *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310 (2007).[4]

## I.    The Complaint Fails to Plead Falsity

Plaintiffs must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1)(B).  In other words, Plaintiffs must allege the "who, what, where, when, and why of the fraudulent statements."  *ViewRay*, 2022 WL 3972478, at *2.  The Complaint fails to

---

[4] In addition to documents referenced in the Complaint, *see* Exhibits 3, 5, 7–11, 13–16, 18–19, 21, 23–30 and 32, the Court must also consider Exhibits 1–33 because courts take "judicial notice of information that was publicly available to reasonable investors at the time the defendant made the allegedly false statements."  *In re Unumprovident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 876 (E.D. Tenn. 2005); *see also In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 467 (6th Cir. 2014) (courts can take notice "of the fact that [defendant] filed [a public document] and what that filing said"); *City of Monroe Emps. Ret. Sys.* v. *Bridgestone Corp.*, 399 F.3d 651, 662 & n.13 (6th Cir. 2005) (taking "judicial notice of the fact that the media articles . . . were published"); *Toth* v. *Grand Trunk R.R.*, 306 F.3d 335, 349 (6th Cir. 2002) ("a Court may take judicial notice of the rules, regulations and orders of administrative agencies issued pursuant to their delegated authority"); Fed. R. Evid. 201. Additionally, the Court must consider the Taxonomy (Ex. 5) because the Complaint quotes it extensively, *e.g.,* ¶¶ 82–86, and because Plaintiffs' falsity allegations are premised on Cruise AVs' alleged failure to satisfy the Taxonomy's criteria for Level 4, ¶¶ 262–64.  *Omnicare*, 769 F.3d at 466.  The Taxonomy's text trumps any allegations contradicting it.  *See* Wright & Miller, 5C Fed. Prac. & Proc. Civ. § 1363 (3d ed.) ("The district court will not accept as true pleading allegations that are contradicted by facts that can be judicially noticed or by other allegations or exhibits attached to or incorporated in the pleading."); *see also Williams* v. *CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012).

satisfy "this heavier, statutorily created burden." *Omnicare*, 769 F.3d at 461.

### A.      Plaintiffs Do Not Allege That Cruise Vehicles Were Not "Level 4"

Plaintiffs claim that statements that Cruise's AV technology was at "Level 4" were false or misleading because "Cruise did not have a Level 4 system, and Cruise's AVs could [not] drive safely, reliably, and legally without input from humans." ¶ 262–63.  But Plaintiffs ignore the Taxonomy's definition of Level 4 and fail to plead particularized facts demonstrating that these statements were false.

*First*, Plaintiffs invent their own definition of  "Level 4," claiming that ***any*** human involvement in Cruise's AV operations means that Cruise had not attained Level 4 status.  ¶¶ 262–63; *see also* ¶ 86.  But that contradicts the Taxonomy.  The Taxonomy ***explicitly contemplates*** human involvement in the operation, management, and troubleshooting of Level 4 AVs.  The actual definition of Level 4 is "[t]he sustained and ODD-specific performance . . . of the entire DDT and DDT fallback."  Ex. 5 at 31; *see supra* 5.  In other words, a Level 4 AV is capable of driving in real-time, under prespecified operating conditions, and achieving a minimal risk condition.

Plaintiffs' invented definition of "Level 4" is contrary to the Taxonomy, which repeatedly contemplates a "***remotely located human***" providing "information or advice" when an AV "encounters a situation it cannot manage."  Ex. 5 at 18.  For example, if a Level 4 AV "encounters an unannounced area of road construction

within its ODD," the AV "communicates to a ***remotely located human*** that it is unable to proceed around the construction," and "[t]he ***remotely located human provides a new pathway*** for the vehicle to follow." *Id.* at 19; *see also id.* (when a Level 4 AV encounters an unknown object, a "***remote assistant . . . provides the instruction*** to the [AV]").

Plaintiffs' interpretation also contradicts California regulations that explicitly require remote human input for testing and deploying AVs. In addition to a certification "that the autonomous technology meets the description of a level 4 or level 5 automated driving system under" the Taxonomy, those regulations establish a role for a "remote operator," who "engages and monitors the autonomous vehicle" and has "the ability to perform the [DDT] for the vehicle or cause the vehicle to achieve a minimal risk condition." Cal. Code. Regs. tit. 13, § 227.02(n); *see also id* §§ 227.38(b)(1), 228.06(b)(1). Far from suggesting that Level 4 AVs must operate "without input from humans," ¶ 263, applicable regulations explicitly discuss an ongoing role for humans.

