Carol C. Villegas (N.Y. 4154324)
Jake Bissell-Linsk (N.Y. 5445911)
Guillaume Buell (N.Y. 4820288)
Matthew J. Grier (N.Y. 5502216)
Adam Federer (N.Y. 5574439)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
cvillegas@labaton.com
jbissell-linsk@labaton.com
gbuell@labaton.com
mgrier@labaton.com
afederer@labaton.com

*Lead Counsel for Lead Plaintiff*
*City of Hollywood Police Officers'*
*Retirement System and the Proposed Class, and*
*Additional Plaintiff Plymouth County Retirement Association*

*[Additional counsel listed on signature page]*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

|  |  |
|---|---|
| IN RE GENERAL MOTORS COMPANY SECURITIES LITIGATION | ) Case No.  4:23-cv-13132-SDK-EAS<br>)<br>) District Judge Shalina D. Kumar<br>) Magistrate Judge Elizabeth A. Stafford<br>)<br>) <u>(Oral Argument Requested)</u><br>) |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS**
**THE AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Pursuant to Rules 7.1(c) and 5.1 of the Local Rules of the United States District Court for the Eastern District of Michigan, Lead Plaintiff City of Hollywood Police Officers' Retirement System and additional named Plaintiff Plymouth County Retirement Association (collectively, "Plaintiffs"), by and through their attorneys, respond to:

(i) Defendants General Motors Company ("GM"), Mary T. Barra, Paul A. Jacobson, and Douglas L. Parks' (collectively, the "GM Defendants") motion to dismiss (ECF No. 31, the "GM Motion" or "GM MTD") Plaintiffs' Amended Consolidated Class Action Complaint (ECF No. 23, the "AC," cited as "¶#"); and

(ii) Defendants Cruise, LLC ("Cruise"), Kyle Vogt, Wayne West, and Daniel Ammann's (collectively, the "Cruise Defendants" and, together with the GM Defendants, "Defendants") motion to dismiss the AC (ECF No. 32, the "Cruise Motion" or "Cruise MTD" and, together with the GM Motion, the "Motions").

The grounds for Plaintiffs' opposition to the Motions are explained more fully below in Plaintiffs' accompanying opposition brief. WHEREFORE, Plaintiffs respectfully request that this Court deny Defendants' Motions in their entirety. In the event that the Court should grant Defendants' Motions, either in whole or in part, Plaintiffs respectfully request any such dismissal be without prejudice so that Plaintiffs may move to cure any defect in the pleadings by amending the pleadings.

1

DATED: October 1, 2024       Respectfully submitted,

*/s/ Jake Bissell-Linsk*
Carol C. Villegas (N.Y. 4154324)
Jake Bissell-Linsk (N.Y. 5445911)
Guillaume Buell (N.Y. 4820288)
Matthew J. Grier (N.Y. 5502216)
Adam Federer (N.Y. 5574439)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
cvillegas@labaton.com
jbissell-linsk@labaton.com
gbuell@labaton.com
mgrier@labaton.com
afederer@labaton.com

*Lead Counsel for Lead Plaintiff*
*City of Hollywood Police Officers'*
*Retirement System and the Proposed Class,*
*and additional named plaintiff Plymouth*
*County Retirement Association*

Matthew Henzi
Cynthia Billings-Dunn
**ASHER KELLY PLLC**
25800 Northwestern Highway, Suite 1100
Southfield, Michigan 48075
Telephone: (248) 746-2710
mhenzi@asherkellylaw.com
cbdunn@asherkellylaw.com

*Liaison Counsel for Lead Plaintiff*
*City of Hollywood Police Officers'*
*Retirement System and the Proposed Class*

2

Robert D. Klausner
Stuart Kaufman
**KLAUSNER, KAUFMAN, JENSEN &
LEVINSON**
7080 Northwest 4th Street
Plantation, Florida 33317
Telephone: (954) 916-1202
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for Lead Plaintiff*

3

**CERTIFICATE OF SERVICE**

I hereby certify that on October 1, 2024, I caused the foregoing paper to be electronically filed with the Clerk of the Court using the ECF system which will send notification of such filing to all parties of record.

DATED: October 1, 2024        Respectfully submitted,

*/s/ Jake Bissell-Linsk*
Jake Bissell-Linsk (N.Y. 5445911)

Carol C. Villegas (N.Y. 4154324)
Jake Bissell-Linsk (N.Y. 5445911)
Guillaume Buell (N.Y. 4820288)
Matthew J. Grier (N.Y. 5502216)
Adam Federer (N.Y. 5574439)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
cvillegas@labaton.com
jbissell-linsk@labaton.com
gbuell@labaton.com
mgrier@labaton.com
afederer@labaton.com

*Lead Counsel for Lead Plaintiff*
*City of Hollywood Police Officers'*
*Retirement System and the Proposed Class, and*
*Additional Plaintiff Plymouth County Retirement Association*

*[Additional counsel listed on signature page]*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

|  |  |
|---|---|
|  | ) Case No. 4:23-cv-13132-SDK-EAS |
|  | ) |
|  | ) District Judge Shalina D. Kumar |
| IN RE GENERAL MOTORS | ) Magistrate Judge Elizabeth A. |
| COMPANY SECURITIES LITIGATION | ) Stafford |
|  | ) |
|  | ) (Oral Argument Requested) |
|  | ) |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS**
**THE AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF ISSUES PRESENTED................................................x

STATEMENT OF CONTROLLING OR MOST APPROPRIATE
    AUTHORITIES ...........................................................................xi

PRELIMINARY STATEMENT ..........................................................1

BACKGROUND ...............................................................................3

LEGAL STANDARDS FOR MOTION TO DISMISS ............................7

ARGUMENT .....................................................................................7

I.      The Technology Statements Were Actionable Fraud........................7

        A.     Defendants' Technology Statements Were False .................8

            1.     Cruise Was Not Ready for Commercialization .........9

            2.     Cruise's AVs Could Not Drive Without Human Input ............12

                a)     Defendants' Reinterpretations Are Meritless .................13

                b)     Cruise's AVs Could Not Drive Fully Autonomously ....19

            3.     Cruise's AVs Were Not "Level 4" ..........................28

            4.     Cruise's AVs Were Not Safer Than Human Drivers................33

        B.     Defendants Made the Technology Statements with Scienter..............35

            1.     Direct Evidence Confirms the Individual Defendants
                 Knew the True State of Cruise's Technology.........................37

            2.     Additional Allegations Further Establish Defendants'
                 Knowledge and Recklessness ....................................43

            3.     Defendants Fail to Proffer a More Compelling Inference.......49

i

C. The Technology Statements Caused Investors Losses ........................51

II. The Accident Statements Were Actionable Fraud .........................................57

    A. Defendants Made the Accident Statements with Scienter ..................58

        1. There Is No Dispute Defendants Acted with Knowledge ........58

        2. Additional Allegations Further Support Scienter .....................61

    B. The Accident Statements Were Made in Connection with the
Purchase of Securities ........................................................................64

        1. The Accident Statements Were Made in Publicly
Accessible Publications and Thus Were Directed At
Investors ..................................................................................64

        2. The Accident Statements Were Important Value Relevant
Lies That Would Influence GM Investors ...............................66

    C. The Accident Statements Caused Investors' Losses ...........................69

CONCLUSION .................................................................................................70

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Ames Dep't Stores Inc. Stock Litig.*,
991 F.2d 953 (2d Cir. 1993) ..................................................................65

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) .......................................50

*Ark. Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
879 F.3d 474 (2d Cir. 2018) ..................................................................65

*Ashland, Inc. v. Oppenheimer & Co.*,
648 F.3d 461 (6th Cir. 2011) .................................................................36

*In re Avon Sec. Litig.*,
2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019).................................41, 47

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)...............................................................................65

*In re BofI Holding, Inc. Sec. Litig.*,
318 F.R.D. 129 (S.D. Cal. 2016) ...........................................................19

*Bond v. Clover Health Invs., Corp.*,
587 F. Supp. 3d 641 (M.D. Tenn. 2022) ..........................19, 36, 41, 45

*Bondali v. Yum! Brands, Inc.*,
620 F. App'x 483 (6th Cir. 2015) ..........................................................41

*Browning v. Amyris, Inc.*,
2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) ......................................46

*Burges v. BancorpSouth, Inc.*,
2015 WL 4198795 (M.D. Tenn. July 10, 2015)....................................36

*In re Cardinal Health Inc. Sec. Litig.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006)...........................................41, 45

*In re Carter-Wallace, Inc. Sec. Litig.*,
150 F.3d 153 (2d Cir. 1998) ..................................................................65

iii

*Chamberlain v. Reddy Ice Holdings, Inc.*,
757 F. Supp. 2d 683 (E.D. Mich. 2010) .......................................................58, 59

*City of Pontiac Gen. Emps.' Ret. Sys.* v. *Stryker Corp.*,
865 F. Supp. 2d 811 (W.D. Mich. 2012) ............................................................38

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
587 F. Supp. 3d 56 (S.D.N.Y. 2022) ............................................................ 67-68

*City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*,
29 F. 4th 802 (6th Cir. 2022) ............................................................................7

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020) .....................................................14, 33, 34

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
22 F.4th 1 (1st Cir. 2021).................................................................................10

*Dailey v. Medlock*,
551 F. App'x 841 (6th Cir. 2014) .......................................................................28

*Di Donato v. Insys Therapeutics, Inc.*,
2017 WL 3268797 (D. Ariz. Aug 1, 2017).........................................................66

*Doshi v. Gen. Cable Corp.*,
823 F.3d 1032 (6th Cir. 2016) .........................................................................40

*Dougherty v. Esperion Therapeutics, Inc.*,
905 F.3d 971 (6th Cir. 2018) ........................................................................59, 64

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005).............................................................................51, 52, 69

*In re Energy Recovery Inc. Sec. Litig.*,
2016 WL 324150 (N.D. Cal. Jan. 27, 2016)......................................................10

*In re Equifax Inc. Sec. Litig.*,
357 F. Supp. 3d 1189 (N.D. Ga. 2019)...............................................................65

*In re Fannie Mae 2008 Sec. Litig.*,
2011 WL 13267340 (S.D.N.Y. Apr. 11, 2011) ...................................................50

iv

*In re FirstEnergy Corp. Sec. Litig.*,
  2022 WL 681320 (S.D. Ohio Mar. 7, 2022)......................................................42

*Foley v. Transocean Ltd.*,
  861 F. Supp. 2d 197 (S.D.N.Y. 2012) ...............................................................60

*In re Ford Motor Co. Sec. Litig.*,
  381 F.3d 563 (6th Cir. 2004) .......................................................................8, 14

*Frank v. Dana Corp.*,
  547 F.3d 564 (6th Cir. 2008) .............................................................................36

*Frank v. Dana Corp.*,
  646 F.3d 954 (6th Cir. 2011) ........................................................35, 36, 42, 63

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ...............................................................52

*In re Galena Biopharma, Inc. Sec. Litig.*,
  117 F. Supp. 3d 1145 (D. Or. 2015) ..................................................................62

*Gauquie v. Albany Molecular Rsch., Inc.*,
  2016 WL 4007591 (E.D.N.Y. July 26, 2016)....................................................43

*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) ...............................................................63

*Handy-Clay v. City of Memphis*,
  695 F.3d 531 (6th Cir. 2012) ...............................................................................7

*Hatamian v. Advanced Micro Devices, Inc.*,
  87 F. Supp. 3d 1149 (N.D. Cal. 2015)..........................................................20, 26

*In re Hayes Lemmerz Int'l, Inc. Equities Sec. Litig.*,
  271 F. Supp. 2d 1007 (E.D. Mich. 2003) ..........................................................19

*Helwig v. Vencor*,
  251 F.3d 540 (6th Cir. 2001) ....................................................................*passim*

*Heritage Glob. Network L.A., Inc. v. Welch*,
  2024 WL 695772 (M.D. Tenn. Feb. 20, 2024).................................................37

v

*I.B.E.W. Loc. 697 v. Limited Brands, Inc.*,
788 F. Supp. 2d 609 (S.D. Ohio 2011) .......................................................*passim*

*Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*,
2021 WL 1316705 (M.D. Tenn. Apr. 8, 2021) ....................................12, 15, 48

*IWA Forest Indus. Pension Plan v. Textron Inc.*,
14 F.4th 141 (2d Cir. 2021) ...............................................................................14

*Jonna v. GIBF GP, Inc.*,
617 F. Supp. 3d 789 (E.D. Mich. 2022) ............................................................36

*Kahn v. Ran*,
2009 WL 1138504 (E.D. Mich. Apr. 27, 2009) .................................................36

*Klein v. Altria Grp., Inc.*,
525 F. Supp. 3d 638 (E.D. Va. 2021) .................................................................67

*La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*,
622 F.3d 471 (6th Cir. 2010) .......................................................................35, 36

*Ley v. Visteon Corp.*,
543 F.3d 801 (6th Cir. 2008) .............................................................................38

*Lindblom v. Mobile Telecomms. Techs. Corp.*,
985 F. Supp. 161 (D.D.C. 1997).........................................................................68

*Loc. 295/Loc. 851 IBT Emp. Grp. Pension Tr. & Welfare Fund v.*
*Fifth Third Bancorp.*,
731 F. Supp. 2d 689 (S.D. Ohio 2010) ..............................................................38

*Lorenzo v. SEC*,
587 U.S. 71 (2019)..............................................................................................70

*MJK Fam. LLC v. Corp. Eagle Mgmt. Servs., Inc.*,
2009 WL 4506418 (E.D. Mich. Nov. 30, 2009)................................................15

*Monk v. Johnson & Johnson*,
2011 WL 6339824 (D.N.J. Dec. 19, 2011).........................................................66

*Morse v. McWhorter*,
290 F.3d 795 (6th Cir. 2002) .............................................................................70

vi

*Naglich v. Applied Optoelectronics*,
　436 F. Supp. 3d 954 (S.D. Tex. 2020)........................................................................60

*In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*,
　541 F. Supp. 2d 986 (S.D. Ohio 2007)......................................................................33

*Nathanson v. Polycom, Inc.*,
　87 F. Supp. 3d 966 (N.D. Cal. 2015)........................................................................62

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
　830 F.3d 376 (6th Cir. 2016) ..........................................................................51, 56, 69

*In re Omnicare, Inc. Sec. Litig.*,
　769 F.3d 455 (6th Cir. 2014) ....................................................................................62

*Padilla v. Cmty. Health Sys., Inc.*
　2022 WL 3452318 (M.D. Tenn. Aug. 17, 2022)......................................................46

*Palazzolo v. Fiat Chrysler Autos. N.V.*,
　2017 WL 6389573 (E.D. Mich. Dec. 14, 2017)......................................................37

*Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*,
　614 F. App'x 237 (6th Cir. 2015) ..............................................................................8

*Pittman v. Unum Group*,
　861 F. App'x 51 (6th Cir. 2021)................................................................................42

*Plagens v. Deckard*,
　2023 WL 2711263 (N.D. Ohio Mar. 30, 2023)........................................................46

*In re Pretium Res. Inc. Sec. Litig.*,
　256 F. Supp. 3d 459 (S.D.N.Y. 2017) ......................................................................60

*In re Proquest Sec. Litig.*,
　527 F. Supp. 2d 728 (E.D. Mich. 2007) ..............................................................56, 70

*In re QuantumScape Sec. Class Action Litig.*,
　580 F. Supp. 3d 714 (N.D. Cal. 2022)......................................................................10

