# Exhibit 39

2010 WL 1494767

2010 WL 1494767
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
E.D. Michigan,
Southern Division.

Kristy J. DOWNING, Plaintiff,

v.

FOLEY & LARDNER LLP, et al., Defendants.

No. 09-14351.
|
April 9, 2010.

**Attorneys and Law Firms**

Kristy J. Downing, Law Offices of Kristy Joi Downing, PLLC, Novi, MI, for Plaintiff.

Philip B. Phillips, Foley & Lardner, Detroit, MI, for Defendants.

***ORDER GRANTING DEFENDANTS' MOTION TO TRANSFER VENUE, TRANSFERRING ACTION TO THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF WISCONSIN AND CLOSING CASE IN THIS DISTRICT'S DOCKET***

DENISE PAGE HOOD, District Judge.

**I. INTRODUCTION**

 **\*1** Before the Court is Defendants' Motion to Transfer Venue, filed on November 25, 2009. Plaintiff filed a Brief in Opposition to Defendants' Motion to Transfer Venue on December 15, 2009. [1] On December 22, 2009, Defendants filed a Reply to Plaintiff's Brief in Opposition.

[1] Plaintiff's Brief in Opposition is untimely pursuant to E.D. Mich. L.R. 7.1(d)(2)(B) which required Plaintiff to file her response to Defendants' Motion to Transfer within fourteen (14) days after service of the motion. *See* E.D. Mich. L.R. 7.1(d)(2)(B). Defendants argue that this Court should not consider Plaintiff's Brief, however Plaintiff filed a

motion for extension of time to file her response, which the court granted on January 13, 2010.

**II. STATEMENT OF FACTS**
On November 5, 2009, Plaintiff, Kristy J. Downing, filed the instant action alleging employment discrimination based on gender and race, harassment, and constructive discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* the Equal Pay Act, 29 U.S.C. § 206(d) ( "EPA"), the Civil Rights Act of 1991, 42 U.S.C. § 1991a, and the Wisconsin Fair Employment Act, Wis. Stat. § 111.31 *et seq.*

Defendant, Foley & Lardner LLP ("Foley") is a limited liability partnership under the laws of Wisconsin and has its main office in Milwaukee, Wisconsin. Plaintiff alleges that sometime in March 2005, she interviewed with the Detroit, Michigan office of Foley. Compl., ¶ 5. Upon request, Plaintiff also interviewed with Foley's Milwaukee, Wisconsin office. *Id.* Plaintiff began her employment as an associate attorney in the 2004 Class at Foley's Milwaukee office on July 5, 2005. *Id.* Plaintiff was assigned to the Intellectual Property Department. *Id.*

Plaintiff alleges that in October of 2005, Foley implemented a policy to increase the salary of the associates hired in the Class of 2004 from $125,000.00 to $130,000.00. *Id.* at ¶¶ 7-9. Plaintiff was only paid $125,000.00. *Id.* at ¶ 10. Plaintiff brought her concerns regarding the discrepancy in her salary compared with her colleagues to her direct supervisor, James Morrow. *Id.* at ¶¶ 12-13. Mr. Morrow informed Plaintiff that Foley had not implemented a policy to increase the salary of the Class of 2004 associates. *Id.* at ¶ 14. Plaintiff also raised her concerns regarding the disparity in her salary to other partners at Foley, but each informed her that no policy for a salary increase had been implemented. *Id.* at ¶¶ 15-22. Plaintiff alleges that Foley informed other associates to not disclose to Plaintiff the discrepancy between her salary and their salaries. *Id.* at ¶ 24.

Plaintiff further alleges that Foley limited her employment opportunities within the firm. She claims that summer associates, as well as regular associates were routinely assigned various work projects, such as drafting freedom-to-operate/invalidity opinions, appeal briefs with the Board of Patent Appeals and Interferences, and other litigation related documents. *Id.* at ¶¶ 29-35. Plaintiff argues that Sharon Barner, a partner and Chair of the Intellectual Property Department, and Jeanne Gills, a partner and Vice-

2010 WL 1494767

Chair of the same department at Foley's Wisconsin office, discouraged members of that department from assigning Plaintiff work projects such as drafting freedom-tooperate/invalidity opinions, appeal briefs with the Board of Patent Appeals and Interferences, and other litigation related documents. *Id.* at ¶¶ 38-42, 44-51. Plaintiff also avers that Mrs. Barner encouraged other members of the Intellectual Property Department to give Plaintiff poor performance reviews. *Id.* at ¶ 43. Plaintiff brought her concerns regarding the apparent sabotage of her work assignments to her supervisors, but nothing was done to correct this. *Id.* at ¶¶ 54. Plaintiff maintains that Foley's actions in limiting her work assignments and opportunities was based on the fact that she is an African-American female. *Id.* at ¶¶ 55-56.

**\*2** Plaintiff also claims that she was retaliated against for raising her concerns regarding her salary and work assignments. After March 2006, partners and employees of Foley actively worked towards removing the volume of work that Plaintiff was assigned so that she could not meet her billable hours requirement of a minimum of nineteen hundred hours per year. *Id.* at ¶ 97. Plaintiff asserts that she was removed from projects involving Johnson Controls, one of Foley's clients. Plaintiff was also given performance evaluations that mischaracterized her work product. *Id.* at ¶¶ 59-63. Plaintiff reported these misleading evaluations to Marilyn Lagerman, a manager of Foley's Human Resources Department. *Id.* at ¶ 64. Ms. Lagerman referred Plaintiff to Maureen McGinnity, Chair of Foley's Diversity Committee. *Id.* at ¶ 65. After a few meetings, Ms. McGinnity informed Plaintiff that the instances of discrimination and retaliation were 'all in her head.' *Id.* at ¶¶ 67.

Plaintiff also experienced harassment and threats to her safety in retaliation for her reports regarding her salary, work assignments, and performance evaluations. *Id.* at ¶¶ 80-81. Another associate working in the Intellectual Property Department at Foley assaulted Plaintiff with his vehicle, nearly missing driving over Plaintiff's foot, as he intentionally drove his vehicle into the pedestrian crosswalk where Plaintiff was standing. *Id.* at ¶ 96. Plaintiff submits that she was also harassed and teased by her colleagues about her lack of work assignments. *Id.* at ¶¶ 91-95.

On May 19, 2008, Plaintiff submitted a two-week notice of resignation. *Id.* at ¶ 81. She was told to reconsider her decision by the manager of one of the practice groups within the Intellectual Property Department, Andrew Rawlins. *Id.* at ¶¶ 72, 81. When Plaintiff attempted to contact Mr. Rawlins to inform him that she wanted to rescind her letter of resignation, he failed to respond to her for two days and on May 29, 2008, told her that she was discharged from employment at Foley. *Id.* at ¶ 82. Plaintiff thereafter relocated to Michigan, and is now working as a solo-practitioner. Plaintiff avers that Foley continues to harass her by hiring agents to interfere with her personal and professional relationships. *Id.* at ¶ 85. Plaintiff believes that Foley has also prevented her from being hired by any local firms. *Id.* at ¶ 83.

## III. APPLICABLE LAW & ANALYSIS

### A. Introduction

Defendants move to transfer venue of this action to the United States District Court, Eastern District of Wisconsin, pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b), because venue is improper in this district. Defendants also move to transfer venue to the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1404(a), for the convenience of the parties, witnesses and in the interest of justice. Defendants first argue that Title VII's exclusive venue provision requires that this action be transferred to the Eastern District of Wisconsin because (1) the alleged unlawful employment practices were committed in the Eastern District of Wisconsin, (2) Plaintiff's employment records are maintained in Wisconsin, and (3) Plaintiff would have worked in Wisconsin but for the alleged unlawful employment practices. Defendants also argue that even if venue was proper under Title VII's venue provision, venue is nonetheless improper under § 1391(b) because not all of the Defendants reside in Michigan, nor did a substantial part of the events giving rise to this action occur in Michigan. Plaintiff is the only anticipated key witness in this action who resides in Michigan, and pursuant to § 1404(a), this action should be transferred as it has a substantial connection to Wisconsin.

### B. Section 2000e-5(f)(3) of Title VII

**\*3** Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.,* has its own exclusive venue provision which provides that:

> [A]n action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to

2010 WL 1494767

such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office.

42 U.S.C. § 2000e-5(f)(3). Title VII also states that " §§ 2000e-5(f)-(k) ... shall govern civil actions brought hereunder...." 42 U.S.C. § 2000e-16(d). "If the plaintiff brings suit in a jurisdiction that does not satisfy one of the venue requirements listed in 42 U.S.C. § 2000e-5(f)(3), venue is improper ." *Spencer v. Rumsfeld,* 209 F.Supp.2d 15, 17 (D.D.C.2002). "Section 5(f)(3) is not simply a supplement to 28 U.S.C. § 1391; it is the exclusive venue provision for all Title VII discrimination actions." *Gwin v. Reynolds & Reynolds Co.,* No. 01C770, 2001 U.S. Dist. LEXIS 9520, 2001 WL 775969 (N.D.Ill. July 10, 2001). Additionally, Title VII's venue provision takes precedence over the general venue provision under § 1391 when the Title VII claim is brought along with claims brought under other federal statutes. *See Strategic Management Harmony, LLC. v. Enhanced Business Consortium, Inc.,* No. 05-cv-0180, 2007 U.S. Dist. LEXIS 59014, 2007 WL 2316484 *18 (S.D.Ind. August 10, 2007).

Under Title VII's exclusive venue provision, venue of this action is proper in the Eastern District of Wisconsin. The alleged unlawful employment practices occurred in Wisconsin. This is where Plaintiff was subject to alleged discrimination in the workplace based on her race and gender, was denied work assignments in retaliation for her reporting this discrimination and was also subject to harassment and threats by colleagues at Foley's office in Wisconsin. Additionally, Plaintiff's employment records are maintained and administered in Wisconsin, Plaintiff would have continued her employment in Wisconsin had Defendant not engaged in discrimination and retaliatory acts and Defendant's principal place of business is in Wisconsin. Plaintiff's arguments to the contrary are without merit. Plaintiff, for the first time in this action, alleges that when she was offered employment at Foley's Wisconsin office, it was with the understanding that she would eventually be transferred to the Detroit office. *See* Plf.'s Br. in Opp. at 5,

Ex. A. Further she argues that she made several requests to transfer to Foley's Detroit office, but was denied based on Foley's retaliatory acts. *Id.* at 6, Ex. A.

Plaintiff did not raise the above allegations in her Complaint and cannot amend her Complaint via a responsive brief. Plaintiff's Complaint fails to allege any unlawful employment practice that was committed in Michigan. The only allegation in the Complaint connected to Michigan is Plaintiff's allegation that after she left Foley, she was harassed and stalked by a former partner of Foley's Detroit office. Because these allegations relate to conduct that occurred after her employment with Foley ended, such allegations cannot support Plaintiff's argument that unlawful employment practices occurred in Michigan. Venue is improper in Michigan and this cause of action is transferred to the Eastern District of Wisconsin.

## C. 28 U.S.C. § 1391

**\*4** Even if Plaintiff had not asserted a claim under Title VII, venue would still be improper under 28 U.S.C. § 1391. In actions such as the one presently before the Court, where jurisdiction is not based solely on diversity of citizenship but on a federal question, § 1391 governs. 28 U.S.C. § 1391 states that an action may:

> [m]ay be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omission giving rise to the claim occurred, [ ] or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b). "In cases with multiple defendants, venue must be proper with respect to all defendants." *Domino's Pizza PMC v. Caribbean Rhino,* 453 F.Supp.2d 998, 1005 (E.D.Mich.2006).

Here, not all of the Defendants reside in Michigan, the first named Defendant, Foley & Lardner LLP, resides in Wisconsin. Therefore, venue would only be proper in this district if a substantial part of the events giving

2010 WL 1494767

rise to this action occurred in this district. A review of Plaintiff's Complaint reveals that a "substantial part" of the events giving rise to this action occurred outside of Michigan. Plaintiff does not allege that any unlawful employment practice occurred in Michigan. Plaintiff's argues that because this Court can assert personal jurisdiction over the Defendants, venue in this district is proper. The cases cited by Plaintiff do not support such an unusual argument. For instance, in *Domino's Pizza,* a case also filed in this district, the defendants argued that the court should transfer the case to the Western District of Texas, without any support for their argument that the action could have been originally brought in that district. 453 F.Supp.2d at 1008. In rendering its decision on whether transfer of the case was appropriate pursuant to 28 U.S.C. § 1404(a), the court evaluated whether the action could have been originally brought in the district court that defendants sought to have the case transferred to. *Id.* Because the defendants could only show that one defendant was subject to personal jurisdiction in Texas, the court could not find that the action could have been brought in the Western District of Texas, holding that "[w]hile personal jurisdiction and venue may be proper in Texas with respect to [one of the defendants], to establish proper venue, venue must be proper for all defendants." *Id.* Plaintiff has made no showing that personal jurisdiction and venue is proper in this Court as to Foley & Lardner, LLP, Milwaukee, Wisconsin. The Court concludes that venue is also improper in Michigan pursuant to § 1391(b) and this action is transferred to the United States District Court for the Eastern District of Wisconsin.

### D. 28 U.S.C. § 1404

Defendants argue that even if venue was proper pursuant to both Title VII and § 1391(b), this action should be transferred for the convenience of the parties and witnesses and in the interest of justice, pursuant to 28 U.S.C. § 1404(a). 28 U.S.C. § 1404(a) provides, in relevant part:

> **\*5** (a) For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

Under this rule, district courts have broad discretion to transfer a case to any judicial district where it may been

brought originally. *Amphion, Inc. v. Buckeye Electric Co.,* 285 F.Supp.2d 943, 947 (E.D.Mich.2003). This Court must determine whether: (1) the action could have been brought in the proposed transferee-court, (2) the transfer will promote the interests of justice, (3) the transfer would serve the parties' and the witnesses' convenience. *See United States v. P.J. Dick Inc.,* 79 F.Supp.2d 803, 805-06 (E.D.Mich.2000).

To determine whether to transfer a case, district courts should "weigh in the balance a number of case-specific factors." *Stewart Organization, Inc. v. Ricoh Corp.,* 487 U.S. 22, 32, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988). Specifically, the court should consider:

> (1) the convenience of the parties; (2) the convenience of the witnesses; (3) the location of relevant documents and relative ease of access to sources of proof; (4) the locus of the operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances.

*Overland, Inc. v. Taylor,* 79 F.Supp.2d 809, 811 (E.D.Mich.2000) (citations omitted). Courts may additionally consider "any factor that may make any eventual trial 'easy, expeditious, and inexpensive.' " *Int'l Car Show Assoc. v. ASCAP,* 806 F.Supp. 1308, 1310 (E.D.Mich.1992) (quoting *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)).

Additionally, the Sixth Circuit has noted that "unless the balance is strongly in favor of the defendant the plaintiff's choice of forum should rarely be disturbed." *Nicol v. Koscinski,* 188 F.2d 537, 537 (6th Cir.1951) (citing *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055). "A plaintiff's chosen forum, however, is not sacrosanct, and will not defeat a well-founded motion for change of venue." *Thomas v. Home Depot, U.S.A., Inc.,* 131 F.Supp.2d 934, 937 (E.D.Mich.2001).

**Downing v. Foley & Lardner LLP, Not Reported in F.Supp.2d (2010)**

2010 WL 1494767

Plaintiff's main argument is that she is a sole practitioner and transfer of this matter to the Eastern District of Wisconsin will be a financial burden on her. She also argues that since she is a key witness, such inconvenience to her does not outweigh any inconvenience to Defendants or the proposed witnesses. Plaintiff's Complaint identifies the following sixteen potential witnesses: James Morrow, Maureen McGinnity, Marilyn Lagerman, Larry Lynch, Sharon Barner, Jeanne Gills, Nancy Geenan, Larry Satzer, David Luettgen, Andrew Rawlins, Joseph Ziebert, Howard Shipley, Walter Zimmerman, Nicole Lamb-Hale, Richard McKenna and Steven Eiserman, none of which reside in Michigan. *See* Defs.' Mot. for Tr. of Venue, Ex. A. None of the anticipated witnesses, other than Plaintiff, reside in Michigan. Likewise, none of these witnesses are subject to service of process in Michigan, which would require Plaintiff to travel outside of Michigan to conduct their depositions. While the convenience to the parties may favor Plaintiff's choice of venue, the convenience of the witnesses favors Defendants' position that this action should be transferred. "Witnesses' convenience is one of the most important factors in determining whether to grant a motion to change venue under § 1404(a)." *Id.* The Court concludes that even if venue is proper under Title VII and § 1391, transfer of this matter is nonetheless appropriate under § 1404(a).

## IV. CONCLUSION

**\*6** Accordingly,

IT IS ORDERED that Defendants' Motion to Transfer Venue **[Docket No. 5, filed on November 25, 2009]** is GRANTED.

IT IS FURTHER ORDERED that this action be transferred to the United States District Court for the Eastern District of Wisconsin.

IT IS FURTHER ORDERED that the Clerk TRANSFER this matter forthwith to the United States District Court for the Eastern District of Wisconsin and CLOSE this case in this Court's docket.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1494767

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 324150, Fed. Sec. L. Rep. P 99,009

2016 WL 324150
United States District Court, N.D. California.

IN RE ENERGY RECOVERY
INC. SECURITIES LITIGATION.

Master Case No. 15-cv-00265-EMC
|
Signed 01/27/2016

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION TO DISMISS

EDWARD M. CHEN, United States District Judge

## I. INTRODUCTION

**\*1** Plaintiffs have filed a class action against Energy Recovery Inc., and two of its officers, Thomas Rooney and Audrey Bold, for violations of federal securities laws. In essence, Plaintiffs charge Defendants with making false and misleading statements about Energy Recovery's contractual negotiations with prospective clients, requests for commercial proposals, core products, and internal controls over financial reporting. *See generally* Amended Class Action Consolidated Complaint ("Compl."). Defendants have moved to dismiss on a number of grounds, including: (1) that the alleged misstatements are protected under the Private Securities Litigation Reform Act's ("PSLRA") safe harbor provision for forward looking statements, (2) that they constitute vague statements of corporate optimism, and (3) that there are insufficient allegations suggesting that the statements were false when made. Finally, defendants argue that the Plaintiffs' allegations fail to give rise to a "strong inference" of scienter as required. The Court **GRANTS** in part and **DENIES** in part Defendants' motion to dismiss.

## II. REQUESTS FOR JUDICIAL NOTICE

A. Defendants' Request
Defendants request judicial notice over seven categories of documents or to consider them under the doctrine of incorporation by reference: (1) Energy Recovery's Form 8-K filed October 19, 2015; (2) Energy Recovery's earnings and conference call transcripts; (3) Energy Recovery's Forms 10-K filed with the SEC; (4) Historic Stock Quotes of Energy Recovery between October 19, 2015 and October 23, 2015 as provided by NASDAQ; (5) October 21, 2015 Report entitled "Schlumberger Endorsement Carries Weight: Upgrading on Oil & Gas Potential" by Credit Suisse; (6) November 5, 2015 Report entitled "More Teeth to the Schlumberger Vor Teq Agreement Than Initially Appreciated" by Credit Suisse; and (7) January 19, 2015 issue of Water Desalination Report. *See* Decl. of David M. Furbush in Support of Defs.' Mot. ("Furbush Decl."), Docket No. 65; Defendants' Request for Judicial Notice ("D's RJN"), Docket No. 66.

B. Plaintiffs' Objection and Motion to Strike
Plaintiffs object to the Court's consideration of four of the items. Lead Plaintiff's Motion to Strike and Objection to Defendants' Request for Judicial Notice ("RJN Response"), Docket No. 68. Plaintiffs object to Exhibits A, B, C, and C.1. These exhibits related to a licensing agreement between Energy Recovery and Schlumberger Technology Corporation ("Schlumberger") on October 14, 2015 and announced on October 19, 2015:

(1) **Exhibit A** is a copy of Energy Recovery's Form 8-K filed with the SEC on October 19, 2015. The form disclosed the Schlumberger Agreement as a material definitive agreement and included a press release announcing the Schlumberger Agreement;

(2) **Exhibit B** is a table of Energy Recovery's closing stock price on the NASDAQ Stock Market from October 19, 2015 to October 23, 2015;

(3) **Exhibit C** is a copy of a market analyst report by Credit Suisse, dated October 21, 2015, titled "Schlumberger Endorsement Carries Weight: Upgrading on Oil & Gas Potential";

**\*2** (4) **Exhibit C.1** is a copy of a market analyst report by Credit Suisse, dated November 5, 2015 titled "More Teeth to the Schlumberger VorTeq Agreement Than Initially Appreciated."

Plaintiffs are asking the Court to strike all factual assertions and arguments about the Schlumberger deal from defendants' motion to dismiss because the deal was not referenced in the Complaint. RJN Response at 4. Defendants respond that Exhibits A and B are filings with the SEC and matters of public record not subject to reasonable dispute. Docket No. 70 at 1-2, Defendant's Reply to Lead Plaintiff's Objection to Request For Judicial Notice and Opposition to Motion to Strike. As for Exhibits C and C.1, Defendants contend that

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 324150, Fed. Sec. L. Rep. P 99,009

the Complaint specifically quotes statements made by Energy Recovery about the VorTeq product (subject of the agreement between Energy Recovery and Schlumberger). *Id.* at 2.

C. Legal Standard for Judicial Notice

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), evidence beyond the pleadings should not be considered unless: (1) the document is attached to or incorporated by reference into the complaint; or (2) the fact is subject to judicial notice pursuant to Federal Rule of Evidence 201. *United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011).

Under Federal Rule of Evidence 201, "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Courts may take judicial notice of "*undisputed* matters of public record," but generally may not take judicial notice of "*disputed* facts stated in public records." *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (emphasis in original). Facts subject to judicial notice may be considered on a motion to dismiss. *Mullis v. U.S. Bankr. Ct.*, 828 F.2d 1385, 1388 (9th Cir. 1987).

The doctrine of incorporation by reference is distinct from judicial notice. The doctrine "permits a district court to consider documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the...pleadings.'" *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (quoting *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994)).

A court "may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion. The court may treat such a document as 'part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).'" *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (internal citations omitted). Such documents do not convert the motion to dismiss into a motion for summary judgment. *Id.* The Ninth Circuit states that "judicial notice is inappropriate where the facts to be noticed are irrelevant." *Meador v. Pleasant Valley State Prison*, 312 F. App'x 954, 956 (9th Cir. 2009).

1. Unopposed Items

**\*3** Defendants do not object to the Court considering Plaintiffs' Exhibits D-P. The Court **GRANTS** Plaintiffs' requests for judicial notice of the Exhibits D-P. When ruling on a motion to dismiss, a court may take judicial notice of SEC filings. *Dreiling v. Am. Express Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006). In this case, Energy Recovery's Forms 10-K and transcripts of conference earnings calls are judicially noticeable because they are matters of public record. Courts can consider securities offerings and corporate disclosure documents that are publicly available. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008); *see also Kuehbeck v. Genesis Microchip Inc.*, No. C 02-05344 JSW, 2005 WL 1787426,\*4 (N.D. Cal. July 27, 2005) (granting request for judicial notice of press releases, earnings call transcripts, and SEC filings referenced in the complaint). As for Exhibit P (January 19, 2015 issue of *Water Desalination Report*), it is referenced in the Complaint. Compl. ¶¶ 159, 170.

2. Opposed Items

The Court **DECLINES** Defendants' requests for judicial notice of the Exhibits C and C.1 and **GRANTS** Plaintiffs' motion to strike all defendants' factual assertions and arguments derived from these exhibits. While the Court may take judicial record of matters of public record, "[s]uch documents as analyst reports, however, may only be considered when they are submitted to establish 'whether and when certain information was provided to the market' not the truth of the matters asserted in the reports." *In re Wet Seal, Inc. Secs. Litig.*, 518 F.Supp.2d 1148 (C.D. Cal. 2007). Here, while it may be appropriate to judicially notice the existence of SEC filings and their contents, they post-date the events at issue and cannot establish whether the market knew about the Schlumberger deal during the Class Period. Thus, it appears their only relevance turns on the truth of statements therein. Determining the ultimate truth or falsity of the statements contained in the analyst reports is not a proper subject of judicial notice.

As to Exhibits A and B, the Court **GRANTS** Defendants' requests for judicial notice because these documents are SEC filings. However, notice is taken to establish the existence of the documents, not for the truth of the disputed facts. *Ritz Camera & Image, LLC v. Sandisk Corp.*, 772 F. Supp. 2d 1100, 1109 (N.D. Cal. 2011), *aff'd*, 700 F.3d 503 (Fed. Cir. 2012) ("[w]hile a court may take judicial notice of the existence of SEC filings, it may not take judicial notice of

Case 4:23-cv-13132-SDK-EAS ECF No. 42-6, PageID.2461 Filed 11/15/24 Page 9 of 109

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 324150, Fed. Sec. L. Rep. P 99,009

documents for the truth of disputed facts."); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) (taking judicial notice of the SEC documents for "the purpose of determining what statements the documents contain and not to prove the truth of the documents contents"). Thus, the Court **GRANTS** Plaintiffs' motion to strike all defendants' factual assertions and arguments derived from these exhibits.

### III. FACTUAL & PROCEDURAL BACKGROUND

In their Amended Class Action Consolidated Complaint, Plaintiffs allege as follows.

Defendant Energy Recovery is a Delaware Corporation with headquarters in San Leandro, California. Compl. ¶ 19. Energy Recovery designs, manufactures, and distributes "pressure energy technology" devices used in the water, oil and gas, and chemical industries. *Id*. ¶ 26. During the class period, Mr. Rooney was Energy Recovery's CEO and a member of the board of directors. *See id*. ¶¶ 8, 37. During the class period, Mr. Rooney was Energy Recovery's Chief Marketing Officer ("CMO"). *Id*. ¶ 6. The putative class consists of persons who purchased or otherwise acquired Energy Recovery common stock between March 7, 2013 and March 5, 2015 ("The Class Period"). *Id*. ¶ 1.

### A. False Statements

**\*4** Energy Recovery is "an industry leader in capturing reusable energy from industrial fluid flows and pressure cycles." *Id*. ¶ 19. Energy Recovery's devices are used in "fluid flow" applications, such as water desalination and oil and gas extraction. *Id*. ¶ 26. Historically, Energy Recovery has derived the majority of its revenue from water desalination operations. *Id*. ¶¶ 3, 27. Mr. Rooney joined Energy Recovery in February 2011 with an objective to diversify Energy Recovery's operations into the gas and oil markets. *Id*. ¶ 3. According to the Complaint, during the Class Period Defendant Rooney made false statements about: (1) prospective clients and contract negotiations; (2) the supposed "pipeline" of sales; (3) technical difficulties with Energy Recovery's products; and 4) internal controls designed to provide reasonable assurance regarding the reliability of financial reporting for external purposes in accordance with a framework developed by the Committee of Sponsoring Organizations for the Treadway Commission ("COSO").

#### 1. Energy Recovery's Prospective Clients and Contract Negotiations

According to the Complaint, between 2011 and 2014, Mr. Rooney ran the day-to-day operations of Energy Recovery as the Company's CEO. Compl. ¶ 28. He joined the company to increase Energy Recovery's oil and gas operations due to uncertainty in desalination markets around the world. *See id*. ¶ 27. During a March 6, 2014 earnings conference call Rooney stated:

> In 2012, we poured millions into researching and developing 3 new platform technologies for use within the sour gas processing industry. Technologies that we now refer to as IsoBoost, IsoGen and IsoPro. We did so in concert and in collaboration with our oil and gas industry plant partners. In 2013, we continued to pour millions into developing, testing and refining our 3 platform technologies. By the end of 2013 all 3 of our oil and gas technology platforms have been shipped to field locations around the world.

*Id*. ¶ 27.

Plaintiffs allege that "Rooney repeatedly misrepresented the Company's arrangements and contractual negotiations with prospective clients." *Id*. ¶ 40. According to Plaintiffs, Mr. Rooney misled Energy Recovery's investors about dealings with potential clients in three separate instances. Docket No. 67 at 6, Plaintiffs' Opposition to Defendants' Motion to Dismiss ("Opp'n"). First, during a March 7, 2013 earnings conference call, Mr. Rooney stated that Energy Recovery had succeeded in "reach[ing] a verbal agreement for a product sale to a new oil and gas client" from Mexico. Compl. ¶ 50. Second, Mr. Rooney misrepresented Energy Recovery's dealings with Aramco, the largest oil and gas producer in Saudi Arabia. Opp'n at 7; Compl. ¶¶ 86, 87. Third, Mr. Rooney misrepresented his dealings with Chinese oil and gas company, Sinopec. Opp'n at 7; Compl. ¶¶ 42, 88.

### a. Pemex

Plaintiffs allege that Mr. Rooney made false and misleading statements about a "verbal agreement" with Pemex. Compl. ¶ 50. In March 2013, Energy Recovery's former employee ("FE1" [1]), traveled to Mexico to present Energy Recovery's oil and gas products to Petróleos Mexicanos ("Pemex"). *Id.* ¶ 40. On March 6, 2013, after the client presentation, FE1 called Mr. Rooney stating that the meeting had gone "well." *Id.* Pemex showed "interest" in proceeding with the discussions, but no formal agreement was reached. *Id.* FE1 also reported that Energy Recovery would need to participate in a public bidding and procurement process. *Id.* FE1 explained to Mr. Rooney that because Pemex was a state-run company, the procurement process could take anywhere from 6 to 18 months. *Id.*

[1] FE1 worked for Energy Recovery from July 2011 through July 2014 as Senior Vice President of Sales and Vice President of Product Development for oil and gas. *Id.* ¶¶ 30, 82. FE1 worked with Mr. Rooney on a day-to-day basis and was hired to assist Mr. Rooney to diversify out of water desalination and into oil and gas services, including but not limited to developing products and business in the oil and gas sector. *Id.* ¶ 30.

 **\*5** The next day, on March 7, 2013, Mr. Rooney held a conference call to discuss 4Q12 financial results. *Id.* ¶ 49. During the call, he stated:

> Just yesterday, we reached a verbal agreement for a product sale to a new oil and gas client. We've just now begun our outbound sales effort. *Id.* ¶ 50. As I'd mentioned, we actually came to a verbal agreement with another significant oil company yesterday to move a project into field trials, in commercial field trials now this year. And that will likely spawn additional projects next year. [ ] So the verbal agreement that we had with the client yesterday was the first of 20 gas field operations that they'd like to attack.

*Id.* ¶ 51.

During the call, Mr. Rooney was referring to Pemex. Ultimately, Energy Recovery did not get the Pemex contract. *Id.* ¶ 53. Plaintiffs maintain that the above statements were false because, as noted above, a confidential witness – a former Energy Recovery vice president of sales – reported that Energy Recovery did not in fact have a contract with Pemex. *See id.* 40.

### b. Saudi Aramco

Next, Plaintiffs allege that Mr. Rooney made false and misleading statements about the delivery of an IsoGen product to Saudi Aramco. On November 7, 2013, Mr. Rooney held a conference call to discuss the 3Q13 financial results. *Id.* ¶ 85. During the call, Rooney stated: "[j]ust this week after a full year of testing the system in our facility, we're happy to announce that as we speak, our first IsoGen Recovery solution is pending shipment to the world's largest oil and gas producer, Aramco, in Saudi Arabia." *Id.* ¶ 86. Plaintiffs allege that the above statements were false because, in fact, "on or about September 24, 2013, the [Energy Recovery's] IsoGen product had failed a critical internal test and required replacement parts." *Id.* ¶ 87. Plaintiffs claim that, as a result of this failure, it was impossible for Energy Recovery to ship IsoGen product to Saudi Aramco before fiscal 2014.

### c. Sinopec

Plaintiffs allege that Mr. Rooney made false and misleading statements about a meeting with Sinopec executives. Between October 25 and 28, 2013, FE 1, Mr. Rooney and Ms. Bold traveled to China to visit a Chinese oil and gas facility, Sinopec. *Id.* ¶ 42. On November 7, 2013 Rooney held a conference call to discuss 3Q13 financial results. *Id.* ¶ 85. During the call, Rooney stated that "[w]hile in China, [he] took the occasion to visit with the regional leadership and plant management of the Sinopec facility in the Chaoyang gas plant where [he] saw firsthand, the progress being achieved in one of [Energy Recovery's] oil and gas field trials." *Id.* ¶ 88. Plaintiffs maintain that the above statements were false because Mr. Rooney "did not in fact meet with Sinopec's executive management." *Id.* ¶ 89.

Case 4:23-cv-13132-SDK-EAS ECF No. 42-6, PageID.2463 Filed 11/15/24 Page 11 of 109

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 324150, Fed. Sec. L. Rep. P 99,009

### 2. Energy Recovery' Core Products and Marketing Strategy

Next, Plaintiffs allege that Mr. Rooney and Ms. Bold were actively and publicly championing Energy Recovery's oil and gas products as "commercial" while they were still in the "engineering prototype phase." *Id*. ¶¶ 38, 39. According to the Complaint, Energy Recovery's core products are IsoBoost, IsoGen, and IsoPro. *Id*. ¶ 27. During several conference calls between March7, 2013 and November 7, 2013, Mr. Rooney made statements indicating that (1) there is no severe technology risk with Energy Recovery core products and that (2) it is certain engineering and technical bureaucracies inside of the oil and gas companies that impede full technical and commercial acceptance of Energy Recovery's core products with the oil and gas companies and that (3) challenges of Energy Recovery's technically successful devices are "more about logistics, approvals and procedures than matters of technical success and acceptance."*Id*. ¶¶ 51, 63, 64, 90.

**\*6** Plaintiffs allege that the above statements were false because according to FE1, by late-2013, IsoBoost was in the engineering prototype phase; IsoGen had failed internal lab tests twice; IsoPro was still waiting to be put into the field. *Id*. ¶ 38. More specifically, in mid-September 2013, Chesapeake Energy Corp. ("Chesapeake") raised concerns with FE 1 about total installations costs of the IsoPro product because the product was not able to function dynamically and had to be controlled manually. *Id*. ¶ 33. Also in September 2013, IsoGen failed a critical internal test performed in San Leandro, California. *Id*. ¶ 34. During the same month, FE1 and Dr. Prem Krish [2] refused to present Energy Recovery's core products at the Gas Processors Association ("GPA") conference scheduled for March/April 2014 because they were not ready. FAC ¶¶ 35, 36. Finally, on November 5, 2013, Energy Recovery's Board of Directors decided that the company would not in fact attend the GPA conference because the products were still experiencing technical difficulties at field-testing sites. *Id*. ¶¶ 7, 37.

[2] Energy Recovery's Chief Technology Officer.

The Complaint further alleges that Ms. Bold, as Chief Marketing Officer, created and implemented a public marketing strategy by which Energy Recovery misrepresented the operational status of the company's core products. ¶¶6-7, 31; Opp'n at 29. According to Plaintiffs, Ms. Bold "convinced Rooney that with smart marketing, Energy Recovery could market products before they were ready for commercialization." *Id*. ¶ 31. Plaintiffs allege that FE1

objected to Mr. Rooney's and Ms. Bold's marketing strategy after the October 2013 corporate retreat in Tucson, Arizona. *Id*.

### 3. Requests for Commercial Proposals

Next, the Complaint alleges that Mr. Rooney materially misled investors about the supposed "pipeline" of sales from oil and gas products while "omitting the truth concerning the design and testing status of the products upon which the 'pipeline' was purportedly based." *Id*. ¶ 9. For example, on May 8, 2014, Rooney held a conference call to discuss 1Q14 financial results. *Id*. ¶ 110. During the call, Rooney stated:

> I think it's probably safe to say that we'll see revenue conversion in 2015 and contract conversions that would beget press releases we hope to see this year and into next year. *Id*. ¶ 112. [W]e received requests for very specific commercial proposals pertaining to specific locations with technical specs already provided to us. Requesting commercial proposals for a substantial number of clients and the sum total of all that is as I say, close to a \$100 million, if all were converted to one time cash sales.

*Id*. ¶ 113.

On August 7, 2014, during the 2Q14 conference call, Mr. Rooney stated:

> So, what we are seeing is we opened the dam if you will on February 23, inbound interest well in excess of \$100 million, commercial contracts, technical vetting, field plant visits, again which have been spectacularly well received and then beginning to talk about calendarizing things. *Id*. ¶ 123. So I think possibly a more interesting question for investors to think about is not is there are \$100 million plus worth of pipeline activity,

Case 4:23-cv-13132-SDK-EAS ECF No. 42-6, PageID.2464 Filed 11/15/24 Page 12 of 109

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 324150, Fed. Sec. L. Rep. P 99,009

sales pipeline activity, but exactly how quickly will this turn into (revenue).

*Id*. ¶ 124.

Finally, on November 11, 2014, during the 3Q14 conference call, Mr. Rooney indicated that a "significant run-up revenue for [Energy Recovery] in oil and gas is inevitable." *Id*. ¶ 141.

Plaintiffs maintain that the above statements are "materially false and/or misleading" because Mr. Rooney "materially misled investors into believing that revenue was guaranteed and imminent," while omitting the truth about technical difficulties with Energy Recovery's core oil and gas products which impeded the recognition of revenue. *Id*. ¶¶ 114, 125, 142.

### 4. Energy Recovery's Internal Controls Over Financial Reporting

In a string of identical paragraphs, Plaintiffs allege that Mr. Rooney made materially false and/or misleading statements when Mr. Rooney certified in Form 10-K reports that Energy Recovery's internal control over financial reporting was effective according to criteria from the internal-control frameworks developed by the Committee of Sponsoring Organizations for the Treadway Commission ("COSO"). *Id*. ¶¶ 56-61, 68-73, 79-84, 93-98, 104-09, 116-21, 127-32, 133-38. Plaintiffs maintain that Mr. Rooney falsely certified that he was complying with the law as required by the Sarbanes-Oxley Act of 2002, because he failed to implement and maintain adequate internal controls. *Id*. ¶ 44.

**\*7** Form 10-K for fiscal 2012 states:

There were no changes in our internal control over financial reporting that occurred during our most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. *Id*. ¶ 57.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial

reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*Id*. ¶ 58.

The Complaint alleges that Mr. Rooney manipulated Energy Recovery's internal projections and "strong-arm[ed]" his subordinates into increasing internal sales projections as well. *Id*. ¶ 59. For example, according to FE1, in April 2013 Mr. Rooney forced FE1 against FE1's judgment to increase his sales projection for the gas and oil industry from $1 million to $4 million. *Id*. ¶ 45. Moreover, Energy Recovery's former SVP of Sales told FE1 that Rooney "calibrated" the desalination projections "all the time." *Id*. ¶ 48.

Plaintiffs maintain that the statements in the 10-K report were materially false and misleading because Mr. Rooney's certification misled investors that Energy Recovery "was implementing and maintaining a rigorous set of internal controls in accordance with COSO's criteria and guidelines," when in fact Energy Recovery's internal controls were ineffective. *Id*. ¶ 60.

### B. Disclosures of Truth

As alleged in the Complaint, the truth was partially disclosed on January 12, 2015, and subsequently on March 5, 2015.

On January 12, 2015, Energy Recovery issued a press release announcing Mr. Rooney's resignation from his position as Chief Executive Officer. *Id*. ¶ 144. Plaintiffs allege that in light of this news, Energy Recovery's stock declined by 20% and market capitalization decreased by approximately $50 million. *Id*. ¶ 147. According to Plaintiffs, another disclosure took place on March 5, 2015 during the 4Q14 conference call. During that call, Joel Gay [3] expressed his disappointment with Energy Recovery's "unacceptable" 2014 financial results. *Id*. ¶ 150. Plaintiffs allege that after that call, Energy Recovery's stock declined by 14.5% and market capitalization decreased by $24.5 million in one day. *Id*. ¶ 153.

Case 4:23-cv-13132-SDK-EAS ECF No. 42-6, PageID.2465 Filed 11/15/24 Page 13 of 109

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 324150, Fed. Sec. L. Rep. P 99,009

3    After Mr. Rooney's resignation, Mr. Gay, then-current CFO, replaced Mr. Rooney as CEO in April 2015. *Id*. ¶ 20.

C. Claims

Based on the above allegations, Plaintiffs have asserted two federal securities claims against Energy Recovery and its executives Mr. Rooney and Ms. Bold:

**\*8** (1) Violation of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. *Id*. ¶¶ 190-200.

(2) Violation of section 20(a) of the Act. *Id*. ¶¶ 201-206.

In the pending motion to dismiss, Defendants seek dismissal of both claims. Docket No. 64 ("MTD").

## IV. **DISCUSSION**

A. Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss based on the failure to state a claim upon which relief may be granted. *See*Fed. R. Civ. P. 12(b)(6). A motion to dismiss based on Rule 12(b)(6) challenges the legal sufficiency of the claims alleged. *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1995). In considering such a motion, a court must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party, although "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). While "a complaint need not contain detailed factual allegations...it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than sheer possibility that a defendant acted unlawfully." *Iqbal*, 550 U.S. at 678.

B. Elements of § 10(b)/10b-5 Claim

As noted above, Plaintiffs have asserted two claims against Defendants: (1) a section 10(b)/10b-5 claim and (2) a section 20(a) claim. Section 10(b) and Rule 10b-5 essentially impose liability for securities fraud. There are five elements that must be proven to establish a violation of Rule 10b-5. More specifically, a plaintiff must prove "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014) (internal citations omitted).

As for section 20(a), it essentially provides for derivative liability; that is, it "makes certain 'controlling' individuals also liable for violations of section 10(b) and its underlying regulations." *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 912 (N.D. Cal. 2012) (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009)). In order to prove a prima facie case under section 20(a), plaintiff must prove: (1) a primary violation of federal securities laws; and (2) that the defendant exercised actual power or control over the primary violator (here, Energy Recovery). *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). "Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions."*Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994) (internal quotation marks and citations omitted).

**\*9** Because Plaintiffs have brought securities fraud claims, Rule 12(b)(6) is not the only governing legal standard; so too are Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The pleading requirement is further heightened by the Private Securities Litigation Reform Act, which requires that a plaintiff alleging securities fraud

> plead with particularity both falsity and scienter." Thus, to properly allege falsity, a securities fraud complaint must now "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief,...state with particularity all facts on which that belief is formed." To adequately plead scienter, the complaint must now "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.

*Zucco*, 552 F.3d at 990-91 (emphasis added).

In the instant case, Defendants challenge Plaintiffs' securities fraud claims on the ground that Plaintiff has failed to adequately plead both material falsity and scienter. MTD at 7.

C. Falsity

To plead falsity, the complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). If an allegation regarding the statement or omission is made on information and belief, the complaint must "state with particularity all facts on which that belief is formed." *Id*.

"Central to a 10b-5 claim is the requirement that a misrepresentation or omission of fact must be material." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010). A statement is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1976). To plead materiality, the complaint's allegations must "suffice to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement, and to allow the court to draw the reasonable inference that the defendant is liable." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1323 (2011). "Although determining materiality in securities fraud cases should ordinarily be left to the trier of fact, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *In re Cutera*, 610 F.3d at 1108.

1. Energy Recovery's Prospective Clients and Contract Negotiations

a. Pemex

The Complaint alleges that the following statements made by Mr. Rooney are false or misleading statements of material fact:

- **March 7, 2013 Earnings Call, Mr. Rooney Statement**: "Just yesterday, we reached a verbal agreement for a product sale to a new oil and gas client." Compl. ¶ 50.

- **March 7, 2013 Earnings Call, Mr. Rooney Statement:** "As I'd mentioned, we actually came to a verbal agreement with another significant oil company

yesterday to move a project into field trial, in commercial field trials now this year." *Id*. ¶ 51.

As discussed above, during the call, Mr. Rooney was referring to Pemex. Ultimately, Energy Recovery did not get the Pemex contract. *Id*. ¶ 53. Defendants argue that the above statements are not actionable because: (1) Pemex was interested in moving forward with Energy Recovery but no formal agreement had been reached and (2) in Defendant's view "investors and analysts understand that reference to a 'verbal agreement' with a major oil company for a radically new product would mean an informal, non-final agreement that could be cancelled at any time." MTD at 14-15. Plaintiffs allege that Mr. Rooney made false and misleading statements about a "verbal agreement" with Pemex because FE1 who met with Pemex relayed to Mr. Rooney that because Pemex was a state-run company, Energy Recovery would need to participate in a lengthy public bidding and procurement process. Compl. ¶ 40. Pemex's interest did not rise to the level of an agreement, verbal or otherwise.

**\*10** In light of the FE1 allegations (discussed *supra*), and taking all inferences in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs have adequately alleged that the statements about "verbal agreement" were false or misleading when made. The Complaint alleges that although FE1's meeting with Pemex had gone "well" and that Pemex showed "interest" in proceeding with discussions, the procurement phase with Pemex could take anywhere from 6 to 18 months. *Id*. According to FE1, the procurement process begins with Energy Recovery providing Pemex with a design plan. Compl. ¶ 40. If acceptable, Pemex forwards the plan to its business management and procurement departments. *Id*. Pemex then tenders projects for open market bidding. *Id*. In response, firms provide Pemex with commercial and technical bids. *Id*. Only after these four steps are complete, does Pemex make the decision. *Id*. Given the complexity of and uncertainty in the procurement phase (including a bidding process) with Pemex, the state of affairs between Energy Recovery and Pemex on March 7, 2013, did not constitute any type of agreement – formal or informal.

b. Saudi Aramco

Next, Plaintiffs argue that Mr. Rooney misrepresented Energy Recovery's dealings with Aramco, the largest oil and gas producer in Saudi Arabia. Opp'n at 7; Compl. ¶¶ 86, 87. The

Case 4:23-cv-13132-SDK-EAS ECF No. 42-6, PageID.2467 Filed 11/15/24 Page 15 of 109

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 324150, Fed. Sec. L. Rep. P 99,009

Complaint alleges that the following statement made by Mr. Rooney is a false and misleading statement of material fact:

- **November 7, 2013 Earnings Call, Mr. Rooney Statement**: "Just this week after a full year of testing the system in our facility, we're happy to announce that as we speak, our first IsoGen Energy Recovery solution is pending shipment to the world's largest oil and gas producer, Aramco, in Saudi Arabia. Compl. ¶ 86.

Plaintiffs allege that the above statements were false because, in fact, "on or about September 24, 2013, the [Energy Recovery's] IsoGen product had failed a critical internal test and required replacement parts." *Id*. ¶ 87. Defendants argue that the above statements are not actionable because: (1) Mr. Rooney did not provide a specific shipment date; (2) there is a two-month gap between the statement and the alleged test failure and that (3) in fact, the IsoGen was shipped to Saudi Aramco in November 2013. MTD at 16.

The Court finds that Plaintiffs have adequately alleged that Mr. Rooney's statement about IsoGen's "pending shipment" to Saudi Aramco was false and misleading for two reasons. First, the word "pending" can reasonably be interpreted as implying immediate shipment. Although Defendants contend the IsoGen was shipped in November 2013, there is nothing before the Court at this juncture to prove this factual assertion. Plaintiffs generally allege that it was impossible for Energy Recovery to ship IsoGen product to Saudi Aramco before fiscal 2014. Compl. ¶ 87. Specifically, IsoGen product had failed a critical internal test and required replacement parts. *Id*. According to FE1, delivery of the replacement parts was not scheduled until the fourth quarter of fiscal 2013. *Id*. Furthermore, when FE1 reported the test results to Mr. Rooney, Mr. Rooney instructed FE1 not to tell Saudi Aramco that the test had failed. *Id*. ¶ 34. Plaintiffs have sufficiently alleged, for purposes of this motion, falsity.

### c. Sinopec

Finally, Plaintiffs allege that Mr. Rooney made false and misleading statements about a meeting with Sinopec executives. The Complaint alleges that the following statement made by Mr. Rooney is a false and/or misleading statement of material fact:

- **November 7, 2013 Earnings Call, Mr. Rooney Statement**: "While in China, we also took the occasion to visit with the regional leadership and plant management of the Sinopec facility in the Chaoyang gas plant where we saw first hand, the progress being achieved in one of our oil and gas field trials....And so 10 days ago or so, I was physically at the plant in China with Sinopec and they are and were effusive in their praise, sharing with us their economics, specifically named individuals at the plant level and at the corporate level that stand ready to give references....So we feel very, very good about that and we expect the same thing. I could say that just first hand, having physically been at the plants, and dealt with my counterpart at Sinopec, and also at the plant level management." *Id*. ¶ 88.

**\*11** Plaintiffs maintain that the above statements were false because according to FE1, during the facility visit at Sinopec, Mr. Rooney declined "to meet a member of Sinopec's executive management team." *Id*. ¶ 89. Defendants argue that the above statements are not actionable because Mr. Rooney merely stated that he visited "with *regional leadership* and *plant*," not executive management. MTD at 15. (emphasis in original). The Court concludes that Plaintiffs have adequately alleged that the statements about dealings with Sinopec were false and misleading when made. Mr. Rooney did state the he met with his "counterpart at Sinopec" while visiting the Sinopec facility in the Chaoyang gas plant. *Id*. ¶ 89.

However, the Complaint does not sufficiently allege that Mr. Rooney's statements about meeting with the executive at Sinopec are material. "Central to a 10b-5 claim is the requirement that a misrepresentation or omission of fact must be material." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010). "For purposes of securities fraud, 'materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information.' A statement is material if 'a reasonable investor would have considered it useful or significant.'" *United States v. Jenkins*, 633 F.3d 788, 802 (9th Cir. 2011). In the context of Mr. Rooney's one-time visit with Sinopec, it is unlikely that a reasonable investor would deem significant the difference between Energy Recovery's meeting with Sinopec's plant leadership and meeting with executive management.

Accordingly, the Court rules that when viewed in Plaintiffs' favor, the allegations that Mr. Rooney's statements about Energy Recovery's dealings with Pemex and Saudi Aramco were false and misleading are sufficient to survive a Rule 12(b)(6) motion. As to Sinopec, the Court holds that Plaintiffs have not alleged materiality.

2016 WL 324150, Fed. Sec. L. Rep. P 99,009

2. Energy Recovery's Core Products and Marketing Strategy

Plaintiffs allege that Mr. Rooney and Ms. Bold were actively marketing Energy Recovery's oil and gas products as "commercial" while they were still in the "engineering prototype phase." *Id*. ¶¶ 38, 39. The Complaint alleges that the following statements made by Mr. Rooney are false and/ or misleading statement of material fact:

- **March 7, 2013 Earnings Call, Mr. Rooney Statement**: "We probably have ongoing discussions with 8 to 10 [oil and gas companies] right now. We actually have not moved forward with anymore than the first 3 until just recently because we did not want to expose ourselves to anymore technology risk than we had with the first 3. We've seen enough in the trials now to change that and so I'd mentioned, we hired our first full-time sales mode. We don't see the technology risk being severe anymore so with the 8 to 10 that we've been working with, we're now actively in discussions about moving forward with various projects." *Id*. ¶ 51.

- **March 7, 2013 Earnings Call, Mr. Rooney Statement:** "[W]hat I can tell you is that the field trials have looked very promising and the conversations with the oil companies we've got going right now suggest extreme interest. But there are certain engineering and technical bureaucracies inside of these oil and gas companies and so as we work our way through that for full commercial acceptance, the timeline is the part that becomes least certain to us, but the level of interest is extreme." *Id*.

- **March 7, 2013 Earnings Call, Mr. Rooney Statement:** "The part that I don't control and maybe I don't even have as much clarity on as I will say a year from now is the path that you work through technical and commercial acceptance with these large giants. We will for sure make it through that, but does it take a month or 3 months or 6 months or where – and in each oil giant case, it seems to have a little bit different pace and speed, but we seem to be getting a great deal of attention in moving things along nicely." *Id*.

- **\*12** • **May 9, 2013 Earnings Call, Mr. Rooney Statement:** "For the most part, our challenges are more about logistics, approvals and procedures than matters of technical success and acceptance." *Id*. ¶ 63.

- **May 9, 2013 Earnings Call, Mr. Rooney Statement:** "[I]n all cases, it's been a tremendous amount of bureaucracy and approvals, double approvals, triple approvals in some cases and so we are methodically working through that and so I guess that of a severe case of naiveté, we felt that upon delivering technically successful devices, we would instantly go into trial modes and trial modes with last 6 months, we would get approvals and move on. And it turns out there is more – there are more hurdles, more bureaucracy, and we are literally creating a new industrial category around Energy Recovery for pressurized fluid flows and so, we simply need to be considerably more patient." *Id*. ¶ 64.

- **August 1, 2013 Earnings Call, Mr. Rooney Statement:** "Entering the oil and gas industry with revolutionary new energy recovery devices is and has taken longer than we originally expected but the outlook is very promising. So on the oil and gas area, as was mentioned in the last call, the field trial process has many more stages, hurdles and logistics to it than we knew when we first entered it." *Id*. ¶¶ 75-76.

- **November 7, 2013 Earnings Call, Mr. Rooney Statement:** "The one thing that we've learned about the oil and gas industry is that it has its own pace and we've been working through things at the oil and gas industry pace, but we are convinced that we're going to be moving now to contracts."*Id*. ¶ 90.

Defendants argue that the above statements are not actionable because: (1) Plaintiffs fail to cite a single marketing statement that was false and misleading; 2) that Mr. Rooney repeatedly referred to the need for "field trials" before receiving commercial contracts; and 3) that Mr. Rooney "never stated that the products were fully developed, tested, or ready to be sold to customers." MTD at 13-14. As to each challenged statement, Plaintiffs allege that the statements were false because according to FE1, by late-2013, IsoBoost was in the engineering prototype phase; IsoGen had failed internal lab tests twice; IsoPro was still waiting to be put into the field. *Id*. ¶ 38. Plaintiffs state that Energy Recovery's core products "were not yet commercially developed" because:

- (a) "Energy Recovery's products...were only engineering prototypes (*i.e.*, either in the midst of field-testing or being modified to remedy certain design deficiencies)." *Id.* ¶ 31.

Case 4:23-cv-13132-SDK-EAS ECF No. 42-6, PageID.2469 Filed 11/15/24 Page 17 of 109

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 324150, Fed. Sec. L. Rep. P 99,009

- (b) "[I]n mid-September 2013, one of Energy Recovery's potential clients, Chesapeake Energy Corp. was experiencing problems with the Company's IsoPro product. Specifically, the IsoPro's "contractor" component was not applying pressure properly throughout the processing phase. The "contractor" is a component or stag in which gas comes into contact with liquid. In other words, the product was not able to function dynamically and had to be controlled manually. Chesapeake began raising concerns with FE1 about the total installation costs of the product. FE 1 relayed these concerns to Rooney. Rooney became worried that Chesapeake may not proceed with Energy Recovery's IsoPro product and, as a result, Rooney told FE1 not to discuss the problems with Chesapeake with anyone, including the public." *Id.* ¶ 33.

**\*13** • (c) In September 2013, "Energy Recovery's IsoGen product also failed a critical internal test. The particular problem with the product involved vibrations emanating from a bearing between a tribune and generator. The vibrations were so severe that they began to bend the product's chassis, which resulted in the nonalignment of the motor and leaking. The test had been performed in San Leandro, California. When FE1 reported the test results to Rooney, Rooney told FE1 not to tell the Company's prospective client, Saudi Aramco, that the test had failed." *Id.* ¶ 34.

- (d) "Notwithstanding, Rooney wanted to present Energy Recovery's products at the GPA conference, which was scheduled to occur in March or April 2014. In September 2013, FE 1 had a conversation with Rooney during a management meeting at the San Leandro office. FE 1 told Rooney that FE 1 refused to present the Company's products at the GPA conference because the product was not ready yet. In response, Rooney immediately asked Dr. Prem Krish (Energy Recovery's Chief Technology Officer) to present at the GPA instead of FE 1. Nocair Bensalah (Energy Recovery's Vice President, Manufacturing, and Bold were present during this conversation." *Id.* ¶ 35.

- (e) "Thereafter, Dr. Krish went to FE 1 and asked FE 1 for advice because he, just like FE 1, did not feel comfortable presenting the products at the GPA conference. FE 1 and Dr. Krish then went to Rooney to tell them that neither of them would present the Company's products at the GPA conference. Facetiously,

Dr. Krish suggested that Rooney have Bold present at the conference in light of the fact that she could avoid certain technical questions on the basis that she was in marketing and not engineering. Rooney asked Dr. Krish why he was declining to speak at the conference, to which Dr. Krish replied that Energy Recovery simply did not have a working product yet." *Id.* ¶ 36.

- (f) "On November 5, 2013, Energy Recovery's Board of Directors held a meeting. During the meeting, FE 1 presented on the status of the Company's products (i.e., that they were in the engineering prototype phase). One of the Company's directors later that after FE 1 had left the meeting, the Board of Directors had asked Rooney why he was so intent on presenting at the GPA if FE 1 was advising against it. According to FE 1, the director said that Rooney responded by stating that "[FE 1] and [Buehler] are now against me so I guess I can't." The Board of Directors decided that the Company would not attend the GPA conference. *Id.* ¶ 37.

- (g) According to FE 1, by late-2013, Energy Recovery's Oil and Gas products still had not reached commercialization. The IsoBoost product had field-tested, but was still in the engineering prototype phase. Energy Recovery's two other products were also still in the engineering prototype phase—IsoGen had failed internal lab tests twice and had not been field-tested and IsoPro was still waiting to be put into the field after being assembled for Chesapeake. All of Energy Recovery's products were engineering prototypes, which meant that nothing was ready for commercial production. *Id.* ¶ 38.

- (h) Meanwhile, Rooney and Bold were actively marketing these products as commercial. Rooney and Bold even went so far as to record a promotional video for the IsoBoost product by filming a gas processing facility in Texas that used only a component of the IsoBoost product (as opposed to the IsoBoost product itself). The component was a product manufactured by Pump Engineering, a company acquired by Energy Recovery in December 2009. Rooney and Bold visited the gas processing facility and recorded the promotional video in December 2013. *Id.* ¶ 39.

**\*14** The Court finds that falsity has not been adequately pled for the August 8, 2013 and November 7, 2013 earnings calls statements. A serious shortcoming of the Complaint is its failure to allege specific facts showing exactly what is false about the full field trial process. As for the November 7, 2013

Case 4:23-cv-13132-SDK-EAS ECF No. 42-6, PageID.2470 Filed 11/15/24 Page 18 of 109

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 324150, Fed. Sec. L. Rep. P 99,009

earnings call statement, it is too vague and general to imply anything concrete.

However, taking all inferences in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs have adequately alleged that the remaining statements contained in the Complaint were false and misleading when made. The Complaint alleges serious technical difficulties with IsoGen and IsoPro that caused Energy Recovery's Board of Directors to decline to present these products at the GPA conference. *Id*. ¶¶ 33-38. The statements about challenges concerning the full commercial acceptance of Energy Recovery's core products were also misleading because they created the impression that the delay in commercial revenue was due only to bureaucracy; meanwhile, Energy Recovery allegedly suffered from serious technical shortcomings of its products. Accordingly, the Court rules that when viewed in Plaintiffs' favor, the allegations that Mr. Rooney's statements were misleading are sufficient to survive a Rule 12(b)(6) motion.

### 3. Requests for Commercial Proposals

Plaintiffs assert that Mr. Rooney made false and misleading statements in March, May, August, and November 2014 by referring to requests for very specific commercial proposals when, in fact, in September 2013, Energy Recovery had experienced significant technical difficulties with IsoGen and IsoPro. *See id*. ¶¶ 33-38, 101, 112, 123, 124, 141. More specifically, during a November 11, 2014, 3Q14 conference call, Mr. Rooney indicated that a "significant run-up revenue for [Energy Recovery] in oil and gas is inevitable." *Id*. ¶ 141. Plaintiffs maintain that Mr. Rooney "materially misled investors into believing that revenue was guaranteed and imminent," while omitting the truth about technical difficulties with Energy Recovery's core oil and gas products. *Id*. ¶ 114, 125, 142. Here, it is unclear whether Energy Recovery was still experiencing technical problems with its core products as of November, 2014. The Complaint alleges that according to FE1, "Energy Recovery's products remained in the engineering prototype phase well into late-2013 and beyond." *Id*. ¶ 77.

Furthermore, during oral argument Plaintiffs' counsel asserted that Energy Recovery's products were not ready for sale until late-2013/early-2014. Thus, as currently pled, it is unclear what the status of the core products was at the end of 2014. Because the most specific statement about the revenue from oil and gas was made in November 2014 (well after late-2013), the Court concludes that Plaintiffs have failed to allege with sufficient particularity under PSLRA

and the plausibility standard of *Iqbal* and *Twombly* that the statement about "inevitable" revenue identified in the Complaint was false or misleading when made. As for August 7, 2014 statements about "calendarizing things" and that there was a question about "how quickly [sales pipeline activity] will...turn into (revenue)," these statements are neither false nor misleading because they merely indicate that Energy Recovery was enjoying a certain level of commercial interest; these statements did not imply with requisite specificity that the oil and gas products were ready to be sold on the market. Finally, Mr. Rooney's revenue projections (including a prediction about "inevitable" revenue) are too vague to be false and misleading. The Complaint fails to allege specific representations or projections: even with the "inevitable" revenue statement, Mr. Rooney does not commit to predictions of "significant revenue." Accordingly, the statements about commercial proposals and revenue projections are dismissed in their entirety.

### 4. Energy Recovery's Internal Controls Over Financial Reporting

**\*15** For the statements about internal controls over financial reporting, Plaintiffs allege that Mr. Rooney made materially false and/or misleading statements when Mr. Rooney certified in Form 10-K reports that (1) Energy Recovery's internal control over financial reporting was effective according to criteria from the internal-control frameworks developed by the Committee of Sponsoring Organizations for the Treadway Commission ("COSO"); and (2) Energy Recovery was complying with the law as required by the Sarbanes-Oxley Act of 2002. *Id*. ¶ 44.

Form 10-K for fiscal 2012 states:

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant

Case 4:23-cv-13132-SDK-EAS ECF No. 42-6, PageID.2471 Filed 11/15/24 Page 19 of 109

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 324150, Fed. Sec. L. Rep. P 99,009

role in the registrant's internal control over financial reporting.

*Id*. ¶ 58.

Plaintiffs maintain that the statements in the 10-K report were materially false and misleading because Energy Recovery's internal controls were ineffective for two reasons. *Id*. ¶ 60. First, Mr. Rooney was forcing his subordinates into increasing internal sales projections. *Id*. ¶ 59. Second, Mr. Rooney was "calibrating" his own sales projections "all the time." *Id*. ¶ 48.

Defendants argue that the above statements are not actionable because: (1) the COSO frameworks are not the law; and (2) the adjustment of *internal* sales projections does not render the Company's internal control over *external* financial reporting ineffective. Opp'n at 11 n. 7; *Id*. at 12 (emphasis in original). The Court addresses each argument in turn. First, courts have imposed liability for non-compliance with COSO frameworks. *See In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 471, 504 (S.D.N.Y. 2011)*on reconsideration*, No. 07 CIV. 10453, 2011 WL 4072027 (S.D.N.Y. Sept. 13, 2011) and *on reconsideration*, No. 07 CIV. 10453, 2011 WL 4357166 (S.D.N.Y. Sept. 13, 2011) (stating that the Securities Complaint has provided sufficiently detailed allegations regarding Bear Stearns' failure to maintain effective internal controls related to its financial reporting and violated the "Internal Control-Integrated Framework" issued by COSO and various other requirements found in the SEC regulations and the Sarbanes-Oxley Act."); *In re Wash. Mut. Inc. Sec.*, 694 F. Supp. 2d 1192, 1212 (W.D. Wash. 2009) (finding misstatements about the adequacy of internal controls as actionable).

Nonetheless, it is not clear from the Complaint whether Mr. Rooney's "calibrated" internal reports produced unreliable and skewed external reports. Plaintiffs rely on *In re Wash. Mut. Inc. Sec.*, 694 F. Supp. 2d 1192 (W.D. Wash. 2009) to argue that misstatements in offering documents about the adequacy of internal controls are actionable under Securities Act. Opp'n at 20. In that case, however, the defendant issued a press release containing false statements as to the defendant's net income, allowance, and earnings per share. *Id*. Here, Plaintiffs do not identify false or misleading financial statements or documents made to the public; nor do Plaintiffs identify how *internal* sales projections materially sanctioned by Mr. Rooney misled the public. Finally, Plaintiffs have failed to pinpoint precisely how paragraph 5 of the Form 10-

K contains a false or misleading statement that was made to the market.

**\*16** Accordingly, the allegations about Mr. Rooney's statements regarding internal controls fail to state a claim.

D. Safe Harbor/Bespeaks Caution

Defendants argue that many of the allegedly false or misleading statements are forward-looking, thus the safe harbor provision of the PSLRA and the bespeaks caution doctrine immunize them from liability. MTD at 22-23.

Under the PSLRA's safe harbor provision:

> a person...shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—
>
> (A) the forward-looking statement is—
>
> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement....

15 U.S.C. § 78u–5(c)(1).

The bespeaks caution doctrine provides for immunity in essentially the same circumstances as does the safe harbor provision *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 948 (9th Cir. 2005) (noting that the PSLRA safe harbor provision codifies the bespeaks caution doctrine for forward-looking statements); *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004) (noting that "[t]he PSLRA created a statutory version of [the bespeaks caution] doctrine by providing a safe harbor for forward-looking statements identified as such, which are accompanied by meaningful cautionary statements"). Thus, the Court addresses the two protections simultaneously. *See e.g.*, *In re Copper Mt. Secs. Litig.*, 311 F.Supp.2d 857, 876 (N.D. Cal.2004) (stating that "it is appropriate to consider the two protections simultaneously").

1. Energy Recovery's Prospective Clients and Contract Negotiations

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 324150, Fed. Sec. L. Rep. P 99,009

### a. Pemex

As noted above, Plaintiffs claim that Mr. Rooney's March 7, 2013 comments about a "verbal agreement" with Pemex were materially false or misleading because FE1 who met with Pemex relayed to Mr. Rooney that because Pemex was a state-run company, Energy Recovery would need to participate in a lengthy public bidding and procurement process before securing a formal contract. Compl. ¶ 40. The statements about a "verbal agreement" with Pemex do not constitute "forward-looking statements" because these statements all contain representations of historical fact – for example, the assertion that Energy Recovery "actually came to" or "reached" a verbal agreement with a significant oil company. *Id*. ¶¶ 50, 51. Thus, the Court concludes that the PSLRA safe harbor does not apply and need not address whether Defendants' cautionary language was "meaningful." *See e.g.*, *City of Hialeah Employees' Retirement Sys. & Laborers Pension Trust Funds v. Toll Brothers, Inc.,* No. 07-1513, 2008 WL 4058690, at *2 (E.D. Pa. Aug. 29, 2008)* ("[B]ecause these statements were not forward-looking...the safe harbor provision of the PSLRA [is] inapplicable.").

### b. Saudi Aramco

As noted above, Plaintiffs claim that Mr. Rooney's November 7, 2013 statement about IsoGen's pending shipment to Saudi Aramco was materially false and misleading because IsoGen failed a critical internal test in September 2013. Compl. ¶ 87. The statement about a "pending shipment" to Saudi Aramco does not constitute a "forward-looking statement" because this statement contains representations of a present fact. Thus, the Court concludes that the PSLRA safe harbor does not apply and need not address whether Defendants' cautionary language was "meaningful." *City of Hialeah Employees' Retirement Sys.*, No. 07-1513, 2008 WL 4058690, at *2.

### 2. Energy Recovery's Core Products and Marketing Strategy

**\*17** As discussed above, Plaintiffs allege that Mr. Rooney concealed from the market serious technical difficulties with Energy Recovery's core products by blaming the delay with the full commercial acceptance of Energy Recovery's core products on logistics, approvals, engineering and technical bureaucracies inside the oil and gas companies. Compl. ¶¶ 51, 63. Because Mr. Rooney's statements concerning the

bureaucracies and general business practices within the oil and gas industry are in the past or present tense, the PSLRA's safe-harbor does not apply. *Id*. ¶¶ 51, 63, 64, 76, 90.

### 3. Requests for Commercial Proposals

In their motion to dismiss, Defendants point out that the following allegedly false or misleading statements are forward-looking. MTD at 23:

- "I think it's probably safe to say that we'll see revenue conversion in 2015 and contract conversions that would beget press releases we hope to see this year and into next year."

  *Id*. ¶ 112. (May 8, 2014 statement by Rooney during earnings call).

- "And then meaningful revenue on oil and gas next year, I think we stand right now is that we see a whole wall of client activity going on, and proposal activity, that give us a very wide spectrum in terms of what potential revenue could come from oil and gas next year."

  *Id*. ¶ 141. (November 11, 2014 statement by Rooney during earnings call).

- "We're positioning for a significant revenue in 2015, but really what we've accepted is that a significant run-up of revenue for us in oil and gas is inevitable. It is going to happen in the first quarter, in the fourth quarter, is it going to happen in 2016? We are taking one step at a time. The word internally now is that this oil and gas industry and revenue there for us is inevitable...Significant revenue in 2015? I would like to think so, but really what we're more focused on is moving significant numbers of projects into the pipeline into this inevitable future for us."

  *Id*. (May 8, 2014 statement by Rooney during earnings call).

Defendants argue that these statements are forward-looking because they are statements about future economic performance. Docket No. 69 at 7 ("Reply"). The Court need not address whether Mr. Rooney's statements concerning Energy Recovery's "inevitable" sales "pipeline" is forward-looking because as discussed above this statement is too vague to be false and misleading. The remaining statements, however, are clearly forward-looking. *See*15 U.S.C. § 78u-5(i)(1)(B). [4] *See generally In re Cutera Sec. Litig.*, 610

Case 4:23-cv-13132-SDK-EAS ECF No. 42-6, PageID.2473 Filed 11/15/24 Page 21 of 109

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 324150, Fed. Sec. L. Rep. P 99,009

F.3d 1103, 1111 (9th Cir. 2010) (earnings projections by definition are forward-looking statements); *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) (analysts calls are "classic growth and revenue projections, which are forward-looking on their face.").

4    "The term 'forward-looking statement means'...a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." 15 U.S.C. § 78u-5(i)(1)(B).

However, to fall within the safe harbor, a statement must not only be forward-looking, but also accompanied by meaningful cautionary language. 15 U.S.C. § 78u-5(c)(1)(A)(i). This requires that the cautionary language "relate directly to that to which plaintiffs claim to have been misled." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1415 (9th Cir. 1994). Plaintiffs contend that the cautionary language here is inadequate because Defendants used the rote opening statements at the outset of their conference calls. Opp'n at 28. In support of this argument, Plaintiffs cite a number of cases where warnings of the generic risks did not constitute meaningful cautionary language. *See e.g.*, *Fecht v. Price Co.*, 70 F.3d 1078, 1081-82 (9th Cir. 1995) (stating that cautionary language did not render statements not misleading); s*ee also In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 882 (N.D. Cal. 2004) (stating that under PSLRA's safe harbor provision for forward-looking statements, "boilerplate language warning that investments are risky or general language not pointing to specific risks is insufficient to constitute a meaningful cautionary warning").

**\*18** In this case, Defendants' Forms contain virtually identical risk factor language. [5] Defendants rely on *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051 (9th Cir. 2014) to argue that less specific factors have been held to be meaningful by the Ninth Circuit. Reply at 8. In *Police Ret. Sys.*, however, defendants "identif[ied] important factors that could cause actual results to differ materially from those in the forward-looking statement." 759 F.3d at 1058. In this case, Energy Recovery's warnings were not attendant to specific types of problems relevant to Energy Recovery. Thus, Mr. Rooney's statements are more akin to non-specific boilerplate warnings insufficient to confer immunity. *See In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d at 882. Thus, Mr. Rooney's statements about potential revenue, though forward-looking, are not protected by bespeaks caution doctrine.

5    Transcripts of the earnings calls state: "Consequently, some of our comments and responses to questions may contain forward-looking statements about market trends, future revenue, growth expectations, cost structure, gross profit margins, new products, and business strategy. Such forward-looking statements are based on current expectations about future events and are subject to the Safe Harbor provisions of the US Private Securities Litigation Reform Act. Forward-looking statements are not guarantees of future performance and are subject to certain risks, uncertainties, and other factors that could cause actual results to differ materially from those discussed. A detailed discussion of these factors and uncertainties is contained in the reports that the Company files with the US Securities and Exchange Commission. The Company assumes no obligation to update any forward-looking statements made during this call except as required by law." D's RJN, Ex. D, I-O at 2.

E. Corporate Optimism

Defendants argue that "the Complaint alleges eight statements which are clearly inactionable optimistic corporate statements." MTD at 19:

- "Entering the oil and gas industry with revolutionary new energy recovery devices is and has taken longer than we originally expected but the outlook is very promising. We have solid expectations for revenue in 2014, followed by strong growth well into the future."

  *Id*. ¶ 75. (August 1, 2013 statement by Rooney during earnings call).

- "With sales cycle in these 2 industries can be long, but we will remain confident that we will achieve revenue in 2014 with serious growth leading into 2015. Where we sit today I feel very good about how far we have come in 3 short years. We have spent the past 3 years steadily and patiently building our position in the oil and gas industry to appoint where today we're now comfortably moving into full speed commercial roll out. The long term potential for Energy Recovery in the oil and gas industry is immense."

  *Id*. ¶ 100. (March 6, 2014 statement by Rooney during earnings call).

Case 4:23-cv-13132-SDK-EAS ECF No. 42-6, PageID.2474 Filed 11/15/24 Page 22 of 109

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 324150, Fed. Sec. L. Rep. P 99,009

• "I think it's probably safe to say that we'll see revenue conversion in 2015 and contract conversions that would beget press releases we hope to see this year and into next year. But I guess I will not pretend to be an expert in terms of the pace at which this stuff will convert, but I will dwell on, I guess the one point that I know which is the amount of attention we are on, I guess the one point that I know which is the amount of attention we are getting in the specific commercial requests and the magnitude of all of those."

*Id.* ¶ 112. (May 8, 2014 statement by Rooney during earnings call).

• "I think we announced last quarter that after our outbound marketing efforts that began on February 23 I believe we had close to $100 million of commercial interest. We have – that number continues to grow and I would prefer not to quantify that anymore and kind of get into that cycle, but let's just say it continues to grow very nicely, where we stand and we are putting together and issuing commercial proposals against that interest level...the results have been eye-popping.

*Id.* ¶ 123. (August 7, 2014 statement by Rooney during earnings call).

**\*19** • "So what we are seeing is, we opened the dam if you will on February 23, inbound interest well in excess of $ 100 million, commercial contracts, technical vetting, filed plant visits, again which have been spectacularly well received and then beginning to talk about calendarizing things....That's one thing we have learned, but the activity level and the interest level has been very, very positive." *Id.* (August 7, 2014 statement by Rooney during earnings call). [p. 10]

• "The $100 million-plus in solicited proposals is an indication of the strength of our value proposition."

*Id.* ¶ 140. (November 11, 2014 statement by Rooney during earnings call).

• "And then meaningful revenue on oil and gas next year, I think we stand right now is that we see a whole wall of client activity going on, and proposal activity, that give us a very wide spectrum in terms of what potential revenue could come from oil and gas next year."

*Id.* ¶ 141. (November 11, 2014 statement by Rooney during earnings call).

• "We're positioning for a significant revenue in 2015, but really what we've accepted is that a significant run-up of revenue for us in oil and gas is inevitable. It is going to happen in the first quarter, in the fourth quarter, is it going to happen in 2016? We are taking one step at a time. The word internally now is that this oil and gas industry and revenue there for us is inevitable...Significant revenue in 2015? I would like to think so, but really what we're more focused on is moving significant numbers of projects into the pipeline into this inevitable future for us."

*Id.* (November 11, 2014 statement by Rooney during earnings call).

"'Vague statements of opinion are not actionable under the federal securities laws because they are considered immaterial and discounted by the market as mere puffing.'" *In re OmniVision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090, 1102 (N.D. Cal. 2013) (quoting *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998)). As the Ninth Circuit has noted, "[w]hen valuing corporations,...investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *In re Cutera*, 610 F.3d at 1111. Thus, courts have noted that "puffing" statements are generally "'not capable of objective verification,' and 'lack[ ] a standard against which a reasonable investor could expect them to be pegged.'" *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005) (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997)).

For example, courts have found statements "projecting 'excellent results,' a 'blowout winner' product, 'significant sales gains,' and '10% to 30% growth rate over the next several years'" held inactionable. *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005); *see also In re Mellanox Techs., Ltd. Sec. Litig.*, No. 13-CV-04909, 2014 WL 7204864, at *3 (N.D. Cal. Dec. 17, 2014) (statements "we continue to soar"; "I'm sure we'll get there"; "we will continue to grow"; and "[w]e intend to increase our market share to 30% and more" held inactionable).

However, "[w]hen determining whether statements amounted only to puffery, the court must analyze the context in which the statements were made." *In re Bridgepoint Educ., Inc. Sec. Litig.*, No. 3:12-CV-1737 JM (WMC), 2013 WL 5206216, at *17 (S.D. Cal. Sept. 13, 2013). Thus, even a statement

2016 WL 324150, Fed. Sec. L. Rep. P 99,009

of opinion or an expression of corporate optimism may be deemed actionable in certain circumstances because "there is a difference between enthusiastic statements amounting to general puffery and opinion-based statements that are anchored in 'misrepresentations of existing facts.'" *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260, 310 (S.D.N.Y. 2010) (quoting *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000)); *see also Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation."). Accordingly, the courts do not evaluate the statements in a vacuum by "plucking the statements out of their context to determine whether the words, taken *per se*, are sufficiently 'vague' so as to constitute puffery," but rather examine the entire statement and its circumstances to determine if it is actionable. *Scritchfield v. Paolo*, 272 F. Supp. 2d 163, 176 (D.R.I. 2003).

**\*20** "Puffery" is not-actionable under the PSLRA because the law deems such statements so amorphous as to be immaterial. *See In re Omnivision*, 937 F. Supp. 2d at 1102. However, determining whether a given statement is material "entail[s] fact-intensive assessments that are more properly left to the jury." *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012). Thus, "[i]n deeming a statement puffery at the motion to dismiss stage, courts must exercise great caution." *Id.*; *see also In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1028 (N.D. Ill. 2004) (declining to hold that statements were puffery at the motion to dismiss stage because materiality involves "delicate assessments of the inferences a reasonable shareholder would draw"). Accordingly, to dismiss claims on the ground that the statements are "puffery," the Court must conclude that the statement is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) (citation omitted); *see also In re Scientific-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1360 (N.D. Ga. 2002) ("A statement can be dismissed as puffery as a matter of law only if it is immaterial because it is so exaggerated or so vague that a reasonable investor would not rely on it in considering the 'total mix' of facts available.").

In this case, Plaintiffs conceded that Rooney's statements about Energy Recovery's oil and gas products were "amorphous." Compl. ¶ 28. Plaintiffs, however, rely on *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008) to argue that Rooney's optimistic statements are actionable. Opp'n at 16. In *Berson*, defendants stated in their SEC's filings that "[o]ur backlog...consists of anticipated revenues from the *uncompleted portions of existing contracts*...." *Berson*, 527 F.3d at 985-86 (9th Cir. 2008) (emphasis in original). In that case, defendants argued that reasonable investors would have interpreted the emphasized phrase to mean that backlog included stopped work. *Id.* at 986. The Ninth Circuit disagreed and stated that "had defendants released no backlog reports, their failure to mention the stop-work orders might not have misled anyone. But once defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of. We cannot say, as a matter of law, that defendants fulfilled this duty." *Id.* at 987.

Plaintiffs argue that like Defendants in *Berson*, "once [Rooney] chose to tout the [C]ompany's [pipeline], [he] [was] bound to do it in a manner that wouldn't mislead investors as to what that [pipeline] consisted of." Opp'n at 16. Plaintiffs' reliance on *Berson* is misplaced because Rooney did not make specific representations on which his statements of corporate optimism were based; in contrast to *Berson* where the statements were predicated specifically on backlog, Rooney did not say, *e.g.*, that Energy Recovery secured existing contracts sufficient to base revenue growth projections; at most, he referred only to requests for commercial proposals and "commercial interest," none of which Plaintiffs claim were factually false. [6] *Id.* ¶ 114. Furthermore, during the May 8, 2014 earnings call, Rooney clarified that "I guess I will not pretend to be an expert in terms of the pace at which this stuff will convert." D's RJN, Ex. D at 7. The Court finds that the alleged statements are enthusiastic statements of corporate optimism which are not actionable. *Police Ret. Sys.*, 759 F.3d at 1060; *In re Cutera*, 610 F.3d at 1111.

[6]     Plaintiffs do not contest accuracy of the assertion there was $100M of commercial interest. Moreover, some of Mr. Rooney's predictions resulted in contracts and revenue. D's RJN, Ex. H at 5, 7: "We have contracted and delivered oil and gas solutions, as pilot projects and sales, comprised of our IsoBoost and IsoGen systems to customers in Asia and the Middle East. For the year ended December 31, 2014, we recognized oil and gas revenue from the operating lease and lease buy-

2016 WL 324150, Fed. Sec. L. Rep. P 99,009

out of an IsoGen system to a customer in Saudi Arabia."

F. Summary

**\*21** The following table summarizes the statements that survive the falsity, safe harbor and corporate optimism tests. Unless otherwise noted, all "source" information refers to paragraphs from Plaintiffs' Amended Complaint.

| Allegation Number and Source | Group | Who, How, When, Where | Statement |
| --- | --- | --- | --- |
| (1) ¶ 50 | Pemex | Def. Rooney, during the 4Q12 conference call, on March 7, 2013. | "Just yesterday, we reached a verbal agreement for a product sale to a new oil and gas client." |
| (2) ¶ 51 | Pemex | Def. Rooney, during the 4Q12 conference call, on March 7, 2013. | "As I'd mentioned, we actually came to a verbal agreement with another significant oil company yesterday to move a project into field trials, in commercial field trials now this year." |
| (3) ¶ 86 | Saudi Aramco | Def. Rooney, during the 3Q13 conference call, on November 7, 2013. | "Just this week after a full year of testing the system in our facility, we're happy to announce that as we speak, our first IsoGen Energy Recovery solution is pending shipment to the world's largest oil and gas producer, Aramco, in Saudi Arabia." |
| (4) ¶ 51 | Core Products | Def. Rooney, during the 4Q12 conference call, on March 7, 2013. | "We probably have ongoing discussions with 8 to 10 [oil and gas companies] right now. We actually have not moved forward with anymore than the first 3 until just recently because we did not want to expose ourselves to anymore technology risk than we had with the first 3. We've seen enough in the trials now to change that and so I'd mentioned, we |

2016 WL 324150, Fed. Sec. L. Rep. P 99,009

|  |  |  | hired our first full-time sales mode. We don't see the technology risk being severe anymore so with the 8 to 10 that we've been working with, we're now actively in discussions about moving forward with various projects." |
|---|---|---|---|
| (5)<br><br>¶ 51 | Core Products | Def. Rooney, during the 4Q12 conference call, on March 7, 2013. | "[W]hat I can tell you is that the field trials have looked very promising and the conversations with the oil companies we've got going right now suggest extreme interest. But there are certain engineering and technical bureaucracies inside of these oil and gas companies and so as we work our way through that for full commercial acceptance, the timeline is the part that becomes least certain to us, but the level of interest is extreme." |
| (6)<br><br>¶ 51 | Core Products | Def. Rooney, during the 4Q12 conference call, on March 7, 2013. | "The part that I don't control and maybe I don't even have as much clarity on as I will say a year from now is the path that you work through technical and commercial acceptance with these large giants. We will for sure make it through that, but does it take a month or 3 months or 6 months or where – and in each oil giant case, it seems to have a little bit different pace and |

**In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)**
2016 WL 324150, Fed. Sec. L. Rep. P 99,009

| | | | speed, but we seem to be getting a great deal of attention in moving things along nicely." |
|---|---|---|---|
| (7)<br><br>¶ 51 | Core Products | Def. Rooney, during the 1Q13 conference call, on May 9, 2013. | "For the most part, our challenges are more about logistics, approvals and procedures than matters of technical success and acceptance." |
| (8)<br><br>¶ 64 | Core Products | Def. Rooney, during the 1Q13 conference call, on May 9, 2013. | "[I]n all cases, it's been a tremendous amount of bureaucracy and approvals, double approvals, triple approvals in some cases and so we are methodically working through that and so I guess that of a severe case of naiveté, we felt that upon delivering technically successful devices, we would instantly go into trial modes and trial modes with last 6 months, we would get approvals and move on. And it turns out there is more – there are more hurdles, more bureaucracy, and we are literally creating a new industrial category around Energy Recovery for pressurized fluid flows and so, we simply need to be considerably more patient." |

G. Scienter

**\*22** Under the PSLRA, plaintiffs must plead "with particularity facts giving rise to a *strong inference*" that the Defendants acted with scienter when making the alleged false statements. 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). In determining whether the facts give rise to a "strong" inference of scienter, "the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "A strong inference of scienter

Case 4:23-cv-13132-SDK-EAS ECF No. 42-6, PageID.2479 Filed 11/15/24 Page 27 of 109

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 324150, Fed. Sec. L. Rep. P 99,009

must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014). The inference must be that the "'defendant[ ] made false or misleading statements either *intentionally* or with *deliberate recklessness*.'" *Id.* (quoting *Zucco*, 552 F.3d at 991 (emphasis in original)). This requires that the plaintiff plead that "the defendants knew specific facts at the time that rendered their [statements] fraudulent." *See In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1011 (N.D. Cal. 2008).

### 1. Pemex

One avenue by which to establish scienter is to show, through direct or circumstantial evidence, that the defendants knew or should have known that their statements were false or misleading. "The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement." *Nursing Home Pension Fund Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004).

As discussed above, the Allegations (1) and (2) turn on the alleged falsity of Mr. Rooney's claim that Energy Recovery reached a "verbal agreement" with Pemex. Thus, the issue here is whether Mr. Rooney knew, in fact, that Energy Recovery did not have such an agreement.

Here, Plaintiff's strongest allegation on scienter is in ¶ 40. Plaintiffs allege that "FE1 reported that, due to the fact that Pemex was state-owned, [Energy Recovery] would need to participate in a public bidding and procurement process." *Id.* FE1 explained to Rooney that "because Pemex was a state-run company, the procurement phase would be significant in terms of length." *Id.* According to the Complaint, Mr. Rooney was "aware" that due to a lengthy procurement process it would have taken at least 6-18 months before Energy Recovery would reach any kind of agreement with Pemex. Compl. ¶¶ 40, 53. Given the lengthy procurement phase and uncertainty in the bidding process with Pemex, the Court finds that Plaintiffs have sufficiently alleged a strong inference of scienter by Mr. Rooney with respect to Allegations (1) and (2). Mr. Rooney acted with deliberate or conscious recklessness when he told investors that Energy Recovery had a "verbal agreement" with Pemex.

### 2. Saudi Aramco

With respect to Allegation (3), the issue here is whether Mr. Rooney knew that IsoGen was not ready for shipment on November 7, 2013. Plaintiffs maintain that the statement about the pending shipment of IsoGen to Saudi Aramco was false because (1) it was impossible for Energy Recovery to ship IsoGen product to Saudi Aramco before fiscal 2014, (2) Mr. Rooney knew that "on or about September 24, 2013" IsoGen had failed a critical internal test, and (3) the delivery of the replacement parts for IsoGen was not scheduled until the fourth quarter of fiscal 2013. Compl. ¶ 87. Given the high bar imposed by the PSLRA, Plaintiffs have failed to make a "strong showing" of scienter with respect to IsoGen's "pending" shipment. First, there is a 45-day gap between the failure of IsoGen's critical internal test and the allegedly fraudulent statement. Second, Plaintiffs have not provided any specifics why it was impossible to deliver IsoGen to Saudi Aramco before fiscal 2014. Finally, Plaintiffs failed to allege a specific date or range of dates for "the fourth quarter of fiscal 2013." In the absence of such specifics, the Court cannot ascertain whether there is any basis for the allegation that Mr. Rooney had actual or constructive knowledge of Energy Recovery's problems with IsoGen. *Silicon Graphics*, 183 F.3d at 985.

### 3. Core Products

**\*23** Plaintiffs further allege that Mr. Rooney concealed from the market significant technical problems with Energy Recovery's core products. *Id.* ¶¶ 51, 63. The Complaint, however, does not allege whether Mr. Rooney was receiving weekly reports about the status of the core products throughout the class period. Nor, until September 2013, is there any other substantial evidence of Mr. Rooney's knowledge. As currently plead, Mr. Rooney instructed FE1 (1) to conceal from Chesapeake and the public the problems with IsoPro in mid-September 2013 and (2) not to tell Saudi Aramco about the problems with IsoGen in September 2013. *Id.* ¶¶ 33, 34. Therefore, with regard to Energy Recovery's core products, the Court finds no scienter until mid-September 2013.

As a result, the Allegations (4) – (8) that pre-date September 2013 do not survive the scienter test.

### 4. Motive

Plaintiffs argue that there was a clear motive for Mr. Rooney to "lie about the Company's success in diversifying to the oil and gas industry." Opp'n at 24. While working for Energy Recovery, Mr. Rooney "received exorbitant

Case 4:23-cv-13132-SDK-EAS ECF No. 42-6, PageID.2480 Filed 11/15/24 Page 28 of 109

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 324150, Fed. Sec. L. Rep. P 99,009

compensation relative to Energy Recovery's other members of senior management." *Id*. ¶ 172. Mr. Rooney's Pay for 2014 ($1,448,971) was greater than the total compensation of the Company's Chief Technology Officer, Chief Sales Officer, and Chief Marketing Officer combined. *Id*. Plaintiffs allege that Rooney's lucrative position at Energy Recovery was a motivating factor to retain his job as long as possible – even if it meant over-promising project pipelines to investors and analysts." *Id*. There are two problems with Plaintiffs' argument. First, in the Ninth Circuit motive by itself is not enough to establish a strong inference of scienter. *In re Silicon Graphics Securities Litigation,* 183 F.3d 970 (9th Cir.1999), *abrogated on other grounds as stated in South Ferry LP v. Killinger,* 542 F.3d 776, 784 (9th Cir.2008). In *Silicon Graphics*, 183 F.3d at 970, the Ninth Circuit stated:

> [A]lthough facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide *some* reasonable inference of intent, they are not sufficient to establish a strong inference of deliberate recklessness. In order to show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity.

*Id.* at 974 (emphasis added); *see also In re Terayon Communs. Sys.,* No. C 00-01967 MHP, 2002 WL 989480, at *8 (N.D. Cal. Mar. 29, 2002)* (stating that "[f]acts showing mere recklessness or a motive to commit fraud and an opportunity to do so may provide some reasonable inference of intent, but they are not sufficient to establish a strong inference of deliberate recklessness"; adding that "facts showing motive and opportunity to commit fraud can provide confirming reasonable inferences that help establish a strong inference along with other allegations").

Second, *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920 (9th Cir. 2003), on which Plaintiffs rely in support of its incentive compensation argument is distinguishable from the case at bar. Opp'n at 25. In *No. 84 Employer-Teamster*, defendants were motivated to inflate their company's financial results and stock prices because defendants' eligibility for stock options

and executive bonuses were based primarily on the company's financial performance. *No. 84 Employer-Teamster*, 320 F.3d at 944. In that case, the court inferred the strong inference of scienter because the defendants received thousands of options during the year of alleged misrepresentations, while receiving none in the previous year. *Id.* In this case, Plaintiffs' sole allegations about Mr. Rooney's salary fall short of specific, particularized allegations in *No. 84 Employer-Teamster*.

**\*24** However, "generalized assertions of motive, without more, are inadequate to meet the heightened pleading requirements of *Silicon Graphics*." *Lipton*, 284 F.3d at 1038. Financial motivation can be a relevant factor, but only if Plaintiffs "provide[ ] specific, particularized allegations." *No. 84 Employer-Teamster*, 320 F.3d at 944 (quoting *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002)).

Taking into account the minimal probative value of the allegations of Mr. Rooney's financial motives, the Court finds that Plaintiffs have sufficiently alleged particularized facts to support a strong inference of scienter under Section 10(b) with respect to Mr. Rooney only as to Allegations (1) and (2).

H. Respondeat Superior

The Court also finds that Mr. Rooney's scienter may be imputed to Energy Recovery based on respondeat superior. The Ninth Circuit recognizes respondeat superior liability for a corporation under 10(b) and 10b-5 based on common law agency principles. *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1576-78 (9th Cir. 1990) (en banc) (imputing individual officer's knowledge to the company through the application of the doctrine of respondeat superior). In *Hollinger*, the Ninth Circuit held that the district court erred in concluding that the doctrine of respondeat superior was supplanted by the controlling person provisions of the Securities Act and the Exchange Act, 15 U.S.C. §§ 77*o* & 78t(a). *Hollinger*, 914 F.2d at 1576-78. Thus, there are two forms of secondary liability for violations of Section 10(b): the statutory "control person" liability set forth in Section 20(a) and the common law doctrine of respondeat superior. *See id*.

Although the PSLRA now imposes a heightened scienter requirement for pleading, courts have held or assumed that *Hollinger* remains good law. As one district court stated:

> The Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994), may appear to cast some doubt on the future viability of the

Case 4:23-cv-13132-SDK-EAS ECF No. 42-6, PageID.2481 Filed 11/15/24 Page 29 of 109

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 324150, Fed. Sec. L. Rep. P 99,009

Ninth Circuit's holding in *Hollinger* regarding respondeat superior liability under the federal securities laws, but currently *Hollinger* remains the law in this circuit. In *Central Bank of Denver*, the Court held that there is no aiding and abetting liability in a private action under § 10 and Rule 10b-5. 511 U.S. at 191-92. In a dissenting opinion, Justice Stevens stated that "the majority's approach to aiding and abetting at the very least casts serious doubt...on *other* forms of secondary liability that, like the aiding and abetting theory, have long been recognized by the SEC and the courts but are not expressly spelled out in the securities statutes." 511 U.S. at 200 (Stevens, J., dissenting). The dissenting opinion then cites *Hollinger* in a list of cases upon which such doubt may fall. *Id.* at 200 n. 12. Nevertheless, *Hollinger* has not in the interim been overruled by the Supreme Court or the Ninth Circuit.

*In re Musicmaker.com Sec. Litig.*, No. CV00-2018 CAS(MANX), 2001 WL 34062431, at *12 n. 5 (C.D. Cal. June 4, 2001).

Multiple district courts have cited *Hollinger* after passage of the PSLRA. *See e.g.*, *Curry v. Hansen Med., Inc.*, No. C 09-5094 CW, 2012 WL 3242447, at *13 (N.D. Cal. Aug. 10, 2012) (stating that "as in *Hollinger*, although [defendant company] may not be primarily liable for securities fraud, it is secondarily liable under the theory of respondeat superior); *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1204 (N.D. Cal. 2012) (finding that an individual officer's information and guilty plea may be imputed to the company based on respondeat superior) (citing *Hollinger*, 914 F.2d at 1576-78). *See generally S.E.C. v. Sells*, 2012 WL 3242551, *8 (N.D. Cal. Aug. 10, 2012) (imputing individual officer's knowledge onto the company through the application of the doctrine of respondeat superior); *In re Hienergy Tech., Inc.*, 2005 WL 3071250, *8 (C.D. Cal. Oct. 25, 2005) (imputing scienter onto the company when the pleadings supported a finding of scienter on the part of a corporate officer or director.).

**\*25** Respondeat superior is a common law principle of secondary liability and generally 'summarizes the doctrine that a master or other principal is responsible, under certain conditions, for the conduct of a servant or other agent.'" *Id.* at n.28 (quoting Seavey, *Speculations as to "Respondeat Superior*," Harv. Legal Essays 433 (1934)). A common application of this doctrine is the liability of an employer for a tort committed by one of its employees acting within the scope of his employment, or for a misleading statement made by an employee or other agent who has actual or apparent

authority. *See Restatement (Second) of Agency* §§ 219, 257, 261 (1958). Here, it sufficient that Mr. Rooney was acting in what reasonably appeared to the third party to be in the scope of his employment, under the doctrine of apparent authority. *See id.* § 265. Apparent authority liability is imposed even when the agent was acting solely for his own purposes, unless this is known to the person with whom the agent is dealing. *Id.* § 262. Here, Mr. Rooney, a corporate officer, made false and misleading statements within the scope of employment with Energy Recovery. In light of the imputation of Mr. Rooney's scienter through respondeat superior, the Court finds that Plaintiffs have sufficiently alleged a primary violation of Section 10(b) and Rule 10(b)-5 by Energy Recovery.

I. Section 20(a)

Plaintiffs' second cause of action is for a violation of Section 20(a) of the 1934 Securities Exchange Act, 15 U.S.C. § 78t, or control person liability. Plaintiffs allege that "by virtue of their positions as controlling persons, Rooney and Bold are liable pursuant to Section 20(a) of the Exchange Act." Compl. ¶ 205.

Section 20(a) provides derivative liability for those who control others found to be primarily liable under the Act. *See In re Ramp Networks, Inc. Sec. Lit.*, 201 F.Supp.2d 1051, 1063 (N.D. Cal. 2002); *see also Johnson v. Aljian*, 490 F.3d 778, 781 n.11 (9th Cir. 2007). To claim "control person" liability under Section 20(a), Plaintiffs must demonstrate "'a primary violation of federal securities law' and 'that the defendant exercised actual power or control over the primary violator.'" *Zucco*, 552 F.3d at 990 (citations omitted). "To be liable under section 20(a), the defendants must be liable under another section of the Exchange Act." *Heliotrope General, Inc. v. Ford Motor Co.*, 189 F.3d 971, 978 (9th Cir. 1999). Where a plaintiff asserts a Section 20(a) claim based on an underlying violation of Section 10(b), the pleading requirements for both violations are the same. *See In re Ramp Networks*, 201 F. Supp. 2d at 1063. "In general, the determination of who is a controlling person...is an intensely factual question." *Paracor Finance, Inc. v. General Electric Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir.1996) (citation omitted); *see also Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir.2000) (determining who is a controlling person is usually an "intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions."). Plaintiffs "need not show the controlling person's scienter or that they 'culpably participated' in the alleged wrongdoing." *Id.* Courts have found "general allegations

Case 4:23-cv-13132-SDK-EAS ECF No. 42-6, PageID.2482 Filed 11/15/24 Page 30 of 109

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 324150, Fed. Sec. L. Rep. P 99,009

concerning an individual's title and responsibilities" to be sufficient to establish control at the motion to dismiss stage. *In re Metawave Communications Corp. Sec. Litig.*, 298 F.Supp.2d 1056, 1087 (W.D. Wash. 2003); *see also In re Immune Response Sec. Litig.,* 375 F.Supp.2d 983, 1031-32 (S.D. Cal.2005) (finding allegations that defendants held positions as CEO and Chairman of the Board and described their roles were sufficient to show they were involved in the company's day-to-day business); *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1079 (N.D. Cal. 2001) (finding sufficient for control person liability allegations that the individual defendants, "by virtue of their executive and managerial positions had the power to control and influence [Cylink], which they exercised").

### 1. Mr. Rooney

Plaintiffs allege that between 2011 and 2014, Rooney ran the day-to-day operations of Energy Recovery as the Company's CEO. *Id*. ¶ 28. Such allegations are sufficient at this procedural stage to state a claim for control person liability. *See S.E.C. v. Todd*, 642 F.3d 1207, 1223-24 (9th Cir. 2011) (finding sufficient for control person liability allegations that the defendant had "day-to-day control of the company."); *Howard*, 228 F.3d at 1065 (finding control where the CEO participated in "the day-to-day management" of the company).

### 2. Ms. Bold

**\*26** Ms. Bold joined Energy Recovery in 2005 and served as its Chief Marketing Officer until April 2015. *Id*. ¶ 21. Plaintiffs have not sufficiently alleged that she possessed the requisite control over a primary violator. *See e.g., In re Int'l Rectifier Corp. Sec. Litig.,* No. CV07-02544-JFWVBKX, 2008 WL 4555794, at \*22 (C.D. Cal. May 23, 2008) (stating that the defendant's position as "Executive Vice President, Global Sales and Marketing does not establish that he had control."). Ms. Bold did not speak on the Company's behalf during earnings conference calls with investors, nor did she sign any SEC filings. There is no allegation that she directed or exercised control over Rooney who allegedly made the false and misleading statements. Plaintiffs have failed to allege sufficient facts to state a claim under Section 20(a) against Ms. Bold.

## V. CONCLUSION

For the foregoing reasons, the Court rejects Defendants' arguments that Plaintiffs' Complaint is lacking with respect to allegations of falsity and that, as a matter of law, Defendants' conduct is immunized by the safe harbor provision or bespeaks caution doctrine. Because Plaintiffs have sufficiently alleged a strong inference of scienter as to some claims, the Court **GRANTS** in part and **DENIES** in part Defendants' motion to dismiss. In particular, Plaintiffs have adequately pled falsity and scienter with respect to the Allegations (1) and (2):

| Allegation Number and Source | Group | Who, How, When, Where | Statement |
|---|---|---|---|
| (1)<br><br>¶ 50 | Pemex | Def. Rooney, during the 4Q12 conference call, on March 7, 2013. | "Just yesterday, we reached a verbal agreement for a product sale to a new oil and gas client." |
| (2)<br><br>¶ 51 | Pemex | Def. Rooney, during the 4Q12 conference call, on March 7, 2013. | "As I'd mentioned, we actually came to a verbal agreement with another significant oil company yesterday to move a project into field trials, in commercial field trials now this year." |

As for the claims otherwise discussed, Plaintiff is given leave to amend within thirty (30) days from the date of this order.

This order disposes of Docket Nos. 64, 66, and 68.

**IT IS SO ORDERED**.

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 324150, Fed. Sec. L. Rep. P 99,009

**All Citations**

Not Reported in Fed. Supp., 2016 WL 324150, Fed. Sec. L. Rep. P 99,009

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Gagnon v. Alkermes PLC, Not Reported in Fed. Supp. (2019)

2019 WL 2866113

2019 WL 2866113
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Nancy GAGNON, Individually and On Behalf
of All Others Similarly Situated, Plaintiff,
v.
ALKERMES PLC, Richard F. Pops,
and James M. Frates, Defendants.

17cv9178
|
Signed 07/02/2019

**Attorneys and Law Firms**

Joseph Alexander Hood, II, Jeremy Alan Lieberman, Pomerantz LLP, New York, NY, for Plaintiff.

Caroline Herman Bullerjahn, Courtney Orazio, Deborah Sager Birnbach, Ian Stearns, Goodwin Procter, LLP, Boston, MA, for Defendants Alkermes plc, James M. Frates.

Courtney Orazio, Deborah Sager Birnbach, Ian Stearns, Goodwin Procter, LLP, Boston, MA, for Defendant Richard F. Pops.

MEMORANDUM & ORDER

WILLIAM H. PAULEY III, Senior United States District Judge:

 **\*1** On March 28, 2019, this Court issued an Opinion & Order (the "March 28 Opinion & Order") dismissing the Second Amended Complaint (the "Complaint") with prejudice for failure to state a claim. Lead Plaintiff Local 731 I.B. of T. Private Scavenger and Garage Attendants Pension Trust Fund ("Local 731") now moves for partial reconsideration of the March 28 Order under Rule 59(e) of the Federal Rules of Civil Procedure and Local Civil Rule 6.3. For the reasons that follow, Local 731's motion is denied.

BACKGROUND

The underlying facts are more fully set forth in the March 28 Opinion & Order, familiarity with which is presumed. See Gagnon v. Alkermes PLC, 368 F. Supp. 3d 750

(S.D.N.Y. 2019). In brief, Alkermes is a pharmaceutical company that produces an opioid dependence medication called Vivitrol. Local 731 alleges that the value of Alkermes stock progressively declined amid a wave of media and governmental scrutiny into Alkermes' efforts to market Vivitrol. According to Local 731, the publication of two academic articles finding Vivitrol to be—at best—no more effective than its competitors further exacerbated the drop in Alkermes' stock price.

Local 731 premises its securities fraud claims on three categories of misstatements by Alkermes' officers. See Gagnon, 368 F. Supp. 3d at 760-61. First, it alleges that Alkermes falsely characterized Vivitrol's success as organic and self-propagating without disclosing its aggressive and deceptive campaign to market Vivitrol to members of the criminal justice system—that is, policymakers and stakeholders who likely lacked the medical knowledge to understand Vivitrol's limitations vis-à-vis its competitors. Second, Local 731 contends that Alkermes misrepresented Vivitrol's efficacy by guaranteeing that patients who had been treated with Vivitrol would not relapse, despite internal studies suggesting the contrary. Finally, it avers that Alkermes falsely—and without any scientific basis—represented that only Vivitrol (and not its competitors) could lead to a drug-free life.

Defendants moved to dismiss Local 731's claims on falsity and scienter grounds. After culling the documents submitted in connection with Local 731's motion to dismiss, [1] this Court held that the majority of the statements proffered by Local 731 were not actionable as a matter of law. Gagnon, 368 F. Supp. 3d at 766-71. As relevant here, the March 28 Opinion & Order determined that in context, the statements that Vivitrol patients "will not" or "cannot" relapse to opioid dependence could not be fairly understood as guarantees against any potential relapse, but rather as representations about how Vivitrol was expected to work. Gagnon, 368 F. Supp. 3d at 769-70. On the other hand, this Court found a July 28, 2016 statement by Defendant James M. Frates attributing Vivitrol's sales growth to Alkermes' "focus on criminal justice programs" and "organic growth within the states" to be actionable half-truths based on Alkermes' purported concealment of the nature of its aggressive marketing efforts to the criminal justice community. Gagnon, 368 F. Supp. 3d at 767-69.

Gagnon v. Alkermes PLC, Not Reported in Fed. Supp. (2019)

2019 WL 2866113

1  Local 731 does not seek reconsideration of this aspect of the March 28 Opinion & Order. See Gagnon, 368 F. Supp. 3d at 762-74.

**\*2** Nonetheless, the March 28 Opinion & Order granted Defendants' motion to dismiss in full based on Local 731's failure to allege a strong inference of scienter with respect to the July 28, 2016 statement. This Court first rejected Local 731's allegations of stock sales by Alkermes' directors and officers as insufficient to demonstrate a motive to defraud. Gagnon, 368 F. Supp. 3d at 772-73. Local 731's allegations were also inadequate to show conscious misbehavior or recklessness by any individual whose state of mind could be imputed to the company. Gagnon, 368 F. Supp. 3d at 773-75. Finally, this Court explained that the July 28, 2016 statement was not so "important and dramatic" as to warrant a finding of corporate scienter notwithstanding Local 731's inability to pin scienter on a specific individual defendant. Gagnon, 368 F. Supp. 3d at 775-76 (citing, inter alia, Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195-96 (2d Cir. 2008)). And based on the lack of a primary violation of the federal securities laws, this Court dismissed Local 731's Section 20(a) claim. Gagnon, 368 F. Supp. 3d at 776.

DISCUSSION

I. Legal Standard

The standard for reconsideration "is strict, and ultimately, the decision is within the sound discretion of the trial court." McGraw-Hill Glob. Educ. Holdings, LLC v. Mathrani, 293 F. Supp. 3d 394, 397 (S.D.N.Y. 2018); see also U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC, 352 F. Supp. 3d 242, 246 (S.D.N.Y. 2019) (describing reconsideration as "an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources" (citation omitted)). Judges in this district have routinely recognized that the standards governing a motion to amend or alter a judgment under Rule 59(e) and motions for reconsideration under Local Civil Rule 6.3 are the same. E.g., In re Facebook, Inc., IPO Secs. & Derivative Litig., 43 F. Supp. 3d 369, 373 (S.D.N.Y. 2014).

It is well-settled that a motion for reconsideration is not "a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." Analytical Surveys, Inc. v. Tonga Partners, L.P., 684 F.3d 36, 52 (2d Cir. 2012)

(citations and quotation marks omitted); see also Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995) (explaining that motions to reconsider "should not be granted where the moving party seeks solely to relitigate an issue already decided"). Such a motion "cannot assert new arguments or claims which were not before the court on the original motion" to " 'ensure the finality of decisions and to prevent the practice of a losing party examining a decision then plugging the gaps of a lost motion with additional matters.' " McGraw-Hill Glob. Educ. Holdings, LLC, 293 F. Supp. 3d at 397 (citation omitted). In other words, a motion for reconsideration is "not an invitation for parties to 'treat the court's initial decision as the opening of a dialogue in which that party may then use such a motion to advance new theories or adduce new evidence in response to the court's rulings.' " McGraw-Hill Glob. Educ. Holdings, LLC, 293 F. Supp. 3d at 397 (citation omitted).

Thus, a motion for reconsideration "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader, 70 F.3d at 257. The movant may satisfy its burden by demonstrating, for example, "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." U.S. Bank Nat'l Ass'n, 352 F. Supp. 3d at 246 (quotation marks omitted) (quoting Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992)).

II. Application

**\*3** Local 731 seeks partial reconsideration of the March 28 Opinion & Order on two grounds—namely, that this Court erred in holding one category of alleged misstatements to be non-actionable and finding the Complaint's scienter allegations insufficient with respect to the sole statement that this Court found to be actionable. This Court addresses each ground in turn.

A. Vivitrol Efficacy Statements

Local 731 contends that this Court erred in finding the statements relating to Vivitrol's efficacy non-actionable. Specifically, Local 731 asserts that instead of adopting its interpretation of the Vivitrol efficacy statements, this Court improperly read those statements in Defendants' favor. It argues, moreover, that in doing so, the March 28 Opinion & Order implicitly (and erroneously) concluded that Defendants had established a truth-on-the-market defense.

Case 4:23-cv-13132-SDK-EAS ECF No. 42-6, PageID.2486 Filed 11/15/24 Page 34 of 109
Gagnon v. Alkermes PLC, Not Reported in Fed. Supp. (2019)
2019 WL 2866113

As an initial matter, Local 731's suggestion that this Court effectively found that Defendants established a truth-on-the-market defense misunderstands the March 28 Opinion & Order. Under the truth-on-the-market doctrine, "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market." Ganino v. Citizens Utils. Co., 228 F.3d 154, 167 (2d Cir. 2000). To raise such a defense, a defendant must show that the corrective information is "conveyed to the public 'with a degree of intensity and credibility to counter-balance effectively any misleading information created by' the alleged misstatements." Ganino, 228 F.3d at 167 (citation omitted). And because the "truth-on-the-market defense is intensely fact-specific," the Second Circuit has cautioned that it "is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." Ganino, 228 F.3d at 167.

Fair enough—but the March 28 Opinion & Order never addressed the materiality of the Vivitrol efficacy statements, only finding them to be non-actionable as a matter of law. [2] Put differently, the relevance of the FDA labels is "not to show that plaintiffs knew the truth" in the contents of the labels. Accord City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 186 n.62 (2d Cir. 2014) (emphasis removed) (rejecting argument that district court "impermissibly considered a 'truth on the market' defense"). Rather, as this Court explained, the reference to the FDA labels and the uses for which Vivitrol was approved or indicated add important context to the nature of the Vivitrol efficacy statements. Gagnon, 368 F. Supp. 3d at 770. Thus, the March 28 Opinion & Order had no occasion to consider the intensity and credibility of the disclosure of the content in the FDA labels for the truth-on-the-market inquiry.

[2]    Likewise, to the extent that the truth-on-the-market doctrine is more accurately conceptualized as a defense to reliance, see Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc., 879 F.3d 474, 485-86 (2d Cir. 2018), the ruling as to the Vivitrol efficacy statements is not premised on any lack of reliance on those statements.

Nor did the March 28 Opinion & Order impermissibly draw inferences in Defendants' favor merely by categorizing the Vivitrol efficacy statements as non-actionable statements of expectation, a determination that buttressed dismissal of the action. Cf. Ong v. Chipotle Mexican Grill, Inc., 329 F.R.D. 43, 53 (S.D.N.Y. 2018) (explaining that "already decided legal issues cannot be relitigated because of 'a mere disagreement with the Court's legal determination' " (quoting Women's Integrated Network, Inc. v. U.S. Specialty Ins. Co., 2011 WL 1347001, at *1 (S.D.N.Y. Apr. 4, 2011))). More to the point, a plaintiff cannot simply use the motion to dismiss standard to transform a non-actionable statement into an actionable statement by peddling an implausible reading shorn of context. Cf. Solmetex, LLC v. Dental Recycling of N. Am., Inc., 2017 WL 2840282, at *4 (S.D.N.Y. June 26, 2017) ("While the Court must accept the well-plead[ed] allegations in the pleadings as true, [a plaintiff] cannot plead falsity by quoting statements out of context.").

**\*4** Ultimately, Local 731 points to no new evidence or change in controlling law that this Court overlooked. Indeed, Local 731's argument that this Court failed to construe all reasonable inferences in its favor merely evinces its disagreement with this Court's interpretation of the Vivitrol efficacy statements and its application of the settled motion to dismiss standard. In substance, the thrust of its argument on reconsideration is that this Court should have found the Vivitrol efficacy statements to be actionable because they were false promises of guaranteed effectiveness—that is, an argument that this Court already considered and rejected in concluding that no reasonable investor could plausibly recognize them as such in the context in which they were made. See Gagnon, 368 F. Supp. 3d at 770.

However, a motion for reconsideration is "not a motion to reargue those issues already considered when a party does not like the way the original motion was resolved." In re Facebook, 43 F. Supp. 3d at 373-74 (quoting In re Bear Stearns Cos. Sec., Derivative & ERISA Litig., 2009 WL 2168767, at *1 (S.D.N.Y. July 16, 2009) (quotation mark omitted)). In other words, a party's assertion that a court misapplied controlling law "is a ground for appeal, not reconsideration." Sikhs for Justice v. Nath, 893 F. Supp. 2d 598, 609 (S.D.N.Y. 2012); see In re Currency Conversion Fee Antitrust Litig., 2005 WL 1705285, at *3 (S.D.N.Y. July 22, 2005) (explaining that mere disagreement with a court's ruling is an insufficient ground for reconsideration). Accordingly, Local 731's motion to reconsider the actionability of the Vivitrol efficacy statements is denied, and this Court need not reach the question of whether Local 731 plausibly alleged that those statements were made with scienter.

B. Corporate Scienter

Local 731 also takes issue with the determination that it did not plausibly allege a strong inference of scienter with respect to Frates' July 28, 2016 statement. It points to allegations that (1) in 2016, Alkermes circulated a white paper attacking one of Vivitrol's competitors; and (2) sometime between 2011 and 2014, a former state public health official held a meeting with unidentified individuals at Alkermes to stop the company from denigrating Vivitrol's competitors to legislators. Local 731 submits that the importance of Vivitrol to Alkermes' revenue growth and the information suggesting that Frates' July 28, 2016 statement was misleading sufficiently demonstrate scienter.

Local 731's second ground for reconsideration fails for substantially the same reasons as its first. To start, Local 731 does not fault this Court with overlooking the applicable standard set forth in Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007). Rather, Local 731 asserts this Court misapplied the Tellabs standard. See Sikhs for Justice, 893 F. Supp. 2d at 609; In re Currency Conversion Fee Antitrust Litig., 2005 WL 1705285, at *3. Indeed, Local 731's arguments and the allegations on which it relies were squarely addressed—and rejected—by the March 28 Opinion & Order. See Gagnon, 368 F. Supp. 3d at 774-75. As this Court explained, the facts pled in the Complaint do not plausibly allege that Frates—or anyone with knowledge imputable to Alkermes—knew of or had access to the information identified by Local 731. Gagnon, 368 F. Supp. 3d at 774-75. In doing so, this Court contrasted cases that found a strong inference of scienter based on specific factual allegations supporting an inference of knowledge or access, not mere conclusory allegations that defendants knew of and recklessly disregarded information contradicting their public statements. Gagnon, 368 F. Supp. 3d at 774-75 (citing Christine Asia Co. v. Ma, 718 F. App'x 20, 23 (2d Cir. 2017) (summary order) and Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc., 367 F. Supp. 3d 16, 36-37 (S.D.N.Y. 2018)).

**\*5** Fundamentally, Local 731's scienter argument is that because of Vivitrol's importance, Frates or somebody sufficiently senior at Alkermes should have known about the 2016 white paper or the meeting with state public health officials that occurred sometime between 2011 and 2014. But an allegation that an individual knew of or had access to information contradicting his public statements solely by virtue of his position in the company does not suffice. See Gagnon, 368 F. Supp. 3d at 775. Nor is an "allegation that a defendant merely ought to have known [about reports or statements containing contrary facts] ... sufficient to allege recklessness." In re Lululemon Sec. Litig., 14 F. Supp. 3d 553, 574 (S.D.N.Y. 2014) (citation and quotation marks omitted). In sum, such allegations are insufficient to raise a strong inference of scienter, especially absent allegations of a motive to commit fraud. See Gagnon, 368 F. Supp. 3d at 774 ("Where, as here, a plaintiff cannot make a showing of 'motive,' the 'strength of the circumstantial allegations must be correspondingly greater.' " (citation omitted)).

CONCLUSION

For the foregoing reasons, Local 731's motion for partial reconsideration is denied. Because Local 731 has not demonstrated that reconsideration of its Section 10(b) and Rule 10b-5 claim is warranted, this Court also leaves its dismissal of the Section 20(a) claim untouched. The Clerk of Court is directed to terminate the motion pending at ECF No. 56 and mark this case as closed.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2866113

---

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 2874575
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

JRS PARTNERS, GP, et al., Plaintiffs-Appellants,
v.
LEECH TISHMAN FUSCALDO &
LAMPL, LLC, et al., Defendants-Appellees.

No. 23-5538
|
FILED June 7, 2024

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

**Attorneys and Law Firms**

John-David H. Thomas, Barnes & Thornburg, Nashville, TN, Kevin Tyler Elkins, Epstein, Becker & Green, Nashville, TN, for Plaintiffs-Appellees.

Fred Carney Statum, III, Manier & Herod, Nashville, TN, for Defendant-Appellant Leech Tishman Fuscaldo & Lampl, LLC.

Charles S. Michels, Taylor, Pigue, Marchetti & Blair, Nashville, TN, for Defendant-Appellant Brett Mankey.

Before: STRANCH, LARSEN, and DAVIS, Circuit Judges.

OPINION

LARSEN, Circuit Judge.

**\*1** The plaintiffs in this case are victims of a Ponzi scheme orchestrated by Chris Warren. They previously obtained a default judgment against Warren in federal district court. Now, they bring several claims of negligence and fraud against the lawyer and the law firm that represented Warren's fraudulent company. The district court dismissed the plaintiffs' state-law claims as time-barred, and it dismissed their federal securities-fraud claims for failure to meet the heightened pleading standards of the Private Securities Litigation Reform Act. For the following reasons, we AFFIRM in part and REVERSE in part.

I.

A.

Chris Warren is the architect of a Ponzi scheme that he ran through his business, Clean Energy Advisors, LLC (CEA). CEA operated two funds—Solar IV and UIF—that purported to invest in solar energy projects in North Carolina and elsewhere in the United States. But these projects did not exist, and Warren "misappropriated the investment funds to create an illusion of a continuing prosperous enterprise." R. 88, Am. Compl., PageID 1570.

The plaintiffs are a partnership, three trusts, and a natural person who, together, lost millions of dollars to Warren's fraudulent scheme. Jack Tyrrell is a partner in the plaintiff partnership and a trustee of two of the plaintiff trusts. Pat Ortale is a trustee of the third plaintiff trust and also an individual plaintiff. The plaintiffs first became acquainted with CEA in 2014, when they received a private offering memorandum inviting them to invest in Solar IV. As they considered investing in the fund, they conducted due diligence, reviewed satellite imagery of solar farms purportedly constructed by CEA, and spoke with Warren. When the plaintiffs asked to speak to CEA's legal counsel, Warren referred them to defendant Brett Mankey, a partner at defendant law firm Leech Tishman Fuscaldo & Lampl, LLC (Leech Tishman). Leech Tishman had been hired to serve as CEA's general counsel, and Mankey was the "lead attorney" working in that capacity. *Id.* at 1567–68.

In October 2014, Tyrrell spoke with Mankey by phone, seeking to ensure that Solar IV was a legitimate investment. Mankey told him that Leech Tishman represented CEA and Solar IV and that the firm had relevant experience. Mankey further confirmed "the accuracy of the representations made to him by Chris Warren about" power purchase agreements that supposedly existed between the relevant solar projects and Duke Energy, and he stated that "there were no red flags" about Warren, CEA, or Solar IV. *Id.* at 1575. "[A]fter receiving advice and representations from Mankey during their due diligence phase," the plaintiffs invested in Solar IV. *Id.* at 1571.

Warren later approached Tyrrell and Ortale to inform them of another investment opportunity, this time in a fund known as UIF. Tyrrell and Ortale began another due-diligence review, seeking both to "validate the ongoing performance of Solar

IV" and to "better understand an insurance policy that would purportedly guarantee their investment in UIF." *Id.* at 1576. Ortale emailed Warren asking that he either provide a copy of the UIF insurance policy or "arrange a call with CEA's legal counsel to provide assurance that Solar IV was a 'done deal.' " *Id.* Warren arranged a call between Ortale and Mankey. During the call, Mankey represented that: (1) "the Solar IV fund had closed to new investors in December 2014 with approximately $60 million of capital" comprising fifteen projects that had contracts with Duke Energy; (2) all of these projects were "installed and producing"; and (3) "Travelers Insurance had provided the wrap insurance policy for the fund, which was in force and effect." *Id.* at 1577–78. Mankey did not tell Ortale that neither he nor anyone at Leech Tishman had ever "seen any of the operative documents [for Solar IV] or taken any independent steps to verify the information" they had received from Warren. *Id.* at 1578.

 **\*2** After the call, Ortale sent a follow-up email to Mankey with questions about the respective tax advantages for UIF's general and limited partners. After consulting tax attorneys at the firm, Mankey explained that "UIF would be structured to provide certain tax benefits to investors like the Plaintiffs." *Id.* at 1579.

Ortale continued to question Mankey about UIF. In an email copied to Tyrrell and Warren, Ortale asked about the relationship between a term in a supposed agreement with Duke Energy and the purported insurance policy. Mankey said he would respond after he looked at the policy. Warren then chimed in, claiming that "the revenue stream in UIF was completely insured in the event of default by the utility company ... and in the event of storm damage." *Id.* at 1580. Ortale responded: "Brett [Mankey], as legal counsel to the partnership, do you concur?" *Id.* Mankey wrote: "After reviewing the list of insurance coverage exclusions provided by Chris [Warren] as well as the language governing the same in a standard Duke [Energy power purchase agreement], I concur that the risk of storm damage should be covered." *Id.* Mankey further noted that the policy's exclusions for cyber risk, governmental action, war, terrorism, and nuclear hazard were "very standard coverage exclusions." *Id.* Despite these representations by Mankey and Warren, no insurance policy existed, and Mankey "never told Plaintiffs that neither he, nor anyone else at Leech Tishman, had ever actually reviewed an insurance policy issued by Travelers Insurance covering either UIF or Solar IV." *Id.* at 1580–81.

Mankey and Leech Tishman also promoted CEA's funds to others. In October 2015, Mankey emailed another individual to connect him to a CEA manager, attaching promotional materials. And in July 2015, another Leech Tishman partner emailed UIF promotional materials to at least two people. Neither Mankey nor Leech Tishman ever told the plaintiffs that they were promoting CEA's funds to others.

In April 2017, Warren provided the plaintiffs with an audit letter supposedly issued by accounting firm CohnReznick. The plaintiffs found the letter suspicious, so they contacted CohnReznick and learned that it had never audited CEA. The plaintiffs planned to confront Warren about this, but before they could do so, on May 5, 2017, several of the plaintiffs received "victim notification letters" from the FBI. *Id.* at 1582–83. These letters identified the plaintiffs as "possible victim[s] of crime." *Id.* at 1583. At the FBI's request, Tyrrell and Ortale met with agents on May 23, 2017.

During the meeting, the agents told Tyrrell and Ortale that they were investigating Warren, CEA, and the funds, and they advised them that other investors in the funds had been able to redeem their investments. At the agents' suggestion, the plaintiffs "began a coordinated effort to seek a redemption of their investments." *Id.* At that time, they "still did not know whether their money was lost." *Id.*

Beginning in June 2017, Tyrrell communicated with Warren about redeeming the investments, and Warren assured him that he would execute the redemption. But Warren repeatedly delayed, and he ceased communications in August 2017 without ever redeeming the investments.

On August 21, 2017, the plaintiffs had a phone call with Mankey, because they had begun "to question the advice and representations" he had made and "the legal work provided by Leech Tishman." *Id.* at 1585. Mankey told the plaintiffs that he and Leech Tishman had "simply accepted what Mr. Warren told him at face value, and failed to do any of his own diligence into Mr. Warren, CEA, or the Funds." *Id.* He also stated that he had never seen "a single" power purchase agreement between CEA and Duke Energy and, indeed, that he had not received "anything [with respect to documentation] that [he] normally would [have] representing someone in a fund." *Id.* (alterations in original). And Mankey admitted to the plaintiffs that he thought Warren was "very squirrelly," that Warren was difficult to work with and "reticent to pay Leech Tishman for its work," and that Mankey

was concerned that Warren was "using Leech Tishman's name to sell UIF after the fact." *Id.* at 1586.

**\*3** On September 14, 2017, the plaintiffs entered into a tolling agreement with Leech Tishman. The parties agreed not to count the period from September 14, 2017, to April 1, 2019, "in determining the applicability of any statute of limitations, laches, or any other defense based on the lapse of time in any action or proceeding brought by either party against the other." R. 17-5, Tolling Agreement, PageID 405.

### B.

On May 31, 2019, the plaintiffs sued Mankey and Leech Tishman in federal district court, alleging legal malpractice, negligent and fraudulent misrepresentation, negligent retention and supervision, and civil conspiracy. [1] After some of those claims were dismissed under Federal Rule of Civil Procedure 12(b)(6), the plaintiffs filed an amended complaint. The amended complaint added a negligence claim against Leech Tishman and federal securities-fraud claims against both Mankey and Leech Tishman.

[1] This was not the first legal action to result from Warren's fraudulent scheme. In September 2017, a partially overlapping group of plaintiffs sued Warren, CEA, and others involved in the scheme. *See JRS Partners, GP v. Warren*, No. 3:17-cv-1258, Dkt. 1 (M.D. Tenn. Sept. 13, 2017). In May 2018, the court entered a default judgment against Warren, ordering him to pay approximately $35 million to those plaintiffs. *See JRS Partners, GP v. Warren*, 2018 WL 4945230, at \*1–2 (M.D. Tenn. May 8, 2018). Shortly thereafter, in June 2018, a federal grand jury charged Warren with twelve counts of fraud and money laundering. *See United States v. Warren*, No. 3:18-cr-153, Dkt. 1 (M.D. Tenn. June 27, 2018). Warren pleaded guilty to two counts, and he was sentenced to 108 months of imprisonment and ordered to pay over $15 million in restitution. *See United States v. Warren*, No. 3:18-cr-153, Dkt. 58 (M.D. Tenn. June 21, 2019).

The defendants again moved to dismiss, and the court granted those motions in part. As relevant here, the court determined that the securities-fraud allegations did not satisfy the heightened pleading standards applicable to those claims

and that the negligence claim was barred by the statute of limitations. But the court denied the motions to the extent they sought dismissal of the claims of negligent and fraudulent misrepresentation and negligent retention and supervision, concluding that this request was barred by Rule 12(g)(2). At the close of the pleadings, the defendants filed Rule 12(c) motions for judgment on the pleadings as to the remaining claims. The court granted those motions on the ground that the remaining claims were barred by the statute of limitations.

The plaintiffs timely appealed.

### II.

In this appeal, the plaintiffs challenge the district court's ruling that their negligence claim against Leech Tishman and their negligent- and fraudulent-misrepresentation claims against both defendants were time-barred. They also challenge the dismissal of their federal securities-fraud claims against Leech Tishman for failure to adequately plead scienter. We review de novo a district court's dismissal under Rule 12(b)(6) or (c). *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 832 (6th Cir. 2015); *Jackson v. City of Cleveland*, 925 F.3d 793, 806 (6th Cir. 2019).

We consider the state-law claims before turning to the federal securities-fraud claims.

### A.

Rule 12 motions are normally "inappropriate vehicle[s] for dismissing a claim based upon the statute of limitations." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). That is because the statute of limitations is an affirmative defense on which a defendant bears the burden of proof, *Surles v. Andison*, 678 F.3d 452, 458 (6th Cir. 2012), and a plaintiff has "no obligation under Rule 8 to plead compliance with the statute of limitations," *Michalak v. LVNV Funding, LLC*, 604 F. App'x 492, 493 (6th Cir. 2015). However, if "the allegations in the complaint affirmatively show that the claim is time-barred," dismissal at the pleading stage is appropriate. *Cataldo*, 676 F.3d at 547.

**\*4** There are three components to the statute-of-limitations defense in Tennessee law: "the length of the limitations period, the accrual of the cause of action, and the applicability of any relevant tolling doctrines." *Redwing v. Cath. Bishop*

Case 4:23-cv-13132-SDK-EAS ECF No. 42-6, PageID.2491 Filed 11/15/24 Page 39 of 109

JRS Partners, GP v. Leech Tishman Fuscaldo & Lampl, LLC, Not Reported in Fed....

2024 WL 2874575

*for the Diocese of Memphis*, 363 S.W.3d 436, 456 (Tenn. 2012). Each of these components is at issue here. Broadly speaking, the parties dispute: (1) whether a one-year or a three-year limitations period applies, (2) whether the face of the complaint reveals the accrual date of the claims, and (3) what effect to give to a tolling agreement between the plaintiffs and Leech Tishman.

1.

Our first task is to identify the relevant limitations period. The district court determined that Tennessee's one-year statute of limitations for legal malpractice claims governed all of the plaintiffs' state-law claims. We conclude that the district court was right as to the claims of negligence and negligent misrepresentation, but that it erred in applying this limitations period to the claim of fraudulent misrepresentation.

Tennessee's statute of limitations for legal malpractice provides:

> Actions and suits against licensed public accountants, certified public accountants, or attorneys for malpractice shall be commenced within one (1) year after the cause of action accrued, whether the action or suit is grounded or based in contract or tort.

Tenn. Code Ann. § 28-3-104(c)(1). This limitations period can apply even if there is no attorney-client relationship between the parties, so long as "the cause of action asserted against the defendant attorneys is one for malpractice in the performance of their [professional] duties." *Sec. Bank & Tr. Co. v. Fabricating, Inc.*, 673 S.W.2d 860, 863 (Tenn. 1983); *see also Hanson v. Rudnick & Wolfe*, 992 F.2d 1216, 1993 WL 100084, at *6 (6th Cir. 1993) (table).

Under Tennessee law, courts must identify the governing statute of limitations by ascertaining "the gravamen of each claim." *Benz-Elliott v. Barrett Enters., LP*, 456 S.W.3d 140, 149 (Tenn. 2015). "[T]his rather elliptical phrase refers to the 'substantial point,' the 'real purpose,' or the 'object' " of the claim. *Redwing*, 363 S.W.3d at 457 (citation and footnote omitted). To ascertain the gravamen of a claim, Tennessee

courts look to (1) "the legal basis of the claim" and (2) "the type of injuries for which damages are sought." *Benz-Elliott,* 456 S.W.3d at 151. The gravamen is "not dependent upon the 'designation' or 'form' litigants ascribe to an action." *Id.* at 148 (quoting *Redwing,* 363 S.W.3d at 457); *cf. Pera v. Kroger Co.*, 674 S.W.2d 715, 719–20 (Tenn. 1984) (explaining that a breach-of-contract claim could be subject to the real property statute of limitations).

***Negligence and Negligent Misrepresentation.*** We agree with the district court that the gravamen of the plaintiffs' negligence and negligent-misrepresentation claims was professional malpractice. In their negligence claim, the plaintiffs alleged that Leech Tishman, through certain of its tax attorneys, breached its "duty to act as a reasonable law firm would in analyzing the tax structure of the UIF Fund." R. 88, Am. Compl., PageID 1596. Those attorneys allegedly gave tax advice to Mankey (who in turn relayed it to the plaintiffs) without ever "review[ing] the underlying documents," which did not exist. *Id.* And in their negligent-misrepresentation claim, the plaintiffs alleged that Mankey and Leech Tishman, who, "[a]s a lawyer and a law firm, ... are held to a higher standard than a lay person," communicated false information to them about CEA's funds. *Id.* at 1598. Specifically, the plaintiffs claimed that the defendants "fail[ed] to verify the accuracy of any information they transmitted to Plaintiffs, fail[ed] to review documentation that a lawyer would normally expect to review when representing entities like CEA," and "merely parrot[ed]" what Warren had told them. *Id.* The defendants had committed these alleged wrongs despite being "in a position to describe the inner workings of CEA and the Funds" by virtue of their role as "general counsel and outside counsel." *Id.* These claims are straightforwardly based on the defendants' alleged failure "to meet the requisite standards of [their] profession." *PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 546 (Tenn. Ct. App. 2012) (citation omitted). Moreover, the plaintiffs claimed that their injuries flowed from their reliance on the tax attorneys' "negligen[t]" analysis of the fund's tax structure and on Mankey's "negligent misrepresentations" about CEA and the funds. R. 88, Am. Compl., PageID 1597, 1599. In sum, the legal basis of the claims and the type of injuries for which the plaintiffs seek damages establish that the gravamen of the claims is professional malpractice.

**\*5** Relying primarily on *Ticor Title Insurance Co. v. Smith,* 794 S.W.2d 734 (Tenn. Ct. App. 1990), the plaintiffs protest that it is premature to identify a statute of limitations because

Case 4:23-cv-13132-SDK-EAS ECF No. 42-6, PageID.2492 Filed 11/15/24 Page 40 of 109
JRS Partners, GP v. Leech Tishman Fuscaldo & Lampl, LLC, Not Reported in Fed....
2024 WL 2874575

factual development might show that the defendants were functioning as agents, not lawyers, for CEA and Warren. But *Ticor* simply demonstrates that malpractice is not always the gravamen of a claim brought against attorneys. *See id.* at 737 ("[T]he fact that one is a lawyer does not prevent his becoming the agent of another for purposes other than the practice of his profession." (citation omitted)). It does not follow that the gravamen of a claim cannot, in appropriate cases, be ascertained at the pleading stage. Indeed, the Supreme Court of Tennessee has explained that the "fact-intensive" effort to ascertain the gravamen of a claim "requires a careful examination of *the allegations of the complaint.*" *Benz-Elliott,* 456 S.W.3d at 151 (emphasis added). At this stage, the plaintiffs enjoy the benefit of having their allegations taken as true. So taken, their negligence and negligent-misrepresentation claims are based solely on the defendants' negligent failure to satisfy professional standards in the performance of their duties as lawyers. As the district court concluded, the plaintiffs' allegations "do[ ] not leave the door open for an alternative theory of liability." R. 135, Order, PageID 2080. In other words, the plaintiffs pleaded that it was the defendants' negligent discharge of their professional duties—their failure to verify information on which they relied in rendering legal advice—that injured them, and they did not plead any alternative theory of injury in these counts. Accordingly, the district court was correct to apply Tennessee's one-year malpractice statute of limitations to the claims of negligence and negligent misrepresentation.

***Fraudulent Misrepresentation.*** The district court erred, however, in reaching that same conclusion as to the claim of fraudulent misrepresentation. To be sure, this count of the complaint is substantially similar to the count alleging negligent misrepresentation. Like the latter, the fraudulent-misrepresentation count alleged that Mankey made misrepresentations to the plaintiffs while he "was working on behalf of Leech Tishman as CEA's general counsel." R. 88, Am. Compl., PageID 1600. The plaintiffs also repeated the assertion that, "[a]s a lawyer and a law firm, Defendants are held to a higher standard than a lay person," and that the defendants "were in a position to describe the inner workings of CEA and the Funds." *Id.* At first blush, these allegations suggest that the legal basis of the claim is, again, professional malpractice. But unlike the negligent-misrepresentation claim, this count of the complaint further alleges that, when the defendants made the misrepresentations, "they either knew [their statements] were false or acted with reckless disregard as to their truth or falsity." *Id.* And the factual background in the complaint

provides at least colorable support to that characterization—alleging that Mankey made specific, technical representations about CEA's funds without ever reviewing anything that could substantiate those representations, and suggesting that Mankey acted with the purpose of promoting the funds.

The knowing-or-reckless allegation, taken in the context of the complaint's broader allegations, shifts the basis of the claim from malpractice to fraud. *See PNC Multifamily Cap.,* 387 S.W.3d at 546 ("[C]omplaints asserting claims for intentional misconduct against a professional, including fraud and misrepresentation, ... do not sound in legal malpractice." (brackets and citation omitted)). True, the claim is premised upon essentially the same factual background as the prior claims, but it relies on an alternative characterization of the defendants' wrongdoing—as fraudulent rather than negligent. *See id.* at 549 (describing the difference between fraudulent and negligent misrepresentation); *Metro. Gov't of Nashville & Davidson Cnty. v. McKinney,* 852 S.W.2d 233, 237 (Tenn. Ct. App. 1992) (explaining that fraudulent misrepresentation requires a "false representation ... made either knowingly or without belief in its truth or recklessly"). And the Supreme Court of Tennessee has emphasized that "parties may assert alternative claims and defenses" that "may well be subject to differing statutes of limitations." *Benz-Elliott,* 456 S.W.3d at 148; *see also id.* at 148–49 (rejecting an approach by which a court would have to "identify a single gravamen from a complaint that alleges alternative, and potentially inconsistent, claims"). In other words, although the defendants' role as legal counsel to CEA provided the *occasion* for the alleged wrongdoing, the basis of this claim is ultimately the allegation that the defendants knowingly or recklessly misled the plaintiffs, not that they were negligent in discharging their professional duties.

**\*6** The type of damages the plaintiffs requested also supports the conclusion that the gravamen of the claim is fraud, not malpractice. *See id.* at 151. Unlike the negligence and negligent-misrepresentation claims, which requested only compensatory damages, the fraudulent-misrepresentation claim additionally sought punitive damages because of the defendants' recklessness. In Tennessee, "punitive damages are restricted to cases involving only the most egregious of wrongs"; accordingly, they may be awarded only if a defendant acted intentionally, fraudulently, maliciously, or recklessly. *Barnett v. Lane,* 44 S.W.3d 924, 928 (Tenn. Ct. App. 2000) (cleaned up). The requested damages likely would not be justified by a malpractice injury stemming only from "failure ... to

2024 WL 2874575

meet the requisite standards of the [legal] profession." *PNC Multifamily Cap.*, 387 S.W.3d at 546 (citation omitted); *cf. Benz-Elliott*, 456 S.W.3d at 152 (concluding that the gravamen of the claim was breach of contract, in part because the requested remedy of "[s]pecific performance ... is available solely for breach of contract claims").

The defendants do not point us to any Tennessee authority that would suggest that the gravamen of this claim is, in fact, legal malpractice. The unpublished district court decisions on which they rely—*Keszthelyi v. Tune, Entrekin & White, P.C.*, 2008 WL 1869740 (E.D. Tenn. Apr. 23, 2008), and *Melton v. Bank of Lexington*, 2008 WL 11411307 (W.D. Tenn. Dec. 18, 2008)—were decided before the Supreme Court of Tennessee clarified its gravamen test in *Benz-Elliott*. So they lack any analysis of the controlling test.

Nor does Mankey's reliance on cases from Ohio or Kentucky get him anywhere. In *Wilkey v. Hull*, the court decided at summary judgment that, as a matter of Ohio law, the plaintiff's claim was "based upon facts that constitute allegations of legal malpractice," rather than fraud. 598 F. Supp. 2d 823, 830 (S.D. Ohio 2009), *aff'd*, 366 F. App'x 634 (6th Cir. 2010). It did not apply Tennessee's gravamen test. And Mankey's reliance on Kentucky caselaw, *see Seiller Waterman, LLC v. RLB Props., Ltd.*, 610 S.W.3d 188, 203–04 (Ky. 2020); *Abel v. Austin*, 411 S.W.3d 728, 737–39 (Ky. 2013), is similarly unavailing because Kentucky's malpractice statute of limitations is framed much more broadly than Tennessee's. It governs civil actions "*arising out of any act or omission* in rendering, or failing to render, professional services for others," Ky. Rev. Stat. Ann. § 413.245 (emphasis added), but Tennessee's applies only to civil actions "*for* malpractice," Tenn. Code Ann. § 28-3-104(c)(1) (emphasis added). Mankey has given us no reason to think that, despite these significant statutory differences, Kentucky caselaw provides suitable guidance for applying the gravamen test articulated by the Supreme Court of Tennessee.

In sum, even though the count asserting a claim of fraudulent misrepresentation contains language invoking the professional duties of lawyers, the legal basis of the claim and the type of injury for which damages are sought reveal that the gravamen of this claim is not professional malpractice but fraud. The district court therefore erred in deciding that Tennessee's one-year malpractice statute of limitations governed this claim.

2.

The next step in evaluating a statute-of-limitations defense is to determine when the plaintiffs' claims accrued. We agree with the district court that the negligence and negligent-misrepresentation claims accrued no later than May 23, 2017.

"The concept of accrual relates to the date on which the applicable statute of limitations begins to run." *Redwing*, 363 S.W.3d at 457. Tennessee employs a "specific formulation" of the discovery rule to identify the accrual of a legal malpractice cause of action. *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995). Under this rule, a claim of legal malpractice accrues when the plaintiff (1) suffers injury as a result of the defendant's negligence and (2) knows or "in the exercise of reasonable diligence" should know "that this injury was caused by [the] defendant's negligence." *Id.* at 28; *see also Redwing*, 363 S.W.3d at 458 (explaining that discovery "include[s] not only the discovery of the injury but also the discovery of the source of the injury"). This rule does not, however, "delay the accrual of a cause of action ... until the plaintiff knows the full extent of the damages or until the plaintiff knows the specific type of legal claim it has." *Redwing*, 363 S.W.3d at 459 (citations omitted).

**\*7** An injury for purposes of the first prong "may ... take the form of the plaintiff being forced to take some action or otherwise suffer 'some actual inconvenience,' such as incurring an expense." *John Kohl & Co. P.C. v. Dearborn & Ewing*, 977 S.W.2d 528, 532 (Tenn. 1998) (citation omitted). For instance, in *John Kohl & Co.*, the defendant lawyer provided the plaintiffs with erroneous tax advice. *Id.* at 530–31. The court concluded that the requisite "injury" occurred when the plaintiffs received a letter from the IRS that required their accountant to clarify discrepancies in their tax return. *Id.* at 533. It was immaterial that the IRS had not, at that time, taken formal action against the plaintiffs, because "it was unnecessary for the plaintiffs to have suffered all the injurious effects or consequences of the defendants' negligence in order for the statute to begin running." *Id.* Similarly, here, the complaint reveals that the plaintiffs had been injured by the time they met with the FBI because they were forced to take action to investigate their possible victimization and to attempt to recover their money. It does not matter that the plaintiffs were not yet certain that their money was lost. That question goes to their knowledge of the *extent* of the injury, which is not the relevant inquiry. *See id.*; *Redwing,*

Case 4:23-cv-13132-SDK-EAS ECF No. 42-6, PageID.2494 Filed 11/15/24 Page 42 of 109
JRS Partners, GP v. Leech Tishman Fuscaldo & Lampl, LLC, Not Reported in Fed....
2024 WL 2874575

363 S.W.3d at 459. The first prong of the discovery rule was therefore satisfied by May 23, 2017.

The second prong was also satisfied at that time. Taken as true, the plaintiffs' allegations show that, in the exercise of reasonable diligence, they should have known by May 23, 2017, that the defendants' false statements were a source of their injury. *See Cataldo,* 676 F.3d at 547 (dismissal on the pleadings is appropriate if "the allegations in the complaint affirmatively show that the claim is time-barred"). The complaint shows that, by May 23, 2017, the plaintiffs: knew that they had relied on Mankey's and Leech Tishman's representations of key facts about CEA's funds; had investigated and confirmed that Warren sent them a fraudulent audit letter; had contacted and met with the FBI to learn about Warren's fraudulent scheme; and were planning a coordinated effort to retrieve their money. The dedicated efforts that were underway by May 23, 2017, demonstrate that the plaintiffs were "aware of facts sufficient to place a reasonable person on notice" that Mankey and Leech Tishman had provided them with false information that led to their injury. *Sherrill v. Souder,* 325 S.W.3d 584, 595 (Tenn. 2010); *see also Redwing,* 363 S.W.3d at 459 ("Once a plaintiff gains information sufficient to alert a reasonable person of the need to investigate the injury, the limitation period begins to run." (cleaned up)). That is enough to satisfy the discovery rule, even if the plaintiffs did not at that time "know the specific type of legal claim [they] ha[d] [against the defendants], or that the injury constituted a breach of the appropriate legal standard." *John Kohl & Co.,* 977 S.W.2d at 533.

In sum, the plaintiffs' negligence and negligent-misrepresentation claims accrued no later than May 23, 2017.[2]

[2] We need not consider whether a different accrual analysis applies to the fraudulent-misrepresentation claim. We have concluded that it is not subject to the one-year statute of limitations, and the defendants have not argued that it is nonetheless time-barred under some other limitations period.

3.

The final step is to determine whether the limitations period must be tolled. The plaintiffs contend that a tolling agreement tolled the limitations period with respect to their claims against Leech Tishman. We agree.

A tolling agreement is "governed by contract law," so we "interpret [the agreement] as written according to its plain terms." *Tenn-Fla Partners v. Shelton,* 233 S.W.3d 825, 829 (Tenn. Ct. App. 2007). The plaintiffs and Leech Tishman entered into an agreement stating that the period of September 14, 2017, through April 1, 2019, was not to be included "in determining the applicability of any statute of limitations, laches, or any other defense based on the lapse of time in any action or proceeding brought by either party against the other." R. 17-5, Tolling Agreement, PageID 405.[3]

[3] The parties apparently amended the tolled period in this agreement several times. The plaintiffs state that the period referenced above reflects the final agreement, and the defendants have not contested this assertion.

**\*8** Leech Tishman maintains that the claims against it are barred "by operation of law." Specifically, Leech Tishman explains that the claims are based on its vicarious liability for the acts of its agents—Mankey and the tax attorneys. When the plaintiffs sued Leech Tishman, it observes, the statute of limitations had already run as to the agents. And, under Tennessee law, a claim "against a principal is precluded 'when the plaintiff's claim against the agent is procedurally barred by operation of law before the plaintiff asserts' " its claim against the principal. *Taylor v. Miriam's Promise,* 2019 WL 410700, at \*10 (Tenn. Ct. App. Jan. 31, 2019) (quoting *Abshure v. Methodist Healthcare-Memphis Hosps.,* 325 S.W.3d 98, 106 (Tenn. 2010)). Thus, in Leech Tishman's view, the plaintiffs allowed their claims against Leech Tishman to become procedurally barred by failing to preserve them against Leech Tishman's agents before the expiration of the limitations period—and the tolling agreement did not save the claims from the operation of this common-law rule.

Leech Tishman's argument conflicts with the plain terms of the tolling agreement. Even though Leech Tishman attempts to characterize its position as an "operation of law" or "vicarious liability" defense, its argument amounts to an assertion that the plaintiffs' claims were barred *by the lapse of time.* It is no matter that the statute of limitations had run as to the agents when the plaintiffs brought their claims against Leech Tishman, the principal. The agreement does not provide special rules for vicarious-liability claims. It simply says, in blanket terms, that the tolled period shall not

be used to "determin[e] the applicability of any statute of limitations ... or any other defense based on the lapse of time." R. 17-5, Tolling Agreement, PageID 405. By those terms, the parties contracted around any time-based common-law rule that Leech Tishman could have invoked, including the defense that the vicarious-liability claims were extinguished by the running of the statute of limitations as to Leech Tishman's agents. [4]

[4]     Leech Tishman cites two Ohio appellate decisions. *See Taft, Stettinius, & Hollister, LLP v. Calabrese,* 69 N.E.3d 72 (Ohio Ct. App. 2016); *Seniah Corp. v. Buckingham Doolittle & Burrows, LLP,* 109 N.E.3d 69 (Ohio Ct. App. 2018). But Leech Tishman makes no effort to analyze these cases, or to explain why it believes the Supreme Court of Tennessee would follow them. So we do not consider them further. *See Williamson v. Recovery Ltd. P'ship,* 731 F.3d 608, 621 (6th Cir. 2013) ("Issues adverted to in a perfunctory manner, without some effort to develop an argument, are deemed forfeited.").

Therefore, the tolled period must be excluded from consideration in evaluating Leech Tishman's time-based defense. The district court erred in failing to do so. [5] *See Beckwith v. LBMC, P.C.,* 2019 WL 1306201, at *5 (Tenn. Ct. App. Mar. 21, 2019) (vacating a trial court's dismissal of a claim as time-barred because "the tolling agreement stopped the running of the statute of limitations during the tolling period").

[5]     Leech Tishman observes that, in a pair of cases decided together, the Supreme Court of Tennessee cited the district court's opinion with apparent approval. *See Ultsch v. HTI Mem'l Hosp. Corp.,* 674 S.W.3d 851, 867 (Tenn. 2023); *Gardner v. Saint Thomas Midtown Hosp.,* 674 S.W.3d 834, 848 (Tenn. 2023). But these cases contain no discussion of the district court's opinion, and they have nothing to do with tolling agreements. Rather, the Supreme Court of Tennessee appears to have cited the opinion as an example of a case articulating the relevant vicarious-liability principles. It is a far stretch to read these citations as an endorsement of the district court's analysis of an issue not before the Supreme Court of Tennessee, and we decline to make that inferential leap.

4.

In light of our analysis of the various aspects of the defendants' statute-of-limitations defenses, we draw the following conclusions as to which of the plaintiffs' claims are time-barred.

**\*9** Contrary to the district court's determination, the fraudulent-misrepresentation claim against both defendants is not barred by the statute of limitations. As discussed above, the gravamen of the claim is fraud, not malpractice, so it is not subject to the one-year statute of limitations for malpractice claims. And Mankey and Leech Tishman have not argued that the claim is time-barred under some other limitations period. In any event, it appears that a three-year statute of limitations should apply to the claim. *See* Tenn. Code Ann. § 28-3-105(1) (providing for a three-year statute of limitations for "[a]ctions for injuries to personal or real property"). So, assuming an accrual date of May 23, 2017, the plaintiffs filed suit comfortably within this limitations period on May 31, 2019. We reverse the district court's dismissal of this claim as to both defendants.

The district court also erred in dismissing the claims of negligence and negligent misrepresentation against Leech Tishman. As the district court concluded, the gravamen of these claims is malpractice, so they are subject to a one-year statute of limitations. But, even though the plaintiffs filed suit after the limitations period had run, their tolling agreement with Leech Tishman preserved the claims. Because the district court failed to enforce the tolling agreement according to its plain terms, we reverse the dismissal of these claims as to Leech Tishman. [6]

[6]     The negligence claim was added in the plaintiffs' amended complaint, which was filed on May 17, 2021, but the district court noted that Leech Tishman did not contest that this claim "relates back to the time of the filing of the original complaint." R. 110, Order, PageID 1888 n.14; *see* Fed. R. Civ. P. 15(c)(1). Nor has Leech Tishman challenged this ruling on appeal, so the argument is waived.

The negligent-misrepresentation claim against Mankey, however, was properly dismissed. The plaintiffs did not enter into a tolling agreement with Mankey, so their filing of suit on May 31, 2019—more than one year after the claim accrued

on May 23, 2017—was not timely. We affirm the dismissal of this claim as to Mankey.

### B.

The plaintiffs next challenge the dismissal of their claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 against Leech Tishman. Because the viability of the § 20(a) claim turns on that of the § 10(b) claim, we focus our attention on the latter.

Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale" of securities, "any manipulative or deceptive device or contrivance in contravention" of rules promulgated by the Securities and Exchange Commission. 15 U.S.C. § 78j(b). That statute and SEC Rule 10b-5 promulgated thereunder prohibit "fraudulent, material misstatements or omissions in connection with the sale or purchase of a security." *Frank v. Dana Corp.*, 547 F.3d 564, 569 (6th Cir. 2008) (citation omitted). To state a claim under § 10(b) and Rule 10b-5, a private litigant "must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 478 (6th Cir. 2010) (quoting *Frank*, 547 F.3d at 569).

This case concerns the scienter element, which is subject to the heightened pleading standards established by the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4(b)(2). *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 810 (6th Cir. 2022). The PSLRA requires that, "with respect to each act or omission alleged," a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, the Supreme Court established a three-step framework for evaluating scienter allegations under this "strong inference" standard. 551 U.S. 308, 322–23 (2007). First, as with any Rule 12(b)(6) motion, we must accept the complaint's factual allegations as true. *Id.* at 322. Second, we must consider the complaint's allegations collectively, or holistically, including any documents incorporated into the complaint by reference and any matters of which we may take judicial notice. *Id.* at 322–23. Third, we must take into account "plausible opposing inferences," because an

inference is only "strong" if it is "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 323–24. "The strength of an inference cannot be decided in a vacuum"; so, to survive a motion to dismiss, the allegations must give rise to an inference of scienter that is "strong in light of other explanations." *Id.*

**\*10** One way to establish scienter in a securities-fraud case is to demonstrate that the defendant acted recklessly. *City of Taylor*, 29 F.4th at 812. "Recklessness requires more than negligence and is akin to conscious disregard." *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016) (internal quotation marks and citation omitted). A court typically will not draw an inference of recklessness without "multiple, obvious red flags" that demonstrate an "egregious refusal to see the obvious, or to investigate the doubtful." *Id.* (citations omitted).

The district court did not err in determining that the plaintiffs' allegations did not overcome the PSLRA's "daunting" pleading standard. *City of Taylor*, 29 F.4th at 807. The plaintiffs' securities-fraud claims against Leech Tishman are premised upon Mankey's conduct. [7] Taken holistically, the plaintiffs' allegations as to Mankey's state of mind amount to this: after Warren connected Mankey with the plaintiffs, Mankey confidently provided them with specific, technical representations about CEA's funds without ever reviewing the documents that would be necessary to substantiate his representations and despite later admitting that he viewed Warren as "very squirrelly," reticent to pay, and difficult to work with; moreover, construing the allegations generously in the plaintiffs' favor, we can infer that Mankey intended to promote CEA's funds.

7    The district court concluded, and Leech Tishman does not now dispute, that Leech Tishman's scienter may be established by way of allegations of Mankey's scienter.

Conspicuously missing from the plaintiffs' complaint is any suggestion that Mankey affirmatively ignored any doubts or suspicions that he harbored. There are no allegations that, at any of the times that Mankey made misrepresentations to the plaintiffs, he suspected anything was amiss with Warren or had any concerns about CEA or the funds. *See* 15 U.S.C. § 78u-4(b)(2)(A) (requiring a plaintiff to particularly allege that "the defendant acted with the required state of mind" "with respect to each act or omission alleged"). Indeed, the only allegations going to Mankey's thoughts on Warren come from

Case 4:23-cv-13132-SDK-EAS ECF No. 42-6, PageID.2497 Filed 11/15/24 Page 45 of 109
JRS Partners, GP v. Leech Tishman Fuscaldo & Lampl, LLC, Not Reported in Fed....
2024 WL 2874575

the plaintiffs' phone call with Mankey in late August 2017, at least three and a half months after the FBI uncovered Warren's scheme. Mankey's last communication with the plaintiffs before that call, however, appears to have been in September 2015—nearly two years prior. The allegations of Mankey's comments on the August 2017 phone call do not raise a strong inference that Mankey had any suspicions about Warren when he communicated with the plaintiffs years earlier, let alone that Mankey acted recklessly in ignoring any such suspicions.

Nor do the plaintiffs allege any "obvious red flags" that Mankey disregarded. *Doshi*, 823 F.3d at 1039 (citation omitted). The only affirmative reasons for suspicion are Mankey's after-the-fact assessments that Warren was "very squirrelly," "difficult," and "reticent" to pay his legal fees —none of which can be said to be an *obvious* red flag that Warren was perpetrating a large-scale fraud. R. 88, Am. Compl., PageID 1586. The complaint makes clear, too, that Warren ultimately *did* pay his legal fees, which might reasonably have assuaged any concerns Mankey might have had about the validity of Warren's enterprises. And Mankey's admission that he was concerned that Warren was using Leech Tishman's name to sell his fund was also made during the August 2017 phone call, and it is expressly framed as a concern "after the fact." *Id.*

**\*11** Although Mankey admitted that he never saw appropriate documentation for the funds, the allegation does not point to suspicious conduct by Warren that should have put Mankey on alert to the need "to investigate the doubtful." *Doshi*, 823 F.3d at 1039 (citation omitted). For instance, a close reading of the complaint reveals that, despite their contrary suggestions, the plaintiffs do not allege that Mankey *sought* documents from Warren but was *denied* them, which could have constituted a red flag that Warren's conduct was suspicious. Rather, all that can be gleaned from the complaint is that Mankey never reviewed the necessary materials before rendering advice to Warren or making representations to the plaintiffs. Mankey's failure to review appropriate documents may constitute professional negligence, but we have held, in the context of accounting errors, that "failure to follow Generally Accepted Accounting Principles is, by itself, insufficient to establish scienter for a securities fraud claim." *La. Sch. Emps.'*, 622 F.3d at 481. Similarly, without more, Mankey's failure to meet the professional standards of a lawyer does not support a strong inference of scienter under the PSLRA.

The plaintiffs' reliance on *SEC v. George*, 426 F.3d 786 (6th Cir. 2005), is inapt. That case was decided against the defendants at summary judgment, *id.* at 790, 795, and the question whether a defendant has put forth evidence to create a genuine dispute as to his state of mind is not the same as the question whether a plaintiff has alleged facts giving rise to a strong inference of scienter. In any event, the evidence in *George* is distinguishable from the allegations here. In *George*, the relevant defendant, Steven Thorn, was an experienced stockbroker who orchestrated a roughly $75 million Ponzi scheme, falsely telling victims that he had a secretive, risk-free investment opportunity. *Id.* at 788. Although we concluded that Thorn was at least reckless for "fail[ing] to witness or receive any documentation confirming that securities had been traded" with investors' funds, that conclusion cannot be separated from Thorn's role in the scheme—an organizer who personally controlled large sums of the victims' funds and who used some of those funds for extravagant personal purchases. *Id.* at 789, 793, 795. We explained that Thorn essentially played the role of a mutual fund manager, and "a mutual fund manager assuredly could be expected to produce documentary records of the trades that the fund made." *Id.* at 795. That such conduct by Thorn qualified as reckless does not mean that Mankey's alleged failures were reckless. *Cf. City of Taylor*, 29 F.4th at 816 (explaining that, although the company's CFO "likely could have done more to verify the [inaccurate] reports, that failure indicates negligence at most"). Mankey is alleged to have played an entirely different role with respect to CEA and its funds. Nowhere is it alleged that he organized any scheme or plan, managed or had control of any funds, or received any compensation other than for his legal services. The allegations here are not like the facts of *George*.

Under ordinary pleading standards, the plaintiffs may have alleged facts that would permit a plausible inference that Mankey acted recklessly. But under the PSLRA's heightened pleading standard, it is not a "powerful or cogent" inference. *Tellabs*, 551 U.S. at 323. The complaint does not point to any obvious red flags that Mankey ignored, and it does not allege anything about Mankey's state of mind at the times he communicated with the plaintiffs. In addition to these shortcomings, the complaint and the incorporated documents contain material that affirmatively supports an inference of negligence. For one, the complaint states that Mankey was first connected to Warren by a mutual friend, Mike Zito, who worked at CEA. And in his alleged promotional efforts, Mankey introduced an old friend to Zito by email, "endors[ing] [them] both as good guys." R. 88-1, Exhs. to

Am. Compl., PageID 1609. These allegations support an inference that Mankey himself had some level of trust that CEA was a legitimate operation. Moreover, the complaint implies that, until Warren's scheme began to unravel in the summer of 2017, CEA's funds timely paid their quarterly distributions to investors, which could reasonably lead Mankey and investors to believe that the funds were operating properly. On the whole, the plaintiffs' allegations "produce a stronger countervailing inference" that Mankey, as a result of his negligence, was duped by Warren into repeating false representations about the supposed funds. *Doshi,* 823 F.3d at 1043. So the district court did not err in dismissing the plaintiffs' securities-fraud claims for failure to state a claim under the PSLRA's heightened pleading standard.[8]

[8] As part of our holistic review of a plaintiff's allegations, we normally rely on nine non-exhaustive factors, known as the "*Helwig* factors," to decide whether the allegations give rise to a strong inference of scienter. *See Doshi,* 823 F.3d at 1039–40 (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001) (en banc)). These factors are apt for evaluating allegations of complex or opaque fraud schemes arising, for example, in the context of publicly traded companies, but it is not clear how relevant they are to a case like this one, which alleges more garden-variety fraud. That said, we need not take a view on the proper weight, if any, to give to the *Helwig* factors in this sort of case, because they do not favor the plaintiffs' position anyway. At most, only one of those nine factors ("disregard of the most current factual information") is implicated, and even that does not weigh very heavily in the plaintiffs' favor. *See id.* at 1039 (quoting *Helwig,* 251 F.3d at 552).

**\*12**

\* \* \*

We AFFIRM the district court's dismissal of the negligent-misrepresentation claim against Mankey and its dismissal of the federal securities-fraud claims against Leech Tishman. We REVERSE its dismissal of the fraudulent-misrepresentation claim against both defendants and its dismissal of the negligence and negligent-misrepresentation claims against Leech Tishman. The case is REMANDED for further proceedings.

**All Citations**

Not Reported in Fed. Rptr., 2024 WL 2874575

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Lamontagne v. Tesla, Inc., Slip Copy (2024)

2024 WL 4353010

2024 WL 4353010
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Thomas LAMONTAGNE, Plaintiff,
v.
TESLA, INC., et al., Defendants.

Case No. 23-cv-00869-AMO
|
Signed September 30, 2024

**Attorneys and Law Firms**

Jennifer Pafiti, Pomerantz LLP, Los Angeles, CA, J. Alexander Hood, II, Pro Hac Vice, Jeremy A. Lieberman, Pro Hac Vice, Pomerantz LLP, New York, NY, for Plaintiff.

Alexander Benjamin Spiro, Pro Hac Vice, Brenna D. Nelinson, Pro Hac Vice, Leigha Empson, Pro Hac Vice, Jesse A. Bernstein, Pro Hac Vice, Quinn Emanuel Urquhart and Sullivan LLP, New York, NY, Michael Timothy Lifrak, Quinn Emanuel Urquhart & Sullivan, LLP, Los Angeles, CA, Michael Ethan Liftik, Quinn Emanuel Urquhart & Sullivan LLP, Washington, DC, for Defendants.

**ORDER GRANTING MOTION TO DISMISS**

Re: Dkt. No. 62

Araceli Martínez-Olguín, United States District Judge

**\*1** This is a securities action case about Tesla's self-driving car technology. The matter is fully briefed and suitable for decision without oral argument. *See* Civil L.R. 7-1(b). Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the Court hereby **GRANTS** the motion to dismiss for the following reasons.

**BACKGROUND** [1]

[1]  The Court accepts Plaintiffs' allegations in the complaint as true and construes the pleadings in the light most favorable to Plaintiffs. *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (citation omitted).

Lead Plaintiffs Oakland County Voluntary Employees' Beneficiary Association and Oakland County Employees' Retirement System (collectively, "Plaintiffs") bring a putative class action alleging Private Securities Litigation Act ("PSLRA") violations by Tesla, Inc., and Elon Musk (collectively, "Defendants"). ECF 57 (First Amended Complaint or "FAC"). They assert that Defendants made 29 false or misleading statements about the development timeline of its autonomous driving technology, the safety of the technology, and its capabilities.

By the start of the Class Period (February 19, 2019 to February 16, 2023), Tesla included a software package in its vehicles called "Autopilot," which it described as providing substantial self-driving capabilities, including providing "highway autonomy." FAC ¶ 63. Musk described Autopilot as being safer than human driving. FAC ¶ 63. Tesla also sold a software upgrade called "Full Self Driving" or "FSD" which enhanced the self-driving capabilities of the car. FAC ¶ 64. As part of the FSD software upgrade, Tesla offered a feature called "Smart Summon" which permitted users to direct the car to drive itself to them across very short distances. FAC ¶ 66. Tesla's software required drivers to occasionally touch the steering wheel, which Musk described as a mere technicality. FAC ¶ 67.

Defendants asserted that Tesla would run a network of "robotaxis" that would allow drivers to use a phone application (similar to Uber) to enable third parties to summon their car and drive them to a destination, allowing drivers to receive passive income while they were not personally using their car. FAC ¶ 75. Tesla equated robotaxis with Level 4-5 autonomy, describing them as "FSD without supervision." FAC ¶ 76. [2]

[2]  The Society for Automotive Engineers has established five levels of vehicle autonomy. FAC ¶ 61. Levels 1-2 refer to systems where a human is driving the vehicle but technology can assist with certain aspects; Level 3 refers to systems where a human can sometimes hand over control of driving tasks but must always be ready to "intervene"; Levels 4-5 refer to systems where the human is not responsible for driving the car while systems are engaged, with Level 4 only providing the functionality in limited conditions (e.g., restricted geographical location or specific conditions such as not during rain). FAC ¶ 61.

During the Class Period, Defendants represented that Tesla was very close to releasing safe and functional Level 4-5 self-driving technology that would drive safer than humans (e.g., Tesla will be "feature complete – full self-driving – this year"). FAC ¶¶ 82-83. However, Tesla's system is currently unsafe for use without human supervision, and its technology is not yet better than humans. FAC ¶¶ 186, 188. Further, the National Transportation Safety Board has criticized Tesla for its dangerous marketing which encourages drivers to not pay as close attention as is necessary for the technology. FAC ¶¶ 190-91. Reports have found that Tesla's autonomous driving technology has led to "far more" crashes than previously reported. FAC ¶¶ 204-05. The Full Self-Driving software has critical safety defects (e.g., it ignores "Do Not Enter" signs, speeds in school zones, runs over children crossing the road, swerves into oncoming traffic). FAC ¶¶ 208-09. Tesla does not report the number of "disengagements" (i.e., human interventions) needed while its vehicles operate. FAC ¶ 211. The self-reported data from Tesla users shows that there is a disengagement of the Tesla's autonomous driving technology once every 16 miles, which is worse than its competitors in the autonomous driving market (1,000 times worse than Waymo and 5,800 times worse than Cruise). FAC ¶ 212.

**\*2** Throughout the Class Period, Tesla continuously assured investors that it was certain to release full self-driving technology at Level 4-5 autonomy very soon, including by the end of 2020. FAC ¶ 220. When suit was filed, over 3 years and 8 months had passed since the 2020 deadline and Tesla had not yet released even a Level 3 autonomous driving system. FAC ¶ 221.

Plaintiffs bring three causes of action: (1) violation of Section 10(b) of the Securities and Exchange Act and Rule 10b-5(b) against Tesla and Musk; (2) violation of Section 10(b) of the Securities and Exchange Act and Rule 10b-5(a) and (c) against Tesla and Musk; and (3) Violation of Section 20(a) of the Securities and Exchange Act against Musk. Defendants move to dismiss the First Amended Complaint in its entirety. FAC ¶¶ 467-474, 475-483, 484-490.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless, Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

Securities fraud cases have heightened pleading requirements as the complaint must satisfy both the pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA. *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Pursuant to Rule 9(b), claims alleging fraud must "state with particularity the circumstances constituting fraud ..." Fed. R. Civ. P. 9(b). The PSLRA mandates that "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading ... [.]" 15 U.S.C. § 78u–4(b)(1)(B). The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007) (quoting 15 U.S.C. § 78u–4(b)(2)(A)). This means a plaintiff must allege that "the defendant[ ] made false or misleading statements either intentionally or with deliberate recklessness." *In re VeriFone Holdings*, 704 F.3d at 701 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009)).

## DISCUSSION

### I. REQUEST FOR JUDICIAL NOTICE
**\*3** While the scope of review on a motion to dismiss is generally limited to the contents of the complaint, courts may take judicial notice of facts that are "not subject

to reasonable dispute." *Fed. R. Evid. 201(b).* Courts may consider documents incorporated into the complaint by reference, *Tellabs*, 551 U.S. at 322, and take judicial notice of matters of public record, *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001), and publicly available financial documents such as SEC filings, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008). Courts may not assume the truth of an incorporated document "if such assumptions only serve to dispute facts in a well-pleaded complaint." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018).

Defendants seek judicial notice of 20 exhibits (Exs. A-T). ECF 63 ("RJN"). Defendants assert that Exhibits A through H and J through T [3] are incorporated by reference. *Id.* at 2; *see Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). Plaintiffs' FAC is premised on earnings call transcripts (Ex. C, H, J-S), *see* FAC ¶¶ 321, 329, 333, 347; and Tesla's Forms 10-K (Exs. B, D-G), *see* FAC ¶¶ 372-75. The FAC also relies on a Southern District of New York order (Ex. T) that purportedly enjoins Tesla from invoking the PSLRA safe harbor, *see* FAC ¶ 459, and references Tesla's website and its disclosures (Ex. A), *see* FAC ¶ 187. Because the FAC alleges misstatements based on Tesla's website and the Southern District of New York order, they are incorporated by reference despite not being attached to the complaint. *See U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.").

[3] Ex. A (Tesla Autopilot Support Page); Ex. B (Tesla 2019 Form 10-K); Ex. C (Oct. 21, 2020 Earnings Call Transcript); Ex. D (Tesla 2018 Form 10-K); Ex. E (Tesla 2020 Form 10-K); Ex. F (Tesla 2021 Form 10-K); Ex. G (Tesla 2022 Form 10-K); Ex H (Apr. 20, 2022 Earnings Call Transcript); Ex. J (Apr. 24, 2019 Earnings Call Transcript); Ex. K (Jul. 24, 2019 Earnings Call Transcript); Ex. L (Oct. 23, 2019 Earnings Call Transcript); Ex. M (Apr. 29, 2020 Earnings Call Transcript); Ex. N (Jul. 22, 2020 Earnings Call Transcript); Ex. O (Jan. 27, 2021 Earnings Call Transcript); Ex. P (Jan. 26, 2022 Earnings Call Transcript); Ex. Q (Oct. 19, 2022 Earnings Call Transcript); Ex. R (Jan 29, 2020 Earnings Call Transcript); Ex. S (Apr. 26, 2021 Earnings Call Transcript); Ex. T (Oct. 16, 2018 Tesla Order).

The Court also takes judicial notice of the contents of Exhibits B and D through G as they are Forms 10-K filed with the SEC. *See In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2017 WL 3727318, at *10 (N.D. Cal. Aug. 30, 2017) (holding that SEC filings referenced in the complaint "are proper subjects of judicial notice"). The Court takes judicial notice of Exhibits C, H, and J through S as they are earnings call transcripts. *See Sneed v. AcelRx Pharm., Inc.*, 2022 WL 4544721, at *3 (N.D. Cal. Sept. 28, 2022) (finding "transcripts of earnings calls ... are proper subjects of judicial notice"). The Court further takes judicial notice of Exhibit I, which reflects Tesla's stock price on the first and last days of the Class Period. *See, e.g., Metzler*, 540 F.3d at 1064 n.7 (holding that district court properly took notice of stock price). Exhibit A, which is an excerpt of content from Tesla's website as displayed during the Class Period, is the proper subject of judicial notice. *See Threshold Enterprises Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 146 (N.D. Cal. 2020) (finding that "websites and their contents may be judicially noticed"). Finally, the Court takes judicial notice of Exhibit T, the Southern District of New York order, as the Court may take judicial notice of court filings, *see Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006). [4]

[4] Plaintiffs do not object to the Court taking judicial notice of each of these documents.

## II. SECTION 10(B) CLAIM

**\*4** Section 10(b) of the Securities Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). To state a claim under section 10(b) and Rule 10b-5, a plaintiff must show: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (citations omitted); *see In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051-52 (9th Cir. 2014). "Rule 9(b) applies to all elements of a securities fraud action, including loss causation." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014). "Even where a plaintiff has properly pleaded all six elements of a Section 10(b) violation, the allegedly false or misleading statement may still be shielded

*Lamontagne v. Tesla, Inc.*, Slip Copy (2024)

2024 WL 4353010

from liability by the 'safe harbor' provision of the PSLRA." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017).

Plaintiffs allege that Elon Musk and Tesla made 29 false and misleading statements in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b). Defendants move to dismiss the FAC in its entirety. They argue that the statements are not actionable because (1) they are forward-looking statements protected by the PSLRA safe harbor; and (2) they are statements of corporate puffery; and (3) Plaintiffs have not adequately pleaded facts to support the elements of a Section 10(b) claim.[5] As statements protected under the safe harbor are nonactionable, the Court considers that argument first. *See, e.g., Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 873 (N.D. Cal. 2023) ("*DocuSign*") (considering safe harbor before addressing whether statements are otherwise actionable). Similarly, the Court considers whether the statements are corporate puffery before considering whether the claims are sufficiently pled.

[5]   In the motion, Defendants categorize the statements into three types: Timeline, Safety, and Capability. Because Plaintiffs adopt this categorization in their response, the Court does as well.

**A. PSLRA Safe Harbor**

The PSLRA "safe harbor" rule protects certain "forward-looking" statements from liability. 15 U.S.C. § 78u-5(c). The safe-harbor provision is "designed to protect companies and their officials when they merely fall short of their optimistic projections." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1189 (9th Cir. 2021) (citation and quotations omitted). Plaintiffs argue that Tesla is statutorily prohibited from invoking the safe harbor doctrine. The Court addresses this argument before turning to the elements of the PSLRA safe harbor.

**1. Statutory Exclusion from Safe Harbor**

The PSLRA Safe Harbor does not protect statements made by an issuer of securities within three years after it has been the subject of an order barring future violations of an antifraud provision of the securities laws. 15 U.S.C. § 78u-5(b). Plaintiffs argue that this exclusion applies to Tesla because a settlement in an SEC action bars Tesla from violating Rule 13a-15. ECF 66 ("Opp.") at 21 (citing FAC ¶¶

457, 459); *United States Securities & Exchange Commission v. Tesla, Inc.*, 1:18-cv-8947-LJL (S.D.N.Y. Oct. 16, 2018), ECF No. 14.[6] Plaintiffs contend that Rule 13a-15 is an antifraud provision within the meaning of Section 15 U.S.C. § 78u-5(b), as it is aimed at preventing fraud. Opp. at 21. Defendants dispute that Rule 13a-15 is an antifraud provision, as it is a controls and procedures provision and does not contain a scienter requirement. Mot. at 14 (citing *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1325 (11th Cir. 2019)) (holding that Rule 12b-20 is not an "antifraud provision" because, among other reasons, it does not contain a scienter requirement, and fraud provisions by their nature involve intentional wrongdoing). Plaintiffs provide no caselaw of any kind considering whether Rule 13a-15 is an antifraud provision. The Court therefore examines the rule and the conduct it regulates.

[6]   Plaintiffs do not dispute that the Musk can avail himself of safe harbor as he is not an "issuer" of a security. *See* Opp. at 21-22.

**\*5** Rule 13a-15 dictates that issuers of securities must maintain "disclosure controls and procedures" and evaluate their effectiveness every fiscal quarter. 17 C.F.R. § 240.13a-15(a)-(b). The Rule defines "disclosure controls and procedures" to mean controls and procedures "designed to ensure that information required to be disclosed by the issuer ... is recorded, processed, summarized and reported" in a timely manner. *Id.* § 240.13a-15(e). The issuer must also evaluate "internal control over financial reporting" every fiscal year, which requires the issuer to provide "reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements[.]" *Id.* §§ 240.13a-15(c)-(d), (f). The Court does not read this rule to be an antifraud provision as fraud involves intentional wrongdoing. *See* Prosser & Keeton on Torts 728 (5th ed. 1984) ("[Fraud] entail[s] [a]n intention to induce the [victim] to act or to refrain from action in reliance on the misrepresentation."). In promulgating Rule 13a-15, the SEC did not discuss any fraud or state of mind requirements for the rule. It explained that "[p]roposed Rule 13a-15 would require a company to maintain sufficient procedures to collect, process and disclose the information required in its periodic and current reports filed with the Commission." *In Re Certification of Disclosure in Companies' Q. & Ann. Reps.*, SEC Release No. 46079 (June 14, 2002); *see also S.E.C. v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 462 (9th Cir. 1985) (differentiating between "registration provisions of the Exchange Act," including Sections 12(g), 13(b)(2),

and Rule 12b-20, recordkeeping provisions of the Securities Act, such as Section 13(b)(2) and "antifraud provisions of the Securities Act, § 17(a), § 10(b)").[7] Rule 13a-15 does not make any reference to the speaker's state of mind. Therefore, the Court cannot find that Rule 13a-15 is an antifraud provision and Plaintiffs have not shown that Tesla is prohibited from availing itself of the PSLRA safe harbor. The Court thus turns to whether the safe harbor applies to the challenged statements.

[7] Plaintiffs argue that Rule 13a-15 was implemented pursuant to "existing antifraud" rules such as Section 10(b). Opp. at 19 (quoting SEC Release No. 46079, at *2). However, this misquotes the SEC Release, which refers broadly to "existing antifraud and disclosure rules." SEC Release No. 46079, at *2.

### 2. Forward-Looking Statements

In determining whether the PSLRA safe harbor applies, the threshold question is whether any of the statements at issue are forward-looking. Relevant here, the provision applies to (1) forward-looking statements that are identified as such and are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially," or (2) forward-looking statements that were not made with "actual knowledge" by the speaker "that the statement was false or misleading." 15 U.S.C. § 78u-5(c); *see Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F. 4th 611, 620 (9th Cir. 2022). The statute defines forward-looking statements as "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (citing 15 U.S.C. § 78u-5(i)). "Whether a statement is forward-looking and protected by the PSLRA's safe harbor 'turns on particular language' and therefore requires an individualized analysis of each statement." *DocuSign*, 669 F. Supp. 3d at 874 (citation omitted).

Defendants argue that 18 Timeline Statements[8] expressing predictions for when Tesla's "Full Self Driving Capability" or "FSDC" would reach certain benchmarks are forward looking statements protected by the PSLRA safe harbor. Mot. at 12-13; *see, e.g.*, FAC ¶¶ 313-14 (predicting "feature complete

for full self-driving" this year); FAC ¶ 327 ("we expect to be feature complete with autonomy by the end of this year ... I think probably sometime next year, you'll be able to have the car be autonomous without supervision"); FAC ¶ 331 (Tesla "appears to be on track" for fully functional FSD by the end of the year); FAC ¶¶ 343, 349, 351, 357 (expressing confidence that Tesla will achieve full autonomy the following year).

[8] Statements 1-3, 5-6, 8-12, 14-16, 18-20, 23, 29. *See* FAC ¶¶ 313, 315, 317, 321, 323, 327, 329, 331, 333, 335, 339, 341, 343, 347, 349, 351, 357, 369. The Court refers to the statement numbers in Plaintiffs' Appendix A at ECF 66-1.

Plaintiffs contend that the Timeline Statements are not forward-looking because they omit present facts rendering them misleading. Opp. at 19. For example, Plaintiffs argue that Musk's statements that "I think we will be feature complete full self driving this year" and "I would say that I'm certain of that. That is not a question mark" (FAC ¶ 314) are misleading "by omitting that Tesla was nowhere near releasing Level 4-5 ADT and not even intending to develop that technology over the near term." *Id.* However, Plaintiffs misunderstand the caselaw. Statements of the "assumptions underlying or relating to" the "plans and objectives of management for future operations" are forward-looking statements. *Wochos*, 985 F.3d at 1191-92 (holding that statements that Tesla is "on track" to produce a certain number of vehicles per week were "unquestionably" forward-looking statements). To establish that a challenged statement contains non-forward-looking assertions, a plaintiff must allege that the statement "goes beyond the articulation of 'plans,' 'objectives,' and 'assumptions' and instead contains an express or implied 'concrete' assertion containing a specific 'current or past fact.' " *Id.* at 1191 (quoting *Quality Sys.*, 865 F.3d at 1142, 1144). Plaintiffs have failed to allege that these challenged statements contain such "concrete" assertions of "current or past fact." *See id.*[9]

[9] Plaintiffs also argue that because the statements were framed as guarantees rather than projections, they misrepresent the current condition of Tesla's business. Opp. at 20. They cite only an out of circuit case from 25 years ago that is not persuasive.

**\*6** The statements here set forth a projected timeline for achieving autonomous driving technology, much like statements of a "projected launch date for [a company's] products" and thus are plainly forward-looking statements of Tesla's plans and objectives. *See In re Intel Corp. Sec. Litig.*,

2023 WL 2767779, at *11 (N.D. Cal. Mar. 31, 2023), *aff'd*, 2024 WL 1693340 (9th Cir. Apr. 19, 2024).

Defendants also argue that two Safety Statements are forward-looking:

- "We'll probably roll it out later this year. But we'll be able to do traffic lights, stop, turns, troughs, everything pretty much. And then it will be a long march of 9s, essentially, how many 9s of reliability are okay. So it's definitely way better than human ..." FAC ¶ 341 (Statement 15) (Jul. 22, 2020 Musk on Earnings Call). [10]

- "Tesla Full Self-Driving will work at a safety level well above that of the average driver this year, of that I am confident. Can't speak for regulators though." FAC ¶ 353 (Statement 21) (Jan. 1, 2021 Musk Tweet).

[10]  Defendants describe this statement as both a Timeline and a Safety Statement.

Plaintiffs argue that the statement "it's definitely way better than human" (Statement 15) is not forward-looking because it is a "mixed" statement that represents a present fact. Opp. at 19. Where a defendant makes a mixed statement containing a non-forward-looking statement as well as a forward-looking statement, the non-forward-looking statement is not protected by the safe harbor. *In re Quality Sys.*, 865 F.3d at 1141-42. However, where the statement, "examined as a whole," challenges "future expectations and performance," the statement is properly classified as forward-looking. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1059 (9th Cir. 2014) ("*Intuitive Surgical*"). Here, the statement discusses rolling out "4D" [11] later in the year, what Tesla will "be able to do," and that reliability is "going to be the real work." FAC ¶ 341. Thus, examined as a whole, the statement is best understood as discussing the "future expectations and performance" possible in the future roll-out. *See Intuitive Surgical*, 759 F.3d at 1059 (statement that defendant was not "hear[ing] anything that causes us any significant concern ... no change from last quarter, I guess ..." was properly understood as "expectations of the future impact of the external economic environment on [defendant]"). Statement 15 (FAC ¶ 341) is thus forward-looking. *See In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 936 (N.D. Cal. 2022) (citing *Wochos*, 985 F.3d at 1190) ("for a challenged statement to be deemed 'mixed,' the non-forward-looking aspects must be 'separable' from the forward-looking aspects"). Plaintiffs do not dispute that Statement 21 (FAC ¶ 353) is forward-looking. As the Court

has concluded that the above statements are forward-looking, the Court next considers whether Defendants have alleged that they were accompanied with meaningfully cautionary language or Plaintiffs have failed to allege knowledge of falsity.

[11]  The parties do not define "4D."

### 3. Prong One of the Safe Harbor: Meaningfully Cautionary Language

Defendants argue that the forward-looking statements are protected under the first prong of the PSLRA safe harbor because they provided meaningful cautionary language warning investors that predictions in their forward-looking statements were subject to certain risks. Mot. at 13-14. Forward-looking statements are protected under the first prong of the safe harbor if they were "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially." 15 U.S.C. § 78u-5(c)(1)(A)(i). "To be adequate under the cautionary-language prong, the caution must 'discredit the [allegedly misleading statements] so obviously that the risk of real deception drops to nil.' " *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 737 (N.D. Cal. 2022) (quoting *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991)). These factors must be "substantive company-specific warnings based on a realistic description of the risks applicable to the particular circumstances." *Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1052 (N.D. Cal. 2018) (citations omitted). But the cautionary language "does not need to warn of the 'exact risk' that transpires." *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 931 (N.D. Cal. 2017).

**\*7**  The forward-looking statements in Statements 5, 9-12, 15, 18, 23, 26, and 29 (FAC ¶¶ 321, 329, 331, 333, 335, 341, 347, 357, 363, and 369) were made during Tesla earnings calls. At the beginning of each call, Defendants cautioned that "[d]uring this call, we will discuss our business outlook and make forward-looking statements. These comments are based on our predictions and expectations as of today. Actual events or results could differ materially due to a number of risks and uncertainties, including those mentioned in our most recent filings with the SEC." ECF 62-13 (Ex. J) (Apr. 24, 2019 Earnings Call) at 2. [12] The SEC filings discussed hardware for Autopilot and FSD features and stated that "[t]here is no guarantee that we will be able to successfully and timely

introduce and scale any such new processes or features" and that Tesla may experience "delays or other complications in launching and/or ramping production of ... future features and services such as new Autopilot or FSD features and the autonomous Tesla ride-hailing network." ECF 62-5 (Ex. B) (Dec. 31, 2019 Form 10-K) at 5. Defendants also cautioned that "certain features of our vehicles such as new Autopilot or FSD features [may] take longer than expected to become enabled ... [.]" *Id.* at 11.

12    Ex. K (July 24, 2019 Earnings Call) at 2 (same); Ex. L (Oct. 23, 2019 Earnings Call) at 2 (same); Ex. M (Apr. 29, 2020 Earnings Call) at 2 (same); Ex. N (July 22, 2020 Earnings Call) at 2 (same); Ex. C (Oct. 21, 2020 Earnings Call) at 2 (same); Ex. O (Jan. 27, 2021 Earnings Call) (same); Ex. P (Jan. 26, 2022 Earnings Call) at 2 (same); Ex. Q (Oct. 19, 2022 Earnings Call) at 2 (same).

Plaintiffs contend that the cautionary language was inadequate as Defendants failed to disclose risks known to them – namely, that Tesla was not close to developing FSDC. Opp. at 20-21. "Risk disclosures that speak entirely of as-yet-unrealized risks and contingencies and do not alert the reader that some of these risks may already have come to fruition can mislead reasonable investors." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) (citation and quotation marks omitted); *see also Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 781 (9th Cir. 2023) (applying this to the context of the safe-harbor provision and finding that "cautionary language is not 'meaningful' if it discusses as a mere possibility a risk that has already materialized."). In November and December of 2020, Tesla's Assistant General Counsel told that California DMV that Tesla's City Streets software was ordinary "Level 2" driving assistance and that Tesla was not expecting any "significant enhancements" or "changes" to the software to render it Levels 3-5. FAC ¶¶ 227-31. The letter also stated that the development of Levels 3-5 will follow Tesla's "iterative process" and will not be released until the company has "fully validated them." FAC ¶ 230. In 2021, Tesla's Director of Autopilot Software told the DMV that Musk's tweet about reaching Level 5 capacity by the end of the year "does not match engineering reality." FAC ¶ 232.

Defendants argue that these allegations do not show that Tesla's statements were false or misleading because the DMV letter refers to a specific technology – the City Streets software – and does not indicate that Tesla's goals of completing FSD by the end of the year were not plausible.

Mot. at 17-18. Further, the 2021 DMV memo indicates that Tesla "couldn't say if the rate of improvement would make it to L5 [Level 5] by the end of the year" and that Musk was "extrapolating on the rates of improvement when speaking about L5 capabilities." FAC ¶ 232. The Court agrees with Defendants that Plaintiffs have failed to point to allegations showing that the risk that the FSD technology could not be achieved by the projected timeline had "already come to fruition." *See In re Alphabet*, 1 F.4th at 703; *cf. Khoja*, 899 F.3d at 1016 (holding that a company's warning in its Form 10-Q that share prices "might" be affected by announcements of study results that "may" be inconsistent with interim study results was misleading because the company "allegedly knew already that the 'new data' revealed exactly that"); *DocuSign*, 669 F. Supp. 3d at 879 (finding that defendant's disclosures that risks related to the pandemic "could" or "may" impact the business were insufficient where defendant was aware that the "pandemic-generated demand was unsustainable" and knew of "plummeting usage rates ... and disappointing sales as customers returned to in-person work and refused to renew" their contracts).

**\*8** Moreover, courts have recognized that language similar to Defendants' is sufficiently cautionary. *See, e.g., Intuitive Surgical*, 759 F.3d at 1059-60 (finding sufficient cautionary language in disclaimer that "[a]ctual results may differ materially from those expressed or implied, as a result of certain risks and uncertainties. These risks and uncertainties are described in detail in the company's [SEC] filings. Prospective investors are cautioned not to place undue reliance on such forward-looking statements"); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) (finding that the following language adequately cautioned investors: "these prepared remarks contain forward-looking statements concerning future financial performance and guidance ... management may make additional forward-looking statements in response to questions, and ... factors like Cutera's ability to continue increasing sales performance worldwide could cause variance in the results."). The cautionary language in the SEC filings mentions potential delays and complications in developing the technology and explains that certain features such as autopilot and FSD may take longer than expected. This precisely addresses the alleged misrepresentations. Indeed, "[t]he PSLRA safe harbor demands only that companies warn of risks that might cause actual results to differ from forward-looking predictions ... [.]" *In re Intel Corp.*, 2023 WL 2767779, at \*14 (citing 15 U.S.C. § 78u-5(c)(1)(A)). As Defendants have done that with respect to Statements 5, 9-12, 15, 18, 23, 26, and 29, the Court

finds that those statements are protected under the PSLRA safe harbor.

### 4. Prong Two of the Safe Harbor: Knowledge of Falsity

This leaves seven statements (Statements 1-3, 14, and 19-21 (FAC ¶¶ 313, 315, 317, 339, 349, 351, 353)), which Defendants contend are protected under the second prong of the PSLRA safe harbor because Plaintiffs have not alleged that the speaker knew that the statements were false or misleading. [13] "Even if a forward-looking statement is not accompanied by adequate cautionary language, it is protected by PSLRA's safe harbor if the speaker did not have 'actual knowledge' that the statement was false or misleading." *In re Quality Sys.*, 865 F.3d at 1149; *see Cutera*, 610 F.3d at 1112-13 (explaining that "actual knowledge" and "cautionary language" safe harbor prongs are disjunctive). Plaintiffs argue that for the same reasons they have sufficiently alleged scienter, they have alleged knowledge of the statements' falsity. Opp. at 20. As discussed in the scienter section below, Plaintiffs have not alleged that Musk had knowledge that his statements were false. Thus, the remaining forward-looking statements, Statements 1-3, 14, and 19-21, are protected under the second prong of the safe harbor.

[13] Defendants also contend that Statements 1-3, 14, and 19-21 (FAC ¶¶ 313, 315, 317, 339, 349, 351, 353), which were not identified as forward-looking or accompanied by forward-looking language, are protected under the "bespeaks caution" doctrine. Mot. at 14-15. The Court cannot agree, as dismissing the pleadings under the bespeaks caution doctrine requires showing that "reasonable minds could not disagree that the challenged statements were not misleading." *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017) (citation omitted). However, the Court need not address whether this doctrine applies, as that Plaintiffs have not adequately alleged knowledge of falsity.

### B. Corporate Puffery

Defendants next argue that several Timeline and Safety Statements, Statements 7, 9-11, 13, 16, 18, and 26 (FAC ¶¶ 325, 329, 331, 333, 337, 343, 347, 363), are nonactionable statements of corporate puffery and optimism. Mot. at 15, 19. In the Ninth Circuit, "vague, generalized assertions of corporate optimism or statements of 'mere puffing' are not actionable material misrepresentations under federal securities laws" because no reasonable investor would rely on such statements. *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1063 (N.D. Cal. 2012) (citations omitted); *see In re Nimble Storage, Inc. Sec. Litig.*, 252 F. Supp. 3d 848, 854 n.8 (N.D. Cal. 2017), *aff'd*, 756 F. App'x 779 (9th Cir. 2019) ("[A]lleged optimistic statements indicating that a company is 'on track' to meet a certain goal are, without more, inactionable puffery."). This is because "[w]hen valuing corporations, ... investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *In re Cutera*, 610 F.3d at 1111. However, even "general statements of optimism, when taken in context," may be misleading "when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys.*, 865 F.3d at 1143 (citation omitted).

**\*9** Defendants argue that the Timeline Statements that FSDC technology "appear[ed] to be on track," would be available "aspirationally by the end of the year," and Tesla was "aiming to release [it] this year," Statements 10, 11, and 18 (FAC ¶¶ 331, 333, 347), were nonactionable statements of corporate puffery and optimism. Mot. at 15. Plaintiffs contend that the statements provided a "concrete description" of the state of Tesla's technology in a way that misled investors. Opp. at 18 (citing *In re Okta, Inc. Sec. Litig.*, 2023 WL 2749193, at *13 (N.D. Cal. Mar. 31, 2023)). These statements about Tesla's aims and aspirations to develop Tesla's technology by the end of the year and Musk's confidence in the development timeline are too vague for an investor to rely on them. *See Nimble Storage*, 252 F. Supp. 3d at 854 n.8. Thus, in addition to being protected under the PSLRA safe harbor, Statements 10, 11, and 18 are nonactionable puffery. [14]

[14] Defendants also point to Statements 9 and 16 (FAC ¶¶ 329, 343) in a footnote. Mot. at 15 n.9. The Court does not address arguments relegated to footnotes. *See Est. of Saunders v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014) ("Arguments raised only in footnotes ... are generally deemed waived.").

Defendants also assert that several Safety Statements are corporate puffery. For example, statements that safety is "paramount" (FAC ¶ 325), Tesla cars are "absurdly safe" (*id.*), autopilot is "superhuman" (FAC ¶ 337), and "we want to get to as close to perfection as possible" (FAC ¶ 363). Mot. at

19. Plaintiffs respond that "super" in "superhuman" is not puffery because it represents that ADT is safer than human and "absurdly safe" conveys greater-than-human safety. Opp. at 12. However, these vague statements of corporate optimism are not objectively verifiable. *See In re Cutera*, 610 F.3d at 1111; *see, e.g., Bodri*, 252 F. Supp. 3d at 924 (statement that the company was "enjoying terrific momentum" which was a "testament to the strength of the GoPro brand" was corporate optimism even though plaintiffs alleged that sales were weak and within days GoPro had cancelled orders). Accordingly, Statement 13 (FAC ¶ 337) is not actionable. Similarly, in Statement 26 (FAC ¶ 363), Tesla states that it wants to get "as close to perfection as possible" and that being safer than a human is a low standard. FAC ¶ 363. As Statement 26 is not objectively verifiable, it is mere puffery. However, Statement 7 (FAC ¶ 325) cannot be dismissed as mere puffery. While describing safety as "paramount" is not objectively verifiable, the rest of the statement explains that safety "bears out in the statistics," describes the "objective numbers" of the low probability of injury, and states "it's really hard to have a serious injury in a Tesla, ... it's quite rare." FAC ¶ 325. Such a statement is more than simply corporate optimism and addresses a "specific aspect[ ] of [Tesla's] operation." *See In re Quality Sys.*, 865 F.3d at 1143. It thus cannot be dismissed on this basis. Similarly, Statement 27 (FAC ¶ 365) (that deploying the technology is "clearly safer than not deploying it") is not mere corporate optimism as it can be objectively verified. [15]

[15]    Defendants also argue in a footnote that the statement that Full-Self Driving "will work at a safety level well above that of the average driver this year" is a forward-looking statement. Mot. at 19 n.12 (quoting FAC ¶ 353). The Court does not address arguments made in footnotes. *See Est. of Saunders*, 745 F.3d at 962 n.8.

To recap, Statements 10, 11, 13, 18, and 26 (FAC ¶¶ 331, 333, 337, 347, and 363) constitute nonactionable puffery and the Court dismisses the claims based on those statements. However, the Court does not find that Statements 7, 9, 16, 21, and 27 (FAC ¶¶ 325, 329, 343, 353, 365) are corporate puffery.

### C. Elements of Section 10(b) Claim

**\*10** Having assessed which statements are sheltered by the PSLRA safe harbor or are non-actionable statements of corporate puffery, the Court turns to Defendants' challenge of the sufficiency of Plaintiff's pleadings for each element of the Section 10(b) claim. The Court examines whether Plaintiffs have adequately the elements of Section 10(b) for the remaining 11 statements, Statements 4, 6, 7, 8, 16, 17, 22, 24, 25, 27, and 28.

To state a claim under section 10(b) and Rule 10b-5, a plaintiff must show: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton*, 573 U.S. at 267 (citations omitted). "Rule 9(b) applies to all elements of a securities fraud action, including loss causation." *Oregon Pub. Emps. Ret. Fund*, 774 F.3d at 605.

### 1. False or Misleading

Defendants argue that the remaining 11 statements regarding the safety of autopilot and FSDC features ("Safety Statements") and the capabilities of FSDC technology ("Capability Statements") are not actionable because Plaintiffs have not alleged that they are false or misleading. [16] For a statement to be actionable under the PSLRA it must be false or misleading as well as material. "Under Rule 10b-5, ... a fraudulent omission is a failure to 'state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.' " *Wochos*, 985 F.3d at 1188 (quoting 17 C.F.R. § 240.10b-5(b)). A statement is misleading "if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.' " *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). An omitted fact is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). "The inquiry into materiality is 'fact-specific.' " *In re Alphabet*, 1 F. 4th at 700 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011)). As such, "resolving materiality as a matter of law is generally appropriate 'only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ.' " *Id.* (citation omitted).

16    The Court does not address Defendants' arguments for dismissing the Timeline Statements here as the Court has already dismissed the claims based on these statements. *Supra* Section A.

The Court considers whether Plaintiffs have alleged that the statements are false or misleading, analyzing the Safety Statements and Capability Statements in turn.

### a. Safety Statements

Defendants argue that several Safety Statements (Statements 4, 7, 13, 15, 21, 24, and 26-28, FAC ¶¶ 319, 325, 337, 341, 353, 359, 363, 365, 367) [17] were not false or misleading. Mot. at 18-20.

- "[W]e publish accidents per mile every quarter, and ***what we see right now is that autopilot is about twice as safe as a normal driver on average.*** And we expect that to increase quite a bit over time." Statement 4 (FAC ¶ 319) (Apr. 22, 2019 Musk at Tesla Autonomy Investor Day) (emphasis in original).

*11 - "*I think safety especially, I think we -- it is paramount for us -- it's like the absolute primary thing is to maximize the safety of the car. So it's like -- and this bears out in the statistics. So it's really hard to have a serious injury in a Tesla, like it's not – it's quite rare*. And when you do look at objective numbers like the NHTSA probability of injury, which is you could get on the Internet, the Teslas have the lowest probability of injury of any car tested. So like if it was possible to have a sixth star, we would have a sixth star. **It's like -- literally it's absurdly safe**." Statement 7 (FAC ¶ 325) (Jun. 11, 2019 Musk at Annual Meeting).

- "Essentially, passive Autopilot (car intervenes only when crash probability is high) cuts crashes in half. ***Active Autopilot (car is driving itself) cuts crashes in half again***. Doesn't mean there are no crashes, but, on balance, Autopilot is unequivocally safer." Statement 24 (FAC ¶ 359) (Apr. 17, 2021 Musk Tweet); *see also* Statement 26 (FAC ¶ 363).

- "[W]ith respect to autopilot ... we see steady improvements all along the way. And you know, sometimes there's this dichotomy of, you know, should you wait until the car is like, I don't know, three times safer than a person before deploying any technology.

But I think that's that's [*sic*] actually morally wrong at the point at which we believe that that adding autonomy reduces injury and death, I think you have a moral obligation to deploy it, even though you're going to get sued and blamed by a lot of people, because the people whose lives you saved don't know that their lives are saved .... And it's not going to be perfect. ***But what matters it is, is that it is very clearly safer than not deploying it.***" Statement 27 (FAC ¶ 365) (Sept. 30, 2020 Musk at Tesla Autonomy Investor Day).

- "***So the safety that we're seeing when the car is in FSD mode is actually significantly greater than the safety we're seeing when it is not***, which is a key threshold for going to a wide Beta." Statement 28 (FAC ¶ 367) (Oct. 19, 2022 Musk on Earnings Call).

17    Defendants also raise this argument for Statements 13, 15, 21, and 26. The Court does not engage the argument because it has already concluded the claims based on these statements should be dismissed. *Supra* Sections II A(3) and B.

Plaintiffs allege that the high rate of driver interventions demonstrates that Tesla's ADT was not safer than humans, as humans had to take control to avoid crashes. Opp. at 11 (citing FAC ¶ 212). In addition, Plaintiffs reference research showing thousands of deficiencies in Tesla's ADT where it fails to safely complete basic driving tasks, FAC ¶ 210, and note that Tesla has more incidents, more severe crashes, and certain types of crashes (such as accelerating on an exit-ramp) than previously reported. FAC ¶¶ 204-05, 217-19. [18] Plaintiffs allege that Musk's recent statements indicate that ADT is not yet safer than humans (e.g., Musk would be "shocked if we do not achieve full self-driving safer than a human this year," and after the Class Period that "I think we'll be better than human by the end of this year," FAC ¶ 188). Plaintiffs allege that various articles show that Autopilot and self-driving technology led to crashes in Teslas. FAC ¶¶ 191-203. For example, a June 10, 2023, Washington Post article (from after the Class Period) indicates that Tesla's autopilot had "far more" crashes than previously reported and that a NHTSA Senior Safety Advisor commented that "Tesla is having more severe – and fatal – crashes than people in a normal data set." FAC ¶ 204.

18    Plaintiffs also detail the large gap between Tesla's current autonomous driving technology and what

*Lamontagne v. Tesla, Inc.*, Slip Copy (2024)

2024 WL 4353010

is required to achieve a Level 4-5 system. FAC ¶¶ 260-302.

**\*12** Defendants argue that articles from after the Class Period about general safety issues do not show that the Safety Statements were false when made. Mot. at 20. In order to satisfy the PSLRA's "exacting requirements for pleading 'falsity," a plaintiff must plead "specific facts" indicating why a statement is false. *Metzler*, 540 F.3d at 1070. Plaintiffs allege that there were safety issues with the technology, "people looked away from the road 18% more often" with autopilot, FAC ¶ 197, and autopilot features caused at least ten car accidents during an unspecified period, FAC ¶¶ 204-05. However, Plaintiffs fail to provide "contemporaneous reports or data" showing that the statement was false or misleading when made. *Nursing Home Pension Fund Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004). Even if this data existed at the time the statements were made, the fact that there were safety issues with the technology does not suggest that it was false or misleading to assert that the technology was safer than regular human driving. *See Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1275 (N.D. Cal. 2019) (dismissing claims where plaintiff "fail[ed] to connect the statements with factual allegations that show how the statements were false or misleading when made"). For example, Plaintiffs allege that the NTSB found that Tesla's autopilot was a "probable cause" of a deadly March 2018 crash and an August 2019 crash. FAC ¶ 206. However, such findings do not contradict statements that Autopilot cut crashes in half or that using it was safer than not using it. [19] Accordingly, Plaintiffs have not alleged that the Safety Statements were false or misleading, and the Court dismisses with leave to amend the claims based on Statements 4, 7, 13, 15, 21, 24, 26, 27, and 28 (FAC ¶¶ 319, 325, 337, 341, 353, 359, 363, 365, 367).

[19]    Indeed, Statement 24 states that Autopilot "cuts crashes in half" but that "[d]oesn't mean there are no crashes ... [.]" Statement 24 (FAC ¶ 359).

### b. Capability Statements

Defendants next argue that Plaintiffs have not alleged that the Capability Statements about the FSDC technology, Statements 6, 16, 17, 18, 20, 22, 23, 25, and 29 (FAC ¶¶ 323, 343, 345, 347, 351, 355, 357, 361, 369), were false or misleading. Mot. at 20-21. Musk stated that the Full Self-Driving software is "almost getting to a point where I can go from my house to work with no interventions" (FAC

¶ 343), "[t]he latest build is capable of zero intervention drives" (FAC ¶ 345), the "car should still be able to drive, just like a person. That is the system that we are developing and aiming to release this year" (FAC ¶ 347), Musk drives the alpha build of the latest fully self-driving software and "many times I can go through a very complicated series of intersections and narrow roads, without ever touching any of the controls" (FAC ¶ 351), it is "very common for me to have no interventions on drives that I do, including drives to a place that I've never been to" (FAC ¶ 355), and "I think we'll also have an update next year to be able to show regulators that the car is safer, much safer than the average human" (FAC ¶ 369); *see also* FAC ¶¶ 323, 357, 361. Plaintiffs allege that these statements are materially misleading because numerous safety issues demonstrate that Tesla did not possess Level 4-5 autonomy, Tesla disclosed to regulators that it remained "firmly" at Level 2, the confidential witness [20] allegations show that Tesla's ADT had not reached Level 4-5 autonomy, and Tesla faced functionality and dependability problems. Opp at 13 (citing FAC ¶¶ 222-34, 236-47, 260-84). However, "the reasons Plaintiffs offer as to why the statements are false or misleading bear no connection" to the substance of the Capability Statements, and do not allege that the software was not capable of no intervention drives. *See Jui-Yang Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at \*15 (N.D. Cal. Apr. 27, 2017). The only factual allegations that are connected to the Capability Statements are CW-2's statements that it was "absolutely" known within the autopilot department that Musk's statements about the viability of autopilot and FSD technologies were "exaggerations." FAC ¶¶ 243-44. However, such allegations are too vague to show that Musk's statements were false or misleading. *See Intuitive Surgical*, 759 F.3d at 1063. Accordingly, the Court dismisses the claims based on the Capability Statements.

[20]    Confidential witnesses are identified in the FAC as CW-1, CW-2, CW-3, and CW-4. FAC ¶ 235 n.8.

### 2. Strong Inference of Scienter

Defendants also challenge the sufficiency of Plaintiffs' allegations with respect to scienter. Scienter is the intent to deceive, manipulate or defraud. *Tellabs*, 551 U.S. at 319. To establish scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). The required state of mind is "a mental state that not only covers 'intent to deceive, manipulate, or defraud,' but also

Lamontagne v. Tesla, Inc., Slip Copy (2024)

2024 WL 4353010

'deliberate recklessness.' " *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (internal citations omitted). Deliberate recklessness is " 'an *extreme* departure from the standards of ordinary care,' which 'presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it.' " *In re Alphabet*, 1 F. 4th at 701 (emphasis in original) (quoting *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020)).

**\*13** The "strong inference" required by the PSLRA "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs*, 551 U.S. at 324. "Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness." *In re VeriFone Holdings*, 704 F.3d at 701. "A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco Partners*, 552 F.3d at 991 (9th Cir. 2009); *see Nguyen*, 962 F.3d at 415 (9th Cir. 2020). In evaluating whether a complaint satisfies the "strong inference" requirement, courts must consider the allegations and other relevant material "holistically," not "scrutinized in isolation." *In re VeriFone Holdings*, 704 F.3d at 701-02 (citing *Tellabs*, 551 U.S. at 323, 326). If no individual allegation is sufficient, the court "conducts a 'holistic' review to determine whether the allegations combine to give rise to a strong inference of scienter." *Glazer*, 63 F.4th at 766 (citation omitted). Because scienter is a subjective inquiry, "the ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity." *Gebhart v. S.E.C.*, 595 F.3d 1034, 1042 (9th Cir. 2010).

Plaintiffs allege scienter based on: (1) confidential witness accounts; (2) Musk's access to data about Tesla's Autonomous Driving Technology; (3) the core operations doctrine; (4) Musk's motives to inflate the stock price; and (5) Musk's history of fraud. The Court addresses each below. At their core, the allegations do not allege a strong inference of scienter because they fail to show that Defendants knew the statements were false, or indeed that there existed contemporaneous data about the capability and safety of the technology at the time the statements were made.

#### a. Confidential Witness Accounts

Plaintiffs allege that confidential witness statements raise a strong inference of scienter. "Where the plaintiff relies upon statements by confidential witnesses, the complaint must also pass two additional hurdles." *In re Quality Sys.*, 865 F.3d at 1144. "First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge." *Zucco Partners*, 552 F.3d at 995. "Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.* Defendants argue that none of the confidential witnesses offer sufficiently specific testimony to raise a strong inference of scienter. Mot. at 24-26. The Court addresses the confidential witness allegations, and whether they support an inference of scienter.

CW-1 only worked for Tesla for six months, and thus did not have "personal knowledge" about the FSDC technology for the majority of the Class Period. FAC ¶ 236. CW-1 alleges that "accident and safety data was reviewed by Tesla" and full-self driving was in beta and faced errors such as phantom braking. FAC ¶¶ 237, 240-41. While these allegations show that Tesla faced issues in its development of the technology, they are not "indicative of scienter," *see Zucco Partners*, 552 F.3d at 995, as they do not show that Defendants knew their statements about auto safety were false or misleading, *see Gebhart*, 595 F.3d at 1042.

CW-2 alleges that it was "absolutely" known within Tesla's "autopilot department" that Musk's statements about the viability of FSD and autopilot were "exaggerations," and "everyone" knew the vehicles were not close to being full self-driving. FAC ¶ 244. CW-2 does not explain how he knew such information. Indeed, CW-2 does not explain how or why "everyone" knew that the technology was not close to full self-driving. Such "unreliable hearsay and ... conclusory assertions of scienter" are too lacking in factual allegations to support an inference of scienter. *See Zucco Partners*, 552 F.3d at 996.

**\*14** CW-3 states that there were issues with the FSDC prototypes that needed to be worked out, and Musk received regular reports and updates regarding the engineering team's work. FAC ¶¶ 248-53. Defendants argue that there is no detail about what the reports reflected, who attended the

meetings, when they occurred, or what was said. Mot. at 25. The Court agrees that without more specificity, it cannot find that Musk's receipt of unspecified reports and updates from the engineering team are indicative of a strong inference of scienter. *See In re Silicon Storage Tech., Inc.,* 2006 WL 648683, at *11-12 (N.D. Cal. Mar. 10, 2006) (no scienter where plaintiffs failed to cite specific report, mention date or contents of report, or allege sources of information on report); *Intuitive Surgical,* 759 F.3d at 1063 (witness statements lacked foundation where they did "not detail the actual contents of the reports the executives purportedly references or had access to"). CW-3 also stated that "if there was a major regression regarding safety, operations, or driver comfort," it would have been reported to certain individuals who reported to Musk. FAC ¶ 255. However, CW-3 does not allege that any such regression occurred. "[N]egative characterizations of reports relied on by insiders, without specific reference to the contents of those reports, are insufficient to meet the heightened pleading requirements of the PSLRA." *Intuitive Surgical,* 759 F.3d at 1062-63 (rejecting "impressions of witnesses who lacked direct access to the executives") (quoting *Lipton v. Pathogenesis Corp.,* 284 F.3d 1027, 1036 (9th Cir. 2002)). Accordingly, these vague allegations do not support scienter.

#### b. Musk's Access to Information

Plaintiffs next argue that Musk's access to information about Tesla's autonomous driving technology establishes a strong inference of scienter. Opp. at 24-25; *see* FAC ¶¶ 252, 256, 405-06, 419. While "detail-oriented management style" supports scienter, *Nursing Home Pension Fund,* 380 F.3d at 1234 (statements that "I love getting involved in every detail of the business" and that executive monitored portions of the global database supported scienter), Plaintiffs fail to connect Musk's hands-on management with any information that he allegedly learned rendering his statements false or misleading. For example, Plaintiffs allege that Tesla employees declined to test the ADT because they did not want to be "test dummies" and that Tesla had access to video feeds from its vehicles which it used to track problems (FAC ¶¶ 241, 248-56, 414, 416). However, there is no indication that Musk viewed these videos or that they rendered his statements false or misleading.

Plaintiffs also repeatedly reference the DMV letter that Tesla was not developing City Streets above a Level 2 autonomy and that Musk's Level 5 tweet did not match engineering reality (but that Tesla could not say whether it was possible by the end of the year). These allegations are not enough to rise to the level of a strong inference of scienter because Plaintiffs have not alleged that statements about City Streets technology applied to all of Tesla's ADT, and Tesla was equivocal in whether it could achieve Level 5 autonomy by the end of the year. FAC ¶¶ 28-29. *See Wochos,* 985 F.3d at 1194 (statements from former Tesla employees who told Musk that they believed Tesla's goal of producing 5,000 Model 3s per week by the end of 2017 was impossible did not show that Tesla or Musk "shared," "adopted," or "accepted" those employees' views that the goal was impossible"). [21] In addition, as discussed above, allegations that "everyone" knew about problems with the technology and that its viability was an "exaggeration" (FAC ¶¶ 243-44, 415) are not "particularized allegations" showing that Musk knew that Tesla could not achieve its goals in the timeline it projected. *See City of Dearborn Heights Act 345 Police & Fire Ret. Syst. v. Align Tech.,* 856 F.3d 605, 620 (9th Cir. 2017). Accordingly, Plaintiffs have not raised a strong nference of scienter.

[21] Plaintiffs also point to an expert analysis showing that Tesla still faces many obstacles to releasing Level 4-5 ADT. Opp. at 9 (citing FAC ¶¶ 260-302). However, Plaintiffs do not indicate that such information was learned by Tesla or Musk at the time the statements were made.

#### c. Core Business

Plaintiffs also contend that Tesla's autonomous driving technology was core to its business, raising a strong inference of scienter. The "core operations" doctrine allows the knowledge of certain facts that are critical to a business's "core operations" to be attributed to a company's key officers. *Webb v. Solarcity Corp.,* 884 F.3d 844, 854 (9th Cir. 2018). "Proof under this theory is not easy. A plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring ... or witness accounts demonstrating that executives had actual involvement in creating false reports." *Intuitive Surgical,* 759 F.3d at 1062. "[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud." *Metzler,* 540 F.3d at 1068. Musk's admitted importance of the self-

driving technology (describing self-driving technology as the "difference between Tesla being worth a lot of money or basically worth zero," FAC ¶ 56) coupled with Musk's involvement in the minutiae of Tesla's ADT supports an inference of Musk's awareness of relevant facts. *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008). As with the previous scienter arguments, however, Plaintiffs do not show what information showed that Musk knew that his predictions about the timeline of FSD development, its capabilities, or its safety were false or misleading.

### d. Motive Allegations from Stock Sales

**\*15** Plaintiffs also highlight Musk's financial motives to mislead investors. Although "evidence of a personal profit motive on the part of officers and directors ... is insufficient to raise a strong inference of scienter," *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008), "personal financial gain may weigh heavily in favor of scienter." *Tellabs*, 551 U.S. at 325. "[S]tock sales by corporate insiders [are] suspicious only when [they are] dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Dearborn Heights*, 856 F.3d at 621 (internal quotation marks and citation omitted). When analyzing insider trading, courts look to "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.* (citations omitted).

Here, Plaintiffs allege that during the Class Period, Musk sold over 141 million Tesla shares, collecting nearly $34 billion in profit. FAC ¶¶ 33, 425-26. These sales were 239% greater in volume, and 6,345% greater in value, than Musk's trading over the same timespan prior to the Class Period. FAC ¶¶ 430-31. The average price of his sales was 70% higher than the Class Period average, and Musk sold 44.8% of the stock he had available for sale. FAC ¶¶ 429, 432-33. The fact that Musk sold a substantial number (141 million) and percentage (44.8%) of shares, and that the sales were not consistent with prior trading history, supports an inference of scienter. *See Dearborn Heights*, 856 F.3d at 621; *cf. Intuitive Surgical*, 759 F.3d 1063-64 (significant profits did not raise inference of scienter because the complaint did not contain allegations regarding the defendants' prior trading history).

However, as Defendants emphasize, the stock sales (over a four-year period) were not linked to any purported

misstatement or corrective disclosure, and the timing of sales undermines any inference of scienter. Mot. at 28-29. For example, Plaintiffs do not allege that Musk sold any stocks until more than two years after the first alleged misstatement, and he sold his first stocks after the two alleged corrective disclosures. *See* ECF 57-1, FAC ¶¶ 313, 315 (first alleged misstatements in February of 2019 and first alleged stock sale in November of 2021). This timing does not support an inference of scienter. *See Hoang, et al. v. Contextlogic, Inc., et al.*, 2023 WL 6536162, at \*26 (N.D. Cal. March 10, 2023) ("[s]ales after corrective disclosures do not support an inference of scienter."). Plaintiffs do not respond to this argument apart from reiterating that the sales were "suspiciously timed" because the average price of the sales over the four-year Class Period was 70% higher than the Class Period average. Opp. at 29 (citing FAC ¶¶ 432-33). Given the timing of the sales, any inference of scienter from the higher sale of stocks is not a strong inference and Plaintiffs have failed to carry their burden. *See In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1160 (C.D. Cal. 2007) ("Because Plaintiff has failed to meet his burden of demonstrating that the stock sales are related to the alleged misstatements, he has failed to demonstrate a strong inference of scienter based upon" the sales).

### e. History of Fraud

Plaintiffs also allege that Musk has a history of making misrepresentations to investors with scienter, and that staged videos from 2014 and 2016 support an inference of Musk's scienter. A summary judgment order in a different case held that Musk's 2018 tweet about securing funding for Tesla was misleading and made with scienter. FAC ¶ 423 (citing *In re Tesla, Inc., Sec. Litig.*, No. 3:18-cv-04865-EMC (N.D. Cal. Apr. 1, 2022), ECF No. 387). A 2016 video shows a Tesla driving itself while a driver sat with their hands on their lap and the video stated that the person in the driver's seat "is only there for legal reasons. He is not doing anything. The car is driving itself." FAC ¶ 69. In January 2023, it came to light that Musk was directly involved in creating the 2016 video, which was staged using 3D mapping on a predetermined route. FAC ¶ 69. Plaintiffs offer no authority to explain why such allegations are relevant here or why a video from before the Class Period is relevant. Thus, the summary judgment order and videos cannot support a strong inference of scienter.

### f. Holistic Review

**\*16** Finally, the Court holistically reviews the scienter allegations, as required by *Tellabs*, 551 U.S. at 322-23. Plaintiffs' allegations show that Tesla's vehicles face numerous limitations that they need to overcome to achieve full self-driving and that Defendants were generally aware that various issues existed. FAC ¶¶ 260-84. However, the FAC lacks allegations describing with particularity the documents to which Musk had access or the documents he received indicating that the software was not capable of no-intervention drives, that full self-driving was not possible within the projected timeframe, or that autopilot was not safer than humans.

In *Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020), the Ninth Circuit held that plaintiffs' theory that defendants promised FDA approval that they knew would not be possible because of migration problems "does not make a whole lot of sense," and relies on the "supposition that defendants would rather keep the stock price high for a time and then face the inevitable fallout" when the migration problem was revealed. *Id.* at 415. The Court reasoned that if defendants had "sought to profit from this scheme in the interim, such as by selling off their stock or selling the company at a premium, the theory might have more legs," but there were no such factual allegations. *Id.* Here, Plaintiffs' profit motive theory makes little sense given that there are no allegations that Musk sold significant amounts of stock right after a purported misstatement, and in fact the allegations show that he sold stock months after corrective disclosures. Moreover, like in *Nguyen*, Plaintiffs' theory that Defendants knew that the software was not safe, not capable of what they alleged, and would not be achieved in the projected timeframe would have inevitably been revealed when Defendants missed their development timeline. Accordingly, the Court finds that Plaintiffs have failed to allege a strong inference of scienter and the Court dismisses the Section 10(b) claim.[22]

22    Because the Court finds that the Section 10(b) claims fail for lack of scienter, it does not address the parties' arguments regarding loss causation.

## III. SECTION 11 CLAIM UNDER ITEMS 105 AND 303

Plaintiffs also bring a claim under Section 11 for failure to comply with Items 303 and 105. Defendants moves to dismiss this claim. Item 303 requires disclosure of any known material "trends or uncertainties," 17 C.F.R. § 229.303 ("Item 303"). Item 105 requires affirmative disclosure of the "material factors" that made investment "risky," 17 C.F.R. § 229.105 ("Item 105"). *See Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296-97 (9th Cir. 1998) (an Item 303 violation automatically states a claim for a Section 11 violation); *Sundaram v. Freshworks Inc.*, 2023 WL 6390622, at \*7 (N.D. Cal. Sept. 28, 2023) (citing cases) (treating violations of Items 105 and 303 as a violation of Section 11).

"To state a Section 11 claim for failing to adhere to Item 303, Plaintiffs must plausibly allege: (1) the existence of a trend or uncertainty; (2) known to management; (3) that is reasonably likely to have a material effect on the registrant's financial condition or results of operation." *Sundaram*, 2023 WL 6390622, at \*7 (citing *Steckman*, 143 F.3d at 1296-97); *see* 17 C.F.R. § 229.303(b)(2)(ii) (requiring disclosure of any "known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"). Plaintiffs allege that a 2023 article claimed that Tesla's Autopilot was involved in more crashes than previously reported and allege that Teslas were involved in a handful of crashes over a four-year period. FAC ¶¶ 204-05. However, Plaintiffs fail to allege that the safety issues represented a pattern or "trend" requiring disclosure as opposed to isolated incidents. *See In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1263 (N.D. Cal. 2019) ("A trend under Item 303 requires an 'observed pattern that accurately reflects persistent conditions of the particular registrant's business environment.' ") (citation omitted). Accordingly, Plaintiffs' Item 303 claim fails.

**\*17** Defendants argue that Plaintiffs' Item 105 claim fails for the same reason the Item 303 claim fails – that Tesla adequately disclosed the risks it faced. Mot. at 22. Item 105 requires a "discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a). A company's risk disclosures may be misleading where the "risk factors" reported have already materialized. *See Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at \*6 (N.D. Cal. Aug. 7, 2020) (company's financial affairs were materially different than what it represented in its Registration Statement).

Here, the Form 10-K disclosures explain that Tesla vehicles "have been involved and we expect in the future will be involved in accidents resulting in death or personal injury, and such accidents where Autopilot or FSD features are

engaged are the subject of significant public attention. We have experienced and we expect to continue to face claims arising from or related to misuse or claimed failures of such new technologies that we are pioneering." ECF 62-8 (Ex. E) at 9. Plaintiffs argue that the "boilerplate" risk disclosures about the possibility of crashes and regulatory action did not apprise investors of risks. Opp. at 22. However, this language warned investors of the risks Tesla faced, and this type of language has been found in similar cases to constitute sufficient disclosure. *See Golubowski v. Robinhood Mkts.*, 2023 WL 1927616 at *8 (N.D. Cal. Feb. 10, 2023); *see also Sundaram*, 2023 WL 6390622, at *9 (risk disclosures sufficiently warned that the company may experience deterioration in revenue growth, listing potential risks such as the COVID-19 pandemic, level of product demand, errors in forecasting product demand, and a reduction in customer renewal rates). Plaintiffs have not alleged facts that plausibly demonstrate that Tesla's car safety was materially different from what was represented in its risk disclosures. Accordingly, Plaintiffs have not plausibly alleged an Item 105 violation.

## IV. RULE 10B-5(A), (C) CLAIM AND SECTION 20(A)

Plaintiffs also allege a scheme or course of conduct liability against Defendants under Ruel 10-5(a) and (c). FAC ¶¶ 475-83; *see* 17 C.F.R. § 240.10b-5(a), (c) (declaring it unlawful "[t]o employ any device, scheme, or artifice to defraud" or "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security"). Defendants state that they are not liable for any such violation as the theory rests on the same facts and purported misstatements as the Rule 10b-5(b) claim and fails for the same reasons. Mot. at 11 n.3. A scheme liability claim can depend on misstatements that also violate Rule 10b-5(b). *See Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71, 80 (2019) (explaining that subsection (b) and subsections (a) and (c) of Rule 10b-5 do not govern "mutually exclusive[ ] spheres of conduct").

Here, Plaintiffs do not adequately allege a violation of subsections (a) and (c) under either the *Lorenzo* dissemination of fraud theory or a scheme liability theory. Under *Lorenzo*, Plaintiffs must allege that Defendants disseminated "false or misleading information to prospective investors with the intent to defraud." 587 U.S. at 79. For the same reasons

discussed above, Plaintiffs have not adequately alleged any false or misleading statements or scienter, and thus may not proceed under that theory. *See Sneed v. AcelRx Pharms., Inc.*, 2022 WL 4544721, at *6 (N.D. Cal. Sept. 28, 2022). Under scheme liability, which Plaintiffs seem to be pursuing, *see* FAC ¶ 477 ("Defendants engaged in a fraudulent scheme, practice, or course of business ..."), Plaintiffs argue that they are focusing on Defendants' "course of business" in which they persuaded investors that Tesla was close to releasing fully autonomous cars based on the collective totality of the false and misleading statements. Opp. at 23; FAC ¶¶ 72-74. However, Plaintiffs fail to allege sufficient facts showing that Defendants engaged in such a fraudulent scheme to mislead investors. *See Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 902 (N.D. Cal. 2022). Accordingly, the Court dismisses this claim with leave to amend.

## V. SECTION 20(A) CLAIM

**\*18** Plaintiffs bring a claim for a violation of Section 20(a) of the Exchange Act against Musk. FAC ¶¶ 484-490. A Section 20(a) claim requires an underlying violation of securities law. *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012). Because Plaintiffs failed to adequately plead a violation under Section 10(b), the Section 20(a) claim also fails. *See id.*[23]

[23] Defendants only raise the arguments about Section 20(a) in a footnote. Mot. at 11 n.3. The Court does typically not address arguments relegated to footnotes. *See Est. of Saunders*, 745 F.3d at 962 n.8.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion to dismiss with leave to amend. Any amended complaint must be filed by **October 30, 2024**. No additional parties or claims may be added without leave of Court or stipulation of Defendants.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2024 WL 4353010

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification

Appeal Filed by Bandol Lim, et al v. Edward Hightower, et al, 6th Cir., November 4, 2024

2024 WL 4349409
Only the Westlaw citation is currently available.
United States District Court, N.D. Ohio, Eastern Division.

Bandol LIM, et al., Plaintiffs,
v.
Edward HIGHTOWER, et al., Defendants.

Case No. 4:23CV1454
|
Signed September 30, 2024

**Attorneys and Law Firms**

Frank R. Cruz, Law Office of Frank R. Cruz, Los Angeles, CA, Ira M. Press, Lauren K. Molinaro, Kirby McInerney LLP, New York, NY, Scott D. Simpkins, Cleveland, OH, for Plaintiffs.

Bruce G. Vanyo, Katten Muchin Rosenman LLP, Los Angeles, CA, Jonathan Rotenberg, Sarah Eichenberger, Thomas M. Artaki, Katten Muchin Rosenman LLP, New York, NY, Thomas D. Warren, Warren Terzian LLP, Pepper Pike, OH, for Defendants.

**MEMORANDUM OF OPINION AND ORDER**

[Resolving ECF Nos. 35 and 35-14]

Benita Y. Pearson, United States District Judge

**\*1** Pending are Defendants Edward Hightower ("Hightower"), Adam Kroll ("Kroll"), and Daniel A. Ninivaggi's ("Ninivaggi") Request for Judicial Notice (ECF No. 35-14) and Motion to Dismiss (ECF No. 35) the amended securities class-action complaint (ECF No. 31) brought by Lead Plaintiffs Andrew and Joshua Strickland, individually and on behalf of all others similarly situated. The Court has been advised, having reviewed the record, the parties' briefs, and the applicable law. For the following reasons, the Court takes Judicial Notice of Exhibits 1-11 (ECF Nos. 35-3 through 35-13) and grants Defendants' Motion to Dismiss (ECF No. 35).

**I. Background**

The above-entitled action concerns statements made by Defendants on behalf of Lordstown Motors Corp. ("LMC") that Plaintiffs allege misled investors about the state of LMC's partnership with Foxconn, an electronics manufacturer out of Taiwan. *See* Amended Class Action Complaint (ECF No. 31) at PageID #: 723, ¶ 2. Plaintiffs claim that Defendants failed to disclose significant problems in the partnership leading up to Foxconn's repudiation of the agreement with LMC and the bankruptcy of LMC. *See* ECF No. 31 at PageID #: 723, ¶ 2.

Hightower has acted as LMC's President and as Chief Executive Officer ("CEO") beginning in July 2022. *See* ECF No. 31 at PageID #: 730, ¶ 25. Kroll has served as LMC's Chief Financial Officer ("CFO") since October 2021. *See* ECF No. 31 at PageID #: 730, ¶ 26. Ninivaggi served as LMC's CEO from August 2021 to July 2022. *See* ECF No. 31 at PageID #: 730, ¶ 27.

After Foxconn repudiated its agreement with LMC, LMC filed an Adversary Complaint against Foxconn (ECF No. 31-1 at PageID #: 829-72) alleging fraud and breach of contract, which accused the company of intentionally driving LMC into bankruptcy. *See* ECF No. 31 at PageID #: 728, ¶ 17. [1] By failing to disclose the problems in the partnership prior to the bankruptcy proceedings, Plaintiffs allege Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and § 78t(a), and associated Rule 10b–5 of the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b–5. *See* ECF No. 31 at PageID #: 723, ¶ 1.

[1] *See Lordstown Motors Corp., et al. v. Hon Hai Precision Industry Co., Ltd, et al.*, No. 23-50414-MFW (Bankr. D. Del. filed June 27, 2023).

Plaintiffs allege the Class Period begins on August 4, 2022, during LMC's earnings conference call for the second quarter of 2022. *See* ECF No. 31 at PageID #: 757, ¶ 112.

**A. Initial Agreement with Foxconn**

In 2018, LMC was founded as an electronic vehicle ("EV") manufacturing company with the main goal of developing the Endurance, an electric full-size pickup truck. *See* ECF No. 31 at PageID #: 733, ¶¶ 37-38. While LMC planned to launch sales of Endurance in 2022, the company faced financial setbacks leading to an initial agreement with Foxconn to

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

obtain needed funding. *See* ECF No. 31 at PageID #: 733, ¶ 39. In September 2021, LMC signed a non-binding Agreement in Principle (ECF No. 31-1 at PageID #: 874-82) with Foxconn which was designed to "combine Foxconn's resources and efficiencies with Lordstown's innovation, technology, manufacturing plant, and human resources to [ ] develop [ jointly] the next generation of electric vehicles." ECF No. 31 at PageID #: 734, ¶ 43.

**\*2** Under the Agreement in Principle, Foxconn would purchase LMC's manufacturing plant for $230 million, $50 million in LMC's common stock, procure LMC's exercisable warrants for $1.7 million in shares of common stock, and enter into a Contract Manufacturing Agreement and Joint Venture Agreement. *See* ECF No. 31 at PageID #: 734-35, ¶ 44. In compliance with the Agreement in Principle, LMC and Foxconn then executed an Asset Purchase Agreement (ECF No. 31-1 at PageID #: 884-954) for Foxconn to purchase the manufacturing plant, *see* ECF No. 31 at PageID #: 734-35, ¶ 44, subject to approval from the Committee on Foreign Investment in the United States, *see* ECF No. 31-1, PageID #: 910.

### B. The Joint Venture Agreement ("JVA") (ECF No. 31-1 at PageID #: 991-1052)

The joint venture was formed with 55% to be owned by Foxconn and 45% by LMC, requiring Foxconn to contribute $55 million. *See* ECF No. 31 at PageID #: 738, ¶¶ 56-57; PageID #: 740, ¶ 64. According to the Adversary Complaint, Foxconn delayed the development of the JVA between November 10, 2021 and May 11, 2022 before finally relenting and executing the agreement. *See* Doc 1 at Page 11, ¶ 33 in No. 23-50414-MFW; ECF No. 31 at PageID #: 737, ¶¶ 52-53. The parties experienced further delays and disagreements surrounding budgeting, with Foxconn attempting to implement a clause in the JVA requiring LMC to get Foxconn's approval for all purchases under the joint venture. *See* ECF No. 31 at PageID #: 739, ¶ 59. Plaintiffs' confidential witness ("CW-1"), a former employee of LMC and employee of Foxconn at the time of the disputed events, alleges Foxconn created "roadblocks" for LMC beginning in late 2022 and that he believed Foxconn intended to force LMC into bankruptcy. *See* ECF No. 31 at PageID #: 739-40, ¶¶ 61-63; PageID #: 743-45, ¶¶ 73-75. Foxconn also failed to provide LMC with the data for its Model C and Model E vehicles as stipulated under the JVA and continued to delay fulfilling its commitments. *See* ECF No. 31 at PageID #: 740-41, ¶¶ 64-66. Foxconn delayed approving LMC's draft budget and providing the agreed

upon funds for several months, stating it disagreed with the proposal. *See* ECF No. 31 at PageID #: 743, ¶¶ 71-72. During these delays, Hightower travelled to Taiwan at Foxconn Chairman Young Liu's request. Hightower met with the chairman of Foxconn, but the CEO of Foxtron, a Foxconn affiliate in Taiwan, "refused to meet with him." ECF No. 31 at PageID #: 742, ¶ 69. Throughout the delays, Foxconn publicly characterized the partnership as successful, stating its investment in LMC served to "strengthen our development and design capabilities." Foxconn's Third Quarter 2022 Investor Conference (ECF No. 35-3) at PageID #: 1265. Under the JVA, Foxconn and LMC began production of the Endurance vehicle in September 2022. *See* ECF No. 31 at PageID #: 801-802, ¶ 188). Regarding manufacturing, LMC disclosed that the Endurance's production cost was "well above our anticipated selling price" and that production would be limited "through 2023 or possibly longer." LMC's Form 10-K filed on February 28, 2022 (ECF No. 35-5) at PageID #: 1299.

### C. The Investment Agreement ("IA")(ECF No. 31-1 at PageID #: 1054-1114)

On October 14, 2022, LMC sent a letter confronting Foxconn about its breaches of the JVA, notably the failure to provide the Model C and Model E designs by October 2022. *See* ECF No. 31 at PageID #: 743, ¶ 72. As a result, Foxconn requested that the companies restructure their agreement, proposing a direct investment agreement with Foxconn and Softbank, a large multi-national technology investor. *See* ECF No. 31 at PageID #: 745, ¶¶ 76-77. After implementing the IA, Foxconn characterized its "cooperation" with LMC as "progressing quite smoothly." Foxconn's Third Quarter 2022 Investor Conference (ECF No. 35-3) at PageID #: 1267. Foxconn Ventures PTE Ltd., a subsidiary of Foxconn and Softbank, agreed to invest a total of approximately $170 million in LMC under the IA, providing substantially greater funding for LMC. *See* ECF No. 31 at PageID #: 745, ¶¶ 77-78. The companies executed the IA on November 7, 2022. LMC and Foxconn subsequently amended the IA to allow the proceeds from Foxconn's purchase of preferred stock to be used either for a Softbank-backed EV program or for a substitute program developed by LMC. *See* ECF No. 31 at PageID #: 747-48, ¶¶ 84-85. On December 22, 2022, the companies rescinded that amendment, and replaced it with Amendment No. 1 to Investment Agreement (ECF No. 31-1 at PageID #: 1119-20), which amended Section 5.12 of the IA and continued to allow funding for a joint EV program. *See* ECF No. 31 at PageID #: 748, ¶ 87. The IA required Foxconn to file a request to the Committee on

Foreign Investment in the United States. This was filed two weeks late as a result of the issues surrounding the formation of the agreement. *See* ECF No. 31 at PageID #: 748-49, ¶ 88. Under the IA, as amended, Foxconn confirmed its "continued intent" to "utilize Lordstown Motors Corp. as its preferred North American vehicle development partner." ECF No. 31-1 at PageID #: 1089, § 5.03(f). Between December 2022 and March 2023, LMC completed several manufacturing milestones including completion of the first phase of the new vehicle development work. *See* ECF No. 31 at PageID #: 749, ¶ 89. Foxconn again delayed providing funding to LMC. *See* ECF No. 31 at PageID #: 749, ¶ 91. Plaintiffs' confidential witnesses ("CW-2" and "CW-3") allege these delays in funding led to little work being done at LMC's Michigan location and caused suppliers to back out of deals between December 2022 and March 2023. *See* ECF No. 31 at PageID #: 750, ¶ 94.

**D. Foxconn's Repudiation**

**\*3** In March 2023, the value of LMC stock dropped below $1.00 per share. On April 19, 2023, the NASDAQ stock market issued LMC a notice informing the company that it had 180 days to return the stock price to the required minimum according to the listing qualification rules. *See* ECF No. 31 at PageID #: 751, ¶ 95. On April 21, 2023, Foxconn sent a notice of default stating the company would terminate the IA, as amended, if the stock price did not rise by May 21, 2023 *See* ECF No. 31 at PageID #: 751, ¶ 96. LMC disputed the notice of default, stating the NASDAQ notice did not constitute a breach of their agreement and that Foxconn's termination of the IA would constitute an unlawful repudiation, causing material damage to the company. *See* ECF No. 31 at PageID #: 751-52, ¶ 97. Foxconn did not respond to LMC's objections, forcing LMC to publicly report the termination. *See* ECF No. 31 at PageID #: 752, ¶ 98. On June 27, 2023, LMC filed a voluntary petition for relief in a case under Chapter 11 of Title 11 of the United States Code. *See In re: Lordstown Motors Corp.*, No. 23-10831-MFW (Bankr. D. Del. filed June 27, 2023). It also filed the Adversary Complaint against Foxconn. *See* ECF No. 31 at PageID #: 728, ¶ 17. LMC's complaint alleges that since Foxconn's material breach of the IA, it continues to refuse financing or cooperation, forcing the company to shut down for lack of funds. *See* Doc 1 in No. 23-50414-MFW; ECF No. 31 at PageID #: 756, ¶ 110.

**E. Alleged Misleading Statements**

Plaintiffs allege Defendants made multiple misleading statements between August 4, 2022 and March 6, 2023. On August 4, 2022, Hightower stated during LMC's earnings conference call for the second quarter of 2022:

> **Our manufacturing partners at the Foxconn plant in Ohio are ready for March**....Our 55/45 joint venture announced in mid-May, in which Foxconn committed an additional $100 million in capital, **is another action in support of the EV ambitions of both companies**....I recently spent 2 weeks in Taiwan with Foxconn Chairman, Young Liu....**we had several meetings about how to best operationalize the JV**....

Also on August 4, Ninivaggi stated:

> In Q2, we closed our transactions with Foxconn, providing us with a flexible and less capital-intensive business model, **a world-class contract manufacturing partner, and a more scalable vehicle development platform as well as additional capital**....

ECF No. 31 at PageID #: 757, ¶ 112 (emphasis in original; ellipsis added).

On November 7, 2022, after the abandonment of the JVA and implementation of the IA, LMC issued a press release stating:

> ...**it has been our objective to develop a broad strategic partnership that leverages the capabilities of both companies. Foxconn's latest investment is another step in that direction**...."**Over the last year, the LMC and Foxconn teams have worked collaboratively to bring the Endurance into commercial production**....**The combination of LMC's experienced vehicle development team, Foxconn's growing EV ecosystem, the MIH platform, and our asset-light**

**business model will allow us to bring great EVs to market faster and more efficiently**."

ECF No. 31 at PageID #: 760-61, ¶ 114 (emphasis in original; ellipsis added).

On November 8, 2022, LMC issued a press release announcing its financial results for the third quarter of 2022, which states:

...**Foxconn's additional investment in LMC is a strong sign of confidence in our team's product development and engineering capabilities**....**We continue to believe that deep collaboration with Foxconn, as its preferred North American vehicle development partner**...**is key to our company's long-term success**...."**We are proud of the accomplishments of the Lordstown and Foxconn EV Technology teams in bringing the Endurance into commercial production**....**We are also extremely excited by the additional investment and expanding relationship with Foxconn and the opportunities it provides**....

ECF No. 31 at PageID #: 763-64, ¶ 117 (emphasis in original; ellipsis added).

On November 8, 2022, Hightower stated during an LMC earnings conference call:

...**While launching the Endurance, we are also expanding our focus to the next vehicle program with Foxconn**....**we continue to make progress in the planning and predevelopment work**....**I believe we have great potential opportunities ahead of us with our growing relationship with Foxconn**....

**\*4** On the same call, Kroll stated:

...**the joint venture**...**is being disbanded. We kind of think the direct investment in Lordstown is a**

**better, simpler, easier structure. So I think its very favorable**.

ECF No. 31 at PageID #: 764-65, ¶ 118 (emphasis in original; ellipsis added).

On November 14, 2022, Hightower stated during a President's Speaker Series:

...**it was very important to me that anything I said publicly be true**....**I told the team we had two objectives**...**launch the Endurance and build this relationship with Foxconn**....**[W]e were going to focus on three principles to do that, integrity, discipline, and collaboration**....

ECF No. 31 at PageID #: 767-68, ¶ 120 (emphasis in original; brackets and ellipsis added).

On November 25, 2022, Hightower gave a presentation containing a slide stating:

**Foxconn and LMC Engineering can share expertise and resources across**

**organizations, globally**.... ECF No. 31 at PageID #: 770, ¶ 122 (emphasis in original).

On December 22, 2022, Foxconn issued a press release quoting Hightower:

"**As Foxconn's preferred vehicle development partner for North America, Lordstown Motors' highly capable team of engineers looks forward to creating additional electric vehicles in collaboration with the MIH Consortium and Foxconn EV ecosystem**[.]"

ECF No. 31 at PageID #: 773, ¶ 124 (emphasis in original; brackets added).

On January 4, 2023, Lordstown filed a disclosure on Form 8-K with the SEC, which states:

> **Worldwide manufacturer Foxconn**...**and Lordstown Motors, are working together to create a new EV-native model to enable increased collaboration, fast-track innovation and the cost-effectiveness needed**....**The Foxconn EV ecosystem,**...**together with Lordstown Motors**...**is uniquely positioned to act upon the increased cross-industry collaboration and rapid innovation that is possible with Evs**....**Foxconn, MIH, and Lordstown Motors are demonstrating that a new era of increased collaboration, rapid innovation and progress is here**....**Foxconn supplies components, software, supply chain and manufacturing expertise**....**The sale of the manufacturing plant** ...**laid the groundwork for the two companies to collaborate on product development**....**The Foxconn EV ecosystem**...**creates a unique ability to address new market opportunities**....

ECF No. 31 at PageID #: 775-76, ¶ 126 (emphasis in original; ellipsis added). A presentation accompanying the Form 8-K also states:

> **The Foxconn & LMC partnership provides the industry with access to the assets and expertise to accelerate innovation, develop and manufacture tailored EVs at scale. Sale of the manufacturing plant located in Lordstown, Ohio to Foxconn laid the groundwork for how the two companies will collaborate.**
> ECF No. 31 at PageID #: 777, ¶ 126 (emphasis in original).

On February 13, 2023, Hightower stated during the CEO Panel Discussion:

> ...**We have an agreement by which we will be developing future electric**

> vehicle products in collaboration with Foxconn EV ecosystem.... ECF No. 31 at PageID #: 779, ¶ 128 (emphasis in original; ellipsis added).

On March 6, 2023, LMC issued a press release stating:

> **In Q4 2022, we expanded and strengthened our partnership with Foxconn. We converted our prior $100 million joint venture into a direct investment in Lordstown Motors of up to $170 million**, $52 million of which was funded in November 2022....**We continue to work collaboratively with Foxconn**....

 **\*5**  ECF No. 31 at PageID #: 782, ¶ 130 (emphasis in original; ellipsis added).

Also on March 6, 2023, Kroll stated during an earnings conference call:

> ...**we benefit from substantially lower operating complexity and risk by**

> **putting manufacturing in the hands of Foxconn**.... On the same call, Hightower stated:

> ...**we plan to leverage common components, common subsystems and share**

**them across, that the plan is for them to be shared across multiple OEMs.** ECF No. 31 at PageID #: 782-83, ¶ 131 (emphasis in original; ellipsis added).

A slideshow accompanying the earnings conference call states:

> **Progressed pre-development work on the new program in collaboration with Foxconn EV Ecosystem....Strengthened Partnership: Additional Foxconn Investment in LMC**....

ECF No. 31 at PageID #: 785, ¶ 133 (emphasis in original; ellipsis added).

Plaintiffs allege these statements were misleading because Defendants omitted significant problems arising under the partnership, characterizing it as collaborative and thriving, while, in reality, Defendants believed Foxconn was sabotaging their business, attempting to drive them into bankruptcy, and take over their assets. *See* ECF No. 31 at PageID #: 792-93, ¶¶ 156-57. Defendants deny any knowledge of the partnership's impending failure until Foxconn repudiated the IA on April 21, 2023. Defendants claim that the sudden repudiation forced them to re-evaluate Foxconn's motive, coming to the conclusion, in hindsight, that Foxconn misled LMC about their commitment to the partnership. *See* Defendants' Memorandum in Support (ECF No. 35-1) at PageID #: 1210.

**F. LMC's Warnings and Disclosures**
Defendants have submitted documents, subject to judicial notice, to contradict Plaintiffs' allegation that Defendants mischaracterized the relationship between LMC and Foxconn. According to Defendants, these documents detail public warnings LMC provided about the uncertainties surrounding the partnership. *See* ECF No. 35-1 at PageID #: 1211-12. LMC stated in the Form 10-K filed on February 28, 2022:

> ...[W]e cannot predict whether we will be able to fully realize the anticipated

benefits from any aspects of our contemplated relationship with Foxconn.... ECF No. 35-5 at PageID #: 1297.

In a Form 8-K filed on August 4, 2022, LMC stated:

> ...No assurances can be given that we will successfully implement...the recently completed transactions with Foxconn...The success of the joint venture depends on many variables....

ECF No. 35-7 at PageID #: 1340 (ellipsis added).

In a Form 10-Q filed on August 4, 2022, LMC stated:

> ...The company's ability to continue as a going concern is dependant on our ability to realize the benefits of the Foxconn Transactions....[T]he Foxconn Joint Venture may not succeed and may be terminated due to the failure to establish a sustainable partnership....

ECF No. 35-7 at PageID #: 1345-46 (ellipsis and brackets added).

On November 7, 2022, after executing the IA, LMC stated:

> ...[T]he Investment Transactions and other relationships entered into with Foxconn are subject to risks and uncertainties....If we are unable to maintain our relationship with Foxconn...[, it could] have a negative effect....

**\*6** ECF No. 35-9 at PageID #: 1364 (ellipsis and brackets added).

LMC stated in a Form 10-K filed on March 6, 2023:

...No assurance can be given that we will ultimately be successful in further vehicle development or that we will be able to effectively realize the potential benefits of the...development partnership with Foxconn....

ECF No. 35-13 at PageID #: 1449 (ellipsis added).

Defendants assert that these statements exemplify the public disclosures they made at the same time as the generally optimistic statements that Plaintiffs allege misled investors. *See* ECF No. 35-1 at PageID #: 1212.

## II. Judicial Notice and Documents Incorporated by Reference

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, *et seq.*, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). "[D]ocuments attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss." *Com. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007). The Court may consider documents that are "referred to in the complaint and [are] central to the plaintiff's claim" without converting a 12(b)(6) motion into a motion for summary judgment. *Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999) (brackets added); *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016). Under Fed. R. Evid. 201(b), the Court may take judicial notice of an adjudicative fact "that is not subject to reasonable dispute because it is generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Adjudicative facts must be relevant to the central issues in a case. *Cece v. Wayne Cnty.*, 758 Fed.Appx. 418, 424 (6th Cir. 2018). The Court considers any documents incorporated into the complaint or subject to judicial notice for the purpose of determining what information is available, not to determine whether statements contained within the documents are true.

*In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 468 (6th Cir. 2014).

Defendants request that the Court take judicial notice of several documents attached as exhibits to the Motion to Dismiss. *See* ECF No. 35-14. The documents are:

• Excerpts from a presentation deck used in connection with an earnings call held by Foxconn on May 12, 2022 (ECF No. 35-3)

• Form 8-K that LMC filed with the SEC on November 10, 2021, attaching the Asset Purchase Agreement and a press release issued on that date (ECF No. 35-4)

• Form 10-K that LMC filed with the SEC on February 28, 2022 (ECF No. 35-5)

• Form 8-K that LMC filed with the SEC on May 11, 2022, attaching the JVA and the Contract Manufacturing Agreement (ECF No. 35-6)

• Published transcript of an earnings call held by LMC on August 4, 2022; Form 10-Q that LMC filed with the SEC on August 4, 2022; Form 8-K that LMC filed with the SEC on August 4, 2022 (ECF No. 35-7)

**\*7** • Two Form 4s that LMC filed with the SEC, which disclose (1) a transaction of LMC stock by Kroll on October 13, 2022, and (2) a transaction of LMC stock by Hightower on November 9, 2022; Form 4 disclosing a third stock transaction – by Hightower on August 26, 2022 (ECF No. 35-8)

• Form 8-K that LMC filed with the SEC on November 7, 2022, attaching a press release LMC issued on that date (ECF No. 35-9)

• Form 8-K that LMC filed with the SEC on November 8, 2022, attaching a press release LMC issued on that date; Published transcript of an earnings call held by LMC on November 8, 2022 (ECF No. 35-10)

• Press release issued by LMC on December 22, 2022 (ECF No. 35-11)

• Form 8-K that LMC filed with the SEC on January 4, 2023, attaching (1) Hightower's prepared remarks for a presentation he gave on January 5, 2023, and (2) a slide show accompanying his presentation (ECF No. 35-12)

• Form 8-K that LMC filed with the SEC on March 6, 2023, attaching a press release LMC issued on that date; Form 10-K that LMC filed with the SEC on March 6, 2023; Published transcript of an earnings call held by LMC on March 6, 2023 (ECF No. 35-13).

Plaintiffs only oppose Defendants' request for the Court to take judicial notice of ECF Nos. 35-3, 35-4, 35-6, and 35-8. *See* Lead Plaintiffs' Memorandum in Opposition (ECF No. 37) at PageID #: 1522-23. The Court takes judicial notice of the unopposed exhibits at ECF Nos. 35-5, 35-7, and 35-9 through 35-13.

**A. ECF No. 35-3**
Contrary to Plaintiffs' opposition to Defendants' request, *see* ECF No. 37 at PageID #: 1525-26, Foxconn's statements during the earnings call held on May 12, 2022 do not create a factual dispute or ask the Court to evaluate them for their "truth." Instead, Defendants use the statements to portray Foxconn's positive characterization and publicly stated commitment to the partnership, regardless of whether the statements were true. Because these statements help to reveal the totality of information Foxconn communicated to LMC, they are relevant in determining whether the Court can infer scienter as to Defendants' optimistic statements. Finally, Plaintiffs do not refute the exhibit's authenticity or the public availability of its contents. *See* ECF No. 37 at PageID #: 1525-27. As such, the Court takes judicial notice of ECF No. 35-3.

**B. ECF Nos. 35-4 and 35-6**
Plaintiffs object to these exhibits because the Form 8-Ks were filed with the SEC before the start of the Class Period, *see* ECF No. 37 at PageID #: 1527, but Plaintiffs fail to provide justification for why this fact alone would make the documents irrelevant. Plaintiffs dispute Defendants' public characterization of the Foxconn partnership, making such public statements relevant in determining whether Defendants misled the public given the totality of available information. Plaintiffs submit no legal authority suggesting otherwise. Plaintiffs also do not refute that the information in these exhibits is publicly available, not subject to reasonable dispute, or accurately determined from a reputable source. As such, the Court finds that these Form 8-Ks are relevant and takes judicial notice of ECF Nos. 35-4 and 35-6.

**C. ECF No. 35-8**

Plaintiffs argue the Form 4s in this exhibit cannot be incorporated by reference into the Amended Class Action Complaint (ECF No. 31) because they are not central to the claims in the complaint. *See* ECF No. 37 at PageID #: 1528. Plaintiffs argue the stock sales documented by the forms are not essential to proving scienter. Plaintiffs, however, make the argument that the sales bolster an inference of scienter. *See* ECF No. 37 at PageID #: 1528. Because Plaintiffs base their scienter argument on the information disclosed in the forms by explicitly citing to them, *see* ECF No. 31 at PageID #: 798-800, ¶¶ 178, 180, Plaintiffs cannot prevent the Court from viewing the entirety of the documents. *See Merzin v. Provident Fin. Grp., Inc.*, 311 F. Supp.2d 676, 676 n.1 (S.D. Ohio 2004); *see also In re Omnicare*, 769 F.3d at 466 (practice exists to prevent plaintiffs from "quot[ing] only selected and misleading portions of [ ] documents") (brackets added) (citation omitted). Additionally, the Form 4s are filed with the SEC and publicly accessible, and an objectively reliable source, making them subject to judicial notice. [2] As such, the Court will consider ECF No. 35-8 in ruling on Defendants' Motion to Dismiss.

[2]     Courts in the Sixth Circuit often review SEC filings, including Form 4s, in determining motions to dismiss. *See Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*, 556 F. Supp.3d 772, 799-800 (N.D. Ohio 2021), *aff'd*, No. 21-3863, 2022 WL 3972478 (6th Cir. Sept. 1, 2022); *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp.2d 951, 970 (S.D. Ohio 2009); *In re Goodyear Tire & Rubber Co. Derivative Litig.*, No. 5:03CV2180, 2007 WL 43557, at *8 & n. 8 (N.D. Ohio Jan. 5, 2007).

**\*8** For the reasons stated above, the Court takes judicial notice of all 11 exhibits attached to Defendants' Motion to Dismiss (ECF No. 35).

### III. Standard of Review

**A. Motion to Dismiss Under Rule 12(b)(6)**
In deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must take all well-pleaded allegations in the complaint as true and construe those allegations in a light most favorable to the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations omitted). A cause of action fails to state a claim upon which relief may be granted when it lacks "plausibility in th[e] complaint." *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 564 (2007). A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal* , 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). Plaintiff is not required to include detailed factual allegations, but must provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678. A pleading that merely offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.* at 557. It must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The plausibility standard is not akin to a "probability requirement," but it suggests more than a sheer possibility that a defendant has acted unlawfully. *Twombly*, 550 U.S. at 556. When a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* at 557 (brackets omitted). "[When] the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.' " *Iqbal*, 556 U.S. at 679 (quoting Rule 8(a)(2)). The Court "need not accept as true a legal conclusion couched as a factual allegation or an unwarranted factual inference." *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 539 (6th Cir. 2012) (citations and internal quotation marks omitted).

**B. Securities Fraud Heightened Pleadings Standard**

Because Sections 10(b) and 20(a) claims involve fraud, the Court also applies the special pleading requirements set forth in Fed. R. Civ. P. 9(b). While the Court interprets all facts in the complaint as true, Plaintiffs must, at a minimum, "detail[ ] the 'who, what, when, where, and how' of the alleged fraud." *Bondali v. Yum! Brands, Inc.*, 620 Fed.Appx. 483, 489 (6th Cir. 2015) (citations omitted; brackets added). In addition, the complaint must meet the heightened pleading standards for securities claims under the PSLRA. *Id.* The PSLRA imposes more "[e]xacting pleading requirements," requiring Plaintiffs to "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.' " *Tellabs*, 551 U.S. at 313 (brackets added) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 and n. 12 (1976)).

Additionally, when "an allegation regarding the statement or omission is made on information and belief," Plaintiffs must "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). These heightened pleading standards mean that not all allegations that would survive a traditional motion to dismiss under Rule 12(b)(6) are sufficient to survive dismissal in a private securities class action.

**IV. Section 10(b) of the Securities Exchange Act and SEC Rule 10b‑5 Analysis**

**\*9** To state a claim under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b‑5, Plaintiffs must establish "(1) a material misrepresentation or omission by the defendant; (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Bondali*, 620 Fed.Appx. at 489 (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)). In this case, the parties dispute the existence of a material misrepresentation or omission and scienter or mental culpability, regarding Defendants' statements.

**A. Actionable Material Misrepresentations or Omissions**

To establish an actionable material misrepresentation or omission, Plaintiffs must allege sufficient facts demonstrating "(1) that a defendant made a statement or omission that was false or misleading; and (2) that this statement or omission concerned a material fact." *In re Omnicare*, 769 F.3d at 470. "[M]ateriality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988) (brackets added); *see In re Nat'l Auto Credit, Inc. Sec. Litig.*, No. 1:98CV0264, 1999 WL 33919791, at \*11 (N.D. Ohio Oct. 12, 1999) (holding facts are only material if a reasonable investor would have viewed the misrepresentation or omission as "having significantly altered the total mix of information made available") (citations omitted). In addition, it is not enough for a statement to be "false or incomplete, if the misrepresented fact is otherwise insignificant." *Basic*, 485 U.S. at 238.

"Soft" information and puffery do not constitute a material misrepresentation upon which stockholders would reasonably rely. *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564,

576 (6th Cir. 2008); *Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 943 (6th Cir. 2009). The Sixth Circuit distinguishes "hard" and "soft" information, defining "hard" information as factual information that is "objectively verifiable" and "soft" information as general predictions and opinions. "Soft" information is not actionable unless it is as certain as "hard" facts. *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005) (citing *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401-402 (6th Cir. 1997)); *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) (citing *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir.1997)). Statements are not actionable if they are overly general, "lack[ing] the sort of definite projections that might require later correction." *In re Express Scripts Holdings Co. Sec. Litig.*, 773 Fed.Appx. 9, 12 (2d Cir. 2019) (citation omitted; brackets added). Any generically optimistic or overly broad statements cannot be the basis for a Section 10(b) claim. *See Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 468 (6th Cir. 2011) (ruling a vague characterization of securities bonds as "safe and secure" not objectively verifiable and, therefore, immaterial); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 418 (5th Cir. 2001) (holding statements about "positive" and "statistically significant" test results were too broad to create actionable misrepresentation).

Actionable omissions require some duty to disclose the information. *See Basic*, 485 U.S. at 239 n. 17 ("Silence, absent a duty to disclose, is not misleading under Rule 10bS5."). Defendants may have a duty to disclose when that duty is set forth in a statute or when an "inaccurate, incomplete or misleading prior" statement exists. *City of Monroe*, 399 F.3d at 669. Even if Defendants had a duty to disclose, the omission must also render affirmative statements misleading. *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 258 (2024) ("§ 10(b) and Rule 10bS5 do not create an affirmative duty to disclose any and all information.") (citation omitted)); *In re Allscripts, Inc. Sec. Litig.*, No. 00 C 6796, 2001 WL 743411 at *8 (N.D. Ill. June 29, 2001) ("[c]orporate executives have no general duty to disclose every problem that arises") (brackets added)). Here, Plaintiffs allege no omitted facts that would render Defendants' material statements untrue.

### 1. "Puffery" and Statements of "Corporate Optimism"

**\*10** The majority of the alleged misstatements relay Defendants' beliefs, goals, and hopes for the future of their relationship with Foxconn. *See* ECF No. 31 at PageID #: 757-88, ¶¶ 112-34; *see I.B.E.W. v. Limited Brands, Inc.*, 788

F. Supp.2d 609, 634 (S.D. Ohio 2011) (finding statements about "significant growth opportunities" were "clearly the type of subjective, optimistic fluff deemed to be immaterial puffery"). Defendants publicly discussed their "**objective to develop a broad strategic partnership**" (ECF No. 31 at PageID #: 760, ¶ 114), their "**progress in the planning and predevelopment work**" (ECF No. 31 at PageID #: 764, ¶ 118), and that LMC looked "**forward to creating additional electric vehicles**" with Foxconn (ECF No. 31 at PageID #: 773, ¶ 124).[3] Defendants' statements do not contain the sort of definite, material information needed to trigger a duty to disclose. Instead, Defendants' statements contain the kinds of generalities and reflections of "corporate optimism" rejected by courts as actionable misrepresentations. *See In re Envision Healthcare Corp. Sec. Litig.*, No. 3:17-cv-01112, 2019 WL 6168254, at *9 (M.D. Tenn. Nov. 19, 2019) ("liability does not attach to mere corporate puffery or statements of corporate optimism") (citing *Ford*, 381 F.3d, at 570); *City of Monroe*, 399 F.3d at 669 ("The failure to disclose soft information is actionable only if it is virtually as certain as hard facts.") (internal quotation marks, brackets, ellipsis, and citation omitted)). Plaintiffs fail to allege with particularity why omissions would make generic, "soft" information in Defendants' statements misleading. *See In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp.3d 740, 767 (N.D. Ohio 2020) (finding no duty to disclose omitted information when the allegedly misleading statements were "vague, non-specific, subjective, and untethered to any kind of objectively measurable standard"); *Omnicare, Inc.*, 583 F.3d at 943 (stating omission of a contract dispute did not make the defendants' vague, optimistic predictions misleading).

3     *See also* ECF No. 31 at PageID #: 757, ¶ 112 ("**Our manufacturing partners** ...**are ready for March**."); ECF No. 31 at PageID #: 757, ¶ 112 (stating Foxconn provides "**a world-class contract manufacturing partner, and a more scalable vehicle development platform**...."); ECF No. 31 at PageID #: 761, ¶ 114 (stating Foxconn partnership has helped LMC bring the Endurance and future EVs into the market); ECF No. 31 at PageID #: 761, ¶ 115 ("...**strongly believe that deep collaboration**...**offers tremendous opportunities**..."); ECF No. 31 at PageID #: 763, ¶ 117 ("**Foxconn's additional investment in LMC is a strong sign of confidence**...."); ECF No. 31 at PageID #: 764, ¶ 117 ("**We are proud of the accomplishments**....**We are also extremely excited by the additional investment**...."); ECF

*Lim v. Hightower, Slip Copy (2024)*

2024 WL 4349409

No. 31 at PageID #: 765, ¶ 118 ("**I believe we have great potential opportunities ahead of us**...."); ECF No. 31 at PageID #: 767, ¶ 120 ("**[I]t was very important to me that anything I said publicly be true**.") (brackets added); ECF No. 31 at PageID #: 783, ¶ 131 ("...**as Foxconn's preferred vehicle development partner**...").

**2. Statements Describing the Foxconn Partnership and Agreements**

Plaintiffs argue Defendants' statements generally discussing the Foxconn partnership misled the public due to the failure to disclose delays and breaches happening behind the scenes. *See* ECF No. 36 at PageID #: 1494. Plaintiffs allege Foxconn "stonewalled" LMC, delayed both entering into and fulfilling their obligations under the JVA, and "consistently failed to honor its agreements." Therefore, according to Plaintiffs, Defendants omitted facts that rendered their public statements misleading. ECF No. 31 at PageID #: 758-60, ¶ 113. There is no dispute regarding the verifiable, factual information in Defendants' public statements about the JVA. Plaintiffs do not refute that the JVA was a "55/45 joint venture...in which Foxconn committed an additional $100 million in capital" or that the agreement provided LMC "a flexible and less capital-intensive business model, **a world-class contract manufacturing partner, and a more scalable vehicle development platform as well as additional capital**." ECF No. 31 at PageID #: 757, ¶ 112. During the same time, Defendants were candid about possible risks under the JVA, explaining to potential investors that it "may not succeed and may be terminated due to the failure to establish a sustainable partnership." Form 10-Q that LMC filed with the SEC on August 4, 2022 (ECF No. 35-7) at PageID #: 1346. In claiming the statements discussing the agreement were misleading, Plaintiffs rely on assertions that the CEO of Foxconn "refused" to meet with Hightower and Foxconn failed to grant LMC access to the Model C and Model E vehicle designs. *See* ECF No. 31 at PageID #: 758-59, ¶ 113. Assuming *arguendo* that Foxconn's CEO refused to meet with Hightower, no facts in Defendants' statements mentioning the meeting are rendered untrue. Hightower did discuss the partnership with other Foxconn executives during his trip to Taiwan. *See* ECF No. 31 at PageID #: 742, ¶ 69. On August 4, 2022, Hightower stated during LMC's Second Quarter 2022 Earnings Conference Call that "**[w]hile in country, we had several meetings on how to best operationalize the [JVA]**." ECF No. 31 at PageID #: 757, ¶ 112 (brackets added). Plaintiffs fail to allege facts showing how this statement by Hightower is false. After all, Defendants have no duty

to disclose every detail of the meetings. *See In re United Am. Healthcare Corp. Sec. Litig.*, No. 2:05CV-72112 LPZ/ RSW, 2007 WL 313491, at *10 (E.D. Mich. Jan. 30, 2007) (finding the omission of a material breach of contract to be immaterial when the breach did not render the defendants' factual statements about the agreement inaccurate).

**\*11** Plaintiffs also allege Defendants mischaracterized the state of their partnership after the companies abandoned the JVA and entered into the IA, as amended. Plaintiffs conclude that the only reason the companies entered into a new agreement was because Foxconn "forced" LMC to renegotiate through their failure to provide the Model C and Model E vehicle designs and "constant bad faith conduct." ECF No. 31 at PageID #: 743, ¶ 72; PageID #: 745, ¶¶ 76-77; ECF No. 36 at PageID #: 1494. Following the restructuring, Defendants described the new agreement as "**favorable**" due to its "**better, simpler, easier structure**," ECF No. 31 at PageID #: 765, ¶ 118, and that they "**benefit from substantially lower operating complexity and risk**," ECF No. 31 at PageID #: 782, ¶ 131. [4] Contrary to Plaintiffs' conclusory beliefs, none of the delays or breaches under a previous agreement mean the general descriptions and beliefs about the new agreement or partnership are misleading. Statements about the terms of the IA, as amended, are unrelated to the alleged omissions about the reasons behind the formation of it. *Albert Fadem Tr. v. Am. Elec. Power Co.*, 334 F. Supp.2d 985, 1024 (S.D. Ohio 2004) (finding no duty to disclose omissions "unrelated to the statements" or "the subject of the omissions was not certain to occur"). Without alleging specific facts contradicting existing statements, Plaintiffs fail to plead omissions with the required particularity. Because they did not result in an affirmative misleading statement, Defendants had no duty to disclose the omitted details behind the formation of the IA, as amended. *City of Monroe*, 399 F.3d at 669.

[4]     *See also* ECF No. 31 at PageID #: 764, ¶ 118 ("**we continue to make progress in the planning and predevelopment work**..."); ECF No. 31 at PageID #: , ¶ 118 ("**Foxconn's additional investment in LMC is a strong sign of confidence**...**and will help accelerate the EV ambitions of both companies**"); ECF No. 31 at PageID #: 770, ¶ 122 ("**Foxconn and LMC Engineering can share expertise and resources across organizations, globally**..."); ECF No. 31 at PageID #: 776, ¶ 126 ("**Foxconn supplies components, software, supply chain**

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Lim v. Hightower, Slip Copy (2024)**

2024 WL 4349409

**and manufacturing expertise**....**The sale of the manufacturing plant located in Lordstown, Ohio to Foxconn**...**laid the groundwork for the two companies to collaborate**...”); ECF No. 31 at PageID #: 779, ¶ 128 (“**We have an agreement by which we will be developing future electric vehicle products**...”).

To be actionable under the securities laws, an omission “must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists.” *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see Basic*, 485 U.S. at 232 (ruling that material misrepresentations or omissions must “significantly alter[ ] the total mix of information made available”) (brackets added; internal quotation marks and citation omitted)). Plaintiffs cannot rely on the problems and ignore the benefits in the partnership to prove Defendants' general, optimistic statements are inconsistent with the actual “state of affairs” between the companies. Despite any disputes or delays that arose as part of a developing partnership, Defendants also experienced success and progress. The Amended Class Action Complaint (ECF No. 31) does not dispute that Foxconn tripled its investment in LMC under the IA, as amended, vouched for LMC with Softbank, moved the Endurance into production despite the delays, referred to LMC as a “strategic partner” and characterized the relationship as “progressing quite smoothly.” ECF No. 35-3 at PageID #: 1265, 1267; *see, e.g.*, IA, as amended, at § 5.03(f) (Foxconn and its Affiliates “will utilize [LMC] as their preferred North American vehicle development partner”) (ECF No. 31-1 at PageID #: 1089). Defendants do not claim that the partnership was without flaws, only that they were hopeful about its success. They submitted numerous statements warning of potential risks surrounding the partnership, acknowledging that “the Investment Transactions and other relationships entered into with Foxconn are subject to risks and uncertainties” and that “[n]o assurances can be given that [LMC] will successfully implement...[the] recently completed transactions with Foxconn.” ECF No. 35-9 at PageID #: 1364 (brackets added). *See Lucescu v. Zafirovski, No. 09cv4691 (DLC), 2018 WL 1773134, at *11 (S.D.N.Y. April 11, 2018)* (rejecting argument that broad or general descriptions of company progress were misleading, especially when the defendants addressed uncertainties); *Allscripts, 2001 WL 743411, at *9* (ruling that a statement is not misleading when defendants clearly disclosed the risks).

**\*12** To the extent Plaintiffs argue that Defendants' general statements describing collaboration between LMC and Foxconn mischaracterized the relationship, the Court finds the argument to be lacking in merit. Throughout the partnership, Defendants generally stated that LMC and Foxconn “**worked collaboratively**,” ECF No. 31 at PageID #: 761, ¶ 114; PageID #: 811, ¶ 212, worked “**together to create a new EV-native model to enable increased collaboration**,” ECF No. 31 at PageID #: 775, ¶ 126, and “**expanded and strengthened**” their partnership, ECF No. 31 at PageID #: 782, ¶ 130. Plaintiffs do not allege facts in the Amended Class Action Complaint (ECF No. 31) that would show the parties did not work collaboratively. Instead, Plaintiffs argue that Foxconn's general “bad faith” and the delays in producing the Endurance S LMC's first electric vehicle S must mean the companies were not working together. *See* Lead Plaintiffs' Memorandum in Opposition (ECF No. 36) at PageID #: 1496-98. While the Memorandum in Opposition asserts that Hightower “discovered” Foxtron's (Foxconn's subsidiary) competitive plans “during [his] Taiwan trip before the Class Period,” ECF No. 36 at PageID #: 1498, that allegation is not in the Amended Class Action Complaint (ECF No. 31) and is in fact contradicted by Plaintiffs' allegation that LMC learned this information “later,” *i.e.*, at some unidentified point *after* that meeting. ECF No. 31 at PageID #: 742, ¶ 70 (citing Adversary Complaint at ¶ 39 (ECF No. 31-1 at PageID #: 843) (LMC learned this “subsequent[ ]” to Hightower's trip)). Defendants disclosed in August 2022 that production of the Endurance would occur “initially at a very slow rate,” ECF No. 35-7, PageID #: 1323, for reasons unrelated to the state of the Foxconn partnership, ECF No. 35-7 at PageID #: 1346. As such, the delays were not concealed by Defendants and were unrelated to collaboration between the companies. Regardless, supposed delays and Plaintiffs' allegations of “bad faith” do not negate the possibility that the companies did collaborate at the times alleged in Defendants' statements. *See Allscripts*, 2001 WL 743411, at *9 (stating there is no “duty to report every glitch that arises” when a company is candid about the risks it faces); *Basic*, 485 U.S. at 232 (ruling that material misrepresentations or omissions must “significantly alter[ ] the total mix of information made available”) (brackets added; internal quotation marks and citation omitted)).

Overall, the breaches under the abandoned JVA, delays, and other minor issues do not render general, positive statements describing the partnership or agreements inaccurate, especially considering the totality of the state of affairs and

public revelation of risks. As such, Plaintiffs fail to allege sufficient misstatements or omissions upon which investors would reasonably rely.

### 3. Forward-Looking Statements and the Safe Harbor Doctrine

The Safe Harbor Doctrine protects forward-looking statements from liability when they are accompanied by meaningful cautionary statements or when they are made without "actual knowledge." 15 U.S.C.A. § 78u-5(c); *see Huntington Bancshares*, 674 F. Supp.2d at 957; *Miller v. Champion Ents., Inc.*, 346 F.3d 660, 672 (6th Cir. 2003) (stating safe harbor provision of the PSLRA protects forward-looking statements accompanied by cautionary language regardless of scienter and forward-looking statements without warnings that Defendants made without actual knowledge that they were false or misleading). A statement is forward-looking if its "veracity" cannot be determined at the time the statement is made. *Lousiana Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*, No. 2:19-cv-3347, 2021 WL 4397946, at *12 (S.D. Ohio Sept. 27, 2021). "A plaintiff may overcome this protection only if the statement was material; if defendants had actual knowledge that it was false or misleading; and if the statement was not identified as 'forward-looking' or lacked meaningful cautionary statements." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 548 (6th Cir. 2001) (en banc), *abrogated on other grounds by Tellabs, supra* (citing 15 U.S.C. § 78u-5(c)(1)). Many of the alleged misstatements contain immaterial, forward-looking statements. [5] *See* 15 U.S.C. § 78u-5(i)(1) (defining forward-looking statements under the PSLRA's safe harbor provision as defendants' projections, statements of plans and objectives, estimates of future economic performance, and the assumptions underlying forward-looking statements).

[5] *See* ECF No. 31 at PageID #: 757, ¶ 112 ("We expect production to accelerate...."); ECF No. 31 at PageID #: 758, ¶ 112 ("...**further developing our broad partnership with Foxconn**..."); ECF No. 31 at PageID #: 761, ¶ 114 ("...**LMC's experienced vehicle development team, Foxconn's growing EV ecosystem**...**will allow us to bring great EVs to market faster and more efficiently**."); ECF No. 31 at PageID #: 761, ¶ 115 ("**deep collaboration**...**offers tremendous opportunities**...."); ECF No. 31 at PageID #:

763-64, ¶ 117 ("**Foxconn's additional investment in LMC**...**will help accelerate the EV ambitions of both companies**."); ECF No. 31 at PageID #: 765, ¶ 118 ("**I believe we have great potential opportunities ahead of us**...**I look forward to our team executing and realizing them**."); ECF No. 31 at PageID #: 767-68, ¶ 120 ("...**we have two objectives**...**launch the Endurance and build this relationship with Foxconn**"); ECF No. 31 at PageID #: 773, ¶ 124 ("...**looks forward to creating additional electric vehicles in collaboration**..."); ECF No. 31 at PageID #: 776, ¶ 126 ("**Foxconn will leverage**..."); ECF No. 31 at PageID #: 779, ¶ 128 ("...**we will be developing future electric vehicle products**..."); ECF No. 31 at PageID #: 783, ¶ 131 ("...**we plan to leverage common components**...**the plan is for them to be shared**...").

**\*13** Defendants made numerous cautionary statements about the Foxconn partnership throughout the class period. [6] To constitute "meaningful cautionary language," Defendants statements must "convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements." *Helwig*, 251 F.3d at 558-59. In multiple forms filed with the SEC, LMC provides warnings about their production abilities and agreements with Foxconn. In the Form 8-K filed on August 4, 2022, Defendants warned investors that their success was subject to dangers including "our limited operating history and our ability to execute our business plan, including through our relationship with Foxconn," and '[t]he success of the joint venture depend[ed] on many variables, including our ability to utilize the designs, engineering data and other foundational work of Foxconn...." ECF No. 35-7 at PageID #: 1339-40 (brackets added). Defendants also explicitly directed shareholders to these warnings in the earnings call held on August 4, 2022 in which Plaintiffs allege that Hightower and Ninivaggi made the first misleading statements of the class period. *Compare* ECF No. 35-7 at PageID #: 1322 ("Before we begin, I want to call your attention to our safe harbor provision, forward-looking statements that is posted on our website as part of our quarterly update and included in our earnings release. The safe harbor provision identifies risk factors and uncertainties that may cause actual results to differ materially from the content of our forward-looking statements for the reasons that we cite in our Form 10-K and other SEC filings, including uncertainties posed by the difficulty in predicting future outcomes.") *with* ECF No. 31 at PageID #: 757, ¶ 112. The

forward-looking statements in the earnings call expressly directed investors to the warnings, therefore, adequately disclosing the risks associated with their statements. *See Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*, 614 Fed.Appx. 237, 244 (6th Cir. 2015) (stating risks are disclosed when the allegedly misleading statements incorporate the warnings by reference). [7]

6    *See* Form 10-K filed with the SEC on February 28, 2022 (ECF No. 35-5 at PageID #: 1297) ("...we cannot predict whether we will be able to fully realize the anticipated benefits from any aspects of our contemplated relationship with Foxconn...."); Form 8-K filed with the SEC on August 4, 2022 (ECF No. 35-7 at PageID #: 1340) ("No assurances can be given that we will successfully implement...the recently completed transactions with Foxconn, including the contract manufacturing agreement and the [JVA]....The success of the joint venture depends on many variables, including our ability to utilize the designs, engineering data and other foundational work of Foxconn, its affiliates,...."); Form 10-Q that LMC filed with the SEC on August 4, 2022 (ECF No. 35-7 at PageID #: 1345) ("The Company's ability to continue as a going concern is dependent on our ability to realize the benefits of the Foxconn Transactions, raise substantial additional capital, complete the development of the Endurance, obtain regulatory approval, begin commercial production and launch the sale of the Endurance...."); Form 10-Q that LMC filed with the SEC on August 4, 2022 (ECF No. 35-7 at PageID #: 1346) ("...the Foxconn Joint Venture may not succeed and may be terminated due to the failure to establish a sustainable partnership...."); Form 8- K filed with the SEC on November 7, 2022 (ECF No. 35-9 at PageID #: 1364) ("...the Investment Transactions and other relationships entered into with Foxconn are subject to risks and uncertainties. No assurances can be given that we will successfully implement ...the Investment Transactions or other recently completed transactions with Foxconn....The funding transactions under the Investment Agreement are subject to closing conditions including regulatory approvals and further negotiation of development milestones....If we are unable to maintain our relationship with

Foxconn or effectively manage outsourcing the production of the Endurance to Foxconn,...[it could] have a negative effect on our production and operations."); Form 10-K filed with the SEC on March 6, 2023 (ECF No. 35-13 at PageID #: 1449) ("...No assurance can be given that we will ultimately be successful in further vehicle development or that we will be able to effectively realize the potential benefits of the...development partnership with Foxconn....").

7    The same analysis applies to the forward-looking statements made in the press releases in November 2022 (ECF No. 31at PageID #: 760-61, ¶ 114; PageID #: 763-65, ¶¶ 117-18) accompanied by the warnings about the amended IA in the Form 8-K filed on November 7, 2022 (ECF No. 35-9, PageID #: 1363-64), and the forward-looking statements made in the press release and earnings call on March 6, 2023 (ECF No. 31, PageID #: 782-85, ¶¶ 130-31 and 133) accompanied by the warnings in the Form 10-K filed that day (ECF No. 35-13, PageID #: 1449-53).

 **\*14** Contrary to Plaintiffs' position, *see* ECF No. 36 at PageID #: 1499-1500, these disclosures do not contain mere generalities applicable to any partnership. Instead, they specifically reference the Foxconn agreements and the specific reasons the partnership could fail. *See Miller*, 346 F.3d at 678 (stating defendant is "not required to detail every facet or extent of that risk to have adequately disclosed the nature of the risk"); *Arbitrage Event-Driven Fund v. Tribune Media Co.*, No. 18 C 6175, 2020 WL 60186, at \*8 (N.D. Ill. Jan. 6, 2020) (finding statements that a merger is "subject to a number of conditions" and there can be "no assurance" of success convey substantive warnings as required under the Safe Harbor provision). In addition, none of the forward-looking statements or warnings in the case at bar disclose risks that had already materialized. The delays in producing the Model C and Model E vehicle designs and other issues do not demonstrate that Defendants failed to "utilize the designs...of Foxconn," (ECF No. 35-7 at PageID #: 1340) or that any other material risks described in the SEC filings had already come to pass. Before the IA was restructured, LMC could not have known Foxconn would never fulfill its responsibilities. Defendants do not deny having experienced challenges in the partnership. The IA, as amended, did not require use of the model designs and none of the alleged breaches or delays after its implementation prove that any of Defendants' disclosed risks had occurred. *See Wochos v. Tesla, Inc.*, 985 F.3d

1180, 1196 (9th Cir. 2021) (stating none of the challenged statements contained an "explicit or implicit representation that Tesla had *not* already experienced" the specific risks they warned investors about, and therefore, defendants' forward-looking statements were protected) (emphasis in original).

Therefore, the Safe Harbor Doctrine excuses from liability the allegations regarding all of Defendants' forward-looking statements qualified by the meaningful cautionary language in LMC's SEC reports. [8]

[8] As detailed in the discussion of scienter in Section IV(C) of this Memorandum of Opinion and Order, Plaintiffs fail to establish Defendants' actual knowledge that their statements were misleading. Without actual knowledge, Plaintiffs forward-looking statements are protected under the Safe Harbor Doctrine, even if they had not been accompanied by cautionary language.

### B. "Fraud by Hindsight" Theory

Many of Plaintiffs' allegations rest on LMC's claims of "bad faith" made against Foxconn in the Adversary Complaint, which was filed after Foxconn's repudiation. *See* ECF No. 31 at PageID #: 756, ¶¶ 110-11. [9] While Defendants may have been aware of the breaches and delays LMC experienced during the partnership, the law does not require them to reach and disclose conclusions about the future of the relationship based on the issues. In the Amended Class Action Complaint, Plaintiffs generally allege that each misleading statement omitted the facts that Foxconn "stonewalled" LMC and was "determined to maliciously and in bad faith destroy Lordstown's business in an effort to strip Lordstown's assets and poach its talent at little cost." ECF No. 31 at PageID #: 765-67, ¶ 119. Allegations made in light of Foxconn's repudiation *after* the fact do not establish Defendants' beliefs or knowledge about the partnership *before* it disbanded.

[9] *See also* ECF No. 31 at PageID #: 728, ¶ 15; PageID #: 748-49, ¶ 88; PageID #: 792-93, ¶¶ 156-59.

Defendants only had a duty to disclose contemporary information that would make material statements misleading. Claims of securities fraud or misrepresentation based on allegations that "defendants should have anticipated future events and made certain disclosures earlier than they actually did" fail on their merits. *Huntington Bancshares, 674 F. Supp.2d at 959* (quoting *Novak v. Kasaks, 216 F.3d 300,*

309 (2d Cir. 2000) ("[W]e have refused to allow plaintiffs to proceed with allegations of 'fraud by hindsight.' Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them.") (brackets added; citation omitted)). Allegations based on a pattern of "bad faith" and other conclusions drawn in the adversary complaint fail to plead facts with the required particularity. *See Doshi v. Gen. Cable Corp., 823 F.3d 1032, 1044 (6th Cir. 2016)* (explaining allegations based on assumptions and conclusions about future consequences represent "impermissible fraud by hindsight"). The only facts Plaintiffs can draw from the adversary complaint are facts that were available to Defendants before the repudiation such as the existence of any breaches or delays. The alleged omissions of Defendants' conclusions drawn after the repudiation are not actionable.

### C. Scienter

 **\*15**  To state a claim under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10bS5, Plaintiffs must allege facts giving rise to a strong inference of either knowing or reckless behavior. *Bondali, 620 Fed.Appx. at 489*. Although "[r]ecklessness will satisfy the scienter requirement for misstatements or omissions of present fact...if the alleged misstatement or omission is a 'forward-looking statement,' the required level of scienter is 'actual knowledge.' " *Plymouth, 556 F. Supp.3d at 793* (quoting *Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 48 n. 14 (2011)*) (brackets added). The Sixth Circuit defines recklessness as an "extreme departure from the standards of ordinary care" rising above mere negligence and "akin to conscious disregard." *In re Comshare Inc. Sec. Litig., 183 F.3d 542, 550 (6th Cir. 1999); In re Officemax, Inc. Sec. Litig., No. 1:00CV2432, 2002 WL 33959993, at \*11 (N.D. Ohio March 26, 2002)*.

To meet the heightened pleading standard for scienter, the Court must "engage in a comparative evaluation," considering "competing inferences rationally drawn from the facts alleged." *Tellabs, 551 U.S. at 314*. When evaluating possible inferences of scienter, the allegations must be assessed "holistically" and not in isolation. *Id. at 326*. The Sixth Circuit established nine factors that can suggest a defendant's mental culpability under Section 10(b) and Rule 10bS5. *See Helwig, 251 F.3d at 552*. The parties only dispute factors "(1) insider trading at a suspicious time or in an unusual amount," "(2) divergence between internal reports and external statements on the same subject" "(3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information," and

"(6) disregard of the most current factual information before making statements." [10] Because the Court does not find the omission of the specific breaches and delays actionable, only Defendants' knowledge of Foxconn's "bad faith" and the state of the partnership is at issue regarding scienter.

[10]    Lead Plaintiffs' Memorandum in Opposition only addresses *Helwig* factors (1), (2), (3), and (6), *see* ECF No. 36 at PageID #: 1506-1509, conceding that the other five factors are not present here.

**1. Insider Trading at a Suspicious Time or in an Unusual Amount**

First, Plaintiffs allege Defendants engaged in insider trading, suggesting that they knew of the issues in the partnership and had motive to conceal them in order to make a profit before stock prices fell. Plaintiffs base this allegation on two Form 4s that LMC filed with the SEC, which disclose (1) a transaction of LMC stock by Kroll on October 13, 2022, and (2) a transaction of LMC stock by Hightower on November 9, 2022. *See* ECF No. 31, PageID #: 798-800, ¶¶ 178, 180. As earlier indicated, the Court takes judicial notice of the Form 4s (ECF No. 35-8 at PageID #: 1351-52). These explicitly state restricted stock units were converted into common stock in LMC to satisfy certain tax withholding obligations and were not sold by Kroll and Hightower as Plaintiffs claim. Considering these documents, the allegation that these Defendants sold stock because of a failing relationship with Foxconn lacks factual support and subsist only on Plaintiffs' conclusory speculation. Additionally, it is noteworthy that Hightower purchased 10,000 shares of LMC stock during the class period. *See* ECF No. 35-8 at PageID #: 1350; *I.B.E.W., 788 F. Supp.2d at 631* (stating insider purchases "undermine any inference of scienter"). Therefore, the Court finds no suspicious insider trading activity supporting an inference of scienter. *See City of Pontiac Gen. Employees' Ret. Sys. v. Stryker Corp., 865 F.Supp.2d 811, 834-35 (W.D. Mich. 2012)* (explaining that a lack of sales by individual defendants "actually undermines an inference of scienter," particularly when they "suffered large losses...from the shares they retained").

**2. Temporal Proximity of a Misleading Statement and Disclosure of Inconsistent Information**

 **\*16** Second, Plaintiffs claim the temporal proximity between allegedly misleading statements and the disclosure of Foxconn's April 21, 2023 repudiation support their allegations of scienter. *See* ECF No. 36 at PageID #: 1508-1509.

Plaintiffs do not allege LMC knew of the termination of the IA, as amended, prior to this disclosure. Rather, they claim that LMC's statement on March 6, 2023 describing an "**expanded and strengthened [ ] partnership with Foxconn**", ECF No. 31 at PageID #: 782, ¶ 130 (brackets added), after Foxconn's additional investment in the company misled investors because LMC knew or should have known the partnership would fail. *See* ECF No. 36 at PageID #: 1509. The IA, as amended S an additional investment and restructured agreement with LMC S reasonably leads to an inference of a continued partnership despite issues under a different, possibly less favorable agreement. After the restructuring, Plaintiffs only allege delays and minor issues, nothing that would suggest Foxconn planned to back out of the partnership. *See* ECF No. 31 at PageID #: 748-50, ¶¶ 88-94. After the final breach and failure to remedy it, Defendants publicly stated that Foxconn did not fulfill their obligations under the IA and likely would not. *See* ECF No. 31 at PageID #: 789-92, ¶¶ 143-52. Plaintiffs do not allege facts suggesting Defendants knew of the upcoming repudiation, and, contrary to Plaintiffs' claim, Defendants did not refuse to see obvious facts suggesting Foxconn would repudiate after they made their initial statement. *See Doshi, 823 F.3d at 1039* ("Before drawing an inference of recklessness, courts typically require multiple, obvious red flags demonstrating an egregious refusal to see the obvious, or to investigate the doubtful.") (internal quotation marks and citations omitted). In light of Defendants' reasonable opposing beliefs, the allegations in the Amended Class Action Complaint (ECF No. 31) do not meet the recklessness standard of "extreme departure from the standards of ordinary care." *Comshare, 183 F.3d at 550*; *Officemax, 2002 WL 33959993, at \*11*. Even if Plaintiffs had meet this standard, the change in relationship caused by Foxconn's material breach of contract undermines the claim that statements made prior to the breach give rise to a strong inference of scienter. *See Officemax, 2002 WL 33959993, at \*18* (ruling that significant changes in circumstance explain the discrepancies in the defendant's statements, rather than any fraudulent conduct); *Tellabs, 551 U.S., at 323-24* (holding that plaintiffs must allege facts giving rise to an inference of scienter that is at least as strong as any plausible opposing inferences).

**3. Disregarding Current Factual Information and "Red Flags"**

Third, Plaintiffs argue Defendants disregarded the most current factual information available to them by failing to disclose Foxconn's breaches and delays, including the Foxconn CEO's failure to meet with Hightower, Foxconn

2024 WL 4349409

not providing the Model designs required by the JVA, and Foxconn's intention to sell its own vehicles in the U.S., allegedly in competition with LMC. *See* ECF No. 36 at PageID #: 1506. Plaintiffs argue Kroll's awareness of "day-to-day operations, business and financial affairs, and books and records" prove Defendants were aware of the alleged omissions. ECF No. 36 at PageID #: 1503-04. "[H]igh-level executives can be presumed to be aware of matters central to their business's operations," however, courts cannot infer "fraudulent intent" solely from "Defendants' positions in the company and alleged access to information." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004) (*abrogated on other grounds by Frank v. Dana Corp.*, 646 F.3d 954 (6th Cir. 2011)) (brackets added); *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp.2d 688, 724 (S.D. Ohio 2006). Defendants do not claim to be unaware that issues arose during the partnership, only to being unaware of Foxconn's bad faith and the likelihood the partnership would fail. Allegations that Defendants "closely monitored" the partnership [11] do not show they knew of the intentions behind Foxconn's actions. Defendants also argue that statements demonstrating LMC's admitted reliance on Foxconn for "critical funding" proves they knew the danger posed by a repudiation. *See* ECF No. 36 at PageID #: 1505. Again, knowledge of issues and possible dangers surrounding the partnership does little to prove Defendants were aware of or even recklessly disregarded information suggesting Foxconn's secret intentions.

[11]    *See, e.g.*, Hightower stated that he was "in constant communication with the chairman of Foxconn," ECF No. 31 at PageID #: 798, ¶ 175; PageID #: 810, ¶ 210; attended "**several meetings on how to best operationalize the** [**JVA**]," ECF No. 31 at PageID #: 757, ¶ 112 (brackets added); and, "had several discussions about the first vehicle program of the [JVA, *i.e.*, the Endurance]," ECF No. 31 at PageID #: 796, ¶ 171 (brackets added). Kroll also admitted to being familiar with "[Lordstown's] day-to-day operations, business and financial affairs, and books and records." ECF No. 31 at PageID #: 808, ¶ 202 (brackets in original). Finally, Ninivaggi noted the "**tremendous opportunities**" that a "**deep collaboration with the Foxconn EV Ecosystem**" would offer Lordstown. ECF No. 31 at PageID #: 761, ¶ 115.

**\*17** Plaintiffs also contend that Defendants' positions as senior level officers in the company means they must have known about the terms of the JVA and IA and the

issues that arose. *See* ECF No. 36 at PageID #: 1504-1508. While knowledge of significant business operations including the issues with the partnership can be assumed based on Defendants' positions, this knowledge does not translate to knowledge of Foxconn's intentions. Plaintiffs again fail to sufficiently justify why knowledge of the terms of the JVA and IA would suggest awareness of Foxconn's bad faith. *See Albert Fadem Trust v. Am. Elec. Power Co., Inc.*, 334 F. Supp.2d 985, 1006 (S.D. Ohio 2004) (finding that conclusory allegations "based wholly on inferences to be drawn from circumstances and Defendants' conduct" insufficiently plead scienter). It is untenable to argue that Defendants would enter into the Foxconn agreements and continue to implement their terms, all the while knowing the partnership would fail and force LMC into bankruptcy. *See In re Sinclair Broadcast Grp., Inc. Sec. Litig.*, 473 F. Supp.3d 529, 537 (D. Md. 2020) (rejecting scienter premised on "secret intention" not to comply with agreement). The Court finds Defendants' explanation of the alleged facts, which lacks fraudulent intent, more compelling. It is not uncommon for businesses to restructure agreements that are unproductive. Here, the facts suggest the companies decided to distance themselves from a business model that was not working and enter into an agreement with a larger investment in LMC, not based on the Model C and E vehicle designs, but on developing a new "EV Program." ECF No. 31 at PageID #: 745, ¶¶ 76-77. In light of this competing inference, the Court finds Plaintiffs' allegation that Defendants knew the partnership would not be successful after the breach of the first agreement speculative.

Even if knowledge of the issues did equate to knowledge of Foxconn's intentions, Defendants' positions alone cannot lead to an inference of scienter. As stated above, all allegations must be viewed holistically. *Tellabs*, 551 U.S. at 326; *see Pittman v. Unum Grp.*, 861 Fed.Appx. 51, 55 (6th Cir. 2021) ("[T]he fact that executives are intimately familiar with a core component of their business does little to suggest fraudulent intent. So this is not a scienter-bolstering fact.") (brackets added). Without compelling facts suggesting scienter, Plaintiffs' arguments based on Defendants' positions in the company or close monitoring of the partnership do not give rise to a strong inference of scienter.

Plaintiffs also allege the red flags in the partnership suggest Defendants knew or should have known of the poor status of the partnership. *See* ECF No. 31 at PageID #: 794-809, ¶¶ 164-207. The alleged red flags do not recharacterize Defendants' overall public portrayal of the relationship, especially considering the warnings Defendants provided.

*See PR Diamonds,* 364 F.3d at 686-87 (stating that ignoring red flags can suggest negligence but typically fails to prove knowing or reckless behavior without blatantly obvious red flags). Plaintiffs do not allege facts contradicting the positive aspects of the partnership that support Defendants' generally hopeful public characterizations of the relationship. *See Campbell v. Lexmark Int'l Inc.,* 234 F. Supp.2d 680, 686 (E.D. Ky. 2002) (holding that scienter must be viewed in light of the "rest of the picture," not just the narrow context alleged by plaintiff); *Albert Fadem Trust,* 334 F. Supp.2d at 1007 (stating that allegations of recklessness in securities fraud cases must be based on highly unreasonable conduct wherein the danger is "so obvious that any reasonable man would have known of it"). In *Ashland, Inc.,* the Sixth Circuit ruled the defendant "may have engaged in bad (in hindsight) business judgments" but "such actions fall short of scienter in the context of securities fraud." *Ashland, Inc.,* 648 F.3d at 470 (citations omitted). Therefore, Defendants alleged "disregard of the most current factual information before making statements," *i.e.,* the sixth *Helwig* factor, favors Defendants and does not establish scienter under the heightened pleading standards.

**4. Confidential Witness Statements Suggesting Scienter**
"[P]laintiffs may rely on confidential witnesses if they plead facts with sufficient particularity to support the probability that a person in the confidential witness's position would possess the information alleged." *Doshi,* 823 F.3d at 1037 n. 2 (brackets added). The Sixth Circuit ruled that "[w]hile...anonymous sources are not altogether irrelevant to the scienter analysis, *conclusory or vague allegations* do not deserve much weight." *Ricker v. Zoo Entm't, Inc.* 534 Fed.Appx. 495, 496 n. 2 (6th Cir. 2013) (emphasis and brackets added) (internal quotation marks and citations omitted); *see also Konkol v. Diebold, Inc.,* 590 F.3d 390, 399 (6th Cir. 2009) ("When confidential sources are used to support vague and conclusory allegations, the allegations are not accorded much weight."), *abrogated on other grounds by Matrixx, supra* (internal quotation marks and citation omitted). To the extent Plaintiffs rely on the statements made by the three confidential witnesses, the Court does not find their scienter arguments persuasive.

 **\*18** CW-1 states the belief that Foxconn deliberately caused delays and failed to provide LMC with data required under the JVA. *See* ECF No. 31 at PageID #: 739-40, ¶¶ 61-63; PageID #: 743-44, ¶ 73. For example, a Foxconn supervisor instructed CW-1, who now worked for Foxconn, not to help LMC with issues that arose at the Lordstown plant. CW-1 based their conclusion that Foxconn was sabotaging LMC on this

instruction and on witnessing other delays. Despite CW-1's "personal belief," Plaintiffs allege that the employee "was not told explicitly that Foxconn wanted [LMC] to fail" *See* ECF No. 31 at PageID #: 739, ¶ 62; PageID #: 804-805, ¶ 196 (brackets added). In addition, Plaintiffs do not allege CW-1 shared the confidential witness's beliefs with Defendants, only that they must have known that the Foxconn partnership was failing because the employees at an LMC plant concluded that it was.

CW-2 and CW-3 merely allege work was stalled at LMC's Michigan location due to lack of funds, *see* ECF 31 at PageID #: 750, ¶ 94, but Plaintiffs again do not allege that these confidential witnesses informed Defendants of their beliefs. Like with CW-1's allegations, Plaintiffs conclude Defendants must have been aware of delays and deteriorating relationships with suppliers because of employees' beliefs. *See* ECF 31 at PageID #: 750, ¶ 94. Plaintiffs claim Hightower's statement congratulating the team at LMC, their "partners at Foxconn," and their "supplier partners around the world for **bringing the Endurance into commercial production,**" *see* ECF No. 31 at PageID #: 802, ¶ 189, is intentionally misleading because of the delays witnessed by CW-2 and CW-3. *See* ECF No. 36 at PageID #: 1511. Delays and the production of only twelve vehicles does not mean the companies did not launch the Endurance together, especially when Defendants did not claim to produce or even plan to produce a certain number. Again, Plaintiffs use the CWs' statements to defend vague, conclusory allegations. Overall, the CWs' statements fail to create a connection between employees' beliefs and Defendants knowledge of the overall state of the partnership; therefore, they do not adequately support an inference of scienter under the heightened pleading standards.

**5. Motive**
Plaintiffs also allege Defendants had motive to deceive investors by portraying the Foxconn partnership as positive and strategic in order to "attract new partners and financing prepetition" and obtain critical financing. ECF No. 31 at PageID #: 809-11, ¶¶ 208-14. *See In re FirstEnergy Corp. Sec. Litig.,* 316 F. Supp.2d 581, 599 (N.D. Ohio 2004) (finding that Plaintiffs had alleged a strong inference of scienter when considering Plaintiffs' allegations in the aggregate). Without also establishing Defendants acted with the requisite state of mind, facts demonstrating motive and opportunity do not establish a strong inference of scienter. *Comshare,* 183 F.3d at 551. While the Court may consider possible motives in analyzing scienter, generic motive allegations are

typically unpersuasive, considering all corporations seek to portray themselves and their operations in a positive light. *PR Diamonds*, 364 F.3d at 690 ("All corporate managers share a desire for their companies to appear successful. That desire does not comprise a motive for fraud.").

Plaintiffs also claim Defendants relied on the Foxconn partnership for funding, and, therefore, had motive to conceal their bad faith and "attempts to sabotage" LMC. ECF No. 31 at PageID #: 795, ¶¶ 167-68; PageID #: 809, ¶ 208. Without knowledge or reckless disregard of facts suggesting Foxconn would repudiate, Defendants' general motive to appear successful to stockholders, does not present persuasive evidence of scienter. *See Bondali*, 620 Fed.Appx. at 492 (stating motive to conceal aspects of plaintiff's operations does not prove scienter simply because they were important to the company's success).

**\*19** Overall, Plaintiffs do not plead sufficient evidence or circumstances that would have alerted Defendants to Foxconn's bad faith prior to their repudiation. When viewed holistically, Plaintiffs' allegations fail to give rise to a strong inference of scienter, especially in light of more compelling opposing inferences.

### V. Analysis of Section 20(a) Claim

When a primary violation of securities law is shown, Section 20(a) imposes joint and several liability on "controlling persons." Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), provides, in relevant part, that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person." (brackets added). Because Plaintiffs' Section 10(b) and Rule 10bS5 claim fails, their Section 20(a) claim also fails. *See Omnicare, Inc.*, 583 F.3d at 947 ("[T]he district court properly dismissed the Plaintiffs' claims under § 10(b) and Rule 10b–5. Therefore, dismissal of control person liability under § 20 was also proper." (brackets added; footnote omitted); *Bondali*, 620 Fed.Appx. at 493.

### VI. Conclusion

For the foregoing reasons, the Court grants Defendants' Request for Judicial Notice (ECF No. 35-14) and takes judicial notice of Exhibits 1-11 (ECF Nos. 35-3 through 35-13). The Court also grants Defendants' Motion to Dismiss (ECF No. 35) and dismisses the Amended Class Action Complaint (ECF No. 31).

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2024 WL 4349409

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 6389573, Fed. Sec. L. Rep. P 99,934

2017 WL 6389573
United States District Court, E.D.
Michigan, Southern Division.

Carl PALAZZOLO and Albert Ferrandi, Individually and
On Behalf of All Others Similarly Situated, Plaintiffs,

v.

FIAT CHRYSLER AUTOMOBILES
N.V., Sergio Marchionne, Richard K.
Palmer, and Reid Bigland, Defendants.

Civil Case No. 16-12803
|
Signed 12/14/2017

**Attorneys and Law Firms**

Naumon A. Amjed, Ryan T. Degnan, Kessler Topaz Meltzer & Check, LLP, Radnor, PA, Dennis A. Lienhardt, E. Powell Miller, The Miller Law Firm, P.C., Rochester, MI, for Plaintiffs.

Darrell S. Cafasso, Robert J. Giuffra, Jr., William B. Monahan, Sullivan & Cromwell LLP, David A. Shargel, Rachel B. Goldman, Bracewell LLP, New York, NY, Jessica Vartanian Currie, Roger P. Meyers, Patrick G. Seyferth, Bush Seyferth and Paige PLLC, Troy, MI, Keefe A. Brooks, Michael T. Price, Brooks Wilkins Sharkey & Turco, PLLC, Birmingham, MI, for Defendants.

## OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

LINDA V. PARKER, U.S. DISTRICT JUDGE

**\*1** This is a putative class action securities fraud case, in which investors in Fiat Chrysler Automobiles N.V. ("FCA") common stock are suing FCA and the following FCA executives: Chief Executive Officer Sergio Marchionne ("Marchionne"), Chief Financial Officer Richard K. Palmer ("Palmer"), and Head of U.S. Sales Reid Bigland ("Bigland"). Court-appointed Lead Plaintiffs Carl Palazzolo and Albert Ferrandi filed a Consolidated Class Action Complaint ("Complaint") on March 17, 2017. In the Complaint, Lead Plaintiffs allege that Defendants made materially false and misleading statements and/or omissions concerning a streak of increased monthly year-over-year United States retail sales

by FCA during the Class Period (i.e., November 3, 2014 and July 26, 2016, inclusive), which Lead Plaintiffs claim was based on "fake" sales. Lead Plaintiffs further allege that Defendants' statements or omissions resulted in the artificial inflation of the price of FCA common stock, which declined when the truth about FCA's U.S. sales emerged. The matter presently is before the Court on Defendants' motion to dismiss, filed pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4. The parties have fully briefed the motion. Finding the facts and legal arguments adequately presented in the parties' briefs, the Court is dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f). For the following reasons, the Court is denying the motion.

### I. Standard of Review

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action...." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not "suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).

As the Supreme Court provided in *Iqbal* and *Twombly*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556.

Case 4:23-cv-13132-SDK-EAS ECF No. 42-6, PageID.2535 Filed 11/15/24 Page 83 of 109

Palazzolo v. Fiat Chrysler Automobiles N.V., Not Reported in Fed. Supp. (2017)
2017 WL 6389573, Fed. Sec. L. Rep. P 99,934

**\*2** In deciding whether the plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). This presumption, however, is not applicable to legal conclusions. *Iqbal*, 556 U.S. at 668. Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

Ordinarily, the court may not consider matters outside the pleadings when deciding a Rule 12(b)(6) motion to dismiss. *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 88 (6th Cir. 1997) (citing *Hammond v. Baldwin*, 866 F.2d 172, 175 (6th Cir. 1989)). A court that considers such matters must first convert the motion to dismiss to one for summary judgment. *See* Fed. R. Civ. P 12(d). However, "[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to [the] defendant's motion to dismiss, so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

Thus in a securities fraud case, the court may consider the full text of filings with the United States Securities and Exchange Commission ("SEC") when deciding a Rule 12(b)(6) motion, even if they are not attached to the complaint. *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360-61 (6th Cir. 2001). Nevertheless, "[i]t would be improper for the [c]ourt to rely upon these documents to determine disputed factual issues" or to "make any determination as to the truth of any of the facts alleged or otherwise asserted in the documents themselves." *In re Unumprovident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 875-76 (E.D. Tenn. 2005). "Such documents should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents." *In re Direct Gen. Corp. Sec. Litig.*, 398 F. Supp. 2d 888, 893 (M.D. Tenn. 2005) (citing *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996)).

Where fraud is alleged, Rule 9(b)'s pleading requirements also must be satisfied. Fed. R. Civ. P. 9(b). Under Rule 9(b), "the circumstances constituting fraud or mistake" must be "state[d] with particularity[.]" Fed. R. Civ. P. 9(b). In the Sixth Circuit, this means the plaintiff must, "at a minimum, ... allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent

scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Coffey v. Foamex LP*, 2 F.3d 157, 161-162 (6th Cir. 1993) (internal quotation marks and citation omitted).

Additional heightened pleading requirements apply to claims arising under the PSLRA. *See* 15 U.S.C. § 78u–4(b)(1), (2). The Court discusses those heightened requirements in detail in Sections III and IV.

### II. Factual and Procedural Background

FCA is a worldwide automotive designer, manufacturer, and retailer. (Compl. ¶ 1.) FCA operates in the United States through its wholly-owned subsidiary FCA US LLC ("FCA US"), which was formerly known as Chrysler Group LLC ("Chrysler"). (*Id.*) FCA operates through six business segments, with its North America segment comprising about 90% of FCA's earnings. (*Id.* ¶ 22.) Chrysler and Fiat S.p.A ("Fiat") consolidated after Chrysler experienced extensive financial difficulties, reorganized, and emerged from bankruptcy in 2009. (*Id.* ¶ 2.) Marchionne, Chairman and Chief Executive Officer ("CEO") of Fiat, began overseeing the consolidated entity in June 2009. (*Id.*)

**\*3** During the Class Period, Marchionne was responsible for the day-to-day management of FCA and controlled and directed its business and activities. (*Id.* ¶ 24.) When he began overseeing FCA, Marchionne instituted, what has been referred to as, "a flat organization with him at the top" in that "all key nerve systems run[ ] directly to [him]." (*Id.* ¶ 37.) In a July 2, 2015 article, *The Detroit News* described Marchionne as being at the "epicenter" of FCA's management matrix: "everyone is directly or indirectly connected to Marchionne, who has 38 executives reporting directly to him as CEO and chief operating officer of North America...." (*Id.* ¶ 38.) Marchionne supervises each of these executives individually. (*Id.* ¶ 39.)

During the Class Period, Marchionne certified the periodic financial reports FCA filed with the SEC and spoke regularly with investors and securities analysts regarding the company. (*Id.* 24.) He also has led FCA's Group Executive Council, its highest management body. (*Id.* ¶ 24.)

In November 2009, soon after Marchionne began overseeing FCA, he and other company executives announced a five-year plan to increase the company's U.S. retail sales by greater than

50% and its U.S. market share from less than 9% in 2009 to greater than 13% by 2014. (*Id.* ¶ 3.) In February 2010, Chrysler reported its first positive monthly U.S. sales results in 26 months. (*Id.* ¶ 4.) When Chrysler became a wholly-owned subsidiary of FCA in October 2014, Chrysler had reported year-over-year monthly U.S. sales growth for fifty-four months. (*Id.*)

FCA common stock began trading on the New York Stock Exchange on October 13, 2014. (*Id.* ¶ 5.) Thereafter, starting on November 3, 2014, FCA issued a monthly press release, which was filed with the SEC on Form 6-K, announcing its U.S. retail sales for the preceding month. (*See, e.g., id.* ¶¶ 174, 194, 202, 211, 218, 223, 270, 276, 291.) From November 3, 2014 through June 1, 2016, these press releases claimed an increase in FCA's U.S. sales compared to the same month the year earlier and an extension of FCA US' consecutive sales streak of year-over-year sales. (*Id.*) The press releases routinely included quotes from Bigland about the increased sales and/or the sales streak. (*Id.*) Palmer signed all but one of the press releases. (*Id.*; *see also id.* ¶ 25.)

Bigland is and, throughout the Class Period, was FCA's Head of U.S. Sales, a position he has held since June 2011. (*Id.* ¶ 26.) In that position, Bigland has full responsibility for sales strategy, dealer relations and operations, order facilitation, incentives and field operations. (*Id.*) He reports directly to Marchionne. (*Id.*) Bigland became a member of FCA's Group Executive Council in September 2011 (*Id.*) During the Class Period, Bigland regularly spoke with investors and securities analysts regarding FCA. (*Id.* ¶ 26.)

Palmer, FCA's Chief Financial Officer ("CFO") since September 2011, also spoke regularly with investors and securities analysts regarding the company during the Class Period. (*Id.* ¶ 25.) In September 2011, Palmer also became a member of FCA's Group Executive Council. (*Id.*) He also has served as CFO of FCA US since June 2009. (*Id.*) In that capacity, he is responsible for all FCA US finance activities. (*Id.*) Palmer also sits on the Board of Directors of FCA US. During the Class Period, Palmer certified FCA's periodic financial reports filed with the SEC. (*Id.*)

In its April 1, 2016 press release, announcing U.S. retail sales for March 2016, FCA claimed that increased sales for the month extended its year-over-year monthly sales gains to six full years. (*Id.* ¶ 306.) In the next two months' press releases, FCA did not mention the sales streak but claimed continued

increased year-over-year sales. (*Id.* ¶¶ 313, 319.) The streak apparently reached 75 months by July 2016. (*Id.* ¶ 6.)

**\*4** FCA recognizes revenue when it ships vehicles to dealerships, not when the dealerships in turn sell vehicles to retail customers. (*Id.* ¶ 59.) Nevertheless, Defendants frequently referred to FCA's U.S. retail sales streak in public statements as evidence of the company's growth and success. (*See, e.g., id.* ¶¶ 95, 98, 149, 174, 194, 200, 202, 207, 211, 218, 223, 224, 270, 276, 291.) Media outlets regularly reported on FCA's consecutive streak of increased year-over-year monthly U.S. sales, noting at times that FCA continued to report growth even when its competitors experienced declining sales and analysts predicted losses. (*See, e.g., id.* ¶¶ 49, 54, 79, 81-86, 92, 96, 153.) Lead Plaintiffs allege in the Complaint that retail sales "provide the investing public, creditors, and partners in potential acquisitions with an important indicator of the underlying health of FCA's business." (*Id.* ¶ 60.) A series of revelations starting in January 2016, however, began to uncover that FCA's increased year-over-year sales streak actually ended in September 2013, and that FCA's claimed increased sales were made possible by "fake" sales reported by franchised dealerships allegedly at the encouragement of executives at FCA headquarters. (*See, e.g., id.* ¶ 173.)

More specifically, Lead Plaintiffs allege in their Complaint that FCA officials encouraged and even bribed dealers with factory cash bonuses, expense reimbursements, and other incentives to carry out sales for which there was no actual buyer—typically at the end of the month to meet the month's sales volume objective. (*See, e.g., id.* ¶¶ 10, 105.) FCA collected retail sales data from dealers through New Vehicle Delivery Reports ("NVDRs"). (*Id.* ¶ 63.) A dealer who submitted an NVDR for a new sale also could cancel the transaction and return the vehicle to the dealer's unsold inventory. (*Id.*) Dealerships would "unwind" the sales before the vehicle warranty went into effect. (*Id.* ¶¶ 99, 113, 333.) While "unwound" sales would be reflected in NVDRs (*see id.* ¶¶ 65, 66.), FCA did not subtract these unwound sales from its monthly reported U.S. sales. (*Id.* ¶¶ 66, 164, 175(d).) Lead Plaintiffs set forth information from two confidential witnesses detailing this scheme.

"CW-1" worked for FCA and its predecessors in various managerial positions from over ten years prior to the Class Period to late 2016. (*Id.* ¶ 28.) During the Class Period, CW-1 was a managerial-level employee with accounting and finance responsibilities in FCA's Denver Business Center.

Palazzolo v. Fiat Chrysler Automobiles N.V., Not Reported in Fed. Supp. (2017)

2017 WL 6389573, Fed. Sec. L. Rep. P 99,934

(*Id.*) CW-1 reported to that center's director, Steven Yandura, who reported directly to Bigland and FCA's Vice President of U.S. Sales Operations, Jeffrey Kommor. (*Id.*) One of CW-1's responsibilities was to process and maintain records of all payment activity to dealers operating within the Denver Business Center's jurisdiction, including marketing related expenses. (*Id.*)

According to CW-1, the Denver Business Center "absolutely" paid dealers to record fictitious sales at Yandura's direction and, based on her [1] observations, the directive was initiated at headquarters. (*Id.* ¶ 108.) CW-1 relates that the practice proliferated in the Denver Business Center after a June 30, 2015 meeting between Bigland, Kommor and the directors of FCA's nine business centers. At that meeting, in response to Yandura's projected sales volume for the Denver Business Center, Bigland and Kommor instructed Yandura to generate additional sales and authorized the release of substantial additional marketing funds to allow him to do so. (*Id.* ¶ 111.) During a subsequent meeting with 30-40 Denver Business Center employees, which included CW-1, Yandura relayed his conversation with Bigland and Kommor. (*Id.*)

[1]     Lead Plaintiffs use feminine pronouns to refer to the confidential witnesses to preserve their anonymity. (Compl. ¶ 28 n.2, ECF No. 34 at Pg ID 661.)

 **\*5**  On June 30, 2015, the Denver Business Center received an extra $150,000 to $180,000 from headquarters, which CW-1 understood was to be used by the center to pay dealers as an incentive to input false sales to maintain the sales streak. (*Id.* ¶¶ 112-113.) CW-1 provides that everyone in the Denver Business Center was expected to participate in the false sales reporting and CW-1 believed the directive came from FCA headquarters based on Yandura's comments. (*Id.* ¶ 113.)

According to CW-1, the June 30, 2015 email approving additional funds for the Denver Business Center came from Bigland or Kommor, was sent to the directors of all nine business centers, and distributed a total of $2 million in additional marketing funds to the nine business centers. (*Id.* ¶ 114.) Based on CW-1's conversations with area sales managers, she believed most of the nine business centers engaged in reporting fictitious sales in June 2015. (*Id.*)

CW-2, an area sales manager in FCA's Southwest Business Center during the Class Period, relates that dealers in her jurisdiction also engaged in reporting fictitious sales. (*Id.* ¶¶

29, 106.) According to CW-2, she started to hear area sales managers use the term "unnatural acts" beginning in 2014 or 2015 to describe "things like reporting vehicles sold that weren't, and then being paid to do it through advertising money." (*Id.*) According to CW-2, area sales managers were "under a lot of pressure" to meet sales goals and to beat the prior year sales numbers in order to keep the sales streak alive. (*Id.* ¶ 121.)

The director of the Southwest Business Center told CW-2 that Bigland and Kommor were "hands on" concerning vehicle sales and that they, along with other headquarters personnel, entered into the FCA in-house system on a daily basis— sometimes several times a day—to track NVDRs. (*Id.* ¶ 122.) CW-2 was aware of at least eleven to sixteen dealerships under the jurisdiction of the Southwest Business Center that participated in the scheme to submit false NVDRs. (*Id.* ¶ 126.) CW-2 provides that fake sales were still occurring when she left the Southwest Business Center in November 2015. (*Id.* ¶ 120.)

Information concerning these fraudulent sales first became public on January 12, 2016, when a group of seven automotive dealers under the common control of Edward F. Napleton filed a lawsuit against FCA US and FCA Realty, LLC in the United States District Court for the Northern District of Illinois ("Napleton Lawsuit"). [2] (*Id.* ¶ 143); *see also Napleton's Arlington Heights Motors, Inc. v. FCA USA LLC*, No. 16-cv-403 (N.D. Ill. filed Jan. 12, 2016). These dealerships were within the jurisdiction of FCA US's Southeast Business Center or its Mid-Atlantic Business Center. (Compl. ¶ 135, ECF No. 34 at Pg ID 699.)

[2]     The dealerships involved in the Napleton lawsuit are located in four different states: Illinois, Florida, Missouri, and Pennsylvania.

The plaintiffs in the Napleton Lawsuit allege that FCA US solicited fraudulent sales reports from certain dealers nationwide to create the appearance of a continual increase in sales volume growth. Mem. Op. & Order, *Napleton's Arlington Heights Motors, Inc.*, No. 16-cv-403 (N.D. Ill. Oct. 4, 2016), ECF No. 62 at 2. According to the plaintiffs' amended complaint, FCA US and its agents devised and executed a scheme to post fraudulently inflated sales numbers through the creation of false NVDRs. *See, e.g.*, Am. Compl., *id.* (filed Mar. 4, 2016), ECF No. 21 ¶ 35. The defendants, the amended complaint alleges, rewarded dealerships with monies and other benefits when they achieved sales targets

2017 WL 6389573, Fed. Sec. L. Rep. P 99,934

FCA US set in its sole discretion and granted priority access to high demand vehicle models to dealers who sold more of those models over other competitors. *Id.* ¶¶ 3-4, 36.

**\*6** FCA issued two separate press releases the day after the Napleton Lawsuit was filed in which it denied the allegations in the complaint. (Compl. ¶ 335, ECF No. 34 at Pg ID 766.) In one of those press releases, FCA stated that it had been aware of the allegations made by the plaintiffs in the Napleton Lawsuit for some time and had conducted an investigation which revealed that the allegations were "baseless[.]" (*Id.* ¶ 336.) Top FCA executives had ordered an internal review in mid-2015, but the investigation in fact uncovered thousands of reported retail vehicle sales for which there had been no buyers (i.e. fake or fraudulent sales). (*Id.* ¶ 378.)

In response to the information revealed in the Napleton Lawsuit, FCA's share price fell 4.2% from a closing price of $7.86 on January 13, 2016 to a closing price of $7.53 on January 14, 2016. (*Id.* ¶ 147.)

On July 18, 2016, news surfaced that the SEC and the United States Department of Justice were investigating FCA's policies for reporting new vehicle sales and had raided FCA's regional business centers and headquarters a week earlier. (Id. ¶ 156.) FCA issued a press release denying the allegations and accusations against it. (*Id.*) In response to the news of the federal investigation, FCA's share price fell 2.53% from a closing price of $6.73 on July 18, 2016 to $6.56 on July 19, 2016. (*Id.* ¶ 160.)

On July 26, 2016, FCA restated its monthly U.S. sales figures for 2011 through June 2016. (*Id.* ¶ 163.) According to these restated figures, FCA's streak of increasing consecutive monthly year-over-year U.S. sales actually ended in September 2013, at month 40. (*Id.*) FCA acknowledged as part of its restatement that dealerships could, in fact, book fake sales and then unwind them in order to meet a volume objective and that FCA previously did not subtract these unwound sales from its monthly reported U.S. retail sales. (*Id.* ¶ 164.) In response to this news, FCA's share price fell 4.29% from a closing price of $7.00 on July 26, 2016 to a closing price of $6.70 on July 27, 2016. (*Id.* ¶ 168.)

Investors of FCA common stock thereafter initiated this lawsuit on July 29, 2016, claiming that Defendants' repeated public assertions of an ongoing streak of year-over-year monthly sales increases artificially inflated the value of the stock, which fell when the truth about those sales was revealed, causing them loss. [3] The Court appointed Lead Plaintiffs and Lead Counsel on January 18, 2017. (ECF No. 31.) Lead Plaintiffs filed their Consolidated Class Action Complaint on March 17, 2017, in which they assert the following two counts: (I) a violation by all Defendants of Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5 promulgated thereunder; and (II) a violation by the individual Defendants (Marchionne, Bigland, and Palmer) of Section 20(a) of the Securities Exchange Act.

[3] Investors actually initiated two separate lawsuits, which this Court consolidated on November 3, 2016. (*See* ECF No. 18.)

### III. Elements of the Claims

To state a claim under Section 10(b) or Rule 10b-5, a plaintiff must allege the following: "(1) a misrepresentation or omission; (2) of a material fact that the defendant had a duty to disclose; (3) made with scienter; (4) justifiably relied on by [the] plaintiffs; and (5) proximately causing them injury." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 668 (6th Cir. 2005) (citations omitted). Under the PSLRA's heightened pleading requirements, any private securities complaint alleging that the defendant made a false or misleading statement must also:

"(1) ... specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed [and]

**\*7** (2) ... state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind."

*Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (emphasis in original) (quoting 15 U.S.C. § 78u–4(b)(1), (2)). Stated differently, the PSLRA "requires [the] plaintiff to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.' " *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 and n.12 (1976)). In seeking to dismiss Lead Plaintiffs' Complaint, Defendants argue that their allegations

2017 WL 6389573, Fed. Sec. L. Rep. P 99,934

do not sufficiently establish the materiality of the alleged false statements and scienter.

"A misrepresentation or an omission is material only if there is a substantial likelihood that a reasonable investor would have viewed the misrepresentation or omission as having significantly altered the total mix of information made available." *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 570 (6th Cir. 2004) (internal quotation marks and citations omitted). The Sixth Circuit has advised that a complaint may be dismissed for failure to demonstrate materiality, "only if '[the misrepresentations or omissions] are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance.' " *Id.* (quoting *Helwig*, 251 F.3d at 563). Ordinarily, materiality is a question of fact for the jury. *Helwig*, 251 F.3d at 563 (citing cases).

Nevertheless, courts have found slight financial inaccuracies (for example, a 2% overstatement of the company's net sales) to be immaterial as a matter of law. *See USM Holdings, Inc. v. Simon*, No. 15-14251, 2016 WL 4396061, at *5 (E.D. Mich. Aug. 18, 2016) (unpublished opinion); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997) (recognizing that in some cases the false information is so insignificant, in relation to the total mix of data available, that it would not have mattered to a reasonable investor). Nevertheless, as the district court recognized in *USM Holdings*, "even relatively small financial errors *can* be material." 2016 WL 4396061, at *5 (emphasis in original) (citing SEC Staff Accounting Bulletin No. 99 (Aug. 12, 19999) (recognizing a 5% rule of thumb for assessing the materiality of accounting discrepancies, but also explaining that qualitative factors may make discrepancies of less than 5% material). "Qualitative factors may cause misstatements of quantitatively small amounts to be material." *Litwin v. The Blackstone Grp., L.P.*, 634 F.3d 706, 717-18 (2d Cir. 2011). As the Sixth Circuit has stated: "Materiality is about marketplace effects, not just mathematics." *Helwig*, 251 F.3d at 563.

The Sixth Circuit defines the scienter requirement for proving securities fraud as "knowing and deliberate intent to manipulate, deceive, or defraud and recklessness[.]" *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 469 (6th Cir. 2011) (internal quotation marks and citation omitted). "Recklessness" is defined as " 'highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be obvious that any reasonable man would have known it.' " *Id.*

at n.3 (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681 (6th Cir. 2004)). The Supreme Court advised in *Tellabs, Inc.*, "[t]o qualify as 'strong' ..., an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. The *Tellabs* Court emphasized that courts should take a holistic approach when evaluating the plaintiff's complaint, focusing on "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 326; *see also Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 917 (6th Cir. 2007) ("We ... employ a 'totality of circumstances' test in assessing whether a plaintiff has adequately alleged scienter.").

### IV. Defendants' Arguments and Analysis

#### A. Materiality

 **\*8** Contending that "Plaintiffs' claims are premised on FCA US LLC's ... publication of a new methodology for compiling and reporting monthly vehicle sales to end users[ ]" and that the newly calculated U.S. sales represent a "tiny adjustment[ ]" from the originally stated figures (0.2% over a period of five and a half years and 0.04% during the 21-month putative class period), Defendants argue that the alleged false statements are not material as a matter of law. (Defs.' Mot. at 2, ECF No. 38 at Pg ID 823.) Defendants contend that FCA's restatement of its sales figures "had little impact on FCA's stock price, which actually *increased* by 1.16% on July 26, 2016, from $6.92 to $7.00." [4] (Defs.' Br. in Supp. of Mot. at 2, ECF No. 39 at Pg ID 840.) Only by misconstruing the gist of Lead Plaintiffs' claims, however, can Defendants realistically challenge Lead Plaintiffs' ability to satisfy the materiality requirement.

[4]  Defendants cite two cases after noting the increase in FCA's stock price the day it restated its sales figures: *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000) and *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013). (Defs.' Br. in Supp. of Mot. at 23, ECF No. 39 at Pg ID 861.) Both cases discuss market efficiency and the presumption that a public, material misrepresentation will be reflected in the security's price in an efficient market. *Oran*, 226 F.3d at 282; *Amgen Inc.*, 133

Case 4:23-cv-13132-SDK-EAS ECF No. 42-6, PageID.2540 Filed 11/15/24 Page 88 of 109

Palazzolo v. Fiat Chrysler Automobiles N.V., Not Reported in Fed. Supp. (2017)
2017 WL 6389573, Fed. Sec. L. Rep. P 99,934

S. Ct. at 1192. As the court stated in *Oran*, in an efficient market, materiality can be judged by looking at the movement of the stock "in the period *immediately* following disclosure." 226 F.3d at 282 (emphasis added). The *Oran* court did not define "immediately," although in a subsequent decision the Second Circuit indicated that "[t]his does not mean instantaneously, of course[.]" *In re Merck & Co., Inc. Sec. Litigation*, 432 F.3d 261, 269 (2d Cir. 2005). This Court does not believe the "period immediately following the disclosure at issue" is necessarily even limited to the day the disclosure is made. According to Lead Plaintiffs' Complaint, the stock price fell 4.29% the day after FCA restated its sales figures, from a closing price of $7.00 on July 26 to $6.70 on July 27. (Compl. ¶ 366, ECF No. 34 at Pg ID 778.)

Lead Plaintiffs do not premise their claims simply on FCA's stated U.S. sales figures. Rather, Lead Plaintiffs base their claims on Defendants' repeated assertions of a continued sales streak throughout the putative class period when the streak in fact ended in September 2013. The purported length of the streak, Lead Plaintiffs maintain, misled investors (among others) about the company's financial strength and success. As such, if it enabled FCA to claim a continuation of increased year-over-year monthly sales, even a slight overstatement regarding the level of U.S. sales was material.

As an initial matter, in deciding Defendants' motion to dismiss, this Court may not consider the mathematical computations Defendants introduce in their motion to evaluate the plausibility of the factual allegations in the Complaint. Rather, the Court must consider only the facts alleged in Lead Plaintiffs' Complaint, which must be accepted as true. This includes Lead Plaintiffs' assertion that FCA previously did not subtract unwound sales from its monthly reported U.S. sales. [5] Moreover, even if Defendants' computations are correct and a restatement of FCA US's sales resulted in a "miniscule effect on the number of reported sales" (Defs.' Br. in Supp. of Mot. at 26, ECF No. 39 at Pg ID 864), this does not undermine Lead Plaintiffs' claim that including false sales in its retail sales figures enabled FCA to present to the public the image that it was experiencing a six-year consecutive streak in year-over-year sales growth.

[5]     In support of their argument that the fraudulent scheme alleged by Lead Plaintiffs "defies common sense and basic math", Defendants contend that

the net number of reported sales over a given period would not be impacted by unwound sales. (Defs.' Br. in Supp. of Mot. at 25-26, ECF NO. 39 at Pg ID 863-64.) According to Defendants, "[i]nducing a dealer to submit and then unwind fake NVDRs in one month would simply decrease sales in the month in which the unwound vehicles were sold[.]" (*Id.*) Lead Plaintiffs assert, however, that FCA was not subtracting the unwound sales from its monthly reported U.S. sales under the alleged fraudulent scheme. Moreover, what is significant for purposes of Lead Plaintiffs' claims is not the impact of the unwound sales on the number of net sales, but rather the purported streak. As Lead Plaintiffs point out, even in FCA's restated figures, it may have chosen the month to subtract an unwound sale (that is, between the month the "fake" sale was recorded, the month it was rewound, and the month the vehicle was resold) to maintain the appearance of growth. As Lead Plaintiffs additionally argue, FCA's restated sales figures should not be accepted as true at this stage of the proceedings.

**\*9** Lead Plaintiffs demonstrate in their Complaint that Defendants frequently touted the consecutive monthly year-over-year U.S. sales increases in public statements as evidence of FCA's growth. For example, as Lead Plaintiffs cite, "Bigland maintained that the sheer length of the streak proved that it was not simply the result of 'easy comparisons': 'when you have gone almost five years, it silences a lot of people who have alleged you have easy comparisons.' " (Compl. ¶ 82, ECF No. 34 at Pg ID 680.) With regard to the streak, Marchionne commented: " 'we've had almost six years of uninterrupted growth in the United States.... That's not an inconsequential feat.' " (*Id.* ¶ 7, at Pg ID 653.) According to the Complaint, "Marchionne added that the Company's streak was proof that FCA was doing something right." (*Id.*) All of FCA's monthly press releases from November 2014 until April 2016 headlined the sales streak.

Media outlets focused on the streak repeatedly when reporting on FCA's viability, and it was the extensive length of the streak that reporters found "virtually unheard of for American auto manufacturers," "jaw-dropping[,]" and "astonishing[.]" (*Id.* ¶¶ 81, 82, 84 ECF No. 34 at Pg ID 680, 681.) As Lead Plaintiffs set forth in the Complaint, media outlets and financial analysts frequently cited the "streak as concrete evidence that [FCA] had turned the corner and was flourishing." (*Id.* ¶ 80, ECF No. 34 at Pg ID 680.) One

Palazzolo v. Fiat Chrysler Automobiles N.V., Not Reported in Fed. Supp. (2017)

2017 WL 6389573, Fed. Sec. L. Rep. P 99,934

financial news outlet explained: " 'Investors weigh monthly sales reports closely for signs of how auto companies are faring.' " (*Id.* ¶ 60, at Pg ID 672.)

The restatement of FCA US's sales may have been quantitatively insignificant. Nevertheless, the previously stated sales figures enabled FCA to maintain the perception of a consecutive streak of year-over-year sales growth for over six years. Lead Plaintiffs' Complaint reflects that this streak was qualitatively material to investors. In other words, the public, media, and investors were not focused on the specifics of FCA US' monthly sales figures, but rather on the fact (or purported fact) that those figures led to a continuation of FCA's growth streak.

For these reasons, the Court cannot find that Defendants' purported false statements or omissions were immaterial as a matter of law.

**B. Scienter**

Defendants argue that Lead Plaintiffs do not plead facts giving rise to the required "strong inference" that they acted with scienter. According to Defendants, because FCA US would have reported more sales from January 2011 through June 2016 under its new methodology, its growth was real and thus there could have been no scheme to "create the perception of growth." Defendants also maintain that Lead Plaintiffs' allegations of scienter are insufficient because they are "based almost exclusively on conclusory and unsubstantiated assertions from two confidential witnesses, media reports and unproven allegations lifted from a single unverified complaint in a separate action filed by two FCA US dealerships." (Defs.' Mot. at 3, ECF No. 38 at Pg ID at Pg ID 824.)

Again, Lead Plaintiffs do not base their claims on FCA US's sales figures. Instead, they premise their claims on Defendants' alleged creation of the perception of a streak of consecutive sales growth through, in part, fraudulent sales. Lead Plaintiffs plead sufficient facts that, when viewed collectively, suggest Defendants were aware of—and in Bigland's case, perhaps directed—the conduct leading to the false sales figures used to continue this streak. At the very least, Lead Plaintiffs allege several red flags and suspicious facts that should have caused Defendants to become aware of the alleged fraudulent scheme.

For example, in mid-2015, business center employees and dealerships began complaining to corporate headquarters about directives to submit false sales to meet sales volume quotas. (Compl. ¶¶ 138, 139, ECF No. 34 at Pg ID 701.) Defendants confirmed that they were made aware of the allegations and ordered an internal investigation. (*See, e.g.*, Compl. ¶ 144, ECF No. 34 at Pg ID 703.) That investigation revealed thousands of fraudulent vehicle sales for which there were no buyers. (*Id.* ¶ 140.) Nevertheless, for approximately another year, Defendants continued to claim sales growth based on figures that included fraudulent sales and to tout the streak in increased sales.

**\*10** Defendants also continued to make those claims after the Napleton Lawsuit was filed, where it again was asserted that FCA was pressing dealerships to report fraudulent sales to maintain the streak. [6] Defendants' public statement that the allegations in the lawsuit were baseless, where a previous internal investigation revealed at least some of them to be true, supports a finding of scienter. At the very least, the Napleton Lawsuit put Defendants on notice of the alleged fraud.

6      It does not matter for purposes of deciding Defendants' motion to dismiss whether the allegations in the Napleton Lawsuit are true. The Court need decide only whether the allegations in Lead Plaintiffs' Complaint, viewed through the prisms of Rules 9(b) and 12(b)(6) and the PSLRA, state a claim for relief. According to Lead Plaintiffs, the filing of the Napleton Lawsuit, regardless of whether it has merit, should have been a red flag to Defendants concerning the fake sales used to increase FCA US sales.

The information provided by two confidential witnesses who worked at different FCA business centers further supports an inference of scienter. These witnesses indicate that FCA US headquarters imposed minimum monthly sales targets for its franchise dealers and solicited, encouraged, and bribed dealers through its business centers to submit fake NVDRs during the last few days of each sales month to meet or exceed those sales goals. The confidential witnesses' statements reflect that this occurred in most, if not all, of FCA's nine business centers. As such, unlike a case cited by Defendants, these witnesses do not "describe the anomalies of a rogue fiefdom," but rather "company-wide practices that rise to the level of a core operation[,]" contributing to a strong inference that the individual Defendants were aware of the fraud. *See*

Case 4:23-cv-13132-SDK-EAS ECF No. 42-6, PageID.2542 Filed 11/15/24 Page 90 of 109

Palazzolo v. Fiat Chrysler Automobiles N.V., Not Reported in Fed. Supp. (2017)

2017 WL 6389573, Fed. Sec. L. Rep. P 99,934

*In re Waschovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 358 (S.D.N.Y. 2011).

Contrary to Defendants' assertions, the allegations in Lead Plaintiffs' Complaint are sufficient in terms of detail to give weight to these witnesses' statements. The statements are not "vague and conclusory" and provide sufficient particularity as to "what, when, where, and how [these complaining witnesses] knew" the alleged facts. *Ley v. Visteon*, 543 F.3d 801, 811 (6th Cir. 2008). Lead Plaintiffs' further allegations concerning the structure of FCA and Marchionne's, Bigland's, and Palmer's central roles within the corporate structure and involvement in day-to-day operations add to the totality of circumstances suggesting that they would have been aware of —if not played a role in—the alleged fraudulent scheme.

For these reasons, Lead Plaintiffs allege sufficient facts in their Complaint to give rise to a strong inference that Defendants acted with the required state of mind.

## V. Conclusion

In summary, the Court holds that Lead Plaintiffs allege sufficient facts to satisfy the pleading requirements in Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the PSLRA.

Accordingly,

**IT IS ORDERED** that Defendants' Motion to Dismiss the Consolidated Class Action Complaint (ECF Nos. 38, 39) is **DENIED**.

## All Citations

Not Reported in Fed. Supp., 2017 WL 6389573, Fed. Sec. L. Rep. P 99,934

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 7090820
Only the Westlaw citation is currently available.
United States District Court,
M.D. Tennessee,
Nashville Division.

Edward B. WINSLOW, Plaintiff,
v.
BANCORPSOUTH, INC., et al., Defendants.

No. 3:10–00463.
|
April 26, 2011.

**Attorneys and Law Firms**

Catherine J. Kowalewski, Darren J. Robbins, David C. Walton, Dennis J. Herman, Christopher M. Wood, Robbins Geller Rudman & Dowd LLP, San Diego, CA, Jeffrey A. Berens, Robert J. Dyer, III, Dyer & Berens LLP, Denver, CO, Corey D. Holzer, Marshall Dees, Michael I. Fistel, Jr., Holzer, Holzer & Fistel, LLC, Atlanta, GA, Douglas S. Johnston, Jr., George Edward Barrett, Barrett Johnston, LLC, Timothy L. Miles, Barrett, Johnston & Parsley, Nashville, TN, for Plaintiff.

Joseph A. Woodruff, Heather J. Hubbard, Waller, Lansden, Dortch & Davis, LLP, James N. Bowen, Milton S. McGee, III, Steven Allen Riley, Riley, Warnock & Jacobson, Nashville, TN, Larry B. Childs, Tera Rica Murdock, Waller, Lansden, Dortch & Davis, LLP, Birmingham, AL, for Defendants.

### *REPORT AND RECOMMENDATION*

JOHN S. BRYANT, United States Magistrate Judge.

**\*1  To: The Honorable William J. Haynes, Jr.**

The District Judge has referred this case to the undersigned for assorted purposes, including the formulation of a Report and Recommendation for the disposition of any Motion filed pursuant to Rule 12 of the Federal Rules of Civil Procedure (Docket No. 23). In accordance with that reference, the undersigned has considered Defendants' Motion to Dismiss and Memorandum of Law in Support thereof (Docket Nos. 41 & 44), Plaintiff's Response (Docket No. 48), and Defendants' Reply (Docket No. 50), along with the voluminous documents attached to those filings. For the following reasons, the undersigned recommends that the Motion to Dismiss be denied.

### I. *INTRODUCTION*

This is a putative class action against BancorpSouth Inc. ("Bancorp South") and certain of its officers and/or directors for alleged violations of the Securities and Exchange Act of 1934 ("Exchange Act"). Plaintiff Edward B. Winslow filed suit, as lead Plaintiff, on behalf of himself and a proposed class of persons who purchased publicly traded securities of BancorpSouth from April 23, 2009, until February 25, 2010 (the "class period").

The upshot of Plaintiff's 109–page, 245–paragraph Consolidated Amended Complaint (Docket No. 36) is that Defendants, in the face of an ongoing economic recession, lured investors by claiming to have a strong loan portfolio that was more resistant to the rising credit delinquency and foreclosure rates plaguing other banking and financial institutions. BancorpSouth attributed its superior financial performance to several factors, including its conservative lending policies, the high credit quality of its loan portfolio, its community-based lending strategy, its strong internal controls, its detailed analysis of repayment risks, and its focus on the early identification of borrowers with potential repayment problems.

However, Plaintiff claims these things were vastly overstated by BancorpSouth, leading to significantly understated loan loss reserves which thereby increased a borrower's risks. Indeed, Plaintiff claims that no later than April 23, 2009— the start of the proposed class period—BancorpSouth, just like other financial institutions in the recessionary market, was struggling to get its borrowers to make payments on their loans. Nevertheless, BancorpSouth ignored warnings that its existing controls over problem loans were inadequate, ignored conditions suggesting the declining credit of its borrowers, and repeatedly agreed to modify troubled loans to defer repayment obligations, rather than record a bad debt expense or increase loss reserves. Such acts and omissions purportedly were in violation of Sections 10(b), Rule 10b–5, and 20(a) of the Exchange Act and accompanying regulations, and allegedly caused millions of dollars in losses to the putative class members.

With that general background, the Court turns to the specific allegations in Plaintiff's Consolidated Amended Complaint.

2011 WL 7090820

In doing so, the Court recognizes that claims under the Exchange Act, and specifically Section 10(b), are intensely fact driven and subject to heightened pleading standards. Therefore, the Court sets forth Plaintiff's factual allegations in some detail, tracking many of the specific allegations in the Consolidated Amended Complaint in order to preserve the import and substance of those allegations. Those facts will be expanded upon where necessary for purposes of the legal discussion.

## II. *FACTUAL ALLEGATIONS*

 **\*2** Plaintiff Winslow is a shareholder of BancorpSouth, having purchased 400 shares of stock at a cost of $8,838.96 on February 11, 2010. (Docket No. 36, Consolidated Amended Complaint ¶ 15 & attached certification). Defendant Bancorp South Inc. is a financial holding company which, through its principal bank subsidiary, BancorpSouth Bank [1] conducts a general commercial banking, trust and insurance business through 318 offices located primarily in the southeastern United States. (*Id.* ¶ 16).

[1]     BancorpSouth Inc. and BancorpSouth Bank will generally be referred to collectively as "BancorpSouth." Where a distinction is necessary, the former will be referred to as "the company," and the latter will be referred to as "the bank."

BancorpSouth focuses its financial services on individuals and small- to medium-size businesses. As of the start of the class period, BancorpSouth had total assets of approximately $13.2 billion and total deposits of approximately $10.7 billion. It regularly communicates with investors through periodic filings with the Securities & Exchange Commission ("SEC"), press releases, conference calls, and investor and analyst presentations. [2] (*Id.* ¶ 16).

[2]     This information is also available to shareholders in the Investor's relations section of BancorpSouth's website: www.bancorpsouthonline.com.

In addition to BancorpSouth, Plaintiff names four individual Defendants. Aubrey B. Patterson, Jr. ("Patterson") is BancorpSouth's Chairman of the Board, Chief Executive Officer, and Chairman of the Board's Executive Committee. James V. Kelley ("Kelley") is President and Chief Operating Officer of BancorpSouth, who, aside from Patterson, is the only BancorpSouth executive on the Board of Directors.

William L. Prater ("Prater") is Treasurer and Chief Financial Officer ("CFO") of the company and Executive Vice President, CFO and Cashier of the bank. Finally, Gregg Cowsert ("Cowsert") is Vice Chairman and Chief Lending Officer of the bank, as well as an Executive Vice President of the company, and is responsible for directing the commercial loan activities of the bank and approving commercial loans in excess of $2 million. (*Id.* ¶¶ 17–20).

The first three individual Defendants, Patterson, Kelley, and Prater are responsible for (1) reviewing and signing Forms 10–K filed with the SEC; (2) leading or participating in quarterly conference calls with shareholders; (3) leading or participating in presentations about the company at financial services conferences; and (4) reviewing and contributing to press releases issued by BancorpSouth. Patterson and Prater are also responsible for signing Sarbanes–Oxley Act of 2002 ("Sarbanes–Oxley") certifications attesting to the accuracy of the BancorpSouth's financial results and the adequacy of its internal controls. Cowsert, as chief lending officer, participates in the quarterly conference calls with shareholders, the presentations at financial services conferences, and is responsible for reviewing and/or contributing to press releases issued by BancorpSouth. (*Id.* ¶¶ 17–20).

Over 60% of BancorpSouth's revenues are derived from its loan portfolio, with three-fourths of that portfolio being comprised of real estate loans. (*Id.* ¶ 24). More germane to this case, BancorpSouth concentrates heavily on construction, acquisition and development ("CA & D") loans used to finance commercial and residential home developments. [3] Those CA & D loans include both loans and credit lines for the purpose of purchasing and developing land into commercial or residential subdivisions and represented 17% of the bank's loans at the outset of the class period. This percentage was almost double that of most competitors whose CA & D portfolios averaged 9% of the total loan portfolio. (*Id.* ¶¶ 26).

[3]     Plaintiff claims that by virtue of this specialization, BancorpSouth has gained a reputation among developers as a "dirt bank." (*Id.* ¶ 25).

 **\*3** CA & D loans can be riskier than other, more conventional loans because contractors can run into unanticipated problems or economic difficulties during construction, a project may not be completed, or the project may not achieve the results the contractor anticipates, all of which can be exacerbated during economic downturns.

Winslow v. BancorpSouth, Inc., Not Reported in F.Supp.2d (2011)
2011 WL 7090820

To guard against such risks, the Federal Deposit Insurance Corporation ("FDIC") requires that lenders undertake any of a number of risk management measures in relation to CA & D loans, including maintaining strong capital levels based upon market conditions, analyzing the collectibility of such loans at least quarterly to ensure that the loan loss allowances cover estimated credit losses, creating a credit review and rating system which accurately reflects the borrower's condition, maintaining recent financial statements, evaluating the continued relevancy of appraisals, and insuring that the bank's loan workout department is adequately staffed by competent personnel to handle problem loans. (*Id.* ¶ 28). [4]

[4] According to Plaintiffs, BancorpSouth failed to follow the FDIC directives and was extremely aggressive in lending to developers, more so than most other lenders. Tactics included full value lending on some projects without any "downside protection" if the value of the project or the land on which it was built declined; failure to reappraise collateral; and having loan-funded interest reserves which paid the interest even if the project faltered, thereby making it appear that what was a troubled loan was actually current. (*Id.* ¶¶ 29–30).

BancorpSouth extolled its supposed conservative lending practices, strong balance sheet, and high lending standards, making it attractive to investors who were recoiling from the economic downturn during 2008 and 2009. While BancorpSouth's credit losses had increased during this period, its stated reserves were higher and its net charge-off ("NCO") rate [5] was lower than the industry norm. BancorpSouth allegedly encouraged investors to rely on such figures as a reliable indicator of the strength of the company's loan portfolio, the quality of its borrowers, the conservativism of its lending practices, and its ability to identify and avoid problem loans. (*Id.* ¶ 33–34). While BancorpSouth acknowledged its greatest risk was in its CA & D loan portfolio, it assured investors it had taken steps to reduce the number and amount of those loans and was closely monitoring existing CA & D loans to identify and address problems at an early stage. (*Id.* ¶ 35).

[5] The NCO reflects the percentage of write-offs and delinquency reserves to the total loan portfolio.

Despite these assurances to investors, BancorpSouth was allegedly at an increasing of risk of loan defaults, particularly in relation to CA & D borrowers in certain particularly

distressed areas. Indeed, by the third quarter of 2008, many CA & D borrowers were delinquent on their loans, and some sought loan workouts, deferrals, or filed for bankruptcy. To address these problems, BancorpSouth allegedly deferred the interest due and added it to the back end of the loan, routinely extended maturity dates and/or otherwise modified terms to accommodate borrowers, all of which were done to downplay a serious problem. Nevertheless, Plaintiff alleges that the problem was serious enough that, in late 2009, bank regulators required (and all Defendants well-knew) that some of the modified loans be converted into standard 15 or 20 year loans which actually ensured defaults because borrowers who could not even make interest payments would not be able to make interest and principal payments. (*Id.* ¶¶ 37–41, 158).

**\*4** BancorpSouth issued its 3Q09 [6] financial report on October 22, 2009, which was below estimates, due in part to an increase in loss reserves and an increase in charges for nonperforming assets. BancorpSouth insisted that the results were primarily the result of a large, but nonperforming, commercial real estate loan, and not due to the quality of loans awarded or increased risks from nonperforming loans. Patterson issued a press release [7] the following day seeking to assure investors that all was well, that BancorpSouth's focus was on "early identification and decisive resolution of any credit issues," and that this focus, and BancorpSouth's strict credit policies would keep problems to a minimum. Patterson voiced similar sentiments on October 23, 2009 during a conference call [8] with Wall Street analysts, telling them that BancorpSouth was "well capitalized and well positioned" with "consistently strong results in our performance," and that BancorpSouth's "conservative business model and [its] strong and experienced team" would enable it "to consistently outperform our industry peer group." He also stated there was some "mild improvements in the overall real-estate climate." (*Id.* ¶¶ 42–43, 152–158).

[6] Quarterly reports are abbreviated by month and year. Thus "3Q09" refers to the third quarter of 2009. Yearly reports are prefaced simply by "FY" for fiscal year, and thus FY2009 refers to fiscal year 2009.

[7] Prater was listed as the contact person on the press release.

[8]    The other three individual Defendants, Kelley, Prater, and Cowsert, participated in the conference call. (*Id.* ¶ 178(b)).

Four months later, on January 22, 2010, BancorpSouth filed a Form 8–K [9] reporting 4Q09/FY09 financial results. The day before, but after the market closed, BancorpSouth issued a press release which indicated "earnings of $0.23 per diluted share for fourth quarter 2009 and $1.25 for full year." [10] This was distributed to the market via financial news wires. (*Id.* ¶ 70).

[9]    In addition to filing annual reports (Form 10–K) and quarterly reports (Form 10–Q), public companies must report material events important to shareholders on Form 8–K.

[10]    For ease of reference, the announcement of the increase and the corresponding Form 8–K will be referred to as the "4Q09/FY09 financial results."

The 4Q09/FY09 financial results generally showed that loan reserves, non-performing assets, and net charge-off rates all appeared to better than the comparable figures for BancorpSouth's competitors, suggesting that BancorpSouth was continuing to manage and respond to credit issues as they arose during the continuing economic downturn. Still the results included an increase in credit reserves and charge-offs for non-performing loans, but those increases were downplayed by BancorpSouth as reflecting isolated and manageable problems, and the company again assured investors that it was aware of, and on top of, any potential problem loans. (*Id.* ¶¶ 45–48, 187).

Some financial observers were not overly impressed with the 4Q09/FY09 results. For example, Robinson Humphrey, a Sun Trust analyst, opined that BancorpSouth was recognizing the credit crunch later than most of its peers, was now feeling greater credit pressure than those competitors, and that BancorpSouth recognized its CA & D loans "have gotten worse recently for some of their more established clientele in larger markets." (*Id.* ¶ 48). Similarly, J.P. Morgan wrote that while BancorpSouth's "assets still best peers," "cracks were evident in the portfolio in 4Q, stemming from the construction and development portfolio." (*Id.* ¶ 187). Plaintiff claims the financial results and immediate concerns expressed by analysts, though far from revealing the whole truth about BancorpSouth's exposure to problem loans, was sufficiently alarming that BancorpSouth's common stock declined $1.32 per share on January 22, 2010, losing 5.4% of its value, and causing million of dollars in damages to the proposed class participants in this case. (*Id.* ¶¶ 48 & 187).

**\*5** During a conference call with analysts on its 4Q09/FY09 financial results, BancorpSouth dismissed concerns that the financial results might reveal a weakening credit quality and greater exposure to the risks of defaults and delinquencies, and assured investors it was well reserved for any credit losses that might arise from a continued economic downturn. Specifically, Patterson told investors that "BancorpSouth's overall performance for the fourth quarter and for all of 2009 was very consistent with the expectations inherent in our conservative long-term approach to the business." He also said: "we see that our credit quality continues to be strong and we are well reserved against potential losses. We expect industry data for the fourth quarter and for 2009 will again show that our loan portfolio is performing substantially better than our peer group." As for the increase in nonperforming loans during the fourth quarter, Patterson told investors that was "not unexpected in the context of [a] troubled real estate market," but assured investors that the Company "remain[s] focused on early identification and effective resolution of potential credit problems" and that its non-performing loans and net charge-off amounts "remain at very manageable levels." (*Id.* ¶ 49). Thereafter, analysts again opined that BancorpSouth was in a position to outperform peers based upon the company's "solid fundamentals, modest credit issues, and solid capital." (*Id.* ¶ 50).

Assurances about the propriety of BancorpSouth's lending practices were again provided at two separate analyst conferences held in early February 2010. (*Id.* ¶ 50). On February 2, 2010, Patterson, Prater, and Cowsert gave a presentation at the Morgan Stanley U.S. Financial Conference, during which Prater provided a detailed breakdown of the company's financial status based upon the 4Q09/FY09 financial results. (*Id.* ¶ 74(b)). At the second conference on February 10, 2010, Kelley and Prater made a presentation at the Sterne, Agee & Leach Financial Services Symposium, going through the 4Q09/FY09 financial results in detail. (*Id.* ¶ 74(c)). At both conferences, BancorpSouth basically repeated and reaffirmed the operating results for 4Q09 and FY 10 as reported on January 21, 2010, and indicated the company was outperforming its peers. (*Id.* ¶¶ 51, 74(a) & (b)).

The 4Q09/FY09 financial results qualified the individual Defendants, collectively, to more than $1 million in bonus compensation and combined stock and stock option awards

valued at more than $2.5 million.[11] Sixty-two other executives also received bonuses based upon those results. (*Id.* ¶¶ 8, 48).

[11] On January 27, 2010, the Executive Compensation and Stock Incentive Committee met and certified the bonuses to the individual Defendants. Historically, the Committee's decision to award bonuses was often based upon unaudited financial reports and was typically paid out prior to the company filing its Form 10–K. (*Id.* ¶¶ 213, 214).

As it turns out, the 4Q09/FY09 financial results that had been reported on January 21, 2010 were incorrect insofar as they revealed a profit of $0.23 per share in the fourth quarter and an annual profit of $1.25 per share. In actuality, BancorpSouth suffered a quarterly loss of $0.03 per share that reduced annual earnings to $0.99 per share. (*Id.* ¶ 57). The differences were attributed to BancorpSouth's failure to disclose tens of millions of dollars in nonperforming and risky loans. (*Id.* ¶ 53). Nevertheless, those who received bonuses based upon the 4Q09/ FY09 financial results were allowed to retain those bonuses. (*Id.* ¶ 48).

**\*6** BancorpSouth recognition of possible problems with the 4Q09 and FYO9 financial results surfaced on February 25, 2010. In a press release issued that day, the company told investors it would be unable to timely file its FY09 Report on Form 10–K because "management has determined, in consultation with BancorpSouth's independent registered public accounting firm and with the concurrence of the Audit Committee of the Board of Directors, that certain asset quality indicators, including the allowance for credit losses, and their impact on BancorpSouth's financial statements for the quarter ended December 31, 2009 should be further reviewed." (*Id.* ¶ 53, 71). BancorpSouth also admitted that it would need to reduce the quarterly and annual earnings announced on January 21, 2010 by booking adjustments to its credit reserves that would decrease its net income. (*Id.* ¶ 53).

Market analysts, including Macquarie Equities Research ("Macquarie") and J.P. Morgan were quick to express various concerns. Macquarie indicated that the delayed 10–K filing was "a negative" and would likely result in a restatement of 4Q09 earnings, a possible reduction in dividends, and a capital raise. (*Id.* ¶ 54). J.P. Morgan opined that, given BancorpSouth's high concentration in construction loans, BancorpSouth's construction portfolio was a logical target for review and it "would be cautious of the shares in light

of yesterday's disclosures which are expected to result in a downward revision to income." (*Id.* ¶ 55).

With BancorpSouth's announcement that the Form 10K would be delayed, BancorpSouth's stock dropped $3.10 per share to close at $19.47 on February 26, 2010. This was a one-day decline of over 13% on a volume of over 6.8 million shares, and nearly ten times its average during the class period. (*Id.* ¶ 56).[12] It is this stock price drop which is at the core of this lawsuit.

[12] In contrast, the KBW Regional Banking Index showed a 0.4% increase for regional banks on February 26, 2010. (*Id.* ¶ 185).

On March 15, 2010, BancorpSouth filed its Form 10–K reporting its FY09 financial results. The report included a $27.6 million increase in the provision for credit losses, a $3.8 million increase in valuation allowances included as part of a $4.5 million increase in foreclosure expenses, and a $21.6 million reduction in net income.[13] This reduction in net income, as already noted, resulted in a quarterly loss of $0.03 per share that reduced fiscal year earnings to 0.99 per share, a 21% reduction. (*Id.* ¶ 57).

[13] Additionally, the report indicated that non-performing loans and leases of $186.5 million represented 1.91% of net loans and leases at year end (as compared with the $145.1 million and 1.48% previously reported) and that the NCO ratio of charge-offs to average loans and leases had climbed to 1.27% in 4Q09 (as compared with the 1.01% previously reported).

A press release issued the same day as the Form 10–K filing confirmed that the 4Q09/FY09 financial results announced on January 21, 2010 had overstated BancorpSouth's net income and earnings per share ("EPS") because the provisions for credit losses and amount of nonperforming loans and leases were understated. The report itself also acknowledged internal control weaknesses led BancorpSouth to issue incorrect 4Q09/FY09 financial results. Specifically, the report stated:

> As a result of management's evaluation of the Company's internal control over financial reporting, management identified a material weakness in the Company's internal control over financial reporting related to the determination of the allowance for credit losses. The material weakness resulted from the aggregation of the following deficiencies:

2011 WL 7090820

*7 • Ineffective controls to timely recognize the impact of changes in credit quality on the grading of loans in the determination of the allowance for credit losses.

• Personnel involved in loan modifications had insufficient knowledge to appropriately identify modifications to be communicated to accounting personnel for accounting and disclosure consideration.

• Ineffective controls to ensure updated appraisals for loans are obtained.

This material weakness resulted in a material error in the allowance for credit losses that was corrected prior to the issuance of the Company's financial statements. Additionally, as a result of the material weakness, management has concluded that the Company's internal control over financial reporting was not effective as of December 31, 2009.

(*Id.* ¶ 59 & Form 10–K at 54).

Though outside the date parameters of the class period, Plaintiff claims that, through the next several months, BancorpSouth disclosed further weaknesses in internal controls and increases in loan loss reserves. Plaintiff claims this is something which should not have been necessary since BancorpSouth, with the release of its Form 10–K, claimed to have reviewed all of its outstanding reserves and was confident from that review that the reserves were adequate to cover any further losses from nonperforming loans.

Nevertheless, the increases in loan loss reserves caused additional losses to the members of the putative class that retained BancorpSouth shares through July 2010. Specifically, when BancorpSouth issued its 1Q10 financial results on April 22, 2010, it significantly missed analyst estimates (expected EPS—$0.20; reported—$0.10) due to higher than expected provisions for loan losses, causing the value of BancorpSouth's common stock to fall 4% on April 23, 2010 and close at $22.33 per share. This was followed by Bancorp South's July 22, 2010 press release announcing its 2Q10 financial results which indicated that the provision for credit loss had increased to $62.4 million, its nonperforming loans and leases had increased by $66.6 million, and that its total nonperforming assets were approximately $370 million as of June 30, 2010, causing common shares to fall another 16% to $14 per share on July 23, 2010. (*Id.* ¶¶ 67–69).

Based upon the foregoing, Plaintiff's Consolidated Amended Complaint is in two counts. In Count I, he alleges that the Defendants violated Section 10(b) and Rule 10b–5 of the Exchange Act. In Count II, he alleges violations of Section 20(a) of the Exchange Act in that Defendants and/or persons under their control allegedly violated Section 10(b) and Rule 10b–5.

### III. *STANDARDS OF REVIEW*

As a general rule, in considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must take "all well-pleaded material allegations of the pleadings" as true. *Fritz v. Charter Township of Comstock,* 592 F.3d 718, 722 (6th Cir.2010). The factual allegations in the complaint "need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." *Id.* (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct., 1937, 1949–50, 173 L.Ed.2d 868 (2009)). " 'A legal conclusion couched as a factual allegation,' " however, "need not be accepted as true on a motion to dismiss, nor are recitations of the elements of a cause of action sufficient." *Id.* (quoting *Hensley Mfg. v. ProPride, Inc.,* 579 F.3d 603, 609 (6th Cir.2009) and *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)). Further, in determining whether a complaint sets forth a plausible claim, a court may consider not only the allegations, but "may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice." *Ley v. Visteon Corp.,* 543 F.3d 801, 805 (6th Cir.2008) (citation omitted).

*8 Where, as here, a complaint contains allegations of fraud under Section 10(b) of the Exchange Act, additional pleading requirements under Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA") apply. The Sixth Circuit has summarized those requirements as follows:

Because § 10(b) claims sound in fraud, the pleading strictures of Federal Rule of Civil Procedure 9(b) apply.... Thus, the complaint must " '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " ...

2011 WL 7090820

Bolstering this rule of specificity, the PSLRA imposes further pleading requirements.... First, the complaint must "specify each statement alleged to have been misleading" along with "the reason or reasons why the statement is misleading." ... Second, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."

*Indiana State Dist. Council of Laborers v. Omnicare, Inc.,* 583 F.3d 935, 942–43 (6th Cir.2009) (internal citations omitted).

### IV. *APPLICATION OF LAW*

As indicated, Plaintiff's claims are brought under Section 10(b), 15 U.S.C. § 78j, Rule 10b–5, 17 C.F.R. § 240.10b–5, and Section 20(a), 15 U.S.C. § 78t(a), of the Exchange Act. "Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder prohibit fraudulent, material misstatements or omissions in connection with the sale or purchase of a security." *PR Diamonds v. Chandler,* 364 F.3d 671, 681–82 (6th Cir.2004) (footnotes omitted). Section 20(a), in turn, "imposes control-person liability on '[e]very person who, directly or indirectly, controls any person liable' under the Act and accompanying rules, unless 'the controlling person acted in good faith and did not directly or indirectly' induce the illegal acts." *Konkol v. Diebold, Inc.,* 590 F.3d 390, 396 (6th Cir.2009) (quoting, 15 U.S.C. § 78t(a)). Because Section 20(a) provides for secondary liability and "is contingent upon the investors' ability to establish an 'underlying' violation of Section 10(b) and Rule 10b–5," *id.* (quoting, *PR Diamonds,* 364 F.3d at 696), the Court's focus necessarily is on Section 10(b) and Rule 10b–5.

While the text of Section 10(b) does not provide for a private cause of action, the Supreme Court "has found a right of action implied in the words of the statute and its implementing regulation." *Stoneridge Inv. Partners, LLC v. Scientific Atlanta,* 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008). In order to recover under Section 10(b), a plaintiff must plead and prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* [14]

[14] "Liability under Rule 10b–5 ... does not extend beyond conduct encompassed by § 10(b)'s prohibition." *United States v. O'Hagan,* 521 U.S. 642, 651, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997).

**\*9** In this case, Defendants argue that the Consolidated Amended Complaint fails to state a claim under Section 10(b) for three primary reasons. First, Plaintiff cannot show causation because he alleges an impossibility, to wit, his stock lost approximately 14% of its value on February 25, 2010, based on a disclosure that was made to the market on March 15, 2010. Second, Plaintiff fails to allege that Defendants made any actionable misrepresentations of material fact that could have caused BancorpSouth's stock price to be artificially inflated during the Class Period. Third, even if Plaintiff had plead such a misrepresentation, he does not plead specific facts which would support a strong inference that Defendants acted with knowledge or recklessness. The corresponding legal arguments and sub-arguments will be considered roughly in the order presented by Defendants.

### A. *Loss Causation and Economic Loss*

#### 1. Loss causation

A private cause of action under Rule 10(b) is "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 344, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). Therefore, "loss causation requires 'a causal connection between the material misrepresentation and the loss.' " *Brown v. Earthboard Sports USA, Inc.,* 481 F.3d 901, 920 (6th Cir.2007) (citation omitted). "It has been likened to proximate cause in tort law," *id.,* in that a "misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." *Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 172 (2nd Cir.2005). "Thus to establish loss causation, 'a plaintiff must allege ... that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' ... i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id.* at 173 (emphasis in original, internal citation omitted).

Here, Defendants argue that, as a matter of law, Plaintiff cannot show loss causation. This so, because the February 25,

2011 WL 7090820

2010 press release—causing the precipitous $3.10 per share and 13.7% overall drop in stock price the following day—was released some eighteen days before the actual March 15, 2010 Form 10–K filing. Defendants also argue the language of the press release cannot be said to have revealed the grounds for Plaintiff's fraud claims—inadequate internal controls and materially understated reserves—because it read, in relevant part, as follows:

> BancorpSouth, Inc. (N.Y.SE: BXS) today announced its intention to file a Form 12b–25 notification of late filing with the Securities and Exchange Commission in connection with its Annual Report on Form 10–K for the year ended December 31, 2009, which is due March 1, 2010. The reason for the delay in filing the annual report is that management has determined, in consultation with BancorpSouth's independent registered public accounting firm and with the concurrence of the Audit Committee of the Board of Directors, that certain asset quality indicators, including the allowance for credit losses, and their impact on BancorpSouth's financial statements for the quarter ended December 31, 2009 should be further reviewed.

> * * *

> **\*10** ... Based on information currently available, management of BancorpSouth anticipates that the unaudited consolidated balance sheet and the consolidated income statement for the quarter and year ended December 31, 2009 will be adjusted prior to issuance of the Annual Report on Form 10–K. The adjustments are expected to decrease net income.

> The impact of management's review on the previously reported financial condition and results of operations of BancorpSouth cannot be estimated or determined until BancorpSouth has completed its review of the Bank's loan portfolio and the auditors have completed their examination.

(Docket No. 42, App. Tab 10, Exh. 99–1). Lastly, Defendants argue that once the Form 10–K was filed on March 15, 2010, the price for BancorpSouth's shares actual went up over the next several weeks and thus any revelations in that filing were not the cause of a stock drop.

"[L]oss causation is fact-dependent." *Katyle v. Penn Nat. Gaming, Inc.,* 637 F.3d 462, 2011 WL 857144 at *6 (4th Cir. Mar.14, 2011). The Court's task at this juncture is not to decide

whether Plaintiff can prove causation, only whether he has pled sufficient facts to support loss causation.

The actual requirements for pleading loss causation, unlike most elements of a Section 10(b) claim, are open to dispute. In *Dura Pharmaceuticals,* 544 U.S. at 346, the Supreme Court assumed for the sake of argument that a heightened pleading standard did not apply. Subsequently, the Sixth Circuit appears not to have addressed the matter directly. Looking elsewhere, some courts have specifically refused to decide the issue, *see, In re Gilead Sciences Securities Litigation,* 536 F.3d 1049, 1056 (9th Cir.2008), while others have suggested Rule 8's short and plain statement standard applies. *See, In re Cardinal Health Inc. Securities Litigations,* 426 F.Supp.2d 688, 758 (S.D.Ohio 2006). Still others, recognizing the fact-driven nature of the issue, have indicated that "the specificity sufficient to plead loss causation will vary depending on the facts and circumstances of each case." *See, Katyle,* 637 F.3d 462, 2011 WL 857144 at *6. The Fourth Circuit in *Katyle,* relying on the Second Circuit in *Lentell,* provided the following example:

> " '[W]hen the plaintiff's loss coincides with a market wide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements [or omissions] as opposed to intervening events.

*Id.* (quoting, *Lentell,* 396 F.3d at 174).

Regardless of whether Rule 8 or a sliding-scale standard applies, the Court concludes Plaintiff has sufficiently *pled* loss causation. In this regard, the Court is of the opinion that Defendants err by considering the February 25, 2010 press release in a vacuum, and by neglecting to consider the import of some of the language in that press release.

**\*11** When the 4Q09/FY09 financial results were released in January 2010, some analysts opined that BancorpSouth was recognizing the credit crunch later than most of its peers, was feeling greater credit pressure, its CA & D loans with

2011 WL 7090820

large established clients could be on shaky grounds, and "cracks" were evident in its portfolio. Still, in a conference call on the financial results, and at conferences for financial professionals the following month, upper management of BancorpSouth essentially assured investors that credit was strong, reserves were good, and that BancorpSouth's loan portfolio was better than any of its peers. It was with this recent history that BancorpSouth issued its press release. While BancorpSouth may not have specifically stated in its press release that there were problems with internal controls or the need to increase loan loss reserves, it did state the decision to delay filing the 10–K form was with the concurrence of its auditor and an independent accounting firm, review was necessary regarding the allowance for credit losses, and adjustments were expected which would decrease net income. This led to immediate and negative comments from financial analysts about BancorpSouth's substantial reliance (as compared to peers) on CA & D loans, and the opinion that a large reduction in income would be an almost inevitable result. Indeed, when the Form 10–K was filed on March 15, 2010, it revealed substantial loan losses and vastly overstated earnings which were attributed to the lack or insufficiency of numerous internal controls.

True, BancorpSouth's stock may have plunged on February 25, 2010 for reasons other than those alleged by Plaintiff. After all, "a drop in a security's price may be a result of the correction of a previous misrepresentation," but "it may also have been caused by 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events.' " *In re DVI, Inc. Securities Litigation,* 639 F.3d 623, 2011 WL 1125926 at *4 (3rd Cir.2011); (quoting, *Dura Pharmaceuticals,* 544 U.S. at 343). However, Defendants present no other reasons for the drop, and it is not encumbent upon Plaintiff at this point to disprove other possible reasons for the drop. *See, e.g., Caremark, Inc. v. Coram Healthcare Corp.,* 113 F.3d 645, 649 (7th Cir.1997) (loss causation requirement does not "place unrealistic burdens on the plaintiff at the initial pleading stage [and] does not require, for instance, that the plaintiff plead that all of its loss can be attributed to the false statement of the defendant"); *Malin v. XL Capital Ltd.,* 2005 WL 2146089 at *4 n. 5 (D.Conn. Sep.1, 2005) ("Defendants' argument is a competing theory of [loss] causation and raises factual questions not suitable for resolution on a motion to dismiss"). Besides, Plaintiff alleges that the KBW Regional Banking Index for February 26, 2010 showed an overall positive performance that day, and a plausible explanation

for BancorpSouth's very different result was the February 25, 2010 press release.

**\*12** Contrary to Defendants' assertion, it is not necessary for Plaintiff to plead that the corrective statement (in this case the February 25, 2010 press release) specifically details the exact basis of the fraud. "If a fact-for-fact disclosure were required to establish loss causation, a defendant could defeat liability by refusing to admit the falsity of it prior misstatements." *Alaska Elec. Pension Fund v. Flowserve Corp.,* 572 F.3d 221, 230 (5th Cir.2009). Rather, "to establish loss causation th[e] disclosed information must reflect part of the 'relevant truth'—the truth obscured by the fraudulent statement." *Id.* Here, the disclosure, fairly read, revealed that "certain asset quality indicators, including the allowance for credit losses" needed to be reviewed and that said review was "expected to decrease net income," (Docket No. 42, App. Tab 10, Exh. 99–1), with a logical inference being that BancorpSouth had overstated its earnings in January 2010. [15]

[15]     At this point, the Court notes that throughout their briefing, Defendants consistently refer to the 4Q09–FY09 financial results of January 21, 2010 as "unaudited" and/or "preliminary." This characterization does not automatically absolve them from financial liability for at least two reasons. First, the "unaudited" results appeared on the Form 8–K and "a Form 8–K [is] a Commission report used to report 'material events or corporate changes[.]' " *S.E.C. v. Gemstar–TV Guide Intern. Inc.,* 401 F.3d 1031, 1036 (quoting, 15 U.S.C. § 78m(a)(1)). *See, SEC v. PCS EdventuresA.Com, Inc.,* 2011 WL 337895 at *3 (D. *Id.* Jan. 27, 2011) (plaintiff adequately alleged fraud based upon misrepresentations and omission in a press release and Form 8–K); *In re Thornburg Mortg. Inc. Sec. Litig.,* 695 F.Supp.2d 1165, 1214 (D.N.M.2010) (finding statement in Form 8–K materially misleading). Second, Defendants did not characterize their results as anything but factual, stating in the press release "BancorpSouth's net income for the fourth quarter of 2009 was $19.4 million, or $0.23 per diluted share, compared with $16.8 million, or $0.20 per diluted share, for the fourth quarter of 2008" and that "[n]et income for the year ended December 31, 2009 was $104.3 million, or $1.25 per diluted share, compared with $120.4 million, or $1.45 per diluted share, for

2008," among other things. (Docket No. 42, App. Tab 9, Ex. 99–1).

The fact that there was no immediate stock drop and the price per share actually rose during the first few weeks following the Form 10K filing does not meant the revelations about insufficient reserves and controls were not of concern to investors. As Plaintiff observes, the ten-fold increase in trading volume of BancorpSouth stock and consequent stock drop immediately following the February 25, 2010 press release could be the investor's reaction to the significance of the announcement, and the neutral response to the actual Form 10K filing may be because investors considered it old news.

Moreover, Plaintiff alleges that in the months after the form 10K filing on March 15, 2010, there were at least two other significant stock drops—a 4% drop on April 23, 2010, and a 16% drop on June 23, 2010. Both drops followed the announcement of quarterly reports which showed significant losses and increases in nonperforming assets. Although a stock drop which occurs after the close of a class period may not show loss causation, *Masters v. GlaxoSmithKline,* 271 Fed. Appx. 46, 51 (2nd Cir.2008), this does not mean post-class period evidence of stock price changes is necessarily irrelevant. *See, Metzler Inv. GMBH v. Corinthian Colleges, Inc.,* 540 F.3d 1049, 1065 n. 9 (9th Cir.2008).

In concluding that Plaintiff has adequately plead loss causation, the Court has considered the authorities relied on by Defendants and, in particular, their substantial reliance on the Sixth Circuit's unpublished decision in *D.E. & J. Limited Partnership v. Conaway,* 133 Fed. Appx. 994 (6th Cir.2005). *Conaway* dealt with K–Mart's bankruptcy, a subsequent stock drop, and a woefully inadequate complaint. Indeed, the Sixth Circuit wrote:

> [Plaintiff] has done nothing more than note that a stock price dropped after a bankruptcy announcement, never alleging that the market's acknowledgment of prior misrepresentations caused that drop. But the observation that a stock price dropped on a particular day, whether the result of a bankruptcy or not, is not the same as an allegation that a defendant's fraud caused the loss.

*13 *Id.* at 1000–01. Here, Plaintiff does not merely note a stock drop followed the February 25, 2010 press release, but rather alleges that the market responded to that stock drop because previously made misrepresentations and omissions had improperly inflated BancorpSouth's shares. Whether Plaintiff can actually prove that connection is something to be decided later, but he has sufficiently *pled* loss causation.

**2. Economic Loss**

Defendants argue that Plaintiff's Consolidated Amended Complaint must be dismissed because he does not plead a compensable injury. In this regard, Defendants note that Plaintiff fails to allege he sold any BancorpSouth shares post-disclosure, let alone that he sold them at a loss. Defendants insist this is fatal because on at least four separate occasions during the ninety-day period following the February 26, 2010 stock drop, BancorpSouth's shares exceeded the $22 .10 per share Plaintiff paid.

Even leaving aside that Plaintiff purports to represent a class of investors who suffered economic losses, the Court need not tarry over Defendants' arguments. *Dura Pharmaceuticals* merely requires that a plaintiff provide a defendant "with some indication of the loss and the causal connection that the plaintiff has in mind ." *Dura Pharmaceuticals,* 544 U.S. at 347. Here, Plaintiff alleges that he, like the other putative class members, was damaged by the price decline which followed the February 25, 2010 press release. *See, Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 258 (5th Cir.2009) (*Dura* requires that plaintiff allege "a facially plausible causal relationship between the fraud[ ] ... and plaintiff's economic loss, including allegations of a material misrepresentation or omission followed by the leaking out of relevant or related truth about the fraud that caused ... depreciation of the stock and plaintiff's economic loss").

In any event, in his response brief, Plaintiff affirmatively states he sold his shares at a loss on March 3, 2010 before the stock returned to the price at which he had purchased it, and Defendants take no issue with that representation in their reply. Even though Plaintiff did not make that allegation in his Consolidated Amended Complaint, *Dura* in conjunction with *Twombly's* plausibility standard only require that a complaint "allege enough facts to give rise to a reasonable hope or expectation that discovery will reveal evidence of" loss causation and economic loss. *Id.* Plaintiff's allegation that he is a member of a class which lost millions as a result of the stock drop makes it plausible that he suffered an

2011 WL 7090820

economic loss, and that plausibility is only strengthened by his subsequent representation that he did, in fact, personally lose money on March 3, 2010.

### B. *Material Misrepresentation or Omission of Material Fact*

Defendants argue that Plaintiff fails to adequately plead a material misrepresentation or omission and that, even if he did, those allegations fail for any of a number of reasons. Those reasons include that BancorpSouth repeatedly disclosed the size of its CA & D loans and the risks associated with such loans, any statements about loan loss reserves were not statements of material fact, BancorpSouth's statements about its loans were nonactionable subjective characterizations and/or general statements of optimism, and Plaintiff's other allegations of misrepresentation do not support a fraud claim under Section 10b–5.

 **\*14**  Section 10(b) of the Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of ... such rules and regulations as the [Securities] Commission may prescribe [.]" 15 U.S.C. § 78j(b). Rule 10b–5, in turn, makes it unlawful for any person, directly or indirectly, "[t]o make any untrue statement or a material fact or to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the sale of any security." 17 C.F.R. § 2.10b–5.

In determining whether a representation is material, a court looks to whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.' " *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194. "Put another way, '[a] fact is to be considered material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares [of stock].' " *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt.,* 595 F.3d 86, 92–3 (2nd Cir.2010) (citation omitted).

#### 1. Adequacy of Allegations Regarding Misstatements

Defendants first argue that Plaintiff fails to allege any single fact showing that any of the statements made by Defendants were false or misleading. This argument is underdeveloped, perhaps because it is akin to trying to prove a negative.

Regardless, the Sixth Circuit has indicated that that Plaintiff's "complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Frank v. Dana Corp.,* 547 F.3d 564, 570 (6th Cir.2008) (citation omitted). "At a minimum, Plaintiffs must allege the time, place and contents of the misrepresentations upon which they relied." *Id.* [16] Here, the Consolidated Complaint is replete with the identification of statements alleged to be false, and includes references to who made the statement, where the statement was made, and why the statement was allegedly fraudulent. (*See, e.g.,* Consolidated Amended Complaint ¶¶ 70, 74, 85, 137–141, 146–147, 150–155 & 162–163).

[16]    Similarly, the PSLRA requires that when alleging a defendant made a material misrepresentation or omission, a complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1).

Defendants also generally assert that Plaintiff fails to connect many of the alleged misstatements to any of the individual Defendants. They also argue that Plaintiff wholly fails to identify any purported misstatements by Kelley.

Defendants cite *United States ex rel. Bledsoe v. Community Health Sys. Inc.,* 342 F.3d 634 (6th Cir.2003) and *Benoay v. Decker,* 517 F.Supp. 490 (E.D.Mich.1981) for the proposition that "[i]n the Sixth Circuit each individual defendant must have separate notice of the specific misstatements or omissions of which he is accused." (Docket No. 44 at 18). In *Bledsoe,* the Sixth Circuit quoted *Benoay* 's language that a complaint " 'may not rely upon blanket references to the acts or omissions by all of the 'defendants,' for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged.' " *Bledsoe,* 342 F.3d at 643 (quoting, *Benoay,* 517 F.Supp. at 493). The Sixth Circuit also observed that under Rule 9(b) a complaint "should provide fair notice to Defendants and enable them to 'prepare an informed pleading responsive to the specific allegations of fraud.' " *Id.* Dismissal of the complaint in *Bledsoe* was warranted since it failed to set forth dates, names of the individual defendants involved (save one), and collectively made allegations that " 'defendants' engaged in

certain practices without ever specifying the defendants to which it was referring." *Id.*

**\*15** Plaintiffs' Consolidated Amended Complaint does not suffer the infirmities identified in *Bledsoe* because, as noted, he sets forth the "who, what, when, and where" of the false statement allegations against the specific individual Defendants. Thus, for example, he makes specific allegations of false (oral or written) statements against Patterson (*see, e.g.,* Consolidated Amended Complaint ¶¶ 34–36, 42–43, 84–87, 144–147, 196–197, 207); Prater (*see e.g., id.,* ¶¶ 74(a)-(b), 161–163, 201, 207); Cowsert (*see e.g., id.,* ¶¶ 88, 144 & 196); and Kelley (*see e.g., id.,* ¶ 74(b), 85, 135, 178(b)-(c), 201). True, some of these paragraphs (and others not listed) contain allegations that a particular Defendant merely participated in a conference call or presentation, or approved a document in which false statements allegedly were made, and this is particularly so with respect to Kelley. However, " 'a high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements' " *Barrie v. Intervoice–Brite, Inc.,* 409 F.3d 653, 656 (5th Cir.2005), nor is he automatically absolved from responsibility if he is not the one who actually authored a document containing a material misrepresentation. *See, Weiss v. S.E.C.,* 468 F.3d 849, 844 (D.C.Cir.2006) (collecting cases) (corporate officer can incur liability for misrepresentation even if he does not communicate it directly to investors if he reviews and approves of document containing the misrepresentation).

### 2. Sufficiency of Disclosures

Defendants next argue that Plaintiff's overarching claim that BancorpSouth failed to disclose material information about the nature of their CA & D loan portfolio, and the extent of the risks arising from those loans, is refuted by the numerous disclosure BancorpSouth made about its CA & D loans during the class period. In this regard, Defendants point out that each quarter, BancorpSouth provided the market with a detailed analysis of it entire loan and lease portfolio from which investors could readily determine how much of that portfolio consisted of CA & D loans, and that said disclosure included a detailed itemization of the sub-categories of loans which made up the CA & D portfolio. Those sub-categories also disclosed the amount of CA & D loans outstanding; 90–days past due but accruing; non-accruing; and non-performing. Additionally, BancorpSouth disclosed the risks surrounding such loans by including disclaimers, such as, BancorpSouth's "business may be adversely affected by conditions in the

financial markets and economic conditions generally"; the market in which it operates had been "materially and adversely affected by significant declines in the values of nearly all asset classes and by a serious lack of liquidity"; and the ability of BancorpSouth's borrowers to "pay interest on and repay principal of outstanding loans and the value of collateral securing those loans, is highly dependent upon the business environment in the markets where [it] operate[s] and in the United States as a whole." (Docket No. 44 at 20–21). Defendants argue that since these eventualities are what actually caused the rise in the loan reserves about which Plaintiff complains, BancorpSouth cannot be guilty of providing investors with a material misrepresentation or omission.

**\*16** As already noted, determining materiality is a "fact-specific inquiry" that "depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic Inc.,* 485 U.S. at 240. Thus, "[t]he veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Local 649,* 595 F.3d at 92. "Some literally accurate statements can, 'through their context and manner of presentation, [become] devices which mislead investors.' " *Id.* (citation omitted). [17] That is essentially Plaintiff's contention in this case.

[17]    In an oft-quoted passage, Judge Milton Pollack explained that disclosures of risk provide "no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he know with near certainty that the Grand Canyon lies one foot away." *In re Prudential Sec. Inc. P'ships Litig.,* 930 F.Supp. 68, 72 (S.D.N.Y.1996).

Plaintiff does not take issue with Defendants' position that CA & D loans can be risky, that setting loss reserves involves some judgment, and that such reserves can increase if the judgment turns out to be wrong. He accepts these things, but claims that the 10(b) violation arises because Defendants did not fully disclose the risk of Bancorp's CA & D portfolio, and did not calculate the reserves in the manner they claimed.

"[G]eneral cautionary language does not render omission of specific adverse historical facts immaterial," *S.E.C. v. Merchant Capital, LLC,* 483 F.3d 747, 768 (11th Cir.2007), and, moreover, "the disclaimer must be meaningful and tailored to the risks the business faces." *Id.* Here, Plaintiff

Case 4:23-cv-13132-SDK-EAS ECF No. 42-6, PageID.2555 Filed 11/15/24 Page 103 of 109
Winslow v. BancorpSouth, Inc., Not Reported in F.Supp.2d (2011)
2011 WL 7090820

alleges that the increase in loss reserves resulted from conditions which existed throughout the class period and that the risk warning provided by BankcorpSouth were meaningless because such warnings portended the future, but did not alert investors about the conditions that then existed. This can be a basis for a Section 10(b) claim. *See, In re Bear Sterns Companies, Inc. Securities & ERISA Litig.,* 2011 WL 223540 at *56 (S.D.N.Y.2011, Jan. 19, 2011) (falsity sufficiently plead where company provided "general boilerplate risk warning" that its "models might not accurately predict the future when it allegedly knew, but withheld from investors that its ... models were fundamentally flawed" and "failed to include the accumulating evidence of market downturn and default risk").

Given Plaintiff's allegations, it is an open question as to whether BancorpSouth's risk warnings and disclaimers were sufficient. For example, Plaintiff contends some CA & D loans contained interest reserves which funded interest payments on the loans until the principal came due, but this information was not shared with investors until after the close of the class period. This may be significant in light of the fact that, according to Plaintiff, the FDIC recognizes that loans containing such interest reserves " 'carry very high levels of risk because using interest reserves to fund interest payments can seriously mask the deteriorating credit quality of a borrower." (Consolidated Amended Complaint ¶ 130). Such allegations suggest that general market disclaimers and vanilla assertions about possibilities (e.g. "business may be adversely affected by conditions in the financial markets and economic conditions generally") may not have been sufficient for a reasonable investor to make an informed decision. *See, Southland Sec. Corp. v. INSpire Ins. Solutions,* 365 F.3d 353, 372 (5th Cir.2004).

 **\*17** Further, the risk warnings to which Defendants point were made at a time when BancorpSouth was allegedly downplaying the very risks it now claims the warnings were meant to address. That is, when BancorpSouth issued general warnings about how its loans were dependent on all sorts of things that could happen in the market, it was also assuring investors the problems affecting the market generally were not affecting BancorpSouth, or so Plaintiff alleges. *See, Freudenberg v. E\*Trade Financial Corp.,* 712 F.Supp.2d 171, 193–194 (S.D.N.Y.2010) (Defendants' general statements that loan losses and securities impairments " 'could be affected by market risks and were subject to change," do not insulate them from liability for their specific misstatements and omissions' "); *In re Credit Suisse–AOL Sec. Litig.,* 465 F.Supp.2d 34, 50 n. 17 (D.Mass.2006) (fact that defendants continued to publish optimistic assessments of the company's financial position was "akin to a statement that the reader need not worry much about the generic risk disclosures that appeared from time to time").

### 3. Safe Harbor

Defendants argue that risk warnings aside, BancorpSouth's statements about its loan loss reserves were not statements of material fact and are protected by the PSLRA's safe harbor provision. Thus, Plaintiff's claims that BancorpSouth understated its loan loss reserves in 1Q09, 2Q09, 3Q09 and 4Q09 cannot support a claim under Section 10(b) and Rule 10b–5 because those loan loss reserves were estimates and forward-looking statements under the PSLRA. The Court is unpersuaded by this argument.

The "safe-harbor 'excuses liability for defendants' projections, statements of plans and objectives, and estimates of future economic performance.' " *Omnicare, Inc.,* 583 F.3d at 933 (citation omitted). "This protection is overcome only 'if the statement was material; if defendants had actual knowledge that it was false or misleading; and if the statement was not identified as 'forward-looking' or lacked meaningful cautionary statements.' " *Id.* (citation omitted). Even "[w]here a company does disclose that its statement is forward-looking, liability may still attach to the extent that the company made the statement in a misleading manner" because "if a company chooses to disclose information about the future, 'its disclosure must be full and fair[.]' " *Zaluski v. United American Healthcare Corp.,* 527 F.3d 564, 572 (6th Cir.2008) (citation omitted). "Therefore, once a company chooses to speak, it must 'provide complete and nonmisleading information with respect to subjects on which [it] undertakes to speak.' " *Id.* (quoting, *Rubin v. Schottenstein, Zox & Dunn,* 143 F.3d 263, 268 (6th Cir.1998)).

In this case, Defendants submit they are entitled to the safe harbor provision because "loss reserves are, [ ] no more than a best estimate about what will happen in the future, [and] do not provide historical information that is objectivably verifiable." (Docket No. 44 at 23). They cite several cases for the proposition that "underestimating the size of loan loss reserves does not amount to securities fraud," and other cases for the proposition that "just because a reserve estimate does not prove to be adequate does not mean that the estimate itself was a false statement upon which a securities claim can be based." (*Id.,* collecting cases).

2011 WL 7090820

**\*18** "Statements about loss reserves and their adequacy are not per se forward-looking." *In re PMA Capital Corp. Securities Litigation,* 2005 WL 1806503 at \*6 (E.D.Pa. Jul.27, 2005). After all, a financial institution which "deliberately hides its financial status by failing to provide adequate loss reserves could significantly affect the behavior of a reasonable investor." *Id.* Further, while "[s]tatements regarding loan loss reserves necessarily include forward-looking projections about future defaults, 'statements regarding loss reserves are not projections [if] they are directed to the then-present state of the Company's financial condition.' " *In re SLM Corp. Sec. Litig.,* 740 F.Supp.2d 542, 556 (S.D.N.Y.2010) (citation omitted, collecting cases). Moreover, even where the safe harbor is triggered, it does not protect statements made with actual knowledge of falsity. *See,* 15 U.S.C. § 78u–5(c)(1)(B). Because the questions about whether a financial institution intended to mislead investors regarding loan loss reserves and whether statements in relation thereto are false cannot be decided in the abstract, it is often "imprudent ... to grant Defendants' Motion to Dismiss based on the safe harbor provision." *In re Netbank, Inc. Securities Litigation,* 2009 WL 2432359 at \*8 (N.D.Ga. Jan.29, 2009).

In this case, were Plaintiff's claims simply that BancorpSouth's underestimated its loan loss reserves and that this miscalculation resulted in loss, there might be merit to Defendants' argument. However, Plaintiff's allegations are broader—he claims the reserves were insufficient in light of the existing risks that had been identified (but ignored) in BancorpSouth's loan portfolio, an allegation which could be bolstered by the auditor's requirement that the FY09/4Q09 financial results be revised. At this juncture, the Court is not in a position to determine whether Defendants knowingly ignored risks of which they were aware regarding the adequacy of the loss reserves.

### 4. Subjective Characterizations and Statements of Opinion and/or Optimism

In the Consolidated Amended Complaint, Plaintiff refers to what Defendants identify as subjective characterizations and general statements of optimism regarding BancorpSouth's commitment to a strong loan portfolio, such as Patterson's statements about BancorpSouth's consistency in a difficult and volatile market being an indication of the effectiveness of it business plan, and his statements to the effect that BancorpSouth has strong control mechanisms geared towards protection against losses. Defendants also note that Plaintiff faults the individual Defendants for using terms such as

"conservative," "strong," and "disciplined" in characterizing BancorpSouth's credit policies and controls.

Standing alone, subjective characterizations, opinions, and corporate optimism do not support a Section 10(b) fraud claim. "[F]ederal courts 'everywhere have demonstrated a willingness to find immaterial as a matter of law certain kinds of rosy affirmation heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, [and] so lacking in specificity, ... that no reasonable investor could find them important to the total mix of information available.' " *City of Monroe Employees Retirement Sys. v. Bridgestone Corp.,* 399 F.3d 651, 669 (6th Cir.2005).

**\*19** "Statements of corporate optimism ... may be material, though, if the speaker knew at the time the statements were made that they were untrue or had no reasonable basis in fact." *Simmons Invest., Inc. v. Conversational Computing, Inc.,* 2011 WL 673759 at \*5 (D.Kan. Feb.17, 2011). As the Supreme Court has observed, subjective characterizations or opinions "can be uttered with knowledge of truth or falsity just like more definitive statements," and "conclusory terms in a commercial context" may be "reasonably understood to rest on a factual basis that justifies them as accurate." *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1093, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). Thus, statements that a proposed merger was a "high value" and its terms were "fair to shareholders" supported a misrepresentation claim, *id.,* just as a "a statement by the executive committee of a law firm that no partner would be any 'worse off' solely because of an impending merger could be found to be a material misrepresentation." *Id.* (citing, *Day v. Avery,* 548 F.2d 1018, 1025–27 (D.C.Cir.1976)). Likewise, a tire manufacturer's press release indicating that "we continually monitor the performance of all our tire lines, and the objective data clearly reinforces our belief that these are high-quality safe, tires" could support a securities claim when it turned out the tires were not so safe. *Bridgestone,* 399 F.3d 672.

Here, too, context matters. Patterson's statements about the effectiveness of BancorpSouth's business plan and control mechanism to stave off losses, and other Defendants' statements about BancorpSouth being conservative and disciplined may be demonstrably false in light of Plaintiff's contention that BancorpSouth loss reserves ignored the declining credit quality of borrowers, failed to inform investors about facts which affected those reserves (such as using interest reserves to keep loans afloat), and failed to

2011 WL 7090820

adopt control measures recommended by the FDIC in relation to CA & D loan.

### 5. GAAP Violations and the Sarbanes–Oxley Certifications

Defendants argue that Plaintiff's identification of BancorpSouth's alleged violations of generally accepted accounting principles ("GAAP") and his reference to the Sarbanes–Oxley certifications signed by Patterson and Prater cannot support a misrepresentation claim because each rests upon a faulty premise. The former is allegedly faulty because Plaintiff simply assumes the March 2010 increase in reserves was the result of prior estimates not being in conformity with GAAP, while the latter is allegedly faulty because Plaintiff not only assumes the former, but also overstates the certifications.

Plaintiff devotes a section of his Consolidated Amended Complaint to the allegation that BancorpSouth violated GAAP and SEC rules in filing its quarterly financial reports and related earning reports for 1Q09 through 3Q09 and, thereafter, "attempted to load all the errors into the Company's 4Q09 results[.]" (Consolidated Amended Complaint ¶ 91). These alleged misstatements during the first three quarters of 2009 included the failure to adequately and timely provide for credit losses; the overstatement of pretax income, net income, EPS, and assets; and the omission of required disclosures concerning the Company's operating results, management's analysis and discussion, and risk factors. (*Id.* ¶¶ 93(a)-(c)). Plaintiff then provides a chart which purports to show how BancorpSouth materially overstated its reported provision for credit losses, income before taxes, net income and EPS during the class period. (*Id.* ¶ 95).

 **\*20**  Defendants argue the chart upon which Plaintiff relies is "made up" because it divides by four the additional $27 million added to the loan loss reserves on March 15, 2010, and allocates equal sums across each quarter of 2009. Defendants contend that, in so doing, Plaintiff merely assumes the "loss reserves increased linearly throughout 2009," and, more importantly ignores the fact that BancorpSouth's independent auditor did not require it to restate or revise any of the loan estimates related to the first three quarters of 2009, opining instead that "the Company's 2009 financials were 'presented fairly' and 'in conformity with U.S. generally accepted accounting principles.' " (Docket No. 44 at 30) (citation omitted).

It is not clear that Plaintiff is merely assuming the prior reserves were not prepared in compliance with GAAP since,

by revising the result, BancorpSouth has conceded problems with its accounting in relation to the reserves. Moreover, even if it can be said that Plaintiff errs by attributing loss reserves equally for the all quarters of 2009, the total amount alleged by Plaintiff to have been misstated would not change. In any event, the Court cannot at this point resolve the parties' different positions on this point, but must accept as true all of the factual allegations made by Plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)

As for the Sarbanes–Oxley certifications signed by Patterson and Prater, Defendants argue that the certifications did not guarantee BancorpSouth would detect all credit issues or that its estimates of future losses would not change. While that may be so, the Sarbanes–Oxley Act requires senior executives of public companies to "certify that they have 'evaluated the effectiveness of the issuer's internal controls' " and have " 'presented in their report their conclusion about the effectiveness of their internal controls'." *Indiana Elec. Workers' Pension Fund v. Shaw Group, Inc.,* 537 F.3d 527, 545 (5th Cir.2008) (citing, 15 U.S.C. §§ 7241(a) & (a)(4)(A)). Here, Plaintiff's claim is that Patterson and Prater attested to the adequacy of the internal controls, and those controls were, for all practical purposes, non-existent. As such, the Court cannot at this point say the Sarbanes–Oxley certifications are not material.

### C. *Scienter Requirements Under the PSLRA*

To state a securities fraud claim under Section 10(b), a plaintiff must show that a misstatement or omission of a material fact was made with scienter. *Stoneridge,* 552 U.S. at 157. "Scienter is 'a mental state embracing the intent to deceive, manipulate, or defraud[.]' " *Louisiana School Employees' Retirement Sys. v. Ernst & Young, LLP,* 622 F.3d 471, 478 (6th Cir.2010). Under the heightened pleading standards required by the PSLRA a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78(u)–54(b)(2).

 **\*21**  In *Tellabs,* 551 U.S. at 317–18, the Supreme Court addressed the scienter requirement at great length, setting forth a "uniform pleading standard" and clarifying "to what extent[ ] a court must consider competing inferences in determining whether a securities fraud complaint gives rise to a 'strong inference' of scienter." In doing so, the Supreme Court "establish[ed] the following prescriptions": (1) "faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action,

2011 WL 7090820

courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true"; (2) "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"; and (3) "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id.* at 322–23.

It is the third prescription which is central to Defendants' position that Plaintiff insufficiently pleads a "strong inference" of scienter. Although "strong inference" is undefined in the PSLRA, the Sixth Circuit has indicated that for there to be a strong inference, a plaintiff "must show that the defendant knew or recklessly disregarded the falsity of the statement at issue." *Konkol,* 590 F.3d at 397. Determining " 'recklessness in securities fraud is an untidy, case-by-case-concept[.]" *PR Diamonds,* 364 F.3d at 684. Any of a number of nonexclusive factors can be probative of recklessness, including:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of

defendants in the form of saving their salaries or jobs.

*Ley,* 543 F.3d at 810.

In this case, Defendants argue the Consolidated Amended Complaint suggests that Plaintiff seeks to show scienter based on three of the foregoing factors—the closeness in time of the statements to the disclosure, the disregard of the most current factual information, and the self-interested motivation of the individual Defendants. Defendants insist Plaintiff's factual allegations relating to these factors do not allow a strong inference of scienter.

**\*22** Determining whether a plaintiff has sufficiently pled scienter "necessarily involves a sifting of allegations in the complaint." *PR Diamonds, Inc.,* 364 F.3d at 684. "Accordingly, [a court is to] sift Plaintiff's allegations individually and then aggregate the nuggets of inference they generate," in order to conclude whether a strong inference arises. *Id.* In this regard, the Supreme Court has instructed:

> The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences." ... Yet the inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations.

*Tellabs,* 551 U.S. at 324–323.

Winslow v. BancorpSouth, Inc., Not Reported in F.Supp.2d (2011)

2011 WL 7090820

Sifting through the allegations and then "aggregating the nuggets," the Court concludes that Plaintiff has sufficiently pled scienter by alleging facts which indicate that Defendants were at least reckless. [18] Those nuggets are as follows:

[18]   In doing so, the Court notes that Defendants in their initial Memorandum correctly anticipated that Plaintiff would rely on three of the factors identified in *Helwig* (temporal proximity, disregard of information, and self-interest), but that, in response, Plaintiff has identified other factual allegations which support scienter.

First, by Plaintiff's calculations, BancorpSouth's provision for credit losses was understated by 80%, and the CA & D loan charge-offs were understated by 40%. This required an increase in reserves and wiped out the 4Q09 profits, resulting in BancorpSouth's first quarterly loss in almost two decades. If true, and while not conclusive, this supports scienter because "common sense and logic dictate that the greater the magnitude of a restatement or violation of GAAP, the more likely it is that such a restatement or violation was made consciously or recklessly." *P.R. Diamonds,* 364 F.3d at 685; *see, In re Proquest Sec. Litig.,* 527 F.Supp.2d 728, 741 (E.D.Mich.2007) (while accounting errors alone are insufficient, large errors can be an indication of scienter); *In re Cardinal,* 426 F.Supp.2d at 720 (collecting cases for the proposition that an inference of knowledge or recklessness may be drawn from accounting violations which are so great that they should have been obvious).

Second, the speed with which Defendants adjusted the reserves based upon the undisclosed problems with the CA & D loans supports scienter. *See, Konkol,* 590 F.3d at 401 (citation omitted) ("closeness in time of an allegedly fraudulent statement ... and the later disclosure of inconsistent information" is one factor supporting a finding of scienter). The 4Q09/FY09 financial results were posted on January 21, 2010, reaffirmed on February 2 and 10, 2010, admitted to be questionable in the February 25, 2010 press release, and restated on March 15, 2010. These dates alone are significant. However, those dates may turn out to be even more supportive of scienter because the audited financial results were to be reported by March 1, 2001, suggesting the possibility that the auditors would have talked with management before the February 25, 2010 press release and, in turn, potentially calling into question whether the Defendants were truthful

when they spoke at the investor conferences on February 2 and 10, 2010.

**\*23**   Third, Defendants repeatedly assured investors they had their eyes on the CA & D loans and had an array of quality controls in place to monitor such loans, with Patterson even going so far as to suggest that "credit relationships of as little as $25,000" were evaluated at the executive level. (Consolidated Amended Complaint ¶ 36). Even though "fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the company and alleged access to information," *PR Diamonds,* 364 F.3d at 688, "specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database are factors in favor of inferring scienter in light of improper accounting reports." *In re Daou Sys. Inc.,* 411 F.3d 1006, 1022 (9th Cir.2005).

Fourth, Plaintiff alleges Defendants recklessly disregarded the problems which led to the understatement of reserves by repeatedly agreeing to modify the terms of loans, so as to prevent borrowers from becoming delinquent which would have necessitated an increase in loss reserves and resulted in a decrease in earning. This practice was allegedly endorsed by company executives and was so widespread that bank examiners informed BancorpSouth it had too many deferred interest loans on its books. Plaintiff claims the individual Defendants had to know about the situation and its impact on the reserves and profits because, for example, Cowsert regularly met with Patterson and Kelley to discuss problem loans, and Cowsert's office generated weekly past-due reports identifying problem loans. Although "generalized facts" alleging the Defendants had access to financial reports or may have attended meetings do not show a "strong inference" of scienter and "are properly discounted," *Konkol,* 590 F.3d at 398–99, the "divergence between internal reports and external statements on the same subject" can be probative of scienter, *Bridgestone,* 399 F.3d at 683, as can the existence of meetings concerning risks which are "inconsistent with the company's public statements downplaying or concealing that risk." *In re Citigroup Securities Litigation,* 2010 WL 4484650 at \*28 (S.D.N.Y.2010).

Fifth, the individual Defendants collectively were awarded over a million dollars in year-end cash bonuses based upon admittedly incorrect FY09 financial results, and would not have received any bonuses based upon a true financial report. Nevertheless, the Defendants were not required to forfeit

any of the bonuses, once it became clear they were not entitled to the bonuses. These bonuses were substantial in relation to the individual Defendants cash compensation: Patterson's salary was $783,500 and his bonus of $681,645 increased his earnings to more than $1.4 million; Cowsert's bonus of $180,000 was equivalent to 55% of his salary; Kelley's $326,250 bonus was 65% of his salary; and and Pater's $107,663 bonus was equivalent to 40% of his salary. While bonuses do not necessarily equate with motivation to commit fraud, "they can be catalysts to fraud and so serve as external markers to the required state of mind." *Helwig,* 251 F.3d 540, 550 (6th Cir.2001). *See, Tellabs,* 551 U.S. at 325 (pecuniary "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference").

**\*24** As has been made clear, none of the foregoing factors, in isolation, is sufficient to support a strong inference of scienter. However, the Court's task is to look at the nuggets and then "aggregate the nuggets of inference they generate," to conclude whether they suggest a strong inference of scienter. *PR Diamonds,* 364 F.3d at 684. The Court finds they do, notwithstanding Defendants' arguments to the contrary.

To be sure, the nuggets upon which Plaintiff relies, viewed through a different prism, could produce an opposite result. In this regard, BancorpSouth offers diametrically different opinions on what Plaintiff's allegations actually suggest.

For example, Defendants assert that the timing between the 4Q09/FY09 financial results and the subsequent revelation that they were incorrect proves nothing and is based upon speculation. Defendants argue that corporate officers should be rewarded for diligently investigating and promptly disclosing errors or omissions, rather than having their diligence be used to support a finding of recklessness. Moreover, they argue Plaintiff's "speculation fails to account for any other, more plausible possibilities, including that, precisely as they disclosed, Defendants acted promptly to inform the market of a potential problem in the fourth quarter preliminary results as soon as management and the Company's independent auditors—who were engaged in their audit of those results—became aware of it." (Docket No. 44 at 35).

Likewise, BancorpSouth paints a different picture regarding the bonuses that they received based upon the unaudited 4Q09/FY09 financial results, submitting it is ludicrous to think that the individual Defendants would engage in a year-long fraud to inflate the fourth quarter earnings and thereby obtain bonuses. After all, the "bonus compensation at issue is far from 'extraordinary" (Docket No. 44 at 54) when one considers that Patterson owned approximately $22 million in stock and Kelley owned approximately $8 million in stock as of January 31, 2010. However, when the fourth quarter results were revised, Patterson's stock declined by approximately $2.9 million and Kelley's by approximately $1.1 million— losses which were in the neighborhood of four times more than the amount of the respective bonuses they received.

Similarly, Defendants argue Plaintiff cannot show recklessness based upon the fact that the individual Defendants may have had access to information, issued reports, and held meetings regarding problem loans. Such allegations fail to consider that the fixing of reserves involves "complicated estimates and aggregations based on a large amount of data and qualitative judgments." (Docket No. 44 at 40). Moreover, the complicated nature of the calculation for reserves losses is underscored in the quarterly reports which clearly state that "the Bank employs a systematic methodology for determining its allowance for credit losses that considers both qualitative and quantitative factors and requires that management make material estimates and assumptions that are particularly susceptible to significant change." (*Id.* at 43).

**\*25** While the Court recognizes Defendants' arguments and finds they have provided cogent explanations for what Plaintiff's characterize as evidence of knowledge or recklessness, the Court cannot ignore the inferences which may be derived from Plaintiff's allegations. As the Supreme Court made clear in *Tellabs,* "a complaint will survive a motion to dismiss so long as 'a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.' " *Frank,* 547 F.3d at 571 (quoting, *Tellabs,* 511 U.S. at 324). "Thus, where two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, *Tellabs* instructs that the complaint should be permitted to move forward." *Id.*

**D.** *Section 20(a) Claim*
Finally, Defendants seek dismissal of Plaintiff's claim under Section 20(a) against BancorpSouth and the individual Defendants. The sole basis given is that Plaintiff cannot establish a Section 10(b) violation and Section 20(a) is a secondary, contingent claim. Since the Court concludes Plaintiff sets forth a viable claim against all of the Defendants

2011 WL 7090820

under Section 10(b), dismissal of the Section 20(a) claim is unwarranted.

## V. *CONCLUSION*

On the basis of the foregoing, the undersigned respectfully RECOMMENDS that Defendants' Motion to Dismiss (Docket No. 41) be DENIED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days from service of this Report and Recommendation in which to file any written objections to this Recommendation, with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in this Report in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 7090820

---

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.