# Exhibit 22

Buhrke Family Revocable Trust v. U.S. Bancorp, --- F.Supp.3d ---- (2024)
2024 WL 1330047, Fed. Sec. L. Rep. P 101,838

2024 WL 1330047
United States District Court, S.D. New York.

The BUHRKE FAMILY REVOCABLE TRUST, on behalf of itself and all others similarly situated, Plaintiff,

v.

U.S. BANCORP, Andrew Cecere, Terry Dolan, Jodi Richard, and Katherine Quinn, Defendants.

22 Civ. 9174 (JPC)
|
Signed March 28, 2024

**Synopsis**
**Background:** Pension funds filed amended complaint in putative class action against bank and its corporate officers, asserting claims against all defendants for violations of § 10(b) and Rule 10b-5, and asserting claims against officers for control person liability under the Securities Exchange Act. Defendants filed motion to dismiss for failure to state a claim.

**Holdings:** The District Court, John P. Cronan, J., held that:

[1] funds failed to plausibly allege bank's risk officer made statements, as required for claim under Rule 10b-5;

[2] officers statements emphasizing trust customers placed in bank, importance of trust for bank's brand and success, and bank's record of ethical business practices constituted inactionable puffery;

[3] statement that bank's brand value had grown by 55% lacked sufficient nexus to allegedly omitted information required to render it misleading, thus, statement was not material misstatement that could support securities fraud claims;

[4] statements about bank's risk management policies and procedures constituted inactionable puffery;

[5] allegations were insufficient to overcome presumption of immateriality of alleged misstatements, as would support claims for securities fraud;

[6] funds failed to plausibly allege that officers had motive to commit fraud, as would support scienter element of funds' claims for securities fraud; and

[7] allegations were insufficient to state claims for scheme liability.

Motions granted.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim; Motion to Amend the Complaint.

West Headnotes (67)

[1] **Securities Regulation** 🔑 Manipulative, Deceptive or Fraudulent Conduct

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must adequately plead: (1) a material misrepresentation or omission by the defendant, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) internal loss causation. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

[2] **Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

Plaintiffs bringing securities fraud claims under § 10(b) and Rule 10b-5 must satisfy the heightened pleading standards for fraud claims; accordingly, a plaintiff alleging fraud under § 10(b) and Rule 10b-5 must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); Fed. R. Civ. P. 9(b); 17 C.F.R. § 240.10b-5(b).

[3] **Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

Conclusory allegations or allegations unsupported by factual assertions are insufficient to satisfy the heightened pleading standards for fraud claims, for purposes of securities fraud

claims under § 10(b) and Rule 10b-5. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); Fed. R. Civ. P. 9(b); 17 C.F.R. § 240.10b-5(b).

**[4]** **Securities Regulation** 🔑 Pleading

Securities fraud claims under § 10(b) must satisfy the Private Securities Litigation Reform Act's (PSLRA) heightened pleading requirements. Securities Exchange Act of 1934 §§ 10, 21D, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(1).

**[5]** **Securities Regulation** 🔑 Scienter

In determining whether the pleaded facts give rise to a strong inference of scienter, for purposes of a securities fraud claim under § 10(b), the district court must take into account plausible opposing inferences. Securities Exchange Act of 1934 §§ 10, 21D, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2).

**[6]** **Securities Regulation** 🔑 Scienter

For an inference of scienter to be strong, for purposes of a securities fraud claim under § 10(b), a reasonable person must deem it cogent and at least as compelling as any opposing inference one could draw from the facts alleged. Securities Exchange Act of 1934 §§ 10, 21D, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2).

**[7]** **Securities Regulation** 🔑 Misrepresentation

For purposes of a securities fraud claim under § 10(b), the Private Securities Litigation Reform Act (PSLRA) does not demand that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Securities Exchange Act of 1934 §§ 10, 21D, 15 U.S.C.A. §§ 78j(b), 78u-4(b)(1).

**[8]** **Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

For purposes of a securities fraud claim under § 10(b), the rule governing the heightened pleading standard for fraud claims does not require the pleading of detailed evidentiary matter in securities litigation. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); Fed. R. Civ. P. 9(b).

**[9]** **Securities Regulation** 🔑 Nondisclosure

Pension funds failed to plausibly allege that bank's chief risk officer made statements, as required for a claim for violation of Rule 10b-5, in putative class action, alleging risk officer presented slides at an investor conference that omitted information about the risk of bank's risk management program in light of bank's alleged scheme to take advantage of its customers by misappropriating consumer data to create fictitious accounts; complaint merely alleged that bank's CEO and an unnamed "executive" presented at the conference, and while the presentation's agenda slide mentioned that risk officer and another individual were speakers on the topic of "Risk Management," there was no allegation that risk officer spoke at the conference, or allegations about what she said. 17 C.F.R. § 240.10b-5(b).

More cases on this issue

**[10]** **Securities Regulation** 🔑 Matters to Be Disclosed

For purposes of securities fraud claims, § 10(b) and Rule 10b-5 do not create an affirmative duty to disclose any and all material information. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[11]** **Securities Regulation** 🔑 Duty to Disclose or Refrain from Trading
**Securities Regulation** 🔑 Corporate officers or directors; insiders

In the context of securities fraud claims under § 10(b) and Rule 10b-5, a duty to disclose material information may arise when there is a corporate insider trading on confidential information, a

2024 WL 1330047, Fed. Sec. L. Rep. P 101,838

statute or regulation requiring disclosure, or a corporate statement that would otherwise be inaccurate, incomplete, or misleading. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[12]** Securities Regulation 🔑 Matters to Be Disclosed

In the context of securities fraud claims under § 10(b) and Rule 10b-5, a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[13]** Securities Regulation 🔑 Matters to Be Disclosed

In assessing whether an omission renders a statement inaccurate, incomplete, or misleading, for purposes of securities fraud claims under § 10(b) and Rule 10b-5, the district court must look at the context and manner of the presentation. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[14]** Securities Regulation 🔑 Facts or opinions

General statements about reputation, integrity, and compliance with ethical norms are inactionable puffery, for purposes of securities fraud claims under § 10(b) and Rule 10b-5, meaning that they are too general to cause a reasonable investor to rely upon them; this is particularly true where the statements are explicitly aspirational, with qualifiers such as "aims to," "wants to," and "should." Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[15]** Securities Regulation 🔑 Facts or opinions

General declarations about the importance of acting lawfully and with integrity fall squarely within the category of inactionable puffery, for purposes of securities fraud claims under § 10(b)

and Rule 10b-5. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[16]** Securities Regulation 🔑 Misrepresentation

While a bank's reputation is undeniably important, that does not render a particular statement by a bank regarding its integrity per se material, for purposes of securities fraud claims under § 10(b) and Rule 10b-5. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[17]** Securities Regulation 🔑 Misrepresentation

Assertions of satisfactory regulatory compliance can be materially misleading, for purposes of securities fraud claims under § 10(b) and Rule 10b-5, if the descriptions of compliance efforts are detailed and specific. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[18]** Securities Regulation 🔑 Facts or opinions

Statements by bank's corporate officers emphasizing the trust customers placed in bank, the importance of that trust for bank's brand and success, and bank's record of ethical business practices constituted inactionable puffery, and, thus, statements were not material misstatements that could support securities fraud claims under § 10(b) and Rule 10b-5, in pension funds' putative class action, alleging the statements omitted material information regarding the opening of unauthorized accounts, the Consumer Financial Protection Bureau's (CFPB) investigation of bank, and bank's exposure to regulatory consequences; statements were too general for a reasonable investor to have considered them as material information that should be relied upon, and some statements were explicitly aspirational. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

More cases on this issue

Buhrke Family Revocable Trust v. U.S. Bancorp, --- F.Supp.3d ---- (2024)
2024 WL 1330047, Fed. Sec. L. Rep. P 101,838

**[19]** **Securities Regulation** 🗝 Matters to Be Disclosed

Statement in a slideshow presented at bank's investor conference, that bank's brand value had grown by 55%, lacked a sufficient nexus to any allegedly omitted information required to render it misleading, and, thus, statement was not a material misstatement that could support securities fraud claims under § 10(b) and Rule 10b-5, in pension funds' putative class action, alleging the statements omitted material information regarding the opening of unauthorized accounts, the Consumer Financial Protection Bureau's (CFPB) investigation of bank, and bank's exposure to regulatory consequences; a reasonable investor would not interpret statements about bank's improved brand value to imply anything regarding the existence of unauthorized account openings or related government investigations. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

More cases on this issue

**[20]** **Securities Regulation** 🗝 Matters to Be Disclosed

For a statement to be actionably misleading, for purposes of securities fraud claims under § 10(b) and Rule 10b-5, there must be a sufficiently close nexus between the statement and the allegedly omitted information; in other words, the subject matter of the alleged statement must relate closely enough to the allegedly omitted information such that a reasonable investor might have drawn inferences about the omitted information because of the statement. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

1 Case that cites this headnote

**[21]** **Securities Regulation** 🗝 Facts or opinions

Statements about bank's risk management policies and procedures, including its "three lines of defense" framework, constituted inactionable puffery, and, thus, statements were not misleading misstatements that could support

securities fraud claims under § 10(b) and Rule 10b-5, in pension funds' putative class action, alleging the statements misleadingly suggested that bank might suffer legal and reputational harm if customer information was mishandled when it already knew that had done so by opening of unauthorized accounts; statements were too general to give rise to liability, as they were exactly the types of routine representations of risk-management practices that almost every bank made. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

1 Case that cites this headnote
More cases on this issue

**[22]** **Securities Regulation** 🗝 Facts or opinions
**Securities Regulation** 🗝 Matters to Be Disclosed

Statements made by bank's CEO at a conference, that the two areas of most interest to regulators regarding bank's business were "ESG" and "consumer protection, and consumer activities," constituted inactionable puffery and lacked a sufficient nexus to any allegedly omitted information required to render the statements misleading, and, thus, statements were not misstatements that could support securities fraud claims under § 10(b) and Rule 10b-5, in pension funds' putative class action, alleging the statements misleadingly omitted that bank had been opening bank accounts with customer information without authorization; statements were general in nature, and no reasonable investor would have relied upon them to draw inferences about bank's account practices or engagement with regulators. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

More cases on this issue

**[23]** **Securities Regulation** 🗝 Nondisclosure

Pension funds failed to plausibly allege that statements by bank's officers warning bank investors about legal and regulatory risks, including that bank could face significant legal

and reputational harm if it failed to safeguard personal information, were misleading on the basis that they omitted officers' involvement in the unauthorized opening of bank accounts and their failure to remediate such wrongdoing, as required for claims for violation of § 10(b) and Rule 10b-5, in putative class action against officers; there were no particularized allegations tying any officer to unauthorized account openings, and while bank's CEO admitted that 342 such accounts were opened, such conduct amounted to a single unauthorized account opening in each of bank's branches. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

More cases on this issue

**[24]** **Securities Regulation** ⚷ Matters to Be Disclosed

In absence of independent duty to disclose, companies do not have duty to disclose uncharged, unadjudicated wrongdoing, for purposes of a securities fraud claim under § 10(b) and Rule 10b-5. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[25]** **Securities Regulation** ⚷ Duty to Disclose or Refrain from Trading

In the context of securities fraud claims under § 10(b) and Rule 10b-5, a company is obligated to speak accurately and completely once it has elected to speak on a topic. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[26]** **Securities Regulation** ⚷ Misrepresentation

The district court must keep in mind that a complaint fails to state claim of securities fraud under § 10(b) and Rule 10b-5 if no reasonable investor could have been misled about nature of risk when he invested. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[27]** **Securities Regulation** ⚷ Facts or opinions

In the context of determining whether an investor could have been misled, for purposes of a securities fraud claim under § 10(b) and Rule 10b-5, statements whose objective factual truth or falsity can be ascertained with certainty are statements of fact, whereas statements that are inherently subjective are statements of opinion. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[28]** **Securities Regulation** ⚷ Matters to Be Disclosed

Where there is no independent duty to disclose, allegations of omissions regarding factual statements are sufficient to support a securities fraud claim under § 10(b) and Rule 10b-5 if the absence of the omitted information renders the statement in question inaccurate, incomplete, or misleading. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[29]** **Securities Regulation** ⚷ Facts or opinions

Statements of opinion may be false or misleading, for purposes of a securities fraud claim under § 10(b) and Rule 10b-5, in three circumstances: (1) the speaker disbelieved the opinion at the time it was made, (2) a statement of opinion contained one or more embedded factual statements that can be proven false, or (3) a statement of opinion, without providing critical context, implied facts that can be proven false; as to the final of these three, a plaintiff can adequately plead such a theory of falsity by alleging that the speaker implied he or she had a reasonable basis for the opinion but in fact did not. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[30]** **Securities Regulation** ⚷ Matters to Be Disclosed

Statements of opinion and fact in bank's annual report, that bank could face significant legal

and reputational harm if it failed to safeguard personal information, and that any mishandling or misuse of customers' personal information could expose bank to regulatory fines, were not misleading by omitting that unauthorized bank accounts had been opened, as would support claims for securities fraud under § 10(b) and Rule 10b-5, in pension funds' putative class action against bank and its officers; if anything, fact that unauthorized accounts had been opened supported the reasonableness of bank's caution to investors that it might face penalties as a result of a failure to safeguard personal information, and the statements did not contain an embedded misleading statement of fact. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

More cases on this issue

**[31]    Securities Regulation** 👈 Matters to Be Disclosed

Opinion statements warning investors about the risks bank faced, including that bank could suffer legal or regulatory sanctions through the failure to comply with regulations related to consumer protection and other requirements, were not misleading by omitting that unauthorized bank accounts had been opened, as would support claims for securities fraud under § 10(b) and Rule 10b-5, in pension funds' putative class action against bank and its officers; no reasonable investor would have read the statements to imply anything about the opening of unauthorized accounts, as they did not dealt in any manner with that topic, and the fact that unauthorized account openings had occurred did not mean that the opinions expressed in those statements lacked a reasonable basis. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

More cases on this issue

**[32]    Securities Regulation** 👈 Matters to Be Disclosed

Statement that bank was subject to pending investigations and was cooperating with such

investigations lacked a reasonable nexus to the fact that bank opened bank accounts for customers without authorization, and, thus, the statement was not a misleading statement that could support securities fraud claims under § 10(b) and Rule 10b-5, in pension funds' putative class action alleging bank and its officers failed to disclose that unauthorized accounts had been opened; no reasonable investor would take a statement that bank was subject to investigations and cooperating with such investigations to imply anything about whether bank ever experienced unauthorized account openings. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

More cases on this issue

**[33]    Securities Regulation** 👈 Matters to Be Disclosed

Pension funds failed to plausibly allege that the opinion statement in bank's annual report to the SEC, that bank was continually subject to investigations in areas of heightened regulatory scrutiny such as risk management and consumer protection, was misleading on the basis that it omitted the fact of the Consumer Financial Protection Bureau's (CFPB) investigation of bank, as would support securities fraud claims under § 10(b) and Rule 10b-5, in putative class action against bank and its officers; complaint merely alleged that CFPB was investigating bank, but did not allege that bank knew of that investigation, statement did not imply that no investigation by CFPB was taking place, and there was no indication bank knew or should have known that it would in fact face a fine by CFPB. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

More cases on this issue

**[34]    Securities Regulation** 👈 Matters to Be Disclosed

Statement of fact in bank's filing to the SEC, that the Consumer Financial Protection Bureau (CFPB) was "investigating certain of [bank's]

consumer sales practices" and that bank "ha[d] responded and continue[d] to respond to the CFPB," was not misleading on the basis that it omitted that CFPB's consent order detailed bank's practice of opening bank accounts using customer information without authorization and that bank was likely to be subject to an enforcement action, as would support securities fraud claims under § 10(b) and Rule 10b-5, in pension funds' putative class action against bank and its officers; disclosures lacked a nexus to the topic of unauthorized account openings, as they did not speak on that topic or assert that bank had complied with account opening regulations. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

More cases on this issue

**[35]**   **Securities Regulation** 🔑 Matters to Be Disclosed

Pension funds failed to allege that the statement of opinion disclosed in bank's filing to the SEC, that bank did not believe an enforcement action by the Consumer Financial Protection Bureau (CFPB) was warranted, "but there can be no assurance that" discussions with the CFPB would "result in a resolution," was misleading by omitting that CFPB's consent order detailed bank's practice of opening of bank accounts without customer authorization and that bank was likely to face a enforcement action, as would support securities fraud claims under § 10(b) and Rule 10b-5, in pension funds' putative class action against bank and its officers; statement had no embedded factual statements on the topic of the unauthorized accounts, and there were no allegations defendants were aware of the accounts. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

More cases on this issue

**[36]**   **Federal Civil Procedure** 🔑 Motion and proceedings thereon

Pension funds abandoned at the dismissal stage their claims for securities fraud under § 10(b) and Rule 10b-5 based on statements bank made

describing its code of ethics, in putative class action against bank and its corporate officers, alleging defendants made statements while failing to disclose that bank accounts had been opened using customer without authorization and that the Consumer Financial Protection Bureau (CFPB) was conducting an investigation of bank account practices; while funds cited in their brief opposing dismissal the statement in bank's code of ethics that "[bank's] reputation is our most valuable asset," the statement was cited in support of fund's claims based on omissions from statements emphasizing the level of trust that bank's customers placed in bank. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[37]**   **Securities Regulation** 🔑 Materiality

At the pleading stage, a plaintiff satisfies the materiality requirement of a claim under Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions; thus, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. 17 C.F.R. § 240.10b-5.

**[38]**   **Securities Regulation** 🔑 Materiality
**Securities Regulation** 🔑 Materiality of violation

A complaint asserting a claim for securities fraud under Rule 10b-5 may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance. 17 C.F.R. § 240.10b-5.

**[39]**   **Securities Regulation** 🔑 Materiality
**Securities Regulation** 🔑 Materiality of violation

2024 WL 1330047, Fed. Sec. L. Rep. P 101,838

Both quantitative and qualitative factors must be considered in determining the materiality of alleged misstatements or omissions, for purposes of a securities fraud claim under Rule 10b-5. 17 C.F.R. § 240.10b-5.

[40]  **Securities Regulation**  Presumptions and burden of proof

Deviations of less than 5% with respect to a particular item in a company's financial statements because of a misstatement may provide the basis for a preliminary assumption of immateriality, for purposes of a securities fraud claim under Rule 10b-5. 17 C.F.R. § 240.10b-5.

[41]  **Securities Regulation**  Materiality of violation

Courts must consider qualitative factors when assessing the materiality of alleged misstatements or omissions, for purposes of a securities fraud claim under Rule 10b-5, and that consideration should be undertaken in an integrative manner; these qualitative factors include: (1) whether the alleged misstatement or omission concealed an unlawful transaction, (2) the significance of the misstatement in relation to the company's operations, and (3) management's expectation that the misstatement would result in a significant market reaction. 17 C.F.R. § 240.10b-5.

[42]  **Securities Regulation**  Nondisclosure

Allegations in pension fund's amended complaint were insufficient to overcome the presumption of immateriality of alleged misstatements, in putative class action against bank and its corporate officers asserting claims under § 10(b) and Rule 10b-5, alleging defendants made statements emphasizing bank's regulatory compliance, and stating that the Consumer Financial Protection Bureau (CFPB) was investigating bank's consumer sales practices, but failed to disclose that bank accounts had been opened without customer authorization; complaint merely alleged that the

omissions called into question the integrity of bank as a whole, but the scope of defendants' misconduct was de minimis, as CFPB's consent order merely imposed a fine on bank amounting to less than one percent of bank's assets. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

More cases on this issue

[43]  **Securities Regulation**  Scienter

To plead scienter, for purposes of a securities fraud claim under § 10(b) and Rule 10b-5, a complaint must allege facts showing either: (1) a motive and opportunity to commit the fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

[44]  **Securities Regulation**  Scienter

To survive a motion to dismiss securities fraud claims under § 10(b) and Rule 10b-5 on grounds of failure to plead scienter, the strength of the circumstantial allegations must be correspondingly greater if there is no motive. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

[45]  **Securities Regulation**  Scienter

A complaint will survive a motion to dismiss a securities fraud claims under § 10(b) and Rule 10b-5 on grounds of failure to plead scienter if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

[46]  **Federal Civil Procedure**  Matters considered in general

On motion to dismiss for failure to state a claim, in which bank and its corporate officers challenged the scienter element of pension fund's securities fraud claims under §

10(b) and Rule 10b-5, the district court would not consider the documents officers submitted to the SEC disclosing their purchases and sales of bank's stock, in action alleging bank and officers omitted material information from their statements emphasizing bank's regulatory compliance and statements disclosing the Consumer Financial Protection Bureau (CFPB) investigation of bank's consumer sales practices; complaint did not reference the documents, and even though the allegations of scienter relied heavily on allegations of officers' stock sales, the court could not consider the documents for the truth they asserted. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

More cases on this issue

**[47]** **Federal Civil Procedure** ⚷ Matters considered in general

Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered on a motion to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

**[48]** **Federal Civil Procedure** ⚷ Matters considered in general

Even where a document is not incorporated by reference, the district court may nevertheless consider it on a motion to dismiss for failure to state a claim where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint; mere notice or possession of the document in question is not enough. Fed. R. Civ. P. 12(b)(6).

**[49]** **Federal Civil Procedure** ⚷ Matters considered in general

Only mentioning a document in the complaint will not satisfy the standard for allowing a court to consider the document on a motion to dismiss for failure to state a claim when the complaint relies heavily upon the document's terms and effect; indeed, even offering limited quotations

from the document is not enough. Fed. R. Civ. P. 12(b)(6).

**[50]** **Securities Regulation** ⚷ Scienter, Intent, Knowledge, Negligence or Recklessness

To properly allege motive, for purposes of the scienter element of securities fraud claims under § 10(b) and Rule 10b-5, plaintiffs must assert a concrete and personal benefit to the defendants resulting from the fraud. Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

**[51]** **Securities Regulation** ⚷ Scienter, Intent, Knowledge, Negligence or Recklessness

For purposes of the scienter element of securities fraud claims under § 10(b) and Rule 10b-5, motives generally possessed by most corporate directors and officers do not suffice to establish motive for securities fraud. Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

**[52]** **Securities Regulation** ⚷ Scienter, Intent, Knowledge, Negligence or Recklessness

Insider sales of stock may be evidence of scienter, as an element of securities fraud claims under § 10(b) and Rule 10b-5, if trades are unusual or suspicious in timing or amount. Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

**[53]** **Securities Regulation** ⚷ Scienter, Intent, Knowledge, Negligence or Recklessness

Stock sales by insiders made a short time before a negative public announcement are suspiciously timed, for purposes of the scienter element of securities fraud claims under § 10(b) and Rule 10b-5. Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

**[54] Securities Regulation** 👈 Scienter, Intent, Knowledge, Negligence or Recklessness

Factors considered in determining whether insider trading activity is unusual, for purposes of the scienter element of securities fraud claims under § 10(b) and Rule 10b-5, include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling. Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

**[55] Securities Regulation** 👈 Scienter

Pension funds failed to plausibly allege that bank's officers had a motive to commit fraud, as would support the scienter element of funds' claims for securities fraud under § 10(b) and Rule 10b-5, in putative class action against bank and officers, alleging defendant's omitted information regarding the Consumer Financial Protection Bureau (CFPB) investigation into bank's unauthorized use of customers' information to create bank accounts; while the complaint alleged that officers benefited concretely from stock sales throughout the class period, collectively selling 463,700 shares to earn gross proceeds of more than $26 million, all sales predated CFPB's consent order against bank by more than a year, and the sales did not directly precede negative announcements. Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

More cases on this issue

**[56] Securities Regulation** 👈 Scienter, Intent, Knowledge, Negligence or Recklessness

In the context of the scienter element of securities fraud claims under § 10(b) and Rule 10b-5, "recklessness" means conscious recklessness, i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence. Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

**[57] Securities Regulation** 👈 Weight and Sufficiency

Circumstantial evidence can support an inference of scienter, for purposes of securities fraud claims under § 10(b) and Rule 10b-5, in a variety of ways, including where defendants (1) benefited in a concrete and personal way from the purported fraud, (2) engaged in deliberately illegal behavior, (3) knew facts or had access to information suggesting that their public statements were not accurate, or (4) failed to check information they had a duty to monitor. Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

**[58] Securities Regulation** 👈 Scienter

There are two routes for pleading corporate scienter in a securities fraud action under § 10(b) and Rule 10b-5: by pleading facts sufficient to create a strong inference either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading. Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

**[59] Securities Regulation** 👈 Scienter

Pension funds failed to plausibly allege that bank CEO's congressional testimony, in which CEO allegedly downplayed the volume of bank accounts created without customer authorization, evinced a strong inference of scienter, as would support funds' securities fraud claims under § 10(b) and Rule 10b-5, in putative class action against bank and its officers, alleging defendant's omitted material information regarding the Consumer Financial Protection Bureau's (CFPB) investigation into bank's consumer sales practices; there were no allegations suggesting CEO or any other officer was aware of the unauthorized account openings when allegedly misleading statements were made, but rather, the testimony merely

Buhrke Family Revocable Trust v. U.S. Bancorp, --- F.Supp.3d ---- (2024)
2024 WL 1330047, Fed. Sec. L. Rep. P 101,838

suggested CEO familiarized himself with the full scope of the misconduct CFPB addressed. Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

More cases on this issue

**[60]    Securities Regulation** 🔑 Scienter

Pension funds failed to plausibly allege that bank executives' positions as executives were sufficient to support an inference of scienter, as would support funds' securities fraud claims under § 10(b) and Rule 10b-5, in putative class action against bank and officers, alleging defendant's omitted information regarding the Consumer Financial Protection Bureau's (CFPB) investigation into bank's unauthorized use of customers' information to create bank accounts; the number of unauthorized accounts created was, in comparison to bank's vast business, negligible, and there were no allegations that CFPB informed bank that its investigation involved the unauthorized accounts or otherwise communicated the findings from the investigation prior to discussion leading to CFPB's consent order. Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

More cases on this issue

**[61]    Securities Regulation** 🔑 Scienter, Intent, Knowledge, Negligence or Recklessness

For purposes of the scienter element of securities fraud claims under § 10(b) and Rule 10b-5, the "core operations doctrine" provides that a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue. Securities Exchange Act of 1934 § 21D, 15 U.S.C.A. § 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

**[62]    Securities Regulation** 🔑 Manipulative, Deceptive or Fraudulent Conduct

To state a scheme liability claim, the plaintiff must show: (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance. 17 C.F.R. § 240.10b-5.

**[63]    Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

Because claims for scheme liability sound in fraud, they are subject to the heightened pleading requirements for fraud. Fed. R. Civ. P. 9(b); 17 C.F.R. § 240.10b-5.

**[64]    Securities Regulation** 🔑 Pleading

To maintain a claim for scheme liability under the provisions of Rule 10b-5 prohibiting employing any device, scheme, or artifice to defraud, and prohibiting engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit, a plaintiff must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue. 17 C.F.R. § 240.10b-5(a), (c).

**[65]    Securities Regulation** 🔑 Manipulative, Deceptive or Fraudulent Conduct

Misstatements and omissions alone are not enough for a claim for scheme liability under Rule 10b-5. 17 C.F.R. § 240.10b-5.

**[66]    Securities Regulation** 🔑 Pleading
**Securities Regulation** 🔑 Scienter

Allegations in amended complaint brought by pension funds were insufficient to state claims for scheme liability under provisions of Rule 10b-5 prohibiting employing a scheme to defraud and engaging in a course of business that would operate as a fraud or deceit, in putative class action against bank's officers, alleging defendant's omitted information regarding the Consumer Financial Protection Bureau's (CFPB)

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.    11

2024 WL 1330047, Fed. Sec. L. Rep. P 101,838

investigation into bank's unauthorized use of customers' information to create bank accounts; complaint failed to plead scienter or any actionable misstatements, and the complaint merely referred to a small number of scattered cursory references to a fraudulent scheme, none of which detailed any scheme separate and apart from their core misstatements theory. 17 C.F.R. § 240.10b-5(a), (c).

More cases on this issue

**[67] Federal Civil Procedure** 🔑 Complaint

District court would grant pension funds leave to amend their amended complaint, in putative class action against bank and its corporate officers, asserting claims against all defendants for securities fraud under § 10(b) and Rule 10b-5, and asserting claims against officers for control person liability under the Securities Exchange Act, alleging defendant's omitted information regarding the Consumer Financial Protection Bureau's (CFPB) investigation into bank's unauthorized use of customers' information to create bank accounts, where the amended complaint was the first complaint submitted following funds' appointments as lead plaintiffs. Securities Exchange Act of 1934 §§ 10, 20, 15 U.S.C.A. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10b-5.

More cases on this issue

**Attorneys and Law Firms**

Andrea Farah, Alesandra Greco, Lowey Dannenberg, P.C., White Plains, NY, for Plaintiff.

Nidhi Yadava, Rajeev Muttreja, Sarah Efronson, Jones Day, New York, NY, for Defendants.

OPINION AND ORDER

JOHN P. CRONAN, United States District Judge:

**\*1** Lead Plaintiffs Teamsters Local 710 Pension Fund and Ohio Carpenters Pension Fund bring this putative securities

class action against U.S. Bancorp ("USB" or the "Company") and four of its corporate officers—Andrew Cecere, Terry Dolan, Jodi Richard, and Katherine Quinn (collectively, the "Individual Defendants")—for alleged misstatements and omissions made from August 1, 2019 through July 28, 2022 (the "Class Period"). Lead Plaintiffs plead two counts, alleging that Defendants knowingly made false and misleading statements and omissions in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, and that the Individual Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Defendants have moved to dismiss, arguing that the Amended Complaint fails to adequately plead a Section 10(b) and Rule 10b-5(b) violation because of the absence of allegations that Defendants made a material misstatement or omission, that Defendants did so with the requisite scienter, or that any misstatements or omissions caused Lead Plaintiffs' losses. Defendants additionally argue that Lead Plaintiffs have not adequately pleaded scheme liability under Rule 10b-5(a) and Rule 10b-5(c), nor have they adequately pleaded control person liability under Section 20(a). For the following reasons, the Court grants Defendants' motion to dismiss, but will allow Lead Plaintiffs to file a Second Amended Complaint in the event they can cure the pleading deficiencies identified herein.

**I. Background**

**A. Facts** [1]

[1] The following facts, which are assumed true for purposes of this Opinion and Order, are taken from the Amended Complaint, Dkt. 33 ("Am. Compl."), as well as documents incorporated by reference in the Amended Complaint and other documents susceptible to judicial notice. *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[ ] all reasonable inferences in plaintiff's favor"); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (noting that, on a motion to dismiss, courts "may consider any written

instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit").

**1. Defendants**

With "nearly 77,000 employees and $675 billion in assets," USB is the "fifth largest bank in the U.S." Am. Compl. ¶ 22. It is the parent company of U.S. Bank, "which is engaged in the general banking business, principally in domestic markets." *Id.* USB's "largest business unit" is "[c]onsumer and business banking," a unit that "generat[es] 40% of the Company's net revenue," *id.*, of which 84% comes from consumer banking, *id.* ¶ 149.

**\*2** Cecere is the Chairman, President, and Chief Executive Officer ("CEO") of USB. *Id.* ¶ 16. He has served as President since January 2016, CEO since April 2017, and Chairman since April 2018. *Id.* Before that, Cecere served as USB's Vice Chairman and Chief Operating Officer from January 2015 to January 2016, and as its Vice Chairman and Chief Financial Officer ("CFO") from February 2007 to January 2015. *Id.* ¶¶ 16, 138. At all relevant times, he has been a member of USB's Executive Committee and Risk Management Committee. *Id.* ¶ 16. Dolan is USB's Vice Chair and CFO, a role he has held since December 2016. *Id.* ¶ 17. "From July 2010 to July 2016, he served as Vice Chair, Wealth Management and Investment Services at the Bank." *Id.* ¶ 138. Richard, also Vice Chair, "has held the role of Chief Risk Officer of USB since October 2018." *Id.* ¶ 18. "Prior to that, she served as the Bank's Executive Vice President and Chief Operational Risk Officer from January 2018 until October 2018, and ... as Senior Vice President and Chief Operational Risk Officer from 2014 until January 2018." *Id.* ¶ 138. Finally, Quinn is USB's Vice Chair and Chief Administrative Officer, a role she has held since April 2017. *Id.* ¶ 19. Before that, she "served in various roles at USB, including as Executive Vice President and Chief Strategy, Marketing and/or Reputation Officer, from September 2013 to April 2017, and has served on the Managing Committee since 2015." *Id.* Dolan and Cecere signed and certified the accuracy of the quarterly and annual reports filed with the SEC during the Class Period; Richard and Quinn did not. *Id.* ¶¶ 16-19, 148.

**2. Key Events**

Lead Plaintiffs' allegations begin chronologically with a discussion of the widely-publicized Wells Fargo unauthorized account scandal. [2] As alleged, "[o]n September 8, 2016, the [Consumer Financial Protection Bureau ('CFPB')] published an enforcement action and Consent Order against Wells Fargo," penalizing the company for its "illegal practice of secretly opening unauthorized deposit and credit card accounts." *Id.* ¶ 34. The CFPB focused on four categories of conduct, finding that Wells Fargo had:

> (1) opened unauthorized deposit accounts for existing customers and transferred funds to those accounts without the customers' knowledge or consent; (2) submitted applications for credit cards in customers' names without the customers' knowledge or consent; (3) enrolled customers in online banking services they did not request; and (4) ordered and activated debit cards using customers' information without their knowledge or consent.

*Id.* The CFPB's announcement accused Wells Fargo of relying on "compensation incentive programs for its employees that encouraged them to sign up existing clients for deposit accounts, credit cards, debit cards, and online banking" and alleged that "Wells Fargo employees illegally enrolled customers in these products and services without their knowledge or consent in order to obtain financial compensation for meetings sales targets." *Id.* ¶ 35. Richard Cordray, the CFPB Director at the time, cautioned that the action "should serve notice to the entire industry that financial incentive programs, if not monitored carefully, carry serious risks that can have serious legal consequences." *Id.* Lead Plaintiffs allege that this comment "was directed at defendants Cecere, Dolan, Quinn, and Richard, among other banking executives," by virtue of their positions "[a]s senior executives in the banking industry." *Id.*

[2]     *See*, *e.g.*, *Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices Involving the Opening of Millions of Accounts without Customer Authorization*, Dep't of Just. (Feb. 21, 2020), available

at https://www.justice.gov/opa/pr/wells-fargo-agrees-pay-3-billion-resolve-criminal-and-civil-investigations-sales-practices (last visited Mar. 27, 2024).

Wells Fargo suffered additional consequences stemming from the unauthorized account openings. The company's CEO resigned, forfeited $41 million in previously awarded compensation, was fined $17.5 million by the Office of the Comptroller of Currency, and was "banned from ever working at a bank again." *Id.* ¶ 39. In addition,

> Wells Fargo ultimately paid billions in fines to various state and federal agencies, including the CFPB, the SEC, the Department of Justice, the U.S. Attorney's Offices for the Central District of California and the Western District of North Carolina and the city and county of Los Angeles, along with hundreds of millions to shareholder and account holders to resolve class action investor and consumer actions in connection with the scheme.

**\*3** *Id.* Having laid out that background, Lead Plaintiffs' allegations turn to USB and the alleged misconduct that gives rise to this case.

"The CFPB launched [an] investigation of USB at least as early as 2017 ...." *Id.* ¶ 144. That means, "[b]y the beginning of the Class Period," the CFPB had been investigating USB "for at least two years, if not longer." *Id.* ¶ 146. Lead Plaintiffs do not specifically allege when USB or the Individual Defendants learned of the CFPB's investigation, and, as discussed below, USB did not publicly disclose that it was being investigated by the CFPB until May 4, 2021. Prior to that disclosure, USB had made general disclosures on government examinations, inquiries, and investigations, as well as the possibility of resulting proceedings and penalties. For purposes of the Class Period, such general disclosures were made in USB's 2019 Annual Report, 2019 Form 10-K,[3] 2020 Annual Report, and 2020 Form 10-K, under a section of those documents titled, "Litigation and Regulatory Matters":

> **Regulatory Matters.** The Company is continually subject to examinations, inquiries and investigations in areas of heightened regulatory scrutiny, such as compliance, risk management, third-party risk management and consumer protection.... The Company is cooperating fully with all pending examinations, inquiries and investigations, any of which could lead to administrative or legal proceedings or settlements. Remedies in these proceedings or settlements may include fines, penalties, restitution or alterations in the Company's business practices (which may increase the Company's operating expenses and decrease its revenue).

*Id.* ¶ 113 (alteration in Amended Complaint). On May 4, 2021, in its Form 10-Q[4] for the first quarter of 2021, however, USB expressly disclosed for the first time that the CFPB was "investigating certain of the Company's consumer sales practices" and that USB "ha[d] responded and continue[d] to respond to the CFPB." *Id.* ¶ 118. This disclosure was repeated in SEC filings made on August 3, 2021 (Form 10-Q for the second quarter of 2021), November 2, 2021 (Form 10-Q for the third quarter of 2021), and February 22, 2022 (Form 10-K for 2021). *Id.* ¶ 119; *see also id.* ¶ 103 (alleging that USB's Form 10-K for 2021 was filed with the SEC on February 22, 2022).

[3] A Form 10-K is a comprehensive financial report that public companies must file annually with the SEC. *See* 15 U.S.C. § 78m; 17 C.F.R. § 249.310.

[4] A Form 10-Q is a comprehensive financial report that public companies must file with the SEC at the end of each of the first three quarters of the fiscal year. *See* 15 U.S.C. § 78m; 17 C.F.R. § 294.308a.

On May 3, 2022, in a Form 10-Q for the first quarter of 2022, USB updated its disclosure, again telling investors that the CFPB "ha[d] been investigating certain of the Company's consumer sales practices," but adding that the CFPB was "now considering a potential enforcement action." *Id.* ¶

120. USB further explained that it did "not believe an enforcement action [was] warranted, but there c[ould] be no assurance that" discussions with the CFPB would "result in a resolution," and noted that USB was "cooperating fully with the investigation." *Id.* ¶ 146 (internal quotation marks omitted); *accord id.* ¶ 120.

 **\*4** On July 28, 2022, the CFPB issued a Consent Order memorializing an agreement with USB that concluded the investigation. *Id.* ¶ 7; *see* Dkt. 42-4 ("Consent Order"). [5] When the Consent Order was issued, CFPB Director Rohit Chopra "stated that 'for over a decade, U.S. Bank knew its employees were taking advantage of its customers by misappropriating consumer data to create fictitious accounts." Am. Compl. ¶ 144 (brackets omitted). Also appearing to quote Chopra, the Amended Complaint alleges that "[t]he CFPB investigation 'found specific evidence that revealed that U.S. Bank was aware that sales pressure was leading employees to open accounts without authorization, and the bank had inadequate procedures to prevent and detect these accounts.' " *Id.* The CFPB fined USB $37.5 million "and ordered the Company [to] submit a compliance plan design to ensure the Company's relevant conduct complies with all applicable federal consumer financial laws and the terms of the Order." *Id.* ¶ 132; *see* Consent Order ¶¶ 33-35, 49.

[5]    The Court may consider the Consent Order at this stage because it is integral to the Amended Complaint, which "relies heavily upon its terms and effect." *See DiFolco v. MSNBC Cable L.L.C.,* *622 F.3d 104, 111 (2d Cir. 2010).*

USB explicitly did not admit or deny the CFPB's findings of fact or law in the Consent Order, other than admitting to those facts necessary to establish the CFPB's jurisdiction. Consent Order ¶ 2. With that caveat, the CFPB represented in the Consent Order that it found the following:

- "In response to sales pressure or to obtain incentive rewards, [USB] employees opened deposit accounts, submitted applications for and issued credit cards, and opened lines of credit linked to deposit accounts without consumers' knowledge and consent. These acts or practices involved a small percentage of [USB]'s new accounts." *Id.* ¶ 10.

- "In 2016, [USB] began enhancing its processes for account opening and retention of affirmative consent. The number of accounts bearing indicia of non-authorization trended downward after these process improvements." *Id.* ¶ 12.

- "In 2016, [USB] began enhancing its processes for detecting and investigating sales misconduct." *Id.* ¶ 13.

  - "[USB] was aware that many allegations [of applying for, opening, issuing, activating, or enrolling a consumer in, without the consumer's knowledge and consent, credit cards, Premier lines of credit, Reserve lines of credit, or deposit accounts] were not escalated or recorded." *Id.*

- USB violated the Truth in Lending Act ("TILA"), 15 U.S.C. § 1642, and Regulation Z, 12 C.F.R. § 1026.12(a), "[b]y issuing credit cards to consumers without the consumers' knowledge and consent and not in response to an oral or written request or application for the card or as a renewal of, or substitute for, an accepted credit card." Consent Order ¶ 16; *see also id.* ¶¶ 15-16.

- USB violated Section 604(f) of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681b(f), "[b]y using or obtaining consumer reports without a permissible purpose." Consent Order ¶ 23; *see also id.* ¶¶ 17-23.

- USB violated the Truth in Savings Act ("TISA"), 12 U.S.C. § 4301(b), and Regulation DD, 12 C.F.R. § 1030.4, "[b]y opening deposit accounts without consumer authorization and, in the process, failing to provide the required disclosures to the account-holder." Consent Order ¶ 26; *see also id.* ¶¶ 24-26.

  - USB violated Section 1036(a)(1)(A) of the Consumer Financial Protection Act, 12 U.S.C. § 5536(a)(1)(A), "[b]y violating TILA, FCRA, and TISA" and thus "committ[ing] acts or omissions in violation of Federal consumer financial laws." Consent Order ¶ 30; *see also id.* ¶¶ 27-30.

After the Consent Order was published, "the price of USB stock declined 4% to close at $46.12 on July 28, 2022." Am. Compl. ¶ 9.

Shortly thereafter, on August 4, 2022, the Banking Committee of the U.S. Senate sent Cecere a letter regarding the Consent Order and expressing the Committee's "deep concern with [USB]'s misconduct, particularly in light of the Wells Fargo fake accounts scandal." *Id.* ¶ 43. The Committee requested information from USB regarding the conduct detailed in the Consent Order and "highlighted the CFPB's findings

2024 WL 1330047, Fed. Sec. L. Rep. P 101,838

that [USB] utilized an incentive-compensation program to pressure employees to 'engage[ ] in unlawful activity by utilizing customers' personal identifying information to open deposit accounts, apply for and issue credit cards, and open lines of credit,' which 'accrued fees and increased profits' and which the CFPB found 'violated federal consumer laws and violated individual consumers' control over their data privacy.' " *Id.* About a month and a half later, on September 22, 2022, Cecere testified at an oversight hearing before the Senate Banking Committee. *Id.* ¶ 44. When questioned whether USB was "opening unauthorized accounts," Cecere responded that he took "full responsibility that [USB] did open up unauthorized bank accounts. It was going back to 2010. It's unacceptable. It's inconsistent with our principles and procedures as well as our ethics." *Id.* ¶ 8; *accord* ¶¶ 44, 147. Cecere also provided some specifics, informing the Banking Committee that USB "identified 342 accounts over that time ... against a population of 40 million opened accounts." *Id.* ¶ 44 (alteration in original). Lead Plaintiffs question the accuracy of Cecere's statistic, alleging that Cecere "failed to provide any context for his improbable assertion and grossly misrepresented the extent of unauthorized accounts at the Bank." *Id.*

**\*5** The basis of Lead Plaintiffs' skepticism—which implies the extremely serious accusation that Cecere made

misrepresentations when testifying before Congress—is twofold. First, they emphasize the CFPB's finding in the Consent Order that USB's procedures from January 1, 2010 through December 31, 2020 "were not reasonably designed to determine the full scope" of unauthorized accounts prior to 2016. *Id.* ¶ 45. Second, they question the plausibility of the number of unauthorized accounts Cecere provided to Congress based on the relative size of the fine assessed against USB when compared to the fine the CFPB levied on Wells Fargo. The CFPB fined Wells Fargo $100 million dollars based on more than 3.5 million accounts that were "impacted by improper and unlawful conduct." *Id.* ¶ 46. Lead Plaintiffs therefore reason that it is implausible that the CFPB would fine USB $37.5 million based on only 342 unauthorized accounts. *Id.*

Lead Plaintiffs also allege that the Individual Defendants executed a number of stock sales during the Class Period, reflecting their fraudulent intent. Specifically, "during the Class Period but before disclosure of the CFPB Consent Order ... the Individual Defendants collectively sold 463,700 shares of their personally-held stock, earning gross proceeds of more than $26 million." *Id.* ¶ 150. The alleged sales break down as follows:

| Insider | Date | Price | Shares Sold | Proceeds |
|---|---|---|---|---|
| Cecere (Chief Executive Officer) | 11/15/2019 | $58.81 | 165,564 | $9,736,819 |
| | 4/22/2021 | $56.48 | 184,187 | $10,402,882 |
| | Subtotal: | | 349,751 | $20,139,701 |
| | | | | |
| Dolan (Chief Financial Officer) | 11/14/2019 | $58.59 | 17,200 | $1,007,748 |
| | 11/19/2020 | $42.98 | 50,000 | $2,149,000 |
| | 4/30/2021 | $59.11 | 19,149 | $1,131,897 |
| | Subtotal: | | 86,349 | $4,288,645 |
| | | | | |
| Richard (Chief Risk Officer) | 11/18/2019 | $59.61 | 2,600 | $154,986 |
| | | | | |
| Quinn (Chief Administrative Officer) | 5/18/2021 | $61.47 | 25,000 | $1,536,750 |

| | | | | Total: | | 463,700 | $26,120,082 |
|---|---|---|---|---|---|---|---|

*Id.* All these sales "were made after the CFPB investigation began and before" issuance of the Consent Order. *Id.* ¶ 151. "[D]efendants Quinn and Richard did not sell any stock in the two years immediately before the Class Period or at any time following the Class Period (as of April 26, 2023)." *Id.*

**B. Procedural History**

The Buhrke Family Revocable Trust filed the original Complaint in this action on February 26, 2022. Dkt. 1. The Honorable Sarah L. Cave then appointed Teamsters Local 710 Pension Fund and Ohio Carpenters Pension Fund as Lead Plaintiffs on February 10, 2023. Dkt. 28. On May 5, 2023, Lead Plaintiffs filed the operative Amended Complaint, which contains two counts. Dkt. 33. Count I alleges violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5, subsections (a)-(c), by all Defendants. Am. Compl. ¶¶ 174-183. Lead Plaintiffs allege four categories of statements, each of which they claim misleadingly omitted material information about the unauthorized account openings and the associated CFPB investigation, namely: (1) statements regarding USB's "Trust, Ethics and Brand," Am. Compl. ¶¶ 54-65, 67-75, 78-80, 83-97, 99, (2) statements regarding USB's "Risk Environment and Risk Management," *id.* ¶¶ 102-114, (3) statements regarding the CFPB investigation, *id.* ¶¶ 118-120, and (4) statements regarding USB's Ethics Code, *id.* ¶¶ 123-129. Count II alleges violations of Section 20(a) of the Exchange Act by the Individual Defendants. *Id.* ¶¶ 184-188.

Defendants filed the instant motion to dismiss on July 11, 2023, Dkts. 40, 41 ("Motion"), Lead Plaintiffs filed their opposition on September 8, 2023, Dkt. 43 ("Opposition"), and Defendants replied on October 23, 2023, Dkt. 45 ("Reply"). The Court held oral argument on the motion on March 5, 2024. Dkt. 48 ("Tr.").

## II. Standard of Review

**A. Federal Rule of Civil Procedure 12(b)(6)**

Defendants have moved to dismiss Lead Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,*

556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* These "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955. Although the Court must "accept[ ] as true the factual allegations in the complaint and draw[ ] all inferences in the plaintiff's favor," *Biro v. Condé Nast,* 807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC,* 570 F.3d 471, 475-76 (2d Cir. 2009).

**B. Securities Fraud Claims**

***6 [1]*** Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Subsection (b) of the SEC's implementing rule, Rule 10b-5, provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b). To state a claim under Section 10(b) and Rule 10b-5(b), a plaintiff must adequately plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 37-38, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011) (internal quotation marks omitted).

**[2] [3]** Plaintiffs bringing securities fraud claims must satisfy heightened pleading standards under Federal Rule of Civil Procedure 9(b). *ATSI Commc'ns,* 493 F.3d at 99. Accordingly, a plaintiff alleging fraud under Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) must "(1) specify the statements that the plaintiff contends were fraudulent,

(2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). Conclusory allegations or allegations unsupported by factual assertions are insufficient. *See ATSI Commc'ns*, 493 F.3d at 99.

 **[4]** **[5]** **[6]** Securities fraud claims under Section 10(b) must also satisfy the PSLRA's heightened pleading requirements. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). The PSLRA requires that "the complaint ... specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *accord Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019). In pleading scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *see Tellabs*, 551 U.S. at 321, 127 S.Ct. 2499. "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323, 127 S.Ct. 2499. For an inference of scienter to be strong, "a reasonable person must deem it cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *ATSI Commc'ns*, 493 F.3d at 99 (brackets and emphasis omitted) (quoting *Tellabs*, 551 U.S. at 324, 127 S.Ct. 2499).

 **[7]** **[8]** The Second Circuit has also cautioned that courts "must be careful not to mistake heightened pleading standards for impossible ones." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021) (quoting *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 161 (2d Cir. 2021)). Simply put, the PSLRA does not demand "that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based." *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000). Nor does Rule 9(b) "require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

### III. Discussion

### A. Defendant Jodi Richard's Liability Under Rule 10b-5(b)

The Court begins with whether Lead Plaintiffs have made sufficient allegations of conduct by Richard to allow for her liability under Rule 10b-5(b). Defendants argue that the Amended Complaint fails to allege any statements that Richard made. Motion at 32-33. This is significant because "only the 'maker' of a misstatement, *i.e.*, the person with ultimate authority over the statement, can have primary liability under Rule 10b-5(b)." *SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) (quoting and citing *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142, 131 S.Ct. 2296, 180 L.Ed.2d 166 (2011)). In opposing Defendants' motion, Lead Plaintiffs cite paragraphs of the Amended Complaint that they maintain allege that Richard presented slides at a September 2019 investor conference. *See* Opposition 19-20 n.18 (citing Am. Compl. ¶¶ 27, 48).

 **\*7** **[9]** The actual allegations, however, do not establish that Richard made any statements that could give rise to liability for her under Rule 10b-5(b). The cited passages of the Amended Complaint merely allege that Cecere and an unnamed "executive" presented at the conference. *See* Am. Compl. ¶¶ 27, 48. Lead Plaintiffs also direct the Court to the slides from that presentation that Defendants submitted in moving to dismiss, while also criticizing Defendants for "cho[osing] to omit the slide containing" Richard's statement. Opposition at 20 n.18 (citing Dkt. 42-6). While the agenda slide submitted in that filing does mention Richard and another individual as speakers on the topic of "Risk Management," Dkt. 42-6 at 6, an agenda identifying Richard as being scheduled to present does not demonstrate that she in fact ended up speaking on risk management at the conference, let alone what she said about that topic. Nor does the mention of Richard on an agenda provided by Defendants in any way remedy the failure of Lead Plaintiffs to allege in the Amended Complaint that Richard made any relevant statement at the conference. And of course it is not Defendants' obligation to provide that information or the entirety of the slides, nor have Lead Plaintiffs provided the supposedly omitted slides (assuming *arguendo* it would be appropriate to consider such extraneous evidence at this stage).

Lead Plaintiffs also assert in their opposition brief that Richard made statements—although they do not specify which ones—by virtue of her role on the Executive Risk Committee and her attendant responsibility "for the risks related to the Company's illegal sales practices." Opposition at 20 n.18. Richard's responsibility for managing risks is

inapposite; the question is whether Richard was "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp.*, 564 U.S. at 142, 131 S.Ct. 2296. Lead Plaintiffs have identified no portion of the Amended Complaint in which they allege that Richard controlled the content of any alleged misstatement or omission. Thus, Lead Plaintiffs have failed to allege a violation of Rule 10b-5(b) as to Richard.

### B. Material Misstatements or Omissions

Lead Plaintiffs allege that, when making statements in four categories, discussed below, Defendants omitted material information regarding the opening of unauthorized accounts, the CFPB investigation and USB's corresponding exposure to regulatory consequences, the risk associated with the sales incentive compensation program being publicly revealed, and the ineffectiveness of USB's risk management program. Opposition at 11, 18-19, 21-22.

[10] [11] [12] [13] Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives*, 563 U.S. at 44, 131 S.Ct. 1309. Instead, "[t]he Supreme Court has instructed that 'silence, absent a duty to disclose, is not misleading under Rule 10b-5.' " *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100-01 (2d Cir. 2015) (brackets omitted) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). "Such a duty may arise when there is 'a corporate insider trading on confidential information,' a 'statute or regulation requiring disclosure,' or a corporate statement that would otherwise be 'inaccurate, incomplete, or misleading.' " *Id.* at 101 (quoting *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992)). The Second Circuit has clarified that, with respect to the last of these three potential avenues for a duty to disclose to arise, "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. JinkoSolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) (citing *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002)). With that said, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). In assessing whether an omission renders a statement inaccurate, incomplete, or misleading, courts must look at the "context and manner of presentation." *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010) (internal quotation marks omitted).

### 1. Trust, Ethics, and Brand

**\*8** The first category is comprised of statements emphasizing the level of trust that USB's customers placed in the bank, the importance of that trust for USB's brand and success, and USB's record of ethical business practices. For example, a slide presented at the September 2019 investor conference contained the statement: "Our Advantages: a strong reputation rooted in trust and engagement." Am. Compl. ¶ 54.[6] Another slide from the same presentation stated that USB's "brand value" had grown 55% since 2016, citing "Brand Finance," and noted that this resulted in "Strengthened Most Trust Choice positioning." *Id.* ¶ 60; *see also id.* ¶ 67 (statement in 2019 Annual Report: "Our brand value — the financial significance a brand carries — grew by 55% in the last three years[ ] in response to our efforts to build brand awareness and strategically market ourselves." (alteration in Amended Complaint)). During the same investor conference, Quinn told investors that USB's "secret sauce" was the combination of "ethics, trust and collaboration" and that trust would "remain a competitive advantage" for USB. *Id.* ¶ 63. Similarly, throughout the Class Period, USB repeatedly emphasized that a strong sense of ethics, often referred to as "doing the right thing," was at the core of its culture. *See id.* ¶¶ 65 (statement by USB's Vice Chairman of Corporate & Commercial Banking following the September 2019 investor conference that "our strong ethical culture really resonates well with our client base"), 68 (statement in USB's 2019 Annual Report that "doing the right thing is in the DNA of our culture"), 70-71 (statements in USB's 2020 Annual Report that " '[w]e do the right thing' leads our core values" and "[e]thical behavior is at the core of our culture"), 78-80 (statements in USB's Forms 8-K[7] filed on September 15, 2020, September 21, 2021, and December 8, 2021 referring to its "culture" of "doing the right thing"), 85 (statement by USB in a February 25, 2020 press release that "[o]ur commitment to doing the right thing is at the heart of everything we do"), 90 (Cecere's statement at an April 21, 2020 annual shareholders meeting that "we operate in a culture rooted in ethics and integrity"), 99 (statement on USB's website, as of at least October 1, 2020: "Relationships are the heart of our business .... Our commitment to the highest ethical standards is what makes that trust possible."). USB also continually referenced in its SEC filings and public statements that it ranked among the most ethical companies in the world in 2019 and 2020 according to "Ethisphere." *Id.* ¶¶ 83-97.

2024 WL 1330047, Fed. Sec. L. Rep. P 101,838

6    Many of the statements on which Lead Plaintiffs rely are emphasized in bold italics in the Amended Complaint. Those emphases have been removed herein when quoting the statements.

7    A Form 8-K is a "Current Report" that companies are required to file pursuant to Section 13 or Section 15(d) of the Exchange Act. *See* Securities and Exchange Commission, Form 8-K, https://www.sec.gov/about/forms/form8-k.pdf (last visited Mar. 27, 2024).

Defendants argue that these statements touting USB's trust, ethics, and brand are non-actionable puffery. Motion at 7-9. They further urge the Court to find statements in this category not false or misleading because they neither contained any objectively false statement of fact nor misleadingly omitted any material information. *Id.* at 9-14. As to the latter argument, Defendants maintain that Lead Plaintiffs have failed to plead both the existence of any fact that was omitted and a sufficiently close nexus between the statements and the allegedly omitted information. *Id.* In response, Lead Plaintiffs argue that "the undisclosed misconduct revealed by the Consent Order – longstanding violations of USB's ethics and the known misappropriation of customer data through the creation of fictious accounts without customer knowledge – directly contradicts Defendants' representations" in this category of statements. Opposition at 14-17. Defendants' first argument largely carries the day: the statements in this category are, with one small exception, non-actionable puffery. As to that exception, that statement lacks a sufficient nexus to any allegedly omitted information to render it misleading.

[14] [15] [16] "It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.' " *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG* ("*UBS*"), 752 F.3d 173, 183 (2d Cir. 2014) (quoting *ECA, Loc. 134 IBEW Jt. Pension Tr. of Chicago v. JP Morgan Chase Co.* ("*JP Morgan Chase*"), 553 F.3d 187, 206 (2d Cir. 2009)). "This is particularly true where ... the statements are explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.' " *Id.* "[G]eneral declarations about the importance of acting lawfully and with integrity, fall squarely within this category." *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019). And "[w]hile a bank's reputation is undeniably important, that does not render a particular statement by a bank regarding its integrity per se material." *JP Morgan Chase*, 553 F.3d at 206.

[17] Meanwhile, "[a]ssertions of satisfactory regulatory compliance can be materially misleading if 'the descriptions of compliance efforts' are 'detailed' and 'specific.' " *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S* ("*Danske Bank*"), 11 F.4th 90, 103 (2d Cir. 2021) (quoting *Singh*, 918 F.3d at 63). Likewise, the Second Circuit has declined to excuse as puffery specific representations about the amount of cash a company had available for investing, the results produced by a particular business line, or the status of inventory. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016) (holding that statements regarding cash for investing and business line results were not puffery); *Novak*, 216 F.3d at 315 (holding that statements that the defendant-company's "inventory situation was 'in good shape' or 'under control' " were not puffery). The Second Circuit also has observed, albeit in *dicta*, that when viewed in context, "a company's specific statements that emphasize its reputation for integrity or ethical conduct as central to its financial condition or that are clearly designed to distinguish the company from other specified companies in the same industry" might "amount to more than 'puffery' and may in some circumstances violate the securities laws." *Indiana Pub. Ret. Sys. v. SAIC, Inc.* ("*SAIC II*"), 818 F.3d 85, 98 (2d Cir. 2016).

**\*9** [18] The statements in this category are far more analogous to those in *Singh, JP Morgan Chase*, *Danske Bank*, and *UBS* than those in *Vivendi* and *Novak*; they are simply too general for a reasonable investor to have considered them as material information that should be relied upon. For example, in *JP Morgan Chase*, the Second Circuit found that statements regarding a bank's "standard-setting reputation for integrity" were puffery. 553 F.3d at 205-06. Many of the statements cited by Lead Plaintiffs in this category plainly land closer to such a statement than a concrete assertion regarding the status of inventory or the results of a particular business line. *See*, *e.g.*, Am. Compl. ¶¶ 24 (Cecere's statement at the September 2019 investor conference that "one of the Company's key '[a]dvantages' [was] a 'strong reputation rooted in trust' "), 54 (statement at the September 2019 investor conference "in which USB underscored its strong reputation rooted in trust and engagement"), 59 (Quinn's statement at the September 2019 investor conference: "We maintain an 'Excellent Reputation' score as defined by our community partners."). Some statements were also explicitly aspirational. *E.g.*, *id.* ¶¶ 72 (statement in USB's

2020 Annual Report: "We are *committed to* protecting the confidentiality, integrity, availability and privacy of customer data." (emphasis added)), 85 (USB's statement in a February 25, 2020 press release: "Our *commitment* to doing the right thing is at the heart of everything we do." (emphasis added)), 90 (Cecere's statement at an April 21, 2020 annual shareholders meeting: "Everyone is intensely *focused on* meeting the financial needs and objectives of our customers as we operate in a culture rooted in ethics and integrity." (emphasis added)). And as to the statements about USB's ranking on Ethisphere's list of the World's Most Ethical Companies, *see id.* ¶¶ 83-97—which are more concrete assertions in this category—this Court agrees with another judge in this District who held that a company's statement regarding its ranking on the Ethisphere list was non-actionable puffery. *In re SAIC, Inc. Sec. Litig.* ("*SAIC I*"), No. 12 Civ. 1353 (DAB), 2013 WL 5462289, at *12-13 (S.D.N.Y. Sept. 30, 2013), *on reconsideration*, 2014 WL 407050 (S.D.N.Y. Jan. 30, 2014), *aff'd in relevant part sub nom. SAIC II*, 818 F.3d 85.

Lead Plaintiffs try to distinguish *SAIC I* by contending that the statements there "did not distinguish the company from its competitors in light of specific industry concerns." Opposition at 12. And, therefore, Lead Plaintiffs argue that USB's statements instead fall under the situation the Second Circuit envisioned in its *dicta* in *SAIC II* because they were designed to distinguish USB from Wells Fargo in the wake of Wells Fargo's fake account scandal, by USB "emphasiz[ing] its reputation for integrity or ethical conduct as central to its financial condition." *Id.* (quoting *SAIC II, 818 F.3d at 98*). This argument is unavailing. The Amended Complaint has no non-conclusory allegations that USB's statements were designed to distinguish it from Wells Fargo. The Amended Complaint does not contain any statements from USB that mention Wells Fargo or even any associated industry-wide concern about opening unauthorized accounts or sales incentive compensation. The closest the Amended Complaint comes to making such allegations are certain statements where USB asserted, in a general sense, that brand, culture, and ethics were differentiators. *See* Am. Compl. ¶¶ 63 (alleging that Quinn stated at the September 2019 investor conference that "[b]rand and culture are differentiators for U.S. Bank and they are fundamental to how we run our business" (alteration in Amended Complaint)), 67 (alleging that USB noted in its 2019 Annual Report that its "culture, brand and reputation are sources of competitive advantage for U.S. Bank and differentiate us from our peers"), 78 (alleging that Defendants presented a slide, appended to a

September 15, 2020 Form 8-K, which stated that USB's "[c]ulture of 'doing the right thing' for all our stakeholders" "differentiates U.S. Bank"). This is insufficient to establish that the statements in this category were "*clearly* designed" to distance U.S. Bank from Wells Fargo in particular, and even more specifically from Wells Fargo's compliance issues.[8] *SAIC II*, 818 F.3d at 98 (emphasis added); *see also Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 580 (S.D.N.Y. 2016) (finding statements that "transparency" was a "competitive strength" and that the company "actively managed 'reputational risks' " to be non-actionable puffery).

[8] Lead Plaintiffs also argue that Defendants waived any challenge to the subset of allegations in this category that specifically discussed USB's asserted "competitive advantage" based on its ethics and integrity. Opposition at 10 n.5. This argument is itself only presented in a footnote, so the Court need not consider it. *See*, *e.g.*, *City of Philadelphia v. Bank of Am. Corp.*, 498 F. Supp. 3d 516, 537 (S.D.N.Y. 2020) (collecting cases). Furthermore, Defendants have explicitly argued that the entire category of statements from which these statements are drawn is immaterial puffery. Motion at 8-9. Lead Plaintiffs filed an eighty-three-page complaint, containing more than fifty alleged misstatements or omissions, some of which are multiple paragraphs long. *See*, *e.g.*, Am. Compl. ¶ 106. Given this pleading—one that might be reasonably criticized as not being a "short and plain statement" of Lead Plaintiffs' claims, Fed. R. Civ. P. 8(a)—Lead Plaintiffs cannot demand that Defendants address every single allegation in detail.

**\*10** Nor is USB alleged to have emphasized "its reputation for integrity or ethical conduct as central to its financial condition" in a way that overcomes the generality of these statements. Plaintiffs rely on three cases stemming from the exposure of widespread corruption in Brazil where courts in this District found that statements about integrity or ethical conduct were materially misleading because the defendants had made "repeated references" emphasizing the defendant-companies' ethical standards or corporate governance practices "in response to specific press reports indicating that" those companies were implicated in the corruption scandal. *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463 (S.D.N.Y. 2017); *accord Wash. St. Inv. Bd. v. Odebrecht S.A.*, 461 F. Supp. 3d 46, 73-74 (S.D.N.Y.

2020) (holding that statements about risks from international competition and regarding competitive bidding processes misleadingly omitted that the company was involved in another part of the bribery scheme); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015); *see* Opposition at 9-12. Here, however, there are no allegations of any reports that the Wells Fargo fake account scandal indicated similar non-compliance by USB or otherwise implicated USB. Instead, the allegations only support the conclusion that the statements about USB's trust, ethics, and brand were issued "in the ordinary course of business." *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 757 (S.D.N.Y. 2017) (finding statements about corporate integrity and ethics non-actionable puffery).

Of the cases emerging from the Brazilian corruption scandal, the most helpful to Lead Plaintiffs probably is a fourth case, *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600 (S.D.N.Y. 2017). There, the defendant-company's "statements about compliance with the law, in general, and bribery, in specific, were made" after "the public had learned of the vast bribery revelations stemming from [the Brazilian corruption scandal]." *Id.* at 659. Even though there was no allegation of reports implicating the defendant-company in the scandal, the court in *Banco Bradesco* found that the statements were not immaterial puffery because the plaintiffs alleged that the "scandal ... intensified investors' focus on the policies in place at Brazilian companies to prevent similar misconduct" and the statements were therefore made "in an effort to reassure the investing public about the Company's integrity, specifically with respect to bribery, during a time of concern." *Id.* at 621 (describing the corruption scandal and related allegations), 660 (holding on puffery). USB is analogous to the defendant-company in *Bradesco* in that neither company had itself been implicated in the scandal in question. And USB certainly emphasized the importance of its brand and that its brand was premised on a reputation of trust. *See* Am. Compl. ¶¶ 58 (Quinn's statement at the September 2019 investor conference regarding the impact of USB's brand on shareholder returns), 63 (Quinn's statement at the September 2019 investor conference: "[S]trong brands drive better shareholder return. They also drive higher top line growth and they outperform the S&P 500."), 129 (USB's statement in its code of ethics that "[o]ur reputation is our most valuable asset, and it's the cornerstone of our brand"). But *Bradesco* remains distinguishable because Lead Plaintiffs have not alleged the same type of explicit references to Wells Fargo, or otherwise to opening unauthorized accounts or sales incentive compensation, in USB's SEC filings that

the defendant-company in *Bradesco* made to the Brazilian corruption scandal:

> Bradesco acknowledged in its own public filings the risks and uncertainties [the corruption scandal] could bring to its own operations and the confidence of its investors, cautioning investors that they "may have momentarily harmed the reputation of Brazil, which could reduce investor confidence," and that, "[i]f uncertainty continues or a reduction in investor confidence as a result of these investigations is material, it may adversely affect the results of our operations."

*Bradesco*, 277 F. Supp. 3d at 659-60 (second alteration in original). While Lead Plaintiffs argue that "Defendants' statements were made repeatedly in the wake of the Wells Fargo scandal and were specifically intended to reassure the public that its brand, reputation and customer trust – key components of the Bank's strategy to compete – were intact," Opposition at 11, they identify no allegation in the Amended Complaint to support their contention that USB's statements were responding to that scandal. [9] In sum, the statements in the category of discussing USB's trust, ethics, and brand amount no more than mere puffery, with the following exception.

[9]    Furthermore, Lead Plaintiffs allege that the marketing effort in question began in 2013 when USB hired Quinn, which was well *before* the Wells Fargo account scandal became public in 2016. *See* Am. Compl. ¶ 23.

**\*11 [19] [20]** One statement in this category is sufficiently specific that it does not clearly qualify as puffery: the statement that USB's brand value had grown by 55% since 2016. Am. Compl. ¶¶ 60 (Quinn's statement at the September 2019 investor conference), 67 (statement in the 2019 Annual Report). As this statement asserted a concrete numerical increase in brand value that could presumably be verified as false or true, it cannot be dismissed as puffery. *See In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 417-18 (2d Cir. 2023). [10] But this statement still is non-actionable because it was not misleading by virtue of the allegedly omitted information. To be actionably misleading, there must be a "sufficiently close nexus" between the statement and the allegedly omitted information. *See In re Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 272-73 (S.D.N.Y. 2021) ("[T]o prevail on [an omission] theory, plaintiffs must establish a sufficiently close nexus between the affirmative statement and the alleged omission to demonstrate that" there

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2821 Filed 11/15/24 Page 24 of 173

**Buhrke Family Revocable Trust v. U.S. Bancorp, --- F.Supp.3d ---- (2024)**
2024 WL 1330047, Fed. Sec. L. Rep. P 101,838

is "a duty to disclose the omitted information ... in order to prevent the statement from being materially misleading."); *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 296 (S.D.N.Y. 2019) (collecting cases). In other words, the subject matter of the alleged statement must relate closely enough to the allegedly omitted information such that a reasonable investor might have drawn inferences about the omitted information because of the statement. *See Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, No. 19 Civ. 7536 (NRB), 2021 WL 1199035, at *15 n.13 (S.D.N.Y. Mar. 30, 2021) (collecting cases), *aff'd sub nom. Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82 (2d Cir. 2022). Here, a reasonable investor would not interpret statements about a bank's improvement in brand value to imply anything regarding the existence *vel non* of unauthorized account openings or related government investigations. Thus, this statement is not actionable either, rendering the entirety of this first category of statements not actionable.

10      Because it can be objectively true or false, this statement is also a statement of fact. *See In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th at 418-19; *see also infra* III.B.2 (discussing distinction between statements of fact and statements of opinion). The Court has not addressed whether the other statements in this category are statements of fact or opinion because their generality renders them non-actionable regardless of their categorization as fact or opinion statements. *See In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th at 417-18.

### 2. Risk Environment and Risk Management

The second category generally consists, first, of statements about USB's risk management policies and procedures and, second, of statements about the compliance, legal, and regulatory risks USB was exposed to during the Class Period. As an example of the former, USB consistently provided a disclosure describing its "three lines of defense" framework for risk management and the roles of the Executive Risk Committee, Board of Directors, CEO, Chief Risk Officer, and Risk Management Committee in managing risk for USB. Am. Compl. ¶¶ 102-104, 111. Relatedly, USB promoted the claimed effectiveness of its risk management practices, stating that its "risk discipline" was a "differentiator." *Id.* ¶ 105. As to the latter—USB's exposure to compliance, legal, and regulatory risks—USB provided comprehensive disclosures on the panoply of legal and reputational harms it might suffer if its risk management and compliance systems failed to prevent prohibited behavior. *Id.* ¶¶ 106-110, 113.

Of particular relevance, and as noted above, USB informed investors in both its 2019 and 2020 Annual Reports, filed with the SEC on February 13, 2020, *id.* ¶ 67, and February 23, 2021, *id.* ¶ 70, respectively, as well as in its 10-K Forms filed for 2019 and 2020:

> **Regulatory Matters.** The Company is continually subject to examinations, inquiries and investigations in areas of heightened regulatory scrutiny, such as compliance, risk management, third-party risk management and consumer protection.... The Company is cooperating fully with all pending examinations, inquiries and investigations, any of which could lead to administrative or legal proceedings or settlements. Remedies in these proceedings or settlements may include fines, penalties, restitution or alterations in the Company's business practices (which may increase the Company's operating expenses and decrease its revenue).

*Id.* ¶ 113. Also notable were USB's disclosures that it "could face significant legal and reputational harm if it fail[ed] to safeguard personal information" and that "[a]ny mishandling or misuse of the personal information of customers, employees or others by the Company ... could expose the Company to litigation or regulatory fines, penalties, or other sanctions." *Id.* ¶ 106. These two disclosures were provided in the 2019 Annual Report, the 2020 Annual Report, and the 2021 Annual Report (filed on February 25, 2022), as well as the associated Form 10-K filings with the SEC. *Id.* ¶¶ 106-107.

**\*12** For this category of statements, Defendants largely reiterate the three arguments that they made as to the trust, ethics, and brand category of statements. *See* Motion at 17 (puffery), 18 (no false statement), 19 (no misleading omission). In response, Lead Plaintiffs again rely on a half-truth theory, primarily arguing that this category of statements is actionable because the statements misleadingly suggested that USB might suffer legal and reputational harm if customer information was mishandled when it already knew that it had, in fact, failed to safeguard customer information by

virtue of the unauthorized account openings starting in 2010. Opposition at 17-18. In addition, pointing to the statement in the Consent Order that "the bank had inadequate procedures to prevent and detect" unauthorized accounts, Lead Plaintiffs argue that the risk management framework described in this category was ineffective, and therefore the statements were misleading by suggesting otherwise. *Id.* at 18-19. Finally, Lead Plaintiffs assert that Defendants emphasized USB's risk management capabilities as a competitive advantage, and that they did so set against the backdrop of, and in response to, the investing public's concern following the Wells Fargo accounts scandal; this amalgamation, they contend, vitiates Defendants' position that such statements are puffery. *Id.* at 19-21.

**[21]** **[22]** For the first subset of statements in this category —USB's descriptions of its risk management procedures and policies and the two associated theories of liability—the statements, like those on USB's trust, ethics, and brand, are too general to give rise to liability. For example, paragraphs 102, 103, and 115 of the Amended Complaint allege that the high-level description of USB's risk governance, including its "three lines of defense" framework, was misleading, "[b]ut these are exactly the types of 'routine representations' of 'risk-management practices' that 'almost every ... bank makes' and which are inactionable." *In re Citigroup Sec. Litig.*, No. 20 Civ. 9132 (LAP), 2023 WL 2632258, at *14 (S.D.N.Y. Mar. 24, 2023) (second alteration in original) (quoting *JP Morgan Chase*, 553 F.3d at 206) (collecting cases); *see also In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021) ("Vague positive statements regarding a corporate entity's risk management strategy, asset quality, and business practices are too general to cause a reasonable investor to rely upon them and therefore are precisely the type of puffery that this and other circuits have consistently held to be inactionable." (internal quotation marks omitted)). Other statements falling under this category suffer from the same fatal flaw. *See*, *e.g.*, Am. Compl. ¶¶ 104 (statement in the August 1, 2019 Form 10-Q: "The Company maintains a system of controls with the objective of providing proper transaction authorization and execution.") [11], 104 (statement in the August 1, 2019 Form 10-Q: "The Company has controls and processes in place for the assessment, identification, monitoring, management and reporting of compliance risks and issues."), 105 (Cecere emphasizing at the September 2019 investor conference USB's "best-in-class" risk management and asserting that USB's risk discipline was a "differentiator"), 111 (statements in Class Period 10-K Forms: "Management regularly provides reports

to the Risk Management Committee of the Board of Directors. The Risk Management Committee discusses with management the Company's risk management performance, and provides a summary of key risks to the entire Board of Directors, covering the status of existing matters, areas of potential future concern and specific information on certain types of loss events."). Regardless of whether, as Lead Plaintiffs contend, these statements can be proven to have been false, their generality renders them immaterial puffery. [12] *See UBS*, 752 F.3d at 183 ("Plaintiffs' claim that these statements were knowingly and verifiably false when made does not cure their generality, which is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment."); *see also Schiro*, 396 F. Supp. 3d at 298 n.5 (explaining that statements at issue regarding compliance would be puffery even if they "had not been explicitly aspirational" due to their use of "broad generalities"). [13]

[11] This statement, by discussing "the objective" of USB's system of controls, also is aspirational, which additionally renders it puffery. *See UBS*, 752 F.3d at 183 (holding that statements are particularly likely to be puffery where "the statements are explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should' ").

[12] Given the conclusion that these statements are nonactionable puffery, the Court does not reach Lead Plaintiffs' argument that these statements were misleading because the risk management framework was ineffective at the time the statements were made. *See* Opposition at 18-19.

[13] Although slightly different in nature, certain statements made by Cecere at a June 2021 conference similarly qualify as puffery and otherwise nonactionable for a lack of sufficient nexus. In response to a question from an analyst about the areas of most interest to regulators regarding USB's business, Cecere said that the two areas were "ESG" and "consumer protection, and consumer activities." Am. Compl. ¶ 114. He went on to discuss overdrafts as an example of an issue from the latter two areas. *Id.* These statements were highly general in nature, and no reasonable investor would have relied upon them to draw any inferences about the status of USB's account

opening practices or USB's engagement with the CFPB.

**\*13** The second subset of statements in this category are those warning investors about legal and regulatory risks, such as:

- "The Company may suffer legal or regulatory sanctions, material financial loss, or damage to its reputation through failure to comply with laws, regulations, rules, standards of good practice, and codes of conduct, including those related to ... consumer protection and other requirements." Am. Compl. ¶ 104 (August 1, 2019 Form 10-Q).

- "The Company could face significant legal and reputational harm if it fails to safeguard personal information." *Id.* ¶ 106 (2019 Annual Report); *accord id.* ¶ 107 (alleging that the statements alleged in paragraph 106 "were repeated in substantially similar form in other Class Period Annual Reports and Class Period 10-Ks").

- "Any mishandling or misuse of the personal information of customers, employees or others by the Company ... could expose the Company to litigation or regulatory fines, penalties, or other sanctions." *Id.* ¶ 106 (2019 Annual Report); *accord id.* ¶ 107.

- "The Company's framework for managing risks may not be effective in mitigating risk and loss to the Company." *Id.* ¶ 106 (2019 Annual Report); *accord id.* ¶ 107.

- "Damage to the Company's reputation could adversely impact its business and financial results. Reputation risk, or the risk to the Company's business, earnings and capital from negative public opinion, is inherent in the Company's business. Negative public opinion about the financial services industry generally or the Company specifically could adversely affect the Company's ability to keep and attract customers, investors, and employees and could expose the Company to litigation and regulatory action." *Id.* ¶ 106 (2019 Annual Report); *accord id.* ¶ 107.

- "The Company is subject to extensive and evolving government regulation and supervision, which can increase the cost of doing business, limit the Company's ability to make investments and generate revenue, and lead to costly enforcement actions." *Id.* ¶ 108 (2019 Annual Report, as well as "in substantially similar form," other Class Period Annual Reports and 10-K Forms).

- "The Company is continually subject to examinations, inquiries and investigations in areas of heightened regulatory scrutiny, such as compliance, risk management, third-party risk management and consumer protection.... The Company is cooperating fully with all pending examinations, inquiries and investigations, any of which could lead to administrative or legal proceedings or settlements. Remedies in these proceedings or settlements may include fines, penalties, restitution or alterations in the Company's business practices (which may increase the Company's operating expenses and decrease its revenue)." *Id.* ¶ 113 (2019 Annual Report, as well as "in material part," 2020 Annual Report, 2019 Form 10-K, and 2020 Form 10-K). [14]

These statements were not the same kind of general, platitudinal affirmative statements the Court has already found to be puffery. Rather, they addressed more specific risks that threatened USB's business performance, such as the failure to safeguard personal information and that its risk management framework might be ineffective, or made descriptive statements about the status of regulatory enforcement, such as that USB was "cooperating fully with all pending ... investigations" and that USB was "continually subject to examinations, inquiries and investigations." Nor were these statements aspirational in nature such that they would be shielded by the puffery doctrine. Because Lead Plaintiffs do not posit that these statements were objectively false, the question is whether they were materially misleadingly by way of omission; in other words, whether the statements were misleading half-truths.

[14]    Lead Plaintiffs also allege that the certifications signed by Dolan and Cecere pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), "wherein [they] certified that the Class Period" quarterly and annual reports filed with the SEC fairly presented the financial condition and results of operations of USB, were false or misleading. Am. Compl. ¶ 112. In opposing Defendants' motion, however, Lead Plaintiffs have not presented any argument that Defendants' financial statements were inaccurate, nor is any such theory alleged in the Amended Complaint. Indeed, this paragraph of the Amended Complaint is not cited once in Lead Plaintiffs' Opposition. Therefore, any argument on this front has been abandoned. *See*, *e.g.*, *Harrington Glob.*

*Opportunity Fund, Ltd. v. CIBC World Mkts. Corp.*, 585 F. Supp. 3d 405, 423 (S.D.N.Y. 2022) ("At the motion to dismiss stage, a plaintiff abandons a claim by failing to respond to [a] defendant's arguments in support of dismissing that claim." (citations omitted)).

**\*14** In the Amended Complaint, Lead Plaintiffs theorize that these statements were misleading by not disclosing:

> (i) the illicit business practices detailed in [the Consent Order and accompanying Press Release], and by the CFPB which had been investigating USB since at least 2010 [15] and necessitated the intervention of corporate headquarters (including the involvement of the Individual Defendants); (ii) that USB's senior management had knowingly failed to remediate these illicit business practices; (iii) that USB had been the target of a CFPB investigation into these known illicit business practices and that Defendants consciously failed to remediate them; and (iv) that, as a result of the foregoing, the Bank was likely to be the subject of a CFPB enforcement action and faced extreme regulatory, legal, reputational and financial peril. [16]

Am. Compl. ¶ 115; *accord id.* ¶ 121. Defendants argue that Lead Plaintiffs have not pleaded facts establishing that the Individual Defendants were involved in, or knowingly failed to remediate, the alleged misconduct. Motion at 19 (referencing Motion at 11). Likewise, they argue that Lead Plaintiffs have not adequately pleaded that the CFPB fine was inevitable and therefore should have been disclosed as a likely event at the time the statements were made. *Id.* at 18. They concede, however, that there were two omitted facts: the existence of the CFPB investigation and the existence of the unauthorized accounts. *Id.* As to these facts, Defendants argue that they were under no duty to disclose them. *Id.* at 19-20; Reply at 7-9.

[15] This reference to 2010 suggests that Lead Plaintiffs allege the CFPB investigation to have started in 2010. At oral argument, however, Lead Plaintiffs' counsel confirmed that they allege the investigation began in "mid 2017." *See* Tr. at 30:19; *accord* Am. Compl. ¶ 144 ("The CFPB launched its investigation of USB at least as early as 2017, as detailed in public reports by *CNN* and other media outlets following issuance of the Consent Order, which stated that the investigation had been pending for over five years. The initiation of the CFPB investigation thus followed closely on the heels of the Wells Fargo revelations and focused on misconduct dating back to 2010.").

[16] The lengthy and somewhat repetitive Amended Complaint purports to articulate a variety of independent reasons why the statements in this category were misleading by omission. *See* Am. Compl. ¶¶ 116-117. These purported reasons are either substantively indistinguishable from the four listed in the text above or are not relevant because they pertain to statements the Court has found to be puffery.

**[23]** Defendants are correct that Lead Plaintiffs have failed to allege both the Individual Defendants' involvement in the unauthorized account opening practices and their knowing failure to remediate such practices. There are no particularized allegations tying any of the Individual Defendants to the unauthorized account openings, and the scope of the misconduct makes implausible any inference that they would have been aware of the misconduct; the 342 unauthorized accounts that Cecere admitted had been opened roughly amount to "a single unauthorized account opened in a single branch each year in each of the 28 states in which the Bank currently maintains branches." Am. Compl. ¶ 46. While Lead Plaintiffs suggest that Cecere downplayed the volume of the unauthorized accounts when he testified before Congress, that hypothesis is purely speculative and finds no support in the factual allegations of the Amended Complaint. Thus, Lead Plaintiffs have not adequately alleged that Defendants' statements were misleading by virtue of omitting the Individual Defendants' involvement in the unauthorized account openings or their knowing failure to remediate such wrongdoing. That, however, only covers some of the theories of liability asserted by Lead Plaintiffs, as their theories premised on the CFPB investigation, including the

Buhrke Family Revocable Trust v. U.S. Bancorp, --- F.Supp.3d ---- (2024)

2024 WL 1330047, Fed. Sec. L. Rep. P 101,838

likelihood of a fine, and on the actual unauthorized opening of accounts remain.

**\*15** With respect to the former, Lead Plaintiffs argue that the CFPB investigation should have been disclosed sooner and accompanied by a disclosure that a substantial fine was likely. Opposition at 21-22. On the latter, Lead Plaintiffs argue that Defendants should have disclosed that unauthorized accounts had been opened by USB employees and Defendants therefore misleadingly presented risks as possibilities when, in fact, the risks had already materialized. *Id.* at 18, 21-22. The parties appear to agree that no statute or regulation imposed an independent duty to disclose either piece of information, but disagree as to whether a duty emerged from Defendants' obligation, once having spoken on a topic, "to be both accurate and complete." *Caiola*, 295 F.3d at 331. Defendants argue that there was an insufficient nexus between the statements and the omitted information and that " 'no reasonable investor would have construed these generic risk disclosures' or risk management statements 'as representations that the company had conducted itself in a manner that negated the risk of future adverse action.' " Motion at 19 (quoting *Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153, 165 (S.D.N.Y. 2018)) (brackets omitted).

**[24]** **[25]** **[26]** In the absence of an independent duty to disclose, "companies do not have a duty 'to disclose uncharged, unadjudicated wrongdoing.' " *UBS*, 752 F.3d at 184 (quoting *Ciresi v. Citicorp*, 782 F. Supp. 819, 823 (S.D.N.Y. 1991), *aff'd without opinion*, 956 F.2d 1161 (2d Cir. 1992)). Applying this principle, the Second Circuit held in *UBS* that "[b]y disclosing its involvement in multiple legal proceedings and government investigations and indicating that its involvement could expose [the defendant-company] to substantial monetary damages and legal defense costs, as well as injunctive relief, criminal and civil penalties, and the potential for regulatory restrictions," the defendant-company "complied with its disclosure obligations under our case law." *Id.* Liability is further circumscribed by the requirement of a sufficiently close nexus between the statements in question and the allegedly omitted information. *Denny v. Canaan Inc.*, No. 21 Civ. 3299 (JPC), 2023 WL 2647855, at \*7 (S.D.N.Y. Mar. 27, 2023); *see also Menora Mivtachim Ins.*, 2021 WL 1199035, at \*17-18. As discussed, statements lacking such a nexus would not mislead a reasonable investor, as the investor would have no basis to infer anything regarding the allegedly omitted information absent the requisite nexus. These limitations on liability are counterbalanced by a company's obligation to speak accurately and completely once it has elected to speak on a topic. *See Caiola*, 295 F.3d at 331. And "[i]n all cases ... the court must keep in mind that a complaint fails to state a claim of securities fraud if no reasonable investor could have been misled about the nature of the risk when he invested." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002).

**[27]** **[28]** **[29]** In determining whether an investor could have been misled, the Court also considers whether the statements in question are statements of fact or opinion. Statements "whose objective factual truth or falsity c[an] be ascertained with certainty" are statements of fact, whereas statements that are "inherently subjective" are statements of opinion. *See In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th at 418 (internal quotation marks, brackets, and citations omitted). Where, as here, there is no independent duty to disclose, omissions allegations regarding factual statements are sufficient if the absence of the omitted information renders the statement in question "inaccurate, incomplete, or misleading." *Stratte-McClure*, 776 F.3d at 101 (internal quotation marks omitted). Statements of opinion, on the other hand, may be false or misleading in three circumstances: (1) "the speaker disbelieved the opinion at the time it was made"; (2) "a statement of opinion contained one or more embedded factual statements that can be proven false"; or (3) "a statement of opinion, without providing critical context, implied facts that can be proven false." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 174-75 (2d Cir. 2020) (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185, 188, 135 S.Ct. 1318, 191 L.Ed.2d 253 (2015)). As to the final of these three, a plaintiff can adequately plead such a theory of falsity by alleging that "the speaker implied he or she had a reasonable basis for the opinion but in fact did not." *Shapiro v. TG Therapeutics, Inc.*, 652 F. Supp. 3d 416, 423 (S.D.N.Y. 2023) (citing *Abramson*, 965 F.3d at 175).

**\*16** USB's disclosures about the risks it faced are almost entirely statements of opinion because they expressed inherently subjective views on the nature and scope of the risks that USB was facing. For example, USB stated that it could "face *significant* legal and reputational harm if it fail[ed] to safeguard personal information." Am. Compl. ¶ 106 (2019 Annual Report) (emphasis added); *accord id.* ¶ 107 (statement "repeated in substantially similar form in other Class Period Annual Reports and Class Period 10-Ks"). Whether the failure to safeguard personal information could expose USB to significant, rather than minimal or some, harm is a subjective assessment USB made. Indeed,

even the more fundamental aspect of this statement—that USB would be exposed to risk by failing to safeguard personal information—is not susceptible to objective truth or falsity, as it too represents USB's subjective view on the potential consequences of certain events. The vast majority of the other statements warning investors about risks USB faced are likewise statements of opinion. *See*, *e.g.*, Am. Compl. ¶¶ 104 (statement in the August 1, 2019 Form 10-Q: "The Company may suffer legal or regulatory sanctions, material financial loss, or damage to its reputation through failure to comply with laws, regulations, rules, standards of good practice, and codes of conduct, including those related to ... consumer protection and other requirements."), 106 (statements in the 2019 Annual Report: "Any mishandling or misuse of the personal information of customers, employees or others by the Company ... could expose the Company to litigation or regulatory fines, penalties, or other sanctions."; "The Company's framework for managing risks may not be effective in mitigating risk and loss to the Company."; and "Damage to the Company's reputation could adversely impact its business and financial results. Reputation risk, or the risk to the Company's business, earnings and capital from negative public opinion, is inherent in the Company's business. Negative public opinion about the financial services industry generally or the Company specifically could adversely affect the Company's ability to keep and attract customers, investors, and employees and could expose the Company to litigation and regulatory action."), 107 (same statements as alleged in paragraph 106 in other Class Period Annual Reports and 10-K Forms). Two statements, however, are comprised of both facts and opinions.

First, USB's disclosure regarding government investigations in the lead up to its eventual May 4, 2021 disclosure of the CFPB investigation is a mix of opinion and fact. Again, that disclosure read:

> The Company is continually subject to examinations, inquiries and investigations in areas of heightened regulatory scrutiny, such as compliance, risk management, third-party risk management and consumer protection.... The Company is cooperating fully with all pending examinations, inquiries and investigations, any of which could lead to administrative or legal proceedings

or settlements. Remedies in these proceedings or settlements may include fines, penalties, restitution or alterations in the Company's business practices (which may increase the Company's operating expenses and decrease its revenue).

Am. Compl. ¶ 113 (2019 Annual Report, as well as "in material part," 2020 Annual Report, 2019 Form 10-K, and 2020 Form 10-K). The first sentence could be proven to be objectively false if, for example, USB was not subject to any "examinations, inquiries and investigations" at the time of the disclosure nor had it been at any time in the past. The second sentence, however, is a statement of opinion: whether a company is "cooperating" is a matter of perspective and degree, and a characterization on which regulators and the companies they regulate may disagree. *Cf. Okla. Police Pension Fund & Ret. Sys. v. Teligent, Inc.*, No. 19 Civ. 3354 (VM), 2020 WL 3268531, at *12 (S.D.N.Y. June 17, 2020) (finding statement that the defendant-company was cooperating with the Food and Drug Administration was, to the extent not borne out by subsequent events, "optimism that, in retrospect, was misguided" rather than a misrepresentation of fact). As for the third sentence, while it accurately identifies potential outcomes of regulatory actions, the statement as to what may occur in the future is not susceptible to being proven true or false at the time the statement was made.

Second, USB's disclosure that it was "subject to extensive and evolving government regulation and supervision, which can increase the cost of doing business, limit the Company's ability to make investments and generate revenue, and lead to costly enforcement actions" is similarly a composite of both fact and opinion statements. That USB was subject to government regulation and supervision is a statement of fact: either USB was or was not subject to regulation. But the statements that the regulation is "extensive and evolving," could "limit the Company's ability to make investments and generate revenue," and could lead to costly enforcement actions" are less susceptible to being proven true or false. Thus, aspects of this disclosure are opinions. With this framework in mind, the Court turns first to whether any of the remaining statements in this category were misleading by omitting the fact that unauthorized accounts had been opened.

**[30]** As to this theory of liability, two disclosures are at least facially related to the openings of unauthorized

accounts. Those disclosures, both contained in the 2019 Annual Report, are: (1) "[t]he Company could face significant legal and reputational harm if it fails to safeguard personal information" and (2) "[a]ny mishandling or misuse of the personal information of customers, employees or others by the Company ... could expose the Company to litigation or regulatory fines, penalties, or other sanctions." Am. Compl. ¶ 106. [17] At the time that these disclosures were made, USB had, as alleged, failed to safeguard customer personal information or prevent the misuse of customer personal information by virtue of the unauthorized account openings. *See*, *e.g.*, Am. Compl. ¶¶ 28 (alleging that the CFPB press release that accompanied the Consent Order stated that "U.S. Bank employees unlawfully accessed customers' credit reports and sensitive personal data to apply for and open unauthorized accounts"), 44 (alleging that Cecere admitted to Congress that the unauthorized account openings dated back to 2010). But that allegation alone does not render these two opinion statements misleading.

[17]     As mentioned earlier, the statements in paragraph 106 were allegedly repeated in other SEC filings, specifically, the Class Period Annual Reports and the Class Period 10-K Forms, as alleged in paragraph 107 of the Amended Complaint.

**\*17** The fact that there had been unauthorized account openings does not support the inference that Defendants lacked a reasonable basis for these statements. If anything, that fact arguably supports the reasonableness of USB's caution to investors that it might face penalties as a result of a failure to safeguard personal information. Nor did these statements contain an embedded misleading statement of fact. Read in context, these disclosures informed investors about the risks of financial loss that USB faced if there was a failure to safeguard personal information. No reasonable investor would have interpreted such a warning to imply that USB had never failed to safeguard personal information. [18] Furthermore, the specific risk that USB warned against—the financial loss resulting from a failure to safeguard personal information—had not materialized at that point, which additionally cuts against the notion that these statements were misleading. *See In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008) ("At the time that the cautionary statements were made, the risk that FBR's noncompliance with securities regulations would actually cause a loss to the company or its shareholders had neither transpired nor become a near certainty. To be sure, the alleged noncompliance had occurred. But the Complaint

does not allege that it was sufficiently clear when the 10-Ks were filed on March 28, 2003 and March 15, 2004 that FBR's noncompliance (in 2001) would cause a financial loss. Therefore the Complaint does not allege that this risk had already transpired."); *see also Okla. L. Enf't Ret. System v. Papa John's Int'l, Inc.*, 444 F. Supp. 3d 550, 563 (S.D.N.Y. 2020) ("Even if the risk that Schnatter [*i.e.*, the company's founder and executive] would be disgraced or fired increased with the expanding influence of the #MeToo movement, an increase in a risk does not mean the risk has already come to pass, such that a disclosure that simply identifies the risk would be misleading." (internal quotation marks and brackets omitted)). Thus, these two disclosures were not misleading by failing to include the fact that unauthorized accounts had been opened.

[18]     Although the Court finds that Lead Plaintiffs have failed to plead misleading omissions, Defendants' reliance on *Heavy & General Laborers' Local 472 & 172 Pension & Annuity Funds v. Fifth Third Bancorp*, No. 20 Civ. 2176, 2022 WL 1642221 (N.D. Ill. May 24, 2022), is somewhat misplaced on this point. In *Fifth Third Bancorp*, the court dismissed securities fraud claims based on another bank's similar issues with unauthorized account openings. The alleged misstatements in *Fifth Third Bancorp*—which were that the defendant-bank was "subject to risk from potential employee misconduct"—was "too general to be actionable." *Id.* at \*17. "Employee misconduct" is far broader than the failure to customer safeguard personal information, or the misuse of such personal information, at issue here.

 **[31]     [32]** Nor were the statements that dealt specifically with the safeguarding of personal information misleading by not disclosing the fact of the unauthorized account openings. First, because the other opinion statements did not deal in any manner with the topic of unauthorized account openings, no reasonable investor would have read them to imply anything about that topic. Likewise, the fact that unauthorized account openings had occurred does not mean that the opinions expressed in those statements lacked a reasonable basis, given that the opinions did not deal with related subject matter. As to the statements that USB was subject to pending investigations and was cooperating with such investigations, the statements again lack a sufficiently close nexus to the fact of the unauthorized account openings, as no reasonable investor would take a statement that USB was subject to investigations and cooperating with such investigations to imply anything

about whether USB ever experienced unauthorized account openings.

**[33]** Turning to Plaintiffs' other theory of liability—that the statements were misleading by not disclosing the CFPB investigation and that USB was, according to Lead Plaintiffs, likely to be subject to a fine from the investigation— the above-quoted disclosure that generally concerned the existence of government investigations, *see* Am. Compl. ¶ 113, bears a sufficiently close nexus to the omitted fact of the CFPB investigation that, as alleged, began "at least as early as 2017," *id.* ¶ 144. This disclosure, which appeared in USB's 2019 Form 10-K, 2019 Annual Report, 2020 Form 10-K, and 2020 Annual Report omitted any mention of the specific investigation being conducted by the CFPB and about the status of that investigation. *See id.* ¶ 113. But whether analyzed as a fact statement or an opinion statement, USB's general disclosure regarding the status of investigations was not misleading. Considered as a fact statement, this disclosure was made multiple times during the Class Period in the lead up to the May 4, 2021 disclosure of the CFPB investigation. In this timeframe, Lead Plaintiffs allege that the CFPB was investigating USB, but they do not allege that USB had any knowledge of that investigation. And even had Lead Plaintiffs alleged that USB was aware of the investigation, this disclosure did not imply that no investigation by the CFPB was taking place. To the contrary, the disclosure stated that USB was "continually subject to examinations, inquiries and investigations in areas of heightened regulatory scrutiny, such as compliance, risk management, third-party risk management and consumer protection." *Id.* ¶ 113. Under the same reasoning, if viewed as an opinion statement, the disclosure did not contain a misleading statement of embedded fact. To the contrary, it cautioned that USB was subject to "pending ... investigations" when that was indeed the case (regardless of whether that investigation was overt and known to USB or not). *Id.* Nor did USB lack a reasonable basis for the opinion aspect of this disclosure; the opinion—that pending investigations might "lead to ... legal proceedings or settlements"—was clearly reasonable and not in any sense undermined by the fact of the investigation. And Lead Plaintiffs have made no allegation to support the inference that, at the point of this disclosure, USB knew or should have known that it would in fact face a fine by the CFPB.

**\*18** The disclosure quoted in paragraph 113 of the Amended Complaint thus stands in contrast to those in cases on which Lead Plaintiffs rely, *see* Opposition at 18, where courts found

disclosures about the status of investigations to be misleading for implying facts that were directly contradicted. *See In re Mylan N.V. Sec. Litig.*, No. 16 Civ. 7926 (JPO), 2018 WL 1595985, at \*10 (S.D.N.Y. Mar. 28, 2018) (holding the disclosure to be misleading because "[a] reasonable investor could have concluded from Mylan's statement that although the government 'may' disagree with Mylan, and 'could' open an investigation, such unfavorable events had not yet occurred," when the government had in fact both opened an investigation and disagreed with Mylan); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015) (finding disclosure that "[f]rom time to time, the Company responds to subpoenas and requests for information from Governmental agencies" to misleadingly imply the absence of an investigation). The language in the disclosure here appropriately conveyed "current investigative activity." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 616 (S.D.N.Y. 2017). In fact, as discussed above, the Amended Complaint does not even allege that Defendants knew the CFPB was investigating USB at the time of any statements made prior to the May 4, 2021 Form 10-Q, nor does it allege any facts indicating that, at the time of the statements with the disclosure in paragraph 113, Defendants were aware that a fine or enforcement action by the CFPB was likely. There are no allegations that USB received, for example, a civil investigative demand ("CID") from the CFPB and suggested otherwise. *Cf. In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d at 727-28 (finding the company's disclosures regarding investigations misleading where the company failed to disclose it had received a civil investigative demand). Thus, because there is no duty to disclose uncharged conduct, and USB's disclosure concerning the existence of government investigations was not otherwise misleading, Lead Plaintiffs' case cannot proceed based on alleged omissions in connection with the statement alleged in paragraph 113.

In sum, this category of statements is either non-actionable puffery or otherwise not misleading.

### 3. CFPB Investigation

The next category is comprised of two disclosures directly related to the CFPB's investigation. *See* Am. Compl. ¶¶ 118-120. First is the disclosure that USB made on May 4, 2021 in its Form 10-Q, in which USB told the market that the CFPB was "investigating certain of the Company's consumer sales practices" and that USB "ha[d] responded and continue[d] to respond to the CFPB." *Id.* ¶ 118. As noted above, the same statement was then reiterated in SEC filings made on August 3, 2021, November 2, 2021,

and February 22, 2022. *Id.* ¶ 119. And second is the May 3, 2022 disclosure in a Form 10-Q, in which USB revealed that the CFPB "ha[d] been investigating certain of the Company's consumer sales practices and [was] now considering a potential enforcement action." *Id.* ¶ 120. This second disclosure was accompanied by the caveat that USB did "not believe an enforcement action [was] warranted, but there can be no assurance that" discussions with the CFPB would "result in a resolution," and noted that USB was "cooperating fully with the investigation." *Id.* ¶ 146 (internal quotation marks omitted).

As to this category, Defendants largely reprise their prior arguments, contending that the statements did not contain any objectively false assertion, that Lead Plaintiffs did not adequately plead the existence of any facts allegedly omitted, that Lead Plaintiffs' allegations amount to nothing more than an improper attempt to argue "fraud by hindsight," and that Lead Plaintiffs have not pleaded a sufficient nexus between the alleged omissions and the statements in this category. Motion at 20-21. Defendants specifically argue that the Amended Complaint did not sufficiently allege facts showing: (1) the involvement of the Individual Defendants in "the purported misconduct"; (2) "that USB's senior management had *knowingly failed* to remediate these illicit business practices; and (3) "the other omitted 'facts.' " *Id.* at 11. And as previously noted, Defendants acknowledge that Lead Plaintiffs have sufficiently alleged the existence of the CFPB investigation and USB's opening of unauthorized accounts. *Id.* at 12. Lead Plaintiffs argue that Defendants' statements in these disclosures were "wholly insufficient to apprise investors of the scope and nature of, and known risks associated with, the CFPB investigation" and that "the true nature of the CFPB investigation and its implications for USB" had been withheld. Opposition at 23. [19] Thus, their position seems to be that the statements in this category should have mentioned the existence of the unauthorized account openings and other practices detailed in the Consent Order and that USB was "likely to be subject of a CFPB enforcement action and faced extreme regulatory, legal, reputational and financial peril." Am. Compl. ¶ 115. In reply, Defendants posit that the Amended Complaint: (1) did "not allege any specific facts about the CFPB investigation—such as how it progressed—that [Lead] Plaintiffs contend should have been disclosed," (2) did "not adequately allege how the investigation's *ultimate result* made any earlier statements misleading at the time," and (3) reiterate their position that USB was under no obligation to disclose the "alleged

misconduct that was the investigation's subject." Reply at 10. The Court agrees with Defendants.

[19] Lead Plaintiffs also argue that Defendants' statement that USB did "not believe an enforcement action is warranted"—which was made as part of the May 3, 2022 disclosure—entailed a materially misleading opinion because "it is unimaginable how this 'belief' was sincere at the time the statement was made." Opposition 23 n.22. This argument, which is not developed by any argument or citation to allegations in the Amended Complaint, is only raised in a footnote, so the Court declines to reach it. *See City of Philadelphia*, 498 F. Supp. 3d at 537 (collecting cases).

**\*19** To start, the statements in this category are again a mix of fact and opinion statements. The first disclosure is of a clearly factual nature. The facts of the investigation and USB's responses thereto are amenable to classification as objectively true or false. The second disclosure incorporates both fact and opinion statements. The first part of the disclosure— informing the market that the CFPB was considering an enforcement action—is again a fact statement; it can be ascertained whether the CFPB was, in fact, considering such a step. The latter part of the disclosure, however, is an opinion statement: it disclosed USB's subjective views that an enforcement action was not "warranted" and that it was cooperating with the investigation. None of these facts and opinion statements was misleading.

**[34]** **[35]** First, the disclosures here did not misleadingly imply anything regarding the fact of the unauthorized account openings. For the fact statements, the disclosures lack a sufficient nexus to the topic of unauthorized account openings. Defendants did not speak on that topic in these disclosures, nor they did assert that they had fully complied with account opening regulations or anything similar. No reasonable investor would have read the disclosures to imply anything regarding the specific issue of unauthorized account openings. On the same reasoning, the opinion statements did not include any embedded factual statements on that topic. As to Lead Plaintiffs' argument that USB lacked a reasonable basis for the opinion that an enforcement action was not warranted, they have failed to allege that Defendants were sufficiently aware of the unauthorized accounts so as to make the opinion unreasonable at the time it was stated. *See In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d at 619 (finding an opinion statement not misleading where the plaintiff "fail[ed] to allege particular facts regarding the

knowledge Defendants did (or did not) possess at the time the opinion statements were made, whose omission made those statements misleading"); *infra* III.D.2. And even if the Defendants were aware of the unauthorized accounts, the occurrence of merely 342 unauthorized accounts would not render unreasonable the position that an enforcement action was unwarranted.

Second, Lead Plaintiffs have failed to allege any facts suggesting that Defendants knew or should have known that they were going to be subject to an enforcement action, and in particular one on the scale that materialized. There are no allegations, for instance, that USB received anything comparable to a so-called Wells Notice, which the SEC issues when it is considering bringing charges. *See In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 19 (S.D.N.Y. 2016) ("A Wells Notice only informs an individual or company that the SEC Enforcement Division staff is considering recommending that the SEC file an action, but the SEC itself has not yet determined whether or not to bring a case."). Yet, in *Lions Gate*, where the company had received a Wells Notice, a disclosure apparently less forthcoming than those here was found not misleading. *See id.* at 15-16 (finding the company's disclosure that it was "involved in certain claims and legal proceedings arising in the normal course of business" not misleading when the company had received a Wells notice, because the plaintiffs did not "allege so-called half-truths by the defendants where the statements mislead investors by saying one thing and holding back another," but instead "at most plead[ed] that the defendants disclosed an investigation was ongoing, but refused to provide details" (internal quotation marks omitted)). The disclosures here accurately conveyed that USB was indeed subject to a CFPB investigation and did not imply anything regarding the likelihood of an enforcement action until an affirmative disclosure that the CFPB was considering an enforcement action. Accordingly, the factual aspects were not misleadingly incomplete or inaccurate, nor did the opinion statement imply any embedded false facts. And as to the opinion statement that USB did not believe an enforcement action was warranted, there are no allegations reflecting the progress of the CFPB's investigation that would have rendered that opinion unreasonable. Indeed, in the absence of any allegations that Defendants previously knew that USB was going to be subject to an enforcement action, there is no basis from which to conclude that USB failed to accurately disclose its impression of the progression of the investigation. The statements in this category therefore are not alleged to have been misleading.

### 4. Code of Ethics

**\*20** **[36]** Finally, the fourth category is comprised of statements USB made describing its code of ethics.[20] Defendants argue that its alleged statements concerning USB's code of ethics were non-actionable puffery and not otherwise false or misleading. Motion at 14-16. Lead Plaintiffs do not present any argument in defense of this category, with one minor exception. In their brief opposing dismissal, Lead Plaintiffs cite the statement in USB's code of ethics that "[USB's] reputation is our most valuable asset." Opposition at 10 n.4 (citing Am. Compl. ¶ 129). But while this allegation appears in the Amended Complaint's section concerning statements about USB's code of ethics, *see* Am. Compl. at 54-56, Lead Plaintiffs cite it in support of their arguments about omissions regarding USB's trust, ethics, and brand, *see* Opposition at 10 n.4 (citing Am. Compl. ¶ 129). The Court therefore has considered that statement as part of its analysis on the trust, ethics, and brand category of statements, *see supra* III.B.1, and otherwise deems Lead Plaintiffs' allegations regarding USB's code of ethics, *see* Am. Compl. ¶¶ 123-128, abandoned. *See*, *e.g.*, *Harrington Glob. Opportunity Fund*, 585 F. Supp. 3d at 423 ("At the motion to dismiss stage, a plaintiff abandons a claim by failing to respond to [a] defendant's arguments in support of dismissing that claim."); *Malik v. City of New York*, 841 F. App'x 281, 284 (2d Cir. 2021) (" '[W]hen a party fails adequately to present arguments' in a brief, a court may properly 'consider those arguments abandoned.' " (quoting *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 172 (2d Cir. 2004))); *Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) (noting that particularly "in the case of a counseled party," "a court may ... infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned").

20    A further description of these statements is unnecessary because, as discussed in this subsection, Lead Plaintiffs have abandoned any theory of liability premised on Defendants' statements concerning USB's code of ethics.

### C. Materiality

Defendants additionally argue that the size of the CFPB fine, coupled with a lack of qualitative importance to USB's business, render immaterial any alleged misstatements or omissions about the unauthorized account openings, the CFPB's investigation, and the resulting fine. Motion at 21-22.

They also argue that the bespeaks caution doctrine nullifies Lead Plaintiffs' allegations. *Id.* at 22-25. [21]

[21] Because the Court ultimately grants leave to amend, *see infra* III.H, the Court reaches its alternative grounds for dismissal for lack of materiality and scienter, so Lead Plaintiffs are on notice of the identified pleading deficiencies should they opt to file a Second Amended Complaint.

**[37]** **[38]** "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161-62 (2d Cir. 2000) (citing *Basic*, 485 U.S. at 231, 108 S.Ct. 978). Thus, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 232, 108 S.Ct. 978 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). "[A] complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino*, 228 F.3d at 162 (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).

**[39]** **[40]** **[41]** "[B]oth quantitative and qualitative factors must be considered in determining materiality." *JP Morgan Chase*, 553 F.3d at 204. Deviations of less than 5% with respect to a particular item in a company's financial statements because of a misstatement "may provide the basis for a preliminary assumption" of immateriality. *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011) (quoting SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150, 45,151 (1999)). Courts in this District have interpreted this to mean that restatements of financial performance involving a less than 5% downward revision are "presumptively immaterial." *E.g.*, *Yaroni v. Pintec Tech. Holdings Ltd.*, 600 F. Supp. 3d 385, 403 (S.D.N.Y. 2022) ("The alleged misstatements in the third and fifth bullet points, net cash from financing activities and net cash used in investing activities for 2017, are presumptively immaterial because the restatements were 1.9% and 2.5% lower, respectively, then the originally stated financials."); *City of Omaha Police & Fire Ret. System v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 415-16 (S.D.N.Y. 2020)

("Plaintiffs allege $4.4 million revenue, and Evoqua's FY17 revenue was $1.25 billion. Plaintiffs thus allege an impact of 0.37% on Evoqua's revenue. Courts have stated that such a small a percentage, by itself, can evince a lack of materiality."); *In re Insys Therapeutics, Inc. Sec. Litig.*, No. 17 Civ. 1954 (PAC), 2018 WL 2943746, at *4 (S.D.N.Y. June 12, 2018) ("[R]estatements of financial performance are presumptively immaterial unless the financial performance is revised downward by more than 5%."). In the context of a civil fine, one court in this District has compared the size of the penalty to the defendant-company's revenue to determine whether this presumption applies. *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d at 13. Courts must also consider qualitative factors when assessing materiality, and "that consideration should be undertaken in an integrative manner." *Litwin*, 634 F.3d at 717. These qualitative factors include: (1) whether the alleged misstatement or omission "conceal[ed] ... an unlawful transaction," (2) the "significance of the misstatement in relation to the company's operations, and (3) management's expectation that the misstatement [would] result in a significant market reaction." *JP Morgan Chase*, 553 F.3d at 197-98 (citing SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. at 4150-52).

**\*21** **[42]** Lead Plaintiffs do not dispute that the CFPB fine falls below the 5% threshold for presumptive immateriality, *see* Opposition at 13-14, and for good reason. They allege that USB has $675 billion in assets, Am. Compl. ¶ 22, and paid a $37.5 million fine as a result of the Consent Order, *id.* ¶ 28. With this fine being less than one percent of USB's assets, [22] the allegedly omitted information—which all ultimately relates to the conduct disclosed by and penalized through the Consent Order—bears at least the initial indicia of immateriality.

[22] Although Defendants also argue that the same is true when the fine is compared to USB's revenue, Lead Plaintiffs have not alleged facts pertaining to USB's total revenue during the Class Period. And while the Court may consider information in SEC filings, it may not do so for the truth of the matter asserted therein. *See Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007).

Lead Plaintiffs have failed to sufficiently allege that the qualitative factors overcome this presumption. They argue that the alleged omissions "called into question the integrity of the company as a whole," so it is "inappropriate to focus only on" the size of the fine. Opposition at 13 (quoting

*Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 349 & n.119 (S.D.N.Y. 2015)). Given the relatively *de minimis* scope of the misconduct here, it is a step too far to conclude that the alleged omissions "called into question the integrity of the company as a whole." Furthermore, the nature of the alleged misconduct here differs dramatically from that in *Strougo*. There, Barclays was engaged in a campaign to repair its public image after its involvement in the wide-ranging LIBOR scandal that occurred from 2005 through 2009. *Strougo*, 105 F. Supp. 3d at 337. In contrast, as extensively discussed above, USB was not trying to distance itself from a scandal. In addition, in *Strougo* the misleading statement concerned a very specific product that one of the high-level corporate defendants was focused on and communicated to the public that he was "intimately knowledgeable" about. *Id.* at 351. Thus, the fact that that same individual was found to have been misleading the public with scienter called into question Barclay's integrity in a manner that is simply not present here. *See infra* III.D (finding no scienter). Lead Plaintiffs also rely on the allegation that the fine implicated USB's consumer banking division, *see* Opposition at 13, which based on the allegations in the Amended Complaint itself generated 33.6% percent of USB's revenue in the fiscal year prior to the Class Period, *see* Am. Compl. ¶ 149 (alleging that, in fiscal year 2018, USB's "Consumer and Business Banking ... comprised 40% of the Bank's total net revenue, 84% of which was specifically attributed to consumer banking"). The Court does not place great weight on this point, however, as there is no allegation that the Consent Order imperiled the revenue-generation capabilities of USB's consumer banking division in the aftermath of the Consent Order. Accordingly, Lead Plaintiffs have failed allege facts sufficient to overcome the presumption of immateriality triggered by the size of the fine here.[23]

[23]  In light of the above conclusion finding no materiality, the Court does not reach Defendants' bespeaks caution doctrine argument. *See* Motion at 22 ("[E]ven if otherwise actionable ..., Plaintiffs' omissions theories are immaterial under the 'bespeaks caution' doctrine insofar as they contend Defendants were obligated to make predictions about the future."). Similarly, the Court does not reach Defendants' argument that some of the at-issue statements were "forward-looking" and therefore protected by the PSLRA's safe harbor for such statements. Motion at 25 n.11; 15 U.S.C. § 78u-5. The Court does not reach the latter argument for the additional reason that it is presented only in

a footnote. *See*, *e.g.*, *City of Philadelphia*, 498 F. Supp. 3d at 537.

**D. Scienter**

 **\*22** Lead Plaintiffs' claims also must be dismissed for the independent reason that they have failed to adequately plead scienter with particularity.[24]

[24]  Although the Court concludes above that the Amended Complaint fails to allege Richard made any relevant statements for purposes of Rule 10b-5(b), *see supra* III.A, the Court addresses the Amended Complaint's allegations of scienter as they apply to Richard in the event Lead Plaintiffs choose to bring a claim against her under Section 10(b) and Rule 10b-5 in a Second Amended Complaint.

 **[43] [44] [45]** To plead scienter, a complaint must allege facts showing "either: 1) a 'motive and opportunity to commit the fraud'; or '2) strong circumstantial evidence of conscious misbehavior or recklessness.' " *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (quoting *ATSI Commc'ns*, 493 F.3d at 99). The Second Circuit recently clarified that, in deciding a motion to dismiss, courts must "assess the total weight of ... circumstantial allegations *together with* ... allegations of motive and opportunity." *In re Hain Celestial Grp. Sec. Litig.*, 20 F.4th 131, 137-38 (2d Cir. 2021). Thus, " 'the strength of the circumstantial allegations must be correspondingly greater' if there is no motive." *JP Morgan Chase*, 553 F.3d at 199 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)). And as noted above, based on an assessment of the relevant allegations in their totality, "[a] complaint will survive if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Blanford*, 794 F.3d at 306 (internal quotations omitted); *accord ATSI Commc'ns*, 493 F.3d at 99. Congress has directed that in pleading scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

 **1. Motive**[25]

[25]  Defendants do not contest that the Individual Defendants, as corporate officers, had the requisite opportunity. *See generally* Motion at 25-28; *see also Lozada v. TaskUs, Inc.*, No. 22 Civ. 1479

(JPC), ⸺ F.Supp.3d ⸺, ⸺ n.28, 2024 WL 68571, at *21 n.28 (S.D.N.Y. Jan. 5, 2024) ("Corporate officers are generally considered to have the opportunity to commit fraudulent acts based on insider information." (citing *In re Scholastic*, 252 F.3d at 74)).

Defendants argue that Lead Plaintiffs have failed to allege facts showing motive on behalf of the Individual Defendants. Specifically, they argue that the Individual Defendants increased their holdings over the Class Period, were holding significant amounts of shares when the Consent Order was disclosed, and sold a relatively small percentage of their total holdings, and further that the timing of the sales does not allow for an inference of impropriety. Motion at 25-28. Lead Plaintiffs argue that the Court cannot consider the SEC filings that the Individual Defendants rely on to argue that they increased their holdings and that their sales were made after the CFPB investigation began but before the Consent Order

was released. Opposition at 31-33. The Court therefore must first resolve what information may be considered in assessing the Individual Defendants' stock holdings during the Class Period.

**\*23** The parties' disagreement centers on whether the Court may take judicial notice of the Individual Defendants' Form 4 filings made with the SEC.[26] If the Court were to consider this information, the Individual Defendants' shareholdings during the Class Period would be:

[26] "Section 16(a) of the Exchange Act requires a public company officer to file a Form 4 with the SEC disclosing any purchase or sale of the company's stock by the officer within two business days of the trade execution date." *SEC v. Honig*, No. 18 Civ. 8175 (ER), 2023 WL 6386918, at *11 (S.D.N.Y. Sept. 29, 2023).

| Insider | Date of Form 4 | Number of Shares Beneficially Owned |
|---|---|---|
| Cecere (Chief Executive Officer) | 2/19/2019 (Dkt. 42-41 at 2) | 734,554 (Dkt. 42-41 at 2) |
| | 3/5/2022 (Dkt. 42-42 at 2) | 956,742 (Dkt. 42-42 at 2) |
| Dolan (Chief Financial Officer) | 2/19/2019 (Dkt. 42-43 at 2) | 128,604 (Dkt. 42-43 at 2) |
| | 3/5/2022 (Dkt. 42-44 at 2) | 165,051 (Dkt. 42-44 at 2) |
| Richard (Chief Risk Officer) | 2/19/2019 (Dkt. 42-45 at 2) | 36,171 (Dkt. 42-45 at 2) |
| | 3/5/2022 (Dkt. 42-46 at 2) | 84,755 (Dkt. 42-46 at 2) |
| Quinn (Chief Administrative Officer) | 2/19/2019 (Dkt. 42-47 at 2) | 79,737 (Dkt. 42-47 at 2) |
| | 3/5/2022 (Dkt. 42-48 at 2) | 110,252 (Dkt. 42-48 at 2) |

**[46]** Defendants argue that the filings are incorporated by reference into the Amended Complaint, are integral to the Amended Complaint, and may also be relied upon as legally required disclosures filed with the SEC. Reply at 11-12. Lead Plaintiffs reject all three positions, accepting only that the Court can consider the filings for what they stated rather than for the truth of the matters asserted therein. Opposition at 32-33. While the Court acknowledges the somewhat odd and perhaps unfair result, Lead Plaintiffs have the better of the argument under governing Second Circuit law.

**[47]** **[48]** **[49]** "Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered." *Roth*, 489 F.3d at 509. "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted). "[M]ere notice or possession of the document in question is not enough." *Id.* And only "mentioning a document in the complaint will not satisfy this standard; indeed, even offering limited quotations from the document is not enough." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (internal quotation marks and brackets omitted). The Amended Complaint does not reference the Form 4 filings at any point, so they are not incorporated by reference. The filings are arguably integral to the Amended Complaint, as the allegations of scienter based on motive and opportunity rely heavily on allegations of the Individual Defendants' stock sales, information that Lead Plaintiffs presumably gleaned from the Form 4 filings.[27] *See* Am. Compl. ¶¶ 150-151. But even if the Form 4 filings are integral to the Amended Complaint, the Court cannot consider the filings for the truth of the matters asserted in those documents. *See Roth*, 489 F.3d at 509. Likewise, while the Court may take judicial notice of SEC filings, it cannot do so to establish the truth of the matters asserted therein. *Id.* The Court therefore declines to consider at this stage the apparent stock acquisitions completed by the Individual Defendants during the Class Period.

27     Lead Plaintiffs' counsel was somewhat noncommittal at oral argument when asked about the source for the stock sales allegations but did not seem to deny that the Form 4 filings were the source. *See* Tr. 42:19-43-4.

**[50]** **[51]** **[52]** **[53]** **[54]** Moving to the substance of the analysis, to properly allege motive, plaintiffs "must assert a concrete and personal benefit to the individual defendants

resulting from the fraud." *Kalnit*, 264 F.3d at 139 (citing *Novak*, 216 F.3d at 307-08). "Motives generally possessed by most corporate directors and officers do not suffice." *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 420 (S.D.N.Y. 2011) (citing *Kalnit*, 264 F.3d at 139). "Insider sales of stock may be evidence of scienter if the trades are unusual or suspicious in timing or amount." *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) (citing *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995)). Stock sales by insiders "made a short time before a negative public announcement are suspiciously timed." *Id.* Other "[f]actors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 74-75.

**\*24** **[55]** Lead Plaintiffs do point to some allegations to support a finding of motive. The Individual Defendants allegedly benefited concretely from stock sales throughout the Class Period, collectively selling 463,700 shares to earn gross proceeds of more than $26 million. *See* Am. Compl. ¶ 150. And the Amended Complaint does not allege that they executed stock sales after the Class Period—*i.e.*, following the Consent Order. On the other hand, the stock sales all predated the Consent Order by more than a year, and sales that do not directly precede negative announcements are less indicative of scienter. *See Lozada*, ——— F.Supp.3d at ———, 2024 WL 68571, at \*22 (finding that a lapse of three months between the last sales and a negative announcement undermined an inference of scienter and collecting cases). The sales also are not so unusual as to, by themselves, support a finding of scienter, independent of circumstantial evidence of scienter. But Lead Plaintiffs also do not need to have alleged "correspondingly greater" circumstantial evidence of scienter as would be required in the absence of any valid motive allegations. *See Hain*, 20 F.4th at 137-38; *JP Morgan Chase*, 553 F.3d at 199.

**2. Conscious Misbehavior or Recklessness**

On the second prong of the scienter analysis, Defendants argue that Lead Plaintiffs have failed to allege that the Individual Defendants knew of the unauthorized accounts or any associated misconduct at the time the allegedly misleading statements were made, and that Lead Plaintiffs improperly attempt to rely on the Individual Defendants' roles at USB to compensate for the absence of particularized scienter allegations. Motion at 29-31. They further argue that Lead Plaintiffs cannot rely on the allegation that the

misconduct "involved a core business at USB" to support an inference of scienter. *Id.* at 31-32. And, finally, they argue that Lead Plaintiffs have not adequately pleaded corporate scienter because no individual's scienter can be imputed to USB and the corporate statements involved are not so "important and dramatic" such that their falsehood would be obvious. *Id.* at 32 (quoting *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 775 (S.D.N.Y. 2019)). Lead Plaintiffs counter that the Individual Defendants must have known about the investigation and underlying alleged misconduct by virtue of their positions, and, as to Cecere in particular, point to his admission during his congressional testimony that USB had opened unauthorized accounts as further evidence of scienter. Opposition at 29-31. As to corporate scienter, Lead Plaintiffs cite the "the Bank's admission that it cooperated with the CFPB's investigation and actively responded to the bureau's requests for information over at least a five-year period," *id.* at 25 (citing Am. Compl. ¶ 146), emphasize the statement in the press release issued by the CFPB that "[f]or over a decade, U.S. Bank knew its employees were taking advantage of its customers by misappropriating consumer data to create fictitious accounts," *id.* at 25, and claim that the CFPB's findings in the Consent Order suggest that the Bank caused the unauthorized account openings through its policies and therefore must have known about the openings, *id.* at 25-26. And they additionally argue that the importance of the consumer banking division to USB belies any suggestion that USB was not aware of the unauthorized account openings. *Id.* at 27.

 [56]    [57]    [58] In this context, recklessness means "conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *Stratte-McClure*, 776 F.3d at 106 (internal quotation marks omitted). Recklessness also has been defined as "at the least, ... an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *JP Morgan Chase*, 553 F.3d at 198 (quoting *Novak*, 216 F.3d at 308). "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Blanford*, 794 F.3d at 306 (internal quotation marks omitted). The assessment of whether conscious misbehavior or recklessness has been adequately pleaded "is a highly fact-based inquiry," *Kalnit*, 264 F.3d at 142, and courts must "analyz[e] scienter holistically," *Setzer v. Omega Healthcare Investors, Inc.*, 968 F.3d 204, 213 n.11 (2d Cir. 2020); *accord Tellabs*, 551 U.S. at 326, 127 S.Ct. 2499 ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."). Finally, there are two routes for pleading corporate scienter: "by pleading facts sufficient to create a strong inference either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (internal quotation marks omitted).

 **\*25** **[59]** Defendants are correct that Cecere's September 2022 congressional testimony does not support an inference of scienter. The Amended Complaint does not allege any statements by Cecere during his testimony to suggest that he or any other Individual Defendant was aware of the unauthorized account openings at the time the allegedly misleading statements were made. Rather, his comments before the Senate Banking Committee only prompt the inference that Cecere prepared for an important Congressional hearing, and as part of that preparation, he likely collected relevant information and familiarized himself with the full scope of the misconduct that led to the Consent Order. The Court also agrees with Defendants that little significance should be ascribed to the mere fact that Dolan and Cecere signed certifications for the SEC filings made during the Class Period; Lead Plaintiffs have not provided specific allegations to demonstrate that Dolan and Cecere were exposed to information about the unauthorized accounts during any review process associated with those certifications, nor do those certifications somehow establish that those Defendants were aware of any such information. *See Woodley v. Wood*, No. 20 Civ. 2357 (ER), 2022 WL 103563, at \*8 (S.D.N.Y. Jan. 11, 2022) ("[T]he fact that a defendant had a duty to review the Company's internal controls is not a substitute for specific allegations that he was provided with information that demonstrated the inadequacy of those internal controls.") (quoting *Schiro*, 396 F. Supp. 3d at 307), *aff'd sub nom. Rotunno v. Wood*, No. 22-502, 2022 WL 14997930 (2d Cir. Oct. 27, 2022). Stripped of these bases for scienter, Lead Plaintiffs' theory amounts to asking the Court to infer scienter on the part of the Cecere, Dolan, Quinn, and Richard by virtue of their positions at USB and the alleged significance of the CFPB investigation.

This theory of scienter is the type of conclusory allegation that the PSLRA was enacted to prevent. There is no allegation of any specific meeting between the CFPB and any of Cecere, Dolan, Quinn, or Richard at which they received any information about the unauthorized account openings or the progress of the CFPB's investigation. *Cf. Gagnon*, 368 F. Supp. 3d at 774-75 (declining to find scienter for statements by the defendant-company, a drug manufacturer, that touted its net sales growth but did not disclose facts pertaining to its marketing of the drug to the criminal justice sector and the role of those effort in the drug's financial success, even though the Secretary of Maryland's Department of Health and Hygiene had called a meeting with the company to tell it to back off of talking down competing drugs to legislators). Lead Plaintiffs make much of the statement by the Director of the CFPB that "for over a decade, U.S. Bank knew its employees were taking advantage of its customers by misappropriating consumer data to create fictious accounts." Am. Compl. ¶ 29; *see also id.* ("The CFPB's investigation found specific evidence that revealed that U.S. Bank was aware that sales pressure was leading employees to open accounts without authorization, and the bank had inadequate procedures to prevent and detect these accounts."). But it is not clear what standard of proof or knowledge the CFPB Director relied on what he made this statement. It therefore is also not clear, based on the Director's statement, who at U.S. Bank supposedly knew what and when. This is insufficient, standing alone, to support a finding of scienter as to either the individuals or USB as a whole; again, corporate scienter must be alleged by stating allegations "(1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." *Loreley Fin. (Jersey) No. 3*, 797 F.3d at 177 (internal quotation marks omitted). Neither route is adequately invoked by a single stray comment in a press release.

 [60]    [61]   To the extent that Lead Plaintiffs seek to rely on the Individual Defendants' positions as executives at USB as the basis for scienter, that argument strays dangerously close to the core operations doctrine. "The core operations doctrine provides that a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue." *In re Renewable Energy Grp. Sec. Litig.*, No. 22-335, 2022 WL 14206678, at \*3 n.4 (2d Cir. Oct. 25, 2022) (internal quotation marks omitted). This doctrine holds little sway here, however, because the number of unauthorized accounts was, in comparison to USB's vast business, negligible. In addition, the Second Circuit has "not clearly affirmed the validity of this doctrine following the passage of the PSLRA." *Id.* And so courts in this Circuit generally treat core operations allegations as providing "supplementary but not independently sufficient means to plead scienter." *Cortina v. Anavex Life Sci. Corp.*, No. 15 Civ. 10162 (JMF), 2016 WL 7480415, at \*7 (S.D.N.Y. Dec. 29, 2016) (internal quotation marks omitted).

 \*26   Even were one to assume that Lead Plaintiffs' argument does not rely on the core operations doctrine, their approach is unconvincing. While it is a plausible inference that, from May 4, 2021 onward, USB executives were likely aware of an CFPB investigation, Lead Plaintiffs have made no allegations that the CFPB informed USB that its investigation involved the unauthorized openings of accounts or otherwise communicated to USB the findings from that investigation prior to discussions leading to USB's entry into the Consent Order. *Cf. Fifth Third Bancorp*, 2022 WL 1642221, at \*21-22 (declining to find scienter in case involving the failure to disclose unauthorized account openings where, *inter alia*, the defendant-company allegedly had "disclosed more than 1,000 unauthorized accounts to the CFPB during a 2015 investigation"). Indeed, the only allegation that sheds any light on what USB and its executives knew about the CFPB's investigation and its focus is the disclosure, starting on May 4, 2021, that the CFPB "is investigating certain of the Company's consumer sales practices." Am. Compl. ¶ 118; *accord id.* ¶ 120. Consumer sales practices is a vast category and the fact that USB knew that this subset of its operations was being investigated reveals little about whether the executives or USB had knowledge that a small number of unauthorized accounts had been opened in the preceding decade. *See Fifth Third Bancorp*, 2022 WL 1642221, at \*21-22 ("The only direct link to either Defendant is that the CFPB CIDs were addressed to [the company's President and CEO]. But all [that defendant]'s assumed receipt of the CIDs demonstrates is that he knew of the investigation, not necessarily of the problem itself.").

There also are no allegations to support the inference that executives at USB had been informed that an enforcement action was inevitable or even likely at any point prior to the Consent Order. At most, certain Defendants had been informed that the CFPB was *considering* an enforcement action as of May 3, 2022. *See* Am. Compl. ¶ 120. Indeed,

the entirety of the concrete allegations in this regard is the existence of the disclosures themselves, causing Lead Plaintiffs' theory of scienter to smack strongly of the impermissible practice of pleading fraud by hindsight. *See Novak,* 216 F.3d at 309 ("[W]e have refused to allow plaintiffs to proceed with allegations of fraud by hindsight. Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them. Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." (internal quotation marks and citations omitted)). Ultimately, even while drawing all reasonable inferences in their favor, Lead Plaintiffs ask the Court to stack inference upon inference, which the PSLRA prohibits. The Court accordingly finds that Lead Plaintiffs have failed to adequately plead scienter.

**E. Loss Causation**

Given the above conclusions, the Court does not reach Defendants' loss causation arguments. *See Diehl,* 339 F. Supp. 3d at 169.

**F. Scheme Liability**

In Count I, Lead Plaintiffs reference subsections (a) and (c) of Rule 10b-5, which prohibit, respectively, "employ[ing] any device, scheme, or artifice to defraud," and "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit." 17 C.F.R. § 240.10b-5(a), (c). Lead Plaintiffs argue that Defendants, by not addressing these subsections in their opening brief, have forfeited any objection to allowing this Count to proceed based on alleged violations of these two subsections. Opposition at 34-35. In response, Defendants argue that they had no obligation to anticipate Lead Plaintiffs' specific arguments and thus were not required to address scheme liability. Reply at 18 n.18. And, more substantively, Defendants contend that Lead Plaintiffs have failed to state a scheme liability claim because they have not alleged a "deceptive act" distinct from any alleged omissions. *Id.* at 17-18.

[62] [63] [64] [65] To state a scheme liability claim, a plaintiff must show: "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Danske Bank A/S,* 11 F.4th at 105. "Because scheme claims sound in fraud, they are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). To

maintain a Rule 10b-5(a) or Rule 10b-5(c) claim, a plaintiff must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." *Id.* As recently confirmed by the Second Circuit, "misstatements and omissions alone are not enough for scheme liability." *Rio Tinto plc,* 41 F.4th at 54.

**\*27** [66] The Court exercises its discretion to overlook Defendants' failure to mention scheme liability in their opening brief given the paucity and plainly deficient pleading of that theory in the Amended Complaint. *See Leo v. Leisure Direct, Inc.,* No. 06 Civ. 13566 (DAB), 2018 WL 4119128, at \*2 (S.D.N.Y. Aug. 29, 2018) ("A district court has discretion as to whether to consider an argument raised for the first time in a reply brief."). First and foremost, Lead Plaintiffs have failed to plead scienter or any actionable misstatements, so their scheme liability claims necessarily fail. *See supra* III.B-D. In addition, Lead Plaintiffs rely on a small number of scattered cursory references in the Amended Complaint to a fraudulent scheme, none of which detail any scheme separate and apart from their core misstatements theory, as well as conclusory assertions. *See* Opposition at 34 (citing Am. Compl. ¶¶ 136-137, 153, 158); *see also* Am. Compl. ¶¶ 175 ("Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of USB securities was a success ...."), 176 (conclusory allegation of "dissemination" of false statements), 177 (stating the text of Rule 10b-5). This pleading is analogous to that in *Danske,* where the plaintiffs did not

> articulate with precision the contours of an alleged scheme to defraud investors, or which specific acts were conducted in furtherance of it. Instead, the claim rested upon the incorporation of the previous 140 pages of the pleading paired with the conclusory assertion that "Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to ... deceive the investing public" and "artificially inflate the market price of Danske Bank ADRs."

11 F.4th at 105 (brackets omitted). Thus, the Courts additionally finds, as the Second Circuit did in *Danske,* that "[a]bsent some sort of enumeration of which specific acts constituted an alleged scheme in connection with the purchase or sale of securities, [Lead Plaintiffs' scheme liability] claim does not comply with the applicable heightened pleading standard and cannot go forward." *Id.* Accordingly, Count I is dismissed in its entirety. But as discussed shortly, *see infra* III.H, the Court grants Lead Plaintiffs leave to amend, in the

event they are able to adequately plead scheme liability under Rule 10b-5(a) and/or Rule 10b-5(c).

### G. Section 20(a)

Because the Court has dismissed Lead Plaintiffs' Section 10(b) and Rule 10b-5 claims, the Section 20(a) claims likewise fail for lack of a primary violation. *See*, *e.g.*, *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 215 (S.D.N.Y. 2019) (dismissing Section 20(a) control liability claims after dismissing Section 10(b) primary violations). The Court therefore dismisses Count II of the Amended Complaint.

### H. Leave to Amend

 [67] Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Lead Plaintiffs have asked the Court for leave to amend their Amended Complaint should the Court rule in Defendants' favor. Opposition at 35 n. 31. Because the Amended Complaint is the first complaint submitted following the appointment of Teamsters Local 710 Pension Fund and Ohio Carpenters Pension Fund as Lead Plaintiffs, the Court grants leave to amend. The Court emphasizes that Lead Plaintiffs should only file a Second

Amended Complaint if they are able to remedy the pleading deficiencies identified herein.

### IV. Conclusion

For the foregoing reasons, the Court grants Defendants' motion to dismiss and dismisses Plaintiffs' claims without prejudice. If Lead Plaintiffs decide to file a Second Amended Complaint, they must file it within thirty days of this Opinion and Order. Failure to file a Second Amended Complaint by that deadline, and without showing good cause to excuse such failure in advance of the deadline, will result in the dismissal of Plaintiffs' claims with prejudice. The Clerk of Court is respectfully directed to close the motion pending at Docket Number 40.

SO ORDERED.

### All Citations

--- F.Supp.3d ----, 2024 WL 1330047, Fed. Sec. L. Rep. P 101,838

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 324150, Fed. Sec. L. Rep. P 99,009

2016 WL 324150
United States District Court, N.D. California.

IN RE ENERGY RECOVERY
INC. SECURITIES LITIGATION.

Master Case No. 15-cv-00265-EMC
|
Signed 01/27/2016

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION TO DISMISS

[EDWARD M. CHEN](), United States District Judge

## I. INTRODUCTION

 **\*1** Plaintiffs have filed a class action against Energy
Recovery Inc., and two of its officers, Thomas Rooney and
Audrey Bold, for violations of federal securities laws. In
essence, Plaintiffs charge Defendants with making false and
misleading statements about Energy Recovery's contractual
negotiations with prospective clients, requests for commercial
proposals, core products, and internal controls over financial
reporting. *See generally* Amended Class Action Consolidated
Complaint ("Compl."). Defendants have moved to dismiss
on a number of grounds, including: (1) that the alleged
misstatements are protected under the Private Securities
Litigation Reform Act's ("PSLRA") safe harbor provision for
forward looking statements, (2) that they constitute vague
statements of corporate optimism, and (3) that there are
insufficient allegations suggesting that the statements were
false when made. Finally, defendants argue that the Plaintiffs'
allegations fail to give rise to a "strong inference" of scienter
as required. The Court **GRANTS** in part and **DENIES** in part
Defendants' motion to dismiss.

## II. REQUESTS FOR JUDICIAL NOTICE

A. Defendants' Request
Defendants request judicial notice over seven categories
of documents or to consider them under the doctrine of
incorporation by reference: (1) Energy Recovery's Form 8-K
filed October 19, 2015; (2) Energy Recovery's earnings and
conference call transcripts; (3) Energy Recovery's Forms 10-
K filed with the SEC; (4) Historic Stock Quotes of Energy

Recovery between October 19, 2015 and October 23, 2015 as
provided by NASDAQ; (5) October 21, 2015 Report entitled
"Schlumberger Endorsement Carries Weight: Upgrading on
Oil & Gas Potential" by Credit Suisse; (6) November 5, 2015
Report entitled "More Teeth to the Schlumberger Vor Teq
Agreement Than Initially Appreciated" by Credit Suisse; and
(7) January 19, 2015 issue of Water Desalination Report.
*See* Decl. of David M. Furbush in Support of Defs.' Mot.
("Furbush Decl."), Docket No. 65; Defendants' Request for
Judicial Notice ("D's RJN"), Docket No. 66.

B. Plaintiffs' Objection and Motion to Strike
Plaintiffs object to the Court's consideration of four of the
items. Lead Plaintiff's Motion to Strike and Objection to
Defendants' Request for Judicial Notice ("RJN Response"),
Docket No. 68. Plaintiffs object to Exhibits A, B, C, and
C.1. These exhibits related to a licensing agreement between
Energy Recovery and Schlumberger Technology Corporation
("Schlumberger") on October 14, 2015 and announced on
October 19, 2015:

> (1) **Exhibit A** is a copy of Energy Recovery's Form 8-
> K filed with the SEC on October 19, 2015. The form
> disclosed the Schlumberger Agreement as a material
> definitive agreement and included a press release
> announcing the Schlumberger Agreement;
>
> (2) **Exhibit B** is a table of Energy Recovery's closing
> stock price on the NASDAQ Stock Market from
> October 19, 2015 to October 23, 2015;
>
> (3) **Exhibit C** is a copy of a market analyst
> report by Credit Suisse, dated October 21, 2015,
> titled "Schlumberger Endorsement Carries Weight:
> Upgrading on Oil & Gas Potential";
>
>  **\*2** (4) **Exhibit C.1** is a copy of a market analyst
> report by Credit Suisse, dated November 5, 2015 titled
> "More Teeth to the Schlumberger VorTeq Agreement
> Than Initially Appreciated."

Plaintiffs are asking the Court to strike all factual assertions
and arguments about the Schlumberger deal from defendants'
motion to dismiss because the deal was not referenced in
the Complaint. RJN Response at 4. Defendants respond that
Exhibits A and B are filings with the SEC and matters of
public record not subject to reasonable dispute. Docket No.
70 at 1-2, Defendant's Reply to Lead Plaintiff's Objection
to Request For Judicial Notice and Opposition to Motion to
Strike. As for Exhibits C and C.1, Defendants contend that

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 324150, Fed. Sec. L. Rep. P 99,009

the Complaint specifically quotes statements made by Energy Recovery about the VorTeq product (subject of the agreement between Energy Recovery and Schlumberger). *Id*. at 2.

C. Legal Standard for Judicial Notice

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), evidence beyond the pleadings should not be considered unless: (1) the document is attached to or incorporated by reference into the complaint; or (2) the fact is subject to judicial notice pursuant to Federal Rule of Evidence 201. *United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011).

Under Federal Rule of Evidence 201, "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Courts may take judicial notice of "*undisputed* matters of public record," but generally may not take judicial notice of "*disputed* facts stated in public records." *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (emphasis in original). Facts subject to judicial notice may be considered on a motion to dismiss. *Mullis v. U.S. Bankr. Ct.*, 828 F.2d 1385, 1388 (9th Cir. 1987).

The doctrine of incorporation by reference is distinct from judicial notice. The doctrine "permits a district court to consider documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the...pleadings.'" *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (quoting *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994)).

A court "may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion. The court may treat such a document as 'part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).'" *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (internal citations omitted). Such documents do not convert the motion to dismiss into a motion for summary judgment. *Id*. The Ninth Circuit states that "judicial notice is inappropriate where the facts to be noticed are irrelevant." *Meador v. Pleasant Valley State Prison*, 312 F. App'x 954, 956 (9th Cir. 2009).

1. Unopposed Items

**\*3** Defendants do not object to the Court considering Plaintiffs' Exhibits D-P. The Court **GRANTS** Plaintiffs' requests for judicial notice of the Exhibits D-P. When ruling on a motion to dismiss, a court may take judicial notice of SEC filings. *Dreiling v. Am. Express Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006). In this case, Energy Recovery's Forms 10-K and transcripts of conference earnings calls are judicially noticeable because they are matters of public record. Courts can consider securities offerings and corporate disclosure documents that are publicly available. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008); *see also Kuehbeck v. Genesis Microchip Inc.*, No. C 02-05344 JSW, 2005 WL 1787426,\*4 (N.D. Cal. July 27, 2005) (granting request for judicial notice of press releases, earnings call transcripts, and SEC filings referenced in the complaint). As for Exhibit P (January 19, 2015 issue of *Water Desalination Report*), it is referenced in the Complaint. Compl. ¶¶ 159, 170.

2. Opposed Items

The Court **DECLINES** Defendants' requests for judicial notice of the Exhibits C and C.1 and **GRANTS** Plaintiffs' motion to strike all defendants' factual assertions and arguments derived from these exhibits. While the Court may take judicial record of matters of public record, "[s]uch documents as analyst reports, however, may only be considered when they are submitted to establish 'whether and when certain information was provided to the market' not the truth of the matters asserted in the reports." *In re Wet Seal, Inc. Secs. Litig.*, 518 F.Supp.2d 1148 (C.D. Cal. 2007). Here, while it may be appropriate to judicially notice the existence of SEC filings and their contents, they post-date the events at issue and cannot establish whether the market knew about the Schlumberger deal during the Class Period. Thus, it appears their only relevance turns on the truth of statements therein. Determining the ultimate truth or falsity of the statements contained in the analyst reports is not a proper subject of judicial notice.

As to Exhibits A and B, the Court **GRANTS** Defendants' requests for judicial notice because these documents are SEC filings. However, notice is taken to establish the existence of the documents, not for the truth of the disputed facts. *Ritz Camera & Image, LLC v. Sandisk Corp.*, 772 F. Supp. 2d 1100, 1109 (N.D. Cal. 2011), *aff'd*, 700 F.3d. 503 (Fed. Cir. 2012) ("[w]hile a court may take judicial notice of the existence of SEC filings, it may not take judicial notice of

documents for the truth of disputed facts."); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) (taking judicial notice of the SEC documents for "the purpose of determining what statements the documents contain and not to prove the truth of the documents contents"). Thus, the Court **GRANTS** Plaintiffs' motion to strike all defendants' factual assertions and arguments derived from these exhibits.

## III. FACTUAL & PROCEDURAL BACKGROUND

In their Amended Class Action Consolidated Complaint, Plaintiffs allege as follows.

Defendant Energy Recovery is a Delaware Corporation with headquarters in San Leandro, California. Compl. ¶ 19. Energy Recovery designs, manufactures, and distributes "pressure energy technology" devices used in the water, oil and gas, and chemical industries. *Id*. ¶ 26. During the class period, Mr. Rooney was Energy Recovery's CEO and a member of the board of directors. *See id*. ¶¶ 8, 37. During the class period, Mr. Rooney was Energy Recovery's Chief Marketing Officer ("CMO"). *Id*. ¶ 6. The putative class consists of persons who purchased or otherwise acquired Energy Recovery common stock between March 7, 2013 and March 5, 2015 ("The Class Period"). *Id*. ¶ 1.

### A. False Statements

**\*4** Energy Recovery is "an industry leader in capturing reusable energy from industrial fluid flows and pressure cycles." *Id*. ¶ 19. Energy Recovery's devices are used in "fluid flow" applications, such as water desalination and oil and gas extraction. *Id*. ¶ 26. Historically, Energy Recovery has derived the majority of its revenue from water desalination operations. *Id*. ¶¶ 3, 27. Mr. Rooney joined Energy Recovery in February 2011 with an objective to diversify Energy Recovery's operations into the gas and oil markets. *Id*. ¶ 3. According to the Complaint, during the Class Period Defendant Rooney made false statements about: (1) prospective clients and contract negotiations; (2) the supposed "pipeline" of sales; (3) technical difficulties with Energy Recovery's products; and 4) internal controls designed to provide reasonable assurance regarding the reliability of financial reporting for external purposes in accordance with a framework developed by the Committee of Sponsoring Organizations for the Treadway Commission ("COSO").

### 1. Energy Recovery's Prospective Clients and Contract Negotiations

According to the Complaint, between 2011 and 2014, Mr. Rooney ran the day-to-day operations of Energy Recovery as the Company's CEO. Compl. ¶ 28. He joined the company to increase Energy Recovery's oil and gas operations due to uncertainty in desalination markets around the world. *See id*. ¶ 27. During a March 6, 2014 earnings conference call Rooney stated:

> In 2012, we poured millions into researching and developing 3 new platform technologies for use within the sour gas processing industry. Technologies that we now refer to as IsoBoost, IsoGen and IsoPro. We did so in concert and in collaboration with our oil and gas industry plant partners. In 2013, we continued to pour millions into developing, testing and refining our 3 platform technologies. By the end of 2013 all 3 of our oil and gas technology platforms have been shipped to field locations around the world.

*Id*. ¶ 27.

Plaintiffs allege that "Rooney repeatedly misrepresented the Company's arrangements and contractual negotiations with prospective clients." *Id*. ¶ 40. According to Plaintiffs, Mr. Rooney misled Energy Recovery's investors about dealings with potential clients in three separate instances. Docket No. 67 at 6, Plaintiffs' Opposition to Defendants' Motion to Dismiss ("Opp'n"). First, during a March 7, 2013 earnings conference call, Mr. Rooney stated that Energy Recovery had succeeded in "reach[ing] a verbal agreement for a product sale to a new oil and gas client" from Mexico. Compl. ¶ 50. Second, Mr. Rooney misrepresented Energy Recovery's dealings with Aramco, the largest oil and gas producer in Saudi Arabia. Opp'n at 7; Compl. ¶¶ 86, 87. Third, Mr. Rooney misrepresented his dealings with Chinese oil and gas company, Sinopec. Opp'n at 7; Compl. ¶¶ 42, 88.

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2842 Filed 11/15/24 Page 45 of 173

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 324150, Fed. Sec. L. Rep. P 99,009

### a. Pemex

Plaintiffs allege that Mr. Rooney made false and misleading statements about a "verbal agreement" with Pemex. Compl. ¶ 50. In March 2013, Energy Recovery's former employee ("FE1" [1]), traveled to Mexico to present Energy Recovery's oil and gas products to Petróleos Mexicanos ("Pemex"). *Id.* ¶ 40. On March 6, 2013, after the client presentation, FE1 called Mr. Rooney stating that the meeting had gone "well." *Id.* Pemex showed "interest" in proceeding with the discussions, but no formal agreement was reached. *Id.* FE1 also reported that Energy Recovery would need to participate in a public bidding and procurement process. *Id.* FE1 explained to Mr. Rooney that because Pemex was a state-run company, the procurement process could take anywhere from 6 to 18 months. *Id.*

[1]     FE1 worked for Energy Recovery from July 2011 through July 2014 as Senior Vice President of Sales and Vice President of Product Development for oil and gas. *Id.* ¶¶ 30, 82. FE1 worked with Mr. Rooney on a day-to-day basis and was hired to assist Mr. Rooney to diversify out of water desalination and into oil and gas services, including but not limited to developing products and business in the oil and gas sector. *Id.* ¶ 30.

 **\*5**  The next day, on March 7, 2013, Mr. Rooney held a conference call to discuss 4Q12 financial results. *Id.* ¶ 49. During the call, he stated:

> Just yesterday, we reached a verbal agreement for a product sale to a new oil and gas client. We've just now begun our outbound sales effort. *Id.* ¶ 50. As I'd mentioned, we actually came to a verbal agreement with another significant oil company yesterday to move a project into field trials, in commercial field trials now this year. And that will likely spawn additional projects next year. [ ] So the verbal agreement that we had with the client yesterday was the first of 20 gas field operations that they'd like to attack.

*Id.* ¶ 51.

During the call, Mr. Rooney was referring to Pemex. Ultimately, Energy Recovery did not get the Pemex contract. *Id.* ¶ 53. Plaintiffs maintain that the above statements were false because, as noted above, a confidential witness – a former Energy Recovery vice president of sales – reported that Energy Recovery did not in fact have a contract with Pemex. *See id.* 40.

### b. Saudi Aramco

Next, Plaintiffs allege that Mr. Rooney made false and misleading statements about the delivery of an IsoGen product to Saudi Aramco. On November 7, 2013, Mr. Rooney held a conference call to discuss the 3Q13 financial results. *Id.* ¶ 85. During the call, Rooney stated: "[j]ust this week after a full year of testing the system in our facility, we're happy to announce that as we speak, our first IsoGen Recovery solution is pending shipment to the world's largest oil and gas producer, Aramco, in Saudi Arabia." *Id.* ¶ 86. Plaintiffs allege that the above statements were false because, in fact, "on or about September 24, 2013, the [Energy Recovery's] IsoGen product had failed a critical internal test and required replacement parts." *Id.* ¶ 87. Plaintiffs claim that, as a result of this failure, it was impossible for Energy Recovery to ship IsoGen product to Saudi Aramco before fiscal 2014.

### c. Sinopec

Plaintiffs allege that Mr. Rooney made false and misleading statements about a meeting with Sinopec executives. Between October 25 and 28, 2013, FE 1, Mr. Rooney and Ms. Bold traveled to China to visit a Chinese oil and gas facility, Sinopec. *Id.* ¶ 42. On November 7, 2013 Rooney held a conference call to discuss 3Q13 financial results. *Id.* ¶ 85. During the call, Rooney stated that "[w]hile in China, [he] took the occasion to visit with the regional leadership and plant management of the Sinopec facility in the Chaoyang gas plant where [he] saw firsthand, the progress being achieved in one of [Energy Recovery's] oil and gas field trials." *Id.* ¶ 88. Plaintiffs maintain that the above statements were false because Mr. Rooney "did not in fact meet with Sinopec's executive management." *Id.* ¶ 89.

2016 WL 324150, Fed. Sec. L. Rep. P 99,009

### 2. Energy Recovery' Core Products and Marketing Strategy

Next, Plaintiffs allege that Mr. Rooney and Ms. Bold were actively and publicly championing Energy Recovery's oil and gas products as "commercial" while they were still in the "engineering prototype phase." *Id*. ¶¶ 38, 39. According to the Complaint, Energy Recovery's core products are IsoBoost, IsoGen, and IsoPro. *Id*. ¶ 27. During several conference calls between March 7, 2013 and November 7, 2013, Mr. Rooney made statements indicating that (1) there is no severe technology risk with Energy Recovery core products and that (2) it is certain engineering and technical bureaucracies inside of the oil and gas companies that impede full technical and commercial acceptance of Energy Recovery's core products with the oil and gas companies and that (3) challenges of Energy Recovery's technically successful devices are "more about logistics, approvals and procedures than matters of technical success and acceptance."*Id*. ¶¶ 51, 63, 64, 90.

**\*6** Plaintiffs allege that the above statements were false because according to FE1, by late-2013, IsoBoost was in the engineering prototype phase; IsoGen had failed internal lab tests twice; IsoPro was still waiting to be put into the field. *Id*. ¶ 38. More specifically, in mid-September 2013, Chesapeake Energy Corp. ("Chesapeake") raised concerns with FE 1 about total installations costs of the IsoPro product because the product was not able to function dynamically and had to be controlled manually. *Id*. ¶ 33. Also in September 2013, IsoGen failed a critical internal test performed in San Leandro, California. *Id*. ¶ 34. During the same month, FE1 and Dr. Prem Krish [2] refused to present Energy Recovery's core products at the Gas Processors Association ("GPA") conference scheduled for March/April 2014 because they were not ready. FAC ¶¶ 35, 36. Finally, on November 5, 2013, Energy Recovery's Board of Directors decided that the company would not in fact attend the GPA conference because the products were still experiencing technical difficulties at field-testing sites. *Id*. ¶¶ 7, 37.

[2] Energy Recovery's Chief Technology Officer.

The Complaint further alleges that Ms. Bold, as Chief Marketing Officer, created and implemented a public marketing strategy by which Energy Recovery misrepresented the operational status of the company's core products. ¶¶6-7, 31; Opp'n at 29. According to Plaintiffs, Ms. Bold "convinced Rooney that with smart marketing, Energy Recovery could market products before they were ready for commercialization." *Id*. ¶ 31. Plaintiffs allege that FE1 objected to Mr. Rooney's and Ms. Bold's marketing strategy after the October 2013 corporate retreat in Tucson, Arizona. *Id*.

### 3. Requests for Commercial Proposals

Next, the Complaint alleges that Mr. Rooney materially misled investors about the supposed "pipeline" of sales from oil and gas products while "omitting the truth concerning the design and testing status of the products upon which the 'pipeline' was purportedly based." *Id*. ¶ 9. For example, on May 8, 2014, Rooney held a conference call to discuss 1Q14 financial results. *Id*. ¶ 110. During the call, Rooney stated:

> I think it's probably safe to say that we'll see revenue conversion in 2015 and contract conversions that would beget press releases we hope to see this year and into next year. *Id*. ¶ 112. [W]e received requests for very specific commercial proposals pertaining to specific locations with technical specs already provided to us. Requesting commercial proposals for a substantial number of clients and the sum total of all that is as I say, close to a $100 million, if all were converted to one time cash sales.

*Id*. ¶ 113.

On August 7, 2014, during the 2Q14 conference call, Mr. Rooney stated:

> So, what we are seeing is we opened the dam if you will on February 23, inbound interest well in excess of $100 million, commercial contracts, technical vetting, field plant visits, again which have been spectacularly well received and then beginning to talk about calendarizing things. *Id*. ¶ 123. So I think possibly a more interesting question for investors to think about is not is there are $100 million plus worth of pipeline activity,

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 324150, Fed. Sec. L. Rep. P 99,009

sales pipeline activity, but exactly how quickly will this turn into (revenue).

*Id.* ¶ 124.

Finally, on November 11, 2014, during the 3Q14 conference call, Mr. Rooney indicated that a "significant run-up revenue for [Energy Recovery] in oil and gas is inevitable." *Id.* ¶ 141.

Plaintiffs maintain that the above statements are "materially false and/or misleading" because Mr. Rooney "materially misled investors into believing that revenue was guaranteed and imminent," while omitting the truth about technical difficulties with Energy Recovery's core oil and gas products which impeded the recognition of revenue. *Id.* ¶¶ 114, 125, 142.

### 4. Energy Recovery's Internal Controls Over Financial Reporting

In a string of identical paragraphs, Plaintiffs allege that Mr. Rooney made materially false and/or misleading statements when Mr. Rooney certified in Form 10-K reports that Energy Recovery's internal control over financial reporting was effective according to criteria from the internal-control frameworks developed by the Committee of Sponsoring Organizations for the Treadway Commission ("COSO"). *Id.* ¶¶ 56-61, 68-73, 79-84, 93-98, 104-09, 116-21, 127-32, 133-38. Plaintiffs maintain that Mr. Rooney falsely certified that he was complying with the law as required by the Sarbanes-Oxley Act of 2002, because he failed to implement and maintain adequate internal controls. *Id.* ¶ 44.

**\*7**  Form 10-K for fiscal 2012 states:

> There were no changes in our internal control over financial reporting that occurred during our most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. *Id.* ¶ 57.

> 5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):

> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial

> reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*Id.* ¶ 58.

The Complaint alleges that Mr. Rooney manipulated Energy Recovery's internal projections and "strong-arm[ed]" his subordinates into increasing internal sales projections as well. *Id.* ¶ 59. For example, according to FE1, in April 2013 Mr. Rooney forced FE1 against FE1's judgment to increase his sales projection for the gas and oil industry from $1 million to $4 million. *Id.* ¶ 45. Moreover, Energy Recovery's former SVP of Sales told FE1 that Rooney "calibrated" the desalination projections "all the time." *Id.* ¶ 48.

Plaintiffs maintain that the statements in the 10-K report were materially false and misleading because Mr. Rooney's certification misled investors that Energy Recovery "was implementing and maintaining a rigorous set of internal controls in accordance with COSO's criteria and guidelines," when in fact Energy Recovery's internal controls were ineffective. *Id.* ¶ 60.

### B. Disclosures of Truth

As alleged in the Complaint, the truth was partially disclosed on January 12, 2015, and subsequently on March 5, 2015.

On January 12, 2015, Energy Recovery issued a press release announcing Mr. Rooney's resignation from his position as Chief Executive Officer. *Id.* ¶ 144. Plaintiffs allege that in light of this news, Energy Recovery's stock declined by 20% and market capitalization decreased by approximately $50 million. *Id.* ¶ 147. According to Plaintiffs, another disclosure took place on March 5, 2015 during the 4Q14 conference call. During that call, Joel Gay [3] expressed his disappointment with Energy Recovery's "unacceptable" 2014 financial results. *Id.* ¶ 150. Plaintiffs allege that after that call, Energy Recovery's stock declined by 14.5% and market capitalization decreased by $24.5 million in one day. *Id.* ¶ 153.

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2845 Filed 11/15/24 Page 48 of 173

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 324150, Fed. Sec. L. Rep. P 99,009

[3] After Mr. Rooney's resignation, Mr. Gay, then-current CFO, replaced Mr. Rooney as CEO in April 2015. *Id*. ¶ 20.

### C. Claims

Based on the above allegations, Plaintiffs have asserted two federal securities claims against Energy Recovery and its executives Mr. Rooney and Ms. Bold:

**\*8** (1) Violation of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. *Id*. ¶¶ 190-200.

(2) Violation of section 20(a) of the Act. *Id*. ¶¶ 201-206.

In the pending motion to dismiss, Defendants seek dismissal of both claims. Docket No. 64 ("MTD").

### IV. DISCUSSION

#### A. Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss based on the failure to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). A motion to dismiss based on Rule 12(b)(6) challenges the legal sufficiency of the claims alleged. *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1995). In considering such a motion, a court must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party, although "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). While "a complaint need not contain detailed factual allegations...it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than sheer possibility that a defendant acted unlawfully." *Iqbal*, 550 U.S. at 678.

#### B. Elements of § 10(b)/10b-5 Claim

As noted above, Plaintiffs have asserted two claims against Defendants: (1) a section 10(b)/10b-5 claim and (2) a section 20(a) claim. Section 10(b) and Rule 10b-5 essentially impose liability for securities fraud. There are five elements that must be proven to establish a violation of Rule 10b-5. More specifically, a plaintiff must prove "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014) (internal citations omitted).

As for section 20(a), it essentially provides for derivative liability; that is, it "makes certain 'controlling' individuals also liable for violations of section 10(b) and its underlying regulations." *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 912 (N.D. Cal. 2012) (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009)). In order to prove a prima facie case under section 20(a), plaintiff must prove: (1) a primary violation of federal securities laws; and (2) that the defendant exercised actual power or control over the primary violator (here, Energy Recovery). *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). "Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994) (internal quotation marks and citations omitted).

**\*9** Because Plaintiffs have brought securities fraud claims, Rule 12(b)(6) is not the only governing legal standard; so too are Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The pleading requirement is further heightened by the Private Securities Litigation Reform Act, which requires that a plaintiff alleging securities fraud

> plead with particularity both falsity and scienter." Thus, to properly allege falsity, a securities fraud complaint must now "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief,...state with particularity all facts on which that belief is formed." To adequately plead scienter, the complaint must now "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.

*Zucco*, 552 F.3d at 990-91 (emphasis added).

2016 WL 324150, Fed. Sec. L. Rep. P 99,009

In the instant case, Defendants challenge Plaintiffs' securities fraud claims on the ground that Plaintiff has failed to adequately plead both material falsity and scienter. MTD at 7.

C. Falsity

To plead falsity, the complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). If an allegation regarding the statement or omission is made on information and belief, the complaint must "state with particularity all facts on which that belief is formed." *Id*.

"Central to a 10b-5 claim is the requirement that a misrepresentation or omission of fact must be material." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010). A statement is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1976). To plead materiality, the complaint's allegations must "suffice to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement, and to allow the court to draw the reasonable inference that the defendant is liable." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1323 (2011). "Although determining materiality in securities fraud cases should ordinarily be left to the trier of fact, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *In re Cutera*, 610 F.3d at 1108.

1. Energy Recovery's Prospective Clients and Contract Negotiations

a. Pemex

The Complaint alleges that the following statements made by Mr. Rooney are false or misleading statements of material fact:

- **March 7, 2013 Earnings Call, Mr. Rooney Statement**: "Just yesterday, we reached a verbal agreement for a product sale to a new oil and gas client." Compl. ¶ 50.

- **March 7, 2013 Earnings Call, Mr. Rooney Statement:** "As I'd mentioned, we actually came to a verbal agreement with another significant oil company

yesterday to move a project into field trial, in commercial field trials now this year." *Id*. ¶ 51.

As discussed above, during the call, Mr. Rooney was referring to Pemex. Ultimately, Energy Recovery did not get the Pemex contract. *Id*. ¶ 53. Defendants argue that the above statements are not actionable because: (1) Pemex was interested in moving forward with Energy Recovery but no formal agreement had been reached and (2) in Defendant's view "investors and analysts understand that reference to a 'verbal agreement' with a major oil company for a radically new product would mean an informal, non-final agreement that could be cancelled at any time." MTD at 14-15. Plaintiffs allege that Mr. Rooney made false and misleading statements about a "verbal agreement" with Pemex because FE1 who met with Pemex relayed to Mr. Rooney that because Pemex was a state-run company, Energy Recovery would need to participate in a lengthy public bidding and procurement process. Compl. ¶ 40. Pemex's interest did not rise to the level of an agreement, verbal or otherwise.

**\*10** In light of the FE1 allegations (discussed *supra*), and taking all inferences in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs have adequately alleged that the statements about "verbal agreement" were false or misleading when made. The Complaint alleges that although FE1's meeting with Pemex had gone "well" and that Pemex showed "interest" in proceeding with discussions, the procurement phase with Pemex could take anywhere from 6 to 18 months. *Id*. According to FE1, the procurement process begins with Energy Recovery providing Pemex with a design plan. Compl. ¶ 40. If acceptable, Pemex forwards the plan to its business management and procurement departments. *Id*. Pemex then tenders projects for open market bidding. *Id*. In response, firms provide Pemex with commercial and technical bids. *Id*. Only after these four steps are complete, does Pemex make the decision. *Id*. Given the complexity of and uncertainty in the procurement phase (including a bidding process) with Pemex, the state of affairs between Energy Recovery and Pemex on March 7, 2013, did not constitute any type of agreement – formal or informal.

b. Saudi Aramco

Next, Plaintiffs argue that Mr. Rooney misrepresented Energy Recovery's dealings with Aramco, the largest oil and gas producer in Saudi Arabia. Opp'n at 7; Compl. ¶¶ 86, 87. The

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2847 Filed 11/15/24 Page 50 of 173
In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 324150, Fed. Sec. L. Rep. P 99,009

Complaint alleges that the following statement made by Mr. Rooney is a false and misleading statement of material fact:

- **November 7, 2013 Earnings Call, Mr. Rooney Statement**: "Just this week after a full year of testing the system in our facility, we're happy to announce that as we speak, our first IsoGen Energy Recovery solution is pending shipment to the world's largest oil and gas producer, Aramco, in Saudi Arabia. Compl. ¶ 86.

Plaintiffs allege that the above statements were false because, in fact, "on or about September 24, 2013, the [Energy Recovery's] IsoGen product had failed a critical internal test and required replacement parts." *Id*. ¶ 87. Defendants argue that the above statements are not actionable because: (1) Mr. Rooney did not provide a specific shipment date; (2) there is a two-month gap between the statement and the alleged test failure and that (3) in fact, the IsoGen was shipped to Saudi Aramco in November 2013. MTD at 16.

The Court finds that Plaintiffs have adequately alleged that Mr. Rooney's statement about IsoGen's "pending shipment" to Saudi Aramco was false and misleading for two reasons. First, the word "pending" can reasonably be interpreted as implying immediate shipment. Although Defendants contend the IsoGen was shipped in November 2013, there is nothing before the Court at this juncture to prove this factual assertion. Plaintiffs generally allege that it was impossible for Energy Recovery to ship IsoGen product to Saudi Aramco before fiscal 2014. Compl. ¶ 87. Specifically, IsoGen product had failed a critical internal test and required replacement parts. *Id*. According to FE1, delivery of the replacement parts was not scheduled until the fourth quarter of fiscal 2013. *Id*. Furthermore, when FE1 reported the test results to Mr. Rooney, Mr. Rooney instructed FE1 not to tell Saudi Aramco that the test had failed. *Id*. ¶ 34. Plaintiffs have sufficiently alleged, for purposes of this motion, falsity.

### c. Sinopec

Finally, Plaintiffs allege that Mr. Rooney made false and misleading statements about a meeting with Sinopec executives. The Complaint alleges that the following statement made by Mr. Rooney is a false and/or misleading statement of material fact:

- **November 7, 2013 Earnings Call, Mr. Rooney Statement**: "While in China, we also took the occasion to visit with the regional leadership and plant management of the Sinopec facility in the Chaoyang gas plant where we saw first hand, the progress being achieved in one of our oil and gas field trials....And so 10 days ago or so, I was physically at the plant in China with Sinopec and they are and were effusive in their praise, sharing with us their economics, specifically named individuals at the plant level and at the corporate level that stand ready to give references....So we feel very, very good about that and we expect the same thing. I could say that just first hand, having physically been at the plants, and dealt with my counterpart at Sinopec, and also at the plant level management." *Id*. ¶ 88.

**\*11** Plaintiffs maintain that the above statements were false because according to FE1, during the facility visit at Sinopec, Mr. Rooney declined "to meet a member of Sinopec's executive management team." *Id*. ¶ 89. Defendants argue that the above statements are not actionable because Mr. Rooney merely stated that he visited "with *regional leadership* and *plant*," not executive management. MTD at 15. (emphasis in original). The Court concludes that Plaintiffs have adequately alleged that the statements about dealings with Sinopec were false and misleading when made. Mr. Rooney did state the he met with his "counterpart at Sinopec" while visiting the Sinopec facility in the Chaoyang gas plant. *Id*. ¶ 89.

However, the Complaint does not sufficiently allege that Mr. Rooney's statements about meeting with the executive at Sinopec are material. "Central to a 10b-5 claim is the requirement that a misrepresentation or omission of fact must be material." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010). "For purposes of securities fraud, 'materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information.' A statement is material if 'a reasonable investor would have considered it useful or significant.'" *United States v. Jenkins*, 633 F.3d 788, 802 (9th Cir. 2011). In the context of Mr. Rooney's one-time visit with Sinopec, it is unlikely that a reasonable investor would deem significant the difference between Energy Recovery's meeting with Sinopec's plant leadership and meeting with executive management.

Accordingly, the Court rules that when viewed in Plaintiffs' favor, the allegations that Mr. Rooney's statements about Energy Recovery's dealings with Pemex and Saudi Aramco were false and misleading are sufficient to survive a Rule 12(b)(6) motion. As to Sinopec, the Court holds that Plaintiffs have not alleged materiality.

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2848 Filed 11/15/24 Page 51 of 173

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 324150, Fed. Sec. L. Rep. P 99,009

2. <u>Energy Recovery's Core Products and Marketing Strategy</u>

Plaintiffs allege that Mr. Rooney and Ms. Bold were actively marketing Energy Recovery's oil and gas products as "commercial" while they were still in the "engineering prototype phase." *Id*. ¶¶ 38, 39. The Complaint alleges that the following statements made by Mr. Rooney are false and/or misleading statement of material fact:

• **March 7, 2013 Earnings Call, Mr. Rooney Statement**: "We probably have ongoing discussions with 8 to 10 [oil and gas companies] right now. We actually have not moved forward with anymore than the first 3 until just recently because we did not want to expose ourselves to anymore technology risk than we had with the first 3. We've seen enough in the trials now to change that and so I'd mentioned, we hired our first full-time sales mode. We don't see the technology risk being severe anymore so with the 8 to 10 that we've been working with, we're now actively in discussions about moving forward with various projects." *Id*. ¶ 51.

• **March 7, 2013 Earnings Call, Mr. Rooney Statement:** "[W]hat I can tell you is that the field trials have looked very promising and the conversations with the oil companies we've got going right now suggest extreme interest. But there are certain engineering and technical bureaucracies inside of these oil and gas companies and so as we work our way through that for full commercial acceptance, the timeline is the part that becomes least certain to us, but the level of interest is extreme." *Id*.

• **March 7, 2013 Earnings Call, Mr. Rooney Statement:** "The part that I don't control and maybe I don't even have as much clarity on as I will say a year from now is the path that you work through technical and commercial acceptance with these large giants. We will for sure make it through that, but does it take a month or 3 months or 6 months or where – and in each oil giant case, it seems to have a little bit different pace and speed, but we seem to be getting a great deal of attention in moving things along nicely." *Id*.

**\*12** • **May 9, 2013 Earnings Call, Mr. Rooney Statement:** "For the most part, our challenges are more about logistics, approvals and procedures than matters of technical success and acceptance." *Id*. ¶ 63.

• **May 9, 2013 Earnings Call, Mr. Rooney Statement:** "[I]n all cases, it's been a tremendous amount of bureaucracy and approvals, double approvals, triple approvals in some cases and so we are methodicly working through that and so I guess that of a severe case of naiveté, we felt that upon delivering technically successful devices, we would instantly go into trial modes and trial modes with last 6 months, we would get approvals and move on. And it turns out there is more – there are more hurdles, more bureaucracy, and we are literally creating a new industrial category around Energy Recovery for pressurized fluid flows and so, we simply need to be considerably more patient." *Id*. ¶ 64.

• **August 1, 2013 Earnings Call, Mr. Rooney Statement:** "Entering the oil and gas industry with revolutionary new energy recovery devices is and has taken longer than we originally expected but the outlook is very promising. So on the oil and gas area, as was mentioned in the last call, the field trial process has many more stages, hurdles and logistics to it than we knew when we first entered it." *Id*. ¶¶ 75-76.

• **November 7, 2013 Earnings Call, Mr. Rooney Statement:** "The one thing that we've learned about the oil and gas industry is that it has its own pace and we've been working through things at the oil and gas industry pace, but we are convinced that we're going to be moving now to contracts."*Id*. ¶ 90.

Defendants argue that the above statements are not actionable because: (1) Plaintiffs fail to cite a single marketing statement that was false and misleading; 2) that Mr. Rooney repeatedly referred to the need for "field trials" before receiving commercial contracts; and 3) that Mr. Rooney "never stated that the products were fully developed, tested, or ready to be sold to customers." MTD at 13-14. As to each challenged statement, Plaintiffs allege that the statements were false because according to FE1, by late-2013, IsoBoost was in the engineering prototype phase; IsoGen had failed internal lab tests twice; IsoPro was still waiting to be put into the field. *Id*. ¶ 38. Plaintiffs state that Energy Recovery's core products "were not yet commercially developed" because:

• (a) "Energy Recovery's products...were only engineering prototypes (*i.e.*, either in the midst of field-testing or being modified to remedy certain design deficiencies)." *Id*. ¶ 31.

2016 WL 324150, Fed. Sec. L. Rep. P 99,009

- (b) "[I]n mid-September 2013, one of Energy Recovery's potential clients, Chesapeake Energy Corp. was experiencing problems with the Company's IsoPro product. Specifically, the IsoPro's "contractor" component was not applying pressure properly throughout the processing phase. The "contractor" is a component or stag in which gas comes into contact with liquid. In other words, the product was not able to function dynamically and had to be controlled manually. Chesapeake began raising concerns with FE1 about the total installation costs of the product. FE 1 relayed these concerns to Rooney. Rooney became worried that Chesapeake may not proceed with Energy Recovery's IsoPro product and, as a result, Rooney told FE1 not to discuss the problems with Chesapeake with anyone, including the public." *Id.* ¶ 33.

**\*13** • (c) In September 2013, "Energy Recovery's IsoGen product also failed a critical internal test. The particular problem with the product involved vibrations emanating from a bearing between a tribune and generator. The vibrations were so severe that they began to bend the product's chassis, which resulted in the nonalignment of the motor and leaking. The test had been performed in San Leandro, California. When FE1 reported the test results to Rooney, Rooney told FE1 not to tell the Company's prospective client, Saudi Aramco, that the test had failed." *Id.* ¶ 34.

- (d) "Notwithstanding, Rooney wanted to present Energy Recovery's products at the GPA conference, which was scheduled to occur in March or April 2014. In September 2013, FE 1 had a conversation with Rooney during a management meeting at the San Leandro office. FE 1 told Rooney that FE 1 refused to present the Company's products at the GPA conference because the product was not ready yet. In response, Rooney immediately asked Dr. Prem Krish (Energy Recovery's Chief Technology Officer) to present at the GPA instead of FE 1. Nocair Bensalah (Energy Recovery's Vice President, Manufacturing, and Bold were present during this conversation." *Id.* ¶ 35.

- (e) "Thereafter, Dr. Krish went to FE 1 and asked FE 1 for advice because he, just like FE 1, did not feel comfortable presenting the products at the GPA conference. FE 1 and Dr. Krish then went to Rooney to tell them that neither of them would present the Company's products at the GPA conference. Facetiously,

Dr. Krish suggested that Rooney have Bold present at the conference in light of the fact that she could avoid certain technical questions on the basis that she was in marketing and not engineering. Rooney asked Dr. Krish why he was declining to speak at the conference, to which Dr. Krish replied that Energy Recovery simply did not have a working product yet." *Id.* ¶ 36.

- (f) "On November 5, 2013, Energy Recovery's Board of Directors held a meeting. During the meeting, FE 1 presented on the status of the Company's products (i.e., that they were in the engineering prototype phase). One of the Company's directors later that after FE 1 had left the meeting, the Board of Directors had asked Rooney why he was so intent on presenting at the GPA if FE 1 was advising against it. According to FE 1, the director said that Rooney responded by stating that "[FE 1] and [Buehler] are now against me so I guess I can't." The Board of Directors decided that the Company would not attend the GPA conference. *Id.* ¶ 37.

- (g) According to FE 1, by late-2013, Energy Recovery's Oil and Gas products still had not reached commercialization. The IsoBoost product had field-tested, but was still in the engineering prototype phase. Energy Recovery's two other products were also still in the engineering prototype phase—IsoGen had failed internal lab tests twice and had not been field-tested and IsoPro was still waiting to be put into the field after being assembled for Chesapeake. All of Energy Recovery's products were engineering prototypes, which meant that nothing was ready for commercial production. *Id.* ¶ 38.

- (h) Meanwhile, Rooney and Bold were actively marketing these products as commercial. Rooney and Bold even went so far as to record a promotional video for the IsoBoost product by filming a gas processing facility in Texas that used only a component of the IsoBoost product (as opposed to the IsoBoost product itself). The component was a product manufactured by Pump Engineering, a company acquired by Energy Recovery in December 2009. Rooney and Bold visited the gas processing facility and recorded the promotional video in December 2013. *Id.* ¶ 39.

**\*14** The Court finds that falsity has not been adequately pled for the August 8, 2013 and November 7, 2013 earnings calls statements. A serious shortcoming of the Complaint is its failure to allege specific facts showing exactly what is false about the full field trial process. As for the November 7, 2013

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2850 Filed 11/15/24 Page 53 of 173
In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 324150, Fed. Sec. L. Rep. P 99,009

earnings call statement, it is too vague and general to imply anything concrete.

However, taking all inferences in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs have adequately alleged that the remaining statements contained in the Complaint were false and misleading when made. The Complaint alleges serious technical difficulties with IsoGen and IsoPro that caused Energy Recovery's Board of Directors to decline to present these products at the GPA conference. *Id*. ¶¶ 33-38. The statements about challenges concerning the full commercial acceptance of Energy Recovery's core products were also misleading because they created the impression that the delay in commercial revenue was due only to bureaucracy; meanwhile, Energy Recovery allegedly suffered from serious technical shortcomings of its products. Accordingly, the Court rules that when viewed in Plaintiffs' favor, the allegations that Mr. Rooney's statements were misleading are sufficient to survive a Rule 12(b)(6) motion.

### 3. Requests for Commercial Proposals

Plaintiffs assert that Mr. Rooney made false and misleading statements in March, May, August, and November 2014 by referring to requests for very specific commercial proposals when, in fact, in September 2013, Energy Recovery had experienced significant technical difficulties with IsoGen and IsoPro. *See id*. ¶¶ 33-38, 101, 112, 123, 124, 141. More specifically, during a November 11, 2014, 3Q14 conference call, Mr. Rooney indicated that a "significant run-up revenue for [Energy Recovery] in oil and gas is inevitable." *Id*. ¶ 141. Plaintiffs maintain that Mr. Rooney "materially misled investors into believing that revenue was guaranteed and imminent," while omitting the truth about technical difficulties with Energy Recovery's core oil and gas products. *Id*. ¶ 114, 125, 142. Here, it is unclear whether Energy Recovery was still experiencing technical problems with its core products as of November, 2014. The Complaint alleges that according to FE1, "Energy Recovery's products remained in the engineering prototype phase well into late-2013 and beyond." *Id*. ¶ 77.

Furthermore, during oral argument Plaintiffs' counsel asserted that Energy Recovery's products were not ready for sale until late-2013/early-2014. Thus, as currently pled, it is unclear what the status of the core products was at the end of 2014. Because the most specific statement about the revenue from oil and gas was made in November 2014 (well after late-2013), the Court concludes that Plaintiffs have failed to allege with sufficient particularity under PSLRA

and the plausibility standard of *Iqbal* and *Twombly* that the statement about "inevitable" revenue identified in the Complaint was false or misleading when made. As for August 7, 2014 statements about "calendarizing things" and that there was a question about "how quickly [sales pipeline activity] will...turn into (revenue)," these statements are neither false nor misleading because they merely indicate that Energy Recovery was enjoying a certain level of commercial interest; these statements did not imply with requisite specificity that the oil and gas products were ready to be sold on the market. Finally, Mr. Rooney's revenue projections (including a prediction about "inevitable" revenue) are too vague to be false and misleading. The Complaint fails to allege specific representations or projections: even with the "inevitable" revenue statement, Mr. Rooney does not commit to predictions of "significant revenue." Accordingly, the statements about commercial proposals and revenue projections are dismissed in their entirety.

### 4. Energy Recovery's Internal Controls Over Financial Reporting

**\*15** For the statements about internal controls over financial reporting, Plaintiffs allege that Mr. Rooney made materially false and/or misleading statements when Mr. Rooney certified in Form 10-K reports that (1) Energy Recovery's internal control over financial reporting was effective according to criteria from the internal-control frameworks developed by the Committee of Sponsoring Organizations for the Treadway Commission ("COSO"); and (2) Energy Recovery was complying with the law as required by the Sarbanes-Oxley Act of 2002. *Id*. ¶ 44.

Form 10-K for fiscal 2012 states:

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant

role in the registrant's internal control over financial reporting.

*Id*. ¶ 58.

Plaintiffs maintain that the statements in the 10-K report were materially false and misleading because Energy Recovery's internal controls were ineffective for two reasons. *Id*. ¶ 60. First, Mr. Rooney was forcing his subordinates into increasing internal sales projections. *Id*. ¶ 59. Second, Mr. Rooney was "calibrating" his own sales projections "all the time." *Id*. ¶ 48.

Defendants argue that the above statements are not actionable because: (1) the COSO frameworks are not the law; and (2) the adjustment of *internal* sales projections does not render the Company's internal control over *external* financial reporting ineffective. Opp'n at 11 n. 7; *Id*. at 12 (emphasis in original). The Court addresses each argument in turn. First, courts have imposed liability for non-compliance with COSO frameworks. *See In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 471, 504 (S.D.N.Y. 2011)*on reconsideration*, No. 07 CIV. 10453, 2011 WL 4072027 (S.D.N.Y. Sept. 13, 2011) and *on reconsideration*, No. 07 CIV. 10453, 2011 WL 4357166 (S.D.N.Y. Sept. 13, 2011) (stating that the Securities Complaint has provided sufficiently detailed allegations regarding Bear Stearns' failure to maintain effective internal controls related to its financial reporting and violated the "Internal Control-Integrated Framework" issued by COSO and various other requirements found in the SEC regulations and the Sarbanes-Oxley Act."); *In re Wash. Mut. Inc. Sec.*, 694 F. Supp. 2d 1192, 1212 (W.D. Wash. 2009) (finding misstatements about the adequacy of internal controls as actionable).

Nonetheless, it is not clear from the Complaint whether Mr. Rooney's "calibrated" internal reports produced unreliable and skewed external reports. Plaintiffs rely on *In re Wash. Mut. Inc. Sec.*, 694 F. Supp. 2d 1192 (W.D. Wash. 2009) to argue that misstatements in offering documents about the adequacy of internal controls are actionable under Securities Act. Opp'n at 20. In that case, however, the defendant issued a press release containing false statements as to the defendant's net income, allowance, and earnings per share. *Id*. Here, Plaintiffs do not identify false or misleading financial statements or documents made to the public; nor do Plaintiffs identify how *internal* sales projections materially sanctioned by Mr. Rooney misled the public. Finally, Plaintiffs have failed to pinpoint precisely how paragraph 5 of the Form 10-

K contains a false or misleading statement that was made to the market.

**\*16** Accordingly, the allegations about Mr. Rooney's statements regarding internal controls fail to state a claim.

D. Safe Harbor/Bespeaks Caution

Defendants argue that many of the allegedly false or misleading statements are forward-looking, thus the safe harbor provision of the PSLRA and the bespeaks caution doctrine immunize them from liability. MTD at 22-23.

Under the PSLRA's safe harbor provision:

> a person...shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—
>
> (A) the forward-looking statement is—
>
> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement....

15 U.S.C. § 78u–5(c)(1).

The bespeaks caution doctrine provides for immunity in essentially the same circumstances as does the safe harbor provision *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 948 (9th Cir. 2005) (noting that the PSLRA safe harbor provision codifies the bespeaks caution doctrine for forward-looking statements); *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004) (noting that "[t]he PSLRA created a statutory version of [the bespeaks caution] doctrine by providing a safe harbor for forward-looking statements identified as such, which are accompanied by meaningful cautionary statements"). Thus, the Court addresses the two protections simultaneously. *See e.g.*, *In re Copper Mt. Secs. Litig.*, 311 F.Supp.2d 857, 876 (N.D. Cal.2004) (stating that "it is appropriate to consider the two protections simultaneously").

1. Energy Recovery's Prospective Clients and Contract Negotiations

### a. Pemex

As noted above, Plaintiffs claim that Mr. Rooney's March 7, 2013 comments about a "verbal agreement" with Pemex were materially false or misleading because FE1 who met with Pemex relayed to Mr. Rooney that because Pemex was a state-run company, Energy Recovery would need to participate in a lengthy public bidding and procurement process before securing a formal contract. Compl. ¶ 40. The statements about a "verbal agreement" with Pemex do not constitute "forward-looking statements" because these statements all contain representations of historical fact – for example, the assertion that Energy Recovery "actually came to" or "reached" a verbal agreement with a significant oil company. *Id*. ¶¶ 50, 51. Thus, the Court concludes that the PSLRA safe harbor does not apply and need not address whether Defendants' cautionary language was "meaningful." *See e.g.*, *City of Hialeah Employees' Retirement Sys. & Laborers Pension Trust Funds v. Toll Brothers, Inc.,* No. 07-1513, 2008 WL 4058690, at *2 (E.D. Pa. Aug. 29, 2008) ("[B]ecause these statements were not forward-looking...the safe harbor provision of the PSLRA [is] inapplicable.").

### b. Saudi Aramco

As noted above, Plaintiffs claim that Mr. Rooney's November 7, 2013 statement about IsoGen's pending shipment to Saudi Aramco was materially false and misleading because IsoGen failed a critical internal test in September 2013. Compl. ¶ 87. The statement about a "pending shipment" to Saudi Aramco does not constitute a "forward-looking statement" because this statement contains representations of a present fact. Thus, the Court concludes that the PSLRA safe harbor does not apply and need not address whether Defendants' cautionary language was "meaningful." *City of Hialeah Employees' Retirement Sys.*, No. 07-1513, 2008 WL 4058690, at *2.

### 2. Energy Recovery's Core Products and Marketing Strategy

 **\*17** As discussed above, Plaintiffs allege that Mr. Rooney concealed from the market serious technical difficulties with Energy Recovery's core products by blaming the delay with the full commercial acceptance of Energy Recovery's core products on logistics, approvals, engineering and technical bureaucracies inside the oil and gas companies. Compl. ¶¶ 51, 63. Because Mr. Rooney's statements concerning the

bureaucracies and general business practices within the oil and gas industry are in the past or present tense, the PSLRA's safe-harbor does not apply. *Id*. ¶¶ 51, 63, 64, 76, 90.

### 3. Requests for Commercial Proposals

In their motion to dismiss, Defendants point out that the following allegedly false or misleading statements are forward-looking. MTD at 23:

- "I think it's probably safe to say that we'll see revenue conversion in 2015 and contract conversions that would beget press releases we hope to see this year and into next year."

  *Id*. ¶ 112. (May 8, 2014 statement by Rooney during earnings call).

- "And then meaningful revenue on oil and gas next year, I think we stand right now is that we see a whole wall of client activity going on, and proposal activity, that give us a very wide spectrum in terms of what potential revenue could come from oil and gas next year."

  *Id*. ¶ 141. (November 11, 2014 statement by Rooney during earnings call).

- "We're positioning for a significant revenue in 2015, but really what we've accepted is that a significant run-up of revenue for us in oil and gas is inevitable. It is going to happen in the first quarter, in the fourth quarter, is it going to happen in 2016? We are taking one step at a time. The word internally now is that this oil and gas industry and revenue there for us is inevitable...Significant revenue in 2015? I would like to think so, but really what we're more focused on is moving significant numbers of projects into the pipeline into this inevitable future for us."

  *Id*. (May 8, 2014 statement by Rooney during earnings call).

Defendants argue that these statements are forward-looking because they are statements about future economic performance. Docket No. 69 at 7 ("Reply"). The Court need not address whether Mr. Rooney's statements concerning Energy Recovery's "inevitable" sales "pipeline" is forward-looking because as discussed above this statement is too vague to be false and misleading. The remaining statements, however, are clearly forward-looking. *See* 15 U.S.C. § 78u-5(i)(1)(B). [4] *See generally In re Cutera Sec. Litig.*, 610

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2853 Filed 11/15/24 Page 56 of 173
In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 324150, Fed. Sec. L. Rep. P 99,009

F.3d 1103, 1111 (9th Cir. 2010) (earnings projections by definition are forward-looking statements); *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) (analysts calls are "classic growth and revenue projections, which are forward-looking on their face.").

4    "The term 'forward-looking statement means'...a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." 15 U.S.C. § 78u-5(i)(1)(B).

However, to fall within the safe harbor, a statement must not only be forward-looking, but also accompanied by meaningful cautionary language. 15 U.S.C. § 78u-5(c)(1)(A)(i). This requires that the cautionary language "relate directly to that to which plaintiffs claim to have been misled." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1415 (9th Cir. 1994). Plaintiffs contend that the cautionary language here is inadequate because Defendants used the rote opening statements at the outset of their conference calls. Opp'n at 28. In support of this argument, Plaintiffs cite a number of cases where warnings of the generic risks did not constitute meaningful cautionary language. *See e.g., Fecht v. Price Co.*, 70 F.3d 1078, 1081-82 (9th Cir. 1995) (stating that cautionary language did not render statements not misleading); s*ee also In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 882 (N.D. Cal. 2004) (stating that under PSLRA's safe harbor provision for forward-looking statements, "boilerplate language warning that investments are risky or general language not pointing to specific risks is insufficient to constitute a meaningful cautionary warning").

**\*18** In this case, Defendants' Forms contain virtually identical risk factor language.[5] Defendants rely on *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051 (9th Cir. 2014) to argue that less specific factors have been held to be meaningful by the Ninth Circuit. Reply at 8. In *Police Ret. Sys.*, however, defendants "identif[ied] important factors that could cause actual results to differ materially from those in the forward-looking statement." 759 F.3d at 1058. In this case, Energy Recovery's warnings were not attendant to specific types of problems relevant to Energy Recovery. Thus, Mr. Rooney's statements are more akin to non-specific boilerplate warnings insufficient to confer immunity. *See In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d at 882. Thus, Mr. Rooney's statements about potential revenue, though forward-looking, are not protected by bespeaks caution doctrine.

5    Transcripts of the earnings calls state: "Consequently, some of our comments and responses to questions may contain forward-looking statements about market trends, future revenue, growth expectations, cost structure, gross profit margins, new products, and business strategy. Such forward-looking statements are based on current expectations about future events and are subject to the Safe Harbor provisions of the US Private Securities Litigation Reform Act. Forward-looking statements are not guarantees of future performance and are subject to certain risks, uncertainties, and other factors that could cause actual results to differ materially from those discussed. A detailed discussion of these factors and uncertainties is contained in the reports that the Company files with the US Securities and Exchange Commission. The Company assumes no obligation to update any forward-looking statements made during this call except as required by law." D's RJN, Ex. D, I-O at 2.

### E. Corporate Optimism

Defendants argue that "the Complaint alleges eight statements which are clearly inactionable optimistic corporate statements." MTD at 19:

- "Entering the oil and gas industry with revolutionary new energy recovery devices is and has taken longer than we originally expected but the outlook is very promising. We have solid expectations for revenue in 2014, followed by strong growth well into the future."

  *Id*. ¶ 75. (August 1, 2013 statement by Rooney during earnings call).

- "With sales cycle in these 2 industries can be long, but we will remain confident that we will achieve revenue in 2014 with serious growth leading into 2015. Where we sit today I feel very good about how far we have come in 3 short years. We have spent the past 3 years steadily and patiently building our position in the oil and gas industry to appoint where today we're now comfortably moving into full speed commercial roll out. The long term potential for Energy Recovery in the oil and gas industry is immense."

  *Id*. ¶ 100. (March 6, 2014 statement by Rooney during earnings call).

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2854 Filed 11/15/24 Page 57 of 173

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 324150, Fed. Sec. L. Rep. P 99,009

• "I think it's probably safe to say that we'll see revenue conversion in 2015 and contract conversions that would beget press releases we hope to see this year and into next year. But I guess I will not pretend to be an expert in terms of the pace at which this stuff will convert, but I will dwell on, I guess the one point that I know which is the amount of attention we are on, I guess the one point that I know which is the amount of attention we are getting in the specific commercial requests and the magnitude of all of those."

*Id.* ¶ 112. (May 8, 2014 statement by Rooney during earnings call).

• "I think we announced last quarter that after our outbound marketing efforts that began on February 23 I believe we had close to $100 million of commercial interest. We have – that number continues to grow and I would prefer not to quantify that anymore and kind of get into that cycle, but let's just say it continues to grow very nicely, where we stand and we are putting together and issuing commercial proposals against that interest level...the results have been eye-popping.

*Id.* ¶ 123. (August 7, 2014 statement by Rooney during earnings call).

**\*19** • "So what we are seeing is, we opened the dam if you will on February 23, inbound interest well in excess of $ 100 million, commercial contracts, technical vetting, filed plant visits, again which have been spectacularly well received and then beginning to talk about calendarizing things....That's one thing we have learned, but the activity level and the interest level has been very, very positive." *Id.* (August 7, 2014 statement by Rooney during earnings call). [p. 10]

• "The $100 million-plus in solicited proposals is an indication of the strength of our value proposition."

*Id.* ¶ 140. (November 11, 2014 statement by Rooney during earnings call).

• "And then meaningful revenue on oil and gas next year, I think we stand right now is that we see a whole wall of client activity going on, and proposal activity, that give us a very wide spectrum in terms of what potential revenue could come from oil and gas next year."

*Id.* ¶ 141. (November 11, 2014 statement by Rooney during earnings call).

• "We're positioning for a significant revenue in 2015, but really what we've accepted is that a significant run-up of revenue for us in oil and gas is inevitable. It is going to happen in the first quarter, in the fourth quarter, is it going to happen in 2016? We are taking one step at a time. The word internally now is that this oil and gas industry and revenue there for us is inevitable...Significant revenue in 2015? I would like to think so, but really what we're more focused on is moving significant numbers of projects into the pipeline into this inevitable future for us."

*Id.* (November 11, 2014 statement by Rooney during earnings call).

"'Vague statements of opinion are not actionable under the federal securities laws because they are considered immaterial and discounted by the market as mere puffing.'" *In re OmniVision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090, 1102 (N.D. Cal. 2013) (quoting *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998)). As the Ninth Circuit has noted, "[w]hen valuing corporations,...investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *In re Cutera*, 610 F.3d at 1111. Thus, courts have noted that "puffing" statements are generally "'not capable of objective verification,' and 'lack[ ] a standard against which a reasonable investor could expect them to be pegged.'" *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005) (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997)).

For example, courts have found statements "projecting 'excellent results,' a 'blowout winner' product, 'significant sales gains,' and '10% to 30% growth rate over the next several years'" held inactionable. *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005); *see also In re Mellanox Techs., Ltd. Sec. Litig.*, No. 13-CV-04909, 2014 WL 7204864, at \*3 (N.D. Cal. Dec. 17, 2014) (statements "we continue to soar"; "I'm sure we'll get there"; "we will continue to grow"; and "[w]e intend to increase our market share to 30% and more" held inactionable).

However, "[w]hen determining whether statements amounted only to puffery, the court must analyze the context in which the statements were made." *In re Bridgepoint Educ., Inc. Sec. Litig.*, No. 3:12-CV-1737 JM (WMC), 2013 WL 5206216, at \*17 (S.D. Cal. Sept. 13, 2013). Thus, even a statement

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2855 Filed 11/15/24 Page 58 of 173
In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 324150, Fed. Sec. L. Rep. P 99,009

of opinion or an expression of corporate optimism may be deemed actionable in certain circumstances because "there is a difference between enthusiastic statements amounting to general puffery and opinion-based statements that are anchored in 'misrepresentations of existing facts.'" *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260, 310 (S.D.N.Y. 2010) (quoting *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000)); *see also Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation."). Accordingly, the courts do not evaluate the statements in a vacuum by "plucking the statements out of their context to determine whether the words, taken *per se*, are sufficiently 'vague' so as to constitute puffery," but rather examine the entire statement and its circumstances to determine if it is actionable. *Scritchfield v. Paolo*, 272 F. Supp. 2d 163, 176 (D.R.I. 2003).

**\*20** "Puffery" is not-actionable under the PSLRA because the law deems such statements so amorphous as to be immaterial. *See In re Omnivision*, 937 F. Supp. 2d at 1102. However, determining whether a given statement is material "entail[s] fact-intensive assessments that are more properly left to the jury." *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012). Thus, "[i]n deeming a statement puffery at the motion to dismiss stage, courts must exercise great caution." *Id.*; *see also In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1028 (N.D. Ill. 2004) (declining to hold that statements were puffery at the motion to dismiss stage because materiality involves "delicate assessments of the inferences a reasonable shareholder would draw"). Accordingly, to dismiss claims on the ground that the statements are "puffery," the Court must conclude that the statement is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) (citation omitted); *see also In re Scientific-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1360 (N.D. Ga. 2002) ("A statement can be dismissed as puffery as a matter of law only if it is immaterial because it is so exaggerated or so vague that a reasonable investor would not rely on it in considering the 'total mix' of facts available.").

In this case, Plaintiffs conceded that Rooney's statements about Energy Recovery's oil and gas products were "amorphous." Compl. ¶ 28. Plaintiffs, however, rely on

*Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008) to argue that Rooney's optimistic statements are actionable. Opp'n at 16. In *Berson*, defendants stated in their SEC's filings that "[o]ur backlog...consists of anticipated revenues from the *uncompleted portions of existing contracts*...." *Berson*, 527 F.3d at 985-86 (9th Cir. 2008) (emphasis in original). In that case, defendants argued that reasonable investors would have interpreted the emphasized phrase to mean that backlog included stopped work. *Id.* at 986. The Ninth Circuit disagreed and stated that "had defendants released no backlog reports, their failure to mention the stop-work orders might not have misled anyone. But once defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of. We cannot say, as a matter of law, that defendants fulfilled this duty." *Id.* at 987.

Plaintiffs argue that like Defendants in *Berson*, "once [Rooney] chose to tout the [C]ompany's [pipeline], [he] [was] bound to do it in a manner that wouldn't mislead investors as to what that [pipeline] consisted of." Opp'n at 16. Plaintiffs' reliance on *Berson* is misplaced because Rooney did not make specific representations on which his statements of corporate optimism were based; in contrast to *Berson* where the statements were predicated specifically on backlog, Rooney did not say, *e.g.*, that Energy Recovery secured existing contracts sufficient to base revenue growth projections; at most, he referred only to requests for commercial proposals and "commercial interest," none of which Plaintiffs claim were factually false. [6] *Id.* ¶ 114. Furthermore, during the May 8, 2014 earnings call, Rooney clarified that "I guess I will not pretend to be an expert in terms of the pace at which this stuff will convert." D's RJN, Ex. D at 7. The Court finds that the alleged statements are enthusiastic statements of corporate optimism which are not actionable. *Police Ret. Sys.*, 759 F.3d at 1060; *In re Cutera*, 610 F.3d at 1111.

[6]     Plaintiffs do not contest accuracy of the assertion there was $100M of commercial interest. Moreover, some of Mr. Rooney's predictions resulted in contracts and revenue. D's RJN, Ex. H at 5, 7: "We have contracted and delivered oil and gas solutions, as pilot projects and sales, comprised of our IsoBoost and IsoGen systems to customers in Asia and the Middle East. For the year ended December 31, 2014, we recognized oil and gas revenue from the operating lease and lease buy-

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 324150, Fed. Sec. L. Rep. P 99,009

out of an IsoGen system to a customer in Saudi Arabia."

F. Summary

**\*21** The following table summarizes the statements that survive the falsity, safe harbor and corporate optimism tests. Unless otherwise noted, all "source" information refers to paragraphs from Plaintiffs' Amended Complaint.

| Allegation Number and Source | Group | Who, How, When, Where | Statement |
|---|---|---|---|
| (1)<br><br>¶ 50 | Pemex | Def. Rooney, during the 4Q12 conference call, on March 7, 2013. | "Just yesterday, we reached a verbal agreement for a product sale to a new oil and gas client." |
| (2)<br><br>¶ 51 | Pemex | Def. Rooney, during the 4Q12 conference call, on March 7, 2013. | "As I'd mentioned, we actually came to a verbal agreement with another significant oil company yesterday to move a project into field trials, in commercial field trials now this year." |
| (3)<br><br>¶ 86 | Saudi Aramco | Def. Rooney, during the 3Q13 conference call, on November 7, 2013. | "Just this week after a full year of testing the system in our facility, we're happy to announce that as we speak, our first IsoGen Energy Recovery solution is pending shipment to the world's largest oil and gas producer, Aramco, in Saudi Arabia." |
| (4)<br><br>¶ 51 | Core Products | Def. Rooney, during the 4Q12 conference call, on March 7, 2013. | "We probably have ongoing discussions with 8 to 10 [oil and gas companies] right now. We actually have not moved forward with anymore than the first 3 until just recently because we did not want to expose ourselves to anymore technology risk than we had with the first 3. We've seen enough in the trials now to change that and so I'd mentioned, we |

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 324150, Fed. Sec. L. Rep. P 99,009

| | | | hired our first full-time sales mode. We don't see the technology risk being severe anymore so with the 8 to 10 that we've been working with, we're now actively in discussions about moving forward with various projects." |
|---|---|---|---|
| (5) ¶ 51 | Core Products | Def. Rooney, during the 4Q12 conference call, on March 7, 2013. | "[W]hat I can tell you is that the field trials have looked very promising and the conversations with the oil companies we've got going right now suggest extreme interest. But there are certain engineering and technical bureaucracies inside of these oil and gas companies and so as we work our way through that for full commercial acceptance, the timeline is the part that becomes least certain to us, but the level of interest is extreme." |
| (6) ¶ 51 | Core Products | Def. Rooney, during the 4Q12 conference call, on March 7, 2013. | "The part that I don't control and maybe I don't even have as much clarity on as I will say a year from now is the path that you work through technical and commercial acceptance with these large giants. We will for sure make it through that, but does it take a month or 3 months or 6 months or where – and in each oil giant case, it seems to have a little bit different pace and |

2016 WL 324150, Fed. Sec. L. Rep. P 99,009

| | | | speed, but we seem to be getting a great deal of attention in moving things along nicely." |
|---|---|---|---|
| (7)<br><br>¶ 51 | Core Products | Def. Rooney, during the 1Q13 conference call, on May 9, 2013. | "For the most part, our challenges are more about logistics, approvals and procedures than matters of technical success and acceptance." |
| (8)<br><br>¶ 64 | Core Products | Def. Rooney, during the 1Q13 conference call, on May 9, 2013. | "[I]n all cases, it's been a tremendous amount of bureaucracy and approvals, double approvals, triple approvals in some cases and so we are methodically working through that and so I guess that of a severe case of naiveté, we felt that upon delivering technically successful devices, we would instantly go into trial modes and trial modes with last 6 months, we would get approvals and move on. And it turns out there is more – there are more hurdles, more bureaucracy, and we are literally creating a new industrial category around Energy Recovery for pressurized fluid flows and so, we simply need to be considerably more patient." |

### G. Scienter

**\*22** Under the PSLRA, plaintiffs must plead "with particularity facts giving rise to a *strong inference*" that the Defendants acted with scienter when making the alleged false statements. 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). In determining whether the facts give rise to a "strong" inference of scienter, "the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "A strong inference of scienter

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2859 Filed 11/15/24 Page 62 of 173
In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 324150, Fed. Sec. L. Rep. P 99,009

must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014). The inference must be that the "'defendant[ ] made false or misleading statements either *intentionally* or with *deliberate recklessness*.'" *Id.* (quoting *Zucco*, 552 F.3d at 991 (emphasis in original)). This requires that the plaintiff plead that "the defendants knew specific facts at the time that rendered their [statements] fraudulent." *See In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1011 (N.D. Cal. 2008).

### 1. Pemex

One avenue by which to establish scienter is to show, through direct or circumstantial evidence, that the defendants knew or should have known that their statements were false or misleading. "The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement." *Nursing Home Pension Fund Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004).

As discussed above, the Allegations (1) and (2) turn on the alleged falsity of Mr. Rooney's claim that Energy Recovery reached a "verbal agreement" with Pemex. Thus, the issue here is whether Mr. Rooney knew, in fact, that Energy Recovery did not have such an agreement.

Here, Plaintiff's strongest allegation on scienter is in ¶ 40. Plaintiffs allege that "FE1 reported that, due to the fact that Pemex was state-owned, [Energy Recovery] would need to participate in a public bidding and procurement process." *Id.* FE1 explained to Rooney that "because Pemex was a state-run company, the procurement phase would be significant in terms of length." *Id.* According to the Complaint, Mr. Rooney was "aware" that due to a lengthy procurement process it would have taken at least 6-18 months before Energy Recovery would reach any kind of agreement with Pemex. Compl. ¶¶ 40, 53. Given the lengthy procurement phase and uncertainty in the bidding process with Pemex, the Court finds that Plaintiffs have sufficiently alleged a strong inference of scienter by Mr. Rooney with respect to Allegations (1) and (2). Mr. Rooney acted with deliberate or conscious recklessness when he told investors that Energy Recovery had a "verbal agreement" with Pemex.

### 2. Saudi Aramco

With respect to Allegation (3), the issue here is whether Mr. Rooney knew that IsoGen was not ready for shipment on November 7, 2013. Plaintiffs maintain that the statement about the pending shipment of IsoGen to Saudi Aramco was false because (1) it was impossible for Energy Recovery to ship IsoGen product to Saudi Aramco before fiscal 2014, (2) Mr. Rooney knew that "on or about September 24, 2013" IsoGen had failed a critical internal test, and (3) the delivery of the replacement parts for IsoGen was not scheduled until the fourth quarter of fiscal 2013. Compl. ¶ 87. Given the high bar imposed by the PSLRA, Plaintiffs have failed to make a "strong showing" of scienter with respect to IsoGen's "pending" shipment. First, there is a 45-day gap between the failure of IsoGen's critical internal test and the allegedly fraudulent statement. Second, Plaintiffs have not provided any specifics why it was impossible to deliver IsoGen to Saudi Aramco before fiscal 2014. Finally, Plaintiffs failed to allege a specific date or range of dates for "the fourth quarter of fiscal 2013." In the absence of such specifics, the Court cannot ascertain whether there is any basis for the allegation that Mr. Rooney had actual or constructive knowledge of Energy Recovery's problems with IsoGen. *Silicon Graphics*, 183 F.3d at 985.

### 3. Core Products

**\*23** Plaintiffs further allege that Mr. Rooney concealed from the market significant technical problems with Energy Recovery's core products. *Id.* ¶¶ 51, 63. The Complaint, however, does not allege whether Mr. Rooney was receiving weekly reports about the status of the core products throughout the class period. Nor, until September 2013, is there any other substantial evidence of Mr. Rooney's knowledge. As currently plead, Mr. Rooney instructed FE1 (1) to conceal from Chesapeake and the public the problems with IsoPro in mid-September 2013 and (2) not to tell Saudi Aramco about the problems with IsoGen in September 2013. *Id.* ¶¶ 33, 34. Therefore, with regard to Energy Recovery's core products, the Court finds no scienter until mid-September 2013.

As a result, the Allegations (4) – (8) that pre-date September 2013 do not survive the scienter test.

### 4. Motive

Plaintiffs argue that there was a clear motive for Mr. Rooney to "lie about the Company's success in diversifying to the oil and gas industry." Opp'n at 24. While working for Energy Recovery, Mr. Rooney "received exorbitant

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2860 Filed 11/15/24 Page 63 of 173
In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 324150, Fed. Sec. L. Rep. P 99,009

compensation relative to Energy Recovery's other members of senior management." *Id*. ¶ 172. Mr. Rooney's Pay for 2014 ($1,448,971) was greater than the total compensation of the Company's Chief Technology Officer, Chief Sales Officer, and Chief Marketing Officer combined. *Id*. Plaintiffs allege that Rooney's lucrative position at Energy Recovery was a motivating factor to retain his job as long as possible – even if it meant over-promising project pipelines to investors and analysts." *Id*. There are two problems with Plaintiffs' argument. First, in the Ninth Circuit motive by itself is not enough to establish a strong inference of scienter. *In re Silicon Graphics Securities Litigation,* 183 F.3d 970 (9th Cir.1999), *abrogated on other grounds as stated in South Ferry LP v. Killinger,* 542 F.3d 776, 784 (9th Cir.2008). In *Silicon Graphics*, 183 F.3d at 970, the Ninth Circuit stated:

> [A]lthough facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide *some* reasonable inference of intent, they are not sufficient to establish a strong inference of deliberate recklessness. In order to show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity.

*Id.* at 974 (emphasis added); *see also In re Terayon Communs. Sys.,* No. C 00-01967 MHP, 2002 WL 989480, at *8 (N.D. Cal. Mar. 29, 2002) (stating that "[f]acts showing mere recklessness or a motive to commit fraud and an opportunity to do so may provide some reasonable inference of intent, but they are not sufficient to establish a strong inference of deliberate recklessness"; adding that "facts showing motive and opportunity to commit fraud can provide confirming reasonable inferences that help establish a strong inference along with other allegations").

Second, *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920 (9th Cir. 2003), on which Plaintiffs rely in support of its incentive compensation argument is distinguishable from the case at bar. Opp'n at 25. In *No. 84 Employer-Teamster*, defendants were motivated to inflate their company's financial results and stock prices because defendants' eligibility for stock options

and executive bonuses were based primarily on the company's financial performance. *No. 84 Employer-Teamster*, 320 F.3d at 944. In that case, the court inferred the strong inference of scienter because the defendants received thousands of options during the year of alleged misrepresentations, while receiving none in the previous year. *Id*. In this case, Plaintiffs' sole allegations about Mr. Rooney's salary fall short of specific, particularized allegations in *No. 84 Employer-Teamster*.

**\*24** However, "generalized assertions of motive, without more, are inadequate to meet the heightened pleading requirements of *Silicon Graphics*." *Lipton*, 284 F.3d at 1038. Financial motivation can be a relevant factor, but only if Plaintiffs "provide[ ] specific, particularized allegations." *No. 84 Employer-Teamster*, 320 F.3d at 944 (quoting *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002)).

Taking into account the minimal probative value of the allegations of Mr. Rooney's financial motives, the Court finds that Plaintiffs have sufficiently alleged particularized facts to support a strong inference of scienter under Section 10(b) with respect to Mr. Rooney only as to Allegations (1) and (2).

H. Respondeat Superior

The Court also finds that Mr. Rooney's scienter may be imputed to Energy Recovery based on respondeat superior. The Ninth Circuit recognizes respondeat superior liability for a corporation under 10(b) and 10b-5 based on common law agency principles. *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1576-78 (9th Cir. 1990) (en banc) (imputing individual officer's knowledge to the company through the application of the doctrine of respondeat superior). In *Hollinger*, the Ninth Circuit held that the district court erred in concluding that the doctrine of respondeat superior was supplanted by the controlling person provisions of the Securities Act and the Exchange Act, 15 U.S.C. §§ 77*o* & 78t(a). *Hollinger*, 914 F.2d at 1576-78. Thus, there are two forms of secondary liability for violations of Section 10(b): the statutory "control person" liability set forth in Section 20(a) and the common law doctrine of respondeat superior. *See id*.

Although the PSLRA now imposes a heightened scienter requirement for pleading, courts have held or assumed that *Hollinger* remains good law. As one district court stated:

> The Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994), may appear to cast some doubt on the future viability of the

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2861 Filed 11/15/24 Page 64 of 173

In re Energy Recovery Inc. Securities Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 324150, Fed. Sec. L. Rep. P 99,009

Ninth Circuit's holding in *Hollinger* regarding respondeat superior liability under the federal securities laws, but currently *Hollinger* remains the law in this circuit. In *Central Bank of Denver*, the Court held that there is no aiding and abetting liability in a private action under § 10 and Rule 10b-5. 511 U.S. at 191-92. In a dissenting opinion, Justice Stevens stated that "the majority's approach to aiding and abetting at the very least casts serious doubt...on *other* forms of secondary liability that, like the aiding and abetting theory, have long been recognized by the SEC and the courts but are not expressly spelled out in the securities statutes." 511 U.S. at 200 (Stevens, J., dissenting). The dissenting opinion then cites *Hollinger* in a list of cases upon which such doubt may fall. *Id.* at 200 n. 12. Nevertheless, *Hollinger* has not in the interim been overruled by the Supreme Court or the Ninth Circuit.

*In re Musicmaker.com Sec. Litig.*, No. CV00-2018 CAS(MANX), 2001 WL 34062431, at *12 n. 5 (C.D. Cal. June 4, 2001).

Multiple district courts have cited *Hollinger* after passage of the PSLRA. *See e.g.*, *Curry v. Hansen Med., Inc.*, No. C 09-5094 CW, 2012 WL 3242447, at *13 (N.D. Cal. Aug. 10, 2012) (stating that "as in *Hollinger*, although [defendant company] may not be primarily liable for securities fraud, it is secondarily liable under the theory of respondeat superior); *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1204 (N.D. Cal. 2012) (finding that an individual officer's information and guilty plea may be imputed to the company based on respondeat superior) (citing *Hollinger*, 914 F.2d at 1576-78). *See generally S.E.C. v. Sells,* 2012 WL 3242551, *8 (N.D. Cal. Aug. 10, 2012) (imputing individual officer's knowledge onto the company through the application of the doctrine of respondeat superior); *In re Hienergy Tech., Inc.,* 2005 WL 3071250, *8 (C.D. Cal. Oct. 25, 2005) (imputing scienter onto the company when the pleadings supported a finding of scienter on the part of a corporate officer or director.).

**\*25** Respondeat superior is a common law principle of secondary liability and generally 'summarizes the doctrine that a master or other principal is responsible, under certain conditions, for the conduct of a servant or other agent.'" *Id.* at n.28 (quoting Seavey, *Speculations as to "Respondeat Superior*," Harv. Legal Essays 433 (1934)). A common application of this doctrine is the liability of an employer for a tort committed by one of its employees acting within the scope of his employment, or for a misleading statement made by an employee or other agent who has actual or apparent

authority. *See Restatement (Second) of Agency* §§ 219, 257, 261 (1958). Here, it sufficient that Mr. Rooney was acting in what reasonably appeared to the third party to be in the scope of his employment, under the doctrine of apparent authority. *See id.* § 265. Apparent authority liability is imposed even when the agent was acting solely for his own purposes, unless this is known to the person with whom the agent is dealing. *Id.* § 262. Here, Mr. Rooney, a corporate officer, made false and misleading statements within the scope of employment with Energy Recovery. In light of the imputation of Mr. Rooney's scienter through respondeat superior, the Court finds that Plaintiffs have sufficiently alleged a primary violation of Section 10(b) and Rule 10(b)-5 by Energy Recovery.

I. Section 20(a)

Plaintiffs' second cause of action is for a violation of Section 20(a) of the 1934 Securities Exchange Act, 15 U.S.C. § 78t, or control person liability. Plaintiffs allege that "by virtue of their positions as controlling persons, Rooney and Bold are liable pursuant to Section 20(a) of the Exchange Act." Compl. ¶ 205.

Section 20(a) provides derivative liability for those who control others found to be primarily liable under the Act. *See In re Ramp Networks, Inc. Sec. Lit.*, 201 F.Supp.2d 1051, 1063 (N.D. Cal. 2002); *see also Johnson v. Aljian*, 490 F.3d 778, 781 n.11 (9th Cir. 2007). To claim "control person" liability under Section 20(a), Plaintiffs must demonstrate "'a primary violation of federal securities law' and 'that the defendant exercised actual power or control over the primary violator.'" *Zucco,* 552 F.3d at 990 (citations omitted). "To be liable under section 20(a), the defendants must be liable under another section of the Exchange Act." *Heliotrope General, Inc. v. Ford Motor Co.,* 189 F.3d 971, 978 (9th Cir. 1999). Where a plaintiff asserts a Section 20(a) claim based on an underlying violation of Section 10(b), the pleading requirements for both violations are the same. *See In re Ramp Networks,* 201 F. Supp. 2d at 1063. "In general, the determination of who is a controlling person...is an intensely factual question." *Paracor Finance, Inc. v. General Electric Capital Corp.,* 96 F.3d 1151, 1161 (9th Cir.1996) (citation omitted); *see also Howard v. Everex Systems, Inc.,* 228 F.3d 1057, 1065 (9th Cir.2000) (determining who is a controlling person is usually an "intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions."). Plaintiffs "need not show the controlling person's scienter or that they 'culpably participated' in the alleged wrongdoing." *Id.* Courts have found "general allegations

2016 WL 324150, Fed. Sec. L. Rep. P 99,009

concerning an individual's title and responsibilities" to be sufficient to establish control at the motion to dismiss stage. *In re Metawave Communications Corp. Sec. Litig.*, 298 F.Supp.2d 1056, 1087 (W.D. Wash. 2003); *see also In re Immune Response Sec. Litig.*, 375 F.Supp.2d 983, 1031-32 (S.D. Cal.2005) (finding allegations that defendants held positions as CEO and Chairman of the Board and described their roles were sufficient to show they were involved in the company's day-to-day business); *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1079 (N.D. Cal. 2001) (finding sufficient for control person liability allegations that the individual defendants, "by virtue of their executive and managerial positions had the power to control and influence [Cylink], which they exercised").

### 1. Mr. Rooney

Plaintiffs allege that between 2011 and 2014, Rooney ran the day-to-day operations of Energy Recovery as the Company's CEO. *Id*. ¶ 28. Such allegations are sufficient at this procedural stage to state a claim for control person liability. *See S.E.C. v. Todd*, 642 F.3d 1207, 1223-24 (9th Cir. 2011) (finding sufficient for control person liability allegations that the defendant had "day-to-day control of the company."); *Howard*, 228 F.3d at 1065 (finding control where the CEO participated in "the day-to-day management" of the company).

### 2. Ms. Bold

**\*26** Ms. Bold joined Energy Recovery in 2005 and served as its Chief Marketing Officer until April 2015. *Id*. ¶ 21. Plaintiffs have not sufficiently alleged that she possessed the requisite control over a primary violator. *See e.g.*, *In re Int'l Rectifier Corp. Sec. Litig.*, No. CV07-02544-JFWVBKX, 2008 WL 4555794, at *22 (C.D. Cal. May 23, 2008) (stating that the defendant's position as "Executive Vice President, Global Sales and Marketing does not establish that he had control."). Ms. Bold did not speak on the Company's behalf during earnings conference calls with investors, nor did she sign any SEC filings. There is no allegation that she directed or exercised control over Rooney who allegedly made the false and misleading statements. Plaintiffs have failed to allege sufficient facts to state a claim under Section 20(a) against Ms. Bold.

## V. CONCLUSION

For the foregoing reasons, the Court rejects Defendants' arguments that Plaintiffs' Complaint is lacking with respect to allegations of falsity and that, as a matter of law, Defendants' conduct is immunized by the safe harbor provision or bespeaks caution doctrine. Because Plaintiffs have sufficiently alleged a strong inference of scienter as to some claims, the Court **GRANTS** in part and **DENIES** in part Defendants' motion to dismiss. In particular, Plaintiffs have adequately pled falsity and scienter with respect to the Allegations (1) and (2):

| Allegation Number and Source | Group | Who, How, When, Where | Statement |
|---|---|---|---|
| (1)<br><br>¶ 50 | Pemex | Def. Rooney, during the 4Q12 conference call, on March 7, 2013. | "Just yesterday, we reached a verbal agreement for a product sale to a new oil and gas client." |
| (2)<br><br>¶ 51 | Pemex | Def. Rooney, during the 4Q12 conference call, on March 7, 2013. | "As I'd mentioned, we actually came to a verbal agreement with another significant oil company yesterday to move a project into field trials, in commercial field trials now this year." |

As for the claims otherwise discussed, Plaintiff is given leave to amend within thirty (30) days from the date of this order.

This order disposes of Docket Nos. 64, 66, and 68.

**IT IS SO ORDERED**.

2016 WL 324150, Fed. Sec. L. Rep. P 99,009

**All Citations**

Not Reported in Fed. Supp., 2016 WL 324150, Fed. Sec. L. Rep. P 99,009

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)

2022 WL 681320, Fed. Sec. L. Rep. P 101,335

2022 WL 681320
United States District Court, S.D. Ohio, Eastern Division.

IN RE FIRSTENERGY CORP. Securities Litigation

Case Nos. 2:20-cv-3785 & 2:20-cv-4287
|
Signed 03/07/2022

**Attorneys and Law Firms**

Daniel Richard Karon, Karon LLC, Cleveland, OH, Brian E. Cochran, Pro Hac Vice, Robbins Geller Rudman Dowd LLP, San Diego, CA, Joseph F. Murray, Murray Murphy Moul Basil LLP, Columbus, OH, for Plaintiff.

Geoffrey J. Ritts, Robert Stephen Faxon, Jones Day, Cleveland, OH, Jordan M. Baumann, Jones Day, Marjorie P. Duffy, Columbus, OH, for Defendant.

**OPINION & ORDER**

ALGENON L. MARBLEY, CHIEF UNITED STATES DISTRICT JUDGE

**\*1** This case is a consolidated action[1] for securities fraud brought by Lead Plaintiff Los Angeles County Employees Retirement Association ("LACERA") on behalf of a putative class of investors in the Ohio-based electrical utility company FirstEnergy Corp. ("FirstEnergy" or the "Company"). Plaintiffs allege violations of the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act") by FirstEnergy, 25 named officers and directors, and 16 underwriters, in relation to the Ohio House Bill 6 ("HB6") scandal. (ECF No. 72). The case is before the Court on Defendants' 10 separate Motions to Dismiss.[2] The Court determines that Plaintiffs' claims may proceed as pled, with some exceptions in Counts II and IV.

[1] The cases *Owens, et al. v. FirstEnergy Corp., et al.* (No. 2:20-cv-3785) and *Frand, et al. v. FirstEnergy Corp., et al.* (No. 2:20-cv-4287) were consolidated in November 2020 under the *Owens* case number by order of this Court. (ECF No. 65). All of the Motions to Dismiss were docketed in *Owens*; some also were cross-filed in *Frand*. Throughout this

Opinion, ECF numbers refer to the *Owens* docket unless otherwise indicated.

[2] The main Motion to Dismiss is brought jointly by FirstEnergy and 17 officers and directors: James Pearson, Steven Strah, K. Jon Taylor, Jason Lisowski, George Smart, Paul Addison, Michael Anderson, Steven Demetriou, Julia Johnson, Donald Misheff, Thomas Mitchell, James O'Neil, Christopher Pappas, Sandra Pianalto, Luis Reyes, Jerry Thornton, and Leslie Turner. (ECF No. 160; *Frand* ECF No. 58). When this Opinion refers to arguments made by FirstEnergy, they are drawn from the brief in support (ECF No. 161). Individual Motions are brought by Robert Reffner (ECF No. 162), John Judge (ECF No. 164; *Frand* ECF No. 60), Michael Dowling (ECF No. 165; *Frand* ECF No. 61), Ty Pine (ECF No. 166), Dennis Chack (ECF No. 168; *Frand* ECF No. 62), Donald Schneider (ECF No. 170), Leila Vespoli (ECF No. 172), and Charles Jones (ECF No. 174; *Frand* ECF No. 64). A final joint Motion is brought by the 16 underwriters (ECF No. 171). Each of these Defendants also joins in the arguments advanced by FirstEnergy in the main Motion.

**I. BACKGROUND**

**A. Factual Allegations**

The following is drawn from Plaintiffs' well-pled allegations, which are assumed true at this stage; the Court implies no findings of fact. Plaintiffs' Complaint details a large corruption and bribery scheme perpetrated by FirstEnergy and its senior executives between February 21, 2017, and July 21, 2020, inclusive (the "Class Period"). (ECF No. 72 ¶¶ 1, 3). Specifically, FirstEnergy is alleged to have paid approximately $60 million to Ohio's former Speaker of the House Larry Householder, the former Chairman of the Public Utilities Commission of Ohio ("PUCO") Sam Randazzo, and others, via a web of lobbyists, shell companies, and political action committees. (*Id.* ¶¶ 3–5, 8). In exchange, FirstEnergy received a bailout of its failing nuclear power plants, in the form of HB6. (*Id.* ¶ 5). HB6 delivered approximately $2 billion to FirstEnergy: $1.3 billion in a ratepayer-funded subsidy and $700 million in a "decoupling" provision that would allow FirstEnergy to charge artificially high rates. (*Id.*). The scheme unraveled on July 21, 2020, when Householder

and his associates were arrested and charged in connection with the bribery scheme. (*Id.* ¶ 8).

**\*2** According to Plaintiffs, HB6 was the culmination of a years-long effort to solve FirstEnergy's "nuclear problems." The Company's two aging nuclear plants had incurred climbing maintenance and repair costs since at least the early 2000s, and the lost profits only grew as nuclear power became less cost competitive. (*Id.* ¶¶ 42–43). By 2016, forecasts projected losses in the hundreds of millions of dollars, which stood in the way of FirstEnergy's strategic decision to exit the competitive energy-generation market and focus solely on transmission. (*Id.* ¶ 44). Investors grew increasingly concerned about FirstEnergy's nuclear liabilities, and the topic came to "dominate" earnings calls and analyst coverage. (*Id.*).

In 2018, FirstEnergy announced plans to decommission the two nuclear power plants—which would entail billions of dollars in direct expenses and future environmental liabilities. (*Id.* ¶¶ 45, 50). In an effort to shed these costs, FirstEnergy Solutions ("FES," now Energy Harbor LLC) and FirstEnergy Nuclear Operating Company ("FENOC," now Energy Harbor Nuclear Corp.), the two subsidiaries through which FirstEnergy operated the nuclear plants, filed for bankruptcy. (*Id.* ¶¶ 42, 45).[3] FirstEnergy proposed a "settlement" to the bankruptcy court, whereby FirstEnergy would gain "sweeping releases" from future claims against FES and FENOC. (*Id.* ¶ 51). After the Department of Justice, the Ohio Consumer Council, and others objected to the plan, the bankruptcy court halted the case. (*Id.* ¶¶ 52–57, 62).[4]

[3] FES and FENOC were renamed and reorganized as part of the bankruptcy proceedings. The Complaint at times refers to them, together, as "Energy Harbor." (*Id.* ¶¶ 17, 42 n.1).

[4] Less than one week after HB6 was introduced, FirstEnergy would file an amended plan that jettisoned the sweeping releases. (*Id.* ¶ 88). The bankruptcy court then approved the amended plan. (*Id.* ¶ 92). Plaintiffs allege that the success of FirstEnergy's legislative tactics obviated its earlier strategy of obtaining releases via bankruptcy. (*Id.* ¶ 88).

All the while, Plaintiffs allege that FirstEnergy "had been laying the groundwork for [a] backup plan" to delay decommissioning of the nuclear plants and seek "legislative or regulatory solutions"—ultimately in the form of HB6. (*Id.* ¶¶ 44, 63). Early in 2017, FirstEnergy began courting State Representative and Speaker-hopeful Larry Householder by flying him and his sons aboard the corporate jet to former President Trump's inauguration. (*Id.* ¶ 65). Shortly thereafter, FirstEnergy established two 501(c)(4) organizations, Partners for Progress and Generation Now, that would serve as the covert vehicles for funneling money to Householder and affiliates. (*Id.*). FirstEnergy made sizable contributions to Householder in 2017 and 2018 but concealed the true magnitude of its spending ($2.9 million). (*Id.* ¶ 67).

While FirstEnergy was making these clandestine contributions, it allegedly misled its shareholders about the nature of its political activity. One of the more notable instances involved the Company's proxy statements issued in connection with a May 16, 2017 shareholder meeting, where one item of business was a shareholder proposal to require an annual report on lobbying policies and payments. (*Id.* ¶ 110). In urging shareholders to vote against the proposal, FirstEnergy referred shareholders to its Political Activity Policy, which represented that the Company "complies with all federal and state lobbying registration and disclosure requirements" and "has decision-making and oversight processes in place for political contributions and expenditures to ensure such contributions or expenditures are legally permissible and in the best interests of FirstEnergy." (*Id.* ¶¶ 110–11). Additionally, FirstEnergy's SEC filings disclosed the Company's pursuit of "[l]egislative or regulatory solutions," but made no mention of the legal, financial, and reputational risks involved in *how* the Company was pursuing those solutions. (*Id.* ¶¶ 95–102).[5]

[5] Similar statements and omissions throughout the Class Period are discussed more fully at Section III.A.1.a, *infra*.

**\*3** Householder, bolstered by the election of FirstEnergy-funded supporters, became Speaker of the Ohio House of Representatives in January 2019. (*Id.* ¶¶ 70–71). Having secured one powerful ally, FirstEnergy expanded its scheme with a $4.3 million payment to incoming PUCO Chairman Sam Randazzo, who in turn helped to write and support HB6. (*Id.* ¶ 72). Householder introduced the bill in April 2019, and it passed the House of Representatives in May. (*Id.* ¶¶ 73–74). In these two months alone, FirstEnergy contributed at least $9.5 million to the scheme in concealed payments. (*Id.* ¶ 67). The Senate added the valuable decoupling provision and passed the bill, after FirstEnergy contributed another $7

Case 4:23-cv-13132-SDK-EAS  ECF No. 43-6, PageID.2866  Filed 11/15/24  Page 69 of 173

In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)
2022 WL 681320, Fed. Sec. L. Rep. P 101,335

million. (*Id.* ¶¶ 75, 78). Ohio's Governor signed HB6 into law on July 23, 2019. (*Id.*).

Public opposition to HB6 quickly arose in the form of a referendum movement, and the scheme shifted to defending the new law. (*Id.* ¶ 81). FirstEnergy funneled over $38 million through groups such as Ohioans for Energy Security (funded by Generation Now) and Partners for Progress in defense of HB6. (*Id.* ¶ 82). The funds were spent on an advertising campaign urging Ohioans not to sign the referendum petition—which the groups baselessly linked to the Chinese government—and also to bribe, disrupt, or disqualify signature collectors. (*Id.* ¶¶ 83–85). The referendum effort failed when its organizers could not produce the required number of signatures by the deadline. (*Id.* ¶ 86). The next day, FirstEnergy sent $3 million to Generation Now through an affiliate. (*Id.*).

Buoyed by the concealment of risk and by the seemingly guaranteed revenue from HB6, FirstEnergy stock traded at artificially high prices, and its credit ratings improved with S&P, Moody's, and Fitch. (*Id.* ¶¶ 242–46). FirstEnergy used the inflated prices to issue $2.5 billion in stock and $2.5 billion in debt securities. (*Id.* ¶ 241). FirstEnergy officers prospered as well: Defendants Jones, Pearson, Strah, Reffner, and Vespoli earned between 78% and 98% of their total compensation as performance-based pay. (*Id.* ¶ 248). Defendants Jones, Pearson, Chack, and Vespoli all sold a combined $14 million of FirstEnergy stock at the inflated prices. (*Id.* ¶ 250).

The scheme crumbled, however, when criminal charges were brought on July 21, 2020, against Householder, his political strategist Jeffrey Longstreth, three lobbyists (Mathew Borges, Neil Clark, and Juan Cespedes), and Generation Now. (*Id.* ¶ 143).[6] The criminal complaint alleged a federal racketeering conspiracy involving honest services wire fraud, receipt of bribes, and money laundering. (*Id.*). The criminal complaint did not identify FirstEnergy by name—it referred to the financier as "Company A"—but prosecutors announced that "[e]veryone in this room knows who Company A is." (*Id.* ¶ 234). While Defendant Jones was claiming ignorance and denying wrongdoing (*Id.* ¶¶ 234–35), FirstEnergy stock plunged almost 35% on July 21 and 22, 2020, representing a loss of over $7.68 billion in market value. (*Id.* ¶¶ 258–59). As further developments became known, FirstEnergy stock fell again: by $1.1 billion on October 29, 2020, and by $1.3 billion between November 19 and 24, 2020. (*Id.* ¶¶ 261, 264). In each of these windows, the price of debt securities declined

as well. (*Id.* ¶¶ 260, 263, 266). By November 2020, the major ratings agencies had downgraded FirstEnergy's credit ratings to "junk status." (*Id.* ¶ 247). Investors, including Plaintiffs, lost billions of dollars collectively. (*Id.* ¶ 13).

[6]    The criminal case is *United States v. Householder*, No. 1:20-cr-0077-TSB (S.D. Ohio).

Longstreth and Cespedes each pleaded guilty to the racketeering conspiracy, admitting that they committed criminal acts to conceal the nature and source of payments that were made to Generation Now in return for specific official action by Householder. (*Id.* ¶ 171). Generation Now later followed suit and admitted to receiving money from "Company A" to be used in return for specific official action by Householder, and to concealing the nature and source of the payments. (*Id.* ¶ 205). On the same day that Longstreth and Cespedes pled guilty, FirstEnergy announced the firing of Defendants Jones, Chack, and Dowling for having "violated certain Company policies and its code of conduct." (*Id.* ¶ 172). Shortly thereafter, FirstEnergy terminated Defendant Reffner and another legal officer for "inaction and conduct that the Board determined was influenced by the improper tone at the top." (*Id.* ¶¶ 184, 191). FirstEnergy's SEC filings following the terminations admitted to "material weakness in [its] internal control over financial reporting" that "could have resulted in material misstatements" in its financial statements. (*Id.* ¶ 192).

**B. Subsequent Developments**

**\*4** Other fallout of the criminal complaint included lawsuits by the Ohio Attorney General and the Cities of Cincinnati and Columbus against FirstEnergy and others, seeking to enjoin implementation of HB6 (*Id.* ¶¶ 164, 170, 185); a PUCO audit (*Id.* ¶ 182); a ratepayer class action filed in this District, alleging racketeering;[7] shareholder derivative actions before this Court[8] and the Northern District of Ohio;[9] and a federal criminal case against FirstEnergy.[10] That criminal case ended with a deferred prosecution agreement in July 2021, under which FirstEnergy paid a $230 million penalty and "admit[ted], accept[ed], and acknowledge[d] that it is responsible under United States law for the acts as charged in the Information and as set forth in the Statement of Facts"— including that it "conspired with public officials and other individuals and entities to pay millions of dollars to and for

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2867 Filed 11/15/24 Page 70 of 173

In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)

2022 WL 681320, Fed. Sec. L. Rep. P 101,335

the benefit of public officials in exchange for specific official action for FirstEnergy Corp.'s benefit." [11] *See* DPA at 1, 4, 17.

7    *Smith v. FirstEnergy Corp.*, No. 2:20-cv-3755-EAS-KAJ (S.D. Ohio). The Court takes judicial notice of this case and those mentioned next, as "such materials are public records [and] are otherwise appropriate for the taking of judicial notice." *New Eng. Health Care Emps. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003).

8    *Emps. Ret. Sys. of City of St. Louis v. Jones*, No. 2:20-cv-4813-ALM-KAJ (S.D. Ohio).

9    *Miller v. Anderson*, No. 5:20-cv-1743-JRA (N.D. Ohio).

10   *United States v. FirstEnergy Corp.*, No. 1:21-cr-0086-TSB (S.D. Ohio).

11   The deferred prosecution agreement, hereinafter the "DPA," is ECF No. 3 in *United States v. FirstEnergy Corp*. The Statement of Facts is Attachment A to the DPA. The Court takes judicial notice of the DPA, as it is "public record[ ]" and its contents are not subject to reasonable dispute. *New Eng. Health Care Emps. Pension Fund*, 336 F.3d at 501; Fed. R. Evid. 201. It appropriately may be considered at this stage without converting the Motions to Dismiss into ones for summary judgment. *See Nieman v. NLO, Inc.*, 108 F.3d 1546, 1554 (6th Cir. 1997) (" 'In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although *matters of public record*, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account.' " (emphasis added) (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990))). The Court is cautious not to use the DPA for broad truths. Of the Defendants in this matter, only FirstEnergy was a party to the DPA, so the admissions therein are of lesser value against the Individual Defendants. Moreover, the DPA postdates the Complaint, so Plaintiffs have not rested their allegations on it. Though the DPA (or FirstEnergy's pursuit thereof) is discussed in the briefing (ECF No. 176 at 15; No. 193 at 1–2), it does not relieve

the necessity of a well-pled Complaint. Yet, to ignore the DPA when it is so plainly relevant to the claims and arguments at issue would be an exercise in artificial blindness. Accordingly, the Court views FirstEnergy's willingness to sign the DPA as reinforcing allegations and inferences in the Complaint that were compelling even without it.

### C. Procedural History

Plaintiff Owens filed her original Complaint on July 28, 2020. (ECF No. 1). On October 23, 2020, the Court ordered Owens's case consolidated with other related class actions (including that by Plaintiff Frand) and appointed LACERA as Lead Plaintiff. (ECF No. 65). LACERA filed its Amended Consolidated Complaint (hereinafter, the "Complaint") on February 26, 2021. (ECF No. 72). The Complaint contains five counts:

- Count I for violation of Section 10(b) of the Exchange Act and SEC Rule 10b–5 thereunder, against FirstEnergy and the "Officer Defendants" [12] (together, the "Exchange Act Defendants");

- Count II for violation of Section 20(a) of the Exchange Act, against the Exchange Act Defendants;

**\*5** • Count III for violation of Section 11 of the Securities Act, against FirstEnergy; Defendants Jones, Strah, and Lisowski; the "Director Defendants"; [13] and the "Underwriter Defendants" [14] (together, the "Securities Act Defendants");

- Count IV for violation of Section 12(a)(2) of the Securities Act, against the Securities Act Defendants; and

- Count V for violation of Section 15 of the Securities Act, against the Securities Act Defendants other than the Underwriter Defendants.

12   The "Officer Defendants" are Jones, Pearson, Strah, Taylor, Dowling, Chack, Pine, Reffner, Vespoli, Judge, and Schneider. (*Id.* ¶¶ 28–39). Plaintiffs clarify in their response brief that Defendant Pine, a FirstEnergy lobbyist, was not in fact an "officer" of the Company but was included

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2868 Filed 11/15/24 Page 71 of 173

In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)
2022 WL 681320, Fed. Sec. L. Rep. P 101,335

in this definition "for ease of reference." (ECF No. 176 at 71 n.23).

13    The "Director Defendants" are Addison, Anderson, Demetriou, Johnson, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, Smart, Thornton, and Turner. (ECF No. 72 ¶ 281).

14    The "Underwriter Defendants" are Barclays Capital Inc., BofA Securities, Inc., Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC, Mizuho Securities USA LLC, PNC Capital Markets LLC, RBC Capital Markets, LLC, Santander Investment Securities Inc., Scotia Capital (USA) Inc., SMBC Nikko Securities America, Inc., CIBC World Markets Corp., KeyBanc Capital Markets Inc., TD Securities (USA) LLC, U.S. Bancorp Investments, Inc., and MUFG Securities Americas Inc. (*Id.* ¶ 283).

All Defendants moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). *See supra* note 2.

## II. STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted "is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." *Golden v. City of Columbus,* 404 F.3d 950, 958–59 (6th Cir. 2005). When evaluating a motion to dismiss under Rule 12(b)(6), "[a]ll factual allegations in the complaint must be presumed to be true, and reasonable inferences must be made in favor of the non-moving party." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield,* 552 F.3d 430, 434 (6th Cir. 2008). But the court "need not ... accept unwarranted factual inferences." *Id.* Complaints must state "more than a bare assertion of legal conclusions to survive a motion to dismiss." *Horn v. Husqvarna Consumer Outdoor Products N.A., Inc.,* 2013 WL 693119, at *1 (S.D. Ohio Feb. 26, 2013) (citing *Allard v. Weitzman,* 991 F.2d 1236, 1240 (6th Cir. 1993)). A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). The claim to relief must be " 'plausible on its face,' " with "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.*

*Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570).

When a plaintiff's claim sounds in fraud, the plaintiff also must satisfy Federal Rule of Civil Procedure 9(b). Rule 9(b) reads: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." The requirement "reflects the rulemakers' additional understanding that, in cases involving fraud and mistake, a more specific form of notice is necessary to permit a defendant to draft a responsive pleading." *United States ex rel. SNAPP, Inc. v. Ford Motor Co.,* 532 F.3d 496, 504 (6th Cir. 2008) (internal quotation marks omitted). The Sixth Circuit has explained that to satisfy Rule 9(b), a plaintiff must at a minimum "allege the time, place, and content of the alleged misrepresentation," as well as "the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Bennett v. MIS Corp.,* 607 F.3d 1076, 1100 (6th Cir. 2010) (internal quotation marks omitted). In the analysis that follows, the Court will specify which claims sound in fraud and thus are subject to the more stringent pleading requirements of Rule 9(b).

**\*6** In a securities fraud case, the Private Securities Litigation Reform Act ("PSLRA") also requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if any allegation regarding the statement or omission is made on information and belief, ... [to] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Additionally, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2). In other words, the PSLRA requires plaintiffs "to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 313 (2007) (internal quotation marks omitted). Failure to meet these pleading requirements subjects the case to dismissal upon a defendant's motion. 15 U.S.C. § 78u–4(b)(3)(A). Here too, the Court will specify which claims are subject to the PSLRA requirements.

For claims to which heightened pleading requirements (Rule 9(b) and/or the PSLRA) do not apply, the pleading standard defaults to that of Rule 8: "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)

2022 WL 681320, Fed. Sec. L. Rep. P 101,335

### III. LAW AND ANALYSIS

Before delving into the Motions to Dismiss, it is worth setting forth several recurrent principles and themes in the Court's analysis. First, heightened pleading requirements exist for specific policy reasons, and overextending them to filter meritorious lawsuits would frustrate, not further, the purposes of federal securities laws. "Rule 9(b) does not require omniscience; rather, the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim," *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) (internal quotation marks omitted), such that they may "draft a responsive pleading." *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (internal quotation marks omitted).

The PSLRA, meanwhile, is intended "to deter strike suits wherein opportunistic private plaintiffs file securities fraud claims of dubious merit in order to exact large settlement recoveries."*Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 465 (2d Cir. 2019) (internal quotation marks omitted) (citing H.R. Conf. Rep. No. 104-369, at 31 (1995)). The statute was Congress's response to "abuse of the securities laws by private litigants," *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 682 (6th Cir. 2005) (internal quotation marks omitted), which " 'presents a danger of vexatiousness different in degree and kind from that which accompanies litigation in general.' " *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 548 (6th Cir. 1999) (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 739 (1975)). However, the PSLRA "would hardly serve its purpose to protect investors and to maintain confidence in the securities markets, were it to become a choke-point for meritorious claims." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001) (internal quotation marks and citation omitted), *abrogated in part on other grounds by*Tellabs, *Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). As stated in *Tellabs*, the PSLRA contains "twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." 551 U.S. at 322.

Second, context matters to Plaintiffs' narrative and is critical to understanding the alleged fraud. Plaintiffs emphasize that nuclear decommissioning was a matter of great importance to the Company, closely monitored by its shareholders. "The Nuclear Plants grew to dominate FirstEnergy earnings calls and analyst coverage, as investors grew increasingly concerned about the potential liabilities stemming from the Nuclear Plants." (ECF No. 72 ¶ 44). As will be discussed, this fact bolsters a fraudulent motive and blunts the plausibility of unwitting participation. Shareholders also were attuned to the Company's political spending. They brought to the May 2017 shareholder meeting a proposal for increased oversight of lobbying policies and payments, which the Company's leadership recommended against. (*Id.* ¶¶ 110–11). Representations about the Company's lobbying activities and legal compliance—which in other cases might be bland and innocuous—take on a different character when, as alleged, they were proffered in response to specific shareholder concerns and served to further the scheme through distraction and concealment.

**\*7** Third, as detailed above in Section I.B, the HB6 scandal has prompted a deluge of lawsuits, including shareholder derivative actions, criminal prosecutions, a racketeering case, and more. That this Court and others have sustained similar allegations adds to the cogency of Plaintiffs' narrative—and dulls the competing theory that Defendants "believed they were engaging in the political process by legal means." (ECF No. 161 at 2). But nor does it displace Plaintiffs' obligation to demonstrate that the federal securities laws, specifically, are an appropriate avenue of redress. With these ideas in mind, the Court turns to Count I.

### A. Exchange Act Section 10(b) and Rule 10b–5 (Count I)

Section 10(b) of the Exchange Act prohibits "directly or indirectly ... us[ing] or employ[ing], in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe ...." 15 U.S.C. § 78j(b). The Supreme Court "has found a [private] right of action implied in the words of the statute and its implementing regulation," Rule 10b–5. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008). Rule 10b–5 gives three categories of prohibited conduct:

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading,

2022 WL 681320, Fed. Sec. L. Rep. P 101,335

or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person ....

17 C.F.R. § 240.10b–5.

Plaintiffs advance theories under each of the three subparts. The Court will follow FirstEnergy's brief in denoting subpart (b) "misstatement liability" and subparts (a) and (c), together, "scheme liability." (ECF No. 161 at 9 nn. 4, 5). The categories are not mutually exclusive, and Plaintiffs' decision to plead both theories under the same Count is consistent with a complementary view. [15] Scheme liability may rest in part on the same statements or omissions that trigger misstatement liability, or it may embrace separate statements or conduct. See *Lorenzo v. SEC*, 139 S. Ct. 1094, 1102 (2019) ("[T]his Court and the Commission have long recognized considerable overlap among the subsections of the Rule and related provisions of the securities laws."). [16] Though misstatement liability is more defined, the "expansive language" of subsections (a) and (c) "capture[s] a wide range of conduct." *Id.* at 1101–02.

[15] *See also* ECF No. 72 ¶ 94 ("[D]efendants also executed the Bailout Scheme through a series of materially false and misleading public statements"); *Id.* ¶¶ 135–36 (alleged misstatements "were materially false and misleading when made" because "defendants knew or recklessly disregarded ... that FirstEnergy, its officers, employees, and other representatives and affiliates had launched [or "had executed"] an elaborate campaign to corrupt the political process in order to secure the passage of legislation and regulatory action favoring the Company and its affiliates"); No. 176 at 22 ("None of these statements so much as suggested that the most important aspect of Defendants' pursuit of legislative solutions depended on (or had been achieved by), a scheme to corrupt the political process and suborn the regulatory framework into which FirstEnergy had poured tens of millions of dollars." (internal quotation marks and citation omitted)).

[16] Defendants' attempt to segregate the allegations supporting the misstatement theory from those

supporting the scheme theory (ECF No. 161 at 57–58) is irreconcilable with this passage of *Lorenzo*. For instance, the passage Defendants cite from *SEC v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 360–61 (D.N.J. 2009) has been acknowledged by another court as "no longer viable following the Supreme Court's decision in *Lorenzo*." *SEC v. Winemaster*, 529 F. Supp. 3d 880, 919 (N.D. Ill. 2021). In another case cited by Defendants, the court distinguished *Lorenzo* on the grounds that —unlike here—all misstatements were alleged to have occurred *after*, and not in connection with, the sale of securities. *Gordon v. Royal Palm Real Est. Inv. Fund I, LLLP*, 2020 WL 2836312, at *5 (E.D. Mich. May 31, 2020).

**\*8** As interpreted by the courts, the required elements for a claim under Section 10(b) and Rule 10b–5 are:

> (1) a material misrepresentation or omission [or, in the case of scheme liability, a "deceptive or manipulative act"]; (2) scienter, that is, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation, a causal connection between the misrepresentation and the loss.

*In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 851 (S.D. Ohio 2016) (Marbley, J.) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)); *see also Gordon v. Royal Palm Real Est. Inv. Fund I, LLLP*, 320 F. Supp. 3d 910, 923 (E.D. Mich. 2018) (adapting misstatement test to scheme liability). Defendants challenge every element of this test except the fifth (economic loss).

As a threshold matter, Plaintiffs' claims under Section 10(b) are subject to the heightened pleading standards of the PSLRA. The misstatement liability theory rests on statements and omissions alleged to be misleading, and the scheme liability theory embraces these statements and omissions as part of the fraudulent scheme. *See* 15 U.S.C. § 78u–4(b)(1). Both theories also demand a "particular state of mind," *i.e.*, scienter. *See id.* § 78u–4(b)(2). Rule 9(b) applies as well because the statements and omissions are alleged to be

In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)
2022 WL 681320, Fed. Sec. L. Rep. P 101,335

fraudulent, as is the overarching scheme. Even against these heightened standards, however, Plaintiffs have established the necessary elements for their Section 10(b) claims, which the Court now will analyze in turn.

### 1. Misrepresentation or Deceptive Act

All Defendants contend that Plaintiffs have not pled false statements or omissions, or deceptive or manipulative acts, with the requisite particularity. (ECF No. 161 at 9). The Court will consider first the false statements or omissions necessary for Plaintiffs' misstatement theory, then the deceptive or manipulative acts necessary for Plaintiffs' scheme theory.

### a. Misstatement Liability

Under the heightened pleading standards of the PSLRA, Plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if any allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Similarly, because the statements and omissions are alleged to be fraudulent, Rule 9(b) demands that Plaintiffs "allege the time, place, and content of the alleged misrepresentation." *Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir. 2010) (internal quotation marks omitted).

"A misrepresentation is an affirmative statement that is misleading or false." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 470 (6th Cir. 2014) ("*Omnicare II*"). "When an alleged misrepresentation concerns hard information— typically historical information or other factual information that is objectively verifiable—it is actionable if a plaintiff pleads facts showing that the statement concerned a material fact and that it was objectively false or misleading." *Id.* (internal quotation marks and citations omitted). "When an alleged misrepresentation concerns soft information, which includes predictions and matters of opinion, a plaintiff must additionally plead facts showing that the statement was made with knowledge of its falsity." *Id.* (internal quotation marks and citations omitted).

**\*9** An omission, on the other hand, is a "failure to disclose information when [the defendant] had a duty to do so." *Id. at 471*. As relevant here, there is an important distinction between total and partial silence. Once a company "chooses to speak on a subject," the company is "obligated ... to do so fairly and fully." *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 700 (E.D. Mich. 2010); *see also City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 670 (6th Cir. 2005) ("Our securities laws therefore require an actor to provide complete and non-misleading information with respect to the subjects on which he undertakes to speak." (internal quotation marks omitted)). Stated differently, "a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001).

In either case—misrepresentation or omission—the information must be material. A "fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote," or as "having significantly altered the total mix of information made available." *Basic, Inc. v. Levinson,* 485 U.S. 224, 231–32 (1988) (internal quotation marks omitted). "Immaterial statements include vague, soft, puffing statements or obvious hyperbole upon which a reasonable investor would not rely." *Omnicare II*, 769 F.3d at 472 (internal quotation marks omitted).

Plaintiffs raise the following statements and omissions in their Complaint:

- Statements in the quarterly ("Form 10-Q") and annual ("Form 10-K") reports filed with the SEC in which the Company indicated it was pursuing "legislative or regulatory solutions" and represented that its internal controls were "effective," but omitted the bribery scheme from that discussion and from the lengthy disclosure of "risk factors" facing the Company. (ECF No. 72 ¶¶ 95–101, 131).

- Defendants Jones's, Pearson's, and Schneider's certifications of one or more of these SEC reports, in which they attested that the form "does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." (*Id.* ¶ 102).

- Statements on investor calls describing the Company's pursuit of legislative or regulatory solutions but omitting or misrepresenting the corrupt means of that pursuit. (*Id.* ¶¶ 103, 113, 115, 117–18, 121, 124, 127, 129, 132, 134).

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2872 Filed 11/15/24 Page 75 of 173
In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)
2022 WL 681320, Fed. Sec. L. Rep. P 101,335

- Proxy statements representing that the Company was committed to "good corporate governance," "integrity," "openness," and "trust." (*Id.* ¶¶ 104–105)

- The Political Activity Policy—which the 2017 proxy statements cited as its rationale to vote against the shareholders' lobbying transparency proposal —representing that the Company "has decision-making and oversight processes in place for political contributions and expenditures to ensure such contributions or expenditures are legally permissible and in the best interests of FirstEnergy." (*Id.* ¶¶ 110–11).

- The Company's Code of Conduct and Director Code of Conduct, espousing "high ethical standards," "fair dealing," and "compliance with the law." (*Id.* ¶¶ 106–09).

- A statement by Defendant Pearson at an energy conference, concerning the Company's pursuit of nuclear subsidy legislation. (*Id.* ¶ 116).

- Statements in a 2019 "current report" ("Form 8-K"), filed with the SEC, reporting the passage of HB6 and hailing its benefits. (*Id.* ¶ 128).

- Newspaper quotes of senior FirstEnergy executives that gave incomplete accounts of HB6 and misrepresented the risk associated with those ill-gotten gains. (*Id.* ¶¶ 112, 114, 119–20, 122–23, 125–26, 130, 133).

**\*10** The Court will begin by addressing Defendants' overarching objections, then it will analyze the specific misstatements. *See Bondali v. YumA Brands, Inc.,* 620 F. App'x 483, 491 (6th Cir. 2015) (directing "a statement-by-statement analysis").

Defendants first contend that these statements are unactionable opinions. (ECF No. 161 at 59–62; No. 174 at 22–25). In *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund* ("*Omnicare III*"), the Supreme Court instructed that opinion statements—those expressing a "belief" or "view," as opposed to "certainty about a thing"— generally will not count as an "untrue statement of material fact," unless the statement (a) expresses an opinion the speaker did not "actually hold[ ]," (b) contains "embedded statements of fact" that are untrue, or (c) "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion" such that the statement as a whole is

misleading to a reasonable investor. 575 U.S. 175, 183–86, 189 (2015) (internal quotation marks omitted). [17]

[17] Though *Omnicare III* concerned liability under Section 11 of the Securities Act, many courts have extended its reasoning to Section 10(b) of the Exchange Act. *See, e.g.*, *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017); *Tongue v. Sanofi*, 816 F.3d 199, 209–10 (2d Cir. 2016); *EveryWare*, 175 F. Supp. 3d at 852 (Marbley, J.).

In addressing the *Omnicare* argument, this Court is not writing on a blank slate. In the shareholder derivative action, this Court sustained allegations that the same proxy solicitation statements at issue here contained material misrepresentations or omissions. It deemed FirstEnergy's *Omnicare* argument "inapposite" for two reasons: "First, Plaintiffs allege that the Director Defendants made numerous specific statements about their legal compliance and risk management actions with respect to lobbying and political spending. Second ... Plaintiffs make extensive allegations about the FirstEnergy Defendants' state of mind." *Emps. Ret. Sys. of City of St. Louis v. Jones*, 2021 WL 1890490, at *9 (S.D. Ohio May 11, 2021).

Here too, the Court is not persuaded that *Omnicare* bars any of the statements to which Defendants object. The statements comprising "[a]ssessments of compliance efforts" and of "the efficacy of internal controls" (ECF No. 161 at 61; No. 174 at 24) are irreconcilable with the Complaint's well-pled allegations of a fraudulent scheme, which notably were absent in *Omnicare III*. *See* 575 U.S. at 186 ("their complaint explicitly 'exclude[s] and disclaim[s]' any allegation sounding in fraud or deception"). If Defendants in fact made "[c]orruption ... a fundamental aspect of the Company's business model" (ECF No. 72 ¶ 4), then their assessments of internal controls either were not honestly held or were not based on the diligence a reasonable investor would expect them to convey. So too with "[s]tatements about the merits of HB6." (ECF No. 161 at 61; No. 174 at 22–23). If HB6 was the ill-gotten gain of an intentional corrupt scheme, then Defendants had no honest basis to hail the benefits of the legislation; on net, it was a grave risk to the Company. Moreover, the omission of that risk from otherwise thorough disclosures (*Id.* at 24–25) was misleading if the risk was known, or if it would have been known through the reasonable diligence that such disclosures imply. [18]

In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)
2022 WL 681320, Fed. Sec. L. Rep. P 101,335

18    Defendants argue that Plaintiffs could not reasonably have interpreted their compliance statements and risk disclosures as "guarantees." (ECF No. 161 at 63–64; No. 174 at 24–25). This is precisely the argument that the Supreme Court rejected as "too far" in *Omnicare III*. 575 U.S. at 188. "Reasonable investors do not understand such statements as guarantees," but they *do* expect opinion statements to convey "that the issuer believes the opinion" and that "it fairly aligns with the information in the issuer's possession at the time." *Id.* at 188–89. Plaintiffs' well-pled scheme liability claims and scienter allegations, discussed in the next Sections, leave this an untenable position.

 **\*11**  Next, Defendants argue that they were under no legal duty to disclose the purported scheme in statements of "soft information." As discussed above, "rosy affirmation" and "loosely optimistic statements" generally are not actionable. *City of Monroe Emps. Ret. Sys.*, 399 F.3d at 669 (internal quotation marks omitted). "If a company 'chooses to volunteer such information,' though, 'its disclosure must be full and fair' ... [and] 'provide complete and non-misleading information with respect to the subjects on which [it] undertakes to speak.' " *Id.* at 670 (quoting *Helwig*, 251 F.3d at 561).

The "legal duty" argument likewise failed in the shareholder derivative action, where this Court wrote: "Even absent a per se rule requiring disclosure of unproven criminal conduct, 'corporations are [nevertheless] obligated to disclose facts necessary to ensure that their statements are not misleading. This duty applies to the disclosure of [uncharged, unadjudicated conduct] to the same extent it applies to the disclosure of any other material information.' " *Emps. Ret. Sys. of City of St. Louis*, 2021 WL 1890490, at \*9 (alterations in original) (quoting *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 536 F. Supp. 2d 313, 323 (S.D.N.Y. 2007)). Once again, when the Court accepts Plaintiffs' well-pled scheme liability claims, Defendants' "[a]spirational statements" and "[g]eneric statements of legal compliance" (ECF No. 161 at 62; No. 174 at 25–26) would be less than a full and fair disclosure of the facts actually known to the Company.[19]

19    Defendants' reliance on *Dailey v. Medlock*, 551 F. App'x 841 (6th Cir. 2014), therefore is misplaced. Defendants cite *Dailey* for its proposition that "this Circuit's precedent holds that a generic claim of legal compliance, absent any specifics, does not form the basis for a misrepresentation actionable under Rule 10b–5 and does not require the disclosure of allegedly illegal activities." *Id.* at 849. (citing *Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 945–47 (6th Cir. 2009) (*"Omnicare I"*); and *Kushner v. Beverly Enters., Inc.,* 317 F.3d 820, 826–27 (8th Cir. 2003)). In its citation to *Kushner*, the *Dailey* court included this parenthetical: "statement that company was in 'substantial compliance' with Medicare regulations did not support Rule 10b–5 claim *where plaintiffs failed to allege* particular facts demonstrating that defendants *then knew of scheme* which violated those regulations." *Id.* (emphasis added). The Sixth Circuit's *Omnicare I* decision highlighted the same fact: "[T]he Eighth Circuit assumed that liability *could* attach to a company's general assertion of legal compliance, but only where the complaint 'adequately pleaded that the defendants *knew the statements were untruthful.* ' " *Omnicare I*, 583 F.3d at 945 (emphasis added) (quoting *Kushner,* 317 F.3d at 831). Here, Defendants are alleged to have known of a scheme that rendered their compliance statements untruthful, which makes those statements actionable even if they amount to soft information.

Furthermore, several of these compliance statements were offered as reasons to vote against a shareholder proposal for increased oversight of lobbying policies and payments. (ECF No. 72 ¶¶ 110–11). Context changes the meaning of those statements from aspiration to assurance; the speakers are claiming that increased oversight is not necessary *because* the Company is compliant and has effective controls. *Cf. Omnicare III*, 575 U.S. at 190 ("The reasonable investor understands a statement of opinion in its full context"). That assurance—which, importantly, helped to shield the scheme from detection—was misleading and more than mere "puffery" or "corporate cheerleading." (ECF No. 174 at 23, 26).

 **\*12**  Applying these principles to the specific statements at issue, it is clear that Plaintiffs have alleged actionable misrepresentations and omissions under Count I:

- Statements in the 10-Q and 10-K reports filed with the SEC (ECF No. 72 ¶¶ 95–101, 131), signed by Defendants Jones, Pearson, Strah, Taylor, and Schneider

In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)

2022 WL 681320, Fed. Sec. L. Rep. P 101,335

were false or misleading in that they misrepresented the nature of FirstEnergy's pursuit of legislative or regulatory solutions, omitted information about the bribery scheme necessary to give a complete account of the Company's lobbying activity and risk portfolio, falsely claimed the Company was legally compliant, and falsely claimed the Company's internal controls were effective.

- Certifications of these SEC reports by Defendants Jones, Pearson, Strah, and Schneider (*Id.* ¶¶ 98, 102) were false or misleading for the same reasons, and for the additional reason that they are alleged to have known of the scheme but still vouched for the completeness and accuracy of the information contained in the reports.

- Statements on investor calls by Defendants Jones, Pearson, and Strah (*Id.* ¶¶ 103, 113, 115, 117–18, 121, 124, 127, 129, 132, 134) were false or misleading in that they misrepresented the nature of FirstEnergy's pursuit of legislative or regulatory solutions, omitted information about the bribery scheme necessary to give a complete account of the Company's lobbying activity and risk portfolio, and misrepresented the benefits of HB6 to the Company when it was, on net, a grave risk.

- Proxy statements (*Id.* ¶¶ 104–105) were false or misleading in that they staved off shareholder proposals for increased political oversight based on the faulty premise that the Company was responsible and compliant in its contributions and lobbying activity.

- The Political Activity Policy (*Id.* ¶¶ 110–11) similarly was false or misleading in that it was presented as a reason to defeat a shareholder proposal for increased political oversight but was not then being followed by the Company or its senior management.

- The Company's Code of Conduct and Director Code of Conduct (*Id.* ¶¶ 106–09) were false or misleading in that they were presented to shareholders in proxy statements but allegedly were being disregarded intentionally by the Company and its senior management. The Company later would admit to violations of these policies in a series of executive firings. (*Id.* ¶¶ 172, 178, 190–92).

- Defendant Pearson's statement at the energy conference (*Id.* ¶ 116) was false or misleading in that it misrepresented the nature of FirstEnergy's pursuit of legislative or regulatory solutions and omitted

information about the bribery scheme necessary to give a complete account of the Company's lobbying activity.

- Statements in the 8-K report (*Id.* ¶ 128) were false or misleading in that they misrepresented the benefits of HB6 to the Company when it was, on net, a grave risk.

- Newspaper quotes of Defendants Jones, Schneider, Judge, and others (*Id.* ¶¶ 112, 114, 119–20, 122–23, 125–26, 130, 133) were false or misleading in that they misrepresented the nature of FirstEnergy's pursuit of legislative or regulatory solutions, omitted information about the bribery scheme necessary to give a complete account of the Company's lobbying activity and risk portfolio, and misrepresented the benefits of HB6 to the Company when it was, on net, a grave risk.

**\*13** Insofar as any of the above statements were soft information or opinions (*e.g.*, the profession of corporate values and personal assessments of compliance, internal controls, or the merits of HB6), Plaintiffs have alleged actual knowledge of falsity, as will be discussed under the scienter analysis. Moreover, all of the information that was misrepresented or omitted would be considered important to a reasonable investor as they closely monitored the Company's nuclear liabilities and determined how to vote on the shareholder proposal for increased political oversight.

Lastly, Defendants Reffner, Dowling, Pine, Chack, and Vespoli argue that they cannot be held responsible for statements they personally did not make or control. (ECF No. 163 at 5–6, No. 165-1 at 2, No. 167 at 10, No. 169 at 9, No. 173 at 5–6). *see also Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) ("For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."). In response, Plaintiffs clarify that their Section 10(b) claims against these five Officer Defendants rest *only* on scheme liability, not on misstatement liability. (ECF No. 176 at 65 n.20). That concession does not require the dismissal of any claims, however, since misstatement liability and scheme liability are complementary theories in the same count. These Defendants still are implicated in Count I via scheme liability.

### b. Scheme Liability

For Plaintiffs' scheme liability theory, fraud must be alleged with particularity per Rule 9(b). *See, e.g., In re Nat'l Century*

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2875 Filed 11/15/24 Page 78 of 173

In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)
2022 WL 681320, Fed. Sec. L. Rep. P 101,335

*Fin. Enters., Inc., Inv. Litig.*, 2006 WL 469468, at \*21 (S.D. Ohio Feb. 27, 2006) ("*Nat'l Century I*") (applying Rule 9(b) to scheme liability claims). "Where a complaint alleges 'a complex and far-reaching fraudulent scheme,' then that scheme must be pleaded with particularity and the complaint must also 'provide [ ] examples of specific' fraudulent conduct that are 'representative samples' of the scheme." *United States ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 444–45 (6th Cir. 2008) (alteration in original) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 510 (6th Cir. 2007)).

The scheme as alleged by Plaintiffs was "to corrupt legislators and regulators" in order to "generate billions of dollars in illicit proceeds for the Company" while "overcoming the Company's most pressing operational challenges." (ECF No. 72 ¶¶ 3, 4, 6). FirstEnergy allegedly pursued this scheme through a variety of means, including by initiating bankruptcy proceedings "to try to evade liability for the Nuclear Plants," "[p]aying lobbyists to orchestrate and execute the political corruption necessary to pass and preserve HB6," "[m]aking personal payments to corrupt politicians and at least one regulator," "[u]sing" those politicians and regulators to "write" and "advance HB6 for consideration," "[c]orruptly preventing a referendum to repeal HB6," "[c]reating and using a web of pass-through entities to transfer and conceal the money to finance" the scheme, making "materially false and misleading public statements," and "[c]oncealing" the scheme "from the investing public." (*Id.* ¶¶ 93–94).

FirstEnergy vigorously contests the existence of any illegal scheme. It notes specifically that corporations have a First Amendment right to speak on issues of public importance, including anonymously through 501(c)(4) groups. (ECF No. 161 at 13). This argument strains credibility. FirstEnergy is not before this Court simply for having contributed to 501(c)(4) entities; it is here for allegedly having used those entities to facilitate payments in exchange for official government action (*i.e.*, bribery) while deceiving and misleading investors. Bribery is not legal. 18 U.S.C. § 201; O.R.C. § 2921.02. And it is not protected speech. *See, e.g.*, *Smith v. FirstEnergy Corp.*, 518 F. Supp. 3d 1118, 1134–35 (S.D. Ohio Feb. 10, 2021). For essentially the same reasons, FirstEnergy's argument that there were no "inherently deceptive" acts must be rejected. (ECF No. 161 at 55, citing *In re Nat'l Century Fin. Enters., Inc. Fin. Inv. Litig.*, 553 F. Supp. 2d 902, 909 (S.D. Ohio 2008) ("*Nat'l Century III*")). The Complaint alleges that Defendants carried out their scheme by way of bribery, corruption, and concealment. (*See, e.g.*, ECF No. 72 ¶ 93). While it might

be true that "there is nothing inherently deceptive about contributing to a 501(c)(4) organization" (ECF No. 161 at 57), this framing by Defendants woefully miscasts the issue. Covertly funneling bribes through a 501(c)(4) organization, as Defendants are alleged to have done, is not an innocent act of political participation. It is illegal, deceptive, and offensive to democracy.

**\*14** Defendants further claim that, insofar as Plaintiffs have alleged any unlawful conduct, they have not pled it with particularity. (ECF No. 161 at 11–12). Yet, Plaintiffs do plead "what, if any, laws or regulations defendants violated," *Dailey*, 551 F. App'x at 849, by referencing specific criminal charges actually brought against Defendants' alleged co-conspirators. The Complaint details the "federal racketeering conspiracy" charged against Householder, Borges, Longstreth, Clark, Cespedes, and Generation Now, which involved "honest services wire fraud, receipt of millions of dollars in bribes and money laundering." (ECF No. 72 ¶ 143). The indictment filed with those charges explicitly acknowledged the role of "Company A," which is alleged without doubt to have been FirstEnergy. (*Id.* ¶ 234). The Court need not "interpolate" (ECF No. 161 at 12) to identify the unlawful conduct alleged against Defendants.

Moreover, as to bribery, the Complaint is replete with allegations of the "explicit *quid pro quo* agreement" Defendants claim is lacking. (ECF No. 161 at 15). The Complaint identifies specific actors, dollar amounts, phone contacts, meetings, and methods of concealment. (*See, e.g.*, ECF No. 72 ¶¶ 3, 4, 8, 67–75, 93, 135–36, 171, 205, 215–16, 221–24, 230). *Cf.Schiro v. Cemex, S.A.B. de C.V.*, 438 F. Supp. 3d 194, 198 (S.D.N.Y. 2020) ("In order adequately to allege an underlying illegal act, such as bribery, Plaintiffs must plead the 'who, what, when, where, and how' of the alleged improper transaction."). Defendants' apparent expectation that Plaintiffs should be required, pre-discovery, to plead the "terms" of an agreement and the "contents" of communications to which Plaintiffs were not a party (ECF No. 161 at 16, 18) is an attempt to graft omniscience into Rule 9(b). That is not the standard. *SeeWilliams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012). In combination with the timing of contributions and the guilty pleas of Longstreth, Cespedes, and Generation Now (and later, the admissions of FirstEnergy itself), Plaintiffs' facts as pled are more than sufficient to support a plausible and cogent inference that a bribery scheme occurred. The alternate inference of "innocent parallelism" (ECF No. 161 at 17) would rest on fantastical coincidence.

Next, Defendants attempt to call out the insufficiency of allegations in the first half of the Class Period (2017 to 2018). (*Id.* at 24–30). In so doing, they fail to engage with the scheme *as pled*. During the first half of the Class Period, Plaintiffs allege that FirstEnergy was executing its first-choice plan—jettisoning liability through bankruptcy proceedings—while simultaneously "laying the groundwork for [their] backup plan ... that would ultimately result in the passage of HB6." (ECF No. 72 ¶ 63). The introduction of HB6 marked the transition from planning to execution, not the origin of the alleged scheme. Plaintiffs describe several specific datapoints in the planning process that occurred in the first half of the Class Period: courting Householder at the presidential inauguration (*Id.* ¶ 65), establishing the 501(c)(4) organizations that later would serve as the vehicles for covertly transferring funds to Householder (*Id.*), financing Householder and allies in the spring 2018 primaries while obscuring the scale of contributions (*Id.* ¶¶ 67, 137), and defeating through misleading means a shareholder proposal that likely would have shed light on the entire operation (*Id.* ¶¶ 110–11). Again, these datapoints are stated with particularity, including specific dates, locations, actors, and dollar amounts. Moreover, Plaintiffs are not required to narrate the planning stages exhaustively before discovery has been exchanged; they need only show "representative samples" of "a complex and far-reaching fraudulent scheme." *Marlar*, 525 F.3d at 445 (internal quotation marks omitted). This is not, as Defendants claim, a case of " 'fraud by hindsight.' " (ECF No. 161 at 24, quoting *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1042 (6th Cir. 1991)). Rather, Defendants' acts and statements in the first half of the Class Period are alleged to have been in furtherance of an intentional and corrupt scheme then underway. In arguing that these earlier acts and statements were neither false nor deceptive at the time, Defendants would have this Court misread the Complaint and ignore the scheme's planning stage.[20]

[20] Defendants' sub-argument about bribery can be dispatched swiftly, as it rests on a nonexistent contemporaneousness element. (ECF No. 161 at 27–29). The crime of bribery is complete when a person "promise[s], offer[s], or give[s] any valuable thing or valuable benefit" "with purpose to corrupt ... or improperly to influence a public servant or party official ... *whether before or after the public servant or party official is elected.*" O.R.C. § 2921.02(A) (emphasis added). The fact that money was exchanged before Householder's election does not prohibit the formation of an explicit *quid pro quo* agreement, and it does not mean that Defendants held "at most, some 'generalized expectation of some future action.' " (ECF No. 161 at 28, quoting *Huff v. FirstEnergy Corp.*, 972 F. Supp. 2d 1018, 1034 (N.D. Ohio 2013)). The other case on which Defendants rely, *McDonnell v. United States*, discusses what constitutes an "official act" under the federal bribery statute, but it does not require or even suggest that the official must have a present ability to deliver that act. 136 S. Ct. 2355, 2372 (2016) ("It must also be something specific and focused that is 'pending' or '*may by law be brought*' before a public official." (emphasis added) (quoting 18 U.S.C. § 201(a)(3))).

**\*15** Last are the arguments by the Officer Defendants that the Complaint fails to plead with particularity their individual involvement in the scheme. Their protests aside, the Court finds that the scheme allegations are sufficient to implicate each of them:

- Defendant Jones, who served as FirstEnergy's CEO throughout the Class Period, is alleged to have overseen the Company's pursuit of legislative and regulatory solutions, to have spoken many of the misstatements at issue, to have signed and certified FirstEnergy's SEC filings, which served to deceive shareholders about the nature of the Company's political activity and which the Company later had to correct to disclose deficient internal controls, to have participated in in-person meetings regarding the scheme, to have made 84 phone contacts with Householder during the Class Period, and to have been terminated for his involvement in the scheme, including with respect to the $4 million payment to Randazzo. (ECF No. 72 ¶¶ 95–96, 98, 102–104, 106, 112–14, 117–18, 121, 123–24, 127, 129, 132, 189, 220–21).

- Defendant Pearson, who served as FirstEnergy's CFO and later its Vice President of Finance, is alleged to have overseen the Company's approach to its nuclear liabilities through his participation in the "Restructuring Working Group," to have "reviewed and determined the Company's accounting for its payments and political contributions, including FirstEnergy's illicit payments to the Bailout Scheme," to have made false or misleading statements on investor calls and at an energy conference, and to have signed and certified FirstEnergy's SEC

filings, which served to deceive shareholders about the nature of the Company's political activity. (*Id.* ¶¶ 95–96, 102, 113, 115–16, 225). Defendant Pearson's retirement in 2019 does not preclude his involvement during the earlier part of the Class Period, which encompassed the scheme's planning stages.

- Defendant Strah, who served as FirstEnergy's Vice President of Utilities Operations, then its CFO, and later its President, is alleged to have "reviewed and determined the Company's accounting for its payments and political contributions, including FirstEnergy's illicit payments to the Bailout Scheme," to have made false or misleading statements on an investor call, and to have signed and certified FirstEnergy's SEC filings, which served to deceive shareholders about the nature of the Company's political activity and which the Company later had to correct to disclose deficient internal controls. (*Id.* ¶¶ 98, 102, 134, 189, 226).

- Defendant Taylor, who served FirstEnergy in a series of senior financial and operational roles (first as Controller and Chief Accounting Officer, then President of Ohio Operations, then Vice President of Utilities Operations, and finally CFO) (*Id.* ¶ 31), is alleged to have signed FirstEnergy's SEC filings, which served to deceive shareholders about the nature of the Company's political activity. (*Id.* ¶¶ 95–96).

- Defendant Dowling, who served as FirstEnergy's Senior Vice President of External Affairs, is alleged to have overseen the Company's governmental and regulatory affairs, to have made at least 14 phone contacts with Householder and several more with other co-conspirators, many in close conjunction with wire payments, and to have been terminated his involvement in the scheme, including with respect to the $4 million payment to Randazzo. (*Id.* ¶ 222).

**\*16** • Defendant Chack, who served as FirstEnergy's Senior Vice President of Product Development, Marketing and Branding, is alleged to have overseen the Company's "extensive media efforts in support of HB6 and efforts to oppose the repeal of the legislation," to have "worked to obscure the Company's role in funding this media campaign," to have attended at least one in-person meeting regarding the scheme in September 2019, and to have been terminated for his involvement in the scheme, including with respect to the $4 million payment to Randazzo. (*Id.* ¶ 224).

- Defendant Pine, who served as a First Energy lobbyist and its Ohio Director of State Affairs, is alleged to have been "a central liaison between FirstEnergy and corrupt Ohio politicians and regulators," to have made "at least 188 phone contacts with Householder and his co-conspirators," including several in close conjunction with wire payments, and to have worked with state legislators in drafting HB6. (*Id.* ¶ 223).

- Defendant Reffner, who served as a Vice President in FirstEnergy's Legal Department, then its General Counsel, and later its Chief Legal Officer, is alleged to have overseen "the Company's fulfillment of its legal and ethical obligations, internal control policies and procedures and adherence to internal control, risk management and compliance guidelines," and to have been terminated for "conduct" in support of the scheme as well as his failure to prevent it. (*Id.* ¶ 227).

- Defendant Vespoli, who served as FirstEnergy's Executive Vice President of Corporate Strategy and Regulatory Affairs and Chief Legal Officer, is alleged to have overseen "the Company's lobbying activities and political contributions, interaction with regulators and state representatives, legal and regulatory compliance activities and efforts to eliminate the Company's liability exposure to the Nuclear Plants," including through her participation in the "Restructuring Working Group." (*Id.* ¶ 228). Defendant Vespoli's retirement in 2019 does not preclude her involvement during the earlier part of the Class Period, which encompassed the scheme's planning stages.

- Defendant Judge, who served as FirstEnergy's Chief Risk Officer and later as Energy Harbor's CEO and President, is alleged to have "facilitated FES's part in the Bailout Scheme through his responsibilities for FES's lobbying and regulatory efforts, separation from FirstEnergy and efforts to find 'solutions' for the Nuclear Plants," to have met in-person with Householder in March 2019 and with other scheme participants in November 2019, to have directed the retention of lobbyist Juan Cespedes "in close consultation with" other scheme participants, to have made false or misleading statements in a July 2019 press release, and to have "directed and overs[een] the use of FES employees in commercials opposing the repeal of HB6, as part of the misleading ad campaign opposing the repeal effort." (*Id.* ¶¶ 79, 130, 230). Defendant Judge's employment by FES (Energy Harbor) during part of

the Class Period does not preclude his participation in the scheme, given that FES is alleged to have been "operationally and financially intertwined" with FirstEnergy, "joined at the hip," and "utterly incapable" of operating independently. (*Id.* ¶¶ 47, 50).

- Defendant Schneider, who served as CEO and Chairman of FES, is alleged to have "facilitated FES's part in the Bailout Scheme through his responsibilities for FES's lobbying and regulatory efforts, separation from FirstEnergy and efforts to find 'solutions' for the Nuclear Plants," to have directed the retention of lobbyist Mathew Borges "in close consultation with" other scheme participants, to have signed and certified FES's portion of the SEC filings at issue, and to have made other misstatements in news articles. (*Id.* ¶¶ 95–96, 102, 120, 125–26, 229). As with Defendant Judge, Defendant Schneider's employment by FES does not preclude his participation in the scheme.

\* \* \*

**\*17** The role of each participant is pled with particularity and "with enough specificity to put defendants on notice as to the nature of the claim." *Williams*, 681 F.3d at 803 (internal quotation marks omitted). In summary, Plaintiffs have pled the requisite misrepresentations and fraudulent acts to proceed with their misstatement and scheme liability theories, in tandem.

### 2. Scienter

The second element of Plaintiffs' Section 10(b) claim is scienter, "a mental state embracing intent to deceive, manipulate or defraud." *Tellabs*, 551 U.S. at 319 (internal quotation marks omitted). The PSLRA requires that Plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). While the inference of scienter need not be the "most plausible of competing inferences," it "must be more than merely reasonable or permissible." *Tellabs*, 551 U.S. at 324 (internal quotation marks omitted). Rather, it must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

Precedent cautions against "reviewing each allegation individually before reviewing them holistically," which "risks losing the forest for the trees." *Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011). The proper test is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322–23 (emphasis in original). The Court first will address the parties' disputes on applicable legal standards, then turn to a comparison of inferences.

### a. Threshold Disputes

First, the parties dispute whether and when scienter requires actual knowledge, as opposed to recklessness. Where misstatement claims are "based on statements of present or historical fact ... scienter consists of knowledge *or* recklessness." *In re Cardinal Health Inc. Sec. Litigations*, 426 F. Supp. 2d 688, 717 (S.D. Ohio 2006) (emphasis added and removed) (citing *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681 (6th Cir. 2004); and *Helwig*, 251 F.3d at 552). "Recklessness" in this context is defined as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care" and "akin to conscious disregard." *Id.* (quoting *PR Diamonds*, 364 F.3d at 681). By contrast, where misstatement claims are based on "soft information," recklessness does not suffice, and "plaintiffs must plead facts showing that the defendants knowingly misrepresented or omitted facts to deceive, manipulate, or defraud the public." *Omnicare II*, 769 F.3d at 472. Finally, in the case of scheme liability, this Court follows *Aaron v. SEC* in concluding that " 'device,' 'scheme,' and 'artifice,' all connote knowing and intentional practices." 446 U.S. 680, 696 (1980). *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197 (1976) ("The words 'manipulative or deceptive' used in conjunction with 'device or contrivance' strongly suggest that [Section] 10(b) was intended to proscribe knowing or intentional misconduct.").

Additionally, Defendants contend that Plaintiffs have taken a shortcut by relying on the "group pleading doctrine," rather than pleading scienter as to each individual. (ECF No. 161 at 36). The group pleading doctrine allows a plaintiff to " 'rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company.' " *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 984 (S.D. Ohio 2008) (quoting *In re Solv–Ex Corp. Sec. Litig.*, 210 F. Supp. 2d 276, 283 (S.D.N.Y.

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2879 Filed 11/15/24 Page 82 of 173

In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)
2022 WL 681320, Fed. Sec. L. Rep. P 101,335

2000)). Courts in this Circuit are split as to whether the group pleading doctrine survived the passage of the PSLRA, and the Sixth Circuit has declined to reach the issue. *See id.* at 986 (discussing the split among district courts and taking the position that group pleading is incompatible with the PSLRA); *City of Monroe Emps. Ret. Sys.*, 399 F.3d at 690 ("This court [the Sixth Circuit] has not taken a position on whether such an exception exists .... We need not decide here [its] current viability"). This ultimately is a sideshow because Plaintiffs do not purport to rely on group pleading. As detailed in the next subsection, there are allegations specific to each Exchange Act Defendant.

**\*18** A third dispute emerges over whether Plaintiffs may invoke *PR Diamonds* for its proposition that "high-level executives can be presumed to be aware of matters central to their business's operation." 364 F.3d at 688, *abrogated in part on other grounds by Frank*, 646 F.3d at 961. Defendants argue that such a presumption would amount to pleading based on position alone. (ECF No. 193 at 30–31, 35). In fact, *PR Diamonds* harmonizes these ideas; before stating the central-matters presumption, it gives the caveat that "fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information." 364 F.3d at 688. Rather, "the Complaint must allege specific facts or circumstances suggestive of their knowledge." *Id.*

This Court views the *PR Diamonds* presumption as aiding, but not alone determining, an inference of scienter. *Cf. Cardinal Health*, 426 F. Supp. 2d at 723–26 (allegations of "access to information" deemed conclusory; but other factors did raise strong inference of scienter, such as the fact that manipulation occurred in "analysts' and investors' primary area of focus"); *Jackson Cty. Emps. Ret. Sys. v. Ghosn*, 510 F. Supp. 3d 583, 617–18 (M.D. Tenn. 2020) (applying *PR Diamonds* presumption and also finding that the competing inference of "ignorance" actually "supports [plaintiff's] allegation of recklessness"). Like in *Cardinal Health*, Plaintiffs have alleged that FirstEnergy's nuclear liabilities and political activity were "analysts' and investors' primary area[s] of focus," 426 F. Supp. 2d at 726, which supports scienter for the executives charged with overseeing said operations. *See* ECF No. 72 ¶¶ 44, 110. As Plaintiffs state in their briefing: "It simply makes no sense that the members of a massive corruption scheme would entrust critical aspects of the scheme to some innocent bystander." (ECF No. 176 at 47). Thus, where Plaintiffs engage the central-matters presumption, it is not based on mere titles and positions, but rather on the intersection between the executive's

responsibilities and the scheme's critical aspects. In this way, the allegations about executive roles join the set of facts that, "taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 323.

### b. Inferences Compared

In *Helwig*, the Sixth Circuit laid out a non-exhaustive list of nine factors relevant to a court's scienter determination:

(1) insider trading at a suspicious time or in an unusual amount;

(2) divergence between internal reports and external statements on the same subject;

(3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

(4) evidence of bribery by a top company official;

(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

(6) disregard of the most current factual information before making statements;

(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

(8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

251 F.3d at 552 (citing *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir. 1999)). These factors merely assist the Court's scienter analysis; they are not a checklist of required showings. *See, e.g.*, *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 981 (6th Cir. 2018) (scienter inferred where only three *Helwig* factors shown).

**\*19** Mindful of *Frank* and *Tellabs*, the Court must begin with a holistic view and evaluate each *Helwig* factor in that context. Plaintiffs' overarching case for scienter is that Defendants "bankrolled one of the largest corruption and bribery schemes in U.S. history" (ECF No. 72 ¶ 3),

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2880 Filed 11/15/24 Page 83 of 173

In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)
2022 WL 681320, Fed. Sec. L. Rep. P 101,335

"personally overseen and facilitated by the senior echelon of Company management" (*Id.* ¶ 4), "as the key to unlocking $2 billion in critical subsidies and overcoming the Company's most pressing operational challenges ... [*i.e.,*] its two failing nuclear plants" (*Id.* ¶¶ 4–5), while "concealing any mention of the monumental risks" from investors (*Id.* ¶ 6). To borrow more succinctly from their opposition brief: "It is impossible for all this corruption to occur by happenstance." (ECF No. 176 at 31). Defendants, and FirstEnergy especially, counter with the opposing inference that "the Exchange Act Defendants at all times believed they were engaging in the political process by legal means." (ECF No. 161 at 2). The *Helwig* factors will be assessed for their consistency with either of these narratives.

The first factor, insider trading, favors Plaintiffs' narrative, albeit slightly. Defendants Jones, Pearson, Vespoli, and Chack are alleged to have "reaped nearly $14 million in insider trading proceeds" through the sale of over 375,000 shares of stock "while the price ... was artificially inflated as a result of their fraudulent scheme." (ECF No. 72 ¶ 250). Plaintiffs allege that each of these Defendants traded in substantially higher volumes than their pre-Class Period baseline: Defendants Pearson and Chack sold no shares in the preceding 45 months, and Defendants Vespoli and Jones increased their sales by approximately 350% and 700%, respectively. (*Id.* ¶ 251). Defendants raise some valid countervailing points. Despite their sales, Defendants Jones, Pearson, Vespoli, and Chack all ended the Class Period as net acquirers; and Defendants Taylor and Strah, for whom no sales are alleged, each "substantially increased their shareholdings." (ECF No. 161 at 47). What tips this factor, ultimately, is the difference between Class Period and pre-Class Period trading. Defendant Jones avers that his Class Period sales "coincided with his equity awards vesting" (ECF No. 174 at 11), as does Defendant Vespoli for hers (ECF No. 173 at 8); but the drastic increase in volume is unaddressed. Defendant Chack raises conflicting evidence about the regularity of his trading, which at most creates an evidentiary dispute.[21] Defendant Pearson cites his impending retirement as plausibly explaining the timing of his sale (ECF No. 194 at 14–15); but that opposing theory is no *more* compelling than scienter, which could have been a dual consideration in how much to sell. Though this factor would be stronger if more Defendants had sold shares and ended the Class Period as net sellers,[22] the change in trading volume by several senior executives is consistent with scienter.

[21] *Compare* ECF No. 169 at 6, 27 (Defendant Chack claims his SEC forms show a "pattern" of sales every year on March 1), *with* ECF No. 176 at 46 (Plaintiffs counter that Thompson Reuters reporting shows "significant" Class Period sales, but "none ... in the 45 months prior").

[22] The incompleteness or absence of suspicious stock sales by other Officer Defendants does not negate their scienter. *See PR Diamonds*, 364 F.3d at 691 ("[W]e have never held that the absence of insider trading defeats an inference of scienter.... We also reject the Individual Defendants' contention that their purchase of shares during the class period refutes any inference that they knowingly or recklessly misled the market to increase the stock's price."); *see also Ross v. Abercrombie & Fitch Co.*, 501 F. Supp. 2d 1102, 1117 (S.D. Ohio 2007) (suspicious stock sales "substantiate[d] a strong inference of scienter" even where "Defendants retained the majority of their holdings"); *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 801 (Del. Ch. 2009) ("There are any number of reasons why they might have chosen to keep their insider trading to a limit, not least of which is that they wanted to avoid getting caught or tipping off the market as to the fraud that prompted them to sell their stock.").

**\*20** The second *Helwig* factor, "divergence between internal reports and external statements on the same subject," is premature. Plaintiffs would need discovery to discern the contents of internal reports as compared to external statements. The absence of this element certainly is not fatal. To have knowledge of internal documents at this pre-discovery stage, Plaintiffs would need either a whistleblower or omniscience, and the pleading standards demand neither. Because the Company's internal reports remain an unknown, this factor favors neither party.

The third factor, "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information," favors Plaintiffs. In particular, Defendant Jones is alleged to have made a series of statements falsely claiming ignorance after the criminal complaint was filed, which prompted "clarifications" "the very next business day." (ECF No. 72 ¶¶ 234–35).

The fourth factor, "evidence of bribery by a top company official," favors Plaintiffs.[23] As is discussed in the preceding Section, Plaintiffs convincingly have alleged a wide-reaching

In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)
2022 WL 681320, Fed. Sec. L. Rep. P 101,335

bribery scheme, overseen personally by the upper echelon of Company management. FirstEnergy terminated several top executives for their roles in the scheme (ECF No. 72 ¶ 216) and also admitted in the DPA that, "through the acts of its officers, employees, and agents," the Company "conspired with public officials and other individuals and entities to pay millions of dollars to and for the benefit of public officials in exchange for specific official action for FirstEnergy Corp.'s benefit." DPA at 17. [24] The DPA's statement of facts discusses extensive meetings and contacts between two FirstEnergy executives, "Public Official A" (implied to be Householder), and "Public Official B" (implied to be Randazzo). *Id.* at 15–17, 20–34, 34–43. Bribery and conspiracy necessarily involve knowledge, so the Company's willingness to make such admissions reinforces an inference of scienter.

[23] Defendant Reffner argues that the "bribery" in this factor is specific to "efforts by an official to bribe *another employee* to conceal improper accounting or other undisclosed conduct, when the act of bribing reflects an official's recognition of the problem." (ECF No. 163 at 14 n.3 (emphasis added)). *Helwig* did not include such a qualifier, and Defendant Reffner's cited authority only shows that the factor *can* apply to bribery by another employee, not that it *must*. *See* *In re Ferro Corp.*, 2007 WL 1691358, at *17 (N.D. Ohio June 11, 2007). The Court sees no reason why the evidence of external bribery in this case would be excluded from a scienter analysis, given that bribery is an intentional act.

[24] *See supra* note 11 for discussion of judicial notice and the role the DPA plays in the Court's analysis. *see also* *Tellabs*, 551 U.S. at 322 (in analyzing scienter, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, *and matters of which a court may take judicial notice*" (emphasis added)).

The fifth factor, "existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit," favors Plaintiffs. The case *United States v. FirstEnergy Corp.*, filed on July 22, 2021, alleged conspiracy to commit honest services wire fraud. FirstEnergy promptly settled that suit by entering the DPA and agreeing to pay a $230 million monetary penalty. Reason dictates

that the Company would not enter such a quick and expensive settlement were there not a substantial likelihood of liability. [25]

[25] Additionally, FirstEnergy and many of the Individual Defendants in this case recently announced their intention to enter a global settlement of the shareholder derivative suits. *Emps. Ret. Sys. of City of St. Louis v. Jones*, ECF No. 166. The preliminary terms include a $180 million payment, departures by six Directors, and adoption of governance reforms related to political spending and lobbying. *Id.* ¶¶ 4, 6. The Court gives minimal (but nonzero) consideration to this settlement announcement, as it is not final, comes less quickly in the case than the DPA did, and includes no express admissions. Defendants' willingness to agree to such terms does have some tendency, however, to corroborate the scienter inference in this case. Judicial notice is appropriate for the same reasons discussed *supra* note 11.

**\*21** The sixth factor, "disregard of the most current factual information before making statements," favors Plaintiffs. Plaintiffs allege that Defendants "knew or recklessly disregarded" the "true facts" of their scheme when making external statements (ECF No. 72 ¶¶ 135–36), which resembles allegations upheld by this Court in the shareholder derivative action. *See* *Emps. Ret. Sys. of City of St. Louis*, 2021 WL 1890490, at *20 ("This Court finds Plaintiffs have alleged by clear and convincing evidence that Defendants[ ] knew or recklessly disregarded reports and red flags that FirstEnergy was paying massive amounts of illicit bribes to Householder and other public officials to ensure passage of legislation and took affirmative steps to conceal the scheme." (internal quotation marks omitted)). Here, the withholding of current factual information is alleged to have furthered the scheme, which relied on shareholders and the public being misled about the nature of the Company's political activity. (ECF No. 72 ¶ 6).

The seventh and eighth factors are inapplicable. The seventh assumes a complete but convoluted accounting disclosure, whereas Plaintiffs allege that information about the bribery scheme was withheld entirely. The eighth assumes a scheme perpetrated by certain directors and concealed from others, whereas Plaintiffs allege a widespread scheme implicating nearly all the Company's senior management. These factors favor neither party.

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2882 Filed 11/15/24 Page 85 of 173
In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)
2022 WL 681320, Fed. Sec. L. Rep. P 101,335

The ninth factor, "the self-interested motivation of defendants in the form of saving their salaries or jobs," favors Plaintiffs. Defendants argue that the Complaint alleges nothing more than "motives common to corporations and executives generally," which "do[ ] not comprise a motive for fraud." *PR Diamonds*, 364 F.3d at 690; *see also EveryWare*, 175 F. Supp. 3d at 859–60. Yet, the Complaint alleges that Defendants had unusually strong incentives to perpetrate the alleged scheme. Defendants Jones, Pearson, Strah, Reffner, and Vespoli each earned the vast majority of their total compensation— between 78% and 98%—as performance-based pay. (*Id.* ¶ 248). Additionally, the nuclear liabilities were a subject of intense scrutiny by shareholders and analysts, being among "the Company's most pressing operational challenges." (*Id.* ¶¶ 4, 44). The passage of HB6, with its $2 billion in direct bailouts, provided "concrete benefits that could be realized" through bribery and concealment. *PR Diamonds*, 364 F.3d at 690. These facts distance Plaintiffs' allegations from motives of generally applicability, and instead demonstrate a motive to commit fraud. The unique confluence of need and greed tips this factor in favor of scienter.

A related factor raised in the Complaint is the series of executive terminations in October and November 2020, following the criminal complaint. FirstEnergy terminated Defendants Jones, Chack, and Dowling for "violat[ing] certain FirstEnergy policies and its code of conduct" and for failing to "maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business." (ECF No. 72 ¶ 216). Defendant Reffner was terminated for "inaction and conduct that the Board determined was influenced by the improper tone at the top." (*Id.* ¶ 191). Moreover, the Company confirmed that these terminations related to the criminal complaint and ensuing investigations—even making specific reference to the Randazzo payment. (*Id.* ¶ 216). Defendants counter that these stated reasons suggest merely "violations of aspirational internal policies," and do not indicate knowledge of illegality. (ECF No. 161 at 37). Yet, terminations need not include a direct confession of scienter to be relevant. Addressing a similar executive reprimand (a "suspension for likely violating company policy"), the court in *Chamberlain* agreed "that the import of this disclosure is that the company suspended one of its top executives for likely doing exactly what the [complaint] alleges [the company] lied about." 757 F. Supp. 2d at 718. *see also In re Am. Serv. Grp., Inc.*, 2009 WL 1348163, at *58 (M.D. Tenn. Mar. 31, 2009) (" 'Such house-cleaning and reforms do not follow innocent mistakes. Rather,

they customarily, even if not invariably, follow systemic and fraudulent abuse of internal financial controls.' " (quoting *In re Sipex Corp. Sec. Litig.*, 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005))). This Court concurs with *Chamberlain* and *America Service Group* and tallies the executive terminations on the side of scienter. [26]

[26]   Defendants' chief case on this issue is *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786 (S.D.N.Y. 2018). *Das* declined to infer scienter from "abrupt" executive terminations because it found "[t]he more plausible inference is that Rio Tinto became aware of misconduct around 2016 and subsequently initiated appropriate disciplinary action." *Id.* at 815. No other factor analyzed by the court supported scienter, and "terminations *alone* are insufficient." *Id.* (emphasis added). Thus, *Das* states no categorical rule against the relevance of executive discipline when paired with other facts.

**\*22**  Returning from the trees to the forest, the Court must consider these *Helwig* factors in the context of an alleged scheme that reached the core of FirstEnergy's business model, providing "the key to unlocking $2 billion in critical subsidies and overcoming the Company's most pressing operational challenges." (ECF No. 72 ¶ 4). It is difficult to imagine such a scheme emerging without scienter; indeed, Plaintiffs argue that the magnitude of the fraud and the direct and personal involvement of senior leadership are even more reason to find scienter. (*Id.* ¶¶ 219, 236–37). [27] The theory permeating the Complaint is that Defendants intentionally concocted the bailout scheme to solve their nuclear liabilities. The *Helwig* factors fit that overarching narrative by adding motive (factors one and nine), cover-up (factor three), and corroboration (factors four, five, and six). Accordingly, the Court finds that a "reasonable person," taking these allegations "collectively," would "deem the inference of scienter at least as strong as any opposing inference." *Tellabs*, 551 U.S. at 326. The competing inference of innocent political participation pales in comparison.

[27]   Plaintiffs' cited authorities confirm that these elements can support an inference of scienter when in combination with other factors. *See PR Diamonds*, 364 F.3d at 684–86 (discussing *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 636 (E.D. Va. 2000), for the proposition that "the 'magnitude,' 'pervasiveness,' and 'repetitiveness' " of violations can " 'amplify,' " but cannot

Case 4:23-cv-13132-SDK-EAS  ECF No. 43-6, PageID.2883  Filed 11/15/24  Page 86 of 173

In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)
2022 WL 681320, Fed. Sec. L. Rep. P 101,335

alone create, a strong inference of scienter); *Cardinal Health*, 426 F. Supp. 2d at 723 n.49 ("magnitude of fraud," "when combined with Plaintiffs' other allegations," may be considered in scienter analysis of company's own officers); *Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at *23 (M.D. Tenn. Apr. 26, 2011) (executives' repeated assurances that "they had their eyes on" allegedly problematic loans counseled in favor of scienter), *report and recommendation approved*, 2012 WL 214635 (M.D. Tenn. Jan. 24, 2012). Defendants' cases on the probative value of "magnitude" follow from *Fidel v. Farley*, 392 F.3d 220 (6th Cir. 2004), which is discussed and distinguished in *Cardinal Health* as concerning "scienter on the part of an outside auditor, not the company or the company's executive officers." 426 F. Supp. 2d at 723 n.49 (emphasis removed).

Finally, and contrary to the Officer Defendants' objections, the discussion in this subsection implicates each of them.[28] To summarize by Defendant:

- Defendant Jones is alleged to have engaged in suspicious stock trading (ECF No. 72 ¶¶ 250–51), to have made false statements in the wake of the criminal complaint that were retracted almost immediately by the Company (*Id.* ¶¶ 234–35), to have been implicated in bribery via the criminal complaint (*Id.* ¶ 234), to have possessed an unusually strong financial motive through his lucrative performance pay to commit fraud (*Id.* ¶¶ 248–49), and to have been terminated for "violat[ing] certain FirstEnergy policies and its code of conduct" and for failing to "maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business," including in relation to the Randazzo payment (*Id.* ¶¶ 216, 221). Additionally, Defendant Jones's act of certifying FirstEnergy's SEC filings (*Id.* ¶¶ 98, 102) "provide[s] evidence either that he knew about the [improprieties] or, alternatively, knew that the controls he attested to were inadequate." *In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007).[29] All of these allegations are viewed against a backdrop of Defendant Jones's significant personal involvement in the scheme and the fact that it occurred in an area of FirstEnergy's business that was not only of keen interest to investors, but also Defendant Jones's stated "top priority." (ECF No. 72 ¶ 220).

- Defendant Pearson is alleged to have engaged in suspicious stock trading (ECF No. 72 ¶¶ 250–51), to have possessed an unusually strong financial motive through his lucrative performance pay to commit fraud (*Id.* ¶¶ 248–49), and to have certified SEC filings that served to deceive shareholders. (*Id.* ¶ 102). The inference of scienter is strengthened by the fact that the scheme occurred in a central area of FirstEnergy's business, of keen interest to investors and to which Defendant Pearson had devoted his "utmost attention." (*Id.* ¶ 225).

**\*23**  - Defendant Strah is alleged to have possessed an unusually strong financial motive through his lucrative performance pay to commit fraud (*Id.* ¶¶ 248–49) and to have certified SEC filings that served to deceive shareholders and which the Company later had to correct to disclose deficient internal controls. (*Id.* ¶¶ 98, 102, 189). The inference of scienter is strengthened by the fact that the scheme occurred in a central area of FirstEnergy's business, of keen interest to investors and over which Defendant Strah had direct responsibility in his senior financial and operational roles. (*Id.* ¶ 226).

- Defendant Taylor is alleged to have signed SEC filings that served to deceive shareholders. (*Id.* ¶¶ 95–96). The inference of scienter is strengthened by the fact that the scheme occurred in a central area of FirstEnergy's business, of keen interest to investors and over which Defendant Taylor had direct responsibility. Defendant Taylor's progression of senior financial and operational roles stands out in that it gave him oversight, at some point or another, of multiple business units involved in different aspects of the scheme. (*Id.* ¶ 31).

- Defendant Dowling is alleged to have been terminated for "violat[ing] certain FirstEnergy policies and its code of conduct" and for failing to "maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business," including in relation to the Randazzo payment. (*Id.* ¶¶ 216, 222). The inference of scienter is strengthened by the fact that the scheme occurred in a central area of FirstEnergy's business, of keen interest to investors and over which Defendant Dowling had direct responsibility in his senior external affairs role. (*Id.* ¶ 222). Moreover, Defendant Dowling's alleged conduct in furtherance of the scheme—which includes contacts with Householder and Longstreth in close proximity to wire payments

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2884 Filed 11/15/24 Page 87 of 173

In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)

2022 WL 681320, Fed. Sec. L. Rep. P 101,335

—is more suggestive of knowing participation than of unwitting coincidence. (*Id.*).

• Defendant Chack is alleged to have engaged in suspicious stock trading (*Id.* ¶¶ 250–51), and to have been terminated for "violat[ing] certain FirstEnergy policies and its code of conduct" and for failing to "maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business," including in relation to the Randazzo payment (*Id.* ¶¶ 216, 224).

• Defendant Pine contests scienter on the ground that he "merely check[ed] the boxes for the duties of a lobbyist[ ] consistent with Ohio law." (ECF No. 167 at 11). However, Defendant Pine's alleged conduct in furtherance of the scheme—which includes contacts with Householder and Longstreth in close proximity to wire payments, as well as extensive work with corrupt lawmakers to draft HB6—is more suggestive of knowing participation than of unwitting coincidence. (ECF No. 72 ¶ 223). These actions support Plaintiffs' positioning of Defendant Pine as a "central liaison" to Householder, Longstreth, and other public officials. (*Id.*).

• Defendant Reffner is alleged to have possessed an unusually strong financial motive through his lucrative performance pay to commit fraud (*Id.* ¶¶ 248–49), and to have been terminated, in connection with the criminal case and ensuing investigations, for failure to prevent wrongdoing and for "conduct that the Board determined was influenced by the improper tone at the top." (*Id.* ¶ 216). The inference of scienter is strengthened by the fact that the scheme occurred in a central area of FirstEnergy's business, of keen interest to investors and which Defendant Reffner had a duty to monitor in his senior legal roles. (*Id.* ¶ 227).

**\*24** • Defendant Vespoli is alleged to have engaged in suspicious stock trading (*Id.* ¶¶ 250–51) and to have possessed an unusually strong financial motive through her lucrative performance pay to commit fraud (*Id.* ¶¶ 248–49). The inference of scienter is strengthened by the fact that the scheme occurred in a central area of FirstEnergy's business, of keen interest to investors and which Defendant Vespoli had a duty to monitor in her senior legal roles. (*Id.* ¶ 228). Defendant Vespoli's arguments against scienter rest heavily on her retirement from the Company before key stages of the scheme (ECF

No. 173 at 7–9); but Defendant Vespoli's retirement does not preclude knowing participation in the planning stages.

• Defendant Judge contests scienter chiefly on the basis of free-speech arguments that this Court has debunked. (ECF No. 164 at 10–12). Defendant Judge's alleged conduct in furtherance of the scheme—which includes meetings and phone contacts with Householder and Cespedes, a leading role on the Energy Harbor side, and close coordination with other scheme participants —is more suggestive of knowing participation than of innocent First Amendment activity. (ECF No. 72 ¶ 230). The inference of scienter is strengthened by the fact that the scheme occurred in a central area of FirstEnergy's and FES's business, of keen interest to FirstEnergy investors and over which Defendant Judge had direct responsibility in his senior compliance and Energy Harbor leadership roles. (*Id.*).

• Defendant Schneider is alleged to have played a leading role on the FES side, including through the retention of Borges "in close consultation" with other scheme participants (*Id.* ¶ 229), and to have certified SEC filings that served to deceive shareholders (*Id.* ¶ 102). The inference of scienter is strengthened by the fact that the scheme occurred in a central area of FES's business, of keen interest to FirstEnergy investors and over which Defendant Schneider had direct responsibility in his FES leadership role. (*Id.* ¶ 229).

28    "Because Plaintiffs have adequately pleaded scienter as to [corporate officers,] they have also pleaded scienter as to [the company]." *Frank*, 646 U.S. at 963; *see also City of Monroe Emps. Ret. Sys.*, 399 F.3d at 688 ("knowledge of a corporate officer or agent acting within the scope of his authority is attributable to the corporation" (internal quotation marks omitted)).

29    Certifications are probative at least when in combination with other facts suggestive of scienter. *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 972 n.10 (S.D. Ohio 2009) (citing *Ley v. Visteon Corp.*, 543 F.3d 801, 812 (6th Cir. 2008)). Signers are not, however, "strictly liable" for their certifications. *Ley*, 543 F.3d at 812 (internal quotation marks omitted), *abrogated*

2022 WL 681320, Fed. Sec. L. Rep. P 101,335

*on other grounds by Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 48–50 (2011).*

Viewing these allegations collectively and holistically, the Court finds that Plaintiffs have supported a strong inference of scienter as to each Exchange Act Defendant. The strength of that inference varies with the extensiveness of the allegations against each Defendant, as would be expected for non-omniscient parties at an early stage of litigation. In each case, however, the inference is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Plaintiffs have made a sufficient threshold showing to warrant discovery, wherein they may attempt to verify their inferences. The scienter element therefore is satisfied.

### 3. Connection with Purchase or Sale of Securities

The third element of Plaintiffs' Section 10(b) claim is that the misleading statements or fraudulent acts occur in "connection with the purchase or sale of a security." *EveryWare*, 175 F. Supp. 3d at 851. Most Defendants do not challenge this element under the misstatement theory;[30] but they do argue that the purported scheme did not involve "market activity" and therefore was too attenuated from the purchase or sale of a security. (ECF No. 161 at 49–52).

[30]  Defendant Judge does assert that the statements in his press release, made on behalf of Energy Harbor, could not have been in connection with investors' purchase or sale of FirstEnergy securities. (ECF No. 164 at 12). Again, this argument rests on corporate separateness that is alleged to be fiction. (ECF No. 72 ¶¶ 47–50). FirstEnergy investors paid close attention to the nuclear liabilities (*Id.* ¶ 44) because FirstEnergy never obtained its "sweeping releases from any and all future claims asserted against FES" (*Id.* ¶¶ 51, 62), and thus, "any actual or potential FES liabilities were also potential liabilities for FirstEnergy, including the billions of dollars needed to decommission the Nuclear Plants" (*Id.* ¶ 50). Reasonable investors *would*, therefore, view statements by Energy Harbor on the topic of its nuclear plants as "material to a decision ... to buy or sell a covered security," which satisfies the connection element. *SEC v. Crowe*, 216 F. Supp. 3d 852, 863 (S.D. Ohio 2016) (internal quotation marks omitted).

**\*25** This Court does not take such a constrained view of market activity. "Deception related to the value or merit of the securities in question has sufficient connection to securities transactions to bring the fraud within the scope of § 10(b)." *Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1026 (9th Cir. 1999). The Complaint abounds with allegations of precisely how FirstEnergy's nuclear liabilities, and the scheme to address them, related directly to investors' valuations and purchases of securities. Plaintiffs plead that "[t]he Nuclear Plants grew to dominate FirstEnergy earnings calls and analyst coverage, as investors grew increasingly concerned about the potential liabilities" (ECF No. 72 ¶ 44, 237), that the legislative effort culminating in HB6 continued to feature prominently in investor calls (*Id.* ¶¶ 103, 113, 115, 117–18, 121, 124, 127, 129, 132), that the passage of HB6 "allowed the Officer Defendants to deliver on their highest strategic priority" (*Id.* ¶ 213), that Defendants thus avoided "a serious risk of FirstEnergy's credit rating being downgraded" and in fact significantly improved the Company's credit rating and cost of capital (*Id.* ¶¶ 245–46), and that the Officer Defendants "took advantage of the inflated prices for FirstEnergy securities to conduct $5 billion worth of debt and equity sales" hailed as " 'transformational' " (*Id.* ¶¶ 7, 213). Under this narrative arc, Plaintiffs have pled that the Exchange Act Defendants' fraudulent acts in furtherance of the scheme were sufficiently connected to the purchase or sale of FirstEnergy securities.

Defendants' authorities differ noticeably from this case, as they describe scheme allegations in search of any acts. In *Menaldi*, the Southern District of New York viewed bribery that had "occurred *years before* the class period" as "far too remote to be in connection with the purchase or sale of any security." *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 518 (S.D.N.Y. 2017) (emphasis added) (internal quotation marks omitted). In *National Century I*, when the court rejected allegations of "a scheme to inflate the market price of [the company's] common stock," it was because the "*sole* basis" for scheme liability was "alleged misrepresentations or omissions," which the plaintiffs had "merely repeat[ed]" from their misstatement theory. 2006 WL 469468, at *21 (emphasis added) (internal quotation marks omitted).[31] Here, Plaintiffs' alleged scheme involves bribery and deceit pervading the Class Period, accomplished through fraudulent acts in addition to the alleged misstatements and omissions. The cases cited by Defendants stand more for the necessity of fraudulent acts to support a scheme theory than for the narrow definition of market activity that they urge upon the Court.

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2886 Filed 11/15/24 Page 89 of 173

In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)
2022 WL 681320, Fed. Sec. L. Rep. P 101,335

The same defect also controlled in three other cited cases: *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 250 (S.D.N.Y. 2018) (court concluded that plaintiffs "have not pled a market manipulation claim" because they "have not pled facts demonstrating misconduct *beyond* misstatements and omissions" (emphasis added)); *SEC v. Narayan*, 2017 WL 4652063, at *10 (N.D. Tex. Aug. 28, 2017) (court found no "independently actionable activity outside of the context of [defendant's] misrepresentations and omissions"); *La. Mun. Police Emps. Ret. Sys. v. KPMG, LLP*, 2012 WL 3903335, at *4 (N.D. Ohio Aug. 31, 2012) ("Plaintiffs do not sufficiently allege [defendant] engaged in conduct other than falsifying statements").

Defendants cite no authority to support the dismissal of a scheme liability claim for lack of market activity where there are well-pled allegations of fraudulent acts in the Class Period, designed to affect securities offerings and valuations. Their arguments therefore are rejected, and element three is satisfied.

### 4. Reliance

The fourth factor requires Plaintiffs to show reliance on Defendants' deceptive acts or statements. *Stoneridge*, 552 U.S. at 159. Scheme liability claims fail on reliance where the deceptive acts are "too remote" to the injury and have only an "attenuated" effect on the price of a security. *Id.* at 161–62. The reliance element is "tied to causation," and thus related to the requirement that the deceptive act or statement be "in connection with the purchase or sale of any security." *Id.* at 160 (internal quotation marks omitted). Resting on the *Stoneridge* line of cases, Defendants argue that the scheme liability theory lacks reliance and therefore cannot proceed. (ECF No. 161 at 52–55). [32] Plaintiffs contend that reliance should be presumed at this stage. (ECF No. 72 ¶¶ 254–56).

32    Aside from the argument by Defendant Judge discussed *supra* note 30, Defendants do not challenge reliance under the misstatement theory. As will be discussed, *Stoneridge* creates a presumption of reliance on the types of misstatements Plaintiffs have alleged. *See* 552 U.S. at 159.

#### a. Applicability of Presumptions

**\*26** An initial flaw is Defendants' neglect for the role of misstatements and omissions in the scheme. Importantly, "a rebuttable presumption of reliance" arises "in two different circumstances": first, when "there is an omission of a material fact by one with a duty to disclose," and second, "when the statements at issue become public [and] [t]he public information is reflected in the market price of the security." *Stoneridge*, 552 U.S. at 159. The former derives from *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and the latter from *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Both are pled in the Complaint. (ECF No. 72 ¶¶ 254–56).

As the Supreme Court recognized in *Lorenzo*, scheme liability is "sufficiently broad to include within [its] scope the dissemination of false or misleading information with the intent to defraud." *Lorenzo*, 139 S. Ct. at 1101; *see also id.* at 1102 (recognizing "considerable overlap among the subsections" of Rule 10b–5). Consequently, Defendants' misrepresentations and omissions—and the presumptions that attach to them—are relevant for scheme liability.

*Basic*'s "fraud-on-the-market theory," 485 U.S. at 241, applies here because the Court has found that Defendants made material misrepresentations in their public statements. Efficient markets rapidly factor public information into pricing; thus, "where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed." *Id.* at 246–47. Moreover, those misrepresentations had a purposeful role in the alleged scheme: they sold the "cover" that Defendants were lobbying for, and eventually obtained, the HB6 bailout through legitimate political advocacy. For years the market factored that material information into its pricing of FirstEnergy securities, and Plaintiffs purchased securities under that inflated pricing.

The *Affiliated Ute* presumption likewise appears appropriate because the Court has found that Defendants made omissions of material fact. Under these circumstances, "positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2887 Filed 11/15/24 Page 90 of 173

In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)
2022 WL 681320, Fed. Sec. L. Rep. P 101,335

the making of this decision [to purchase or sell]." 406 U.S. at 153–54. [33]

[33] It is unsettled whether a plaintiff alleging both misrepresentations and omissions can engage the *Basic* and *Affiliated Ute* presumptions simultaneously. *Compare* *Burges v. Bancorpsouth, Inc.*, 2017 WL 2772122, at *10 (M.D. Tenn. June 26, 2017) (applying *Basic* to misrepresentations and *Affiliated Ute* to omissions in mixed case); *with* *Grae v. Corrs. Corp. of Am.*, 329 F.R.D. 570, 583–85 (M.D. Tenn. Jan. 18, 2019) (*Affiliated Ute* inapplicable where case was "primarily about" misleading statements, as opposed to nondisclosures; thus, only *Basic* was analyzed). Both cases were at the class certification stage, which implies that this issue is premature on a motion to dismiss.

The *Basic* and *Affiliated Ute* presumptions resolve this element for all Exchange Act Defendants who are alleged to have made misrepresentations or omissions as part of the scheme: Defendants Jones, Pearson, Strah, Taylor, Judge, and Schneider (and through them, FirstEnergy). Five other Defendants, however, have no misstatements or omissions alleged and are proceeding on scheme liability independently: Defendants Reffner, Dowling, Pine, Chack, and Vespoli. (ECF No. 176 at 65 n.20). For these Defendants, additional analysis is required.

b. Necessity of Public Knowledge

**\*27** Each of these remaining Defendants joins or expands upon FirstEnergy's contention that "[w]here the alleged scheme is not publicly disclosed, there can be no reliance." (ECF No. 161 at 53). Yet, for the scheme to succeed, it had to be concealed from the shareholders; otherwise, it would have unraveled, and "Plaintiffs and the Class would not have purchased FirstEnergy securities at the prices they paid, or at all." (ECF No. 72 ¶ 271). The illogical import of Defendants' stance is that FirstEnergy could be liable for securities fraud only if it willingly put its fraud into broad daylight. *See* ECF No. 161 at 54 (arguing no reliance because "[n]ot a single one of the allegedly false and misleading statements Plaintiffs point to mention anything about *purported bribery*." (emphasis added)).

A more apt inquiry is whether Defendants presented a deceptive public-facing "cover" that would be reflected in share prices and relied on by investors. [34] Such was the case in *Medtronic*, where the company's "deceptive conduct directly caused the production of the information on which the market relied." *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 394 (8th Cir. 2016). The court did not require the defendants to have disclosed their scheme to falsify clinical trials, nor their fraudulent payments to the trials' physician-authors. *See id.* Reliance could be had on the public-facing product of Medtronic's scheme—the clinical trial results that investors presumed to be valid. Here too, HB6 was a public-facing product of Defendants' scheme, and its pursuit and passage factored prominently into FirstEnergy's share price. FirstEnergy's support for HB6 was no secret, but its fraudulent means necessarily were. As in *Medtronic*, Defendants "cannot instruct individuals"—here, Householder and associates—"to take a certain action"—here, pass HB6 —"pay to induce them to do it, and then claim any causal connection is too remote when they follow through." *Id*. When a scheme has no public-facing cover, and there is no information for the market to digest, *then* it fairly can be said that the scheme fails to engender any reliance by investors. [35]

[34] This is analogous to typical misstatement liability, where the investor hears or knows of the statement but does not know its falsehood at the time.

[35] Continuing the analogy to misstatement liability, see *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) ("A plaintiff unaware of the relevant statement, on the other hand, could not establish reliance on that basis."). *Compare id. with* *Menaldi*, 277 F. Supp. 3d at 519 (reliance rejected in scheme liability case where the "Complaint fails to allege that investors *knew of*, or relied upon, [defendant's] *attempt to cover up* his alleged self-dealing" (emphasis added)).

In reaching their overinclusive disclosure theory, Defendants have attributed too great a meaning to *Stoneridge* and other authorities, which speak to the concerns about presuming reliance upon remote and indirect actors. In *Stoneridge*, the respondents were suppliers and customers external to the company, who "had no duty to disclose; and their deceptive acts were not communicated to the public." 552 U.S. at 152, 159. The Supreme Court found reliance lacking because these external parties were connected to the company's fraudulent financial statements only by "an indirect chain that we find

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2888 Filed 11/15/24 Page 91 of 173

In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)
2022 WL 681320, Fed. Sec. L. Rep. P 101,335

too remote for liability." *Id*. The theme of delineating liability for parties with only remote involvement is one that recurs in Defendants' cited authorities. [36]

36      *See, e.g.*, *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 148–49, 159 (2d Cir. 2010), (no scheme liability for "a secondary actor," specifically a law firm that facilitated the company's allegedly fraudulent loan transactions, where plaintiffs " 'did not rely on [ ] any of [the firm's] work' " (quoting and affirming *In re Refco, Inc. Sec. Litig.*, 609 F. Supp. 2d 304, 315 (S.D.N.Y. 2009))); *Cosby v. KPMG, LLP*, 2018 WL 3723712, at *10 (E.D. Tenn. Aug. 2, 2018) (independent auditor was "only [a] secondary actor[ ]" and could not be considered the " 'maker' " of statements in the auditee's public filings on which "the shareholders claimed to have relied" (quoting *Janus*, 564 U.S. at 142)); *Siegmund v. Xuelian Bian*, 2018 WL 1611197, at *9 (S.D. Fla. Apr. 2, 2018) (outside law firm sued under scheme theory for its involvement in company's merger).

 **\*28** Some courts have applied *Stoneridge* against internal executives, including in *Hawaii Ironworkers Annuity Trust Fund v. Cole*, 296 F.R.D. 549 (N.D. Ohio 2013). [37] The court acknowledged the difference between internal and external actors but ultimately concluded that, "absent public disclosure of a defendant['s] own deceptive conduct, the market cannot have taken that conduct into account when pricing the company's securities." *Id.* at 558. In that case, however, "[t]he only evidence the [plaintiff] cite[d] to show public disclosure of these acts [were] three [company] press releases," which reported high-level profits and gave no indication of underlying transactions. *Id.* at 557. The analogy to this case would be if investors suddenly saw additional revenue in FirstEnergy's bottom line but never knew of the source (HB6) or that the Company had lobbied for it. Furthermore, the *Hawaii Ironworkers* decision came on a motion for class certification, not a motion to dismiss. The claims survived a motion to dismiss, with the court reasoning as follows:

> The information defendants gave to [the company] played a major role in falsely inflating public reports of the company's overall and (remarkable) financial success during

a very challenging period. These circumstances, and the direct nexus they show between the defendants' fraudulent conduct and the publication of false information to the investing public differentiates this case from *Stoneridge*.

*Id.* at 556 (quoting prior decision, 2011 WL 1257756, at *8).

37      Several other cited authorities concerning internal executives continued the theme of limiting liability for remote actors. *See, e.g.*, *Affco Invs. 2001, L.L.C. v. Proskauer Rose, L.L.P.*, 625 F.3d 185, 192 (5th Cir. 2010) ("Without direct attribution to [defendant] of its role in the tax scheme, reliance on [defendant's] participation in the scheme is too indirect for liability."); *Pugh v. Trib. Co.*, 521 F.3d 686, 697 (7th Cir. 2008) (reliance lacking because "*Stoneridge* indicates that an indirect chain to the contents of false public statements is too remote to establish primary liability"); *Gordon v. Elite Consulting Grp. L.L.C.*, 2009 WL 4042911, at *5–6 (E.D. Mich. Nov. 19, 2009) (no fraudulent statements or deceptive acts alleged by moving defendant; at most, defendant aided and abetted others). By contrast, all Defendants here are alleged to have engaged directly and substantially in the scheme. *See supra* Section III.A.1.b.

As is discussed more fully in the preceding Sections, the Complaint alleges that FirstEnergy's own officers committed fraudulent acts that created misleading information about the nature and propriety of the Company's political activity, and later culminated in HB6. That information was publicized by the Company and factored efficiently into share prices. Defendants have raised no controlling authority that would compel the dismissal of such claims. The Court finds that this direct causal chain supports reliance, even for the non-speaking Defendants.

### 5. Economic Loss

The fifth element, economic loss, is not contested by any Defendant. Plaintiffs satisfy this element by pleading that they purchased securities at prices "artificially inflated" by Defendants, which "plummeted" once the scheme was

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2889 Filed 11/15/24 Page 92 of 173

In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)
2022 WL 681320, Fed. Sec. L. Rep. P 101,335

unveiled. (ECF No. 72 ¶¶ 257–67). FirstEnergy investors collectively suffered billions of dollars in losses. (*Id.* ¶ 9, 13). Clearly, Plaintiffs have alleged an economic loss.


### 6. Loss Causation

The final element in Plaintiffs' Section 10(b) claim is loss causation, meaning "a causal connection between the material misrepresentation [or deceptive act] and the loss." *Dura Pharms.*, 544 U.S. at 342. The main challenge to this element is brought by Defendant Jones, who contests it as to the $4.3 million payment made to ex-PUCO Chairman Sam Randazzo. (ECF No. 174 at 26–27). [38]

[38] Defendant Judge adds a short loss causation argument concerning the lack of a corrective disclosure on his own statements. (ECF No. 164 at 13–14). Corrective disclosures are one way to show loss causation, but they are not exclusive. *See, e.g.*, *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016) ("Put more simply, proof of loss causation requires demonstrating that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered. If the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant ... is sufficiently direct, loss causation is established." (internal quotation marks and citations omitted) (emphasis in original)); *Omnicare I*, 583 F.3d at 944 (loss causation lacking where no allegations "explain[ed] how the statements were revealed to be false and thereby caused a drop in the stock price"). Here, the largest single drop in share value came in response to the criminal complaint filing, which allegedly revealed the falsehood of most, if not all, of Defendants' statements about HB6.

**\*29** Jones reasons that the Randazzo payment, which was revealed approximately four months after the Class Period ended, "cannot retroactively cause class period losses." (*Id.* at 27). Perhaps that would be true if the Randazzo revelation had been the inflection point at which the market first learned of Defendants' fraudulent scheme. Details of the payment were not known, however, when the Department of Justice filed its criminal complaint; those facts emerged later, in the course of ensuing investigations.

In a scheme of this breadth, it is illogical to expect that the truth would emerge in "a singular, unitary disclosure," as opposed to "a series of disclosing events." *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828–29 (D.N.J. 2006) (finding loss causation satisfied where a corrective disclosure occurred one month after the close of the class period, and rejecting "Defendants' rigid and dogmatic interpretation of *Dura*"). To adopt Jones's argument, the Court would need to analyze the Randazzo payment in isolation. "The market would not consider these [disclosures] in a vacuum and neither does the Court." *Chamberlain*, 757 F. Supp. 2d at 718. Upon learning of the criminal complaint, any reasonable investor would anticipate a series of revelations as the case progressed and would factor that expectation into their appraisals.

The Court therefore rejects Jones's loss causation logic, which " 'would allow wrongdoers to immunize themselves with a protracted series of partial disclosures.' " *Cardinal Health*, 426 F. Supp. 2d at 761 n.75 (compiling cases and quoting *Parker Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40, 47 (D.D.C. 2006)). Tellingly, Jones's cited authorities find loss causation lacking where plaintiffs' *first* concrete knowledge of the scheme or misstatement postdates the class period. [39] Where, as here, details of wrongdoing emerge in the Class Period and a series of disclosures continues beyond it, no rule prohibits loss causation as to the later events. *SeeIn re Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1023 (S.D. Cal. 2006) (district court, on remand from *Dura*, explained "the Supreme Court could have held that as a matter of law Plaintiffs cannot establish loss causation because the corrective disclosures ... were made several months after the Class Period," but it "did not so hold"). Loss causation is established, even as to the Randazzo payment.

[39] *SeeLighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, 2013 WL 4405538, at *10 (S.D.N.Y. Aug. 5, 2013) ("Plaintiffs only allege that the truth about [defendant's] exposure to subprime securities came out in [defendant's] 2008 annual report," released "more than a month after the close of the proposed class period," and "do not allege that the market became aware [of the scheme] at any previous point" (emphasis removed)); *Lloyd v. CVB Fin. Corp.*, 2012 WL 12883517, at *26 (C.D. Cal. Aug. 21, 2012) (class period disclosure revealed "the mere risk of future loss," and "clearly did not reveal the existence of fraud, or expose [defendant's] alleged misrepresentations to the

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2890 Filed 11/15/24 Page 93 of 173

In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)
2022 WL 681320, Fed. Sec. L. Rep. P 101,335

public"); *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 243 (S.D.N.Y. 2006) (complaint "does not allege facts showing that, during the class period, the market became aware" of the scheme; "[o]n the contrary, plaintiffs acknowledge that [defendants' wrongdoing] did not become public knowledge during the class period").

\* \* \*

In summary, Plaintiffs have pled every element of their Section 10(b) claims adequately and have satisfied heightened pleading standards where applicable. Their extensive and detailed allegations set out a plausible, persuasive case for securities fraud under theories of both misstatement liability and scheme liability. Count I stands as pled.

### B. Exchange Act Section 20(a) (Count II)

**\*30** Section 20(a) of the Exchange Act provides joint and several liability for "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder," including Section 10(b) and Rule 10b–5. 15 U.S.C. § 78t(a). Defendants' chief argument against this Count is premised on a dismissal of Count I. *See* ECF No. 161 at 66 (reasoning no secondary liability absent primary liability); No. 165-1 at 6 (same); No. 174 at 29 (same). Because the Court has sustained Plaintiffs' allegations in Count I that Defendants committed primary violations of Section 10(b) and Rule 10b–5, Defendants' corollary arguments must fail. The only issue to resolve in Count II is the control element.

The standard for control under Section 20(a) is the subject of considerable debate. In *National Century III*, the court summarized several competing approaches as follows:

> The most rigorous standard is that the controlling person "was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998). Other courts have declined to impose a requirement of culpability, but do require allegations that the controlling person both had the capacity to control the primary violator and actually exercised that control. *SeeAldridge v. A.T. Cross Corp.,* 284 F.3d 72, 85 (1st Cir.2002); *Metge v. Baehler,* 762 F.2d 621 (8th Cir.1985). Finally, other courts apply a more lenient standard yet,

requiring only that the controlling person be alleged to have had the capacity to control the primary violator; the "actual exercise of that control need not be alleged." *In re Enron Corp. Sec., Derivative & ERISA Litig.,* 258 F.Supp.2d 576, 642 (S.D.Tex.2003) (citing Fifth Circuit cases) ....

*Nat'l Century III*, 553 F. Supp. 2d 902, 911 (S.D. Ohio 2008).

The Sixth Circuit in *PR Diamonds* made no mention of a culpability requirement and defined control as " 'the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.' " 364 F.3d 671, 696–97 (6th Cir. 2004) (quoting 17 C.F.R. § 230.405). [40] Stated differently, it is "the practical ability to direct the actions of the people who committed the violation." *In re Nat'l Century Fin. Enters., Inc.,* 504 F. Supp. 2d 287, 300 (S.D. Ohio 2007) ("*Nat'l Century II*") (internal quotation marks omitted). "Position as an officer or director ... and the direction of employees within the scope of their duties, although not dispositive of the question, is evidence that may establish the exercise of 'control.' " *JAC Holding Enters., Inc. v. Atrium Cap. Partners, LLC,* 997 F. Supp. 2d 710, 738 (E.D. Mich. 2014) (finding control where principals "instructed [others] in carrying out specific elements of the plan, and in several cases ... came up with elements of the scheme themselves"). *But seeLansing Automakers' Fed. Credit Union v. MCF Portfolio Mgmt. Corp.,* 1991 WL 238974, at \*3 (W.D. Mich. Sept. 12, 1991) ("A director or officer is not, simply by virtue of his position, a 'controlling person' under the federal securities laws." (citing *Herm v. Stafford*, 663 F.2d 669, 684 (6th Cir. 1981))).

[40] In a prior decision, *Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.,* the Sixth Circuit observed that the standard of control is an open question. 973 F.2d 474, 486 (6th Cir. 1992) ("Our circuit has not adopted a test for liability as a 'controlling person' under the securities laws"). *PR Diamonds* did not claim to settle the law of the Circuit. Because the court found no primary violation, it did not need to analyze the control allegations. 364 F.3d at 697–98.

**\*31** This Court need not resolve the control standard. If a culpability requirement applies, the scienter findings are sufficient to meet it. Those allegations were tested against the PSLRA's heightened pleading standards, and the requirements for Count II are lower. *SeeNat'l Century II, 504 F. Supp. 2d at 300* (" 'Allegations of control are not averments

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2891 Filed 11/15/24 Page 94 of 173

In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)
2022 WL 681320, Fed. Sec. L. Rep. P 101,335

of fraud and therefore need not be pleaded with particularity. They need satisfy only the less stringent requirements of Fed.R.Civ.P. 8.’ ” (quoting *In re Parmalat Sec. Litig.,* 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006))).

Only six Defendants contest the control element on grounds other than culpability or the absence of primary liability —those being Defendants Reffner, Judge, Pine, Chack, Schneider, and Vespoli. As to each, except for Defendant Pine, the Court finds that Plaintiffs have satisfied their burden under basic pleading standards.

- Defendant Reffner rests his argument on his less-senior role in the Legal Department, at least until his May 2020 promotion to Chief Legal Officer. (ECF No. 163 at 18). Defendant Reffner does not contest that he had direct or indirect control for the portion of the Class Period after he became Chief Legal Officer, nor does he contest that the scheme was underway at that time. The Complaint also supports an inference that, during his preceding term as General Counsel, Defendant Reffner influenced and participated in the deficient operation of internal controls. (ECF No. 72 ¶ 227).

- Defendant Judge rests his argument on the corporate separateness of Energy Harbor (ECF No. 164 at 18), which avoids the allegations of FES's functional intertwinement with FirstEnergy (ECF No. 72 ¶ 45) and of his control over FES employees involved in the media campaign against HB6's repeal (*Id.* ¶ 230). Moreover, Defendant Judge's argument on corporate separateness does not suggest a lack of control during his preceding term as FirstEnergy's Chief Risk Officer. The Complaint supports an inference that Defendant Judge possessed power, direct or indirect, to control predicate acts on both sides of the purported corporate divide.

- Defendant Pine prompted Plaintiffs to clarify in their response brief that they are *not* pursuing control person claims against him. (ECF No. 176 at 71 n.23). This is not apparent from the Complaint; Count II is styled against “the Exchange Act Defendants,” which definitionally includes Defendant Pine. (ECF No. 72 ¶¶ 34, 39, 272– 75). Defendant Pine therefore will be dismissed from Count II. He is not terminated from the litigation, however, as he remains implicated in Count I.

- Defendant Chack rests his argument on the lack of attributed misstatements (ECF No. 169 at 19–20), but he overlooks the allegations about his leading role in

the media campaign against HB6's repeal (ECF No. 72 ¶ 224). Furthermore, Defendant Chack's termination reportedly related to his failure to “maintain and promote a control environment with an appropriate tone of compliance” and to his role in the Randazzo payment. (*Id.* ¶ 216). The Complaint supports an inference that Defendant Chack possessed power, direct or indirect, to control predicate acts, including the media campaign and the Randazzo payment.

- Defendant Schneider, like Defendant Judge, rests his argument on the purported corporate separateness of FES. (ECF No. 170-1 at 14–15). Again, this neglects the allegations of FES's functional intertwinement with FirstEnergy (ECF No. 72 ¶ 45) and of his acts to facilitate FES's part in the scheme (*Id.* ¶ 229). The Complaint supports an inference that Defendant Schneider possessed power, direct or indirect, to control predicate acts, even from the FES side of the purported corporate divide.

**\*32** • Defendant Vespoli rests her argument on her retirement from FirstEnergy in April 2019 and on a mistakenly heightened pleading standard of “particularity.” (ECF No. 173 at 10–11). As stated above in the scienter analysis, Defendant Vespoli's retirement does not preclude her involvement in the scheme's planning stages. Defendant Vespoli's participation on the “Restructuring Working Group” and her “direct oversight and responsibility for the Company's lobbying activities and political contributions” support an inference of power, direct or indirect, to control predicate acts. (ECF No. 72 ¶ 228).

Defendant Vespoli raises a separate argument deserving of brief discussion: that she cannot be liable simultaneously as a primary actor under Section 10(b) and a control person under Section 20(a). (ECF No. 173 at 11 n.6). Defendant Vespoli refers to a footnote in *PR Diamonds*, where the Sixth Circuit stated:

> Without deciding the question, we note that some [out-of-Circuit] authority suggests that a plaintiff may not be able simultaneously to assert both Section 10(b) and Rule 10b–5 claims and Section 20(a) claims against the same defendant. “Arguably, a § 20(a) claim cannot be asserted against a defendant who is also charged with primary violation of § 10(b) and Rule 10b–5; that is, secondary liability under § 20(a) is an alternative, not a supplement, to primary liability under § 10(b) and Rule 10b–5.”

Case 4:23-cv-13132-SDK-EAS  ECF No. 43-6, PageID.2892  Filed 11/15/24  Page 95 of 173

In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)
2022 WL 681320, Fed. Sec. L. Rep. P 101,335

364 F. 3d at 697 n.4 (quoting *Lemmer v. Nu–Kote Holding, Inc.*, 2001 WL 1112577, at *12 (N.D. Tex. Sept. 6, 2001)). It might become necessary to resolve this issue later in the case, but the Court will leave it open at this juncture for two reasons. First, the *PR Diamonds* dicta is, as it says, arguable. To state the counterpoint, nothing in the plain text of Section 20(a) makes it mutually exclusive with other theories of liability, and nothing logically prevents a person from violating Section 10(b) themselves while controlling others who also violate it. Second, even if Plaintiffs ultimately can prevail against each Exchange Act Defendant on only one theory, a motion to dismiss is not the correct time to determine which. At the pleadings stage, "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). *see also*Nat'l Century *I*, 2006 WL 469468, at *24 (S.D. Ohio Feb. 27, 2006) (on a motion to dismiss, citing the same principle and "allow[ing] [plaintiffs] to pursue both their § 10(b) and their § 20(a) claims against [defendant] at this time").

Apart from Defendant Pine, who is dismissed from this Count only, Count II stands as pled.

### C. Securities Act Section 11 (Count III)

Plaintiffs' remaining claims are brought under a separate statute, the Securities Act, and against a different set of Defendants. [41] They relate to FirstEnergy's bond offerings in February and June 2020, which raised a combined $2.5 billion. (ECF No. 72 ¶¶ 285–90).

[41]  The "Securities Act Defendants" are FirstEnergy's non-management directors, three FirstEnergy officers (Defendants Jones, Strah, and Lisowski), and 16 banking and finance firms that served as underwriters for FirstEnergy's bond offerings. *See supra* notes 13–14 and accompanying text.

Count III sounds under Section 11 of the Securities Act, which provides a cause of action to "any person acquiring [a] security" when it is shown that "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). As relevant here, the cause of action runs against:

 *33  (1) every person who signed the registration statement;

(2) every person who was a director of ... the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

(3) every person who, with his consent, is named in the registration statement as being or about to become a director ... [and]

(5) every underwriter with respect to such security.

*Id.* Plaintiffs' required showing under Section 11 is as follows:

> (1) he purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under Section 11; and (3) the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."

*Loc. 295/Loc. 851 IBT Emp'r Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp.*, 731 F. Supp. 2d 689, 704 (S.D. Ohio 2010) ("*Local 295*").

Compared with Section 10(b) of the Exchange Act, "Section 11 [of the Securities Act] places a relatively minimal burden on a plaintiff." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). "The section was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering. If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case." *Id.* at 381–82.

The Securities Act Defendants contest the third element (a misstatement or omission) by reference to the briefing on misstatement liability reviewed under Count I. (ECF No. 161 at 59, 62; No. 171 at 4; No. 174 at 27). They implicitly

**In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)**

2022 WL 681320, Fed. Sec. L. Rep. P 101,335

concede that their arguments rise or fall with the Court's determination on Count I. As discussed above, the Court has found the misstatement allegations sufficient and allowed Count I to proceed as pled.

The only other argument raised as to Count III concerns the appropriate pleading standard. The Securities Act Defendants aver that Plaintiffs' allegations "sound in fraud" and therefore must satisfy the heightened pleading standards of Rule 9(b). (ECF No. 161 at 8 n.3). As a general principle, "fraud is not an element or requisite to a claim under § 11," meaning "the claims are not subject to Rule 9(b)." *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 602 (N.D. Ohio 2004). An exception occurs "[a]s to claims that sound in fraud," where "Plaintiffs must also satisfy the particularity requirements of Rule 9(b)." *In re EveryWare, Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 869 (S.D. Ohio 2016) (citing *Omnicare I*, 583 F.3d 935, 948 (6th Cir. 2009)). Plaintiffs contend that they carefully have separated their Securities Act claims from any allegations of fraud elsewhere in the Complaint. (ECF No. 176 at 78). To that end, the Complaint declines to incorporate Exchange Act allegations into the Securities Act section and "expressly disavows all averments of fraud contained [t]herein for the purposes of pleading claims under the Securities Act as such claims do not require a showing of fraud or scienter." (ECF No. 72 ¶ 276).

 **\*34**  The Court finds that Plaintiffs have not separated their claims against the Securities Act Defendants who served in management roles (Defendants Jones, Strah, and Lisowski), nor against FirstEnergy. The Complaint pleads that the registration statements were false or misleading because they "failed to disclose that FirstEnergy and several of the Company's most senior executives had carried out an illegal bribery scheme" (*Id.* ¶ 292), which ties the Securities Act claims to the fraud allegations against "the senior echelon of Company management, including [Defendant] Jones and numerous other executives" (*Id.* ¶ 4). The quoted passage from paragraph 276 is a "blanket disavowal ... insufficient to rescue [Plaintiffs] from the requirements of Rule 9(b)." *Local 295*, 731 F. Supp. 2d at 709 (noting also that "Plaintiffs' allegation that their Securities Act claims do not sound in fraud is a legal conclusion that the Court does not have to accept as being true"). [42]

[42]    Furthermore, the scheme allegations in paragraphs 3–6 *are* incorporated by reference into the

Securities Act claims. (ECF No. 72 ¶ 276 ("This section incorporates solely ¶¶1-6, 14-26")).

The non-management Director Defendants [43] and the Underwriter Defendants are different. No allegations in the Complaint suggest that they knew of or participated in the scheme in a way that would be fraudulent, as opposed to reckless or negligent. [44] *Cf.EveryWare*, 175 F. Supp. 3d at 869 ("Defendants' argument [for applying heightened pleading standards] mainly relies on Plaintiffs' allegations of fraud against *other* Defendants, and therefore ... fails." (emphasis in original)). For that reason, the Court finds that the allegations against the non-management Director Defendants and the Underwriter Defendants are separated properly from averments of fraud. The pleading standard therefore is a hybrid: basic pleading under Rule 8(a) for allegations concerning the non-management Director Defendants and the Underwriter Defendants, and heightened pleading under Rule 9(b) for allegations concerning FirstEnergy and Defendants Jones, Strah, and Lisowski.

[43]    The "non-management" qualifier is added to exclude Defendant Jones. As CEO, Defendant Jones was both an officer and a director. (ECF No. 72 ¶ 28).

[44]    This Court did allow the derivative action to proceed against the same directors on allegations that "Defendants[ ] knew or recklessly disregarded reports and red flags ... and took affirmative steps to conceal the scheme." *Emps. Ret. Sys. of City of St. Louis*, 2021 WL 1890490, at \*20 (S.D. Ohio May 11, 2021) (internal quotation marks omitted). There are not, however, sufficient allegations in *this* Complaint to support a finding of knowledge or participation, largely due to Plaintiffs' efforts to avoid averments of fraud in their Securities Act claims.

Even against heightened pleading standards, as applicable, Plaintiffs' allegations suffice. The SEC Form 10-K for Fiscal Year 2019 and Form 10-Q for Q1 2020, which were incorporated into the registration statements at issue (ECF No. 72 ¶ 290), are among the same forms alleged to be misleading in Count I; and the Court found those allegations to withstand Rule 9(b). As was true in Count I, Plaintiffs have pled the " 'time, place and contents of the misrepresentations upon which they relied.' " *In re Regions Morgan Keegan Sec., Derivative, & Erisa Litig.*, 743 F. Supp. 2d 744, 759–60 (W.D. Tenn. 2010) (quoting *Frank v. Dana Corp.*, 547 F.3d

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2894 Filed 11/15/24 Page 97 of 173

In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)
2022 WL 681320, Fed. Sec. L. Rep. P 101,335

564, 570 (6th Cir. 2008)). Plaintiffs quote specific passages from the registration statements concerning the Company's compliance and internal controls, highlight omissions about the extraordinary risks associated with HB6, explain how and why those statements and omissions were materially false and misleading, and juxtapose them against the Company's own subsequent admissions. (ECF No. 72 ¶¶ 291–301). Count III stands as pled.

### D. Securities Act Section 12(a)(2) (Count IV)

**\*35** Section 12(a)(2) of the Securities Act creates civil liability for "[a]ny person who ... offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading ...." 15 U.S.C. § 77*l*(a)(2). It is "similar to Section 11," but it "only imposes liability on 'statutory sellers' of securities." *Local 295*, 731 F. Supp. 2d 689, 704–05 (S.D. Ohio 2010).

Plaintiffs' required showing under Section 12(a)(2) can be summarized as follows:

> (1) the defendant is a "statutory seller"; (2) the sale was effectuated by means of a prospectus or oral communication; and (3) the prospectus or oral communication included an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

*Id.* at 705 (citing *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010)).

The Underwriter Defendants bring a standing challenge (ECF No. 171 at 4–7); the non-management Director Defendants and Defendant Jones challenge their "statutory seller" status (ECF No. 161 at 65–66; No. 174 at 27–28); and all Securities Act Defendants extend their challenges from Count III about misstatements and heightened pleading standards. (ECF No. 161 at 8 n.3, 65; No. 171 at 4; No. 174 at 27). These latter arguments can be dispensed with swiftly. They concern the same underlying misstatements discussed in Count I, which were restated in the registration statements and prospectuses at issue in Counts III and IV. (ECF No. 72 ¶¶ 286, 88, 90). In Count I, and again in Count III, the Court found those allegations well-pled and sufficient for Rule 9(b); there is no need to belabor the point a third time. This leaves only two arguments for discussion: standing and the "statutory seller" element.

#### 1. Standing

The Underwriter Defendants challenge Plaintiffs' standing to pursue their Section 12(a)(2) claims "because Plaintiffs have not alleged that they purchased FirstEnergy securities in the Offerings from any of the Underwriter Defendants," "as opposed to the secondary market." (ECF No. 171 at 4). Since "Section 12(a)(2) applies only to purchases made through initial offerings and not to aftermarket trading," most courts hold "that purchasers who buy their shares on the secondary market lack standing to assert Section 12(a)(2) claims." *Local 295*, 731 F. Supp. 2d at 713 (citing *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995)). [45]

[45]  Purchasers through aftermarket trading may have claims under Section 11, but not Section 12. *Seeid.* at 704 (first element of a Section 11 claim is that the plaintiff "purchased a registered security, either directly from the issuer or in the aftermarket following the offering").

To indulge the Underwriter Defendants' argument, however, requires the Court to draw reasonable inferences *against* Plaintiffs, which is backwards on a motion to dismiss. Plaintiffs allege that they "purchased FirstEnergy notes *directly in* and traceable to" the Offerings (ECF No. 72 ¶ 307 (emphasis added)); and that "the Securities Act Defendants issued, promoted, and sold FirstEnergy notes *to Plaintiffs*" (*Id.* ¶ 313 (emphasis added)). The Complaint also refers to Plaintiffs' "purchases of the FirstEnergy notes *issued in* the Offerings." (*Id.* ¶ 317 (emphasis added)). This is hardly the "coy choice of words" that gave "pause" to the court in *Yates*, one of the Underwriter Defendants' main authorities. *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 900 (4th Cir. 2014). *Yates* considered purchases alleged to be " 'pursuant *and/or* traceable to' " an offering. *Id.* (emphasis added). Ambiguous slash-mark aside, the court held that if "coupled with sufficient supporting facts," such claims

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2895 Filed 11/15/24 Page 98 of 173

In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)
2022 WL 681320, Fed. Sec. L. Rep. P 101,335

"can give rise to a plausible inference of standing in certain circumstances." *Id.* (discussing *Plumbers' Union Loc.No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 776 (1st Cir. 2011)). [46]

[46] The pleading in the other case cited by the Underwriter Defendants was weaker still. *SeeIn re Regions Morgan Keegan Sec., Derivative & Erisa Litig.*, 166 F. Supp. 3d 948, 968 (W.D. Tenn. 2014) (plaintiffs alleged they had " 'purchased shares issued pursuant *or* traceable to the misleading registration statements' " (emphasis added)). That formulation was deemed insufficient to plead direct purchases, at least where aftermarket trading remained a possibility. *Id.* at 968–69.

**\*36** Furthermore, Plaintiffs do couple their comparatively firm pleading with supporting certifications, incorporated into the Complaint (ECF No. 72 ¶¶ 23–26), that show large bond purchases by each Plaintiff aligned in timing and series with either or both Offerings. [47] The certifications also align with each other. Plaintiffs LACERA and Wisconsin Laborers' Pension Fund each made large purchases on February 18, 2020. *See supra* note 47. Likewise, Plaintiffs LACERA and Amalgamated Bank each made large purchases on June 3, 2020. These latter purchases were of the same series of notes (1.6% due 2026), which allows for a unit-price comparison that matches to the penny: $99.85. *Id.*; *compare* ECF No. 33-4 *with* ECF No. 72 PAGEID # 1666. The Underwriter Defendants propose no explanation for how the various named Plaintiffs, who had no affiliation prior to this case, could have synchronized in so many respects. A reasonable explanation is that they independently purchased from the same initial offerings. At this stage of the litigation, reasonable inferences go to Plaintiffs.

[47] Plaintiff LACERA reports acquisitions on February 18 and 26, 2020, of 2.65% notes due 2030 (ECF No. 33-4), which align with Series B notes in the February Offering (ECF No. 72 ¶ 286). LACERA further reports acquisitions on June 3, 2020, of 1.6% notes due 2026 (ECF No. 33-4), which align with Series A notes in the June Offering (ECF No. 72 ¶ 288). Plaintiff Amalgamated Bank reports acquisitions on June 3, 2020, of 1.6% notes due 2026 (*Id.* PAGEID # 1666), which align with Series A notes in the June Offering (*Id.* ¶ 288). Plaintiff Wisconsin Laborers' Pension Fund reports acquisitions on

February 18, 2020, of 3.4% notes due 2050 (*Id.* PAGEID # 1668), which align with Series C notes in the February Offering (*Id.* ¶ 286). Plaintiff City of Irving Supplemental Benefit Plan reports acquisitions on June 23, 2020, of 2.25% notes due 2030 (*Id.* PAGEID # 1671), which align with Series B notes in the June Offering (*Id.* ¶ 288).

The Court also rejects the corollary argument that Plaintiffs should be required to allege purchases from "particular Underwriter Defendant[s]." (ECF No. 171 at 6). The Underwriter Defendants cite two cases for this proposition, but neither dismissed any claims over a failure to identify particular underwriters. *Regions Morgan Keegan* rebuffed an attempt to import the aftermarket purchaser standing from Section 11; thus, when the court wrote that plaintiffs "d[id] not allege with particularity that [they] purchased their shares from [defendant fund] directly," the operative word was "directly." 166 F. Supp. 3d at 968–69. The second case, *In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*, considered lead plaintiffs who "concede[d]" that none of them alleged purchases from a group of individual defendants and attempted to rest their standing on other purchases by "potential members of the proposed class." 2012 WL 12893520, at \*5 (C.D. Cal. Feb. 16, 2012). The court rejected that attempt because the lead plaintiffs suffered no injury and no class had been certified. *Id.* Meanwhile, Plaintiffs direct the Court's attention to multiple cases from the Southern District of New York that found Section 12(a)(2) allegations well-pled despite not identifying particular underwriters. *See, e.g.*, *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 404 (S.D.N.Y. 2020) ("[T]he fact that Plaintiffs did not identify which Underwriter Defendant they purchased shares from does not defeat their claim at this stage."); *Perry v. Duoyuan Printing, Inc.*, 2013 WL 4505199, at \*12 (S.D.N.Y. Aug. 22, 2013) ("courts within the Second Circuit do not require that the putative class representative identify the specific underwriter from which it purchased shares as long as the allegations are sufficient"). This Court will decline to impose such a requirement in the first instance and against the weight of the cited authority. Plaintiffs' standing allegations are sufficient, as measured against basic pleading standards, to obtain discovery.

### 2. Statutory Seller

**\*37** For purposes of Section 12(a)(2), statutory sellers are those who have "(1) 'passed title, or other interest in the security, to the buyer for value,' or (2) 'successfully solicit[ed]

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2896 Filed 11/15/24 Page 99 of 173

In re Firstenergy Corp., Not Reported in Fed. Supp. (2022)

2022 WL 681320, Fed. Sec. L. Rep. P 101,335

the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities['] owner.' " *Morgan Stanley*, 592 F.3d at 359 (alterations in original) (quoting *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988)). The non-management Director Defendants and Defendant Jones urge the Court to dismiss Count IV because "the mere signing of a registration statement" is insufficient to establish "statutory-seller status." (ECF No. 161 at 66 n.19; No. 174 at 28).

This Court considered the same question in *EveryWare*. After surveying the First, Third, and Fifth Circuits, this Court dismissed Section 12(a)(2) claims against director defendants who merely had signed the registration statement:

> In *Shaw v. Digital Equipment Corp.*, the First Circuit dismissed for lack of standing the plaintiffs' Section 12(a)(2) claims against individual directors, applying the Supreme Court's decision in *Pinter v. Dahl*, 486 U.S. 622, 651 n. 27, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), to conclude that "neither involvement in preparation of a registration statement or prospectus..., standing alone, demonstrates the kind of *relationship between defendant and plaintiff* that could establish statutory seller status." 82 F.3d 1194, 1216 (1st Cir.1996), *superseded on other grounds by* 15 U.S.C. 78u–4(b)(2). The First Circuit held that a "bald assertion" that the individual officers "solicited" the purchases by signing and participating in the preparation of the registration statement was insufficient to confer standing. *Id*. In *Rosenzweig v. Azurix Corp.*, also applying *Pinter*, the Fifth Circuit found that signing the registration statement was insufficient in itself to constitute solicitation, asserting that "[t]o count as 'solicitation,' the seller must, at a minimum directly communicate with the buyer," and that an issuer, rather than an underwriter, "may only be liable under § 12(a)(2) if the plaintiff alleges 'that an issuer's role was not the usual one; that it went farther and became a vendor's agent.' " 332 F.3d 854, 871 (5th Cir.2003) (quoting *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 636 (3d Cir.1989) and *Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.*, 238 F.3d 363, 370 (5th Cir.2001)). *see also* *Pinter*, 486 U.S. at 648–49, 108 S.Ct. 2063 (rejecting the "substantial factor" test, which would impose liability on a non-transferor seller "whose participation in the buy-sell transaction is a substantial factor in causing the transaction to take place."). In *Craftmatic*, the Third Circuit found that an issuer was not liable "solely on the basis of his involvement in preparing the prospectus." 890 F.2d at 636. The Sixth Circuit has not yet considered this issue, but the Court finds the reasoning of the other three circuits

persuasive and holds that Plaintiffs lack standing to bring a Section 12(a)(2) claim against the Non-Management Director Defendants because they have not alleged any facts to indicate that the Directors' roles were "not the usual one." *Rosenzweig*, 332 F.3d at 871.

*In re EveryWare, Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 868–69 (S.D. Ohio 2016) (Marbley, J.) (footnotes omitted) (emphasis in original), *aff'd sub nom. IBEW Loc.No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th Cir. 2017).[48]

[48]   The Sixth Circuit did not state an opinion on the quoted passage. *Seeid.* at 328 n.3 ("We need not, and accordingly do not, address the district court's discussions of the statute of limitations and standing."). It affirmed only on the absence of plausibly pleaded material misrepresentations. *Id.* at 328. The question of whether the mere signing of a registration statement suffices for statutory-seller status remains an open one in the Sixth Circuit.

**\*38** Despite appearing multiple times in Plaintiffs' briefing (ECF No. 176 at 28, 78, 81), *EveryWare* is conspicuously absent in their discussion of the statutory-seller element (*Id.* at 83–85). This Court sees no occasion to reconsider its holding in *EveryWare* that directors are not liable under Section 12(a)(2) merely for having signed the registration statements.

As to the non-management Director Defendants in Count IV, the Complaint states no other specific allegations of solicitation; Plaintiffs appear to rest on the signatures. *See* ECF No. 72 ¶ 281 ("Each of the Director Defendants signed the registration statement for the Offerings, and/or were named as directors in the registration statements for the Offerings"). Absent other allegations of how the non-management Director Defendants solicited the purchase of securities, the statutory-seller element is not met.

By contrast, Count IV states many allegations about Defendant Jones's soliciting role. Defendant Jones was among the "senior echelon of Company management ... responsible for FirstEnergy's ... investor disclosures," who are alleged to have "personally overseen and facilitated" the scheme, including by "repeatedly affirmatively reassur[ing] investors that the Company was not engaged in any illicit activities and 'compl[ied]' with all laws and regulations applicable to its regulatory affairs and investor disclosure obligations." (*Id.* ¶¶ 3–6 (emphasis removed) (incorporated by reference in ¶ 310); *see also id.* ¶¶ 291–301 (connecting misstatements to scheme)). From these allegations, it cannot fairly be

said that Defendant Jones "merely signed the registration statement" (ECF No. 174 at 28); rather, he is alleged to have reassured and deceived investors, actively and intentionally, into purchasing the securities at issue. The Court must take these allegations as pled and find that Defendant Jones was a "person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter*, 486 U.S. at 647. [49]

[49]    Defendant Jones also states a corollary argument on "privity," *i.e.*, whether Plaintiffs purchased securities " 'from him.' " (ECF No. 174 at 28–29 (quoting 15 U.S.C. § 77*l*(a)(2))). Defendant Jones cites no cases from this Circuit and seemingly overlooks an important passage in *Pinter*: "Congress' express definition of 'sells' in the original Securities Act to include solicitation suggests that the class of those from whom the buyer 'purchases' extended to persons who solicit him."486 U.S. at 645 (noting also that subsequent amendments "intended to preserve existing law" and not "to narrow the meaning of 'purchased from' ").

In conclusion, the Complaint does not state a claim under Section 12(a)(2) against the non-management Director Defendants in this Count (Defendants Addison, Anderson, Demetriou, Johnson, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, Smart, Thornton, and Turner). These Defendants are not released from the litigation, however, as they remain implicated in Counts III and V. Count IV may proceed against the other Securities Act Defendants: FirstEnergy, Jones, Lisowski, Strah, and the Underwriter Defendants.

### E. Securities Act Section 15 (Count V)

Section 15 of the Securities Act establishes joint and several liability for "[e]very person who ... controls any person liable under" Sections 11 or 12. 15 U.S.C. § 77*o*(a). Control under Section 15 is analyzed "using the same legal standards" as under Section 20(a).*Pullins v. Klimley*, 2008 WL 85871, at *27 (S.D. Ohio Jan. 7, 2008).

 **\*39**  The only basis on which Defendants move to dismiss this Count is the absence of a primary violation. *See* ECF No. 161 at 66 (reasoning no secondary liability absent primary liability); No. 174 at 29 (same). Because the Court has found

primary violations in Counts III and IV, the premise of Defendants' argument is defeated, and no further analysis is required. Count V stands as pled.

### F. Whether *Nickerson v. AEP* Controls

In a final effort, Defendants ask the Court to take notice of the recent decision in *Nickerson v. American Electric Power Co.*, Case No. 2:20-cv-4243-SDM-EPD (S.D. Ohio), dismissing securities fraud claims related to AEP's involvement in HB6. (ECF No. 209). That case only underscores the reasons why Plaintiffs' claims here should proceed. The *Nickerson* complaint presented no coherent scheme theory; only at oral argument did any bribery allegations emerge. 2021 WL 5998536, at *12–13 (S.D. Ohio Dec. 20, 2021). Nor were there shareholder proposals for lobbying transparency that would make the "vague, generic, and innocuous" misstatements at issue, *Id.* at *16, material to reasonable investors. [50] The roles of the companies differed in kind: AEP was alleged to have contributed $900,000 to Householder's enterprise, *Id.* at *5, which FirstEnergy outmatched *67-to-1*. FirstEnergy undoubtedly played the dominant role in passing HB6 and stood to gain the bulk of the benefits, valued at $2 billion. Unlike FirstEnergy, AEP has not been charged with any criminal wrongdoing. The market, too, recognized the difference: the AEP lawsuit was precipitated by a 5% drop in share price, *Id.* at *12, while FirstEnergy's losses reached 35% in the first of three major selloffs. (ECF No. 72 ¶ 259). Simply stated, if there is a strike suit between the two, this is not it.

[50]    Because the *Nickerson* plaintiffs did not state actionable misstatements, the court never reached their allegations on scienter, connection, reliance, or loss causation. *Id.* at *14. Nor did the court analyze any Securities Act claims, as none were not brought.

### IV. CONCLUSION

The Court finds Plaintiffs' allegations meritorious and compelling and determines that the Complaint may proceed as pled, with minor exceptions as noted. To dismiss this Complaint, as Defendants urge, would be to adopt a severely strained view of bribery laws, pleading requirements, and the facts of the case. Absent literal omniscience, it is difficult to envision a securities fraud complaint that would *not* falter on the unrealistic expectations Defendants seek to impose as law.

2022 WL 681320, Fed. Sec. L. Rep. P 101,335

This Court will not do such a great disservice to the statutory rights of shareholders and investors to recover against those who defraud them.

For the reasons stated above, the Motion to Dismiss filed by Defendant FirstEnergy Corp. (ECF No. 160) is **GRANTED IN PART** as to the non-management Director Defendants in Count IV only and is **DENIED** in all other respects. Defendant Pine's Motion to Dismiss (ECF No. 166) is **GRANTED IN PART** as to Count II and is **DENIED IN PART** as to Count I. The remaining Motions to Dismiss filed by Defendant Reffner (ECF No. 162), Defendant Judge (ECF No. 164), Defendant Dowling (ECF No. 165), Defendant Chack (ECF No. 168), Defendant Schneider (ECF No. 170), the Underwriter Defendants (ECF No. 171), Defendant Vespoli (ECF No. 172), and Defendant Jones (ECF No. 174) each are **DENIED**. The partial dismissals are without prejudice.

**\*40 IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 681320, Fed. Sec. L. Rep. P 101,335

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4353010
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Thomas LAMONTAGNE, Plaintiff,
v.
TESLA, INC., et al., Defendants.

Case No. 23-cv-00869-AMO
|
Signed September 30, 2024

**Attorneys and Law Firms**

Jennifer Pafiti, Pomerantz LLP, Los Angeles, CA, J. Alexander Hood, II, Pro Hac Vice, Jeremy A. Lieberman, Pro Hac Vice, Pomerantz LLP, New York, NY, for Plaintiff.

Alexander Benjamin Spiro, Pro Hac Vice, Brenna D. Nelinson, Pro Hac Vice, Leigha Empson, Pro Hac Vice, Jesse A. Bernstein, Pro Hac Vice, Quinn Emanuel Urquhart and Sullivan LLP, New York, NY, Michael Timothy Lifrak, Quinn Emanuel Urquhart & Sullivan, LLP, Los Angeles, CA, Michael Ethan Liftik, Quinn Emanuel Urquhart & Sullivan LLP, Washington, DC, for Defendants.

**ORDER GRANTING MOTION TO DISMISS**

Re: Dkt. No. 62

Araceli Martínez-Olguín, United States District Judge

**\*1** This is a securities action case about Tesla's self-driving car technology. The matter is fully briefed and suitable for decision without oral argument. *See* Civil L.R. 7-1(b). Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the Court hereby **GRANTS** the motion to dismiss for the following reasons.

**BACKGROUND** [1]

[1] The Court accepts Plaintiffs' allegations in the complaint as true and construes the pleadings in the light most favorable to Plaintiffs. *See Manzarek v. St. Paul Fire & Marine Ins. Co.,* 519 F.3d 1025, 1031 (9th Cir. 2008) (citation omitted).

Lead Plaintiffs Oakland County Voluntary Employees' Beneficiary Association and Oakland County Employees' Retirement System (collectively, "Plaintiffs") bring a putative class action alleging Private Securities Litigation Act ("PSLRA") violations by Tesla, Inc., and Elon Musk (collectively, "Defendants"). ECF 57 (First Amended Complaint or "FAC"). They assert that Defendants made 29 false or misleading statements about the development timeline of its autonomous driving technology, the safety of the technology, and its capabilities.

By the start of the Class Period (February 19, 2019 to February 16, 2023), Tesla included a software package in its vehicles called "Autopilot," which it described as providing substantial self-driving capabilities, including providing "highway autonomy." FAC ¶ 63. Musk described Autopilot as being safer than human driving. FAC ¶ 63. Tesla also sold a software upgrade called "Full Self Driving" or "FSD" which enhanced the self-driving capabilities of the car. FAC ¶ 64. As part of the FSD software upgrade, Tesla offered a feature called "Smart Summon" which permitted users to direct the car to drive itself to them across very short distances. FAC ¶ 66. Tesla's software required drivers to occasionally touch the steering wheel, which Musk described as a mere technicality. FAC ¶ 67.

Defendants asserted that Tesla would run a network of "robotaxis" that would allow drivers to use a phone application (similar to Uber) to enable third parties to summon their car and drive them to a destination, allowing drivers to receive passive income while they were not personally using their car. FAC ¶ 75. Tesla equated robotaxis with Level 4-5 autonomy, describing them as "FSD without supervision." FAC ¶ 76. [2]

[2] The Society for Automotive Engineers has established five levels of vehicle autonomy. FAC ¶ 61. Levels 1-2 refer to systems where a human is driving the vehicle but technology can assist with certain aspects; Level 3 refers to systems where a human can sometimes hand over control of driving tasks but must always be ready to "intervene"; Levels 4-5 refer to systems where the human is not responsible for driving the car while systems are engaged, with Level 4 only providing the functionality in limited conditions (e.g., restricted geographical location or specific conditions such as not during rain). FAC ¶ 61.

Lamontagne v. Tesla, Inc., Slip Copy (2024)

2024 WL 4353010

During the Class Period, Defendants represented that Tesla was very close to releasing safe and functional Level 4-5 self-driving technology that would drive safer than humans (e.g., Tesla will be "feature complete – full self-driving – this year"). FAC ¶¶ 82-83. However, Tesla's system is currently unsafe for use without human supervision, and its technology is not yet better than humans. FAC ¶¶ 186, 188. Further, the National Transportation Safety Board has criticized Tesla for its dangerous marketing which encourages drivers to not pay as close attention as is necessary for the technology. FAC ¶¶ 190-91. Reports have found that Tesla's autonomous driving technology has led to "far more" crashes than previously reported. FAC ¶¶ 204-05. The Full Self-Driving software has critical safety defects (e.g., it ignores "Do Not Enter" signs, speeds in school zones, runs over children crossing the road, swerves into oncoming traffic). FAC ¶¶ 208-09. Tesla does not report the number of "disengagements" (i.e., human interventions) needed while its vehicles operate. FAC ¶ 211. The self-reported data from Tesla users shows that there is a disengagement of the Tesla's autonomous driving technology once every 16 miles, which is worse than its competitors in the autonomous driving market (1,000 times worse than Waymo and 5,800 times worse than Cruise). FAC ¶ 212.

 *2 Throughout the Class Period, Tesla continuously assured investors that it was certain to release full self-driving technology at Level 4-5 autonomy very soon, including by the end of 2020. FAC ¶ 220. When suit was filed, over 3 years and 8 months had passed since the 2020 deadline and Tesla had not yet released even a Level 3 autonomous driving system. FAC ¶ 221.

Plaintiffs bring three causes of action: (1) violation of Section 10(b) of the Securities and Exchange Act and Rule 10b-5(b) against Tesla and Musk; (2) violation of Section 10(b) of the Securities and Exchange Act and Rule 10b-5(a) and (c) against Tesla and Musk; and (3) Violation of Section 20(a) of the Securities and Exchange Act against Musk. Defendants move to dismiss the First Amended Complaint in its entirety. FAC ¶¶ 467-474, 475-483, 484-490.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless, Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

Securities fraud cases have heightened pleading requirements as the complaint must satisfy both the pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA. *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Pursuant to Rule 9(b), claims alleging fraud must "state with particularity the circumstances constituting fraud ..." Fed. R. Civ. P. 9(b). The PSLRA mandates that "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading ... [.]" 15 U.S.C. § 78u–4(b)(1)(B). The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007) (quoting 15 U.S.C. § 78u–4(b)(2)(A)). This means a plaintiff must allege that "the defendant[ ] made false or misleading statements either intentionally or with deliberate recklessness." *In re VeriFone Holdings*, 704 F.3d at 701 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009)).

## DISCUSSION

### I. REQUEST FOR JUDICIAL NOTICE

 *3 While the scope of review on a motion to dismiss is generally limited to the contents of the complaint, courts may take judicial notice of facts that are "not subject

Lamontagne v. Tesla, Inc., Slip Copy (2024)

2024 WL 4353010

to reasonable dispute." *Fed. R. Evid. 201(b).* Courts may consider documents incorporated into the complaint by reference, *Tellabs*, 551 U.S. at 322, and take judicial notice of matters of public record, *Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001)*, and publicly available financial documents such as SEC filings, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008). Courts may not assume the truth of an incorporated document "if such assumptions only serve to dispute facts in a well-pleaded complaint." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018).

Defendants seek judicial notice of 20 exhibits (Exs. A-T). ECF 63 ("RJN"). Defendants assert that Exhibits A through H and J through T [3] are incorporated by reference. *Id.* at 2; *see Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). Plaintiffs' FAC is premised on earnings call transcripts (Ex. C, H, J-S), *see* FAC ¶¶ 321, 329, 333, 347; and Tesla's Forms 10-K (Exs. B, D-G), *see* FAC ¶¶ 372-75. The FAC also relies on a Southern District of New York order (Ex. T) that purportedly enjoins Tesla from invoking the PSLRA safe harbor, *see* FAC ¶ 459, and references Tesla's website and its disclosures (Ex. A), *see* FAC ¶ 187. Because the FAC alleges misstatements based on Tesla's website and the Southern District of New York order, they are incorporated by reference despite not being attached to the complaint. *See U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.").

[3] Ex. A (Tesla Autopilot Support Page); Ex. B (Tesla 2019 Form 10-K); Ex. C (Oct. 21, 2020 Earnings Call Transcript); Ex. D (Tesla 2018 Form 10-K); Ex. E (Tesla 2020 Form 10-K); Ex. F (Tesla 2021 Form 10-K); Ex. G (Tesla 2022 Form 10-K); Ex H (Apr. 20, 2022 Earnings Call Transcript); Ex. J (Apr. 24, 2019 Earnings Call Transcript); Ex. K (Jul. 24, 2019 Earnings Call Transcript); Ex. L (Oct. 23, 2019 Earnings Call Transcript); Ex. M (Apr. 29, 2020 Earnings Call Transcript); Ex. N (Jul. 22, 2020 Earnings Call Transcript); Ex. O (Jan. 27, 2021 Earnings Call Transcript); Ex. P (Jan. 26, 2022 Earnings Call Transcript); Ex. Q (Oct. 19, 2022 Earnings Call Transcript); Ex. R (Jan 29, 2020 Earnings Call Transcript); Ex. S (Apr. 26, 2021 Earnings Call Transcript); Ex. T (Oct. 16, 2018 Tesla Order).

The Court also takes judicial notice of the contents of Exhibits B and D through G as they are Forms 10-K filed with the SEC. *See In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2017 WL 3727318, at *10 (N.D. Cal. Aug. 30, 2017) (holding that SEC filings referenced in the complaint "are proper subjects of judicial notice"). The Court takes judicial notice of Exhibits C, H, and J through S as they are earnings call transcripts. *See Sneed v. AcelRx Pharm., Inc.*, 2022 WL 4544721, at *3 (N.D. Cal. Sept. 28, 2022) (finding "transcripts of earnings calls ... are proper subjects of judicial notice"). The Court further takes judicial notice of Exhibit I, which reflects Tesla's stock price on the first and last days of the Class Period. *See, e.g., Metzler*, 540 F.3d at 1064 n.7 (holding that district court properly took notice of stock price). Exhibit A, which is an excerpt of content from Tesla's website as displayed during the Class Period, is the proper subject of judicial notice. *See Threshold Enterprises Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 146 (N.D. Cal. 2020) (finding that "websites and their contents may be judicially noticed"). Finally, the Court takes judicial notice of Exhibit T, the Southern District of New York order, as the Court may take judicial notice of court filings, *see Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006). [4]

[4] Plaintiffs do not object to the Court taking judicial notice of each of these documents.

## II. SECTION 10(B) CLAIM

**\*4** Section 10(b) of the Securities Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). To state a claim under section 10(b) and Rule 10b-5, a plaintiff must show: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (citations omitted); *see In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051-52 (9th Cir. 2014). "Rule 9(b) applies to all elements of a securities fraud action, including loss causation." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014). "Even where a plaintiff has properly pleaded all six elements of a Section 10(b) violation, the allegedly false or misleading statement may still be shielded

from liability by the 'safe harbor' provision of the PSLRA." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017).

Plaintiffs allege that Elon Musk and Tesla made 29 false and misleading statements in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b). Defendants move to dismiss the FAC in its entirety. They argue that the statements are not actionable because (1) they are forward-looking statements protected by the PSLRA safe harbor; and (2) they are statements of corporate puffery; and (3) Plaintiffs have not adequately pleaded facts to support the elements of a Section 10(b) claim.[5] As statements protected under the safe harbor are nonactionable, the Court considers that argument first. *See, e.g., Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 873 (N.D. Cal. 2023) ("*DocuSign*") (considering safe harbor before addressing whether statements are otherwise actionable). Similarly, the Court considers whether the statements are corporate puffery before considering whether the claims are sufficiently pled.

[5]    In the motion, Defendants categorize the statements into three types: Timeline, Safety, and Capability. Because Plaintiffs adopt this categorization in their response, the Court does as well.

**A. PSLRA Safe Harbor**

The PSLRA "safe harbor" rule protects certain "forward-looking" statements from liability. 15 U.S.C. § 78u-5(c). The safe-harbor provision is "designed to protect companies and their officials when they merely fall short of their optimistic projections." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1189 (9th Cir. 2021) (citation and quotations omitted). Plaintiffs argue that Tesla is statutorily prohibited from invoking the safe harbor doctrine. The Court addresses this argument before turning to the elements of the PSLRA safe harbor.

**1. Statutory Exclusion from Safe Harbor**

The PSLRA Safe Harbor does not protect statements made by an issuer of securities within three years after it has been the subject of an order barring future violations of an antifraud provision of the securities laws. 15 U.S.C. § 78u-5(b). Plaintiffs argue that this exclusion applies to Tesla because a settlement in an SEC action bars Tesla from violating Rule 13a-15. ECF 66 ("Opp.") at 21 (citing FAC ¶¶

457, 459); *United States Securities & Exchange Commission v. Tesla, Inc.*, 1:18-cv-8947-LJL (S.D.N.Y. Oct. 16, 2018), ECF No. 14.[6] Plaintiffs contend that Rule 13a-15 is an antifraud provision within the meaning of Section 15 U.S.C. § 78u-5(b), as it is aimed at preventing fraud. Opp. at 21. Defendants dispute that Rule 13a-15 is an antifraud provision, as it is a controls and procedures provision and does not contain a scienter requirement. Mot. at 14 (citing *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1325 (11th Cir. 2019)) (holding that Rule 12b-20 is not an "antifraud provision" because, among other reasons, it does not contain a scienter requirement, and fraud provisions by their nature involve intentional wrongdoing). Plaintiffs provide no caselaw of any kind considering whether Rule 13a-15 is an antifraud provision. The Court therefore examines the rule and the conduct it regulates.

[6]    Plaintiffs do not dispute that the Musk can avail himself of safe harbor as he is not an "issuer" of a security. *See* Opp. at 21-22.

**\*5** Rule 13a-15 dictates that issuers of securities must maintain "disclosure controls and procedures" and evaluate their effectiveness every fiscal quarter. 17 C.F.R. § 240.13a-15(a)-(b). The Rule defines "disclosure controls and procedures" to mean controls and procedures "designed to ensure that information required to be disclosed by the issuer ... is recorded, processed, summarized and reported" in a timely manner. *Id.* § 240.13a-15(e). The issuer must also evaluate "internal control over financial reporting" every fiscal year, which requires the issuer to provide "reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements[.]" *Id.* §§ 240.13a-15(c)-(d), (f). The Court does not read this rule to be an antifraud provision as fraud involves intentional wrongdoing. *See* Prosser & Keeton on Torts 728 (5th ed. 1984) ("[Fraud] entail[s] [a]n intention to induce the [victim] to act or to refrain from action in reliance on the misrepresentation."). In promulgating Rule 13a-15, the SEC did not discuss any fraud or state of mind requirements for the rule. It explained that "[p]roposed Rule 13a-15 would require a company to maintain sufficient procedures to collect, process and disclose the information required in its periodic and current reports filed with the Commission." *In Re Certification of Disclosure in Companies' Q. & Ann. Reps.*, SEC Release No. 46079 (June 14, 2002); *see also S.E.C. v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 462 (9th Cir. 1985) (differentiating between "registration provisions of the Exchange Act," including Sections 12(g), 13(b)(2),

and Rule 12b-20, recordkeeping provisions of the Securities Act, such as Section 13(b)(2) and "antifraud provisions of the Securities Act, § 17(a), § 10(b)"). [7] Rule 13a-15 does not make any reference to the speaker's state of mind. Therefore, the Court cannot find that Rule 13a-15 is an antifraud provision and Plaintiffs have not shown that Tesla is prohibited from availing itself of the PSLRA safe harbor. The Court thus turns to whether the safe harbor applies to the challenged statements.

[7]    Plaintiffs argue that Rule 13a-15 was implemented pursuant to "existing antifraud" rules such as Section 10(b). Opp. at 19 (quoting SEC Release No. 46079, at *2). However, this misquotes the SEC Release, which refers broadly to "existing antifraud and disclosure rules." SEC Release No. 46079, at *2.

### 2. Forward-Looking Statements

In determining whether the PSLRA safe harbor applies, the threshold question is whether any of the statements at issue are forward-looking. Relevant here, the provision applies to (1) forward-looking statements that are identified as such and are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially," or (2) forward-looking statements that were not made with "actual knowledge" by the speaker "that the statement was false or misleading." 15 U.S.C. § 78u-5(c); *see Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F. 4th 611, 620 (9th Cir. 2022). The statute defines forward-looking statements as "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (citing 15 U.S.C. § 78u-5(i)). "Whether a statement is forward-looking and protected by the PSLRA's safe harbor 'turns on particular language' and therefore requires an individualized analysis of each statement." *DocuSign*, 669 F. Supp. 3d at 874 (citation omitted).

Defendants argue that 18 Timeline Statements [8] expressing predictions for when Tesla's "Full Self Driving Capability" or "FSDC" would reach certain benchmarks are forward looking statements protected by the PSLRA safe harbor. Mot. at 12-13; *see, e.g.*, FAC ¶¶ 313-14 (predicting "feature complete

for full self-driving" this year); FAC ¶ 327 ("we expect to be feature complete with autonomy by the end of this year ... I think probably sometime next year, you'll be able to have the car be autonomous without supervision"); FAC ¶ 331 (Tesla "appears to be on track" for fully functional FSD by the end of the year); FAC ¶¶ 343, 349, 351, 357 (expressing confidence that Tesla will achieve full autonomy the following year).

[8]    Statements 1-3, 5-6, 8-12, 14-16, 18-20, 23, 29. *See* FAC ¶¶ 313, 315, 317, 321, 323, 327, 329, 331, 333, 335, 339, 341, 343, 347, 349, 351, 357, 369. The Court refers to the statement numbers in Plaintiffs' Appendix A at ECF 66-1.

Plaintiffs contend that the Timeline Statements are not forward-looking because they omit present facts rendering them misleading. Opp. at 19. For example, Plaintiffs argue that Musk's statements that "I think we will be feature complete full self driving this year" and "I would say that I'm certain of that. That is not a question mark" (FAC ¶ 314) are misleading "by omitting that Tesla was nowhere near releasing Level 4-5 ADT and not even intending to develop that technology over the near term." *Id.* However, Plaintiffs misunderstand the caselaw. Statements of the "assumptions underlying or relating to" the "plans and objectives of management for future operations" are forward-looking statements. *Wochos*, 985 F.3d at 1191-92 (holding that statements that Tesla is "on track" to produce a certain number of vehicles per week were "unquestionably" forward-looking statements). To establish that a challenged statement contains non-forward-looking assertions, a plaintiff must allege that the statement "goes beyond the articulation of 'plans,' 'objectives,' and 'assumptions' and instead contains an express or implied 'concrete' assertion containing a specific 'current or past fact.'" *Id.* at 1191 (quoting *Quality Sys.*, 865 F.3d at 1142, 1144). Plaintiffs have failed to allege that these challenged statements contain such "concrete" assertions of "current or past fact." *See id.* [9]

[9]    Plaintiffs also argue that because the statements were framed as guarantees rather than projections, they misrepresent the current condition of Tesla's business. Opp. at 20. They cite only an out of circuit case from 25 years ago that is not persuasive.

**\*6** The statements here set forth a projected timeline for achieving autonomous driving technology, much like statements of a "projected launch date for [a company's] products" and thus are plainly forward-looking statements of Tesla's plans and objectives. *See In re Intel Corp. Sec. Litig.*,

*Lamontagne v. Tesla, Inc.*, Slip Copy (2024)

2024 WL 4353010

2023 WL 2767779, at \*11 (N.D. Cal. Mar. 31, 2023), *aff'd*, 2024 WL 1693340 (9th Cir. Apr. 19, 2024).

Defendants also argue that two Safety Statements are forward-looking:

- "We'll probably roll it out later this year. But we'll be able to do traffic lights, stop, turns, troughs, everything pretty much. And then it will be a long march of 9s, essentially, how many 9s of reliability are okay. So it's definitely way better than human ..." FAC ¶ 341 (Statement 15) (Jul. 22, 2020 Musk on Earnings Call). [10]

- "Tesla Full Self-Driving will work at a safety level well above that of the average driver this year, of that I am confident. Can't speak for regulators though." FAC ¶ 353 (Statement 21) (Jan. 1, 2021 Musk Tweet).

[10] Defendants describe this statement as both a Timeline and a Safety Statement.

Plaintiffs argue that the statement "it's definitely way better than human" (Statement 15) is not forward-looking because it is a "mixed" statement that represents a present fact. Opp. at 19. Where a defendant makes a mixed statement containing a non-forward-looking statement as well as a forward-looking statement, the non-forward-looking statement is not protected by the safe harbor. *In re Quality Sys.*, 865 F.3d at 1141-42. However, where the statement, "examined as a whole," challenges "future expectations and performance," the statement is properly classified as forward-looking. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1059 (9th Cir. 2014) ("*Intuitive Surgical*"). Here, the statement discusses rolling out "4D" [11] later in the year, what Tesla will "be able to do," and that reliability is "going to be the real work." FAC ¶ 341. Thus, examined as a whole, the statement is best understood as discussing the "future expectations and performance" possible in the future roll-out. *See Intuitive Surgical,* 759 F.3d at 1059 (statement that defendant was not "hear[ing] anything that causes us any significant concern ... no change from last quarter, I guess ..." was properly understood as "expectations of the future impact of the external economic environment on [defendant]"). Statement 15 (FAC ¶ 341) is thus forward-looking. *See In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 936 (N.D. Cal. 2022) (citing *Wochos*, 985 F.3d at 1190) ("for a challenged statement to be deemed 'mixed,' the non-forward-looking aspects must be 'separable' from the forward-looking aspects"). Plaintiffs do not dispute that Statement 21 (FAC ¶ 353) is forward-looking. As the Court

has concluded that the above statements are forward-looking, the Court next considers whether Defendants have alleged that they were accompanied with meaningfully cautionary language or Plaintiffs have failed to allege knowledge of falsity.

[11] The parties do not define "4D."

### 3. Prong One of the Safe Harbor: Meaningfully Cautionary Language

Defendants argue that the forward-looking statements are protected under the first prong of the PSLRA safe harbor because they provided meaningful cautionary language warning investors that predictions in their forward-looking statements were subject to certain risks. Mot. at 13-14. Forward-looking statements are protected under the first prong of the safe harbor if they were "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially." 15 U.S.C. § 78u-5(c)(1)(A)(i). "To be adequate under the cautionary-language prong, the caution must 'discredit the [allegedly misleading statements] so obviously that the risk of real deception drops to nil.' " *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 737 (N.D. Cal. 2022) (quoting *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991)). These factors must be "substantive company-specific warnings based on a realistic description of the risks applicable to the particular circumstances." *Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1052 (N.D. Cal. 2018) (citations omitted). But the cautionary language "does not need to warn of the 'exact risk' that transpires." *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 931 (N.D. Cal. 2017).

**\*7** The forward-looking statements in Statements 5, 9-12, 15, 18, 23, 26, and 29 (FAC ¶¶ 321, 329, 331, 333, 335, 341, 347, 357, 363, and 369) were made during Tesla earnings calls. At the beginning of each call, Defendants cautioned that "[d]uring this call, we will discuss our business outlook and make forward-looking statements. These comments are based on our predictions and expectations as of today. Actual events or results could differ materially due to a number of risks and uncertainties, including those mentioned in our most recent filings with the SEC." ECF 62-13 (Ex. J) (Apr. 24, 2019 Earnings Call) at 2. [12] The SEC filings discussed hardware for Autopilot and FSD features and stated that "[t]here is no guarantee that we will be able to successfully and timely

introduce and scale any such new processes or features" and that Tesla may experience "delays or other complications in launching and/or ramping production of ... future features and services such as new Autopilot or FSD features and the autonomous Tesla ride-hailing network." ECF 62-5 (Ex. B) (Dec. 31, 2019 Form 10-K) at 5. Defendants also cautioned that "certain features of our vehicles such as new Autopilot or FSD features [may] take longer than expected to become enabled ... [.]" *Id.* at 11.

[12]    Ex. K (July 24, 2019 Earnings Call) at 2 (same); Ex. L (Oct. 23, 2019 Earnings Call) at 2 (same); Ex. M (Apr. 29, 2020 Earnings Call) at 2 (same); Ex. N (July 22, 2020 Earnings Call) at 2 (same); Ex. C (Oct. 21, 2020 Earnings Call) at 2 (same); Ex. O (Jan. 27, 2021 Earnings Call) (same); Ex. P (Jan. 26, 2022 Earnings Call) at 2 (same); Ex. Q (Oct. 19, 2022 Earnings Call) at 2 (same).

Plaintiffs contend that the cautionary language was inadequate as Defendants failed to disclose risks known to them – namely, that Tesla was not close to developing FSDC. Opp. at 20-21. "Risk disclosures that speak entirely of as-yet-unrealized risks and contingencies and do not alert the reader that some of these risks may already have come to fruition can mislead reasonable investors." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) (citation and quotation marks omitted); *see also Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 781 (9th Cir. 2023) (applying this to the context of the safe-harbor provision and finding that "cautionary language is not 'meaningful' if it discusses as a mere possibility a risk that has already materialized."). In November and December of 2020, Tesla's Assistant General Counsel told that California DMV that Tesla's City Streets software was ordinary "Level 2" driving assistance and that Tesla was not expecting any "significant enhancements" or "changes" to the software to render it Levels 3-5. FAC ¶¶ 227-31. The letter also stated that the development of Levels 3-5 will follow Tesla's "iterative process" and will not be released until the company has "fully validated them." FAC ¶ 230. In 2021, Tesla's Director of Autopilot Software told the DMV that Musk's tweet about reaching Level 5 capacity by the end of the year "does not match engineering reality." FAC ¶ 232.

Defendants argue that these allegations do not show that Tesla's statements were false or misleading because the DMV letter refers to a specific technology – the City Streets software – and does not indicate that Tesla's goals of completing FSD by the end of the year were not plausible.

Mot. at 17-18. Further, the 2021 DMV memo indicates that Tesla "couldn't say if the rate of improvement would make it to L5 [Level 5] by the end of the year" and that Musk was "extrapolating on the rates of improvement when speaking about L5 capabilities." FAC ¶ 232. The Court agrees with Defendants that Plaintiffs have failed to point to allegations showing that the risk that the FSD technology could not be achieved by the projected timeline had "already come to fruition." *See In re Alphabet*, 1 F.4th at 703; *cf. Khoja*, 899 F.3d at 1016 (holding that a company's warning in its Form 10-Q that share prices "might" be affected by announcements of study results that "may" be inconsistent with interim study results was misleading because the company "allegedly knew already that the 'new data' revealed exactly that"); *DocuSign*, 669 F. Supp. 3d at 879 (finding that defendant's disclosures that risks related to the pandemic "could" or "may" impact the business were insufficient where defendant was aware that the "pandemic-generated demand was unsustainable" and knew of "plummeting usage rates ... and disappointing sales as customers returned to in-person work and refused to renew" their contracts).

**\*8**    Moreover, courts have recognized that language similar to Defendants' is sufficiently cautionary. *See, e.g., Intuitive Surgical*, 759 F.3d at 1059-60 (finding sufficient cautionary language in disclaimer that "[a]ctual results may differ materially from those expressed or implied, as a result of certain risks and uncertainties. These risks and uncertainties are described in detail in the company's [SEC] filings. Prospective investors are cautioned not to place undue reliance on such forward-looking statements"); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) (finding that the following language adequately cautioned investors: "these prepared remarks contain forward-looking statements concerning future financial performance and guidance ... management may make additional forward-looking statements in response to questions, and ... factors like Cutera's ability to continue increasing sales performance worldwide could cause variance in the results."). The cautionary language in the SEC filings mentions potential delays and complications in developing the technology and explains that certain features such as autopilot and FSD may take longer than expected. This precisely addresses the alleged misrepresentations. Indeed, "[t]he PSLRA safe harbor demands only that companies warn of risks that might cause actual results to differ from forward-looking predictions ... [.]" *In re Intel Corp.*, 2023 WL 2767779, at \*14 (citing 15 U.S.C. § 78u-5(c)(1)(A)). As Defendants have done that with respect to Statements 5, 9-12, 15, 18, 23, 26, and 29, the Court

Lamontagne v. Tesla, Inc., Slip Copy (2024)
2024 WL 4353010

finds that those statements are protected under the PSLRA safe harbor.

**4. Prong Two of the Safe Harbor: Knowledge of Falsity**

This leaves seven statements (Statements 1-3, 14, and 19-21 (FAC ¶¶ 313, 315, 317, 339, 349, 351, 353)), which Defendants contend are protected under the second prong of the PSLRA safe harbor because Plaintiffs have not alleged that the speaker knew that the statements were false or misleading.[13] "Even if a forward-looking statement is not accompanied by adequate cautionary language, it is protected by PSLRA's safe harbor if the speaker did not have 'actual knowledge' that the statement was false or misleading." *In re Quality Sys.*, 865 F.3d at 1149; *see Cutera*, 610 F.3d at 1112-13 (explaining that "actual knowledge" and "cautionary language" safe harbor prongs are disjunctive). Plaintiffs argue that for the same reasons they have sufficiently alleged scienter, they have alleged knowledge of the statements' falsity. Opp. at 20. As discussed in the scienter section below, Plaintiffs have not alleged that Musk had knowledge that his statements were false. Thus, the remaining forward-looking statements, Statements 1-3, 14, and 19-21, are protected under the second prong of the safe harbor.

[13] Defendants also contend that Statements 1-3, 14, and 19-21 (FAC ¶¶ 313, 315, 317, 339, 349, 351, 353), which were not identified as forward-looking or accompanied by forward-looking language, are protected under the "bespeaks caution" doctrine. Mot. at 14-15. The Court cannot agree, as dismissing the pleadings under the bespeaks caution doctrine requires showing that "reasonable minds could not disagree that the challenged statements were not misleading." *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017) (citation omitted). However, the Court need not address whether this doctrine applies, as that Plaintiffs have not adequately alleged knowledge of falsity.

**B. Corporate Puffery**

Defendants next argue that several Timeline and Safety Statements, Statements 7, 9-11, 13, 16, 18, and 26 (FAC ¶¶ 325, 329, 331, 333, 337, 343, 347, 363), are nonactionable statements of corporate puffery and optimism. Mot. at 15, 19. In the Ninth Circuit, "vague, generalized assertions of

corporate optimism or statements of 'mere puffing' are not actionable material misrepresentations under federal securities laws" because no reasonable investor would rely on such statements. *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1063 (N.D. Cal. 2012) (citations omitted); *see In re Nimble Storage, Inc. Sec. Litig.*, 252 F. Supp. 3d 848, 854 n.8 (N.D. Cal. 2017), *aff'd*, 756 F. App'x 779 (9th Cir. 2019) ("[A]lleged optimistic statements indicating that a company is 'on track' to meet a certain goal are, without more, inactionable puffery."). This is because "[w]hen valuing corporations, ... investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *In re Cutera*, 610 F.3d at 1111. However, even "general statements of optimism, when taken in context," may be misleading "when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys.*, 865 F.3d at 1143 (citation omitted).

**\*9** Defendants argue that the Timeline Statements that FSDC technology "appear[ed] to be on track," would be available "aspirationally by the end of the year," and Tesla was "aiming to release [it] this year," Statements 10, 11, and 18 (FAC ¶¶ 331, 333, 347), were nonactionable statements of corporate puffery and optimism. Mot. at 15. Plaintiffs contend that the statements provided a "concrete description" of the state of Tesla's technology in a way that misled investors. Opp. at 18 (citing *In re Okta, Inc. Sec. Litig.*, 2023 WL 2749193, at *13 (N.D. Cal. Mar. 31, 2023)). These statements about Tesla's aims and aspirations to develop Tesla's technology by the end of the year and Musk's confidence in the development timeline are too vague for an investor to rely on them. *See Nimble Storage*, 252 F. Supp. 3d at 854 n.8. Thus, in addition to being protected under the PSLRA safe harbor, Statements 10, 11, and 18 are nonactionable puffery.[14]

[14] Defendants also point to Statements 9 and 16 (FAC ¶¶ 329, 343) in a footnote. Mot. at 15 n.9. The Court does not address arguments relegated to footnotes. *See Est. of Saunders v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014) ("Arguments raised only in footnotes ... are generally deemed waived.").

Defendants also assert that several Safety Statements are corporate puffery. For example, statements that safety is "paramount" (FAC ¶ 325), Tesla cars are "absurdly safe" (*id.*), autopilot is "superhuman" (FAC ¶ 337), and "we want to get to as close to perfection as possible" (FAC ¶ 363). Mot. at

19. Plaintiffs respond that "super" in "superhuman" is not puffery because it represents that ADT is safer than human and "absurdly safe" conveys greater-than-human safety. Opp. at 12. However, these vague statements of corporate optimism are not objectively verifiable. *See In re Cutera*, 610 F.3d at 1111; *see, e.g., Bodri*, 252 F. Supp. 3d at 924 (statement that the company was "enjoying terrific momentum" which was a "testament to the strength of the GoPro brand" was corporate optimism even though plaintiffs alleged that sales were weak and within days GoPro had cancelled orders). Accordingly, Statement 13 (FAC ¶ 337) is not actionable. Similarly, in Statement 26 (FAC ¶ 363), Tesla states that it wants to get "as close to perfection as possible" and that being safer than a human is a low standard. FAC ¶ 363. As Statement 26 is not objectively verifiable, it is mere puffery. However, Statement 7 (FAC ¶ 325) cannot be dismissed as mere puffery. While describing safety as "paramount" is not objectively verifiable, the rest of the statement explains that safety "bears out in the statistics," describes the "objective numbers" of the low probability of injury, and states "it's really hard to have a serious injury in a Tesla, ... it's quite rare." FAC ¶ 325. Such a statement is more than simply corporate optimism and addresses a "specific aspect[ ] of [Tesla's] operation." *See In re Quality Sys.*, 865 F.3d at 1143. It thus cannot be dismissed on this basis. Similarly, Statement 27 (FAC ¶ 365) (that deploying the technology is "clearly safer than not deploying it") is not mere corporate optimism as it can be objectively verified. [15]

[15] Defendants also argue in a footnote that the statement that Full-Self Driving "will work at a safety level well above that of the average driver this year" is a forward-looking statement. Mot. at 19 n.12 (quoting FAC ¶ 353). The Court does not address arguments made in footnotes. *See Est. of Saunders*, 745 F.3d at 962 n.8.

To recap, Statements 10, 11, 13, 18, and 26 (FAC ¶¶ 331, 333, 337, 347, and 363) constitute nonactionable puffery and the Court dismisses the claims based on those statements. However, the Court does not find that Statements 7, 9, 16, 21, and 27 (FAC ¶¶ 325, 329, 343, 353, 365) are corporate puffery.

### C. Elements of Section 10(b) Claim

**\*10** Having assessed which statements are sheltered by the PSLRA safe harbor or are non-actionable statements of corporate puffery, the Court turns to Defendants' challenge of the sufficiency of Plaintiff's pleadings for each element of the Section 10(b) claim. The Court examines whether Plaintiffs have adequately the elements of Section 10(b) for the remaining 11 statements, Statements 4, 6, 7, 8, 16, 17, 22, 24, 25, 27, and 28.

To state a claim under section 10(b) and Rule 10b-5, a plaintiff must show: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton*, 573 U.S. at 267 (citations omitted). "Rule 9(b) applies to all elements of a securities fraud action, including loss causation." *Oregon Pub. Emps. Ret. Fund*, 774 F.3d at 605.

### 1. False or Misleading

Defendants argue that the remaining 11 statements regarding the safety of autopilot and FSDC features ("Safety Statements") and the capabilities of FSDC technology ("Capability Statements") are not actionable because Plaintiffs have not alleged that they are false or misleading. [16] For a statement to be actionable under the PSLRA it must be false or misleading as well as material. "Under Rule 10b-5, ... a fraudulent omission is a failure to 'state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.' " *Wochos*, 985 F.3d at 1188 (quoting 17 C.F.R. § 240.10b-5(b)). A statement is misleading "if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.' " *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). An omitted fact is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). "The inquiry into materiality is 'fact-specific.' " *In re Alphabet*, 1 F. 4th at 700 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011)). As such, "resolving materiality as a matter of law is generally appropriate 'only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ.' " *Id.* (citation omitted).

The Court does not address Defendants' arguments for dismissing the Timeline Statements here as the Court has already dismissed the claims based on these statements. *Supra* Section A.

The Court considers whether Plaintiffs have alleged that the statements are false or misleading, analyzing the Safety Statements and Capability Statements in turn.

### a. Safety Statements

Defendants argue that several Safety Statements (Statements 4, 7, 13, 15, 21, 24, and 26-28, FAC ¶¶ 319, 325, 337, 341, 353, 359, 363, 365, 367) [17] were not false or misleading. Mot. at 18-20.

- "[W]e publish accidents per mile every quarter, and ***what we see right now is that autopilot is about twice as safe as a normal driver on average.*** And we expect that to increase quite a bit over time." Statement 4 (FAC ¶ 319) (Apr. 22, 2019 Musk at Tesla Autonomy Investor Day) (emphasis in original).

*11
- "*I think safety especially, I think we -- it is paramount for us -- it's like the absolute primary thing is to maximize the safety of the car. So it's like -- and this bears out in the statistics. So it's really hard to have a serious injury in a Tesla, like it's not – it's quite rare*. And when you do look at objective numbers like the NHTSA probability of injury, which is you could get on the Internet, the Teslas have the lowest probability of injury of any car tested. So like if it was possible to have a sixth star, we would have a sixth star. ***It's like -- literally it's absurdly safe***." Statement 7 (FAC ¶ 325) (Jun. 11, 2019 Musk at Annual Meeting).

- "Essentially, passive Autopilot (car intervenes only when crash probability is high) cuts crashes in half. ***Active Autopilot (car is driving itself) cuts crashes in half again***. Doesn't mean there are no crashes, but, on balance, Autopilot is unequivocally safer." Statement 24 (FAC ¶ 359) (Apr. 17, 2021 Musk Tweet); *see also* Statement 26 (FAC ¶ 363).

- "[W]ith respect to autopilot ... we see steady improvements all along the way. And you know, sometimes there's this dichotomy of, you know, should you wait until the car is like, I don't know, three times safer than a person before deploying any technology.

But I think that's that's [*sic*] actually morally wrong at the point at which we believe that that adding autonomy reduces injury and death, I think you have a moral obligation to deploy it, even though you're going to get sued and blamed by a lot of people, because the people whose lives you saved don't know that their lives are saved .... And it's not going to be perfect. ***But what matters it is, is that it is very clearly safer than not deploying it.***" Statement 27 (FAC ¶ 365) (Sept. 30, 2020 Musk at Tesla Autonomy Investor Day).

- "***So the safety that we're seeing when the car is in FSD mode is actually significantly greater than the safety we're seeing when it is not***, which is a key threshold for going to a wide Beta." Statement 28 (FAC ¶ 367) (Oct. 19, 2022 Musk on Earnings Call).

[17]    Defendants also raise this argument for Statements 13, 15, 21, and 26. The Court does not engage the argument because it has already concluded the claims based on these statements should be dismissed. *Supra* Sections II A(3) and B.

Plaintiffs allege that the high rate of driver interventions demonstrates that Tesla's ADT was not safer than humans, as humans had to take control to avoid crashes. Opp. at 11 (citing FAC ¶ 212). In addition, Plaintiffs reference research showing thousands of deficiencies in Tesla's ADT where it fails to safely complete basic driving tasks, FAC ¶ 210, and note that Tesla has more incidents, more severe crashes, and certain types of crashes (such as accelerating on an exit-ramp) than previously reported. FAC ¶¶ 204-05, 217-19. [18] Plaintiffs allege that Musk's recent statements indicate that ADT is not yet safer than humans (e.g., Musk would be "shocked if we do not achieve full self-driving safer than a human this year," and after the Class Period that "I think we'll be better than human by the end of this year," FAC ¶ 188). Plaintiffs allege that various articles show that Autopilot and self-driving technology led to crashes in Teslas. FAC ¶¶ 191-203. For example, a June 10, 2023, Washington Post article (from after the Class Period) indicates that Tesla's autopilot had "far more" crashes than previously reported and that a NHTSA Senior Safety Advisor commented that "Tesla is having more severe – and fatal – crashes than people in a normal data set." FAC ¶ 204.

[18]    Plaintiffs also detail the large gap between Tesla's current autonomous driving technology and what

Lamontagne v. Tesla, Inc., Slip Copy (2024)

2024 WL 4353010

is required to achieve a Level 4-5 system. FAC ¶¶ 260-302.

**\*12** Defendants argue that articles from after the Class Period about general safety issues do not show that the Safety Statements were false when made. Mot. at 20. In order to satisfy the PSLRA's "exacting requirements for pleading 'falsity," a plaintiff must plead "specific facts" indicating why a statement is false. *Metzler*, 540 F.3d at 1070. Plaintiffs allege that there were safety issues with the technology, "people looked away from the road 18% more often" with autopilot, FAC ¶ 197, and autopilot features caused at least ten car accidents during an unspecified period, FAC ¶¶ 204-05. However, Plaintiffs fail to provide "contemporaneous reports or data" showing that the statement was false or misleading when made. *Nursing Home Pension Fund Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004). Even if this data existed at the time the statements were made, the fact that there were safety issues with the technology does not suggest that it was false or misleading to assert that the technology was safer than regular human driving. *See Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1275 (N.D. Cal. 2019) (dismissing claims where plaintiff "fail[ed] to connect the statements with factual allegations that show how the statements were false or misleading when made"). For example, Plaintiffs allege that the NTSB found that Tesla's autopilot was a "probable cause" of a deadly March 2018 crash and an August 2019 crash. FAC ¶ 206. However, such findings do not contradict statements that Autopilot cut crashes in half or that using it was safer than not using it.[19] Accordingly, Plaintiffs have not alleged that the Safety Statements were false or misleading, and the Court dismisses with leave to amend the claims based on Statements 4, 7, 13, 15, 21, 24, 26, 27, and 28 (FAC ¶¶ 319, 325, 337, 341, 353, 359, 363, 365, 367).

---

[19]     Indeed, Statement 24 states that Autopilot "cuts crashes in half" but that "[d]oesn't mean there are no crashes ... [.]" Statement 24 (FAC ¶ 359).

### b. Capability Statements

Defendants next argue that Plaintiffs have not alleged that the Capability Statements about the FSDC technology, Statements 6, 16, 17, 18, 20, 22, 23, 25, and 29 (FAC ¶¶ 323, 343, 345, 347, 351, 355, 357, 361, 369), were false or misleading. Mot. at 20-21. Musk stated that the Full Self-Driving software is "almost getting to a point where I can go from my house to work with no interventions" (FAC

¶ 343), "[t]he latest build is capable of zero intervention drives" (FAC ¶ 345), the "car should still be able to drive, just like a person. That is the system that we are developing and aiming to release this year" (FAC ¶ 347), Musk drives the alpha build of the latest fully self-driving software and "many times I can go through a very complicated series of intersections and narrow roads, without ever touching any of the controls" (FAC ¶ 351), it is "very common for me to have no interventions on drives that I do, including drives to a place that I've never been to" (FAC ¶ 355), and "I think we'll also have an update next year to be able to show regulators that the car is safer, much safer than the average human" (FAC ¶ 369); *see also* FAC ¶¶ 323, 357, 361. Plaintiffs allege that these statements are materially misleading because numerous safety issues demonstrate that Tesla did not possess Level 4-5 autonomy, Tesla disclosed to regulators that it remained "firmly" at Level 2, the confidential witness[20] allegations show that Tesla's ADT had not reached Level 4-5 autonomy, and Tesla faced functionality and dependability problems. Opp at 13 (citing FAC ¶¶ 222-34, 236-47, 260-84). However, "the reasons Plaintiffs offer as to why the statements are false or misleading bear no connection" to the substance of the Capability Statements, and do not allege that the software was not capable of no intervention drives. *See Jui-Yang Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at \*15 (N.D. Cal. Apr. 27, 2017). The only factual allegations that are connected to the Capability Statements are CW-2's statements that it was "absolutely" known within the autopilot department that Musk's statements about the viability of autopilot and FSD technologies were "exaggerations." FAC ¶¶ 243-44. However, such allegations are too vague to show that Musk's statements were false or misleading. *See Intuitive Surgical*, 759 F.3d at 1063. Accordingly, the Court dismisses the claims based on the Capability Statements.

---

[20]     Confidential witnesses are identified in the FAC as CW-1, CW-2, CW-3, and CW-4. FAC ¶ 235 n.8.

### 2. Strong Inference of Scienter

Defendants also challenge the sufficiency of Plaintiffs' allegations with respect to scienter. Scienter is the intent to deceive, manipulate or defraud. *Tellabs*, 551 U.S. at 319. To establish scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). The required state of mind is "a mental state that not only covers 'intent to deceive, manipulate, or defraud,' but also

'deliberate recklessness.' " *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (internal citations omitted). Deliberate recklessness is " 'an *extreme* departure from the standards of ordinary care,' which 'presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it.' " *In re Alphabet*, 1 F. 4th at 701 (emphasis in original) (quoting *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020)).

**\*13** The "strong inference" required by the PSLRA "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs*, 551 U.S. at 324. "Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness." *In re VeriFone Holdings*, 704 F.3d at 701. "A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco Partners*, 552 F.3d at 991 (9th Cir. 2009); *see Nguyen*, 962 F.3d at 415 (9th Cir. 2020). In evaluating whether a complaint satisfies the "strong inference" requirement, courts must consider the allegations and other relevant material "holistically," not "scrutinized in isolation." *In re VeriFone Holdings*, 704 F.3d at 701-02 (citing *Tellabs*, 551 U.S. at 323, 326). If no individual allegation is sufficient, the court "conducts a 'holistic' review to determine whether the allegations combine to give rise to a strong inference of scienter." *Glazer*, 63 F.4th at 766 (citation omitted). Because scienter is a subjective inquiry, "the ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity." *Gebhart v. S.E.C.*, 595 F.3d 1034, 1042 (9th Cir. 2010).

Plaintiffs allege scienter based on: (1) confidential witness accounts; (2) Musk's access to data about Tesla's Autonomous Driving Technology; (3) the core operations doctrine; (4) Musk's motives to inflate the stock price; and (5) Musk's history of fraud. The Court addresses each below. At their core, the allegations do not allege a strong inference of scienter because they fail to show that Defendants knew the statements were false, or indeed that there existed contemporaneous data about the capability and safety of the technology at the time the statements were made.

#### a. Confidential Witness Accounts

Plaintiffs allege that confidential witness statements raise a strong inference of scienter. "Where the plaintiff relies upon statements by confidential witnesses, the complaint must also pass two additional hurdles." *In re Quality Sys.*, 865 F.3d at 1144. "First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge." *Zucco Partners*, 552 F.3d at 995. "Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.* Defendants argue that none of the confidential witnesses offer sufficiently specific testimony to raise a strong inference of scienter. Mot. at 24-26. The Court addresses the confidential witness allegations, and whether they support an inference of scienter.

CW-1 only worked for Tesla for six months, and thus did not have "personal knowledge" about the FSDC technology for the majority of the Class Period. FAC ¶ 236. CW-1 alleges that "accident and safety data was reviewed by Tesla" and full-self driving was in beta and faced errors such as phantom braking. FAC ¶¶ 237, 240-41. While these allegations show that Tesla faced issues in its development of the technology, they are not "indicative of scienter," *see Zucco Partners*, 552 F.3d at 995, as they do not show that Defendants knew their statements about auto safety were false or misleading, *see Gebhart*, 595 F.3d at 1042.

CW-2 alleges that it was "absolutely" known within Tesla's "autopilot department" that Musk's statements about the viability of FSD and autopilot were "exaggerations," and "everyone" knew the vehicles were not close to being full self-driving. FAC ¶ 244. CW-2 does not explain how he knew such information. Indeed, CW-2 does not explain how or why "everyone" knew that the technology was not close to full self-driving. Such "unreliable hearsay and ... conclusory assertions of scienter" are too lacking in factual allegations to support an inference of scienter. *See Zucco Partners*, 552 F.3d at 996.

**\*14** CW-3 states that there were issues with the FSDC prototypes that needed to be worked out, and Musk received regular reports and updates regarding the engineering team's work. FAC ¶¶ 248-53. Defendants argue that there is no detail about what the reports reflected, who attended the

meetings, when they occurred, or what was said. Mot. at 25. The Court agrees that without more specificity, it cannot find that Musk's receipt of unspecified reports and updates from the engineering team are indicative of a strong inference of scienter. *See In re Silicon Storage Tech., Inc., 2006 WL 648683, at \*11-12 (N.D. Cal. Mar. 10, 2006)* (no scienter where plaintiffs failed to cite specific report, mention date or contents of report, or allege sources of information on report); *Intuitive Surgical, 759 F.3d at 1063* (witness statements lacked foundation where they did "not detail the actual contents of the reports the executives purportedly references or had access to"). CW-3 also stated that "if there was a major regression regarding safety, operations, or driver comfort," it would have been reported to certain individuals who reported to Musk. FAC ¶ 255. However, CW-3 does not allege that any such regression occurred. "[N]egative characterizations of reports relied on by insiders, without specific reference to the contents of those reports, are insufficient to meet the heightened pleading requirements of the PSLRA." *Intuitive Surgical, 759 F.3d at 1062-63* (rejecting "impressions of witnesses who lacked direct access to the executives") (quoting *Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1036 (9th Cir. 2002)*). Accordingly, these vague allegations do not support scienter.

### b. Musk's Access to Information

Plaintiffs next argue that Musk's access to information about Tesla's autonomous driving technology establishes a strong inference of scienter. Opp. at 24-25; *see* FAC ¶¶ 252, 256, 405-06, 419. While "detail-oriented management style" supports scienter, *Nursing Home Pension Fund, 380 F.3d at 1234* (statements that "I love getting involved in every detail of the business" and that executive monitored portions of the global database supported scienter), Plaintiffs fail to connect Musk's hands-on management with any information that he allegedly learned rendering his statements false or misleading. For example, Plaintiffs allege that Tesla employees declined to test the ADT because they did not want to be "test dummies" and that Tesla had access to video feeds from its vehicles which it used to track problems (FAC ¶¶ 241, 248-56, 414, 416). However, there is no indication that Musk viewed these videos or that they rendered his statements false or misleading.

Plaintiffs also repeatedly reference the DMV letter that Tesla was not developing City Streets above a Level 2 autonomy and that Musk's Level 5 tweet did not match engineering reality (but that Tesla could not say whether it was possible by the end of the year). These allegations are not enough to rise to the level of a strong inference of scienter because Plaintiffs have not alleged that statements about City Streets technology applied to all of Tesla's ADT, and Tesla was equivocal in whether it could achieve Level 5 autonomy by the end of the year. FAC ¶¶ 28-29. *See Wochos, 985 F.3d at 1194* (statements from former Tesla employees who told Musk that they believed Tesla's goal of producing 5,000 Model 3s per week by the end of 2017 was impossible did not show that Tesla or Musk "shared," "adopted," or "accepted" those employees' views that the goal was impossible"). [21] In addition, as discussed above, allegations that "everyone" knew about problems with the technology and that its viability was an "exaggeration" (FAC ¶¶ 243-44, 415) are not "particularized allegations" showing that Musk knew that Tesla could not achieve its goals in the timeline it projected. *See City of Dearborn Heights Act 345 Police & Fire Ret. Syst. v. Align Tech., 856 F.3d 605, 620 (9th Cir. 2017).* Accordingly, Plaintiffs have not raised a strong nference of scienter.

[21] Plaintiffs also point to an expert analysis showing that Tesla still faces many obstacles to releasing Level 4-5 ADT. Opp. at 9 (citing FAC ¶¶ 260-302). However, Plaintiffs do not indicate that such information was learned by Tesla or Musk at the time the statements were made.

### c. Core Business

Plaintiffs also contend that Tesla's autonomous driving technology was core to its business, raising a strong inference of scienter. The "core operations" doctrine allows the knowledge of certain facts that are critical to a business's "core operations" to be attributed to a company's key officers. *Webb v. Solarcity Corp., 884 F.3d 844, 854 (9th Cir. 2018).* "Proof under this theory is not easy. A plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring ... or witness accounts demonstrating that executives had actual involvement in creating false reports." *Intuitive Surgical, 759 F.3d at 1062.* "[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud." *Metzler, 540 F.3d at 1068.* Musk's admitted importance of the self-

driving technology (describing self-driving technology as the "difference between Tesla being worth a lot of money or basically worth zero," FAC ¶ 56) coupled with Musk's involvement in the minutiae of Tesla's ADT supports an inference of Musk's awareness of relevant facts. *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008). As with the previous scienter arguments, however, Plaintiffs do not show what information showed that Musk knew that his predictions about the timeline of FSD development, its capabilities, or its safety were false or misleading.

### d. Motive Allegations from Stock Sales

**\*15** Plaintiffs also highlight Musk's financial motives to mislead investors. Although "evidence of a personal profit motive on the part of officers and directors ... is insufficient to raise a strong inference of scienter," *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008), "personal financial gain may weigh heavily in favor of scienter." *Tellabs*, 551 U.S. at 325. "[S]tock sales by corporate insiders [are] suspicious only when [they are] dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Dearborn Heights*, 856 F.3d at 621 (internal quotation marks and citation omitted). When analyzing insider trading, courts look to "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.* (citations omitted).

Here, Plaintiffs allege that during the Class Period, Musk sold over 141 million Tesla shares, collecting nearly $34 billion in profit. FAC ¶¶ 33, 425-26. These sales were 239% greater in volume, and 6,345% greater in value, than Musk's trading over the same timespan prior to the Class Period. FAC ¶¶ 430-31. The average price of his sales was 70% higher than the Class Period average, and Musk sold 44.8% of the stock he had available for sale. FAC ¶¶ 429, 432-33. The fact that Musk sold a substantial number (141 million) and percentage (44.8%) of shares, and that the sales were not consistent with prior trading history, supports an inference of scienter. *See Dearborn Heights*, 856 F.3d at 621; *cf. Intuitive Surgical*, 759 F.3d 1063-64 (significant profits did not raise inference of scienter because the complaint did not contain allegations regarding the defendants' prior trading history).

However, as Defendants emphasize, the stock sales (over a four-year period) were not linked to any purported

misstatement or corrective disclosure, and the timing of sales undermines any inference of scienter. Mot. at 28-29. For example, Plaintiffs do not allege that Musk sold any stocks until more than two years after the first alleged misstatement, and he sold his first stocks after the two alleged corrective disclosures. *See* ECF 57-1, FAC ¶¶ 313, 315 (first alleged misstatements in February of 2019 and first alleged stock sale in November of 2021). This timing does not support an inference of scienter. *See Hoang, et al. v. Contextlogic, Inc., et al.*, 2023 WL 6536162, at \*26 (N.D. Cal. March 10, 2023) ("[s]ales after corrective disclosures do not support an inference of scienter."). Plaintiffs do not respond to this argument apart from reiterating that the sales were "suspiciously timed" because the average price of the sales over the four-year Class Period was 70% higher than the Class Period average. Opp. at 29 (citing FAC ¶¶ 432-33). Given the timing of the sales, any inference of scienter from the higher sale of stocks is not a strong inference and Plaintiffs have failed to carry their burden. *See In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1160 (C.D. Cal. 2007) ("Because Plaintiff has failed to meet his burden of demonstrating that the stock sales are related to the alleged misstatements, he has failed to demonstrate a strong inference of scienter based upon" the sales).

### e. History of Fraud

Plaintiffs also allege that Musk has a history of making misrepresentations to investors with scienter, and that staged videos from 2014 and 2016 support an inference of Musk's scienter. A summary judgment order in a different case held that Musk's 2018 tweet about securing funding for Tesla was misleading and made with scienter. FAC ¶ 423 (citing *In re Tesla, Inc., Sec. Litig.*, No. 3:18-cv-04865-EMC (N.D. Cal. Apr. 1, 2022), ECF No. 387). A 2016 video shows a Tesla driving itself while a driver sat with their hands on their lap and the video stated that the person in the driver's seat "is only there for legal reasons. He is not doing anything. The car is driving itself." FAC ¶ 69. In January 2023, it came to light that Musk was directly involved in creating the 2016 video, which was staged using 3D mapping on a predetermined route. FAC ¶ 69. Plaintiffs offer no authority to explain why such allegations are relevant here or why a video from before the Class Period is relevant. Thus, the summary judgment order and videos cannot support a strong inference of scienter.

#### f. Holistic Review

**\*16** Finally, the Court holistically reviews the scienter allegations, as required by *Tellabs*, 551 U.S. at 322-23. Plaintiffs' allegations show that Tesla's vehicles face numerous limitations that they need to overcome to achieve full self-driving and that Defendants were generally aware that various issues existed. FAC ¶¶ 260-84. However, the FAC lacks allegations describing with particularity the documents to which Musk had access or the documents he received indicating that the software was not capable of no-intervention drives, that full self-driving was not possible within the projected timeframe, or that autopilot was not safer than humans.

In *Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020), the Ninth Circuit held that plaintiffs' theory that defendants promised FDA approval that they knew would not be possible because of migration problems "does not make a whole lot of sense," and relies on the "supposition that defendants would rather keep the stock price high for a time and then face the inevitable fallout" when the migration problem was revealed. *Id.* at 415. The Court reasoned that if defendants had "sought to profit from this scheme in the interim, such as by selling off their stock or selling the company at a premium, the theory might have more legs," but there were no such factual allegations. *Id.* Here, Plaintiffs' profit motive theory makes little sense given that there are no allegations that Musk sold significant amounts of stock right after a purported misstatement, and in fact the allegations show that he sold stock months after corrective disclosures. Moreover, like in *Nguyen*, Plaintiffs' theory that Defendants knew that the software was not safe, not capable of what they alleged, and would not be achieved in the projected timeframe would have inevitably been revealed when Defendants missed their development timeline. Accordingly, the Court finds that Plaintiffs have failed to allege a strong inference of scienter and the Court dismisses the Section 10(b) claim.[22]

[22] Because the Court finds that the Section 10(b) claims fail for lack of scienter, it does not address the parties' arguments regarding loss causation.

### III. SECTION 11 CLAIM UNDER ITEMS 105 AND 303

Plaintiffs also bring a claim under Section 11 for failure to comply with Items 303 and 105. Defendants moves to dismiss this claim. Item 303 requires disclosure of any known material "trends or uncertainties," 17 C.F.R. § 229.303 ("Item 303"). Item 105 requires affirmative disclosure of the "material factors" that made investment "risky," 17 C.F.R. § 229.105 ("Item 105"). *See Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296-97 (9th Cir. 1998) (an Item 303 violation automatically states a claim for a Section 11 violation); *Sundaram v. Freshworks Inc.*, 2023 WL 6390622, at \*7 (N.D. Cal. Sept. 28, 2023) (citing cases) (treating violations of Items 105 and 303 as a violation of Section 11).

"To state a Section 11 claim for failing to adhere to Item 303, Plaintiffs must plausibly allege: (1) the existence of a trend or uncertainty; (2) known to management; (3) that is reasonably likely to have a material effect on the registrant's financial condition or results of operation." *Sundaram*, 2023 WL 6390622, at \*7 (citing *Steckman*, 143 F.3d at 1296-97); *see* 17 C.F.R. § 229.303(b)(2)(ii) (requiring disclosure of any "known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"). Plaintiffs allege that a 2023 article claimed that Tesla's Autopilot was involved in more crashes than previously reported and allege that Teslas were involved in a handful of crashes over a four-year period. FAC ¶¶ 204-05. However, Plaintiffs fail to allege that the safety issues represented a pattern or "trend" requiring disclosure as opposed to isolated incidents. *See In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1263 (N.D. Cal. 2019) ("A trend under Item 303 requires an 'observed pattern that accurately reflects persistent conditions of the particular registrant's business environment.' ") (citation omitted). Accordingly, Plaintiffs' Item 303 claim fails.

**\*17** Defendants argue that Plaintiffs' Item 105 claim fails for the same reason the Item 303 claim fails – that Tesla adequately disclosed the risks it faced. Mot. at 22. Item 105 requires a "discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a). A company's risk disclosures may be misleading where the "risk factors" reported have already materialized. *See Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at \*6 (N.D. Cal. Aug. 7, 2020) (company's financial affairs were materially different than what it represented in its Registration Statement).

Here, the Form 10-K disclosures explain that Tesla vehicles "have been involved and we expect in the future will be involved in accidents resulting in death or personal injury, and such accidents where Autopilot or FSD features are

engaged are the subject of significant public attention. We have experienced and we expect to continue to face claims arising from or related to misuse or claimed failures of such new technologies that we are pioneering." ECF 62-8 (Ex. E) at 9. Plaintiffs argue that the "boilerplate" risk disclosures about the possibility of crashes and regulatory action did not apprise investors of risks. Opp. at 22. However, this language warned investors of the risks Tesla faced, and this type of language has been found in similar cases to constitute sufficient disclosure. *See Golubowski v. Robinhood Mkts.*, 2023 WL 1927616 at *8 (N.D. Cal. Feb. 10, 2023); *see also Sundaram*, 2023 WL 6390622, at *9 (risk disclosures sufficiently warned that the company may experience deterioration in revenue growth, listing potential risks such as the COVID-19 pandemic, level of product demand, errors in forecasting product demand, and a reduction in customer renewal rates). Plaintiffs have not alleged facts that plausibly demonstrate that Tesla's car safety was materially different from what was represented in its risk disclosures. Accordingly, Plaintiffs have not plausibly alleged an Item 105 violation.

## IV. RULE 10B-5(A), (C) CLAIM AND SECTION 20(A)

Plaintiffs also allege a scheme or course of conduct liability against Defendants under Ruel 10-5(a) and (c). FAC ¶¶ 475-83; *see* 17 C.F.R. § 240.10b-5(a), (c) (declaring it unlawful "[t]o employ any device, scheme, or artifice to defraud" or "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security"). Defendants state that they are not liable for any such violation as the theory rests on the same facts and purported misstatements as the Rule 10b-5(b) claim and fails for the same reasons. Mot. at 11 n.3. A scheme liability claim can depend on misstatements that also violate Rule 10b-5(b). *See Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71, 80 (2019) (explaining that subsection (b) and subsections (a) and (c) of Rule 10b-5 do not govern "mutually exclusive[ ] spheres of conduct").

Here, Plaintiffs do not adequately allege a violation of subsections (a) and (c) under either the *Lorenzo* dissemination of fraud theory or a scheme liability theory. Under *Lorenzo*, Plaintiffs must allege that Defendants disseminated "false or misleading information to prospective investors with the intent to defraud." 587 U.S. at 79. For the same reasons

discussed above, Plaintiffs have not adequately alleged any false or misleading statements or scienter, and thus may not proceed under that theory. *See Sneed v. AcelRx Pharms., Inc.*, 2022 WL 4544721, at *6 (N.D. Cal. Sept. 28, 2022). Under scheme liability, which Plaintiffs seem to be pursuing, *see* FAC ¶ 477 ("Defendants engaged in a fraudulent scheme, practice, or course of business ..."), Plaintiffs argue that they are focusing on Defendants' "course of business" in which they persuaded investors that Tesla was close to releasing fully autonomous cars based on the collective totality of the false and misleading statements. Opp. at 23; FAC ¶¶ 72-74. However, Plaintiffs fail to allege sufficient facts showing that Defendants engaged in such a fraudulent scheme to mislead investors. *See Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 902 (N.D. Cal. 2022). Accordingly, the Court dismisses this claim with leave to amend.

## V. SECTION 20(A) CLAIM

**\*18** Plaintiffs bring a claim for a violation of Section 20(a) of the Exchange Act against Musk. FAC ¶¶ 484-490. A Section 20(a) claim requires an underlying violation of securities law. *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012). Because Plaintiffs failed to adequately plead a violation under Section 10(b), the Section 20(a) claim also fails. *See id*. [23]

[23] Defendants only raise the arguments about Section 20(a) in a footnote. Mot. at 11 n.3. The Court does typically not address arguments relegated to footnotes. *See Est. of Saunders*, 745 F.3d at 962 n.8.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion to dismiss with leave to amend. Any amended complaint must be filed by **October 30, 2024**. No additional parties or claims may be added without leave of Court or stipulation of Defendants.

## IT IS SO ORDERED.

**All Citations**

Slip Copy, 2024 WL 4353010

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Universal American Corp. v. Partners Healthcare Solutions Holdings, L.P., D.Del., March 31, 2016

2011 WL 6339824

Only the Westlaw citation is currently available.

NOT FOR PUBLICATION

United States District Court, D. New Jersey.

Ronald MONK, Individually and on Behalf of All Others Similarly Situated, Plaintiff,

v.

JOHNSON & JOHNSON, William C. Weldon, Dominic J. Caruso, Colleen A. Goggins, and Peter Luther, Defendants.

Civil Action No. 10–4841 (FLW).

|

Dec. 19, 2011.

**Attorneys and Law Firms**

James E. Cecchi, Lindsey H. Taylor, James E. Cecchi, Carella Byrne Cecchi Olstein Brody & Agnello, P.C., Roseland, NJ, Darren J. Check, Kessler Topaz Meltzer & Check, LLP, Radnor, PA, for Plaintiff.

Christina Olson, Covington & Burling LLP, New York, NY, for Defendants.

**OPINION**

WOLFSON, District Judge.

**\*1** This securities fraud putative class action complaint includes allegations that certain former and current officers and directors of Johnson & Johnson ("J & J"), and J & J's wholly-owned subsidiary McNeil–PPC, Inc. ("McNeil"), in their communications with and to shareholders, misrepresented and omitted material information about systemic quality control failures at McNeil's over-the-counter ("OTC") drug manufacturing plants. Defendants, J & J, William C. Weldon, Dominic J. Caruso, Colleen A. Goggins, and Peter Luther (collectively, "Defendants") now move to dismiss Plaintiff Ronald Monk's ("Plaintiff's") Amended Complaint, for failure to allege that each defendant possessed the requisite scienter to commit securities fraud. Applying the heightened pleading standards of the Private Securities

Litigation Reform Act of 1995 ("PSLRA") 15 U.S.C § 78u et seq., I conclude that Plaintiff has sufficiently pled scienter with respect to Defendants J & J, Goggins, and Caruso. Plaintiff's scienter allegations against Defendants Weldon and Luther, however, are insufficient; hence those defendants are dismissed from this suit without prejudice and Plaintiff is granted leave to file a Second Amended Complaint in accordance with the dictates of this Opinion.

**I. BACKGROUND**

**A. Facts**

As I must on a motion to dismiss, I take Plaintiff's allegations as true. The Amended Complaint totals 114 pages, and contains 298 numbered paragraphs of facts relating to recalls of OTC medicines manufactured by McNeil as well as the closure of McNeil's Fort Washington, Pennsylvania manufacturing plant. In this background section, I provide an overview of the extensive allegations found in the Amended Complaint and provide further detail about Plaintiff's allegations, where appropriate, in connection with my analysis later in this Opinion.

J & J is a Fortune 500 global health care company incorporated in New Jersey that consists of numerous subsidiaries. *See* Am.Compl., ¶ 23. Through its subsidiaries, J & J manufactures and sells consumer packaged goods, medical devices, and pharmaceutical products. *Id.* The pharmaceutical segment of J & J's business accounts for approximately 36% of J & J's sales, the consumer segment accounts for 38%, and the medical devices segment accounts for 26%. *Id.* at ¶ 29.

McNeil is one of J & J's wholly-owned subsidiaries that sells OTC pharmaceutical products. According to the Amended Complaint, prior to 2007, J & J regulated the manufacture and quality assurance for its subsidiaries' OTC medicines through the pharmaceutical segment. *Id.* at ¶ 31. While seated within the pharmaceutical segment, Plaintiff alleges, the OTC products were subjected to rigorous quality control procedures similar to those to which J & J subjected it prescription medications. *Id.* at p. 32.

In or around January of 2007, Plaintiff alleges that J & J acquired Pfizer Consumer Healthcare ("PCH"), along with PCH's popular OTC medicines-Sudafed, Benadryl, and Zyrtec. *Id.* at ¶ 36. Following the PCH acquisition, according to the Amended Complaint, J & J shifted the regulation and quality assurance of OTC medicines from

2011 WL 6339824

the rigorous pharmaceutical segment to the less-experienced consumer products segment. *Id.* at ¶ 35–37. The consumer division was run by Defendant Colleen Goggins, J & J's Worldwide Chairman of the division, who allegedly had no pharmaceutical background but, rather, "made baby shampoo all her life." *Id.* at ¶ 38. Nevertheless, McNeil proved to be profitable for J & J, generating more than twice the typical 10 percent margin that other J & J subsidiaries generated. *Id.* at ¶ 56.

**\*2** Plaintiff's allegations center on two McNeil facilities at which quality control problems arose during the Class Period of October 14, 2008 through July 21, 2010—the Las Piedras Puerto Rico plant, and the Fort Washington, Pennsylvania plant. Plaintiff's allegations, further, focus on two types of recalls that related to OTC products produced at those plants. The first type of recall is termed as a "phantom recall" of Motrin products. The second type is a traditional recall of various Tylenol-related medicines and children's medicine products. I address each in turn.

### 1. Phantom Recall Allegations

Plaintiff alleges that, on November 20, 2008 at McNeil's Puerto Rico plant, J & J discovered that a batch of Motrin tablets failed to dissolve at the appropriate rate; the tablets dissolved too slowly and were, therefore, less effective. *See id.* at ¶¶ 63, 73. While McNeil notified the Food and Drug Administration ("FDA") about the product failure, *id.,* McNeil allegedly surreptitiously orchestrated a scheme to remove the defective product from stores' shelves without notifying the public of the defect. *Id.* at ¶ 64. According to the Amended Complaint, in March of 2009, McNeil hired a third-party contractor, Inmar, to engage in what the Plaintiff terms a "phantom recall" of the product by purchasing it from store shelves. *Id.* at ¶ 65. Notably, the Amended Complaint alleges that Defendant Peter Luther, the President of McNeil, was aware of the phantom recall because he directed McNeil employees, in an internal J & J memo, to "make this happen ASAP." *Id.* at ¶ 69. Once the FDA became aware of the phantom recall, Plaintiff alleges, the FDA expressed its disapproval in a July 16, 2009 email stating that "it seems your company is doing a recall even though you are calling it a retrieval." *Id.* at ¶ 72.

The phantom recall was not publically announced until over a year after it had been completed. At a hearing before the U.S. House of Representatives Committee on Oversight and Government Reform ("Committee") held on May 27, 2010 ("May Congressional Hearing"), Representative Edolphus

Towns, Chairman of the Committee, questioned Defendant Goggins about the phantom recall. *See* Phillips Decl., Exh. A ("May Cong. Hrg.") at 29. While Defendant Goggins acknowledged that she was aware of McNeil's hiring of Inmar, she testified that she was under the false impression that Inmar was merely taking inventory of what Motrin product remained on the shelves. She was not aware that Inmar was purchasing the product as part of a phantom recall. *Id.*

A second hearing was held on September 30, 2011 ("September Congressional Hearing"), at which Defendant Goggins and Defendant Weldon appeared. *See* Hearing of the House Committee on Oversight and Government Reform, Johnson & Johnson's Recall of Children's Tylenol and other Children's Medicines and the Phantom Recall of Motrin (Part 2), September 30, 2010. [1] At that hearing, Goggins confirmed that she did not know about the phantom recall until she was advised of it by Representative Towns at the May Congressional Hearing. Weldon acknowledged the phantom recall at the hearing, noting that he believed the "McNeil personnel were trying to be transparent with the FDA, ... [n]onetheless, based on what I have learned since the May hearing, including the points that this committee brought to light, it is clear to me that in retrospect, McNeil should have handled things differently ...." *Id.* at 8. Moreover, the Amended Complaint alleges, Weldon admitted that "we made a mistake. We should have notified them that we would be taking these products ... off the shelves." *Id.,* ¶ 246 (emphasis omitted).

[1]   While this document was not submitted by the parties, the Court may take judicial notice of it on this motion because it is a publically available document that is referenced in the Amended Complaint. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997) (internal citations omitted).

**\*3** Plaintiff further alleges that, throughout the Class Period, the Defendants made several misrepresentations and omissions about the phantom recall, which ultimately caused J & J's stock prices to decline when the phantom recall was made public and became the subject of critical news reporting. One example is Defendant Goggins' statement at the May Congressional Hearing that she had no knowledge of the recall aspect of the Motrin retrieval. *See id.* at ¶ 260. In Plaintiff's view, Goggins' testimony was false in light of the internal J & J memo between Luther and other J

2011 WL 6339824

& J executives planning the phantom recall; because those individuals knew, Goggins must have also known or she consciously disregarded the facts in her role as the head of the consumer products group. *Id.* at ¶ 259–60. This, of course, is only one example. Additional examples detailed in the Amended Complaint will be discussed in connection with my analysis below.

### 2. Tylenol-related Recalls

According to the Amended Complaint, J & J's and McNeil's inadequate quality assurance oversight, and J & J's unabated drive to lower costs at the expense of patient safety, caused J & J to recall multiple OTC medicines during the Class Period. The first of these recalls was for the Tylenol product.

Starting in April 2008, J & J began receiving complaints that its Tylenol and other OTC medicines had a musty odor that induced nausea. Am.Compl., ¶ 76. According to the Amended Complaint, a confidential informant ("CW1") states that J & J conducted an internal investigation. *Id.* Despite conducting the investigation, Plaintiff further alleges, J & J failed to initially notify the FDA about the problem. Over a year later, on November 6, 2009, J & J began receiving similar complaints about another Tylenol product, Tylenol Arthritis. J & J discovered that the musty odor emanated from wooden pallets that transported and stored packaging materials at the Puerto Rico plant. *Id.* at ¶¶ 77, 175.

Meanwhile, on January 8, 2010, the FDA issued a Form 483 Inspectional Observations report to McNeil that highlighted deficiencies at the Puerto Rico plant. *Id.* at ¶ 174. The report indicated, among other things, that there had been several product mix-ups where, for example, Tylenol PM Geltabs were mixed in with Children's Tylenol Meltaway packages. According to the Amended Complaint, the FDA noted that product mix-up was a "recurrent observation" and that there was "no assurance" that McNeil was taking the appropriate preventative and corrective actions. *Id.*

Thereafter, on January 15, 2010, McNeil announced its recall of the Motrin and Benadryl brands, again due to the musty odor, *id.* at ¶ 78, and, on that same date, the FDA sent a warning letter to Defendants Weldon and Luther, documenting deficiencies at both the Fort Washington plant and the Puerto Rico plant, from which the musty odor problem originated. *Id.* at ¶ 175. The warning letter stated that J & J "did not conduct a timely, comprehensive investigation," *id.* at p. 81, and that the FDA was "concerned about the response of Johnson & Johnson (J & J) to this matter ...

Neither upper management at J & J nor at McNeil ... assured timely investigation and resolution of the issues." *Id.* at ¶ 84.

### 3. Children's Medicine Recall

 **\*4** According to the Amended Complaint, from June of 2009 through April 2010, the Fort Washington plant received consumer complaints about several children OTC products, including pediatric versions of Tylenol, Motrin, Zyrtec, and Benadryl. *Id.* at ¶¶ 87, 90. These complaints stated that there were "foreign materials, black or dark specs" in the medicines. *Id.* at ¶ 90. As noted, the January 15, 2010 FDA warning letter referenced manufacturing problems at the Fort Washington plant where these medicines were produced. Ultimately, on April 30, 2010, J & J recalled more than 136 million bottles of children's OTC medicines, *id.* at ¶ 87, and, on May 4, 2010, J & J closed the Fort Washington plant. *Id.* at ¶ 91. Several months later, on July 20, 2010, Defendants disclosed that the closing of the plant would cost J & J $600 million in sales during 2010. *Id.* at ¶ 229. In addition, Defendants disclosed that the U.S. Attorney's Office for the Eastern District of Pennsylvania had issued a grand jury subpoena regarding the recalls [2] . *Id.* at ¶ 100.

[2]    In March of 2011, the U.S. Attorney's Office and McNeil entered into a Consent Decree of Permanent Injunction which prohibited the Fort Washington plant from reopening until brought into strict compliance with the FDA's directives. *See id.* at ¶ 105.

Plaintiff alleges that it was not until J & J received the January 15, 2010 FDA warning letter that it chose to initiate the recall, yet a McNeil spokesperson stated that it was J & J's investigation of consumer complaints that led to the recall. *Id.* at ¶ 88. While Plaintiff alleges that this McNeil statement is misleading, it is not clear from the Amended Complaint, however, that any of the Defendants in this action made that statement. *Id.*

As with the phantom recall allegations, Plaintiff alleges that recall of the children's medicines was discussed at the May Congressional Hearing. Several congressmen and women expressed their concern over the recall, with Chairman and Representative Towns noting that J & J's actions "paint[ ] a picture of a company that is deceptive, dishonest, and has risked the health of many of our children." *Id.* at ¶ 96. The topic was, again, addressed at the September Congressional Hearing, where Defendant Weldon stated that "in 2008, there were adverse events that we knew." *Id.* at ¶ 104; Sept.

Monk v. Johnson & Johnson, Not Reported in F.Supp.2d (2011)

2011 WL 6339824

Cong. Hrg. at 20. Plaintiff alleges that this statement fails to acknowledge, i.e., omits, the true cause of the recalls—J & J's alleged reckless cost-cutting practices. *Id.* at ¶ 104.

Plaintiff further alleges that Defendant Dominic J. Caruso misrepresented the systemic nature of the quality control problems at McNeil, by stating in a May 11, 2010 investor conference that McNeil's deficiencies were limited to the Fort Washington plant. *See id.* at¶ 11. Finally, the Amended Complaint includes allegations that the Defendants misrepresented, and omitted from their public statements, that J & J engaged in reckless cost cutting that sacrificed the quality of the OTC products produced at both McNeil plants. *See e.g.,* Am.Compl., ¶ 251 (discussing Defendant Caruso). In Plaintiff's view, the Defendants were obligated to inform shareholders about the extent of J & J's cost-cutting practices, and that all statements suggesting that J & J was successful or profitable are misleading. *See e.g., id.* at ¶ 179. Plaintiff further alleges that statements failing to acknowledge that McNeil's product recalls were a result of the cost-cutting practices is also misleading. *See e.g., id.* at ¶ 251.

**\*5** Lastly, I note here Plaintiff's allegation that FDA's compliance staff held a meeting with Defendants Goggins and Luther "and other Company executives" on February 19, 2010. *Id.* at ¶ 186. At that meeting, the FDA challenged J & J's and McNeil's response to the quality control problems at McNeil's Puerto Rico plant, and queried whether there was a culture of compliance at J & J. *Id.* at ¶¶ 186, 189. Other than alleging that Defendants Goggins and Luther attended the meeting, the Amended Complaint does not specify which executives were present.

In addition, the Amended Complaint includes allegations from six confidential witnesses, CW 1 through CW6. These witnesses include CW 1, a former Quality Control Manager at McNeil who worked during 2007 and 2008 as a supervisor of McNeil quality control employees. *Id.* at ¶ 32. CW2 is described in the Amended Complaint as an employee who reported to a Former Director of Quality at McNeil, Bob Miller. *Id.* at ¶ 34. According to the Amended Complaint, CW3 is a former Direct of Quality at McNeil who worked there from early 2005 through early 2008. *Id.* at ¶ 41. CW4 is described as a former "Risk Management" employee who worked in the Quality Assurance department at McNeil for many years, through 2008. *Id.* at ¶ 49. In addition, CW5 is described as "a former McNeil Quality Assurance Supervisor from 2000 through early 2009 who was responsible for cGMP compliance and investigations of quality control at

McNeil." *Id.* at ¶ 52. The Amended Complaint describes CW6 as a former J & J employee who worked in McNeil's Quality Assurance Science department from 2007 through late 2010. *Id.* at ¶ 89. Most of these allegations revolve around observations the confidential witnesses made while employed at McNeil or J & J and, in some instances, conversations they participated in or overhead amongst their fellow employees and supervisors. The confidential witness statements are discussed in more detail in my analysis, where relevant.

**B. Procedural History**

The instant suit was filed by Plaintiff Monk on September 21, 2010, as a putative class action, seeking to represent J & J shareholders. Several months later, on March 11, 2011, he filed an Amended Complaint. In the Amended Comlaint, he asserts a securities fraud claim under Rule 10b–5 against all Defendants in Count I, and a Section 20(a) claim under the Securities Exchange Act of 1934, against Defendants Weldon, Caruso, and Goggins in Count II. Defendants jointly move to dismiss both of Plaintiff's claims.

**II. STANDARD OF REVIEW AND LEGAL STANDARDS**

**A. Motion to Dismiss Standard**

In reviewing a motion to dismiss for failure to state a claim under 12(b)(6), a court must take all allegations in the complaint as true, viewed in the light most favorable to the plaintiff "and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir.2008) (citation and quotations omitted). In *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court "retired" the language in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 550 U.S. at 561 (quoting *Conley,* 355 U.S. at 45–46). Rather, the factual allegations in a complaint "must be enough to raise a right to relief above the speculative level." *Id.* at 555. In short, "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside,* 578 F.3d 203, 211 (3d Cir.2009).

**Monk v. Johnson & Johnson, Not Reported in F.Supp.2d (2011)**

2011 WL 6339824

### B. Pleading Requirements of a 10b–5 Claim

#### 1. Elements of a10b–5 Claim

**\*6** The Securities Act of 1933, 48 Stat. 74, as amended, 15 U.S.C. § 77a *et seq.,* ("Securities Act") and The Securities Exchange Act of 1934, 48 Stat. 881, as amended, 15 U.S.C. § 78a *et seq.,* were enacted, respectively, to ensure "full and fair disclosure of the character of securities sold in interstate and foreign commerce and through the mails, and to prevent frauds in the sale thereof ..." *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 725, 728, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), and "to provide for the regulation of securities exchanges and of over-the-counter markets operating in interstate and foreign commerce and through the mails, to prevent inequitable and unfair practices on such exchanges and markets ..." *Id.* at 728.

Rule 10b–5 provides, in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange.

> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

> in connection with the purchase or sale of any security.

17 CFR § 240.10b–5.

A cause of action under Rule 10b–5 consists of the following elements: "(1) a material misrepresentation ...; (2) scienter, i.e., [defendant's] wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to ... as 'transactional causation'; (5) economic loss; and (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); *McCabe v. Ernst & Young, LLP,* 494 F.3d 418, 424 (3d. Cir.2007); *In re Bradley Pharms., Inc. Secs. Litig.,* 421 F.Supp.2d 822, 826 (D.N.J.2006). In this case, Defendants

submit that Plaintiff's allegations of misrepresentations and omissions under 10(b)–5 lack allegations of a strong inference of scienter.

#### 2. PSLRA Heightened Pleading Standard

In reviewing a motion to dismiss under Fed.R.Civ.P. 12(b)(6), "the court must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party." *In re Intelligroup Securities Litigation,* 527 F.Supp.2d 262, 275 (D.N.J.2007); *Allegheny Gen. Hosp. v. Philip Morris, Inc.,* 228 F.3d 429, 434–35 (3d Cir.2000); *see also* Fed.R.Civ.P. 12(b)(6).[3] However, when the allegations are grounded in fraud, this standard is heightened by Fed.R.Civ.P. 9(b). This Rule requires that allegations of fraud must be plead with particularity,[4] and it has been "rigorously applied in securities fraud cases." *Id.* (*quoting Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1417 (3d Cir.1997)).

[3]  As a general matter under Rule 12(b)(6), a court may not consider matters extraneous to the pleadings without treating the motion as one for summary judgment and giving all parties reasonable opportunity to present materials pertinent to such a motion under Rule 56. An exception is made, however, for a "document integral to or explicitly relied upon in the complaint," and it has been long established that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1426 (internal citations omitted.) In securities fraud actions, it is equally well-established that a court may consider public filings such as quarterly and annual reports filed with the SEC, *Oran v. Stafford,* 226 F.3d 275, 289 (3d Cir.2000), and the Supreme Court has explicitly directed courts to consider such documents in assessing whether a plaintiff has sufficiently pled scienter. *See Tellabs,* 553 U.S. at 322.

[4]  Rule 9(b) reads, in pertinent part, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b).

2011 WL 6339824

**\*7** To this end, Congress enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA") 15 U.S.C § 78u et seq. The purpose of requiring particularized pleadings is to prevent abusive securities litigations. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 313, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) ("Private securities fraud actions, however, if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law"); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71, 81, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006) (identifying "ways in which the class-action device was being used to injure the entire U.S. economy" and listing examples such as "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and manipulation by class action lawyers of the clients whom they purportedly represent ...") (internal quotes and citations omitted).

The PSLRA provides two distinct pleading requirements, both of which must be met in order for a complaint to survive a motion to dismiss. *Institutional Investors Group v. Avaya, Inc.,* 564 F.3d 242, 252 (3d. Cir.2009). First, under 15 U.S.C. § 78u–4(b)(1), the complaint must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Winer Family Trust v. Queen,* 503 F.3d 319, 326 (3d Cir.2007) (construing 15 U.S.C. § 78u–4(b)(1)). Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).[5]

[5] The PSLRA states, in pertinent part:
(b) Requirements for securities fraud actions
(1) Misleading statements and omissions
In any private action arising under this chapter in which the plaintiff alleges that the defendant-
(A) made an untrue statement of a material fact; or
(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
(2) Required state of mind
In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.
15 U.S.C.A. § 78u–4(b)(1), (2).

Both provisions of the PSLRA require facts to be pled with "particularity." *Avaya,* 564 F.3d at 253. This particularity language "echoes precisely Fed.R.Civ.P. 9(b)." *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 534 (3d Cir.1999); *see* Fed.R.Civ.P. 9(b) ("[A] party must state with particularity the circumstances constituting fraud or mistake."). Indeed, although the PSLRA replaced Rule 9(b) as the pleading standard governing private securities class actions, Rule 9(b)'s particularity requirement "is comparable to and effectively subsumed by the requirements of [§ 78u–4(b)(1) of] the PSLRA." *Avaya,* 564 F.3d at 253 (citations omitted). This standard "requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story." *Advanta,* 180 F.3d at 534 (internal quotation marks omitted).

**3. Scienter**

While the PSLRA standard is generally similar to Rule 9(b), "the PSLRA's requirement for pleading scienter ... marks a sharp break with [the] Rule 9 ...." *Id.* Under § 78u–4(b)(2), "a plaintiff can no longer plead the requisite scienter element generally, as he previously could under Rule 9(b)." *Id.* (citing *Mizzaro v. Home Depot, Inc.,* 544 F.3d 1230, 1238 (11th Cir.2008)); *see* Fed.R.Civ.P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). Instead, under the PSLRA's "[e]xacting" pleading standard for scienter, "any private securities complaint alleging that the defendant made a false or misleading statement must ... state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs,* 551 U.S. at 313 (internal quotation marks omitted).

**\*8** A "strong inference" of scienter is one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 2504–05; *see also id.* at 2510 ("The inference that the defendant acted with scienter need

not be irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences" (internal quotation marks omitted)). The pertinent question is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 2509; *see also id.* at 2511 ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."). Omissions and ambiguities "count against inferring scienter." *Id.* at 2511.

Simply put, in finding scienter, "[i]t will ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Avaya,* 564 F.3d at 269 (citing *South Ferry LP v. Killinger,* 542 F.3d 776, 784 (9th Cir.2008) (*"Tellabs* counsels us to consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation.")); *see also In re Cabletron Sys., Inc.,* 311 F.3d 11, 32 (1st Cir.2002) ("Each securities fraud complaint must be analyzed on its own facts; there is no one-size-fits-all template.").

### 4. Circumstantial Evidence of Conscious Misbehavior or Recklessness

A plaintiff alleging a strong inference of scienter from circumstantial evidence must sufficiently plead "defendants' knowledge of facts or access to information contradicting their public statements.... [*i.e.,* that] defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *In re Campbell Soup Co. Sec. Litig.,* 145 F.Supp.2d 574, 599 (D.N.J.2001). However, where plaintiffs "choose to establish[ ] scienter ... by asserting circumstantial evidence of intent or recklessness, 'the strength of the circumstantial allegations must be [even] greater.' " *Intelligroup,* 527 F.Supp.2d at 285 (*quoting Kalnit v. Eichler,* 264 F.3d 131, 142 (2d Cir.2001)). The allegations of circumstantial evidence must be supported by detailing, with particularity, "the who, what, when, where and how" of the events at issue and present clear facts verifying plaintiff's deductions with respect to defendant's state of mind. *Burlington,* 114 F.3d at 1422 (citation omitted); *see also Ronconi v. Larkin,* 253 F.3d 423, 437 (9th Cir.2001) (finding that a temporal proximity of events, standing alone, is insufficient circumstantial evidence). Moreover, as noted, the totality of circumstantial facts alleged must give rise to an inference of scienter "at least

as compelling as any opposing inference one could draw from the facts." *Tellabs,* 127 S.Ct. at 2510.

**\*9** "Conscious misbehavior is alleged by 'stating with particularity facts giving rise to a strong inference of conscious wrongdoing, such as intentional fraud or other deliberate illegal behavior.' " *Aviva Partners LLC v. Exide Techs.,* No. 05–3098, 2007 U.S. Dist. LEXIS 17347, at \*26, 2007 WL 789083 (D.N.J. Mar. 13, 2007) (quotations omitted). Recklessness is conduct that represents "an extreme departure from the standards of ordinary care ... which represents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Suprema,* 438 F.3d at 276. Again, the key inquiry is whether "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Campbell Soup,* 145 F.Supp.2d at 599 (quotations omitted).

### 5. Confidential Witness Allegations

In order to rely on the statements of a confidential witness for the purpose of pleading scienter, the plaintiff must allege: (1) the time period that the confidential source worked at the defendant-company, (2) the dates on which the relevant information was acquired, and (3) the facts detailing how the source obtained access to the information. *Intelligroup,* 527 F.Supp.2d at 290 (citations omitted); *Portal Software, Inc. Secs. Litig.,* No. 03–5138, 2005 WL 1910923, at \*9 (N.D.Cal. Aug.10, 2005) ("[P]laintiffs must describe the job title, job description, duties, and dates of employment for the controller's sources before this information can be deemed reliable"). Moreover, in *Chubb,* the Third Circuit cautioned that allegations attributed to the information obtained from a confidential source must contain specific details regarding the basis for the source's personal knowledge and describe supporting events in detail. *See Chubb,* 394 F.3d at 146. Indeed, "failure to meet these requirements with respect to each and every confidential source the plaintiff relies upon, renders that source irrelevant for the purposes of plaintiff's allegations." *Intelligroup,* 527 F.Supp.2d. at 290; *see Chubb,* 394 F.3d at 146. "The sheer volume of confidential sources cited cannot compensate for these inadequacies.... Cobbling together a litany of inadequate allegations does not render those allegations particularized in accordance with Rule 9(b) or the PSLRA." *Chubb,* 394 F.3d at 155.

## III. DISCUSSION

2011 WL 6339824

Defendants generally argue that Plaintiff's allegations are conclusory, not specific to particular defendants, and based on non-actionable corporate misconduct as opposed to a recklessness indicative of an intent to deceive. Defendants, further, separately address each individual defendant and the alleged misstatements made, or omissions, of each.[6] In response, Plaintiff argues that he sufficiently alleges that the Defendants had knowledge of McNeil's phantom recall and incessant quality control problems, yet they made material misrepresentations about McNeil's problems and failed to fully inform shareholders about McNeil's problems in press releases, investor conference calls, and Congressional testimony, despite a duty to disclose the same.

[6] In addition, Defendants raise challenges to specific categories of allegations, including confidential witness statements recounted in the Amended Complaint, the Amended Complaint's allegations regarding cost containment strategies at McNeil, and the Amended Complaint's allegations regarding the phantom recall and other manufacturing deficiencies. Plaintiff, likewise, argues that certain categories of allegations sufficiently create a strong inference of scienter. In light of admonitions of the Third Circuit and the Supreme Court not to "develop separately rules of thumb for each type of scienter allegation," but to "consider the totality of circumstances" when assessing scienter allegations, *Avaya,* 564 F.3d at 269 (citing *Killinger,* 542 F.3d at 784), I will address the categories of allegations addressed by the parties in connection with my analysis of the totality of allegations made as to each specific defendant. *Accord In re Merck & Co., Inc. Securities, Derivative, & ERISA Litig.,* No. 05–1151, 2011 WL 3444199 at *24–25 (Aug. 8, 2011).

**\*10** As noted, to sufficiently plead scienter, Plaintiff must "state with particularity facts giving rise to a strong inference that [each] defendant acted with the required state of mind." *Tellabs,* 551 U.S. at 313 (internal quotation marks omitted). Indeed,

[t]o establish corporate liability for a violation of Rule 10b–5 requires "look[ing] to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment."

*Makor,* 513 F.3d at 708. Indeed, the Third Circuit made clear in *Winer* that the so-called group pleading doctrine is no longer viable, and any private securities fraud claims against corporate officers "must be pleaded with the specificity required by the PSLRA with respect to each defendant." 503 F.3d at 337.

Moreover, where, as here, Plaintiff's allegations rest on circumstantial evidence of each defendant's intent, such allegations must be supported by detailing, with particularity, "the who, what, when, where and how" of the events at issue and by presenting clear facts verifying Plaintiff's deductions with respect to each defendant's state of mind. *Burlington,* 114 F.3d at 1422 (citation omitted). Finally, this Court reiterates that my scienter ruling "will ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Avaya,* 564 F.3d at 269 (citing *Killinger,* 542 F.3d at 784. Hence the Court will consider the totality of circumstances in addressing Plaintiff's allegations against each defendant. With these principles in mind, I turn to the Amended Complaint's allegations regarding each individual officer Defendant and, lastly, J & J.[7]

[7] In this regard, I note that my assessment is complicated by Plaintiff's failure to clearly set forth in his opposition papers the particular alleged misrepresentations and omissions of each defendant. By failing to delineate the allegations related to each particular defendant, the Court was burdened with combing through Plaintiff's 114–page Amended Complaint to glean the specific alleged misrepresentations and omissions attributable to each defendant.

**A. Defendant Weldon**

Plaintiff alleges that Defendant Weldon made several misrepresentations and omissions during the Class Period. The backdrop for these alleged misrepresentations and omissions, Plaintiff asserts, is the January 15, 2010 FDA warning letter addressed to Weldon which "put him on clear notice of the pervasive quality control problems, deficiencies and violations at the McNeil Puerto Rico plant." Am. Compl.,

2011 WL 6339824

¶ 244. This plant, as noted *supra,* produced the Tylenol and other OTC medicines that were recalled due to a musty odor.

Against this backdrop, Plaintiff alleges that Weldon misrepresented in a January 26, 2010 press release that "[i]n a year of tremendous challenge, [J & J] maintained our long-term focus while delivering solid results ..." Am.Compl., ¶ 177.[8] According to the Amended Complaint, this statement is materially false and misleading because the FDA Warning Letter suggested that J & J had not maintained a long-term focus but, to the contrary, sacrificed J & J's quality image for short-term profits. *Id.* In addition, Plaintiff's allege that Weldon stated in an analyst and investor conference call that "[w]e are very conscious of the bar we set for ourselves and that consumers expect more from us than from others because of our history and reputation. A recent consumer product recall and FDA warning letter were important reminders of this expectation and the vigilance it requires." *Id.* at ¶ 178.[9] Plaintiff alleges that this statement, and the January 26, 2010 press release, both fail to disclose that J & J and McNeil executives approved the Motrin phantom recall during 2009. *Id.* at ¶¶ 177–80. Plaintiff further alleges that this statement created the misleading impression that the recalls referenced in the FDA letter were isolated incidents and that J & J was taking steps toward ensuring product safety. *Id.* at ¶ 180.

8    It is not clear from the Amended Complaint why Plaintiff attributes the press release to Weldon, however, the Court assumes for the sake of argument that Weldon made this statement.

9    Plaintiff's do not allege the date of this call, but assert that it was "[i]n connection with the Fourth Quarter and Full–Year 2009 earnings release ...." *Id.* Because the only FDA warning letter referenced in the Amended Complaint is dated January 15, 2010, it appears that the conference call must have taken place after that date.

 **\*11** As an initial matter, Plaintiff's allegation of omission cannot stand because there are no particularized facts in the Amended Complaint suggesting, much less creating, the strong inference that Weldon knew about the phantom recall at the time he made the conference call statement or when the January 26, 2010 press release was issued. Moreover, Plaintiff points to nothing in Weldon's congressional hearing testimony that suggests he was aware of the phantom recall in January. Indeed, the only allegations that speak to his knowledge or conscious disregard of the phantom recall are conclusory. *See*

*e.g.,* Am.Compl., ¶ 247 ("Weldon ... knew or consciously and recklessly disregarded that the phantom recalls and other material facts were misrepresented in, or omitted from, the Company's public statements.") Thus, Plaintiff's omission allegations do not present clear facts verifying Plaintiff's deductions about Weldon's state of mind when he made the statement. *See Burlington,* 114 F.3d at 1422 (citation omitted).

As for the purported misstatements in the conference call and press release, Plaintiff has not alleged with particularity that Weldon made those statements *knowing* that he was "misrepresenting material facts related to the corporation."[10] *Campbell Soup,* 145 F.Supp.2d at 599 (quotations omitted). Nor has Plaintiff alleged with particularity that Weldon *recklessly* made those statements by disregarding a substantial risk that the statements were false. Indeed, Weldon's statement in the press release that J & J maintained a "long-term focus" is vague, and Plaintiff's allegations do not link that statement to the quality control issues at the McNeil Puerto Rico plant. Moreover, while Plaintiff alleges, in a conclusory fashion, that Weldon knew that McNeil sacrificed J & J's quality image for short-term profits, Plaintiff has not asserted any particularized facts to support that conclusion. As for the conference call statement, quoted supra, nothing in that statement intimates that Weldon knew about, or recklessly disregarded, McNeil's quality control problems prior to the FDA warning letter.

10    To be clear, the Court does not rule upon whether any of the alleged statements are misrepresentations or omissions; this Opinion focuses solely on whether Plaintiff has sufficiently pled scienter.

In addition, while Plaintiff makes much of Weldon's statement before the congressional committee that "there were adverse events reported that we knew," Am.Compl., ¶ 264, it is clear from the context of his statement that he was referring to the consumer complaints received in 2008 about the musty odor in certain Tylenol and other OTC products. Thus, Weldon's statement is relevant only to the Tylenol OTC recalls—not the Motrin phantom recall. Moreover, while Weldon stated in his testimony that the phantom recall was a "mistake," and that McNeil "should have notified [the FDA] that we would be taking [the] products ... off the shelves," *id.* at ¶ 246, he did not testify that he knew about the phantom recall at the time of the January 26, 2010 press release statement or the conference call.[11]

11    Even if his statements could be read to suggest that Weldon knew about the phantom recall prior to the January 26, 2010 press release, that conclusion would not alter my holding because, as explained herein, Weldon was under no duty to disclose the phantom recall.

**\*12** Plaintiff, further, alleges that the magnitude of Weldon's incentive-based compensation during the Class Period is "probative" of his state of mind. *Id.* at ¶¶ 247–48. In making this allegation, Plaintiff appears to challenge Weldon's motives. However, "[m]otives that are generally possessed by most corporate directors and officers do not suffice" as particularized allegations of scienter. *Intelligroup,* 527 F.Supp.2d at 284; (citing *GSC Partners CDO Fund v. Washington,* 368 F.3d 228, 237 (3d Cir.2004)). *See also Nat'l Junior Baseball,* 720 F.Supp.2d at 552. Moreover, courts have specifically held that incentive compensation is not a colorable basis upon which an allegation of fraud can be predicated. *Nat'l Junior Baseball,* 720 F.Supp.2d at 552 (quoting *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1068 (5th Cir.1994)). [12]

12    Relatedly, Defendants point out that Weldon (as well as Caruso and Goggins) all increased their holdings of stock during the Class Period, which raises a compelling inference against scienter under Third Circuit law. *See Globis,* 241 Fed App'x at 832. In support of this argument, Defendants attach documents evincing Weldon's stock purchases. The Court may consider such documents because they are publically-filed SEC documents. *See In re NAHC, Inc. Sec. Litig.,* 306 F.3d 1314, 1331 (3d Cir.2002) (holding that district court may rely on "documents filed with the SEC, but not relied upon in the Complaint"); *Intelligroup,* 468 F.Supp.2d at 678–79. Moreover, the Court agrees that these documents raise an inference against scienter.

Additionally, Plaintiff makes the generalized allegation that Weldon either knew or "consciously disregarded" the phantom recall and the quality control problems at McNeil, and that he failed to disclose these problems in J & J's public statements. [13] Am. Compl., ¶ 247. Even assuming that Weldon had full knowledge of both the recall of the musty-smelling OTC products and the phantom recall, Plaintiff has not sufficiently alleged that he was a under a duty to disclose those facts. Under Third Circuit case law, there are only three instances when a corporate officer is under an affirmative duty

to disclose—"when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure." *Oran,* 226 F.3d at 285–86. Where no such duty exists, an officer's "[s]ilence ... is not misleading under Rule 10b–5." *Id.* at 285 (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). [14]

13    Plaintiff also alleges that Weldon refused to appear at the May 2010 Congressional hearing on the J & J recalls, and that this failure "is further probative of his conscious and reckless disregard of the material omissions that severely impacted [J & J]." Am.Compl., ¶ 246. This conclusory allegation, which provides no factual basis for asserting why Weldon did not appear at the May hearing, does not constitute a fact from which Weldon's state of mind may be inferred. Moreover, Weldon testified at the September 30, 2010 Congressional hearing that he was unable to attend the May hearing because of back surgery. *See* September Cong. Hrg. at 7. The Amended Complaint even acknowledges that he made this excuse. *See* Am.Compl., ¶ 94.

14    As explained below, an officer may make statements affirmatively characterizing a management practice that require the officer to speak truthfully about the matters addressed. *See Shapiro v. UJB Financial Corp.,* 964 F.2d 272 (3d Cir.1992). That doctrine is discussed in connection with my analysis of Defendant Caruso.

The Amended Complaint does not allege that Weldon engaged in insider trading, and, although Plaintiff points to 17 C.F.R. 229.303 ("S–K 303") as a regulation mandating disclosure, in Oran, the Third Circuit has explicitly rejected the argument that SK–303 creates a duty of disclosure that would constitute a material omission under Rule 10b–5. *See Oran,* 226 F.3d at 288. [15] Furthermore, Plaintiff has not alleged that Weldon made an inaccurate, incomplete or misleading prior disclosure that he was obligated to correct or supplement. Accordingly, I conclude that Weldon was under no duty to disclose either the Tylenol OTC recall or the phantom recall.

15    Plaintiff attempts to distinguish the Third Circuit's decision in *Oran,* arguing that *Oran's* holding applies only to allegations that fail to satisfy the general test for securities fraud materiality set forth by the Supreme Court's decision in *Basic.*

*See* Pl. Opp. at 39 n. 7. I disagree. In reaching its holding, *Oran* reasons: "demonstration of a violation of the disclosure requirements of Item 303 does not lead inevitably to the conclusion that such disclosure would be required under Rule 10b–5. *Such a duty to disclose must be separately shown."* 226 F.3d at 288 (emphasis added) (quoting *Alfus v. Pyramid Tech. Corp.,* 764 F.Supp. 598, 608 (N.D.Cal.1991)). *Accord In re Marsh & Mclennan Companies, Inc. Securities Litig.,* 501 F.Supp.2d 452, 473 (S.D.N.Y.2006) (relying on *Oran* for the proposition that "even if the Complaint's allegations were sufficient to establish a violation of [S–K 303], the violation alone would be insufficient to establish Defendants' liability under Section 10(b) and Rule 10b–5."). *See S.E.C. v. Conaway,* 698 F.Supp.2d 771, 835 n. 52 (E.D.Mich.2010) (collecting cases). Plaintiff further argues that the Second Circuit recently held in *Litwin v. Blackstone Group, L.P.,* 634 F.3d 706 (2d Cir.2011), that S–K 303 can give rise to liability under the securities laws. As Defendants point out, however, that decision does not address Rule 10b–5 violations and is, accordingly, not applicable here.

In terms of recklessness, the Amended Complaint appears to further allege that Weldon did not fully apprise himself of how J & J's cost-cutting initiatives might affect the quality of the medicines McNeil produced, and that he unduly focused on McNeil's short-term profitability rather than paying attention to signs that McNeil's quality assurance problems were getting out of control. As noted, a plaintiff may allege scienter either by asserting that a defendant knew a statement was false, or by asserting that the defendant was "reckless in disregarding a substantial risk that it was false." *Makor,* 513 F.3d at 704.

**\*13** In his opposition brief, Plaintiff argues that he has pled allegations of "red flags" that Weldon ignored. Indeed, cases have entertained such "red flag" theories where the allegations set forth "specific facts to show that defendants knew or could have known about the ... errors, "or that their regular procedures should have alerted them to the errors sooner than they did." *In re Comshare, Inc. Securities Litig.,* 183 F.3d 542, 553 (6th Cir.1999) *cited in Intelligroup,* 527 F.Supp.2d at 286–87.[16] Courts have also found sufficient allegations that a defendant was actually advised of, but ignored, "red flags." *See e.g., In re Health Mgmt. Inc. Sec. Litig.,* 970 F.Supp. 192 (E.D.N.Y.1997).

[16]    Defendant challenges Plaintiff's citation to *Shogen v. Global Aggressive Growth Fund,* Ltd., No. 04–5695, 2007 WL 1237829 at \*12 (2007), for the proposition that a plaintiff may utilize "red flag" allegations to assert recklessness. Whether or not *Shogan* stands for this proposition, there are several cases within this district that do so. *See e.g., Nat'l Jr. Baseball,* 720 F.Supp.2d at 557; *Intelligroup,* 527 F.Supp.2d at 286–87.

The key for successfully pleading a "red flag" theory is asserting specific facts from which a particular defendant's recklessness can be inferred. Here, Plaintiff generally alleges widespread quality control failures at J & J and the several OTC medicine recalls. *See* Am. Compl., ¶¶ 63, 105, 175, 217. Plaintiff further alleges that the FDA deemed these failures a "systemic problem." *Id.* at ¶¶ 189, 212. Relatedly, Plaintiff alleges that the OTC medicines, particularly the J & J flagship brands of Tylenol, Motrin, and Benadryl, were part of J & J's core business. *See id* at ¶ 30. According to Plaintiff, the OTC medicines were part of the profitable consumer healthcare segment of J & J, which segment accounted for at least 25% of J & J's total revenues. *See id.* at ¶¶ 29, 69. Plaintiff claims that Weldon acknowledged as much by stating that "[w]e are very conscious of the bar we set for ourselves and that consumers expect more from us than from others because of our history and reputation." *Id.* at ¶ 178.

Notably, these allegations do not specify which red flags Weldon knew. Of course, elsewhere in the Amended Complaint, Plaintiff alleges that Weldon received the January 15, 2010 FDA warning letter. But, even if the warning letter placed him on notice of the nature of McNeil's quality control problems, Plaintiff have not sufficiently alleged that he was under a duty to disclose the contents of the FDA warning letter, or the phantom recall. In this connection, it is also important to note that Weldon is the CEO of J & J, the parent company of McNeil; he is not an officer of McNeil. For this reason, even though Plaintiff characterizes Tylenol, Motrin, and Benadryl as flagship products, the Amended Complaint acknowledges that the consumer healthcare division as a whole makes up less than one-third of J & J's sales.[17]

[17]    In this way, Plaintiff's allegations differ from those in *Makor,* where the Seventh Circuit held that the CEO of a company that sold two key products must have known that statements he made about those products were false. *See* 513 F.3d at 711.

2011 WL 6339824

In this regard, cases have held that "[f]raud cannot be inferred simply because [the parent corporation] might have been more curious or concerned about the activity at [its subsidiary]," *id.* (quoting *In re Comshare, Inc. Sec. Litig.,* 183 F.3d 542, 554 (6th Cir.1999), and courts "should not presume recklessness or intentional misconduct from a parent corporation's reliance on it subsidiary's internal controls," *id.* (quoting *Advanta,* 180 F.3d at 540). Indeed, "the failure of a parent company to interpret extraordinarily positive performance by its subsidiary ... as a sign of problems and thus to investigate further does not amount to recklessness under the securities laws." *Alpharma,* 372 F.3d at 151 (quoting *Kushner v. Beverly Enterpr.,* 317 F.3d 820, 829 (8th Cir.2003)). In short, "[a]llegations akin to corporate mismanagement are not sufficient." *City of Roseville,* 2011 WL 3695897 at *2. Therefore, Plaintiff's "red flag" allegations do not sufficiently allege scienter against J & J's CEO Weldon.

**\*14** Finally, Plaintiff argues that "Defendants' " role in approving practices that contributed to McNeil's quality assurance problems is further evidence that they were aware of the problems at McNeil. Pl. Opp. at 26. In support of this argument, Plaintiff points to allegations in the Amended Complaint that J & J transferred quality control for OTC medicines from the pharmaceutical segment to the consumer healthcare segment, and that Defendant denied or delayed requests for additional resources and/or equipment to address quality control failures. *See* Am.Compl., ¶¶ 2, 36, 46–61. However, none of these allegations specifically address Weldon's role in approving any of the practices that allegedly led to McNeil's demise and, therefore, they are not probative of his scienter, nor that of any other individual defendant.

Considering the totality of all of the allegations against Weldon in the Amended Complaint, and all documents referenced therein, I find that Plaintiff has not alleged particularized facts that give rise to a strong inference of scienter. However, it is possible that Plaintiff may amend his pleading to include more particularized facts that will meet the PSLRA's heightened pleading standard. Therefore, Plaintiff's claim against Weldon is dismissed without prejudice and Plaintiff is granted leave to file a Second Amended Complaint in accordance with the dictates of this Opinion.

### B. Defendant Luther

Plaintiff makes several scienter allegations about Defendant Luther, the President of McNeil. I first address Plaintiff's

allegations as to what facts Luther knew, and then turn to his alleged misrepresentations and omissions.

As for the phantom recall, Plaintiff alleges that Luther knew about the phantom recall, based on his receipt of an email communication in May 2009, and as demonstrated by the alleged internal J & J memo in which he directed McNeil employees to "make [the recall] happen ASAP." Am.Compl. at ¶ 69. To be clear, Plaintiff alleges that Luther's full statement was: "Given our current financial situation, I hope we're not going to double our costs to do this. Let's make this happen ASAP." *Id.*

In addition, Plaintiff alleges that Luther knew about McNeil's systemic quality control problems, at both the Fort Washington and Puerto Rico plants, because Luther received a copy of the January 15, 2010 FDA warning letter, *id.* at ¶ 11, and was present at the February 19, 2010 FDA meeting with senior McNeil and J & J executives, *id.* at ¶ 6. *See also id.* at ¶¶ 268–69. As noted, FDA compliance officials discussed J & J's apparent lax culture of compliance at that meeting. Further, Plaintiff alleges, Luther knew that J & J's and McNeil's aggressive cost cutting was the source of McNeil's quality control difficulties. *Id.* at ¶ 269.

In support of the assertion that Luther knew that the cost-cutting measures caused McNeil's quality control problems, Plaintiff alleges that a confidential witness, CW1, attended a "Town Hall Meeting," in 2007 or 2008, at which a "brave" floor plant worker questioned Luther about the company's cost-cutting measures, and Luther responded that the cost-cutting measures were company wide. *Id.* at ¶ 53.

**\*15** Additionally, Plaintiff alleges that the same confidential witness describes Luther as the one who repeatedly denied his quality control employees' requests for funding for necessary improvements at the Fort Washington plant. *Id.* at ¶ 54. Aside from these specific allegations, Plaintiff generally asserts that Luther knew about the effects of J & J's cost-cutting measures due to his position as the President of McNeil. *Id.* at ¶ 269.

In my view, Plaintiff alleges with particularity that Luther knew about the phantom recall. That he directed subordinates to ensure that the recall was cost-efficient sufficiently alleges his knowledge. Accord *Steiner v. MedQuist, Inc.,* No. 04–5487, 2006 WL 2827740 at * 18 (D.N.J. Sept.29, 2006) (holding that officer who allegedly directed employee to falsify bills had knowledge of fraudulent billing scheme). While Defendants argue that his directive merely suggests

2011 WL 6339824

that he instructed the employees to retrieve the products quickly, and that no untoward motive should be drawn from his statement, in light of the other allegations in the Amended Complaint that suggest McNeil intentionally failed to disclose the phantom recall to the FDA, Plaintiff's interpretation of Luther's email is just as compelling as Defendants' proposed interpretation. *See Tellabs, supra* at 2504–05 (A "strong inference" of scienter is one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent.").

With respect to his knowledge of the quality control problems at the McNeil plants, the Amended Complaint alleges that Luther received a Form 483 report from the FDA on June 4, 2009. Am.Compl., ¶ 267. That report highlighted several deficiencies at the Fort Washington plant, including rusty and leaky metal beams located above the "Dry Granulation/ Dry Blend" area. *Id.* In addition, the FDA's form noted that McNeil's quality assurance department had failed to "reject any lot of components that did not meet the appropriate written specifications for identity, strength, quality, and purity." *Id.* Furthermore, the FDA indicated that procedures for handling "all written and oral complaints regarding a drug product are not followed." As an example, the FDA recounted an incident where complaints received about Children's Tylenol products were classified "Adverse Events" before McNeil conducted a complete investigation. Moreover, the FDA stated that McNeil did not perform batch quality reviews or trend analyses in investigating those complaints. *Id.* Additionally, as noted *supra,* Plaintiff alleges that Luther received the January 15, 2010 FDA warning letter and attended the February 19, 2010 FDA meeting that addressed McNeil's quality control problems. These FDA documents and the meeting sufficiently allege that Luther was aware of McNeil's systemic quality control problems.

As for Plaintiff's allegations that CW1 heard Luther respond that cost-cutting measures were employed throughout J & J, and that Luther repeatedly denied requests for capital improvements at the Fort Washington plant, these assertions do not sufficiently allege pre-FDA warning letter knowledge of the quality control problems, or that cost-cutting led to those problems. Assuming for the sake of argument that CW1's assertions should be taken as true for purposes of this motion, [18] that Luther was aware of J & J's cost-cutting initiatives does not suggest that he was also aware of the effect of those initiatives. Moreover, that Luther denied capital improvement requests also does not suggest that he was aware of the effect of that decision on his

employees' ability to perform their quality assurance duties. Therefore, this allegation, on its own, is not sufficient to allege that Luther knew that J & J's cost-cutting strategies were inhibiting McNeil's quality assurance efforts. Nevertheless, considering the Plaintiff's allegations as a whole, Plaintiff has sufficiently alleged Luther's knowledge of the phantom recall and McNeil's more systemic quality control problems.

| 18 | As noted, when evaluating a complaint that is based upon the statements of confidential witnesses, courts "consider the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Nat'l Jr. Baseball,* 720 F.Supp.2d at 557 (quoting *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.,* 394 F.3d 126, 148 (3d Cir.2004)). |

**\*16** The more difficult question is whether Plaintiff has sufficiently alleged that Luther possessed the requisite scienter when he allegedly misrepresented the facts he knew and failed to disclose both the phantom recall and McNeil's general quality control deficiencies. Plaintiff alleges that "[t]hrough J & J's and McNeil's press releases, Luther provided materially false and misleading information regarding [J & J's] systemic quality control deficiencies and actions taken to redress the same." *Id.* at ¶ 267. The Amended Complaint further alleges that Luther lied to the FDA investigators at the Fort Washington plant, telling them that the plant did not manufacture medicines for other companies, only to have a competitor publically announce four days later that their PediaCare children's medicines were made at the same plant. *Id.* at ¶¶ 99, 221 (quoting June 11, 2010 Pharmalot.com website). Further, the Amended Complaint alleges that Luther failed to disclose the phantom recall in SEC public filings and other public statements. *Id.* at ¶ 272. According to the Amended Complaint, Luther was responsible for the content of the SEC filings and public statements because he reported directly to Marc Robinson, J & J's Group Chairman of Consumer Healthcare, who reported directly to Defendant Goggins. *Id.*

As an initial matter, Plaintiff's press release allegations do not satisfy Rule 9(b), or the PSLRA heightened pleading standard, because they do not specify, with particularity, the date of the press releases or the precise statements attributable to Luther and why those statements are misleading. *See Advanta,* 180 F.3d at 534 (stating that rule 9(b) "requires

Monk v. Johnson & Johnson, Not Reported in F.Supp.2d (2011)

2011 WL 6339824

plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story.") (internal quotation marks omitted); *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 284 (3d Cir.1992) ("Rule 9(b) requires a plaintiff to plead (1) a specific false representation of material fact ...."). The Amended Complaint makes the general assertion that Luther was responsible for press releases, but even assuming that portions of the press release are attributable to him, the Amended Complaint fails to link Luther to any particular press release statements and explain why those statements are misleading. *Cf. Winer Family Trust v. Queen,* 503 F.3d 319 (3d Cir.2007) ("Winer failed to adequately plead scienter by failing to link the declarant of the challenged statement with facts that might contradict his statement.") This same analysis holds true for the SEC filings and public statements; Plaintiffs do not allege with particularity which misstatements Luther incorporated into particular filings and public statements, and how those misstatements relate to the facts Luther knew. *Compare In re Merck & Co., Inc. Securities, Derivative, & ERISA Litig.,* No. 05–1151, 2011 WL 3444199 at *23 (Aug. 8, 2011) (addressing particular statements found within 10–Ks signed by defendant). Plaintiff's allegation that Luther reported directly to J & J's Group Chairman of Consumer Healthcare, who reported directly to Defendant Goggins, does not explain why the press releases, SEC filing, or any public statements are generally attributable to him or what portions of those documents he authored or directed for inclusion.

**\*17** By merely citing to documents and generally attributing them to Luther, Plaintiff runs afoul of the group pleading doctrine repudiated in *Winer. See* 503 F.3d at 337. Previously, under that doctrine, a plaintiff could simply allege that a statement was attributable to "to officers and directors who have day-to-day control or involvement in regular company operations." *Id.* at 335. *Winer,* however, held that the group pleading doctrine is not compatible with the PSLRA's heightened pleading standard. The plaintiff in *Winer* did not connect several of the corporate defendants in that case to a press release issued by the company, and the *Winer* court upheld the district court's dismissal of securities fraud claims against those defendants. However, the court left in claims against another defendant whom the plaintiff alleged was quoted in the company's press releases. According to the court, the quoted statements were "directly attributed" to that defendant and, therefore, did not violate the group pleading doctrine. *Id.* [19]

[19] On a related point, Defendants argue that Plaintiff's allegations are inconsistent with the Supreme

Court's recent decision in *Janus Cap. Group, Inc. v. First Derivative Traders,* 524 U.S. ——, 131 S.Ct. 2296, 180 L.Ed.2d 166, (June 13, 2011), where the Court held that a company statement may not be attributed to a corporate officer unless that officer has "ultimate control over the statement and it is attributed to him." Def. Reply at 7. This general proposition is true, *see Janus,* 131 S.Ct. at 2302, although the facts of *Janus* are distinguishable from this case. As explained by a recent district court decision in this district, *Janus* involved a plaintiff's attempt to attribute statements issued by one corporation to the officer of a separate, but related, corporation. *Merck,* 2011 WL 3444199 at *24–25. Here, in contrast, Plaintiff does not appear to be attributing the statement of McNeil to J & J's officers or vice versa.

Plaintiffs, further, allege that Luther omitted the phantom recall and McNeil's pervasive quality control problems from McNeil press releases and from McNeil's SEC statements and public filings. As explained above, however, a corporate officer does not commit securities fraud by omitting information unless he is under a duty to disclose that information. *See United States v. Schiff,* 602 F.3d 152, 163 (3d Cir.2010). An affirmative duty to disclose arises only when one of *Oran's* three prongs is triggered: (1) insider trading; (2) a statute requiring disclosure; or (3) an inaccurate, incomplete, or misleading prior disclosure. *Id.* at 162 (quoting *Oran,* 226 F.3d at 285).

Plaintiff has not alleged that Luther engaged in insider trading, that he was under a statutory obligation to disclose, or that he previously made an inaccurate, incomplete, or misleading disclosure that needed to be corrected or updated. The only alleged misrepresentation that could potentially fall within this latter category is Luther's alleged lie to the FDA that the Fort Washington plant did not manufacture medicines for other companies. That statement, however, was not directed at shareholders but at the FDA and, more importantly, it has nothing to do with the *McNeil* product recalls that form the basis of Plaintiff's claims.

Plaintiff further argues that the Amended Complaint alleges facts akin to the sufficiently pled allegations of *In re Able Laboratories Securities Litig.,* No. 05–2681, 2008 WL 1967509 (D.N.J. Mar.24, 2008). The complaint in *Able* addressed allegations of recklessness against Dhananjay G. Wadekar, the CEO of the drug company Able Laboratories ("Able"). The complaint, in that case, alleged that the

Wadekar received notice of several FDA warning letters, as well as a Form 483 inspection report detailing numerous deficiencies at Able's drug manufacturing facilities. Ultimately, Wadekar and the other corporate officers failed to comply with the FDA's directives in its warning letters, one of which explicitly told Wadekar that "[t]he specific violations noted in this letter are serious and may be symptomatic of serious underlying problems. You are responsible for investigating and determining the causes of the violations identified above and preventing recurrence of similar violations." *Id.* at \*2 (emphasis added). Thereafter, Able initiated a nationwide recall of a key drug. *Id.* at \*7.

**\*18** Importantly, the complaint in *Able* alleged with particularity that Wadekar made several misrepresentations to shareholders about Able's manufacturing deficiencies. For one, he misrepresented that a consent decree between Able and the FDA was resolved. *Id.* at \*3. In addition, he stated at a healthcare conference that "[o]ur facility is fully compliant with the current good manufacturing practices," when the company was not. *Id.* Thereafter, Wadekar added to an Able press release that "[o]ur fundamentals and pipeline continue to be strong ...." *Id.* at \*4. Further, Wadekar remarked on an investor conference call that the recall of Able's key drug "was fairly contained and ... would have no impact on the second quarter." *Id.* at \*8. Each of these alleged statements was linked specifically to Wadekar, and the date of each of these alleged statements was also set forth in the plaintiff's allegations. In light of the alleged misrepresentations, and Wadekar's knowledge that Able was facing serious manufacturing problems, the *Able* court concluded that these allegations sufficiently alleged that Wadekar recklessly made misstatements about the company. *Id.* at \*15–17.

Here, by contrast and as explained above, the Amended Complaint does not include specific misstatements attributable to Luther that contradict facts he knew or consciously disregarded. Also unlike *Able,* Plaintiff's allegations here do not reference any misrepresentations that Luther recklessly made about the status of McNeil's quality control program. Morever, there are no particularized allegations that Luther failed to address the concerns highlighted in the June 4, 2009 FDA Form 483 inspection report or the January 15, 2010 FDA warning letter. Thus, *Able* is factually distinguishable.[20]

[20]  Plaintiff argues that his allegations mirror those in *Able* because he alleges that Defendants

initially failed to disclose the phantom recall to the FDA, *see* Am.Compl., ¶¶ 63–64, 72, and because the FDA also issued a Form 483 letter detailing inspection violations, *id.* at ¶ 174–75, 212. Despite the Amended Complaint's inclusion of these allegations, *Able* is nonetheless factually distinguishable because Plaintiff's allegations here do not address Luther's post-FDA warning letter response but focus primarily on the phantom recall, which took place before the warning letter was issued.

Considering all the facts relating to Luther in the Amended Complaint, while Luther's knowledge of the phantom recalls and McNeil's quality assurance deficiencies is sufficiently pled, Plaintiff has not sufficiently alleged that Luther either made a statement he knew was false or that he made a statement recklessly disregarding a substantial risk that it was false. Nor has Plaintiff sufficiently alleged that Luther was under a duty to disclose what he knew. Accordingly, for the foregoing reasons, I conclude that Plaintiff has not sufficiently alleged scienter, and the claims against Defendant Luther are hereby dismissed without prejudice. Plaintiff is granted leave to file a Second Amended Complaint consistent with this Opinion, if Plaintiff can attribute specific statements to Luther.

### C. Defendant Goggins

The Amended Complaint paints a picture of Goggins as an inept chairman of the consumer products division at J & J, who imposed "mind-boggling, unheard-of" cost-cutting goals for the sake of increasing McNeil's bottom line, and sacrificing quality OTC products to meet that goal. *See* Am.Compl., at ¶ 45. For example, the Amended Complaint alleges that Goggins denied funding for essential capital improvements. *Id.* at ¶ 141. Plaintiff alleges that, by making these sort of decisions, Goggins consciously and recklessly disregarded known deficiencies.

**\*19** The Amended Complaint further alleges that Goggins made several misstatements and omissions. In general terms, Plaintiff alleges that "Goggins reported to analysts, investors and consumers that J & J's cost-containment efforts were not having any adverse impact on J & J's operations," without pointing to any specific statement made by Defendant Goggins to this effect. *Id.* at ¶ 47. Plaintiff additionally alleges that on March 30, 2008, Goggins touted J & J's acquisition of Pfizer Consumer Healthcare, stating that with the acquisition "It's our intention to build a premier consumer

2011 WL 6339824

healthcare company as part of Johnson & Johnson's broadly based strategy." *Id.* at ¶ 118. In a June 5, 2008 conference call with investors and analysts, she also described the acquisition as positive, stating that J & J's "global medicine cabinet is expanding." *Id.* at ¶ 119. [21] She allegedly failed to disclose, in that conference call, that J & J was transferring the quality control oversight functions from the company's pharmaceutical division to its consumer product division. *Id.* at ¶ 124.

[21]      The Amended Complaint includes similar, additional allegations too lengthy to repeat here. *See id.* at ¶¶ 120–123.

With respect to Defendant Goggins' knowledge of the phantom recall, Plaintiff's allegations center on her testimony at the May and September 2010 Congressional hearings. At the hearing, Goggins responded to Congressman Town's question whether McNeil or J & J hired a third-party contractor to go into stores and buy the Motrin rather than recalling it by stating "No, we didn't ... I know nothing about that, sir." *Id.* at ¶ 98. According to the Amended Complaint, while Goggins claimed that she was not aware of the phantom recall until advised by the congressional committee, she must have known about the recall because Luther, her subordinate, knew of that fact. Further, her position as the head of J & J's consumer products division mandates such a conclusion. Am.Compl., ¶ 12, 26. Plaintiff additionally alleges that Goggins knew about the phantom recall because she attended the February 19, 2010 FDA meeting at which the FDA's concerns about the phantom recall were discussed, *id.* at ¶ 216, along with the FDA's general concerns about McNeil's systemic quality control failures. *Id.* at ¶¶ 6; 259. [22] In addition, Plaintiff alleges that, at the May hearing, Goggins denied reducing the number of quality control employees at McNeil, yet CW1 asserts that Goggins refused to employ additional staff to help "tackle the additional load at McNeil," *id.* at ¶ 51, and Plaintiff generally alleges that Goggins otherwise directed the reduction of quality control personnel, *id.* at ¶ 216.

[22]      While Defendants contest that Goggins was present at the February 19, 2010 meeting, the Court must take this allegation as true on a motion to dismiss.

With respect to the quality control failures at the Fort Washington plant, Plaintiff alleges that Goggins admitted to Congress that she was aware of the quality control problems at that plant since the first half of 2009. *Id.* at ¶¶ 196; 255. This allegation, however, does not point to any particular statement in the May or September hearing transcripts. Nonetheless, in Plaintiff's view, Goggins' admission contradicts the tenor of a May 4, 2010 McNeil press release announcing the closing of the Fort Washington plant, which failed to acknowledge the long history of problems. *Id.* at ¶ 195. That press release did acknowledge the FDA's observations at the plant and states that "[e]arly [in 2010] we initiated a comprehensive assessment of quality and manufacturing systems across our operations [and w] e have committed extensive internal resources to this effort ...." *Id.* Plaintiffs appear to argue that the press release was misleading because it did not indicate that McNeil's quality assurance problems pre-dated 2010. The Amended Complaint, however, does not allege that the press release is attributable to Goggins. *Id.*

**\*20** As for quality control at McNeil generally, the Amended Complaint generally alleges that "it is impossible to imagine that J & J's Consumer Group leader, who also was a member of the Company's Executive Committee, can plausibly claim that he [sic] was unaware of the dire situation arising from the Company's lax quality control." *Id.* at ¶ 257. Lastly, as with the allegations against Weldon, Plaintiff alleges that Goggins stood to receive bonuses and additional compensation if she met certain sales goals. The Amended Complaint, further, alleges that Goggins resigned on September 16, 2011, stating that she was retiring. According to Plaintiff, the "suspicious timing" of her departure from J & J is further evidence of scienter. *Id.* at ¶ 265.

While Plaintiff asserts a host of allegations against Goggins, many of the allegations do not sufficiently allege scienter. For one, allegations that Goggins' subordinates knew of the phantom recall are insufficient. *See In re Alpharma Inc. Securities Litig. .,* 372 F.3d 137, 150–51 (3d Cir.2004). Moreover, many of Plaintiff's allegations are that Goggins should have known about McNeil's quality control problems by virtue of her position. These sort of allegations have been rejected by courts; it can not be presumed that a corporate officer has knowledge of the day-to-day operations of each plant under her supervision, there must be some additional "special circumstance which, taken together with an officer's position, support a strong inference of scienter." *See Avaya,* 564 F.3d at 271 (quoting *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 342 (5th Cir.2008)). *See also Nat'l Jr. Baseball, supra* at 38–39. In addition, many of Plaintiff's allegations do not point to any specific misstatement or omission made personally by Goggins. As noted in my analysis of Plaintiff's

2011 WL 6339824

claims against Luther, the PSLRA and Rule 9(b) standards require greater specificity.

As for Plaintiff's allegation that, at the May hearing, Goggins denied reducing the number of quality control employees at McNeil, the only fact alleged in support of that assertion is that CW1 states that Goggins reduced the number of quality control staff. As explained above, when evaluating a complaint that is based upon the statements of confidential witnesses, courts "consider the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Avaya,* 564 F.3d at 253 (*quoting Chubb* at 148). Here, there is no corroboration of the confidential witness's statement that Goggins reduced quality assurance staff at McNeil, nor are there any additional facts that demonstrate the plausibility of this allegation. Hence I do not credit the confidential witness assertion and, therefore, do not find that Plaintiff has sufficiently alleged scienter with respect to Goggins' statement about the number of employees retained.

**\*21** That said, Plaintiff's assertion that Goggins attended the February 19, 2010 meeting where the phantom recall was discussed sufficiently alleges that she had knowledge of the recall when she testified at the May Congressional Hearing that she did not have such knowledge. Defendant questions whether this statement constitutes the sort of public statement that is actionable under the securities law; it was not a statement made to investors, but to the congressional committee. Neither party provided the Court with authority on this question, and this Court's research has not revealed any cases addressing the issue. In my view, while the statement was not directed at investors, it was nonetheless a public hearing, reported to the public, and it was under oath. In this way, a congressional hearing that is reported publically is similar to media statements or press releases, which courts have analyzed under Rule 10b–5. *See e.g., Furst v. Feinberg,* 54 Fed.Appx. 94, 97 (3d Cir.2002).

Defendant further argues that Goggins did not unequivocally state that she was unaware of the phantom recall. Rather, according to Defendants, she clarified at the May hearing that "I can't tell you about the behavior of these contractors in the market or what they said or what they didn't say or how they acted." Def. Open. Br. at 27 (citing May Cong. Hrg. at 87–88). [23] But this statement does not expressly disavow her alleged prior statement that J & J did not "have contractors

go back to stores and buy medicine instead of recalling the medicine ..." Am.Compl., ¶ 144. A plausible interpretation of two statements is that the Goggins attempted to qualify her "No, we didn't" statement, which referred to whether *J & J* or *McNeil* directed contractors to perform the recall, with the follow-up statement that she did not know what the *contractors* did. What J & J or McNeil directed and what the contractors did may very well have been two different things. Thus, in my view, Plaintiff's allegations that Goggins acted with scienter by testifying that she did not know about the phantom recall when she in fact did is just as plausible of an inference as the one Defendants put forth.

23    Defendants also point to Goggins' testimony at the September Congressional Hearing that she did not know about the instructions given to the contractors. *See* Def. Open. Br. at 27. But taking as true Plaintiff's allegation that she was present at the February 19, 2010 meeting, this testimony actually suggests that Goggins was not truthful about her knowledge of the phantom recall.

Considering these allegations, along with the other allegations specific to Goggins that are pled in the Amended Complaint, I conclude that Plaintiff has alleged facts from which a compelling inference of Goggins' scienter can be drawn.

### D. Defendant Caruso

For Defendant Caruso, J & J's Chief Financial Officer, Plaintiff asserts that he participated in several investor and analyst conference calls in which he misrepresented the nature of J & J's cost-cutting initiatives and the resulting effect on quality control at McNeil. For example, in paragraph 158 of the Amended Complaint, Plaintiff recounts a conference call that reported the financials for the second fiscal quarter of 2009. Plaintiff does not specify the date of the call, but quotes some of Caruso's comments which include: "I think our people did an excellent job in managing the business, quite frankly, and keeping a rein on cost and being judicious about where we could make investments and where we can otherwise operate more efficiently." According to Plaintiff, these sorts of statements are misleading because J & J was not being judicious about cutting costs, but was recklessly cutting costs and sacrificing quality control. Plaintiff also alleges that, in that same conference call, Caruso falsely represented to shareholders and the public that J & J was "making prudent investments that will grow our business for the long term." *Id.* Further, Plaintiff alleges, Caruso stated in that conference call that " "[a]s I have said many times before, the people of

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2932 Filed 11/15/24 Page 135 of 173
Monk v. Johnson & Johnson, Not Reported in F.Supp.2d (2011)
2011 WL 6339824

Johnson & Johnson always manage the business very well." *Id.* at ¶ 161. Caruso's failure to inform the public of the systemic nature of McNeil's quality control problems makes this statement misleading, according to Plaintiff. *Id.*

**\*22** In addition, Plaintiff alleges that Caruso "recklessly assured investors during a May 11, 2010 investor conference that the Company's control deficiencies were limited to the Fort Washington plant, characterizing the FDA's crackdown on Fort Washington as an isolated occurrence." *Id.* at ¶ 11. Caruso's alleged statement was made as part of the following colloquy:

> [Analyst]: In terms of providing a level of confidence that this is a McNeil-specific issue, what could you say to that in terms of giving people comfort that in the larger pharmaceutical business, you are comfortable with the quality systems that you have today and comfortable with your positioning? ...

> [Caruso]: Well, one thing to keep in mind is this is a very specific inspection of one manufacturing plant in our consumer business. *The comments by the FDA are very specific to that particular facility.* And the other thing to point out is that we have many manufacturing facilities around the world that are consistently inspected, both internally and by outside regulatory agencies, throughout the year, and those are individually addressed by the management teams at those businesses. And this particular instance and this particular recall is reflective of the conditions at the McNeil Fort Washington facility."

*Id.* at ¶ 199 (quoting May 11, 2010 conference call) (emphasis in original). Plaintiff asserts that this statement was false and misleading, and omitted material information, because the FDA warning letter issued on January 15, 2010, also addressed deficiencies at the Puerto Rico plant. *Id.* Moreover, Plaintiff points to the February 19, 2010 meeting as a source of Caruso's knowledge, and the May Congressional hearing which took place on May 27, 2010. *Id.*

Relatedly, Plaintiff alleges that Caruso misrepresented in an April 20, 2010 conference call that the "OTC recall has not really impacted either physician recommendations or consumer preferences." *Id.* at ¶ 184. Plaintiff alleges that this conference call was misleading because "in the context of discussing the Company's purported voluntary recalls and other steps taken to address product quality concerns, he consciously and recklessly omitted material information regarding the twenty-month delay of the 'moldy'

Tylenol recall in 2008 and 2009, and the phantom recall of Motrin conducted in early 2009," as well as McNeil's systemic quality assurance failures. *Id.* at ¶ 186. In short, Caruso's statements allegedly "created a materially misleading impression that J & J, through its initiation of voluntary recalls, was taking responsible steps toward ensuring product safety and transparency with consumers." *Id.*

As with the other Defendants, Plaintiff alleges that Caruso failed to disclose the phantom recall and that McNeil was subjected to cost-cutting mechanisms that sacrificed quality. Lastly, Plaintiffs also point to Caruso's compensation package as further evidence of scienter. *Id.* at ¶¶ 254–55. As these two issues have been addressed in my analysis of the claims against the other Defendants, I need not repeat that analysis here but simply note that these allegations are insufficient to create a compelling inference of scienter.

**\*23** In terms of Caruso's alleged statements, several of them are inactionable puffery. His comments that "our people did an excellent job in ... keeping a rein on cost and being judicious about where we could make investments and where we can otherwise operate more efficiently," and that J & J was "making prudent investments that will grow our business for the long term," and that "the people of Johnson & Johnson always manage the business very well," are all vague and general statements of optimism that do not give rise to a duty to disclose. *See Kearns,* 691 F.Supp.2d at 617 ("[V]ague and general statements of optimism 'constitute no more than puffery and are understood by reasonable investors as such.' ") (quoting *Advanta,* 180 F.3d at 538). As explained by the Third Circuit in *Advanta,* "[s]uch statements, even if arguably misleading, do not give rise to a federal securities claim because they are not material: there is no 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.' " No reasonable investor would have relied upon these statements.

A strong inference of scienter can be drawn from other alleged statements by Caruso, however. Caruso allegedly stated in a May 11, 2010 conference call that "one thing to keep in mind is this is a very specific inspection of one manufacturing plant in our consumer business. *The comments by the FDA are very specific to that particular facility....* And this particular instance and this particular recall is reflective of the conditions at the McNeil Fort

**Monk v. Johnson & Johnson, Not Reported in F.Supp.2d (2011)**

2011 WL 6339824

Washington facility." Am.Compl. at ¶ 199 (emphasis in original). Plaintiff's allegation describes this statement with particularity by noting the substance of his statement and the date upon which it was made. And, importantly, a reasonable construction of this statement is that it creates the impression that Caruso reviewed FDA correspondence prior to making the statement. More to the point, Caruso's alleged statement brings the issues of cost-cutting and quality assurance into "play," thereby creating a duty to disclose McNeil's general quality control deficiencies, the phantom recall, the other recalls. As the Third Circuit explained in *Shapiro v. UJB Financial Corp.,* 964 F.2d 272 (3d Cir.1992), "where a defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play,'" and "[b]y addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully." *Id.* at 282. [24] Here, Caruso's statement was made in response to the analyst's question: "In terms of providing a level of confidence that this is a McNeil-specific issue, what could you say to that in terms of giving people comfort that in the larger pharmaceutical business, *you are comfortable with the quality systems that you have today* and comfortable with your positioning?" Am. Compl., ¶ 199 (emphasis added). By responding to this directed question with the answer that "[t]he comments by the FDA are very specific to [the Fort Washington] facility," a plausible implication of Caruso's alleged statement is that McNeil does not have systemic quality assurance problems that extend beyond that facility.

[24]    While *Shapiro* is an older Third Circuit decision, it is cited in the Circuit's more recent duty-to-disclose decision in *Oran.* To be clear, the *Oran* court distinguished *Shapiro* on its facts. By merely distinguishing *Shapiro* on its facts, the *Oran* court acknowledged the continuing viability of *Shapiro's* legal holding. *See Oran,* 226 F.3d at 285.

**\*24** Defendants argue that Caruso did not falsely represent the quality control problems because he also stated in that same May 11, 2011 call that "he didn't know yet if the issues were limited to McNeil." Def. Open. Br. at 29, n. 5 (citing page 4 of the May 11, 2010 Transcript of the conference call). Indeed, the analyst on the conference call asked Caruso the following additional question: "[D]o you feel like you've identified the specific set of issues and therefore can have comfort that it, again, is a McNeil-specific issue?" Phillips Decl., Exh. B at 4. Caruso responded, "the timing of this and

the ultimate resolution of the issues is as yet unknown because the investigation is still ongoing. So I really can't comment any further on it." *Id.*

In my view, Caruso's response does not relate to whether there are adequate quality control systems in place at McNeil but, rather, it relates to whether J & J's quality control problems are "McNeil-specific." In other words, Caruso's response addresses whether there are additional subsidiaries that are experiencing quality control failures. Therefore, that statement does not alter Caruso's earlier statement that McNeil's quality control problems were limited to the Fort Washington facility.

As the Supreme Court explained in *Tellabs,* a "strong inference" of scienter is one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 2504–05. "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Id.* at 2510 (internal quotation marks omitted)). Plaintiff's allegation that Caruso's statement brought "into play" the issue of McNeil's quality assurance program yet failed to disclose that there were additional problems beyond those at the Fort Washington plant is at least as plausible as any competing inferences that could be drawn from Plaintiff's allegations.

In addition, Plaintiff alleges that Caruso misrepresented in an April 20, 2010 conference call that the "OTC recall has not really impacted either physician recommendations or consumer preferences." *Id.* at ¶ 184. Plaintiff alleges in paragraph 187 of the Amended Complaint that this statement was misleading because, by omitting reference to the phantom recall, it fails to acknowledge the impact that recall had on consumer preferences. It is plausible that Caruso's statement could be interpreted as misleading by an investor, and when considered in conjunction with Caruso's statement about the FDA's concerns being limited to the Fort Washington facility, it further supports a finding that scienter is sufficiently alleged here. Indeed, these allegations, read in conjunction with all the remaining allegations against Caruso, lead me to conclude that Plaintiff has sufficiently alleged scienter with respect to Caruso.

### E. J & J's Scienter

**\*25** Having concluded that Plaintiff has sufficiently pled scienter with respect to at least one corporate officer, I further conclude that scienter has been pled against J & J. *Accord*

2011 WL 6339824

*In re Honeywell Intern., Inc. Securities Litig.,* 182 F.Supp.2d 414, 429–30 (D.N.J.2002) (denying corporation's motion to dismiss where scienter properly pled against individual officer defendants).

### F. Section 20(a) of the Securities Exchange Act

"The Securities Exchange Act of 1934 Section 20(a) imposes liability on controlling persons who aid and abet violations of the Act." *Aetna,* 617 F.3d at 285 (citing 15 U.S.C. § 78t). "Under the plain language of the statute, 'plaintiffs must prove not only that one person controlled another person, but also that the controlled person is liable under the Act. If no controlled person is liable, there can be no controlling person liability." *In re Royal Dutch/Shell Transport Securities Litig.,* 380 F.Supp.2d 509, 565 (D.N.J.2005). Thus, having concluded that Plaintiff sufficiently plead scienter with respect to Defendants Goggins and Caruso, who both were

allegedly directly involved in J & J's decision making processes, I conclude that Plaintiff has sufficiently alleged controlling person liability under Section 20 against those two defendants. *Accord Avaya,* 564 F.3d at 230; *In re Royal Dutch,* 380 F.Supp.2d at 565.

### IV. CONCLUSION

For the reasons expressed above, Defendant's motion to dismiss is granted with respect to Defendants Weldon and Luther and denied with respect to Defendants J & J, Goggins, and Caruso. Plaintiffs are hereby granted thirty (30) days to file a Second Amended Complaint in accordance with the dictates of this Opinion. An appropriate Order shall follow.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 6339824

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Plagens v. Deckard, Not Reported in Fed. Supp. (2023)
2023 WL 2711263

2023 WL 2711263
Only the Westlaw citation is currently available.
United States District Court, N.D. Ohio, Eastern Division.

William PLAGENS, et al., Plaintiffs,
v.
Jenniffer D. DECKARD, et al., Defendants.

Case No. 1:20-cv-2744
|
Signed March 30, 2023

**Attorneys and Law Firms**

Joshua E. Baker, Rosen Law, Jenkintown, PA, Laurence M. Rosen, Phillip C. Kim, Rosen Law, New York, NY, Daniel R. Karon, Law Office of Daniel R. Karon, Cleveland, OH, for Plaintiffs.

Daniel T. Donovan, Katharine C. Collins, Matthew S. Owen, Kirkland & Ellis, Washington, DC, Gabor Balassa, Kirkland & Ellis, Chicago, IL, for Defendants.

**OPINION AND ORDER**

J. Philip Calabrese, United States District Judge

**\*1** Lead Plaintiff Dr. Thomas Phelps seeks to recover on behalf of a putative class for alleged violations of federal securities laws. Defendants Jenniffer Deckard, Mark Barrus, Michael Biehl, Andrew Eich, and Richard Navarre, all of whom served as officers of Covia Holdings Corporation or its predecessors, principally Fairmount Santrol Holdings Inc., move to dismiss the consolidated amended complaint. For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss.

**STATEMENT OF FACTS**

Taking the facts alleged in the consolidated amended complaint as true and construing them in favor of the non-moving party, as the Court must in the present procedural posture, Plaintiff bases his claims in this putative class action on the following facts and defines the class period as running from March 10, 2016 through June 29, 2020. (ECF No. 50, ¶ 1, PageID #1066.)

**A. The Company's Products**

When it became a publicly traded company in October 2014, Fairmount Santrol's shares traded on the New York Stock Exchange. (*Id.*, ¶ 28, PageID #1073.) Effective June 1, 2018, Fairmount Santrol merged with Unimin Corporation to form Covia Holdings Corporation. (*Id.*, ¶¶ 28–29, PageID #1073.) In the merger, shareholders received $0.73 in cash consideration and 0.2 shares of Covia stock for each Fairmount Santrol share held at the time of the merger. (*Id.*) For the sake of convenience in this ruling, when the Court refers to the Company or Covia, it includes Covia, Fairmount Santrol, and Unimin.

Plaintiff's allegations arise in the context of the hydraulic fracturing space, commonly known as fracking. (*Id.*, ¶ 2, PageID #1066; *see also id.*, ¶ 39, PageID #1075.) Hydraulic fracturing injects large quantities of water, chemicals, and sand at high pressure into a wellbore to create cracks in rock formations, allowing oil and gas trapped within to flow more freely. (*Id.*, ¶¶ 39 & 40, PageID #1075–76.) Specifically, Fairmount Santrol sold sand and sand-based products to oil and gas companies, which used these materials in fracking operations. (*Id.*, ¶ 2, PageID #1066.) The Company's chief product was Northern White sand, which is not at issue in this case. (*Id.*, ¶ 43, PageID #1076.) Instead, this case involves value-added products known as proppants, which prop open fractures in rock formations promoting the flow of hydrocarbons (oil and gas) through wells, that the Company marketed as having higher conductivity than traditional sand. (*Id.*, ¶¶ 40, 42 & 44, PageID #1076.) Conductivity provides a key measure of proppant performance, and higher conductivity means that more oil and gas can be extracted from a well. (*Id.*, ¶¶ 2 & 42, PageID #1066 & #1076.)

In the early 2010s, hydraulic fracturing expanded in the United States, creating a booming oil and gas industry and significant demand for sand for use as a proppant. (*Id.*, ¶ 41, PageID #1076.) According to the consolidated amended complaint, Fairmount Santrol and later Covia attempted to differentiate itself in the market with high-quality and value-added proppants. (*Id.*, ¶ 3, PageID #1066–67; *see also id.*, ¶¶ 43–45, PageID #1076–77.) It invested heavily in developing these products and sought to sell them at a premium. (*Id.*, ¶¶ 44 & 49, PageID #1067 & #1078.) Plaintiff focuses on three of the Company's value-added proppant products in particular:

**\*2** (1) PowerProp, a premium resin-coated sand;

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2936 Filed 11/15/24 Page 139 of 173

Plagens v. Deckard, Not Reported in Fed. Supp. (2023)
2023 WL 2711263

(2) Propel SSP, a gel-coated sand compatible with freshwater that the Company touted as delivering proppants further into the ground to increase oil and gas production; and

(3) Propel SSP 350, a version of Propel SSP compatible with almost any type of water.

(*Id.*, ¶ 4, PageID #1067; *id.*, ¶¶ 46–51, PageID #1077–78.) But these were not the Company's only value-added proppants. (*See* ECF No. 51-3, PageID #1320.)

**B. The Company's Business Strategy**
Generally, the Company told investors that its long-term strategy included developing and commercializing value-added proppant products. (ECF No. 50, ¶ 3, PageID #1066–67; *id.*, ¶ 45, PageID #1077.) As one example of the market advantages for the Company of these premium products, a confidential witness—a former employee who served as a senior district sales manager from 2017 through March 2020 and whom the consolidated amended complaint references as FE2 (*id.*, ¶ 35, PageID #1075)—reports that PowerProp sold for approximately $250 per ton, compared to the $100 per ton base commodity price for Northern White Sand, or prices as low as $8 per ton for local sand (*id.*, ¶ 44, PageID #1076). The Company first introduced PowerProp in 2010. (*Id.*, ¶ 47, PageID #1077; ECF No. 51-3, PageID #1320.)

According to the consolidated amended complaint, the Company acquired the right to use Propel SSP in 2013 for approximately $55 million and spent more than $58 million toward its development. (ECF No. 50, ¶ 49, PageID #1078; ECF No. 50-1, ¶ 32, PageID #1132.) Further, it avers that PowerProp and Propel SSP accounted for 6.6% of the Company's revenue for its proppant segment in 2014, dropping to 4% in 2017. (ECF No. 50, ¶ 52, PageID #1078; ECF No. 50-1, ¶ 12, PageID #1130.) In 2016, these products accounted for 7.8% of the Company's total profit margin, and they accounted for 4.75% of that margin in 2017. (*Id.*)

Internally, the Company tracked the tons sold and average selling price of these products, and considered them a key component in its profit and loss metrics. (ECF No. 50, ¶ 53, PageID #1078; ECF No. 50-1, ¶ 12, PageID #1130; *see also* ECF No. 50, ¶¶ 187 & 191, PageID #1113–14 & #1115.) Externally, market analysts who covered the Company followed and discussed these proppant products and their commercial prospects. (ECF No. 50, ¶ 54, PageID #1078; ECF No. 50-1, ¶ 13, PageID #1130.) To illustrate the market's focus on the Company's statements and reports about these productions, the consolidated amended complaint outlines four examples:

• On May 19, 2016, the Company held an event for investors and analysts at which it made statements about Propel SSP. (ECF No. 50, ¶ 55, PageID #1078–79.) The next day, an analyst from Wells Fargo credited Fairmount Santrol's claims: "we see potential upside from the Company's self-suspending proppant 'Propel SSP,' which has been successful in increasing production (30%) compared to offset wells in trials with nearly 20 E&Ps and over 90 wells." (*Id.*) A few days later, an analyst from Jefferies noted the potential upside of Propel SSP as well. (*Id.*, ¶ 56, PageID #1079.)

**\*3** • Two analysts in March 2017 provided favorable reports on the Company. On March 9, 2017, an analyst report from Wells Fargo noted increasing demand for resin-coated products that prompted the Company to reopen a facility. (*Id.*, ¶ 59, PageID #1079–80.) On March 27, 2017, a report from Guggenheim Securities pointed to the Company's value-added products and unique proppant technology "that could take off and provide an additional avenue of growth." (*Id.*, ¶ 60, PageID #1080.) That report also relied on statements from the Company about Propel SSP, including that the Company "believes the production uplift [from Propel SSP] is usually at least 30%." (*Id.*, ¶ 61, PageID #1080.)

• On November 5, 2017, an analyst report from the energy specialists of Piper Jaffray noted that the Company's management touted Fairmount Santrol's products: "value-added proppant, especially Propel SSP, has been a component of the company's product suite that management has long touted," leading the analyst to "believe the increased commercialization of Propel SSP influenced quarterly results. Modeling sales of the product is difficult but we are increasing our estimates and price target largely under the assumption that value added proppant volumes and revenues continue to improve in the [future]." (*Id.*, ¶ 57, PageID #1079.) In that same report, the analyst increased its price target "due largely to increased value added proppant volume." (*Id.*)

• Between May 2017 and May 2019, analyst reports from Morningstar Equity Research included favorable projections for the Company based on sales of Propel SSP, which the reports said "could be a blockbuster seller, as

it holds promise of dramatically reducing well costs while increasing well productivity." (*Id.*, ¶ 58, PageID #1079.)

## C. Allegedly False Statements

The consolidated amended complaint points to "numerous false and misleading claims" about PowerProp, Propel SSP, and Propel SSP 350 before and during the class period, which covers the time from March 10, 2016 through June 29, 2020. (*Id.*, ¶¶ 1 & 62, PageID #1066 & #1080.)

## C.1. Before the Class Period (March 10, 2016)

Fairmount Santrol did not sell ceramic products for hydraulic fracturing. (ECF No. 50-1, ¶ 3, PageID #1128.) Plaintiff maintains that the Company misrepresented that the performance of PowerProp was comparable to lightweight ceramics, which "are higher-performing, more expensive proppant products" compared to sand. (ECF No. 50, ¶ 63, PageID #1080.) Plaintiff points to representations to this effect that Fairmount Santrol made to analysts in an August 2014 presentation, a road-show presentation from September 2014, and Fairmount Santrol's registration statement with the Securities and Exchange Commission in connection with its initial public offering. (*Id.*, ¶¶ 64–66, PageID #1080–81; *see also* ECF No. 50-1, ¶¶ 16–18, PageID #1130.) Beginning in 2014, Fairmount Santrol posted data purportedly supporting this claim on its website. (ECF No. 50, ¶ 68, PageID #1081; ECF No. 50-1, ¶ 20, PageID #1130.) Moreover, internal documents of Fairmount Santrol confirmed that the Company's statements regarding competitiveness with ceramics referred to conductivity. (ECF No. 50, ¶ 67, PageID #1081; ECF No. 50-1, ¶ 19, PageID #1130.)

Notwithstanding these public representations, employees internally acknowledged that PowerProp's conductivity fell short of Fairmount Santrol's published performance results, which appeared comparable to lightweight ceramics. (ECF No. 50-1, ¶¶ 19–21, PageID #1130–31; *see also* ECF No. 50, ¶ 68, PageID #1081.) Beginning in 2011, the Company convened a product performance team and a conductivity improvement team to address the performance of its resin-coated products. (ECF No. 50, ¶ 156, PageID #1106–07; ECF No. 50-1, ¶ 21, PageID #1130–31.) These teams included employees from the research and development, sales and marketing, and investor relations departments, as well as product experts and executives, and met for several years. (*Id.*) Minutes from their meetings describe unsuccessful efforts to increase the conductivity of PowerProp. (ECF No. 50, ¶ 156, PageID #1107; ECF No. 50-1, ¶ 21, PageID #1131.)

Moreover, according to an unidentified former employee, whom the consolidated amended complaint references as FE3, the Company received many complaints from customers that PowerProp did not work well or increase productivity and that it actually plugged some wells. (ECF No. 50, ¶ 184, PageID #1113.)

**\*4** Minutes from these internal team meetings reflect concern about continuing to market PowerProp as comparable to ceramics. (ECF No. 50, ¶ 156, PageID #1107; ECF No. 50-1, ¶ 21, PageID #1131.) Two managers internally acknowledged in 2014 that PowerProp could not compete with ceramics. (ECF No. 50, ¶ 158, PageID #1107; ECF No. 50-1, ¶ 23, PageID #1131.) Internal documents show that, in the first quarter of 2014, PowerProp's conductivity was as much as 49% below what the Company said on its website. (ECF No. 50, ¶ 157, PageID #1107; ECF No. 50-1, ¶ 22, PageID #1131.) In 2015, Fairmount Santrol employees learned that a former employee forged the conductivity numbers published on its website. (ECF No. 50, ¶ 159, PageID #1107; ECF No. 50-1, ¶ 26, PageID #1131.) Nonetheless, the Company left the results on the website until mid-2017. (ECF No. 50, ¶ 162, PageID #1108.)

Additionally, Plaintiff alleges that the Company oversold the success of Propel SSP in increasing production from test wells, including in filings with the SEC. (ECF No. 50, ¶ 69, PageID #1081.) For example, in a presentation in 2015 for investors and analysts, the Company stated that the use of Propel SSP in more than ninety wells typically resulted in production increases of more than 30%. (ECF No. 50-1, ¶ 36, PageID #1132.) According to the consolidated amended complaint, this statement was false because the Company had data for only twenty-nine wells, less than half of which showed increased production of more than 30%. (ECF No. 50, ¶¶ 163–64, PageID #1108; ECF No. 50-1, ¶ 36, PageID #1132.) Although Propel SSP performed adequately in the lab, an unidentified former employee, FE4, avers that those tests were not performed in conditions that adequately predicted real-world performance. (ECF No. 50, ¶ 186, PageID #1113.) Further, FE4 reports that the Company received feedback from customers about problems with Propel SSP in the field, including that the product gummed up equipment and created a lot of dust, an occupational hazard. (*Id.*) Another unidentified former employee, FE1, joined the Company in 2014 and spoke regularly with a chemist at the Company from whom FE1 learned that the Company was unable to get the results it expected for PowerProp's conductivity and performance. (*Id.*, ¶¶ 177 & 178, PageID #1111.)

2023 WL 2711263

Throughout this period, and continuing through 2018, the Company allegedly received negative feedback from customers that its data did not support claims about Propel SSP's effectiveness. (ECF No. 50, ¶ 165, PageID #1108; ECF No. 50-1, ¶ 40, PageID #1133.) Only one customer that used Propel SSP on a trial basis became a commercial customer. (ECF No. 50, ¶ 166, PageID #1109; ECF No. 50-1, ¶ 40, PageID #1133; *see also* ECF No. 50, ¶ 189, PageID #1114.) An unidentified former employee, whom the consolidated amended complaint references as FE5, avers that, while employed at the Company, he cross referenced publicly available data about well productivity with internal, non-public data regarding sales of the Company's proppants and determined that its proppants yielded "no discernible difference" in well productivity. (ECF No. 50, ¶ 190, PageID #1114–15.) Another former employee, FE2, avers that he struggled to sell PowerProp because of its cost. (ECF No. 50, ¶ 182, PageID #1112.) The same price issues limited FE2's ability to sell Propel SSP and Propel SSP 350. (*Id.*)

### C.2. During the Class Period (March 10, 2016 through June 29, 2020)
In the consolidated amended complaint, Plaintiff identifies several statements that he contends are false and misleading. The Court groups them into four categories and attempts to lay out chronologically the allegations of the consolidated amended complaint by going beyond those specific statements in the first category— the Company's annual reports.

### C.2. a. Annual Reports
Plaintiff identifies specific statements in the Company's annual reports that he alleges are false and misleading. Additionally, Plaintiff claims that the Company's annual reports made misleading risk disclosures.

### C.2. a.i. 2015
 **\*5** When the Company filed its annual Form 10-K for 2015, it represented that PowerProp "delivers strength and performance characteristics similar to lightweight ceramics." (*Id.*, ¶ 73, PageID #1082.) Defendant Jenniffer D. Deckard, Fairmount Santrol's president and chief executive officer (*id.*, ¶ 22, PageID #1071) and Defendant Mark E. Barrus, who served as the interim chief financial officer and interim principal accounting officer of Fairmount Santrol from October 20, 2015 to May 2016 (*id.*, ¶ 23, PageID

#1072), signed Fairmount Santrol's 2015 Form 10-K and made certifications under the Sarbanes-Oxley Act of 2002 (*id.*, ¶ 72, PageID #1082; *id.*, ¶¶ 77–78, PageID #1083–84). The certification under the Sarbanes-Oxley Act provides the filing "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading[.]" (*Id.*, ¶ 77, PageID #1083.)

Plaintiff alleges that this statement is false and misleading because Ms. Deckard and Mr. Barrus knew but failed to disclose that PowerProp's conductivity "was as much as 49% lower than the Company's published performance results and much lower than that of lightweight ceramics." (*Id.*, ¶ 74, PageID #1082–83.) Plaintiff claims that the Company based its published performance results for PowerProp on forged test results. (*Id.*)

Also in its 2015 10-K, Fairmount Santrol touted that "Propel SSP continues to undergo extensive field trials with key customers with successful results (increased productivity and reduced operating costs)." (*Id.*, ¶ 75, PageID #1083.) Plaintiff alleges that this statement is false and misleading because Defendants knew but failed to disclose that "only a small subset of all Propel SSP test wells actually had production increases of 30% or more." (*Id.*, ¶ 76, PageID #1083.) Of the twenty-nine production wells for which Fairmount Santrol had production data, Plaintiff alleges that less than half showed increased production of more than 30%. (*Id.*) "The Company's only results came from a very limited set of test wells, only a portion of which showed any meaningful increases in production." (*Id.*)

These reasons for the alleged falsity of the statements at issue also apply to the risk disclosures Plaintiff places at issue in the consolidated amended complaint. (*Id.*, ¶ 117, PageID #1097.) The Company's 2015 Form 10-K disclosed that Fairmount Santrol was conducting field trials of Propel SSP that might "demonstrate that the product is ineffective or not commercially viable":

> The development and marketing of Propel SSP may prove to be unsuccessful.

> In April 2013, we acquired intellectual property rights to self-suspending proppant technology which led to the development of Propel SSP. We are currently conducting field trials on Propel SSP. The technology supporting Propel SSP is still unproven. Although the results of field

trials have been encouraging, additional testing ultimately may demonstrate that the product is ineffective or not commercially viable.

(*Id.*, ¶ 116, PageID #1096.) Plaintiff alleges that this risk disclosure was not sufficient to inform investors of the limited positive field trial results and lack of commercial demand. (*Id.*, ¶ 117, PageID #1097.) Also, Plaintiff alleges that Defendants already knew that Propel SSP was not commercially viable because it had only signed a single contract with a repeat customer to purchase Propel SSP. (*Id.*)

### C.2.a.ii. 2016

When the Company filed its Form 10-K for 2016 with the SEC, Ms. Deckard and Defendant Michael F. Biehl, Fairmount Santrol's chief financial officer and its principal accounting officer and executive vice president from May 2016 to May 2018 (*id.*, ¶ 24, PageID #1072), signed the annual report and made certifications under the Sarbanes-Oxley Act (*id.*, ¶ 93, PageID #1090; *see also id.*, ¶¶ 100 & 101, PageID #1092). Again, the Company touted PowerProp as having "strength and performance characteristics similar to lightweight ceramics." (*Id.*, ¶ 94, PageID #1090.)

**\*6** Like the 2015 Form 10-K, the annual report for 2016 again reported successful field trials for Propel SSP. (*Id.*, ¶ 96, PageID #1091.) Specifically, the 2016 annual report claimed that Propel SSP allowed more extraction of oil and gas from wells and other benefits that lowered production costs:

> Test results indicate that the lower specific gravity allows greater volumes of proppant and/or coarser mesh sizes coated with the Propel SSP® product to be carried deep into the fracture, which in turn allow more hydrocarbons to escape into the wellbore. As a result, field trials have shown a variety of benefits, including increased production, decreased use of fluids, and reduced pumping time.

(*Id.*) Additionally, the annual report reinforced these statements:

> Propel SSP® products continue to undergo extensive field trials with key customers with successful results (increased productivity and reduced operating costs)....Extensive field tests have shown the benefits of Propel SSP® products, including increased initial production, reduced fluid usage, and reduced pumping time. Propel SSP® 350 products can now accomplish the same results in hard water.

(*Id.*, ¶ 98, PageID #1091.) Regarding the risk disclosure, the 2016 Form 10-K contained a similar generic disclaimer regarding Propel SSP as the prior year's annual report:

> *The development and marketing of Propel SSP® products may prove to be unsuccessful.*

> The technology supporting Propel SSP® products is still being proven through field trials. Although the results of field trials have been encouraging, and one customer in particular is using Propel SSP® products on a commercial basis in all of its wells, additional testing ultimately may demonstrate that the product is ineffective or not commercially viable.

(*Id.*, ¶ 118, PageID #1097.)

Plaintiff alleges that all these statements and the risk disclosure are false and misleading for the same reasons as the similar statements in the 2015 Form 10-K and, in particular, because of the production data and field test results the Company had at the time. (*Id.*, ¶¶ 95, 97, 99 & 119, PageID #1090–92 & #1097–98.) In short, Plaintiff claims that field trials for Propel SSP did not show increased production or productivity and that, at the time, the Company had not yet done field testing for Propel SSP 350 and the product was not commercially available. (*Id.*, ¶ 99, PageID 1092; *id.*, ¶ 167, PageID #1109.) In fact, the Company could not manufacture Propel SSP 350 in sufficient quantities or at competitive prices. (*Id.*; ECF No. 50-1, ¶ 42, PageID #1133.) By this time, Plaintiff claims that the risks of which the Company warned had already materialized because of its inability to convert trial customers of Propel SSP into commercial customers and because of the continued testing results. (ECF No. 50, ¶ 119,

Plagens v. Deckard, Not Reported in Fed. Supp. (2023)
2023 WL 2711263

PageID #1097–98.) Plaintiff alleges that Defendants knew, or were severely reckless in not knowing, that these risks had already materialized. (*Id.*)

In May 2017, according to an article that Bloomberg Businessweek published in 2020, four employees of Fairmount Santrol told their bosses at meetings that they believed the Company was committing fraud. (*Id.*, ¶ 170, PageID #1110.) They allegedly raised concerns about PowerProp's performance and misrepresentations in marketing materials and public statements. (*Id.*, ¶¶ 6 & 161, PageID 1067–68 & #1108; ECF No. 50-1, ¶ 29, PageID #1131.) Specifically, the employees took turns speaking to two unnamed executives who met with each employee for at least an hour and, in some cases, more than two. (ECF No. 50, ¶ 173, PageID #1110.) An employee of Fairmount Santrol later described the fraud to the SEC as involving the marketing of "scientific testing to create the illusion of proven performance and reliability." (*Id.* ¶ 172, PageID #1110.) In 2018, the same publication quoted another whistleblower who said the Company had "a culture of covering up its lies without regard to who might suffer." (*Id.*) The Company never disclosed the actual conductivity of PowerProp and stopped the selling product in 2018 when Fairmount Santrol merged with Unimin to form Covia. (ECF No. 50, ¶ 162, PageID #1108; ECF No. 50-1, ¶ 31, PageID #1132.)

**\*7** Another unnamed employee, whom the consolidated amended complaint references as FE3, described Propel SSP as a "scam" and "snake oil that they were trying to sell for profit." (ECF No. 50, ¶ 184, PageID #1113.) Like FE2, FE3 avers that the Company was unable to sell Propel SSP because of its cost. (*Id.*)

**C.2.a.iii. 2017**
On March 3, 2018, the Company filed its 2017 Form 10-K with the SEC. Again, Ms. Deckard and Mr. Biehl signed the annual report and its accompanying certifications. (*Id.*, ¶ 106, PageID #1094; *id.*, ¶¶ 113 & 114, PageID #1095–96.) Like the 2015 and 2016 annual reports, the 2017 Form 10-K touted PowerProp (*id.*, ¶ 107, PageID #1094), the successful results for Propel SSP in extensive field tests (*id.*, ¶ 109, PageID #1095), and the benefits of Propel SSP 350 (*id.*, ¶ 111, PageID #1095.) Plaintiff alleges that these statements were false and misleading for the same reasons as those in the earlier annual reports. (*Id.*, ¶¶ 108, 110 & 112, PageID #1094 & #1095.)

Also, the 2017 annual report contained a similar generic risk disclosure regarding Propel SSP and its allegedly unproven technology:

*The development and marketing of Propel SSP® products may prove to be unsuccessful.*

The technology supporting Propel SSP® products is unproven through field trials. Although the results of field trials have been encouraging, and some customers are using Propel SSP® products on a commercial basis in all of their wells, additional testing ultimately may demonstrate that the product is ineffective or not commercially viable.

(*Id.*, ¶ 120, PageID #1098.) Plaintiff alleges that this disclosure was misleading and inadequate for the same reasons as the earlier disclosures in the previous annual reports. (*Id.*, ¶ 121, PageID #1098.) Only one customer, not "some," had adopted Propel SSP. (*Id.*) By this time, the Company still did not have field test results for Propel SSP 350. (*Id.*, ¶ 168, PageID #1109.)

By 2018, an unidentified former employee, whom the consolidated amended complaint references as FE1, avers that executives at the Company discussed PowerProp less frequently "because it was not gaining any sales traction or commercial adoption." (*Id.*, ¶ 181, PageID #1112.) As a result, the Company shifted its efforts to Propel SSP. (*Id.*)

**C.2.a.iv. 2018**
On March 22, 2019, the Company filed its 2018 Form 10-K with the SEC. (*Id.*, ¶ 122, PageID #1098.) Ms. Deckard signed the report, as did Defendant Andrew D. Eich, Covia's executive vice president and chief financial officer from June 2018 through the end of the class period (*id.*, ¶ 25, PageID #1072) and Defendant Richard A. Navarre, who served as Covia's chief executive officer from September 2019 through the end of the class period and as chair of the board of directors and the chair of its executive and audit committee beginning in June 2018 (*id.*, ¶ 26, PageID #1072; *id.*, ¶¶ 122 & 125–26, PageID #1098 & 1100). Plaintiff alleges that the 2018 annual report contained a generic and misleading risk disclosure warning that the Company's products might prove unsuccessful:

*The initial and sustained commercialization of our products may prove to be unsuccessful.*

The products we develop may or may not be technically viable, and those that are technically viable may not be

or remain commercially viable....A failure to capitalize on Propel SSP® products in commercial application would result in a significant unrecouped investment and the failure to realize certain anticipated benefits, each of which may have a material adverse effect on our business, financial condition, and results of operations.

**\*8** (*Id.*, ¶ 123, PageID #1099–1100.) Plaintiff contends that this disclosure was misleading for the same reasons as the other statements and disclosures at issue. (*Id.*, ¶ 124, PageID #1099.) By this time, Plaintiff claims that Propel SSP products "were already a significant unrecouped investment resulting in material adverse effects on the Company's business and financial condition." (*Id.*, ¶ 124, PageID #1100.) By the end of 2018, the Company stopped selling Propel SSP 350. (*Id.*, ¶ 169, PageID #1109.)

### C.2.b. Earnings Calls

In the consolidated amended complaint, Plaintiff identifies six earnings calls in which Ms. Deckard allegedly made false or misleading statements or omissions.

### C.2.b.i. 4Q15 Earnings

On March 10, 2016, the Company held a conference call with analysts and investors to discuss fourth quarter earnings from 2015. (*Id.*, ¶ 70, PageID #1082.) During the call, Ms. Deckard touted Propel SSP's performance and superior recovery of oil and gas from wells:

> We continue to see very positive productivity trends from our Propel SSP trial wells. To date, documented third-party field performance data demonstrates an average of 30% cumulative enhanced hydrocarbon recovery over non-SSP offset wells after only 90 days of production, with the differentials continuing to increase over producing time.

(*Id.*, ¶ 70, PageID #1082.) Plaintiff alleges that this statement is false and misleading because Ms. Deckard knew but failed to disclose that "only a small subset of all Propel SSP test wells actually had production increases of 30% or more." (*Id.*, ¶ 71, PageID #1082.) Of the twenty-nine production wells for which Fairmount Santrol had production data, Plaintiff

alleges that less than half showed increased production of more than 30%. (*Id.*) "The Company's only results came from a very limited set of test wells, only a portion of which showed any meaningful increases in production." (*Id.*)

### C.2.b.ii. 1Q16 Earnings

In a conference call with investors and analysts on May 10, 2016 to discuss results from the first quarter of the year, Ms. Deckard reaffirmed the performance data of Propel SSP and reported the commercial success of the product:

> To date, trials have included placement of Propel SSP in 87 wells with 19 different operators across all major U.S. basins. And we continue to work with our customers to document their improved operational efficiency and their enhanced production rate.

> Third-party field performance data continues to demonstrate an average of 30% cumulative enhanced hydrocarbon recovery over non-SSP offset wells after 90 days of production, with differentials continuing to increase over producing time. After seeing successful results during field trials, multiple customers have committed to ongoing commercial use of Propel SSP.

(*Id.*, ¶ 79, PageID #1084.) During the call, an analyst asked a question about Propel SSP, prompting Ms. Deckard to say that the product enjoyed widespread success:

> ANALYST: On this SSP, could you tell us which regions is it more successful or is it pretty widespread?

> MS. DECKARD: It's pretty widespread. And the productivity gains are across most of the basins that we've tested the product. So we're feeling pretty confident and we don't, at this point, have a targeted market with a difference in productivity gains.

(*Id.*, ¶ 81, PageID #1084–85.) Plaintiff alleges that these statements were false and misleading for the same reasons the statements on the March 10, 2016 call allegedly were. (*Id.*, ¶¶ 80 & 82, PageID #1084 & #1085.)

### C.2.b.iii. 2Q16 Earnings

**\*9** On August 4, 2016, Fairmount Santrol held a conference call with investors and analysts to discuss results from the second quarter of the year. (*Id.*, ¶ 85, PageID #1086–87.) Ms. Deckard stated that a recent study confirmed her prior statements regarding Propel SSP:

Plagens v. Deckard, Not Reported in Fed. Supp. (2023)
2023 WL 2711263

Our recent reservoir engineering study of Propel SSP trial well[s], as validated by an external petroleum engineering firm, confirms our previous communications regarding 30% to 50% production enhancement with an optimized completion design using Propel SSP[.]

We remain very excited about the prospects for Propel SSP. Moving forward and as operators once again become more focused on maximizing well productivity, the company is well-positioned to provide the most advanced proppant technology solution from base resin to resin-coated proppants, to Propel SSP and to many other value added solutions.

(*Id.*, ¶ 85, PageID #1087.) Again, Plaintiff alleges that this statement is false and misleading for the same reasons as the others. (*Id.*, ¶ 86, PageID #1087.) Additionally, Plaintiff contends that Ms. Deckard knew that PowerProp and Propel SSP were not able to maximize well productivity. (*Id.*)

#### C.2.b.iv. 3Q16 Earnings

On November 3, 2016, the Company held a conference call with analysts and investors to discuss financial results from the third quarter. (*Id.*, ¶ 89, PageID #1088.) During the call, Ms. Deckard advised of additional successful field test results for Propel SSP:

[W]e're pleased to provide an update on Propel SSP, our Self-Suspending Proppant solution, which optimizes frac geometry to superior subsurface transport and placement of proppant, while also providing key operational benefits at the wellhead.

The operational benefits and the significant production uplift that have been experienced by our customers continue to be both convincing and repeatable. During the third quarter, the successful completion of additional trial wells with new customers and the commercial adoption of Propel SSP by repeat customers, added to our successful track record and we believe further differentiated Propel SSP from other products. We remain truly energized by the value of the Propel SSP provides the customers, as well as a prospects for broader market adoption.

(*Id.*, ¶ 89, PageID #1089.) Plaintiff alleges that these statements were false and misleading for the same reasons as those from the earlier earnings calls. (*Id.*, ¶ 90, PageID #1089.)

Further, the consolidated amended complaint alleges that the production increases customers of Fairmount Santrol experienced with Propel SSP were not significant, convincing, or repeatable. (*Id.*) Moreover, it claims that Ms. Deckard knew that the Company consistently failed to convert Propel SSP trial customers into commercial customers. (*Id.*) Indeed, according to the consolidated amended complaint, the Company only signed one contract for Propel SSP with a repeat commercial customer. (*Id.*)

#### C.2.b.v. 4Q16 Earnings

When the Company held a conference call on March 9, 2017 to discuss results form the fourth quarter of 2016, Ms. Deckard touted the "meaningful productivity gains" from use of Propel SSP:

Before we get to Q&A, I'd also like to provide an update on Propel SSP. In addition to ongoing commercial activity driven by wells which continue to yield meaningful productivity gains, we're also building a compelling case on operational efficiencies that produce benefits for both E&Ps and for service companies....

**\*10** We continue to invest in the commercialization of Propel SSP, including the recently launched product line extension, Propel SSP 350....We remain optimistic on Propel SSP's future.

(*Id.*, ¶ 102, PageID 1092–93.) Plaintiff alleges that these statements were false and misleading for the same reasons as the other statements at issue. (*Id.*, ¶ 103, PageID #1093.)

Additionally, the consolidated amended complaint alleges that field tests for Propel SSP did not yield meaningful productivity gains and that Ms. Deckard knew there was no reason for optimism regarding Propel SSP or Propel SSP 350. (*Id.*) As bases for the latter allegation, the consolidated amended complaint avers that the Company consistently failed to convert Propel SSP trial customers into commercial customers—only signing one contract for Propel SSP with a repeat commercial customer—and was unable to manufacture Propel SSP 350 in sufficient quantities to achieve economies of scale. (*Id.*) Further, the Company could not consistently manufacture Propel SSP 350 to specification and had only one plant where it could manufacture the product in limited quantities. (*Id.*)

#### C.2.b.vi. 1Q17 Earnings

**Plagens v. Deckard, Not Reported in Fed. Supp. (2023)**
2023 WL 2711263

In a conference call with investors and analysts on May 4, 2017, Ms. Deckard reported growth in demand for Propel SSP based on results in trial wells for the past two years:

> Another key value-add on which I'd like to provide an update is Propel SSP. We saw good growth in demand in quarter 1, as users were able to leverage Propel SSP to both gain productivity and operational efficiencies, which are valuable to both E&P and service companies. The productivity enhancements that Propel SSP provide have been well demonstrated through many trial wells in different basins over the past 2 years.

(*Id.*, ¶ 104, PageID #1093–94.) For the same reasons Plaintiff claims the earlier statements during earnings calls were false and misleading, he alleges that these were too. (*Id.*, ¶ 105, PageID #1094.) Namely, the Company had limited production data, which did not show any meaningful increase in production. (*Id.*)

**C.2.c. Presentations**
On May 18, 2016, the Company attached a presentation to a Form 8-K filing with the SEC and used that presentation at an event on May 19, 2016 for investors and analysts. (*Id.*, ¶ 83, PageID #1085.) This presentation touted results based on field activity showing that use of Propel SSP in over ninety wells typically resulted in production increases greater than 30%. (*Id.*, ¶ 83, PageID #1085–86.)

On September 16, 2016, the Company filed another investor presentation on Form 8-K. (*Id.*, ¶ 87, PageID #1087.) Like the earlier presentation, this one claimed that use of Propel SSP in over ninety wells typically resulted in production increases greater than 30%. (*Id.*, ¶ 87, PageID #1087–88.)

Again, Plaintiff alleges that the statements in both presentations are false and misleading because, of the twenty-nine production wells for which Fairmount Santrol had production data, less than half showed increased production of more than 30%. (*Id.*, ¶¶ 84 & 88, PageID #1086 & PageID #1088.) "The Company's only results came from a very

limited set of test wells, only a portion of which showed any meaningful increases in production." (*Id.*)

**C.2.d. Press Release**
*11 On January 18, 2017, the Company issued a press release, which stated that Propel SSP 350 "leverages the field-proven characteristics of Propel SSP technology into the realm of high salinity water sources." (*Id.*, ¶ 91, PageID #1090.) For the same reasons Plaintiff alleges the other statements at issue are false and misleading, the consolidated amended complaint claims this one is too. (*Id.*, ¶ 92, PageID #1090.) Additionally, Plaintiff alleges that at this time the Company had not done field testing for Propel SSP 350. (*Id.*)

**D. The SEC Investigation & Ms. Deckard's Separation from Covia**
In its 2018 annual report filed on March 22, 2019, the Company disclosed that it had received a subpoena from the Securities and Exchange Commission: "On March 18, 2019, we received a subpoena from the SEC seeking information relating to certain value-added proppants marketed and sold by Fairmount Santrol or Covia within the Energy segment since January 1, 2014." (*Id.*, ¶ 127, PageID #1100.) Four employees brought whistleblower claims to the Securities and Exchange Commission, which opened an investigation. (*Id.*, ¶ 7, PageID #1068.) According to the consolidated amended complaint, disclosure of this investigation "partially revealed to the market that the Company faced the previously undisclosed risk of governmental penalties" relating to its proppant products. (*Id.*, ¶ 128, PageID #1100–01.) This news prompted Covia's share price to drop 6.9% during the next trading day. (*Id.*, ¶ 129, PageID #1101.)

After markets closed on May 9, 2019, two weeks after reporting the SEC subpoena, Covia announced the termination of Ms. Deckard at the direction of the board effective immediately. (*Id.*, ¶¶ 130–31, PageID #1101; *see also id.*, ¶ 7, PageID #1068.) Although announced as a termination without cause, entitling Ms. Deckard to retain her severance amounting to some $5.5 million, Plaintiff alleges that the termination amounted to a for-cause separation. (*Id.*, ¶¶ 131 & 132, PageID #1101.) This announcement did not reference the SEC's investigation. (*Id.*) On the same day the Company announced Ms. Deckard's separation, it also filed its Form 10-Q for the first quarter of 2019, which reported excess proppant supply in the market and a decrease of 47% in revenues for the Company's energy business. (ECF No. 51-8, PageID #1857 & #1860.)

Defendant Richard A. Navarre, who served as chair of the board of directors of the Company after the merger and chair of its executive and audit committee, took over as the interim chief executive officer. (ECF No. 50, ¶ 26, PageID #1072; *see also* ECF No. 51-1, PageID #1154 n.1.) In September 2019, Mr. Navarre served as the Company's chief executive officer without the "interim" title. (ECF No. 50, ¶ 26, PageID #1072.) In its report for the third quarter filed with the SEC on November 6, 2019, Covia disclosed that the SEC requested additional information and served subpoenas on multiple current and former employees regarding "certain value-added proppants marketed and sold by Fairmount Santrol or Covia within the Energy segment since January 1, 2014." (*Id.*, ¶ 135, PageID #1102.) Further, Covia's Form10-Q for the third quarter reported that the Company discontinued sales and marketing of Propel SSP and took a related charge of $7.8 million. (*Id.*, ¶ 136, PageID #1102.)

### E. Bankruptcy

On June 29, 2020, after markets closed, Covia announced that it had reached a comprehensive restructuring agreement with lenders and voluntarily filed petitions under Chapter 11 of the Bankruptcy Code to implement that agreement. (*Id.*, ¶ 138, PageID #1102.) Previously, the Company had been able to renegotiate its debt obligations on several occasions due in part to the statements about PowerProp, Propel SSP, and Propel SSP 350 that Plaintiff alleges were false and misleading. (*Id.*, ¶ 140–43, PageID #1103.) Analyst reports noted the Company's large debt load relative to peers due to its investments in and infrastructure to support resin-coating and proppant operations. (*Id.*, ¶ 144, PageID #1104.)

 *12 When Covia filed for bankruptcy protection, the New York Stock Exchange delisted its shares. (*Id.*, ¶ 13, PageID #1070; *id.*, ¶ 32, PageID #1074; *id.*, ¶ 147, PageID #1104.) When its shares resumed over-the-counter trading, their value declined, leaving shareholders with nothing. (*Id.*, ¶ 148, PageID #1104–05; *see also id.*, ¶ 31, PageID #1074.) Specifically, Covia's share price fell from $0.48 at closing on June 29, 2020 to $0.04 on July 1, 2020. (*Id.*, ¶ 148, PageID #1104–05.)

At its peak, the Company's stock traded at a high of $30.00 per share in June 2018. (ECF No. 51-7, PageID #1823.) By December 31, 2018, it had fallen to $3.49 per share. (*Id.*, PageID #1818.)

Throughout the class period, Dr. Phelps purchased 1,338,925 shares of the Company's stock, both pre- and post-merger. (ECF No. 42, PageID #883.) Accounting for sales in which Dr. Phelps engaged pursuant to his investment strategy, his net purchases of the Company's stock exceeded 700,000 shares during the class period. (*Id.*) At the end of the putative class period, Dr. Phelps retained approximately 724,400 Covia shares (*id.*, PageID #896) and suffered hundreds of thousands of dollars in losses (*id.*, PageID #885 & #888).

### F. The SEC's Cease-and-Desist Order

On August 10, 2020, Covia filed its quarterly report for the second quarter and disclosed that the SEC's staff recommended that the Commission file an action against the Company based on its investigation. (ECF No. 50, ¶ 149, PageID #1105.) By November 2020, the SEC interviewed the four Company employees who filed whistleblower complaints with the Commission. (*Id.*, ¶ 175, PageID #1111.) On December 8, 2020, the SEC commenced cease-and-desist proceedings in an order which Plaintiff attaches and incorporates into the consolidated amended complaint. (*Id.*, ¶ 8, PageID #1068; ECF No. 50-1.) In that order, the SEC accepted a settlement offer from the Company and imposed a cease-and-desist order. (ECF No. 50-1, PageID #1127.)

The SEC's order made numerous factual findings. (*Id.*, ¶¶ 10–45, PageID #1129–34.) In short, the SEC's order finds that the Company made materially false and misleading statements about PowerProp, Propel SSP, and Propel SSP 350 in its SEC filings, presentations to investors and analysts, and on the Company's website. (ECF No. 50, ¶ 8, PageID #1068; *id.*, ¶ 151, PageID 1105.) These findings also detail internal Company documents, correspondence, and meetings before and during the class period that informed the Company and its officers that their statements about the proppants at issue were false and misleading. (*Id.*, ¶ 9, PageID #1069.) For example, a former employee forged test results that the Company touted, and the Company relied on laboratory tests for Propel SSP that did not correlate with real-world conditions. (*Id.*; *see also id.*, ¶ 154, PageID #1106.) Nonetheless, the Company continued to make public statements that were allegedly false and misleading. (*Id.*, ¶ 9, PageID #1069; *see also id.*, ¶ 154, PageID #1106.)

Notably, the SEC made its factual findings to settle the violations of federal securities laws the agency pursued and made clear that its findings "are not binding on any other person or entity in this or any other proceeding." (ECF No. 50-1, PageID #1128 n.2.) The SEC determined that the

2023 WL 2711263

Company violated provisions of the Securities Act of 1933, the Exchange Act, and SEC Rules. (ECF No. 50-1, ¶¶ 46 & 47, PageID #1134; ECF No. 50, ¶ 10, PageID #1069; *id.*, ¶ 152, PageID #1106.) The Commission ordered the Company to cease and desist from committing further violations and imposed a $17 million civil penalty. (*Id.*, ¶ 153, PageID #1106.) Because of Covia's bankruptcy, the SEC deemed the monetary penalty satisfied with a $1 million payment. (*Id.*)

### STATEMENT OF THE CASE

**\*13** Based on these alleged facts, plaintiffs filed various lawsuits against Defendants, but not against Covia. After a hearing, the Court consolidated those cases, appointed Dr. Phelps as the lead Plaintiff (ECF No. 42), then appointed lead counsel (ECF No. 43). Plaintiff amended the complaint (ECF No. 46), then the parties stipulated to the filing of a corrected consolidated amended complaint (ECF No. 48), which remains the operative pleading and which the Court references as the consolidated amended complaint (ECF No. 50).

Plaintiff asserts three causes of action. In Count I, Plaintiff alleges violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5. (*Id.*, ¶¶ 204–13, PageID #1119–21.) Count II alleges violations of Section 20(a) of the Exchange Act. (*Id.*, ¶¶ 214–19, PageID #1121–22.) In Count III, Plaintiff alleges violation of Section 14(a) of the Exchange Act and Rule 14a-9 against Ms. Deckard. (*Id.*, ¶¶ 220–25, PageID #1122–23.) He also seeks to maintain these claims on behalf of a class. (*Id.*, ¶¶ 1 & 194–203, PageID #1066 & #1116–19.) Plaintiff defines the class period as running from March 10, 2016 through June 29, 2020. (*Id.*, ¶ 1, PageID #1066.) Plaintiff seeks compensatory damages. (*Id.*, PageID #1124.) Because Plaintiff's class allegations do not otherwise bear on analysis of the present motion to dismiss, the Court does not summarize them here.

### GOVERNING LEGAL STANDARDS

The Court evaluates Defendants' motion to dismiss Plaintiff's consolidated amended complaint for securities fraud under three different standards.

### I. Rule 8

In any civil action, a complaint must "state[ ] a claim for relief that is plausible, when measured against the elements" of a claim. *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. American Bar Ass'n*, 826 F.3d 338, 345–46 (6th Cir. 2016)). A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). To survive a motion to dismiss, a complaint must "raise a right to relief above the speculative level" into the "realm of plausible liability." *Twombly*, 550 U.S. at 555, 557 n.5.

When analyzing a complaint under this standard, the Court construes factual allegations in the light most favorable to the plaintiff, accepts them as true, and draws all reasonable inferences in the plaintiff's favor. *Wilburn v. United States*, 616 F. App'x 848, 852 (6th Cir. 2015). But a pleading must offer more than mere "labels and conclusions," because "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Nor is a court required to accept "[c]onclusory allegations or legal conclusions masquerading as factual allegations[.]" *Eidson v. Tennessee Dep't of Child.'s Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

Therefore, the Court must distinguish between "well-pled factual allegations," which must be treated as true, and "naked assertions," which need not be. *See Iqbal*, 556 U.S. at 678 ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (cleaned up); *see also, e.g.*, *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 375 (6th Cir. 2011) (determining that because some of the plaintiff's factual allegations were "not well-pleaded[,]" "their conclusory nature 'disentitles them to the presumption of truth' "). Rule 8, to say nothing of the Private Securities Litigation Reform Act, "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79.

**\*14** On a motion under Rule 12(b)(6), the Court's inquiry is limited to the content of the complaint, although it may also consider matters of public record, orders, items appearing in the record of the case, and exhibits attached to or made part of the complaint. *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001). Accordingly, the Court considers

2023 WL 2711263

the public filings and statements, reported stock prices, and the bankruptcy court docket. *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014) ("*Omnicare III*"). Further, the Court considers the SEC order dated December 8, 2020, which Plaintiff attaches to the consolidated amended complaint and incorporates by reference. (ECF No. 50-1; ECF No. 50, ¶ 8, PageID #1068.)

## II. Rule 9(b)

In addition, fraud claims must meet Rule 9(b)'s heightened pleading standard. That Rule requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "To satisfy this Rule, 'the plaintiff, at a minimum, must allege the time, place, and content of the alleged misrepresentation; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.' " *In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d 740, 760 (N.D. Ohio 2020) (cleaned up) (quoting *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012)). But "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

## III. Private Securities Litigation Reform Act

Under the Private Securities Litigation Reform Act of 1995, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); *Doshi v. General Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016). Also, the Reform Act requires that "the complaint...specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B); *In re TransDigm Grp.*, 440 F. Supp. 3d. at 760.

Where a plaintiff fails to meet these standards, "the court shall, on the motion of any defendant, dismiss the complaint." 15 U.S.C. § 78u-4(b)(3)(A). In determining whether to dismiss, courts consider not only the complaint, but also "plausible opposing inferences" that favor the defendant. *Doshi*, 823 F.3d at 1039 (citation and quotation omitted). The Reform Act's requirements are intended to be an "elephant-sized boulder" in the way of private securities fraud cases. *Omnicare III*, 769 F.3d at 461.

## ANALYSIS

In briefing on Defendants' motion, Plaintiff concedes that his claims in Count III fail to state a claim. (ECF No. 52, PageID #1956 n.2.) Therefore, the Court **GRANTS** the motion to dismiss this count and proceeds to analyze the motion with respect to Counts I and II.

## I. Section 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for anyone to "use or employ, in connection with the purchase or sale of any security...any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest for the protection of investors." 15 U.S.C. § 78j(b). To enforce this statute, the SEC promulgated Rule 10b-5, which makes it "unlawful to, among other things, 'make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (quoting 17 C.F.R. § 240.10b-5(b)).

 **\*15** "The scope of Rule 10b-5 is coextensive with the coverage of § 10(b)." *SEC v. Zandford*, 535 U.S. 813, 816 n.1 (2002) (citing *United States v. O'Hagan*, 521 U.S. 642, 651 (1997); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214 (1976)). To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must sufficiently allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx*, 563 U.S. at 37–38 (quotation and citation omitted); *see Omnicare III*, 769 F.3d at 469. Based on the "text and purpose of § 10(b)," Supreme Court precedent permits an implied "private cause of action" under this statute. *See Matrixx*, 563 U.S. at 37. But what Section 10(b) and Rule 10b-5 do not create is "an affirmative duty to disclose any and all material information." *Id.* at 44. "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988).

**Plagens v. Deckard, Not Reported in Fed. Supp. (2023)**

2023 WL 2711263

**I.A. Alleged Material Misrepresentations and Omissions**

"Successfully pleading an actionable material misrepresentation or omission requires a plaintiff to allege facts demonstrating two things: (1) that a defendant made a statement or omission that was false or misleading; and (2) that this statement or omission concerned a material fact." *Omnicare III*, 769 F.3d at 470. What is required of a plaintiff changes based on whether they allege an "affirmative misrepresentation[ ], as opposed to omissions," and whether the misrepresentation or omission "concerns hard, as opposed to soft, information." *Id.*

"The [Reform Act] mandates that," to survive a motion to dismiss, Plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint [must] state with particularity all the facts on which the belief is formed." *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 568 (6th Cir. 2004) (citing 15 U.S.C. § 78u-4(b)(1)); *see Omnicare III*, 769 F.3d at 480 n.6.

Generally, a misrepresentation or omission is attributable only to the person who made it, and only that person or entity is potentially liable for the misrepresentation or omission under Rule 10-b5(b). *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141–43 (2011) (quoting 17 C.F.R. § 240.10b-5(b)). "For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement," not one who merely "prepares or publishes a statement on behalf of another." *Id.* at 142. Under the Supreme Court's reasoning in *Janus*, corporate officers who sign documents filed with the SEC make the statements contained in those documents. *Louisiana Mun. Police Emps. Ret. Sys. v. KPMG, LLP*, No. 1:10-cv-01461, 2012 WL 3903335, at *5 (N.D. Ohio Aug. 31, 2012) (holding that under Rule 10b-5 corporate officers made allegedly misleading statements contained in annual and quarterly reports they signed and filed with the SEC).

*Misrepresentations.* "A misrepresentation is an affirmative statement that is misleading or false." *Omnicare III*, 769 F.3d at 470. Misrepresentations may contain either hard or soft information. Hard information usually concerns "historical information or other factual information that is objectively verifiable." *Id.* (quotation omitted). That type of statement may be actionable where "a plaintiff pleads facts showing that the statement concerned a material fact and that it was objectively false or misleading." *Id.* Misrepresentations

containing soft information "add[ ] a subjective inquiry to an otherwise objective element" and "include predictions and matters of opinion." *Id.* At this first step, the Court determines whether statements are in fact actionable misstatements and, if so, whether they were material, nothing more. *Id.* Whether the defendants made those statements with knowledge of their falsity is reserved for the scienter analysis. *Id.* at 471.

**\*16** *Omissions.* Omissions may be actionable in two circumstances: where a company has an affirmative duty to disclose (for example, when an insider trades or a statute requires disclosure) or where a company makes "an inaccurate, incomplete, or misleading prior disclosure" that it must then correct. *Id.* at 471 (citing *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005)). In the latter circumstance, a person has a duty to disclose hard information it may receive "if it renders a prior disclosure objectively inaccurate, incomplete, or misleading." *Id.* (citing *Zaluski v. United American Healthcare Corp.*, 527 F.3d 564, 576 (6th Cir. 2008)). If "new information is soft, then a person or corporation has a duty to disclose it only if it is virtually as certain as hard facts and contradicts the prior statement." *Id.* (cleaned up). At bottom, where a person chooses to speak, federal securities laws "require an actor to 'provide complete and non-misleading information with respect to the subjects on which he undertakes to speak.' " *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001) (en banc) (quoting *Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263, 268 (6th Cir. 1998)).

*Materiality.* A "fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Basic*, 485 U.S. at 231 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Because materiality is an element of a Rule 10b-5 claim, *Matrixx*, 563 U.S. at 37–38, a misstatement or omission is only actionable if a reasonable investor would have viewed the information as "alter[ing] the total mix of information available" to the market. *Basic*, 485 U.S. at 232; *see also Omnicare III*, 769 F.3d at 472. But courts have a "limited understanding of investor behavior and the actual economic consequences of certain statements," which means they run the "risk [of] prematurely dismissing suits on the basis of [judicial] intuition." *Omnicare III*, 769 F.3d at 472.

"[V]ague, soft, puffing statements or obvious hyperbole" of "corporate optimism[,]" which can be either "forward looking" or generalized to the point they are "not capable

of objective verification," cannot form the basis of a Section 10(b) claim. *In re Ford Motor Co.*, 381 F.3d at 570.

> [F]ederal courts everywhere have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace —loosely optimistic statements that are so vague, [and] so lacking in specificity,...that no reasonable investor could find them important to the total mix of information available.

*Id.* at 570–71 (quotations omitted).

Similarly, where sufficient forward-looking cautionary language accompanies affirmative statements, the "bespeaks caution" doctrine renders predictions of business results immaterial as a matter of law. *See In re Donald J. Trump Casino Sec. Litig.—Taj Mahal Litig.*, 7 F.3d 357, 371–73 (3d Cir. 1993). That is, "forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the 'total mix' of information the document provided investors." *Id.* at 371. This doctrine, "as an analytical matter, equally appli[es]" to both "affirmative misrepresentations and omissions concerning soft information." *Id.* Applying the doctrine depends on the specific communication at issue and requires a case-by-case analysis. *Id.* Materiality is a question of fact. *Matrixx*, 563 U.S. at 43 (quoting *Basic*, 485 U.S. at 236).

Plaintiff's allegations concerning Defendants' alleged misrepresentations and omissions are subject to the heightened pleading standards of the PSLRA and Rule 9(b) that the Court set forth above. *Omnicare III*, 769 F.3d at 470. The Court determines whether a statement was false or misleading at the time it was made in light of all the evidence in Plaintiff's pleadings. In this case, that includes the SEC order dated December 8, 2020 (ECF No. 50-1) and the confidential witness statements set forth in the consolidated amended complaint. "[P]laintiffs may rely on confidential witnesses if they plead facts with sufficient particularity to support the probability that a person in the confidential witness's position would possess the information alleged." *Doshi*, 823 F.3d at 1037 n.2.

**\*17** The alleged misrepresentations and omissions Plaintiff maintains are actionable fall into three general categories: (1) statements comparing PowerProp's performance to that of lightweight ceramics; (2) overstatements or misstatements of testing performance results for Propel SSP; and (3) inadequate, misleading risk disclosures concerning the commercial prospects for PowerProp, Propel SSP, and Propel SSP 350. The Court will analyze each in turn. *See Bondali v. TumA Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015) (directing district courts to engage in "a statement-by-statement analysis"). Throughout its analysis, the Court identifies whether the statement is attributable to any particular Defendant or solely to the Company or certain non-parties.

**I.A.1. Comparison to Lightweight Ceramics**

Both before and during the class period, Defendants and the Company made statements in presentations and SEC filings asserting that PowerProp "delivers strength and performance characteristics similar to lightweight ceramics," a higher-performing and more expensive product on the market. (ECF No. 50, ¶¶ 63–66, PageID #1080–81; *see also id.*, ¶¶ 73, 94 & 107, PageID #1082, #1090 & #1094.) Ms. Deckard, Mr. Barrus, and Mr. Biehl each signed at least one of the Company's annual reports that contained these statements. (*Id.*, ¶¶ 72, 93 & 106, PageID #1082, #1090 & #1094.) Plaintiff alleges that these statements were false and misleading because PowerProp's conductivity—a key measure of proppant performance (*id.*, ¶¶ 2 & 42, PageID #1066 & #1076)—was not in fact comparable to lightweight ceramics. (*Id.*, ¶¶ 68, 74, 95 & 108, PageID #1081, #1082–83, #1090 & #1094; ECF No. 50-1, ¶¶ 15, 19, 21–23 & 25–29, PageID #1130–31.) Notably, Defendants do not argue that these statements were false. Instead, they argue that the comparisons are puffery, which is not actionable.

Plaintiff's allegations satisfy the heightened pleading standard under the Reform Act. Defendants' assertions that PowerProp's conductivity is comparable to or competes with that of lightweight ceramics constitutes hard information because it is "objectively verifiable." *Omnicare III*, 769 F.3d at 470. According to the consolidated amended complaint, conductivity presents a reasonably quantitative metric that can be verified—presumably by comparing the volume of oil and gas extracted from a well using each product as a proppant. (ECF No. 50, ¶¶ 42 & 156–57, PageID #1076 & #1106–07.)

Further, in the consolidated amended complaint Plaintiff specifies each time that Defendants or the Company stated PowerProp was comparable to lightweight ceramics, followed immediately by an allegation concerning why that statement was false. (*See, e.g.*, *id.*, ¶¶ 74 & 75, PageID #1082–83.) Plaintiff identifies each misleading statements including its time, place, and content, as Rule 9(b) and the Reform Act require. (*See, e.g.*, *id.*) And the SEC order Plaintiff incorporates into the consolidated amended complaint, while not conclusive, finds that PowerProp's conductivity was in fact not as high as lightweight ceramics. (ECF No. 50-1, ¶ 21, PageID #1130–31.) Confidential witness statements confirm the same as early as 2011. (*Id.*; *see also* ECF No. 50, ¶ 156, PageID #1106–07.) Further, the consolidated amended complaint alleges that Fairmount Santrol employees learned in 2015 that a former employee forged some PowerProp rest results on which the Company continued to rely in public statements. (*Id.*, ¶ 159, PageID #1107.) Therefore, these statements by Ms. Deckard, Mr. Barrus, and Mr. Biehl are misleading representations under Rule 10b-5 if they are material. *Omnicare III*, 769 F.3d at 470.

Defendants argue that these statements amount to mere puffery. (ECF No. 51-1, PageID #1186–87.) Specifically, they argue that statements to the effect that PowerProp could compete with lightweight ceramics are vague and incapable of being proven or disproven. Therefore, they are immaterial as a matter of law. (*Id.*) Generalized, vague statements of corporate optimism are often unverifiable and are too general to cause a reasonable investor to rely on them. *In re TransDigm*, 440 F. Supp. 3d at 763–64. Therefore, such statements are immaterial puffery and cannot support a securities fraud claim. *Id.* As the Sixth Circuit explained: "All public companies praise their products and their objectives...as a matter of law a certain kind of rosy affirmation ... so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker" does not alter the total mix of information and is immaterial. *In re Ford Motor Co.*, 381 F.3d at 570 (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996)).

**\*18** Without question, vague propositions of "competitiveness" in a market will not always be verifiable. *See Norfolk Cnty. Ret. Sys. v. Tempur-Pedic, Int'l, Inc.*, 22 F. Supp. 3d 669, 684 (E.D. Ky. 2014), *aff'd*, *Pension Fund Grp. v. Tempur-Pedic, Int'l, Inc.*, 614 F. App'x 237 (6th Cir. 2015). But Plaintiff alleges that the statements at issue comparing PowerProp to lightweight ceramics reference a particular metric important in the proppant industry—conductivity. As

explained above, that metric appears reasonably capable of being proven or disproven, unlike a vague assertion that the Company "strengthened [its] competitiveness." *Id.* For these reasons, Plaintiff sufficiently alleges that the statements comparing PowerProp's performance to lightweight ceramics were material misstatements.

**I.A.2. Propel SSP Test Results**

Before and during the class period, Defendants and the Company made statements in presentations, press releases, and SEC filings that Plaintiff alleges oversold the success of Propel SSP in increasing production from test wells. (ECF No. 50, ¶ 69, PageID #1081; *see also id.*, ¶¶ 75, 83, 87, 96, 98, 109, PageID #1083, #1085, #1087–88, #1091 & #1095.) Ms. Deckard made similar statements on earnings calls. (*Id.*, ¶¶ 70, 79, 85, 89, 102, 104, PageID #1082, #1084, #1086–87, #1088–89, #1092–93 & #1093–94.) Also, the Company issued a press release on January 18, 2017 concerning Propel SSP 350, stating that "it leverages the field-proven characteristics of Propel SSP's technology" in saltwater. (ECF No. 50, ¶ 91, PageID #1090.)

Some of these statements included specific figures for enhanced productivity in test wells. For example, during a March 10, 2016 earnings call, Ms. Deckard reported that Propel SSP's performance data "demonstrate[d] an average of 30% cumulative enhanced" production compared to non-SSP wells after 90 days. (*Id.*, ¶ 70, PageID #1082; *see also* ¶¶ 79, 83, 85 & 87, PageID #1084, #1085 & #1086–87.) Other statements do not include specific data. During a March 9, 2017 earnings call Ms. Deckard stated that the Company "remaine[d] optimistic about Propel SSP's future" (*id.*, ¶ 102, PageID #1093) and that the Company's 2015 10-K stated that "key customers" showed "successful results (increased productivity and reduced operating costs)" using Propel SSP (*id.*, ¶ 75, PageID #1083). Ms. Deckard and the Company—in the form of 8-Ks filed with the SEC and signed by a non-defendant corporate officer—made statements that included numerical testing data. (*Id.*, ¶¶ 70, 79, 83 & 85, PageID #1082, #1084, #1085 & #1087.) Mr. Biehl and Mr. Barrus signed 10-Ks that touted Propel SSPs "successful" trials and results, including increased production, but did not include specific numbers. (*Id.*, ¶¶ 75, 96, 98 & 109, PageID #1083, #1091 & #1095.)

Plaintiff alleges that these statements were false or misleading because, contrary to these representations, Propel SSP in fact performed poorly in test wells. (ECF No. 50, ¶¶ 71, 76, 80, 84, 86, 97, 99, 110 & 186, PageID #1082, #1083, #1084,

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2950 Filed 11/15/24 Page 153 of 173

Plagens v. Deckard, Not Reported in Fed. Supp. (2023)

2023 WL 2711263

#1086, #1087, #1091, #1091–92, #1095 & #1113; ECF No. 50-1, ¶¶ 33, 36 & 38, PageID #1132 & #1133; *see also* ECF No. 52, PageID #1960–62.) According to Plaintiff, the Company only had test data for 29 wells, and less than half of those wells showed increased production rates greater than thirty percent. (*Id.*) Taking the allegations in the consolidated amended complaint as true, the Company had this test data as early as March 2016. (ECF No. 50, ¶ 71, PageID #1082.) Further, when Defendants stated that Propel SSP 350 brought the success of Propel SSP to saltwater, they had no test data for Propel SSP 350. (*Id.*, ¶ 99, PageID #1092.)

**\*19** For much the same reasons that the Court concludes that Defendants' and the Company's statements about PowerProp are actionable misstatements, the Court concludes that Plaintiff adequately alleges Defendants' and the Company's statements concerning Propel SSP's test results were false or misleading. Defendants take pains not to cite the portions of Plaintiff's allegations that include numerical test data in their brief (ECF No. 51-1, PageID #1187), but Defendants' statements that Propel SSP increased productivity by 30% are "objectively verifiable" by comparing the statement to the actual test results. *Omnicare III*, 769 F.3d at 470. As alleged, Propel SSP's actual test results—showing increased production of 30% in less than half of the only 29 test wells (ECF No. 50, ¶ 71, PageID #1082)—verify the falsity of the statements. And Plaintiff specifies each time that Defendants or the Company touted Propel SSP's test results, followed immediately by an allegation concerning why that statement was false. (*See, e.g.*, ECF No. 50, ¶ 70 & 71, PageID #1082.) Plaintiff identifies each misleading statement, including its time, place, and content, as Rule 9(b) and the Reform Act require. (*See, e.g., id.*)

Again, Defendants argue that these statements amount to mere puffery that is unactionable. (ECF No. 51-1, PageID #1187.) A "rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace" is unactionable optimistic puffing. *In re Ford Motor Co.*, 381 F.3d at 570; *see also In re TransDigm*, 440 F. Supp. 3d at 764. But as the Court notes above, Defendants ignore the portions of Defendants' statements that include hard numbers. Like the comparison between PowerProp's conductivity and that of lightweight ceramics, Propel SSP's test results are objective, verifiable numbers.

Defendants identify certain statements that merely say the Company was "optimistic" about Propel SSP. (ECF No. 51-1, PageID #1187; ECF No. 50, ¶ 102, PageID #1092–93.) This statement, and the others like it, are vague puffery. For example, in one statement Ms. Deckard said that Propel SSP "continue[d] to yield meaningful productivity gains" (*id.*), but meaningful is far from an objective measure. In contrast, Ms. Deckard and the Company made statements on at least four occasions that referenced the number of test wells and percentage increase in productivity. Unlike the alleged misstatements concerning "statistically significant" test results in *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 417 n.15 (5th Cir. 2001), which did not include hard numbers and on which Defendants rely, these statements contain concrete data, not vague "rosy affirmations." Plaintiff sufficiently alleges misleading statements with respect to those allegations, even if Defendants made them at the same time as other vague, puffing statements.

### I.A.3. Commercial Prospects and Risk Disclosures

During the class period, Defendants made statements about Propel SSP and Propel SSP 350's commercial prospects that Plaintiff alleges were false or misleading. Defendants represented that repeat customers adopted Propel SSP after testing and that the Company was "optimistic" and "excited" about the commercial prospects for both Propel SSP and Propel SSP 350. (ECF No. 50, ¶¶ 79, 85, 89 & 120, PageID #1084, #1086–87, #1089 & #1098.) To the extent these statements appeared in the Company's SEC filings, they were accompanied by certain risk disclosures that Plaintiff alleges were misleading. These risk disclosures warned that the technology supporting Propel SSP products may fail and that the products may not be commercially viable. (*Id.*, ¶¶ 116, 118 & 123, PageID #1096, #1097 & #1099.)

Plaintiff relies on information from confidential witnesses to allege that these statements were false or misleading for a few reasons. First, the Company only signed one contract with a repeat customer for Propel SSP, and the Company failed to convert trial customers into commercial customers as represented. (*Id.*, ¶ 90, PageID #1089.) Second, confidential witnesses reported that the Company received negative feedback about Propel SSP from customers. (*Id.*, ¶ 165, PageID #1108.) Third, the Company did not have the capability to produce Propel SSP 350 in marketable quantities or at competitive prices. (*Id.*, ¶ 167, PageID #1109.) And fourth, former sales employees report that Propel SSP was not gaining sales traction because it was too expensive. (*Id.*, ¶¶ 181 & 184, PageID #1112–13.) For these reasons, Plaintiff alleges that the risk disclosures were misleading because the

2023 WL 2711263

risks of which they warned had already occurred. (*Id.*, ¶¶ 117, 119 & 124, PageID #1097, #1098 & #1099–1100.)

**\*20** Defendants argue that these statements were not false or misleading because, when they made the statements, the Company was still working to commercialize Propel SSP and Propel SSP 350. (ECF No. 53, PageID #2023.) Also, Defendants point to the 2016 10-K, which accurately stated that one customer adopted Propel SSP. (ECF No. 51-1, PageID #1186 n.5.) Further, Defendants argue that Plaintiff cannot base a securities fraud claim on statements disclosing the possibility of the precise risk Plaintiff alleges forms the basis for this lawsuit—that PowerProp, Propel SSP, and/or Propel SSP 350 would fail. (ECF No. 51-1, PageID #1185–86.) In fact, Defendants argue, the Company's risk disclosures were accurate and prescient because the Company did discontinue PowerProp, Propel SSP, and Propel SSP 350. (ECF No. 51-1, PageID #1185.) To the extent Plaintiff alleges actionable omissions, Defendants argue that the Company had no obligation to disclose the latest Propel SSP test results. (*Id.*, PageID #1185–86.)

These alleged misrepresentations include a mix of hard and soft, subjective information such as "predictions and matters of opinion." *Omnicare III*, 769 F.3d at 470. Defendants' statements concerning customers who adopted Propel SSP are concrete and were objectively verifiable when Defendants made them, and Plaintiff alleges that at no point had more than one commercial customer adopted Propel SSP for regular use in its wells. (ECF No. 50, ¶¶ 80, 90 & 121, PageID #1084, #1089 & #1098.) Therefore, statements that customers (plural) adopted the product in the Company's 2017 10-K (signed by Mr. Biehl and Ms. Deckard) (*id.*, ¶ 120, PageID #1098) and Ms. Deckard's statement during two 2016 earnings calls (*id.*, ¶¶ 79 & 89, PageID #1084 & 1089) were false.

**I.A.3.i. Safe Harbor**

The remaining statements of optimism about Propel SSP's prospects and risk disclosures call for further analysis. The Reform Act contains a limited safe-harbor for forward-looking statements, including "a statement of the plans and objectives...for future operations, including...relating to the products or services of" the Company and "any statement of the assumptions underlying or relating" to a forward-looking statement. 15 U.S.C. § 78u-5(i)(1)(B) & (D). Subject to other limitations that are not relevant here, a forward-looking statement is actionable as securities fraud only where (1) it is material, (2) the defendant failed to identify

the statement as forward-looking or provide "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," and (3) the defendant made the statement "with actual knowledge...that [it] was false or misleading." 15 U.S.C. § 78u–5(c)(1).

This safe harbor does not extend to "a statement of present or historical fact." *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 678 (6th Cir. 2003). "The critical inquiry...is whether [the statement]'s veracity can be determined at the time the statement is made." *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 983 (6th Cir. 2018) (quoting *Julianello v. K-V Pharm. Co.*, 791 F.3d 915, 921 (8th Cir. 2015)). Assumptions underlying forward-looking statements qualify for safe-harbor protection. *Id.* Defendants argue that the safe harbor applies to the Company's risk disclosures and the forward-looking statements those risk disclosures accompany. (ECF No. 51-1, PageID #1186; ECF No. 53, PageID #2023.)

As an initial matter, Ms. Deckard's statements on earnings calls in 2016 and 2017 (ECF No. 50, ¶¶ 79, 81, 89, 102 & 104, PageID #1084, #1085, #1089, #1093 & #1094) were not accompanied by "meaningful cautionary statements" as the safe harbor provision requires. 15 U.S.C. § 78u–5(c) (1). Plaintiff alleges that each of those statements were misleading because no facts supported Propel SSP's prospects for commercialization, and only one customer signed a contract to adopt Propel SSP. (*See, e.g.*, *id.*, ¶ 90, PageID #1089.) These statements were misleading and are actionable if they were material.

**\*21** Regarding the risk disclosures in the Company's SEC filings, Plaintiff cannot rest on "the fact that something turned out badly" to argue that a "defendant knew earlier that it would turn out badly." *Louisiana Sch. Emps.'s Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 484 (6th Cir. 2010) (quoting *Konkol v. Diebold, Inc.*, 590 F.3d 390, 403 (6th Cir. 2009)), *abrogated on other grounds by Matrixx*, 563 U.S. at 48–50. Because Propel SSP performed poorly in tests and elicited customer complaints, Plaintiff argues that the Company's disclosures that the product may fail were misleading; the product had already failed. (ECF No. 50, ¶¶ 116–26, PageID #1096–1100.) This argument goes too far. In *Miller*, 346 F.3d at 676–77, the Sixth Circuit rejected an argument that the company's risk disclosure was inadequate because it did not specify the nature of its loans to a struggling home retailer that accounted for a large portion of its business.

Plagens v. Deckard, Not Reported in Fed. Supp. (2023)

2023 WL 2711263

In rejecting an argument similar to the one Plaintiff makes here, the Sixth Circuit recognized that the argument "goes too far. [The company] disclosed the exact risk that occurred in this situation: excess retailer inventory that could lead to negative economic effects" and companies are "not required to detail every facet or extent of that risk to have adequately disclosed the nature of the risk." *Id.* at 678.

The same logic applies here. The Company's risk disclosures warned of the risk that occurred here—Propel SSP failed. As in *Miller*, Plaintiff alleges that the Company did not disclose information showing that the products had already or would likely fail. (*See, e.g.*, ECF No. 50, ¶ 121, PageID #1098.) But like the Company here, the defendant in *Miller* had information showing the potential risk was extremely likely to occur, or already had, and did not have to disclose that information. *Miller*, 346 F.3d at 667–69. The Company's risk disclosures were vague. However, following *Miller*, they were adequate, and forward-looking statements accompanied by those risk disclosures fall under the safe harbor.

**I.A.3.ii. Materiality**

As discussed above, the safe harbor does not protect Ms. Deckard's statements on earnings calls or statements in the Company's SEC filings indicating that more than one commercial customer adopted Propel SSP in its wells. Defendants argue that even if these statements were misleading, they were immaterial because (1) they were puffery; (2) based on analyst reports, investors did not care about them; and (3) the Company's stock price rose after it discontinued Propel SSP. (ECF No. 51-1, PageID #1174–76.)

The Company's stock price is of limited use in determining materiality. "[T]he demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material." SAB No. 99, 1999 WL 1123073, at *45,153 (Aug. 12, 1999). The "[c]onsideration of potential market reaction to disclosure of a misstatement is by itself too blunt an instrument to be depended on in considering whether a fact is material." *Id.* at 45,152 (quotations omitted).

Defendants argue that Ms. Deckard's statements of optimism about the future of Propel SSP are puffery. Ms. Deckard made some of these statements on the same calls as statements concerning Propel SSP's test results. (*See, e.g.*, ECF No. 50, ¶ 85, PageID #1087) (citing Propel SSP's test results as increasing productivity 30 to 50 percent and representing

that the Company was "very excited" about its prospects). As discussed above, the misleading statements regarding Propel SSP's test results are actionable. However, because Defendants focus on these "rosy affirmations" to argue that their statements were puffery, the Court addresses them here. Ms. Deckard's statement that the Company "remain[ed] optimistic about Propel SSP's future" (*id.*, ¶ 102, PageID #1093), was "energized" by its "prospects for broader market adoption" (*id.*, ¶ 89, PageID #1089), was "feeling pretty confident" about the product (*id.*, ¶ 81, PageID #1085), and "remain[ed] very excited" about its prospects (*id.*, ¶ 85, PageID #1087) are all classic "rosy affirmations" of the Company's products. *In re Ford Motor Co.*, 381 F.3d at 570. Standing alone, they are not material. However, for the most part, they did not stand alone. Typically, they formed part of statements tied to hard numbers or metrics that Plaintiffs allege are false.

**\*22** Finally, Defendants argue that any statement about Propel SSP is immaterial because analyst reports demonstrate that the market did not pay attention to the product. (ECF No. 51-1, PageID #1177; ECF No. 53, PageID #2017–18.) However, the consolidated amended complaint cites several investor reports that refute that assertion. For example, in 2016 Wells Fargo declined to raise its outlook on the Company but *quoted* the Company's false statements concerning Propel SSP's test results. (ECF No. 50, ¶ 55, PageID #1078–79; ECF No. 51-1, PageID #1175.) And in 2017 Morningstar reported that Propel SSP could be a blockbuster seller, although the industry was shifting away from value-added proppants. (ECF No. 50, ¶ 58, PageID #1079; ECF No. 51-1, PageID #1175–76.) Materiality is a question of fact, and the Court cannot conclude at this stage of the proceedings that these reports demonstrate the market did not care about Propel SSP. To the contrary, the Morningstar report appears to confirm Plaintiff's theory. The Company's bet on value-added proppants as an industry-differentiator, presented Propel SSP's inaccurate test results to the public to support that strategy, and lost.

**I.A.4. Quantitative Materiality of the Products**

Defendant argues that each alleged misstatement and omission Plaintiff identifies is immaterial as a matter of law because the products at issue were such a small portion of the Company's overall business, particularly post-merger. (ECF No. 51-1, PageID #1176–78.) Further, the amount of money the Company invested in Propel SSP was not a factor that investors considered because it was not public until after the class period. (ECF No. 53, PageID #2017–18.)

Plagens v. Deckard, Not Reported in Fed. Supp. (2023)

2023 WL 2711263

There is no bright-line rule to determine materiality. *See Matrixx*, 563 U.S. at 30, 49. The Supreme Court declined to adopt a bright-line rule in *Basic*, where the defendant argued that a potential merger is immaterial as a matter of law until the parties reach an agreement in principle, 485 U.S. at 249, and again in *Matrixx*, where the defendant argued for a bright-line rule that statements concerning pharmaceutical products are not material absent a "statistically significant" risk associated with the product, 563 U.S. at 39. Defendants acknowledge this legal rule but point to a "rule of thumb" that if the "financial magnitude" of a misstatement is below five percent, it is "presumptively immaterial." *Weiner v. Tivity Health, Inc.*, 528 F. Supp. 3d 795, 808–09 (M.D. Tenn. 2021) (citing SAB No. 99, 1999 WL 1123073, at \*45,151).

On this point, both parties point to the SEC's Staff Accounting Bulletin No. 99, which states in relevant part: "The use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that...a deviation of less than the specified percentage with respect to a particular item" is likely immaterial. SAB No. 99, 1999 WL 1123073, at \*45,151. "But quantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality" and is not a substitute for "a full analysis of all relevant considerations." *Id.* One relevant consideration is whether the misstatement "concerns a segment or other portion [of the business] that has been identified as playing a significant role" in "operations or profitability." *Id.* at \*45,152.

Plaintiff alleges that PowerProp and Propel SSP accounted for 6.6 percent of the Company's proppant segment revenue in 2014, dropping to four percent in 2017. (ECF No. 50, ¶ 52, PageID #1078.) At least one analyst increased its estimate and price target for the Company based on the "increased commercialization of Propel SSP...largely under the assumption that value-added proppant volumes and revenues continue to improve." (*Id.*, ¶ 57, PageID #1079.) Further, Ms. Deckard mentioned Propel SSP in nearly every quarterly earnings call between 2015 and 2017. These facts weigh in favor of materiality and against the application of a bright-line rule that makes the representations at issue in this case immaterial.

Defendants cite *Weiner* to support their argument that the Court should apply the five percent rule of thumb. (ECF No. 51-1, PageID #1176.) However, in *Weiner*, the district court applied the five percent rule of thumb but determined

"materiality is clearly a question for the jury in this case." *Weiner*, 528 F. Supp. 3d at 807–08. There, the defendants made material misstatements about a program that accounted for less than one percent of its estimated revenue. *Id.* at 808. However, the plaintiff's claim survived summary judgment because, considering the entire record, the misstatement altered the total mix of information available to investors. *Id.* at 810–11.

**\*23** Defendants' argument that the products were immaterial post-merger (ECF No. 51-1, PageID #1177–78) is unavailing. Defendants' and the Company's previous misleading statements remained a part of the total mix of information available to investors. And in 2019, the Company disclosed that it had discontinued commercialization efforts of Propel SSP and recorded an impairment charge of $7.8 million. (ECF No. 50, ¶ 136, PageID #1102.) Even without considering the debt the Company took on to develop Propel SSP, which was not public, a jury could find that Defendants' statements concerning PowerProp, Propel SSP, and Propel SSP 350 were quantitatively material.

\* \* \*

For the foregoing reasons, Plaintiff adequately alleges material misrepresentations or omissions attributable to Ms. Deckard, Mr. Biehl, and Mr. Barrus in the following paragraphs of the consolidated amended complaint: ¶ 66, PageID #1081; ¶ 70, PageID #1082; ¶ 73, PageID #1082; ¶¶ 79 & 81, PageID #1084–85; ¶ 85, PageID #1087; ¶ 89, PageID #1089; ¶ 94, PageID #1090; ¶ 107, PageID #1094. Plaintiff may not base his claim on the alleged misrepresentations that the Court determines are not actionable, as detailed above. Therefore, the Court **GRANTS** Defendants' motion to dismiss as to Mr. Navarre and Mr. Eich and **DISMISSES** all counts against those two Defendants.

### I.B. Loss Causation

Defendants focus their lead argument in support of dismissal on whether Plaintiff adequately pleads loss causation. (ECF No. 51-1, PageID #1167–73.) To state a claim for securities fraud, a plaintiff must prove "that the act or omission of the defendant alleged to violate" Rule 10b-5 "*caused the loss* for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4) (emphasis added). Plaintiff must allege more than that the Company's stock price was inflated when he purchased it because of Defendants' misrepresentations or omissions. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

2023 WL 2711263

The requirement that Plaintiff prove loss causation is "not meant to impose a great burden upon a plaintiff." *Id.* at 346–47. Rather, "it is meant to prevent disappointed shareholders from filing suit merely because their shares have lost value and then using discovery to determine whether the loss was due to fraud." *Norfolk Cnty. Ret. Sys. v. Community Health Sys., Inc.*, 877 F.3d 687, 695 (6th Cir. 2017). At the pleading stage, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347. The element of loss causation is not subject to the heightened pleading standards of Rule 9 or the Reform Act. *Id.* at 346 (noting that the Rule 8 pleading standard governs loss causation).

The Sixth Circuit recognizes more than one method of pleading loss causation. *Ohio Pub. Emps. Ret. Sys. v. Federal Home Loan Mortg. Corp.*, 830 F.3d 376, 384–85 (6th Cir. 2016) ("*OPERS*"). Most commonly, plaintiffs will allege that the market "reacted negatively to a corrective disclosure" of fraud. *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010); *see also In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356, 360 (6th Cir. 2014) (recognizing that loss causation is "easiest to show when a corrective disclosure reveals the fraud to the public"). Also, the Sixth Circuit has adopted the materialization of the risk theory of loss causation. *OPERS*, 840 F.3d at 385. To plead loss causation under this theory, plaintiffs must plead facts showing that "negative investor inferences" from an event or disclosure caused a decrease in stock price that was a foreseeable result of the risk a defendant concealed by fraud. *Id.* at 384–85. A loss is foreseeable if it is "within the zone of risk concealed by the misrepresentations and omissions alleged by the disappointed investor." *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 305 (S.D.N.Y. 2011).

**\*24** Primarily, Defendants argue that Plaintiff fails to state a claim for loss causation because no corrective disclosure occurred. (ECF No. 51-1, PageID #1167–73.) Defendants also argue that Plaintiff "cannot mix and match" theories of loss causation. (ECF No. 53, PageID #2007.) However, Rule 8's pleading standard allows pleading in the alternative. *See* Fed. R. Civ. P. 8(d); *Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 796 (6th Cir. 2016). Plaintiff bears the risk that proposing alternative theories of loss causation undermines the plausibility of either theory. But he is entitled to do so at the pleading stage.

Plaintiff alleges that his loss, and those of the class, resulted at least in part from the materialization of the risk that the Company's development of and investment in PowerProp, Propel SSP, and Propel SSP 350 would not be commercially viable. (ECF No. 50, ¶ 139, PageID #1103.) In reply, Defendants argue that this theory lacks plausibility and that the actual cause of Covia's bankruptcy and Plaintiff's losses was a general decline of the fracking industry and concomitant collapse in demand for proppants. (ECF No. 53, PageID #2012–16.)

Plaintiff need not allege that the misstatements and omissions in this case caused their entire loss. *In re Lehman Bros.*, 799 F. Supp. 2d at 305 (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 (2d Cir. 2005)). Plaintiff's allegations suffice if he alleges that the risk Defendants' misstatements and omissions concealed caused at least a portion of the loss. *Id.* In *Lehman Brothers*, the plaintiffs adequately pled loss causation by alleging that the materialization of the risk of Lehman's overleveraged status and investment in subprime assets, which the company concealed through its misstatements, caused some part of their losses. *Id.* at 306. By contrast in *Lentell*, which was a similar case, the plaintiffs failed to make any allegation that the defendant's misstatements caused any part of their loss. *Lentell*, 396 F.3d at 175–76. The district court dismissed the claim, at least in part, for that reason. *Id.*

Unlike the plaintiffs in *Lentell*, Plaintiff here alleges that Defendants' misstatements concealed the risk that PowerProp and Propel SSP would fail and contribute to the Company's financial downfall. (ECF No. 50, ¶¶ 139–46, PageID #1103–04.) That leaves the question whether Plaintiff plausibly alleges that these statements or omissions caused at least part of his losses, given the general decline of the overall market in which the Company operated and a drop in demand for its chief product, Northern White Sand. (ECF No. 53, PageID #2015.) Defendants argue that Plaintiff cannot "untangle [his] losses from the contemporaneous collapse of the frac sand market." (*Id.*, PageID #2016; ECF No. 51-1, PageID #1173.) In *Lehman Brothers* and *OPERS*, the risks that the defendants concealed were directly related to the cause of the overall decline in the market, which in those cases was "the worst financial crisis since the Great Depression." *OPERS*, 830 F.3d at 388 (internal citations omitted). That is not the case here. But at the pleading stage, Plaintiff need only allege a plausible claim that Defendants' false and misleading statements caused some *portion* of his losses.

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2955 Filed 11/15/24 Page 158 of 173

Plagens v. Deckard, Not Reported in Fed. Supp. (2023)
2023 WL 2711263

Plaintiff specifically alleges that the failure of PowerProp, Propel SSP, and Propel SSP 350 was a "material factor" and referenced the fixed costs and debt load the Company took on to attempt to develop these products. (ECF No. 50, ¶¶ 139, 144 & 145, PageID #1103 & #1004.) *See OPERS*, 830 F.3d at 388. The Company publicly touted the potential upside of these products as a market-differentiator, which analysts noted. (ECF No. 50, ¶ 55, PageID #1078–79.) But that upside never materialized because the products did not prove as successful as Defendants represented. For these reasons, Plaintiff has adequately alleged loss causation, at least at the pleading stage. Because the Court determines that Plaintiff adequately alleged loss causation under a materialization of the risk theory, it does not evaluate Plaintiff's allegations under the alternative theory of a series of partial corrective disclosures.

### I.C. Scienter

**\*25** Scienter "is the lynchpin of most" Section 10(b) claims. *Albert Fadem Tr. v. American Elec. Power Co.*, 334 F. Supp. 2d 985, 1006 (S.D. Ohio 2004). To allege it sufficiently, a plaintiff must demonstrate that each defendant "had a mental state embracing intent to deceive, manipulate or defraud." *Omnicare III*, 769 F.3d at 472.

"[T]he Supreme Court set forth a three-part test used by lower courts to determine the sufficiency of a plaintiff's scienter allegations." *Dougherty*, 905 F.3d at 979 (citing *Tellabs*, 551 U.S. at 322). This inquiry requires lower courts to: (1) "accept all factual allegations in the complaint as true"; (2) "consider the complaint in its entirety" to determine "whether all of the facts alleged, taken collectively, give rise to a *strong inference of scienter*"; and then (3) "take into account plausible opposing inferences" to decide whether "a reasonable person would deem the inference of scienter *cogent and at least as compelling* as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 322–24 (emphasis added).

To aid in this inquiry, and to determine if there is a "strong inference of scienter" that is "cogent and at least as compelling as any opposing inference," *id.*, the Sixth Circuit looks to "a non-exhaustive list of nine factors," *Doshi*, 823 F.3d at 1039–40. They include whether there are allegations of:

(1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Dougherty*, 905 F.3d at 979 (quoting *Omnicare III*, 769 F.3d at 473); *see Helwig*, 251 F.3d at 552. A strong inference of scienter may be inferred from circumstantial evidence. *Tellabs*, 551 U.S. at 323.

Although the Sixth Circuit's *en banc* decision in "*Helwig* is no longer good law" when it comes to the legal standard for scienter, its framework remains useful for analyzing factual allegations. *See, e.g.*, *Dougherty*, 905 F.3d at 979 (applying *Helwig*); *Pittman v. Unum Grp.*, 861 F. App'x 51, 57 (6th Cir. 2021) ("Our starting point is *Helwig*."); *Doshi*, 823 F.3d at 1039–43 (applying the factors); *Boynton Beach Firefighters' Pension Fund v. HCP, Inc.*, No. 3:16-cv-1106, 2019 WL 6251435, at \*3–7 (N.D. Ohio Nov. 22, 2019) (same). At the same time, however, courts "evaluate scienter by looking at 'all the allegations holistically.' " *Pittman*, 861 F. App'x at 54 (quoting *Tellabs*, 551 U.S. at 326). "A complaint adequately pleads scienter" under the Reform Act "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw

Plagens v. Deckard, Not Reported in Fed. Supp. (2023)
2023 WL 2711263

from the facts alleged." *Matrixx*, 563 U.S. at 48 (quotation omitted).

**\*26** In the end, scienter remains difficult to plead and hard to prove. Compared to a run-of-the-mill civil action, a plaintiff alleging securities fraud must do "more— much more—"to survive a motion to dismiss. *Albert Fadem Trust*, 334 F. Supp. 2d at 1006. And although Rule 12(b)(6) requires that all inferences be drawn in the plaintiff's favor, "*inferences of scienter do not survive if they are merely reasonable.*" *Id.* (quoting *Campbell v. Lexmark Int'l Inc. (In re Lexmark Int'l Sec. Litig.)*, 234 F. Supp. 2d 680, 683 (E D. Ky. 2002)). At this stage, a plaintiff's allegations about scienter must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. *See Tellabs*, 551 U.S. at 324.

### I.C.1. Scienter Under the *Helwig* Factors

Recklessness presents one way to demonstrate scienter. For example, a plaintiff may allege that a company's directors or executives recklessly made statements to the market or recklessly omitted information from those statements. The Supreme Court has not squarely addressed "whether recklessness suffices to fulfill the scienter requirement." *Matrixx*, 563 U.S. at 48. Under the law of this Circuit, however, the requisite recklessness requires "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Doshi*, 823 F.3d at 1039 (quoting *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011)). In this context, recklessness is "akin to conscious disregard." *Dougherty*, 905 F.3d at 980. "Before drawing an inference of recklessness, courts typically require multiple obvious red flags...demonstrating an egregious refusal to see the obvious, or to investigate the doubtful." *Doshi*, 823 F.3d at 1039 (citations and quotations omitted).

Recklessness will satisfy the scienter requirement for misstatements or omissions of present fact. With respect to forward-looking statements and soft information, however, recklessness does not suffice. "Under the [Reform Act], if the alleged misstatement or omission is a 'forward-looking statement,' the required level of scienter is 'actual knowledge.' " *Matrixx*, 563 U.S. at 48 n.14 (citing 15 U.S.C. § 78u-5(c)(1)(B)); *Omnicare III*, 769 F.3d at 471. Additionally, "scienter must be found with respect to each defendant and with respect to each alleged violation of the statute." *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017–18 (11th Cir. 2004).

Plaintiff identifies four categories of allegations that he contends support scienter, which touch primarily on two *Helwig* factors, although some do not squarely speak to any of the *Helwig* factors. Plaintiff argues that: (1) there was a divergence between the Company's internal data and Defendants' public statements; (2) when they made their public statements, Defendants ignored the most recent information certain employees reported through internal channels, including customer complaints and reports of difficulty selling Propel SSP; (3) because the Company's value-added proppant sector was a "primary focus," Defendants were likely paying attention to the sector and knew their statements were false; and (4) Ms. Deckard's abrupt departure from the Company following the announcement of the SEC investigation is probative of scienter. (ECF No. 52, PageID #1986–91.)

### I.C.1.a. Divergence from Internal Reports and Disregard for Most Current Information

Plaintiff argues that two *Helwig* factors—divergence between internal reports and external statements on the same subject; and disregard for the most current information—support an inference of scienter. (*Id.*, PageID #1987–88.) Generally, Plaintiff cites the same factual bases in support of an inference of scienter under both factors.

**\*27** In this context, internal reports and records receive broad construction. *See Dougherty*, 905 F.3d at 981. The "contents of meetings at which senior corporate officers were present" count. *Id.* (citing *City of Monroe*, 399 F.3d at 688). So too would regulatory agency meeting minutes. *Id.* (finding FDA End-of-Phase 2 meeting minutes qualify). However, the mere existence of internal records and reports does not mean an inference of scienter necessarily follows. To give rise to sufficient indicia of intent, there must be some divergence between those internal reports and the external statements the company makes on the same subject. *Id.* (citing *Helwig*, 251 F.3d at 552). What is relevant are not particular details about the reports themselves, but "the role of these reports in perpetuating" the alleged fraud and the "role of these reports in the Defendants' decision-making process." *Konkol*, 590 F.3d at 398. "The standard from *Tellabs* requires *specific* facts" that the "reports were known to Defendants" and that they reflect the allegedly fraudulent scheme. *Id.* Confidential witnesses are one way to meet the *Tellabs* requirement. *See id.* at 398– 99.

Plaintiff avers that Defendants publicly told investors that PowerProp's performance was comparable to lightweight

**Plagens v. Deckard, Not Reported in Fed. Supp. (2023)**

2023 WL 2711263

ceramics, Propel SSP showed positive test results, and Propel SSP and Propel SSP 350 had strong indicators of successful commercialization. At the same time, internal company records showed PowerProp's conductivity—the key indicator of proppant performance—fell far below that of lightweight ceramics, Propel SSP test results were limited and minimally successful, and only one customer adopted either Propel SSP or Propel SSP 350. To support this allegation, Plaintiff points to several paragraphs in the consolidated amended complaint. (ECF No. 52, PageID #1987) (citing ECF No. 50, ¶¶ 157, 159 & 178, PageID #1107 & #1111 (regarding Power Prop); *id.*, ¶¶ 163–64, 184 & 190, PageID #1108, #1113 & #1114–15 (regarding Propel SSP); *id.*, ¶¶ 167 & 184, PageID #1109 & #1113 (regarding Propel SSP 350).) According to Plaintiff, Defendants knew, or were reckless in not knowing, that these statements were false because the Company's own data contradicted the statements about PowerProp's performance and Propel SSP's test results and its employees observed these discrepancies and received complaints from customers. (ECF No. 52, PageID #1987.) Further, whistleblowers raised these concerns with four unnamed executives. (*Id.*)

These allegations support an inference of scienter, at least as to Defendants' misleading statements concerning hard information. Ms. Deckard, Mr. Biehl, and Mr. Barrus all signed SEC filings that compared PowerProp's performance to that of lightweight ceramics (ECF No. 50, ¶¶ 73, 94, PageID #1082 & #1090) and that touted Propel SSP's field trials (*id.*). Also, Ms. Deckard made the same or similar statements on earnings calls. (*Id.*, ¶¶ 70, 79 & 85, PageID #1082, #1084 & #1086–87.) Notably, only Ms. Deckard made statements concerning the allege successful results of Propel SSP's field trials using hard numbers. (*See, e.g.*, *id.*) These numbers were not subjective or unverifiable—they were hard facts and internal reports allegedly demonstrate their falsity. Also, Ms. Deckard, Mr. Biehl, and Mr. Barrus served as officers of Fairmount Santrol when it first developed PowerProp and Propel SSP. Therefore, they had access to information about the products and their development before the merger with Unimin, after which, Defendants aver, they became a less important part of the Company's overall business.

Plaintiff's allegations show at least that Defendants had "access to information contradicting their public statements." *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 711 (E.D. Mich. 2010). Defendants distinguish *Chamberlain* on two grounds. First, most of the defendants in that case were actively involved in an anti-competitive scheme, which they concealed. (ECF No. 53, PageID #2020) (citing *Chamberlain*, 747 F. Supp. 2d at 712–13, 719).) Though true, this factual difference does not negate the rule that access to contradicting information can support an inference of scienter based on recklessness. Each of Defendants' citations supporting a contrary rule—that access to information contradicting public statements is insufficient to show recklessness—are from a single Circuit (and district courts in that Circuit), not the Sixth Circuit. (ECF No. 51-1, PageID #1184.) Second, the district court in *Chamberlain* dismissed one defendant, Booth, because the court could not "infer Booth's fraudulent intent merely from his position in the company." *Id.* at 719. But Defendants do not mention that the plaintiffs in *Chamberlain* did not even allege any false or misleading statements attributable to Booth. *Id.*

### I.C.1.b. Countervailing Explanation

**\*28** Defendants explain that they and the Company believed PowerProp, Propel SSP, and Propel SSP 350 could be developed and commercialized successfully, such that they reported to the market what they learned about the products from subordinates and did not commit fraud. (ECF No. 51-1, PageID #1184–85.) Further, none of the alleged reports from subordinates who allegedly alerted the Company's officers to fraud specifically name Defendants. (ECF No. 53, PageID #2019.) Plaintiff argues that his theory of scienter is cogent and "at least equally as likely" as Defendants' countervailing explanation because "all the facts alleged, taken collectively" support a strong inference of scienter. (ECF No. 52, PageID #1986) (quoting *Tellabs*, 551 U.S. at 322–23).)

Defendants' countervailing explanation is equally as likely as Plaintiff's theory of scienter, at least at the pleading stage, for two reasons. First, Defendants focus on the fact that no confidential witness names them to undermine an inference of scienter rising to the level of actual knowledge. But that fact does not speak to recklessness. Plaintiff alleges that Ms. Deckard, Mr. Biehl, and Mr. Barrus made misleading statements concerning hard information. The standard for scienter with respect to these statements is recklessness, not actual knowledge. *Omnicare III*, 769 F.3d at 471. Second, Defendants' theory focuses on shortcomings in the allegations based on Plaintiff's confidential witnesses—not on "all of the facts alleged, taken collectively" as the Supreme Court instructs. *Tellabs*, 551 U.S. at 323. As the Court explained above, the facts taken collectively support an inference of recklessness under the relevant *Helwig* factors.

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2958 Filed 11/15/24 Page 161 of 173
Plagens v. Deckard, Not Reported in Fed. Supp. (2023)
2023 WL 2711263

Also, Defendants argue that the SEC order does not find scienter on the part of any individual. (ECF No. 51-1, PageID #1179.) But the SEC's order, without more, fails to refute a showing of scienter for at least three reasons. First, the SEC order is the result of an agreement between the Company and the SEC. Second, the SEC order names the Company as a whole, not the individual Defendants in this lawsuit. (ECF No. 50-1, PageID #1127.) Third, the SEC order does not address scienter on the part of any person. The words "scienter" or "state of mind" appear nowhere in the SEC order. For these reasons, the SEC order does not foreclose an inference of scienter in this lawsuit.

\* \* \*

Defendants spend the balance of their briefing attacking the insufficiency of Plaintiff's allegations as to each individual Defendant, rather than addressing the *Helwig* factors. The Court will address scienter holistically as to each Defendant below. However, the two *Helwig* factors on which Plaintiff relies give rise to a strong inference of scienter at the pleading stage.

### I.C.2. Ms. Deckard's Separation from Employment

Plaintiff argues that Ms. "Deckard's abrupt termination shortly following the announcement of the SEC's investigation is also probative of scienter" as to the Company and the individual Defendants. (ECF No. 52, PageID #1991; ECF No. 50, ¶ 133, PageID #1101–02.) Plaintiff argues that the "unexpected departure of a CEO connected temporally to a regulatory investigation 'weighs slightly in favor of a finding of scienter.' " *Forman v. Meridian Bioscience, Inc.*, 367 F. Supp. 3d 674, 695 (S.D. Ohio 2019). Mr. Biehl and Mr. Barrus no longer worked at the Company when Ms. Deckard separated from employment. Therefore, her departure has little bearing on their scienter.

Citing several out-of-circuit authorities, Defendants maintain that Ms. Deckard's separation from employment does not support an inference of scienter

because nothing in her departure announcement referenced alleged fraud. (ECF No. 51-1, PageID #1180–81.) Standing alone, they argue, Ms. Deckard's resignation cannot establish scienter where "no specific evidence indicates the resigning officials, or their replacements, knew of" the alleged fraud.

*Schott v. Nobilis Health Corp.*, 211 F. Supp. 3d 936, 956 (S.D. Tex. 2016); *see also In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 251 (S.D.N.Y. 2007) (finding no inference of scienter where majority of the fraud occurred before CEO joined the company and resignation was not explicitly linked to fraud); *M&M Hart Living Tr. v. Global Eagle Ent., Inc.*, No. CV 17-1479, 2017 WL 5635424, at \*13 (C.D. Cal. Aug. 20, 2017) (finding no inference of scienter where plaintiff did not allege facts sufficient to distinguish a suspicious change in personnel from a benign one).

 **\*29** Similarly, Defendants cite *In re Intelligroup Securities Litigation*, 527 F. Supp. 2d 262, 344–48 (D.N.J. 2007), for the proposition that, where an officer's resignation is not explicitly connected to the allege fraud, it cannot form "even a piece" of the scienter puzzle. (ECF No. 51-1, PageID #1181.) There, the district court relied on a line of cases from the Northern District of California. *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d at 346–47 (citing *Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1093 (N.D. Cal. 2005); *In re Network Assocs., Inc. II Sec. Litig.*, No. C 00-CV-4849, 2003 WL 24051290, at \*14 n.26 (N.D. Cal. Mar. 25, 2003); *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1073 (N.D. Cal. 2002)). The Court declines to adopt such a bright line rule where the Sixth Circuit has not done so and will consider whether Ms. Deckard's departure supports an inference of scienter viewing the facts alleged in the consolidated amended complaint holistically.

Covia attributed Ms. Deckard's departure to the Board's decision "to pursue a different direction with our leadership." (ECF No. 50, ¶ 130, PageID #1101.) When the Company made that announcement on May 9, 2019, the scope of the SEC investigation was not yet public. By then, the Company had only disclosed the fact of the investigation and that it had received a subpoena concerning some of its value-added proppant products. (*Id.*, ¶ 127, PageID #1100.) Unlike the plaintiffs in *Schott*, *Openwave*, and *M&M Hart*, here Plaintiff alleges that Ms. Deckard knew of the alleged fraud, or was severely reckless in not knowing (*see, e.g.*, ECF No. 50, ¶ 90, PageID #1089) and the SEC order further supports that the fraud occurred while Ms. Deckard was an officer first of Fairmount Santrol and then of Covia. (ECF No. 50-1, ¶¶ 10–41, PageID #1129–33.) These allegations support an inference of scienter, even if the inference is not as strong as it would be had the Company's announcement explicitly tied Ms. Deckard's departure to fraud.

Further, relying on *Albert Fadem Trust*, 334 F. Supp. 2d at 1014, Defendants argue that Ms. Deckard's departure

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2959 Filed 11/15/24 Page 162 of 173

Plagens v. Deckard, Not Reported in Fed. Supp. (2023)

2023 WL 2711263

occurred too long after the Company announced the SEC subpoenas to be plausibly related to the alleged fraud. (ECF No. 51-1, PageID #1180–81.) In that case, Plaintiff proposed no plausible explanation for the significance of the dates of certain officers' resignations, which occurred a year before discovery of the alleged fraud. *Id.* One officer resigned a month after the public disclosure of the alleged fraud, but there was a more plausible explanation for that resignation. Just one month earlier, the company publicly disclosed it was decreasing the size of the officers' entire department. *Id.* An anodyne statement that the Board was going "in a different direction" does not present the same kind of plausible alternative explanation for Ms. Deckard's departure, particularly in light of the SEC investigation that was ongoing at the same time.

Finally, Defendants argue that, if Ms. Deckard's termination were related to the alleged fraud, the Company would not have kept her on as a consultant. (ECF No. 51-1, PageID #1181.) In *Forman*, the departing CEO stayed on pending the naming of his replacement. 367 F. Supp. 3d at 695. Still, the district court determined that his departure weighed slightly in favor of an inference of scienter. *Id.* Similarly, Ms. Deckard's departure a few weeks after the SEC issued a subpoena— which the record reflects concerned PowerProp, Propel SSP, and Propel SSP 350—weighs slightly in favor of a showing of a strong inference of scienter.

### I.C.3. Holistic Analysis of Scienter

 **\*30** As the Supreme Court's decision in *Matrixx* requires, the Court also reviews "all the allegations holistically." *Matrixx*, 563 U.S. at 48 (quoting *Tellabs*, 551 U.S. at 326). Additionally, as courts within this Circuit continue to do following *Matrixx*, the Court also considers the allegations of the second amended complaint under *Helwig*. *See, e.g.*, *Dougherty*, 905 F.3d at 979 (applying *Helwig*); *Pittman*, 861 F. App'x at 57 ("Our starting point is *Helwig*."). "A complaint adequately pleads scienter" under the Reform Act "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Matrixx*, 563 U.S. at 48 (quotation omitted).

Ms. Deckard signed each of the Company's Form 10-Ks during the class period. Mr. Barrus signed the Company's 2015 Form 10-K, and Mr. Biehl signed the Company's 2016 and 2017 Forms 10-K. Plaintiff generally alleges that each Defendant: "directly participated in management of the Company"; "was directly involved in the day-to-day

operations of the Company at the highest levels"; "was privy to confidential proprietary information concerning the Company and its business and operations"; "was directly or indirectly involved in...disseminating the false and misleading statements and information alleged herein"; "was directly or indirectly involved in...the Company's internal controls"; "was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company"; and/or "approved or ratified" the false or misleading statements. (ECF No. 50, ¶ 27, PageID #1072–73.)

Considering the totality of Plaintiff's allegations against each Defendant under the Reform Act and the law of this Circuit both individually and collectively, Plaintiff adequately alleges scienter only as to Ms. Deckard.

### I.C.3.a. Ms. Deckard

The bulk of the specific allegations in the consolidated amended complaint concern Ms. Deckard. She spoke during the Company's earnings calls and press conferences, and she signed the Company's Form 10-Ks during the class period.

Plaintiff's biggest hurdle with respect to scienter is that neither the SEC order nor any of Plaintiff's confidential witnesses identify which unnamed executive was affirmatively told about the Company's alleged fraud. However, other facts support an inference of scienter. The consolidated amended complaint identifies at least four occasions on which Ms. Deckard repeated in her own words allegedly false metrics concerning Propel SSP's test results. Plaintiff alleges that Ms. Deckard attended sales meetings where attendees discussed the commercial viability of PowerProp and Propel SSP. (ECF No. 50, ¶¶ 185 & 191, PageID #1113 & #1115.) Further, according to the Company's former marketing executive, Ms. Deckard "emphasiz[ed] the critical role" the Company's resin-coated products "would play in driving Covia into profitability." (*Id.*, ¶ 191, PageID #1115.)

"At the motion-to-dismiss stage, we need not view [the CEO]'s optimism as mere ignorance." *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F. 4th 802, 813 (6th Cir. 2022). And Ms. Deckard expressed more than generalized optimism. She repeatedly touted Propel SSP's allegedly false test results and signed several SEC filings that compared PowerProp's performance to lightweight ceramics, which Plaintiff claim was false.

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2960 Filed 11/15/24 Page 163 of 173

Plagens v. Deckard, Not Reported in Fed. Supp. (2023)
2023 WL 2711263

In particular, Ms. Deckard's emphasis on Propel SSP as an important component of the Company's future profitability supports an inference of scienter. *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 725 (S.D. Ohio 2006). Certainly, the products at issue represented a small share of the Company's business. But taking all of Ms. Deckard's statements together, and considering the *Helwig* factors, Plaintiff's allegations establish a strong inference that she at least recklessly, if not knowingly, misled investors when she made the material misstatements of hard information alleged in the consolidated amended complaint. *Cf. id.* (finding a strong inference of scienter where defendants' misstatements concerned the company's "main driver" of growth). This inference is at least as strong as the competing explanations for Ms. Deckard's statements that she advances.

### I.C.3.b. Mr. Barrus and Mr. Biehl

**\*31** To determine whether the allegations raise a strong inference of scienter as to each individual defendant, the Court must analyze Plaintiff's allegations holistically. But there are no allegations against Mr. Barrus or Mr. Biehl other than their signatures on the Company's 2015 10-K and 2016 and 2017 10-Ks, respectively. Without more, their failure to verify the veracity of each statement in the filing "indicates negligence at most." *Astec*, 29 F. 4that 816. Mr. Barrus's name appears in the consolidated amended complaint only five times, three of which are in the case caption and "Parties" section. Mr. Biehl's name appears only six times. These allegations do not satisfy the heightened pleading requirement for scienter or amount to a "cogent and compelling inference of scienter." *Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*, 556 F. Supp. 3d 772, 801 (N.D. Ohio 2021). For these reasons, the Court **GRANTS** Defendants' motion as to Mr. Barrus and Mr. Biehl and **DISMISSES** all counts against those two Defendants.

### I.C.3.c. The Company

Plaintiff does not allege claims against the Company because of its bankruptcy. However, Plaintiff argues that the individual Defendants have control-person liability because the Company itself violated federal securities laws. (ECF No. 50, ¶ 217, PageID #1122.) The Court addresses those claims in more detail below.

Plaintiff argues that he sufficiently alleges scienter as to the Company. Because the Company is not a Defendant in this case, the Court declines to determine whether Plaintiff alleges a strong inference of scienter—or any other element of a securities fraud claim—against the Company. However, as a matter of law Ms. Deckard's scienter can be imputed to Company by virtue of her position as its chief executive officer. *Astec*, 29 F. 4th at 816 (quoting *Omnicare III*, 769 F.3d at 476).

## II. Section 20(a) Control-Person Liability

As an initial matter, Plaintiff urges the Court to adjust its holding in *Plymouth County Retirement Association v. ViewRay, Inc.* to determine that there is no requirement that a party liable under Section 20(a) be a "culpable participant" in the underlying violation. (ECF No. 52, PageID #1992.) The Sixth Circuit affirmed that decision without addressing the control-person claims. *Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*, No. 21-3863, 2022 WL 3972478 (6th Cir. Sept. 1, 2022). For the following reasons, the Court declines to re-examine its holding in *ViewRay* here because Plaintiff's theory of control-person liability fails for another reason.

Plaintiff's theory of control-person liability against Ms. Deckard for her control of the Company is circular. Although Plaintiff does not seek to recover against the Company because of its bankruptcy, he alleges in the consolidated amended complaint that the Company's conduct constitutes a primary violation for purposes of Section 20(a). (ECF No. 50, ¶ 218, PageID #1122.) Because the Company is not properly a Defendant in this case, as a formal matter the Court cannot conclusively determine that it committed an underlying violation of Section 10(b) or Rule 10b-5.

Even if a claim against the Company were properly before the Court, the Company's scienter, at least in part, relies on Ms. Deckard's scienter as its chief executive. As the Sixth Circuit has noted, without deciding, that "a plaintiff may not be able to simultaneously assert both Section 10(b) and Rule 10b-5 claims and Section 20(a) claims against the same defendant." *PR Diamonds Inc. v. Chandler*, 91 F. App'x 418, 442 n.4 (6th Cir. 2004). The Court declines to impute Ms. Deckard's scienter for her alleged primary violation of Section 10(b) and Rule 10b-5 to the Company to support an additional control-person claim against Ms. Deckard herself where, as here, an underlying Section 10(b) violation against the Company is not before the Court.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss. The Court **DISMISSES** Mr. Barrus, Mr. Biehl, Mr. Navarre, and Mr. Eich and **DISMISSES** Counts II and III against all Defendants, including Ms. Deckard. But Count I will proceed against Ms. Deckard based on the allegations in the following paragraphs of the consolidated amended complaint: ¶ 66, PageID #1081; ¶ 70, PageID #1082; ¶ 73, PageID #1082;

¶¶ 79 & 81, PageID #1084–85; ¶ 85, PageID #1087; ¶ 89, PageID #1089; ¶ 94, PageID #1090; ¶ 107, PageID #1094.

 **\*32  SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 2711263

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1985562
Only the Westlaw citation is currently available.
United States District Court,
C.D. California.

Mark ROBERTI

v.

OSI SYSTEMS, INC., et al.

No. CV 13–9174–MWF (VBKx).
|
Signed Feb. 27, 2015.

**Attorneys and Law Firms**

Lionel Zevi Glancy, Michael M. Goldberg, Robert Vincent Prongay, Lesley F. Portnoy, Glancy Binkow and Goldberg LLP, Los Angeles, CA, Jeremy A. Lieberman, Pomerantz LLP, New York, NY, for Mark Roberti.

Peter Allen Wald, Latham and Watkins LLP, San Francisco, CA, Anita P. Wu, James H. Moon, Latham & Watkins LLP, Los Angeles, CA, Erica Lyn Swoyer Anderson, Michele D. Johnson, Latham & Watkins LLP, Costa Mesa, CA, for Osi Systems, Inc., et al.

**Proceedings (In Chambers):** ORDER DENYING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT [49]

Honorable MICHAEL W. FITZGERALD, District Judge.

**\*1** Deputy Clerk, Cheryl Wynn.

Before the Court is Defendants' Motion to Dismiss Plaintiff's Amended Class Action Complaint (the "Motion") filed by Defendants OSI Systems, Inc., Deepak Chopra, Alan I. Edrick, and Ajay Mehra on July 18, 2014. (Docket No. 49). The Court has reviewed and considered the papers, and held a hearing on November 3, 2014. For the reasons set forth below, the Court **DENIES** the Motion.

**I.** *BACKGROUND*

On December 12, 2013, Plaintiff Mark Roberti initiated this class action suit, individually and on behalf of all other persons similarly situated (the "Putative Class"), by filing a Complaint in this Court. (Docket No. 1). The Complaint alleged that Defendants OSI Systems, Inc. ("OSI"), OSI

President, Chairman, and CEO Deepak Chopra, and OSI CFO and Executive Vice President Alan I. Edrick (collectively the "Defendants") violated the Securities Exchange Act of 1934 (the "Exchange Act") by making materially false and misleading statements regarding OSI's business, operational, and compliance policies. (*Id.*).

The Court filed an Order appointing Arkansas State Highway Employees Retirement System as Lead Plaintiff on March 17, 2014. (Docket No. 35). Lead Plaintiff then filed an Amended Class Action Complaint on May 20, 2014, adding Executive Vice President and Director Ajay Mehra as a defendant. (Docket No. 44).

The action arises from questions raised by the U.S. Department of Homeland Security ("DHS") and the Transportation Security Administration ("TSA") about contracts made with OSI subsidiary Rapiscan Systems, Inc. ("Rapiscan") for two security screening and inspection products: Advanced Imaging Technology ("AIT") full-body scanners, and Advanced Technology 2 ("AT–2") checkpoint baggage scanners. Lead Plaintiff alleges that between January 24, 2012 and December 6, 2013 (the "Class Period"), all persons who purchased or otherwise acquired OSI Systems securities were damaged by Defendants' materially false and misleading statements regarding these technologies, including allegations that OSI was intentionally manipulating government testing, and was knowingly using foreign and unapproved parts in violation of contracts with the U.S. Government. Lead Plaintiff bases these claims on its review and analysis of OSI's public filings with the SEC, the reports of securities and financial analysts concerning OSI's business, press releases, news articles, and other public statements concerning the Defendants, and interviews with numerous former OSI employees now serving as Confidential Witnesses in this action.

**A.** *Fraud Related to Advanced Imaging Technology Contract*

OSI develops and manufactures X-ray security and inspection systems to detect explosives, weapons, and other contraband, through its subsidiary and "core business segment," Rapiscan. (Amended Compl. at ¶ 2). Of OSI's $800 million in revenue in 2012 and 2013, nearly $400 million came from Rapiscan. (*Id.* at ¶ 25). Among Rapiscan's most important customers for these technologies were the Department of Homeland Security ("DHS") and the Transportation Security Administration ("TSA"). (*Id.* at ¶ 2). In fact, between 2009 and December 2013, OSI received around $267 million in

2015 WL 1985562

work from DHS alone, and a total of $463 million in U.S. Government contracts. (*Id.* at ¶ 31).

*\*2* In September 2009, TSA awarded Rapiscan a $173 million contract for potential future orders of Rapiscan's Advanced Imaging Technology ("AIT") systems, also known as "whole-body imaging" scanners, to be used for security screening in U.S. airports. (*Id.* at ¶¶ 36, 38). Following the award of this contract, OSI received various orders for its body scanner and related services. (*Id.* at ¶ 39). After deployment of these machines in airports, however, the public began raising privacy concerns over the detailed "naked body" images produced by the AIT scanners. (*Id.* at ¶ 42). Responding to these concerns, in late 2010, TSA mandated that all AIT scanners be upgraded with Automated Target Recognition ("ATR") software, which would modify the scanner's images to display only generic figures. (*Id.* at ¶ 44). Under the 2012 FAA Modernization and Reform Act (P.L. 112–95), passed by Congress on February 14, 2012, all AIT equipment was to be updated with this ATR software by June 1, 2012. (*Id.* at ¶ 46).

According to the Amended Complaint, Rapiscan encountered significant difficulties in developing the upgraded ATR software. (*Id.* at ¶ 53). Despite these difficulties, however, Defendants allegedly made numerous representations to investors that it was "business as usual" at Rapiscan, and allegedly indicated that the ATR software was already developed and "undergoing its final testing," that "could lead to more sales in the future" or "within the next few months." (*Id.* at ¶ 53). According to the Amended Complaint, Defendants were in fact nowhere close to developing software that would meet the TSA requirements. (*Id.* at ¶ 53).

Confidential Witness 1, who allegedly "worked directly on the testing of the ATR software," stated that Rapiscan "pretty much knew from the start" that it was running far behind schedule and that "[i]t was clear" to individuals that worked on the testing that "the algorithm was behind" by about a year. (*Id.* at ¶ 54). Confidential Witness 2, a Director of International Programs who worked at Rapiscan until July 2013, explained that he "was aware all along that they were ... having trouble meeting the criteria," regarding the ATR software. (*Id.* at ¶ 56). This Confidential Witness allegedly heard some Vice Presidents "say they did not think [Rapiscan] would ever meet the Congressional deadline." (*Id.*). Confidential Witnesses 3, a Rapiscan Field Service Engineer from 2007 to December 2012 explained that there were "too many bugs" in the software and that

the quality assurance staff were "not as diligent" as they should have been. (*Id.* at ¶ 59). According to Confidential Witness 1, engineers developing the software "never had management support" for properly completing the integration of the software. (*Id.* at ¶ 60).

In light of these difficulties, Rapiscan eventually requested an extension of the TSA's June 1, 2012 deadline, which TSA Administrator John Pistole granted based on the belief "that ATR certification was near." (*Id.* at ¶ 61). The Amended Complaint alleges that in order to create this impression, Rapiscan "cherry-picked" the few machines that were not encountering problems to send to TSA for testing. (*Id.* at 62). Confidential Witness 2 stated that "there was some manipulation of the data on the part of the engineers." (*Id.* at 63). Confidential Witness 4 stated that former quality assurance director Robert Mosley would have been aware of any manipulations and that this information would have been known "all the way up to the president." (*Id.*). Confidential Witness 1 stated that these problems were also documented as Issue # 8117 in Rapiscan's defect tracking database, which was allegedly accessible to all OSI management. (*Id.* at 64).

*\*3* The Amended Complaint alleges that even in the face of these difficulties, the "Defendants continued to knowingly or with reckless disregard represent to the market throughout 2012 that OSI was on track to comply with the TSA's directive in a timely manner, stating ... (1) "We are actually going through some operational testing of our ATR ... and we expect that [TSA] will be looking at potential orders within the next few months"; (2) "ATR [is] ... undergoing its final testing as we speak"; and (3) "[W]e're currently in testing, so we've completed on our side and the customer [is] currently in testing. We're hopeful that that could happen—that could be completed any time this summer." (*Id.* at 65). According to the Amended Complaint, OSI eventually disclosed to TSA that it would not be able to meet the extended deadline of May 31, 2013; however, OSI did not make this same disclosure to investors. (*Id.* at ¶ 66).

On November 9, 2012, TSA sent OSI a show cause letter that alleged that Rapiscan had not disclosed the issues related to the development process in a timely or complete manner. (*Id.* at ¶ 67). The chairman of the House Transportation Security Subcommittee also requested information from OSI, expressing concerns that OSI "may have attempted to defraud the Government by knowingly manipulating an operational test of Automated Target Recognition (ATR) software in the field in order to have a successful outcome." (*Id.* at ¶ 68). On

November 14, 2012, OSI responded that "Rapiscan became aware of an issue related to software under development months ago and promptly notified the TSA." (*Id.* at ¶ 69). The Amended Complaint asserts that on November 15, 2012, two analysts at Oppenheimer stated that "Rapiscan manipulated test results for a software algorithm it was developing to enhance privacy features on its full body scanners." (*Id.* at ¶ 70). Additionally, on November 16, 2012, an analyst at Benchmark also indicated that "OSI simply manually selected the best sensors that came off the line for the three units sent for testing," in order to have good results. (*Id.* at ¶ 71).

On January 17, 2013, OSI announced that the TSA had cancelled the contract with Rapiscan for ATR software development, and that it planned to de-book the $5 million backlog and report a related $2.7 million impairment charge. (*Id.* at ¶ 73). That same day OSI filed with the SEC a Form 8–K signed by Defendant Edrick discussing these developments. (*Id.*). The Amended Complaint explains that on January 24, 2013, Defendant Chopra stated in a conference call that the cancellation of the contract would "allow[ ] [Rapiscan] to stop the R & D spending on this program for which we saw a limited future beyond the TSA." (*Id.* at ¶ 74).

On May 20, 2013, OSI announced that DHS had issued a Notice of Proposed Debarment in connection with TSA's show cause letter. (*Id.* at ¶ 75). OSI's General Counsel filed a Form 8–K with the SEC that same day, indicating that this Notice "alleges that Rapiscan failed to disclose a defect with the Products and replaced hardware in the Products without being granted proper governmental approval." (*Id.* at ¶ 75). On June 21, 2013, OSI and DHS announced that they had entered into a 30–month Administrative Agreement to resolve the Notice of Proposed Debarment. (*Id.* at ¶ 76). Rapiscan had agreed to certain compliance upgrades and organizational improvements, had made certain personnel changes, and had created additional positions dedicated to compliance and quality assurance. (*Id.*).

### B. *Fraud Related to Checkpoint Baggage and Parcel Scanners Contract*

**\*4** The Amended Complaint also alleges a separate fraud involving OSI's checkpoint baggage and parcel scanners. On September 16, 2010, OSI announced that the TSA had awarded it a $325 million contract for this type of equipment, including Rapiscan's 620DV model. (*Id.* at ¶¶ 47). This contract required all parts to be manufactured and assembled in the United States, and prohibited changes to parts or configurations of the scanners without prior government

approval. (*Id.* at ¶¶ 50, 78). Following the award of this contract, TSA ordered and Rapiscan delivered millions of dollars worth of 620DVs to the U.S. Government. (*Id.* at ¶ 49).

According to the Amended Complaint, however, Rapiscan began using unapproved X-ray generators manufactured in China to assemble and repair these scanners, and concealed this contractual violation by labeling the unapproved components with the same part number as the originally approved component. (*Id.* at ¶ 80). In total, OSI delivered at least 250 devices with these unapproved components. (*Id.*).

The Amended Complaint alleges that after OSI replaced some of its employees following the revelation of the ATR software issue described above, the new employees quickly discovered that Rapiscan was using unapproved parts in the 620DVs. (*Id.* at ¶ 81). Nevertheless, OSI bid on a new $67 million 620DV contract. (*Id.* at ¶ 81). According to the Amended Complaint, "[f]ormer employees confirmed that Rapiscan routinely changed the configuration of one of its products without gaining approval from the TSA in violation of the contracts' terms." (*Id.* at ¶ 83). Confidential Witness 4 stated that "[t]here just were rumors that [Rapiscan] would just go ahead and make the changes they needed, if it was a minor one." (*Id.*). Confidential Witness 3 indicated that Rapiscan's quality assurance program suffered from severe deficiencies. (*Id.* at ¶ 84).

TSA issued Rapiscan a show cause letter on November 20, 2013, in relation to the use of these unapproved components. (*Id.* at ¶ 85). The Amended Complaint alleges that Defendants did not disclose this second show cause letter to their investors until nineteen days later on December 9, 2013. (*Id.*). TSA canceled the $67 million contract on December 4, 2013. (*Id.* at ¶ 86). On December 8, 2013, OSI issued a press release stating that "[w]hile the component change was vetted by Rapiscan's internal quality assurance, it did not meet the contractual requirement of obtaining TSA's approval in advance." (*Id.* at ¶ 88). An analyst at Stephens concluded that this issue stemmed from "personnel and compliance shortfalls." (*Id.*). An analyst at Quillin wrote that "long before the [$67 million] bid, [Rapiscan] had swapped out a component of its checkpoint x-ray systems without concurrently notifying the TSA of the change." (*Id.* at ¶ 89). Several individuals were allegedly let go after this came to light. (*Id.* at ¶ 90).

### C. *Shareholder Lawsuit*

**\*5** Lead Plaintiff is now bringing claims under sections 10(b), 20(a) and 20(A) of the Securities Exchange Act (15

Case 4:23-cv-13132-SDK-EAS ECF No. 43-6, PageID.2965 Filed 11/15/24 Page 168 of 173
Roberti v. OSI Systems, Inc., Not Reported in F.Supp.3d (2015)
2015 WL 1985562

U.S.C. §§ 78j(b), 78t(a) and 78t–1), along with Rule 10b–5 promulgated thereunder (17 C.F.R. § 240.10b–5), alleging that Defendants' conduct caused a decline in the market value of OSI Systems securities and that the decline in value caused significant losses and damage to shareholders. (*Id.* at ¶ 1). Defendants brought a Motion to Dismiss Plaintiff's Amended Class Action Complaint on July 18, 2014. (Docket No. 49). Lead Plaintiff filed an Opposition to Defendants' Motion to Dismiss the Amended Complaint on August 29, 2014. (Docket No. 51). Defendants filed a Reply in Support of their Motion to Dismiss Plaintiff's Amended Class Action Complaint on September 26, 2014. (Docket No. 52).

## II. *DISCUSSION*

"A Rule 12(b)(6) dismissal is proper only where there is either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Brown v. China Integrated Energy, Inc.,* 875 F.Supp.2d 1096, 1102 (C.D.Cal.2012) (internal quotation omitted). In reviewing a motion to dismiss, the Court must accept all factual allegations pleaded in the complaint as true. *Id.*

Securities fraud class actions are held to the heightened pleading requirements of the Private Securities Litigation Reform Act (the "PSLRA") and Federal Rule of Civil Procedure 9(b). *Tellabs, Inc. v. Makor Issues & Rights Ltd.,* 551 U.S. 308, 313, 127 S.Ct. 2499, 168 L.Ed.2d 179, (2007) (reversing dismissal of securities fraud class action and clarifying that plaintiff alleging fraud in § 10(b) action need only plead facts rendering inference of scienter at least as likely as any plausible opposing inference). "The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention to deceive, manipulate, or defraud." *Id.* at 313 (internal quotation omitted).

Specifically, a complaint must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading," and "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Additionally, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The Ninth Circuit provides a two-part inquiry for scienter: (1) "whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter," and (2) "if no individual allegation is sufficient ... whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *New Mexico*

*State Inv. Council v. Ernst & Young,* 641 F.3d 1089, 1095 (9th Cir.2011) (citing *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 991–92 (9th Cir.2009)). The requisite state of mind must be a "departure from the standards of ordinary care that presents a danger of misleading buyers that is either known to the defendant or so obvious that the actor must have been aware of it." *Zucco,* 552 F.3d at 991 (internal quotations omitted).

**\*6** In sum, a complaint "must contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi v. Larkin,* 253 F.3d 423, 432 (9th Cir.2001) (affirming the dismissal of a securities fraud class action on the ground that optimistic statements made eight months before merger and conclusory allegations that statements were false when made were insufficient to raise a strong inference that defendants intentionally or with deliberate recklessness made false or misleading statements to investors). "If a plaintiff fails to plead either the alleged misleading statements or scienter with particularity, the complaint must be dismissed." *In re Immune Response Sec. Litig.,* 375 F.Supp.2d 983, 1018 (S.D.Cal.2005) (internal quotation omitted) (denying motions to dismiss securities class action because, among other things, investors sufficiently stated facts that supported strong inference that representations were false or misleading when made and cautionary statements were too generic to invoke safe harbor protection). These heightened requirements "prevent[ ] a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating why the defendant's alleged statements or omissions are deceitful." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.,* 540 F.3d 1049, 1061 (9th Cir.2008) (affirming dismissal of putative securities fraud class action because, among other things, investors failed to allege loss causation, investors failed to adequately plead scienter, and complaint lacked specificity required to adequately allege falsity). On the other hand, "courts must be careful not to set the hurdles so high that even meritorious actions cannot survive a motion to dismiss. Such a regime would defeat the remedial goals of the federal securities laws." *Id.*

### A. *Request for Judicial Notice*
As an initial matter, Defendants request the Court take judicial notice of the documents attached as Exhibits A–CC to the Declaration of Anita P. Wu. (Docket No. 48). These exhibits include documents referenced in Lead

2015 WL 1985562

Plaintiff's Amended Complaint, such as transcripts from hearings before the House of Representatives' Subcommittee on Transportation Security, analyst reports, news articles, Administrative Agreements signed by Rapiscan, and transcripts of conference calls with OSI investors. (*See* Wu Decl. at 1–2 (Docket No. 50)). These exhibits also include public filings with the Securities and Exchange Commission. (*Id.*).

In deciding the present Motion, the Court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs,* 551 U.S. at 322. Judicial notice may be taken of any adjudicative fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b)(2).

**\*7** The Court **GRANTS** Defendants' unopposed Request for Judicial Notice. SEC filings are generally subject to judicial notice. *Metzler,* 540 F.3d at 1064 n. 7 (citing *Dreiling v. Am. Exp. Co.,* 458 F.3d 942, 946 n. 2 (9th Cir.2006)). Courts can also take judicial notice of conference call transcripts, which are "publicly available and ... disclosed to the market." *Rosenbaum Cap., LLC v. McNulty,* 549 F.Supp.2d 1185, 1189 (N.D.Cal.2009). Finally, a "court may take judicial notice of a document if it relied on in the complaint ... and its authenticity is not disputed." *In re Northpoint Comm's Group, Inc.,* 221 F.Supp.2d 1090 (N.D.Cal.2002).

**B.** *Section 10(b* **)**
To state a claim under Section 10(b) of the Exchange Act, a plaintiff must allege the following elements: (i) a material misrepresentation (or omission); (ii) scienter (a wrongful state of mind); (iii) a connection with the purchase or sale of a security; (iv) reliance (also known as "transaction causation"); (v) economic loss; and (vi) loss causation (a causal connection between the material misrepresentation and the loss). *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).

Defendants challenge Lead Plaintiff's Amended Complaint on two of these elements. First, Defendants argue that Lead Plaintiff fails to allege an actionable misstatement, because the statements alleged in the Amended Complaint are "puffing," forward-looking statements, or opinion statements that are nonactionable, and in any event, Lead Plaintiff fails to adequately plead the falsity of current or historical fact

statements. Second, Defendants argue that Lead Plaintiff fails to establish a strong inference of scienter.

**1.** *Falsity*
"To be actionable under the securities laws, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosp. Corp.,* 280 F.3d 997, 1006 (9th Cir.2002). In general, "whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *Fecht v. Price Co.,* 70 F.3d 1078, 1081 (9th Cir.1995) (superseded by statute on other grounds) (citing *Durning v. First Boston Corp.,* 815 F.2d 1265, 1268 (9th Cir.1987)). "[O]nly if the adequacy of the disclosure ... is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law." *Id.* (internal quotations omitted).

Lead Plaintiff asserts that Defendants made specific statements that concealed Rapiscan's inability to develop ATR software. Specifically, Lead Plaintiff points out that in January 2012, Defendant Mehra stated that OSI was working with TSA, was going through operational testing of the ATR software, and expected "that [TSA] will be looking at potential orders within the next few months." (Amended Compl. at ¶ 21). In April 2012, Defendant Edrick told investors that the ATR software was "undergoing its final testing as we speak," (*id.* at ¶ 93), and six weeks later, again indicated that the ATR software was "in testing right now, and we think that could lead to more sales in the future" (*id.* at ¶ 94). Upon further questioning, Defendant Edrick indicated that "we've completed our side" of development of the ATR software. (*Id.* at ¶ 95).

**\*8** In fact, it appears that by at least May 2012, Rapiscan was already aware of problems with the ATR software (Wu Decl., Ex. D at 2), and had to seek an extension of the original June 1, 2012 Congressional deadline for installing ATR software (Amended Compl. at ¶ 61). Moreover, the Amended Complaint includes statements from Confidential Witnesses who state that Rapiscan was aware of some of these problems from early on in testing, and in fact "cherry-picked" machines during testing, which is consistent with the theory that Rapiscan was concealing these issues. (*Id.* at ¶¶ 54, 56, 57, 63).

Lead Plaintiff also asserts that Defendants made specific statements that concealed Rapiscan's use of an unapproved

component in their baggage screeners. Specifically, it points to a statement by Defendant Mehra on April 17, 2012, that OSI had begun fulfilling a 5–year, $325 million contract for baggage screeners, and that "we expect we'll see more orders over the course of the next several years ... as the TSA replaces their checkpoint machines." (*Id.* at ¶ 102). In June 2012, Defendant Edrick stated that the baggage scanners "continue[ ] to be a very strong product line for us." (*Id.* at ¶ 104). On December 13, 2012, Defendant Edrick indicated that the contract with the government on the baggage scanners "should also continue to generate revenues for us for this product." (*Id.* at ¶ 105). Moreover, on October 13, 2013, Defendant Chopra told analysts that the $67 million TSA order for additional baggage screeners was included in Rapiscan's backlog. (*Id.* at ¶ 109).

Lead Plaintiff indicates that these statements are all misleading because Rapiscan was "knowingly" using an unapproved component "inappropriately labeled with the same part number as the originally approved component." (*Id.* at ¶ 87). Lead Plaintiff asserts that this component switch occurred before the problems with the ATR software came to light and before Rapiscan even bid on the order for additional baggage screeners. (*Id.* at ¶ 89).

Defendants challenge that these statements are actionable. First, Defendants argue that many of the alleged statements are "mere puffing," or are opinion statements. (Mot. at 9, 16). In the Ninth Circuit, "vague, generalized assertions of corporate optimism or statements of 'mere puffing' are not actionable material misrepresentations under federal securities laws." *In re Impac Mortg. Holdings, Inc. Sec. Litig.,* 554 F.Supp.2d 1083, 1096 (C.D.Cal.2008) (concluding that CEO's statements that company was expecting "solid" loan origination and acquisition in the forthcoming year were mere puffery not actionable as material misrepresentations); *see also In re Cutera Sec. Litig.,* 610 F.3d 1103, 1111 (9th Cir.2010) ("When valuing corporations ... investors do not rely on vague statements of optimism like "good," "well-regarded," or other feel good monikers. This mildly optimistic, subjective assessment hardly amounts to a securities violation."). Additionally, in the Ninth Circuit opinion statements can give rise to a claim "only if the complaint alleges with particularity that the statements were both objectively and subjectively false or misleading." *Rubke v. Capital Bancorp, Ltd.,* 551 F.3d 1156, 1162 (9th Cir.2009).

**\*9** While Lead Plaintiff does rely in part on statements that merely reflect corporate optimism, other alleged statements

provide specific details to investors about the status of specific products. For example, the Amended Complaint asserts that Defendant Edrick indicated that "we've completed our side" of development of the ATR software, when in fact the company was far from completion. In addition, the Amended Complaint asserts that Defendant Chopra told analysts that the $67 million TSA order for additional baggage screeners was included in Rapiscan's backlog, when by that point Defendants knew that they were not in compliance with the government contract and disclosing this fact would likely lead to the cancellation of the order. Taking the facts in the Amended Complaint as true, these comments, among others, were not vague and optimistic, but specific and materially misleading at the time they were made.

Second, Defendants assert that Lead Plaintiff's statements are non-actionable forward-looking statements. Under the PSLRA's safe harbor, forward-looking statements are not actionable if either (1) they are identified as such and accompanied by meaningful cautionary language, or (2) plaintiff fails to allege particularized facts demonstrating that the statements were made with actual knowledge of their falsity. 15 U.S.C. § 78u–5(c)(1); *In re Cutera Sec. Litig.,* 610 F.3d 1103, 1111–12 (9th Cir.2010). Defendants argue that the statements provided in the Amended Complaint are "forward-looking statements reflecting Defendants' hopes or expectations about the completion of ATR software testing or Rapiscan's receipt of future orders for baggage scanners," and that these statements are accompanied by cautionary language. (Mot. at 10–11).

Lead Plaintiff, however, is alleging the *omission of present facts* with respect to the challenged statements. Another court has previously explained that, "to the extent Plaintiffs [ ] challenge Defendants' alleged *omission of present facts* with respect to the challenged statements, the PSLRA's safe harbor does not apply." *Mallen v. Alphatec Holdings, Inc.,* 861 F.Supp.2d 1111, 1126 (S.D.Cal.2012) (concluding that defendants' statements that the company had "already begun to realize synergies from the Scient'x acquisition" and "we anticipate that our revenues throughout the balance of 2010 *will continue to grow* " were not protected by the PSLRA safe harbor for "forward-looking" statements, but dismissing the case on other grounds). "The fact that defendants used those inadequately disclosed historical facts to support unsound projections does not shield their alleged misrepresentations as forward-looking statements." *In re CV Therapeutics, Inc.,* No. 03–03709 SI, 2004 WL 1753251, at \*10 (N.D.Cal. Aug.5, 2004).

2015 WL 1985562

Finally, Defendants argue that Lead Plaintiff has failed to adequately plead the falsity of current or historical fact statements. The Court disagrees, and concludes that Defendants' alleged statements were misleading because they "created an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Reese v. Malone,* 747 F.3d 557 (9th Cir.2014) (concluding that the statement of the BP Vice President that there was a "low manageable corrosion" rate was misleading and not merely incomplete because the company in fact had evidence of high corrosion levels); *see also In re Immune Response,* 375 F.Supp.2d at 1020 (optimistic statements about new drug under development were misleading because they failed to reflect the drug's true condition at the time the statements were made).

**\*10** Taken as a whole, the crux of Lead Plaintiff's claim is that Defendants consistently misrepresented the strength of the two product lines at issue, thus portraying Rapiscan's contracts with the government in "an unduly optimistic light." *In re Immune Response,* 375 F.Supp.2d at 1020. Lead Plaintiff has pointed to specific elements of particular statements and then provided reasonable explanations as to why it believes these specific statements to be false or misleading. The specific references to SEC filings, analyst reports, press releases, news articles, and interviews with numerous former OSI employees "are sufficiently particular, and that is all that the PSLRA requires." *Id.* Lead Plaintiff "ha[s] clearly served the PSLRA's purpose by putting Defendants on notice of the specific misstatements and omissions at issue." *Id.*

This conclusion extends to Lead Plaintiff's allegations of accounting fraud under GAAP and allegations that Defendants' SOX and internal control certifications were false. The nature of these allegations is sufficiently particular and specific to satisfy the pleading requirements of the PSLRA.

As to the allegations of GAAP violations, the Amended Complaint alleges that OSI did not properly account for charges and expenses related to the development of the ATR software and the cancellation of the $67 million order for AT–2 baggage screeners. (Amended Compl. at ¶¶ 112–25). Lead Plaintiff alleges that OSI was required to record those changes in the reporting period ending December 31, 2011, at the latest, as that is when the charges allegedly became probable and estimable. The Amended Complaint alleges that it was improper for Defendants to spread those charges over several periods, lessening the impact of the charges. (*Id.*). Second, the Amended Complaint charges that Defendants improperly classified those charges as "impairment, restructuring and other charges," thus obscuring from investors the full extent of OSI's problems. (*Id.* at ¶¶ 140–42). Third, and as explained below, Lead Plaintiff asserts that it was improper for Rapiscan to include the $67 million order for additional baggage screeners in their backlog when in fact they were aware they were in violation of the terms of the contract. (*Id.* at ¶ 137). Fourth, clearly articulates alleged wrongdoing when OSI treated as capitalized expenses the costs of developing the ATR software even though such development costs should only be capitalized after technological feasibility. (*Id.* at ¶¶ 138–39). The Court concludes that these allegations are detailed and stem from the same detailed scheme discussed above.

The allegations of Chopra and Edrick's false and misleading SOX and internal-control certifications arise out of the same basic facts discussed at length above: that Defendants omitted material information in making their financial reports. The fact that OSI received a clean audit opinion and that the financial statements were not restated does not alone immunize public companies and their principal officers from securities fraud claims that otherwise meet the specificity requirements of the PSLRA. *See In re New Century Sec. Litig.,* 588 F.Supp.2d, 1206, 1231 (C.D.Cal.2008) ("[T]he fact that [the company's] independent auditor may have approved the accounting methods will not shiel[d] [the officers] from liability for deception such methods may have caused."); *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 83 (1st Cir.2002) ( "[T]he fact that the financial statements for the year in question were not restated does not end [plaintiff's] case when he has otherwise met the pleading requirement of the PSLRA.").

**\*11** As Lead Plaintiff provides lengthy and detailed allegations that OSI "affirmatively create[d] an impression of a state of affairs which differ[ed] in a material way from the one that actually exist[ed]," the Court concludes that the Amended Complaint has sufficiently plead falsity to survive the present Motion to Dismiss. *Police Retirement Sys. of St. Louis v. Intuitive Surgical, Inc.,* 759 F.3d 1051, 1061 (9th Cir.2014) (internal citation omitted).

### 2. *Scienter*

In addition to falsity, the PSLRA requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."

15 U.S.C. § 78u–4(b)(2)(A). To satisfy the requisite state of mind element, "a complaint must allege that the defendant [ ] made false or misleading statements either intentionally or with deliberate recklessness." *Zucco,* 552 F.3d at 991.

In *Tellabs,* the Supreme Court clarified the inquiry for determining whether a plaintiff's allegations are sufficient to establish scienter. 551 U.S. at 321. Accepting all factual allegations in the complaint as true, a court must "consider the complaint in its entirety," and determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23 (emphasis in the original). Under the *Tellabs* analysis, "[a] complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

Following *Tellabs,* this Court will thus conduct a dual inquiry: first, the Court will determine "whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter," and second, "if no individual allegations are sufficient, [the Court] will conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Zucco,* 552 F.3d at 992.

The Court concludes that none of the statements or evidence in the Amended Complaint independently establishes scienter. However, viewed holistically, the allegations in the Amended Complaint sufficiently bolster the inference of scienter to survive the Motion to Dismiss.

In relation to the ATR software, Lead Plaintiff provides a statement from Defendants indicating that "Rapiscan became aware of an issue related to software under development months ago." (Amended Compl. at ¶ 99). This statement was made less than six months after Defendant Edrick indicated the ATR software was in final testing, and thus is supportive of scienter. *See Reese,* 747 F.3d at 574 ("Temporal proximity of an allegedly fraudulent statement or omission and a later disclosure can be circumstantial evidence of scienter.").

**\*12** This inference is buttressed by specific statements from confidential witnesses connecting the problems to the management. For example, Confidential Witness 1, a Senior Test Engineer who worked on the ATR testing, stated that Rapiscan "pretty much knew from the start" that the software

was running far behind schedule, and indicated that "for most of my testing we were about a year behind" the original schedule. (Amended Compl. at ¶ 54). Confidential Witness 2, who worked at OSI until July 2013, indicated that he "was aware all along that they were trying and having trouble meeting the criteria" for the ATR software, that "the company knew all along that it was a difficult process," and that Rapiscan "never even got close to having the issue solved." (*Id.* at ¶ 56). Significantly, Confidential Witness 2 confirmed that OSI "cherry-picked a few machines that were working better [than others]," which clearly establishes knowledge of the problem and knowing obfuscation. (*Id.* at ¶ 63). Confidential Witness 4, who worked at Rapiscan until January 2013, stated that Quality Director Robert Mosey would have known of any manipulations and that the knowledge would have risen "all the way up to the president and even [CEO]." (*Id.* at ¶ 63).

Moreover, an inference of scienter can be established by the fact that the Defendants touched on the specific issue of ATR testing and readiness in their public statements. As the Ninth Circuit has previously explained, an assertion that defendants were unaware of the alleged issues can be "directly contradicted by the fact that [they] specifically addressed it in [their] statement[s]." *Reese,* 747 F.3d at 571. By making "detailed factual statement [s], contradicting important data to which [the Individual Defendants] had access, a strong inference arises that [they] knowingly misled the public as to its clear meaning." *Id.* at 572.

The Amended Complaint similarly creates a strong inference of scienter as to the use of foreign parts in Rapiscan's AT–2 baggage scanners. First, Lead Plaintiff explains that Defendants admit that the use of the unapproved part in the machines "was vetted by Rapiscan's internal quality assurance," but never raised with TSA as required under the contract. (Amended Compl. at ¶¶ 9, 88, 195). Confidential Witness 4 indicates that the quality-assurance department was "not an independent organization" (*id.* at ¶ 84), and that he or she was aware that Rapiscan "would just go ahead an make" configuration changes without TSA approval (*id.* at ¶ 83).

Moreover, when allegations pertain to a company's core operations, the Ninth Circuit permits an inference of scienter. *Reese,* 747 F.3d at 575 (internal citation omitted). According to the Ninth Circuit in *Reese,* allegations regarding management's role "may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information," or

"such allegations may be sufficient, without accompanying particularized allegations, where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Id.* at 575–76.

**\*13** Both of these scenarios apply: ***First,*** Defendants allegedly had "actual access" to Rapiscan's defect database, which listed the problems encountered in ATR software development. (Amended Compl. at ¶¶ 64, 165). *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1230 (9th Cir.2004) ("The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement."). ***Second,*** Rapiscan was OSI's largest and most profitable division and the individual Defendants regularly attributed OSI's success and growth to Rapiscan. The technology at issue was the focus of intense media scrutiny at the time, and according to the Amended Complaint, the government contracts involved were "very closely controlled within [an] inner circle of executives that consisted of Chopra, Edrick and Mehra." (Amended Compl. at ¶ 165). It is thus "absurd" to suggest that the individual Defendants were not aware of issues relating to these divisions.

Alternatively, Lead Plaintiff argues that Defendants' trading history supports a strong inference of scienter. "Unusual" or "suspicious" stock sales that are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information" are supportive of scienter. *Ronconi v. Larkin,* 253 F.3d 423, 435 (9th Cir.2001). Here, however, each Defendant's total holdings actually increased over the Class Period. (Wu Decl. at ¶¶ 14–15; Exs. AA–CC). Other courts have concluded that an increase in total holdings "hardly suggest[s] that

the defendants sought to dump their shares at an inflated price." *Cozzarelli v. Inspire Pharms.,* 549 F.3d 618, 628 (4th Cir.2008). The Court agrees.

Nevertheless, when considered holistically, the facts alleged in the Amended Complaint create an inference of scienter sufficient even under the PSLRA and Rule 9(b). Moreover, since the Amended Complaint adequately pleads scienter as to the individual executives and directors, this scienter can be imputed to the OSI as a corporation. *See Immune Response,* 375 F.Supp.2d at 1022 ("Since the Complaint adequately pleads scienter, it is imputed to the Company."); *In re Apple Computer Inc. Sec. Litig.,* 127 Fed. Appx. 296, 303 (9th Cir.2005) ("A corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter at the time that he or she makes the statement.").

**C. *Section 10(b )***
Defendants argue that if Lead Plaintiff failed to plead a primary violation, its remaining claims should also fail as a matter of law. *See Zucco,* 552 F.3d at 990. However, the Court concluded that Lead Plaintiff had established a primary violation. This argument is therefore unavailing.

**III. *CONCLUSION***
**\*14** The Motion is **DENIED.** Defendants shall answer the Amended Complaint on or before **March 30, 2015.**

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1985562

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.