UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**EDWARD SHAMOON, INDIVIDUALLY, and ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, PLYMOUTH COUNTY RETIREMENT ASSOCIATION,**

Plaintiffs,

**HONORABLE SHALINA KUMAR**

V

**No. 23-cv-13132**

**CITY OF HOLLYWOOD POLICE OFFICERS RETIREMENT SYSTEM,**

Consol Plaintiff,

V

**GENERAL MOTORS COMPANY, MARY T. BARRA, and PAUL A. JACOBSON, CRUISE LLC, DANIEL AMMANN, DOUGLAS L. PARKS, KYLE VOGT, WAYNE G. WEST**

Defendants,

V

**CITY OF HOLLYWOOD POLICE OFFICERS RETIREMENT SYSTEM,**

Movant.
_____/

**DEFENDANT'S 12(B)(6) MOTION TO DISMISS**
**Wednesday, December 18, 2024**

(All parties appearing via Zoom videoconference.)

- - -

*To obtain a certified transcript, contact:*
*Andrea E. Wabeke*
*Federal Official Court Reporter • Certified Realtime Reporter*
*810.341.7849 · www.transcriptorders.com*
*Transcript produced using machine shorthand and CAT software.*

**APPEARANCES:**

•On behalf of Plaintiffs:
MATTHEW J. GRIER, JAKE BISSELL-LINSK, CAROL C. VILLEGAS
Labaton Keller Sucharow LLP
140 Broadway
New York, NY 10005
212-907-0700
Email:  mgrier@labaton.com,jbissell-linsk@labaton.com,
cvillegas@labaton.com

•On behalf of all Defendants:
STEPHANIE A. DOUGLAS, ROGER P. MEYERS
Bush Seyferth PLLC
100 W. Big Beaver Road-Suite 400
Troy, MI 48084
248-822-7806
Email: douglas@bsplaw.com, meyers@bsplaw.com

•On behalf of Defendants GM, Barra, Parks, & Jacobson:
ANDREW J. EHRLICH, KRISTINA A. BUNTING, DANIEL J. KRAMER,
SAMUEL PATTERSON, RICHARD C. TARLOWE
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
212-373-3000
Email: aehrlich@paulweiss.com, kbunting@paulweiss.com,
dkramer@paulweiss.com, spatterson@paulweiss.com,
rtarlowe@paulweiss.com

•On behalf of Defendants Cruise, Ammann, Vogt, & West:
STEPHEN ASCHER, REID SCHAR, JACOB WENTZEL, ANNA M. WINDEMUTH
Jenner & Block LLP
1155 Avenue of the Americas
New York, NY 10036
212-891-1670
Email: sascher@jenner.com, rschar@jenner.com,
awindemuth@jenner.com, jwentzel@jenner.com

•On behalf of Defendant, Kyle Vogt:
SOPHIE HOOD
Keker and Van Nest LLP
633 Battery Street
San Francisco, CA 94111
415-391-5400
Email: shood@keker.com

*Defendants' 12(b)(6) Motion to Dismiss*
*Wednesday, December 18, 2024*


**I N D E X**

- - -

<u>Motion Hearing</u>                                    <u>Page</u>

Argument by Mr. Ehrlich  .........................6

Argument by Mr. Ascher  .........................27

Reply Argument by Mr. Grier  ...................40

Rebuttal Argument by Mr. Ehrlich  ..............60

Rebuttal Argument by Mr. Ascher  ..............64

Matter taken under advisement by the Court ......65

*23-cv-13132; Shamoon, et.al. v. General Motors, et.al.*

Flint, Michigan

Wednesday, December 18, 2024

1:06 p.m.

- - -

**PARALEGAL:** The United States District Court for the Eastern District of Michigan is now in session, the Honorable Shalina Kumar, United States District Judge, presiding.ment.

The Court will now hear civil case number 23-13132, Edward Shamoon, et.al. versus General Motors Company, et.al.

Would counsel please place your appearances on the record, beginning with Plaintiff.

**MS. VILLEGAS:** Good afternoon, your Honor. Carol Villegas from Labaton Keller Sucharow on behalf of the Plaintiffs, the City of Hollywood Police Officers Retirement System and the Plymouth County Retirement System.

With me from Labaton is Jake Bissell-Linsk and Matthew Grier, and Matthew Grier, who is an associate at our firm, will be presenting the argument on behalf of the Plaintiffs. Thank you, your Honor.

**MS. DOUGLAS:** Stephanie Douglas on behalf of Defendants -- all of the Defendants. Roger Myers and I are on behalf of all the Defendants, and then the rest of them split a little more.

**THE COURT:** Okay.

**MR. EHRLICH:** Good afternoon, Judge Kumar. My name is

Andrew Ehrlich of the Paul, Weiss law firm.  I represent the General Motors Defendants, that's GM, Ms. Barra, Mr. Parks, and Mr. Jacobson.

**THE COURT:**  Thank you.

**MR. ASCHER:**  Good afternoon, your Honor.  This is Stephen Ascher.  I'm from Jenner & Block.  I'm here with my colleagues, Reid Shar, Jacob Wentzel, and Anna Windemuth, and we represent the Cruise Defendants, which include both Cruise as an entity and the Defendants Mr. Ammann, Mr. Vogt, and Mr. West.

**MS. HOOD:**  Good afternoon, your Honor.  Sophie Hood of Keker, Van Nest, and Peters on behalf of another Cruise affiliated Defendant, Kyle Vogt.

**THE COURT:**  Good afternoon.  Is that everybody?

**MR. EHRLICH:**  I think so, your Honor.  I realize I was quite rude.  I neglected to introduce my colleagues who I am in a conference room with, some of my colleagues at Paul Weiss, my partner Dan Kramer, Rich Tarlowe, Kristina Bunting, and our colleague, Sam Patterson, as well.

**THE COURT:**  Okay.  Thank you.

All right.  How do you guys want to proceed?  Did you want to argue these motions separately, or does it make sense to argue them together?  Let Defendants go first with their respective motions and then let Plaintiff respond to both, or do you think it's better to do it separately.

**MR. EHRLICH:**  Your Honor, Andrew Ehrlich for GM Defendants.  Our thought, on the Defense side, was to present both arguments.  If it meets with the Court's approval, I'd address the GM motion.  Mr. Ascher would address the Cruise motion, and then Plaintiffs would respond to both, if that's agreeable to Plaintiffs.

**THE COURT:**  That's what I thought.  Mr. Grier, does that make sense to you?

**MR. GRIER:**  Yes.  Yes, your Honor.  That's exactly what we were envisioning as well.

**THE COURT:**  Very good.  Then, Mr. Ehrlich, you're going to go first?

**MR. EHRLICH:**  Yes, your Honor.

**THE COURT:**  Okay.  Go ahead.

**MR. EHRLICH:**  Thank you, Judge, and my colleague here, Mr. Patterson, if it's agreeable to the Court, if we could share his screen.  We have a handful of demonstratives that I might use during the course of the argument that I hope will be helpful to the Court, if that's okay.

**THE COURT:**  Okay.

**MR. EHRLICH:**  Great.

Your Honor, this is an alleged securities fraud class action under Section 10(b) of the Securities Exchange Act, and we respectfully submit it should be dismissed.  The gist of this case is Plaintiffs assert that GM violated the statutory

scheme around disclosure concerning securities, concerning certain statements about the level of autonomy of Cruise autonomous vehicles, and, as we demonstrate in our papers, and as I will discuss today, no reasonable investor, Judge, could have been misled by these challenged statements given all of the context around them and the nature of the allegations, and, much less intentionally so, given the total lack of any specific allegations that the people talking to the market from GM had any specific information contrary to what they were saying.

As I'm going to come back to probably repeatedly over the course of this argument, Plaintiffs in this case labor under a uniquely -- uniquely demanding pleading burden under the Private Securities Litigation Reform Act of 1995.

This is not, Judge, a mere notice pleading case under Rule 8, like the vast majority of cases that this Court sees every day, indeed all federal courts. This is different, and the Sixth Circuit said in *OmniCare*, which is one of the leading PSLRA cases in this circuit, that it's a heavier statutorily weighted burden that acts as "an elephant-sized boulder blocking securities fraud claims," and the circuit said that because it is such a rigorous standard for both falsity and scienter, and, here, Judge, the case should be dismissed for three independent reasons, three elements where Plaintiffs just don't get around that boulder.

*23-cv-13132; Shamoon, et.al. v. General Motors, et.al.*

*Defendants' 12(b)(6) Motion to Dismiss*
*Wednesday, December 18, 2024*
***Page 8***

Falsity. They're required to specify each statement that's misleading, and, importantly, here, they -- I will concede they identify specific statements, but not specific reasons why they're false. So that's number one.

Number two, state of mind, scienter. They have to plead, again, with particularity a strong inference, facts giving rise to a strong inference that the Defendants intentionally misled the market, which they fail to do.

And then, third, and, finally, loss causation; that the stock price drops, about which they complain was actually proximately caused by the disclosure, the revelation of what was supposedly misstated to the market and that that was, you know, a revelation. So it had to be new, and it had to be corrective of what had been allegedly misstated before, and they missed the mark on both of those, as I will get into.

