UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE GENERAL MOTORS
COMPANY SECURITIES
LITIGATION

Case No. 23-13132
Honorable Shalina D. Kumar
Magistrate Judge Elizabeth A. Stafford

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS TO DISMISS (ECF NOS. 31, 32)**

Lead plaintiff City of Hollywood Police Officers' Retirement System
and named plaintiff Plymouth County Retirement Association (together,
"plaintiffs") bring this putative federal securities class action on behalf of
themselves and a class consisting of all persons who purchased GM
securities between February 24, 2021 and November 8, 2023 (the "Class
Period"). ECF No. 23, PageID.¶449.[1] Plaintiffs bring claims for securities
fraud under Sections 10(b) and 20(a) of the Securities Exchange Act of
1934 (the "Exchange Act"), 15 U.S.C. § 75a *et seq.*, and SEC Rule 10b-5,
17 C.F.R. § 240.10b-5 ("Rule 10b-5") against defendants General Motors

---

[1] Citations to "¶ __" refer to paragraphs of plaintiffs' amended consolidated
class action complaint (the "complaint"), ECF No. 23, PageID.240-445.

Company ("GM"), Mary T. Barra, Paul A. Jacobson, Doug L. Parks (collectively, "GM Defendants"), as well as Cruise LLC ("Cruise"), Kyle Vogt, Wayne G. West, and Daniel Ammann (collectively, "Cruise Defendants"). ¶¶ 458-85.

Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6) and 9(b). ECF Nos. 31-32. The motions are fully briefed, and the Court heard oral argument on December 18, 2024. ECF Nos. 31-32, 39, 42-43. For the reasons below, the Court grants in part and denies in part defendants' motions.

## I.    Background

Cruise is a majority-owned subsidiary of GM, ¶ 26, which referred to Cruise in its public filings as "GM Cruise" and GM's "global segment responsible for the development and commercialization of [autonomous vehicle ("AV")] technology." ¶ 48. Plaintiffs allege that Cruise's AV technology was paramount to the future of GM, with "Cruise [a]s a key element of GM's growth strategy." ¶ 387. In February 2021, Cruise was valued at about $30 billion, more than half of GM's market capitalization throughout the Class Period, and GM publicly projected that Cruise had the potential to deliver $50 billion in annualized revenues by the end of the decade. *Id.*

According to plaintiffs, defendants made various misrepresentations to investors about the state and capabilities of Cruise's AV technology during the Class Period. Defendants allegedly represented that Cruise's AV technology had reached the point where Cruise could already operate a revenue-generating, fully driverless robotaxi business without any additional research and development ("R&D"). For example, as Cruise's then-CEO speaking to GM investors on October 6, 2021, Ammann stated that Cruise had exited the "R&D phase," by "solv[ing] that engineering challenge of a generation of building a self-driving system that can drive with a human or better level of performance," and that this achievement "marked the beginning" of Cruise's pivot to "commercialization." ¶ 278. Similarly, as Ammann's successor as Cruise's CEO, Vogt stated on March 10, 2022 that "from a technical standpoint, there's basically zero incremental work to get to revenue." ¶ 304. Plaintiffs allege that Cruise's entire enterprise was to commercialize its AVs and that its massive contribution to GM's valuation depended on its ability to do so. ¶¶ 26, 49.

Plaintiffs allege that defendants also claimed Cruise AVs could drive safely, reliably, and legally without input from humans. For example, Ammann claimed on October 6, 2021 that Cruise AVs "can operate without a human in the loop now." ¶ 284. Defendants likewise described Cruise

AVs as "fully autonomous," "fully driverless," and "truly driverless" at various times to investors throughout the Class Period. *E.g.*, ¶¶ 276-80, 290-98, 324-26. For example, as Cruise's Chief Operating Officer ("COO"), West stated on March 6, 2023, "[W]e launched full driverless service a little over a year ago," ¶ 340; and on an October 27, 2021 GM earnings call, Barra, who was GM's CEO and Chair of Cruise's Board of Directors, touted Cruise's ability to provide "full driverless ride-hail service" in San Francisco, ¶ 292.

Defendants also described Cruise AVs as having "Level 4" autonomy, which is a reference to the five levels of autonomy defined by the Society for Automotive Engineers Taxonomy (the "Taxonomy"). *E.g.*, ¶¶ 274, 290, 308, 344, 348, 350. For example, Parks, as a GM Executive Vice President, claimed that Cruise was "launching a driverless fully autonomous Level 4 vehicle," ¶ 290; and Jacobson, as GM's CFO and a GM Executive Vice President, stated that Cruise's AV technology was "full Level 4," ¶ 348. Cruise allegedly explained, during the Class Period, that there was an "essential expectation" that an AV referred to as "Level 4" or "fully driverless" must be "capable of driving fully autonomously 100% of the time." ¶ 80. Finally, throughout the Class Period, Barra allegedly

claimed at various times that Cruise's AV technology was already safer than a human driver. ¶¶ 266, 268, 354.

However, these representations were allegedly false and misleading. The complaint contains detailed allegations from former Cruise and GM employees serving as confidential witnesses ("CWs"), media reports, and complaints submitted to the California Department of Motor Vehicles (the "DMV"), which according to plaintiffs, attest to persistent and severe problems with Cruise AVs. ¶¶ 95-165. According to plaintiffs, the CW allegations show that Cruise AVs could not operate without frequent input from humans, and they could not operate as functional vehicles, even with human assistance—that is, they did not drive safely, reliably, or legally, as defendants claimed.

For example, the allegations show that Cruise relied on humans to remotely operate its AVs; Cruise AVs stalled or failed frequently, requiring physical retrieval by humans; Cruise AVs failed to reliably recognize and drive safely around children; Cruise AVs engaged in "unsafe" and "erratic" driving, *e.g.*, ¶ 167 (describing Cruise AV's "erratic and high[ly] unpredictable stop, as if it was about to run over a pedestrian," which was a "a computer error, locking the[] brakes" and causing a rear end collision); this unsafe and erratic driving caused numerous crashes and internal

safety concerns that went unresolved; and Cruise AVs suffered from additional functionality and safety problems, such as an inability to consistently recognize pedestrians or children or large holes in the road. ¶¶ 95-220.

Plaintiffs allege that defendants' fraud regarding the state and capabilities of Cruise's AV technology started unwinding after a Cruise AV's crash on October 2, 2023 (the "October 2 Crash" or "Accident"). That evening, a human-driven vehicle struck a pedestrian in San Francisco, launching the pedestrian into the pathway of a Cruise AV in the adjacent lane. ¶ 194. The AV then hit the pedestrian and came to an initial stop, allegedly pinning her beneath it. *Id.* Plaintiffs allege that although the Cruise AV's camera could see the pedestrian it had struck, it began driving again with the pedestrian underneath—dragging her about 20 feet down the street and causing serious injuries. ¶¶ 194, 219.

Within hours of the Accident, high-ranking Cruise executives, including Cruise's then-CEO and CTO Vogt, became aware of these details. ¶¶ 226-30. Plaintiffs allege that Vogt, Cruise, and GM, however, made the conscious decision to misrepresent the circumstances of the Accident to the public by disseminating incomplete video footage and issuing media statements claiming the AV had come to a complete stop

upon impact, while concealing that the AV subsequently continued driving and dragging the pedestrian. ¶¶ 356-64.

The truth about the October 2 Crash and Cruise's AV technology was allegedly revealed through three corrective disclosures on October 24, October 26, and November 8, 2023. ¶¶ 365-82. According to plaintiffs, the corrective disclosures revealed that the Cruise AV had dragged the pedestrian rather than safely coming to a stop; the DMV was suspending Cruise AV permits after the DMV found the AVs posed an "unreasonable risk to public safety," ¶ 195; federal authorities were investigating Cruise for its AVs' allegedly unsafe and erratic driving behavior; and Cruise was pausing all AV operations nationwide, recalling its entire fleet, conducting an investigation led by an engineering firm, searching for a Chief Safety Officer, and overhauling its internal processes relating to safety, transparency, and community engagement. ¶¶ 365-82. The corrective disclosures allegedly caused GM's stock price to decline by about 2.3%, about 4.8%, and over 3%, respectively. ¶ 17. GM lost billions in market capitalization, and investors suffered substantial losses as a result. *Id.*

After the Class Period, Cruise released an internal report by the law firm Quinn Emanuel Urquhart & Sullivan, LLP (the "Quinn Report"), which investigated the October 2 Crash and laid out certain facts regarding

Cruise's handling of its response to the Accident. ¶¶ 249-53. According to

plaintiffs, the Quinn Report found that Vogt knowingly directed the

dissemination of the misstatements concerning the October 2 Crash and

pedestrian dragging. *Id.* Plaintiffs allege that this behavior is consistent with

Cruise's pattern of otherwise deceptive behavior, noting, for example, an

administrative ruling that Cruise made "misleading" statements in the

context of its disclosures to regulators about the October 2 Crash and that

by "withholding information . . . Cruise misled the DMV." ¶ 248.

