## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| IN RE GENERAL MOTORS COMPANY SECURITIES LITIGATION | Case No. 4:23-cv-13132-SDK-EAS<br><br>District Judge Shalina D. Kumar<br><br>Magistrate Judge Elizabeth A. Stafford |

## CRUISE DEFENDANTS' ANSWER TO PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Defendants Cruise, LLC ("Cruise" or the "Company"), Kyle Vogt ("Mr. Vogt"), Wayne West ("Mr. West"), and Daniel Ammann ("Mr. Ammann") (together, the "Cruise Defendants") hereby answer and respond to the allegations contained in the Amended Consolidated Class Action Complaint (the "Complaint"). All responses in this Answer are made as of the date of this filing. The Cruise Defendants reserve the right to amend any responses in this Answer.

## GENERAL DENIALS

Except as otherwise expressly admitted herein, the Cruise Defendants deny each and every allegation in the Complaint, including without limitation any allegations contained in headings, subheadings, footnotes, unnumbered paragraphs, tables of contents, exhibits, appendices, or documents incorporated by reference in the Complaint. On behalf of the Company, no denial or response in this Answer is

1

intended to contradict the acceptance of responsibility or a statement contained in the "Statement of Facts" in the November 15, 2024 deferred prosecution agreement between Cruise and the U.S. Attorneys' Office for the Northern District of California (the "DPA").

The Court dismissed General Motors Company ("GM"), Mary Barra, Paul Jacobson, and Douglas Parks (together with GM, the former "GM Defendants") from this case entirely in its February 11, 2026 order granting the GM Defendants' Motion for Clarification and/or Reconsideration. The Court has also dismissed claims against the Cruise Defendants with respect to several purported misstatements and schemes ("Dismissed Claims"), as set forth in the Court's March 28, 2025 order granting in part the Cruise Defendants' Motion to Dismiss and the GM Defendants' Motion to Dismiss. No response is required to allegations related to Dismissed Claims. To the extent a response is made to allegations related to Dismissed Claims, including without identifying allegations as forming the basis of Dismissed Claims, it is without waiver of any defenses thereto, including on the basis of the Court's prior dismissal of those claims.

To the extent that Plaintiffs purport to characterize, paraphrase, and/or quote selectively and out of context the statement(s) of any Defendant, the full and complete statement(s) speak for themselves and the Cruise Defendants otherwise deny the allegations.

2

## ANSWER TO SPECIFIC ALLEGATIONS

The Complaint contains two unnumbered introductory paragraphs containing prefatory language to which no response is required. To the extent a response is required, the Cruise Defendants (i) admit that Court-appointed Lead Plaintiff City of Hollywood Police Officers' Retirement System ("Hollywood") and additional named plaintiff Plymouth County Retirement Association ("Plymouth," and together with Hollywood, "Plaintiffs") filed the Complaint and purport to make the allegations therein; and (ii) lack sufficient knowledge or information to form a belief about the truth or falsity of the statements concerning Plaintiffs' knowledge, information, and belief or the basis thereof. The Cruise Defendants otherwise deny the allegations in the two unnumbered introductory paragraphs.

## I.    INTRODUCTION

1.    Cruise is GM's global business segment responsible for the development and commercialization of autonomous vehicle ("AV") technology. Cruise purportedly aims to develop fully autonomous driving technology for use in a lucrative fleet of driverless robotaxis, driverless delivery services, and eventually in personal self-driving vehicles sold by GM.

**ANSWER:** The Cruise Defendants admit that (i) Cruise currently is a wholly-owned subsidiary of GM that works with GM on autonomous vehicle ("AV") technology and advanced driver assistance systems ("ADAS") for personal vehicles; and (ii) in February 2025, GM began to wind down the Cruise robotaxi operations and combined the GM and Cruise ongoing personal autonomous technical efforts in

3

its GM North America Automotive segment.  The Cruise Defendants otherwise deny the allegations in Paragraph 1.

2.    Throughout the Class Period, Defendants repeatedly touted the capabilities and safety of Cruise's AV technology. Unbeknownst to investors, Cruise's AV technology was nowhere near as advanced as Defendants claimed. Cruise's fraud unraveled in the aftermath of a crash where one of its AVs struck and then dragged a pedestrian. Following this incident, Defendants doubled down to further hide the truth by misleading the public about the circumstances of the crash.

**ANSWER:** The Cruise Defendants deny the allegations in Paragraph 2.

3.    On October 2, 2023, at approximately 9:30 PM PT, a human-driven Nissan vehicle struck a pedestrian in San Francisco, California, launching the pedestrian into the pathway of a Cruise AV traveling in autonomous mode without a passenger in the adjacent lane. The Cruise AV then hit the pedestrian and came to an initial stop, pinning the pedestrian beneath it. While the Cruise AV's camera could see the pedestrian, the car began driving again with the pedestrian underneath—dragging them approximately 20 feet and causing serious injuries (the "October 2 Crash" or "Crash").

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to the "The October 2, 2023 Accident" section under the "Statement of Facts" in the DPA for a description of the October 2, 2023 accident (the "Accident").  The allegations in Paragraph 3 form the basis for Dismissed Claims against Mr. Ammann.  Accordingly, no response is required from Mr. Ammann.  To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 3 and denies the allegations in Paragraph 3 on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 3.

4

4. Within hours of the Crash, high-ranking Cruise executives, including Cruise's then-Chief Executive Officer ("CEO") and Chief Technology Officer ("CTO") Kyle Vogt, became aware of these details. Defendants, however, made the conscious decision to launch a scheme to misrepresent the circumstances of the Crash to the public by hiding the fact that the Cruise AV continued to drive after the initial impact, slowly dragging the pedestrian. This scheme included: (i) disseminating to the media incomplete and misleading video footage of the Crash that cut away after impact and just before the Cruise AV began dragging the pedestrian across the pavement; and (ii) disseminating misleading statements to media outlets (which were then published or described by those outlets) that the Cruise AV came to a complete or immediate stop without noting that the Cruise AV subsequently resumed driving while dragging the pedestrian.

**ANSWER:** Cruise, Mr. West, and Mr. Vogt deny the allegations in Paragraph 4. The allegations in Paragraph 4 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 4 and denies the allegations in Paragraph 4 on that basis.

5. These facts are not in dispute; indeed, Cruise has admitted to them. After the Class Period, Cruise released a report by the law firm Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") that investigated the October 2 Crash (the "Quinn Report"). When it released the Quinn Report, Cruise stated that it "accepts Quinn Emanuel's conclusions" therein. Among the conclusions conceded by Cruise in the Quinn Report are that: (i) Defendant Vogt "personally wanted to see and authorize the final cut of any video or media statement" disseminated to the media; (ii) Vogt and other Cruise executives became aware the morning of October 3, 2023 that the Cruise AV dragged the pedestrian; and (iii) despite Defendants' knowledge of these details, Cruise disseminated video footage and statements to the media that detailed the initial impact but deliberately omitted the subsequent pedestrian dragging and pullover maneuver.

5

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that Quinn Emanuel Urquhart & Sullivan, LLP prepared a "Report to the Boards of Directors of Cruise LLC, GM Cruise Holdings LLC, and General Motors Holdings LLC Regarding the October 2, 2023 Accident in San Francisco" (the "Quinn Report") and (ii) respectfully refer the Court to the Quinn Report referenced in Paragraph 5 for a complete and accurate descriptions of its contents.  Cruise also (iii) admits that Cruise issued a blog post on January 25, 2024 announcing that Cruise "is releasing the Quinn Emanuel Urquhart & Sullivan report regarding the October 2, 2023 incident in San Francisco and Cruise's subsequent interactions with regulators and the media" and (iv) respectfully refers the Court to the January 25, 2024 blog post referenced in Paragraph 5 for a complete and accurate description of its contents.  Mr. West and Mr. Vogt lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 5 that Cruise issued the January 25, 2024 blog post referenced in Paragraph 5 and deny those allegations on that basis.  The allegations in Paragraph 5 form the basis for Dismissed Claims against Mr. Ammann.  Accordingly, no response is required from Mr. Ammann.  To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 5 and denies the allegations in Paragraph 5 on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 5.

6.    The October 2 Crash and Defendants' misleading conduct in its aftermath were not one-off events. Instead, they were the culmination of a years-long campaign of fraud by Defendants misleadingly touting the capabilities and safety of Cruise's AV technology.

**ANSWER:** Cruise, Mr. West, and Mr. Vogt deny the allegations in Paragraph 6. The allegations in Paragraph 6 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent a response is required, Mr. Ammann denies the allegations in Paragraph 6.

7.    Defendants' scheme to conceal the truth concerning the October 2 Crash went beyond merely hiding the particular facts about one safety incident. Rather, their desperate attempts—complete with overnight and early morning "War Room" discussions, crisis management team meetings, and direct involvement from CEO Vogt and other Senior Leadership Team members—spoke to the dire and existential issues for Cruise that this particular crash would expose. Specifically, that Cruise's AV technology was so lacking that it could not even reach a safe, "stable," and "stopped" position when needed, which is a minimum requirement for public operation of driverless AVs.

**ANSWER:** Cruise, Mr. West, and Mr. Vogt deny the allegations in Paragraph 7. The allegations in Paragraph 7 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 7 and denies the allegations in Paragraph 7 on that basis.

8.    Since at least February 2021, Defendants touted to the investing public the high level of autonomy that Cruise's AV technology had reached. Cruise used a variety of terms to describe the degree of autonomy its AV technology had achieved, including "fully driverless," and "fully autonomous."

7

**ANSWER:** The allegations in Paragraph 8 form the basis for Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the unspecified public statements referenced in Paragraph 8 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 8.

9. Defendants also repeatedly referred to Cruise's AV technology as having reached "Level 4" autonomy, which is a reference to the five "levels" of autonomy defined by the Society for Automotive Engineers ("SAE"). Defendants have articulated an understanding of Level 4 autonomy that emphasizes that Cruise's AV technology must be able to drive 100% of the time without human input, including by stating that its AV technology must be able to "handle the solutions it's going to see on the road in all cases, not just what's 98% of what you see. It's got to be able to do everything," and that Level 4 and "fully driverless" are analogous terms meaning that "[t]he AV must be capable of driving fully autonomously 100% of the time." Defendants also claimed that Cruise's AV technology had taken humans "out of the loop," that the technology was "safer" and "better" than human drivers and touted that Cruise had exited the "R&D phase" by solving the self- driving puzzle.

**ANSWER:** To the extent Paragraph 9 pertains to Dismissed Claims, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the unspecified public statements referenced in Paragraph 9 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 9.

10. These statements, and others like them, throughout the Class Period, were incredibly significant to investors because of the immense value that Cruise's purportedly "fully driverless" technology would create for GM. Indeed, Defendants repeatedly described how their plans for Cruise included launching a global fleet of fully autonomous robotaxis servicing cities from San Francisco to Dubai and integrating Cruise's AV technology into personal vehicles to create an

"all AV future." Indeed, during the Class Period, Defendant Vogt described the total addressable market ("TAM") for Cruise as "multi-trillion-dollar[s]."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the unspecified public statements referenced in Paragraph 10 for a complete and accurate description of their contents and otherwise deny the allegations in Paragraph 10.

11. According to Defendants, Cruise was the first company to reach this level of autonomy, which provided a first-mover advantage, as Cruise's competitors were at least one step behind. This enabled Cruise to obtain driverless testing permits from California regulators to test and then operate a fleet of robotaxis in San Francisco during the Class Period. To obtain these permits, Cruise was required to certify that its AVs operated at Level 4 autonomy.

**ANSWER:** The Cruise Defendants admit that (i) Cruise obtained certain driverless testing permits from California regulators; (ii) Cruise was authorized to test and then operate a fleet of robotaxis in San Francisco during the purported Class Period; (iii) in certain permit applications, Cruise acknowledged that its vehicles under those permits met the description of a Level 4 system under the SAE Taxonomy; and (iv) respectfully refer the Court to the unspecified statements referenced in Paragraph 11 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 11.

12. In reality, Cruise did not have Level 4 autonomy and did not have a fully autonomous system that was capable of driving 100% of the time without human input; rather its system (i) was highly dependent on remote operators who would provide remote assistance every 2.5 to 5 miles; (ii) faced an enormous number of safety issues, many of which were logged and unresolved; (iii) struggled with basic requirements of safe driving, such as identifying children on the road;

and (iv) routinely stopped in traffic or became dangerously stranded, as Cruise's technology did not have robust capabilities to manage dangerous situations without human intervention.

**ANSWER:** The Cruise Defendants deny the allegations in Paragraph 12.

13. Numerous former Cruise and GM employees describe a legion of problems with the capabilities and safety of Cruise's AV technology during the Class Period[1], including instances where Cruise AVs were stranded and required retrieval, and were failing frequently on the side of the road, engaged in "random" hard breaking, and struggling with "simple things" such as a "big splash" of water hitting the car and the car thinking that it was in an accident.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported confidential witnesses ("CWs") made the statements attributed to them in Paragraph 13 and deny the allegations in Paragraph 13 on that basis.  Footnote 1 does not state an allegation to which a response is required.  To the extent a response is required, Cruise Defendants admit that Plaintiffs purport to use the defined term.

14. CW-7 recalled Autonomous Vehicle Operators ("AVTOs") regularly coming back from their AV rides stating that the cars made them extremely nervous and describing their rides as "dangerous," reporting to him on near misses with pedestrians, hitting curbs, and almost hitting other objects when the vehicles should have slowed down and stopped sooner. Further, CW-6 explained that what occurred during the accident in October 2023 was "not a one-time thing" and that problems had been demonstrated over several years. CW-6 also recalled issues with human injuries that required emergency room visits and a "long track record" of "really bad accidents." CW-6 explained that part of the reason why he departed Cruise was that he believed that people were going to get hurt and die as a result of the vehicles. In the words of CW-3, Cruise AVs "were not ready for primetime."

---

[1] Confidential witnesses ("CWs") are herein identified by number ("CW-#"). All CWs will be referenced using masculine pronouns to protect their identities.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-3, purported CW-6, and purported CW-7 made the statements attributed to them in Paragraph 14 and deny the allegations in Paragraph 14 on that basis.

15. News reports corroborate these CW accounts of the capabilities and safety deficiencies of Cruise AVs. For example, after the Class Period, *The New York Times* revealed—and Defendant Vogt subsequently confirmed—that Cruise AVs rely on remote operators every 2.5 to 5 miles, which amounts to 2-4% of the time Cruise AVs are on the road. Further, *The Intercept* revealed that Cruise AVs struggled to recognize children and to detect large holes in roads, including large construction pits with workers inside. Similarly, *Wired* reported that Austin, Texas had requested that Cruise suspend operations on Halloween for the safety of trick-or-treaters, and *NBC News* detailed multiple near-misses where Cruise AVs nearly struck children and their families. Media reports also include instances where Cruise AVs have pulled away from a police officer attempting to pull the vehicle over, stopped operating and sat in the middle of streets, gotten stuck in wet concrete, and an instance where a Cruise AV collided with an ambulance en route to an emergency scene.

**ANSWER:** The Cruise Defendants respectfully refer the Court to *The New York Times*, *The Intercept*, *Wired*, and *NBC News* articles, and unspecified news reports, referenced in Paragraph 15 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 15.

16. The truth of Defendants' misrepresentations did not begin to come to light until October 24, 2023, when the California Department of Motor Vehicles (the "DMV") suspended Cruise's driverless permits ("DMV Order") because, inter alia, the DMV "determine[d] the manufacturer's vehicles are not safe for the public's operation," and Cruise admitted that the AV implicated in the October 2 Crash collided with the pedestrian, stopped, and then started driving again, dragging the pedestrian for approximately 20 feet before coming to a final stop. Concurrently Cruise's analogous driverless permit from the California Public Utilities Commission ("CPUC") was also suspended.

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that the DMV suspended certain of Cruise's DMV permits on October 24, 2023; (ii) respectfully refer the Court to the DMV's October 24, 2023 suspension statement referenced in Paragraph 16 for a complete and accurate description of its contents; (iii) admit that Cruise's CPUC permit No. TCP0039080-P was suspended; and (iv) respectfully refer the Court to the CPUC's October 24, 2023 suspension statement referenced in Paragraph 16 for a complete and accurate description of its contents. Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 16 and denies the allegations in Paragraph 16 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 16.

17. Then, on October 26, 2023, the National Highway Traffic Safety Administration ("NHTSA") released a letter the agency had sent to Cruise, on October 20, 2023, indicating that NHTSA was investigating five reports of Cruise AVs engaging in inappropriately hard braking that resulted in collisions, and Cruise announced that it would pause all of its AV operations across the country. Finally, on November 8, 2023, it was announced that Cruise issued a recall impacting its entire fleet of 950 driverless cars across the US, which Cruise stated was necessary to correct the flaws in its AV technology that caused it to drag the pedestrian after the October 2 Crash. On these three revelations, GM's stock price declined by almost 2.3%, almost 4.8%, and over 3%, respectively, losing billions in market capitalization.

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that the National Highway Traffic Safety Administration ("NHTSA") released a letter dated October 20, 2023, addressed to Cruise on October 26, 2023 and (ii) respectfully refer the Court to the  October 20, 2023 NHTSA letter referenced in Paragraph 17 for a

12

complete and accurate description of its contents; (iii) admit that Cruise issued a blog post on November 8, 2023, stating (among other things) that Cruise had "issued a voluntary recall of part of our AV software based on a new analysis of our AV's post-collision response on October 2"; and (iv) respectfully refer the Court to the November 8, 2023 blog post referenced in Paragraph 17 for a complete and accurate description of its contents. Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 17 and denies the allegations in Paragraph 17 on that basis. The Cruise Defendants respectfully refer the Court to GM's publicly reported historical stock price data for information regarding GM's stock price. The Cruise Defendants otherwise deny the allegations in Paragraph 17.

18. The aftermath of the October 2 Crash, including the October 24, 26, and November 8 disclosures, further show the falsity of Defendants' misstatements touting Cruise's purportedly "fully driverless" technology. The engineering firm, Exponent, Inc., performed a technical root cause analysis of the October 2 Crash that was included in the Quinn Report detailing numerous safety and functionality flaws, which contributed to the Crash. Further, Cruise has recalled all its driverless cars off the road, the Department of Justice ("DOJ") and SEC have opened investigations, and Cruise's valuation has been cut in half. As of the filing of this amended complaint, over six months after the DMV's Order of Suspension— Cruise's driverless permits have not been reinstated, and Cruise does not have a single driverless AV on the road in the country.

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that the engineering firm Exponent, Inc. ("Exponent") performed a "technical root cause analysis" (the "Exponent Analysis") of the Accident that was included in the Quinn Report; (ii)

13

respectfully refer the Court to the Exponent Analysis referenced in Paragraph 18 for a complete and accurate description of its contents; and (iii) admit that the Department of Justice ("DOJ") and the Securities and Exchange Commission ("SEC") opened investigations in connection with the Accident. Cruise also admits (iv) that certain of Cruise's DMV permits and Cruise's CPUC permit No. TCP0039080-P remain suspended; and (v) that the software on any Cruise AVs currently operating on public roads does not allow the AVs to engage autonomous mode. Mr. West and Mr. Vogt lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 18 that Cruise's driverless permits have not been reinstated and that Cruise does not have a single driverless AV on the road in the country and deny those allegations on that basis. Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 18 and denies the allegations in Paragraph 18 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 18.

19. As a result of Defendants' misconduct alleged herein, Plaintiffs and the Class have suffered significant losses and damages.

**ANSWER:** The Cruise Defendants deny the allegations in Paragraph 19.

## II. JURISDICTION AND VENUE

20. The claims alleged herein arise under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b), "§ 10(b)"); Rule 10b-5 promulgated thereunder by the

SEC (17 C.F.R. § 240.10b-5, "Rule 10b-5"); and Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a), "§ 20(a)").

**ANSWER:** The allegations in Paragraph 20 assert a legal conclusion to which no response is required.

21. This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. In connection with Defendants' acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**ANSWER:** The allegations in Paragraph 21 assert a legal conclusion to which no response is required.

22. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because GM is headquartered in this District, and many of Defendants' acts and practices complained of herein occurred in substantial part in this District, including the dissemination of materially false or misleading information.

**ANSWER:** The allegations in Paragraph 22 assert a legal conclusion to which no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 22.

## III.   THE PARTIES AND WITNESSES

### A.   Plaintiffs

23. Lead Plaintiff City of Hollywood Police Officers' Retirement System purchased GM Stock during the Class Period, as set forth in the certification attached hereto as Exhibit A.

15

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 23 and deny the allegations in Paragraph 23 on that basis.

24. Additional named plaintiff Plymouth County Retirement Association purchased GM Stock during the Class Period, as set forth in the certification attached hereto as Exhibit B.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 24 and deny the allegations in Paragraph 24 on that basis.

## B. Defendants

25. Defendant GM is a Delaware corporation with principal executive offices located at 300 Renaissance Center, Detroit, Michigan 48265-3000. GM's common stock ("GM Stock") trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "GM." There is a large liquid market for call options to buy GM Stock and put options to sell GM Stock, both of which trade at prices that efficiently correspond to GM's stock price. References to "GM Securities" refer to GM Stock and call and put options on GM Stock.[2] GM designs, builds, and sells automobiles and automobile parts, and provides software-enabled services and subscriptions worldwide. GM also invests in and aims to develop AV technology.

**ANSWER:** The allegations in Paragraph 25 and Footnote 2 are not directed at the Cruise Defendants. Accordingly, no response is required. To the extent

---

[2] Put options have essentially the same economics as call options but inverted. The inflation of GM's stock price through the fraud alleged herein would injure those who sold GM put options during the Class Period as those prices would be artificially deflated by the fraud. References herein to purchasing or otherwise acquiring GM Securities at inflated prices and related allegations, refer to purchasing or acquiring GM Stock and GM call options at inflated prices, but also refer to selling GM put options at deflated prices.

16

Paragraph 25 and Footnote 2 assert legal conclusions, no response is required.  To the extent a response is required, the Cruise Defendants (i) admit that GM is a Delaware corporation with principal executive offices in Detroit, Michigan; (ii) admit that GM's common stock is traded on the New York Stock Exchange under the symbol "GM"; (iii) admit that GM designs, builds, and sells trucks, crossovers, cars, and automobile parts and provides software-enabled services and subscriptions worldwide; and (iv) admit that GM invests in and develops AV technology.  The Cruise Defendants otherwise deny the allegations in Paragraph 25 and Footnote 2.

26.   Defendant Cruise was founded in 2013 by Defendant Vogt with aims to develop and employ AV technology. In 2014, Daniel Kan joined Cruise as a co-founder. Prior to the Class Period, GM purchased a majority stake in Cruise[3], which GM increased during the Class Period to approximately 80%. Throughout the Class Period, multiple GM executives sat on Cruise's Board of Directors, and GM described Cruise as GM's "global segment responsible for the development and commercialization of [AV] technology."

**ANSWER:** The Cruise Defendants (i) admit that Cruise was founded by Kyle Vogt in 2013 and that Daniel Kan joined as a co-founder in 2014; (ii) admit that GM purchased a majority stake in Cruise prior to the purported Class Period; (iii) admit that GM increased its majority stake in Cruise during the purported Class Period to approximately 80%; (iv) admit that multiple GM executives were on Cruise's Board of Directors during the purported Class Period; and (v) respectfully refer the Court

---

[3] GM's ownership is of and through GM Cruise Holdings LLC, which, for simplicity, is incorporated herein into the definition of "Cruise."

to the unspecified public statements referenced in Paragraph 26 for a complete and accurate description of their contents. In response to Footnote 3, the Cruise Defendants (i) admit that GM Cruise Holdings LLC was a majority-owned subsidiary of GM during the purported Class Period; and (ii) admit that Plaintiffs purport to use the defined term. The Cruise Defendants otherwise deny the allegations in Paragraph 26 and Footnote 3.

27. Defendant Mary T. Barra ("Barra") has served as GM's CEO and Chair of GM's Board of Directors at all relevant times. Barra also served as the Chair of Cruise's Board of Directors during the Class Period.

**ANSWER:** To the extent Paragraph 27 pertains to Dismissed Claims, no response is required. The allegations in Paragraph 27 are not directed at the Cruise Defendants and therefore do not require a response. To the extent a response is required, the Cruise Defendants admit that Mary T. Barra served as the Chair of Cruise's Board of Directors during the purported Class Period. The Cruise Defendants otherwise deny the allegations in Paragraph 27.

28. Defendant Paul A. Jacobson ("Jacobson") served as GM's Executive Vice President and Chief Financial Officer ("CFO") during the Class Period.

**ANSWER:** The allegations in Paragraph 28 are not directed at the Cruise Defendants. Accordingly, no response is required. To the extent Paragraph 28 pertains to Dismissed Claims, no response is required.

29. Defendant Daniel Ammann ("Ammann") held multiple roles at GM prior to the Class Period and served as Cruise's CEO from January 2019 until December 2021.

18

**ANSWER:** The Cruise Defendants admit the allegations in Paragraph 29.

30.   Defendant Kyle Vogt ("Vogt") founded Cruise. Throughout the Class Period, Vogt served as Cruise's President and CTO and served as Cruise's CEO from December 2021 through the end of the Class Period.

**ANSWER:** The Cruise Defendants admit the allegations in Paragraph 30.

31.   Defendant Douglas L. Parks ("Parks") served as GM's Executive Vice President of Global Product Development, Purchasing and Supply Chain during the Class Period.

**ANSWER:** The allegations in Paragraph 31 are not directed at the Cruise Defendants.   Accordingly, no response is required.   To the extent Paragraph 31 pertains to Dismissed Claims, no response is required.

32.   Defendant Wayne G. West ("West") served as Cruise's Chief Operating Officer ("COO") during the Class Period.

**ANSWER:** The Cruise Defendants admit the allegations in Paragraph 32.

33.   The Defendants referred to above in ¶¶25-26 are collectively referred to herein as the "Corporate Defendants." The Defendants referred to above in ¶¶27-32 are collectively referred to herein as the "Individual Defendants." The Corporate Defendants and Individual Defendants are collectively referred to herein as the "Defendants."

**ANSWER:** The allegations in Paragraph 33 do not contain any statement of fact to which a response is required.

### C.    Witnesses

34.   This amended complaint references numerous former employees of GM and Cruise that support Plaintiffs' allegations herein.

**ANSWER:** The Cruise Defendants respectfully refer the Court to the Complaint for a complete and accurate description of its contents and otherwise deny the allegations in Paragraph 34.

35. CW-1 was formerly employed in California by Cruise from September 2019 to July 2022. CW-1 had multiple software engineering titles, including Senior Software Engineer II. CW-1's responsibilities included developing a software fleet management tool, which was critical to the safety of Cruise's AVs.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 35 and deny the allegations in Paragraph 35 on that basis.

36. CW-2 was employed by Cruise as the Safety Assurance Manager of Cruise's SMS or Safety Management System team from April 2022 to December 2023. According to CW-2, the SMS team rolled up under current Director of Operational Safety Julia Cabral, who ultimately reported to current Vice President AV Performance and Validation Louise Zhang. CW-2 was responsible for developing policies to monitor risks and audit safety methodologies, and his responsibilities also included designing risk assessment and confidential risk forms, among other duties. According to CW-2, he was one of three members of the SMS team, and that the team rolled up into the Operational Safety group, which was a part of the wider Systems Engineering Group.

**ANSWER:** The Cruise Defendants admit that (i) Julia Cabral was a Director of Operational Safety during the purported Class Period; and (ii) Louise Zhang was a Vice President at Cruise during the purported Class Period. The Cruise Defendants otherwise lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 36 and deny the allegations in Paragraph 36 on that basis.

20

37. CW-3 was employed by Cruise as an Autonomous Vehicle Operator from October 2021 until approximately late May or early June 2022. CW-3 explained that he worked in Operations and his responsibilities primarily focused on ensuring the vehicles were prepared to launch and to go onto public roads. CW-3 continued to say that when he initially began at Cruise he was tasked with preparing the software on the vehicles prior to deployment and was responsible for 10–20 cars per shift at the 1201 Bryant facility in San Francisco. According to CW-3, preparation included software installation and safety checks.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 37 and deny the allegations in Paragraph 37 on that basis.

38. CW-4 was employed by Cruise as an Autonomous Vehicle Test Specialist from April 2022 until December 2023. CW-4 explained that his position included riding in Cruise's AVs, detailing performance and any "malfunctions."

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 38 and deny the allegations in Paragraph 38 on that basis.

39. CW-5 was employed by GM in a variety of roles, including Controls Integration Engineer, Active Safety Calibration Engineer, and most recently, as an Autonomous Vehicle Validation Engineer from August 2018 until December 2023.

**ANSWER:** The allegations in Paragraph 39 are not directed at the Cruise Defendants. Accordingly, no response is required. To the extent Paragraph 39 pertains to Dismissed Claims, no response is required. To the extent a response is required, the Cruise Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 39 and deny the allegations in Paragraph 39 on that basis.

21

40.   CW-6 was Senior Director, Autonomous Vehicles at Cruise from March 2022 until November 2022.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 40 and deny the allegations in Paragraph 40 on that basis.

41.   CW-7 was formerly employed by Cruise as Operations Team Lead from November 2017 to April 2023, working in the San Francisco Bay area of California. CW-7 advised that his responsibilities included managing a shift of 150 AVTOs. CW-7's previous title was Autonomous Vehicle Operator Level II from early 2017 to November 2017. According to CW-7, in his final role, he reported to Operations Manager Said Pairasta.

**ANSWER:** The Cruise Defendants (i) admit that Said Pairasta served as an Operations Manager at Cruise during the purported Class Period; and (ii) otherwise lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 41 and deny the allegations in Paragraph 41 on that basis.

42.   CW-8 formerly employed in a senior role by Cruise before 2022, after 2022, and throughout the entirety of 2022.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 42 and deny the allegations in Paragraph 42 on that basis.

43.   Between March 2023 and December 2023, CW-9 was employed by Cruise as a contractor with the role of Driverless Support Specialist and then as a full-time employee as a Commercial Operations Coordinator.

22

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 43 and deny the allegations in Paragraph 43 on that basis.

## IV.   EXPOSITION OF SUBSTANTIVE ALLEGATIONS

### A.   Background

#### 1.   History of Cruise's Business and Role Within GM

##### a.   Pre-Class Period: GM Purchases Cruise to Incorporate Its Development of "Fully Driverless" Technology

44.   GM designs, builds, and sells automobiles and automobile parts, and provides software-enabled services and subscriptions worldwide. GM also invests in and aims to develop AV technology. For example, GM has developed and released its "Super Cruise" product, which GM has described as a Level 2 advanced driver assistance system ("ADAS") that allows for hands-free driving on mapped divided highways under certain circumstances. GM has also teased the eventual release of Super Cruise's successor, "Ultra Cruise," also a Level 2 ADAS, the goal of which will be to enable "hands-free driving in 95 percent of all driving scenarios."

**ANSWER:** The allegations in Paragraph 44 are not directed at the Cruise Defendants.  Accordingly, no response is required.  To the extent Paragraph 44 pertains to Dismissed Claims, no response is required.  To the extent a response is required, the Cruise Defendants (i) admit that GM designs, builds, and sells trucks, crossovers, cars, and automobile parts and provides software-enabled services and subscriptions worldwide; and (ii) admit that GM invests in and develops AV technology.  The Cruise Defendants respectfully refer the Court to the unspecified statements and unspecified filings referenced in Paragraph 44 for a complete and

accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 44.

45. Cruise (formerly Cruise Automation, Inc.) was founded in 2013 by Defendant Vogt. Cruise's initial goal was to build a retrofit kit that would allow cars already in the market to drive on highways with high-level—though not "full"— autonomy, similar to GM's Super Cruise product. However, Vogt told *The Verge* that in 2015, "[Cruise] decided to pivot away from that [business plan] when we discovered that fully driverless technology is a far larger business opportunity, and have been working on that quietly ever since."

**ANSWER:** The Cruise Defendants (i) admit that Cruise was founded in 2013 by Kyle Vogt; (ii) admit that Cruise was formerly known as Cruise Automation, Inc.; and (iii) respectfully refer the Court to the *The Verge* article referenced in Paragraph 45 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 45.

46. In March 2016—after Cruise made its pivot toward "fully driverless technology"—GM acquired a majority stake in Cruise "to further accelerate [GM's] development of autonomous vehicles." At the time of the acquisition, GM's then- President, Defendant Amman, told the media that GM's intent was to integrate Cruise's technology within its fleet of vehicle brands as soon as possible. Specifically, Ammann advised that "[t]he next step is to make sure we bring the full resources to the table to accelerate what Cruise is doing and integrate into the GM vehicle system." Similarly, Defendant Vogt stated that "[w]e believe this is the best path forward to implement [C]ruise tech at a massive scale . . . this is a ground-breaking and necessary step toward rapidly commercializing autonomous vehicle technology." Since GM's acquisition, Cruise has utilized General Motors' Bolt vehicles that are retrofitted with Cruise AV technology (which are sometimes referred to as "AV-Bolts").

**ANSWER:** The Cruise Defendants (i) admit that GM announced that it planned to acquire Cruise Automation, Inc. in March 2016; (ii) admit that the Cruise

24

AV was built on a Chevrolet Bolt vehicle platform; and (iii) respectfully refer the

Court to the unspecified public statements referenced in Paragraph 46 for a complete

and accurate description of their contents. The Cruise Defendants otherwise deny

the allegations in Paragraph 46.

47. In January 2019, GM's then-President, Defendant Amman, took over as CEO of Cruise. Defendant Vogt, who had previously served as CEO, remained as President and CTO of Cruise. The media noted that Amman's appointment as Cruise's CEO was a "sign of the growing importance of [GM's] Cruise self-driving business." According to media reports, Ammann had "been closely involved with Cruise's development from early on and orchestrated GM's acquisition of the company in 2016." When Amman's appointment was announced, he touted Cruise's importance: "This is technology that we wanted to develop and deploy in massive scale, measured ultimately in units of trillions . . . [t]o go from where we are to achieve that objective requires a major commitment of time and resources, and so I'm going all in."

**ANSWER:** The Cruise Defendants (i) admit that GM's then-President,

Defendant Mr. Ammann, took over as CEO of Cruise in January 2019; (ii) admit

that Defendant Mr. Vogt, who had previously served as CEO of Cruise, remained as

President and CTO of Cruise at that time; and (iii) respectfully refer the Court to the

unspecified media reports and public statements referenced in Paragraph 47 for a

complete and accurate description of their contents. The Cruise Defendants

otherwise deny the allegations in Paragraph 47.

48. In 2018, GM invested an additional $1.1 billion in Cruise and began describing Cruise (denoted at that time as "GM Cruise") in its public filings as "our global segment responsible for the development and commercialization of [AV] technology." Similarly, GM advised the market that "[a]s a result of the growing importance of our autonomous vehicle operations, we moved these operations from

Corporate to GM Cruise and began presenting GM Cruise as a new reportable segment in the three months ended June 30, 2018."

**ANSWER:** To the extent Paragraph 48 pertains to Dismissed Claims, no response is required.  To the extent the allegations in Paragraph 48 are not directed at the Cruise Defendants, they do not require a response.  To the extent a response is required, the Cruise Defendants (i) admit that, in 2018, GM invested $1.1 billion in Cruise; and (ii) respectfully refer the Court to the unspecified public filings referenced in Paragraph 48 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 48.

### b.  2021: Cruise's Value Increases as It Enters "Early Commercialization"

49.  At the beginning of the Class Period, on GM's February 10, 2021, earnings call, Defendant Barra represented that "the estimated valuation of Cruise now stands at $30 billion." On the same call, Defendant Jacobson touted GM's commitment to Cruise, stating that in 2021 GM would spend $1 billion on AV development and $6 billion on EV development, which represented greater capital investment than GM would spend that year "on gasoline and diesel power development for the first time in our history." Since the beginning of the Class Period, GM has touted its grand plans for Cruise and Cruise's AV technology.

**ANSWER:** The allegations in Paragraph 49 are not directed at the Cruise Defendants.  Accordingly, no response is required.  To the extent Paragraph 49 pertains to Dismissed Claims, no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the February 10, 2021 statements and unspecified statements referenced in Paragraph 49 for a complete and

26

accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 49.

50. **First**, GM planned for Cruise to develop and operate a fleet of robotaxis. These efforts would begin in San Francisco and spread from there. Defendant Barra stated on GM's February 10, 2021, earnings call that "once we have launched in one city, [there will be] the opportunity to go to the next and do the work to make sure the technology is adaptable to the unique things of another city. So, I think once we launch successfully and demonstrate that the technology is safer than a human driver and we demonstrate to customers, I think that we can really increase the number of cities that we're offering it quite quickly, and that's what we'll focus on doing."

**ANSWER:** The allegations in Paragraph 50 are not directed at the Cruise Defendants. Accordingly, no response is required. To the extent Paragraph 50 pertains to Dismissed Claims, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the February 10, 2021 statements referenced in Paragraph 50 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 50.

51. **Second**, as Defendant Barra stated at a February 24, 2021, conference hosted by Wolfe Research, "big package delivery," i.e., driverless delivery services, would also unlock significant value for GM.

**ANSWER:** The allegations in Paragraph 51 are not directed at the Cruise Defendants. Accordingly, no response is required. To the extent Paragraph 51 pertains to Dismissed Claims, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the February 24, 2021

27

statements referenced in Paragraph 51 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 51.

52. **Third**, Cruise's AV technology eventually would enable GM to produce fully autonomous vehicles for personal use. For example, Defendant Barra cited "the opportunity for personal autonomous vehicles" in response to an analyst's question at the February 24, 2021, Wolfe Research Global Auto, Auto Tech, and Mobility Conference as to how Cruise would unlock value for GM in the long term.

**ANSWER:** The allegations in Paragraph 52 are not directed at the Cruise Defendants.  Accordingly, no response is required.  To the extent Paragraph 52 pertains to Dismissed Claims, no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the February 24, 2021 statements and unspecified statements referenced in Paragraph 52 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 52.

53. By the beginning of the Class Period on February 10, 2021, and throughout the rest of 2021, Cruise was seemingly making significant progress on these goals. For example, by the start of 2021, Cruise and Walmart announced a pilot program where Cruise AVs would perform limited deliveries to Walmart customers in Arizona.

**ANSWER:** The Cruise Defendants (i) admit that, by the start of 2021, Cruise and Walmart Inc. ("Walmart") had announced a joint pilot program; and (ii) respectfully refer the Court to Cruise and Walmart's announcements referenced in

28

Paragraph 53 for a complete and accurate description of their contents.  The Cruise

Defendants otherwise deny the allegations in Paragraph 53.

54.   More importantly, Cruise seemed to be making significant progress on the robotaxi front. In 2020, GM and Cruise unveiled plans to release the "Cruise Origin," which would be a driverless vehicle with no steering wheel, meant to carry four passengers on robotaxi trips. As Defendant Barra noted during the February 24, 2021, Wolfe Research Global Auto, Auto Tech, and Mobility Conference, Cruise Origins would be produced at a GM factory in Detroit, and Barra described the Origin as one of the "pieces that [is] necessary to have a successful ride-sharing business, autonomous ride-sharing business."

**ANSWER:** To the extent Paragraph 54 pertains to Dismissed Claims, no

response is required.  To the extent the allegations in Paragraph 54 are not directed

at the Cruise Defendants, they do not require a response.  To the extent a response

is required, the Cruise Defendants (i) admit that in 2020, GM and Cruise announced

plans to release the "Cruise Origin"; and (ii) respectfully refer the Court to the

announcements referenced in Paragraph 54 for a complete and accurate description

of their contents.   The Cruise Defendants otherwise deny the allegations in

Paragraph 54.

55.   Also, by the start of the Class Period, Cruise had begun testing its purportedly autonomous robotaxis on public streets. In October 2020, the DMV issued a permit to Cruise authorizing it to test driverless vehicles without a safety driver in San Francisco. During the February 24, 2021, Wolfe Research Global Auto, Auto Tech, and Mobility Conference, Defendant Barra touted "what we're doing in San Francisco today with the testing" as "a very important part and a step toward commercialization." And on GM's May 5, 2021 earnings call, Defendant Barra touted Cruise's recent commitment from Dubai to make Cruise "the city's exclusive provider of self-driving taxis and ride-hailing services, with plans to deploy up to 4,000 self-driving vehicles by 2030." According to Barra on this same earnings call, Cruise's progress in the robotaxi space and GM's forthcoming Origin

29

vehicle presaged worldwide growth, as GM and Cruise planned to "grow not only in Dubai but in other cities across the United States, across North America, and across the world."

**ANSWER:** To the extent Paragraph 55 pertains to Dismissed Claims, no response is required. To the extent the allegations in Paragraph 55 are not directed at the Cruise Defendants, they do not require a response. To the extent a response is required, the Cruise Defendants (i) admit that Cruise had started testing driverless AVs on public streets by the start of the purported Class Period; and (ii) admit that in October 2020, the DMV issued a permit to Cruise authorizing it to test driverless vehicles without a safety driver in San Francisco. The Cruise Defendants otherwise deny the allegations in Paragraph 55.

56. Over the summer of 2021, Cruise seemingly continued to make progress and Defendant Barra continued touting the core nature of Cruise to GM. In June 2021, Cruise received a driverless test permit from the CPUC to provide unpaid rides to the public in driverless vehicles. That same month, on a June 3, 2021 Credit Suisse Fireside Chat, Barra told investors: "I'm really excited about Cruise. It's very integral to our zero, zero, zero[] goal of zero crashes, zero emissions and zero congestion." On June 14, 2021, during GM's Annual General Meeting, Barra told investors that "[t]he relationship between GM and Cruise brings unmatched benefits. Because of our combined deep electric vehicle and autonomous experience, we approach the development of autonomous electric vehicles by integrating the autonomous technology from the ground up into vehicles to maximize performance." Two days later, on June 16, 2021, GM announced that it planned to spend $35 billion on AV and EV technology by 2025, up from $27 billion that had been planned in November 2020. And on GM's August 4, 2021 earnings call, Barra assured investors that "we have the resources to move more quickly toward an all EV future, an all AV future."

**ANSWER:** To the extent Paragraph 56 pertains to Dismissed Claims, no response is required. The allegations are in part not directed at the Cruise Defendants

30

and therefore do not require a response.  The Cruise Defendants (i) admit that Cruise obtained a permit from the CPUC to participate in the "Driverless Autonomous Vehicle Passenger Service Pilot Program," pursuant to Permit No. TCP0039080-P issued on June 2, 2021; and (ii) respectfully refer the Court to the June 3, 2021, June 14, 2021, June 16, 2021, and August 4, 2021 statements referenced in Paragraph 56 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 56.

57.   That fall, Cruise's march appeared to continue, and its value to GM grew. Specifically, on September 30, 2021, the DMV issued an autonomous vehicle deployment permit to Cruise, allowing Cruise to charge a fee and receive compensation for autonomous services offered to the public under limited circumstances between 10 PM and 6 AM. However, California law required that Cruise obtain an additional permit from the CPUC before charging for commercial passenger service in an AV. As Defendant Ammann touted during GM's October 6, 2021 Investor Day, "we are very close – sort of one permit away from being in a position to charge for rides in San Francisco."

**ANSWER:** Paragraph 57 in part asserts a legal conclusion to which no response is required.  The Cruise Defendants (i) admit that the DMV issued a permit to Cruise effective September 30, 2021, to "Deploy Autonomous Vehicles on Public Streets (OL 321)"; and (ii) respectfully refer the Court to the October 6, 2021 statement referenced in Paragraph 57 for a complete and accurate description of its contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 57.

58.   Also, during GM's October 6, 2021 Investor Day, GM executives repeatedly reiterated the importance of Cruise to GM. For example, Defendant Barra stated that "[w]e all know that Cruise has huge value creation potential [W]ith Cruise, we are defining the commercialization strategies for Level 4

31

autonomy," and Mark L. Reuss, President of GM, stated that "our AV business led by Cruise [] will drive significant value creation." Defendant Jacobson promised that, through 2025, GM would "invest $6 billion in Cruise" and projected that "[b]y the end of the decade, Cruise has the potential to deliver $50 billion in annualized revenues."

Jacobson continued: "AVs are an integral piece of the future of mobility and Cruise is a key element of GM's growth strategy. Our vertical integration strategy is a significant enabler for Cruise. The Cruise Origin, GM's manufacturing capabilities and funding from GM Financial are going to enable Cruise to scale rapidly. And with an expected 1 million mile vehicle useful life, our integrated strategy will allow Cruise to achieve an operating cost of $1 per mile . . . as we deploy hundreds of thousands of Origin globally."

**ANSWER:** The allegations in Paragraph 58 are not directed at the Cruise Defendants. Accordingly, no response is required. To the extent Paragraph 58 pertains to Dismissed Claims, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the October 6, 2021 statements and unspecified statements referenced in Paragraph 58 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 58.

59. Importantly, on GM's October 6, 2021 Investor Day, Defendant Ammann outlined Cruise's three-part business plan, describing Cruise's "journey as having three main phases to it." First, "[o]ver the last several years from 2015, 2016 timeframe through the end of last year, we were clearly very much in an R&D phase," which "was all about building up the core technology and trying to solve that engineering challenge of a generation of building a self-driving system that can drive with a human or better level of performance." According to Ammann, Cruise had completed this phase, and Cruise's "fully driverless testing on the streets of San Francisco" that began in the fall of 2020 "marked the beginning of the next phase of the Cruise journey which we refer to as early commercialization." The goal of the "early commercialization" phase is to "tak[e] that first minimum viable level of driverless technology that allowed us to go driverless on public

32

streets and to turn that into a product that people want to use." The "early commercialization" phase, according to Ammann, would take place during 2021 and 2022 such that Cruise would achieve "a good level of product market fit by the end of 2022." Finally, in 2023, GM and Cruise would start production of the Cruise Origin, which would mark the beginning of the "rapid scaling phase," during which Cruise would "really scale up the business and do it profitably." Ammann underscored the importance of hitting these benchmarks on time, stating that "the reason that that's so important, and so important we do it on that timeline, is that the beginning of 2023 is when the Cruise Origin starts production."

**ANSWER:** The allegations in Paragraph 59 relate in part to Dismissed Claims and therefore do not require a response  The Cruise Defendants otherwise respectfully refer the Court to the October 6, 2021 statements referenced in Paragraph 59 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 59.

60.   On November 3, 2021, Cruise seemed to hit a milestone, as Defendant Vogt posted on his Twitter account a video titled, "My first fully driverless pickup!" Vogt teased the video by commenting that "[he] got to take the first ride, by anyone, ever, in a *driverless* robotaxi on the streets of San Francisco."

**ANSWER:** The Cruise Defendants (i) admit that Defendant Mr. Vogt posted a video on his Twitter account titled "My first fully driverless pickup!" on November 3, 2021; and (ii) respectfully refer the Court to the November 3, 2021 Twitter post referenced in Paragraph 60 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 60.

61.   On December 1, 2021, Defendant Jacobson stated at the Credit Suisse Industrials Conference that "when you look at our autonomous investments, [C]ruise is just one pyramid away from sort of commercialization of robotaxis and autonomous rides that is such a core part of our integrated strategy as we've talked

33

about leading in both EVs and AVs. And we expect to see that on the cusp of opening up a massive new [Total Addressable Market] for us going forward."

**ANSWER:** The allegations in Paragraph 61 are not directed at the Cruise Defendants. Accordingly, no response is required. To the extent Paragraph 61 pertains to Dismissed Claims, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the December 1, 2021 statements referenced in Paragraph 61 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 61.

62. Analysts took notice of these apparent developments in 2021. For example, an analyst during the February 24, 2021 Wolfe Research Global Auto, Auto Tech, and Mobility Conference noted to Defendant Barra that "if you're successful in developing Cruise, it's not unreasonable to see a business like that worth as much as GM is today." Additionally, another analyst noted during GM's October 6, 2021 Investor Day that "just starting out on Cruise, there's an inherent amount of significant value there for shareholders in the stock today." And an analyst noted during a December 9, 2021 Deutsche Bank AutoTech Conference that "[i]t seems like Cruise is a very big part of long-term strategy [] of GM."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the February 24, 2021, October 6, 2021, and December 9, 2021 analyst statements referenced in Paragraph 62 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 62.

63. On October 7, 2021, RBC Capital Markets released a report noting that "[o]n the regulatory side, Cruise continues to make progress, having just received the fifth of six permits needed to do paid, driverless ride-hail in California. Cruise hopes to receive its initial permit in early 2022, which would allow it to start generating revenue from rides." The RBC report continued: "In order to be able to

34

offer low-cost, generalized autonomy, there are two strategies: 1) start with low-cost L2 ADAS and improve performance; or 2) solve performance (L4/5 with human out of the loop) and then optimize cost. Cruise chose the latter, as it believes that it can bring down the cost curve more quickly than others can improve the performance from L2."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the October 7, 2021 RBC Capital Markets report referenced in Paragraph 63 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 63.

64. Additionally, on October 10, 2021, Morningstar wrote that it was "optimistic about Cruise because we think GM has underrated AV tech relative to how the market thinks of Tesla. GM, to us, looks far along in AVs because it expects to get the last permit it needs in early 2022 to start providing AV passenger rides in San Francisco without remote assistance or a safety driver (that is, true Level 4 geofenced autonomy)." Morningstar's report continued, "We think Cruise CEO Dan Ammann correctly stressed how Cruise's majority ownership by GM will, in the coming years, enable scaling that other AV ride hailing providers cannot match anytime soon."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the October 10, 2021 Morningstar report referenced in Paragraph 64 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 64.

    c.     **2022: GM Increases Its Investment in Cruise, and Cruise Is Approved to Operate Commercial Driverless Service and Begins Expanding**

65. On January 5, 2022, Defendant Barra told the public at a Consumer Electronics Show that "Cruise remains on track to begin commercialization in the coming months" and "GM and Cruise teams will continue to work together to build a range of future personal autonomous vehicles, enabling us to aggressively pursue the massive AV market opportunities that lay ahead and to lead for both

35

commercial and retail applications." Barra reiterated this sentiment the next month, on GM's February 1, 2022 earnings call, stating that Cruise "is one of our most significant growth opportunit[ies]" and that Cruise had launched a waiting list for members of the public to sign up for Cruise autonomous rides once they become available— which was a "major milestone [that] brings Cruise even closer to offering its first paid rides and generating $50 billion in annual revenue by the end of the decade."

**ANSWER:** The allegations in Paragraph 65 are not directed at the Cruise Defendants. Accordingly, no response is required. To the extent Paragraph 65 pertains to Dismissed Claims, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the January 5, 2022 and February 1, 2022 statements referenced in Paragraph 65 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 65.

66. At the March 10, 2022 Morgan Stanley Technology Media & Telecom Conference, Defendant Vogt outlined the stratospheric ambitions of Cruise. Specifically, Vogt stated that Cruise "intend[s] to expand geographic area, to lots of cities, lots more customers, and then lead into personal AVs that—in partnership with GM, which we think will really explode the number of vehicles out there and size of the market and the revenue we can generate." When asked how he defined "the TAM of Cruise," Vogt responded that "personal transportation" is "a multi-trillion-dollar market . . . in United States, there's 3 trillion passenger miles each year. And so, you can do the math there. It gets big pretty quickly. And so, we see a pretty easy path with our cost down curve to $500 billion to $1 trillion market size. And that's the floor. . . . [W]e think the TAM could be much, much bigger . . . . multi- trillion-dollar TAM . . . where we are today is really just the tip of the iceberg." Vogt later stated at the same conference that "we do see a path to 1 million plus AVs."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the March 10, 2022 statement referenced in Paragraph 66 for a complete and accurate

36

description of its contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 66.

67.  In early 2022, GM increased its investment in Cruise, purchasing SoftBank's equity ownership stake and making an additional $1.35 billion investment in Cruise. As a result, GM's ownership in Cruise increased to approximately 80%. When asked about GM's increased ownership stake, Defendant Jacobson told investors at the April 12, 2022 BofA Automotive Summit that "obviously Cruise is a huge, huge part of what we think the future of GM is, both in terms of rideshare, but also personal autonomy, and the entire EV/AV movement that's going on." Similarly, Defendant Barra repeatedly touted GM's bullishness on Cruise, stating on GM's April 26, 2022 earnings call that GM increased its ownership position in Cruise because it was "extremely bullish on the [Cruise] team's rapid progress toward commercialization" and at GM's June 13, 2022 Annual General Meeting that "we are so bullish on Cruise's technology and revenue potential that we recently increased our ownership stake to approximately 80%."

**ANSWER:** To the extent Paragraph 67 pertains to Dismissed Claims, no response is required.  To the extent allegations in Paragraph 67 are not directed at the Cruise Defendants, they do not require a response.  To the extent a response is required, Cruise, Mr. West, and Mr. Vogt (i) admit that GM acquired SoftBank Vision Fund 1's equity ownership stake in Cruise in March 2022; (ii) admit that GM made an additional $1.35 billion investment in Cruise in March 2022; and (iii) respectfully refer the Court to the April 12, 2022, April 26, 2022, and June 13, 2022 statements referenced in Paragraph 67 for a complete and accurate description of their contents.  Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of those allegations in Paragraph 67 and denies those

allegations in Paragraph 67 on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 67.

68.   In June 2022, the CPUC approved Cruise's application for a permit to offer passenger service in its autonomous vehicles without a safety driver present on select streets in San Francisco from the hours of 10 PM to 6 AM, among other conditions. With this approval, GM executives touted GM/Cruise's first-mover advantage. For example, at GM's June 13, 2020 Annual General Meeting, Defendant Barra stated that the CPUC's decision "means Cruise is now officially the first and only company to operate a commercial driverless ride-hail service in a major US city." And at the June 15, 2022 Deutsche Bank Global Auto Industry Conference, Defendant Jacobson touted the fact that "we received the first ever permit to charge for driverless rides in an urban – highly dense urban metro area," while also describing Cruise's technology as "revolutionary." Additionally, on GM's July 26, 2022 earnings call, Barra stated that "we're going to make sure that we have all of the resources available to scale that business quickly because we do think there's a first-mover advantage. And so one of the strengths and the work that Cruise and GM do together is [to] make sure that we have a plan and we have the funding available to support a rapid growth strategy."

**ANSWER:** To the extent Paragraph 68 pertains to Dismissed Claims, no response is required.  To the extent the allegations in Paragraph 68 are not directed at the Cruise Defendants, they do not require a response.  To the extent a response is required, Cruise, Mr. West, and Mr. Vogt (i) admit that Cruise obtained a permit from the CPUC to participate in the "Driverless Autonomous Vehicle Passenger Service Pilot Program," the "Phase I Drivered Autonomous Vehicle Passenger Service Deployment Program," and the "Phase I Driverless Autonomous Vehicle Passenger Service Deployment Program" pursuant to Permit No. TCP0039080-P issued on June 2, 2021, amended on June 6, 2022, August 11, 2023, and October 13, 2023; and (ii) respectfully refer the Court to the June 13, 2020, June 15, 2022, and

July 26, 2022 statements referenced in Paragraph 68 for a complete and accurate description of their contents. Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 68 that in June 2022, the CPUC approved Cruise's application for a permit to offer passenger service in in its autonomous vehicles without a safety driver present on select streets in San Francisco from the hours of 10 PM to 6 AM, among other conditions, and denies those allegations on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 68.

69. This growth strategy seemingly bore fruit in September 2022 when Cruise acquired regulatory permits to operate driverless ride-hail services in Phoenix, Arizona and began pursuing ride-hail operations in Austin, Texas. Thus, Defendant Vogt stated at the Goldman Sachs' Communacopia Technology Conference on September 12, 2022, "the question we should all be asking, I think, is no longer does the tech work, but is my city next?"

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that in September 2022, Cruise obtained regulatory permits to operate driverless ride hail services in Phoenix, Arizona and began pursuing ride hail operations in Austin, Texas; and (ii) respectfully refer the Court to the September 12, 2022 statement referenced in Paragraph 69 for a complete and accurate description of its contents. Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 69 and denies the allegations on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 69.

70. Analysts took note of Cruise's growth and importance to GM. For example, similar to its prior statements, on January 3, 2022, Morningstar wrote that it was "optimistic about Cruise because we think GM has underrated AV tech relative to how the market thinks of Tesla. GM, to us, looks far along in AVs because it expects to get the last permit it needs in early 2022 to start providing AV passenger rides in San Francisco without remote assistance or a safety driver (that is, true Level 4 geofenced autonomy)." Morningstar's report continued, "We think Cruise CEO Dan Ammann correctly stressed how Cruise's majority ownership by GM will, in the coming years, enable scaling that other AV ride-hailing providers cannot match anytime soon." Morningstar repeated these sentiments nearly verbatim in multiple reports on January 3, January 20, March 7, March 20, and April 6, 2022. Additionally, at the February 23, 2022 Wolfe Research Global Auto Tech, and Mobility Conference, an analyst commented to Defendant Barra that Cruise's AV technology "could conceivably become one of the most important competitive advantages that GM has" because "[i]t's world changing kind of technology."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the January 3, 2022, January 20, 2022, March 7, 2022, March 20, 2022, and April 6, 2022 Morningstar reports and February 23, 2022 analyst comment referenced in Paragraph 70 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 70.

### d.    2023: Cruise Expands Rapidly

71. Defendant Vogt advised investors on GM's January 31, 2023, earnings call that "we will be expanding in 2023 to several new cities, but our current focus is on expanding our driverless service in San Francisco as well as in Phoenix and Austin following our initial driverless launches there. The initial deployments in Phoenix and Austin were modest, and we want to expand those very quickly." And on GM's April 25, 2023 earnings call, Vogt reported to investors that "right now, a small portion of our fleet is now serving driverless rides 24 hours a day across all of San Francisco." At the Bernstein Strategic Decisions Conference on June 2, 2023, Defendant Barra touted how Cruise had accumulated one million "driverless miles" in the fifteen (15) months preceding early 2023 and that Cruise subsequently accumulated an additional million driverless miles in just three

months—evidencing Cruise's rapid scaling. Barra highlighted that "right now, we're testing the Origin on streets in Austin" and bragged that "[w]e're the only full-line portfolio manufacturer that has the autonomous capability in-house."

**ANSWER:** To the extent Paragraph 71 pertains to Dismissed Claims, no response is required.  The allegations are in part not directed at the Cruise Defendants and therefore do not require a response.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the January 31, 2023, April 25, 2023, and June 2, 2023 statements referenced in Paragraph 71 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 71.

72.   On June 20, 2023, at GM's Annual General Meeting, Defendant Barra touted the fact that Cruise had expanded "into Austin and Phoenix and recently began supervised autonomous driving in Houston and Dallas." Later that month, on GM's July 25, 2023 earning call, Defendant Vogt highlighted that "[o]n the supply side, we recently hit 390 concurrent driverless AVs"—referring to Cruise's autonomous Bolt vehicles—which "we can scale to thousands of AVs." However, Vogt specified that "we're also about to transition to Origins, which are a game-changer for costs."

**ANSWER:** To the extent Paragraph 72 pertains to Dismissed Claims, no response is required.  The allegations are in part not directed at the Cruise Defendants and therefore do not require a response.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the June 20, 2023 and July 25, 2023 statements referenced in Paragraph 72 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 72.

73. During the summer of 2023, Cruise's expansion went into overdrive. On June 27, 2023, Defendant Vogt announced, via X (formerly Twitter), that Nashville, Tennessee would be "our next robotaxi-enabled city. You'll see driverless @cruise AVs there in a few months." On July 19, 2023, Cruise announced, via X, that it was "start[ing] initial testing and data collection in" Miami, Florida. On August 7, 2023, Cruise announced, via X, that it was "begin[ning] our initial testing across" Atlanta. In August 2023, Cruise began testing its AVs in multiple cities in North Carolina. On August 28, 2023, Cruise announced, via X, that it was "begin[ning] our manual data collection in both Seattle and Washington, D.C." And on September 1, 2023, Cruise announced, via X, that it was "begin[ning] our manual data collection in Las Vegas, North Las Vegas, Henderson and more across Clark County, NV."

**ANSWER:** The Cruise Defendants admit that Mr. Vogt posted on X (formerly Twitter) on July 27, 2023; and respectfully refer the Court to the July 27, 2023 X post referenced in Paragraph 73 for a complete and accurate description of its contents. Cruise, Mr. West, and Mr. Vogt also admit that Cruise posted on X on July 19, 2023, August 7, 2023, August 28, 2023, and September 1, 2023; and respectfully refer the Court to the July 19, 2023, August 7, 2023, August 28, 2023, and September 1, 2023 X posts referenced in Paragraph 73 for a complete and accurate description of their contents. Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 73 that Cruise made the July 19, 2023, August, 7, 2023, August 28, 2023, and September 1, 2023 posts on X (formerly Twitter) referenced in Paragraph 73 and deny those allegations on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 73.

42

74.   Crucially, on August 10, 2023, the CPUC approved Cruise's request to expand its service to offer passenger service in its autonomous vehicles without a safety driver present throughout the city of San Francisco, at all hours of day or night. The next month, at the September 7, 2023 Goldman Sachs Communacopia & Technology Conference, Defendant Vogt touted that "[w]e are now cleared to operate commercially in all of San Francisco 24/7 and collect fares, so that was a big win for us, first in the industry; we're one of only two companies who can do that at all."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that Cruise obtained a CPUC permit to participate in the "Driverless Autonomous Vehicle Passenger Service Pilot Program," the "Phase I Drivered Autonomous Vehicle Passenger Service Deployment Program," and the "Phase I Driverless Autonomous Vehicle Passenger Service Deployment Program" pursuant to Permit No. TCP0039080-P issued on June 2, 2021, amended on June 6, 2022, August 11, 2023, and October 13, 2023; (ii) respectfully refer the Court to the CPUC permit referenced in Paragraph 74 for a complete and accurate description of its contents; and (iii) respectfully refer the Court to the September 7, 2023 statement referenced in Paragraph 74 for a complete and accurate description of its contents.  Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 74 that on August 10, 2023, the CPUC approved Cruise's request referenced in Paragraph 74.  The Cruise Defendants otherwise deny the allegations in Paragraph 74.

75.   Finally, in October 2023, GM announced a joint venture with Honda that would begin a driverless ride-hail service in Japan in early 2026. As Defendant Barra noted during GM's October 24, 2023 earnings call, this ride-hail service

would utilize "our Origin, the world's first-ever vehicle purpose-built for autonomous driving on public roads."

**ANSWER:** The allegations in Paragraph 75 are not directed at the Cruise Defendants. Accordingly, no response is required. To the extent Paragraph 75 pertains to Dismissed Claims, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the unspecified October 23, 2023 announcement and the October 24, 2023 statements referenced in Paragraph 75 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 75.

76. Analysts took note of Cruise's purported progress through October 24, 2023. For example, Morningstar, again similar to its prior comments, wrote on March 2, 2023, that it was "optimistic about Cruise because we think GM has underrated AV tech relative to how the market thinks of Tesla. Cruise in 2022 began offering AV passenger rides for a fee in San Francisco without remote assistance or a safety driver, so it has in this market reached level 4 geofenced autonomy. This service expanded to Austin and Phoenix in late 2022, and a previously announced exclusive robotaxi contract with Dubai starts this year. In contrast, Ford in fall 2022 surprisingly shut down its Argo AI AV joint venture with Volkswagen, saying advanced AV technology was too far off in time and not worth the effort presently. Cruise to us shows GM's leadership in the AV space and that level 4 is coming to many cities soon."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the March 2, 2023 Morningstar report referenced in Paragraph 76 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 76.

77. Similarly, a report released by RBC Capital Markets on July 25, 2023 advised that "[w]e are encouraged by the progress at Cruise (3M driverless miles;

safer than a human on like for like roads), and believe GM may be close to an inflection point that unlocks significant upside vs our current $18bn valuation for Cruise."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the July 25, 2023 RBC Capital Markets report referenced in Paragraph 77 for a complete and accurate description of its contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 77.

### 2.   Key Language Defendants Used When Touting Cruise's Autonomous Driving Technology

78. Defendants used a variety of terms to describe the safety and capabilities of its AV technology. In the context of Defendants' public statements concerning Cruise's technology, relevant regulations, documented industry standards, and Cruise's publicly stated definitions and descriptions of what is expected of a driverless AV, Cruise's representations that their vehicles were "fully driverless," "truly driverless," "fully autonomous," "Level 4," or "L4" would be understood by the investing public to convey the same common meaning, that: Cruise's AVs could drive safely, reliably, and legally without input from humans. In other words, without human input, Cruise's AVs could:

    a.    drive safely, which investors would reasonably understand to mean, among other things, that the cars would not engage in facially unsafe driving activity, and would consistently recognize and respond to road conditions in safe and reasonable ways;

    b.    drive reliably, which investors would reasonably understand to mean, among other things, that the cars would consistently navigate to their destinations, without becoming stranded; and

    c.    drive legally, which investors would reasonably understand to mean, among other things, that the cars would consistently comply with driving laws, and were legitimately and legally permitted to operate without a driver.

**ANSWER:** To the extent Paragraph 78 pertains to Dismissed Claims, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the unspecified public statements referenced in Paragraph 78 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 78.

79. Additionally, investors would have understood representations that Cruise's AVs were "fully driverless," "truly driverless," "fully autonomous," "Level 4," or "L4," to mean that the technology it possessed had reached a degree of maturity, such that Cruise could operate a revenue generating robotaxi business, without human intervention, without additional research and development. In other words, that the technology was ready for primetime, and while it may continue to improve, was good enough to begin the commercialization phase without the need for further improvement to reasonably operate a robotaxi business.

**ANSWER:** To the extent Paragraph 79 pertains to Dismissed Claims, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the unspecified public statements referenced in Paragraph 79 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 79.

80. Indeed, Defendants' own statements further cement that their use of these words caries the meaning stated in the prior two paragraphs. For example:

a. At the March 25, 2021 JP Morgan ESG Conference, Defendant Barra stated that "the software driving technology" must be able to show that it "can handle the solutions it's going to see on the road in all cases, not just what's 98% of what you see. It's got to be able to do everything."

b. Likewise in an April 17, 2023 blog post on Cruise's website, by two senior Cruise employees, Cruise stated that Level 4 or "L4" and

46

"fully driverless" are analogous terms, and that "[t]he term fully driverless is used not merely for effect but to communicate an essential expectation: The AV must be capable of driving fully autonomously 100% of the time" (emphasis in original). The blog post continues: "This is to draw a distinction with the L2-L3 ADAS function where there is an expectation of an alert safety driver, who must be prepared to quickly take over. Driving the car autonomously 90% of the time may be extremely desirable in the ADAS context but would be disastrous in the AV context." That blog post went on to explain that "conquering" that last 10% involves 90% of the total effort. It further clarified that a fully driverless AV "must account for the worst- case scenarios to ensure safety and reliability."

c. During a JP Morgan Analyst Conference on March 25, 2021, Defendant Barra stated: "we're working to deliver vehicles that are safer than a human driver will create an improvement from a safety perspective on our roads because autonomous vehicles follow all of the traffic rules. They don't drive distracted or impaired."

d. During GM's first quarter 2021 earnings call, on May 5, 2021, Defendant Barra stated: "Our focus at Cruise is to create the technology that's safer than a human driver and deploy in our first market from a commercialization perspective, and then we'll continue to expand that into other cities   [W]e have kind of a revolutionary and an evolutionary strategy around driver assistance all the way to full Level 4-Level 5 autonomy. So you see Cruise really focused on that full autonomy." During a February 24, 2021 conference hosted by Wolfe Research, Defendant Barra stated: "we want to create a world with zero crashes  and we've got all the assets necessary to do that   We see an opportunity as we demonstrate technology for Cruise that's safer than a human driver."

e. On April 26, 2022, on GM's first quarter 2022 earnings call, Defendant Barra stated: "Cruise continues to make great progress safely and deliberately expanding its full driverless operations in San Francisco."

f. On October 6, 2021, at GM's Investor Day, Defendant Ammann stated that from 2015-2016 until late 2020, Cruise had been in an "R&D phase," wherein it built up the technology and solved the "engineering challenge of a generation," namely "building a self-

47

driving system that can drive with a human or better level of performance." Ammann then explained that Cruise had "reached that level of performance" in late 2020, and that is what "allowed [Cruise] to begin fully driverless testing on the streets of San Francisco." Ammann then said Cruise was "in the middle of th[e] early commercialization phase."

g. On March 10, 2022, at a conference hosted by Morgan Stanley, Defendant Vogt stated that Cruise had reached a point where "from a technical standpoint," Cruise required "zero incremental work" to actually begin operating its robotaxis business (i.e., to "get to revenue"). In the same statement he conveyed that the vehicles would benefit the public in terms of "safety."

h. Throughout the Class Period Cruise's website was full of references to the safety of its AV technology. For example, Cruise claimed they were building "a transportation system that is safe, more affordable, and better for us," that their AVs are "safe, shared, and all-electric," that they were "saving lives," In a blog post on Cruise's website published on February 22, 2023, the company claimed that their "virtuous technology cycle has allowed us to safely and quickly scale our operating fleet in San Francisco," adding that "we've continued to keep safety at the absolute center of everything we do."

**ANSWER:** To the extent Paragraph 80 pertains to Dismissed Claims, no response is required. To the extent the allegations in Paragraph 80 are not directed at the Cruise Defendants, they do not require a response. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the October 6, 2021 and March 10, 2022 statements referenced in Paragraph 80 for a complete and accurate description of their contents. Cruise, Mr. West, and Mr. Vogt (i) admit that Cruise issued a blog post on April 17, 2023; (ii) respectfully refer the Court to the April 17, 2023 blog post referenced in Paragraph 80 for a complete and accurate description of its contents; (iii) admit that Cruise issued a blog post on February 22,

48

2023; and (iv) respectfully refer the Court to the February 22, 2023 blog post referenced in Paragraph 80 for a complete and accurate description of its contents. Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity as to the allegations in Paragraph 80 that Cruise issued the April 17, 2023 and February 22, 2023 blog posts referred to in Paragraph 80 and denies those allegations on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 80.

81.  Likewise, analysts and news publications, demonstrate that the investing public understood Cruise's representations carried the meaning stated in paragraphs 78-79. For example:

a. A March 25, 2021 report by Citi described the scalability of Cruise's AV technology as depending on "key safety x performance metrics (i.e., much safer than human but with human-like agility)" (italics in original).

b. A BofA Global Research report published on October 6, 2023 stated that "[a]mong the most notable of updates from [GM] . . . was around its Cruise business, which has moved from R&D phase (2016-2020) to early commercialization (2021-2022) and a target for rapid scaling in short order (2023- 2025+), with $50bn in incremental revenue seen as an achievable target by end of decade."

c. On October 7, 2021, J.P.Morgan published a report stating that "GM argued in our view convincingly that its focus first on the technology (solving for cost secondarily) has the best chance of advancing toward a workable Level 4 truly fully autonomous commercial robo-taxi application, with the prize being ~$50 bn of annual revenue by 2030." The J.P.Morgan report continued by highlighting that "GM contrasted its own approach to that of others seeking to graduate Level 2 systems to Level 4, which it believes is more problematic from a technical perspective or at

49

least would take longer to resolve." The J.P.Morgan report singled out Defendants Ammann's representation that Cruise had exited the "R&D phase:" "Cruise CEO Dan Ammann characterized the firm as having advanced from the 'R&D Phase' seen in the 2015 / 2016 timeframe to currently being in the 'Early Commercialization' phase over the period 2021-2022, which is the last phase before 'Rapid Scaling' phase which could begin around 2023 on the way to $50 bn of revenue by 2030." On October 21, 2021, J.P.Morgan republished these comments in a State of the Auto Industry report.

d.   In an October 7, 2021 report, RBC Capital Markets noted that Cruise "just received the fifth of six permits needed to do paid, driverless ride-hail in California" and that the next permit "would allow it to start generating revenue from rides." This RBC report also described Cruise's "strateg[y]" of achieving "low-cost generalized autonomy" as the result of "solv[ing] performance (L4/5 with human out of the loop) and then optimiz[ing] cost."

e.   On July 25, 2023, a report by RBC Capital Markets July 25, 2023 advised that "[w]e are encouraged by the progress at Cruise (3M driverless miles; safer than a human on like for like roads), and believe GM may be close to an inflection point that unlocks significant upside vs our current $18bn valuation for Cruise."

f.   On September 11, 2023, Goldman Sachs Equity Research released a report that highlighted Cruise as a company that "continue[d] to make progress with autonomous/ADAS technologies and timelines" because, among other things, "Cruise emphasized that its vehicle performance has been better than human drivers in SF."

g.   Throughout the Class Period, Morningstar repeatedly advised that Cruise was either on the cusp of or had already begun providing AV passenger rides in San Francisco "without remote assistance or a safety driver (that is, true Level 4 geofenced autonomy)." Specifically, Moningstar stated this on October 10, 2021; January 3, January 20, March 7, March 20, and April 6, 2022; and October 24, 2023. In its October 24, 2023 publication, Morningstar also wrote that "Cruise to us shows GM's leadership in the AV space and that level 4 is coming to many cities soon."

50

**ANSWER:** To the extent Paragraph 81 pertains to Dismissed Claims, no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the referenced reports in Paragraph 81 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 81.

82. In addition, **at a minimum**, investors would have reasonably understood Defendants' representations that Cruise's AVs were "fully driverless," "truly driverless," "fully autonomous," "Level 4," or "L4," to mean that the system complied with the SAE's minimum requirements for a system to qualify as Level 4. To operate legally in California, Cruise needed to verify to the DMV that its vehicles operated at Level 4 autonomy, according to the SAE's definition of that term. In the DMV's announcement, in October 2020, that it had approved Cruise to test driverless vehicles on the streets of San Francisco, the DMV accepted Cruise's representation its vehicles were either "SAE Level 4 or 5 vehicle[s]." Likewise, when Cruise applied to the CPUC on November 5, 2021 to offer passenger service without a safety driver on select streets in San Francisco from the hours of 10 PM to 6 AM (which the CPUC approved in June 2022), Cruise represented to the CPUC that "[t]he Cruise AV meets the description of a Level 4 automated driving system under SAE International's Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles." Cruise made this same representation when it applied on December 16, 2022 for approval to operate its driverless vehicles around the clock (which the CPUC approved in August 2023).

**ANSWER:** The Cruise Defendants (i) respond that Paragraph 82 in part asserts a legal conclusion to which no response is required; (ii) respectfully refer the Court to the October 2020 DMV announcement referenced in Paragraph 82 for a complete and accurate description of its contents; (iii) admit that Cruise submitted an application to the CPUC on November 5, 2021 (the "November 2021 CPUC Application") for a "Driverless Deployment permit in the form of a Tier 3 Advice

51

Letter to participate in the Commission's Phase I Driverless Autonomous Vehicle ('AV') Deployment Program"; and (iv) respectfully refer the Court to the November 2021 CPUC Application referenced in Paragraph 82 for a complete and accurate description of its contents. Cruise, Mr. West, and Mr. Vogt (v) admit that the CPUC approved Cruise's November 2021 CPUC Application in June 2022; (vi) admit that Cruise submitted an application to the CPUC on December 16, 2022 (the "December 2022 CPUC Application") for a "service expansion of its Driverless Deployment permit issued pursuant to the Commission's Phase I Driverless Autonomous Vehicle ('AV') Deployment Program"; (vii) respectfully refer the Court to the December 2022 CPUC application referenced in Paragraph 82 for a complete and accurate description of its contents; and (viii) admit that the CPUC approved Cruise's December 2022 CPUC Application in August 2023. Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of Cruise's application on December 16, 2022 or CPUC's approval in August 2023 and denies the allegations in Paragraph 82 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 82.

83. The SAE defines five levels of vehicle autonomy. Ranging from basic driver assistance (Level 1) to vehicles that can complete the entirety of all driving tasks on any road a human could also drive on (Level 5). A Level 4 system differs from a Level 5 system, in that it may be subject to an "Operational Design Domain,"

such as being restricted to driving within a specific geography (e.g., San Fransisco).[4]

**ANSWER:** The Cruise Defendants respectfully refer the Court to the SAE Taxonomy referenced in Paragraph 83 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 83 and Footnote 4.

84. Under the SAE's definition, when in operation, a Level 4 system must perform the "entire" dynamic driving task (the "DDT"). The DDT is essentially defined as every aspect of driving, including steering, accelerating, breaking, identifying objects on the road, determining how to respond to road conditions, determining how to maneuver the vehicle, and signaling to other vehicles. The formal definition is as follows:

> All of the real-time operational and tactical functions required to operate a vehicle in on-road traffic, excluding the strategic functions such as trip scheduling and selection of destinations and waypoints, and including, without limitation, the following subtasks:
>
> 1. Lateral vehicle motion control via steering (operational).
>
> 2. Longitudinal vehicle motion control via acceleration and deceleration (operational).
>
> 3. Monitoring the driving environment via object and event detection, recognition, classification, and response preparation (operational and tactical).
>
> 4. Object and event response execution (operational and tactical).
>
> 5. Maneuver planning (tactical).

---

[4] The description herein of a Level 4 system largely omits discussion of the concept of an operational design domain ("ODD"), because no major issues here turn on that concept—e.g., Cruise's ODD was to operate in the geographies it operated within, during the hours it operated within.

6.        Enhancing conspicuity via lighting, sounding the horn, signaling, gesturing, etc. (tactical).

**ANSWER:** The Cruise Defendants respectfully refer the Court to the SAE Taxonomy referenced in Paragraph 84 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 84.

85. Importantly, SAE also distinguishes between the role of (1) "users" (which it defines as any human, whether remote or in the vehicle) and (2) the role of the autonomous driving system ("ADS"), when a Level 4 system is in operation. The only proper role for humans is to "request that the ADS disengage," and "become the driver after the system is disengaged." This further clarifies the formal definition of Level 4, by cementing that a system that expects humans to perform any aspect of the DDT (including "object and event detection, recognition, classification, and response preparation"), cannot properly be considered a Level 4 system. Similarly, the SAE defines the concept of "remote driving," which refers to any instance where a human outside the car is performing any portion of the DDT, and clarifies that "remote driving is not driving automation"—in other words, if a system relies on remote humans to assist in performing the DDT, it cannot be classified as a Level 4 system.

**ANSWER:** The Cruise Defendants respectfully refer the Court to the SAE Taxonomy referenced in Paragraph 85 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 85.

86. A final relevant aspect of the SAE's definition of Level 4 autonomy is the concept of "fallback," which refers to what the vehicle does when its driving systems fail to function in properly.[5] Per the SAE, whenever something occurs that prevents the autonomous driving technology from "reliably performing" the complete DDT, a Level 4 system must come to a "stable, stopped condition," without human input.[6] If an autonomous driving system cannot come to a stable, stopped condition without human input, when its systems fail to perform every aspect of the

_____

[5] The technical terms for this are "DDT Fallback" and a "DDT Relevant Performance System Failure."

[6] The technical term for this is the "minimal risk condition."

DDT reliably (*e.g.*, it misidentifies or fails to identify a person or an object), it cannot be classified as Level 4. Striking a pedestrian, failing to recognize that a pedestrian is under the car, and proceeding to drive, while dragging the pedestrian, would be a quintessential example of activity that violates this mandate.

**ANSWER:** The Cruise Defendants respectfully refer the Court to the SAE Taxonomy referenced in Paragraph 86 and Footnotes 5 and 6 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 86 and Footnotes 5 and 6.

### B. Defendants Mislead the Market Concerning Cruise's AV Technology

#### 1. Defendants Repeatedly Touted the Capability and Safety of Cruise's AVs

87. Throughout the Class Period Defendants repeatedly told investors that Cruise's AV technology had reached a such a high degree of autonomy that it enabled Cruise's AVs to drive safely, reliably, and legally without interaction from humans, and that Cruise's AV technology had reached a degree of maturity, such that Cruise could operate a revenue generating robotaxi business, without human intervention, without additional research and development.

**ANSWER:** To the extent Paragraph 87 pertains to Dismissed Claims, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the unspecified public statements referenced in Paragraph 87 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 87.

88. At GM's October 6, 2021 Investor Day, Defendant Ammann repeatedly stated that Cruise's AV technology had taken humans "out of the loop," thus conveying to the market that Cruise's AVs were not reliant on humans while in operation. Specifically, Ammann stated that the performance of Cruise's AV technology had reached such a high level of autonomy that "we can take the human

out of the loop." Ammann continued, telling investors that Cruise had "solve[d] that part of the equation first to get to the point where we know we can take the human out of the loop and do that safely." In that same event, Ammann was unequivocal, proclaiming that "we have a system that can operate without a human in the loop now."

**ANSWER:** The allegations in Paragraph 88 form the basis for Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the October 6, 2021 statements referenced in Paragraph 88 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 88.

89. During GM's October 6, 2021 Investor Day, Defendants also touted the supposedly "fully driverless" capabilities of Cruise's AV technology. Defendant Ammann, for example, stated that Cruise had developed an "end-to-end fully driverless AV system" and had "beg[u]n fully driverless testing on the streets of San Francisco." Defendants repeated their claims that Cruise had developed "fully driverless" AV technology throughout the Class Period. Defendant Barra, for example, assured investors during GM's fourth quarter 2021 earnings call, on February 1, 2022, that "Cruise team members have been taking fully driverless rides in San Francisco since November," and during GM's July 26, 2022 second quarter 2022 earnings call touted "the Cruise team's launch of fully driverless commercial operations in San Francisco in June," noting that the launch was "[w]ithout question . . . historic." Later that year, on September 12, 2022, at a conference hosted by Goldman Sachs, Defendant Barra, referring to Cruise, stated that "they are the first company, as I mentioned, to operate a fully autonomous ride-hailing business in a major US city, a dense urban environment."

**ANSWER:** The allegations in Paragraph 89 form the basis for Dismissed Claims. Accordingly, no response is required. The allegations are in part not directed at the Cruise Defendants and therefore do not require a response. To the extent a response is required, the Cruise Defendants respectfully refer the Court to

56

the October 6, 2021 statement referenced in Paragraph 89 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 89.

90. Similarly, during GM's third quarter 2022 earnings call on October 25, 2022, Defendant Vogt told investors that "[w]e've now driven well over 400,000 fully driverless miles in San Francisco." Vogt doubled down three months later during GM's fourth quarter 2022 earnings call on January 31, 2023, stating that "last year was the year that fully driverless AVs transitioned from being a moonshot to reality, with the Cruise robotaxi fleet serving thousands of rides to real customers in a major US market, and making its first fully driverless deliveries."

**ANSWER:** The allegations in Paragraph 90 form the basis for Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the October 25, 2022 and January 31, 2023 statements referenced in Paragraph 90 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 90.

91. Throughout the Class Period Defendants also repeatedly described Cruise's AV technology as having reached "Level 4" autonomy. For example, at GM's Investor Day on October 6, 2021, Defendant Barra stated that "with Cruise, we are defining the commercialization strategies for Level 4 autonomy," and Defendant Parks represented that "Cruise, as [Defendant Ammann] just discussed, is developing and launching a driverless fully autonomous Level 4 vehicle." Similarly, On June 15, 2023, at a conference hosted by Deutsche Bank, Defendant Jacobson stated "it's not like we're Level 2. We're full Level 4, no driver in the vehicle at all" and that reiterated that "we've got the Level 4 technology."

**ANSWER:** The allegations in Paragraph 91 are not directed at the Cruise Defendants. Accordingly, no response is required. To the extent Paragraph 91

57

pertains to Dismissed Claims, no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the October 6, 2021 and June 15, 2023 statements and unspecified statements referenced in Paragraph 91 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 91.

92. Defendants also repeatedly touted to the market that Cruise's AV technology had progressed beyond the "R&D phase" and into the "early commercialization phase," which sent the message to investors that Cruise had developed and were employing "fully driverless" technology and that Cruise's AVs did not require additional research and development for Cruise to operate a revenue generating robotaxi business. For example, on October 6, 2021, at GM's Investor Day, Defendant Ammann stated that "[o]ver the last several years from 2015, 2016 timeframe through the end of last year, we were clearly very much in an R&D phase," which "was all about building up the core technology and trying to solve that engineering challenge of a generation of building a self-driving system that can drive with a human or better level of performance. And we first reached that threshold for the first time late last year." This technological breakthrough, according to Defendant Ammann was "what allowed us to begin fully driverless testing on the streets of San Francisco which we began around October, November of last year. And that marked the beginning of the next phase of the Cruise journey which we refer to as early commercialization." Ammann reiterated this sentiment at the same Investor Day, stating "we're in the middle of this early commercialization phase." Similarly, on September 12, 2022, at a conference hosted by Goldman Sachs, Defendant Vogt stated that "we crossed that critical inflection point when we did our first driverless deployment in a major urban market like that was the point at which this turned from a binary problem, like does the tech exist or does it not, to a scaling problem, which is how quickly can we light up new markets, how quickly can we build vehicles."

**ANSWER:** To the extent Paragraph 92 pertains to Dismissed Claims, no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the October 6, 2021 and September 12, 2022

58

statements referenced in Paragraph 92 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 92.

93.  Defendants also assured investors numerous times that Cruise's AV technology was safer than a human driver.  For example, on February 24, 2021, at a conference hosted by Wolfe Research, Defendant Barra stated that "[w]e see an opportunity as we demonstrate technology for Cruise that's safer than a human driver."  Later that year, on October 6, 2021, at GM's Investor Day, Defendant Ammann stated that Cruise had "reached that threshold for the first time late last year" referring to "building up the core technology and trying to solve that engineering challenge of a generation of building a self-driving system that can drive with a human or better level of performance."  Barra continued claiming that Cruise vehicles were safer than humans to the very end of the Class Period, stating on GM's third quarter 2023 earnings call on October 24, 2023 that "it [*i.e.*, Cruise's AV technology] is safer than a human driver."

**ANSWER:** The allegations in Paragraph 93 form the basis for Dismissed Claims.  Accordingly, no response is required.  The allegations are in part not directed at the Cruise Defendants and therefore do not require a response.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the October 6, 2021 statements referenced in Paragraph 93 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 93.

94.  Finally, throughout the Class Period Defendants continually touted their receipt of, or applications for, certain regulatory permits that depended on Cruise certifying its AV technology was at Level 4.  For instance, on June 14, 2021, at GM's Annual General Meeting, Defendant Barra stated that just recently, "the California Public Utilities Commission issued Cruise a permit to give passengers a ride without a driver behind the wheel."  Similarly, on October 6, 2021, at GM's Investor Day, Defendant Ammann boasted that "on the regulatory front, we are

making really great progress. We need six permits in total to get to do paid ridehail driverless in California. We have five of the six. The fifth one we just received late last week." Defendant Vogt parroted this misrepresentation on February 1, 2022, on GM's fourth quarter 2021 earnings call, stating that "we still have five out of the six necessary permits to operate a fared rideshare service     And we filed the last – the application for the last remaining permit in November last year, and we continue to work with the CPUC." When Cruise finally received this final permit, Barra touted Cruise's achievement to the market at GM's Annual General Meeting on June 13, 2022, stating "Cruise received a final permit i[t] needed from the California Public Utilities Commission to charge for rides. So, that means Cruise is now officially the first and only company to operate a commercial driverless ride-hail service in a major US city."

**ANSWER:** To the extent Paragraph 94 pertains to Dismissed Claims, no response is required. The allegations are in part not directed at the Cruise Defendants and therefore do not require a response. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the October 6, 2021 and February 1, 2022 public statements referenced in Paragraph 94 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 94.

### 2. The Undisclosed Truth About Cruise's Lack of "Fully Driverless" Technology

#### a. Former Cruise and GM Employees Detail Persistent Deficiencies in the Safety and Capability of Cruise Avs

95. Multiple former Cruise and GM employees recount persistent problems with Cruise's AV technology during the Class Period, specifically with its safety and capabilities.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether former Cruise and GM employees made the

60

statements attributed to them in Paragraph 95 and deny the allegations in Paragraph

95 on that basis.

96. CW-1 was formerly employed in California by Cruise from September 2019 to July 2022. CW-1 had multiple software engineering titles, including Senior Software Engineer II. His responsibilities included developing a software fleet management tool, which was critical to the safety of Cruise's AVs.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information

to form a belief as to the truth or falsity of the allegations in Paragraph 96 and deny

the allegations in Paragraph 96 on that basis.

97. At Cruise, CW-1 witnessed a culture of downplaying internal concerns by many employees regarding safety and compliance issues with Cruise AVs in order to push production along. At Cruise, there were "many employees" that felt that Cruise's AV technology was "unsafe and rushed," and they felt pressure from "Cruise leadership" to downplay those concerns.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information

to form a belief about whether purported CW-1 made the statements attributed to

him in Paragraph 97 and deny the allegations in Paragraph 97 on that basis.

98. CW-1 advised that safety tickets were entered into Siren, which was a system at Cruise for logging safety issues. These safety tickets were seemingly not addressed in a timely manner. CW-1 recalled that he entered one safety ticket into that system in December 2021 concerning an incident on November 19, 2021, and he was "pressured to close" the ticket before an assessment of the incident and what led to it had been conducted, and that he noticed the ticket was still open and unresolved months later in May 2022.

**ANSWER:** The Cruise Defendants (i) admit that Siren was a system at Cruise

for logging safety-related reports during the purported Class Period; and (ii)

otherwise respond that the Cruise Defendants lack sufficient knowledge or

information to form a belief about whether purported CW-1 made the statements

attributed to him in Paragraph 98 and deny the allegations in Paragraph 98 on that

basis.

99. According to CW-1, the ticket he entered into Siren regarding the November 19, 2021 incident involved how Cruise did not have a threshold in number of occurrences that would automatically lead to a grounding so that the problem could be investigated and fully resolved before operating the fleet again. According to CW-1, the subject of the ticket was that fleets of Cruise AVs were being grounded with a high frequency and that this high volume of AV groundings was a safety concern. CW-1 added that in that ticket he explained how operators did not fully understand what to do and would take control of the AVs out of an overabundance of caution. According to CW-1, he entered this ticket after Cruise's entire fleet in San Francisco, California was grounded. CW-1 recalled that in some cases groundings of the entire fleet occurred because of a software issue and then the fleet would be up and running the following day without knowing or understanding how serious the software issue had been.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information

to form a belief about whether purported CW-1 made the statements attributed to

him in Paragraph 99 and deny the allegations in Paragraph 99 on that basis.

100. On February 28, 2022, CW-1 discussed procedural and/or safety concerns with his manager, who forwarded the emails to others.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information

to form a belief as to the truth or falsity of the allegations in Paragraph 100 and deny

the allegations in Paragraph 100 on that basis.

101. CW-1 personally witnessed the result of Cruise ignoring safety and compliance concerns when he was stranded with a malfunctioning AV while having been an operator during a test ride in Spring 2022. On that night, CW-1 experienced what he described as an "outage" of Cruise's test AV fleet. According to CW-1, he was in one of Cruise's AVs during testing when an outage occurred and the fleet's

"critical and safety functions went out," leaving him stranded on the side of the road and required VRE (vehicle retrieval). CW-1 said that this led to some of the AVs involved in the test that night stopping in the middle of lanes. It was CW-1's understanding given the severity of the outage, that a longer-term grounding of the fleet should have occurred based on both internal and California DMV requirements, he believes. CW-1 said that by the next day, however, the fleet was in operation again without resolution of this safety issue.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-1 made the statements attributed to him in Paragraph 101 and deny the allegations in Paragraph 101 on that basis.

102. CW-1 advised that the next day he entered a question into Cruise's Slido system—which he described as an internal question-and-answer platform— asking why Cruise had only temporarily shut down the fleet when it should have been grounded after such an incident had occurred. CW-1 explained that a grounding occurs during more serious events and calls not only for the problem to be fixed but for a fulsome investigation to understand what led to the problem before the fleet is put back into operation.

**ANSWER:** The Cruise Defendants (i) admit that Slido is a question-and-answer platform that Cruise employees used during the purported Class Period; and (ii) otherwise respond that the Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-1 made the statements attributed to him in Paragraph 102 and deny the allegations in Paragraph 102 on that basis.

103. CW-1 recalled Vogt stating in many all-hands meetings that "he and the C-Suite" review many of the questions entered into Slido. CW-1 added that Vogt "assured" the attendees that the C-Suite made reviewing the questions in Slido a priority and that Vogt addressed some of the questions submitted to Slido in person at these all-hands meetings held weekly on Mondays at lunch. CW-1 recalled that

63

Vogt stated that Cruise employees should enter concerns into Slido and that he and the C-Suite would address them.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-1 made the statements attributed to him in Paragraph 103 and deny the allegations in Paragraph 103 on that basis.

104. CW-1 then sent an anonymous email to the CPUC, advising that Cruise was internally concealing safety issues.

**ANSWER:** The Cruise Defendants (i) lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 104; and (ii) respectfully refer the Court to the CPUC email referenced in Paragraph 104 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 104.

105. CW-1 provided this email to Lead Counsel.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 105 and deny the allegations in Paragraph 105 on that basis.

106. In CW-1's email to the CPUC, CW-1 states that "Currently (as of May 2022) with regularity there are incidents where our San Francisco fleet of vehicles individually or in clusters enter a 'VRE' or Vehicle Retrieval Event. When this occurs, a vehicle is stranded, often in lanes where they are blocking traffic and potentially blocking emergency vehicles. Sometimes it is possible to remotely assist the vehicle safely pulling over, but there have been some cases where fallback systems have also failed and it was not possible to remotely maneuver the vehicle outside of the lanes they were blocking until they were physically towed from their location to a facility."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the CPUC email referenced in Paragraph 106 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 106.

107. CW-1's email also states that "[a] couple other things worth mentioning are that documentation of core system functionality is routinely non-existent and doesn't appear to be a priority, and that it appears that the results of investigations performed into collisions involving Cruise vehicles and other sensitive potentially damaging matters are intentionally being hidden from the majority of employees. As an employee working on safety critical systems, the only reason I can think of for this type of information to be hidden from employees like me is for the purpose of optics and damage control, and I do not believe is consistent with a safety-first culture."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the CPUC email referenced in Paragraph 107 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 107.

108. Additionally, CW-1's email to the CPUC recounts an instance where he entered a report into a "safety reporting system" to "report a safety concern," but "[o]ver six months later, the safety ticket that I filed is still in an in-progress status." CW-1's email went on: "The in progress status does not mean that the underlying issue hasn't been addressed which may understandably take some time, but rather that a risk assessment for the concern itself has not been completed. I would expect that this process take days, or perhaps a few weeks at most during busy times, but a period of six months suggests the ticket will remain in triage indefinitely without having had a completed risk assessment performed." CW-1's email then stated that "[t]he company does not to my knowledge have a required turnaround time for these tickets which may make leaving them in triage indefinitely appear to not be a problem. I do not know if my experience with our safety reporting system is representative of the majority of cases, but I do believe it is at least indicative of a very chaotic environment that allows this kind of thing to happen."

65

**ANSWER:** The Cruise Defendants respectfully refer the Court to the CPUC email referenced in Paragraph 108 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 108.

109. In early July 2022, reports of CW-1's email to the CPUC appeared in some publications, including the *Wall Street Journal* and *Wired*. After the articles appeared, there was internal questioning at Cruise as to who sent the email to the CPUC, and CW-1 was then terminated in July 2022. CW-1 believes that Cruise retaliated against him for his email to the CPUC and/or because of the safety issues he had raised, including the tickets he had submitted into Siren.

**ANSWER:** The Cruise Defendants (i) respectfully refer the Court to the *Wall Street Journal*, *Wired*, and unspecified articles referenced in Paragraph 109 for a complete and accurate description of their contents; and (ii) otherwise lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 109 and deny the allegations in Paragraph 109 on that basis.

110. CW-2 was employed by Cruise as the Safety Assurance Manager of Cruise's SMS or Safety Management System team from April 2022 to December 2023. According to CW-2, the SMS team rolled up under current Director of Operational Safety Julia Cabral, who ultimately reported to current Vice President AV Performance and Validation Louise Zhang. CW-2 was responsible for developing policies to monitor risks and audit safety methodologies, and his responsibilities also included designing risk assessment and confidential risk forms, among other duties. According to CW-2, he was one of three members of the SMS team, and that the team rolled up into the Operational Safety group, which was a part of the wider Systems Engineering Group.

**ANSWER:** The Cruise Defendants (i) admit that Julia Cabral was a Director of Operational Safety during the purported Class Period; (ii) admit that Louise Zhang was a Vice President at Cruise during the purported Class Period; and (iii) otherwise

lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 110 and deny the remaining allegations in Paragraph 110 on that basis.

111. According to CW-2, interactions with GM included GM employees occupying Board seats at Cruise and a Cruise's Functional Safety (FUSA) Team having weekly interfaces with GM. According to CW-2, these weekly interfaces occurred throughout his tenure.

**ANSWER:** The allegations in Paragraph 111 form the basis for Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-2 made the statements attributed to him in Paragraph 111 and deny the allegations in Paragraph 111 on that basis.

112. CW-2 recalled the environment at Cruise was "toxic" and "straining," particularly towards the end of 2022 when there was greater urgency on scaling at Cruise.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-2 made the statements attributed to him in Paragraph 112 and deny the allegations in Paragraph 112 on that basis.

113. According to CW-2, the Systems Engineering Group held quarterly All Hands Meetings that then became monthly following the accident in October 2023 where a pedestrian was dragged underneath a Cruise vehicle. CW-2 recalled that these meetings often involved shouting and engineers voicing concerns that Cruise was scaling too fast and that they were not being provided enough time to minimize safety concerns. Leadership present at these meetings included current Vice President AV Performance and Validation Louise Zhang, who was the Vice President of Systems and Safety before temporarily being elevated to Interim Chief Safety Officer.

67

**ANSWER:** The Cruise Defendants (i) admit that the Systems Engineering Group held All Hands Meetings before and after the Accident; (ii) admit that Louise Zhang generally attended the Systems Engineering Group's All Hands meetings and served as Vice President AV Performance and Validation, Vice President of Systems and Safety, and Interim Chief Safety Officer at times during the purported Class Period; and (iii) lack sufficient knowledge or information to form a belief about whether purported CW-2 made the statements attributed to him in Paragraph 113 and deny the remaining allegations in Paragraph 113 on that basis.

114. CW-2 recalled that Zhang reported to current President and CTO, then Executive Vice President, Mohamed (Mo) Elshenawy while serving as the Vice President of Systems and Safety and held weekly staff meetings with Elshenawy. CW-2 explained that during this period Zhang maintained "a normal cadence" of communication with Vogt.

**ANSWER:** The Cruise Defendants (i) admit that Louise Zhang reported to then Executive Vice President Mohamed Elshenawy while serving as a Vice President during part of the purported Class Period; (ii) admit that Louise Zhang typically held regular meetings with Mohamed Elshenawy during part of the purported Class Period; (iii) admit that Louise Zhang communicated with Mr. Vogt during the purported Class Period; and (iv) lack sufficient knowledge or information to form a belief about whether purported CW-2 made the statements attributed to him in Paragraph 114 and deny the remaining allegations in Paragraph 114 on that basis.

68

115. According to CW-2, Cruise was split between engineering and operations with Vogt leading the engineering side while maintaining his CTO role when he was also CEO.

**ANSWER:** The allegations in Paragraph 115 are too vague to be admitted or denied. To the extent a response is required, the Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-2 made the statements attributed to him in Paragraph 115 and deny the allegations in Paragraph 115 on that basis.

116. CW-2 explained that safety risk assessments were conducted to identify high levels of risks and many concerns and hazards were being identified as "high risk." Risks or hazards categorized as "high" are supposed to be fixed, but they often weren't fixed because the mentality at Cruise, which prioritized scaling quickly over ensuring the safety and capabilities of Cruise technology, prevented this. CW-2 explained that a list of Safety Risk Assessments ("SRA(s)") was maintained in an Excel spreadsheet and additional details were recorded in a running Word document. CW-2 continued to say that it got to the point where filling out SRAs became just a "check in the box" and even where they were addressed they were never mitigated.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-2 made the statements attributed to him in Paragraph 116 and deny the allegations in Paragraph 116 on that basis.

117. CW-2 explained that Vogt and West had access to the "Risk Register," which was a database that included every SRA company-wide. According to CW-2, risks deemed "extreme" went to Vogt, "high" to West, "medium" to a director, and "low" to a manager. According to CW-2, Vogt "owned" the extreme risks in the register, meaning if they were marked "extreme," Vogt had responsibility for them and there would be a meeting about the issue. CW-2 recalled that Vogt and West "always" had access to the Risk Register.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-2 made the statements attributed to him in Paragraph 117 and deny the allegations in Paragraph 117 on that basis.

118. According to CW-2, there was an Executive Leadership Board referred to as the Safety Review Board ("SRB") that was "briefed" on all high and extreme risk SRAs.  CW-2 explained that Vogt, West, and former Co-Founder and Chief Product Officer Daniel Kan were on the SRB.

**ANSWER:** The Cruise Defendants (i) admit that Cruise had executive level meetings during the purported Class Period that reviewed certain Safety Risk Assessments and certain other safety-related issues; (ii) admit that Mr. Vogt, Mr. West, and Daniel Kan attended certain of these meetings; and (iii) lack sufficient knowledge or information to form a belief about whether purported CW-2 made the statements attributed to him in Paragraph 118 and deny the remaining allegations in Paragraph 118 on that basis.

119. According to CW-2, Remote Assistance Operators handled issues like the car unexpectedly stopping in traffic and could manually direct the vehicle from their computers, such as directing the vehicle, go around an object, back up, make a U-turn, etc. in order to get the car moving in the correct direction.  CW-2 added that this action could take several minutes to complete.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-2 made the statements attributed to him in Paragraph 119 and deny the allegations in Paragraph 119 on that basis.

120. According to CW-2, there were also Fleet Service Coordinators in charge of Fleet Service Representatives, who waited all around San Francisco to physically drive the cars if a Remote Assistance Operator could not correct an issue.

70

CW-2 explained that there is a key hidden on each car that allows the Fleet Service Representatives to take control of the vehicle. CW-2 continued to say that Fleet Service Representatives needed to retrieve and drive malfunctioning vehicles "almost every night."

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-2 made the statements attributed to him in Paragraph 120 and deny the allegations in Paragraph 120 on that basis.

121. CW-2 recalled that West was provided with a monthly MPR report with Operations statistics, including details about the Remote Assistance Operators, including how often they intervened. CW-2 continued to say that Vogt received a similar report from Systems Engineering. According to CW-2, Vogt was also apprised of when Fleet Service Representatives needed to retrieve and drive malfunctioning vehicles. CW-2 explained that in addition to this summary received by Vogt, he received a phone call from the Incident Commander about every accident. For example, CW-2 recalled Vogt receiving a call when Cruise vehicles were hitting downed powerlines in San Francisco following a storm.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-2 made the statements attributed to him in Paragraph 121 and deny the allegations in Paragraph 121 on that basis.

122. CW-2 recalled that the Systems Engineering Team "always expressed grief" with regards to Cruise "scaling recklessly," but that former Executive Vice President and now current President and CTO Mohamed (Mo) Elshenawy only wanted to fix small issues and was not interested in addressing systemic issues, that would have prevented the company from scaling or delay their timeline to scale.

**ANSWER:** The Cruise Defendants (i) admit that Mohamed Elshenawy previously served as Cruise's Executive Vice President, President, and CTO; and (ii) lack sufficient knowledge or information to form a belief about whether

71

purported CW-2 made the statements attributed to him in Paragraph 122 and deny the remaining allegations in Paragraph 122 on that basis.

123. CW-2 went on to recall that there was a public inquiry from regulators following a storm in San Francisco where Cruise vehicles ran into downed powerlines. CW-2 explained that Cruise was hesitant to share risk assessments with the NHTSA, the DMV, and CPUC. CW-2 described the Legal Department as taking advantage of "loopholes" to provide as little information as possible.

**ANSWER:** The Cruise Defendants (i) admit there was public reporting regarding regulator contact with Cruise following a storm in San Francisco in March 2023; and (ii) lack sufficient knowledge or information to form a belief about whether purported CW-2 made the statements attributed to him in Paragraph 123 and deny the remaining allegations in Paragraph 123 on that basis.

124. CW-2 recalled that after the accident in October 2023, Legal and Safety leadership did not want an in-depth root cause analysis conducted as a part of the investigation.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-2 made the statements attributed to him in Paragraph 124 and deny the allegations in Paragraph 124 on that basis.

125. CW-3 was employed by Cruise as an Autonomous Vehicle Operator from October 2021 until approximately late May or early June 2022. CW-3 explained that he worked in Operations and his responsibilities primarily focused on ensuring the vehicles were prepared to launch and to go onto public roads. CW-3 continued to say that when he initially began at Cruise he was tasked with preparing the software on the vehicles prior to deployment and was responsible for 10–20 cars per shift at the 1201 Bryant facility in San Francisco. According to CW-3, preparation included software installation and safety checks.

72

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 125 and deny the allegations in Paragraph 125 on that basis.

126. CW-3 explained that Cruise AVs "were not ready for primetime" and that this was apparent when he initially joined the company in October 2021 and throughout his tenure. According to CW-3, it was "not hard to see" that the Cruise AVs were not ready, and he was surprised by the push to launch more cars.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-3 made the statements attributed to him in Paragraph 126 and deny the allegations in Paragraph 126 on that basis.

127. CW-3 recalled that the cars failed "quite frequently" when facing congestion, which is very common in San Francisco, and also when there were road obstructions, such as a police action. CW-3 recalled an issue when cars departing the Bryant Street facility reached the next corner, approximately 100 yards away, and "just stopped" and needed to be physically retrieved.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-3 made the statements attributed to him in Paragraph 127 and deny the allegations in Paragraph 127 on that basis.

128. CW-3 recalled witnessing police taping off an intersection after an accident and re-routing traffic, but the Cruise vehicle could not adjust its route properly and the car just stopped. CW-3 continued to say that the car's route could not be remotely adjusted, and the car had to be retrieved. According to CW-3, Cruise AV's map was telling the car to go straight, but it was being forced to go right due to the incident. CW-3 explained that at this time that Cruise was unable to "dynamically" change a vehicle's route. According to CW-3, three separate Cruise AVs failed to adjust properly, and the launch had to be stopped and each car had to be physically retrieved and launched from another location.

73

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-3 made the statements attributed to him in Paragraph 128 and deny the allegations in Paragraph 128 on that basis.

129. According to CW-3, another issue involved a Cruise vehicle that "banged" into a municipal vehicle and just stopped.  CW-3 explained that functionality and safety issues like this were a "daily occurrence."  CW-3 explained that there were several instances of similar events that eventually led the San Francisco Fire Department to complain about Cruise vehicles.  According to CW-3, "not a day" went by without functionality and safety issues arising.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-3 made the statements attributed to him in Paragraph 129 and deny the allegations in Paragraph 129 on that basis.

130. According to CW-3, he observed issues with Cruise AVs taking unprotected left turns.  CW-3 explained that the Cruise AVs made "questionable" unprotected left turns and colleagues noted to CW-3 that it was a "problem."  According to CW-3, the Cruise AVs made "sketchy decisions" when making unprotected left turns, including turns when they should not have gone.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-3 made the statements attributed to him in Paragraph 130 and deny the allegations in Paragraph 130 on that basis.

131. CW-3 also observed instances towards the end of 2022 when Cruise AVs would take wide right-hand turns such that the AV would nearly go into another lane. CW-3 explained that this issue regarding wide right turns was eventually fixed, but there was no communication that it was being or had been addressed.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-3 made the statements attributed to him in Paragraph 131 and deny the allegations in Paragraph 131 on that basis.

132. CW-3 recalled another issue where Cruise AVs drove "off map" and Cruise was unaware of where the vehicles were. CW-3 continued to say that the Security team, at this time comprised of former law enforcement officers, were able to locate the vehicles using social media. CW-3 explained that this occurred "at least" two or three times. According to CW-3, the Operations Coordinator working at the time would have escalated the issue and he was "sure" that Senior Management would have known about the incidents.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-3 made the statements attributed to him in Paragraph 132 and deny the allegations in Paragraph 132 on that basis.

133. According to CW-3, the Cruise AVs struggled with "simple things" such as a "big splash" of water hitting the car and the car thinking that it was in an accident. CW-3 continued to say that this happened "all the time," even when the car was sitting in a parking lot.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-3 made the statements attributed to him in Paragraph 133 and deny the allegations in Paragraph 133 on that basis.

134. CW-4 was employed by Cruise as an Autonomous Vehicle Test Specialist from April 2022 until December 2023. CW-4 explained that his position included riding in Cruise's autonomous vehicles and detailing performance and any "malfunctions."

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-4 made the statements attributed to him in Paragraph 134 and deny the allegations in Paragraph 134 on that basis.

135. CW-4 explained that his role at Cruise consisted of a "good amount of troubleshooting" because there were "some things" that the cars "couldn't do on their own."

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-4 made the statements attributed to him in Paragraph 135 and deny the allegations in Paragraph 135 on that basis.

136. According to CW-4, Cruise vehicles were "not ready to go fully autonomous" during his tenure and Cruise was "pushing" to keep up with competitors. CW-4 recalled several issues that persisted throughout his tenure and noted that problems arose after Cruise removed the human driver from their vehicles.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-4 made the statements attributed to him in Paragraph 136 and deny the allegations in Paragraph 136 on that basis.

137. CW-4 recalled two specific issues the Cruise vehicles routinely encountered, the biggest being issues taking "unprotected" left turns and the other involved "random" hard braking or "jolting." CW-4 explained that the Cruise vehicles could not gauge the speed of cars across from them in an intersection when taking an unprotected left turn and would yield to oncoming traffic, stopping in the middle of an intersection.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-4 made the statements attributed to him in Paragraph 137 and deny the allegations in Paragraph 137 on that basis.

138. CW-4 continued to say that the cars would "randomly" hard brake or "jolt." CW-4 explained that this issue occurred "all the time" where the car would react to something seemingly not there. According to CW-4, the vehicles also had issues reacting to other drivers on the road who made erratic maneuvers.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-4 made the statements attributed to him in Paragraph 138 and deny the allegations in Paragraph 138 on that basis.

139. CW-4 further explained that Cruise employees, whether a driver in the car or a Remote Assistance Operator, were instructed to give the vehicle a "grace period" during malfunctions to see if it would correct itself on its own before intervening.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-4 made the statements attributed to him in Paragraph 139 and deny the allegations in Paragraph 139 on that basis.

140. CW-4 recalled that when a takeover maneuver was conducted by a test driver in a Cruise vehicle that an application called "Note Logger" automatically recorded the time of the incident and then the human in the vehicle was responsible for providing feedback and detailing a timeline of the "malfunction." CW-4 explained that Cruise wanted employees to "keep updating" and tracking malfunctions, but it appeared that concerns reported "fell on deaf ears" as problems persisted throughout his tenure and did not get fixed. CW-4 continued to explain that it appeared Cruise had accepted that these issues were going to exist.

**ANSWER:** The Cruise Defendants (i) admit that Cruise used an application called "Note Logger" during the purported Class Period; and (ii) lack sufficient knowledge or information to form a belief about whether purported CW-4 made the statements attributed to him in Paragraph 140 and deny the remaining allegations in Paragraph 140 on that basis.

141. CW-4 explained that there were "so many" entries into Note Logger that there was no way that every one could be reviewed.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-4 made the statements attributed to him in Paragraph 141 and deny the allegations in Paragraph 141 on that basis.

77

142. CW-5 was employed by GM in a variety of roles including Controls Integration Engineer, Active Safety Calibration Engineer, and most recently as an Autonomous Vehicle Validation Engineer from August 2018 until December 2023.

**ANSWER:** The allegations in Paragraph 142 are not directed at the Cruise Defendants. Accordingly, no response is required. To the extent Paragraph 142 pertains to Dismissed Claims, no response is required. To the extent a response is required, the Cruise Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 142 and deny the allegations in Paragraph 142 on that basis.

143. CW-5 explained that as an Autonomous Vehicle Validation Engineer, from July 2020 until December 2023, he was a member of the Functional Safety team, and he worked on testing for the Cruise Origin and Cruise AV-Bolt. CW-5 continued to explain that he worked on testing to ensure that the modules GM was responsible for—essentially anything that controlled motion of the vehicle (body of the car, steering, breaks, cooling systems, etc.)—communicated correctly with Cruise's compute module.

**ANSWER:** The allegations in Paragraph 143 are not directed at the Cruise Defendants. Accordingly, no response is required. To the extent Paragraph 143 pertains to Dismissed Claims, no response is required. To the extent a response is required, the Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-5 made the statements attributed to him in Paragraph 143 and deny the allegations in Paragraph 143 on that basis.

144. According to CW-5, his primary responsibility concerned GM's interface module. CW-5 explained that he primarily worked on software testing months prior to it being released and used on public roads. CW-5 continued to say that once testing was completed by teams at GM, Cruise then conducted their testing

and if all stages of testing were passed it was tested on public roads. CW-5 explained that he did not test Cruise software, only the communications between Cruise's software and the portions of the vehicle that GM was responsible for.

**ANSWER:** The allegations in Paragraph 144 are not directed at the Cruise Defendants. Accordingly, no response is required. To the extent Paragraph 144 pertains to Dismissed Claims, no response is required. To the extent a response is required, the Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-5 made the statements attributed to him in Paragraph 144 and deny the allegations in Paragraph 144 on that basis.

145. CW-5 recalled that Cruise had an onsite presence in Milford, Michigan, which included approximately 20 test engineers and drivers who went out and tested for eight hours a day and supported his team. CW-5 continued to say that in addition to this group there were four or five Cruise engineers onsite and another four or five that he worked with that were located in San Francisco, California. CW-5 explained that many of the engineers at Cruise previously worked at GM.

**ANSWER:** The Cruise Defendants (i) admit that certain Cruise engineers were based in Milford, Michigan during the purported Class Period; (ii) admit that certain Cruise engineers were based in San Francisco, California during the purported Class Period; (iii) admit that certain Cruise engineers during the purported Class Period previously worked at GM; and (iv) lack sufficient knowledge or information to form a belief about whether purported CW-5 made the statements attributed to him in Paragraph 145 and deny the remaining allegations in Paragraph 145 on that basis.

79

146. CW-5 explained that there was an issue in approximately April or early Spring 2023, where Cruise wanted to add functionality to be able to recover vehicles that were failing frequently on the side of the road. According to CW-5, Cruise "threw a bunch of unplanned work" for Cruise AV-Bolt to his team that was deemed a high priority.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-5 made the statements attributed to him in Paragraph 146 and deny the allegations in Paragraph 146 on that basis.

147. According to CW-5, he heard of additional issues on public roads "through the grapevine" from ATOs, who did test driving for Cruise. CW-5 explained that they had a Slack channel with those working in San Francisco that they discussed issues on. CW-5 continued to say that he also became aware of issues with Cruise through the news and then often saw a software change that addressed problems that he had heard about.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-5 made the statements attributed to him in Paragraph 147 and deny the allegations in Paragraph 147 on that basis.

148. CW-5 explained that he also worked with Cruise engineers in instances where it was necessary to use special technology possessed by Cruise.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 148 and deny the allegations in Paragraph 148 on that basis.

149. CW-6 was Senior Director, Autonomous Vehicles at Cruise from March 2022 until November 2022.

80

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 149 and deny the allegations in Paragraph 149 on that basis.

150. CW-6 explained that there was not a "clear set of objectives" or measurement of success when it came to safety, partially due to the newness of the industry, but also due to the lack of appetite to establish clear objective criteria. According to CW-6, when a desire to implement objective criteria was brought to Senior Leadership, it was met with negative feedback. CW-6 explained that there was "a lot of effort and energy" put into "going fast."

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-6 made the statements attributed to him in Paragraph 150 and deny the allegations in Paragraph 150 on that basis.

151. CW-6 recalled there being "lots and lots of problems." CW-6 explained that part of the reason why he departed Cruise was that he believed that people were going to get hurt and die as a result of the vehicles. CW-6 recalled a number of incidents in 2022 that Cruise did not respond to appropriately and noted that the AVs did not respond correctly in novel situations.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-6 made the statements attributed to him in Paragraph 151 and deny the allegations in Paragraph 151 on that basis.

152. According to CW-6, leadership, including Vogt, looked at 1,000 problems as individual issues rather than addressing broader concerns. CW-6 explained that there were also issues that the company could not even predict yet and they were still viewing the vehicle as an "airplane ready to fly," when it in fact was not ready.

81

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-6 made the statements attributed to him in Paragraph 152 and deny the allegations in Paragraph 152 on that basis.

153. CW-6 explained that what occurred during the accident in October 2023 was "not a one-time thing" and that problems had been demonstrated over several years. CW-6 recalled issues with human injuries that required emergency room visits and a "long track record" of "really bad accidents" that ultimately involved intervention from the San Francisco Police Department, the San Francisco Fire Department, and other emergency services.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-6 made the statements attributed to him in Paragraph 153 and deny the allegations in Paragraph 153 on that basis.

154. According to CW-6, the "primary driver" and "top priority" at Cruise was maintaining the company's committed roadmap for delivery of autonomous vehicles on the road. CW-6 continued to say that there was a Silicon Valley mentality of "move fast and break things."

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-6 made the statements attributed to him in Paragraph 154 and deny the allegations in Paragraph 154 on that basis.

155. CW-7 was formerly employed by Cruise as Operations Team Lead from November 2017 to April 2023, working in the San Francisco Bay area of California. CW-7 advised that his responsibilities included managing a shift of 150 AVTOs. CW-7's previous title was Autonomous Vehicle Operator Level II from early 2017 to November 2017. According to CW-7, in his final role he reported to Operations Manager Said Pairasta.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 155 and deny the allegations in Paragraph 155 on that basis.

156. CW-7 described Cruise as an "aggressive company" in seemingly rushing forward with its AV technology in spite of feedback from the company's AVTOs that the cars were extremely dangerous. CW-7 also recalled AVTOs often returning from a ride and telling him that it was the most dangerous ride they had ever experienced. CW-7 described Cruise as directing AVTOs to intentionally downplay the seriousness of their experiences when reporting any concerns or issues that they encountered.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-7 made the statements attributed to him in Paragraph 156 and deny the allegations in Paragraph 156 on that basis.

157. CW-7 explained that AVTOs are employees who ride in an AV and take notes on the performance of the car while automated driving is engaged and are supposed to take direct control of the vehicle if they feel the need to. According to CW-7, AVTOs were "coached" to not take direct control of the AV even when they felt they should, and even when AVTOs felt the AV was driving into a dangerous situation. CW-7 recalled that AVTOs were directed not to take direct control because of the need to record that the AV was driving on its own accord for longer and longer mileage. When the AVTO takes control "it comes across our metrics as a takeover," and the earlier an AVTO took control of the vehicle, the lower that metric would be. CW-7 recalled Cruise CEO Kyle Vogt "on stage" at a meeting for Team Leaders and above sometime in 2022 dismissively addressing internal concerns about the safety of the AV technology.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-7 made the statements attributed to him in Paragraph 157 and deny the allegations in Paragraph 157 on that basis.

83

158. CW-7 also recounted how AVTO intake forms were seemingly changed to tone down negative incidents that took place during a ride in an AV. According to CW-7, once an AV ride ended, the AVTO reported what he experienced during the ride. CW-7 explained that during the first half of his tenure, the AVTO reported the details to CW-7 who would then report it in the intake form and then passed it on to "management." During the second half of his tenure, the AVTOs filled out the forms themselves and it then went directly to "management." According to CW-7, he was one of a few people who originally designed the intake form that eventually became standardized by the company.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-7 made the statements attributed to him in Paragraph 158 and deny the allegations in Paragraph 158 on that basis.

159. CW-7 advised that once the intake form went to management, neither he nor the AVTO saw the form again, but he recalled hearing numerous times throughout his tenure that others above him in the chain of command were debating the accuracy of what was recorded in the forms. CW-7 recalled AVTOs regularly coming back from their AV rides stating that the cars made them extremely nervous and describing their rides as "dangerous," reporting to him on near misses with pedestrians, hitting curbs, and almost hitting other objects when the vehicles should have slowed down and stopped sooner. CW-7 suggested "management" was the operational department, above his direct report Said Pairasta.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-7 made the statements attributed to him in Paragraph 159 and deny the allegations in Paragraph 159 on that basis.

160. Another example was that AVTOs were instructed to not push the "Notable" button on their tablets and to instead only push the "For Review" button. According to CW-7, AVTOs had a tablet while driving that had a "Notable" button and a "For Review" button. CW-7 explained that the "For Review" button was to be pushed for incidents that were considered by Cruise as not too serious such as the AV speeding up when a pedestrian entered the street but stopping well before an accident occurred. The "Notable" button was to be pushed for more serious incidents when the operator had to take direct control such as the AV coming too

84

close to hitting a pedestrian. According to CW-7, the reason the AVTOs were directed not to push the "Notable" button was because the report would go "straight to the DMV."

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-7 made the statements attributed to him in Paragraph 160 and deny the allegations in Paragraph 160 on that basis.

161. CW-7 felt that Cruise was pushing the testing too aggressively with AV rides growing from 12 vehicles per night, to 50 and then 100, which he described as "drastic" and the increase occurring too rapidly. According to CW-7, software upgrades for the AV would come out almost weekly and the AVTOs did not know what to expect from the car with the upgrades, what its new capabilities were and how well it would react in certain situations. CW-7 added the software upgrades were occurring without previous concerns being taken into account or fully remediated.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-7 made the statements attributed to him in Paragraph 161 and deny the allegations in Paragraph 161 on that basis.

162. CW-7 decided to end his tenure at Cruise partly because, among other reasons, he did not trust the direction of the company, Cruise's AV technology was dangerous, and he did not want to be part of it anymore.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-7 made the statements attributed to him in Paragraph 162 and deny the allegations in Paragraph 162 on that basis.

163. Between March 2023 and December 2023, CW-9 was employed by Cruise as a contractor with the role of Driverless Support Specialist and then as a full-time employee as a Commercial Operations Coordinator.

85

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 163 and deny the allegations in Paragraph 163 on that basis.

164. CW-9 recalled that during his tenure there were All Hands Meetings at 1:00 PM each week on either Monday or Tuesday.

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that All Hands Meetings typically took place on a weekly basis between March 2023 and December 2023; and (ii) lack sufficient knowledge or information to form a belief about whether purported CW-9 made the statements attributed to him in Paragraph 164 and deny the remaining allegations in Paragraph 164 on that basis.  Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 164 and denies the allegations in Paragraph 164 on that basis.

165. CW-9 recalled that Cruise was scaling up "very quickly" and reached approximately 350 cars on the road in August 2023.  Whenever Cruise hit its goal for cars on the road, the very next day the goal increased by 50 to 100 cars. CW-9 explained that this increase was "ludicrous" and that the company "pushed too fast" and should have tested the current number of vehicles on the road for a week or two at least.  According to CW-9, while some contractors were hesitant to speak up about the speed of deployment, he did ask his superiors to consider longer test periods before increasing the number of cars deployed.  This request was met with the response: "let's just test it out [*i.e.*, the current approach to scaling] and see."

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-9 made the statements attributed to him in Paragraph 165 and deny the allegations in Paragraph 165 on that basis.

### b. Numerous Reports Corroborate CW Accounts of Safety and Capability Deficiencies

166. Counsel to Plaintiffs obtained documents from the DMV that detail the safety and capability deficiencies of Cruise's AV technology. These documents detail multiple complaints submitted to the DMV in the months preceding the Class Period. For example, an individual recounted the following in a September 29, 2020 complaint to the DMV:

I recently completed pre-employment "test operator" training in a self-driving car with Cruise GM. They know the cars regularly malfunction, but continue to let them drive on public roads, which makes me very concerned about public safety. The trainer told me they have "a lot of crashes" because the cars break hard unexpectedly a lot and are frequently rearended. Sometimes the car simply breaks too abruptly at a stop sign, but there are many instances of the car stopping unexpectedly for no discernible reason (maybe discernible to engineers after the fact, but not to people in the car at the time of the malfunction).

Instead of fixing the computer, their solution to this frequent malfunction is training humans to constantly be on alert for an abrupt stop so they can mitigate the damage that could cause. Those cars are too dangerous to be on public roads at this time. Their permit should be revoked.

**ANSWER:** The Cruise Defendants respectfully refer the Court to the DMV document referenced in Paragraph 166 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 166.

167. Similarly, an October 4, 2020 complaint from a person who was driving behind a "Cruise car []in AV mode" detailed that the Cruise AV "made an erratic and high unpredictable stop, as if it was about to run over a pedestrian, but there was no one in the crosswalk or intersection. Clearly it was a computer error, locking the[] brakes. I rear ended the[] car." The complainant continued: "I have been driving for almost 40 years and have never witnessed a more erratic car move – it was not human."

87

**ANSWER:**  The Cruise Defendants respectfully refer the Court to the DMV document referenced in Paragraph 167 for a complete and accurate description of its contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 167.

168. An October 19, 2020 complaint from a "Senior AVTO Safety Driver for Cruise/Aerotek" detailed that "[t]he current state of the technology build is not sufficient to recognize nor yield to a pedestrian in an AV mode.  Rather as safety drivers we diligently and with great care must override the AV."  The complainant continued: "The ethos of Cruise is Safety First.  Yet, in no way, shape or form is an entirely driverless car safe to drive on public roads in SF.  The [takeover or "TKO"] statistics of Cruise AVTOs does not represent the true number.  I personally TKO 10 times per drive multipl[i]ed by 4 unique drives per 2 member shift.  The TKOs reported to DMV are inaccurate and false."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the DMV document referenced in Paragraph 168 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 168.

169. This complainant followed up with a detailed email to the DMV on November 18, 2020, stating, among other things that: (1) Cruise was "hiding or withholding TKO data from the DMV by not accurately reporting all TKOs;" (2) both "notable" and "for review" TKO's are "safety critical," but Cruise management pressured AVTOs to "only use Notable TKOs in rare cases" if "but for the AVTO taking over there would have been a collision with another car or impacting a pedestrian," even though "nearly all TKOs represent a dangerous situation that requires immediate TKO and manual driving to prevent an accident or regain control;" (3) Cruise used "mileage metrics" to "reward teams" for keeping the autonomous driving engaged," rather than conducting a TKO, and "low engagement times would be subject to penalties;" (4) Cruise's "[c]ulture" is to "get miles at any cost" and while it touts "Safety First," this is "in reality" a "farce" based on the "sheer number of dangerous situations and aberrant behavior exhibited by AVs on a daily basis."  This complainant also gave the following specific examples of dangerous activity:

Many times we were forced to TKO on Unprotected Left Turns where the AV would pull in front of other cars and stop as a result mid-

intersection forcing us to TKO to prevent a collision. These circumstances are the most harrowing because other drivers zealously assert their right-of-way without regard to mutually avoiding an imminent collision. It is principally these scenarios and actual unsafe AV actions that prompted me to report my objections to allowing and permitting Cruise to test driverless cars at the present time.

Also the AV does not . . . always recognize pedestrians in crosswalks and yield to them forcing us AVTOS [out] of necessity to TKO, and the AV rarely yields to pedestrians in legal demarcated crosswalks mid-street. Pedestrian related TKOS are among the most common and of course the most vital for protecting the safety of the public.

**ANSWER:** The Cruise Defendants respectfully refer the Court to the DMV document referenced in Paragraph 169 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 169.

170. Materials disclosed by the DMV show that complaints about the safety and capabilities of Cruise's AV technology continued in the Class Period.

**ANSWER:** The Cruise Defendants respectfully refer the Court to the unspecified DMV documents referenced in Paragraph 170 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 170.

171. For example, a May 11, 2021 complaint details a Cruise vehicle "making a mess of traffic" because it was "[s]lowing to stop where there was no stop [sign or red light]," which was "[d]angerous for everyone." On June 18, 2022, a complainant wrote to the DMV noting that a Cruise vehicle "pulled into the wrong lane and started going back and forth and wreaking havoc. Very unsafe. We drove off to avoid getting hit." And on May 9, 2022, a complainant detailed multiple dangerous encounters with Cruise AVs that the complainant had reported to Cruise:

I had two unfortunate encounters with Cruise vehicles on May 3, 2022. The first occurred at about 11:30 pm; the second occurred at about 11:45 pm. The encounters involved the Cruise vehicles not yielding the

89

right of way to me as pedestrian while I was in the crosswalk at Buena Vista Ave E at Buena Vista Terrace in San Francisco[.]

In both cases, the Cruise vehicles turned left into Buena Vista Terr from Buena Vista E and accelerated through this turn even though my dog and I were in the crosswalk which the vehicle crossed to make the left turn. It seemed to me that the vehicles sensors failed to detect my presence in the crosswalk as, in the case of the 11:30 pm incident, the Cruise vehicle passed very closely behind me (less than 3 feet) while I was in the crosswalk.

These incidents involved the same facts as an incident on April 8, which I reported to Cruise. I have also reported the May 3 incidents to Cruise.

I hope this serious pedestrian safety issue can be resolved.

**ANSWER:** The Cruise Defendants respectfully refer the Court to the DMV documents referenced in Paragraph 171 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 171.

172. Multiple news reports have corroborated the safety and capability flaws recounted by the CWs and the DMV complainants.

**ANSWER:** The Cruise Defendants respectfully refer the Court to the unspecified news reports and documents referenced in Paragraph 172 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 172.

173. On November 3, 2023, the *New York Times* published an article titled, "G.M.'s Cruise Moved Fast in the Driverless Race. It Got Ugly." According to the *New York Times*, "[c]ompany insiders are putting the blame for what went wrong on a tech industry culture — led by the 38-year-old Mr. Vogt — that put a priority on the speed of the program over safety." The *New York Times* recounted multiple collisions involving Cruise AVs throughout the Class Period, including the October

90

2 Crash, as well as an instance where a Cruise AV collided with a Toyota Prius driving in a bus lane and where a Cruise AV collided with a San Francisco fire truck that was responding to an emergency.  According to the article, after the Prius collision, Cruise personnel proposed having its vehicles temporarily avoid streets with bus lanes, but Defendant Vogt vetoed the idea.

**ANSWER:** The Cruise Defendants respectfully refer the Court to the November 3, 2023 *The New York Times* article referenced in Paragraph 173 for a complete and accurate description of its contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 173.

174. According to the November 3, 2023 *New York Times* article, Cruise AVs in San Francisco "were supported by a vast operations staff, with 1.5 workers per vehicle.  The workers intervened to assist the company's vehicles every 2.5 to 5 miles, according to two people familiar with Cruise's operations.  In other words, they frequently had to do something to remotely control a car after receiving a cellular signal that it was having problems."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the November 3, 2023 *The New York Times* article referenced in Paragraph 174 for a complete and accurate description of its contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 174.

175. In response to the November 3, 2023 *New York Times* article, Defendant Vogt posted on *Hacker News* confirming the existence of Cruise's large staff of remote operators, that the AVs initiate a remote assistance "session" every 2.5 to 5 miles, and that "Cruise AVs are being remotely assisted (RA) 2-4% of the time":

Cruise CEO here.  Some relevant context follows.

Cruise AVs are being remotely assisted (RA) 2-4% of the time on average, in complex urban environments. This is low enough already that there isn't a huge cost benefit to optimizing much further, especially given how useful it is to have humans review things in certain situations.

91

The stat quoted by nyt is how frequently the AVs initiate an RA session. Of those, many are resolved by the AV itself before the human even looks at things, since we often have the AV initiate proactively and before it is certain it will need help. Many sessions are quick confirmation requests (it is ok to proceed?) that are resolved in seconds. There are some that take longer and involve guiding the AV through tricky situations. Again, in aggregate this is 2-4% of time in driverless mode.

In terms of staffing, we are intentionally over staffed given our small fleet size in order to handle localized bursts of RA demand. With a larger fleet we expect to handle bursts with a smaller ratio of RA operators to AVs. Lastly, I believe the staffing numbers quoted by nyt include several other functions involved in operating fleets of AVs beyond remote assistance (people who clean, charge, maintain, etc.) which are also something that improve significantly with scale and over time.

**ANSWER:** The Cruise Defendants (i) admit that Mr. Vogt posted on *Hacker News* on November 5, 2023; and (ii) respectfully refer the Court to the November 5, 2023 *Hacker News* post referenced in Paragraph 175 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 175.

176. In November 6, 2023, *The Intercept* published an article titled, "Cruise Knew Its Self-Driving Cars Had Problems Recognizing Children – And Kept Them On The Streets." This article recounted how the month before, the NHTSA announced it was investigating Cruise's nearly 600-vehicle fleet because of risks posed to other cars and pedestrians. The *Intercept* article then reported that "previously unreported internal materials such as chat logs show Cruise has known internally about two pressing safety issues: Driverless Cruise cars struggled to detect large holes in the road and have so much trouble recognizing children in certain scenarios that they risked hitting them."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the November 6, 2023 *The Intercept* article referenced in Paragraph 176 for a complete

92

and accurate description of its contents.  The Cruise Defendants otherwise deny the

allegations in Paragraph 176.

177. The *Intercept* article recounted Cruise's persistent inability to function properly and safely around children:

> One of the problems addressed in the internal, previously unreported safety assessment materials is the failure of Cruise's autonomous vehicles to, under certain conditions, effectively detect children so that they can exercise extra caution.  "Cruise AVs may not exercise additional care around children," reads one internal safety assessment. The company's robotic cars, it says, still "need the ability to distinguish children from adults so we can display additional caution around children."

> In particular, the materials say, Cruise worried its vehicles might drive too fast at crosswalks or near a child who could move abruptly into the street.  The materials also say Cruise lacks data around kid-centric scenarios, like children suddenly separating from their accompanying adult, falling down, riding bicycles, or wearing costumes.

> The materials note results from simulated tests in which a Cruise vehicle is in the vicinity of a small child.  "Based on the simulation results, we can't rule out that a fully autonomous vehicle might have struck the child," reads one assessment.  In another test drive, a Cruise vehicle successfully detected a toddler-sized dummy but still struck it with its side mirror at 28 miles per hour.

> The internal materials attribute the robot cars' inability to reliably recognize children under certain conditions to inadequate software and testing.  "We have low exposure to small VRUs" — Vulnerable Road

> Users, a reference to children — "so very few events to estimate risk from," the materials say.  Another section concedes Cruise vehicles' "lack of a high-precision Small VRU classifier," or machine learning software that would automatically detect child-shaped objects around the car and maneuver accordingly.  The materials say Cruise, in an attempt to compensate for machine learning shortcomings, was relying on human workers behind the scenes to manually identify children encountered by AVs where its software couldn't do so automatically.

In its statement, Cruise said, "It is inaccurate to say that our AVs were not detecting or exercising appropriate caution around pedestrian children" — a claim undermined by internal Cruise materials reviewed by The Intercept and the company's statement itself.  In its response to The Intercept's request for comment, Cruise went on to concede that, this past summer during simulation testing, it discovered that its vehicles sometimes temporarily lost track of children on the side of the road.  The statement said the problem was fixed and only encountered during testing, not on public streets, but Cruise did not say how long the issue lasted.  Cruise did not specify what changes it had implemented to mitigate the risks.

Despite Cruise's claim that its cars are designed to identify children to treat them as special hazards, spokesperson Navideh Forghani said that the company's driving software hadn't failed to detect children but merely failed to classify them as children.

**ANSWER:** The Cruise Defendants respectfully refer the Court to the November 6, 2023 *The Intercept* article referenced in Paragraph 177 for a complete and accurate description of its contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 177.

178. The *Intercept* article continued by quoting Erik Moser, Cruise's director of communications, who stated that Cruise had performed an "internal assessment" in the summer of 2023 that "determined from observed performance on-road, the risk of the potential collision with a child could occur once every 300 million miles at fleet driving, which we have since improved upon."  While at first blush this statistic may seem to indicate the rarity of such an event, a deeper look reveals the disturbing reality.  For approximately the past decade, the total vehicle miles traveled in the United States has been over three trillion miles each year.  An event that occurs once every 300 million miles would occur 10,000 times in a year where three trillion miles are traversed.  Thus, if Cruise's statistics were mapped onto the driving public at large, it would result in Cruise AVs hitting children over 27 times *per day*.

**ANSWER:** The Cruise Defendants respectfully refer the Court to the November 6, 2023 *The Intercept* article referenced in Paragraph 178 for a complete

and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 178.

179. The *Intercept* article also described how Cruise AVs could not detect holes, including large construction pits, and this fact was known within Cruise for more than a year:

> Cruise has known its cars couldn't detect holes, including large construction pits with workers inside, for well over a year, according to the safety materials reviewed by The Intercept. Internal Cruise assessments claim this flaw constituted a major risk to the company's operations. Cruise determined that at its current, relatively miniscule fleet size, one of its AVs would drive into an unoccupied open pit roughly once a year, and a construction pit with people inside it about every four years. Without fixes to the problems, those rates would presumably increase as more AVs were put on the streets.

> It appears this concern wasn't hypothetical: Video footage captured from a Cruise vehicle reviewed by The Intercept shows one self-driving car, operating in an unnamed city, driving directly up to a construction pit with multiple workers inside. Though the construction site was surrounded by orange cones, the Cruise vehicle drives directly toward it, coming to an abrupt halt. Though it can't be discerned from the footage whether the car entered the pit or stopped at its edge, the vehicle appears to be only inches away from several workers, one of whom attempted to stop the car by waving a "SLOW" sign across its driverless windshield.

> "Enhancing our AV's ability to detect potential hazards around construction zones has been an area of focus, and over the last several years we have conducted extensive human-supervised testing and simulations resulting in continued improvements," Moser said. "These include enhanced cone detection, full avoidance of construction zones with digging or other complex operations, and immediate enablement of the AV's Remote Assistance support/supervision by human observers."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the November 6, 2023 *The Intercept* article referenced in Paragraph 179 for a complete

95

and accurate description of its contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 179.

180. The *Intercept* article also stated that "[a]ccording to other internal materials, some vehicles in the company's fleet suddenly began making unprotected left turns at intersections, something Cruise cars are supposed to be forbidden from attempting.  The potentially dangerous maneuvers were chalked up to a botched software update."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the November 6, 2023 *The Intercept* article referenced in Paragraph 180 for a complete and accurate description of its contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 180.

181. This *Intercept* article quoted Bryant Walker Smith, a University of South Carolina law professor and engineer who studies automated driving and who stated that "[t]hese are not self-driving cars.  These are cars driven by their companies."  Smith continued: "It's I think especially egregious to be making the argument that Cruise's safety record is better than a human driver.  It's pretty striking that there's a memo that says we could hit more kids than an average rideshare driver, and the apparent response of management is, keep going."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the November 6, 2023 *The Intercept* article referenced in Paragraph 181 for a complete and accurate description of its contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 181.

182. On January 4, 2024, *Wired* published an article titled, "Cruise Was Asked to Ground Robotaxis on Halloween to Keep Kids Safe."  The January 4, 2024 *Wired* article stated that city of Austin employee Rachel Castignoli requested that Cruise suspend operations on Halloween evening to minimize the risk of hitting trick-or-treaters:

Case 4:23-cv-13132-SDK-EAS   ECF No. 75, PageID.3493   Filed 03/20/26   Page 97 of 271

A week before Halloween last year, city of Austin employee Rachel Castignoli sent a polite but firm email to a government relations staffer

at self-driving vehicle developer Cruise. "We would like you to not operate between 5 pm and 9 pm on Halloween," she wrote in bold text highlighted in yellow, documents obtained by WIRED through a public records request show      The email chain shows that Cruise agreed not

to operate on Halloween, although by the time that night rolled around the company had stopped driving nationwide after a San Francisco accident.

**ANSWER:** The Cruise Defendants respectfully refer the Court to the January 4, 2024 *Wired* article referenced in Paragraph 182 for a complete and accurate description of its contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 182.

183. On February 14, 2024, *NBC News* published an article titled, "Self-driving Cruise vehicle accused of nearly hitting kids in two separate close calls one day apart." The *NBC News* article recounted the harrowing experience of a family whose 7-year-old boy was nearly struck by a Cruise AV:

The California Department of Motor Vehicles is investigating allegations that a self-driving vehicle operated by Cruise nearly hit a 7-year-old boy after it failed to yield to him and his family while they crossed the street in San Francisco last year, according to DMV records obtained by NBC News.

The family says the driverless Cruise car headed straight toward them as they crossed the street.

The car "was fully stopped, and then it started when he had gotten maybe a third of the way or halfway across the intersection," said Sascha Retailleau, who was crossing 20th Street near the intersection of York Street with his wife and son in their Mission District neighborhood on the evening of Aug. 14. "It started to accelerate towards us like we weren't there."

97

Retailleau said the car swerved as it approached, right toward his young son, Luke, who said he had to rush ahead to avoid being hit.  Retailleau reported the incident to the DMV, which told NBC News it couldn't disclose any details of its ongoing investigation.

"If I didn't run, it would have hit me, probably," said Luke, 7.  "I felt scared."

* * *

"We were scared at first, and then I was just angry, super angry," Retailleau said.  "My kid could have been hurt or killed by this Cruise vehicle."

* * *

Retailleau reached out to Cruise to explain how one of its driverless cars nearly hit his son, but after he gave the company all the details it asked for, he said, he is still waiting to hear back more than five months later.

"There was no apology," he said.  "There was no 'we'll try to make this right.'"

Cruise acknowledged to the NBC Bay Area Investigative Unit that it never replied to the family, adding that it apologizes for the lack of communication.

Retailleau said: "They shouldn't be allowed to have 2,000 pounds of metal rolling through the streets of San Francisco, potentially endangering other people.  Here is a company that is beta testing on the public."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the February 14, 2024 *NBC News* article referenced in Paragraph 183 for a complete and accurate description of its contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 183.

98

184. The February 14, 2024 *NBC News* article also described that a Cruise AV had been recorded behaving similarly before, and that regulators had obtained a video of a Cruise AV accelerating toward four pedestrians walking in a crosswalk, two of whom are children:

> An eerily similar near-miss was caught on camera just the day before in the city's Pacific Heights neighborhood. The video, posted to the website Reddit and later obtained by regulators, shows a Cruise car accelerating straight toward two women and two children walking in a crosswalk. The vehicle then brakes and swerves around them at the last second.

> Cruise acknowledged its vehicle was involved but declined to comment further, citing an ongoing federal investigation.

**ANSWER:** The Cruise Defendants respectfully refer the Court to the February 14, 2024 *NBC News* article referenced in Paragraph 184 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 184.

185. The February 14, 2024 *NBC News* article also recounted that "[t]he National Highway Traffic Safety Administration is investigating at least four incidents involving Cruise vehicles and pedestrians, including the one posted on Reddit." As detailed in the *NBC News* piece, the NHTSA confirmed that "[t]he Office of Defects Investigation (ODI) has received reports of incidents in which Automated Driving System (ADS) equipped vehicles operated by Cruise LLC (Cruise) may not have exercised appropriate caution around pedestrians in the roadway."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the February 14, 2024 *NBC News* article referenced in Paragraph 185 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 185.

186. Additional reports of Cruise AVs' safety and capability deficiencies are legion.

**ANSWER:** The Cruise Defendants deny the allegations in Paragraph 186.

187. On April 11, 2022, *Tech Crunch* reported that a Cruise vehicle was pulled over by police because it failed to switch its lights on. The Cruise AV pulled over, and as the officer approached, drove away, only to pull over again.

**ANSWER:** The Cruise Defendants respectfully refer the Court to the April 11, 2022 *Tech Crunch* article referenced in Paragraph 187 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 187.

188. On June 30, 2022, *Tech Crunch* reported that "[m]ore than a half dozen Cruise robotaxis stopped operating and sat in a street in San Francisco late Tuesday night, blocking traffic for a couple of hours until employees arrived and manually moved the autonomous vehicles."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the June 30, 2022 *Tech Crunch* article referenced in Paragraph 188 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 188.

189. Reports of Cruise AVs' safety and capability deficiencies began to spike after the CPUC approved Cruise for 24/7 service in San Francisco in August 2023. These reports show the endemic nature of Cruise's safety and capability deficiencies.

**ANSWER:** The Cruise Defendants deny the allegations in Paragraph 189.

190. On August 15, 2023, *SFGATE.com* reported that "[a] Cruise vehicle got stuck in wet concrete driving around San Francisco's Western Addition."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the August 15, 2023 *SFGATE.com* article referenced in Paragraph 190 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 190.

191. On August 14, 2023, *CNBC* published an article titled, "Cruise vehicles cause weekend traffic jam one day after California approves 24-7 robotaxi service." The article details how within a day of the CPUC's approval for 24/7 service in San Francisco "as many as 10 of Cruise's driverless cars stopped on and around Vallejo Street in North Beach, trapping human-driven vehicles for at least 15 minutes, according to reports. The company cited cell phone service issues related to a nearby music festival, which it said hampered its ability to route the vehicles." The *CNBC* article also referenced an August 7, 2023 hearing where representatives from the San Francisco Fire Department, Police Department, and Municipal Transportation Agency presented to the CPUC on the hazards of AVs. Their presentation described, among other things, how "Cruise does not disclose the duration of unexpected stops; City records show incidents ranging from minutes to hours."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the August 14, 2023 *CNBC* article referenced in Paragraph 191 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 191.

192. On August 18, 2023, *CNBC* reported that a Cruise AV entered an intersection and was struck by an ambulance en route to an emergency scene, injuring one person. This incident occurred less than a week after the CPUC approved Cruise for 24/7 robotaxi service in San Francisco. That same day, *Tech Crunch* reported that the DMV was investigating "recent concerning incidents" involving Cruise vehicles in San Francisco and requested that Cruise reduce its fleet by 50% and have no more than 50 driverless vehicles in operation during the day and 150 driverless vehicles in operation at night until the investigation is complete.

**ANSWER:** The Cruise Defendants respectfully refer the Court to the August 18, 2023 *CNBC* and *Tech Crunch* articles referenced in Paragraph 192 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 192.

193. On April 17, 2024, a representative of a local branch of the Arizona Teamsters Union released a statement urging that "Cruise has a deeply troubling record of dangerous incidents involving its autonomous vehicles. This company must not be allowed to test its vehicles on Arizona roads." The statement continued: "Cruise recently suspended operations nationwide after a string of safety incidents in which its vehicles left a pedestrian grievously injured, collided with fire trucks, blocked waste trucks, nearly collided with children in two separate incidents, caused a massive traffic jam outside of a music festival, and triggered a 20-car pileup in a tunnel."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the April 17, 2024 Arizona Teamsters Union statement referenced in Paragraph 193 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 193.

### c. The October 2 Crash and Immediate Aftermath Further Show the Deficiencies in the Safety and Capability of Cruise Avs

194. On October 2, 2023, a human-driven Nissan vehicle struck a pedestrian in San Francisco, launching the pedestrian into the pathway of the Cruise AV traveling in autonomous mode without a passenger in the adjacent lane. The Cruise AV then hit the pedestrian, pinning the pedestrian beneath it. Cruise maintained to the public that the Cruise AV came to a "complete stop," but approximately three weeks after the Crash, on October 24, 2023, Defendant Vogt published a blog post acknowledging that the Cruise AV collided with the pedestrian and "then attempted to pull over to avoid causing further road safety issues, pulling the individual forward approximately 20 feet."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) respectfully refer the Court to the "The October 2, 2023 Accident" section under the "Statement of Facts" in the DPA for a description of the Accident.  Cruise, Mr. West, and Mr. Vogt also (ii) admit that Cruise issued a blog post on October 24, 2023 titled "A detailed review of the recent SF hit-and-run incident"; and (iii) respectfully refer the Court to the October 24, 2023 blog post referenced in Paragraph 194 for a complete and accurate description of its contents.  To the extent the allegations in Paragraph 194 form the basis for Dismissed Claims against Mr. Ammann, no response is required from Mr. Ammann.  To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 194.  The Cruise Defendants otherwise deny the allegations in Paragraph 194.

195. Less than thirty minutes before Cruise's announcement, the DMV issued a suspension order of Cruise's driverless permit. In so doing, the DMV announced that it was "suspending Cruise's autonomous vehicle deployment and driverless testing permits, effective immediately." The DMV's public announcement grounded the suspension on the DMV's prerogative to suspend Cruise's permits "[w]hen there is an unreasonable risk to public safety." Specifically, the DMV stated that it had determined that "the manufacturer's vehicles are not safe for the public's operation"; "[t]he manufacturer has misrepresented [] information related to safety of the autonomous technology of its vehicles;" Cruise had engaged in "act[s] or omission[s] . . . which the department finds makes the conduct of autonomous vehicle testing on public roads by the manufacturer an unreasonable risk to the public;" and Cruise had been "engaging in a practice in such a manner that immediate suspension is required for the safety of persons on a public road."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that the DMV suspended certain of Cruise's DMV permits on October 24, 2023; (ii) admit that the DMV issued a "DMV Statement on Cruise LLC Suspension" on October 24, 2023; and (iii) respectfully refer the Court to the October 24, 2023 DMV statement referenced in Paragraph 195 for a complete and accurate description of its contents. Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 195 and denies the allegations in Paragraph 195 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 195.

196. The DMV's suspension announcement stated that "[t]here is no set time for a suspension" and that the DMV had "provided Cruise with the steps needed to apply to reinstate its suspended permits, which the DMV will not approve until the company has fulfilled the requirements to the department's satisfaction."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that the DMV issued a "DMV Statement on Cruise LLC Suspension" on October 24, 2023; and (ii) respectfully refer the Court to the October 24, 2023 DMV statement referenced in Paragraph 196 for a complete and accurate description of its contents. Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 196 and denies the allegations in Paragraph 196 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 196.

197. The DMV's Order of Suspension to Cruise stated, *inter alia*, that after hitting the pedestrian on October 2, 2023 and coming to an initial stop, the Cruise AV "subsequently attempted to perform a pullover maneuver while the pedestrian

104

was underneath the vehicle. The AV traveled approximately 20 feet and reached a speed of 7 mph before coming to a subsequent and final stop. The pedestrian remained under their vehicle." According to the DMV Order, the AV's maneuvering "indicates that Cruise's vehicles may lack the ability to respond in a safe and appropriate manner during incidents involving a pedestrian so as not to unnecessarily put the pedestrian or others at risk of further injury" and "the behavior of the vehicle raises concerns that vehicles operated under Cruise's driverless testing permit also lack the ability to respond in a safe and appropriate manner during incidents involving a pedestrian. Until the department can make a determination regarding the safe operation of the vehicles, the continued operation of Cruise's driverless test vehicles on public roads poses an unreasonable risk to the public."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that the DMV issued an "Order of Suspension" on October 24, 2023; and (ii) respectfully refer the Court to the DMV Order of Suspension referenced in Paragraph 197 for a complete and accurate description of its contents. Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 197 and denies the allegations in Paragraph 197 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 197.

198. Concurrent with the DMV's suspension, the CPUC also suspended Cruise's permit to offer driverless passenger service. The CPUC suspended Cruise's permit pursuant to the CPUC Decision 20-11-046, Ordering Paragraph 13, which mandates that Cruise's permit for driverless passenger service from the CPUC "shall be suspended immediately from the deployment program upon suspension or revocation of [the AV operator's] testing permit by the [DMV] and not reinstated until the [DMV] has reinstated the testing permit."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that Cruise's CPUC permit No. TCP0039080-P was suspended; (ii) respond that Paragraph 198 in part states a legal conclusion to which no response is required; and (iii) respectfully refer

105

the Court to CPUC Decision 20-11-046 referenced in Paragraph 198 for a complete and accurate description of its contents. Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 198 and denies the allegations in Paragraph 198 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 198.

199. As of the filing of this amended complaint—over six months after the DMV's and the CPUC's suspensions—Cruise's driverless permits have not been reinstated—permits that require Cruise to have a Level 4 system in place.

**ANSWER:** The Cruise Defendants (i) admit that some of the permits require Cruise's AVs to have "Level 4" capabilities as that term is defined under the SAE Taxonomy. Cruise also (ii) admits that certain of Cruise's DMV permits and CPUC permit No. TCP0039080-P are currently suspended. Mr. Ammann, Mr. West, and Mr. Vogt lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 199 that Cruise's DMV Permits and CPUC permit No. TCP0039080-P are currently suspended and deny those allegations on that basis.

200. Two days after the DMV and the CPUC's suspensions, on October 26, 2023, the NHTSA publicly released a letter the agency had sent to Cruise six days earlier indicating that the NHTSA was investigating five reports of Cruise vehicles engaging in inappropriately hard braking that resulted in collisions:

> Since opening [the investigation], this office has received reports of five (5) incidents in which a Cruise ADS equipped vehicle initiated a braking maneuver with no stated obstacles ahead and with another road user approaching from the rear. In each case, the other road user subsequently struck the rear of the ADS equipped vehicle. The ADS

106

equipped vehicles involved were operating without onboard human supervision at the time of each crash.

**ANSWER:**  Cruise, Mr. West, and Mr. Vogt (i) admit that NHTSA released a letter dated October 20, 2023, addressed to Cruise on October 26, 2023; and (ii) respectfully refer the Court to the October 20, 2023 NHTSA letter referenced in Paragraph 200 for a complete and accurate description of its contents.  Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 200 and denies the allegations in Paragraph 200 on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 200.

201. Later that day, after close of market, Cruise announced via a post on X (formerly Twitter) that it would "pause driverless operations across all our fleets while we take time to examine our processes, systems, and tools and reflect on how we can better operate in a way that will earn public trust":

> (1/3) The most important thing for us right now is to take steps to rebuild public trust.  Part of this involves taking a hard look inwards and at how we do work at Cruise, even if it means doing things that are uncomfortable or difficult.
>
> * * *
>
> (2/3) In that spirit, ***we have decided to proactively pause driverless operations across all of our fleets*** while we take time to examine our processes, systems, and tools and reflect on how we can better operate in a way that will earn public trust.
>
> * * *
>
> (3/3) This isn't related to any new on-road incidents, and supervised AV operations will continue.  We think it's the right thing to do during a period when we need to be extra vigilant when it comes to risk, relentlessly focused on safety, & taking steps to rebuild public trust.

**ANSWER:** Cruise, Mr. West and Mr. Vogt (i) admit that Cruise posted on X (formerly Twitter) on October 26, 2023; and (ii) respectfully refer the Court to the October 26, 2023 X posts referenced in Paragraph 201 for a complete and accurate description of their contents.  Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 201 that Cruise posted on X on October 26, 2023 and denies those allegations on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 201.

202. Then, on November 8, 2023, Cruise announced, and the media reported, that Cruise issued a recall impacting its entire fleet of 950 driverless cars across the US.  The recall notice described that the "Collision Detection Subsystem"—which "is responsible for detecting [a] collision and electing a post- collision response"—may, after a collision, "cause the Cruise AV to attempt to pull over out of traffic instead of remaining stationary when a pullover is not the desired post-collision response."  Cruise deemed this a "[d]efect" that posed a "[s]afety [r]isk," and concluded that this defect "played a role" in the October 2 Crash.  As a result, the recall notice stated that Cruise had developed a "remedy" in the form of "an update to the Collision Detection Subsystem" that "Cruise has deployed the remedy to its supervised test fleet and will deploy the remedy to its driverless fleet prior to resuming driverless operations."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that Cruise published a blog post on November 8, 2023 titled "Important Updates from Cruise" and stating (among other things) that Cruise had "issued a voluntary recall of part of our AV software based on a new analysis of our AV's post-collision response on October 2"; and (ii) respectfully refer the Court to the November 8, 2023 blog post and unspecified media reports and recall notice referenced in Paragraph 202 for a complete and accurate description of their contents.  Mr. Ammann lacks sufficient

108

knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 202 that Cruise issued a blog post on November 8, 2023 and denies those allegations on that basis and respectfully refers the Court to the unspecified media reports and recall notice referenced in Paragraph 202 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 202.

203. Separately on November 8, 2023, Cruise issued a blog post further elaborating on the recall.  Cruise reiterated that the recall "addresses circumstances in which the Cruise collision detection subsystem may cause the Cruise AV to attempt to pull over out of traffic instead of remaining stationary when a pullover is not the desired post-collision response."  Cruise noted in its post that "we determined that a similar collision with a risk of serious injury could have recurred every 10 million - 100 million miles of driving on average prior to the software update." While at first blush this statistic may seem to indicate the rarity of such an event, a deeper look reveals the disturbing reality.  For approximately the past decade, the total vehicle miles traveled in the United States has been over three trillion miles each year.  An event that occurs once every 10 million to 100 million miles would occur 30,000 to 300,000 times in a year where three trillion miles are traversed. Thus, if Cruise's statistics were mapped onto the driving public at large, it would result in a collision like the October 2 Crash between 82 to 820 times *per day*.

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that Cruise published a further updated blog post on November 8, 2023 titled "Important Updates from Cruise"; and (ii) respectfully refer the Court to the November 8, 2023 blog post referenced in Paragraph 203 for a complete and accurate description of its contents. Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 203 that Cruise issued a blog post on

November 8, 2023 and denies those allegations on that basis.  The Cruise Defendants

otherwise deny the allegations in Paragraph 203.

204. Additionally, Cruise's November 8, 2023 blog post stated that Cruise was conducting a search to hire a Chief Safety Officer and that it had retained Quinn Emanuel "to examine and better understand Cruise's response to the October 2 incident."  Cruise also announced that it had hired the independent, third-party engineering firm, Exponent, "to perform a technical root cause analysis of the October 2 incident," and that Cruise "will incorporate their findings into our safety and engineering processes." Cruise also announced that it "identified four key areas of potential improvements to how we operate and have assigned leaders to investigate each one and complete follow up actions."  First, "Safety Governance: We are taking a deep look at our overall safety approach and risk management structures to ensure we are built and positioned to enable continuous improvement." Second, "Safety and Engineering Processes: We have advanced tools and processes in place and are committed to further upgrades wherever warranted.  We are comprehensively reviewing all of our safety, testing, and validation processes and will add or modify processes where there is room to improve."  Third, "Internal & External Transparency: We understand that transparency is key to trust, especially in an emerging industry like ours.  We are committed to improving how we communicate with the public, our customers, regulators, the media, and Cruise employees." Fourth, "Community Engagement: We also understand the importance of collaborative partnerships.  To realize the community benefits of autonomous driving, we need to do a better job engaging with our stakeholders and soliciting their feedback."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that Cruise published a

blog post on November 8, 2023 titled "Important Updates from Cruise"; and (ii)

respectfully refer the Court to the November 8, 2023 blog post referenced in

Paragraph 204 for a complete and accurate description of its contents.  Mr. Ammann

lacks sufficient knowledge or information to form a belief as to the truth or falsity

of the allegations in Paragraph 204 that Cruise issued a blog post on November 8,

110

2023 and denies those allegations on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 204.

205. On November 14, 2023, Cruise announced via a blog post on its website that its Board was taking "further steps to enhance safety and transparency as we work to build a better Cruise." Among other things, these steps included the "[r]etention of an independent expert to conduct a comprehensive safety assessment," the expansion of Exponent's remit "to include a comprehensive review of our safety systems and technology," and "pausing our supervised and manual AV operations in the US, affecting roughly 70 vehicles." Cruise elaborated that the pause of its supervised and manual AV operations was necessary "to rebuild public trust while we undergo a full safety review." As a result of this pause, Cruise would only "continue to operate our vehicles in closed course training environments" in conjunction with "an active simulation program." Thus, Cruise's announcement confirmed that its AVs were not even capable or safe enough to operate with a safety driver outside the confines of closed course training environments and that Cruise required a "comprehensive review of our safety systems and technology" before it could launch again.

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that Cruise published a blog post on November 14, 2023 titled "Important Updates from Cruise"; and (ii) respectfully refer the Court to the November 14, 2023 blog post referenced in Paragraph 205 for a complete and accurate description of its contents. Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 205 that Cruise issued the November 14, 2023 blog post referenced in Paragraph 205 and denies those allegations on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 205.

206. On December 1, 2023, Cruise's newly appointed President and CTO, Mo Elshenawy, emailed Cruise employees, notifying them then that while "[w]e remain focused on commercializing a fully driverless L4 service," Cruise would need to "relaunch[] ridehail in one city to start" before expanding to additional cities.

111

This cautious approach stands in stark contrast to Cruise's Class Period conduct of unleashing hundreds of Cruise AVs on the streets of multiple cities throughout the United States.

**ANSWER:** Cruise and Mr. West (i) admit that then-Cruise President and CTO Mo Elshenawy emailed Cruise employees on December 1, 2023; and (ii) respectfully refer the Court to the December 1, 2023 email referenced in Paragraph 206 for a complete and accurate description of its contents. Mr. Ammann and Mr. Vogt lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 206 and deny the allegations in Paragraph 206 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 206.

207. Despite the seemingly modest goal of launching AVs in only one city, Elshenawy elaborated that Cruise had not yet determined what steps it needed to do so, stating that "[a] cross-functional working group of subject matter experts is working hard to define what is needed to relaunch, including what work we should continue or stop. This will be informed by the independent reviews we have underway and we'll be sharing more soon on this."

**ANSWER:** Cruise and Mr. West (i) admit that then-Cruise President and CTO Mo Elshenawy emailed Cruise employees on December 1, 2023; and (ii) respectfully refer the Court to the December 1, 2023 email referenced in Paragraph 207 for a complete and accurate description of its contents. Mr. Ammann and Mr. Vogt lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 207 and deny the allegations in Paragraph 207

112

on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 207.

208. Elshenawy also acknowledged the flaws in Cruise's prior approach to AV technology, writing that "[t]he bar has been raised for driverless operations, and it needs to encompass the entire experience and not only aggregate safety performance."

**ANSWER:** Cruise and Mr. West (i) admit that then-Cruise President and CTO Mo Elshenawy emailed Cruise employees on December 1, 2023; and (ii) respectfully refer the Court to the December 1, 2023 email referenced in Paragraph 208 for a complete and accurate description of its contents.  Mr. Ammann and Mr. Vogt lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 208 and deny the allegations in Paragraph 208 on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 208.

209. On April 9, 2024, Cruise wrote on its blog that Cruise had suspended driverless operations in October 2023 because, *inter alia*, Cruise needed to "redesign our approach to safety."  Cruise wrote that it had "made significant progress" in consultation with "third-party experts," but that Cruise was not yet able to "resume driverless operations."  Instead, Cruise announced that it was resuming "*manual* driving to create maps and gather road information" in Phoenix, Arizona. (Emphasis added).  Before relaunching in Phoenix, Cruise needed to "us[e] human-driven vehicles without autonomous systems engaged," which represented "a critical step for validating our self-driving systems as we work towards returning to our driverless mission."  Cruise had "elevated [its] safety and performance targets," and these targets needed to be met in order to achieve "future driverless service."

**ANSWER:** Cruise (i) admits that Cruise published a blog post on April 9, 2024 titled "Cruise resumes manual driving as next step in return to driverless

113

mission"; and (ii) respectfully refers the Court to the April 9, 2024 blog post

referenced in Paragraph 209 for a complete and accurate description of its contents.

Mr. Ammann, Mr. West, and Mr. Vogt lack sufficient knowledge or information to

form a belief as to the truth or falsity of the allegations in Paragraph 209 and deny

the allegations in paragraph 209 on that basis.  The Cruise Defendants otherwise

deny the allegations in Paragraph 209.

210. Reporting on the April 9, 2024 blog post observed that Cruise's approach detailed therein indicated that Cruise's prior technology may have been flawed.  For example, *Tech Crunch* observed that "Cruise appears to be going back to basics" and that the April 9, 2024 blog post "reads like it could have been written in 2018."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the *Tech*

*Crunch* article referenced in Paragraph 210 for a complete and accurate description

of its contents.  The Cruise Defendants otherwise deny the allegations in Paragraph

210.

211. Cruise's April 9, 2024 blog post went on to detail that it had implemented certain measures to improve operations, noting that Cruise had: (i) "[e]stablished new leadership, and engaged more closely with experienced advisors from GM to support safety, legal, regulatory, and communications functions"; (ii) "[h]ired an experienced Chief Safety Officer to guide improved safety processes and procedures throughout the organization"; (iii) "[e]stablished a cross-disciplinary regulatory team to guide engagement with regulators in regard to incident reporting"; and (iv) "[r]eviewed and strengthened key internal safety governance processes to incorporate more robust cross-functional review and leadership accountability."

**ANSWER:** Cruise (i) admits that Cruise published a blog post on April 9,

2024 titled "Cruise resumes manual driving as next step in return to driverless

114

mission"; and (ii) respectfully refers the Court to the April 9, 2024 blog post referenced in Paragraph 211 for a complete and accurate description of its contents. Mr. Ammann, Mr. West, and Mr. Vogt lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 211 and deny the allegations in paragraph 211 on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 211.

212. Cruise's April 9, 2024 blog post also stated work was still underway to "establish important systems and processes for ensuring safe operations," such as: (i) "[r]eforming and updating incident response and crisis management protocols to ensure more consistent, effective and transparent response"; (ii) "[r]enewing internal training and reinforcing safety culture systems"; (iii) "[r]eevaluating and reestablishing our safety target for supervised and driverless operations"; and (iv) "[r]eengaging with first responders to facilitate ongoing trainings for each precinct and fire house in the areas we intend to operate in."

**ANSWER:** Cruise (i) admits that Cruise published a blog post on April 9, 2024 titled "Cruise resumes manual driving as next step in return to driverless mission"; and (ii) respectfully refers the Court to the April 9, 2024 blog post referenced in Paragraph 212 for a complete and accurate description of its contents. Mr. Ammann, Mr. West, and Mr. Vogt lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 212 and deny the allegations in paragraph 212 on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 212.

213. On January 25, 2024, Cruise announced via a blog post that the DOJ and the SEC had both opened investigations or inquiries in connection with the October 2 Crash.

115

**ANSWER:** Cruise (i) admits that Cruise published a blog post on January 25, 2024 titled "Cruise Releases Third-Party Findings Regarding October 2"; and (ii) respectfully refers the Court to the January 25, 2024 blog post referenced in Paragraph 213 for a complete and accurate description of its contents. Mr. West and Mr. Vogt lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 213 that Cruise issued the January 25, 2024 blog post referenced in Paragraph 213 and deny those allegations on that basis. The allegations in Paragraph 213 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 213 and denies the allegations in Paragraph 213 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 213.

214. Contemporaneously with its announcement of the DOJ and SEC investigations, Cruise released the Quinn Report, which incorporated Exponent's analysis, to the public. Cruise announced that it "accepts Quinn Emanuel's conclusions."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that Cruise released the Quinn Report on January 25, 2024. Cruise also admits that (ii) Cruise published a blog post on January 25, 2024 titled "Cruise Releases Third-Party Findings Regarding October 2"; and (iii) respectfully refers the Court to the January 25, 2024 blog post referenced in Paragraph 214 for a complete and accurate description of its

116

contents.  Mr. West and Mr. Vogt lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 214 that Cruise issued the blog post on January 25, 2024 referenced in Paragraph 214 and deny those allegations on that basis.  The allegations in Paragraph 214 form the basis for Dismissed Claims against Mr. Ammann.  Accordingly, no response is required from Mr. Ammann.  To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 214 and denies the allegations in Paragraph 214 on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 214.

215. The Exponent analysis highlights at least five flaws that led to the October 2 Crash, evidencing Cruise's lack of "fully driverless" capabilities.

**ANSWER:** The allegations in Paragraph 215 form the basis for Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, Cruise, Mr. West, and Mr. Vogt (i) admit that the engineering firm Exponent performed the Exponent Analysis of the Accident; and (ii) respectfully refer the Court to the Exponent Analysis referenced in Paragraph 215 for a complete and accurate description of its contents; and Mr. Ammann (iii) lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 215 and denies the allegations in Paragraph 215 on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 215.

117

216. First, when the AV initially detected the pedestrian in front of it, it *accelerated* because it predicted that the pedestrian would be out of its way before any collision. In this respect, the AV violated California Rules of the Road, which state that "[t]he driver of a vehicle approaching a pedestrian within any marked or unmarked crosswalk shall exercise all due care and shall reduce the speed of the vehicle or take any other action relating to the operation of the vehicle as necessary to safeguard the safety of the pedestrian."

**ANSWER:** The allegations in Paragraph 216 form the basis for Dismissed Claims. Accordingly, no response is required. To the extent a response is required, Cruise, Mr. West, and Mr. Vogt (i) admit that the engineering firm Exponent performed the Exponent Analysis of the Accident; and (ii) respectfully refer the Court to the Exponent Analysis referenced in Paragraph 216 for a complete and accurate description of its contents; and (iii) Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 216 and denies the allegations in Paragraph 216 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 216.

217. Second, Exponent concluded that, had the AV "initiat[ed] a brake request no later than 0.78 second prior to AV-pedestrian contact," such a maneuver would have "completely avoid[ed] contact" between the AV and the pedestrian. Further, had a "hypothetical brake activation occur[ed] after this time (and prior to when the AV initiated braking at 0.25 s[econds])," it "would have potentially mitigated the severity of the initial collision between the AV and the pedestrian."

**ANSWER:** The allegations in Paragraph 217 form the basis for Dismissed Claims. Accordingly, no response is required. To the extent a response is required, Cruise, Mr. West, and Mr. Vogt (i) admit that the engineering firm Exponent performed the Exponent Analysis of the Accident; and (ii) respectfully refer the

118

Court to the Exponent Analysis referenced in Paragraph 217 for a complete and accurate description of its contents; and (iii) Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 217 and denies the allegations in Paragraph 217 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 217.

218. Third, Exponent admitted that "[t]he AV's lack of anticipation of a potential future incursion of the pedestrian into its travel lane was a contributing factor to this incident." While Exponent's analysis goes on to state that "reasonable human drivers would not likely have had adequate time to avoid the collision once the pedestrian was struck by the Nissan," it is notable that Defendants repeatedly touted Cruise's "fully driverless" technology as "safer" and "better" than a human driver.

**ANSWER:** The allegations in Paragraph 218 form the basis for Dismissed Claims. Accordingly, no response is required. To the extent a response is required, Cruise, Mr. West, and Mr. Vogt (i) admit that the engineering firm Exponent performed the Exponent Analysis of the Accident; (ii) respectfully refer the Court to the Exponent Analysis referenced in Paragraph 218 for a complete and accurate description of its contents; and (iii) Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 218 and denies the allegations in Paragraph 218 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 218.

219. Fourth, Exponent's analysis revealed that "[t]he pedestrian's feet and lower legs were visible in the wide-angle left side camera view from the time of the collision between the pedestrian and the AV through to the final rest position of the

119

AV." Thus, the AV could "see" that it was pinning and dragging a pedestrian while it engaged in the pullover maneuver.

**ANSWER:** The allegations in Paragraph 219 form the basis for Dismissed Claims. Accordingly, no response is required. To the extent a response is required, Cruise, Mr. West, and Mr. Vogt (i) admit that the engineering firm Exponent performed the Exponent Analysis of the Accident; and (ii) respectfully refer the Court to the Exponent Analysis referenced in Paragraph 219 for a complete and accurate description of its contents; and (iii) Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 219 and denies the allegations in Paragraph 219 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 219.

220. Fifth, Exponent "did not identify any evidence of reported vehicle, sensor, actuator, or computer hardware failures or software faults that could have contributed to the incident." In other words, the Cruise AV behaved according to its programming as it slammed into a pedestrian and needlessly dragged the pedestrian 20 feet down the road.

**ANSWER:** The allegations in Paragraph 220 form the basis for Dismissed Claims. Accordingly, no response is required. To the extent a response is required, Cruise, Mr. West, and Mr. Vogt (i) admit that the engineering firm Exponent performed the Exponent Analysis of the Accident; and (ii) respectfully refer the Court to the Exponent Analysis referenced in Paragraph 220 for a complete and accurate description of its contents; and (iii) Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations

120

in Paragraph 220 and denies the allegations in Paragraph 220 on that basis. The

Cruise Defendants otherwise deny the allegations in Paragraph 220.

### C. Defendants Misrepresented the October 2, 2023 Crash

#### 1. Defendants Issued Materially Misleading Statements to the Media Regarding the October 2 Crash

221. As detailed herein, on October 2, 2023, a human-driven Nissan vehicle struck a pedestrian in San Francisco, launching the pedestrian into the pathway of the Cruise AV traveling in autonomous mode without a passenger in the adjacent lane. The Cruise AV then hit the pedestrian and came to an initial stop, pinning the pedestrian beneath it. However, the Cruise AV did not detect the pedestrian underneath it, so it resumed driving at up to 7.7 mph for approximately 20 feet, dragging the pedestrian with it before stopping again, causing the pedestrian additional severe injuries. Shortly thereafter, emergency responders arrived at the scene and removed the pedestrian from underneath the AV and transported her to a hospital for medical attention.

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to

the "The October 2, 2023 Accident" section under the "Statement of Facts" in the

DPA for a description of the Accident. The allegations in Paragraph 221 form the

basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is

required from Mr. Ammann. To the extent a response is required, Mr. Ammann

lacks sufficient knowledge or information to form a belief as to the truth or falsity

of the allegations in Paragraph 221 and denies the allegations in Paragraph 221 on

that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 221.

222. According to the Quinn Report, within an hour of the Crash, Cruise contractors arrived at the scene. One contractor took over 100 photos and videos and saw the pedestrian's blood and skin patches on the ground, showing that the Cruise AV had moved from the initial point-of-impact to its final stopping point.

121

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to the Quinn Report referenced in Paragraph 222 for a complete and accurate description of its contents. The allegations in Paragraph 222 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 222 and denies the allegations in Paragraph 222 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 222.

223. After the October 2 Crash, Cruise set up a "War Room" the focus of which, according to the Quinn Report, "centered almost exclusively on correcting a false media narrative that the Cruise AV had caused the [a]ccident." Initial media coverage had blamed the Cruise AV for the Crash without mentioning the human-driven Nissan and, according to the Quinn Report, "certain senior Cruise executives focused on rebutting the erroneous media narrative, using words like they were 'under siege' and 'we have no fighting chance with these headlines/media stories…we are drowning.'" As a result, Cruise showed the media a 21-second video that had been taken with the Cruise AV's cameras (the "Media Video"). The Media Video included slowed-down footage of the Crash and ended after the Nissan threw the pedestrian into the Cruise AV's path, but did not depict the post-collision dragging of the pedestrian.

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to the Quinn Report referenced in Paragraph 223 for a complete and accurate description of its contents. Cruise respectfully refers the Court to the "Statement of Facts" in the DPA for a description of the Accident and incident response. The allegations in Paragraph 223 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent

a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 223 and denies the allegations in Paragraph 223 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 223.

224. In the early morning hours of October 3, Defendant Vogt attended a meeting where he decided what portion of the AV's recording would be shown to the media, and even selected specific camera angles to be included. According to the Quinn Report, Vogt "expressed to Cruise meeting attendees that he personally wanted to see and authorize the final cut of any video or media statement and that 'nothing would be shared or done' . . . without his sign off."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to the Quinn Report referenced in Paragraph 224 for a complete and accurate description of its contents. The allegations in Paragraph 224 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 224 and denies the allegations in Paragraph 224 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 224.

225. Also during the early morning hours of October 3, Cruise's communications team drafted a set of bullet points to share on background as an official comment from Cruise, that included the statement: "the AV came to a complete stop immediately after impacting the struck pedestrian." According to the Quinn Report, "this statement is not accurate given [] AV's subsequent pullover maneuver," but "the communications team was unaware of this inaccuracy" at the time. At 12:53 AM PT, Cruise published a press release that the communications team had drafted with input from Defendant Vogt and Communications VP McLear. This press release did not mention the pullover maneuver.

**ANSWER:** Cruise, Mr. West, and Mr. Vogt  (i) respectfully refer the Court to the Quinn Report referenced in Paragraph 225 for a complete and accurate description of its contents; and (ii) respectfully refer the Court to the press release referenced in Paragraph 225 for a complete and accurate description of its contents. The allegations in Paragraph 225 form the basis for Dismissed Claims against Mr. Ammann.  Accordingly, no response is required from Mr. Ammann.  To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 225 and denies the allegations in Paragraph 225 on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 225.

226. According to the Quinn Report, at 2:14 AM PT, a 45-second video of the accident depicting the pullover maneuver and pedestrian dragging was first made available within Cruise. Shortly thereafter, Director of Systems Integrity Matt Wood reviewed this video footage and additional technical data and posted a communication noting the pullover maneuver and the pedestrian dragging to the War Room Slack channel containing 77 Cruise employees at the time.

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to the Quinn Report referenced in Paragraph 226 for a complete and accurate description of its contents.  The allegations in Paragraph 226 form the basis for Dismissed Claims against Mr. Ammann.  Accordingly, no response is required from Mr. Ammann.  To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations

124

in Paragraph 226 and denies the allegations in Paragraph 226 on that basis.  The

Cruise Defendants otherwise deny the allegations in Paragraph 226.

227. As detailed in the Quinn Report, at 6:00 AM PT, Cruise held a virtual Crisis Management Team ("CMT") meeting, attended by more than 100 people, including Defendant West, where the pedestrian dragging was discussed. Afterward, the 45-second video was posted on the War Room Slack channel. According to the Quinn Report, "the AV's 'pulling' of the pedestrian for one to two car lengths was discussed" at this meeting, and West notified Defendant Vogt and others via direct message that the AV had continued to travel after initial impact.

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to

the Quinn Report referenced in Paragraph 227 for a complete and accurate

description of its contents.  The allegations in Paragraph 227 form the basis for

Dismissed Claims against Mr. Ammann.  Accordingly, no response is required from

Mr. Ammann.  To the extent a response is required, Mr. Ammann lacks sufficient

knowledge or information to form a belief as to the truth or falsity of the allegations

in Paragraph 227 and denies the allegations in Paragraph 227 on that basis.  The

Cruise Defendants otherwise deny the allegations in Paragraph 227.

228. At 6:45 AM PT, Cruise held a virtual Senior Leadership Team ("SLT") meeting, attended by Defendant Vogt and others. Per the Quinn Report, "[d]ocumentary evidence and accounts from meeting participants confirm that Cruise senior leadership discussed the pedestrian dragging. One interviewee who attended the SLT meeting recalled discussing that the AV had dragged the pedestrian, saying the 'SLT was aware.' Another interviewee reported that 'there was a whole discussion about the facts. We knew the vehicle came to a stop, then accelerated again.'"

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to

the Quinn Report referenced in Paragraph 228 for a complete and accurate

125

description of its contents. The allegations in Paragraph 228 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 228 and denies the allegations in Paragraph 228 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 228.

229. According to the Quinn Report, senior executives, including Defendant Vogt, discussed whether to correct Cruise's prior statement omitting reference to the pullover maneuver and pedestrian dragging, and they concluded that Cruise should stick to its story omitting the pullover maneuver:

> Vogt, Communications VP McLear, and other employees discussed whether to amend Cruise's initial media communications, including its social media statement, to disclose the pullover maneuver and pedestrian dragging. According to one interviewee, "the outcome [of these discussions] was whatever statement was published on social we would stick with because the decision was we would lose credibility by editing a previously agreed upon statement."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to the Quinn Report referenced in Paragraph 229 for a complete and accurate description of its contents. The allegations in Paragraph 229 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 229 and denies the allegations in Paragraph 229 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 229.

126

230. As noted in the Quinn Report, a message between two Cruise employees—one of whom attended the SLT meeting—confirmed that the SLT "agreed to not share anything just yet . . . seems like SLT leaning towards not sharing unless we're backed into a corner."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to the Quinn Report referenced in Paragraph 230 for a complete and accurate description of its contents. The allegations in Paragraph 230 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 230 and denies the allegations in Paragraph 230 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 230.

231. Cruise continued representing to media outlets that the Cruise AV came to a stop after it collided with the pedestrian, omitting any reference to the pullover maneuver and pedestrian dragging:

In light of this decision, the Cruise communications team continued to screen-share the Media Video well into the afternoon of October 3 with

such media outlets as CBS News, SFGate, KRON4, KPIX, and *Crain's Business*, despite knowing that the video stopped at the point of impact and omitted key details of the [a]ccident.
Communications members also continued to give reporters the following bullet point on background: "[t]he AV came to a complete stop immediately after impacting the struck pedestrian," even though by this time Cruise, including senior members of its communications team, knew that the AV moved forward immediately after striking the pedestrian. Cruise communications team members gave this statement to media reporters after the 6:45 am SLT meeting, some of whom published it, well into the afternoon of October 3, including *Forbes*, CNBC, ABC News Digital, Engadget, Jalopnik, and *The Register*. For

example, CNBC reported at 8:51 am: "The Cruise vehicle immediately came to a stop after the woman was thrown into it"; ABC News Digital reported at 9:48 am: "The autonomous vehicle came to a complete stop after striking the pedestrian, Cruise said"; and Engadget reported at 10:14 am: "As the autonomous taxi proceeded through the green light, it ran over her and came to a complete stop, pinning her leg under its rear axle and tire."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to the Quinn Report referenced in Paragraph 231 for a complete and accurate description of its contents. The allegations in Paragraph 231 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 231 and denies the allegations in Paragraph 231 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 231.

232. The Quinn Report further noted that "[i]t was not until October 13, when a communications employee was planning on giving the same set of pre-drafted 'on background' bullet points to a reporter that Cruise ultimately deleted this 'complete stop' sentence from their communications plan. A communications employee flagged it for legal, and a lawyer responded: 'I don't think we can say this.' Wood agreed that he '[w]ould not recommend stating this given the sensitivity.'"

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to the Quinn Report referenced in Paragraph 232 for a complete and accurate description of its contents. The allegations in Paragraph 232 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from

128

Mr. Ammann.  To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 232 and denies the allegations in Paragraph 232 on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 232.

233. As detailed in the Quinn Report, Cruise received a media inquiry from *Forbes* magazine on October 5, 2023 regarding the October 2 Crash.  This inquiry stated that that President of the San Francisco Board of Supervisors Aaron Peskin had told the reporter from *Forbes* that the pedestrian struck on October 2 had been dragged 20 feet and that Cruise did not disclose it publicly.  Specifically, the *Forbes* reporter inquired: "Yesterday, I spoke to SF Sup. Aaron Peskin who told me that his understanding is that the victim here was 'dragged an additional 20 or more feet [by the Cruise AV], resulting in more grievous injuries to the victim.'"  According to the Quinn Report, "[t]he *Forbes* reporter asked to 'view the video' in person so that he could see whether the victim was dragged 'per Peskin's allegation' or whether 'the AV came to a complete stop immediately after impacting the struck pedestrian,' as Cruise stated in the 'On background' statements it provided to the media on October 2 and 3."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to the Quinn Report referenced in Paragraph 233 for a complete and accurate description of its contents.  The allegations in Paragraph 233 form the basis for Dismissed Claims against Mr. Ammann.  Accordingly, no response is required from Mr. Ammann.  To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 233 and denies the allegations in Paragraph 233 on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 233.

234. According to the Quinn Report, "Cruise discussed internally whether to update its messaging and respond to the *Forbes* reporter, ultimately opting not

129

to respond. Cruise again decided not to offer details that it believed would trigger a new media cycle and, instead, updated its messaging to state it was no longer sharing video with the media and that Cruise did not have more to add beyond its original statement. McLear's position . . . was that as contrasted with the regulators, Cruise has 'no obligation to share anything with the press.'"

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to the Quinn Report referenced in Paragraph 234 for a complete and accurate description of its contents. The allegations in Paragraph 234 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 234 and denies the allegations in Paragraph 234 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 234.

235. On October 6, 2023 a *Forbes* reported that a local politician alleged that during the October 2 Crash the Cruise AV "dragged" the pedestrian, causing her injuries. However, Forbes did not confirm this allegation, and instead reported that Cruise, "said that it had nothing further to add" from its prior media comments, and claimed it had already "shared all pertinent information."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the October 6, 2023 *Forbes* article referenced in Paragraph 235 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 235.

236. Despite the October 6, 2023 *Forbes* article, Defendants' misleading media strategy had its intended effect, as the news coverage continued to omit references to the pullover maneuver and pedestrian dragging. For example, on October 17, 2023, *CNBC* news published an article titled, "Federal regulators open

probe into Cruise after pedestrian injury reports." This article described the October 2 Crash but continued to omit any reference to the pullover maneuver:

> One incident on Oct. 2 involved a situation where a pedestrian was thrown by another vehicle into the path of a driverless Cruise vehicle. That incident matches the details of a hit-and-run crash in San Francisco, which resulted in one pedestrian being transported to the hospital.

> At the time of the incident, the company said its autonomous vehicle braked "aggressively" and that it was "actively working" with San Francisco police to identify the hit-and-run driver. Cruise said it had spoken with the NHTSA about the Oct. 2 incident and provided it with video footage, adding that the regulator had not raised further questions.

**ANSWER:** The Cruise Defendants respectfully refer the Court to the October 17, 2023 *CNBC* article referenced in Paragraph 236 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 236.

237. Additional articles published on October 17, 2023 described the October 2 Crash without references to the pullover maneuver and pedestrian dragging, including: (1) *The Register*: "According to the NHTSA report that Cruise told us was filed after the accident, a San Francisco woman was run over by a robo-taxi after the human driver of a Nissan Sentra struck the pedestrian and launched them in front of the Cruise taxi. Not mentioned in the NHTSA report is the fact that the victim was in critical condition, and the Cruise vehicle stopped on top of her, trapping her leg under a rear tire;" (2) *Reuters*: "One incident occurred Oct 2 in San Francisco in which a pedestrian was struck by a hit-and-run driver, thrown into an adjacent lane and hit a second time by a Cruise robotaxi, which was not able to stop in time and trapped the pedestrian for a period of time;" and (3) *CNN*: "The probe comes just over two weeks after an incident in San Francisco in which a pedestrian was struck by a hit-and-run driver, thrown into an adjacent lane and hit a second time by a Cruise robotaxi, which was not able to stop in time."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the October 17, 2023 *The Register*, *Reuters*, and *CNN* articles referenced in Paragraph 237 for a

131

complete and accurate description of their contents.   The Cruise Defendants

otherwise deny the allegations in Paragraph 237.

238. It was not until October 24, 2023—after the DMV suspended Cruise's permit—that Cruise finally acknowledged that the Cruise AV engaged in a pullover maneuver and dragged the pedestrian on the pavement.  Specifically, in a blog post on Cruise's website, Cruise finally admitted that "[the] AV detected a collision, bringing the vehicle to a stop; then attempted to pull over to avoid causing further road safety issues, pulling the individual forward approximately 20 feet."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that Cruise issued a

blog post on October 24, 2023 titled "A detailed review of the recent SF hit-and-run

incident"; and (ii) respectfully refer the Court to the October 24, 2023 blog post

referenced in Paragraph 238 for a complete and accurate description of its contents.

Mr. Ammann lacks sufficient knowledge or information to form a belief as to the

truth or falsity of the allegations in Paragraph 238 and denies the allegations in

Paragraph 238 on that basis.  The Cruise Defendants otherwise deny the allegations

in Paragraph 238.

### 2.    Defendants Misled Regulators About the October 2 Crash, and Misled the Public About Their Interactions with Regulators

239. After the October 2 Crash, Defendants repeatedly represented to the public that Cruise had been proactively cooperating with regulators regarding the Crash.

**ANSWER:** The allegations in Paragraph 239 are too vague to be admitted or

denied.  To the extent a response is required, the Cruise Defendants respectfully refer

the Court to the unspecified public statements referenced in Paragraph 239 for a complete and accurate description of their contents.

240. For example, in the October 6, 2023 *Forbes* article, Cruise stated that "[w]e have shared all pertinent information with regulators and investigators and are focused on assisting the police with identifying the person responsible, who left the scene." Similarly, in the October 17, 2023 *CNBC* news article: "Federal regulators open probe into Cruise after pedestrian injury reports" stated that "Cruise said it had spoken with the NHTSA about the Oct. 2 incident and provided it with video footage, adding that the regulator had not raised further questions."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the October 6, 2023 *Forbes* article and the October 17, 2023 *CNBC* article referenced in Paragraph 240 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 240.

241. These statements were materially misleading. After learning the truth about the Crash, Cruise representatives met virtually with the NHTSA. According to the Quinn Report, Director of Systems Integrity Matt Wood played the video of the accident but "paused the video at the point of impact, and then never resumed playing it." The Quinn Report continues: "As a result, Cruise employees neither received any questions from NHTSA nor proactively informed regulators about the pullover maneuver and pedestrian dragging they were unable to see." According to the Quinn Report, Cruise's approach was to let "the video speak for itself." But, as the Quinn Report concludes, "'the video did [not] speak for itself.' Even if it had played smoothly and fully, Cruise should have affirmatively pointed out and explained to NHTSA exactly what had transpired during the [Crash] after the Cruise AV initially hit the pedestrian."

**ANSWER:** The allegations in Paragraph 241 assert a legal conclusion to which no response is required. To the extent a response is required, Cruise, Mr. West, and Mr. Vogt refer the Court to the Quinn Report referenced in Paragraph 241 for a complete and accurate description of its contents. Cruise admits that on

133

October 3, 2023, Cruise employees met with NHTSA by videoconference. The allegations in Paragraph 241 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 241 and denies the allegations in Paragraph 241 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 241.

242. Cruise also failed to proactively share the full details of the Crash in additional meetings with regulators that day. As stated in the Quinn Report, "Cruise repeated this same mistake in each of its meetings with regulators and government officials on October 3."

**ANSWER:** The allegations in Paragraph 242 are too vague to be admitted or denied. To the extent a response is required, Cruise respectfully refers the Court to the "Statement of Facts" in the DPA for a description of the Accident and incident response; and Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to the Quinn Report referenced in Paragraph 242 for a complete and accurate description of its contents. The allegations in Paragraph 242 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 242 and denies the allegations in Paragraph 242 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 242.

134

243. Specifically, on October 3, 2023, Cruise representatives met with representatives from the DMV and California Highway Patrol ("CHP") to discuss the Crash. The Quinn Report details that "Cruise did not affirmatively tell the DMV that the pedestrian had been dragged underneath the Cruise AV for 20 feet." Indeed, according to the Quinn Report, numerous Cruise employees were relieved that the DMV and CHP representatives did not become aware of the pullover maneuver and pedestrian dragging during this meeting:

> In subsequent interviews about the DMV meeting, one Cruise employee not in the meeting stated that a Cruise employee who had been in the DMV meeting expressed relief afterwards that DMV had not raised pedestrian dragging, stating: "the car moved and they didn't ask and we're kind of lucky they didn't ask." The interviewee expressed discomfort with this comment. A second interviewee confirmed that the source of this information had recounted that the Cruise employee in the meeting had said something to effect of "phew, DMV didn't notice" the dragging and "we dodged a bullet."

> Slack messages also indicate that another senior Cruise employee expressed relief that the DMV did not observe the dragging. In a November 17, 2023 text message exchange between two Cruise employees discussing a Vice article titled "Cruise Exec Omitted Pedestrian Dragging in Summary of Self Driving Car Incident to California DMV, Email Shows," one employee wrote about another Cruise employee who had participated in the DMV meeting that "[a]fter the DMV call, I heard him tell people we were lucky they didn't pick up on the dragging." This employee later clarified that while he did not directly hear the comment from the DMV participant, he "heard something like [DMV] didn't notice and that was a good thing." While he could not recall the source of that information, his takeaway was that was "the general consensus about [the DMV] meeting."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to the Quinn Report referenced in Paragraph 243 for a complete and accurate description of its contents. Cruise admits that on October 3, 2023, Cruise employees met with officials from the California Department of Motor Vehicles and the

135

California Highway Patrol.  The allegations in Paragraph 243 form the basis for Dismissed Claims against Mr. Ammann.  Accordingly, no response is required from Mr. Ammann.  To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 243 and denies the allegations in Paragraph 243 on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 243.

244. It was also later revealed in the DMV's Order of Suspension that during the October 3, 2023 meeting between the DMV, CHP, and Cruise, that while Cruise showed "video footage of the accident captured by the AV's onboard cameras," to the DMV and CHP, "[t]he video footage presented to the department ended with the AV's initial stop following the hard-braking maneuver.  Footage of the subsequent movement of the AV to perform a pullover maneuver was not shown to the department and Cruise did not disclose that any additional movement of the vehicle had occurred after the initial stop of the vehicle."  Cruise has disputed this, claiming that it did show the full video during this meeting.  Indeed, the Quinn Report notes that "[r]ecollections differ" "sharply" among Cruise employees "over whether th[e] video played all the way through to the pullover maneuver and pedestrian dragging."  While "one Cruise employee does not believe the [f]ull [v]ideo was played, several other employees believe that the DMV saw the entire video at least once."  However, the Quinn Report concedes that "[t]he perspective of these Cruise employees [who think the full video was shown] differs sharply from the DMV regulators at the meeting, who said they do not believe that the Full Video was played or that the pullover maneuver and pedestrian dragging were depicted."  Finally, the Quinn Report does assert that "the weight of the evidence" indicates that Cruise at least attempted to show the full video to the DMV.  However, the Quinn Report concedes that "[w]ithout conclusive forensic evidence, Quinn Emanuel cannot determine which video Cruise showed, or attempted to show, to the DMV."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) respectfully refer the Court to the DMV's Order of Suspension referenced in Paragraph 244 for a complete and accurate description of its contents; and (ii) respectfully refer the Court to the Quinn

Report referenced in Paragraph 244 for a complete and accurate description of its contents. The allegations in Paragraph 244 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 244 and denies the allegations in Paragraph 244 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 244.

245. Nonetheless, the Quinn Report concluded that "[i]n any event, the debate over which video was shown is really beside the point when Cruise indisputably did not affirmatively tell the DMV that the pedestrian had been dragged underneath the Cruise AV for 20 feet" and "it is clear that the DMV left the meeting without realizing or understanding that the AV had pulled forward, dragging the pedestrian underneath it." Further, "Cruise should have informed a key regulator like the DMV of all material facts surrounding the [Crash], and not have relied on a video to do so. When the DMV did not know to ask about the pullover maneuver and pedestrian dragging, Cruise attendees should have volunteered it, and not sat silently."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to the Quinn Report referenced in Paragraph 245 for a complete and accurate description of its contents. The allegations in Paragraph 245 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 245 and denies the allegations in Paragraph 245 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 245.

137

246. Finally, the Quinn Report details how in the afternoon of October 3, 2023—after Cruise senior executives were aware of the pullover maneuver and pedestrian dragging—Cruise Government Affairs Senior Manager Jose Alvarado called CPUC Analyst Ashlyn Kong to discuss the Crash. According to the Quinn Report, "[d]uring their call, Alvarado used the pre-approved [Crash] talking points that Cruise's government affairs had provided. Consistent with those talking points, Alvarado did not mention that the AV had engaged in a pullover maneuver after initial impact, or that the AV had dragged the pedestrian." The Quinn Report notes that Alvarado claims that he offered to play the full video and that Kong declined, but Kong disputes this, recalling that Alvarado did not offer to share the video.

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to the Quinn Report referenced in Paragraph 246 for a complete and accurate description of its contents. The allegations in Paragraph 246 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 246 and denies the allegations in Paragraph 246 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 246.

247. Approximately three weeks later, on October 24, 2023, when the DMV suspended Cruise's driverless permit and Cruise admitted in its blog post that the Crash involved a pullover maneuver and pedestrian dragging, Cruise underplayed its deceptive scheme in the same blog post. Specifically, the blog post—which the Quinn Report stated Defendant Vogt drafted—stated that "[s]hortly after the incident, our team proactively shared information with the California Department of Motor Vehicles (DMV), California Public Utilities Commission (CPUC), and National Highway Traffic Safety Administration (NHTSA), including the full video, and have stayed in close contact with regulators to answer their questions."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that the DMV suspended certain of Cruise's DMV permits on October 24, 2023; (ii) admit that

Cruise issued a blog post on October 24, 2023 titled "A detailed review of the recent SF hit-and-run incident"; (iii) respectfully refer the Court to the October 24, 2023 blog post referenced in Paragraph 247 for a complete and accurate description of its contents; and (iv) respectfully refer the Court to the Quinn Report referenced in Paragraph 247 for a complete and accurate description of its contents. Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 247 and denies those allegations on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 247.

248. On December 1, 2023, the CPUC issued a "Ruling Ordering Cruise LLC to Show Cause Why It Should Not be Sanctioned by the Commission for Failing to Provide Complete Information and for Making Misleading Public Comments Regarding the October 2, 2023 Cruise Related Incident and Its Subsequent Interactions with the Commission" (the "CPUC Order") ordering Cruise to appear on February 6, 2024 to show cause why Cruise should not be "fined, penalized, and/or receive other regulatory sanctions for failing to provide complete information to the Commission regarding a Cruise related incident that occurred on October 2, 2023, and for making misleading public comments regarding its interactions with the Commission." The CPUC Order detailed how Cruise "[f]ail[ed] to [p]rovide a [c]omplete [r]eport of the October 2, 2023 [i]ncident to the Commission" and how Cruise made "[p]ublic [m]isrepresentations [r]egarding the [e]xtent of its [c]ooperation with the [c]ommission." As for Cruise's misrepresentations to the public, the CPUC Order homed in on Cruise's October 24, 2023 blog post touting that Cruise "proactively shared information with the DMV, California Public Utilities Commission (CPUC), and National Highway Traffic Safety Administration (NHTSA), including the full video, and have stayed in close contact with regulators to answer their questions." The CPUC Order found that this statement is "misleading in two respects: First Cruise claims to have 'proactively shared information' when, in fact, it withheld information from the Commission for 15 days, thus misleading the Commission. Second, by "withholding information about the extent of the Cruise AV interaction with the pedestrian, Cruise misled the DMV and, in turn, the Commission into thinking that

139

the original video shown and commented on accurately memorialized the full extent of the incident."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that the CPUC issued a "Ruling Ordering Cruise LLC to Show Cause Why It Should Not be Sanctioned by the Commission for Failing to Provide Complete Information and for Making Misleading Public Comments Regarding the October 2, 2023 Cruise Related Incident and Its Subsequent Interactions with the Commission" on December 1, 2023; and (ii) respectfully refer the Court to the CPUC ruling referenced in Paragraph 248 for a complete and accurate description of its contents. The allegations in Paragraph 248 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 248 and denies the allegations in Paragraph 248 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 248.

### 3. The Quinn Report Makes Damning Conclusions Regarding Cruise

249. On January 25, 2024, Cruise released the Quinn Report. In a blog post announcing its release, Cruise stated that "Cruise accepts Quinn Emanuel's conclusions and will act on all of their recommendations . . . We acknowledge that we have failed to live up to the justifiable expectations of regulators and the communities." Many of the details of the Quinn Report are discussed separately herein. However, certain additional conclusions are relevant to Plaintiffs' allegations, and are described herein.

140

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that Cruise released the Quinn Report on January 25, 2024.  Cruise (ii) admits that Cruise published a blog post on January 25, 2024 titled "Cruise Releases Third-Party Findings Regarding October 2"; and (iii) respectfully refer the Court to the January 25, 2024 blog post referenced in Paragraph 249 for a complete and accurate description of its contents. Mr. West and Mr. Vogt lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 249 that Cruise issued a blog post on January 25, 2024 and deny those allegations on that basis.  The allegations in Paragraph 249 form the basis for Dismissed Claims against Mr. Ammann.  Accordingly, no response is required from Mr. Ammann.  To the extent a response is required, Mr. Ammann otherwise lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 249 and denies the allegations in Paragraph 249 on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 249.

250. The Quinn Report concluded that "On October 2 and 3, Cruise leadership was fixated on correcting the inaccurate media narrative that the Cruise AV, not the Nissan, had caused the [Crash].  This myopic focus led Cruise to convey the information about the Nissan hit-and-run driver having caused the [Crash] to the media, regulators, and other government officials, but to omit other important information about the [Crash].  Even after obtaining the Full Video, Cruise did not correct the public narrative but continued instead to share incomplete facts and video about the [Crash] with the media and the public."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to the Quinn Report referenced in Paragraph 250 for a complete and accurate

141

description of its contents.  The allegations in Paragraph 250 form the basis for

Dismissed Claims against Mr. Ammann.  Accordingly, no response is required from

Mr. Ammann.  To the extent a response is required, Mr. Ammann lacks sufficient

knowledge or information to form a belief as to the truth or falsity of the allegations

in Paragraph 250 and denies the allegations in Paragraph 250 on that basis.  The

Cruise Defendants otherwise deny the allegations in Paragraph 250.

251. The Quinn Report also concluded that "Cruise's senior leadership repeatedly failed to understand the importance of public trust and accountability." The Quinn Report concluded that Cruise's senior leadership "continue[d] to transmit inaccurate background points and show the media—well into the afternoon of October 3—an incomplete video that did not depict the pullover maneuver and pedestrian dragging even after obtaining the Full Video by 6:28 AM, earlier that morning.  While it was important to correct the initial media narrative that incorrectly blamed the Cruise AV for the [Crash] and omitted the Nissan altogether, they allowed this reasonable concern to overtake everything else, including the disclosure of other material aspects of the [Crash]."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to

the Quinn Report referenced in Paragraph 251 for a complete and accurate

description of its contents.  The allegations in Paragraph 251 form the basis for

Dismissed Claims against Mr. Ammann.  Accordingly, no response is required from

Mr. Ammann.  To the extent a response is required, Mr. Ammann lacks sufficient

knowledge or information to form a belief as to the truth or falsity of the allegations

in Paragraph 251 and denies the allegations in Paragraph 251 on that basis.  The

Cruise Defendants otherwise deny the allegations in Paragraph 251.

252. The Quinn Report further concluded that "[t]he reasons for Cruise's failings in this instance are numerous: Poor leadership, mistakes in judgment, lack of coordination, an 'us versus them' mentality with regulators, and a fundamental misapprehension of Cruise's obligations of accountability and transparency to the government and the public."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to the Quinn Report referenced in Paragraph 252 for a complete and accurate description of its contents. The allegations in Paragraph 252 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 252 and denies the allegations in Paragraph 252 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 252.

253. Finally, the Quinn Report concluded "Cruise's response to the [Crash] reflects deficient leadership at the highest levels of the [c]ompany —including among some members of the C-Suite, legal, governmental affairs, systems integrity, and communications teams—that led to a lack of coordination, mistakes of judgment, misapprehension of regulatory requirements and expectations, and inconsistent disclosures and discussions of material facts at critical meetings with regulators and other government officials. The end result has been a profound loss of public and governmental trust and a suspension of Cruise's business in California."[7]

---

[7] While the Quinn Report explicitly referenced Cruise's "inaccurate" disclosures to media, even its scathing critiques should be interpreted with a recognition that Quinn Emanuel was retained by Cruise and General Motors Holdings LLC, such that it had at an incentive to downplay its clients' wrongdoing. Exponent was also retained by Cruise and, therefore, had at incentive to downplay its clients' wrongdoing.

143

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit in response to Footnote 7 that Cruise and GM retained Quinn Emanuel Urquhart & Sullivan, LLP and Cruise retained Exponent in connection with the Accident; and (ii) respectfully refer the Court to the Quinn Report referenced in Paragraph 253 and Footnote 7 for a complete and accurate description of its contents. The allegations in Paragraph 253 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 253 and denies the allegations in Paragraph 253 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 253 and Footnote 7.

### 4.    Cruise Has Been in a Tailspin Since the October 2 Crash

254. On November 18, 2023, it was reported that Defendant Vogt emailed Cruise's employees acknowledging his responsibility for Cruise's problems, stating "I am sorry we have veered off course under my leadership" and "[a]s CEO, I take responsibility for the situation Cruise is in today. There are no excuses, and there is no sugar coating what has happened. We need to double down on safety, transparency, and community engagement."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that Mr. Vogt emailed Cruise's employees on November 18, 2023; and (ii) respectfully refer the Court to the email and unspecified report referenced in Paragraph 254 for a complete and accurate description of their contents. The allegations in Paragraph 254 form the basis for Dismissed Claims against Mr. Ammann. To the extent a response is

144

required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in paragraph 254 and denies the allegations in Paragraph 254 on that basis.   The Cruise Defendants otherwise deny the allegations in Paragraph 254.

255. The next day, on November 19, 2023, Defendant Vogt announced his resignation as CEO of Cruise.  Cruise did not name a replacement CEO.  As of the filing of this amended complaint, Cruise still has not appointed Vogt's successor as CEO.

**ANSWER:** The Cruise Defendants (i) admit that Mr. Vogt departed as CEO of Cruise on November 19, 2023; (ii) admit that Mr. Vogt's successor as CEO, Marc Whitten, was announced on June 25, 2024.

256. On December 13, 2023, the media reported that nine Cruise managers and executives left Cruise, including Defendant West.  Cruise confirmed these departures, stating that "following an initial analysis of the October 2 incident and Cruise's response to it, nine individuals departed Cruise.  These include key leaders from Legal, Government Affairs, and Commercial Operations, as well as Safety and Systems."  That same day, GM announced the resignation of Defendant Parks, who made numerous materially misleading statements and/or omissions regarding Cruise during the Class Period.

**ANSWER:**  To the extent Paragraph 256 pertains to Dismissed Claims, no response is required.  To the extent the allegations in Paragraph 256 are not directed at the Cruise Defendants, they do not require a response.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the unspecified December 13, 2023 media reports and public statements referenced in Paragraph 256

for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 256.

257. On January 25, 2024, Cruise announced via a blog post that the DOJ and the SEC had both opened investigations or inquiries in connection with the October 2 Crash.

**ANSWER:** Cruise (i) admits that Cruise published a blog post on January 25, 2024 titled "Cruise Releases Third-Party Findings Regarding October 2"; and (ii) respectfully refers the Court to the January 25, 2024 blog post referenced in Paragraph 257 for a complete and accurate description of its contents.  Mr. West and Mr. Vogt lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 257 that Cruise issued the January 25, 2024 blog post referenced in Paragraph 257 and deny those allegations in Paragraph 257 on that basis.  The allegations in Paragraph 257 form the basis for Dismissed Claims against Mr. Ammann.  Accordingly, no response is required from Mr. Ammann.  To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 257 and otherwise denies the allegations in Paragraph 257 on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 257.

258. On March 1, 2024, it was reported that Cruise's valuation had been cut by more than half.

**ANSWER:** The Cruise Defendants respectfully refer the Court to the unspecified March 1, 2024 report referenced in Paragraph 258 for a complete and

146

accurate description of its contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 258.

## V.   SUBSTANTIVE ALLEGATIONS BY ELEMENT

### A.   Defendants' False and Misleading Statements, Omissions and Deceitful Conduct

259. Plaintiffs allege that the statements highlighted in *bold and italics* within this Section were materially false, materially misleading, and/or omitted to disclose material information.  The terms "misleading" and "misrepresentation" refer to statements that are false or misleading, including due to omission of information necessary to render the statement not misleading.

**ANSWER:** The allegations in Paragraph 259 assert a legal conclusion to which no response is required.  To the extent a response is required, the Cruise Defendants admit that the Complaint purports to make the allegations therein.  The Cruise Defendants otherwise deny the allegations in Paragraph 259.

260. Each statement and all conduct in this Section by or attributed to Defendants Vogt, Ammann, West, or Barra are attributable to Cruise as well, because each such statement or conduct was made or performed by the relevant Individual Defendant in their capacity as a representative of Cruise, and because each such statement or conduct can be properly deemed a statement by Cruise or conduct by Cruise.  Each statement and all conduct in this Section by or attributed to Cruise, Vogt, Ammann, West, or Barra can also be attributed to GM, because, as stated in the prior sentence, such statement or conduct is properly attributable to Cruise and (1) Cruise was part of GM; and/or (2) Cruise was held out publicly to be part of GM; and/or (3) GM had ultimate control over Cruise.

**ANSWER:** The allegations in Paragraph 260 (i) assert a legal conclusion; (ii) form the basis for Dismissed Claims; and (iii) are in part not directed at the Cruise Defendants.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 260.

261. Each statement and all conduct in this Section by or attributed to Defendants Barra, Jacobson, and Parks are attributable to GM as well, because each such statement or conduct was made or performed by the relevant Individual Defendant in their capacity as a representative of GM and/or their dual capacity as a representative of Cruise and GM and because each such statement or conduct can be properly deemed a statement by GM.

**ANSWER:** The allegations in Paragraph 261 are not directed at the Cruise Defendants and form the basis of Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 261.

### 1.    Deceit Concerning Cruise's Capabilities and Safety

262. Each of the misstatements in this Section misrepresented the capabilities and safety of Cruise's AV technology. As discussed in Section IV(A)(2), Cruise used a variety of terms to describe the degree of autonomy its AV technology had achieved, including "Level 4," "L4," "fully driverless," or "fully autonomous." Cruise repeatedly described these terms as carrying a common meaning—for example it stated that "L4" (*i.e.*, "Level 4") and "fully driverless" specifically "communicate an essential expectation" that the technology is "capable of driving fully autonomously 100% of the time." Some of the misrepresentations discussed below directly used these terms, while others indirectly conveyed that Cruise had such capabilities, but each created a perception among the investing public that (1) Cruise's AVs could drive safely, reliably, and legally without input from humans and (2) Cruise could operate a revenue generating robotaxi business, without human intervention, without additional research and development.

**ANSWER:** To the extent Paragraph 262 pertains to Dismissed Claims, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the unspecified public statements referenced in Paragraph 262 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 262.

148

263. As discussed in Section IV(B)(2), Cruise did not have a Level 4 system, and Cruise's AVs could drive safely, reliably, and legally without input from humans. Rather, Cruise's AV technology was: (1) highly dependent on remote operators who intervened every 2.5 to 5 miles; (2) faced an enormous number of safety issues, many of which were logged and unresolved; (3) struggled with basic requirements of safe driving; and (4) routinely stopped in traffic or became dangerously stranded.

**ANSWER:** The Cruise Defendants deny the allegations in Paragraph 263.

264. Misrepresenting Cruise's technology as a Level 4 system that was "capable of driving fully autonomously 100% of the time" was material because doing so: (1) drastically overstated how close Cruise was to achieving its "commercialization" goals of generating substantial revenue through operating a lucrative robotaxi business in select cities, spreading to other cities, and ultimately providing GM with technology that could be offered in personal vehicles; (2) drastically understated the prospect that its operations would be suspended by regulators or based on an internal assessment of safety risks; and (3) drastically understated the risk that Cruise's vehicles would become involved in accidents causing major harm to Cruise's reputation and exposing it to liability. All three of these factors would have a substantial impact on the value investors placed on GM's securities because they would affect the future revenue, profit, and risk from GM's ownership interest in Cruise, arising from Cruise's robotaxi business and the use of Cruise's AV technology in personal vehicles sold by GM.

**ANSWER:** The allegations in Paragraph 264 assert a legal conclusion and form the basis for Dismissed Claims. Accordingly no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 264.

265. Several of the misrepresentations discussed below also claim that Cruise's autonomous driving technology could drive cars at safer than human levels. As discussed in Section IV(B)(2), in reality, the technology engaged in facially unsafe driving activity, and was dangerously dependent on remote operators. Indeed, Cruise's technology was subject to an enormous number of safety issues, many of which were logged but not resolved. These statements were material for the reasons stated in the prior paragraph.

149

**ANSWER:** The allegations in Paragraph 265 assert a legal conclusion and form the basis for Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 265.

266. On February 24, 2021, at a conference hosted by Wolfe Research, Defendant Barra stated:

> [W]e want to create a world with zero crashes, zero emissions, and zero congestion. We want to be leaders in that and we've got all the assets necessary to do that. We see that we can grow. We can not only be a leader in EVs and early in the transition, we can get a disproportionate of the share and also grow in areas where it will first be important. So, as you get into that mid-decade to late-decade, we see a huge opportunity for growth in EV. ***We see an opportunity as we demonstrate technology for Cruise that's safer than a human driver.***

**ANSWER:** The allegations in Paragraph 266 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the February 24, 2021 statements referenced in Paragraph 266 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 266.

267. This statement conveyed that Cruise was presently demonstrating AV technology that was safer than a human driver, which was materially misleading for the reasons stated in paragraph 265.

**ANSWER:** The allegations in Paragraph 267 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is

150

required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 267.

268. On March 25, 2021 at a conference hosted by JPMorgan, Defendant Barra stated, while discussing Cruise, that:

So, you mentioned the safety aspect of it. ***We very much feel that autonomous vehicles and we're working to deliver vehicles that are safer than a human driver will create an improvement from a safety perspective on our roads because autonomous vehicles follow all of the traffic rules. They don't drive distracted or impaired***. And research suggests that 90% of incidents or fatalities on the road are caused by human error. So, we think there's a huge opportunity from a safety perspective. And safety is an important part of our culture and this strategy. So, we're very excited about that.

**ANSWER:** The allegations in Paragraph 268 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the March 25, 2021 statements referenced in Paragraph 268 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 268.

269. This statement conveyed that Cruise was presently demonstrating AV technology that was safer than a human driver, which was materially misleading for the reasons stated in paragraph 265.

**ANSWER:** The allegations in Paragraph 269 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 269.

270. On June 3, 2021, at a conference hosted by Credit Suisse, Defendant Barra stated, in reference to Cruise:

> And they're really shifting from just the R&D to the whole – what will it take from a commercialization perspective. ***They recently received their approval to test in San Francisco without a backup driver and they filed an application with the California DMV to deploy the self-driving vehicles in San Francisco with no driver behind the wheel***. And this is a significant accomplishment which is really getting us much closer to literally being on the streets of San Francisco.

**ANSWER:** The allegations in Paragraph 270 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the June 3, 2021 statements referenced in Paragraph 270 for a complete and accurate description of their contents.   The Cruise Defendants otherwise deny the allegations in Paragraph 270.

271. This statement conveyed that Cruise's AV technology did not depend on a "backup" human operator, such that it was fully autonomous, which was materially misleading for the reason stated in paragraphs 262-264.  This statement conveyed that Cruise's AV technology was a Level 4 system because this statement touted Cruise's receipt of, and application for, regulatory approvals, which depended on Cruise certifying its AV technology was at Level 4, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 271 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 271.

272. On June 14, 2021, at GM's Annual General Meeting, Defendant Barra stated:

> Cruise's real-word driverless vehicle testing in San Francisco and its last mile delivery pilot with Walmart in Arizona are paving the way for new commitments, like the one Cruise recently signed with the City of Dubai for up to 4,000 automated taxis. And ***just recently, the California Public Utilities Commission issued Cruise a permit to give passengers a ride without a driver behind the wheel***. It's the first permit of its kind and another significant validation of Cruise's approach to AVs.

**ANSWER:** The allegations in Paragraph 272 are not directed at the Cruise Defendants and form the basis of Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the June 14, 2021 statements referenced in Paragraph 272 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 272.

273. This statement conveyed that Cruise's AV technology was a Level 4 system because this statement touted Cruise's receipt of a regulatory permit, which depended on Cruise certifying its AV technology was at Level 4, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 273 are not directed at the Cruise Defendants and form the basis of Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 273.

274. On October 6, 2021, at GM's Investor Day, Defendant Barra stated:

We're creating software enabled services including the development of Ultifi. And we're extending our lead in automated driver assistance with Ultra Cruise and further commercializing Super Cruise. ***And with Cruise, we are defining the commercialization strategies for Level 4 autonomy.*** We're launching businesses that will bring new customers and new revenues to GM. And thanks to GM Manufacturing, we're able to do this at scale with speed, agility and quality. I said it earlier but it's worth repeating, we have changed the world before and we're doing it again.

**ANSWER:** The allegations in Paragraph 274 are not directed at the Cruise Defendants and form the basis of Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the October 6, 2021 statements referenced in Paragraph 274 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 274.

275. This statement conveyed that Cruise's AV technology was a Level 4 system by indicating that Cruise was operating within the "commercialization" stage, which Cruise publicly indicated would follow the R&D stage (*i.e.*, would only occur once Cruise successfully developed marketable Level 4 AV technology), and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 275 are not directed at the Cruise Defendants and form the basis of Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 275.

276. On October 6, 2021, at GM's Investor Day, Defendant Ammann stated:

154

*[W]e are close, very close to offering our first driverless rides to passengers on the streets of San Francisco, very close. . . . So the question is – that gives rise to a question, which is how will consumers react to this, how will users react to their first fully driverless ride experience.*

**ANSWER:** The allegations in Paragraph 276 form the basis for Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the October 6, 2021 statement referenced in Paragraph 276 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 276.

277. This statement conveyed that Cruise's AV technology was a Level 4 system because Cruise could not legally provide driverless rides to passengers without such a system and because Cruise could not reasonably claim it was "very close" to actually offering such rides without already having such a system, as there would be numerous steps (from regulatory approvals to safety validation testing) between developing such a system and offering rides using that system, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.  This statement also conveyed that Cruise's AV technology was a Level 4 system because the phrase "how will consumers react to this," referred to a "fully driverless ride experience," which indicated that Cruise already had a Level 4 system, which consumers would soon begin to use, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 277 form the basis for Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 277.

278. On October 6, 2021, at GM's Investor Day, Defendant Ammann stated:

So where are we on the Cruise journey?  We think about the journey as having three main phases to it.  Over the last several years from 2015,

155

2016 timeframe through the end of last year, we were clearly very much in an R&D phase. ***This was all about building up the core technology and trying to solve that engineering challenge of a generation of building a self-driving system that can drive with a human or better level of performance. And we first reached that threshold for the first time late last year. And that's what allowed us to begin fully driverless testing on the streets of San Francisco which we began around October, November of last year. And that marked the beginning of the next phase of the Cruise journey which we refer to as early commercialization.***

**ANSWER:** The Cruise Defendants respectfully refer the Court to the October 6, 2021 statement referenced in Paragraph 278 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 278.

279. This statement conveyed that Cruise's AV technology could, as of late 2020, drive at a greater than human safety level, which was materially misleading for the reasons stated in paragraph 265. This statement conveyed that Cruise's AV technology was a Level 4 system because it claimed Cruise has begun testing "fully driverless" rides and (1) Cruise defined that term to refer to a Level 4 system, and (2) Cruise could not legally give driverless rides without operating a Level 4 system, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264. This statement conveyed that Cruise's AV technology was a Level 4 system by indicating that Cruise was operating within the "commercialization" stage, which Cruise publicly indicated would follow the R&D stage (*i.e.*, would only occur once Cruise successfully developed marketable Level 4 AV technology), and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The Cruise Defendants deny the allegations in Paragraph 279.

280. On October 6, 2021, at GM's Investor Day, Defendant Ammann stated:

So, what's enabled us to make this really rapid rate of progress has been an investment and a fundamental belief that we have at Cruise which is rate of improvement is what is going to give rise to our core competitive

156

advantage. ***And so we've had a huge team of people working on building what we refer to here as product number one, which is our end-to-end fully driverless AV system***. But one of the things that we realized early on is that ***this is the first time building a fully driverless AV system*** is really the first time that AI is getting deployed, cutting edge AI is getting deployed into the physical world, into the real world. First time that AI is really intersecting with robotics.

**ANSWER:** The allegations in Paragraph 280 form the basis for Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the October 6, 2021 statement referenced in Paragraph 280 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 280.

281. This statement conveyed that Cruise's AV technology was a Level 4 system because Cruise contemporaneously stated it was imminently launching its robotaxi business and already in the "commercialization" phase, while this statement boasted that Cruise's "product number one" was an "end-to-end fully driverless AV system," and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 281 form the basis for Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 281.

282. On October 6, 2021, at GM's Investor Day, Defendant Ammann stated:

***And so what we did then was to work really hard on driving the level of performance up, that 1000x improvement that you saw, to get to the point where we can take the human out of the loop***. And unsurprisingly along the way of driving up that performance, we discovered a lot of unknown unknowns, unanticipated problems, things we hadn't thought would happen along the way and ***that's why we felt it was so important to solve that part of the equation first to get to the***

157

*point where we know we can take the human out of the loop and do that safely*. And then we can start to optimize on things like operating domain and taking costs down and so on.

**ANSWER:** The allegations in Paragraph 282 form the basis for Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the October 6, 2021 statement referenced in Paragraph 282 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 282.

283. This statement conveyed that Cruise's AV technology was a Level 4 system because it claimed, in the past tense, that Cruise had driven performance to a level where it could "take the human out of the loop," and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 283 form the basis for Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 283.

284. On October 6, 2021, at GM's Investor Day, Defendant Ammann stated:

*So we have a system that can operate without a human in the loop now.* It is more expensive. And so the question becomes how do you deploy that into a business successfully and profitably and grow a business off of that? And this is where the partnership between Cruise and GM becomes incredibly important. So as most of you know today, we're operating a fleet of Bolt EVs based off the Chevy Bolt platform. That's our development fleet. And that's also the vehicle fleet that we will initially commercialize with through this early commercialization period here. And so having that vehicle purpose built or purpose upgraded to support our AV system by GM and built in a factory and that level of reliability has been a huge advantage for us from a development point of view. But that's really just the beginning.

158

**ANSWER:** The allegations in Paragraph 284 form the basis for Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the October 6, 2021 statement referenced in Paragraph 284 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 284.

285. This statement conveyed that Cruise's AV technology was a Level 4 system because it claimed, in the present tense, that Cruise's AV technology operated "without a human in the loop now," and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 285 form the basis for Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 285.

286. On October 6, 2021, at GM's Investor Day, Defendant Ammann stated:

*So where are we right now? So we're in the middle of this early commercialization phase. In San Francisco, we're doing driverless testing as you know and we're about very soon going to move from that into offering rides to passengers, fully driverless rides to passengers.*

**ANSWER:** The Cruise Defendants respectfully refer the Court to the October 6, 2021 statement referenced in Paragraph 286 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 286.

287. This statement conveyed that Cruise's AV technology was a Level 4 system because (1) it indicated that Cruise was operating within the "commercialization" stage, which Cruise publicly indicated would follow the R&D

159

stage (*i.e.*, would only occur once Cruise successfully developed marketable Level 4 AV technology); and (2) it claimed that "very soon" Cruise would provide "fully driverless rides," which it could not legally provide without such system. Depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The Cruise Defendants deny the allegations in Paragraph 287.

288. On October 6, 2021, at GM's Investor Day, Defendant Ammann stated:

So, on the regulatory front, we are making really great progress. *We need six permits in total to get to do paid ridehail driverless in California. We have five of the six. The fifth one we just received late last week. And the next one, we're just applying for now*. We couldn't apply for the last one until we got the one that we just got. And we would hope to receive that last one in the early part of next year.

**ANSWER:** The allegations in Paragraph 288 form the basis for Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the October 6, 2021 statement referenced in Paragraph 288 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 288.

289. This statement conveyed that Cruise's AV technology was a Level 4 system because this statement touted Cruise's receipt of, and application for, regulatory permits, which depended on Cruise certifying its AV technology was at Level 4, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 289 form the basis for Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 289.

290. On October 6, 2021, at GM's Investor Day, Defendant Parks stated:

160

> *Now Cruise, as [Defendant Ammann] just discussed, is developing and launching a driverless fully autonomous Level 4 vehicle*. This is how we plan to be first to market and win in rideshare, autonomous delivery and other AV services.

**ANSWER:** The allegations in Paragraph 290 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the October 6, 2021 statements in Paragraph 290 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 290.

291. This statement conveyed that Cruise's AV technology was a Level 4 system because it claimed, in the present tense, that Cruise is launching a "driverless fully autonomous Level 4 vehicle," and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 291 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 291.

292. On October 27, 2021, on GM's third quarter 2021 earnings call, Defendant Barra stated:

> *As we speak, Cruise is just one state level approval away from full regulatory approval to charge customers for rides in San Francisco, and it is still the only company with the permit to provide full driverless ride-hail service in the city.*

**ANSWER:** The allegations in Paragraph 292 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is

161

required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the October 27, 2021 statements referenced in Paragraph 292 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 292.

293. This statement conveyed that Cruise's AV technology was a Level 4 system because this statement touted Cruise's receipt of, and application for, regulatory permits, which depended on Cruise certifying its AV technology was at Level 4, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 293 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 293.

294. On December 9, 2021, at a conference hosted by Deutsche Bank, Defendant Parks stated:

> The third thing I wanted to touch on is our assisted driving technology, all the way from what we have in the marketplace is Super Cruise, and we're growing rapidly this year to a new functionality we call Ultra Cruise, which is basically Super Cruise in 95% of the roads.  And then what I call ***San Francisco Cruise, our fully self-driving autonomous platform.***  And I happen to have the pleasure last Thursday evening at about 11:15 PM in San Francisco of taking my first driverless ride, about 30 minutes through the streets of San Francisco.  No driver in the car.  I'll never forget the experience.  So we are very close, and we're very excited about all those.

**ANSWER:** The allegations in Paragraph 294 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is

162

required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the December 9, 2021 statements referenced in Paragraph 294 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 294.

295. This statement conveyed that Cruise's AV technology was a Level 4 system because it claimed Cruise's operation in San Fransisco utilized "fully self-driving autonomous" AVs, which Cruise defined that term to refer to a Level 4 system, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 295 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 295.

296. On December 9, 2021, at a conference hosted by Deutsche Bank, Defendant Parks stated:

And then you get to, well, what I call, ***San Francisco Cruise, which is full self-driving.***  And that is a terrific technology that's moving very, very fast.

**ANSWER:** The allegations in Paragraph 296 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the December 9, 2021 statements referenced in Paragraph 296 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 296.

297. This statement conveyed that Cruise's AV technology was a Level 4 system because it claimed Cruise's operation in San Fransisco utilized "full self-driving" AVs, which Cruise defined that term to refer to a Level 4 system, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 297 are not directed at the Cruise Defendants and form the basis of Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 297.

298. On February 1, 2022, on GM's fourth quarter 2021 earnings call, Defendant Barra stated:

> As Kyle has shared, ***Cruise team members have been taking fully driverless rides in San Francisco since November to demonstrate and refine the software and hardware ecosystem we have created together. In fact, they have logged over 20,000 miles and completed more than 600 trips****.* I rode in a driverless Cruise a couple of weeks ago, and I can tell you it was the highlight of my career as an engineer and as the leader of General Motors. The ride is smooth and confident. It's like having an experience and attentive driver behind the wheel.
>
> Now, as Cruise announced this morning, it is inviting members of the public to sign up for their own driverless rides through a waitlist on the Cruise website. ***This is the first truly driverless ride-hail service offered to members of the public in a dense urban environment****.* To maximize its learnings, Cruise will prioritize use cases that are all natural fit for autonomous ridesharing. This major milestone brings Cruise even closer to offering its first paid rides and generating $50 billion in annual revenue by the end of the decade.

**ANSWER:** The allegations in Paragraph 298 are not directed at the Cruise Defendants and form the basis of Dismissed Claims. Accordingly, no response is

164

required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the February 1, 2022 statements referenced in Paragraph 298 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 298.

299. This statement conveyed that Cruise's AV technology was a Level 4 system because (1) it claimed Cruise's operation in San Fransisco was providing, and had logged over 20,000 miles and more than 600 trips, of "fully driverless" rides, which Cruise defined that term to refer to a Level 4 system, and (2) it claimed Cruise's AV technology was "truly driverless," which can only reasonably be interpreted to refer to a Level 4 system, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 299 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 299.

300. On February 1, 2022, on GM's fourth quarter 2021 earnings call, Defendant Vogt stated:

> On the permit, *we still have five out of the six necessary permits to operate a fared rideshare service*.  So, as of today, all of the rides are free.  And *we filed the last – the application for the last remaining permit in November last year, and we continue to work with the CPUC, California Public Utilities Commission*, and answer questions they have about that application as they pop up.  So, stay tuned for more news on that.

**ANSWER:** The Cruise Defendants respectfully refer the Court to the February 1, 2022 statement referenced in Paragraph 300 for a complete and accurate

description of its contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 300.

301. This statement conveyed that Cruise's AV technology was a Level 4 system because this statement touted Cruise's receipt of, and application for, regulatory permits, which depended on Cruise certifying its AV technology was at Level 4, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The Cruise Defendants deny the allegations in Paragraph 301.

302. On February 2, 2022, GM filed its Form 10-K for the fiscal year ended December 31, 2021, which was signed and/or certified pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Barra and Jacobson, and which stated:

> ***In October 2020, Cruise received a driverless test permit from the California Department of Motor Vehicles to remove test drivers from Cruise autonomous test vehicles in San Francisco and subsequently began fully driverless testing.*** In October 2020, GM and Cruise also announced they will file an exemption petition with the National Highway Traffic Safety Administration (NHTSA) seeking regulatory approval for the Origin's deployment, and withdrew an earlier exemption petition that was limited to the Cruise AV derived from the Chevrolet Bolt platform.
>
> In June 2021, Cruise received a driverless test permit from the California Public Utilities Commission (CPUC) to provide unpaid rides to the public in driverless vehicles. In September 2021, Cruise received approval of its Autonomous Vehicle Deployment Permit from the California Department of Motor Vehicles to commercially deploy driverless AVs.

**ANSWER:** The allegations in Paragraph 302 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants respectfully

166

refer the Court to the February 2, 2022 filing and statements referenced in Paragraph

302 for a complete and accurate description of their contents.  The Cruise Defendants

otherwise deny the allegations in Paragraph 302.

303. This statement conveyed that Cruise's AV technology was a Level 4 system because this statement touted Cruise's receipt of, and application for, regulatory permits, which depended on Cruise certifying its AV technology was at Level 4, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 303 are not directed at the Cruise

Defendants and form the basis of Dismissed Claims.  Accordingly, no response is

required.  To the extent a response is required, the Cruise Defendants deny the

allegations in Paragraph 303.

304. On March 10, 2022, at a conference hosted by Morgan Stanley, Defendant Vogt stated:

> The only thing that separates us that that last permit does is it lets our engineers put the switch on the back end so it starts accepting people's credit cards for rides. ***So from a technical standpoint, there's basically zero incremental work to get to revenue.***  On the regulatory side, we've been working with the CPUC, the California DMV, other regulators. And they're pretty interested in seeing this happen.  There's obvious benefits that self-driving cars bring in terms of safety and accessibility of transportation.

**ANSWER:** The Cruise Defendants respectfully refer the Court to the March

10, 2022 statement referenced in Paragraph 304 for a complete and accurate

description of its contents.  The Cruise Defendants otherwise deny the allegations in

Paragraph 304.

167

305. This statement conveyed that Cruise's AV technology was a Level 4 system because it claimed that "zero incremental work" was needed "from a technical standpoint . . . to get to revenue," while Cruise's plan for generating revenue was the operation of a robotaxi business that was only sustainably possible and legally permissible if Cruise had a Level 4 AV technology, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The Cruise Defendants deny the allegations in Paragraph 305.

306. On March 10, 2022, at a conference hosted by Morgan Stanley, Defendant Vogt stated:

> *What I would say and what I've said in the past is that given the amount of work it takes to take the driver out of the car and put a vehicle on a public road, especially in a major city, that's a proof point. That's an existence proof. This technology has reached a certain level of maturity*.
>
> *And I think that really is a line you can draw in the sand between companies who have reached that milestone and have the conviction behind the quality and safety of their technology to deploy it, and those that are somewhere still in the R&D phase.*

**ANSWER:** The Cruise Defendants respectfully refer the Court to the March 10, 2022 statement referenced in Paragraph 306 for a complete and accurate description of its contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 306.

307. This statement conveyed that Cruise's AV technology was a Level 4 system because it claimed Cruise had reached a "level of maturity" in its technology where it was safely able to operate without drivers in the vehicle, and because it conveyed that Cruise had progressed past the "R&D phase" when doing so meant having completed the development of a Level 4 AV, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The Cruise Defendants deny the allegations in Paragraph 307.

308. On March 10, 2022, at a conference hosted by Morgan Stanley, Defendant Vogt stated:

Well, that, I don't know.  That I don't know.  I think a lot of people do like driving some of the time.  And there are certain use cases where *our vehicles are level four*.  We don't need as much point in level five vehicles because you don't necessarily need a vehicle that can drive on an ice highway in Alaska or something.

**ANSWER:** The Cruise Defendants respectfully refer the Court to the March 10, 2022 statement referenced in Paragraph 308 for a complete and accurate description of its contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 308.

309. This statement conveyed that Cruise's AV technology was a Level 4 system because it directly stated, "our vehicles are level four," and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The Cruise Defendants deny the allegations in Paragraph 309.

310. On April 26, 2022, on GM's first quarter 2022 earnings call, Defendant Barra stated:

I'd like to wrap up with an update on Cruise.  During the quarter, we took the opportunity to increase our ownership position to approximately 80% because we are extremely bullish on the team's rapid progress toward commercialization.  As Kyle shared on our last call, *Cruise continues to make great progress safely and deliberately expanding its full driverless operations in San Francisco*.  Cruise is now operating in about 70% of the city and is moving toward operating 24/7 across the entire city by the end of this year.

**ANSWER:** The allegations in Paragraph 310 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants respectfully

169

refer the Court to the April 26, 2022 statements referenced in Paragraph 310 for a complete and accurate description of their contents.   The Cruise Defendants otherwise deny the allegations in Paragraph 310.

311. This statement conveyed that Cruise's AV technology was a Level 4 system because it claimed Cruise had and was expanding "full driverless operations," which is a term Cruise used to describe Level 4 AV technology, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 311 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 311.

312. On April 26, 2022, Barra published a letter to GM's shareholders stating:

> I will close this letter by recognizing the progress of the incredible team at Cruise. ***In January, Cruise became the first company to begin offering fully driverless rides in a congested urban environment. That is San Francisco, with all its complexities***.

**ANSWER:** The allegations in Paragraph 312 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the April 26, 2022 statements referenced in Paragraph 312 for a complete and accurate description of their contents.   The Cruise Defendants otherwise deny the allegations in Paragraph 312.

313. This statement conveyed that Cruise's AV technology was a Level 4 system because it claimed Cruise had launched "fully driverless rides" in San Francisco, which term Cruise used to describe Level 4 AV technology, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 313 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 313.

314. On April 27, 2022, GM filed its Form 10-Q for the quarter ending March, 31, 2022, which was signed and/or certified pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Barra and Jacobson, and which stated:

*In 2021, Cruise received a driverless test permit from the California Public Utilities Commission (CPUC) to provide unpaid rides to the public in driverless vehicles and received approval of its Autonomous Vehicle Deployment Permit from the California Department of Motor Vehicles to commercially deploy driverless AVs.  Cruise will need one additional permit from the CPUC to charge the public for driverless rides in California.*

**ANSWER:** The allegations in Paragraph 314 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the April 27, 2022 filing and statements referenced in Paragraph 314 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 314.

315. This statement conveyed that Cruise's AV technology was a Level 4 system because this statement touted Cruise's receipt of, and application for,

171

regulatory permits, which depended on Cruise certifying its AV technology was at Level 4, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 315 are not directed at the Cruise Defendants and form the basis of Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 315.

316. On April 28, 2022, GM released its 2021 Sustainability Report, which stated that:

> *In October 2020, Cruise became one of the first California companies permitted by the California Department of Motor Vehicles to test AVs without a trained test driver in the vehicle, and the first company to do so in the complex driving environment of San Francisco.*
>
> *In June 2021, Cruise became the first company to receive a permit from the California Public Utilities Commission (CPUC) to provide passenger test rides in its AVs without a trained test driver in the vehicle. As the first company to receive such a permit, Cruise has been conducting fully driverless rides with the public—completing hundreds of such test rides by the end of 2021.*
>
> *Pending final approval from the CPUC, Cruise is one permit away from being able to commercialize its fully autonomous ride-hail business within its operational design domain in San Francisco. Cruise remains on track to begin charging for fully driverless ride- hail operations in the coming months.*
>
> Cruise is also continuing to expand its collaboration with Walmart, which invested in Cruise in 2021. *Last year, Cruise and Walmart launched a fully autonomous commercial delivery service in Scottsdale, Arizona, with more than 3,000 deliveries completed by the end of 2021.* Walmart customers in

172

the area are now able to opt-in to autonomous delivery services and track their order through the Cruise web app.

**ANSWER:** The allegations in Paragraph 316 are not directed at the Cruise Defendants and form the basis of Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the April 28, 2022 report and statements referenced in Paragraph 316 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 316.

317. These statements conveyed that Cruise's AV technology was a Level 4 system because these statements touted Cruise's receipt of, and application for, regulatory permits, which depended on Cruise certifying its AV technology was at Level 4, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264. These statements also conveyed that Cruise's AV technology was a Level 4 system because they claimed Cruise (1) had been "been conducting fully driverless rides with the public;" (2) was "one permit away from being able to commercialize its fully autonomous ride-hail business" and was "on track to begin charging for fully driverless ride-hail operations in the coming months;" and (3) had "launched a fully autonomous commercial delivery service in Scottsdale, Arizona, with more than 3,000 deliveries completed by the end of 2021"—and Cruised used the terms "fully driverless" and "fully autonomous" to describe Level 4 AV technology, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 317 are not directed at the Cruise Defendants and form the basis of Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 317.

318. On June 13, 2022, at GM's Annual General Meeting, Defendant Barra stated:

173

As I mentioned in my business remarks, ***Cruise received a final permit i[t] needed from the California Public Utilities Commission to charge for rides.  So, that means Cruise is now officially the first and only company to operate a commercial driverless ride-hail service in a major US city***.

**ANSWER:** The allegations in Paragraph 318 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the June 13, 2022 statements referenced in Paragraph 318 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 318.

319. This statement conveyed that Cruise's AV technology was a Level 4 system because this statement touted Cruise's receipt of a regulatory permit, which depended on Cruise certifying its AV technology was at Level 4, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 319 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 319.

320. On July 26, 2022, on GM's second quarter 2022 earnings call, Defendant Barra stated:

All of this will help us continue to execute our growth strategy and insulate it from short-term market challenges. Cruise is an example. ***Without question, the Cruise team's launch of fully driverless commercial operations in San Francisco in June was historic.***

174

**ANSWER:** The allegations in Paragraph 320 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the July 26, 2022 statements referenced in Paragraph 320 for a complete and accurate description of their contents.   The Cruise Defendants otherwise deny the allegations in Paragraph 320.

321. This statement conveyed that Cruise's AV technology was a Level 4 system because it claimed Cruise had launched "fully driverless commercial operations," which term Cruise used to describe Level 4 AV technology, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 321 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 321.

322. On July 26, 2022, GM filed its Form 10-Q for the quarterly period ended June 30, 2022, which was signed by and/or certified pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Barra and Jacobson, and which stated:

*In 2021, Cruise received a driverless test permit from the California Public Utilities Commission (CPUC) to provide unpaid rides to the public in driverless vehicles and received approval of its Autonomous Vehicle Deployment Permit from the California Department of Motor Vehicles to commercially deploy driverless AVs. In June 2022, Cruise received the first ever Driverless Deployment Permit granted by the CPUC, which allows them to charge a fare for the driverless rides they are providing to members of the public in certain parts of San Francisco.*

175

**ANSWER:** The allegations in Paragraph 322 are not directed at the Cruise Defendants and form the basis of Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the July 26, 2022 filing and statements referenced in Paragraph 322 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 322.

323. Defendants also repeatedly touted to the market that Cruise's AV technology had progressed beyond the "R&D phase" and into the "early commercialization phase," which sent the message to investors that Cruise had developed and were employing "fully driverless" technology and that Cruise's AVs did not require additional research and development for Cruise to operate a revenue generating robotaxi business. For example, on October 6, 2021, at GM's Investor Day, Defendant Ammann stated that "[o]ver the last several years from 2015, 2016 timeframe through the end of last year, we were clearly very much in an R&D phase," which "was all about building up the core technology and trying to solve that engineering challenge of a generation of building a self-driving system that can drive with a human or better level of performance. And we first reached that threshold for the first time late last year." This technological breakthrough, according to Defendant Ammann was "what allowed us to begin fully driverless testing on the streets of San Francisco which we began around October, November of last year. And that marked the beginning of the next phase of the Cruise journey which we refer to as early commercialization." Ammann reiterated this sentiment at the same Investor Day, stating "we're in the middle of this early commercialization phase." Similarly, on September 12, 2022, at a conference hosted by Goldman Sachs, Defendant Vogt stated that "we crossed that critical inflection point when we did our first driverless deployment in a major urban market like that was the point at which this turned from a binary problem, like does the tech exist or does it not, to a scaling problem, which is how quickly can we light up new markets, how quickly can we build vehicles."

**ANSWER:** The allegations in Paragraph 323 form the basis of Dismissed Claims. Accordingly, no response is required. To the extent a response is required,

the Cruise Defendants respectfully refer the Court to the October 6, 2021 and September 12, 2022 statements referenced in Paragraph 323 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 323.

324. On August 19, 2022, GM filed its Form 8-K and issued a press release proclaiming "[t]he historic ***launch of a fully driverless commercial ride share service in San Francisco by Cruise***, GM's majority-owned subsidary" as one of GM's "***[r]ecent growth milestones***."

**ANSWER:** The allegations in Paragraph 324 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the August 19, 2022 filing and statements referenced in Paragraph 324 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 324.

325. This statement conveyed that Cruise's AV technology was a Level 4 system because it claimed Cruise had launched a "fully commercial ride share service in San Francisco," and Cruise used the term "fully driverless" to describe Level 4 AV technology, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 325 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 325.

326. On September 12, 2022, at a conference hosted by Goldman Sachs, Defendant Barra stated:

I'd like to make a couple comments about Cruise before I turn it over to Kyle. First, we believed in the mission that, Kyle as one of the Co-Founders at Cruise, had outlined when we made the acquisition in 2016. At that point in time, Cruise had 40 employees. They now have over 3,000 employees, ***and they are the first company, as I mentioned, to operate a fully autonomous ride-hailing business in a major US city, a dense urban environment***.

**ANSWER:** The allegations in Paragraph 326 are not directed at the Cruise Defendants and form the basis of Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the September 12, 2022 statements referenced in Paragraph 326 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 326.

327. This statement conveyed that Cruise's AV technology was a Level 4 system because it claimed Cruise had launched a "fully autonomous ride-hailing business," and Cruise used the term "fully autonomous" to describe Level 4 AV technology, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 327 are not directed at the Cruise Defendants and form the basis of Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 327.

328. On September 12, 2022, at a conference hosted by Goldman Sachs, Defendant Vogt stated:

[W]e've done some great work on the regulatory front. ***It took us 33 months to get all the permits necessary for commercial operation in California. And I think along that way, we built a lot of credibility and trust***. It might have helped because to get the permits for our next city, it took three weeks. So three weeks, 33 months

**ANSWER:** The Cruise Defendants respectfully refer the Court to the September 12, 2022 statement referenced in Paragraph 328 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 328.

329. This statement conveyed that Cruise's AV technology was a Level 4 system because this statement touted Cruise's receipt of, and application for, regulatory permits, which depended on Cruise certifying its AV technology was at Level 4, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The Cruise Defendants deny the allegations in Paragraph 329.

330. On September 12, 2022, at a conference hosted by Goldman Sachs, Defendant Vogt stated:

I guess, as I mentioned the last eight years have been this R&D phase. You got to get the technology to work before you can scale it. ***And we crossed that critical inflection point when we did our first driverless deployment in a major urban market like that was the point at which this turned from a binary problem, like does the tech exist or does it not, to a scaling problem, which is how quickly can we light up new markets, how quickly can we build vehicles.*** And really it was that foundational work that we've done over the last eight years, kind of, it's a tip in the iceberg situation. The majority of it is below the surface and now you're just seeing the very tip with our service that's at this point still just a few months old.

**ANSWER:** The Cruise Defendants respectfully refer the Court to the September 12, 2022 statement referenced in Paragraph 330 for a complete and

accurate description of its contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 330.

331. This statement conveyed that Cruise's AV technology was a Level 4 system by indicating that Cruise had completed the R&D phase, which, per its business plans, would mean it had an operational Level 4 AV technology that it could begin commercializing, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The Cruise Defendants deny the allegations in Paragraph 331.

332. On October 25, 2022, on GM's third quarter 2022 earnings call, Defendant Vogt stated:

Overall, we remain largely on track for our goals this year, including expansion in San Francisco and the goal we announced in September, to begin commercial driverless operation in two new markets. *We've now driven well over 400,000 fully driverless miles in San Francisco and given thousands of rides to members of the public, and we expect to expand our service area and hours of operation soon*.

**ANSWER:** The allegations in Paragraph 332 form the basis for Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the October 25, 2022 statement referenced in Paragraph 332 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 332.

333. This statement conveyed that Cruise's AV technology was a Level 4 system because it claimed Cruise had driven "well over 400,000 fully driverless miles," and Cruise used the term "fully driverless" to describe Level 4 AV technology, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 333 form the basis for Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 333.

334. On October 25, 2022, GM filed its Form 10-Q for the quarterly period ended September 30, 2022, which was signed by and/or certified pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Barra and Jacobson, and which stated:

> *In 2021, Cruise received a driverless test permit from the California Public Utilities Commission (CPUC) to provide unpaid rides to the public in driverless vehicles and received approval of its Autonomous Vehicle Deployment Permit from the California Department of Motor Vehicles to commercially deploy driverless AVs. In June 2022, Cruise received the first ever Driverless Deployment Permit granted by the CPUC, which allows them to charge a fare for the driverless rides they are providing to members of the public in certain parts of San Francisco.*

**ANSWER:** The allegations in Paragraph 334 are not directed at the Cruise Defendants and form the basis of Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the October 25, 2022 filing and statements referenced in Paragraph 334 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 334.

335. This statement conveyed that Cruise's AV technology was a Level 4 system because this statement touted Cruise's receipt of, and application for, regulatory permits, which depended on Cruise certifying its AV technology was at Level 4, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 335 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 335.

336. On January 31, 2023, on GM's fourth quarter 2022 earnings call, Defendant Vogt stated:

> Before I share more about the rapid scaling ahead of us for 2023, I'd like to take a minute to highlight what we accomplished in 2022. ***As you said, last year was the year that fully driverless [A]Vs transitioned from being a moonshot to reality, with the Cruise robotaxi fleet serving thousands of rides to real customers in a major US market, and making its first fully driverless deliveries.***

**ANSWER:** The allegations in Paragraph 336 form the basis for Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the January 31, 2023 statement referenced in Paragraph 336 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 336.

337. This statement conveyed that Cruise's AV technology was a Level 4 system because it claimed Cruise's AV system was "fully driverless" and had made "fully driverless deliveries," and Cruise used the term "fully driverless" to describe Level 4 AV technology, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 337 form the basis for Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 337.

338. On January 31, 2023, GM filed its Form 10-K for the fiscal year ended December 31, 2022, which was signed by and/or certified pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Barra and Jacobson, and which stated:

*In 2021, Cruise received a driverless test permit from the California Public Utilities Commission (CPUC) to provide unpaid rides to the public in driverless vehicles and received approval of its Autonomous Vehicle Deployment Permit from the California Department of Motor Vehicles to commercially deploy driverless Avs.  In June 2022, Cruise received the first ever Driverless Deployment Permit granted by the CPUC, which allows them to charge a fare for the driverless rides they are providing to members of the public in certain parts of San Francisco.*

**ANSWER:** The allegations in Paragraph 338 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the January 31, 2023 filing and statements referenced in Paragraph 338 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 338.

339. This statement conveyed that Cruise's AV technology was a Level 4 system because this statement touted Cruise's receipt of, and application for, regulatory permits, which depended on Cruise certifying its AV technology was at Level 4, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 339 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 339.

340. On March 6, 2023, at a conference hosted by Morgan Stanley, Defendant West stated:

So, we – just to give a little bit of context around it, so *we launched full driverless service a little over a year ago*. Since then, we've accumulated over 1 million miles of driverless miles. This is no safety driver, but driverless miles.

**ANSWER:** The allegations in Paragraph 340 form the basis for Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the March 6, 2023 statement referenced in Paragraph 340 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 340.

341. This statement conveyed that Cruise's AV technology was a Level 4 system because it claimed Cruise's AV system was "full driverless," and Cruise used the term "fully driverless" to describe Level 4 AV technology, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 341 form the basis for Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 341.

342. On April 25, 2023, GM filed its Form 10-Q for the quarterly period ended March 31, 2023, which was signed by and/or certified pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Barra and Jacobson, and which stated:

In 2021, Cruise received a driverless test permit from the California Public Utilities Commission (CPUC) to provide unpaid rides to the *public in driverless vehicles and received approval of its Autonomous Vehicle Deployment Permit from the California Department of Motor Vehicles to commercially deploy driverless AVs. In June 2022, Cruise received the first ever Driverless Deployment Permit granted by the*

184

*CPUC, which allows them to charge a fare for the driverless rides they are providing to members of the public in certain parts of San Francisco.*

**ANSWER:** The allegations in Paragraph 342 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the April 25, 2023 filing and statements referenced in Paragraph 342 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 342.

343. This statement conveyed that Cruise's AV technology was a Level 4 system because this statement touted Cruise's receipt of, and application for, regulatory permits, which depended on Cruise certifying its AV technology was at Level 4, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 343 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 343.

344. On April 25, 2023 GM presented a Q1 2023 Earnings Deck that included a graphic describing "Cruise" as "*L4,*" and stated:

*GM is the only automaker with both Level 2 and Level 4 AV technology offerings and a scalable vehicle built for autonomy ready for production.*

**ANSWER:** The allegations in Paragraph 344 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is

185

required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the April 25, 2023 presentation and statements referenced in Paragraph 344 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 344.

345. These statements conveyed that Cruise's AV technology was a Level 4 system because it claimed Cruise's AV system was "L4" and described Cruise's AV technology as "Level 4 AV technology," and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 345 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 345.

346. GM's April 25, 2023 Q1 2023 Earnings Deck also touted GM's "[l]eadership in [s]afe [d]eployment of ADAS and AV," and stated:

> *[The] [f]irst million fully driverless miles took [Cruise] 15 months to achieve, while the following half-million took ~90 days.*
>
> *…*
>
> *[Cruise has] Surpassed 1.5M fully driverless miles ~9- days after reaching first million.*

**ANSWER:** The allegations in Paragraph 346 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the April 25, 2023 presentation and statements referenced in

Paragraph 346 for a complete and accurate description of their contents.  The Cruise

Defendants otherwise deny the allegations in Paragraph 346.

347. This statement conveyed that Cruise's AV technology was a Level 4 system because it claimed Cruise's AVs had driven 1.5 million "fully driverless miles," and Cruise used the term "fully driverless" to describe Level 4 AV technology, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 347 are not directed at the Cruise

Defendants and form the basis of Dismissed Claims.  Accordingly, no response is

required.  To the extent a response is required, the Cruise Defendants deny the

allegations in Paragraph 347.

348. On June 15, 2023, at a conference hosted by Deutsche Bank, Defendant Jacobson stated:

> Well, I think one of the things that I'd chuckle at, as I'm watching TV is all the discussion about AI and what the future is.  And we probably have one of the most sophisticated AI platforms and autonomous driving that exists anywhere.  And the scaling that's occurring with Cruise, they eclipsed 1 million miles earlier this year and then 90 days later, eclipsed 2 million miles. So they're in a position where they're in really rapid growth and deployment of the AI.  And ***these miles are all driverless, so it's not like we're Level 2.  We're full Level 4, no driver in the vehicle at all.***

**ANSWER:** The allegations in Paragraph 348 are not directed at the Cruise

Defendants and form the basis of Dismissed Claims.  Accordingly, no response is

required.  To the extent a response is required, the Cruise Defendants respectfully

refer the Court to the June 15, 2023 statements referenced in Paragraph 348 for a

complete and accurate description of their contents.   The Cruise Defendants otherwise deny the allegations in Paragraph 348.

349. This statement conveyed that Cruise's AV technology was a Level 4 system because it claimed Cruise's AV system was "full Level 4," and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 349 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 349.

350. On June 15, 2023, at a conference hosted by Deutsche Bank, Defendant Jacobson stated:

> I mean, between not just the rideshare applications, but delivery, but personal autonomous vehicles, and ultimately, where that's going, nobody has a cost-effective Level 4 solution that's out there for customers. ***But we've got the Level 4 technology***. As we've said before, we started with the strategy of saying, let's solve the problem. The problem is the most difficult thing to solve, which is get the tech right. Once you get the tech right, you can bring the cost down.

**ANSWER:** The allegations in Paragraph 350 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the June 15, 2023 statements referenced in Paragraph 350 for a complete and accurate description of their contents.   The Cruise Defendants otherwise deny the allegations in Paragraph 350.

351. This statement conveyed that Cruise's AV technology was a Level 4 system because it claimed Cruise's AV system was "Level 4 technology," and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 351 are not directed at the Cruise Defendants and form the basis of Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 351.

352. On July 25, 2023, GM filed its Form 10-Q for the quarterly period ended June 30, 2023, which was signed by and/or certified pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Barra and Jacobson, and which stated:

> ***In 2021, Cruise received a driverless test permit from the California Public Utilities Commission (CPUC) to provide unpaid rides to the public in driverless vehicles and received approval of its Autonomous Vehicle Deployment Permit from the California Department of Motor Vehicles to commercially deploy driverless AVs. In June 2022, Cruise received the first ever Driverless Deployment Permit granted by the CPUC, which allows it to charge a fare for the driverless rides it is providing to members of the public in certain parts of San Francisco.***

**ANSWER:** The allegations in Paragraph 352 are not directed at the Cruise Defendants and form the basis of Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the July 25, 2023 filing and statements referenced in Paragraph 352 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 352.

353. This statement conveyed that Cruise's AV technology was a Level 4 system because this statement touted Cruise's receipt of, and application for,

189

regulatory permits, which depended on Cruise certifying its AV technology was at Level 4, and depicting Cruise's AV technology as a Level 4 system was misleading for the reasons stated in paragraphs 262-264.

**ANSWER:** The allegations in Paragraph 353 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 353.

354. On October 24, 2023, on GM's third quarter 2023 earnings call, Defendant Barra stated:

As I said in my remarks, ***it is safer than a human driver***, and it's constantly improving and getting better, and that's what we're focused on doing.

**ANSWER:** The allegations in Paragraph 354 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the October 24, 2023 statement referenced in Paragraph 354 for a complete and accurate description of its contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 354.

355. This statement conveyed that Cruise was presently demonstrating AV technology that was safer than a human driver, which was materially misleading for the reasons stated in paragraph 265.

**ANSWER:** The allegations in Paragraph 355 are not directed at the Cruise Defendants and form the basis of Dismissed Claims.  Accordingly, no response is

required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 355.

### 2.  Deceit Concerning the October 2 Crash

356. As more fully discussed herein, at approximately 9:30 PM PT, on October 2, 2023, a Cruise vehicle struck a pedestrian and dragged the pedestrian approximately 20 feet before coming to a stop.  In the period after the Crash, Defendants made a number of misrepresentations to and through the media concerning the Crash.  By 6:45 AM PT the following day, Cruise had thoroughly discussed the Crash, including via a 77 person "War Room" instant messenger (Slack) channel, a 100+ employee "Crisis Management Team" meeting attended by Defendant West, and a Senior Leadership Team meeting attended by Defendant Vogt and other senior leadership of Cruise.  Prior to 6:45 AM PT, Vogt had communicated to Cruise employees that he wanted to "personally . . . authorize" any video shown to the media, and any media statements, and that "nothing would be shared or done" without his sign off.

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) respectfully refer the Court to the Quinn Report referenced in Paragraph 356 for a complete and accurate description of its contents.  Cruise (ii) respectfully refers the Court to the "Statement of Facts" in the DPA for a description of the Accident and incident response.  The allegations in Paragraph 356 form the basis for Dismissed Claims against Mr. Ammann.  Accordingly, no response is required from Mr. Ammann.  To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 356 and denies the allegations in Paragraph 356 on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 356.

191

357. **Misconduct through Dissemination of Misleading Video Footage.** At 2:14 AM PT, on October 3, 2023, a 45-second video of the Crash depicting the pullover maneuver and pedestrian dragging was first made available within Cruise. This video and Cruise's attempted pullover maneuver were openly reviewed and/or discussed by senior leadership, including Director of Systems Integrity Matt Wood, and Defendants West and Vogt. Despite this, Cruise continued to share a misleading version of the video, which cut out before the pullover maneuver, and misleadingly represented to media outlets that the AV came to a complete stop, without any reference of the subsequent pullover maneuver and pedestrian dragging. Vogt is responsible for these representations to the media because of his position of control and authority and his role in personally authorizing any video or statements shared with the media. As the Quinn Report explained:

> In light of this decision, the Cruise communications team continued to screen-share the Media Video well into the afternoon of October 3 with such media outlets as CBS News, SFGate, KRON4, KPIX, and *Crain's Business*, despite knowing that the video stopped at the point of impact and omitted key details of the [Crash].

**ANSWER:** The Cruise Defendants (i) respond that Paragraph 357 in part states a legal conclusion to which no response is required. Cruise, Mr. West, and Mr. Vogt (ii) respectfully refer the Court to the Quinn Report referenced in Paragraph 357 for a complete and accurate description of its contents. Cruise (iii) respectfully refers the Court to the "Statement of Facts" in the DPA for a description of the Accident and incident response. The allegations in Paragraph 357 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 357 and denies the allegations in Paragraph 357 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 357.

358. These media outlets published articles on the basis of the misleading video footage Cruise shared with them. For example:

a. *CBS News* published an article at 6:59 PM PT, on October 3, 2023, which quoted a statement Cruise had made on social media (at 12:53 AM PT) that the pedestrian was struck by another vehicle, that the Cruise vehicle had "braked aggressively to minimize the impact," without mentioning that after breaking the Cruise proceeded to drive (in the attempted pullover maneuver) dragging the pedestrian. This article did not make mention of the pullover maneuver because Cruise had misleadingly omitted that portion of the video footage from what they shared with *CBS News*, and instead stated that the victim was "pinned" to the ground. By misleadingly omitting relevant portions of the video, Cruise influenced *CBS News'* reporting, such that the article omitted reference to the pullover maneuver and dragging, and recited Cruises' incomplete description of the incident, whereas it is clear from the article that the pullover maneuver and dragging would have been disclosed if the Cruise had shared the complete video.

b. A KPIX TV segment (a local, *CBS News* affiliate in San Fransico) aired at 6:00 PM PT, on October 3, 2023, which recounted that *CBS News* had reviewed video footage of the accident and described that *CBS News* reporter Kenny Choi had seen the video "taken from inside the AV provided by [C]ruise and outside that car showing us a pretty good perspective of exactly what happened." The *CBS News* TV segment recounted Cruise's assertion that the vehicle "braked aggressively to minimize the impact before coming to a complete stop." By misleadingly omitting relevant portions of the video, Cruise influenced *CBS News'* reporting, such that the article omitted reference to the pullover maneuver and dragging, and recited Cruise's incomplete description of the incident, whereas it is clear from *CBS News* that the pullover maneuver and dragging would have been disclosed if Cruise had shared the complete video.

193

c.  *KRON4* published an article at 4:35 PM PT, on October 3, 2023, stating that "[a] Cruise representative allowed *KRON4* to view video footage recorded by its AV involved in the accident. The video confirmed that a human- driven car struck the woman first before she was thrown directly into the path of the Cruise car." The *KRON4* article included a bullet-point list of a moment-by-moment description of the video, which does not include any mention of the pullover maneuver. The article also included a statement from Cruise, wherein the company stated: "A human-driven vehicle struck a pedestrian while traveling in the lane immediately to the left of a Cruise AV. The initial impact was severe and launched the pedestrian directly in front of the AV. The AV then braked aggressively to minimize the impact." Further, the article stated that "[t]he woman was still pinned under the Cruise car when firefighters and police arrived on scene." Neither the article, nor Cruise's statement that it gave to *KRON4*, stated that, after braking, the Cruise AV proceeded to drive (in the attempted pullover maneuver), dragging the pedestrian. This *KRON4* article did not make mention of the pullover maneuver because Cruise had misleadingly omitted that portion of the video footage from what they shared with *KRON4*. By misleadingly omitting relevant portions of the video, Cruise influenced *KRON4's* reporting, such that the article omitted reference to the pullover maneuver and dragging, and recited Cruise's incomplete description of the incident, whereas it is clear from the *KRON4* article that the pullover maneuver and dragging would have been disclosed if Cruise had shared the complete video.

d.  *SFGate* published an article at 10:49 AM PT, on October 3, 2023, stating that *SFGate* had reviewed "[s]urveillance video taken by multiple cameras in the autonomous vehicle" and quoted Cruise's statement that the Cruise AV had "braked aggressively" to minimize impact." By misleadingly omitting relevant portions of the video, Cruise influenced *SFGate's* reporting, such that the *SFGate* article omitted reference to the pullover maneuver and dragging, and recited Cruise's incomplete description of the incident, whereas it is clear from the *SFGate* article that the pullover maneuver and dragging would have been disclosed if

194

Cruise had shared the complete video.

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to the October 3, 2023 *CBS News* article, October 3, 2023 KPIX TV segment, October 3, 2023 *KRON4* article, and October 3, 2023 *SFGate* article referenced in Paragraph 358 for a complete and accurate description of their contents. The allegations in Paragraph 358 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 358 and denies the allegations in Paragraph 358 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 358.

359. As discussed in the prior two numbered paragraphs, Cruise and Defendant Vogt's conduct in releasing an incomplete version of the video footage of the October 2 Crash that omitted the attempted pullover maneuver and resulting injury to the pedestrian was deceitful conduct, which was likely to, and in fact did, influence the media's reporting regarding the Crash. This deceitful conduct was intended to, and did, create a false public perception of Cruise's role in the Crash, including that Cruise's autonomous "fallback" action of engaging in the pullover maneuver directly resulted in injury to the pedestrian. This deceit also had the effect of hiding from the public that Cruise would face, or was at risk of facing, serious repercussions from regulators, including a suspension of its operating and testing permits due to its AV's unsafe reaction to the Crash.

**ANSWER:** The allegations in Paragraph 359 assert a legal conclusion, to which no response is required. The allegations in Paragraph 359 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from

195

Mr. Ammann.  To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 359 and denies the allegations in Paragraph 359 on that basis.  Further, to the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 359.

360. **Misconduct through Dissemination of Misleading Statements to the Media.**  At 2:14 AM PT, on October 3, 2023, the full 45-second video of the Crash depicting the pullover maneuver and pedestrian dragging was first made available within Cruise. This video and Cruise's attempted pullover maneuver were openly reviewed and/or discussed by senior Cruise personnel, including Director of Systems Integrity Matt Wood, and Defendants West and Vogt. Despite this, Cruise communication members continued to disseminate misleading statements to the media. Vogt is responsible for these representations to the media because of his position of control and authority and his role in personally authorizing any video or statements shared with the media. As the Quinn Report explained:

> Communications members also continued to give reporters the following bullet point on background: "*[t]he AV came to a complete stop immediately after impacting the struck pedestrian*," even though by this time Cruise, including senior members of its communications team, knew that the AV moved forward immediately after striking the pedestrian. Cruise communications team members gave this statement to media reporters after the 6:45 am SLT meeting, some of whom
>
> published it, well into the afternoon of October 3, including *Forbes*, CNBC, ABC News Digital, Engadget, Jalopnik, and *The Register*.

**ANSWER:** The Cruise Defendants (i) respond that Paragraph 360 in part states a legal conclusion to which no response is required.  Cruise, Mr. West, and Mr. Vogt (ii) respectfully refer the Court to the Quinn Report referenced in

196

Paragraph 360 for a complete and accurate description of its contents. Cruise (iii) respectfully refers the Court to the "Statement of Facts" in the DPA for a description of the Accident and incident response. The allegations in Paragraph 360 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 360 and denies the allegations in Paragraph 360 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 360.

361. These media outlets published articles on the basis of the misleading bullet points Cruise shared with them. For example:

   a. *Forbes* published an article at 1:52 PM PT, on October 3, 2023, stating "[t]he unfortunate pedestrian was flung into the path of a Cruise robotaxi in the lane to the right. The robotaxi stopped hard and the pedestrian ended up under its wheels," mirroring the talking points Cruise and Defendant Vogt had disseminated. Notably, this article included a lengthy discussion of whether the vehicle *should* have attempted to move from atop the pedestrian or whether it should have stayed in place – further evidencing that *Forbes* understood Cruise's representations to indicate that the vehicle had in fact stayed in place. Indeed, *Forbes* discussed the risk – a "nightmare question" – of whether a car could "drag a victim" after such a crash, further evidencing that *Forbes* was misled by Cruise into believing that the pedestrian had not been dragged in the Crash.

   b. *Engadget* published an article on October 3, 2023 concerning the Crash, reciting Cruise's representation that the Cruise AV came to a complete stop, writing: "As the autonomous taxi proceeded through the green light, it ran over her and came to a complete stop, pinning her leg under its rear axle and tire." The article also quoted a statement from Cruise communications manager

197

Hannah Lindow stating that "[t]he AV then braked aggressively to minimize the impact. The driver of the other vehicle fled the scene, and at the request of the police the AV was kept in place." This statement from Lindow misleadingly conveyed that the Cruise vehicle braked, and was then "kept in place," as opposed to the truth, that the Cruise vehicle proceeded to attempt a pullover maneuver dragging the victim.

c.   *CNBC* published an article at 9:40 AM PT, on October 3, 2023, stating that "[t]he Cruise vehicle immediately came to a stop after the woman was thrown into it" and that "[t]he Cruise vehicle came to an immediate stop after the impact." *CNBC*'s article mirrored the talking points that Defendants' Cruise and Vogt disseminated.

d.   *ABC News* published an article at 2:24 PM PT, on October 3, 2023, titled, "Woman gets pinned under driverless car after being hit by other vehicle." The article stated that "[t]he autonomous vehicle came to a complete stop after striking the pedestrian, Cruise said. The other driver fled the scene, while the driverless vehicle stayed at the request of police, the company said." The article also mentioned that "[f]ootage from the Cruise vehicle of the incident viewed by *ABC News* shows both vehicles proceed through the intersection, when the initial car strikes the pedestrian. The victim then lands in the path of the autonomous vehicle, the footage shows."

e.   *Jalopnik*, a publication focused on cars, published an article on October 3, 2023, titled, "Cruise Taxi Runs Over, Pins Woman Hit By Other Car To The Ground." The Quinn Report noted that *Jalopnik* received Cruise's talking points, which were clearly reflected in the article, though the article did not directly mention the communication from Cruise. Notably though, the article did not merely state that the Cruise vehicle had braked, but clarified that the "Cruise robotaxi parked on the woman's leg," conveying that the Cruise vehicle had come to a complete stop upon impact, when in fact it had attempted a pullover maneuver dragging the woman before stopping on top of her.

f.   *The Register* published an article on October 3, 2023, titled, "Human knocks down woman in hit-and-run. Then driverless

198

Cruise car parks on top of her." This headline itself, repeated the false narrative perpetuated by Cruise that its vehicle had "parked," rather than attempting the pullover maneuver that dragged the pedestrian down the street. The article quoted Cruise's talking points that the Cruise AV had "braked aggressively to minimize the impact" and that the Cruise AV was "kept in place" following the crash.

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to the October 3, 2023 *Forbes* article, October 3, 2023 *Engadget* article, October 3, 2023 *CNBC* article, October 3, 2023 *ABC News* article, October 3, 2023 *Jalopnik* article, and October 3, 2023 *The Register* article and the Quinn Report referenced in Paragraph 361 for a complete and accurate description of their contents. The allegations in Paragraph 361 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 361 and denies the allegations in Paragraph 361 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 361.

362. As discussed in the prior two numbered paragraphs, Cruise and Defendant Vogt's conduct in releasing misleading bullet points to the media that claimed the Cruise vehicle had "braked aggressively" and was "kept in place" while omitting to disclose the attempted pullover maneuver and resulting injury to the pedestrian was deceitful conduct, which was likely to, and in fact did, influence the media's reporting on the October 2 Crash. This deceitful conduct was intended to, and did, create a false public perception of Cruise's role in the Crash, including that Cruise's autonomous "fallback" action of engaging in the pullover maneuver directly resulted in injury to the pedestrian. This deceit also had the effect of hiding from the public that Cruise would face or was at risk of facing, serious repercussions

199

from regulators, including a suspension of its operating and testing permits, due to its vehicle's unsafe reaction to the Crash.

**ANSWER:** The allegations in Paragraph 362 assert a legal conclusion, to which no response is required. The allegations in Paragraph 362 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 362 and denies the allegations in Paragraph 362 on that basis. Further, to the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 362.

363. **Misleading Statement Concerning the Crash.** As mentioned above, a written statement by Cruise communications manager Hannah Lindow was directly quoted in the media, including the October 3, 2023 *Engadget* article, for her comments about the Crash. While Ms. Lindow is directly listed as the source of this quote, it is properly attributable to Defendant Vogt because of his role in approving all statements to the media. Regardless of whether the statement is deemed attributable to Vogt, it is clearly attributable to Cruise as Ms. Lindow was a communications manager disseminating the statement on behalf of Cruise. The statement was quoted as follows:

> At approximately 9:30 pm on October 2, a human-driven vehicle struck a pedestrian while traveling in the lane immediately to the left of a Cruise AV. . . . The initial impact was severe and launched the pedestrian directly in front of the AV. ***The AV then braked aggressively to minimize the impact. The driver of the other vehicle fled the scene, and at the request of the police the AV was kept in place.*** Our heartfelt concern and focus is the wellbeing of the person who was injured and we are actively working with police to help identify the responsible driver.

200

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to the October 3, 2023 *Engadget* article referenced in Paragraph 363 for a complete and accurate description of its contents.  The allegations in Paragraph 363 form the basis for Dismissed Claims against Mr. Ammann.  Accordingly, no response is required from Mr. Ammann.  To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 363 and denies the allegations in Paragraph 363 on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 363.

364. It was misleading of Ms. Lindow to state, in the above statement, that the Cruise vehicle braked aggressively and was then "kept in place" without disclosing that the vehicle had attempted a pullover that resulted in the pedestrian being dragged.  This statement was intended to, and did, create a false public perception of Cruise's role in the Crash, including that Cruise's autonomous "fallback" action of engaging in the pullover maneuver directly resulted in injury to the pedestrian.  This deceit also had the effect of hiding from the public that Cruise would face, or was at risk of facing, serious repercussions from regulators, including a suspension of its operating and testing permits, due to its vehicle's unsafe reaction to the Crash.

**ANSWER:** Cruise, Mr. West, and Mr. Vogt deny the allegations in Paragraph 364.  The allegations in Paragraph 364 form the basis for Dismissed Claims against Mr. Ammann.  Accordingly, no response is required from Mr. Ammann.  To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 364 and denies the allegations in Paragraph 364 on that basis.

## B.     Revelations of Truthful Information[8]

### 1.     October 24, 2023 Disclosure (First Partial Disclosure)

365. On October 24, 2023, the DMV issued a suspension order of Cruise's deployment and driverless testing permits.  In so doing, the DMV announced that it was "suspending Cruise's autonomous vehicle deployment and driverless testing permits, effective immediately."  The DMV's public announcement based the suspension order on the DMV's prerogative to suspend or revoke permits "[w]hen there is an unreasonable risk to public safety."  Specifically, the DMV stated that it had "determine[d] the manufacturer's vehicles are not safe for the public's operation;" that "[t]he manufacturer has misrepresented [] information related to safety of the autonomous technology of its vehicles;" that Cruise had engaged in "act[s] or omission[s] . . . which the department finds makes the conduct of autonomous vehicle testing on public roads by the manufacturer an unreasonable risk to the public;" and that Cruise had been "engaging in a practice in such a manner that immediate suspension is required for the safety of persons on a public road."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that the DMV suspended certain of Cruise's DMV permits on October 24, 2023; (ii) admit that the DMV issued a "DMV Statement on Cruise LLC Suspension" on October 24, 2023; and (iii) respectfully refer the Court to the October 24, 2023 DMV statement referenced in Paragraph 365 for a complete and accurate description of its contents. Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 365 and denies the allegations in Paragraph 365 on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 365.

366. The DMV's suspension order stated that "[t]here is no set time for a suspension."  The DMV further stated that it had "provided Cruise with the steps

---

[8] In this Section, language is bold and italicized for emphasis only.

needed to apply to reinstate its suspended permits, which the DMV will not approve until the company has fulfilled the requirements to the department's satisfaction." As of the filing of this amended complaint—approximately six months after the DMV's suspension order—the DMV has not reinstated Cruise's driverless permits.

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that the DMV issued a "DMV Statement on Cruise LLC Suspension" on October 24, 2023; and (ii) respectfully refer the Court to the October 24, 2023 DMV statement referenced in Paragraph 366 for a complete and accurate description of its contents. Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 366 and denies the allegations in Paragraph 366 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 366.

367. Concurrent with the DMV's suspension, the CPUC also suspended Cruise's permit to offer driverless passenger service. The CPUC suspended Cruise's permit pursuant to the CPUC Decision 20-11-046, Ordering Paragraph 13, which mandates that Cruise's permit for driverless passenger service from the CPUC "shall be suspended immediately from the deployment program upon suspension or revocation of [the AV operator's] testing permit by the [DMV] and not reinstated until the [DMV] has reinstated the testing permit."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that Cruise's CPUC permit No. TCP0039080-P was suspended; (ii) respond that Paragraph 367 in part states a legal conclusion to which no response is required; and (iii) respectfully refer the Court to CPUC Decision 20-11-046 referenced in Paragraph 367 for a complete and accurate description of its contents. Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph

367 and otherwise denies the allegations in Paragraph 367 on that basis.  The Cruise

Defendants otherwise deny the allegations in Paragraph 367.

368. At 10:49 AM PT, on October 24, 2023, Cruise published a blog post addressing the DMV Order and the October 2 Crash titled, "A detailed review of the recent SF hit-and-run incident."  According to the Quinn Report, it was Vogt who posted this blog on Cruise's website.  There, for the first time, Cruise acknowledged that the Cruise AV collided with the pedestrian and "then attempted to pull over to avoid causing further road safety issues, pulling the individual forward approximately 20 feet."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that Cruise issued a

blog post on October 24, 2023 titled "A detailed review of the recent SF hit-and-run

incident"; (ii) respectfully refer the Court to the October 24, 2023 blog post

referenced in Paragraph 368 for a complete and accurate description of its contents;

and (iii) respectfully refer the Court to the Quinn Report for a complete and accurate

description of its contents.  Mr. Ammann lacks sufficient knowledge or information

to form a belief as to the truth or falsity of the allegations in Paragraph 368 and

denies the allegations in Paragraph 368 on that basis.  The Cruise Defendants

otherwise deny the allegations in Paragraph 368.

369. Despite revealing certain corrective information to the public, the October 24, 2023 disclosure did not reveal the full misleading nature of Defendants' Class Period misstatements.  For example, the DMV noted in its announcement of Cruise's suspension that the suspension "does not impact the company's permit for testing with a safety driver."  In other words, the DMV still permitted Cruise to test its vehicles with a safety driver.

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that Cruise issued a

blog post on October 24, 2023 titled "A detailed review of the recent SF hit-and-run

incident"; (ii) respectfully refer the Court to the October 24, 2023 blog post referenced in Paragraph 369 for a complete and accurate description of its contents; (iii) admit that the DMV issued a "DMV Statement on Cruise LLC Suspension" on October 24, 2023; and (iv) respectfully refer the Court to the October 24, 2023 DMV statement referenced in Paragraph 369 for a complete and accurate description of its contents.  Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 369 and denies those allegations on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 369.

370. Further, Defendant Vogt's October 24, 2023 blog post continued to minimize the October 2 Crash, Cruise's subsequent misleading conduct with regulators, and the safety and capability problems of Cruise's AVs.  Specifically, Vogt wrote that "scenarios such as" the October 2 Crash were "extremely rare" and "[w]ith over 5 million miles of driving, our safety record shows that our AVs are safer than a human benchmark in dense, urban environments."  Vogt went on to claim that the Cruise AV's actions during the October 2 Crash were actually safer than a human driver and minimized the severity of the incident, claiming that "the AV responded to the individual deflected in its path within 460 milliseconds, faster than most human drivers, and braked aggressively to minimize the impact."  Finally, Vogt asserted that "[s]hortly after the incident, our team proactively shared information with the California Department of Motor Vehicles (DMV), California Public Utilities Commission (CPUC), and National Highway Traffic Safety Administration (NHTSA), including the full video, and have stayed in close contact with regulators to answer their questions."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that Cruise issued a blog post on October 24, 2023 titled "A detailed review of the recent SF hit-and-run incident"; and (ii) respectfully refer the Court to the October 24, 2023 blog post

205

referenced in Paragraph 370 for a complete and accurate description of its contents.

Mr. Ammann lacks sufficient knowledge or information to form a belief as to the

truth or falsity of the allegations in Paragraph 370 and denies the allegations in

Paragraph 370 on that basis.  The Cruise Defendants otherwise deny the allegations

in Paragraph 370.

371. The CPUC Order singled out the latter of these statements—which touted that Cruise "proactively shared information with" regulators, including "the full video"—as "misleading" because Cruise "withheld information from the Commission for 15 days, thus misleading the Commission" and because "Cruise misled the DMV and, in turn, the Commission into thinking that the original video shown and commented on accurately memorialized the full extent of the incident."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that the CPUC issued a

"Ruling Ordering Cruise LLC to Show Cause Why It Should Not be Sanctioned by

the Commission for Failing to Provide Complete Information and for Making

Misleading Public Comments Regarding the October 2, 2023 Cruise Related

Incident and Its Subsequent Interactions with the Commission" on December 1,

2023; and (ii) respectfully refer the Court to the CPUC ruling referenced in

Paragraph 371 for a complete and accurate description of its contents.  Mr. Ammann

lacks sufficient knowledge or information to form a belief as to the truth or falsity

of the allegations in Paragraph 371 and denies the allegations in Paragraph 371 on

that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 371.

372. Also on October 24, the DMV's Order of Suspension to Cruise was leaked to the media.  The DMV Order, *inter alia*, that after hitting the pedestrian on October 2, 2023, and coming to an initial stop, the Cruise AV "subsequently

206

attempted to perform a pullover maneuver while the pedestrian was underneath the vehicle.  The AV traveled approximately 20 feet and reached a speed of 7mph before coming to a subsequent and final stop.  The pedestrian remained under the vehicle." The DMV Order continued, stating that on October 3, 2023, when Cruise representatives met with DMV and CHP representatives, Cruise showed "video footage of the accident captured by the AV's onboard cameras.  The video footage presented to the department ended with the AV's initial stop following the hard-braking maneuver.  Footage of the subsequent movement of the AV to perform a pullover maneuver was not shown to the department and Cruise did not disclose that any additional movement of the vehicle had occurred after the initial stop of the vehicle."  According to the DMV Order, the AV's maneuvering "indicates that Cruise's vehicles may lack the ability to respond in a safe and appropriate manner during incidents involving a pedestrian so as not to unnecessarily put the pedestrian or others at risk of further injury" and the behavior of Cruise's vehicles raise concerns that vehicles operated under Cruise's driverless testing permit also "lack the ability to respond in a safe and appropriate manner during incidents involving a pedestrian."  Until the department can make a determination regarding the safe operation of the vehicles, the continued operation of Cruise's driverless test vehicles on public roads poses an unreasonable risk to the public.  The DMV Order also noted that Cruise's "omission hinders the ability of the [DMV] to effectively and timely evaluate the safe operation of Cruise's vehicles and puts the safety of the public at risk."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that the DMV issued an "Order of Suspension" on October 24, 2023; and (ii) respectfully refer the Court to the DMV Order of Suspension referenced in Paragraph 372 for a complete and accurate description of its contents.  Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 372 and denies the allegations in Paragraph 372 on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 372.

373. On October 24, 2023, Wells Fargo announced that it was lowering its price target for GM.  In the report released by Wells Fargo announcing its price target change, Wells Fargo noted that "GM reported a Q3 beat; however the

207

subsequent UAW strike expansion & Cruise CA suspension resulted in GM shares falling ~2% (S&P +1%)." The Wells Fargo report continued: "Cruise announced the pause of operations after the CA DMV suspended their deployment & AV testing permits. The news is a big set back as San Francisco is its first major market. GM is already in ramp mode, expanding to 16 cities and increasing the EBIT burn rate to now ~$700M/qtr. GM also faces funding questions as Cruise is burning ~$2B/yr in cash and has only $1.7B on hand."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the October 24, 2023 Wells Fargo report referenced in Paragraph 373 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 373.

374. On this news, GM's stock price fell $0.66 per share, or nearly 2.3%, to close at $28.56 per share on October 24, 2023.

**ANSWER:** The Cruise Defendants respectfully refer the Court to publicly reported historical stock price data for information regarding GM's stock price and otherwise deny the allegations in Paragraph 374.

### 2. October 26, 2023 Disclosure (Second Partial Disclosure)

375. On October 26, 2023, the NHTSA publicly released a letter the agency had sent to Cruise six days earlier indicating that the NHTSA was investigating five reports of Cruise vehicles engaging in inappropriately hard braking that resulted in collisions:

Since opening [the investigation], this office has received reports of five (5) incidents in which a Cruise ADS equipped vehicle initiated a braking maneuver with no stated obstacles ahead and with another road user approaching from the rear. In each case, the other road user subsequently struck the rear of the ADS equipped vehicle. The ADS equipped vehicles involved were operating without onboard human supervision at the time of each crash.

208

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that NHTSA released a letter dated October 20, 2023, addressed to Cruise on October 26, 2023; and (ii) respectfully refer the Court to the October 20, 2023 NHTSA letter referenced in Paragraph 375 for a complete and accurate description of its contents. Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 375 and denies the allegations in Paragraph 375 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 375.

376. Later that day, after close of market, Cruise announced via a post on X (formerly Twitter) that it would pause all of its AV operations across the country "while we take time to examine our processes, systems, and tools and reflect on how we can better operate in a way that will earn public trust":

(1/3) The most important thing for us right now is to take steps to rebuild public trust. Part of this involves taking a hard look inwards and at how we do work at Cruise, even if it means doing things that are uncomfortable or difficult.

* * *

(2/3) In that spirit, ***we have decided to proactively pause driverless operations across all of our fleets*** while we take time to examine our processes, systems, and tools and reflect on how we can better operate in a way that will earn public trust.

* * *

(3/3) This isn't related to any new on-road incidents, and supervised AV operations will continue. We think it's the right thing to do during a period when we need to be extra vigilant when it comes to risk, relentlessly focused on safety, & taking steps to rebuild public trust.

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that Cruise posted on X (formerly Twitter) on October 26, 2023; and (ii) respectfully refer the Court to the October 26, 2023 X posts referenced in Paragraph 376 for a complete and accurate

209

description of their contents.   Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 376 that Cruise made the October 26, 2023 post on X referenced in Paragraph 376 and denies those allegations on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 376.

377. On this news, GM's stock price fell $1.33 per share, or nearly 4.7%, to close at $27.22 per share on October 27, 2023.

**ANSWER:** The Cruise Defendants respectfully refer the Court to publicly reported historical stock price data for information regarding GM's stock price and otherwise deny the allegations in Paragraph 377.

### 3.      November 8, 2023 Disclosure (Third Partial Disclosure)

378. On November 8, 2023, Cruise announced and the media reported that Cruise issued a recall impacting its entire fleet of 950 driverless cars across the US. The recall notice described that the "Collision Detection Subsystem"—which "is responsible for detecting [a] collision and electing a post-collision response"—may, after a collision, "cause the Cruise AV to attempt to pull over out of traffic instead of remaining stationary when a pullover is not the desired post-collision response." Cruise deemed this a "[d]efect" that posed a "[s]afety [r]isk," and concluded that this defect "played a role" in the October 2 Crash.  As a result, the recall Notice stated that Cruise had developed a "remedy" in the form of "an update to the Collision Detection Subsystem" that "Cruise has deployed the remedy to its supervised test fleet and will deploy the remedy to its driverless fleet prior to resuming driverless operations."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that Cruise published a blog post on November 8, 2023 titled "Important Updates from Cruise" and stating (among other things) that Cruise had "issued a voluntary recall of part of our AV software based on a new analysis of our AV's post-collision response on October

2"; and (ii) respectfully refer the Court to the November 8, 2023 blog post and the unspecified recall notice referenced in Paragraph 378 for a complete and accurate description of their contents. Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 378 and denies the allegations in Paragraph 378 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 378.

379. Separately on November 8, 2023, Cruise issued a blog post further elaborating on its recall. Cruise reiterated that the recall "addresses circumstances in which the Cruise collision detection subsystem may cause the Cruise AV to attempt to pull over out of traffic instead of remaining stationary when a pullover is not the desired post-collision response." Cruise notes in its post that "we determined that a similar collision with a risk of serious injury could have recurred every 10 million - 100 million miles of driving on average prior to the software update." While at first blush this statistic may seem to indicate the rarity of such an event, a deeper look reveals the disturbing reality. For approximately the past decade, the total vehicle miles traveled in the United States has been over three trillion miles each year. An event that occurs once every 10 million to 100 million miles would occur 30,000 to 300,000 times in a year where three trillion miles are traversed. Thus, if Cruise's statistics were mapped onto the driving public at large, a collision like the October 2 Crash would occur in the range of 82 to 820 times *per day*.

**ANSWER:** Cruise, Mr. West, and Mr. Vogt  (i) admit that Cruise published a blog post on November 8, 2023 titled "Important Updates from Cruise" regarding (among other things) Cruise's "voluntary recall of part of our AV software based on a new analysis of our AV's post-collision response on October 2"; and (ii) respectfully refer the Court to the November 8, 2023 blog post referenced in Paragraph 379 for a complete and accurate description of its contents. Mr. Ammann

211

lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 379 and denies the allegations in Paragraph 379 on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 379.

380. Additionally, Cruise's November 8, 2023 blog post stated that Cruise was conducting a search to hire a Chief Safety Officer and that it had retained Quinn Emanuel "to examine and better understand Cruise's response to the October 2 incident."  Implicitly recognizing that it had not yet determined the root cause of the October 2 Crash, Cruise also announced that it had hired the independent, third-party engineering firm, Exponent, "to perform a technical root cause analysis" of the October 2 incident, and that Cruise "will incorporate their findings into our safety and engineering processes."  Cruise also announced that it "identified four key areas of potential improvements to how we operate and have assigned leaders to investigate each one and complete follow up actions."  First, "Safety Governance: We are taking a deep look at our overall safety approach and risk management structures to ensure we are built and positioned to enable continuous improvement."  Second, "Safety and Engineering Processes: We have advanced tools and processes in place and are committed to further upgrades wherever warranted.  We are comprehensively reviewing all of our safety, testing, and validation processes and will add or modify processes where there is room to improve."  Third, "Internal & External Transparency: We understand that transparency is key to trust, especially in an emerging industry like ours.  We are committed to improving how we communicate with the public, our customers, regulators, the media, and Cruise employees."  Fourth, "Community Engagement: We also understand the importance of collaborative partnerships.  To realize the community benefits of autonomous driving, we need to do a better job engaging with our stakeholders and soliciting their feedback."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that Cruise published a blog post on November 8, 2023 titled "Important Updates from Cruise" and (ii) respectfully refer the Court to the November 8, 2023 blog post referenced in Paragraph 380 for a complete and accurate description of its contents.  Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity

212

of the allegations in Paragraph 380 and denies the allegations in Paragraph 380 on

that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 380.

381. Cruise's recall was widely covered by the media.  For example, *MT Newswires* described the recall in a mid-day November 8, 2023 article titled, "General Motors' Cruise Recalling 950 Driverless Cars After Pedestrian Collision in San Francisco," and noted that "[s]hares of GM fell 2.7% in recent Wednesday trading."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the

November 8, 2023 *MT Newswires* article referenced in Paragraph 381 for a complete

and accurate description of its contents.  The Cruise Defendants otherwise deny the

allegations in Paragraph 381.

382. On this news, GM's stock price fell $0.85 per share, or nearly 3%, to close at $27.56 per share on November 8, 2023.[9]

**ANSWER:** The Cruise Defendants (i) respectfully refer the Court to publicly

reported historical stock price data for information regarding GM's stock price; and

(ii) respond that Paragraph 382 and Footnote 9 in part state a legal conclusion to

which no response is required.  The Cruise Defendants otherwise deny the

allegations in Paragraph 382 and Footnote 9.

### C.    ADDITIONAL SCIENTER ALLEGATIONS

383. At all relevant times, Defendants acted with scienter.  Numerous facts support that Defendants had actual knowledge of the truth that they omitted to disclose, and which contradicted their false or misleading statements, and rendered their conduct deceptive. Additionally, numerous facts support that Defendants acted

[9] A complete understanding of the declines in GM's stock price that resulted from the three corrective disclosures described herein will require expert analysis following discovery, and Plaintiffs reserve all rights regarding their assessment of Class-wide damages.

with deliberate recklessness as to whether their statements, omissions, and conduct were false, misleading, and/or deceitful. GM and Cruise have the scienter of their management level employees.

**ANSWER:** The allegations in Paragraph 383 assert a legal conclusion to which no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 383.

384. **Cruise's AV Technology Was Core to and/or of Extreme Importance to Cruise's and GM's Business.** As detailed herein, Cruise and GM made many statements unambiguously touting the importance of Cruise's AV technology to Cruise's and GM's business.

**ANSWER:** The allegations in Paragraph 384 are too vague to be admitted or denied. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the unspecified statements referenced in Paragraph 384 for a complete and accurate description of their contents and otherwise deny the allegations in Paragraph 384.

385. It cannot be disputed that Cruise's AV technology is core to its business. For example, Defendant Vogt is quoted in *The Verge* as stating that in 2015 Cruise pivoted its business to focus on "fully driverless technology." GM has described Cruise in its filings as "responsible for the development and commercialization of [AV] technology." Vogt stated at the March 10, 2022 Morgan Stanley Technology Media & Telecom Conference that Cruise's AV technology paved "a pretty easy path" toward a "multi trillion-dollar TAM." After the truth about Cruise's AV technology was revealed to the market, it was reported on March 1, 2024 that Cruise's valuation had been cut by more than half. Cruise, in other words, rises or falls on the success or failure of its AV technology.

**ANSWER:** The allegations in Paragraph 385 are too vague to be admitted or denied. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the *The Verge* article, March 10, 2022 statement, and March 1, 2024

214

report referenced in Paragraph 385 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 385.

386. Additionally, given their high-ranking roles within Cruise, it is reasonable to conclude that Defendants Ammann, Vogt, and West were unaware of the design of Cruise's AV system. Thus, Defendants Ammann, Vogt, and West understood, *inter alia*, that Cruise's AVs were heavily reliant on human operators and were not actually "Level 4" or "fully driverless."

**ANSWER:** The Cruise Defendants deny the allegations in Paragraph 386.

387. Cruise's AV technology was also of extreme importance to GM's business. For example, Defendant Barra touted Cruise's $30 billion valuation on GM's February 10, 2021 earnings call, which is more than half of GM's approximate market capitalization throughout the Class Period of more than $50 billion. On GM's October 6, 2021 Investor Day, Defendant Jacobson projected that "[b]y the end of the decade, Cruise has the potential to deliver $50 billion in annualized revenues" and stated that "AVs are an integral piece of the future of mobility and Cruise is a key element of GM's growth strategy." Similarly, Barra stated that GM was pursuing an "all AV" future, and GM's filings described Cruise as GM's "global segment responsible for the development and commercialization of [AV] technology." Thus, GM relied on Cruise to develop the technology to enable this "all AV" future. Indeed, Barra cited, as early as February 24, 2021, that Cruise would unlock value for GM through "the opportunity for personal autonomous vehicles," which Vogt described later in the Class Period as opening up a "multi trillion-dollar TAM." Thus, it is unsurprising that an analyst at the February 24, 2021 conference hosted by Wolfe Research surmised that "if you're successful in developing Cruise, it's not unreasonable to see a business like that worth as much as GM is today."

**ANSWER:** The allegations in Paragraph 387 are not directed at the Cruise Defendants. Accordingly, no response is required. To the extent Paragraph 387 pertains to Dismissed Claims, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the February 10, 2021, October 6, 2021, and February 24, 2021 statements, unspecified statements,

215

and unspecified filings referenced in Paragraph 387 for a complete and accurate

description of their contents.  The Cruise Defendants otherwise deny the allegations

in Paragraph 387.

388. Given the importance of Cruise's AV technology and given the Individual Defendants' roles within GM and/or Cruise, and their constant public discussion of Cruise's AV technology, it is reasonable to conclude that the Individual Defendants had a thorough knowledge of Cruise's AV technology rendering their statements false.

**ANSWER:** The Cruise Defendants deny the allegations in Paragraph 388.

389. **Cruise's AV Technology Was Meticulously Tracked by Defendants**. Numerous CWs detailed how Cruise meticulously tracked and logged metrics detailing the safety and capabilities of Cruise's AV technology. CW-1 advised that safety tickets were entered into Siren, which was a system at Cruise for logging safety issues. CW-1 also advised that Cruise had a system called Slido, which he described as an internal question-and-answer platform. CW-2 explained that safety risk assessments were conducted to identify high levels of risks and many concerns and hazards were being identified as "high risk."  CW-2 explained that a list of Safety Risk Assessments ("SRA(s)") was maintained in an Excel spreadsheet and additional details were recorded in a running Word document. CW-4 recalled that when a takeover maneuver was conducted by a test driver in a Cruise vehicle that an application called "Note Logger" automatically recorded the time of the incident and then the human in the vehicle was responsible for providing feedback and detailing a timeline of the "malfunction."

**ANSWER:** The Cruise Defendants (i) admit that Siren was a system at Cruise

for logging safety-related reports during the purported Class Period; (ii) admit that

Slido is a question-and-answer platform that Cruise employees used during the

purported Class Period; (iii) admit that Cruise maintained a list of Safety Risk

Assessments during the purported Class Period; (iv) admit that Cruise used an

application called "Note Logger" during the purported Class Period; and (v) lack

sufficient knowledge or information to form a belief about whether purported CW-1, purported CW-2, and purported CW-4 made the statements attributed to them in Paragraph 389 and deny the remaining allegations in Paragraph 389 on that basis.

390. According to CW-7, once an AV ride ended, the AVTO reported what he experienced during the ride. CW-7 explained that during the first half of his tenure, the AVTO reported the details to CW-7 who would then report it in the intake form and then passed it on to "management." During the second half of his tenure, the AVTO filled out the forms themselves and it then went directly to "management." CW-7 advised that once the intake form went to management, neither he nor the AVTO saw the form again, but he recalled hearing numerous times throughout his tenure that others above him in the chain of command were debating the accuracy of what was recorded in the forms.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-7 made the statements attributed to him in Paragraph 390 and deny the allegations in Paragraph 390 on that basis.

391. GM also had meticulously tracked data on the safety and capabilities of Cruise's AV technology. When GM President, Mark Reuss, was asked in an August 29, 2022 *Wired* article about how to "create a positive safety culture at Cruise" after a crash involving a Cruise vehicle, Reuss stated that "[f]irst of all, everything's monitored. There are no big mysteries on what's happening there [*i.e.*, at Cruise]." Reuss continued, stating that "[w]e have a system in place that looks at data every day from our fleet; I don't care what kind of car it is. If we think this is something that could happen again, we'll do a very deep statistical analysis on what the problem is, the surroundings, the circumstances. There's a formal forum that happens every week, and we'll make the decisions."

**ANSWER:** The allegations in Paragraph 391 are not directed at the Cruise Defendants. Accordingly, no response is required. To the extent Paragraph 391 pertains to Dismissed Claims, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the August 29, 2022

217

*Wired* article and statements referenced in Paragraph 391 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 391.

392. **<u>High-Ranking Cruise and GM Executives, Including Individual Defendants, Had Access to and/or Were Presented with Reports, Data, and Information Detailing the State of Cruise's AV Technology</u>**. CW-1 recalled Vogt stating in many all-hands meetings that "he and the C-Suite" review many of the questions entered into Slido. CW-1 added that Vogt "assured" the attendees that the C-Suite made reviewing the questions in Slido a priority and that Vogt addressed some of the questions submitted to Slido in person at these all-hands meetings held weekly on Mondays at lunch.  CW-1 recalled that Vogt stated that Cruise employees should enter concerns into Slido and that he and the C-Suite would address them.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-1 made the statements attributed to him in Paragraph 392 and deny the allegations in Paragraph 392 on that basis.

393. According to CW-2, the Systems Engineering Group held quarterly All Hands Meetings that then became monthly following the accident in October 2023 where a pedestrian was dragged underneath a Cruise vehicle.  Leadership present at these meetings included current Vice President AV Performance and Validation Louise Zhang, who was the Vice President of Systems and Safety before temporarily being elevated to Interim Chief Safety Officer.  CW-2 recalled that Zhang reported to current President and CTO, then Executive Vice President, Mohamed (Mo) Elshenawy while serving as the Vice President of Systems and Safety and held weekly staff meetings with Elshenawy.  CW-2 explained that during this period Zhang maintained "a normal cadence" of communication with Vogt.

**ANSWER:** The Cruise Defendants (i) admit that Louise Zhang at times reported to then Executive Vice President Mohamed Elshenawy while serving as the Vice President of Systems and Safety during the purported Class Period; (ii) admit that Louise Zhang at times held regular meetings with Mohamed Elshenawy during

218

the purported Class Period; (iii) admit that Louise Zhang communicated with Mr. Vogt during the purported Class Period; and (iv) lack sufficient knowledge or information to form a belief about whether purported CW-2 made the statements attributed to him in Paragraph 393 and deny the remaining allegations in Paragraph 393 on that basis.

394. CW-2 explained that Vogt and West had access to the "Risk Register," which was a database that included every SRA company-wide. According to CW-2, risks deemed "extreme" went to Vogt, "high" to West, "medium" to a director, and "low" to a manager. According to CW-2 Vogt "owned" the extreme risks in the register, meaning if they were marked "extreme," Vogt had responsibility for them and there would be a meeting about the issue. CW-2 recalled that Vogt and West "always" had access to the Risk Register.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-2 made the statements attributed to him in Paragraph 394 and deny the allegations in Paragraph 394 on that basis.

395. According to CW-2, there was an Executive Leadership Board referred to as the Safety Review Board (SRB), that was "briefed" on all high and extreme risk SRAs. CW-2 explained that Vogt, West, and former Co-Founder & Chief Product Officer Daniel Kan were on the Safety Review Board.

**ANSWER:** The Cruise Defendants (i) admit that Cruise had executive level meetings during the purported Class Period that reviewed certain Safety Risk Assessments and certain other safety-related issues; (ii) admit that Mr. Vogt, Mr. West, and Daniel Kan attended certain of these meetings; and (iii) lack sufficient knowledge or information to form a belief about whether purported CW-2 made the

219

statements attributed to him in Paragraph 395 and deny the remaining allegations in

Paragraph 395 on that basis.

396. CW-2 recalled that West was provided with a monthly MPR report with Operations statistics, including details about the Remote Assistance Operators, including how often they intervened. CW-2 continued to say that Vogt received a similar report from Systems Engineering. According to CW-2, Vogt was also apprised of when Fleet Service Representatives needed to retrieve and drive malfunctioning vehicles. CW-2 explained that in addition to this summary received by Vogt, he received a phone call from the Incident Commander about every accident. For example, CW-2 recalled Vogt receiving a call when Cruise vehicles were hitting downed powerlines in San Francisco following a storm.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information

to form a belief about whether purported CW-2 made the statements attributed to

him in Paragraph 396 and deny the allegations in Paragraph 396 on that basis.

397. CW-3 recalled another issue where Cruise AVs drove "off map" and Cruise was unaware of where the vehicles were. CW-3 explained that this occurred "at least" two or three times. According to CW-3, the Operations Coordinator working at the time would have escalated the issue and he was "sure" that Senior Management would have known about the incidents.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information

to form a belief about whether purported CW-3 made the statements attributed to

him in Paragraph 397 and deny the allegations in Paragraph 397 on that basis.

398. CW-7 recalled Cruise CEO Kyle Vogt "on stage" at a meeting for Team Leaders and above sometime in 2022 dismissively addressing internal concerns about the safety of the AV technology. According to CW-6, leadership, including Vogt, looked at 1,000 problems as individual issues rather than addressing broader concerns.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information

to form a belief about whether purported CW-6 and purported CW-7 made the

220

statements attributed to them in Paragraph 398 and deny the allegations in Paragraph

398 on that basis.

399. CW-8 advised that five of the six or so members of the Cruise Board were GM executives or GM Board Members, including GM CEO Mary Barra. CW-8 recalled that the Cruise Board was given reports quarterly providing insights and updates that were used by Cruise to make multi-year projections.

**ANSWER:** The Cruise Defendants (i) admit that Cruise's Board of Directors

held approximately quarterly meetings during the purported Class Period; (ii)

respond that the allegations in Paragraph 399 in part form the basis for Dismissed

Claims; and (iii) lack sufficient knowledge or information to form a belief about

whether purported CW-8 made the statements attributed to him in Paragraph 399

and deny the remaining allegations in Paragraph 399 on that basis.  To the extent

Paragraph 399 pertains to Dismissed Claims, no response is required.

400. CW-8 recalled that multi-year projections were also provided to the Cruise Board in connection with Cruise's annual Board meeting. CW-8 stated that GM CEO Mary Barra, Cruise CEO Kyle Vogt, and Cruise COO Gil West attended Cruise's annual meeting in 2022, and that Cruise CEO Kyle Vogt and Cruise COO Gil West also attended GM Board Meetings (from time to time).

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that Mr. Vogt and Mr.

West attended Cruise Board meetings in 2022; (ii) admit that Mr. Vogt and Mr. West

have attended certain GM Board meetings; and (iii) lack sufficient knowledge or

information to form a belief about whether purported CW-8 made the statements

attributed to him in Paragraph 400 and deny the remaining allegations in Paragraph

400 on that basis.  Mr. Ammann lacks sufficient knowledge or information to form

a belief as to the truth or falsity of the allegations in Paragraph 400 and denies the allegations in Paragraph 400 on that basis.

401. CW-8 explained that during Cruise's annual Board meeting, presentations were made by Cruise employees concerning its financial projections, which included assessments of Cruise's AV capabilities and how those capabilities were expected to develop over time as relevant to Cruise's financial projections. These presentations included updates on the Cruise AV's ability to navigate specific situations as well as more general assessments of how the technology was functioning. Presentations prepared for the Cruise Board to review during its quarterly meeting included details and progress updates on safety, technology, and commercial plans concerning Cruise's AV vehicles, and was filled with caveats that the technology was still new and with many unknowns that could not be made until testing progressed.

**ANSWER:** The Cruise Defendants (i) respectfully refer the Court to the Board materials referenced in Paragraph 401 for a complete and accurate description of their contents; and (ii) lack sufficient knowledge or information to form a belief about whether purported CW-8 made the statements attributed to him in Paragraph 401 and deny the remaining allegations in Paragraph 401 on that basis.

402. According to CW-2, interactions with GM included GM employees occupying Board seats at Cruise and a Cruise's Functional Safety (FUSA) Team having weekly interfaces with GM. According to CW-2, these weekly interfaces occurred throughout his tenure.

**ANSWER:** The allegations in Paragraph 402 form the basis for Dismissed Claims. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-2 made the statements attributed to him in Paragraph 402 and deny the allegations in Paragraph 402 on that basis.

403. **<u>Knowledge of the Deficiencies in Cruise's AV Technology Was Widespread.</u>**  The reports provided by the DMV to Counsel for Plaintiffs show that knowledge of Cruise's AV deficiencies was widespread. For example, the September 29, 2020 complaint detailed how the complainant had received training from "Cruise GM" as a "test operator" and "[t]hey know the cars regularly malfunction, but continue to let them drive on public roads, which makes me very concerned about public safety.  The trainer told me they have "a lot of crashes."  The May 9, 2022 complaint notes that the complainant has encountered multiple dangerous near-misses involving Cruise AVs and has reported them to Cruise.

**ANSWER:** The Cruise Defendants respectfully refer the Court to the reports referenced in Paragraph 403 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 403.

404. CW allegations also show that knowledge of Cruise's AV deficiencies was widespread.  At Cruise, CW-1 witnessed a culture of downplaying internal concerns by many employees regarding safety and compliance issues with Cruise AVs in order to push production along.  CW-1 described that there were "many employees" that felt that Cruise's AV technology was "unsafe and rushed," and they felt pressure from "Cruise leadership" to downplay those concerns.  According to CW-1, the subject of a ticket he entered into Siren was that fleets of Cruise AVs were being grounded with a high frequency, and that this high volume of AV groundings was a safety concern.  On February 28, 2022, CW-1 discussed procedural and/or safety concerns with his manager, who forwarded the emails to others.  In CW-1's email to the CPUC, CW-1 states that "Currently (as of May 2022) with regularity there are incidents where our San Francisco fleet of vehicles individually or in clusters enter a 'VRE' or Vehicle Retrieval Event."

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-1 made the statements attributed to him in Paragraph 404 and deny the allegations in Paragraph 404 on that basis.

405. CW-2 stated that Fleet Service Representatives needed to retrieve and drive malfunctioning vehicles "almost every night."  CW-2 recalled that Systems Engineering Group All Hands Meetings often involved shouting and engineers voicing concerns that Cruise was scaling too fast and that they were not being

provided enough time to minimize safety concerns.  CW-2 recalled that the Systems Engineering Team "always expressed grief" with regards to the company "scaling recklessly," but that former Executive Vice President and now current President and CTO Mohamed (Mo) Elshenawy only wanted to fix small issues and was not interested in addressing systemic issues, that would have prevented the company from scaling or delay their timeline to scale.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-2 made the statements attributed to him in Paragraph 405 and deny the allegations in Paragraph 405 on that basis.

406. CW-3 explained that Cruise AVs "were not ready for primetime" and that this was apparent when he initially joined Cruise in October 2021 and throughout his tenure.  According to CW-3, it was "not hard to see" that the Cruise AVs were not ready, and he was surprised by the push to launch more cars.  CW-3 recalled that the cars failed "quite frequently" when facing congestion, which is very common in San Francisco, and also when there were road obstructions, such as a police action.  According to CW-3, another issue involved a Cruise vehicle that "banged" into a municipal vehicle and just stopped CW-3 explained that functionality and safety issues like this were a "daily occurrence."  CW-3 explained that there were several instances of similar events that eventually led the San Francisco Fire Department to complain about Cruise vehicles.  According to CW-3, "not a day" went by without functionality and safety issues arising.  According to CW-3, the Cruise AVs struggled with "simple things" such as a "big splash" of water hitting the car and the car thinking that it was in an accident.  CW-3 continued to say that this happened "all the time," even when the car was sitting in a parking lot.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-3 made the statements attributed to him in Paragraph 406 and deny the allegations in Paragraph 406 on that basis.

407. CW-4 recalled two specific issues the Cruise vehicles routinely encountered, the biggest being issues taking "unprotected" left turns and the other involved "random" hard braking or "jolting."  CW-4 explained that there were "so

many" entries into Note Logger that there was no way that every one could be reviewed.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-4 made the statements attributed to him in Paragraph 407 and deny the allegations in Paragraph 407 on that basis.

408. CW-5 explained that there was an issue in approximately April or early Spring 2023, where Cruise wanted to add functionality to be able to recover vehicles that were failing frequently on the side of the road.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-5 made the statements attributed to him in Paragraph 408 and deny the allegations in Paragraph 408 on that basis.

409. According to CW-5, he heard of additional issues on public roads "through the grapevine" from ATOs, who did test driving for Cruise. CW-5 explained that they had a Slack channel with those working in San Francisco that they discussed issues on.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-5 made the statements attributed to him in Paragraph 409 and deny the allegations in Paragraph 409 on that basis.

410. CW-6 explained that what occurred during the accident in October 2023 was "not a one-time thing" and that problems had been demonstrated over several years. CW-6 recalled issues with human injuries that required emergency room visits and a "long track record" of "really bad accidents" that ultimately involved intervention from the San Francisco Police Department, the San Francisco Fire Department, and other emergency services.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-6 made the statements attributed to him in Paragraph 410 and deny the allegations in Paragraph 410 on that basis.

411. CW-7 recalled AVTOs regularly coming back from their AV rides stating that the cars made them extremely nervous and describing their rides as "dangerous," reporting to him on near misses with pedestrians, hitting curbs, and almost hitting other objects when the vehicles should have slowed down and stopped sooner. CW-7 also recalled AVTOs often returning from a ride and telling him that it was the most dangerous ride they had ever experienced.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-7 made the statements attributed to him in Paragraph 411 and deny the allegations in Paragraph 411 on that basis.

412. According to CW-9, while some contractors were hesitant to speak up about the speed of deployment, he did ask his superiors to consider longer test periods before increasing the number of cars deployed. This request was met with the response: "let's just test it out [*i.e.*, the current approach to scaling] and see."

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-9 made the statements attributed to him in Paragraph 412 and deny the allegations in Paragraph 412 on that basis.

413. CW-6 recalled there being "lots and lots of problems." CW-6 explained that part of the reason why he departed Cruise was that he believed that people were going to get hurt and die as a result of the vehicles. CW-6 recalled a number of incidents in 2022 that Cruise did not respond to appropriately and noted that the autonomous vehicles did not respond correctly in novel situations.

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-6 made the statements attributed to him in Paragraph 413 and deny the allegations in Paragraph 413 on that basis.

226

414. **Defendants' Pattern of Deception and Recklessness Leads to An Inference of Scienter.**  As described in Section IV(C), after the October 2 Crash, Defendants engaged in a campaign of deceit to cover up the truth of what happened. Cruise and its executives, including Defendant Vogt, purposely issued a misleading video and misleading talking points to media outlets.  Similarly, Cruise misled regulators by not showing the full video of the October 2 Crash and/or not affirmatively explaining the October 2 Crash, and multiple of Cruise's regulators have accused them of misleading them.  Defendants' conduct evidences consciousness of guilt and supports an inference of scienter.  It is no surprise, then, that on January 25, 2024, Cruise announced that the DOJ and the SEC had both opened investigations or inquiries in connection with the October 2 Crash.

**ANSWER:** The allegations in Paragraph 414 assert a legal conclusion to which no response is required.  To the extent a response is required, the Cruise Defendants (i) respectfully refer the Court to the unspecified January 25, 2024 announcement referenced in Paragraph 414 for a complete and accurate description of its contents.  Cruise also (ii) respectfully refers the Court to the "Statement of Facts" in the DPA for a description of the Accident and incident response.  The allegations in Paragraph 414 form the basis for Dismissed Claims against Mr. Ammann.  Accordingly, no response is required from Mr. Ammann.  To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 414 and denies the allegations in Paragraph 414 on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 414.

415. But Cruise's pattern of deception long predated October 2, 2023, as numerous CWs attest.  For example, CW-2 recalled that there was a public inquiry from regulators following a storm in San Francisco where Cruise vehicles ran into downed powerlines.  CW-2 explained that the Cruise was hesitant to share risk

227

assessments with the National Highway Traffic Safety Administration (NHTSA), California Department of Motor Vehicles (DMV), and the California Public Utilities Commission (CPUC). CW-2 described the Legal Department as taking advantage of "loopholes" to provide as little information as possible. CW-2 also recalled that after the accident in October 2023, Legal and Safety leadership did not want an in-depth root cause analysis conducted as a part of the investigation.

**ANSWER:** The Cruise Defendants (i) admit there was public reporting regarding regulator contact with Cruise following a storm in San Francisco in March 2023; and (ii) lack sufficient knowledge or information to form a belief about whether purported CW-2 made the statements attributed to him in Paragraph 415 and deny the remaining allegations in Paragraph 415 on that basis.

416. CW-7 described Cruise as an "aggressive company" in seemingly rushing forward with its AV technology, in spite of feedback from the company's AVTOs that the cars were extremely dangerous. CW-7 described Cruise as directing AVTOs to intentionally downplay the seriousness of their experiences when reporting any concerns or issues that they encountered. CW-7 explained that AVTOs are employees who ride in an AV and take notes on the performance of the car while automated driving is engaged and are supposed to take direct control of the vehicle if they feel the need to. According to CW-7, AVTOs were "coached" to not take direct control of the AV even when they felt they should, and even when AVTOs felt the AV was driving into a dangerous situation. CW-7 recalled that AVTOs were directed not to take direct control because of the need to record that the AV was driving on its own accord for longer and longer mileage. Another example was that AVTOs were instructed to not push the "Notable" button on their tablets and to instead only push the "For Review" button. According to CW-7, AVTO's had a tablet while driving that had a "Notable" button and a "For Review" button. He explained that the "For Review" button was to be pushed for incidents that were considered by Cruise as not too serious such as the AV speeding up when a pedestrian entered the street but stopping well before an accident occurred. The "Notable" button was to be pushed for more serious incidents when the operator had to take direct control such as the AV coming too close to hitting a pedestrian. According to CW-7, the reason the AVTOs were directed not to push the "Notable" button was because the report would go "straight to the DMV" (the Department of Motor Vehicles).

228

**ANSWER:** The Cruise Defendants lack sufficient knowledge or information to form a belief about whether purported CW-7 made the statements attributed to him in Paragraph 416 and deny the allegations in Paragraph 416 on that basis.

417. These allegations are corroborated by allegations contained in the November 19, 2020 email to the DMV obtained by Counsel for Plaintiffs stating that "Management pressures AVTOs to only use Notable TKOS in rare cases, but instead told us to use For Review for serious TKO incidents. . . . But, in fact, nearly all TKOS represent a dangerous situation that requires immediate TKO and manual driving to prevent an accident or regain control of the AV. The TKO Statistics that Cruise reports to the DMV is underrepresented and in fact withheld."

**ANSWER:** The Cruise Defendants respectfully refer the Court to the DMV email referenced in Paragraph 417 for a complete and accurate description of its contents. The Cruise Defendants otherwise deny the allegations in Paragraph 417.

418. CW-1's email to the DMV states that "A couple other things worth mentioning are that documentation of core system functionality is routinely non-existent and doesn't appear to be a priority, and that it appears that the results of investigations performed into collisions involving Cruise vehicles and other sensitive potentially damaging matters are intentionally being hidden from the majority of employees. As an employee working on safety critical systems, the only reason I can think of for this type of information to be hidden from employees like me is for the purpose of optics and damage control, and I do not believe is consistent with a safety-first culture." In early July 2022, reports of CW-1's email to the CPUC appeared in some publications including the *Wall Street Journal* and *Wired*. After the articles appeared, there was internal questioning at Cruise as to who sent the email to the CPUC, and CW-1 was then terminated in July 2022. CW-1 believes that Cruise retaliated against him for his email to the CPUC and/or because of the safety issues he had raised, including the tickets he had submitted into Siren.

**ANSWER:** The Cruise Defendants (i) respectfully refer the Court to the July 2022 *Wall Street Journal* and *Wired* articles referenced in Paragraph 418 for a complete and accurate description of their contents; and (ii) lack sufficient

229

knowledge or information to form a belief about whether purported CW-1 made the statements attributed to him in Paragraph 418 and deny the allegations in Paragraph 418 on that basis.

419. **The Individual Defendants Touted Their Deep Involvement and Intimate Knowledge of Cruise's AV Technology.** On GM's August 4, 2021 earnings call, Defendant Barra stated "I would say I am having conversations with Dan [Ammann] on a weekly basis. And we continue to see very strong progress in the technology that they're doing and also readying the company from a commercialization perspective. And so again, I'll say no more than I reiterate, this is quarters away, not years away. And the technology is really progressing well." Similarly, Barra stated at a February 23, 2022 conference hosted by Wolfe Research that "I don't think this is [merely] a minimum viable product    [T]he technolog[y] is really quite sophisticated," and at GM's June 13, 2022 Annual General Meeting that "Cruise's technology is improving exponentially." Barra even touted Cruise's AV technology on GM's February 1, 2022 earnings call by citing her professional credentials as an engineer, stating that riding in a "driverless" Cruise AV "was the highlight of my career as an engineer and as the leader of General Motors." Barra also spoke during the February 16, 2023 Wolfe Global Auto, Auto Tech, and Auto Consumer Conference of the informational exchange between her team at GM and Defendant Vogt's team at Cruise, stating on that "[e]ven though Kyle runs Cruise and we have a separate team, they collaborate a lot and share best practices and lessons learned."

**ANSWER:** The allegations in Paragraph 419 are not directed at the Cruise Defendants. Accordingly, no response is required. To the extent Paragraph 419 pertains to Dismissed Claims, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the August 4, 2021, February 23, 2022, June 13, 2022, February 1, 2022, and February 16, 2023 statements referenced in Paragraph 419 for a complete and accurate description of

230

their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 419.

420. Defendant Vogt repeatedly touted his knowledge of Cruise's AV technology.  For example, at a March 10, 2022 conference hosted by Morgan Stanley, Vogt stated that he "ha[s] . . . intimate knowledge of the technology and the business," while assuring investors that "[t]his technology has reached a certain level of maturity."  Similarly, in a February 1, 2022 blog post, Vogt stated: "I work on these cars every day, and I've seen every inch of progress."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) admit that Mr. Vogt issued a blog post on February 1, 2022 titled "Welcome, Riders"; (ii) respectfully refer the Court to the February 1, 2022 blog post referenced in Paragraph 420 for a complete and accurate description of its contents; and (iii) respectfully refer the Court to the March 10, 2022 statement for a complete and accurate description of its contents. Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 420 and denies those allegations on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 420.

421. Defendant Ammann's intimate knowledge of Cruise's AV technology is evidenced by his statements on October 6, 2021 during GM's Investor Day. Ammann detailed the three "phases" of Cruise's development and described the "R&D phase," during which Cruise has been "building up the core technology and trying to solve that engineering challenge of a generation of building a self-driving system that can drive with a human or better level of performance." Ammann then described various approaches to achieving "fully autonomous" driving, and juxtaposed the approach of Cruise's competitors—which began "with a really low cost system like an L2 system and try to work your way up from a performance point of view"—with the approach taken by Cruise—which began with "try[ing] [to] solve the performance piece first, we're going to try and get the human out of the loop first and then once we've solve that we can start to optimize on some of the other parameter."

231

**ANSWER:** To the extent that the allegations in Paragraph 421 form the basis for Dismissed Claims, no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the October 6, 2021 statements referenced in Paragraph 421 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 421.

422. Defendant Jacobson stated at the April 12, 2022 BofA Automotive Summit that "the technology is really strong and it's continuing to improve as we know with a lot of AI platforms, right?  the more you use it, the better it gets," and at a conference hosted by Deutsche Bank on June 15, 2022 that "we're all focused on the technology of Cruise, which is great, right.  It's revolutionary and the team's done a phenomenal job."  The next year, at another conference hosted by Deutsche Bank on June 15, 2023, Jacobson stated that "nobody has a cost-effective Level 4 solution that's out there for customers.  But we've got the Level 4 technology."

**ANSWER:** The allegations in Paragraph 422 are not directed at the Cruise Defendants.  Accordingly, no response is required.  To the extent Paragraph 422 pertains to Dismissed Claims, no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to the April 12, 2022, June 15, 2022, and June 15, 2023 statements referenced in Paragraph 422 for a complete and accurate description of their contents.  The Cruise Defendants otherwise deny the allegations in Paragraph 422.

423. Defendant Jacobson also touted Defendant West's intimate involvement, stating on August 9, 2023 that West was "a bit underrated in the tech space as to what his value is to Cruise because when you think about going to different cities, you need a very strong operationally minded individual to focus on reliability, to focus on optimizing resources."

232

**ANSWER:** The allegations in Paragraph 423 are not directed at the Cruise Defendants. Accordingly, no response is required. To the extent Paragraph 423 pertains to Dismissed Claims, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the August 9, 2023 statements referenced in Paragraph 423 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 423.

424. Defendant Parks stated at a conference hosted by Deutsche Bank on December 9, 2021 that the "terrific technology" of Cruise is "moving very, very fast."

**ANSWER:** The allegations in Paragraph 424 are not directed at the Cruise Defendants. Accordingly, no response is required. To the extent Paragraph 424 pertains to Dismissed Claims, no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to the December 9, 2021 statements referenced in Paragraph 424 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 424.

425. **Defendants' Misstatements Support Scienter.** Throughout the Class Period, Defendants spoke repeatedly and in detail to investors about Cruise's AV technology. As detailed in Sections IV(A)(2) and V(A)(1), these misstatements homed in on the specifics of the capabilities and safety of Cruise's AV technology. For example, Defendants touted the "fully driverless" and "Level 4" capability of Cruise's AV technology, which Defendants have defined to mean that the technology has "got to be able to do everything" rather than just 98% of what you see" and that it is an "essential expectation that "*[t]he AV must be capable of driving*

*fully autonomously 100% of the time*" (emphasis in original).  Defendants also repeatedly claimed that Cruise's AV technology had taken humans "out of the loop," that the technology was "safer" and "better" than human drivers and touted that Cruise had exited the "R&D phase" by solving the self-driving puzzle.

**ANSWER:** The allegations in Paragraph 425 assert a legal conclusion to which no response is required.  To the extent Paragraph 425 pertains to Dismissed Claims, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 425.

426. Defendants' repeated assurances to investors that Cruise's AV technology had reached this level of autonomy—when they already knew of or recklessly disregarded that Cruise's AV technology fell far short—demonstrate that they either knew that their statements were false and misleading or were reckless in not knowing so.  In either scenario, there is a strong inference that Defendants made these statements with scienter.

**ANSWER:** The allegations in Paragraph 426 relate in part to Dismissed Claims and assert a legal conclusion to which no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 426.

427. **The Suspicious Departures of Vogt, West, and Parks Support Scienter.**  On November 19, 2023—less than two weeks after the final corrective disclosure—Defendant Vogt announced his resignation as CEO of Cruise.  Cruise did not name a replacement CEO.  As of the filing of this amended complaint, Cruise still has not appointed Defendant Vogt's successor as CEO.

**ANSWER:** The Cruise Defendants (i) admit that Mr. Vogt departed as CEO of Cruise on November 19, 2023; and (ii) admit that Mr. Vogt's successor as CEO, Marc Whitten, was announced on June 25, 2024.  The Cruise Defendants otherwise deny the allegations in Paragraph 427.

234

428. Less than one month later, on December 13, 2023, the media reported that Defendant West, among others, were leaving Cruise. Cruise confirmed the departures stating that its decision came "following an initial analysis of the October 2 incident and Cruise's response to it." On the exact same day, December 13, 2023, GM also announced the resignation of Defendant Parks, who had been with GM for nearly 40 years.

**ANSWER:** To the extent Paragraph 428 pertains to Dismissed Claims, no response is required. To the extent the allegations in Paragraph 428 are not directed at the Cruise Defendants, they do not require a response. To the extent a response is required, the Cruise Defendants (i) admit that the departure of Mr. West and other Cruise personnel was publicly reported on December 13, 2023; and (ii) respectfully refer the Court to the unspecified December 13, 2023 media reports and public statements referenced in Paragraph 428 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 428.

429. **Post-Class Period Admissions Support Scienter.** In response to the *New York Times'* article disclosing that AVs initiate a remote assistance "session" every 2.5 to 5 miles, Defendant Vogt responded by disclosing "that Cruise AVs are being remotely assisted (RA) 2-4% of the time on average" and claimed that "there isn't a huge cost benefit to optimizing much further." Vogt's claim that the "2-4%" rate of remote assistance was properly optimized indicates that Vogt had been aware of this statistic throughout the Class Period. Approximately two weeks later, on November 18, 2023, it was reported that Vogt emailed Cruise staff acknowledging his responsibility for Cruise's problems, stating "I am sorry we have veered off course under my leadership" and "[a]s CEO, I take responsibility for the situation Cruise is in today." The next day, on November 19. 2023, Vogt abruptly departed.

**ANSWER:** The allegations in Paragraph 429 assert a legal conclusion, to which no response is required. To the extent a response is required, the Cruise

Defendants (i) admit that Mr. Vogt posted on *Hacker News* on November 5, 2023;

(ii) respectfully refer the Court to the November 5, 2023 *Hacker News* post and

unspecified report referenced in Paragraph 429 for a complete and accurate

description of their contents and (iii) admit that Mr. Vogt departed Cruise on

November 19, 2023.   The Cruise Defendants otherwise deny the allegations in

Paragraph 429.

430. At least two additional post-Class Period admissions support an
inference of scienter.  In a December 1, 2023, email to employees, Cruise's newly
appointed President and CTO, Mo Elshenawy, acknowledged the flaws in Cruise's
prior approach to AV technology, recognizing that safety "needs to encompass the
entire experience and not only aggregate safety performance."  On April 9, 2024,
Cruise wrote on its blog that Cruise had suspended driverless operations in
October 2023 because, *inter alia*, Cruise needed to "redesign our approach to
safety."

**ANSWER:** The allegations in Paragraph 430 assert a legal conclusion, to

which no response is required.  To the extent a response is required, Cruise (i) admits

that Cruise published a blog post on April 9, 2024 titled "Cruise resumes manual

driving as next step in return to driverless mission"; (ii) admits that then-Cruise

President and CTO Mo Elshenawy emailed Cruise employees on December 1, 2023;

and (iii) respectfully refers the Court to the April 9, 2024 blog post and the December

1, 2023 email referenced in Paragraph 430 for a complete and accurate description

of their contents.  Mr. Ammann, Mr. West and Mr. Vogt lack sufficient knowledge

or information to form a belief as to the truth or falsity of the allegations in Paragraph

430 that Cruise issued the April 9, 2024 blog post or that Mo Elshenawy sent the

236

December 1, 2023 email referenced in Paragraph 430 and deny those allegations on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 430.

431. **<u>There Is No Dispute as to the Scienter of Defendants Cruise, Vogt, and West Regarding Their Misstatements and Conduct About the October 2 Crash.</u>**  Cruise has "accepted" the conclusions of the Quinn Report, which details many facts that establish scienter as to Defendants Cruise, Vogt, and West on and after October 3, 2023.

**ANSWER:** The allegations in Paragraph 431 assert a legal conclusion, to which no response is required.  To the extent a response is required, Cruise (i) admits that Cruise published a blog post on January 25, 2024 titled "Cruise Releases Third-Party Findings Regarding October 2"; and (ii) respectfully refers the Court to the January 25, 2024 blog post and Quinn Report referenced in Paragraph 431 for a complete and accurate description of their contents.  Mr. West and Mr. Vogt lack sufficient knowledge or information to form a belief as to the truth or falsity of those allegations in Paragraph 431 and deny the allegations in Paragraph 431 on that basis.  The allegations in Paragraph 431 form the basis for Dismissed Claims against Mr. Ammann.  Accordingly, no response is required from Mr. Ammann.  To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 431 and denies the allegations in Paragraph 431 on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 431.

432. After the October 2 Crash, Cruise set up a "War Room," the focus of which, according to the Quinn Report, "centered almost exclusively on correcting

237

a false media narrative that the Cruise AV had caused the [a]ccident" rather than disclosing all material information to the public.  The Quinn Report also details that in the early morning hours of October 3, Defendant Vogt attended a meeting where he decided what portion of the AV's recording would be shown to the media, and even selected specific camera angles to be included.  Vogt "expressed to Cruise meeting attendees that he personally wanted to see and authorize the final cut of any video or media statement and that 'nothing would be shared or done' . . . without his sign off."

**ANSWER:** Cruise, Mr. West, and Mr. Vogt (i) respectfully refer the Court to the Quinn Report referenced in Paragraph 432 for a complete and accurate description of its contents.  Cruise (ii) respectfully refers the Court to the "Statement of Facts" in the DPA for a description of the Accident and incident response.  The allegations in Paragraph 432 form the basis for Dismissed Claims against Mr. Ammann.  Accordingly, no response is required from Mr. Ammann.  To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 432 and denies the allegations in Paragraph 432 on that basis.  The Cruise Defendants otherwise deny the allegations in Paragraph 432.

433. As detailed in the Quinn Report, at 6:00 AM PT, Cruise held a virtual Crisis Management Team meeting, attended by more than 100 people, including Defendant West, where the pedestrian dragging was discussed.  Afterward, the 45-second video is posted on the War Room Slack channel.  According to the Quinn Report, "the AV's 'pulling' of the pedestrian for one to two car lengths was discussed" at this meeting, and West notified Defendant Vogt and others via direct message that the AV had continued to travel after initial impact.

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to the Quinn Report referenced in Paragraph 433 for a complete and accurate

238

description of its contents.  The allegations in Paragraph 433 form the basis for

Dismissed Claims against Mr. Ammann.  Accordingly, no response is required from

Mr. Ammann.  To the extent a response is required, Mr. Ammann lacks sufficient

knowledge or information to form a belief as to the truth or falsity of the allegations

in Paragraph 433 and denies the allegations in Paragraph 433 on that basis.  The

Cruise Defendants otherwise deny the allegations in Paragraph 433.

434. At 6:45 AM PT, Cruise held a virtual Senior Leadership Team ("SLT") meeting, attended by Defendant Vogt and others. Per the Quinn Report, "[d]ocumentary evidence and accounts from meeting participants confirm that Cruise senior leadership discussed the pedestrian dragging. One interviewee who attended the SLT meeting recalled discussing that the AV had dragged the pedestrian, saying the 'SLT was aware.' Another interviewee reported that 'there was a whole discussion about the facts. We knew the vehicle came to a stop, then accelerated again.'"

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to

the Quinn Report referenced in Paragraph 434 for a complete and accurate

description of its contents.  The allegations in Paragraph 434 form the basis for

Dismissed Claims against Mr. Ammann.  Accordingly, no response is required from

Mr. Ammann.  To the extent a response is required, Mr. Ammann lacks sufficient

knowledge or information to form a belief as to the truth or falsity of the allegations

in Paragraph 434 and denies the allegations in Paragraph 434 on that basis.  The

Cruise Defendants otherwise deny the allegations in Paragraph 434.

435. According to the Quinn Report, Cruise senior executives, including Defendant Vogt, discussed whether to correct Cruise's prior statement omitting

reference to the pullover maneuver and pedestrian dragging, and they concluded that Cruise should stick to its story omitting the pullover maneuver.

**ANSWER:** Cruise, Mr. West, and Mr. Vogt respectfully refer the Court to the Quinn Report referenced in Paragraph 435 for a complete and accurate description of its contents. The allegations in Paragraph 435 form the basis for Dismissed Claims against Mr. Ammann. Accordingly, no response is required from Mr. Ammann. To the extent a response is required, Mr. Ammann lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 435 and denies the allegations in Paragraph 435 on that basis. The Cruise Defendants otherwise deny the allegations in Paragraph 435.

### D. LOSS CAUSATION

436. Throughout the Class Period, as detailed herein, Defendants made false and misleading statements and omissions and engaged in deceitful conduct, which misrepresented the capabilities and safety of Cruise's AV technology and the circumstances of the October 2 Crash. These misleading statements, omissions, and deceitful conduct caused GM Securities to trade at artificially inflated and artificially maintained levels, because they created and/or maintained an incorrect impression concerning Cruise's technology, future, and risks, which was important to investors' assessments of the investment value of GM Securities.

**ANSWER:** The allegations in Paragraph 436 assert a legal conclusion, to which no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 436.

437. Due to Defendants' misrepresentations and omissions, GM Stock reached a Class Period high closing price of $64.55 and throughout the Class Period. GM Stock traded at artificially inflated levels due to Defendants' misrepresentations and omissions.

240

**ANSWER:** The allegations in Paragraph 437 assert a legal conclusion, to which no response is required.  To the extent a response is required, the Cruise Defendants respectfully refer the Court to publicly reported stock price information for complete and accurate information regarding GM's stock price.  The Cruise Defendants otherwise deny the allegations in Paragraph 437.

438. As truthful information was revealed to the market and/or as the previously undisclosed, understated, or misrepresented risks materialized, GM's stock price declined as the artificial inflation was removed from its share price. Specifically, truthful information that removed artificial inflation from GM's stock price was revealed on October 24, 2023, October 27, 2023, and November 8, 2023, which respectively corresponded to stock price declines of at least $0.66 per share (almost 2.3%), $1.33 per share (almost 4.7%), and $0.85 per share (almost 3%). Each of these stock price declines are statistically significant at a 90% confidence level. The timing and magnitude of each of these price declines and analyst/media reactions to the news, individually and collectively, negate any alternative inference that the losses suffered by Plaintiffs and Class members were caused by changed market conditions, macroeconomic or industry factors, or GM-specific facts unrelated to Defendants' fraudulent conduct.

**ANSWER:** The Cruise Defendants respectfully refer the Court to publicly reported historical stock price data for information regarding GM's stock price and respond that Paragraph 438 in part states a legal conclusion, to which no response is required.  The Cruise Defendants otherwise deny the allegations in Paragraph 438.

439. As a result of their purchases of GM Securities at artificially inflated levels during the Class Period, Plaintiffs and Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

241

**ANSWER:** The allegations in Paragraph 439 assert a legal conclusion, to which no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 439.

### E.   PRESUMPTION OF RELIANCE

440. Plaintiffs allege omissions insofar as Defendants' failure to disclose information necessary to make Defendants' statements not misleading. Where claims, like these, involve primarily failures to disclose, the requirement of proving reliance is relieved, pursuant to the Supreme Court's decision in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972) ("*Affiliated Ute*").

**ANSWER:** The allegations in Paragraph 440 assert a legal conclusion, to which no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 440.

441. Plaintiffs and Class members are entitled to a presumption of reliance on the material misrepresentations, omissions, and deceitful conduct alleged herein pursuant to the fraud on the market theory adopted by the Supreme Court in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*," the "*Basic presumption*," or the "fraud on the market" presumption). Throughout the Class Period, GM Stock traded in an efficient market and under *Basic*, Plaintiffs are entitled to a presumption that: (a) the misrepresentations, omissions, and deceitful conduct alleged herein affected the market price for GM Stock; and (b) reasonable investors, including Plaintiffs and members of the Class, relied on such misrepresentations, omissions and deceitful conduct when trading GM Stock at the market price or at prices informed thereby. The following allegations show that GM Stock traded in an efficient market throughout the Class Period:

     a.     GM Stock was actively traded on the NYSE;

     b.     GM Stock traded at high volumes, with an average daily trading volume during the Class Period of over 15 million shares;

     c.     GM Stock traded with a narrow bid-ask spread, with an average daily bid-ask spread of well under 1% of GM's trading price;

d.   GM maintained a large market capitalization and GM's average market capitalization was well over $50 billion;

e.   GM Stock was registered with the SEC, and GM filed periodic reports with the SEC;

f.   GM communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

g.   the market reacted promptly to public information disseminated by and about GM; and

h.   GM was covered by numerous securities analysts employed by major brokerage firms. GM reported over two dozen securities analysts covering the GM during the Class Period. GM was also extensively covered by news media and investor publications.

**ANSWER:** The allegations in Paragraph 441 assert a legal conclusion, to which no response is required. To the extent a response is required, the Cruise Defendants (i) respectfully refer the Court to publicly reported stock price information for information regarding GM's stock price; (ii) admit that GM's stock was traded on the NYSE during the purported Class Period; (iii) admit that GM's stock was registered with the SEC during the purported Class Period; and (iv) respectfully refer the Court to the unspecified public disclosures, news media publications, and investor publications referenced in Paragraph 441 for a complete and accurate description of their contents. The Cruise Defendants otherwise deny the allegations in Paragraph 441.

442. Throughout the Class Period, GM was consistently followed by the market, including securities analysts. The market relied upon public statements by Defendants and information contained in news reports about GM and Cruise to value GM Stock. During this period, Defendants disseminated materially false and misleading information into the marketplace regarding Cruise's AV technology and the October 2 Crash. This information was digested by analysts, institutional investors, and others and promptly assimilated into the price of GM Securities.

**ANSWER:** The allegations in Paragraph 442 assert a legal conclusion, to which no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 442.

443. As a result of the misconduct alleged herein (including Defendants' false and misleading statements and omissions), the market for GM Stock was artificially inflated and artificially maintained during the Class Period. Under such circumstances, the presumption of reliance available under the "fraud-on-the market" theory applies. Thus, Plaintiffs and Class members are presumed to have indirectly relied upon the misrepresentations, omissions, and deceitful conduct for which Defendants are responsible.

**ANSWER:** The allegations in Paragraph 443 assert a legal conclusion, to which no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 443.

444. Plaintiffs and Class members justifiably relied on the integrity of the market price for GM Securities and were substantially damaged as a direct and proximate result of their purchases of GM Securities at artificially inflated prices, and the subsequent decline in the price of GM Securities.

**ANSWER:** The allegations in Paragraph 444 assert a legal conclusion, to which no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 444.

445. Had Plaintiffs and Class members known of the material adverse information not disclosed by Defendants, or been aware of the truth behind

244

Defendants' material misstatements and deceitful conduct, Plaintiffs and other Class members would not have purchased GM Securities at artificially inflated prices and/or artificially maintained prices.

**ANSWER:** The allegations in Paragraph 445 assert a legal conclusion, to which no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 445.

## VI.   NO SAFE HARBOR

446. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false and misleading statements alleged in this amended complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

**ANSWER:** The allegations in Paragraph 446 assert a legal conclusion, to which no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 446.

447. In addition, to the extent certain of the statements, alleged to be false and misleading, may be characterized by Defendants as forward-looking those statements were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in any purportedly forward-looking statements.

**ANSWER:** The allegations in Paragraph 447 assert a legal conclusion, to which no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 447.

448. In the alternative, to the extent that the statutory safe harbor is determined to apply to any misrepresentations alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking

245

statement was authorized or approved by an executive officer who knew that the statement was false when made.

**ANSWER:** The allegations in Paragraph 448 assert a legal conclusion, to which no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 448.

## VII.   CLASS ACTION ALLEGATIONS

449. Plaintiffs bring this federal securities class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all persons and entities that (1) purchased or otherwise acquired publicly traded GM common stock (NYSE: "GM") ("GM Stock") and exchange-traded call options to acquire GM Stock or (2) sold exchange-traded put options to sell GM Stock, during the period from February 24, 2021 through November 8, 2023, inclusive, the ("Class Period"), and were damaged thereby, except as excluded below (the "Class").

**ANSWER:** The allegations in Paragraph 449 assert a legal conclusion, to which no response is required.  To the extent a response is required, the Cruise Defendants admit that the Complaint purports to bring this action pursuant to Federal Rule of Civil Procedure 23.  The Cruise Defendants otherwise deny the allegations in Paragraph 449.

450. Excluded  from  the  Class  are:  (a)  Defendants;  (b)  members  of  the immediate families of any Individual Defendant; (c) the subsidiaries and affiliates of GM and Cruise; (d) any person who is an officer, director or controlling person of GM or Cruise during the Class Period; (e) any entity in which any Defendant has a controlling interest; and (f) the legal representatives, heirs, successors or assigns of any such excluded party, in their capacity as such.

**ANSWER:** The allegations in Paragraph 450 assert a legal conclusion, to which no response is required.  To the extent a response is required, the Cruise

246

Defendants admit that the Complaint purports to make the allegations therein. The Cruise Defendants otherwise deny the allegations in Paragraph 450.

451. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. Indeed, as of November 8, 2023, GM had 1 billion outstanding shares of stock.

**ANSWER:** The allegations in Paragraph 451 assert a legal conclusion, to which no response is required. To the extent a response is required, the Cruise Defendants respectfully refer the Court to GM's publicly reported stock information for complete and accurate information regarding GM's stock. The Cruise Defendants otherwise deny the allegations in Paragraph 451.

452. Members of the Class may be identified from records maintained by GM or its transfer agent and may be notified of the pendency of this Action by mail, using a form of notice customarily used in securities class actions.

**ANSWER:** The allegations in Paragraph 452 assert a legal conclusion and are not directed at the Cruise Defendants. Accordingly, no response is required.

453. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including:

a) whether the federal securities laws were violated by Defendants' respective acts as alleged herein;

b) whether the statements made by Defendants were materially false or misleading, or omitted material facts;

c) whether Defendants acted knowingly or with deliberate recklessness in making false or misleading statements, omitting material facts, or engaging in deceptive conduct;

> d)      whether Defendants engaged in a scheme to defraud investors or otherwise engaged in actionable deceitful conduct;
>
> e)      whether the prices of GM Securities during the Class Period were artificially inflated and/or artificially maintained because of Defendants' conduct complained of herein; and
>
> f)      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

**ANSWER:** The allegations in Paragraph 453 assert a legal conclusion, to which no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 453.

454. Plaintiffs' claims are typical of the claims of other members of the Class and sustained damages arising out of Defendants' wrongful conduct in violation of federal law as alleged in this amended complaint.

**ANSWER:** The allegations in Paragraph 454 assert a legal conclusion, to which no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 454.

455. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation.  Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

**ANSWER:** The allegations in Paragraph 455 assert a legal conclusion, to which no response is required.  To the extent a response is required, the Cruise Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 455.

248

456. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impractical for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this Action as a class action.

**ANSWER:** The allegations in Paragraph 456 assert a legal conclusion, to which no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 456.

457. Plaintiffs will rely, at least in part, on the presumption of reliance established by the fraud on the market doctrine.  All purchasers of GM Securities during the Class Period suffered similar injuries, including injury through their purchase of GM Securities at artificially inflated prices and/or artificially maintained prices.  A presumption of reliance therefore applies.

**ANSWER:** The allegations in Paragraph 457 assert a legal conclusion, to which no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 457.

## COUNT I
### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Against GM, Cruise, and the Individual Defendants

458. Plaintiffs reallege each allegation above as if fully set forth herein.

**ANSWER:** The Cruise Defendants restate and incorporate their responses to every allegation contained above as if set forth herein, and further incorporate their defenses in response thereto.

459. This Count is brought under § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5(b) promulgated thereunder by the SEC, 17 C.F.R.

249

§ 240.10b-5(b), against Defendants GM, Cruise, Ms. Barra, Mr. Jacobson, Mr. Vogt, Mr. Ammann, Mr. Parks, and Mr. West.

**ANSWER:** The allegations in Paragraph 459 assert a legal conclusion, in part form the basis for Dismissed Claims, and are in part not directed at the Cruise Defendants. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 459, except admit that Plaintiffs purport to bring this claim under § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5(b) promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5(b), against GM, Cruise, Ms. Barra, Mr. Jacobson, Mr. Vogt, Mr. Ammann, Mr. Parks, and Mr. West.

460. Defendants made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading in violation of § 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

**ANSWER:** The allegations in Paragraph 460 assert a legal conclusion, in part form the basis for Dismissed Claims, and are in part not directed at the Cruise Defendants. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 460.

461. Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of or attributable to GM and Cruise were materially false and misleading and would be issued or disseminated to the investing public.

**ANSWER:** The allegations in Paragraph 461 assert a legal conclusion, in part form the basis for Dismissed Claims, and are in part not directed at the Cruise

Defendants.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 461.

462. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for GM Securities, Plaintiffs and other members of the Class purchased GM Securities at artificially inflated prices during the Class Period.  But for the fraud, Plaintiffs and members of the Class would not have purchased GM Securities at such artificially inflated prices.

**ANSWER:** The allegations in Paragraph 462 assert a legal conclusion, in part form the basis for Dismissed Claims, and are in part not directed at the Cruise Defendants.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 462.

463. As set forth herein, when adverse, previously undisclosed facts concerning the Corporate Defendants were disclosed and/or when previously concealed risks materialized, the price of GM Stock declined precipitously, and Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchase of shares of GM Securities at artificially inflated prices and the subsequent decline in the price of those securities.

**ANSWER:** The allegations in Paragraph 463 assert a legal conclusion, in part form the basis for Dismissed Claims, and are in part not directed at the Cruise Defendants.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 463.

464. By virtue of the foregoing, Defendants are liable to Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

**ANSWER:** The allegations in Paragraph 464 assert a legal conclusion, in part form the basis for Dismissed Claims, and are in part not directed at the Cruise

Defendants.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 464.

### COUNT II
### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a)/(c) Against GM, Cruise, and the Individual Defendants

465. Plaintiffs reallege each allegation above as if fully set forth herein.

**ANSWER:** The Cruise Defendants restate and incorporate their responses to every allegation contained above as if set forth herein, and further incorporate their defenses in response thereto.

466. This Count is brought under § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5(a)/(c) promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5(a)/(c), against Defendants GM, Cruise, Barra, Jacobson, Vogt, Ammann, Parks, and West.

**ANSWER:** The allegations in Paragraph 466 assert a legal conclusion, in part form the basis for Dismissed Claims, and are in part not directed at the Cruise Defendants.  Accordingly, no response is required.  To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 466, except admit that Plaintiffs purport to bring this claim under § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5(a)/(c) promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5(a)/(c) against GM, Cruise, Ms. Barra, Mr. Jacobson, Mr. Vogt, Mr. Ammann, Mr. Parks, and Mr. West.

467. Defendants employed devices, schemes and artifices to defraud and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs and the Class, in violation of § 10(b) of the Exchange Act and Rule 10b-5(a)/(c) promulgated thereunder. Defendants actionable conduct included

252

creating and perpetuating a false perception concerning the safety and capabilities of Cruise's AV technology and the facts and circumstances of the October 2 Crash, through their public representations, the authorization or dissemination of misrepresentation or omissions to the public, and through the misrepresentations and incomplete video footage they shared with members of the press.

**ANSWER:** The allegations in Paragraph 467 assert a legal conclusion, form the basis for Dismissed Claims, and are in part not directed at the Cruise Defendants. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 467.

468. Defendants acted with scienter in that they knew or recklessly disregarded that their conduct would deceive the investing public in ways that were material to investment in GM.

**ANSWER:** The allegations in Paragraph 468 assert a legal conclusion, form the basis for Dismissed Claims, and are in part not directed at the Cruise Defendants. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 468.

469. In ignorance of the false and misleading nature of Defendants' conduct, and relying directly or indirectly on the perceptions created by that conduct, or upon the integrity of the market price for GM Securities, Plaintiffs and other members of the Class purchased GM Securities at artificially inflated prices during the Class Period. But for the fraud, Plaintiffs and other members of the Class would not have purchased GM Securities at such artificially inflated prices.

**ANSWER:** The allegations in Paragraph 469 assert a legal conclusion, form the basis for Dismissed Claims, and are in part not directed at the Cruise Defendants. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 469.

253

470. As set forth herein, when adverse, previously undisclosed facts concerning the Corporate Defendants were disclosed and/or when previously concealed risks materialized, the price of GM Stock declined precipitously and Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchase of shares of GM Securities at artificially inflated prices and the subsequent decline in the price of those securities.

**ANSWER:** The allegations in Paragraph 470 assert a legal conclusion, form the basis for Dismissed Claims, and are in part not directed at the Cruise Defendants. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 470.

471. By virtue of the foregoing, Defendants are liable to Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**ANSWER:** The allegations in Paragraph 471 assert a legal conclusion, form the basis for Dismissed Claims, and are in part not directed at the Cruise Defendants. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 471.

## COUNT III
### For Violations of Section 20(a) of the Exchange Act
### Against Defendants Barra, Jacobson, and Parks as Control Persons of GM

472. Plaintiffs reallege each allegation as if fully set forth herein.

**ANSWER:** The Cruise Defendants restate and incorporate their responses to every allegation contained above as if set forth herein, and further incorporate their defenses in response thereto.

473. This Count is brought under § 20(a) of the Exchange Act, 15 U.S.C. § 78t, against Defendants Barra, Jacobson, and Parks.

**ANSWER:** The allegations in Paragraph 473 are not directed at the Cruise Defendants.  Accordingly, no response is required.  To the extent Paragraph 473 pertains to Dismissed Claims, no response is required.

474. Defendants Barra, Jacobson, and Parks, by reason of their status as senior executive officers and/or directors of GM, directly or indirectly controlled the conduct of GM's business and its representations to the public, within the meaning of § 20(a) of the Exchange Act.

**ANSWER:** The allegations in Paragraph 474 are not directed at the Cruise Defendants.  Accordingly, no response is required.  To the extent Paragraph 474 pertains to Dismissed Claims, no response is required.

475. Defendants Barra, Jacobson, and Parks knew or recklessly disregarded the fact that GM's representations were materially false and misleading and/or omitted material facts when made.  In doing so, Defendants Barra, Jacobson, and Parks did not act in good faith.

**ANSWER:** The allegations in Paragraph 475 are not directed at the Cruise Defendants.  Accordingly, no response is required.  To the extent Paragraph 475 pertains to Dismissed Claims, no response is required.

476. By virtue of their high-level positions and their participation in and awareness of GM's operations and public statements, Defendants Barra, Jacobson, and Parks were able to and did influence and control GM's decision-making, including controlling the content and dissemination of the misrepresentations and other deceptive conduct, that Plaintiffs and the Class contend artificially inflated the price of GM Securities.

**ANSWER:** The allegations in Paragraph 476 are not directed at the Cruise Defendants.  Accordingly, no response is required.  To the extent Paragraph 476 pertains to Dismissed Claims, no response is required.

477. Defendants Barra, Jacobson, and Parks had the power to control or influence the statements made and conduct engaged in, giving rise to the securities violation alleged herein, as set forth more fully above.

**ANSWER:** The allegations in Paragraph 477 are not directed at the Cruise Defendants.  Accordingly, no response is required.  To the extent Paragraph 477 pertains to Dismissed Claims, no response is required.

478. By virtue of their positions as controlling persons, Defendants Barra, Jacobson, and Parks are also liable pursuant to § 20(a) of the Exchange Act.  As a direct and proximate result of Barra, Jacobson, and Parks' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchase of GM Securities.

**ANSWER:** The allegations in Paragraph 478 are not directed at the Cruise Defendants.  Accordingly, no response is required.  To the extent Paragraph 478 pertains to Dismissed Claims, no response is required.

## COUNT IV
### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants as Control Persons of Cruise

479. Plaintiffs reallege each allegation as if fully set forth herein.

**ANSWER:** The Cruise Defendants restate and incorporate their responses to every allegation contained above as if set forth herein, and further incorporate their defenses in response thereto.

480. This Count is brought under § 20(a) of the Exchange Act, 15 U.S.C. § 78t, against Defendants Barra, Jacobson, Vogt, Ammann, Parks, and West.

**ANSWER:** The allegations in Paragraph 480 assert a legal conclusion, in part form the basis for Dismissed Claims, and are in part not directed at the Cruise

256

Defendants. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 480, except admit that Plaintiffs purport to bring this claim under § 20(a) of the Exchange Act, 15 U.S.C. § 78t, against Defendants Ms. Barra, Mr. Jacobson, Mr. Vogt, Mr. Ammann, Mr. Parks, and Mr. West. The Cruise Defendants otherwise deny the allegations in Paragraph 480.

481. Defendants Barra, Jacobson, Vogt, Ammann, Parks, and West, by reason of their status as senior executive officers and/or directors of Cruise or GM (which controlled Cruise), directly or indirectly controlled the conduct of Cruise's business and its representations the public, within the meaning of § 20(a) of the Exchange Act.

**ANSWER:** The allegations in Paragraph 481 assert a legal conclusion, in part form the basis for Dismissed Claims, and are in part not directed at the Cruise Defendants. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 481.

482. Defendants Barra, Jacobson, Vogt, Ammann, Parks, and West knew or recklessly disregarded the fact that Cruise's representations were materially false and misleading and/or omitted material facts when made. In doing so, Barra, Jacobson, Vogt, Ammann, Parks, and West did not act in good faith.

**ANSWER:** The allegations in Paragraph 482 assert a legal conclusion, in part form the basis for Dismissed Claims, and are in part not directed at the Cruise Defendants. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 482.

257

483. By virtue of their high-level positions and their participation in and awareness of Cruise's operations and public statements, Defendants Barra, Jacobson, Vogt, Ammann, Parks, and West were able to and did influence and control Cruise's decision-making, including controlling the content and dissemination of the misrepresentations and other deceptive conduct, that Plaintiffs and the Class contend artificially inflated the price of GM Securities.

**ANSWER:** The allegations in Paragraph 483 assert a legal conclusion, in part form the basis for Dismissed Claims, and are in part not directed at the Cruise Defendants. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 483.

484. Defendants Barra, Jacobson, Vogt, Ammann, Parks, and West had the power to control or influence the statements made and conduct engaged in, giving rise the securities violation alleged herein, as set forth more fully above.

**ANSWER:** The allegations in Paragraph 484 assert a legal conclusion, in part form the basis for Dismissed Claims, and are in part not directed at the Cruise Defendants. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 484.

485. By virtue of their positions as controlling persons, Defendants Barra, Jacobson, Vogt, Ammann, Parks, and West are also liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of Barra, Jacobson, Vogt, Ammann, Parks, and West's wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchase of GM Securities.

**ANSWER:** The allegations in Paragraph 485 assert a legal conclusion, in part form the basis for Dismissed Claims, and are in part not directed at the Cruise Defendants. Accordingly, no response is required. To the extent a response is required, the Cruise Defendants deny the allegations in Paragraph 485.

## ANSWER TO PRAYER FOR RELIEF

The Cruise Defendants deny that Plaintiffs or any putative class members whom Plaintiffs purport to represent are entitled to the relief sought in the Prayer for Relief or under any other theory, and request that the Court dismiss all claims against them with prejudice and order such further relief in the Cruise Defendants' favor as the Court deems just and proper.

## ANSWER TO JURY DEMAND

The Cruise Defendants admit that Plaintiffs purport to demand a jury trial. The Cruise Defendants reserve the right to challenge this demand.

## DEFENSES

Without assuming any burden of proof that they would not otherwise bear under applicable law, without reducing or removing Plaintiffs' burden of proof on their affirmative claims against the Cruise Defendants, reserving their right to assert additional defenses and/or affirmative defenses, and solely to the extent deemed necessary by the Court to maintain any or all of the following defenses, the Cruise Defendants assert the following defenses or affirmative defenses:

## FIRST DEFENSE

The Complaint fails, in whole or in part, to state a claim upon which relief can be granted.

259

## SECOND DEFENSE

Any and all actions taken by the Cruise Defendants were, at all times, lawful, proper and consistent with their duties and obligations, and the Cruise Defendants did not otherwise have any obligation or duty to take any other action or make any other disclosure.

## THIRD DEFENSE

The Cruise Defendants are not liable because they did not make any false or misleading statements of material fact or omit any material fact.

## FOURTH DEFENSE

The Cruise Defendants' public statements and filings were accurate in all material respects.

## FIFTH DEFENSE

The alleged omissions were either disclosed or the alleged facts were not required to be disclosed.

## SIXTH DEFENSE

The Cruise Defendants are not liable for Plaintiffs' and any putative class members' claims to the extent Plaintiffs failed to specify each statement alleged to have been misleading and/or the reason or reasons why the statement is misleading.

## SEVENTH DEFENSE

Mr. Vogt, Mr. Ammann, and Mr. West are not liable for Plaintiffs' and any putative class members' claims under Section 20(a) of the Exchange Act because they were not culpable participants in any alleged fraud.

## EIGHTH DEFENSE

Cruise is not liable to Plaintiffs and any putative class members because the maker of each allegedly false or misleading statement did not have the requisite scienter.

## NINTH DEFENSE

The Cruise Defendants are not liable for Plaintiffs' and any putative class members' claims because the dissemination of allegedly false or misleading information is not actionable under Rule 10b-5(b).

## TENTH DEFENSE

The Cruise Defendants are not liable for any alleged misstatements that were forward-looking statements and/or contained sufficient cautionary language and risk disclosure.

## ELEVENTH DEFENSE

Plaintiffs' and any putative class members' claims are barred in whole or in part because the Cruise Defendants acted in good faith at all times during the relevant period, made no material misrepresentations or omissions during the relevant period,

261

did not participate in any alleged wrongful conduct challenged by Plaintiffs, and did not act with scienter.

## TWELFTH DEFENSE

The Cruise Defendants are not liable to Plaintiffs or other members of the putative class because any alleged misstatements or omissions for which the Cruise Defendants were allegedly responsible were not material to the investment decisions of a reasonable investor.

## THIRTEENTH DEFENSE

The Cruise Defendants are not liable to Plaintiffs or other members of the putative class because Plaintiffs and any putative class members did not reasonably rely on any alleged misstatements or omissions of material fact by the Cruise Defendants, and neither the "fraud-on-the market" nor any other presumption of reliance is available in this action.

## FOURTEENTH DEFENSE

Plaintiffs' damages, if any, are speculative, and thus are not recoverable.

## FIFTEENTH DEFENSE

Plaintiffs and any putative class members did not suffer any losses, and thus cannot recover any damages.

## SIXTEENTH DEFENSE

Plaintiffs and members of the putative class are limited to those damages authorized by the Securities Act, the Private Securities Litigation Reform Act,

and/or any other applicable laws, and therefore may not recover damages in excess of those authorized by the statutes or the regulations promulgated pursuant to these statutes.

## SEVENTEENTH DEFENSE

Plaintiffs' and any putative class members' claims are barred, in whole or in part, because of the lack of transaction causation and/or loss causation.

## EIGHTEENTH DEFENSE

The claims purportedly asserted by Plaintiffs and the putative class are barred, in whole or in part, because the Cruise Defendants' conduct did not actually or proximately cause them damages.

## NINETEENTH DEFENSE

Plaintiffs' and any putative class members' claims are barred in whole or in part because all losses and damages alleged in the Complaint are the result of superseding and/or intervening causes and are not the result of any act or omission of the Cruise Defendants.

## TWENTIETH DEFENSE

The damages for which Plaintiffs claim the Cruise Defendants are responsible arise from a depreciation in share price that was not the result of any material misrepresentation or actionable omission by the Cruise Defendants and were otherwise caused or contributed to by persons or entities for whom the Cruise

263

Defendants are not responsible and for whom the Cruise Defendants are not liable, or by factors other than any alleged misrepresentations or omissions for which the Cruise Defendants may be responsible.

## TWENTY-FIRST DEFENSE

The Cruise Defendants are not liable to the extent that the alleged misstatements and omissions attributed to the Cruise Defendants were not made in connection with the purchase or sale of GM securities.

## TWENTY-SECOND DEFENSE

Plaintiffs' and any putative class members' claims against the Cruise Defendants are barred, in whole or in part, because the alleged misstatements are non-actionable forward-looking statements that are accompanied by sufficient cautionary language and risk disclosure and are protected by the bespeaks caution doctrine and/or the Safe Harbor provisions for forward-looking statements in the Private Securities Litigation Reform Act of 1995, including, without limitation, 15 U.S.C. §§ 78u-4 and 78u-5.

## TWENTY-THIRD DEFENSE

Plaintiffs' and any putative class members' claims are barred in whole or in part because the alleged misstatements or omissions are nonactionable expressions of opinion that Plaintiffs or other members of the putative class cannot prove were not truly held at the time they were made.

264

## TWENTY-FOURTH DEFENSE

Plaintiffs' and any putative class members' claims against the Cruise Defendants are barred, in whole or in part, because the statements challenged constitute immaterial puffery or corporate optimism that are not actionable.

## TWENTY-FIFTH DEFENSE

Plaintiffs' and any putative class members' claims against the Cruise Defendants are barred in whole or in part to the extent that they did not make the alleged misstatements or omissions.

## TWENTY-SIXTH DEFENSE

Other parties not named in the Complaint may be indispensable parties to this Action.

## TWENTY-SEVENTH DEFENSE

Plaintiffs' and any putative class members' claims against the Cruise Defendants are barred in whole or in part because at all relevant times, the Cruise Defendants relied in good faith on the representations, reports, expert opinions, and advice of others.

## TWENTY-EIGHTH DEFENSE

Plaintiffs' and any putative class members' claims are barred in whole or in part because the Cruise Defendants neither owed nor breached any duty to Plaintiffs or other members of the putative class to disclose information allegedly omitted in

265

the public statements, and had no duty to verify, opine upon, audit, review, or correct such information disclosed in the public statements.

## TWENTY-NINTH DEFENSE

Mr. Vogt, Mr. Ammann, and Mr. West are not liable for Plaintiffs' and any putative class members' claims because they are not "Control Persons" within the definition of Section 20(a) of the Exchange Act.

## THIRTIETH DEFENSE

Plaintiffs and members of the putative class lack standing to assert and maintain their claims against the Cruise Defendants.

## THIRTY-FIRST DEFENSE

Members of the putative class who acquired any GM security after the Cruise Defendants made generally available information that was allegedly omitted from any relevant public disclosure, or after the Cruise Defendants made generally available information that otherwise corrected any of the challenged statements purportedly alleged in the Complaint, cannot recover, because they cannot prove they acquired the security relying upon the alleged untrue statements in, or not knowing of the alleged omissions from, any such public disclosure or statement.

## THIRTY-SECOND DEFENSE

Plaintiffs and members of the putative class are not entitled to any recovery from the Cruise Defendants because Plaintiffs and the putative class members would

266

have purchased at-issue common stock shares even with full knowledge of the facts that they now allege were misrepresented or omitted.

### THIRTY-THIRD DEFENSE

Purportedly material information which Plaintiffs alleged in the Complaint was omitted by the Cruise Defendants was a matter of public knowledge and therefore not required to be disclosed.  Plaintiffs' and any putative class members' claims with respect to such information are therefore barred.  No person or entity may recover from the Cruise Defendants to the extent such person or entity had actual or constructive knowledge of the facts allegedly concealed or misrepresented.

### THIRTY-FOURTH DEFENSE

The claims purportedly asserted by Plaintiffs and the putative class are barred, in whole or in part, because the Cruise Defendants' statements were never the subject of a corrective disclosure.

### THIRTY-FIFTH DEFENSE

Plaintiffs' and putative class members' claims are barred in whole or in part to the extent Plaintiffs and putative class members failed to make reasonable efforts to mitigate their alleged injury or damage.

### THIRTY-SIXTH DEFENSE

Plaintiffs and members of the putative class purchased shares of the at issue common stock with actual or constructive knowledge of the risks involved in an

267

investment in the stock, and thus assumed the risk that the value would decline if such risks materialized.

## THIRTY-SEVENTH DEFENSE

The relief sought by Plaintiffs and members of the putative class is barred, in whole or in part, by the doctrine of laches, waiver, equitable estoppel, in pari delicto, unclean hands, and/or other related equitable doctrines.

## THIRTY-EIGHTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations and/or repose.

## THIRTY-NINTH DEFENSE

Plaintiffs are not entitled to recover attorneys' fees, experts' fees, or other costs or disbursements.

## FORTIETH DEFENSE

The purported putative class is not certifiable under Rule 23 of the Federal Rules of Civil Procedure.

## FORTY-FIRST DEFENSE

The purported claims against the Cruise Defendants and the allegations upon which they are based are improperly vague, ambiguous, and confusing.  The Cruise Defendants reserve the right to request a more definite statement.

**RELIANCE ON JURY DEMAND**

The Cruise Defendants rely on Plaintiffs' demand for a jury trial in this Action.

**RESERVATION OF RIGHTS**

The Cruise Defendants have insufficient knowledge or information upon which to form a belief as to whether there may be additional defenses available to them, and therefore reserve the right to assert such additional defenses in the event that discovery indicates they would be appropriate. The Cruise Defendants also assert and expressly reserve all rights with respect to all counterclaims, cross-claims, third-party claims, or contribution claims that may be revealed during the course of discovery.

**PRAYER FOR RELIEF**

WHEREFORE, the Cruise Defendants deny that Plaintiffs are entitled to any relief and respectfully request a judgment against Plaintiffs as follows:

A.     That Plaintiffs take nothing by their Complaint in this Action;

B.     That the Court enter judgment against Plaintiffs and in favor of the Cruise Defendants, and that the Complaint in this Action be dismissed with prejudice; and

C.     That the Court award the Cruise Defendants any and all other relief to which they may be entitled, or which the Court deems just and proper.

DATED:  March 20, 2026

Respectfully submitted,

/s/ Roger P. Meyers

Stephanie A. Douglas (P70272)
Roger P. Meyers (P73255)
**BUSH SEYFERTH PLLC**
100 W. Big Beaver Road, Suite 400
Troy, MI 48084
(248) 822-7800
douglas@bsplaw.com
meyers@bsplaw.com

*Counsel for Cruise Defendants*

/s/ Daniel J. Kramer

Daniel J. Kramer
Andrew J. Ehrlich
Richard C. Tarlowe
Kristina A. Bunting
**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000
dkramer@paulweiss.com
rtarlowe@paulweiss.com
aehrlich@paulweiss.com
kbunting@paulweiss.com

*Additional Counsel for Cruise LLC*

/s/ Reid Schar

Reid Schar
**JENNER & BLOCK LLP**
525 Market Street, 29th Floor
San Francisco, CA 94105
 (628) 267-6800
rschar@jenner.com

Stephen L. Ascher
**JENNER & BLOCK LLP**
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600
sascher@jenner.com

Jacob P. Wentzel
**JENNER & BLOCK LLP**
353 North Clark Street

/s/ Cody Gray

John W. Keker
Ryan Wong
Sophie A. Hood
Cody Gray
**KEKER, VAN NEST
& PETERS LLP**
633 Battery Street
San Francisco, CA 94111-1809
 (415) 391-5400
jkeker@keker.com
rwong@keker.com
shood@keker.com
cgray@keker.com

*Additional Counsel for Kyle Vogt*

270

Chicago, IL 60653
(312) 222-9350
jwentzel@jenner.com

*Additional Counsel for Cruise LLC,*
*Daniel Ammann, and Wayne G. West*