Moreover, GM and Cruise were clear that Level 4 technology did not preclude all human involvement. For example, when Jacobson described Cruise AVs as "full Level 4," he explained that there was "***no driver in the vehicle*** at all." ¶ 348.[5]

---

[5] GM's statements regarding Cruise's "driverless," "fully driverless," and "fully autonomous" AVs, discussed *infra* 19–22, further underscored that Cruise AVs

Additionally, Cruise's 2022 Safety Report, which described Cruise as an "L4 high automation system," discussed at length the remote human assistance that Cruise provided to its AV fleet.  Ex. 22 (2022 Cruise Safety Report) at 106–32 (discussing human fleet monitors, human remote operators, in-person operators, and other human involvement in Cruise operations).

Plaintiffs' only source for their definition of "Level 4" is an April 2023 Cruise blog post.  ¶¶ 9, 80(b), 262, 264, 425.  That blog post discussed "[t]he compute workload for executing the L4 fully driverless [AV] function[.]"  Ex. 18 (Apr. 17, 2023 Cruise blog post).  It stated that "[t]he term *fully driverless* is used not merely for effect but to communicate an essential expectation:  *The AV must be capable of driving fully autonomously <u>100% of the time</u>.*"  *Id.* (emphasis in original).  Plaintiffs seize on this statement but ignore the rest of the blog post, which makes clear that "driverless" and "fully autonomous" refer to driving without a human safety driver.  The post went on to "draw a distinction" between Level 4, on the one hand, and Levels 2 and 3, "where there is an expectation of **an alert safety driver**, who **must be prepared to quickly take over**."  *Id.*  Cruise continued by explaining that "fully autonomous" driving—i.e., "executing the L4 fully driverless" AV function—thus meant driving "**without a safety driver**."  *Id.*

---

operated without human safety drivers in the vehicle—not without any human input at all.

Consistent with the Taxonomy and applicable regulations, GM described Cruise's AVs as "Level 4" because they met the relevant criteria, ***not*** because they operated without any human input whatsoever.  Plaintiffs' "theory is fundamentally flawed" because Level 4 is a "term of art" and because the AVs "meet[] the regulatory criteria," then "it cannot be false or misleading for it to so describe itself." *Dailey* v. *Medlock*, 551 F. App'x 841, 847–48 (6th Cir. 2014).   Given the Taxonomy's text, GM's statements and state regulations, no reasonable investor would have adopted Plaintiffs' interpretation.  *See ViewRay*, 2022 WL 3972478, at *4–6 (interpreting statements "as a reasonable investor would" and rejecting contrary interpretation as inconsistent with their context).

*Second*, Plaintiffs fail to plead particularized facts that GM's Level 4 statements were false.  No allegations contradict the notion that Cruise AVs were Level 4.  Plaintiffs cite reports of several confidential witnesses ("CWs"), but none even mentions the Taxonomy, and Plaintiffs do not explain how those reports render any statement false.  For example, CW-5—the only CW employed by GM—did not work on Cruise's AVs and merely reported that he heard "through the grapevine" about unspecified "issues on public roads."  ¶¶ 144, 147.  His unattributed hearsay should be disregarded because it "merely regurgitat[es] gossip and innuendo"—not "personal knowledge."  *In re Ferro Corp.*, 2007 WL 1691358, at *12 (N.D. Ohio June 11, 2007); *In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 852–

16

53 (S.D. Ohio 2016) (disregarding CW not "in a position to establish their basis of knowledge of the alleged misconduct"), *aff'd*, 849 F.3d 325 (6th Cir. 2017). Other CWs offer similarly generalized accounts. *See, e.g.*, ¶ 130 (CW-3: "Cruise AVs made 'sketchy decisions'"); ¶¶ 151, 153 (CW-6: "lots and lots of problems," a "number of incidents," and "issues with human injuries"); ¶¶ 163–65 (CW-9: Cruise "pushed too fast" to deploy more AVs). These allegations are too vague to establish that any statement was false. *Doshi* v. *Gen. Cable Corp.*, 386 F. Supp. 3d 815, 839 n.9 (E.D. Ky. 2019) ("conclusory and vague" CW accounts are "unhelpful"); *see also* Cruise Defs.' Br. at 9–11, 30–31.

The remaining CWs' accounts of Cruise AVs are ***consistent*** with Level 4 status. For example, accounts from CW-1, CW-2, and CW-4 discuss the involvement of remote human operators providing assistance to Cruise AVs. *E.g.*, ¶¶ 99, 119, 139. Both the Taxonomy and applicable regulations expressly contemplate remote-operator assistance AVs under the very circumstances described by the CWs. *See supra* 6, 13–14.[6] Likewise, the CWs' accounts—and

---

[6] CW-7, described as a former Cruise "Operations Team Lead" from 2017 to 2023, ¶ 155, largely recounts the alleged experiences of unnamed personnel who rode in Cruise AVs during testing at unspecified times. *Ferro*, 2007 WL 1691358, at *12. The majority of CW-7's tenure at Cruise fell before the class period, making his account "irrelevant" to whether GM's class period statements were false. *Loc. 295/Loc. 851 IBT Emp. Grp. Pension Tr. & Welfare Fund* v. *Fifth Third Bancorp.*, 731 F. Supp. 2d 689, 722 (S.D. Ohio 2010); *Das* v. *Unity Software Inc.*, 2024 WL 1141733, at *9 (N.D. Cal. Mar. 15, 2024) ("pre-[c]lass [p]eriod allegations do not establish the falsity of the statements made during the [c]lass [p]eriod").

news reports—of Cruise AVs stopping in lanes or experiencing system failures are consistent with Level 4. *E.g.*, ¶¶ 186–91. These reflect AVs executing the DDT fallback contemplated by Level 4, i.e., achieving a minimal risk condition by coming to a "stable, stopped condition," "within its current travel path" or by "remov[ing] the vehicle from an active lane of traffic." Ex. 5 at 15.