*Reese v. Malone*,
　747 F.3d 557 (9th Cir. 2014) ....................................................................................43

*Roberti v. OSI Sys., Inc.*,
  2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) .......................................................43

*In re Rsrv. Fund Sec. & Deriv. Litig.*,
  732 F. Supp. 2d 310 (S.D.N.Y. 2010) ...............................................................66

*Sapssov v. Health Mgmt. Assocs., Inc.*,
  608 F. App'x 855 (11th Cir. 2015).....................................................................45

*SEC v. Pirate Inv. LLC*,
  580 F.3d 233 (4th Cir. 2009) .......................................................................64, 65

*SEC v. Rana Rsch., Inc.*,
  8 F.3d 1358 (9th Cir. 1993) ...............................................................................65

*Shupe v. Rocket Cos., Inc.*,
  660 F. Supp. 3d 647 (E.D. Mich. 2023) ..........................................18, 38, 41, 65

*South Ferry LP #2 v. Killinger*,
  687 F. Supp. 2d 1248 (W.D. Wash. 2009) .........................................................43

*Strougo v. Tivity Health, Inc.*,
  551 F. Supp. 3d 839 (M.D. Tenn. 2021) ............................................................36

*St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*,
  2021 WL 195370 (M.D. Tenn. Jan. 20, 2021) ...................................................46

*Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*,
  83 F.4th 514 (6th Cir. 2023) ...................................................................41, 46, 51

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)...............................................................................*passim*

*Vanderhoef v. China Auto Logistics Inc.*,
  2020 WL 5105243 (D.N.J. Aug. 31, 2020) ........................................................62

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ..............................................................................14

*Wildes v. BitConnect Int'l PLC*,
  25 F.4th 1341 (11th Cir. 2022) ..........................................................................66

*Wilkof v. Caraco Pharm. Lab'ys, Ltd.,*
   2010 WL 4184465 (E.D. Mich. Oct. 21, 2010)...................................................37

*Winslow v. BancorpSouth, Inc.,*
   2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011) .................................................38

*Yellowdog Partners, LP v. CURO Grp. Holdings Corp.,*
   426 F. Supp. 3d 864 (D. Kan. 2019)............................................................ 46-47

*Zwick Partners, LP v. Quorum Health Corp.,*
   2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018) .................................................38

## Statutes & Rules

Cal. Code Regs. tit. 13, §228.02 ..............................................................................33

Cal. Code Regs. tit. 13, § 228.06 .............................................................................31

## Other Authorities

3 Busse, J. A. & T. Clifton Green, *Market Efficiency in Real Time* 416
   (vol. 65 2002)..................................................................................................65

12 Deshpande, S. & Svetina, M., *Does local news matter to investors?*
   1190-212 (vol. 37 2011) ..................................................................................65

*Intent,* BLACK'S LAW DICTIONARY (12th ed. 2024)..................................................60

**STATEMENT OF ISSUES PRESENTED**

1.      Whether Plaintiffs adequately allege that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, by making false and misleading statements concerning Cruise's Autonomous Vehicle ("AV") technology, including (i) its readiness for commercialization (*e.g.*, that no further R&D was necessary to commercialize the product); (ii) its capabilities of driving "fully autonomously 100% of the time" with humans "out of the loop;" (iii) that it complied with the minimum requirements of established standards defining "Level 4" AVs and regulations governing AVs; and (iv) that Cruise's AVs drove safer than humans.

2.      Whether Plaintiffs adequately allege that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, by making false and misleading statements concerning an October 2, 2023 crash (the "Crash"), wherein a Cruise AV profoundly failed to perform the minimum safety maneuver required by AVs and instead dragged a pedestrian (who was in plain view of its cameras) across the pavement, and then, with full knowledge of these facts, Defendants made and disseminated false and misleading statements that the vehicle properly came to a complete stop.

3.      Whether Plaintiff adequately alleged that the Individual Defendants are liable under Section 20(a) of the Exchange Act as control persons of GM and Cruise.

x

## STATEMENT OF CONTROLLING OR MOST APPROPRIATE AUTHORITIES

**Applicable Statutes and Federal Rules**

The Private Securities Litigation Reform Act of 1995

Securities Exchange Act of 1934, Section 10(b)

Securities Exchange Act of 1934, Section 20(a)

SEC Rule 10b-5

Fed. R. Civ. P. 8

Fed. R. Civ. P. 9(b)

Fed. R. Civ. P. 12(b)(6)

**Cases**

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005)

*Lorenzo v. SEC*, 587 U.S. 71 (2019)

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007)

*Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461 (6th Cir. 2011)

*Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483 (6th Cir. 2015)

*City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F. 4th 802 (6th Cir. 2022)

*Dailey v. Medlock*, 551 F. App'x 841 (6th Cir. 2014)

*Doshi v. Gen. Cable Corp.*, 823 F.3d 1032 (6th Cir. 2016)

*Dougherty v. Esperion Therapeutics, Inc.,* 905 F.3d 971 (6th Cir. 2018)

*In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563 (6th Cir. 2004)

*Frank v. Dana Corp.*, 547 F.3d 564 (6th Cir. 2008)

*Frank v. Dana Corp.*, 646 F.3d 954 (6th Cir. 2011)

*Handy-Clay v. City of Memphis*, 695 F.3d 531 (6th Cir. 2012)

*Helwig v. Vencor*, 251 F.3d 540 (6th Cir. 2001)

*La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471 (6th Cir. 2010)

*Ley v. Visteon Corp.*, 543 F.3d 801 (6th Cir. 2008)

*Morse v. McWhorter*, 290 F.3d 795 (6th Cir. 2002)

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376 (6th Cir. 2016)

*In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455 (6th Cir. 2014)

*Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*, 614 F. App'x 237 (6th Cir. 2015)

*Pittman v. Unum Grp.*, 861 F. App'x 51 (6th Cir. 2021)

*Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514 (6th Cir. 2023)

*In re Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d 953 (2d Cir. 1993)

*In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189 (N.D. Ga. 2019)

*SEC v. Pirate Inv. LLC*, 580 F.3d 233 (4th Cir. 2009)

*SEC v. Rana Rsch., Inc.*, 8 F.3d 1358 (9th Cir. 1993)

xii

## PRELIMINARY STATEMENT

Defendants repeatedly touted the capabilities and safety of Cruise's AV technology.[1]  The technology was nowhere near as advanced as Defendants claimed. The fraud unraveled in the aftermath of a Crash in which a Cruise AV struck and then dragged a pedestrian down the street, injuring her.  Following this incident, which risked exposing the deficiencies of Cruise AVs, Defendants doubled down by misrepresenting the circumstances of the Crash.  When the truth about Cruise's AVs and the Crash were finally revealed, investors suffered substantial losses.

The two elements of a securities fraud claim that are typically challenged on a motion to dismiss (falsity and scienter), cannot seriously be disputed in this case:

**First**, Defendants concede that many of their statements were misleading, including (a) representations that Cruise AVs were ready for commercialization without any additional R&D; (b) the claim that Cruise AVs could drive with "human[s] out of the loop;" and (c) all alleged misstatements concerning the Crash.

**Second**, the allegations that Defendants knew the true facts that differed from their public statements are essentially unopposed.  Defendants admit to knowing the truth concerning the Crash, and attorneys that GM retained in the aftermath of the Crash meticulously documented Defendants' knowledge.  The technological

---

[1] Unless otherwise noted, all emphasis is added, and internal citations and quotations have been removed.  Terms not defined herein are defined as in the AC.

1

deficiencies detailed in the AC were central to the design of Cruise's AV operations—*e.g.*, reliance on an army of remote operators who directed the AVs every few miles for minutes on end. Humans were very much "in the loop," and Defendants cannot deny knowing these facts. Likewise, Defendants do not seriously dispute the AC's allegations that frequent vehicle failures, erratic performance, and documented but unresolved persistent safety issues were known to Defendants.

As a result, Defendants are left raising outlandish arguments that cannot support their Motions. On scienter, they dispute motive, though where knowledge is adequately pled, like here, allegations of motive are irrelevant. They argue that the terms "fully driverless" and "fully autonomous," solely indicated the absence of an in-car driver. This reinterpretation contravenes the plain meaning of their misstatements, ignores the context and definitions they provided during the Class Period, and asks the Court to improperly endorse Defendants' factual judgment about this interpretation at the pleading stage. Similarly, Defendants rely on an erroneous view of the minimum requirements of a "Level 4" AV, to argue that their misrepresentations about the specific capabilities of Cruise AVs should be ignored.

Defendants also lob Hail Mary attempts to challenge loss causation, though the requisite plausible allegations of loss are easily satisfied by the AC. And as a last-ditch effort to avoid liability for their misstatements about the Crash, Defendants badly misconstrue settled law concerning the "in connection with" requirement.

2

**BACKGROUND**

Cruise is a majority-owned subsidiary of GM. ¶26. It was referred to in GM's public filings as "GM Cruise" and GM's "global segment responsible for the development and commercialization of [AV] technology." ¶48. Cruise's AV technology was paramount to the future of GM. ¶387. Cruise was valued at approximately $30 billion, which was more than half of GM's market capitalization, and GM publicly projected that Cruise had the potential to deliver $50 billion in annualized revenues by the end of the decade. *Id.*

Defendants claimed that Cruise's AV technology had reached the point where Cruise could already operate a revenue generating, fully driverless robotaxi business without any additional research and development ("R&D"). For example, then-CEO of Cruise Daniel Ammann stated that Cruise had exited the "R&D phase," by "solv[ing] that engineering challenge of a generation of building a self-driving system that can drive with a human or better level of performance," and that this achievement "marked the beginning" of Cruise's pivot to "commercialization." ¶278. Similarly, Ammann's successor as CEO, Kyle Vogt, stated that "from a technical standpoint, there's basically zero incremental work to get to revenue." ¶304. Commercializing its AVs was the entire purpose of Cruise, and its massive contribution to GM's valuation depended on its ability to do so. ¶¶26, 49.

3

Defendants also misleadingly claimed Cruise AVs could drive safely, reliably, and legally without input from humans.  Ammann, for example, claimed Cruise AV's "can operate without a human in the loop now." ¶284.  Similarly, Defendants described Cruise AVs as "fully autonomous," "fully driverless," and "truly driverless." *E.g.,* ¶¶276-80, 290-98, 324-26.

Cruise also described its AVs as having reached "Level 4" autonomy, which is a reference to the five levels of autonomy defined by the Society for Automotive Engineers Taxonomy (the "Taxonomy").  ¶¶274, 290, 308, 344, 348, 350.  Cruise publicly explained, during the Class Period, that there was an "essential expectation" that an AV referred to as "Level 4" or "fully driverless" must be "capable of driving fully autonomously 100% of the time." ¶80.  Finally, throughout the Class Period, Defendants repeatedly claimed that Cruise's AV technology was already safer than a human driver.  ¶¶266, 268, 354.

These representations were false and misleading.  The AC contains detailed allegations from former Cruise and GM employees serving as confidential witnesses ("CWs"), media reports, and complaints submitted to the California Department of Motor Vehicles (the "DMV") attesting to persistent and severe problems with Cruise AVs.  These CW allegations show that Cruise AVs could not operate without frequent input from humans, and they could not operate as functional vehicles, even with human assistance—*i.e.*, they did not drive safely, reliably, or legally.

For example: (i) Cruise relied on humans to remotely operate its AVs; (ii) Cruise AVs stalled or failed frequently, requiring physical retrieval by humans; (iii) Cruise AVs failed to reliably recognize and drive safely around children; (iv) Cruise AVs engaged in unsafe and erratic driving, and safety concerns went unresolved; (v) this unsafe and erratic driving caused numerous crashes; and (vi) Cruise AVs suffered from additional functionality and safety problems such as an inability to consistently recognize pedestrians or large holes in the road.  ¶¶95-220.

The fraud unwound following a grisly crash on October 2, 2023.  That evening, a human-driven vehicle struck a pedestrian in San Francisco, launching her into the pathway of a Cruise AV in the adjacent lane.  ¶194.  The AV then hit the pedestrian and came to an initial stop, pinning her beneath it.  *Id*.  While the Cruise AV's camera could see the pedestrian, it began driving again with the pedestrian underneath—dragging her down the street and causing serious injuries.  ¶¶194, 219.

Within hours, high-ranking Cruise executives, including Cruise's then-CEO and CTO Kyle Vogt, became aware of these details.  ¶¶226-30.  Vogt, Cruise, and GM, however, made the conscious decision to misrepresent the circumstances of the Crash to the public by disseminating incomplete video footage and issuing media statements claiming the AV had come to a complete stop upon impact, while concealing that it had continued driving while dragging the pedestrian.  ¶¶356-64.

5

The truth was revealed through three corrective disclosures (October 24, October 26, and November 8, 2023), which caused GM's stock price to plummet and investors to suffer substantial losses.  ¶¶365-82.

These disclosures revealed that Cruise's AV had dragged the pedestrian rather than safely coming to a stop. *Id.*  They also revealed that the DMV was suspending Cruise's AV permits—the DMV found the AV's posed an "***unreasonable risk to public safety***."  ¶195.  Likewise, it was revealed that federal authorities were investigating Cruise, and that Cruise was pausing all AV operations nationwide, recalling its entire fleet, conducting an investigation led by an engineering firm, Exponent, searching for a Chief Safety Officer, and overhauling its internal processes relating to safety, transparency, and community engagement. ¶¶365-82.

After the Class Period, Cruise released a report by the law firm Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emmanuel"), which investigated the Crash and laid out the facts (the "Quinn Report").  ¶¶249-53.  It found that Vogt spearheaded the dissemination of the misstatements concerning the Crash ***after*** he knew the truth. *Id.*  Cruise publicly accepted "Quinn Emanuel's conclusions." ¶249.

As of the filing of the AC, Cruise had not restarted its "driverless" AV program. ¶199.  Strikingly, an administrative law judge has ruled that Cruise made "misleading" statements in the context of its disclosures to regulators about the Crash and that by "withholding information . . . Cruise misled the DMV." ¶248.

6

## LEGAL STANDARDS FOR MOTION TO DISMISS

"A securities-fraud claim under § 10(b) requires (1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) upon which the plaintiff justifiably relied, and (5) which proximately caused the plaintiff's injury." *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F. 4th 802, 810 (6th Cir. 2022).

In assessing a motion to dismiss, a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012). This remains true in Private Securities Litigation Reform Act of 1995 ("PSLRA") cases (*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)), though heightened standards are discussed herein.

## ARGUMENT

## I.    THE TECHNOLOGY STATEMENTS WERE ACTIONABLE FRAUD

Defendants misrepresented the capabilities and safety of Cruise AVs, inflating GM's stock price and causing investor losses. *See* ¶¶266-355 (the "Technology Statements").[2] Defendants challenge falsity, scienter, and loss causation.

---

[2] Conduct by Vogt, Ammann, West, and Barra is imputed to Cruise by virtue of their positions at Cruise; conduct by Barra, Jacobson, and Parks is imputed to GM by virtue of their positions at GM; and conduct by Cruise is imputed to GM by virtue of GM's ownership and Cruise's role as a core business segment of GM. ¶¶260-61.

7

## A.      Defendants' Technology Statements Were False

One who speaks on a subject "assumes a duty to speak fully and truthfully on that subject." *Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*, 614 F. App'x 237, 242 (6th Cir. 2015) (cleaned up); *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 569 (6th Cir. 2004) (One "cannot choose half-truths."). Yet, Defendants engaged in a years-long fraud to overstate the capabilities and safety of Cruise's AV technology.