So let's get right into it. This is the roadmap, falsity of scienter, loss causation.

And let's start with falsity, and there are, as the Court knows from our papers, three buckets of statements that GM Defendants made to the market that Plaintiffs allege are false, and let's start with the first, which is these so-called level-four statements.

Now, as the Court knows, level four has a very particular meaning. As set forth if our papers, you know, autonomous vehicles are governed by industry standards. The Society of

*23-cv-13132; Shamoon, et.al. v. General Motors, et.al.*

Automotive Engineers published a taxonomy of different categories of autonomous driving starting from one, least autonomous, to five, most autonomous.

And GM certainly, on many occasions during the proposed class period here, characterized the Cruise vehicles as in fact autonomous, and Plaintiff says this was false, and they have a very long complaint. But what's not in that complaint are specific reasons showing that the vehicles are not in fact level four, because level four has an objective meaning. It is laid out in black and white in the taxonomy, which is repeatedly referenced in the complaint and is incorporated by reference in the complaint, and it's Exhibit 5 to our motion.

And this gets us, Judge, to a really critical legal point on this motion. Plaintiffs can't allege false statements that are divorced from reality and context and definitions, right. They can't allege that Lake Michigan is in fact an ocean because lake has specific definition and ocean has a specific definition, and so, you know, that's not the kind of claim you can make up. That's exactly what they do. I know it's maybe a silly example, but a Plaintiff, under the PSLRA, can't just allege as false a statement that a product fits into a particular category without actually alleging facts that the product doesn't meet the definition of that category.

So it's totally appropriate here, and I believe incumbent upon the Court, to examine the definition of the category and

whether Plaintiff alleged facts that the product doesn't fit in the category, and I think the best case on point here in this circuit is the *Dailey versus Medlock* case, which is cited in our brief and which the court affirmed the dismissal of that claim. It was a bank defendant and the bank described itself as well-capitalized, and the plaintiffs attacked it, but well-capitalized was like a bank regulatory phrase, term of art, and the court dismissed it, the case, and the circuit affirmed because there were no specific facts inconsistent with the definition of well-capitalized. They alleged problems with the bank. They alleged, you know, certain things that were potentially an issue but not that violated the definition of well-capitalized, and the same thing is true here.

Plaintiffs, the central kind of element on their argument on the level-four statements is that they're false because, from time to time, there were remote operators that assisted the Cruise vehicles which were operating almost all of the time in a fully autonomous way. But that theory of falsity is actually precluded by the taxonomy itself. As I mentioned, that's Exhibit 5 to our motion, and when you look at the taxonomy, there's a whole section on remote assistance.

Indeed, it's required, under the industry governing standards, that there be remote assistance, and if we look at Exhibit -- example one here under remote assistance, it says, "A level-four vehicle encounters an unannounced area of road

construction within its area of operation" -- ODD is a technical term, "and the vehicle communicates to a remotely located human that it is unable to proceed and the remotely located human provides a new pathway." That's exactly how the vehicles are supposed to operate, and, indeed, Paragraph 175 of Plaintiff's complaint acknowledges, that 96 to 98 percent of the time they were not operating with any human intervention, and that probably understates it because some number of those interventions or some large number of them were terminated because the car figured out the issue itself. So, you know, you can't say it's not level four because of remote operators when the very [indiscernible] level four doesn't mean anything without concerns to taxonomy.

So that's their first argument.

Their second argument that it's not level four is that the vehicles stop sporadically in the road when there are problems. Again, looking at the same page, if we look at example two, a level-four vehicle detects an object in its lane appears to be too large to drive over and stops, a remote assistant uses the vehicle's camera to identify the object is an empty bag and directs the vehicle to proceed. So, yes, Plaintiffs allege in their complaint these cars stopped, that they stopped in the middle of the road. They didn't pull over to the side of the road, therefore, they couldn't have been level four. Well, your Honor, that set of allegations, too, is expressly

contradicted by the very document that defines level four.

Plaintiffs make two more arguments on level four, neither of them I think are particularly successful. The first is they point to, largely through confidential witnesses, some number of anecdotal accounts of safety issues and they say, a-ha, there are these safety issues. Perhaps they point to an event that happened on October 2nd of last year in San Francisco, although, that's not a corrective disclosure, but they point to it and they say, look, these things happened, couldn't be level four.

Well, look, the vehicles were -- it's very clear from all -- from Plaintiff's own complaint, developing, in testing, in early commercialization, you know, just as a person in the world, we know autonomous vehicles are relatively new technology, and, again, the taxonomy itself acknowledges that they're not going to work perfectly all the time.

If we turn to the next slide.

It says very clearly, "manifestation of one or more performance deficiencies in either the driving automation system or the user's use of it doesn't change the level assignment," and then it gives an example of a car designated to be level five wouldn't automatically be demoted to level four simply by virtue of encountering a particular road on which it is unable to operate the vehicle.

So simply because there may have been malfunctions or at

times problems does not render the four statements false when you look at what truly establishes the meaning of the term level four.

So, finally, on this topic, with respect to level four, given that they can't come up with any specific factual allegations that the cars have features inconsistent with level four, they then say, oh, well, actually, the Defendants define level four for themselves in some way that is somehow inconsistent or different from the taxonomy that governs the whole industry. Well, that argument is as implausible as it sounds, and the basis for it is a blog post on Cruise's website, and I will just note parenthetically, your Honor, that this is not a statement that GM made. GM is not the speaker. GM is not alleged to be involved with this statement, but, nevertheless, a statement on Cruise's website concerning a blog post concerning the vehicles.

Now, this particular blog post, it's like nine pages long. It's highly technical. It's full of schematics and all the rest. The Court can see it itself. It's Exhibit 18 to our motion, but the important point for this purpose is, in the very first sentence, it talks about how to -- basically, this post is going to talk about the computer workload for executing the level-four system, and it says, in the first line I highlighted, "It must be able to function autonomously 100 percent of the time," and that is the supposed redefinition

in this blog post.

Then it goes on to the very next sentence to say, "This is to draw a distinction with level two and level three where there's an expectation of an alert safety driver who must be prepared to quickly take the reins." In other words, level two, level three you've got a human in the vehicle. Level four, no human, 100 percent autonomous, no person. That is not a redefinition of what level four is. It is exactly what level four is as defined in the taxonomy, Judge.

And one last point on this. This blog post is actually dated in April of 2023. So that's three quarters of the way into the class period, and it is entirely implausible that investors for a two-year period would be deceived by some redefinition of level four that happens, you know, almost all the way to the end of the class period but, somehow, people who bought the stock 18 months earlier were deceived by this. It doesn't -- and this is the only evidence they have for this supposed redefinition. So, your Honor, their first bucket of statements, the level-four statements, just don't have any specific factual allegations contradicting the vehicle characteristics.

So that brings us to the second bucket of statements that the cars were driverless or that they were autonomous, fully driverless, fully autonomous, and the gist of this theory of falsity is that the market was misled when GM said this about

the cars because they somehow suggested that the Cruise vehicles operated with no human intervention anywhere, but that of course isn't what General Motors said.

And, again, under the PSLRA, the Court doesn't just credit allegations.  Like when in an ordinary case, a plaintiff can plead this statement is untrue and, you know, plaintiff gets every inference on the motion, that, you know, you credit that statement that's untrue, but, here, the Court needs to scrutinize the reasons why the statement is supposedly untrue in light of ordinary meanings of the words and context.

And that's, Judge, why we brought the Ninth Circuit's recent opinion in *Cloudera* to the Court's attention, because, there, plaintiffs had made allegations about how native architecture computing company, said their cloud native structure -- this is getting way beyond by canon on computers. But anyway, they said this about cloud native computers, and the judge dismissed the case in the Northern District of California said, "That's a vague term.  What do plaintiffs mean by this?"  So then plaintiffs gave a definition in their amended complaint that was untethered to, really, anything, and the judge dismissed it again saying, you know, this is essentially saying the statements are false for a reason plaintiffs made up, and the Ninth Circuit affirmed.

And I didn't really fully understand Plaintiff's lengthy submission yesterday about this case, but the reason we gave it

to you, Judge was because it's such a good illustration of the motive analysis to be applied when analyzing falsity, and what Plaintiffs do here is they put their own meaning and draft their own meaning onto the statements GM made, which are literally true.

The statements are the cars were driverless; the cars were autonomous. And there's no fact alleged in this case that there was no -- there was a human driver in any of these level-four Cruise vehicles; there just aren't. And, as we saw, indeed, the Cruise blog post we just looked at, when Cruise and GM said "fully autonomous," they made very clear what they meant.

If we go back just for a moment, please, Mr. Patterson, to slide seven.

If we look at the highlighted language, "fully-autonomous model, (i.e., without a safety driver)."

Nobody could be confused about this, Judge, but, if that weren't enough, let's look at another demonstrative. These are all statements that are incorporated by reference in the complaint of which the Judge can take judicial notice, your Honor, and here, we see on the left a Reuters article in which the CEO of Cruise, Mr. Vogt, is discussing -- he's asked whether at some point Cruise is going to get rid of remote human operators, and what does he say, "Why? I can provide my customers peace of mind knowing there's always a human there to

help if needed. I don't know why I'd ever want to get rid of that."