In the aftermath of the October 2 Crash, plaintiffs filed this putative

securities class action. Plaintiffs claim under Section 10(b) of the Exchange

Act, 15 U.S.C. § 78j(b) ("Section 10(b)"), and Rule 10b-5(b) that defendants

are liable for securities fraud in connection with the sale of GM securities

based on alleged misstatements, ¶¶ 458-71, which fall into two broad

categories—statements made before the October 2 Crash concerning

Cruise's AV technology (the "Technology Statements") (the "Technology

Statement Claims") and statements to the press immediately after the

October 2 Crash (the "Accident Statements") (the "Accident Statement

Claims"). ¶¶ 259-363. Plaintiffs further claim under Section 10(b) and Rules

10b-5(a) and (c) that defendants are liable for securities fraud based on an

actionable scheme (the "scheme liability claims") and under Section 20(a)

of the Exchange Act, 15 U.S.C. § 78t(a) ("Section 20(a)"), that Barra,

Jacobson, and Parks are liable as control persons of GM and Cruise and

Vogt, West, and Ammann are liable as control persons of Cruise.[2] ¶¶ 472-

85.

## II.   Standard of Review

When deciding a motion to dismiss for failure to state a claim, the

Court must "construe the complaint in the light most favorable to plaintiff

and accept all allegations as true." *Keys v. Humana, Inc.*, 684 F.3d 605,

608 (6th Cir. 2012). "To survive a motion to dismiss, a complaint must

contain sufficient factual matter, accepted as true, to state a claim to relief

---

[2] For each claim, the complaint is not clear as to which statements allegedly establish each defendant's liability. At oral argument, plaintiffs clarified that they assert their claims as to each defendant based only on that defendant's own statements, except for the Section 20(a) claims, for which they assert control-person liability as to each individual defendant based on the statements made by employees at the company they allegedly controlled. ECF No. 52, PageID.3186-87. Accordingly, besides the Section 20(a) claims, plaintiffs assert their claims relating to alleged misstatements made by the GM Defendants against GM only; those made by Barra against Barra only; those made by Jacobson against Jacobson only; and so on. The clarification also means that plaintiffs assert their Section 20(a) claims relating to misstatements made by any individual working at GM against Barra, Jacobson, and Parks and those made by any individual working at Cruise against Barra, Jacobson, Parks, Vogt, West, and Ammann. The Court, therefore, grants Cruise's request to dismiss the Technology Statement Claims based on alleged misstatements made by GM as to Cruise. *See* ¶¶ 89, 91, 93, 94, 266, 268, 270, 272, 274, 290, 292, 294, 296, 302, 310, 312, 314, 316, 318, 320, 322, 324, 326, 334, 338, 342, 344, 348, 350, 352, 354.

that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (concluding that a plausible claim need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action").

The court "consider[s] the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also Weiner v. Klais & Co. Inc.*, 108 F.3d 86, 89 (6th Cir. 1997) (noting documents that a defendant attaches to a motion to dismiss are also considered part of the pleadings if referred to in the complaint and central to the claim).

## III.  Analysis

Section 10(b) of the Securities Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5(b) implements

this provision by making it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 CFR § 240.10b-5(b).

To state a claim under Section 10(b) and Rule 10b-5(b), plaintiffs must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 37-38 (2011); *Teamsters Loc. 237 Welfare Fund* v. *ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 525 (6th Cir. 2023).

## A. Technology Statement Claims

The Technology Statements comprise numerous alleged misstatements, which fall into five categories: commercialization statements, "fully driverless" statements, "Level 4" statements, permit statements, and safety-comparison statements.

The Court must address two preliminary matters. First, defendants do not move to dismiss the Technology Statement Claims based on the

commercialization statements. Plaintiffs base their claims in part on alleged

misstatements conveying that Cruise's AV technology had reached the

point where Cruise could already operate a revenue-generating, fully

driverless robotaxi business without additional research and development.

*See, e.g.*, ¶¶ 278, 286, 304, 306, 330. Defendants filed motions to dismiss

challenging the Technology Statement Claims based on the "fully

driverless" statements, "Level 4" statements, and safety-comparison

statements, and challenged plaintiffs' claims as to the commercialization

statements for the first time in their reply briefs. Because defendants did

not assert arguments as to the commercialization statements in their

opening briefs, they waived such arguments. *See State Farm Fire & Cas.*

*Co. v. Liberty Ins. Underwriters, Inc.*, 613 F. Supp. 2d 945, 968 (W.D. Mich.

2009).  Accordingly, the Court declines to further analyze the Technology

Statement Claims based on the commercialization statements.

Second, the parties put little effort in arguing over the Technology

Statement Claims based on the permit statements, but they at least agree

that at this stage, the claims based on the permit statements rise or fall with

the claims based on the "Level 4" statements. *See* ECF No. 31,

PageID.510 n.8 ("Plaintiffs repackage their Level 4 theory with challenges

to statements discussing Cruise's permits."); ECF No. 39, PageID.2324 n.8

(adopting "same reasons" opposing dismissal of claims based on "Level 4" statements to oppose dismissal of claims based on permit statements). Because the Court concludes, as discussed below, that plaintiffs adequately plead the Technology Statement Claims only as to the "Level 4" statements made by Cruise, Vogt, and West, the Court dismisses the Technology Statement Claims based on the permit statements as to the GM Defendants and Ammann, and concludes that plaintiffs adequately plead their Technology Statement Claims based on the permit statements as to Cruise, Vogt, and West.

As to the Technology Statement Claims based on the remaining statement categories, defendants dispute falsity, scienter, and loss causation. The Court analyzes each element in turn, focusing on the parties' key arguments and expressing no opinion on alternative arguments that need not be addressed at this stage.

### 1.    Falsity

Successfully pleading an actionable material misrepresentation or omission under Section 10(b) and Rule 10b-5(b) requires a plaintiff to allege facts demonstrating two things: (1) that a defendant made a statement or omission that was false or misleading; and (2) that this statement or omission concerned a material fact. *In re Omnicare, Inc. Sec.*

*Litig.*, 769 F.3d 455, 470 (6th Cir. 2014). Materiality requires "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). As a result, courts analyzing falsity interpret statements "as a reasonable investor would." *See Plymouth Cty. Ret. Ass'n v. Viewray, Inc.*, 2022 WL 3972478, at *4-6 (6th Cir. Sept. 1, 2022) (citing *Levinson*, 485 U.S. at 231-32) (interpreting statements as a reasonable investor would and rejecting contrary interpretation as inconsistent given context).

"Federal Rule of Civil Procedure 9(b) and the [Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 (PSLRA)] apply to the misstatement-or-omission element." *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus.*, 29 F.4th 802, 810 (6th Cir. 2022) (citing *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 478 (6th Cir. 2010)). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). And the PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15

U.S.C. § 78u-4(b)(1). Thus, under Rule 9(b) and the PSLRA, plaintiffs must also allege the "who, what, where, when, and why of the fraudulent statements." *Viewray*, 2022 WL 3972478, at *2.

### a.      "Fully Driverless" Statements

Plaintiffs claim that defendants' statements that Cruise AVs were "fully driverless" and other like statements falsely conveyed that Cruise AVs could drive safely, reliably, and legally without human input. For example, plaintiffs allege that on October 6, 2021, Ammann claimed Cruise AVs operated with "the human out of the loop" and that "we have a system that can operate without a human in the loop now." ¶¶ 282, 284. According to plaintiffs, defendants repeatedly described Cruise AVs as "fully driverless," "fully autonomous," "full driverless," and "truly driverless." *E.g.*, ¶¶ 276, 290, 292, 294, 296, 298, 302, 310, 314, 316, 318, 320, 324, 326, 348.

The parties' dispute over the "fully driverless" statements centers on the plausible meaning of these statements. According to GM, plaintiffs fail to plausibly allege the falsity of these statements because reasonable investors would not have interpreted these statements to mean that Cruise AVs could drive without human input but instead that the AVs could drive without a safety driver in the vehicle and because the AVs could indeed drive without a safety driver in the vehicle. The Court disagrees in part.