Plaintiffs also allege that the October 2, 2023 crash shows that Cruise's AVs were not Level 4 because the AV was incapable of performing the DDT fallback that time. ¶ 86. But this, too, misconstrues the Taxonomy: an AV's "level" reflects the "design intention" of the AV such that "the manifestation of one or more performance deficiencies . . . does not automatically change the level assignment." Ex. 5 at 36. A single incident, while tragic, is insufficient to show that "Cruise did not have a Level 4 system," or that its AVs could not "drive safely, reliably, and legally without input from humans," as Plaintiffs allege—particularly given the *millions* of miles that Cruise AVs had driven without any similar incident, Ex. 19 at 5. *See Bondali* v. *Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015) ("[t]aken alone, eight [safety concerns] is hardly a companywide food safety epidemic").[7]

---

[7] Even assuming that the October 2 incident showed that the AVs were then not Level 4 status, it does not discharge Plaintiff's burden to plead facts showing that GM's previous statements (made months or years earlier) were "false when made." *Sinay* v. *Lamson & Sessions Co.*, 948 F.2d 1037, 1040 (6th Cir. 1991); *La. Sch. Emps. Ret. Sys.* v. *Ernst & Young, LLP*, 622 F.3d 471, 484 (6th Cir. 2010) ("that something turned out badly" does not mean that "defendant knew earlier that. . . it would turn out badly").

The Level 4 statements should be dismissed for failure to plead falsity.[8]

## B.    Plaintiffs Do Not Allege That Cruise Vehicles Were Not Fully Driverless or Fully Autonomous

Plaintiffs also contend that statements that Cruise AVs were "driverless," "fully driverless," or "fully autonomous," ¶¶ 276, 290, 292, 294, 296, 302, 310, 314, 316, 318, 320, 324, 326, 348, like GM's Level 4 statements, conveyed that Cruise AVs were operating "without input from humans" and "without human intervention." ¶¶ 262–63. But GM said no such thing. Plaintiffs' attempt to rewrite GM's statements is belied by the statements' plain meaning and context. And, in any event, Plaintiffs fail to plead facts establishing that the statements were false.

*First*, Plaintiffs' interpretation of GM's statements is belied by their context. GM repeatedly explained that "fully driverless" and "fully autonomous" meant that Cruise's Level 4 AVs operated without a safety driver in the vehicle—*not* that they operated without any human input or intervention at all. GM made this clear from the outset. On its 4Q20 earnings call—after Cruise received its DMV Testing Permit in October 2020—Barra stated that "Cruise has now reached the point where *it has*

---

[8] Plaintiffs repackage their Level 4 theory with challenges to statements discussing Cruise's permits. ¶¶ 270, 272, 292, 298, 316, 318, 320. Plaintiffs do not, however, allege that GM misrepresented that Cruise obtained these permits; their *sole* falsity theory is that the permits "depended on Cruise certifying its AV technology was at Level 4," when Cruise "did not have a Level 4 system." *See, e.g.*, ¶ 273. Because Plaintiffs have not adequately alleged that GM's Level 4 statements were false, their claims related to the permit statements fail.

*removed the human driver* from behind the wheel" and "is now fully testing *driverless* cars on the streets of San Francisco successfully."  Ex. 7 at 8; *see also id.* at 11 ("You know that they're testing right now in San Francisco *without drivers in the vehicle* in certain situations.").

The very statements on which Plaintiffs rely reinforce this critical context and demonstrate that Plaintiffs' interpretation is implausible.  For example:

- On June 14, 2021, Barra stated that the CPUC's permit authorized Cruise to provide rides "*without a driver behind the wheel*," as part of "Cruise's real-world driverless vehicle testing in San Francisco."  ¶ 272; Ex. 23 (2021 GM Annual Meeting) at 11.

- On October 27, 2021, Barra explained that Cruise's "full driverless ride-hail service," ¶ 292, would "*take the driver out of the vehicle*." Ex. 11 at 11.

- On December 9, 2021, Parks described Cruise's "fully self-driving autonomous platform," ¶ 294, as requiring "*[n]o driver in the car*." Ex. 24 (Deutsche Bank Conf.) at 5.