Defendants claimed that Cruise had accomplished the "engineering challenge of a generation" by developing "*fully* driverless" AVs that operated with "human[s] out of the loop," could drive "fully autonomously 100% of the time" at a safer-than-human level, and met the minimum definition of "Level 4" autonomy. ¶¶80-81. Thus, they told investors that, having completed all necessary R&D, Cruise was shifting to commercializing its business, which was valued at about $30 billion. ¶¶49, 387.

In reality, Cruise AVs: (i) relied on an army of remote human operators intervening every 2.5 to 5 miles; (ii) regularly stalled out, requiring retrieval by humans; (ii) could not drive safely around children; (iv) engaged in facially unsafe and erratic driving, resulting in many documented but unresolved safety issues; (v) experienced other critical functionality and safety problems; and (vi) caused numerous crashes, including the October 2 Crash, which prompted regulatory action and the suspension of all of Cruise's "driverless" operations. *See* Section I.A.2.b.

Defendants' "falsity" arguments are meritless.  Indeed, Defendants do not even address key misstatements (*e.g.*, those touting Cruise's readiness for commercialization and those claiming humans were "out of the loop").  As to those they do address, Defendants do not seriously dispute Plaintiffs' depiction of the undisclosed true condition of Cruise's technology.  Rather, they primarily raise unpersuasive and premature fact disputes about the meaning of those misstatements.

### 1.    Cruise Was Not Ready for Commercialization

Defendants explicitly claimed that Cruise's AV technology had reached the point where Cruise could already operate a revenue generating fully driverless robotaxi business without any additional R&D.  ¶¶278, 286, 304, 306, 330.

On October 6, 2021, Ammann stated that "late last year," Cruise had "reached th[e] threshold" of exiting the "R&D phase," which "was all about building up the core technology and trying to solve that engineering challenge of a generation of building a self-driving system that can drive with a human or better level of performance," adding that this has allowed Cruise to enter the "commercialization" phase. ¶278; *see also* ¶286 (similar).  Likewise, on March 10, 2022, Vogt stated that "from a technical standpoint, there's basically zero incremental work to get to revenue" (¶304) and distinguished Cruise from competitors "that are somewhere still in the R&D phase" (¶306).  On September 12, 2022, Vogt reiterated that Cruise "crossed that critical inflection point," of exiting the "R&D phase." ¶330.

9

In sum, Defendants claimed Cruise's AV technology was ready for primetime, and that it was already good enough to begin operating, and scaling up, as a lucrative robotaxi business. ¶79. Courts regularly find similar statements actionable. *E.g.*, *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 739 (N.D. Cal. 2022) (finding actionable statements claiming QuantumScape's batteries were "ready for commercialization" due to having solved the underlying technological challenges); *Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 5, 7 (1st Cir. 2021) (finding actionable statement touting marketability of software when, in reality, it "was not ready and should not be running"); *In re Energy Recovery Inc. Sec. Litig.*, 2016 WL 324150, at *17 (N.D. Cal. Jan. 27, 2016) (finding actionable statement touting products as "commercial" while they were still suffering from "serious technical difficulties").

Investors believed Defendants' statements. For example, on October 6, 2023, BofA Global Research stated that "[a]mong the most notable of updates from [GM] . . . was around its Cruise business, which has moved from R&D phase . . . to early commercialization." ¶81. The next day, JPMorgan recounted that Cruise had "advanced from the 'R&D Phase'" and was now in the "[c]ommercialization phase." *Id*. Also on October 7, 2023, RBC described Cruise's progress in achieving "low-cost generalized autonomy," commenting on its success "solv[ing] performance (L4/5 with human out of the loop)," and noting it was now "optimiz[ing] cost." *Id*.

10

Cruise was nowhere near ready for commercialization. Cruise AVs required near-constant human input and were subject to a litany of safety and performance issues, many of which were studied and documented internally but not resolved. *See* Section I.A.2.b. The DMV found that Cruise AVs posed an "unreasonable risk to public safety." ¶195. Cruise's AV did not even meet the minimum requirements for a Level 4 AV system, as needed to legally operate. *See* Section I.A.3.

While an AV operating even momentarily without an onboard driver is a neat technological feat, commercialization required ***much*** more. Cruise publicly acknowledged (i) the "essential expectation" that Cruise AVs "*must be capable of driving fully autonomously 100% of the time,*" that (ii) "[d]riving the car autonomously 90% of the time . . . would be disastrous," and (iii) that "conquering" that last 10% involves 90% of the total effort. ¶80. By representing that commercialization required no additional R&D, Defendants were claiming Cruise had conquered that last 10%. Indeed, as Barra stated, the AV technology has "got to be able to do everything" and "not just [] 98% of what you see." *Id.*

Through its actions Cruise has all but admitted it was nowhere near commercialization. After the October 2 Crash, Cruise recalled its entire fleet and halted all public testing of its AVs without an in-car driver. ¶¶195-205; ¶18 (still halted). This is telling, as Cruise was focused on securing a first mover advantage. ¶¶49-52, 68. If Cruise was ***already*** able to commercialize back in October 2021,

11

Cruise would not have taken its cars off the road while its competitors gained ground. The public explanation for this long delay is that Cruise needed to continue developing its technology to regain public trust (*e.g.*, ¶¶201, 205), which is a clear admission that it was not ready for commercialization.  Indeed, Cruise subsequently stated it was still working to figure out what was "***needed*** to relaunch," another clear admission that it previously was not actually ready to commercialize.  ¶207.

Defendants offer ***no response*** denying ***or even addressing*** the misrepresentations discussed in this subsection.[3]   Thus, they concede both (i) Plaintiffs' interpretation of these statements and (ii) that Cruise was not ready for commercialization.  Defendants cannot raise new arguments on reply and thus the Court should sustain these statements.  *See Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2021 WL 1316705, at *4 (M.D. Tenn. Apr. 8, 2021) (collecting cases).

### 2.    Cruise's AVs Could Not Drive Without Human Input

Defendants used a variety of terms to convey the reoccurring false narrative that Cruise's AVs could drive safely and appropriately without human input.  For example, on October 6, 2021, Ammann claimed that Cruise's AVs operated with

---

[3] While certain of these statements include language describing Cruise AVs as "fully driverless" and operating "with a human or better level of performance" (¶¶278, 286), Defendants' arguments addressing those terms do not address these misstatements for what they indicated about Cruise's ability to enter commercialization.  Nowhere do Defendants address ***anything*** in Vogt's statement that claiming no additional technical work was needed.  ¶304.

"the human out of the loop" (¶282) and that "we have a system that can operate without a human in the loop now" (¶284).   Similarly, Defendants repeatedly described Cruise AVs as "fully autonomous," "fully driverless," "full driverless," and "truly driverless."  ¶¶276, 278, 280, 290, 292, 294, 296, 298, 302, 310, 312, 316, 320, 324, 326, 332, 336, 340, 346.  Defendants also described Cruise AVs as having "Level 4" autonomy.  ¶¶274, 290, 308, 344, 348, 350.

Defendants also went further to clarify what these phrases meant.  *E.g.*, ¶80 (Cruise: "Level 4" and "fully driverless" "communicate an essential expectation" that the technology is "capable of driving ***fully autonomously 100% of the time***."); *id.* (Barra: Cruise AVs must "handle the solutions it's going to see on the road ***in all cases, not just what's 98% of what you see.  It's got to be able to do everything***."). With each of these terms, Defendants ultimately conveyed that the AVs could drive safely, reliably, and legally without human input, and could do so "100% of the time."  ¶¶80, 262.  Investors believed these claims.  For example, Morningstar repeated in its analyst reports no less than ***seven*** times during the Class Period that Cruise AVs could operate "without remote assistance or a safety driver."  ¶81.

### a)      Defendants' Reinterpretations Are Meritless

While ignoring key misstatements, Defendants broadly argue that references to Cruise's "driverless" capabilities exclusively meant the AVs operated without an in-car safety driver.  GM MTD at 19-22.  This argument fails for four reasons.

13

**First**, attempts to reinterpret these statements, at most, raise a factual dispute that cannot be grounds for dismissal at this stage. *See City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.* ("*WWE*"), 477 F. Supp. 3d 123, 130 (S.D.N.Y. 2020) ("[R]ather than resolve [a] factual dispute" over the meaning of the word "renewal," the court "must assume" the meaning asserted in the complaint at the motion to dismiss stage.). Thus, the Court must reject Defendants' "benign reading of [their] statements" and sustain Plaintiffs' allegations. *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 147 (2d Cir. 2021) ("[T]he District Court in effect required [plaintiffs] to show that [their] reading was superior to the court's own benign reading of those statements—a requirement we have described as error.").

This rule follows from the more general one that on a motion to dismiss all facts must be interpreted in Plaintiffs' favor. *See Tellabs*, 551 U.S. at 322 ("[C]ourts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true."). Moreover, courts recognize that even literally true statements may be misleading when they foster a perception that differed from the truth. *See Ford*, 381 F.3d at 569 ("half-truths" actionable); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016) ("The law is well settled . . . half-truths—literally true statements that create a materially misleading impression—support claims for securities fraud.").

14

**Second**, while Defendants attempt to dispute the meaning of some of their statements, they do not even address the two most direct ones. Specifically, at GM's October 6, 2021 Investor Day, Ammann claimed that Cruise's AV technology had reached the point where "we can take ***the human out of the loop***" and "we have a system that can operate ***without a human in the loop now***." ¶¶282, 284. These statements obviously did not merely convey the absence of a safety driver.

The reference to "the loop" (i) acknowledges that it would be relevant to assessing the technology if humans were involved in operating the AVs (*i.e.*, "in the loop") even if not sitting behind the wheel in-car and (ii) expressly assured investors that Cruise's AV technology did not rely on humans in that "loop." Indeed, analysts shared this interpretation—for example, immediately after Amman's statement, Morningstar began noting that the AVs could drive "without remote assistance." ¶81. Thus, because Defendants have no response to these October 6, 2021 statements, at a minimum, they must be credited as carrying the meaning Plaintiffs assert. *AAC Holdings*, 2021 WL 1316705, at *4 (no new arguments on reply). ***Furthermore***, these unaddressed statements provide context to the ones Defendants do address. *MJK Fam. LLC v. Corp. Eagle Mgmt. Servs., Inc.*, 2009 WL 4506418, at *7 (E.D. Mich. Nov. 30, 2009) (a court "must look at the statements in light of the circumstances and events that create the context in which they were made").

15

**Third**, Defendants' primary argument that their misstatements merely conveyed the absence of a safety driver is unpersuasive and logically fallacious.

Defendants do not *even* try to interpret the actual language alleged to be misleading, but instead argue that because Cruise separately often talked about the absence of a safety driver, their statements here could only reflect that representation.  GM MTD at 19-22.  In essence, Defendants have identified statements concerning the absence of safety drivers—statements (or aspects of statements) that Plaintiffs do not allege are materially misleading—and seek to impute their meaning onto the alleged misleading statements.  That Defendants did not lie with every word they uttered does not negate securities fraud.

The language Defendants cite does nothing to contextualize their misstatements.  Defendants point to Barra's statements on a *pre-Class Period* earnings call, where Barra noted that Cruise AVs do not have a safety driver (GM MTD at 19-20), three statements noting that California's driverless permits allow Cruise AVs to operate without in-car drivers (¶¶272, 292, 302), and one statement by Parks describing his experience of riding in an AV with "[n]o driver in the car" (¶294).  GM MTD at 20.  None of these statements function to *define* "fully driverless," but were merely describing one aspect of these "fully driverless" cars.

Defendants' interpretation is inconsistent with the plain text of their misstatements **and** the statements that actually do contextualize those misstatements.

16

Plaintiffs do not challenge statements merely mentioning "driverless" AVs, but those claiming the AVs were "fully driverless," "fully autonomous," etc., and the terms "fully" would be superfluous if Defendants interpretation were adopted.

The relevant context are those statements in which Defendants described what their "fully driverless" AV could do.  For example, Barra's statement that the AV technology must "be able to do everything," "not just [] 98% of what you see"—a statement Defendants tellingly ignore—obviously stated "fully driverless" and similar phrases meant much more than the mere absence of a safety driver.  ¶80.

Most strikingly, Cruise stated in a blog post that "fully driverless" AVs "*must be capable of driving fully autonomously 100% of the time*" (*id.* (emphasis in original)), not just that they lacked an in-car safety driver.  Here, Defendants suggest the "rest of the blog post" provides other context.  GM MTD at 15.  But the only context they identify, is that the blog post noted that Level 2 and Level 3 AVs require "an alert safety driver" and that Level 4 AVs do not. *Id.*  This by no means suggested that the only definitional requirement of a Level 4 AV was the absence of  an "alert safety driver" or that any AV without one was Level 4 or "fully driverless."

**Fourth**, Defendants' only remaining argument here is that the Taxonomy and California regulations contemplate remote operators and that other disclosures by Defendants revealed to the market that humans were involved in operating Cruise's AVs.  GM MTD at 13-15.  However, as thoroughly discussed in Section I.A.3,

17

Cruise's reliance on human input in the operation of its AVs was plainly inconsistent with the Taxonomy and California regulations.

Defendants' attempted "truth on the market" arguments are meritless.  For example, in a single sentence, Defendants reference a passage buried in a PDF Cruise published, mentioning certain roles humans played in Cruise's operations.  GM MTD at 14-15.  But truth-on-the-market arguments cannot support dismissal because they depend on establishing that the truth was conveyed with sufficient force and clarity to counteract Defendants' misstatements.  *See Shupe v. Rocket Cos., Inc.,* 660 F. Supp. 3d 647, 671 (E.D. Mich. 2023).  This requires factual judgment that cannot be resolved at this stage.  *See id.* ("the Sixth Circuit has not applied the truth-on-the-market defense" and "[e]ven if it had, truth on the market is an issue for the trier of fact").  Here, *even if* one interpreted the language buried in Cruise's PDF to disclose the truth,[4] Defendants do not establish, as a matter of law, that it was sufficiently clear or strong.  Such a conclusion is belied by the fact that analysts believed Cruise's AVs operated "without remote assistance or a safety driver."  ¶81.

---

[4] Cruise's PDF did not detail that remote employees would perform dynamic driving tasks (*i.e.*, real-time driving), and *certainly* did not convey the frequency or extent of its reliance on this remote support.  *See* ECF No. 31-23 at 112-115 (detailing four roles for remote persons as (i) "[a]dvisor[s]," who could "confirm" information for the AV system, as opposed to operating the AV; (ii) customer service staff; (iii) incident response staff to respond *after* situations were handled by the AV; and (iv) emergency advisors, who acted as 9-1-1 conduits upon crashes and similar events).

18

### b)      Cruise's AVs Could Not Drive Fully Autonomously

Cruise AVs relied on an army of remote and in-person human operators, and failed to drive safely or reasonably even with this support, resulting in numerous crashes, including the October 2 Crash.  While Defendants raise a few meritless critiques, they do not seriously contest that the AC accurately depicts the true state of the AVs during the Class Period.  If Plaintiffs' interpretations of Defendants' Technology Statements are accepted, there is no basis to deny that Plaintiffs have adequately alleged they were false and misleading.