Similarly the Cruise safety report, same thing, discusses the role of remote human operators. So the idea that the words "fully driverless" or "fully autonomous" are rendered false by virtue of the fact that there are remote human operators totally ignores the context here. They are, one, literally true, right, because there are no drivers in the car and no allegation to the contrary, and to the extent that Plaintiffs are saying they're actually false because of these remote operators, we never said there weren't remote operators. We never said that the statements -- we never said the cars were operating without human intervention. Had they pleaded that we said, and if we'd actually said the cars were operating without human intervention, that would be a very different case. That's not this case. So these statements, too, should be dismissed.

And, Judge, that's to the third and final bucket, which I will touch on briefly, which are a set of statements by GM CEO Mary Barra that refer to the Cruise vehicles as safer than a human driver. But to allege one thing is safer than another, I -- it's common sense. You need a comparison, right, but what the complaint doesn't do is plead any facts about the Cruise vehicles and their relative safety to human drivers.

They have, again, some largely anecdotal information from

*23-cv-13132; Shamoon, et.al. v. General Motors, et.al.*

confidential witnesses or public sources and say, "Oh, here are some problems these vehicles, this new technology had, therefore, this statement was false." It's kind of like the sound of one hand clapping, Judge. It's like we've got half the story but not the other half and that doesn't get them over around the boulder in their way of pleading with specificity.

And in this regard, Judge, I would really point the Court to the *Tesla* case, which was just decided in September of this year, where a case alleging 10(b) violations against Tesla concerning its autonomous vehicles was dismissed by the Northern District of California and very similar allegations there about comparative safety statements, and the court reached exactly the conclusion that we would urge you to, Judge, that where you don't have any information about the comparison pleaded to render it false, you can't have a pleaded false statement.

So, Judge, that really brings us to the three buckets of statements why we believe Plaintiffs haven't pleaded facts showing them to be false, and unless the Court has questions, then I will turn to the second element, independent element we believe the complaint fails, which is scienter.

Scienter, your Honor, similarly, is governed by the PSLRA. Congress imposed a uniquely high standard for adequately pleading scienter, and, actually, just last year, the Sixth Circuit, in the *ServiceMaster* case, gave kind of a really nice

synopsis of the scienter standard that applies here, largely citing the Supreme Court in *Tellabs*, which is the touchstone for all of this analysis, and the circuit made clear that the statute requires plaintiffs state with particularity facts giving rise to a strong inference -- that's the court's highlight -- "that the defendant acted with the required state of mind," and then goes on to explain, "The inference of scienter must be more than merely 'reasonable' or 'permissible.' It must be cogent and compelling" -- and this is unusual at a pleading motion -- more so than alternative, nonculpable inferences. So requiring the Court to engage in a weighing of inferences even at the pleading stage, and, respectfully, we don't think this weighing is particularly close.

In *ServiceMaster*, the court also made clear that you have to do this "on a defendant-by-defendant basis," and that's what I'd like to do now, and I'll start with the three individuals, Ms. Barra, Mr. Parks, and Mr. Jacobson.

Now, none of the Plaintiff's allegations, including from their nine confidential witnesses, provide any basis to say that these three individuals knew their statements were false. You know, in cases where Plaintiffs get over the boulder on scienter, they have, you know, witnesses or documents that show, you know, "I was in a meeting. I told Mary Barra X, and then she went out to the market and said whatever. I wrote a

report. I know it went to the CFO so I know when he said X, it was false." There's nothing like that here. It is totally generic.

I mean, as to Mr. Parks and Mr. Jacobson, there is really zero. They don't even, I think, attempt to plead specific facts, and that's, again, I think very much on all fours with *ServiceMaster*. I mean here's how the court, the Sixth Circuit, in *ServiceMaster*, described the allegations. It basically said "Because of their positions with the company and their access to material, nonpublic information available to them but not the public," the two individual defendants "knew the adverse facts had not been disclosed and were being concealed." That's what we've got here. It's like a must-have-known. Because they were senior executives in the company, they must have known, and that is squarely foreclosed by *ServiceMaster*, by *Tellabs*, by pretty much any scienter authority that I'm aware of.

As to Ms. Barra, the allegations are that she attended meetings, that she attended Cruise board meetings, that she attended certain other meetings where Cruise was discussed and there were reports made about the progress of the company and technology and safety and so forth. But, again, if you look at Page 531 of *ServiceMaster*, and I'm reading here, "Completely absent is any detail about exactly what was discussed, and, without this information, the mere attendance at meetings where

the topic at issue was discussed does little to establish the kind of red flags necessary to support a strong inference of scienter," and that's Page 531, 883 F.4 531.

So now we get to the company, GM, and they seem to argue, Plaintiffs, that because somebody at GM, no matter what their level, no matter their position knew facts contrary to the public statements, scienter is imputable to GM, but that is not the law in the Sixth Circuit.  You need an actual human person with actual knowledge who is somehow involved in the making of the statements, to know information contrary to the statements. Otherwise, you don't get over the hump.

And this, again, *OmniCare* makes that clear, and this is *ServiceMaster* actually quoting *OmniCare*, in terms of the categories of people who could be -- whose state of mind suffices to satisfactorily plead scienter.  It's the person making the statement.  It's people who provided the information for the statement, reviewed or approved it before it was made, or someone very senior who essentially ratified it in some way. None of those people, Judge, have specific facts alleged about them, contrary to GM's public statement that there were no drivers in the car, that the cars functioned autonomously, that they were designed as level-four vehicles.

Now, to the extent that Plaintiffs try to impute Cruise's scienter to GM, that doesn't work either, and, here, Judge, the key authority is the *Comshare* case, the *Comshare* securities

litigation case.  It's a 1999 Sixth Circuit decision, makes very clear that courts should not presume scienter from a parent corporation's reliance on its subsidiary.  That is -- that is black letter law, and Plaintiffs don't really argue otherwise, Judge.  They have a couple of kind of half-hearted footnotes on this point but don't cite any cases, so I think -- although, we'll hear that they view that as essentially waived.

And the last point on scienter, in terms of their allegations, their final refuge is something called the core operations doctrine, which is a broadly disfavored doctrine that basically says because certain activities, here Cruise, is really important to the company, you should presume that senior people know all about it and know all the facts, and that's really kind of contrary to what the PSLRA requires in terms of specific pleading, and, more important, the Sixth Circuit has said it's contrary to what the PSLRA requires.

And, here, I would point the Court to the *Yum!Brands* case, to the *Pittman* case, and *ServiceMaster*.  And, indeed, at Page 531 of *ServiceMaster*, the court said, just last year, "The fact that executives are intimately familiar with the core component of their business does little to suggest fraudulent intent." So the core operations doctrine should be rejected, just as the Sixth Circuit directs.

Now, I promise, this is actually the last point on scienter, which is that you'll recall at the outset, I said

*23-cv-13132; Shamoon, et.al. v. General Motors, et.al.*

that one of the really unique things about the scienter analysis at the pleading stage is that it's comparative. You look at what Plaintiffs allege and then you look at any other potential inferences that might be out there. So, on the one hand, we have essentially must-have-known allegations. On the other side of that balance, we have the fact that, over the course of the class period, GM bought back its stock. It bought a billion dollars worth of Cruise stock, and all three of the individuals ended the class period with more GM stock than when they started.

And what courts make very clear is that when individuals or corporations buy the securities in the entity that is the subject of a lawsuit that is alleged to be artificially inflated as a result of a fraud they're perpetrating, that cuts against scienter, because of course it does. If you're perpetrating a securities fraud and you're pumping up a stock, you're not going to invest in it because you know that at some point, you know, it's going to come down on the other side.

So when you look at all of that on this side of the scale, in combination with the -- and I'm not going to belabor this because it's in our papers -- the robust disclosures. As I said earlier, everybody knew that these vehicles were in their infancy. It was, frankly, common sense that there would be challenges, as any new technology develops, but then there are specific risk disclosures in the various documents. So you

have disclosure of risk. You have further investment on the one hand and you kind of have must-have-known on the other. So with respect to scienter, those claims should also be dismissed.

And, finally, Judge, the third independent element for which dismissal is warranted is loss causation, which is not necessarily an intuitive concept, but, you know, under Section 10(b), Plaintiffs bear the burden of pleading loss causation, which is that the stock price declined, about which they complain about, that caused the class damages, are proximately caused by something the Defendant said earlier was false. So that the day the stock goes down, it has to be a result of something that was said that corrects whatever it is that was lied about earlier. It can't be unconnected to that, and it has to be unique. It can't be that it's something that the market already knew about.

So the cases often talk about the correct -- these disclosures as corrective disclosures, which makes sense. It both has to be corrective and it has to be a disclosure. In this case, Plaintiffs identify three dates on which certain information was allegedly revealed to the market and GM stock went down, and they allege the class was consequently damaged. I want to talk about each of them briefly.