Defendants' argument fails as to Ammann's statements that Cruise AVs operated with "the human out of the loop." Unlike the other "fully driverless" statements, these statements in particular did not merely convey the absence of a safety driver. As plaintiffs argue, Ammann's reference to "the loop" acknowledges that it is relevant to assessing the technology if humans were involved in operating the AVs regardless of whether drivers were in the AVs and assured investors that Cruise's AV technology did not involve humans in that "loop." Contrary to defendants' interpretation of the "fully driverless" statements generally, the statements that Cruise AVs operated with "the human out of the loop" is clear enough that a reasonable investor could interpret them to mean that Cruise AVs operated without human input. *See City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc. ("WWE")*, 477 F. Supp. 3d 123, 130 (S.D.N.Y. 2020) (finding plausible plaintiffs' meaning of the word "renewal" and holding context showing a different meaning raised a "factual dispute"). Defendants do not dispute that humans are involved in operating the AVs—indeed, their motions develop no arguments addressing the falsity of the statements that Cruise AVs operated with "the human out of the loop." *See* ECF No. 31, PageID.510. Because defendants do not challenge the falsity of these statements despite their distinct and plausible meaning, defendants'

general argument regarding the falsity of the "fully driverless" statements fails as to Ammann's statements that Cruise AVs operated with "the human out of the loop."

As to the other "fully driverless" statements, the Court agrees with defendants that based on context, reasonable investors would have interpreted the other "fully driverless" statements to mean that Cruise AVs could drive without a safety driver but not without human input. Throughout the Class Period, GM consistently explained that "fully driverless" and "fully autonomous" meant that Cruise's AVs operated without a safety driver in the vehicle. For example, on October 27, 2021, Barra explained that Cruise's "full driverless ride-hail service," ¶ 292, would "take the driver out of the vehicle." ECF No. 31-12 at PageID.840, 846. As another example, on December 9, 2021, Parks clarified Cruise's "fully self-driving autonomous platform," ¶ 294, as meaning "[n]o driver in the car." ECF No. 31-25, PageID.1067. In addition, Cruise and the media repeatedly disclosed Cruise's use of remote operators to assist its AV fleet. *See, e.g.*, ECF No. 31-23 at PageID.1016-41 (Cruise safety report discussing human remote operators and other human involvement in Cruise operations); ECF Nos. 31-17, 31-18 (media reports of human involvement in Cruise operations). Likewise, both the Taxonomy and the regulatory scheme

governing the AVs contemplated that Cruise AVs would operate with ongoing human input. *See* ECF No. 31-6 at PageID.18-19 (Taxonomy contemplating "remotely located human" involvement); Cal. Code. Regs. tit. 13, § 227.02(n), 227.38(b)(1), and 228.06(b)(1) (regulations contemplating remote human operators).

To support the interpretation that defendants' "fully driverless" statements meant that Cruise AVs could drive without human input, plaintiffs rely on 1) an April 2023 blog post on Cruise's website and 2) a statement Barra made in March 2021. However, when read in context, these statements do not reasonably convey the absence of human input.

In the April 2023 blog post, Cruise states, "The term *fully driverless* is used not merely for effect but to communicate an essential expectation" that "*The AV must be capable of driving fully autonomously 100% of the time*," and then immediately explains that "[t]his is to draw a distinction with the L2-L3 ADAS function where there is an expectation of an alert safety driver, who must be prepared to quickly take over." ECF No. 31-19, PageID.971. In the next paragraph, Cruise states, "our AVs have already accumulated over 1,000,000 miles of fully autonomous miles (i.e., *without a safety driver*) on SF streets." *Id.* (emphasis added). Contrary to plaintiffs'

reading, Cruise gave no indication that "fully driverless" meant "without human input."

As for Barra's March 2021 statement, a presenter asked Barra, "[Y]ou're very confident you're going to get there in terms of taking the human driver out of the equation. Any more color you could provide on time frame?" ECF No. 31-9, PageID.794. To explain when Cruise's AV technology may develop over time, Barra answered, "I think it's just a continued development, and demonstrating that the software driving technology can handle the solutions it's going to see on the road in all cases, not just what's 98% of what you see. It's got to be able to do everything." *Id.* Barra did not indicate, as plaintiffs suggest, that Cruise was already "there in terms of taking the human driver out of the equation"— rather, she explained that Cruise was "piloting or testing vehicles *without a driver* in San Francisco right now, I think that shows you how far along we are in the development." *Id.* (emphasis added). Barra explained that Cruise was hitting "metrics" and "milestones" for "what we had to demonstrate to be able to take the driver out of the vehicle safely." *Id.* Contrary to plaintiffs' reading, Barra gave no indication that defendants' "fully driverless" statements meant "without human input."

Plaintiffs argue that none of defendants' statements function to define "fully driverless" but were "merely describing one aspect of 'fully driverless' cars." ECF No. 39, PageID.2312. To them, the term "fully driverless" should be defined by defendants' descriptions of "what their 'fully driverless' AVs could do." *Id.* Plaintiffs provide no reason or authority showing why "fully driverless" should be defined in that way. Nor can the Court assume such a definition when defendants consistently clarified that Cruise AVs were "fully driverless" because they required no driver in the vehicle, not because they required no human input. *See, e.g.*, ECF No. 31-19, PageID.971 (clarifying very clearly that Cruise AVs logged "fully autonomous miles (i.e., [miles] without a safety driver)"). Even if the Court were to assume that "fully driverless" should be defined based on how defendants' described the capabilities of Cruise AVs, defendants never described Cruise AVs as being able to drive without human input. Rather, based on plaintiffs' cited statements, defendants described Cruise AVs as being able to drive without a driver in the vehicle while giving no description or indication that the AVs had the ability to drive without any human input.

Given that reasonable investors would not have interpreted the "fully driverless" statements to mean that Cruise AVs could drive without human input but instead that Cruise AVs could drive without a safety driver in the

vehicle, the complaint pleads no particularized facts showing that the "fully driverless" statements are false. Rather, all allegations purporting to show falsity as to the "fully driverless" statements are consistent with the idea that Cruise AVs could drive without a safety driver in the vehicle. For example, that Cruise AVs had the support of "1.5 workers per vehicle," who "intervened to assist the company's vehicles every 2.5 to 5 miles," ¶¶ 173-74, does not negate that the AVs could operate without a safety driver and is consistent with both the repeated disclosures of Cruise's use of remote operators and the applicable regulatory scheme and Taxonomy. *See, e.g.*, ECF Nos. 31-17, 31-18; Cal. Code. Regs. tit. 13, § 227.02(n); ECF No. 31-6 at PageID.18-19.

In sum, reasonable investors would have interpreted the "fully driverless" statements to mean that Cruise AVs could drive without a safety driver in the vehicle, and nothing plausibly shows that they would have interpreted such statements to mean that Cruise AVs could operate without human input. Because the complaint pleads no facts negating the statements that Cruise AVs were "fully driverless" in the sense that they could drive without a safety driver in the vehicle, the Court dismisses plaintiffs' claims as to the "fully driverless" statements, except the claims as

to Ammann's statements that Cruise AVs operated with "the human out of the loop."

### b.        "Level 4" Statements

Plaintiffs claim that statements that Cruise AVs had "Level 4" autonomy were false. Plaintiffs primarily allege that these statements conveyed the same meaning as the "fully driverless" statements. According to plaintiffs, in its April 2023 blog post, "Cruise stated that Level 4 or 'L4' and 'fully driverless' are analogous terms." ¶ 80.b; *see also* ECF No. 39, PageID.2323 ("Cruise specifically defined 'Level 4' as synonymous with 'fully driverless' which meant that Cruise AVs were 'capable of driving fully autonomously 100% of the time.'").

However, in the April 2023 blog post, Cruise states, "The term *fully driverless* is used not merely for effect but to communicate an essential expectation" that "*The AV must be capable of driving fully autonomously 100% of the time*." There is no indication that Cruise used "Level 4" synonymously with "fully driverless." Further, the blog post is highly technical, and "Level 4" undisputedly has a specific, technical meaning—if anything, the blog post's references to Level 4 autonomy conveyed that specific, highly technical meaning. Even if the Court were to accept plaintiffs' allegation that the "Level 4" statements conveyed the same

meaning as the "fully driverless" statements, plaintiffs' claims as to the "Level 4" statements would fail because, as discussed above, the complaint contains no allegations showing that the "fully driverless" statements are false given the statements' only plausible meaning.

Plaintiffs alternatively interpret the "Level 4" statements to mean that the Cruise AV system met the technical requirements for Level 4 autonomy under the Taxonomy. *See* ¶ 82 ("[A]t a minimum, investors would have reasonably understood . . . "Level 4," or "L4," to mean that the system complied with the SAE's minimum requirements for a system to qualify as Level 4."). Defendants do not dispute this alternative meaning.

However, defendants argue that plaintiffs fail to plead particularized facts showing that the Level 4 statements were false. According to defendants, no allegations contradict the notion that Cruise AVs had Level 4 autonomy. Plaintiffs counter that the complaint plausibly alleges that Cruise AVs did not meet the Taxonomy's requirements for Level 4 autonomy because they did not or did not properly execute "DDT fallbacks" when required to do so in certain situations, and because they relied on remote operators who took over "DDTs" 2-4% of the time by manually directing the AVs' driving.