- On February 2, 2022, GM's 2021 Form 10-K stated that Cruise "received a driverless test permit," from the California DMV "to *remove test drivers from Cruise autonomous vehicles*."  ¶ 302; Ex. 1 at 2.

- On June 2, 2023, Barra described "driverless miles, true driverless miles," as driving with "*no one[] behind the steering wheel*."  ¶ 71; Ex. 19 at 5.

*See also supra* 7–10.  A reasonable investor would have understood that Cruise AVs were "fully driverless" and "fully autonomous" ***not*** because they operated "without

human intervention," but because they operated ***without a driver*** in the vehicle.[9] And this understanding would have been reinforced by the repeated disclosure of Cruise's use of remote operators to assist its AV fleet. *See, e.g.*, Ex. 22 at 106–32; *see also supra* 9–10 (citing media reports of human involvement).

Plaintiffs' interpretation is also inconsistent with the regulatory scheme, and the Taxonomy, which contemplated that Cruise AVs would operate with ongoing human input. *See supra* 6, 13–14. Plaintiffs' contrary interpretation of GM's statements is untenable and should be rejected. *See ViewRay*, 2022 WL 3972478, at *4–6.

*Second*, the Complaint pleads no particularized facts showing that GM's statements were false. As discussed *supra* 16–18, Plaintiffs merely offer scattershot allegations that Cruise vehicles at times received human assistance. The Complaint does not allege that Cruise AVs were unable to ***ever*** operate remotely, but rather that, on average, remote operators "intervened every 2.5 to 5 miles." ¶ 263. Even if true, these allegations do not negate that Cruise AVs could (and did) operate without a human driver in the vehicle. *See Yum! Brands*, 620 F. App'x at 491.

---

[9] Statements by the Cruise Defendants provide additional, critical context that further undermines Plaintiffs' interpretation. *See, e.g.*, ¶ 306 (Vogt: the "proof point" is "***tak[ing] the driver out*** of the car"); Ex. 18 ("fully autonomous miles" are "***without a safety driver***"); Ex. 25 (Sept. 7, 2023 Goldman Sachs Conf.) at 12 (Vogt: Cruise AVs are "true driverless cars" because they have "***no driver***" and passengers are "never asked to do any part of the driving").

Rather, these allegations are consistent with Vogt's publicly stated approach that the ability to provide human assistance gives "customers peace of mind knowing ***there is always a human there to help*** if needed" and not "ever want[ing] to get rid of that." Ex. 17 at 2.

### C.    Plaintiffs Do Not Allege That Cruise AVs Were Less Safe than Human Drivers

Plaintiffs also challenge three statements by Barra comparing the safety of Cruise's AVs to human drivers.  ¶ 266 ("We see an opportunity as we demonstrate technology for Cruise that's safer than a human driver."); ¶ 268 ("[W]e're working to deliver vehicles that are safer than a human driver."); ¶ 354 ("[I]t is safer than a human driver.").  For these statements, Plaintiffs plead ***no*** contrary information.

Plaintiffs have failed to plead a single fact showing that Cruise's AVs were ***not*** "safer than a human driver."  ¶ 354.  Barra's statements were not representations that Cruise's vehicles would be ***perfectly safe***, but rather that Cruise's AVs would be safer ***overall*** compared to human drivers.  But Plaintiffs plead ***no facts*** regarding the overall safety of human drivers.  Plaintiffs cannot plead that a comparison is false without pleadings facts about both subjects of the comparison.  *ViewRay, Inc.*, 2022 WL 3972478, at *2; *Yum! Brands*, 620 F. App'x at 491 (no falsity because courts "need not speculate into existence facts which might favor the plaintiffs").

Plaintiffs try to distract from this failure by pointing to Cruise's "internal assessment" in the summer of 2023 that "the risk of the potential collision with a

child could occur once every 300 million miles at fleet driving, which we have since improved upon." ¶ 178; Ex. 26 (Nov. 6, 2023 *The Intercept* article). Plaintiffs plead no facts showing that AVs' experiences in a dense urban environment are representative of nationwide driving statistics. And in any event, Plaintiffs still fail to plead any comparison to the safety of human drivers, or any facts suggesting that this statistic is the only metric relevant to "safety." These failures doom their claim.[10]

## II.   The Complaint Fails to Raise a Strong Inference of Scienter

The Complaint does not "state with particularity facts giving rise to a strong inference" of scienter, which provides an independent basis for dismissal. 15 U.S.C. § 78u-4(b)(2)(A). Plaintiffs must plead specific facts that a defendant acted (i) with a "knowing and deliberate intent to manipulate, deceive, or defraud" or (ii) recklessly, which is to engage in "highly unreasonable conduct which is an extreme departure from the standards of ordinary care" that "is ***akin to conscious***

---

[10] Two of the alleged misstatements are also inactionable because they are forward-looking statements protected by the PSLRA. *See* ¶ 266 ("[w]e see an opportunity"); ¶ 268 ("we're working to deliver vehicles"). Neither statement conveyed that Cruise vehicles were—at that time—safer than human drivers, but instead discussed the "opportunity" that Cruise was "working" towards and "deliver" such AV technology. *See Pension Fund Grp.* v. *Tempur-Pedic Int'l*, 614 F. App'x 237, 247 (6th Cir. 2015) (statements regarding "opportunity" to grow business were forward-looking and protected by safe harbor). And Plaintiffs do not allege that Barra had "actual knowledge" that either statement was false. *Miller* v. *Champion Enters.*, 346 F.3d 660, 672 (6th Cir. 2003).