The AC contains detailed allegations from CWs,[5] media reports, and reports submitted to the DMV attesting to persistent and severe problems with Cruise's AVs.  The allegations show that Cruise's AVs could not operate without frequent input from humans, and they could not drive appropriately, even with human assistance—*i.e.*, they did not drive safely, reliably, or legally.

**Cruise relied on an army of humans who remotely operated the AVs.**  On November 3, 2023, *The New York Times* reported that Cruise AVs in San Francisco "were supported by a vast operations staff, with 1.5 workers per vehicle," who

---

[5] CWs are "ubiquitous" in securities litigation. *In re BofI Holding, Inc. Sec. Litig.*, 318 F.R.D. 129, 130 n.2 (S.D. Cal. 2016).  Where, like here, CWs are described with sufficient detail to support the probability that they would possess the information alleged, CW allegations should be credited. *In re Hayes Lemmerz Int'l, Inc. Equities Sec. Litig.*, 271 F. Supp. 2d 1007, 1016 n.8 (E.D. Mich. 2003).  Courts further credit CW allegations where, like here, they are corroborated by other CWs or reports. *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 650 (M.D. Tenn. 2022).

"intervened to assist the company's vehicles every 2.5 to 5 miles." ¶173-74. After publication, Vogt confirmed that Cruise had a large staff of remote operators, and admitted that Cruise AVs initiate a remote assistance "session" every 2.5 to 5 miles and "are being remotely assisted (RA) 2-4% of the time" when the AV is "in driverless mode." ¶175. *See Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1160 (N.D. Cal. 2015) ("later admissions" support falsity). Vogt's admissions are consistent with CW allegations that detail frequent and extensive involvement by remote operators. *E.g.*, ¶106 (CW-1); ¶119 (CW-2).

To be clear, reliance on remote operators 2-4% of the time reflects an incredible reliance on remote operators in complex situations. If a taxi driver warned that his brakes fail 2-4% of the time, no one would get in his car. Indeed, Defendants recognized that Cruise AVs must work "100% of the time," that driving autonomously only 90% of the time would be "disastrous," and that Cruise's AV technology must work "in all cases, not just [] 98% of what you see." ¶80.

These remote operators were far more than safety monitors or fleet managers. As CW-2 recounted, they manually directed AVs from their computers, for example, by directing them to go around objects, go into reverse, and make U-turns, which could take several minutes to complete. ¶119. In essence, then, Cruise AVs were driven by remotely-located humans up to 4% of the time they were in operation.

20

**Cruise AVs failed frequently, requiring physical retrieval by humans**. CW-1 provided Plaintiffs with an email he wrote to the California Public Utilities Commission ("CPUC") in 2022 stating that "*with regularity,*" Cruise AVs would get "stranded, often in lanes where they are blocking traffic and potentially blocking emergency vehicles," requiring the AVs to be either "remotely assist[ed]" or "physically towed" by humans.  ¶¶104-06.  Similarly, CW-2 detailed that Fleet Service Representatives waited around San Francisco to physically retrieve and drive malfunctioning cars, which they did "*almost every night*."  ¶120.  Other CWs confirm Cruise AVs failed frequently and required retrieval.  *E.g.*, ¶¶127, 146 (CW-3: Cruise AVs failed "quite frequently"; CW-5: Cruise sought to add functionality in spring 2023 to recover frequently failing vehicles).

Reports confirm that Cruise AVs frequently failed, necessitating human retrieval.  *E.g.*, ¶188 (*Tech Crunch*: "Cruise robotaxis stopped operating and sat in a street . . . blocking traffic for a couple of hours until employees arrived and manually moved the [AVs]"); ¶191 (*CNBC*: Cruise AVs stopped and caused a traffic jam).

**Cruise AVs could not reliably recognize and drive safely around children**. On November 6, 2023, *The Intercept* reported that internal Cruise documents revealed that Cruise AVs "have so much trouble recognizing children in certain scenarios that they risked hitting them."  ¶176.  The article included an admission by Cruise that Cruise had performed an "internal assessment" in the summer of 2023

21

concluding that "the risk of the potential collision with a child could occur once every 300 million miles at fleet driving." ¶178. As the AC sets forth, if this statistic were mapped onto the US driving public (which travels over three trillion miles each year), it would result in ***Cruise AVs hitting children over 27 times per day***.[6] *Id*.

Post-Class Period media coverage confirms the danger Cruise AVs posed to children, including articles detailing that Cruise (i) had been requested to suspend operations in Austin, Texas on Halloween to lower the risk of hitting trick-or-treaters (¶182); and (ii) was accused of nearly hitting children in two separate close calls one day apart, and had been recorded behaving similarly before (¶¶183-84).

**Cruise AVs persistently engaged in facially unsafe and erratic driving, and safety concerns went unresolved**. CW-4 recounted that Cruise AVs would "randomly" hard brake or "jolt" "all the time," and could not gauge the speed of cars across from them in an intersection when taking an unprotected left turn and would yield to oncoming traffic, stopping in the middle of an intersection. ¶¶137-38. Similarly, CW-3 recalled that Cruise AVs made "questionable" unprotected left turns and there were instances towards the end of 2022 when Cruise AVs would take wide right-hand turns such that the AV would nearly go into another lane. ¶¶130-

---

[6] Defendants assert that Plaintiffs' extrapolation is inappropriate because there are "no facts showing that AVs' experiences in a dense urban environment are representative of nationwide driving statistics." GM MTD at 22-23. This observation misses the point, which is that Cruise AVs were unsafe and had an unreasonably high likelihood of crashing into children.

31; s*ee also* ¶159 (CW-7: AV test drivers regularly described their rides as "dangerous," reporting near misses with pedestrians and hitting curbs).  And, as described above, Cruise AVs frequently failed in traffic and could not recognize children.  Further, safety issues were logged or raised but were not resolved.  *E.g.*, ¶¶98-99 (CW-1: Cruise downplayed concerns internally, and seemingly did not timely address safety tickets); ¶116 (CW-2: Safety Risk Assessments, which identified high levels of risks, were logged but not mitigated); ¶140 (CW-4: Cruise employees tracked malfunctions, but problems persisted and did not get fixed).

Media reports and reports received by the DMV also detail erratic and unsafe driving by Cruise AVs.  *E.g.*, ¶166 (September 2020 DMV complaint: "the cars regularly malfunction"; they "break hard unexpectedly a lot and are frequently rearended"; "many instances of the car stopping unexpectedly for no discernible reason"); ¶171 (May 2021 DMV complaint: Cruise AV "[s]lowing to stop where there was no" reason and "making a mess of traffic"); *Id.* (June 2022 DMV complaint: Cruise AV "pulled into the wrong lane and started going back and forth and wreaking havoc"); *Id.* (May 2022 DMV complaint: dangerous encounters with Cruise AVs that were reported to Cruise); ¶192 (August 2023, *Tech Crunch*: DMV investigating "recent concerning incidents" involving Cruise AVs in San Francisco and requested that Cruise reduce its fleet until the investigation was complete).

23

**Cruise's unsafe and erratic driving caused numerous crashes**.  CWs recalled multiple instances where unsafe driving by Cruise AVs caused crashes.  *E.g.*, ¶129 (CW-3: Cruise AV "banged" into a municipal vehicle and just stopped; issues like this were a "daily occurrence"); ¶153 (CW-6: recalling a "long track record" of "really bad accidents" that ultimately involved intervention from San Francisco emergency services).  Reports also detailed crashes caused by Cruise AVs.  *E.g.*, ¶167 (October 2020 DMV complaint: Cruise AV made "an erratic and high[ly] unpredictable stop" causing a crash); ¶173 (November 2023, *New York Times*: describing multiple collisions); ¶193 (April 2024 labor union statement: Cruise has a "deeply troubling record of dangerous incidents," including where "vehicles left a pedestrian grievously injured, collided with fire trucks, blocked waste trucks, nearly collided with children in two separate incidents, caused a massive traffic jam outside of a music festival, and triggered a 20-car pileup in a tunnel.").

**Cruise AVs suffered from additional functionality and safety problems**.  CWs recounted numerous other problems.  CW-3 recalled that there was an issue where Cruise AVs drove "off map" and Cruise was unaware of their locations, and Cruise AVs struggled with "simple things" such as a "big splash" of water hitting the car, thinking it was an accident.  ¶¶132-33; s*ee also* ¶151 (CW-6: Cruise AVs did not respond correctly to novel situations).  DMV and media reports confirm that Cruise AVs suffered from other problems, like an inability to recognize pedestrians

24

or large holes in the road. *E.g.*, ¶168 (fall 2020 DMV complaint: Cruise AV technology "is not sufficient to recognize nor yield to a pedestrian in an AV mode"); ¶176 (November 2023, *Intercept*: "Driverless Cruise cars struggled to detect large holes in the road"); ¶¶184-85 (February 2024, *NBC News*: regulators obtained video of a Cruise AV accelerating toward four pedestrians, and the NHTSA was "investigating at least four incidents involving Cruise vehicles and pedestrians").

**The October 2 Crash and its aftermath support that Cruise AVs could not drive safely, reliably, and legally without input from humans**. When the DMV suspended Cruise's driverless permit on October 24, 2023, the DMV stated that it was doing so because it had determined that "the manufacturer's vehicles are not safe for the public's operation." ¶¶194-95. The CPUC also suspended Cruise's permit to offer rides without an in-car safety driver. ¶198. As of the filing of the AC—over six months after the DMV's and the CPUC's suspensions—Cruise's permits have not been reinstated. ¶199.

Cruise's self-imposed suspensions and recalls also support that Cruise AVs were deficient. Specifically, Cruise has (i) "pause[d] driverless operations across all [its] fleets" (¶201); (ii) issued a recall impacting its entire US fleet of AVs in light of the "[d]efect" that caused the October 2 Crash (¶202); and (iii) "paus[ed] our supervised and manual AV operations in the US" such that Cruise would only "operate [its] vehicles in closed course training environments," meaning Cruise AVs

were not even capable or safe enough to operate with a safety driver outside the confines of closed course training environments (¶205). As of the filing of the AC, Cruise did not have a single driverless AV on the road in the US. ¶18.

Post-Class Period admissions also support falsity. *See Hatamian*, 87 F. Supp. 3d at 1160. On December 1, 2023, Cruise's newly appointed President and Chief Technological Officer, Mo Elshenawy told Cruise employees in an internal email that Cruise's aim was to "relaunch[] ridehail in one city to start" before expanding to additional cities (¶206), but that "[a] cross-functional working group of subject matter experts is working hard to define what is needed to relaunch" (¶207). Thus, Elshenawy admitted that Cruise AV technology could not even launch in a single city, and he could not even describe the steps needed to achieve this modest goal. Similarly, on April 9, 2024, Cruise posted that it needed to "redesign our approach to safety" and that Cruise was not yet able to "resume driverless operations." ¶209.

Additionally, Exponent (an engineering firm hired to investigate the October 2 Crash) made damning findings, including that the AV accelerated toward the pedestrian before striking her and could see her feet in its cameras while it dragged her. ¶¶216, 218-19. Exponent "did not identify any . . . hardware failures or software faults," meaning ***the AV behaved exactly as programmed***. ¶220. Cruise "accepts" these conclusions." ¶214; *see Hatamian*, 87 F. Supp. 3d at 1160.

26

Finally, multiple federal agencies have launched investigations into Cruise, including NHTSA, which is investigating five reports of Cruise vehicles engaging in inappropriately hard braking that resulted in collisions (¶200), and the DOJ and SEC, which launched investigations into the October 2 Crash (¶214).

Defendants largely do not contest Plaintiffs' description of the true state of Cruise's AV technology during the Class Period. The entirety of Defendants' responses are the minor and meritless arguments that follow.

**First**, Defendants challenge only discrete portions of CW allegations: (i) CW-5's statement that he "heard through the grapevine" about "issues on public roads"; (ii) CW-3's allegation that AVs made "sketchy decisions"; (iii) CW-6's assertion that there were "lots and lots of problems," a "number of incidents," and "issues with human injuries;" and (iv) CW-9's claim that Cruise "pushed too fast" to deploy more AVs. GM MTD at 16. But these allegations are all corroborated by additional CWs, news reports, and reports submitted to the DMV. *See supra*. More fundamentally, Plaintiffs do not even primarily rely on the limited snippets of CW allegations excerpted by Defendants. And Defendants ignore the scores of other CW allegations, that are similarly corroborated. *Id.*[7]

---

[7] Defendants also challenge CW-7 because "[t]he majority of CW-7's tenure at Cruise fell before the class period" (GM MTD at 17 n.6), but they ignore that CW-7 did not leave Cruise until April 2023 (¶155), nearly two years into the Class Period.

27

**Second**, Defendants argue that the October 2 Crash was merely a "single incident" and did not show that Cruise's technology was flawed.  GM MTD at 18.  The AC does not rely on the Crash alone, but meticulously documents the flaws in Cruise's technology.  The Crash was notable because Cruise's glaring failures in the Crash highlighted these deficiencies and catalyzed a chain of events that exposed the dangerous flaws in Cruise's AV technology.

### 3.    Cruise's AVs Were Not "Level 4"

Defendants spill much ink arguing that their statements touting Cruise's "Level 4" AVs were not misleading because Cruise purportedly met the definition of "Level 4" under the Taxonomy and California regulations.  GM MTD at 13-19.

As an initial matter, this argument is unavailing because Cruise specifically defined "Level 4" as synonymous with "fully driverless," which meant that Cruise AVs were "capable of driving fully autonomously 100% of the time."  ¶80; *see supra,* Section I.A.2.  Thus, because Cruise conveyed to investors its own specific definition of "Level 4," this case is entirely distinguishable from *Dailey v. Medlock*, 551 F. App'x 841, 847-48 (6th Cir. 2014), where the defendants used a "term of art" defined by federal regulations that they had *not* separately defined themselves.

Even if the Court were forced to hew strictly to the definition of "Level 4" in the Taxonomy or California regulations, Defendants' position still falls flat, because,

28

as designed, Cruise's AVs did not meet these requirements.[8] *Cf.* ¶214-20 (Quinn Report finding Cruise AV performed as designed in October 2 Crash).

**First**, a core minimum requirement of a Level 4 system is that it will always, when necessary, perform a dynamic driving task ("DDT") fallback to achieve a minimal risk condition.  ECF No 31-6 at 10-13, 15.  This means the AV must drive to a "stable, stopped condition" designed to "reduce the risk of a crash" whenever the AV is not "reliably" driving appropriately and safely.  *Id*. at 15.  Cruise AVs failed this basic requirement regularly, as they consistently failed to initiate a DDT fallback when the AV needed to do so and did not appropriately execute DDT fallbacks when they did initiate them.

CWs and media/DMV reports recount myriad instances of AVs engaging in facially unsafe and erratic driving that should have triggered a DDT fallback but did not.  *See supra*, Section I.A.2.b.  Defendants do not discuss or deny this core deficiency in Cruise's AV technology.  Instead, they argue that the instances of AVs stalling/failing in the middle of the road are examples of DDT fallback to achieve a minimal risk condition.  GM MTD at 17-18.  This argument tacitly concedes that

---

[8] For these same reasons, Defendants' statements touting that Cruise had received—or was imminently going to obtain—permits requiring Level 4 technology were misleading.  *See* ¶¶270, 272, 288, 292, 298, 300, 302, 314, 316, 318, 322, 328, 334, 338, 342, 352.

Cruise AVs should have triggered DDT fallbacks in the numerous situations detailed in the AC in which they drove erratically and unsafely without coming to a stop.