The first of them is October 24. Now, that is -- there's a lot in the complaint, Judge, and you may well be -- otherwise

be aware that October of last year, there was an unfortunate event in San Francisco, California where a human driver struck a pedestrian, threw that pedestrian. A Cruise vehicle then struck that pedestrian and dragged the pedestrian for some period of time.

To be clear, the October 2nd event is not a date that Plaintiffs plead is a corrective disclosure. They do not say the event of that accident caused them losses. The first date they identify is October 24th, some three weeks later, when two things happened. One is that Cruise made a blog post about that October 2nd event, and, second, there was the California DMV suspended Cruise's permits pending an investigation of the issues around the October 2nd crash, and, at a fundamental level, setting aside that the crash was already public, including the element that the pedestrian had been dragged, so it's not a disclosure. As unfortunate as that event might have been, it doesn't disclose that the prior statements that the vehicles were level four, that they didn't have human drivers in them, that they were fully driverless, fully autonomous, doesn't disclose that those things were false. They're disconnected.

Similarly, and perhaps more dramatically, the second disclosure date is October 26th, and they allege two things. One, that there's a NHTSA, National Highway Transportation Safety Administration, NHTSA letter discussing -- that's made

public about certain Cruise vehicles hard braking and then Cruise's announcement that it would pause driverless operations. So, again, none of those things contradict GM's earlier statements. The NHTSA investigation is totally disconnected from the earlier statements and also was already public. So it's neither corrective nor a disclosure.

As to the pausing of driverless operations, for the same reason the first corrective disclosure isn't corrective, this one isn't either. It has nothing to do with whether the statements earlier that the cars were driverless was true or false.

And then, finally, Judge, the November 8th partial corrective disclosure. That relates to Cruise's announcement that it was recalling its autonomous fleet to do a software update, and it was to do a software update to correct certain issues that might impact how the vehicle behaved on October 2nd, and, again, they don't specify how any of that information, that there was going to be this software update, changed the fact that when GM said these vehicles were level-four designed, that that was true; when they said they were driverless and when they said they were autonomous, that those were true statements when made.

So for any of these three reasons, Judge, whether it's, you know, failure to plead specific facts, showing the statements to be false, failure to plead a specific intent to

defraud, or failure to plead the necessary connection between the alleged fraud and the things that are supposedly revealed to the market, for any of these reasons, and all of them, frankly, the complaint should be dismissed.

THE COURT:  Thank you.

MR. EHRLICH:  That's what I've got, Judge, unless you have any questions.

THE COURT:  Thank you.

Mr. Ascher.

MR. ASCHER:  Good afternoon, Judge.

The Cruise Defendants, Judge, joined GM's motion, to the extent that it's applicable, which is largely the case, and so, as we did in our briefs, I will try to avoid duplication and focus on I think a handful of issues that are not addressed in GM's papers.  To help do that, we also have a roadmap document we'd like to put up.

Jacob, can we do that?

So, your Honor, on the next page, you know, we have a table of contents, if you will, to the argument, and as we did in our briefs, we're going to discuss the technology statements and the accident statements separately.  The Plaintiffs accepted that division of the case into those two pieces, and, then, within each of those two pieces, we are going to argue insufficient allegations of falsity and scienter on the technology statement side, and insufficient allegations of

scienter and in connection with elements on the other side.

And so I'd like to start with the insufficient allegations of falsity with respect to the technology statements, and, of course, your Honor, that's -- that was just the primary focus of Mr. Ehrlich's presentation and the GM's brief. So I'm not going to talk about the three categories of alleged misrepresentations that Mr. Ehrlich already covered so thoroughly. I'm going to limit myself to the two categories that, frankly, Plaintiffs seem to have focused on and addressed for the first time in their brief, really coming up with a new theory, and the new theory that you see in the brief, which is not stated in the amended complaint, is that Cruise misrepresented that it was ready to commercialize this technology, this technology is ready to go. We're going to start making tons of money.

And I think the most helpful thing, your Honor, for you to appreciate what a weak theory this is, we thought it would be very helpful to put side-by-side statements, the statements that make up Plaintiffs' theory in this case, and put them side by side with the alleged misrepresentations in the three commercialization cases that are cited in their papers where false commercialization claims were sustained and allowed to proceed at the motion to dismiss stage, and what you can see, your Honor, from this slide, is how different the statements are.

Cruise's statements are not definitive. They don't make any promises. They don't talk about a timeline for commercializing the technology. They don't talk about numbers of expected revenues. They don't make specific comparisons to other products. They're extraordinarily vague. You know, "We are very close to offering our first rides in the streets of San Francisco. We're in the middle of an early commercialization phase."

And then the third one, your Honor, that seems to be the one that Plaintiffs think is their best statement, and even that one is just extraordinarily vague. "From a technical standpoint, there's basically zero incremental work to get to revenue." There's no statement of fact in there. We don't -- Cruise didn't say, "We're six months away from putting this product or this product is ready to go to market tomorrow." It doesn't say how much revenue they expect to generate, and if you compare it to the cases the Plaintiffs rely on, your Honor, those cases had very specific factual statements that were alleged to be false, and the contrast between them is very instructive.

The other point I'd like to make, your Honor, in the three cases the Plaintiffs rely on, there are many statements that were dismissed as being not sufficiently definitive to be the subject of a securities fraud case, and those statements are much closer to Cruise's statements than the false statements

that were sustained in those cases.

The other point, your Honor, I want to make about this false commercialization theory that Plaintiffs offer for the first time in their brief. You know, Plaintiffs have devoted a lot of space in their brief to claiming that there were so many accidents and so many problems with the autonomous vehicles for Cruise, and putting aside whether those are overstated, we don't reach that at the motion to dismiss stage. I think it's important to appreciate, your Honor, that almost all of that information comes from articles that were published publicly. Those -- those allegations are not based on the confidential witnesses for the most part. So this isn't information that Cruise was hiding. This is information that was in the public domain. That's not the basis for a securities fraud case.

Your Honor, next, I'd like to turn to the other category of, if you will, new false statement claim that the Plaintiffs make in their brief, and that's the claim based on the statement that we've taken the human out of the loop, and that portion, that alleged misrepresentation, your Honor, really misconstrues the meaning of that statement, and, in context, it was clear that that statement meant they're used to be a safety driver in these autonomous vehicles to make sure that there was backup assistance right there in the car. That was sort of at an earlier stage of testing this technology.

Take the human out of the loop refers to the point in time

when the technology was sufficiently advanced that Cruise could take the human out of the car and rely, instead, on remote assistance, and anyone following the development of this technology would and should have understood that, and there are two other reasons why it's clear that that statement should have been understood and was not false.

First of all, the very same speech in which Mr. Ammann referred, used the phrase "take the human out of the loop" also referred to the remote assistance that our vehicles need. So, clearly, anyone reviewing that statement in its entirety would have understood "take the human out of the loop" doesn't mean that there's no remote assistance. It just means no human in the car.

Second of all, Judge, Plaintiffs rely heavily on analyst reports, and they say, "Seven times analysts misconstrued this statement." Well, that's -- that's not correct, for a few reasons, your Honor. First of all, it was the same analyst seven times. It wasn't seven different analysts. It's the same analyst over and over again, who obviously didn't understand the meaning of the phrase "level four" or the phrase "driverless." That's just one analyst.

Second of all, your Honor, nothing in those reports even mentions the human out of the loop statement, and, third of all, your Honor, most importantly, I think, there's case law that makes it very clear that the fact that a single analyst

misunderstood a company's public statement is not adequate to plead falsity, and, contrary to what Plaintiffs claim, it's not adequate to raise an issue of fact.

Your Honor, if I may, I'll move on to the next category of issues, which is scienter.

We have a slide regarding the legal standard here, but having heard Mr. Ehrlich's presentation, I think we can probably skip that one, and I'd like to just address Plaintiffs' next argument concerning the next disputed element of the technology statement claims, which is that Plaintiffs fail to plead scienter, and it seems to be Plaintiffs' theory that Cruise management knew all along that its technology wasn't working and that it was unsafe and that, therefore, somehow, all of these statements were false, and there are several problems with that theory.

First of all, there's just a huge disconnect between the knowledge that the Plaintiffs say that the Cruise management had and the false statements. Cruise was not making statements about how great its technology was and making promises about when they were going to earn revenues from this. They weren't making statements comparing themselves to other autonomous vehicle manufacturers. There were statements about all of the technical issues that Mr. Ehrlich discussed, and there's just a disconnect between the alleged false statements and the knowledge.

Second of all, your Honor, again, this is all in the public domain, and that very strongly cuts against scienter. As I mentioned a moment ago, most -- most of the supposed facts that the Plaintiffs rely upon come from news articles. Clearly, Cruise wasn't trying to hide the fact that its technology had not been perfected and that it was still working out the kinks, and, in fact, Cruise repeatedly disclosed the technology -- technological risks, the unique technological risks related to the timing and commercialization of autonomous vehicles. Everybody in the market, any investor, your Honor, had to understand that this was a difficult endeavor and that there was huge investment risk here; it was not guaranteed to succeed.