"DDT fallbacks" and "DDTs" are references to technical terms within the Taxonomy. Under the Taxonomy, a "Level 4" AV must have an automated driving system that, when engaged, executes the "*sustained* and [*operational design domain*]-specific performance . . . of the entire [*dynamic driving task*] and [*dynamic driving task*] *fallback*." ECF No. 31-6, PageID.726 (italics in original). The key terms to understand here are "dynamic driving task" ("DDT") and "dynamic driving task fallback" ("DDT fallback"). The "DDT" encompasses "[a]ll of the real-time operational and tactical functions required to operate a vehicle in on-road traffic," such as steering, acceleration/deceleration, and responding to objects and events. *Id.* at PageID.704. The "DDT fallback" is "the response by an [automated driving system] to achieve minimal risk condition,"[3] which is "[a] stable, stopped condition . . . in order to reduce the risk of a crash when a given trip cannot or should not be continued." *Id.* at 705, 710.

Based on the Taxonomy, plaintiffs' allegations permit reasonable inferences that Cruise AVs did not have an automated driving system that

---

[3] The Taxonomy makes clear that the achievement of a minimal risk condition looks different in different circumstances. *Id.* For example, a minimal risk condition "may entail automatically bringing the vehicle to a stop within its current travel path, or it may entail a more extensive maneuver designed to remove the vehicle from an active lane of traffic and/or to automatically return the vehicle to a dispatching facility." *Id.*

met the core requirements of Level 4 autonomy. One core requirement of a Level 4 system demands that the system will, when necessary, perform a DDT fallback to achieve a minimal risk condition—that is, it will drive to a "stable, stopped condition" designed to "reduce the risk of a crash" whenever the AV is not driving "reliably" due to some malfunction. *Id.* at 705-08, 710. Plaintiffs' allegations detailing how Cruise AVs would frequently fail in the middle of traffic, block emergency vehicles, require physical retrieval, and stall out on roads allow the Court to reasonably infer that the AVs did not drive to a "stable, stopped condition" designed to "reduce the risk of a crash" despite being required to do so in the situations alleged. *Id.* at 705, 710; *see also* ¶ 106 (whistleblower's allegations that Cruise AVs were regularly "stranded" in traffic lanes, indicating that "fallback systems have . . . failed" and would require employees to remotely control the AVs or physically move them out of lanes).

Without addressing these reasonable inferences, defendants assert that these situations "reflect the DDT fallback *precisely* as Level 4 contemplates." ECF No. 42, PageID.2413. But under the Taxonomy, DDT fallbacks take different forms in different circumstances—achieving a minimal risk condition "may entail automatically bringing the vehicle to a stop within its current travel path, or it may entail a more extensive

maneuver . . . ." ECF No. 31-6 at PageID.710. Whether the AVs properly performed DDT fallbacks in the situations alleged constitute fact issues that cannot be resolved at this stage. Because the complaint allows a reasonable inference that the AVs frequently did not execute proper DDT fallbacks, it plausibly alleges that Cruise AVs did not meet a core requirement of Level 4 autonomy.

Another core requirement of a Level 4 system mandates that when engaged, the AV system will perform "the entire DDT within its [operational design domain]." ECF No. 31-6, PageID.724. As plaintiffs argue, and defendants do not dispute, if a remote operator performs any part of the DDT, such as perceiving road conditions, steering, breaking, signaling, or deciding how to maneuver while an AV is operating within the circumstances in which it can supposedly drive autonomously (that is, its "operational design domain"), the AV cannot be classified as a Level 4 AV under the Taxonomy. *Id.* at PageID.726-27. Allegations that Cruise's remote operators took over DDTs 2-4% of the time by manually directing AVs to reverse, make U-turns, or take other actions and that the AVs "need[ed]" this assistance plausibly show that the AVs did not meet the core requirement of Level 4 autonomy that the AV system perform "the

entire DDT within its [operational design domain]." *See* ¶¶ 119, 175; ECF
No. 31-6, PageID.724.

In sum, the complaint plausibly alleges that contrary to defendants'
"Level 4" statements, Cruise AVs did not meet the Taxonomy's
requirements for Level 4 autonomy because they did not or frequently did
not properly execute a DDT fallback when required to do so in various
situations and because they relied on remote operators who took over
DDTs 2-4% of the time by manually directing AV driving. Accordingly,
plaintiffs adequately plead falsity with respect to their claims based on
defendants' "Level 4" statements.

### c.    Safety-Comparison Statements

Plaintiffs claim that statements that Cruise AVs were "safer than a
human driver" were false. ¶¶ 266, 268, 354.10. Defendants argue that the
complaint does not plead the falsity of these statements because it pleads
no facts about the safety of human drivers to allow a comparison between
the safety of a Cruise AV and a human-driven vehicle. Plaintiffs contend
that they need not plead such facts. According to plaintiffs, because "safer
than a human driver" conveyed that Cruise AVs drove more safely than
human drivers based on both "safe driving behavior" and "safe driving
results," and because the complaint alleges that Cruise AVs frequently

drove erratically, the complaint adequately pleads the falsity of the safety-comparison statements.

Even if the Court assumed that "safer than a human driver" meant that Cruise AVs drove more safely than human drivers based on both "safe driving behavior" and "safe driving results," the complaint contains no allegations allowing a comparison of the driving behavior and driving results between Cruise AVs and human drivers. Although the complaint provides details about how Cruise AVs tend to drive "erratically," it is entirely plausible that human drivers drive just as erratically in the same or different ways. For example, plaintiffs allege that Cruise AVs had difficulty recognizing children in order to drive with "additional care around children" and statistics show that, if one were to map Cruise's rate of crashes onto the driving public at large, it would result in Cruise AVs hitting children over 27 times per day. ¶¶ 177-78. However, plaintiffs do not allege that human drivers do not have similar difficulties in avoiding children or do not hit children in entirely preventable circumstances due to distracted driving, lack of visibility, or reaction speed, and the Court cannot infer such allegations without more.

Moreover, without comparable allegations about the ways humans have less difficulty avoiding children or the rate at which the human driving

public at large hits children daily, the Court may only speculate from the alleged facts about whether Cruise AVs were safer than human drivers based on driving behavior and results. The Court need not and should not engage in such speculation. *See ViewRay*, 2022 WL 3972478, at *2; *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483 (6th Cir. 2015) (holding falsity not adequately alleged because courts "need not speculate into existence facts which might favor the plaintiffs"); *Lamontagne v. Tesla, Inc.*, 2024 WL 4353010, at *12 (N.D. Cal. 2024) ("[T]hat there were safety issues with the [AVs] does not suggest that it was false or misleading to assert that the technology was safer than regular human driving."). Because plaintiffs fail to sufficiently plead falsity regarding their claims based on the safety-comparison statements, the Court dismisses these claims.

### 2. Scienter

Plaintiffs adequately plead falsity for their claims related to the "Level 4" statements and Ammann's statements that Cruise AVs operated with "the human out of the loop." The Court, therefore, proceeds to analyze scienter as it relates to these statements.

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). The Supreme Court has made clear that "the inference of scienter must be

more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, [and] thus strong in light of other explanations." *Id.* at 324. Therefore, to determine "whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id.* at 323. "A complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference" of nonfraudulent intent. *Id.* at 324.

"[S]cienter can be established by either demonstrating a 'knowing and deliberate intent to manipulate, deceive, or defraud' or 'recklessness.'" *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 812 (6th Cir. 2022) (quoting *Doshi*, 823 F.3d at 1039). "Recklessness is . . . highly unreasonable conduct which is an extreme departure from the standards of ordinary care," where the "danger . . . must at least be so obvious that any reasonable man would have known of it." *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011) (internal citations and quotation marks omitted). It requires something more than negligence and is "akin to conscious disregard," and "typically require[s] multiple, obvious red flags, demonstrating an egregious refusal to see the obvious, or to investigate the doubtful." *Doshi*, 823 F. 3d at 1039 (internal citations and quotation marks omitted).

Corporate scienter may be imputed from the state of mind of "[a]ny high managerial agent . . . who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance." *Omnicare*, 769 F.3d at 476-77 (stating corporate scienter may also be imputed from "the individual agent who uttered or issued the misrepresentation" and "[a]ny individual agent who authorized, requested, commanded, furnished information for, prepared . . . reviewed, or approved the statement in which the misrepresentation was made before its utterance or issuance").