*disregard*." *Doshi* v. *Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016).
Unlike most motions to dismiss, this inquiry is "inherently comparative," and
Plaintiffs must allege a culpable inference "at least as compelling as any opposing
inference." *Tellabs*, 551 U.S. at 324.

Courts in this Circuit consider a "non-exhaustive list of considerations known
as the *Helwig* factors" in assessing scienter. *ServiceMaster*, 83 F.4th at 526 (citing
*Helwig* v. *Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001)).[11]  Scienter "must be pled
separately as to **each** defendant." *D.E. & J Ltd. P'ship* v. *Conaway*, 284 F. Supp.
2d 719, 742 (E.D. Mich. 2003), *aff'd*, 133 F. App'x 994 (6th Cir. 2005).  The
Complaint fails to plead scienter as to any GM Defendant, which requires dismissal.

### A. The Complaint Lacks Specific Allegations that Barra, Parks, or Jacobson Intentionally or Recklessly Misled Investors

Plaintiffs do not attempt to plead seven of the nine *Helwig* factors; at most,
they assert that there was a "divergence between internal reports" and the GM

---

[11] The *Helwig* factors are: "(1) insider trading at a suspicious time or in an unusual
amount; (2) divergence between internal reports and external statements on the same
subject; (3) closeness in time of an allegedly fraudulent statement or omission and
the later disclosure of inconsistent information; (4) evidence of bribery by a top
company official; (5) existence of an ancillary lawsuit charging fraud by a company
and the company's quick settlement of that suit; (6) disregard of the most current
factual information before making statements; (7) disclosure of accounting
information in such a way that its negative implications could only be understood by
someone with a high degree of sophistication; (8) the personal interest of certain
directors in not informing disinterested directors of an impending sale of stock; and
(9) the self-interested motivation of defendants in the form of saving their salaries
or jobs." *Helwig*, 251 F.3d at 552.

Defendants' statements or "disregard of the most current factual information." But Plaintiffs plead no facts that Barra, Parks, or Jacobson ever learned that Cruise vehicles were ***not*** any of: (1) Level 4, (2) driverless or autonomous, or (3) safer than a human driver. Nor do they allege that Barra, Parks, or Jacobson were aware of— and ignored—"multiple, obvious red flags" suggesting that Cruise vehicles were less advanced than their public statements conveyed. *Doshi*, 823 F.3d at 1039.

**Barra.** The only scienter allegation that mentions Barra is from CW-8, who is alleged to have been "formerly employed in a senior role by Cruise before 2022, after 2022, and throughout the entirety of 2022." ¶ 42. But where, as here, "no information is given regarding [a CW] except the title of his position," the CW's account is "steeply discount[ed]." *Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund* v. *Omnicare, Inc.*, 583 F.3d 935, 946 (6th Cir. 2009). Moreover CW-8's account says only that Barra allegedly received "updates" and "reports" in her role as a Cruise Director. ¶¶ 399–401. This account is too vague to support scienter. *ServiceMaster*, 83 F.4th at 531 ("vague assertions that issues . . . were discussed" do not show scienter without "detail about exactly what was discussed"); *Omnicare*, 769 F.3d at 482–83 (CW raised "compliance related concerns" but "failed to elaborate—at all—upon the nature of the concerns"); *Konkol* v. *Diebold, Inc.*, 590 F.3d 390, 397 (6th Cir. 2009) (requiring "detailed facts regarding the financial reports, how they were used, and their connection to the

Defendants").

**Jacobson.**  Plaintiffs plead no particularized facts about Jacobson's scienter. There are no facts about reports that Jacobson was given or meetings he participated in, or that ***any*** information about Cruise was ***ever*** communicated to him—let alone that he was given contemporaneous information contradicting any of his statements.

**Parks.**  The ***only*** allegation regarding Parks is that GM announced his retirement—after a 40-year career at the company—on the same day that the media learned of the departures of certain Cruise employees.  ¶ 428; Ex. 27 (Dec. 13, 2023 GM press release).  But conclusory allegations about the timing of executive departures do not "support a strong inference of scienter." *ServiceMaster*, 83 F.4th at 531.