When DDT fallbacks were triggered, the AVs failed to reach a "stable, stopped condition" to minimize the risk of a crash.  Most profoundly, Cruise AVs demonstrated their inability to achieve a DDT fallback during the Crash when, instead of stopping in a stable condition, the vehicle dragged a pedestrian in plain sight of its cameras across the pavement.  ¶¶194, 219.  Even if this were the only failure, it would mean Cruise AVs were not Level 4.  However, Cruise's failures to achieve a DDT fallback were routine, as CWs and media/DMV reports describe persistent instances of AVs failing in the middle of traffic, blocking emergency vehicles, and requiring physical retrieval.  *See supra,* Section I.A.2.b.  Indeed, these issues were so frequent, CW-5 recalled that Cruise sought to add functionality in spring 2023 to recover frequently failing vehicles, and employees were so disturbed about the frequency of instances of AVs failing (*e.g.*, "with regularity") that CW-1 even blew the whistle to regulators and was fired because of it.  ¶¶106-09, 408.

Contrary to Defendants' argument, stalling out is not an appropriate DDT fallback.  Certainly, at the pleading stage, one cannot conclude that, as a matter of law, stalling out in traffic, blocking emergency vehicles, and failing to the point where physical retrieval is necessary, is reaching a stable, safe position that minimizes risk.  These are examples of AVs essentially just giving up in the middle

30

of the road.  Just giving up is not a DDT fallback.  Indeed, California regulations expressly envision that AVs undergoing a DDT fallback will "mov[e] the vehicle a safe distance from the travel lanes."  Cal. Code Regs. tit. 13, § 228.06.

**Second**, if a remote operator performs any part of the DDT, such as perceiving road conditions, steering, breaking, signaling, or deciding how to maneuver while an AV is operating within the circumstances in which it can supposedly drive autonomously (*i.e.*, its "Operational Design Domain" or "ODD"), the AV cannot be classified as a Level 4 AV under the Taxonomy.  ECF No 31-6 at 31-32.[9]

The AC alleges that Cruise's remote operators took over DDTs 2-4% of the time by manually directing AVs, *e.g.*, by directing them to go around objects, go into reverse, and make U-turns, which could take several minutes to complete.  ¶119. Vogt even confirmed that the AVs "need[ed]" this assistance.  ¶175.

Defendants' reliance on California regulatory requirements is similarly unavailing.  These regulations require that AV manufacturers certify that their AVs "meet[] the description of a level 4" AV under the Taxonomy.  GM MTD at 5.  Thus,

---

[9] While the Taxonomy does envision that "remote assistance" may be necessary, such assistance is confined to non-DDT tasks, such as when remote assistance provides "a new pathway for the *vehicle* to follow" or "provides the instruction to . . . proceed" on a path.  ECF No. 31-6 at 18-19 (emphasis in original).  But "[r]emote assistance does not include real-time" execution of the DDT, which is defined as the "*operational* and tactical functions required to *operate* a *vehicle* in on-road traffic," and includes "[o]bject and event response execution" and "[m]aneuver planning." *Id.* at 9, 18 (emphasis in original).

31

since Cruise's AVs did not meet the Taxonomy's definition of "Level 4," they also fell short of California's regulatory definition as well.

Defendants rely on the fact that California regulations envision some role for remote operators.  This is deeply misguided.  The regulations do not alter the Taxonomy; they only create *additional* requirements.  Defendants rely on two quotes from the regulation, but—as a threshold matter—cannot explain how their view would square with regulations that require AVs to meet the Taxonomy's definition of "Level 4."  In reality, neither of Defendants' quotes permit Level 4 vehicles (operating within their ODD) to rely on remote operators.

Specifically, Defendants cite the general definition of a "remote operator," as permitting a remotely-located person to perform the DDT.  GM MTD at 14.  But this text exists to describe the function of a remote operator when an AV is operating outside of its ODD; it does not permit operators to control Level 4 AVs when these AVs are operating within their ODD.  There is no contradiction with the Taxonomy; Defendants are merely citing a definition without explaining the relevant context.

Defendants' other quote is equally misguided.  The passage they cite does ***not*** permit remote operators to handle the DDT of Level 4 vehicles operating in their ODD.  It merely states that if a manufacturer has remote operators (*e.g.*, for use outside the ODD), they are required to also provide a "communication link" to assist and inform passengers in certain situations.  GM MTD at 6.  Again, there is no

contradiction with the Taxonomy; Defendants are merely citing an additional requirement above and beyond what is required by the Taxonomy.

There should be no confusion here because, in addition to requiring certification that the AV meets the Taxonomy's definition of Level 4, the regulations reiterate that an autonomous vehicle is one that "has the capability of performing the [DDT] *without the active physical control or monitoring of a natural person*." Cal. Code Regs. tit. 13, §228.02. However, to the extent there is any ambiguity as to which interpretation of the regulation is correct, this at most, raises a factual dispute that cannot be grounds for dismissal at this stage. *See WWE*, 477 F. Supp. 3d at 130. Further, even if Defendants' interpretation of the regulation were accepted, it would not change the fact that Defendants falsely conveyed that Cruise AVs were Level 4 in accordance with the Taxonomy.

### 4.    Cruise's AVs Were Not Safer Than Human Drivers

Defendants contest the meaning of Barra's misstatements asserting that Cruise AVs were "safer than a human driver." ¶¶266, 268, 354.[10] Specifically, Defendants

---

[10] Defendants claim that two of these statements are inactionable forward-looking statements. But both of these statements are in the present tense. ¶266 ("We *see* opportunity *as we demonstrate* technology for Cruise that's safer thana human driver."); ¶268 ("*[W]e're working* to deliver vehicles that are safer than a human driver will create an improvement from a safety perspective on our roads because autonomous vehicles follow all of the traffic rules. They *don't* drive distracted or impaired."). Even if they are deemed forward-looking, the AC pleads Barra's knowledge of their falsity. *See infra,* Section I.B; *In re Nat'l Century Fin. Enters.,*

33

argue that these statements conveyed that Cruise's AVs were safer compared to human drivers because Cruise's AVs got in statistically fewer crashes than human-driven cars. GM MTD at 22-23. But crash rate is only one metric in considering the safety of a driver, and Plaintiffs' interpretation of the term as conveying both safe driving behavior and safe driving results must be credited at this stage. *See WWE*, 477 F. Supp. 3d at 130. For example, a drunk driver swerving his way home from a bar is not a safe driver because he happened to arrive home without crashing.

As explained *supra*, Section I.A.2.b, Cruise AVs frequently drove erratically, stopped in the middle of traffic (including intersections), experienced outages requiring physical retrieval, had difficulty recognizing children and large holes in the road, needed remote assistance every 2.5 to 5 miles, and would "randomly" hard brake or "jolt" "all the time." A human who drives like this clearly is not a safer driver than most other humans

Even if the Court credited Defendants' data-centric interpretation of Barra's misstatements and looked purely at safe driving *results*, Defendants' argument that Plaintiffs failed to plead comparative data falls flat. The AC sets forth statistics showing that, if one were to map Cruise's rate of crashes onto the driving public at large, it would result in Cruise AVs hitting children over 27 times per day and getting

---

*Inc., Inv. Litig.*, 541 F. Supp. 2d 986, 1005 (S.D. Ohio 2007) ("No degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made.").

34

into crashes like the October 2 Crash between 82 to 820 times per day.  ¶¶178, 203.

Even absent these statistics, one does not need human-driving data to know that a

safer-than-average human does not drive in the dangerous way that Cruise AVs did.

### B.      Defendants Made the Technology Statements with Scienter

Defendants' misstatements cut to the core of Cruise and GM's business and

comprised a years-long effort to deceive the investing public about Cruise's business

and technology.   The allegations overwhelmingly establish that the Individual

Defendants clearly knew the true, undisclosed reality, or at a minimum, made false

statements touting Cruise's business, with reckless disregard for the truth.

On a motion to dismiss, scienter is established by a strong inference of

"knowledge or recklessness." *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622

F.3d 471, 479 (6th Cir. 2010).  A defendant is reckless when acting with "conscious

disregard" for the truth, which may be shown by pleading "red flags," a refusal to

see "the obvious," or the failure to "investigate the doubtful."  *Id.* at 479, 482.

Under the Supreme Court's *Tellabs* decision, courts must consider "whether

***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter,

not whether any individual allegation, scrutinized in isolation, meets that standard."

*Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011) (quoting *Tellabs*, 551 U.S.

at 310).  While an inference of scienter "must be cogent and at least as compelling

as any opposing inference of nonfraudulent intent," it "need not be irrefutable, *i.e.*,

of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 314, 324.  In other words, a "draw" goes to the Plaintiffs.  *See Frank v. Dana Corp.*, 547 F.3d 564, 571 (6th Cir. 2008).

Prior to *Tellabs,* the Sixth Circuit set forth in *Helwig v. Vencor*, 251 F.3d 540 (6th Cir. 2001), a non-exhaustive list of factors to consider when assessing scienter that is now part of *Tellabs'* holistic analysis.  "[A]fter *Tellabs*, the standard of law set forth in *Helwig* is no longer good law because the standard for pleading scienter is now less onerous."  *Kahn v. Ran*, 2009 WL 1138504, at *9 (E.D. Mich. Apr. 27, 2009); *Ernst & Young*, 622 F.3d at 480 (*Helwig* is superseded by *Tellabs*).

Even when it was controlling, the *Helwig* factors were "***not*** exhaustive," and meant to be merely "helpful" in "guiding securities fraud pleading."  251 F.3d at 552.  This has been repeatedly stated by courts in this Circuit.  *See, e.g.*, *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 469 (6th Cir. 2011) (eschewing *Helwig*'s "non-exhaustive" factors and analyzing scienter under *Tellabs'* "holistic" approach); *Bond*, 587 F. Supp. 3d at 676 (treating the *Helwig* factors as a "pleading requirement" would be "unsupported by the caselaw").[11]

---

[11] Courts in this Circuit have found scienter adequately pled without referencing the *Helwig* factors ***at all*** (*e.g.*, *Jonna v. GIBF GP, Inc.*, 617 F. Supp. 3d 789, 807 (E.D. Mich. 2022); *Burges v. BancorpSouth, Inc.*, 2015 WL 4198795, at *6 (M.D. Tenn. July 10, 2015)), or where only certain factors were present (*e.g., Dana*, 646 F.3d at 959; *Strougo v. Tivity Health, Inc.*, 551 F. Supp. 3d 839, 851 (M.D. Tenn. 2021)).

Defendants argue that Plaintiffs need to satisfy each factor discussed by *Helwig*. Cruise MTD at 19, 29; *cf.* GM MTD at 24-25. As discussed above, there is no such requirement, as *Tellabs'* holistic analysis is the controlling standard. Even so, many of the *Helwig* factors that do not "involve situational circumstances with little bearing on many types of fraud" would be satisfied here. *Heritage Glob. Network L.A., Inc. v. Welch*, 2024 WL 695772, at *13 (M.D. Tenn. Feb. 20, 2024) Here, the allegations amply support factor 2 (divergence between internal reports and external statements or omission), factor 3 (proximity between misstatements and disclosure of inconsistent information), factor 5 (ancillary governmental actions), factor 6 (disregard of most current factual information), and factor 9 (self-interested motivation to save compensation or job). *See Wilkof v. Caraco Pharm. Lab'ys, Ltd.*, 2010 WL 4184465, at *7 (E.D. Mich. Oct. 21, 2010) (finding complaint sufficiently plead scienter with only *Helwig* factors 2 and 3).

### 1. Direct Evidence Confirms the Individual Defendants Knew the True State of Cruise's Technology

During the Class Period, Barra, Jacobson, Amman, Vogt, Parks, and West were among GM's and Cruise's highest-ranking executives. ¶¶27-32. As confirmed by several CWs, they were hands-on executives who actively monitored, had full access to, and were made aware of the state of Cruise's AV technology. ¶¶389-402, 419-424; *see also Palazzolo v. Fiat Chrysler Autos. N.V.*, 2017 WL 6389573, at *5, *9-10 (E.D. Mich. Dec. 14, 2017) (CWs' statements confirming executives were

37

hands-on with vehicle sales and thus were aware of, or directed, the alleged fraud). The Individual Defendants also touted their deep involvement and intimate knowledge of Cruise's AV technology.  ¶¶419-24; *see, e.g.*, ¶419 (Barra describing her weekly conversations with Ammann concerning the technology's progress and underscoring the regular collaboration and information exchange between GM and Cruise concerning "best practices and lessons learned"); ¶¶398, 420 (Vogt affirming his knowledge of "every inch of [the AVs] progress," assuring investors of the technology's "maturity," and addressing safety concerns with employees); ¶421 (Ammann describing in detail the development of Cruise's self-driving system); and ¶422 (Jacobson stressing his focus on the technology of Cruise).

The Individual Defendants' scienter is further supported by their access to key reports and information regarding the effectiveness and safety of Cruise's AV technology.  *Shupe*, 660 F. Supp. 3d at 679; *Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at *23 (M.D. Tenn. Apr. 26, 2011) (scienter alleged where "executives . . . monitored portions of the company's database" containing key data).[12]

---

[12] In contrast with *Zwick Partners, LP v. Quorum Health Corp.*, 2018 WL 2933406, at *5 (M.D. Tenn. Apr. 19, 2018), *Local 295/Local 851 IBT Employer Group Pension Trust & Welfare Fund v. Fifth Third Bancorp.*, 731 F. Supp. 2d 689, 726 (S.D. Ohio 2010), *City of Pontiac General Employees' Retirement System v. Stryker Corp.*, 865 F. Supp. 2d 811, 834 n.9 (W.D. Mich. 2012), and *Ley v. Visteon Corp.*, 543 F.3d 801, 817 (6th Cir. 2008) relied upon by Defendants (Cruise MTD at 30-31; GM MTD at 26-27), the AC details specific information that Individual Defendants accessed concerning Cruise's AVs' shortcomings, including Safety Risk

For example: (i) Vogt regularly assured employees that "he and the C-Suite" reviewed many of the questions submitted on Slido, Cruise's internal question-and-answer platform in which Cruise employees raised concerns on safety issues (¶¶103, 392); (ii) Vogt and West had access to the "Risk Register," a database that included every Safety Risk Assessment, and each respectively received and managed the "extreme" and "high" risks in the register (¶394); (iii) Vogt and West participated in the Safety Review Board, which was "briefed" on all high and extreme Safety Risk Assessments (¶395); (iv) Vogt and West were provided monthly reports containing operations statistics, including how often Remote Assistance Operators intervened (¶396); (v) Vogt was apprised of when Fleet Service Representatives retrieved and drove malfunctioning vehicles, and received a call from the Incident Commander about every incident (which, according to CWs, happened "with regularity," "almost every night," and "frequently") (¶¶404-05, 408); (vi) Barra, Vogt, and West attended Cruise's annual meeting in 2022, which included assessments of the capabilities and safety of Cruise's AV technology, and updates on Cruise AVs' ability to navigate specific situations (¶¶400-01); and (vii) Barra participated in the Cruise Board's

---

Assessments and Remote Assistance Operator data.  ¶¶394-96.  For example, Vogt and West received reports and participated in briefings on these aspects of Cruise's AV technology (*id.*), and Vogt cited specific statistics about Cruise's AVs' reliance on remote operators.  ¶175.

quarterly meetings during which details and progress updates on safety, technology, and commercial plans concerning Cruise's AVs were provided (¶¶399, 401).