The final point I want to make, your Honor, with respect to the scienter allegations. The Plaintiffs rely heavily on confidential witnesses. They present their argument as if they have an avalanche of confidential witnesses, but, virtually everything that they have from those confidential witnesses is really vague, it's really conclusory, and it does not go to the heart of the alleged misrepresentations.

And, again, I don't want to repeat Mr. Ehrlich. He cited the *Tesla* case for a slightly different point, but the *Tesla* case is incredibly on point here for the failure to plead scienter. Judge, that's a case that involved almost the exact same claims as this one involving autonomous vehicles, claiming

that they don't work, that they're not safe based on confidential witnesses. Frankly, the allegations there I think were significantly stronger than the ones here, and that case was dismissed because the confidential witnesses just didn't say specifically what was wrong with the technology and why it showed a fraudulent intent on behalf of the defendants.

And the scienter point, your Honor, I just want to mention very briefly that Plaintiffs also don't allege scienter as to the individual Cruise Defendants. Mr. Ammann left Cruise two years earlier; very surprising, frankly, that he was included in the caption. The complaint is almost devoid of any allegations concerning Mr. West, and, as to Mr. Vogt, it's all the generalities of the fact that he got risk reports and that sort of thing.

Your Honor, next I want to turn to the accident statements that are alleged in the amended complaint. Here, again, I'm going to address two issues that the Plaintiffs have not alleged sufficiently. Mr. Ehrlich described the accident. So I won't go into that again. But these are claims that I think are, in reality, directed at Cruise rather than GM. There's no evidence that GM was involved in the response to the accident, and, so let's talk about scienter first.

With respect to scienter, you know, the question, based on the analysis that Mr. Ehrlich explained earlier, is whether there is a cogent and compelling inference that Cruise didn't

disclose the fact that the pedestrian, right, there's a pedestrian that was hit and landed underneath the Cruise autonomous vehicle, and when the Cruise autonomous vehicle pulled over to the side, it dragged her with it.

The question is is it a cogent and compelling inference that Cruise didn't disclose that immediately because it was intending to defraud GM investors?  And, your Honor, the facts that are already in the record from the Quinn report -- recall, this is a situation where a law firm has already conducted an incredibly thorough and complete investigation which has been disclosed and which is in fact the basis for much of the complaint and is incorporated by reference in the complaint.

And the Quinn report explains in detail all of the many facts that show that the failure to disclose the pedestrian dragging sooner and more completely was not the result of an intent to defraud investors.  That wasn't the focus of the Quinn report, but it follows clearly from the Quinn report, and the Quinn report made several factual findings that are relevant to that, the first one being that the Cruise leadership including Mr. Vogt, was initially unaware of the pedestrian dragging, and when it sent out its first public statement about the accident, it just wasn't aware of the pedestrian dragging, and the reason was that the initial record of the accident -- it's sort of a computerized video, your Honor.  It was only -- that video only showed the first

14 seconds after the accident, and so that didn't show the pedestrian dragging. It wasn't until the Cruise people saw a longer computerized video of the accident that they realized, and so that's the initial reason.

Second of all, the Quinn report notes that Cruise leadership was very focused on correcting an important false media report about the accident. Initial reports of the media accident said that the Cruise autonomous vehicle hit the pedestrian in the first instance, which was wrong. It was a Nissan driven by a human driver, one the great ironies of this case, that hit the pedestrian and threw her underneath the Cruise autonomous vehicle, and so, understandably, Cruise leadership was very focused at the outset on correcting that mistaken report and dealing with regulators and fully investigating what happened before they made additional statements.

Third important point in the Quinn report is that Mr. Vogt himself, he was not involved in drafting the challenged accident statements after the very first portion when the initial statement was made, at which point he and other Cruise leadership were unaware of the pedestrian dragging. So these are some very important facts, your Honor, and I think they make it much more cogent and compelling to conclude that the failure to mention the pedestrian dragging sooner was the result of a lot of factors, people moving quickly during a

crisis trying to figure out what happened and had really nothing to do with defrauding investors.

On this point, your Honor, you did receive some supplemental submissions about the deferred prosecution agreement with the Government, and the Plaintiffs argue that the DPA by Cruise, that it shows intent to defraud, and that's also unsupported, your Honor. It really -- the DPA really doesn't change anything. First of all, the facts in the DPA were already disclosed in the Quinn report. They're largely mentioned in the amended complaint, and the DPA is just the same facts, so doesn't add anything.

Second of all, your Honor, I think it's helpful to understand exactly what the criminal charge is in the DPA, because it's a very specific false statement charge, and the charge is that Cruise did not disclose the pedestrian dragging in certain one-day and ten-day accident reports to its regulator, its primary regulator, NHTSA, and so the point is that Cruise should have included a mention of the pedestrian dragging when it was making these required reports to NHTSA. The statement of facts attached to the DPA states that this omission had the tendency to influence NHTSA in administration of its response to the accident.

None of that, your Honor, has anything to do with protecting investors. That's not what NHTSA is about, and the fact that there is this regulatory issue doesn't show an intent

to defraud investors. And if you're going to read one case on this point, your Honor, the *Boeing* case that we've cited is just incredibly on point in this. That's a case where a transportation company suffered a tragic accident or two in that case, and there was a securities fraud litigation afterwards. Boeing entered into a DPA with its primary regulator, the FAA, and the court held, in that case, that the DPA with the FAA didn't show an intent to defraud investors. It's remarkably similar, your Honor.

I'll note that the *Boeing* case has some other parallels, your Honor. It dismisses a lot of securities fraud claims that are similarly vague to the ones here, and, frankly, the only claims that are sustained in that case are clearly distinguishable. They're much more specific and undeniable misrepresentations that Boeing made concerning the cause of that accident.

Your Honor, finally, I want to address the other key element that is not pleaded with respect to the accident statements, and that's the element of a securities fraud claim where the misrepresentation has to be in connection with a purchase or sale of securities, and that element, your Honor, is designed to ensure that when public companies say things, they have notice in advance of whether it's something that could subject them to liability, and this is a case where the Plaintiffs cannot allege that, have not alleged it, and it's

because it's really quite an unusual situation, and there are four factors that we've emphasized in our brief, your Honor and I'm going to go out of order from the slide a little bit.

The first -- the first factor here is this is a statement that was not made by the public company itself, GM.  It's made by a non-issuer subsidiary, Cruise, but that's not the entire basis for our argument by any means, your Honor.  It's really the combination and the confluence of these four -- of these four factors.  So, number one, Cruise is itself is not an issuer.  Number two, none of the statements about the accident even mention GM.  GM is not mentioned by name.  GM's finances are not mentioned by name, rather, number three, this is a statement that is an isolated incident.  It's Cruise specific.

And, then, finally, your Honor, and, again, this is not the sole basis, it's the confluence of all of these factors.  These are statements that are made to the popular press during a fast moving crisis management situation.  This is not a typical securities fraud claim based on statements to investors.  It has none of the qualities of those cases.

And we cite just one incredibly on point case for this, your Honor.  It's called *Lindblom*, and I'm not going to summarize it because it's essentially the exact same thing, and it's very telling, your Honor.  The Plaintiffs try to distinguish it by saying it's fact specific, and they're right, it is fact specific.  It's got the same specific facts that we

have here, and so this is a case where the Plaintiffs cannot plead the in-connection-with requirement.  Thank you.

THE COURT:  Thank you, Mr. Ascher.

Mr. Grier.

MR. GRIER:  May it please the Court.

As you know, my name is Matthew Grier from Labaton Keller Sucharow, and I represent the Plaintiffs in this action.

Plaintiff's burden at this early stage is to adequately allege that Defendants made material misrepresentations, that they did so either knowingly or recklessly, and that the revelations of this fraud caused investor losses.

The basic facts at the core of this case made clear that Plaintiffs have adequately pled their claims and that Defendants' arguments are meritless.

Defendants misrepresented the supposedly revolutionary state of Cruise's autonomous vehicle or AV technology for years, which was critical to General Motors and its investors but hidden from view.  This technology was fundamentally deficient.  After a crash threatened to expose this fraud, Defendants tried to keep the truth buried by misleading the public about the crash, and when the truth finally came to light, GM's stock price tanked and investors suffered massive losses.

Defendants had touted that Cruise and GM had solved what they described as the engineer challenge of a lifetime by

developing AV technology that was fully autonomous, meaning it could drive without human involvement, in their words, 100 percent of the time. Defendants didn't claim that they were on the road to developing this technology. They claim that it was here. They had developed technology enabling Cruise to "operate without a human in the loop now and that additional research and development or R & D was necessary to begin commercializing."

These representations were hugely important to GM investors. Cruise was not some minor subsidiary within GM. It was valued at approximately $30 billion, which was more than half of GM's market capitalization in the class period. GM stated that it was working toward an all-AV future and Cruise was its business segment developing the technology to make it possible which paved the path to a multitrillion dollar addressable market, in Defendants' words.

On GM's earnings calls, GM executives touted Cruise's technology and Cruise executives were invited to elaborate and investors listened. Analysts routinely described Cruise's an AV technology as important to GM's valuation.