In determining scienter, courts consider "all the allegations holistically." *Tellabs*, 551 U.S. at 322-23, 326 ("The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."). The Sixth Circuit has made clear that "the only appropriate approach following *Tellabs*'s mandate to review scienter pleadings based on the collective view of the facts . . ." is to "address[] the allegations collectively, [do] so quickly, and, importantly, not parse out the allegations for individual analysis." *Frank*, 646 F.3d at 961. "[R]eviewing each allegation individually . . . risks losing the forest for the trees" and, under *Tellabs,* "is an unnecessary inefficiency." *Id.*

Courts, however, must "analyze scienter on a defendant-by-defendant basis." *Astec*, 29 F.4th at 813. To facilitate that analysis, courts may "consult a non-exhaustive list of considerations known as the *Helwig* factors."[4] *ServiceMaster*, 83 F.4th at 526; *but see Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 469 (6th Cir. 2011) (eschewing "*Helwig*'s checklist approach in favor of [an] entirely collective assessment" that does not sort through each allegation); *see also Frank*, 646 F.3d at 961 (similar).

GM argues that plaintiffs fail to allege that Barra, Jacobson, or Parks, and by extension GM, ever learned that Cruise AVs were not Level 4 or that any GM defendant was aware of and ignored red flags suggesting Cruise AVs were not Level 4. Likewise, according to Cruise, plaintiffs fail to

---

[4] The *Helwig* factors are: "(1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs." *Helwig*, 251 F.3d at 552.

allege that Vogt, West, or Ammann, and by extension Cruise, made their "Level 4" statements with scienter or that Ammann made his statements that Cruise AVs operated with "the human out of the loop" with scienter. The Court analyzes each defendant's scienter in turn.

### a.    GM Defendants

The Court concludes that plaintiffs' allegations, taken collectively, fail to give rise to a cogent and compelling inference that any GM defendant made "Level 4" statements intentionally or recklessly to defraud investors.

The complaint shows that Cruise's AV technology was extremely important to GM in general. *E.g.*, ¶387 (Barra touting Cruise's $30 billion valuation, more than half of GM's approximate market capitalization; Jacobson projecting that "[b]y the end of the decade, Cruise has the potential to deliver $50 billion in annualized revenues" and stating that "Cruise is a key element of GM's growth strategy."). It shows as a result that GM tracked Cruise's AV technology. *See, e.g.*, ¶ 390 (GM president stating "[f]irst of all, everything's monitored. There are no big mysteries on what's happening there [i.e., at Cruise]. . . . '[w]e have a system in place that looks at data every day from our fleet; I don't care what kind of car it is.'").

As to Barra's scienter specifically, plaintiffs point to allegations that she attended Cruise's board meetings and had weekly discussions with Ammann. The complaint shows that Barra, as part of Cruise's board, received "reports quarterly providing insights and updates that were used by Cruise to make multi-year projections"; "updates on the Cruise AV's ability to navigate specific situations as well as more general assessments of how the technology was functioning"; and "details and progress updates on safety, technology, and commercial plans concerning Cruise's AV vehicles." ¶¶ 399, 401. Barra also publicly touted Cruise's valuation, ¶ 387, expressed general opinions such as "Cruise's technology is improving exponentially," *e.g.*, ¶ 419, and made statements about Cruise's permits and AV technology progress, *e.g.*, ¶¶ 298, 302.

However, plaintiffs' general allegations as to GM and specific allegations as to Barra collectively do not permit a reasonable inference that Barra knew or should have known that her "Level 4" statements were false. That she generally paid special attention to Cruise's AV technology due to its importance to GM, attended meetings discussing the technology and its progress, and made statements about the technology's progress does not suggest that she had notice, let alone knowledge, of facts showing Cruise AVs were not Level 4—that is, facts showing that Cruise

AVs were frequently executing DDT fallbacks improperly or that remote operators manually directed the AVs DDTs 2-4% of the time. Nothing shows that Barra personally monitored Cruise's AV data or was otherwise so involved in or attentive to the development of Cruise's AV technology that she knew or should have known facts negating Cruise AVs' Level 4 status. Because the Court would have to engage in speculation to infer that she knew or should have known such facts, the complaint does not permit a cogent or compelling inference of Barra's scienter.

As to Jacobson's scienter specifically, plaintiffs point to a few allegations, showing certain statements regarding the progress of Cruise's AV technology and Jacobson's attention to it. ¶ 348 ("We're full Level 4, no driver in the vehicle at all."; ¶ 387 (projecting that "[b]y the end of the decade, Cruise has the potential to deliver $50 billion in annualized revenues" and stating that "Cruise is a key element of GM's growth strategy"); ¶ 422 (stating Cruise's AV technology "is really strong and it's continuing to improve," "we're all focused on the technology," and "we've got the Level 4 technology"); *see also, e.g.*, ¶ 302 (stating Cruise received permits to operate driverless vehicles).

Taken together, plaintiffs' general allegations as to GM and specific allegations as to Jacobson fail to raise a reasonable inference that

Jacobson knew or should have known that his "Level 4" statements were false. Even if he found Cruise's AV technology to be important to GM, paid special attention to the technology, and generally touted its progress, the complaint does not show that he personally tracked or paid so much attention to the technology that he at least had notice of facts showing that Cruise AVs were frequently executing DDT fallbacks improperly, remote operators manually directed the AVs DDTs 2-4% of the time, or other facts that would preclude Level 4 status. Based on plaintiffs' allegations, the Court cannot reasonably infer that Jacobson made his "Level 4" statements knowing or having notice that they were false.

As to Parks' scienter specifically, plaintiffs point only to allegations that Parks publicly stated the "terrific technology" of Cruise is "moving very, very fast," ¶ 424, and allegations that Parks resigned from GM less than a month after the last alleged corrective disclosure and following the departures of Vogt and West.

Again, a reasonable person would not infer from plaintiffs' general allegations as to GM and few allegations specifically as to Parks that Parks made his "Level 4" statements with the requisite level of scienter. Although Parks may have found Cruise's AV technology important to GM like other GM executives did, the complaint shows that Parks made unspecific

statements about the Level 4 capabilities of Cruise AVs, and plaintiffs do not explain why Parks' resignation is particularly "suspicious." *See ServiceMaster*, 83 F.4th at 531. Because an inference of Parks' scienter would require speculation based on plaintiffs' allegations, plaintiffs fail to plead scienter with respect to Parks.

Plaintiffs argue that GM's scienter is imputed from the purported scienter of Barra, Jacobson, and Parks. Because the Court concludes that Barra, Jacobson, and Parks did not make the "Level 4" statements while knowingly or consciously disregarding their falsity, their lack of scienter precludes GM's scienter.

Because plaintiffs do not adequately plead scienter as to the GM Defendants with respect to these defendants' "Level 4" statements, the Court dismisses the Technology Statement Claims against the GM defendants related to the "Level 4" statements.

### b.    Cruise Defendants

The Court concludes that with respect to Vogt, West, and Cruise by imputation, plaintiffs' allegations collectively give rise to a cogent inference of scienter as least as compelling as any opposing inferences. The Court finds that with respect to Ammann, plaintiffs' allegations fail to raise a cogent inference of scienter.

The complaint shows that Cruise's AV technology was core to Cruise's business and that Cruise and its management meticulously tracked its AV data. *See, e.g.*, ¶ 385 (Vogt stating Cruise paved "a pretty easy path" toward a "multi trillion-dollar TAM"); ¶ 389 (CWs stating that Cruise tracked safety issues in specific databases, conducted "Safety Risk Assessments" which detailed and recorded AV malfunctions and risky driving behavior such as unsafe takeover maneuvers); ¶ 390 (CW-7 stating "management" received reports on test rides). The complaint sets forth detailed CW allegations relating how management would often debate the accuracy of the company's data reports and that "[Vogt] and the C-Suite" regularly reviewed databases to address employees' safety concerns. *See* ¶¶ 390, 392.

According to plaintiffs' CW allegations, there were "many employees" that felt that Cruise's AV technology was "unsafe and rushed" and that there was general pressure from "Cruise leadership" to downplay those concerns and withhold damaging safety information from regulators. ¶¶ 404, 415-18. One CW alleged that fleets of Cruise AVs were being grounded with a high frequency. *Id.* This CW detailed in a whistleblower email that Cruise concealed investigations into vehicle collisions, ¶ 107, and that the AVs were "with regularity" getting "stranded" and "blocking

traffic," requiring either remote control or physical retrieval. ¶¶ 106-08. Other CW allegations show that the deficiencies in Cruise's AV technology were widely known throughout the company. ¶¶ 403-16. For example, CW-2 remarked that Fleet Service Representatives retrieved and drove malfunctioning vehicles "almost every night" and that the Systems Engineering Team "always expressed grief" about Cruise deploying AVs or "scaling [its AV operations] recklessly" but that such concerns were ignored. ¶ 405.