## B.    Generalized Allegations Do Not Suffice to Plead Scienter

**CWs.**  Unable to allege specific facts showing that Barra, Parks, or Jacobson knew information that contradicted their public statements, Plaintiffs rely on the CWs' generalized accounts.  ¶¶ 34–43, 95–165, 392–402.  But these nine CWs do not discuss what any GM Defendant allegedly knew.  *City of Pontiac Gen. Emps.' Ret. Sys.* v. *Stryker Corp.*, 865 F. Supp. 2d 811, 834 n.9 (W.D. Mich. 2012) (because "none of the CWs had contact with Defendants," the CWs could not "testify as to what Defendants knew," and their "statements cannot, either alone or in combination with all of the other circumstances, establish a strong inference of scienter"); *Fifth*

26

*Third Bancorp.*, 731 F. Supp. 2d 722 (CW did "not allege that he met with or reported any of these problems to the Defendants"). Rather, they confirm that what was known within Cruise was also publicly known even before Plaintiffs allege the "truth" was publicly revealed. *See, e.g.*, ¶ 109; *compare* ¶ 137 (discussing CW-4's account that "'random' hard breaking" was one of Cruise's "biggest" issues) *with supra* 11 (discussing public report of investigation into Cruise AV "hard braking"); *see also* Cruise Defs.' Br. 9–11. And even if the CWs' accounts said anything about anyone's scienter, their accounts are even less relevant as to the GM Defendants because eight of the nine CWs did not even work for GM.[12]

**Access to Information.** Plaintiffs conclusorily allege that Defendants had access to information contradicting their statements. ¶¶ 392–413. Whatever Plaintiffs may allege about information purportedly known within **Cruise**, the Complaint does not allege that anyone at **GM**—let alone Barra, Jacobson, or Parks— had access to any contradictory information. And even if they did, scienter "cannot be inferred merely from . . . alleged access to information" because the Complaint "must allege specific facts or circumstances suggestive of their knowledge." *PR Diamonds, Inc.* v. *Chandler*, 364 F.3d 671, 688 (6th Cir. 2004); *see also Konkol*, 590 F.3d at 398 (no scienter where defendant "used real-time data software to track"

---

[12] The account of CW-5, an engineer and the only CW who is alleged to have worked for GM, ¶ 39, adds nothing for the reasons discussed *supra* 16.

relevant metric but complaint did not "explain what the software reflected and what would have been obvious to a reasonable person upon examining the software"); *Ley* v. *Visteon Corp.*, 543 F.3d 801, 818 (6th Cir. 2008) (no scienter without "alleg[ing] what documents in particular [defendant] had access to or what information it would have learned from reviewing said documents").[13]

**Defendants' Statements.**  Plaintiffs claim that the GM Defendants' own statements "[t]outed [t]heir [d]eep [i]nvolvement" in Cruise.  ¶ 419. Characterizations aside, the statements to which Plaintiffs point are high-level and do not evince deep involvement. *See id.* (Barra said she spoke to Amman (a former GM executive) "weekly" about unidentified topics, that Cruise's technology was "really progressing well" and "really quite sophisticated," and that Cruise and GM "share best practices"); ¶ 422 (Jacobson: "the technology is really strong," Cruise "team's done a phenomenal job," and "we've got the Level 4 technology"); ¶ 424 (Parks: Cruise's "terrific technology" is "moving very, very fast").  These statements are insufficient because they merely discuss Cruise in "general terms." *ServiceMaster*, 83 F.4th at 533; *see also Konkol*, 590 F.3d at 402 ("generalized"

---

[13] Allegations that "Defendants" "tracked" Cruise's AV technology and safety, ¶¶ 389–91, likewise do not allege *which* Defendants did this tracking, or what it showed, or how it contradicted any public statements.  And the statement by GM's President, Mark Reuss, that "everything's monitored," was about Cruise's general "system" for monitoring "data" from its AV fleet.  ¶ 391; Ex. 28 (Aug. 29, 2022 *Wired* article).

statements about "overall profits and growth" "do not establish that the Defendants were intimately familiar with . . . revenue-recognition practices").

**No "Core Operations" Inference.**  Plaintiffs otherwise allege that "Cruise's AV technology was also of extreme importance to GM's business." ¶ 387.  But "the fact that executives are intimately familiar with a core component of their business does little to suggest fraudulent intent."  *ServiceMaster*, 83 F.4th at 519, 527, 531 (no scienter for executives who attended meetings about "largest and most important subsidiary"); *see also Pittman* v. *Unum Grp.*, 861 F. App'x 51, 55 (6th Cir. 2021) (knowledge of core operations is "not a scienter-bolstering fact"); *Yum! Brands*, 620 F. App'x at 492 (no scienter simply because safety was important to company operations and test results were from "core" of company's business).[14]

## C.    The Complaint Does Not Allege Corporate Scienter as to GM

Plaintiffs' failure to plead the scienter of Barra, Jacobson, or Parks is fatal to their claim against GM.  *See ServiceMaster*, 83 F.4th at 532 ("any purported knowledge on the part of executives not alleged to have participated in formulating the challenged statements cannot support scienter").  Cruise's state of mind—as GM's partially-owned subsidiary—cannot be imputed to GM, its parent.  *Omnicare*, 769 F.3d at 476–77; *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 554 (6th Cir.