Defendants argue the CWs should be discredited because they did not directly report to the Individual Defendants. *See* Cruise MTD at 31; GM MTD at 26-27.  But no such standard exists in this Circuit.  "[P]laintiffs may rely on [CWs] if they plead facts with sufficient particularity to support the probability that a person in the confidential witness's position would possess the information alleged." *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1037 n.2 (6th Cir. 2016).  Here, ***all*** of the CWs were described with sufficient particularity to support the basis of their allegations. *See* ¶¶96-165 (describing CWs' roles and knowledge).  Defendants only challenge the CW descriptions as to CW-8 (GM MTD at 25), but the AC pleads his "senior role" at Cruise during the Class Period, which is sufficient given his *specific* first-hand knowledge of Defendants' involvement in specific meetings and the fact that "assessments of Cruise's AV capabilities" were discussed therein.  ¶¶42, 399-401.

Moreover, the Individual Defendants, as Cruise's and GM's highest-level executives, are presumed to be aware of matters central to Cruise's and GM's business.  "Courts may presume that high-level executives are aware of matters related to their business' operation where the misrepresentations or omissions pertain to 'central, day-to-day operational matters.'" *In re Cardinal Health Inc. Sec.*

*Litig.*, 426 F. Supp. 2d 688, 724 (S.D. Ohio 2006); *see also Shupe*, 660 F. Supp. 3d at 683.

AV technology is the primary focus of Cruise's business, and both Cruise and GM made many statements unambiguously touting the importance of the technology. *See, e.g.*, ¶385 (Vogt: Cruise paved "a pretty easy path" toward a "multi trillion-dollar TAM."); ¶387 (Barra touting Cruise's $30 billion valuation, more than half of GM's approximate market capitalization; Jacobson projecting that "[b]y the end of the decade, Cruise has the potential to deliver $50 billion in annualized revenues" and stating that "Cruise is a key element of GM's growth strategy.");[13] *see also In re Avon Sec. Litig.*, 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019) ("it would be absurd to suggest that Avon's senior management was unaware of a widespread delinquency problem in the company's single largest market").

Here, likewise, it "would be absurd" to suggest that Cruise's and GM's executives were unaware of the problems with Cruise's AV technology, given the singular importance of Cruise's AV technology to Cruise and GM, and the Individual Defendants' roles within GM and/or Cruise and constant public

---

[13] Defendants' cited cases have little relevance. *See* GM MTD at 29. The import of Cruise to GM far exceeds the subsidiary at issue in *Teamsters Local 237 Welfare Fund v. ServiceMaster Global Holdings, Inc.*, 83 F.4th 514, 519, 527, 531 (6th Cir. 2023) as Cruise's AV technology was pivotal to GM's proclaimed "all AV" future. ¶387. Further, unlike *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483 (6th Cir. 2015), the AC does not merely rely on "core" operations theory, but includes many other compelling allegations supporting an inference of scienter.

discussion of Cruise's AV technology.[14]  *See Dana*, 646 F.3d at 962 (crediting scienter based on inference that, given defendants' roles and public statements, they likely knew the truth); *In re FirstEnergy Corp. Sec. Litig.*, 2022 WL 681320, at \*22-24 (S.D. Ohio Mar. 7, 2022) (scienter supported given "that the scheme occurred in a central area of [defendant]'s business, of keen interest to investors and over which [Individual Defendants] had direct responsibility in [their] senior . . . roles").

The allegations of Defendants' knowledge are bolstered by their meticulous tracking of the AV technology.  *E.g.*, ¶389 (CW-1: safety issues tracked in Slido and Siren databases); *id*. (CW-2: Safety Risk Assessments conducted and logged); *id*. (CW-4: takeover maneuvers recorded in "Note Logger" application); ¶390 (CW-7: "management" received reports on test rides).  According to GM President, Mark Reuss, "everything's monitored.  There are no big mysteries on what's happening [at Cruise] . . . . We have a system in place that looks at data every day."  ¶391.

Defendants' specific statements about the capabilities and safety of Cruise's AV technology also support an inference of scienter.  ¶¶262-355.  It is well-settled

---

[14] *Pittman v. Unum Group*, 861 F. App'x 51, 53, 55, 57 (6th Cir. 2021), on which Defendants rely, turned on the fact that the company made numerous disclosures of losses in a specific business line, which required significant accounting judgment and complex forecasting.  Cruise MTD at 32; GM MTD at 29.  That is not the case here, where Defendants falsely touted the immense capabilities and safety of Cruise's AV technology when that technology was the sole reason for Cruise's existence and held the keys to GM's "all AV" future.

that "an inference of scienter can be established by the fact that the Defendants touched on [a] specific issue . . . in their public statements." *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at \*12 (C.D. Cal. Feb. 27, 2015). Indeed, "[a]ctively communicating with the public about [an] issue demonstrates [D]efendants' sensitivity to it." *Gauquie v. Albany Molecular Rsch., Inc.*, 2016 WL 4007591, at \*2 (E.D.N.Y. July 26, 2016). By repeatedly making public assertions about specific capabilities of Cruise AVs—*e.g.*, that Cruise was ready to commercialize its Level 4 AVs that operated with humans out of the loop at a safer-than-human level—it is fair to infer that Defendants were aware of information concerning such capabilities and thus either knew about the legions of problems with the technology or were deliberately reckless in claiming that the technology had reached a state where those flaws did not exist. *See, e.g.*, *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) (because defendant addressed particular issue in statement, it was "unlikely that she was not aware of it"); *South Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) ("If [Defendants] did not in fact have such knowledge, it would be at least actionably reckless to reassure the public about these matters at all.").

### 2. Additional Allegations Further Establish Defendants' Knowledge and Recklessness

Taken together with Individual Defendants' active involvement and focus on Cruise's core AV technology, Plaintiffs plead additional facts that bolster scienter.

**First**, there is no question that Defendants were aware of the problems detailed by CW-1. Importantly, CW-1 noted that there were "many employees" that felt that Cruise's AV technology was "unsafe and rushed" and that there was pressure from "Cruise leadership" to downplay those concerns. ¶404. He also remarked that fleets of Cruise AVs were being grounded with a high frequency. *Id.* CW-1 detailed in his whistleblower email that Cruise concealed investigations into vehicle collisions (¶107), and AVs were "with regularity" getting "stranded" and "blocking traffic," requiring either remote assistance or physical retrieval. ¶¶106-08. After Cruise investigated the matter, CW-1 was fired that same month. ¶109. Thus, it is undeniable that Defendants knew of CW-1's allegations.

**Second**, additional CW allegations demonstrate that knowledge of the deficiencies in Cruise's AV technology was widespread. ¶¶403-13. For example, CW-2 remarked that Fleet Service Representatives retrieved and drove malfunctioning vehicles "almost every night" and that the Systems Engineering Team "always expressed grief" with regards to Cruise "scaling recklessly," but such concerns were ignored. ¶405. CW-3 recounted that Cruise AVs "quite frequently" failed when facing congestion and road obstructions, and that "not a day" went by without functionality and safety issues arising. ¶406.

These issues were so common that, according to CW-5, Cruise endeavored to add functionality to be able to recover vehicles in spring 2023. ¶408; *see also* ¶407

44

(CW-4: "so many" entries into Note Logger); ¶¶410, 413 (CW-6: October 2 Crash was "not a one-time thing"; "lots and lots of problems" had been demonstrated over several years; Cruise had a "long track record" of "really bad accidents" that required intervention from emergency services); ¶411 (CW-7: employees regularly described their rides as "dangerous" and reported near misses with pedestrians, hitting curbs, and almost hitting other objects); ¶¶404, 416 (Cruise directed employees to intentionally downplay the seriousness of their experiences).

In the face of this laundry list of prevalent problems with Cruise's AV technology, "it would be highly implausible for [Defendants] to have remained in the dark about so widespread an issue." *Bond*, 587 F. Supp. 3d at 677; *see also Cardinal Health*, 426 F. Supp. 2d at 723 ("widespread and varied" problems support scienter); *Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 861 (11th Cir. 2015) ("widespread nature of the fraud," along with other factors, "when viewed holistically, create a strong inference of scienter"). Further, Vogt and West were directly apprised of the above-described safety issues and risks. *See* ¶¶394-96.

**Third**, the suspicious departures of Vogt, West, and Parks further support an inference of scienter. On November 19, 2023—less than two weeks after the final corrective disclosure (¶¶378-80) and one day after Vogt emailed Cruise employees

45

acknowledging his responsibility for Cruise's safety and transparency issues[15] (¶254)—Vogt announced his resignation as CEO of Cruise.  ¶255.  As of the filing of the AC, Cruise did not name a replacement CEO.  *Id.*; *see Plagens v. Deckard*, 2023 WL 2711263, at \*29 (N.D. Ohio Mar. 30, 2023) (CEO departure a "few weeks" after revelation of fraud supported scienter); *St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*, 2021 WL 195370, at \*7 (M.D. Tenn. Jan. 20, 2021) (abrupt resignation "with no notice" supported scienter).

Less than one month later, on December 13, 2023, it was reported that West and others were leaving Cruise.  ¶256.  Cruise confirmed this was due to their involvement in the October 2 Crash and Cruise's response to the incident.  *Id.*  That same day, GM also announced the resignation of Parks, who had been with GM for nearly 40 years.  ¶428.  Defendants cite *ServiceMaster* and *Padilla v. Community Health Systems, Inc.* (Cruise MTD at 22), but those cases merely hold that the timing of the resignations is not itself sufficient and must be accompanied by something "more" or "particularly unusual facts" to support scienter, as they were here.  83 F.4th at 531; 2022 WL 3452318, at \*33 (M.D. Tenn. Aug. 17, 2022).

**Fourth**, Defendants' admissions further support scienter.  ¶¶429-30; *see Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*, 426 F. Supp. 3d 864, 868,

---

[15] Unlike in *Browning v. Amyris, Inc.*, 2014 WL 1285175, at \*20 (N.D. Cal. Mar. 24, 2014) (Cruise MTD at 22), Vogt did not merely express "regret"; he took responsibility for Cruise's AV deficiencies and then abruptly resigned the next day.

873-74 (D. Kan. 2019) ("post-class-period admissions" supported scienter); *Avon*, 2019 WL 6115349, at \*11 (new CEO's post-class period disclosures demonstrated scienter for ex-CEO's class period statements).

Specifically: (i) Vogt admitted that Cruise "intentionally" employed a large staff of remote operators, and confirmed that the AVs initiate a remote assistance "session" every 2.5 to 5 miles and "are being remotely assisted (RA) 2-4% of the time in driverless mode" (¶¶173-75); (ii) Vogt acknowledged his responsibility for Cruise's problems, stating, "we have veered off course under my leadership" and "[a]s CEO I take responsibility for the situation Cruise is in" before departing the very next day (¶429); (iii) Cruise confirmed that it commissioned a study earlier in 2023 that analyzed the risks that Cruise AVs posed to children (¶¶176-78); (iv) Elshenawy admitted that Cruise needed to "redesign our approach to safety" but provided no next steps for Cruise to "resume driverless operations" in even a single city (¶209); and (v) Cruise accepted Exponent's conclusions about the October 2 Crash, including that the AV behaved exactly as it had been programmed (¶214-20).

These incriminating admissions extend to Defendants' briefing. As described above, Defendants do not seriously contest that the AC paints an accurate picture of Cruise's AV technology during the Class Period. Defendants even argue that the Taxonomy and California regulations contemplate the existence of remote assistance, and that the incidents and functionality/safety problems described by the

47

CWs and media/DMV reports are merely examples of AVs performing a DDT fallback to achieve a minimal risk condition.  GM MTD at 16-18.  For the reasons articulated *supra,* Section I.A.2-3, these arguments fail.  Nonetheless, they are telling admissions that Defendants were well-aware of the true state of Cruise's AV technology throughout the Class Period.  Further, Defendants' similarly faulty argument that they disclosed the existence of remote and field operators during the Class Period (GM MTD at 13-15) also is an admission of scienter.  *See AAC Holdings*, 2021 WL 1316705, at *7 n.12 (purportedly "truthful disclosures . . . serve to make clear that the defendants were aware of the facts truthfully disclosed, and such awareness in some cases can undermine the defendants' position").

**Fifth**, Defendants' pattern of deception and recklessness supports an inference of scienter.  As explained in full*, infra*, Section II, after the October 2 Crash, Defendants engaged in a campaign of deceit to cover up the truth, evidencing a consciousness of guilt.  But Cruise's pattern of deception long predated October 2, 2023, as numerous CWs and reports to the DMV attest.  For example, CW-2 recalled that there was a public inquiry from regulators following a storm in San Francisco where Cruise vehicles ran into downed powerlines, and that Cruise was hesitant to share risk assessments with the relevant authorities and instead took advantage of "loopholes" to provide as little information as possible.  ¶415.  Similarly, CW-7 described Cruise as an "aggressive company" in rushing forward with its AV

48

technology, despite feedback from the company's employees that the cars were extremely dangerous, and recalled that Cruise directed test drivers to intentionally downplay the seriousness of any concerns or issues they encountered.  ¶416.  These allegations are corroborated by: (i) the November 2020 email to the DMV reporting that "Management pressures [employees] to only use Notable TKOS [takeovers] in rare cases . . . .  The TKO Statistics that Cruise reports to the DMV [are] underrepresented and [] withheld" (¶417); and (ii) CW-1's 2022 email to the DMV describing how potentially damaging matters were intentionally hidden (¶418).

### 3.    Defendants Fail to Proffer a More Compelling Inference

The comparative inquiry here weighs in Plaintiffs' favor: the notion that Defendants were ignorant of the basic facts about the capabilities and safety of Cruise's AV technology[16] is far less plausible than the inference that Defendants were at least reckless, given the allegations described above.

**First**, Defendants argue it would be illogical for GM to have increased its investment in Cruise while knowing that the AV technology was not as advanced or safe as claimed.  GM MTD at 30-31.  But Cruise was critical to GM, investing in it made perfect sense, and Plaintiffs do not contend that GM knew Cruise was doomed,

---

[16] Defendants' reference to *I.B.E.W* (Cruise MTD at 33) further undercuts any argument for an innocent inference as, unlike here, where Defendants merely provided generic warnings (GM MTD at 31), defendants in *I.B.E.W.* provided information to their investors concerning actual problems at the distribution center at issue from the onset of the class period.  *Id.* at 630.

only that it knew Cruise's AV technology was less advanced than publicly claimed. Furthermore, frauds frequently take the form of lies that occur while the fraudster hopes the situation would "right itself" before the truth comes to light. *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at \*13 n.12 (N.D. Cal. Nov. 4, 2020).

**Second**, Defendants suggest that because GM made stock buybacks during the Class Period, it could not have known that the false statements were inflating its stock price. GM MTD at 30. This assertion is lacking in *any* factual context needed to make the leaps in logic Defendants suggest. *See In re Fannie Mae 2008 Sec. Litig.*, 2011 WL 13267340, at \*3 (S.D.N.Y. Apr. 11, 2011) (scienter pleaded for executives who bought stock on market). GM conducts buybacks for many reasons, including to *maintain* its share price, and Plaintiffs' theory does not depend on GM believing its stock was overvalued—subjective belief about valuation is different than knowledge that inflation was introduced, and markedly different than knowledge of facts rendering statements misleading. Moreover, unlike the case Defendants cite (*id.*), Plaintiffs' scienter allegations do not depend on establishing *motive*, given the direct and circumstantial evidence of knowledge and recklessness.