Counsel for Defendants brought up Morningstar and asserted that that's the only analyst we cite. It's not even close. BofA Global Research describes Cruise's purported advancements beyond the R & D stage as "among the most notable updates from GM," and Morningstar advised that the AV technology "shows GM's

leadership in the AV space," but, in reality, Cruise's AV technology was nowhere near where Defendants claimed it was.

Defendant Vogt admitted that the AV relied on a huge staff of remotely-located human operators who assisted every two-and-a-half to five miles. These operators manually directed the AVs from their computers directing them to go around objects, go into reverse and make U-turns, and, even with the assistance of three remote operators, the AVs were still so dysfunctional and would stall so frequently that Cruise employees needed to retrieve the malfunctioning vehicles, in the words of a former employee, "almost every night."

Cruise recognized internally during the class period that its AVs could not reliably recognize and drive safely around children, and many Cruise former employees, media reports, and complaints to the California DMV were recounted how the AVs engaged in unsafe and erratic driving. They would randomly hard brake or jolt all the time, stop in the middle intersections and veer into other lanes. Safety concerns like these and others were logged and raised internally but were not resolved.

As a result, Cruise's AVs got into numerous crashes detailed in Plaintiffs' brief and the complaint, the most notable of which is the October 2023 crash. And to sum up the details of that crash, a Cruise AV struck a pedestrian and then

came to a stop with the pedestrian stuck underneath. Even though the pedestrian was visible in the AV's cameras, the AV started driving again, slowly dragging the pedestrian down the street until the AV eventually stopped on the side of the road. A Cruise contractor dispatched to the scene reported that the trajectory of the crash was evidenced by the pedestrian's blood and skin patches in the pavement.

This created a crisis for Cruise. It threatened to expose the true state of their deficient technology. So what did Cruise do? It double downed by misrepresenting the true nature of the crash, advising media outlets that the Cruise AV simply came to a complete stop but omitting that it started driving again, slowly dragging the pedestrian across the pavement.

Finally, the truth came to light over a series of corrective events when, among other things, the California DMV revoked Cruise's driverless permits because it determined that the AVs posed an "unreasonable risk to the public," which then forced Cruise to admit what really happened in the October crash, and then Cruise halted its AV operations across the country and then issued a recall impacting all of its AVs.

On these disclosures, GM stock price plummeted. This, your Honor, is prototypical securities fraud, but what makes this case unique are Defendants' remarkable admissions and additional weaknesses on core elements of this case. These admissions and weaknesses are particularly striking as they

relate to the category of misstatements regarding the accident, which we refer to as the accident misstatements.

To remind the Court, these misstatements took the form of publicly disseminated assertions that the AV came to a complete stop while omitting to disclose that the vehicles started driving again, dragging the pedestrian down the street. Defendants even circulated an edited video that cut out before the dragging.

Turning to the elements of Plaintiffs' claim. There's no question that the complaint adequately alleged the falsity of these misstatements. This is literally true because Defendants don't even contest that their misrepresentations about the accident were false and misleading. Regarding scienter, GM's own lawyers, Quinn Emanuel, published a report that was publicly accepted by Cruise, establishing that before the accident statements went out, Vogt stated that he personally wanted to see and authorize any cut of any video or media statement, that he knew the Cruise AV dragged the pedestrian after initial impact, and that Vogt and other Cruise executives discussed whether to correct Cruise's prior statement omitting the pedestrian dragging and they decided not to.

Counsel claimed that Vogt didn't know initially what happened, and that's true, but he did know by the time the accident statements went out. Defendants' claim that they were motivated here by crisis management, but that's not an excuse.

*23-cv-13132; Shamoon, et.al. v. General Motors, et.al.*

As our brief establishes, it is black letter law that scienter is an inquiry into intent which is satisfied where Plaintiffs allege recklessness or knowledge. That is clearly satisfied here, where Cruise has admitted that its former CEO knew of the facts contradicting Cruise's public statements before they went out and had issued a directive that he was to approve any such statements. This alone adequately pleads scienter.

But Plaintiffs' brief goes even further by detailing other allegations of scienter, including Cruise's campaign of deceit in which they intentionally misled regulators about the crash, Vogt's suspicious departure, and numerous government investigation into Defendants' conduct.

Counsel had brought up the DPA that we submitted as supplemental authority. We stand on our pleadings and our view is that scienter's established even without that, but just to correct the record, the DPA does add to scienter because it establishes that Cruise engaged in a criminal act by misleading regulators about the crash. This behavior is evidence of Cruise's own consciousness of guilt. Why else would they mislead the authorities just like they were misleading the public?

On the loss causation prong, Defendants claim in their brief that the truth leaked in a Forbes article, where a local politician claimed that the AV dragged the pedestrian, but Cruise denied that allegation in the very same article, stating

that it already "shared all pertinent information," and "had nothing further to add."

After that, the media continued to omit references to the pedestrian dragging and coverage of that incident, and I'll note that counsel for Cruise did not dispute this characterization in today's oral argument.

Finally, Defendants launch a true Hail Mary of an argument, that their accident statements were not made in connection with the purchase of securities but, as detailed in Plaintiffs' briefing, Defendants' argument fundamentally misunderstands this element. The in-connection-with requirement is almost never contested by Defendants in contexts like this, and that's because this element simply requires there to be a nexus between the misstatements and the purchase of securities upon which a Plaintiff claims injury. This is a complete nonissue in most securities class actions, like here, where the fraud-on-the-market doctrine applies.

This doctrine recognizes that a market price of a security reflects all public material information, and cases cited in our brief show that courts regularly hold misstatements, even in nontraditional media like YouTube and Twitter, to be actionable. Here, the accident misstatements were published in reputable and widely-read news services, including CBS News, Crain's Business, Forbes, CNBC, ABC, and others.

Material statements published in these sources would

obviously be incorporated into the market price of GM, and, as I mentioned a few minutes ago, Cruise was exceptionally important to GM's valuation. I will note again it was valued at approximately $30 billion, more than half of GM's market capitalization. So these accident misstatements were indeed relevant lies that would influence GM's investors. The fact that Cruise doesn't issue its own stock and that Defendants didn't specifically mention GM's finances does not alter Cruise's importance to GM.

And, once again, Defendants, in their briefing, argue that they should be immunized under this element because their motivation wasn't really to target investors, it was just to manage the crisis and minimize bad press, but issuing misstatements to avoid bad press that could affect the price of your stock is securities fraud, and so, in sum, as to the accident misstatements, Plaintiffs have more than satisfied their burden of pleading that these statements are actionable. Defendants have conceded falsity. Their own lawyers publicly outline their scienter. Their loss causation argument is exceptionally weak and was seemingly abandoned today, and their farfetched argument contesting the in-connection-with prong stands in contrast to reams of case law and the normal practice in securities litigation.

But, your Honor, this fraud was not an isolated occurrence. It was the culmination of a years-long scheme to

misrepresent Cruise's technology, the so-called technology statements. Throughout the class period, Defendants conveyed that Cruise's AVs could drive safely, reliably, and legally without human input and that Cruise was shifting to commercialization -- shifting to commercializing its business because it had completed all the necessary R & D.

Regarding the falsity prong of this analysis. As I mentioned before, Cruise's AV technology suffered from remarkable flaws. These flaws were so fatal to Cruise's technology that Cruise's driverless permits were revoked by the DMV and Cruise pulled all of its driverless cars off the road, and it has not been able to reintroduce them since. And Defendants don't even seriously contest that my articulation describes the true state of Cruise's AV technology. They concede their remote operators were involved all the time and that human drivers regularly needed to rescue these malfunctioning vehicles.

Instead, Defendants improperly try it reinterpret their misstatements years after they were made, but this tactic fails. Before I get into the precise mis -- the precise misstatements here, I want to address Defendants' claim that all these -- all these misstatements were basically just saying there's no driver in the vehicle and nothing more. A few points on that.

Defendants cite purported context to justify their

interpretation, but what they cite are just other statements saying that the cars had no driver inside of them. If that's all they said, we wouldn't be here discussing these misstatements right now, but they went further. They said that the cars had humans out of the loop. They said that the cars were fully driverless. They didn't just say they didn't physically have a driver in them, but, more fundamentally, Defendants' argument here is a truth-on-the-market argument, which posits that investors really knew the truth despite Defendants' own misstatements, but this kind of an argument, the truth-on-the-market argument is an issue for the trier of fact and not grounds for dismissal at the motion to dismiss stage. And as I'll discuss in a minute, analysts covering GM didn't see it the same way that Defendants do now. They thought humans were actually out of the loop and not involved in the operation of those vehicles.

So moving on to the -- of the specific tech statements. As an initial matter, Defendants didn't even address two of the most critical categories of technology statements in their opening briefs. Those would be Defendant Ammann's claim that Cruise's technology had taken humans out of the loop, and Defendant Ammann and Vogt's representation that Cruise had exited the R & D phase and entered commercialization.

Now, in their reply, and on oral argument, Defendants attempt to shift gears to address these misstatements, but as

your Honor is aware, an argument raised for the first time in reply is waived.