As to Vogt's scienter specifically, plaintiffs point to allegations showing that Vogt was deeply involved in and intimately knew about Cruise's AV technology and operations. *E.g.*, ¶¶ 398, 420 (Vogt affirming his knowledge of "every inch of [the AVs] progress," assuring investors of the technology's "maturity"). Vogt regularly reviewed and addressed employees' safety concerns and managed "extreme" risks related to Safety Risk Assessments detailed and recorded in Cruise's safety database. ¶¶ 389, 394. Vogt was also briefed on all high and extreme safety risk assessments and regularly received a variety of reports about the state and progress of Cruise's AV technology, including monthly reports showing how often remote operators intervened in AV operation and other operations statistics. ¶¶ 395-96, 400-401.

Vogt knew about most incidents of Cruise AVs malfunctioning. He kept informed about when employees would retrieve and drive malfunctioning vehicles, receiving a call about every such incident "almost every night," according to CW allegations. ¶¶ 404-05, 408. Vogt further admitted a few weeks after the October 2 Crash that Cruise "intentionally" employed a large staff of remote operators, who "remotely assisted (RA) [the AVs] 2-4% of the time in driverless mode." ¶¶ 173-75. Caving in to Cruise's post-Accident problems, Vogt acknowledged on November 18, 2023 his responsibility for Cruise's problems, stating, "we have veered off course under my leadership" and "[a]s CEO I take responsibility for the situation Cruise is in" before resigning the very next day. ¶ 429.

Based on plaintiffs' general allegations about Cruise and specific allegations about Vogt, a reasonable person could infer that Vogt made his "Level 4" statements while at least recklessly disregarding the statements' falsity. The allegations provide a picture of Vogt as manager who knew "every inch" of Cruise's AV technology progress, keeping apprised in multiple ways of specific details regarding the nature and extent of Cruise AV remote assistance, failures and malfunctions, and risky driving behavior. The allegations collectively and cogently show that he directed Cruise "off course"—by either ignoring or refusing to acknowledge

numerous signs that Cruise AVs frequently both relied on remote operator intervention and executed improper DDT fallbacks, while attempting to minimize his employees' and the media's concerns about these deficiencies and to protect from scrutiny a technology that was key to both Cruise and GM. It would be naïve to believe, as defendants ask the Court to do, that despite having incentives to rush Cruise's AV technology and ample notice of facts showing that Cruise AVs were not Level 4 in the ways alleged, Vogt stated they were Level 4 out of mere optimism in a fast-moving industry. Based on plaintiffs' allegations as a whole, the more compelling inference is that Vogt at least consciously disregarded the falsity of his "Level 4" statements.

As to West's scienter specifically, plaintiffs point to allegations showing that West was also deeply involved in and intimately knew about Cruise's AV technology and operations. *E.g.*, ¶ 423 (Jacobson touting West as "a very strong operationally minded individual" who "focus[ed] on reliability" and "optimizing resources"). Like Vogt, the complaint shows that West regularly reviewed and addressed employees' safety concerns and managed "high" risks related to detailed Safety Risk Assessments cataloged in Cruise's safety database. ¶¶ 392, 389, 394. And like Vogt, the allegations show West was briefed on all high and extreme safety risk

assessments and regularly received reports about the state and progress of Cruise's AV technology, including monthly operations reports conveying statistics specifically about remote operator intervention. ¶¶ 395-96, 400-01. After the alleged corrective disclosures revealed Cruise's AV technology deficiencies, West resigned from his position as Cruise's COO due to his involvement in the October 2 Crash and Cruise's response to the incident. ¶ 428.

Considering plaintiffs' allegations holistically, a reasonable person could infer that West at least recklessly disregarded the falsity of his "Level 4" statements. As Cruise's COO who paid particular attention to Cruise's operations, including AV reliability, and who managed and received detailed information through various means about the frequent alleged failures, malfunctions, and risky driving behavior of Cruise AVs, West likely had deep knowledge or at least ample notice about how Cruise AVs were allegedly executing improper DDT fallbacks and relied on remote operator intervention. Given this, his work with Vogt to address widespread internal concerns about the AVs' unsafe driving, and his departure from Cruise as a direct result of his involvement in the October 2 Crash and Cruise's response to it, it is reasonable to infer that West at least recklessly disregarded the falsity of his "Level 4" statements. Although the complaint

does not show as much specific engagement with Cruise's AV technology deficiencies by West as it does by Vogt, the inference of West's conscious disregard for the falsity of his statements is at least as compelling as defendants' proposed inference that West merely spoke optimistically about Cruise's AV technology despite industry risks.

Defendants argue that *Lamontagne v. Tesla, Inc.* shows why the complaint here fails to establish scienter, but that case is distinguishable. 2024 WL 4353010 (N.D. Cal. Sept. 30, 2024). In *Lamontagne*, the court held that a complaint did not provide a strong inference of scienter behind Tesla CEO Elon Musk's representations that Tesla vehicles were capable of driving without operator intervention. Critically, the court found that there were no "allegations describing with particularity the documents to which Musk had access or the documents he received indicating that the software was not capable of no-intervention drives . . . ." *Id.* at *16. But here, the allegations show that Vogt and West had access to Safety Risk Assessments, which identified safety risks, concerns, and hazards from Cruise AVs driving; a database called "Slido," which similarly contained employees' concerns about Cruise AVs driving; and monthly "MPR report[s]" providing details and statistics about remote operator intervention. *See* ¶¶ 389, 392, 394-96. Moreover, the allegations show that

Vogt and West personally managed or were briefed on issues relating to the most concerning Safety Risk Assessments, which, given the alleged frequency and nature of the AVs' malfunctions, should have at least indicated that Cruise's AV technology was improperly executing DDT fallbacks, and thus was not Level 4. *See* ¶¶ 394-95.

As to Ammann's scienter specifically, plaintiffs point to few allegations. These allegations show that Ammann had weekly conversations with Barra about the progress of Cruise's AV technology and "detailed the three phases' of Cruise's development." ¶ 421 (describing Ammann's presentation to investors regarding Cruise's "R&D phase" and approach to achieving fully autonomous AVs).

Plaintiffs' general allegations about Cruise and specific allegations about Ammann do not cogently permit a reasonable and compelling inference of scienter. The allegations do not suggest that Ammann had the same level of access and engagement with specific data and facts about (1) Cruise AVs failing, malfunctioning, and driving unsafely in the ways alleged such that he at least had notice that his "Level 4" statements were false, or (2) Cruise AVs relying on remote operator intervention such that he should have known his statements that Cruise AVs operated without a human in the loop were false. At best, the allegations suggest that early in

the Class Period, Ammann knew enough about the state of Cruise's AV technology to report its progress to GM executives and investors and to address employee safety concerns. However, without any allegations linking his individual activities to sources of the facts showing Cruise AVs were not Level 4 in the ways alleged or relied on remote operators, the Court cannot cogently infer a compelling inference that Ammann made his "Level 4" statements or statements that Cruise AVs operated without a human in the loop with scienter.

In sum, the Court finds that plaintiffs' allegations permit cogent inferences of scienter as to Vogt and West related to their "Level 4" statements but not as to Ammann related to his "Level 4" statements and statements that Cruise AVs operated without a human in the loop. The inferences of scienter as to Vogt and West related to their "Level 4" statements are at least as compelling as defendants' proposed corporate optimism inference. Because the Court finds that plaintiffs adequately allege scienter as to Vogt and West and these two were undisputedly "high managerial agent[s]" of Cruise, scienter is imputed onto Cruise. *Omnicare*, 769 F.3d at 476. Because plaintiffs fail to adequately plead scienter as to Ammann with respect to his Level 4 statements and statements that Cruise AVs operated without a human in the loop, the Court dismisses plaintiffs'

claims with respect to Ammann's "Level 4" statements and statements that
Cruise AVs operated without a human in the loop.

### 3.    Loss Causation

Plaintiffs adequately plead scienter for their claims against Vogt,
West, and Cruise related to these defendants' "Level 4" statements. The
Court thus proceeds to analyze loss causation for these claims.

To state a securities fraud claim, plaintiffs must plausibly allege "loss
causation"—that the alleged misstatements "caused" plaintiffs' losses.
"Loss causation is the causal link between the alleged misconduct and the
economic harm ultimately suffered by the plaintiff." *Ohio Pub. Emples. Ret.
Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016).
Loss causation can be shown by pleading a corrective disclosure, *i.e.*,
statements revealing what the defendants themselves previously
concealed. *In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d 740, 771
(N.D. Ohio 2020) (citing *Norfolk Cty. Ret. Sys. v. Cmty. Health Sys.*, 877
F.3d 687, 695 (6th Cir. 2017)). Such "revelations can come from many
sources, including whistleblowers, analysts, and newspaper reports," and
they "need not come all at once but can come in a series of partial
disclosures." *Id.*

A corrective disclosure need not be the "mirror image" of a misstatement, as the "relevant truth" revealed must be about "the underlying circumstances that [were] concealed" rather than an admission of fraud. *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)). However, for the revelations to cause plaintiffs' losses, "the information must in a practical sense be new; otherwise the market will have processed and reacted to that information already." *TransDigm Group*, 440 F. Supp. 3d at 771.