---

[14] In any event, Cruise was not sufficiently "core" to GM to invoke any inference. Cruise's contribution to GM's total revenue was infinitesimal—about 0.06% of GM's 2023 revenue.  *See* Ex. 2 at 67.

1999) (courts "should not presume recklessness or intentional misconduct from a parent corporation's reliance on its subsidiary's internal controls."). Absent particularized allegations that **GM** knew a fact, **Cruise's** knowledge is irrelevant to GM's scienter.

### D. The Non-Culpable Inference Is More Compelling

At bottom, Plaintiffs have not alleged a culpable inference "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. They ignore seven of the nine *Helwig* factors. *ServiceMaster*, 83 F.4th at 533 (no inference of scienter where "only three of the so-called *Helwig* factors are implicated"). And their attempt to plead the remaining two is inadequate. *See supra* 24–28.

Unique, perhaps, among pleading standards, the Court must weigh culpable and nonculpable inferences on this motion. Here, Plaintiffs do not allege "suspicious insider trading" or that the alleged "misstatements actually increased incentive compensation," which weighs against scienter. *Doshi*, 823 F.3d at 1042. In fact, during the class period, "GM *increased* its investment in Cruise" by $1.35 billion. ¶ 67. It is an illogical theory of fraud that GM would pay an allegedly inflated price if it thought that Cruise's AV technology was not as advanced or safe as claimed. *Doshi*, 386 F. Supp. 3d at 838. GM also repurchased $2.5 billion of its own stock in 2022 alone. Ex. 2 at 94. This too "undermines any inference of scienter." *Id.*; *see*

*also Bldg. Trades Pension Fund of W. Pa.* v. *Insperity, Inc.*, 2022 WL 784017, at *15 (S.D.N.Y. Mar. 15, 2022) ("It would make no economic sense for [defendant] to inflate its stock price, so that, in turn, it could buy its own stock back at a higher, inflated price[.]").

The GM Defendants' scienter is further undermined by the fact that they repeatedly warned investors that Cruise's AV "strategy [was] dependent upon [its] ability to successfully mitigate unique technological, operational, and regulatory risks" and that it "face[d] risks related to the . . . achievement of adequate safety and other performance standards." Ex. 1 at 15 (also noting that "accidents" and "government scrutiny" "could deter consumer adoption of [AV] technology"). In addition, Barra—on the same call as an alleged misstatement—told investors that perfecting AV technology is "really hard," that "there's no way to learn this stuff except by doing it," and that Cruise was continuing to "work on" the issues, including "nuanced interactions with emergency vehicles" and "dealing with damaged and disabled vehicles." Ex. 29 (Sept. 12, 2022 Goldman Sachs Conf.) at 7. It is implausible that GM and its executives would knowingly lie about Cruise's technological progress at the same time as they warned investors about the risks it faced and Cruise was telling the media about its long-term plans for remote assistance. *See, e.g.*, *ServiceMaster*, 83 F.4th at 529 ("disclosures made at earlier times during the Class Period"—even if "general"—were "[c]rucial[]" in showing

31

lack of scienter).

## III.    The Complaint Fails to Plead Loss Causation

The Complaint also fails because it does not allege with particularity that the GM Defendants' purported misstatements "caused" Plaintiffs' alleged losses. *ServiceMaster*, 83 F.4th at 525.  Plaintiffs must plead a "causal link" between released information that "must in a practical sense be new." *In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d 740, 770–71 (N.D. Ohio 2020).  But each of the three alleged corrective disclosures revealed something different than the subject of the statements alleged to be false—so there is an impermissible disconnect fatal to the Complaint.  Many of the "corrective" disclosures also fail as a matter of law because they had already been disclosed, and thus are not "new" news.

**October 24, 2023.**  Plaintiffs allege that the first "corrective" disclosure was the DMV's suspension of Cruise's permits, and a Cruise blog post about the October 2023 crash.  ¶¶ 365–74.  But it was reported weeks before that the Cruise AV had "dragged [the pedestrian] underneath the car for approximately 20 feet" and that Cruise was "accus[ed]" of "telling a half truth" to regulators regarding the crash.  Ex. 30 (Oct. 6, 2023 *Forbes* article); ¶ 235.  The basis for the DMV's suspension and the information in Cruise's post about Cruise allegedly misleading regulators about the collision were "old news" that cannot have caused the alleged loss.  *In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356, 360 (6th Cir. 2014); *TransDigm*, 440

F. Supp. 3d at 771 (no loss causation where disclosure "contained information that was already in the public domain").[15]

And any new information in the disclosures was about "something different" than the alleged misstatements. *In re Washington Prime Grp., Inc. Sec. Litig.*, 2024 WL 1307103, at *14 (S.D. Ohio Mar. 27, 2024). While the "subject of the [allegedly] fraudulent statement[s]" was the Level 4 status of Cruise's AV technology, *id.* at *11, the disclosure addressed the circumstances of the crash and the alleged lack of candor in Cruise's post-crash interactions with regulators. *See* Ex. 32 (DMV Suspension Order). It had nothing to do with whether prior statements about Cruise satisfying Level 4 and operating in a "driverless" manner were accurate.