**Third**, Defendants point to various generic warnings about the challenges of developing Cruise's AV technology. GM MTD at 31. Every company makes risk disclosures, and the mere fact that some risks were discussed does not weigh on the scienter inference. Furthermore, the examples of risk language Defendants cite are

50

extraordinarily ambiguous in affect—stating that AV technology is "really hard," while simultaneously boasting that Cruise had "solved that engineering challenge of a generation" (¶278) functions more as a brag than a warning.[17]

Here, no actual warnings or information were provided by Defendants on the problems with Cruise's AV technology, only vague statements on the importance of the technology to Cruise's AV strategy, vague references to "adequate safety and other performance standards," theoretical notions that accidents "could deter consumer adoption of [AV] technology." GM MTD at 31. Such inadequate disclosures fail to undermine an inference of scienter.

### C. The Technology Statements Caused Investors Losses

The AC plausibly pleads loss causation, *i.e.*, a plausible "causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 388 (6th Cir. 2016) (plausibility is the standard). Loss causation can be met either through pleading a corrective disclosure or a materialization of undisclosed risk. *See id.* at 384-85, 388. A corrective disclosure need not be the "mirror image" of a misstatement, as the "relevant truth" revealed

---

[17] Indeed, the warnings in *ServiceMaster*, 83 F.4th at 529, which Defendants cite, only underscore the inadequacy of Defendants' warnings here. In *ServiceMaster*, a pest-control company made omissions regarding an upward trend in termite-damage claims, but the defendants had acknowledged the existence of termite damage claims and the steps the company was taking to prepare for possible liabilities. *Id.*

must be about "the underlying circumstances that [were] concealed" rather than an admission of fraud. *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) (*citing Dura Pharms.*, 544 U.S. at 342). Defendants' misstatements conveyed that Cruise had developed fully autonomous Level 4 AVs that could operate without human involvement at a safer-than-human level, and that this breakthrough enabled Cruise to shift its business beyond R&D to commercialization. Over three corrective disclosures, the market learned these representations were false.

**First,** on October 24, 2023, the DMV and CPUC suspended Cruise's driverless testing permits following the October 2 Crash, and Cruise published a blog post addressing the suspension and the Crash. ¶¶365-71. In suspending Cruise's driverless permits, the DMV stated that it was doing so pursuant to the DMV's prerogative to suspend Cruise's permits "[w]hen there is an unreasonable risk to public safety" and because it had determined that "the manufacturer's vehicles are not safe for the public's operation" such that "immediate suspension is required for the safety of persons on a public road." ¶365. Vogt then published a blog post disclosing, for the first time, that the Cruise AV involved in the October 2 Crash collided with the pedestrian and "then attempted to pull over to avoid causing further road safety issues, pulling the individual forward approximately 20 feet." ¶368. On this news, GM's stock price fell nearly 2.3%. ¶374. This stock drop is directly

attributable to the news disclosed to the market on that day.  Indeed, immediately after these disclosures, Wells Fargo announced that it was lowering its price target for GM and noted that the suspension "is a big set back" that contributed to "GM shares falling ~2% (S&P +1%)."  ¶373.  Despite revealing certain corrective information, this disclosure did not reveal the full misleading nature of Defendants' Class Period misstatements, as the DMV noted Cruise's suspension "does not impact the company's permit for testing with a safety driver" and Vogt's blog post minimized the implications of the October 2 Crash.  ¶¶369-70.

Defendants argue that the October 24, 2023 disclosure was not corrective because the truth of the October 2 Crash was reported "weeks before" and thus constituted "old news."  GM MTD at 32-33.  But, as described in the foregoing paragraph, the October 24, 2023 disclosure was the first time that Cruise revealed that not only was a pedestrian dragged across the pavement during the October 2 Crash, but that the DMV assessed Cruise's AV technology to be a threat to the public, warranting suspension.  Further, as discussed *infra*, Section II.C, the October 6, 2023 *Forbes* article referenced by Defendants—which included an allegation by a local politician that the Cruise AV "dragged" the pedestrian—did not disclose the truth to the market, as Defendants essentially denied that report (*e.g.*, stating there was "nothing further to add" to their prior misleading comments), and media reports *after* that *Forbes* article continued repeating Defendants' falsehoods about the

53

October 2 Crash.  ¶¶233-38.  And the aforementioned commentary from Wells Fargo connecting the price drop to this disclosure adequately alleges that the information revealed was not "old news."

**Second**, on October 26, 2023, the NHTSA publicly released a letter the agency had sent to Cruise six days earlier, indicating that the NHTSA was investigating five reports of Cruise vehicles engaging in inappropriately hard braking that resulted in collisions.  ¶375.  Later that day, after close of market, Cruise announced via a post on X (formerly Twitter) that it would pause all of its AV operations across the country "while we take time to examine our processes, systems, and tools and reflect on how we can better operate in a way that will earn public trust."  ¶376.  On this news, GM's stock price fell nearly 4.7% on October 27, 2023.  ¶377.

Defendants argue that Cruise's pause of its driverless operations was not corrective because the pause was merely meant to "rebuild public trust."  GM MTD at 33.  But Cruise explicitly stated that the pause was necessary "to examine our processes, systems, and tools"—*i.e.*, its entire AV business.  And there the decision to pause driverless operations was a clear indicator that Cruise could not commercialize its AV fleet—because the AVs could not operate safely, reliably, or legally.  Defendants also argue that the NHTSA letter was not corrective because the subject of NHTSA's investigation had been reported before.  GM MTD at 33-34.

54

But the article Defendants point to mentions an NHTSA investigation into *three* incidents (ECF No. 31-21), whereas the October 26, 2023 disclosure includes the NHTSA's letter disclosing an investigation into *five* reports. ¶375.

Despite revealing certain corrective information, this disclosure did not reveal the full misleading nature of Defendants' Class Period misstatements, which were not revealed in full until approximately two weeks later.

**Third**, on November 8, 2023, Cruise announced, and the media reported, that Cruise issued a recall impacting its entire fleet of 950 driverless cars across the US. ¶378. This recall was meant to "remedy" a "[d]efect" that posed a "[s]afety [r]isk," and concluded that this defect "played a role" in the October 2 Crash. ¶378. Separately, on November 8, 2023, Cruise issued a blog post further elaborating on its recall and stating that "we determined that a similar collision with a risk of serious injury could have recurred every 10 million - 100 million miles of driving on average prior to the software update." ¶379. This statistic is jarring because, as the AC sets forth, if this statistic were mapped onto the US driving public (which travels over three trillion miles each year), it would result in a collision like the October 2 Crash would occur in the range of 82 to 820 times *per day*. *Id*. In this same blog post, Cruise stated that it was conducting a search to hire a Chief Safety Officer, had retained Quinn Emanuel "to examine and better understand Cruise's response to the October 2 incident," hired Exponent "to perform a technical root cause analysis" of

the Crash, and announced that Cruise was overhauling certain internal processes relating to safety, transparency, and community engagement. ¶380. On this news, GM's stock price fell nearly 3% on November 8, 2023 (¶382)—which the media connected to that day's disclosures. ¶381 (*MT Newswires*: noting that "[s]hares of GM fell 2.7% in recent Wednesday trading" in article titled "General Motors' Cruise Recalling 950 Driverless Cars After Pedestrian Collision in San Francisco").

Defendants once again argue that this disclosure revealed nothing new to the market because the October 2 Crash was already public, recalls are "routine[]" in the automotive industry, and Cruise's remedial measures don't reveal any misstatements were false. GM MTD at 34. This undersells what was disclosed that day, as Defendants finally revealed that *Cruise's entire fleet* had suffered from the same "defect" that caused the October 2 Crash—which by Cruise's own admission could have caused scores of other similar crashes—and that the defects in Cruise's AV technology required an overhaul of Cruise's internal processes.

It is clear that the AC pleads that these disclosures caused Plaintiffs' losses. Nothing more is needed from Plaintiffs at the pleading stage. *See Fed. Home Loan*, 830 F.3d at 388 (plausibility is the standard).[18]

---

[18] As Plaintiffs state a Section 10(b) claim, the Court should also sustain the Section 20(a) claims against the Individual Defendants. *See In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 746 (E.D. Mich. 2007). Cruise does not contest that Vogt and West were control persons of Cruise (Cruise MTD at 35), and Ammann was clearly a

56

## II.   THE ACCIDENT STATEMENTS WERE ACTIONABLE FRAUD

Acting with scienter, Vogt, Cruise, and GM misrepresented the circumstances of the October 2 Crash (the "Accident Misstatements").[19]  They did so in three ways.

**First**, Cruise, at the direction of Vogt, disseminated a misleading video of the October 2 Crash through the media, which ended before showing or addressing the "pullover maneuver" that dragged the pedestrian, thus misleadingly representing that the AV came to a complete stop, while omitting to show the subsequent pullover maneuver and further pedestrian injury.  ¶¶357-59.  The video was then repeatedly described by numerous media outlets.  *Id*.

**Second**, Cruise, at the direction of Vogt, disseminated talking points to media outlets stating that the AV came to a complete stop immediately after impacting the struck pedestrian, without any reference of the subsequent pullover maneuver and pedestrian dragging.  ¶¶360-362.  Variations of this statement were repeated numerous times by various media outlets*. Id*.

---

control person of Cruise acting as CEO when he made his misstatements before his departure in December 2021.  GM does not contest that Barra, Jacobson, and Parks were control persons of GM, and only argues that they were not control persons of Cruise.  GM MTD at 35.  Barra was not only a Board member of Cruise, but she, Jacobson, and Parks were high-ranking executives at GM, which controlled Cruise.
[19] Conduct by Vogt is attributable to Cruise because of his position at Cruise, and conduct by Cruise is attributable to GM by virtue of GM's ownership and Cruise's role as a core business segment of GM.  ¶¶357, 360, 363.

57

**Third**, Cruise issued a materially misleading quote to the media through a communications manager stating that after impact, "[t]he AV then braked aggressively to minimize the impact.  The driver of the other vehicle fled the scene, and at the request of the police the AV was kept in place." ¶¶363-64.  This statement was then published by the media.

These representations artificially inflated GM's stock price and caused investor losses when the truth came to light on October 24, 2023.  Defendants concede that their representations were materially misleading, but challenge scienter, the "in connection with" requirement, and loss causation.

### A.    Defendants Made the Accident Statements with Scienter

Considered holistically, Defendants' acceptance of the Quinn Report's findings, along with the AC's other allegations, establish that Vogt, Cruise, and GM issued the Accident Misstatements with scienter.  *Tellabs*, 551 U.S. at 323.

### 1.    There Is No Dispute Defendants Acted with Knowledge

Critically, **there is no dispute** that Cruise and Vogt knew their statements about the October 2 Crash were false, as Cruise "accepted" the Quinn Report's conclusions detailing their knowledge.  ¶249.  Thus, it is astounding that Defendants are disputing scienter here.  *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 711 (E.D. Mich. 2010) ("defendants' knowledge or access to information

contradicting their public statements" is sufficient to establish scienter).

Specifically, the Quinn Report concluded that:

- (i) Vogt expressed in the early morning hours of October 3, 2023 that he "personally wanted to see and authorize the final cut of any video or media statement" disseminated to the media (¶224);

- (ii) at or around 6:00 AM PT, Vogt, West, and other Cruise executives learned that the Cruise AV dragged the pedestrian after the initial impact (¶¶227-28); and

- (iii) at or around 6:45 AM PT, Vogt and other Cruise senior executives further discussed whether to correct Cruise's prior statement and they concluded that Cruise should stick to its story omitting the pullover maneuver so as not to "lose credibility" (¶¶228-30).

Despite Defendants' knowledge of the truth, Cruise disseminated videos and statements to the media throughout October 3, 2023 that detailed the initial impact—but deliberately omitted the subsequent pedestrian dragging and pullover maneuver. ¶¶360-63. Thus, there is no question that Vogt and Cruise acted with full knowledge of the falsity of their statements, which is sufficient to establish scienter. *Chamberlain*, 757 F. Supp. 2d at 711; *cf. Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 981 (6th Cir. 2018) (finding "divergence" between internal information available to Defendant and public statements to be the "key factor" in finding scienter adequately pled). Defendants' arguments fail to detract from such damning allegations.

**First**, Defendants argue they can be excused for knowingly peddling falsehoods to the market because they were acting under the guise of "crisis

59

management." Cruise MTD at 17-18, 20.[20] Plaintiffs are not, as Cruise claims, required to demonstrate Defendants were "animated by a motive to defraud GM's investors." Cruise MTD at 18. Indeed, scienter is an inquiry into Defendants level of *intent—i.e.* whether their misrepresentations were made knowingly or recklessly as opposed to negligently or accidentally. "When the intent to do an act that violates the law exists"—here, making material misstatements—"motive becomes immaterial." *Intent,* BLACK'S LAW DICTIONARY (12th ed. 2024). As a result, courts do not require allegations of motive. *See Tellabs*, 551 U.S. at 325.[21]

**Second**, Defendants incorrectly claim that neither the Quinn Report nor the AC alleges that Vogt had any role in Cruise's communications to the media once he became aware of the pullover maneuver and pedestrian dragging. Cruise MTD at 21. But Vogt has expressed "that he personally wanted to see and authorize the final cut of any video or media statement and that 'nothing would be shared or done' . . .

---

[20] Defendants' reliance on *Naglich v. Applied Optoelectronics*, 436 F. Supp. 3d 954, 974 (S.D. Tex. 2020) and *In re Pretium Resources Inc. Securities Litigation*, 256 F. Supp. 3d 459, 479–80 (S.D.N.Y. 2017) (Cruise MTD at 21) to assert that Vogt was entitled to a prolonged investigation before disclosing the truth is unavailing, as (i) Vogt learned the truth immediately after the crash; and (ii) Vogt and Cruise did not remain silent while investigating but proactively spread falsehoods. ¶¶227-29.

[21] *Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197, 214 (S.D.N.Y. 2012), which Defendants cite (Cruise MTD at 18), does not mitigate the clearcut evidence of scienter as the defendants in *Foley* enlisted a third party to investigate the fraud at issue during its class period; while, here, Cruise announced that it retained Quinn Emanuel on November 8, 2023 (¶204), weeks after Vogt had already revealed the truth of the October 2 Crash (¶194).

without his sign off" (¶224), and he was part of the Senior Leadership Team that decided during the morning of October 3, 2023 to not correct Cruise's media statements (¶¶229-30). Therefore, Vogt's knowledge is not in dispute and his scienter is imputed to Cruise. *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 476 (6th Cir. 2014) (when "[a]ny high managerial agent" acts with the necessary scienter, their state of mind can be imputed to the corporation); ¶¶260, 357, 360, 363 (Accident Statements attributable to Cruise, Vogt, GM).

### 2. Additional Allegations Further Support Scienter

In addition to the direct evidence and admissions that Defendants knew the truth and actively misrepresented the facts publicly, Plaintiffs have plead several additional sets of facts that bolster the inference of scienter.