Defendants claim that Plaintiff just didn't address the commercialization in our complaint. I would direct the Court's attention to Paragraph 262 in the complaint, which posits that certain misstatements, which are identified, misleadingly convey that "Cruise could operate a revenue-generating robotaxi business without human intervention without additional R & D," which is quoted directly in our brief. So this was not some new theory that was included in our opposition and not our motion. It's a new response in their reply to the theory they ignored in their motion.

They also claim that the out-of-the-loop statements are newly alleged to be false in our brief, and, honestly, I'm not quite sure what to do with that because they clearly are in our complaint cited. They're in Paragraphs 282 to 285. They're there. They are articulated why they are misleading, and, so, both these categories of misstatements were in our complaint. They were ignored in the motion. We pointed this out, and only now, on reply in oral argument, Defendant is addressing it.

But even so, Defendants new attempts to cast doubt on the meaning of these misstatements fail. Contrary to their arguments, Defendants' misstatements regarding Cruise's progress, from the R & D stage to commercialization, were specific and not bounded by cautionary language. I'll also

note counsel has focused on one half of these phrases, which is that Cruise has entered commercialization.

The commercialization stage was defined by Defendants as the stage that came after the R & D stage. For example, Ammann stated that Cruise had exited the R & D stage and entered commercialization, and Defendant Vogt claimed that from a -- pardon me, "from a technical standpoint, there's basically zero incremental work to get to revenue." Analysts echoed these statements in their equity research reports, with JP Morgan hailing that Cruise had advanced from the R & D phase and was now in the commercialization phase, and RBC reported that Cruise had, "solved generalized autonomy with human out of the loop," and was now "optimizing the costs."

As to Defendant Ammann's representations that Cruise's AV technology had taken humans again out of the loop. These did not merely convey the absence of safety drivers. They represented that humans had been removed entirely from the loop of operations, not just -- not just from the driver's seat. Once again, analysts took Ammann at his word. Four days after he made this statement, Morningstar published their report noting that they were optimistic about Cruise's technology because of its ability to operate without remote assistance, and, as I just mentioned, RBC also cited this out-of-the-loop statement in praising Cruise for solving general autonomy.

As to the statements Defendants did address in their

motions, their reinterpretations also fall flat. Defendants refer to Cruise's AV technology as fully driverless or fully autonomous. They now claim that this merely meant the cars had no driver inside of them. This, though, contravenes the plain meaning their assertions. A car that required remote operators to maneuver the vehicle every two-and-a-half to five miles and regularly stalled out requiring human retrieval is not driverless let alone fully driverless.

Defendants' argument also fails because they specifically define these terms. In the April 2023 blog post that was discussed earlier, Cruise stated that the term "fully driverless" is meant to communicate an essential expectation that the technology is capable of driving fully autonomously 100 percent of the time. Defendants pointed out earlier that this blog post was posted in July of 2023, but Defendant Barra articulated the same standard more than two years earlier, on a March 2021 investor conference call, stating that Cruise AVs must, "handle the solutions it's going to see on the road in all cases, not just 98 percent of what you see. It's got to be able to do everything."

Defendants stated that nobody could be confused by this language. Well, they might be correct but not in the way they think, because, once again, analysts took Defendants at their words with Morningstar repeating seven times in the class period that the AVs could operate without remote assistance or

a safety tracker, and I'll note that the first time they said that was in 2021 before the blog post came on the Internet.

Similarly, Defendants claimed that the Cruise AVs had reached level-four autonomy. Contrary to Defendants' argument, the Court does not need to dig into the regulatory definition of level four to determine falsity here because that same blog post I just discussed defined level four as synonymous with fully driverless, and, thus, these misstatements are false just for the reasons I just articulated.

But even under the regulatory definition of level four, Cruise's AVs fell far short because they rely on remote operators to perform dynamic driving tests. According to a confidential witness in our complaint, these operators manually directed AVs from their computers, directing them to go around objects, go into reverse, make U-turns, essentially helping them drive. In addition, the October crash, and other instances of unsafe driving, including where the AV stopped in the middle of the road, show that the AVs could not even perform the most basic function of a level-four vehicle under the requirements, which is to achieve a stable stopped condition when needed.

Defendants, once again on this point, highlight their claim that the remote operators were disclosed and these incidents were disclosed to the public, but, once again, these are truth-on-the-market arguments, which are not properly

decided at this stage, and they contravene what analysts were saying at the time. I'll quote Morningstar again. They stated that -- pardon me. They stated that Cruise's technology was, "true level four" because it could operate "without remote assistance or a safety tracker."

And, finally, Defendants also advised investors that Cruise AVs were safer than a human driver. These statements are false because a typical safe human driver certainly does not engage in the erratic and dangerous driving that Cruise AVs did. A normal and safe human driver doesn't need assistance every two-and-a-half to five miles to figure out what to do on the road.

In sum, Plaintiffs' interpretation of these misstatements is reasonable and well-supported and, under these interpretations, there really isn't a dispute that the complaint is adequately alleged or that the complaint adequately alleges falsity, but the question at this stage is not even whether the Court agrees with Plaintiff's interpretations. It's whether Plaintiffs' allegations, taken as true, state a claim.

Plaintiffs cite multiple cases establishing that factual disputes about the meaning of misstatements are not a basis to dismiss, and, in light of it, Defendants must show that Plaintiffs' understanding of these misstatements are unquestionably wrong as a matter of law, which they haven't

done, and that's no surprise because our interpretation conforms with the plain meaning of these statements, which is supported by analyst commentary at the same time. As a result, Plaintiffs have adequately alleged the falsity of these technology statements.

Turning to the scienter element. I want to briefly step back and recognize the legal standard here. Plaintiffs must allege a strong inference that Defendants acted at least recklessly, but Plaintiffs do not need to allege so-called smoking gun style evidence, only that the inference of scienter is at least at compelling as any nonfraudulent competing inference, and these scienter allegations under *Tellabs* are to be assessed on a holistic basis considering all the facts alleged in the complaint together, and, under such an analysis, it's clear that Plaintiffs have alleged scienter.

The Defendants touted their involvement and intimate knowledge of Cruise's AVs. For example, with Vogt claiming that he knew, "every inch of the technology's progress," and Barra recounted how she had weekly conversations with Ammann regarding the state of technology. These executive also had access to key reports and information on the technology's progress. For example, CWs recall that Vogt assured Cruise that he in the C-suite reviewed the company's internal system where safety concerns were raised and that he and Defendant West had access and were responsible for reviewing entries in

the company's risk register.

Barra participated in Cruise's quarterly board meetings, during which safety and technology was -- sorry, where safety and technology progress was discussed, and she and Vogt and West attended Cruise's annual meeting in 2022, which included assessments of the capabilities and safety of AV technology.

It would be absurd for these executive not to be aware of the true state of Cruise's technology, given its importance to Cruise and to GM. As I mentioned before, Cruise's sole reason for existing was to develop AV technology, and, as I discussed again earlier, Cruise was valued at over half of GM's market capitalization and was critical to GM's all-AV future.

The suspicious departures of numerous Defendants, their subsequent admissions, and their pattern of deceit in the aftermath of the crash all add further to the evidence of scienter, as do additional CWs, or confidential witnesses, who were former employees. In particular, I'll highlight CW-1 whose allegations were in fact known to Cruise and General Motors because he blew the whistle to the DMV and was fired for it.

The fact that these confidential witnesses did not report directly to the individual Defendants does not strip them of their reliability. Plaintiffs have included particularized descriptions of their roles, which is all that is required here.

In the face of these allegations, Defendants point to the fact that GM increased its investment in Cruise during the class period and made some stock buybacks, but these do not defeat the inference of scienter. Here, there are many reasons why a company invests in a subsidiary, including in the hopes that more money would help develop the technology to get to where they claimed it was publicly, and there's also many reasons why stock buybacks occur, including to maintain GM stock price, the same reason Defendants misrepresented the technology in the first place.

Finally, onto loss causation. Defendants' arguments here are fatally flawed, and this is a straightforward matter for Plaintiffs. The first disclosure revealed the details of the crash, and, as I discussed earlier, Defendants' argument that these facts already were known to the market do not hold up to scrutiny. Additionally, on that very same day, Cruise's driverless permits were revoked by the DMV because they posed a safety risk, which Wells Fargo explicitly described as a, "big setback" that contributed to "GM shares falling."

Regarding the next two corrective events. Defendants' argument boils down to the claim that nothing really corrective or new was really disclosed on those dates, but this doesn't stand up to scrutiny either. In the second corrective event, on October 26, Cruise announced that it was pausing all of its AV operations. Cruise explicitly stated that the pause was

needed to, "examine our processes, systems, and tools," in other words, its entire business, which cast into serious doubt Cruise's technology and its ability to commercialize.

The NHTSA's contemporaneous announcement that it was investigating five incidents of dangerous driving further revealed the state of Cruise's technology to the public.

And, finally, on the third disclosure, on November 8th, Cruise announced a recall of its entire fleet to remedy the defect that played a role in the October crash which they deemed a safety risk, and, thus, for the first time, the market became aware that the October crash was not an isolated incident. It represented a core deficiency impacting every single Cruise AV which put Cruise's entire business into question. Cruise's announcement that it was overhauling internal safety processes, hiring a third party to investigate the crash again or further, and that it was searching for a chief safety officer all hammered home the dire state of Cruise's technology and its business. On these disclosures, GM stock dropped dramatically.