Here, plaintiffs plausibly allege loss causation resulting from corrective disclosures relevant to the "Level 4" statements. Plaintiffs first point to an October 24, 2023 blog post by Cruise allegedly disclosing, for the first time, that the Cruise AV involved in the October 2 Crash collided with the pedestrian and "then attempted to pull over to avoid causing further road safety issues, pulling the individual forward approximately 20 feet." ¶ 368. Although GM's stock price fell the next day and this news allegedly revealed the failed execution of a DDT fallback, plaintiffs allege that the news did not reveal the full misleading nature of defendants' misstatements because the blog post minimized the implications of the

October 2 Crash by saying such incidents were "extremely rare" and touting Cruise's safety record. ¶ 370.

According to plaintiffs, a November 8, 2023 recall and Cruise blog post about the recall revealed the full truth about Cruise's AV technology deficiencies. That day, Cruise recalled its entire fleet of driverless cars to "remedy" a "[d]efect" that posed a "[s]afety [r]isk" and concluded that this defect "played a role" in the October 2 Crash. ¶ 378. In the blog post, Cruise revealed that before the recall, "a similar collision with a risk of serious injury could have recurred every 10 million - 100 million miles of driving on average,"—that is, the defect would have resulted in a collision like the October 2 Crash between 82 to 820 times per day. ¶ 379. This permits a reasonable inference that Cruise AVs would have frequently failed to execute DDT fallbacks properly, precluding Level 4 status. The blog post further revealed that Cruise hired an engineering firm to "perform[] a technical root cause analysis" of the October 2 Crash and was overhauling internal processes relating to safety and transparency. This further confirms the extent of Cruise's AV technology deficiencies.

Because GM's stock price fell nearly 3% that same day and the media connected the price drop to these revelations, plaintiffs adequately

plead loss causation with respect to their claims against Vogt, West, and Cruise related to these defendants' "Level 4" statements.

### B. Accident Statement Claims

Plaintiffs' claims relating to the Accident Statements are based on the following statements: 1) a video that Vogt allegedly disseminated in the media, showing the October 2 Crash but ending before showing the "pullover maneuver" that dragged the pedestrian; 2) talking points that Cruise, at Vogt's direction, disseminated to media outlets, stating that the AV came to a complete stop immediately after impacting the pedestrian without referencing the pullover maneuver or pedestrian dragging; and 3) a quote made by Cruise's communications manager, stating that after the impact, "[t]he AV then braked aggressively to minimize the impact. The driver of the other vehicle fled the scene, and at the request of the police the AV was kept in place." ¶¶ 363-64.

As a preliminary matter, the Cruise Defendants argue that the Accident Statement Claims should be dismissed as to each of them, yet plaintiffs respond with arguments only as to Vogt, Cruise, and GM. Because plaintiffs concede their Accident Statement Claims as to the remaining Cruise Defendants, West and Ammann, the Court dismisses these claims as to these defendants. Further, based on plaintiffs'

representations at oral argument, the Court also dismisses the Accident Statement Claims as to the GM Defendants because those claims relate to alleged misstatements made only by the Cruise Defendants. *See supra* note 2; *but see* ECF No. 52, PageID.3187 (maintaining alleged control-person liability under Section 20(a) as to Barra based on Accident Statements).

The parties dispute scienter, the connection between the alleged misstatements and GM stock trading, and loss causation relating to the Accident Statement Claims against Vogt and Cruise. The Court analyzes each element in turn.

### 1.    Scienter

The Cruise Defendants argue that plaintiffs fail to allege a strong inference of scienter as to Vogt and Cruise with respect to the Accident Statements. Plaintiffs argue that when considered holistically, defendants' acceptance of the Quinn Report's findings, along with other allegations, show that Vogt and Cruise issued the Accident Statements with scienter. The Court agrees.

According to the Quinn Report, Vogt expressed in the early morning hours of October 3, 2023 that he "personally wanted to see and authorize the final cut of any video or media statement" disseminated to the media

and that 'nothing would be shared or done' . . . without his sign off." ¶ 224. The report concluded that after Vogt and other Cruise executives learned about the pedestrian dragging, he and these executives decided that Cruise should stick to its story omitting the pullover maneuver. ¶¶ 227-30. As plaintiffs allege, despite Vogt's and Cruise's knowledge, Cruise deliberately omitted the pedestrian dragging from the Accident Statements it disseminated to the media throughout October 3, 2023.

Although Cruise disclosed the truth about the October 2 Crash to certain regulators, Cruise withheld the full video of the Accident from others, including additional key regulators. *E.g.*, ¶¶ 240-41, 371-72, 349. Cruise only publicly disclosed the truth about the October 2 Crash when the DMV suspended Cruise's permit on October 24, 2023. ¶ 238. Plaintiffs allege that Vogt resigned from Cruise soon after the final alleged corrective disclosure and after he had acknowledged his responsibility for causing Cruise's problems, which included multiple government investigations accusing or suspecting Cruise of misconduct. ¶¶ 200, 257, 429.

When viewed holistically, the complaint permits a reasonable inference that Vogt, and Cruise by extension, issued the Accident Statements with scienter. That Vogt said that he "personally wanted to see and authorize the final cut of any video or media statement" and that

"nothing would be shared or done . . . without his sign off" plausibly shows that he directed the issuance of the undisputedly misleading Accident Statements despite already knowing about the pedestrian dragging.

As the Cruise Defendants argue, the Court could draw a nonculpable inference that Vogt and Cruise issued the Accident Statements merely because they wanted to focus on investigating the October 2 Crash and communicating with regulators. But this inference is not particularly compelling. Even if Vogt and Cruise wanted to focus on their investigation and communications with regulators, nothing suggests that they would have chosen to eventually disclose the pedestrian dragging to the public. And the Court sees no legitimate reason for them to continue disseminating the Accident Statements with knowledge of the statements' misleading nature or to withhold information about the pedestrian dragging from certain regulators.

To the extent that the Cruise Defendants proposed nonculpable inference is compelling, there is an at least as compelling inference of scienter—that Vogt and Cruise issued the Accident Statements to cover up the truth of the October 2 Crash and its implications for the core of Cruise's business and GM's growth. Accordingly, plaintiffs adequately plead scienter for their claims against Vogt and Cruise related to the Accident Statements.

### 2.      Connection with GM Stock Trading

The Cruise Defendants argue that the Accident Statements were not made in connection with the purchase or sale of securities. To satisfy this element, plaintiffs must allege that the misrepresentations or scheme were made in a manner "reasonably calculated to influence the investing public." *SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir. 1968).

Where, as here, a claim is based on the "fraud-on-the-market theory," "it is sufficient that statements which manipulate the market are connected to resultant stock trading." *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1250-51 (N.D. Ga. 2019); *In re Carter-Wallace, Inc.*, 150 F.3d 153, 156 (2d Cir. 1998) ("[When] a claim is based on the fraud-on-the-market theory, a 'straightforward cause and effect' test is applied.").

Here, the complaint shows that the Accident Statements were connected to GM stock trading because they were made through widely-read media outlets and because investment analysts would have considered such statements, which cut to the core of Cruise's business and GM's growth strategy, in valuing GM. *See* ¶¶ 80, 373, 357-61, 387; *see Basic Inc. v. Levinson*, 485 U.S. 224, 247 n.24 (1988) ("[M]arket professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.").

Page **53** of **62**

Contrary to the Cruise Defendants' argument, the fact that these statements did not relate to GM stock or were not made by GM does not preclude the Accident Statements' "connect[ion] to resultant [GM] stock trading." *Equifax*, 357 F. Supp. 3d at 1251; *see Carter-Wallace*, 150 F.3d at 156 (holding as "irrelevant" that technical information about products were found in medical journals "so long as the journals are used by analysts studying the prospects of drug companies"). Accordingly, plaintiffs adequately plead a connection between the Accident Statements and GM stock trading.

### 3.    Loss Causation

The Cruise Defendants argue that plaintiffs fail to allege loss causation as to the Accident Statements because details about the October 2 Crash had already been revealed weeks prior in an October 6, 2023 *Forbes* article. The Court disagrees.