**October 26, 2023.** The October 26 purported disclosures also fail. Neither the NHTSA letter discussing "hard braking" nor Cruise's announcement that it would "pause driverless operations," ¶¶ 375–76, revealed any falsity of GM's prior statements. *Washington Prime*, 2024 WL 1307103, at *12. Cruise paused driverless operations to "rebuild public trust" after the October crash. ¶ 376. And the subject

---

[15] Plaintiffs also imply that CPUC Decision 20-11-046 was a "disclosure" made on October 24, 2023. *E.g.*, ¶ 367. But Decision 20-11-046 was no such thing: it was a CPUC rulemaking issued on *November 19, 2020*. Ex. 31 (CPUC Decision 20-11-046). Decision 20-11-046 merely provided that a CPUC Driverless AV Deployment Permit would be "suspended immediately" "upon suspension or revocation" of the corresponding DMV Deployment Permit. *Id.* at 138.

of the NHTSA letter was "old news," *KBC*, 572 F. App'x at 360, as the investigation had been revealed months before.  *See* Ex. 20.

**November 8, 2023.**  Plaintiffs allege that the final partial corrective disclosure occurred on November 8, when Cruise announced that it was recalling its AV fleet. ¶ 378.  In reality, this "recall" was a software update with which "the Cruise AV would have remained stationary during the October 2 incident."  Ex. 33 (Cruise-NHTSA Safety Recall Report).  Plaintiffs do not specify what new information was allegedly revealed or how that information corrected any alleged misstatement. Information about the crash was already public, *see supra* 32, and Plaintiffs do not explain how Cruise issuing a recall (a task faced routinely by all auto manufacturers) or taking other actions following the October 2 incident, ¶¶ 379–80, revealed that GM's previous statements about Cruise's AV technology or its safety relative to human drivers were false.  *Washington Prime*, 2024 WL 1307103, at *12.

## IV.    The Complaint Fails to Plead Scheme Liability

Scheme liability under Rules 10b-5(a) and (c) "requires **something beyond misstatements and omissions**[.]"  *SEC* v. *Rio Tinto*, 41 F.4th 47, 49 (2d Cir. 2022); *see also ServiceMaster*, 83 F.4th at 525.  Here, Plaintiffs' allegations of "deceit" and "misconduct" relate **exclusively** to Cruise, *see* ¶¶ 356–64, 467; Plaintiffs allege nothing "beyond misstatements" by the GM Defendants.  *Rio Tinto*, 41 F.4th at 49; *see also Kolominsky* v. *Root, Inc.*, 667 F. Supp. 3d 685, 712 (S.D. Ohio 2023) (no

"meaningful distinction between" misrepresentation and scheme liability theories),

*aff'd,* 100 F.4th 675 (6th Cir. 2024).

## V.   Plaintiffs' Section 20(a) Claims Must Be Dismissed

Absent a predicate violation of section 10(b) or Rule 10b-5, Plaintiffs' claims

under Section 20(a) must also be dismissed.  *Doshi*, 823 F.3d at 1045.[16]

## CONCLUSION

The Court should dismiss the Complaint with prejudice.

DATED:  August 2, 2024                    Respectfully submitted,

                                          /s/Roger P. Meyers
                                          _____
Daniel J. Kramer (N.Y. 1979392)           Stephanie A. Douglas (P70272)
Andrew J. Ehrlich (N.Y. 4103909)          Roger P. Meyers (P73255)
Richard C. Tarlowe (N.Y. 4122677)         **BUSH SEYFERTH PLLC**
Kristina A. Bunting (N.Y. 5510847)
**PAUL, WEISS, RIFKIND,**
  **WHARTON & GARRISON LLP**

                    *Counsel for GM Defendants*

---

[16] The Section 20(a) claim against Barra, Jacobson, and Parks as "Control Persons of Cruise," ¶¶ 479–85, also must be dismissed because the Complaint fails to allege that they (i) "actually participated in (i.e., exercised control over) the operations of [Cruise] in general," and (ii) "possessed the power to control the specific transaction or activity upon which the primary violation is predicated." *Sanders Confectionery Prod., Inc.* v. *Heller Fin., Inc.*, 973 F.2d 474, 486 (6th Cir. 1992).  Jacobson and Parks are not alleged to have had ***any role*** with Cruise, and Barra's role as a Cruise director, without more, is insufficient. *Herm* v. *Stafford*, 663 F.2d 669, 684 (6th Cir. 1981) ("A director of a corporation is not automatically liable as a controlling person.").