**First**, Defendants' campaign of deceit to cover up the truth of the October 2 Crash further establishes an inference of scienter. Cruise and its executives, including Vogt, purposely issued a misleading video and misleading talking points to media outlets, and continued to do so even when specifically asked by *Forbes* to confirm whether the Cruise AV continued to drag the pedestrian. ¶¶231-35. Similarly, Cruise misled regulators by not showing the full video of the October 2 Crash and/or not affirmatively explaining the crash. This caused regulators to accuse Cruise of misleading them. ¶¶239-48. Indeed, in subsequent litigation, an administrative law judge found that Cruise had made "misleading" statements in the

context of its disclosures to regulators concerning the October 2 Crash and that by "withholding information about the extent of the Cruise AV interaction with the pedestrian, Cruise misled the DMV and [the CPUC]." ¶248.

In fact, Cruise only disclosed the truth about the October 2 Crash upon the DMV suspending Cruise's permit on October 24, 2023. ¶238. Such "[a]ttempts to cover up fraud demonstrate a high degree of scienter." *Vanderhoef v. China Auto Logistics Inc.*, 2020 WL 5105243, at *3 (D.N.J. Aug. 31, 2020); *see also In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1166 (D. Or. 2015) (stating that defendant CEO's attempts to cover up specifics of an unlawful promotional scheme "support[s] a strong inference of scienter"); *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 979-80 (N.D. Cal. 2015) (noting that the defendant CEO's attempts to hide his conduct was evidence of scienter).

While Defendants may have disclosed the truth about the October 2 Crash to certain regulators (Cruise MTD at 18), this does not negate that Cruise intentionally withheld the full video of the Crash from others, including additional key regulators. *E.g.,* ¶¶240-41 (Cruise materially misled the media that Cruise had shared all pertinent information with regulators, including the NHTSA); ¶371 (December 2023 Order by the CPUC: Vogt's statements on October 24, 2023, touting that Cruise "proactively shared information with" regulators were "misleading" because Cruise "withheld information from the Commission for 15 days, thus misleading the

Commission" and because "Cruise misled the DMV and, in turn, the Commission into thinking that the original video shown and commented on accurately memorialized the full extent of the incident"); ¶372 (October 2023 DMV Order suspending Cruise's permit:  Cruise failed to show the full video of the October 2 Crash); ¶249 (January 25, 2024, Cruise itself "acknowledge[ed] that we have failed to live up to the justifiable expectations of regulators").

**Second**, the existence of numerous government investigations accusing or suspecting Cruise of misconduct supports scienter, because such investigations are more likely to occur when companies are engaged in fraud, than innocent misstatements.  On October 26, 2023, the NHTSA publicly released a letter stating that it was investigating Cruise, and on January 25, 2024, Cruise announced that the DOJ and the SEC had both opened investigations or inquiries in connection with the October 2 Crash.  ¶¶200, 257.  *See, e.g.*, *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) ("a governmental investigation as one piece of the puzzle when taking a holistic view of . . . scienter."); *Dana¸* 646 F.3d at 961 (finding scienter on holistic analysis of allegations that included SEC investigation).

**Third**, the AC establishes a closeness in time between Defendants' fraudulent conduct and the subsequent disclosure of inconsistent information.  *See Helwig,* 251 F.3d at 552.  Specifically, Defendants disseminated misleading video footage and statements to the media concerning the Crash on October 3, 2023, three weeks before

the first corrective disclosure on October 24, 2023.  ¶¶356-64.  *See Dougherty*, 905 F.3d at 981 (six-week gap supporting inference of scienter).  Given the proximity between Defendants' false statements and the first corrective disclosure, Plaintiffs are entitled to an inference of scienter under the third *Helwig* factor.

**Fourth**, for the reasons articulated *supra*, Section I.B.2, the suspicious departure of Vogt further supports an inference of scienter.

### B.    The Accident Statements Were Made in Connection with the Purchase of Securities

Section 10(b)'s "in connection with" element requires a nexus between misstatements and the securities transaction upon which a plaintiff claims injury. "The Supreme Court has consistently embraced an expansive reading of [this] requirement."  *SEC v. Pirate Inv. LLC*, 580 F.3d 233, 244 (4th Cir. 2009).

Defendants correctly state that the requirement is satisfied if either "[(i)] the statements were made in publications directed at investors *or* [(ii)] were otherwise intended to influence securities transactions."  Cruise MTD at 23.  Plaintiffs easily satisfy either of these prongs.  However, to the extent there is any uncertainty, any such fact dispute must be resolved in Plaintiffs' favor.  *See Tellabs,* 551 U.S. at 322.

### 1.    The Accident Statements Were Made in Publicly Accessible Publications and Thus Were Directed At Investors

Defendants' only argument as to this prong mistakenly interprets "directed" to capture only a narrow universe of sources, such as press releases, national business

press, and SEC filings. This is contrary to settled law and betrays a misunderstanding of securities cases (like this) invoking the fraud-on-the-market doctrine.  ¶¶441-45.

When "a claim is based on the fraud-on-the-market theory . . . it is sufficient that statements which manipulate the market are connected to resultant stock trading." *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1250-51 (N.D. Ga. 2019); *In re Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d 953, 965 (2d Cir. 1993) (similar); *Pirate Inv. LLC*, 580 F.3d at 249 (similar); *SEC v. Rana Rsch., Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993) (similar).  This makes perfect sense.  The fraud-on-the-market doctrine establishes presumptions:

> [1] that the price of stock traded in an efficient market reflects all public, material information . . . and [2] that investors rely on the integrity of the market price when they choose to buy or sell stock.

*Ark. Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 478 (2d Cir. 2018); *Basic Inc. v. Levinson*, 485 U.S. 224, 246 n. 24 (1988) ("market professionals generally consider most publicly announced material statements").[22]

Legions of caselaw establish that securities fraud claims may be predicated on misstatements in a wide variety of publicly accessible media.  *See, e.g, Equifax*, 357 F. Supp. 3d at 1250–51 (presentation at a college uploaded to YouTube); *Shupe*, 660 F. Supp. 3d at 674 (Tweets); *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153,

---

[22] Market prices react to TV news and local papers.  *See* 3 Busse, J. A. & T. Clifton Green, *Market Efficiency in Real Time* 416 (vol. 65 2002); *see also* 12 Deshpande, S. & Svetina, M., *Does local news matter to investors?* 1190-212 (vol. 37 2011).

156 (2d Cir. 1998) (ads for drugs in medical journals); *In re Rsrv. Fund Sec. & Deriv. Litig.*, 732 F. Supp. 2d 310, 317 (S.D.N.Y. 2010) (statements to newspaper); *Monk v. Johnson & Johnson*, 2011 WL 6339824, at *21 (D.N.J. Dec. 19, 2011) (statements at congressional hearing reported by media); *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341, 1346 (11th Cir. 2022) (online videos and links).[23]

Here, the Accident Statements were made through widely disseminated media outlets, including broadcast television and publicly accessible news websites. Indeed, the statements were published by reputable and widely-read news sources, including *CBS News*, *SFGate*, *KRON4*, *KPIX*, *Crain's Business*, *Forbes*, *CNBC*, *ABC News*, *Engadget*, *Jalopnik*, and *The Register*.  ¶357-61.  Material statements published in these sources clearly are directed at and likely to influence investors.

> ### 2.   The Accident Statements Were Important Value Relevant Lies That Would Influence GM Investors

Cruise is a majority-owned subsidiary of GM (¶26), which GM referred to in its public filings as "GM Cruise" and GM's "global segment responsible for the development and commercialization of [AV] technology." ¶48. GM touted Cruise's

---

[23] Defendants' reliance on *Di Donato v. Insys Therapeutics Inc.* (Cruise MTD at 24)*, is unpersuasive.  Its approach is contrary to the accepted law cited within this Section, and its holding was predicated on the vague pleading of the alleged misstatement (lacking the "when, where, or to whom") even whether they were actually made by Defendants. *Insys Therapeutics, Inc.*, 2017 WL 3268797, at *16 (D. Ariz. Aug 1, 2017).  In contrast, Plaintiffs allege, based on conceded facts in the Quinn Report those precise details, including Defendants intentional dissemination of the misleading statements themselves.  ¶¶221-37, 360-64.

AV technology as paramount to the future of GM (¶387), and described Cruise's supposed successes as one of GM's "*growth milestones*" (¶324).  Analysts *valuing GM* routinely commented on Cruise's prospects as relevant to that consideration (*e.g.*, ¶80), and when the truth concerning Cruise was revealed, they commented on it as "a big set back" that contributed to "GM shares falling" **(**¶373).  GM's executives regularly discussed Cruise during GM's earnings calls.  *E.g.*, ¶¶50, 55.  Indeed, during a GM earnings call during the Class Period, Barra touted Cruise's $30 billion valuation — *more than half* of GM's market capitalization.  ¶387.

In light of these facts, its undeniable that misstatements withholding information relevant to the capabilities and safety of Cruise AVs, which forecast a massive imminent setback in Cruise's business plans, would influence investment in GM.  Defendants counter with three misguided arguments.

**First**, Defendants vaguely attribute significance to the fact that Cruise does not issue stock.  Cruise MTD at 23.  Cruise was a key segment of GM, and the fraud concerning that segment affected GM investors.  The operations of essentially all public companies are housed in subsidiaries. That the same is true here, is irrelevant. *E.g.*, *Klein v. Altria Grp., Inc.*, 525 F. Supp. 3d 638, 658 (E.D. Va. 2021) (sustaining statements by executives of the issuer about subsidiary of that issuer); *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp.

67

3d 56, 91 (S.D.N.Y. 2022) (holding statements made in analyst call by president and former CEO of subsidiary of issuer to be actionable).

Defendants' reference to *Lindblom* (Cruise MTD at 25), to suggest that there is some significance to Cruise being a non-issuer subsidiary, is entirely misplaced. *Lindblom v. Mobile Telecomms. Techs. Corp.*, 985 F. Supp. 161, 164 (D.D.C. 1997). As a threshold matter, this out-of-circuit and rarely-cited opinion ignores both the standard Defendants articulate (*see supra* at 64) and the clearcut law regarding how the "in connection with" requirement is analyzed in fraud-on-the-market cases (*see supra* at 64). Moreover, far from articulating any general rule about subsidiaries, *Lindblom* engaged in fact-specific analysis about the substance of the misstatements (essentially their materiality). Here, the allegations cited above, firmly establish that Cruise's deceit concerning the fraud was important to investment in GM.

**Second**, Defendants argue that the misstatements did not "mention GM" or GM's finances. Cruise MTD at 24. This too has no relevance, as misstatements often do not expressly name the company—investors understood the subsidence of each false statement to investment in GM. It is equally irrelevant that the lies did not expressly discuss financial metrics—accounting fraud is only one type of fraud.

**Third**, Defendants argue that the Quinn Report found that Cruise's "motivation" was primarily to minimize bad press. *Id.* at 24-25. But accepting the say-so of attorneys retained by GM, as to Cruise's motivation would flip *Tellabs'*

68

requirement on its head by accepting unpled and untested facts in Defendants favor. *See Tellabs*, 551 U.S. at 322; ¶253 n. 7 (noting Quinn Emanuel's damning conclusions, *despite* its incentive to "*downplay* its clients' wrongdoing").

Regardless, Defendants' argument is facially nonsensical. Trying to avoid bad press that could affect a stock's valuation, through lies, is a paradigmatic example of securities fraud, and of the sort of conduct likely to influence investors. Even in the scienter inquiry, one need not allege that influencing share prices was any Individual Defendant's motive (knowledge of the truth or recklessness suffice)—it certainly doesn't matter as to the "in connection with" element.

## C. The Accident Statements Caused Investors' Losses

The AC plausibly pleads loss causation as to the Accident Statements. *Dura Pharms.*, 544 U.S. at 342; *Fed. Home Loan*, 830 F.3d at 388. These statements conveyed that the Cruise AV came to a complete stop without disclosing that the Cruise AV subsequently resumed driving, dragging the pedestrian. Defendants' October 24, 2023 disclosure revealed the truth of the Crash, causing a significant decline in GM's stock price. ¶374. Nothing more is needed at the pleading stage.

Defendants erroneously assert that the full truth about the October 2 Crash had already been revealed in a *Forbes* article published on October 6, 2023. Cruise MTD at 28; GM MTD at 32. But that article merely reported that a local politician alleged that Cruise AV "dragged" the pedestrian, which was contradicted by a

69

statement from Cruise "that it had nothing further to add" from its prior media comments in which Cruise had purportedly already "shared all pertinent information." ¶235. Due to Cruise maintaining its misleading statements surrounding the October 2 Crash and thus denying the allegations in the *Forbes* article, Defendants' media strategy had its intended effect, as the news coverage continued to omit references to pedestrian dragging. ¶¶236-37. Only on October 24, 2023 did the market learn the truth about the damage that the Cruise AV caused during the October 2 Crash and the consequences for Cruise. ¶¶365-75; 436-39.[24]

## CONCLUSION

Defendants' Motions should be denied. Should the Court grant any part of Defendants' Motions, Plaintiffs respectfully request dismissal be without prejudice so that Plaintiffs may move to cure any defect in the pleadings by amendment. *See Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002) (leave to amend "particularly appropriate" in cases subject to heightened pleading requirements).

---

[24] As Plaintiffs state a Section 10(b) claim, the Court should also sustain the Section 20(a) claims against the Individual Defendants. *See Proquest*, 527 F. Supp. 2d at 746. Separately, Defendants claim Plaintiffs' Rule 10b-5(a)/(c) claims should be dismissed because they are duplicative of the misstatement claims, but they should be sustained along with the misstatement claims. *Lorenzo v. SEC*, 587 U.S. 71, 84 (2019) (subsections of Rule 10b-5 govern overlapping conduct).

70

DATED: October 1, 2024                    Respectfully submitted,


                                          */s/ Jake Bissell-Linsk*
                                          Carol C. Villegas (N.Y.  4154324)
                                          Jake Bissell-Linsk (N.Y.  5445911)
                                          Guillaume Buell (N.Y.  4820288)
                                          Matthew J. Grier (N.Y.  5502216)
                                          Adam Federer (N.Y. 5574439)
                                          **LABATON KELLER SUCHAROW LLP**
                                          140 Broadway
                                          New York, NY 10005
                                          Telephone: (212) 907-0700
                                          cvillegas@labaton.com
                                          jbissell-linsk@labaton.com
                                          gbuell@labaton.com
                                          mgrier@labaton.com
                                          afederer@labaton.com

                                          *Lead Counsel for Lead Plaintiff*
                                          *City of Hollywood Police Officers'*
                                          *Retirement System and the Proposed Class,*
                                          *and additional named plaintiff Plymouth*
                                          *County Retirement Association*

                                          Matthew Henzi
                                          Cynthia Billings-Dunn
                                          **ASHER KELLY PLLC**
                                          25800 Northwestern Highway, Suite 1100
                                          Southfield, Michigan 48075
                                          Telephone: (248) 746-2710
                                          mhenzi@asherkellylaw.com
                                          cbdunn@asherkellylaw.com

                                          *Liaison Counsel for Lead Plaintiff*
                                          *City of Hollywood Police Officers'*
                                          *Retirement System and the Proposed Class*

71

Robert D. Klausner
Stuart Kaufman
**KLAUSNER, KAUFMAN, JENSEN &
LEVINSON**
7080 Northwest 4th Street
Plantation, Florida 33317
Telephone: (954) 916-1202
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for Lead Plaintiff*

72

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2024, I caused the foregoing paper to be electronically filed with the Clerk of the Court using the ECF system which will send notification of such filing to all parties of record.

DATED: October 1, 2024         Respectfully submitted,

*/s/ Jake Bissell-Linsk*
Jake Bissell-Linsk (N.Y. 5445911)