Thus, Plaintiff's have satisfied their burden at this stage of the case. Defendants' technology statements were materially false and misleading to GM investors. Defendants knew about or were, at the very least, reckless to the true state of Cruise's AV technology, and when the truth was revealed, investors suffered significant losses.

*23-cv-13132; Shamoon, et.al. v. General Motors, et.al.*

As I noted at the top, your Honor, this is prototypical security fraud and we respectfully request the Court deny Defendants' motions.

**THE COURT:** Thank you, Mr. Grier.

I just have a couple clarifying questions for you. First, you are asserting liability against each Defendant based on their own statements.

Are you also asserting liability against individual Defendants based on other Defendants' statements?

**MR. GRIER:** Yeah -- well, so we certainly are asserting liability as to each Defendant as to his or her own statement. We're also asserting control-person liability as to each Defendant for their own statements and the statements that are made under them. So, for example, the control persons of General Motors would be liable for not only their own statements but the statements of others at General Motors as well.

**THE COURT:** The control people being?

**MR. GRIER:** The people who run the business and are, you know, in charge of the operations of the business, but the primary theory is that each person is responsible for their own statement, your Honor.

**THE COURT:** Okay. And with respect to the accident statements, kind of the same. You're making arguments as to GM, but are you also making claims against the individual GM

Defendants as to the accident statements?

**MR. GRIER:** As to the accident statements, I believe the only individual GM Defendant would be Defendant Barra, because she was a control person of Cruise because she sat on the board.

**THE COURT:** Okay. Thank you.

All right. Mr. Ehrlich.

**MR. EHRLICH:** Thank you, Judge, and your question hopefully segues into the first thing I wanted to address, which is that Mr. Grier made a lot of comments about Defendants mushing stuff together, and I think now it's clear that, as we argue in our brief, GM is liable for GM's own statements. We don't dispute that there are control person claims alleged. We believe those should be dismissed because the primary statement should be dismissed, but there's not an independent basis to challenge control person liability, but GM is not responsible for Cruise's statements, and, indeed, I think on the -- for instance, on the accident statements, I don't believe that any GM Defendant was the maker of any of those statements.

The GM Defendants were the maker of what Mr. Grier has called the technology statements, and I do want to address those because I think it was very telling, Judge, on scienter, what you heard there, which was very little. It was Defendant Barra attended the Cruise annual meeting and some board meetings and that it would be absurd, given how important

Cruise allegedly was to GM that they wouldn't know this information about technological operations.

That's the core operations doctrine. That's exactly what the Sixth Circuit in *ServiceMaster* and *Yum!Brands* and *OmniCare* said nuh-uh. Like, you have to say how the person knew it was false. Because I got this weekly report. Because I sat in this specific meeting where it was told that this thing wasn't true. This is just it would have been absurd and that isn't scienter, respectfully. So we think, on that basis alone frankly, the GM Defendants should be dismissed from the case.

But, you know, we heard a lot, Judge, from Mr. Grier about safety, safety issues, and, you know, this is a very long complaint and there's a lot of what I'll call stuff in here about safety, and safety is indisputably important, of course. But they didn't plead a safety case. That's -- you could plead -- one could, right, like -- in fact, the *Tesla* case said, that Mr. Ascher and I talked about, if you look at the alleged misstatements there, it's like you're less likely to get injured in a Tesla vehicle. The brakes work in this way. The safety system works in this way. There's no pleading of that kind in this case.

And, very helpfully, Plaintiff, starting at Page 113 of their complaint, identify all of the statements that they contend are false and misleading under the securities laws, and they very helpfully highlight in bold and italics exactly what

they contend violated the securities laws.

And I think, Judge, if, you know, after that argument, you were to turn the pages starting at Page 113 of their complaint and look at what's actually bolded and highlighted, it bears very little relation to the reasons that you just heard as to why these statements are supposedly false. They largely relate to we are taking the driver out of the car. We are -- you know, starting -- we're finishing research. We're starting commercialization. We're launching these autonomous vehicles without a driver.

You know, Mr. Patterson, if I could ask you to just -- I'm going -- we obviously can't look at all of them, but, like, for instance, you know, Page 130 of I guess it's ECF Page 134, right.

Let's, like, look at an example here from Defendant Barra on an earnings call at the top of the page, the highlighted part. "Cruise continues to make great progress safely and deliberately expanding its full driverless operations in San Francisco."

If we turn to, I don't know, Page 141. Another example. You know what, I got that wrong. This is a little too tricky to do on the fly, but you get the point, Judge. If you look at the statements --

You can take that down, Mr. Patterson.

-- and they allege that the driver is coming out of the

car, that the cars are fully driverless, and that the cars are fully autonomous.

And the last thing that I would say, Judge -- we've been going a long time. I don't want to prolong this, but there are certainly times under Rule 8 where, you know, always under Rule 8, not times, where you give the Plaintiff the benefit of the doubt of the allegations, but you didn't hear Mr. Grier talk about the PSLRA, and you didn't hear him talk about it for a reason. Like, they urge inferences about statements of level-four, fully driverless, fully autonomous. They urge inferences but you can't accept the inferences when they're contrary to the very document that defines level four.

So when Mr. Grier talks evidence -- or allegations, I should say, which are, again, anecdotal from individuals who are not pleaded to necessarily have a lot of direct knowledge, that, you know, vehicles stopped in a particular way. The question is is that inconsistent with the company statement that they're level four? And as I tried to show the Court in my opening argument, when you actually read what level four means, it's totally consistent, even accepting what we do have to do to accept them as true, and even accepting them as true, right. Like, saying this isn't, you know, a tiger because it has stripes when tigers have stripes, you know, it just -- or this is a tiger because it has polka dots. You know, no, because there's a definition of what a tiger is. It has

stripes, not polka dots.  And that's kind of what they're doing here.

We're not asking the Court to reject the truth of the allegations at this point.  We're saying assuming them to be true, they are contrary to the definition of the level-four vehicles.  So when the company said that vehicles were level four, those statements were, in fact, literally true.

So with that, given how long we've been going on, I will cede the podium to Mr. Ascher if he has anything else.

**THE COURT:**  Thank you.

Mr. Ascher.

**MR. ASCHER:**  Thank you, Judge, and I will, too, be quick and try not to be repetitive.

First of all, just to pick up on what Mr. Ehrlich was saying, your Honor.  If you go through and read the dozens of pages devoted to laying out the so-called allegations of false statements here, I think you will be struck by how innocuous these statements are.  They really are unusual statements to be alleged to be false.

I also want to pick up, Judge, on your question about disentangling the Defendants; I think that's helpful, and also point out that, you know, Cruise cannot be held liable for General Motors' statements.  So I think those are two separate and we've tried to keep them separate in our briefs.

Also, Judge, the Plaintiffs have devoted a lot of effort,

*23-cv-13132; Shamoon, et.al. v. General Motors, et.al.*

both in their briefs and in argument today, to claiming that the Defendants have waived various things. I don't know that I need to go through all of those claims one by one, but I just wanted to be clear, we do believe we have addressed the complaint. It's 200 pages long, but I think we did a good job of contesting it in its entirety, and, if you read our papers, I think it's clear that we're not conceding falsity as to any of the technology statements, nor are some of the other claimed concessions well-founded.

The final point I wanted to make, your Honor, is on the accident statements. I just wanted to make one other point that I don't think the Plaintiffs addressed in their presentation, which is Cruise did mention the pedestrian dragging to numerous regulators. It didn't to NHTSA, and we've got the DPA as a result, but it mentioned it to numerous other regulators. It just doesn't make any sense that Cruise was trying to hide the pedestrian dragging from the investors at large by disclosing it to several regulators and not to another one. That just is not a cogent theory of any intent to defraud the investing public. Why on earth would you disclose it to some but not others unless there was something else going on, and the Quinn report explains exactly what was going on.

On that note, your Honor, thank you for your patience.

**THE COURT:** Thank you. Did anyone else want to say anything? I just want to give anyone an opportunity if they'd

*Defendants' 12(b)(6) Motion to Dismiss*
*Wednesday, December 18, 2024*

**Page 66**

like to say anything for the record.

No.

All right.  Very good.  Thanks, counsel, oral argument, all of yours, very helpful today.

I'll issue an opinion, all right.

Thank you.  Happy holidays.

**CASE MANAGER:**  Court is adjourned.

(Proceedings concluded 2:53 p.m.)

- - -


**C E R T I F I C A T I O N**

I, Andrea E. Wabeke, official court reporter for the United States District Court, Eastern District of Michigan, Southern Division, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a correct transcript of the proceedings in the above-entitled cause on the date hereinbefore set forth. I do further certify that the foregoing transcript has been prepared by me or under my direction.


/s/Andrea E. Wabeke          January 10, 2025

Official Court Reporter          Date
RMR, CRR, CSR
- - -




*23-cv-13132; Shamoon, et.al. v. General Motors, et.al.*