The Accident Statements conveyed that the Cruise AV came to a complete stop without disclosing that the Cruise AV then resumed driving and dragged the pedestrian for about 20 feet. The October 6, 2023 *Forbes* article reported a local politician's allegation that the Cruise AV "dragged" the pedestrian and conveyed that "[w]hen *Forbes* asked Cruise to specifically respond to [the] allegation . . . the company said that it had

nothing further to add. [According to Cruise] 'We have shared all pertinent information with regulators and investigators . . . .'" ECF No. 32-16, PageID.2064. Drawing reasonable inferences in plaintiffs' favor, the Court finds that Cruise gave no information revealing the pedestrian dragging. The complaint shows that Cruise did not reveal the truth about the October 2 Crash until the first alleged corrective disclosure, an October 24, 2023 blog post where Cruise disclosed the pedestrian dragging. Accordingly, plaintiffs adequately allege loss causation with respect to the Accident Statements.

### C.    Scheme Liability Claims

Defendants argue that plaintiffs fail to plead their Section 10(b) claims for scheme liability. Rule 10b-5 prohibits any person from "employ[ing] any device, scheme, or artifice to defraud" or "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(a), (c). Critically, "Rules 10b-5(a) and (c) encompass conduct beyond disclosure violations." *Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 610 (6th Cir. 2005).

"To state a scheme liability claim, a plaintiff must show: '(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of

the alleged scheme to defraud, (3) with scienter, and (4) reliance.'"
*ServiceMaster*, 83 F.4th at 525 (quoting *Plumber & Steamfitters Local 773
Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021)).
Essentially, the elements of a scheme liability claim under Section 10(b)
and Rules 10b-5(a) and (c) are the same as a misrepresentation or
omission claim, except that "a deceptive or manipulative act in furtherance
of the alleged scheme" substitutes for a material misrepresentation or
omission. *In re Galena Biopharma, Inc. Secs. Litig.*, 117 F. Supp. 3d 1145,
1192 (D. Or. 2015). An actionable scheme liability claim, therefore,
"requires something *beyond* misstatements and omissions." *SEC v. Rio
Tinto*, 41 F.4th 47, 49 (2d Cir. 2022) (emphasis in original); *see also
ServiceMaster*, 83 F.4th at 525 (stating scheme liability covers "conduct
beyond disclosure violations").

Here, plaintiffs allege that defendants' employed schemes by (1)
making "public representations" about Cruise's AV technology and the
October 2 Crash and (2) "disseminating" the Accident Statements to media
outlets. ¶ 467; *see* ¶¶ 4, 356-64 (alleging scheme based on making and
sharing Accident Statements). Defendants argue that the alleged schemes
involve nothing beyond misstatements and are thus inactionable. Plaintiffs
do not dispute this— instead, they merely assert, in a footnote and without

Page **56** of **62**

further explanation, that their scheme liability claims "should be sustained along with the misstatement claims" because "subsections of Rule 10b-5 govern overlapping conduct." ECF No. 39, PageID.2365. Because plaintiffs do not respond to defendants' arguments or explain on what conduct their scheme liability claims rest, plaintiffs waive any counterargument on the issue. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

Moreover, defendants are correct that the alleged schemes involve nothing more than misstatements. Making "public representations" plainly amounts to nothing beyond misstatements, precluding scheme liability. ¶ 476; *see Rio Tinto*, 41 F.4th at 49; *ServiceMaster*, 83 F.4th at 525. Likewise, plaintiffs' allegations that Cruise disseminated the Accident Statements by sharing them to media outlets, which then chose to republish the statements, essentially seeks to hold the Cruise Defendants liable for their own alleged misstatements. *See* ¶ 4, 356-64. Plaintiffs do not allege any conduct beyond those misstatements, such as specific directions from Cruise to media outlets to republish the Accident Statements. Where, as here, scheme liability is asserted based on making public statements published by third parties, courts have held that there is no actionable scheme. *See, e.g.*, *Kang v. PayPal Holdings Inc.*, 620 F. Supp. 3d 884, 902 (N.D. Cal. 2022) (dismissing scheme liability claim

based on "media campaign" as "consist[ing] entirely of . . . misstatements");

*La. Mun. Police Emples. Ret. Sys. v. KPMG, LLC*, 2012 WL 3903335, at *4

(N.D. Ohio Aug. 31, 2012) (same where a defendant allegedly made false

statements to a third party who then published them). The scheme liability

claims may be dismissed on this basis as well.

### D.    Section 20(a) Claims

Plaintiffs assert Section 20(a) claims against Barra, Jacobson, and

Parks as control persons of GM and Cruise and against Vogt, West, and

Ammann as control persons of Cruise. Defendants argue that these claims

fail because plaintiffs do not adequately allege a predicate Section 10(b)

and Rule 10b-5 violation as required for control-person liability. *See Doshi*,

823 F.3d at 1045. But plaintiffs do adequately allege predicate violations

because, as the Court concluded above, some of the Technology

Statement and Accident Statement Claims remain. *See, e.g.*, *supra* Section

III.A (Technology Statement Claims based commercialization statements

remain against all defendants, including GM and Cruise); Section III.B

(Accident Statement Claims remain against Cruise and Vogt).  Accordingly,

the Section 20(a) claims do not fail on this basis.

However, defendants alternatively seek to narrow the Section 20(a)

claims. First, the GM Defendants argue that plaintiffs fail to adequately

plead the Section 20(a) claims against Barra, Jacobson, and Parks as control persons of Cruise in particular because plaintiffs do not allege "(1) that [Barra, Jacobson, or Parks] actually participated in (i.e., exercised control over) the operations of [Cruise] in general and (2) that [Barra, Jacobson, or Parks] possessed the power to control the transaction or activity upon which the primary violation is predicated," as required to state a Section 20(a) claim under *Sanders Confectionary Products, Inc. v. Heller Financial Inc.*, 973 F.2d 474, 486 (6th Cir. 1992). In response, plaintiffs argue that "Barra was not only a Board member of Cruise, but she, Jacobson, and Parks were high-ranking executives at GM, which controlled Cruise." ECF No. 39, PageID.2352.

Plaintiffs provide no authority or further explanation, let alone show that Barra, Jacobson, or Parks actually participated in Cruise's operations or had the power to control Cruise's alleged misstatements. And although Barra was chair of Cruise's board of directors, "[a] director of a corporation is not automatically liable as a controlling person." *Herm v. Stafford*, 663 F.2d 669, 684 (6th Cir. 1981). The Court, thus, dismisses the Section 20(a) claims against Barra, Jacobson, and Parks as control persons of Cruise. But, as discussed, the Section 20(a) claims against these defendants as control persons of GM remain, as the GM Defendants do not dispute that

Barra, Jacobson, and Parks would be liable as control persons of GM based on GM's alleged misstatements regarding commercialization.

Second, the Cruise Defendants argue that plaintiffs fail to adequately plead a Section 20(a) claim against Ammann because Ammann "left Cruise in December 2021, before most of the alleged misstatements were made." ECF No. 32, PageID.1334. The Cruise Defendants provide no further explanation or authority to support their argument.

This argument fails because while Ammann was still serving as Cruise's CEO, he made Technology Statements on which certain remaining Technology Statement Claims are based. For example, Ammann made some of the commercialization statements as CEO of Cruise, *see, e.g.,* ¶ 286 ("So we're in the middle of this early commercialization phase."), and the Technology Statement Claims based on these commercialization statements remain. Because some alleged misstatements were made while Ammann was a control person of Cruise, the Court denies Cruise's request to dismiss Ammann from the Section 20(a) claim against him.

## IV.    Conclusion

For the reasons above, the Court **GRANTS IN PART** and **DENIES IN PART** defendants' motions to dismiss (ECF Nos. 31, 32).

The Court **GRANTS** the motions to the extent that it **DISMISSES** the following claims: the Technology Statement Claims against Cruise based on any alleged misstatements made by GM; the Technology Statement Claims against the GM Defendants and Ammann based on all Technology Statements except for the commercialization statements; the Technology Statement Claims against Cruise, Vogt, and West based on all Technology Statements except for the commercialization statements, the "Level 4" statements, and the permit statements; the Accident Statement Claims against West, Ammann, and the GM Defendants; the scheme liability claims against all defendants; and the Section 20(a) claims against Barra, Jacobson, and Parks as control persons of Cruise.

The Court **DENIES** the motions in all other respects, and the following claims remain: the Technology Statement Claims against all defendants based on the commercialization statements; the Technology Statement Claims against Cruise, Vogt, and West based on the "Level 4" and permit statements; the Accident Statement Claims against Cruise and Vogt; and the Section 20(a) claims against Barra, Jacobson, and Parks as control persons of GM and Vogt, West, and Ammann as control persons of Cruise.

**IT IS SO ORDERED.**

Page **61** of **62**

s/ Shalina D. Kumar
SHALINA D. KUMAR
Dated: March 28, 2025                    United States District Judge